## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| Dr. Stephanie Waggel ) | |
| 50 Linden Place ) | |
| Uniontown, PA 15401 ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: |
| v. ) | |
| ) | |
| THE GEORGE WASHINGTON UNIVERSITY ) | |
| 2121 I Street, N.W. ) | JURY TRIAL DEMANDED |
| Suite 250 ) | |
| Washington, D.C. 20052 ) | |
| ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT AND JURY DEMAND**

Plaintiff, Dr. Stephanie Waggel ("Plaintiff"), by and through her undersigned counsel, brings this action to redress deprivation and interference of rights secured by the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq.* (the "FMLA"), the D.C. Human Rights Act (the "DCHRA"), D.C. Code § 32-501 *et seq.*, and the D.C. Family and Medical Leave Act (the "DCFMLA"), D.C. Code § 2-1401.01 *et seq.*

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over Plaintiff's federal claims by virtue of, among other provisions of law, 28 U.S.C. §§ 1331 and 42 U.S.C. §§ 2000e and 12101, *et seq.*, for claims arising under the laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claims by virtue of 28 U.S.C. § 1367 and D.C. Code § 11-921(a).

2. Venue is proper in this Court because the unlawful employment practices (and the majority of the events that underlie this action and the injuries Plaintiff has sustained) took place/occurred in this district, Plaintiff worked in this District, and the Defendant is in this District.

## PARTIES

3. Plaintiff is an adult female individual residing at the captioned address. At all relevant times, Plaintiff was a psychiatric resident at GW Hospital and an employee of GW within the meaning of the ADA, FMLA, DCFMLA, DCHRA, and any other relevant civil rights laws. At all times relevant hereto, Plaintiff suffered from kidney cancer, an impairment that substantially limits several of Plaintiff's major life activities including working, concentrating, thinking, and major bodily functions as defined by the ADA and the 2008 amendments thereto. Plaintiff has a record of her disability and impairments and Plaintiff has been treated by, and continues to be treated by, physicians for her medical condition.

4. George Washington University ("GW") is a private educational institution located at the captioned address. At all relevant times, GW was Plaintiff's employer within the meaning of the ADA, FMLA, DCFMLA, DCHRA, and any other relevant civil rights laws. At all times relevant, GW employed more than 500 employees. At all times relevant hereto, GW perceived Plaintiff to be (i.e., regarded Plaintiff as being) disabled due to her medical condition. As noted in detail below, GW first denied Plaintiff's promotion and then terminated Plaintiff's employment based on Plaintiff's perceived (and/or actual) impairments.

## FACTS

5. Plaintiff, a medical doctor, began her residency program at GW on July 1, 2014. As part of this program, Plaintiff worked in different specialties at GW Hospital and affiliated

institutions. As a participant in GW's residency program, Plaintiff was at all times relevant an employee of GW and GW was at all times relevant Plaintiff's employer.

6.      In the spring of 2015, Plaintiff underwent a medical workup for a kidney mass while on an internal medicine rotation at GW. Plaintiff's medical records demonstrate that Plaintiff's kidney mass was malignant and eventually had to be removed. Plaintiff's medical records also demonstrate that, even after the mass was removed, Plaintiff's medical condition continued to substantially impact several major life activities, including working and major bodily functions. Plaintiff informed her relevant superiors (all GW employees) of her medical condition and her need to attend medical appointments in this time frame. Once Defendant became aware of Plaintiff's condition, Defendant began to engage in a pattern of discriminatory conduct against Plaintiff.

7.      Given Plaintiff's work schedule, which then required Plaintiff to work more than 100 hours a week (likely in violation of relevant rules and regulations), Plaintiff asked GW for, and initially received permission to attend her medical appointments in the spring of 2015. Dr. Lisa Catapano, then the head of GW's psychiatric residency program and Plaintiff's ultimate supervisor, informed Plaintiff that she had been made aware of Plaintiff's medical condition/disability.

8.      At all times prior to notifying GW of her medical condition, Plaintiff was in good stead with her program and performed at or above expectations. Plaintiff was able to satisfy the essential functions of her employment with GW. Indeed, Plaintiff more than adequately performed the essential functions of her position and received very favorable ratings and feedback.

9. On June 10, 2015, Plaintiff was scheduled to work on an Emergency Room Rotation at GW Hospital. Plaintiff appeared for her Emergency Room Rotation that morning and commenced work. At some point well into Plaintiff's shift, Plaintiff attempted to find someone to cover for her as she had an important medical appointment shortly after her shift that afternoon (her shift was to end at 3 p.m.). Plaintiff properly informed GW staff that she needed to meet with her doctor that afternoon to discuss her need for a nephrectomy for the malignancy. Plaintiff also informed GW staff that she was feeling quite ill. Nobody ever came to cover for Plaintiff, so Plaintiff remained until the end of her 3 p.m. shift.

10. GW began to discriminate against Plaintiff on the basis of her medical condition almost immediately thereafter. Indeed, although Plaintiff followed proper procedures in informing staff about her appointment on June 10, 2015, and although Plaintiff worked most of her June 10, 2015 shift, GW and Dr. Catapano issued Plaintiff a "letter of deficiency" approximately one month later, on July 15, 2015. The letter of deficiency incorrectly stated that Plaintiff did not answer phone calls during that shift, and when finally reached, indicated she would not be coming in that day because she did not feel well. As noted above, Plaintiff did appear for work on June 10, 2015 and, in fact, worked until the end of her shift.

11. GW's issuance of the letter of deficiency was in retaliation for Plaintiff's exercise of her right to take medical leave and due to GW and Dr. Catapano's misguided perception that Plaintiff would no longer adequately perform her job functions due to her medical condition. Rather than attempt to accommodate Plaintiff in any meaningful way, GW and Dr. Catapano discriminated against Plaintiff on account of her disability.

12. The issuance of the letter of deficiency was not in accordance with GW's relevant policies. According to relevant GW policies, letters of deficiency are given to GW medial

4

residents when there is an issue so the resident can be given a chance to remedy a situation before a "reportable action" is taken. According to GW's "Academic Improvement policy," a "reportable action" is, "a decision not to promote a Resident to the next PGY level, to extend a Resident's contract, to extend a Resident's period of training, to deny a Resident credit for a previously completed rotation, and/or to terminate a Resident's participation in a residency or fellowship program are each considered "Reportable Actions." Reportable Actions are those actions that the program must disclose upon request to certain individuals or entities such as future employers hospitals, credentialing organizations, and licensing and specialty boards. Residents who are subject to a Reportable Action may request a review as provided in this Policy."

13.     Only a few days later, on July 20, 2015, Plaintiff had a partial nephrectomy and was on approved medical leave for ten (10) days. Plaintiff had many follow-up appointments and procedures scheduled for which Plaintiff made GW aware in accordance with appropriate policies and procedures. As noted below, GW embarked upon a pattern of retaliation and discriminatory treatment after Plaintiff's request, and use, of medical leave (that ultimately ended with Plaintiff's dismissal from the residency program). GW made no effort to accommodate Plaintiff's schedule to allow her to attend medical appointments without facing punishment/criticism for attending those appointments.

14.     By way of example, after Plaintiff returned from her approved medical leave in early August 2015, and while recovering from her surgery, Plaintiff resumed her shifts at GW Hospital as a resident. During some of these shifts, Plaintiff had to deal with large numbers of admissions into the psychiatry ward and did not receive the requisite assistance. During this period, Plaintiff witnessed a suicide attempt (where she found a patient who had hanged herself

5

and cut hereself so severely that the muscle was exposed), but was denied trauma counseling. During this period, Plaintiff was exposed to blood from another suicide attempt, but was not provided information as to whether the patient had HIV. Similarly situated employees who did not assert their FMLA rights and who were not perceived (by GW) as having a disability were routinely afforded such counseling.

15. Plaintiff also sought to meet with Dr. Allen Dyer during this time frame in an effort to correct the alleged deficiencies in her performance outlined in the letter of deficiency. GW had assigned Dr. Dyer to work with Plaintiff on the issue outlined in the aforementioned letter of deficiency. Dr. Dyer, however, refused to make himself available to meet with Plaintiff for approximately one month. On September 3, 2015, Plaintiff finally was able to meet with Dr. Dyer. At that meeting, however, Dr. Dyer talked about other issues, and did not address the letter of deficiency (despite Plaintiff's attempts to do so). GW subsequently assigned other staff members to work with Plaintiff to address the alleged deficiencies, but none of these staff members actually worked with Plaintiff in any meaningful way – despite Plaintiff's repeated, best efforts to do so.

16. In September 2015, Plaintiff rotated through Children's Hospital. During that time, she received positive feedback for her work and she continued to perform at or above expected levels. Thus, even though Plaintiff's medical condition substantially impacted several major life activities, Plaintiff was in fact, at all times relevant hereto, able to fulfill the essential functions of her employment as a psychiatric resident at GW.

17. On October 15, 2015, Plaintiff learned that she would be receiving another letter of deficiency for the August 25, 2015 shift where Plaintiff received a blood exposure while trying to keep a patient from harming herself. When Plaintiff asked Dr. Catapano about it, she

was told that she should already know the details from an alleged meeting between Plaintiff and Drs. Norris and Gandhi. However, that meeting had never occurred. Once again, rather than accommodate Plaintiff (or at least treat her as it would other employees who did not have life-altering medical conditions), GW penalized Plaintiff for her medical condition and retaliated against her for enforcing her FMLA rights.

18. On October 19-20, 2015, Plaintiff took additional sick leave so her treating physicians could do further testing to see if her malignancy had spread. Plaintiff informed her attending of her intention to take the sick leave and the leave was approved after Plaintiff produced a doctor's note. Although the attending approved Plaintiff's request for leave, Defendant immediately continued its pattern of retaliation and discrimination. Thus, on October 22, 2015, Plaintiff was informed that because she took the approved days off for testing, and was scheduled to take an approved licensing exam, Plaintiff would have to repeat the entire rotation.

19. On November 7, 2015, Plaintiff received an email from Dr. Collins, an instructor at GW, noting that she was passing a class required by the residency program. On November 10, 2015, Plaintiff received a phone call from Dr. Catapano, who stated that Plaintiff was to begin forced Administrative Leave. Plaintiff was concerned that the leave would interfere with her properly completing Dr. Collins' class. Plaintiff was not told why she was forced to take leave or when the leave would end.

20. On November 11, 2015, Plaintiff received a letter of deficiency relating to her August 25, 2015 shift. When Plaintiff asked Dr. Catapano about a number of inconsistencies in the letter of deficiency, Dr. Catapano informed Plaintiff that the letter was based on an email from a nurse named "Shemika" and that Dr. Catapano had not read the email (but that that two

7

attendings, Drs. Norris and Gandhi, had read the email). However, the attendings informed Plaintiff that they were unaware of any such letter or punishment relating to the August 25th shift. The letter also stated Plaintiff was deficient for having failed to follow up with Dr. Dyer, despite Plaintiff's repeated efforts do so. The letter also stated Plaintiff was not on track to be promoted to the residency program's PGY 3 year.

21. On November 19, 2015, Plaintiff met with Dr. Berger, the Associate Dean for Medical Education at GW, about returning to work from her forced administrative leave and the fact that Plaintiff would not be allowed to progress to the PGY 3 year. Dr. Berger told Plaintiff to work with another attending physician to address the alleged deficiency as Dr. Dyer had not been helpful or responsive. Subsequently, Plaintiff also learned she would be failing Dr. Collins' class because of the approved time she missed (and that she would also be failing another class given by Dr. Griffith for the same reason). Once again, rather than accommodate Plaintiff and/or engage in the required interactive process, GW chose to take adverse employment actions and otherwise discriminate against Plaintiff.

22. On December 15, 2015, GW (through Dr. Catapano) issued Plaintiff yet another letter of deficiency, based on Plaintiff failing to pass Dr. Collins (and a second class with a Dr. Griffith) (based on the approved medical and forced administrative leave). According to this letter, because of the failure to complete these classes, Plaintiff was not to be promoted to the PGY 3 year.

23. Plaintiff timely appealed the decision not to promote her to the PGY 3 year. At the same time, she tried unsuccessfully to meet with Dr. Kels, Dr. Dyer's assigned replacement, about addressing her alleged deficiencies. When Plaintiff finally reached Dr. Kels, she referred Plaintiff instead to Dr. Gandhi.

24. On December 29, 2015, Plaintiff learned from another resident that GW had removed Plaintiff from all call schedules. Upon learning the news, Plaintiff suffered a panic attack and admitted herself to the ER.

25. Plaintiff subsequently tried to work with Dr. Gandhi to address what was required of her to in the deficiency letters. Dr. Gandhi, however, refused to meet with Plaintiff. Because GW and its relevant employees were refusing to meet with Plaintiff to address the alleged deficiencies, and because GW's treatment of Plaintiff was causing Plaintiff significant emotional distress and otherwise affecting her health, Plaintiff started considering transferring to another program.

26. As noted above, GW removed Plaintiff from all call schedules during this time frame and, therefore, refused to allow Plaintiff to perform her job. By refusing to let Plaintiff perform the essential functions of her position as a resident in the psychiatric program, GW significantly altered the terms and conditions of Plaintiff's employment with GW. GW made no effort to accommodate Plaintiff and, in fact, did the opposite – choosing to discriminate against Plaintiff on account of her medical condition. Even though Plaintiff was able to perform the essential functions of her position with or without accommodations, Defendant refused to let Plaintiff work.

27. On February 16, 2016, Plaintiff was informed that she would be receiving a letter of misconduct for her alleged failure to address the letters of deficiency. As noted above, Plaintiff did attempt to address the letters of deficiency and meet with assigned staff for a period of months. GW, however, prevented Plaintiff from doing so when its relevant employees refused to meet with Plaintiff to address the letters of deficiency.

28. On February 25, 2016, Plaintiff was informed that her appeal was being denied. The notice stated, incorrectly, that Plaintiff did not request help from GW for her Medical Absence. Plaintiff decided to file a further appeal.

29. On March 8, 2016, Plaintiff applied for and was granted additional FMLA leave for March 9-16, 2016. During this same time frame, Plaintiff began to apply to transfer out of the GW residency program into other programs for the coming year. Several institutions expressed interest in accepting Plaintiff into their program. During a meeting with Dr. Berger, Plaintiff was led to believe that GW would help her transfer to another program.

30. In late March 2016, Plaintiff timely filed an ADA discrimination claim with the EEOC based on GW's refusal to allow Plaintiff to progress to the PGY 3 year. Plaintiff also timely filed a FMLA claim with the Department of Labor.

31. On March 25, 2016, Plaintiff received news that her appeal had been granted and that her case was being remanded for further action.

32. On March 28, 2016, Plaintiff communicated to GW, via correspondence to Dr. Catapano, that she had filed a discrimination claim with the EEOC.

33. By letter dated April 8, 2016, the EEOC notified Plaintiff of her "right to sue" concerning her ADA claim. This action is being brought within ninety (90) days of Plaintiff's receipt of the right to sue letter (which was approximately two weeks after April 8). This action is also being brought within ninety (90) days of April 8, 2016.

34. In April 2016, despite promises of help from Dr. Berger, GW failed to provide the documentation and information requested by prospective schools to effectuate a transfer. GW also dragged its feet in providing information to regulatory authorities to allow Plaintiff to secure a Virginia medical license and a full D.C. medical license. Due to GW's failure to

provide the requested information in a timely fashion, Plaintiff lost the opportunity to transfer into a different residency program this resident year.

35. On May 2, 2016, GW (through Dr. Catapano) responded to the remand to the CCC by dismissing Plaintiff from GW's residency program (and, therefore, terminating Plaintiff's employment). Plaintiff subsequently timely appealed that decision.

36. On or around May 17, 2016, Plaintiff timely filed another ADA-based claim with the EEOC based upon GW's dismissal of Plaintiff from the residency program.

37. Because GW has refused to allow Plaintiff to progress to the PGY 3 year, and because GW has dismissed Plaintiff from the residency program, it would be virtually impossible for Plaintiff to transfer into another residency program.

## COUNT I
## VIOLATION OF AMERICANS WITH DISABILITIES ACT
### (Failure to Accommodate and Disability Discrimination)

38. Plaintiff incorporates the allegations of paragraphs 1-37 of the Complaint as if fully stated herein.

39. As noted, Plaintiff had a qualifying disability within the meaning of the ADA and GW had notice of that disability. As also noted, with (or without) reasonable accommodations, Plaintiff could continue to perform the essential functions of her position. As further noted, Plaintiff requested reasonable accommodations (although she was not legally obliged to do so) to allow her to continue to perform the essential functions of her position – which included, but were not limited to, Plaintiff requesting (through proper channels) leave and/or a change in her work schedule to allow her to attend important medical appointments to treat her condition.

40. GW denied this reasonable accommodation by *ex post facto* penalizing Plaintiff for taking the time off to attend the medical appointments, requiring her to repeat the entire

11

month's rotation, failing Plaintiff for two classes because she had missed a few days of class (and refusing to allow Plaintiff to make up those classes), pulling Plaintiff off the work schedule and refusing to allow her to perform her employment functions, and issuing her letters of deficiency for missing work to attend the medical appointments. Ultimately, these penalties led to GW denying Plaintiff's promotion and dismissing Plaintiff from the residency program. Although GW gave the appearance of accommodating Plaintiff's disability by allowing her to attend medical appointments, in reality, GW refused to engage in the requisite interactive process because GW penalized Plaintiff for attending the appointments.

41. Defendant intentionally discriminated against Plaintiff in violation of the ADA by, among other things, not making reasonable accommodations to the known physical or mental limitations of Plaintiff (an otherwise qualified individual with a disability who was an employee of GW), placing Plaintiff on forced administrative leave, denying Plaintiff to ability to perform the essential functions of her position, refusing to promote Plaintiff to the PGY 3 year, and dismissing Plaintiff from the residency program (thereby terminating Plaintiff's employment with GW).

42. By virtue of Defendant's intentional actions, Plaintiff was discharged or otherwise discriminated against with respect to her compensation, terms, conditions and/or privileges of employment on the basis of her disability status in violation of the ADA.

43. As a direct and proximate result of said intentional acts, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer extreme emotional distress, humiliation, great expense, embarrassment and damage to her reputation.

44. Plaintiff has been forced to seek, and continues to receive, medical care for the extreme emotional distress she has suffered as a result of GW's discriminatory and otherwise illegal conduct.

45. Defendant's termination of Plaintiff's employment occurred under circumstances giving rise to an inference of unlawful discrimination.

## COUNT II
## VIOLATION OF THE DC HUMAN RIGHTS ACT
### (Failure to Accommodate and Disability Discrimination)

46. Plaintiff incorporates the allegations of paragraphs 1-45 of the Complaint as if fully stated herein.

47. As noted, Plaintiff had a qualifying disability within the meaning of the DCHRA and GW had notice of that disability. As also noted, with (or without) reasonable accommodations, Plaintiff could continue to perform the essential functions of her position. As further noted, Plaintiff requested reasonable accommodations (although she was not legally obliged to do so) to allow her to continue to perform the essential functions of her position – which included, but were not limited to, Plaintiff requesting (through proper channels) leave and/or a change in her work schedule to allow her to attend important medical appointments to treat her condition.

48. GW denied this reasonable accommodation by ex post facto penalizing Plaintiff for taking the time off to attend the medical appointments, requiring her to repeat the entire month's rotation, failing Plaintiff for two classes because she had missed a few days of class (and refusing to allow Plaintiff to make up those classes), pulling Plaintiff off the work schedule and refusing to allow her to perform her employment functions, and issuing her letters of deficiency for missing work to attend the medical appointments. Ultimately, these penalties led

to GW denying Plaintiff's promotion and dismissing Plaintiff from the residency program. Although GW gave the appearance of accommodating Plaintiff's disability by allowing her to attend medical appointments, in reality, GW refused to engage in the requisite interactive process because GW penalized Plaintiff for attending the appointments.

49. Defendant intentionally discriminated against Plaintiff in violation of the DCHRA by, among other things, not making reasonable accommodations to the known physical or mental limitations of Plaintiff (an otherwise qualified individual with a disability who was an employee of GW), placing Plaintiff on forced administrative leave, denying Plaintiff the ability to perform the essential functions of her position, refusing to promote Plaintiff to the PGY 3 year, and dismissing Plaintiff from the residency program (thereby terminating Plaintiff's employment with GW).

50. By virtue of Defendant's intentional actions, Plaintiff was discharged or otherwise discriminated against with respect to her compensation, terms, conditions and/or privileges of employment on the basis of her disability status in violation of the DCHRA.

51. As a direct and proximate result of said intentional acts, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer extreme emotional distress, humiliation, great expense, embarrassment and damage to her reputation.

52. Plaintiff has been forced to seek, and continues to receive, medical care for the extreme emotional distress she has suffered as a result of GW's discriminatory and otherwise illegal conduct.

53. Defendant's termination of Plaintiff's employment occurred under circumstances giving rise to an inference of unlawful discrimination.

## COUNT III
## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
## (Interference and Retaliation)

54. Plaintiff incorporates the allegations of paragraphs 1-53 of the Complaint as if fully stated herein.

55. By requesting medical leave and then raising her concerns to GW about GW's retaliation against her for taking medical leave, Plaintiff engaged in protected activity within the meaning of the FMLA.

56. Defendant intentionally retaliated against Plaintiff and interfered with Plaintiff's rights under the FMLA by, among other things, not making reasonable accommodations to the known physical or mental limitations of Plaintiff after Plaintiff returned from approved medical leave, placing Plaintiff on forced administrative leave after she returned from approved medical leave, denying Plaintiff to ability to perform the essential functions of her position after Plaintiff returned from approved medical leave, refusing to promote Plaintiff to the PGY 3 year after Plaintiff returned from approved medical leave, and eventually dismissing Plaintiff from the residency program (thereby terminating Plaintiff's employment with GW).

57. There exists a causal connection between Plaintiff's use of medical leave and other FMLA protected activities and the adverse employment actions noted above. Evidence of this causal connection exists in many forms, including the close temporal proximity of Plaintiff's use of medical leave and engaging in other protected activity and the adverse employment actions taken by GW. Further GW engaged in a pattern of retaliatory behavior – every time Plaintiff took medical leave, GW took some form of adverse employment action against her or otherwise penalized Plaintiff.

**COUNT IV**
**VIOLTION OF THE DC FAMILY AND MEDICAL LEAVE ACT**
**(Interference and Retaliation)**

58. Plaintiff incorporates the allegations of paragraphs 1-57 of the Complaint as if fully stated herein.

59. By requesting medical leave and then raising her concerns to GW about GW's retaliation against Plaintiff for taking medical leave, Plaintiff engaged in a protected activity within the meaning of the DCFMLA.

60. Defendant intentionally retaliated against Plaintiff and interfered with Plaintiff's rights under the DCFMLA by, among other things, not making reasonable accommodations to the known physical or mental limitations of Plaintiff after Plaintiff returned from approved medical leave, placing Plaintiff on forced administrative leave after she returned from approved medical leave, denying Plaintiff to ability to perform the essential functions of her position after Plaintiff returned from approved medical leave, refusing to promote Plaintiff to the PGY 3 year after Plaintiff returned from approved medical leave, and eventually dismissing Plaintiff from the residency program (thereby terminating Plaintiff's employment with GW).

61. There exists a causal connection between Plaintiff's use of medical leave and other DCFMLA protected activities and the adverse employment actions noted above. Evidence of this causal connection exists in many forms, including the close temporal proximity of Plaintiff's use of medical leave and engaging in other protected activity and the adverse employment actions taken by GW. Further GW engaged in a pattern of retaliatory behavior – every time Plaintiff took medical leave, GW took some form of adverse employment action against her or otherwise penalized Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant, equitable relief, and damages in an ascertainable sum as follows:

(1) An injunction requiring Defendant to cease its illegal personnel practices;

(2) Reinstatement to the position Plaintiff held prior to the prohibited personnel action; if reinstatement is unavailable, Plaintiff seeks back pay and front pay;

(3) Reinstatement of Plaintiff's seniority rights (*i.e.*, to a PYG 3 year);

(4) Restoration of lost benefits;

(5) Compensatory damages in an amount to be determined at trial, but not less than $300,000;

(6) Punitive damages in an amount to be determinBacked at trial;

(7) Attorneys fees; and

(8) Reasonable costs and expenses associated with this suit.

## Jury Demand

Plaintiff respectfully demands a jury trial in this action.

Dated: July 7, 2016

Respectfully submitted,

*//s//  Jason H. Ehrenberg*

Jason H. Ehrenberg (# 469077)
Peter K. Tompa (#413752)
BAILEY & EHRENBERG PLLC
1015 18th Street N.W.
Suite 204
Washington, D.C. 20036
T:  (202) 331-1331
F:  (202) 318-7071
jhe@becounsel.com
pkt@becounsel.com

**Attorneys for Plaintiff**