**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant George Washington University, by undersigned counsel, pursuant to Fed. R. Civ. P. 56 and LCvr 7(h), hereby moves this Court for summary judgment as to all claims herein brought by Plaintiff under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act, 28 U.S.C. § 2601 *et* seq., the D.C. Human Rights Act, D.C. Code § 32-501 *et seq.*, and the D.C. Family and Medical Leave Act, D.C. Code § 2-1401.01 *et seq.*

This case essentially involves an allegedly wrongful dismissal from an academic education training program because the dismissal allegedly was based on a discriminatory animus forbidden by the statutes Plaintiff invokes. The record, however, shows that Plaintiff's performance during her tenure in Defendant's Psychiatry Residency Training Program was marked by many instances of substandard and unacceptable performance, including but not limited to failures of essential didactic courses, multiple instances of unprofessional behavior (including lying repeatedly to faculty members), failure to show up for clinical duties, frequent instances of abuse and disrespect directed toward professional colleagues, failure to obtain health clearance certification required by District of Columbia law, issuance of four Letters of Deficiency with plans of remediation which Plaintiff failed to address appropriately, issuance of

a Notice of Unprofessional Conduct, and a refusal to accept at any time that her substandard performance required remediation and extension of time in the training program to acquire medical knowledge essential to the field of psychiatry and to complete clinical training time required by the national accrediting agency to achieve competency in clinical practice. The record is filled with many other instances of Plaintiff's deficiencies, her refusal to acknowledge them, and thus her failure to remediate them.

Further, Plaintiff was explicitly directed to the University's EEO Office on multiple occasions to pursue any request she might have for a claim of disability or for an accommodation for any disability, but Plaintiff never pursued the procedure the GW University offered all residents and other employees for obtaining any reasonable accommodation they might need.

Based on the entire record, there is no genuine dispute as to any material fact and Defendant is entitled to summary judgment.

For further grounds in support of this motion, Defendant respectfully refers the Court to the attached Statement of Material Facts as to Which There Is No Genuine Issue and Memorandum of Points and Authorities.

Dated: January 2, 2018

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

_/s/  Nicholas S. McConnell_____
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| THE GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT GEORGE WASHINGTON UNIVERSITY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

 _/s/     Nicholas S. McConnell_____
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com

*Counsel for Defendant*

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999)...........................................2, 27, 30, 31

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 26

*Bain v. Howard University*, 968 F.Supp.2d 294 (D.D.C. 2013)..................................... 27

*Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) ..................... 27

*Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999)............................................................ 30

*Burke v. Emory Univ.*, 177 Ga.App. 30, 338 Se.E.2d 500 (1985) .................................. 2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 26

*Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017) .........................3, 30

*Clements v. Nassau Cnty.*, 835 F.2d 1000 (2nd Cir. 1987)............................................. 27

*Davis v. Mann,* 882 F.2d 967 (5th Cir. 1989) .................................................................. 2

*Hajjar-Nejad v. George Washington University*, 37 F. Supp.3d 90 (D.D.C. 2014)...............2, 27

*Kraft v. William Alanson White Psychiatric Foundation*, 498 A.2d 1145 (D.C. 1985) ................. 3

*Nichols v. Billington*, 402 F. Supp.2d 48   (D.D.C. 2005) ............................................ 31

*Paulin v. George Washington Univ. School of Medicine & Health Sciences*,
878 F. Supp.2d 241 (D.D.C. 2012) .......................................................................... 2

*Rossomando v. Board of Regents of University of Nebraska*,
2 F. Supp.2d 1223 (D. Neb. 1998)........................................................................... 30

*Steele v. Schafer*, 535 F.3d 689 (D.C. Cir 2008) ......................................................... 31

*Walker v. Children's National Medical Center,* 236 F. Supp.2d 136 (D.D.C. 2017)................... 31

**Statutes**

Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 .................................................... 1

D.C. Family and Medical Leave Act, D.C. Code § 2-1401.01 ....................................................... 1

D.C. Human Rights Act, D.C. Code § 32-501 ................................................................................ 1

Family and Medical Leave Act, 28 U.S.C. § 2601 ........................................................................ 1

**Rules**

Fed. R. Civ. P. 56 .................................................................................................................... 1, 26

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GEORGE WASHINGTON UNIVERSITY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
<u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Fed. R. Civ. P. 56, Defendant George Washington University (the "University") hereby submits this Memorandum of Points and Authorities in support of its motion for summary judgment.

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Dr. Stephanie Waggel brings this suit alleging that her dismissal from the University's Psychiatry Residency Training Program (the "Program") violated the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq.*, the D.C. Human Rights Act, D.C. Code § 32-501 *et seq.*, and the D.C. Family and Medical Leave Act, D.C. Code § 2-1401.01 *et seq.*

This case essentially involves an allegedly wrongful dismissal from an academic education training program because the dismissal allegedly was based on a discriminatory animus forbidden by the statutes Plaintiff invokes. The record, however, shows that Plaintiff's performance during her tenure in Defendant's Psychiatry Residency Training Program was marked by many instances of substandard and unacceptable performance, including but not limited to failure of essential didactic courses, multiple instances of unprofessional behavior

(including lying repeatedly to faculty members), failure to show up for clinical duties, frequent instances of abuse and disrespect directed toward professional colleagues, failure to obtain health clearance certification required by District of Columbia law, issuance of four Letters of Deficiency with plans of remediation which Plaintiff failed to address appropriately, issuance of a Notice of Unprofessional Conduct, and a refusal to accept at any time that her substandard performance required remediation and extension of time in the training program to acquire medical knowledge essential to the field of psychiatry and to complete clinical training time required by the national accrediting agency to achieve competency in clinical practice. The record is filled with many other instances of Plaintiff's deficiencies, her refusal to acknowledge them, and her failure to remediate them.

None of these instances of Plaintiff's substandard performance and unprofessional behavior was caused by Plaintiff's alleged disability or any alleged failure to accommodate for the disability, and they amply justified the decision to dismiss Plaintiff from the Program.

Under well established case law, decisions involving academic dismissal merit summary judgment "[u]nless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Hajjar-Nejad v. George Washington University*, 37 F. Supp.3d 90, 116 (D.D.C. 2014), citing *Paulin v. George Washington Univ. School of Medicine & Health Sciences*, 878 F. Supp.2d 241, 247 (D.D.C. 2012) (quoting *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999). This rule of judicial non-intervention is "particularly appropriate in the health care field" where students who receive a medical credential will provide care to the public. *Burke v. Emory Univ.*, 177 Ga. App. 30, 338 S.E.2d 500 (1985), including post-medical school residency training programs, *Davis v. Mann,* 882 F.2d 967 (5th Cir. 1989), or

other advanced medical training. *Kraft v. William Alanson White Psychiatric Foundation*, 498 A.2d 1145 (D.C. 1985).

Further, Plaintiff was explicitly directed to the University's EEO Office on multiple occasions to pursue any request she might have for a claim of disability or for an accommodation for any disability. Plaintiff never went to the EEO Office to pursue the procedure the University offered to all of its residents and other employees to present a claim of disability and a request for any reasonable accommodation they might need. The statutes relied upon by Plaintiff required nothing more. *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017). In the course of her residency training, Plaintiff did request leave time of Program personnel to attend medical appointments, take vacations, or other personal leave as all residents must do so the Program can coordinate coverage for residents to be available for important ongoing clinical care in hospitals and other sites where their presence is essential to delivery of care. All of Plaintiff's requests for this leave were granted. None of those requests was a substitute for presenting any claim of disability or need for disability accommodation to the University's EEO Office.

On this record and the applicable law, Defendant is entitled to summary judgment.

## II.     FACTUAL BACKGROUND

### A.     The University's Psychiatry Residency Training Program

Residency training is the process by which medical school graduates are transformed to the level of being able to practice a medical specialty safely and effectively across generally encountered health care settings. (Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ["SOF"] ¶ 3). The University's Program is conducted under the auspices of the Accreditation Council for Graduate Medical Education ("ACGME") (SOF ¶ 5), and is a four-

year program (SOF ¶ 8)[1] with approximately 26 – 28 trainees (SOF ¶ 9). The University receives payment from Medicare for some of the administrative components and other indirect costs of conducting residency training as part of a national commitment to assure a supply of appropriately trained physician specialists. (SOF ¶¶ 4, 15.) The University's payment for resident training is fixed by formulas such that an extension of a resident's time in a training program results in the cost of the additional training time being absorbed by the University. (SOF ¶ 4.) Medicare also pays residents a salary, generally about $50,000 per year, as part of the commitment to physician specialty training. (SOF ¶ 15.)

Each residency program is required to have a Program Director whose duties are to administer and maintain an educational environment conducive to educating the residents in each of 22 ACGME designated competency and subcompetency areas such as Patient Care, Medical Knowledge, Interpersonal and Communications Skills, Professionalism, and Systems-Based Practice. (SOF ¶¶ 16-17.) Lisa A. Catapano, M.D., served as the Program Director during Dr. Waggel's tenure in the Program and had completed a two-year training program specifically for that purpose. (SOF ¶ 17 and Exhibit A, Catapano Decl. ¶¶ 2 -3, 5.) Other key personnel in the administration of the Program include the Program Administrator (responsible for general administrative duties and coordination of communications within the Program) (SOF ¶ 18) and the Chief Residents (who are residents who have shown particular aptitude and leadership skills and are appointed by the Program Director to take a lead role in reviewing resident performance and evaluation, serving as a liaison between the residents and faculty, developing on-call schedules for clinical training assignments, teaching more junior residents, and serving as a

---

[1] The first year of residency training is denominated as the Intern Year or PGY1 with trainees thereafter designated as second-year (PGY2), third-year (PGY3), and fourth-year (PGY4) (SOF ¶ 23), although the documents also variously refer to these as PGY-I, PGY-II, PGY-III, and PGY-IV.

sounding board when a resident raises a concern about the program or his or her own performance). (SOF ¶¶ 24 – 27.)

The Program Director conducted weekly meetings with the administrative team, including the Associate Program Director, the Program Administrator, and the Chief Residents to review all aspects of the Program including a review of the residents and any problems or issues that needed to be addressed. (SOF ¶ 21.)

The Program Director is also responsible to appoint a Clinical Competency Committee (the "CCC") consisting of no fewer than three Program faculty members which is responsible for conducting and preparing Milestones evaluations (measurements of each resident's progress in training in the ACGME psychiatry competencies and subcompetencies for all residents at least semi-annually and reporting the evaluations to ACGME. (SOF ¶¶ 16, 20.) The CCC also advises the Program Director on decisions regarding resident progress, including promotion, remediation, and dismissal. (SOF ¶ 20.)

The University's Office of Graduate Medical Education, headed by the Dean of Graduate Medical Education, Dr. Jeffrey Berger, conducts most of the institutional administrative responsibility for the Program but is not responsible for day-to-day management and operation of each residency program or for creating individual training plans and/or curriculum for each residency program. (SOF ¶¶ 10, 12, 14). The GME Office assists residents in navigating administrative procedures and meeting their responsibilities within their programs. (SOF ¶ 13.)

The Chair of the Department of Psychiatry, Dr. James L. Griffith, had ultimate responsibility for the clinical activities of the Department, the quality of clinical practice by the Department, and especially matters related to patient safety. (SOF ¶ 22.) As Chair, Dr. Griffith

had a responsibility to promote clinical excellence and training pursuant to which he meets every week with the Program Director to review the status of the Program. (SOF ¶¶ 22 and **Exh. N**, Griffith Decl., ¶¶ 4, 11.)

ACGME sets the standards which must be met both by the training program and by each resident within the program in order for each resident to be recognized as trained and qualified to practice in the particular medical specialty and thus become eligible for Board certification. (SOF ¶¶ 7-8.) The standards include both didactic and clinical training. (SOF ¶ 8.) Residents must spend a stated minimum number of actual clinical days on rotations in specific medical specialty services, although Program Directors have some minimal leeway to grant waivers from the minimum training time standards for residents who have shown exceptional ability. (SOF ¶ 28.)

ACGME also requires each resident to attend a minimum of 70 percent of regularly scheduled didactic sessions, but the standard of the GW Program for resident attendance in didactics classes is even higher. (SOF ¶ 29.) The Program sets aside one full day each week for didactics which all PGY2 – PGY4 residents must attend – more time than most psychiatry residency programs – and appointments scheduled as vacation or sick time off during didactics require the same process of notification to faculty as is required for clinical duties. (SOF ¶ 30-31.) The Program Director reminds residents of this requirement and notes that residents must participate in at least 70% of all didactics or they can be required to repeat the seminar which could delay graduation. (SOF ¶ 33.)

The Clinical Neurosciences Seminar taught by Department Chair Dr. Griffith is the centerpiece around which the rest of the Program's curriculum is organized, and mastery of the material is necessary to be able to learn the material in subsequent courses and seminars in the

Program. (SOF ¶ 34.) The course is taught over the entire PGY2 academic year (July 1 – June 30) in six segments, each ending with an exam to assess mastery of the material in the segment before students move onto the next segment. (SOF ¶ 35.) The seminar has three components, each consisting of a series of lectures (Cognitive and Social Neuroscience – a basic understanding of the structure and physiology of the human nervous system required to understand the psychopathology of psychiatric disorders and their treatments; Neurobiology of Major Psychiatric Disorders – current research on the neurobiology of psychotic, mood, and anxiety disorders as major psychiatric illnesses, and Psychopharmacology for Major Psychiatric Disorders – residents study clinical psychopharmacology for psychotic, mood, and anxiety disorders). The approximately 35 lectures span all the major psychiatric illnesses and their treatment and each has a detailed handout with learning objectives. (SOF ¶ 38.) The course is the most comprehensive and intensive component of the PGY-II residency year. (SOF ¶ 39.) Verification of adequate mastery of medical knowledge lends itself to testing by written examinations, and as such, Dr. Griffith has given regular written examinations in the course for the past 23 years. (SOF ¶ 314.) Residents who fail to demonstrate mastery of the information on exams are required to repeat the seminar. (SOF ¶¶ 667 – 670.)

## B.    The Resident Physician Agreement, Resident Manual and University and Program Policies

Each resident signs a Resident Physician Agreement ("Resident Agreement") regarding his or her appointment for training. (SOF ¶ 41.) The Resident Agreement incorporates the policies, terms, and conditions of the Resident Manual into the agreement with which the resident further agrees to abide. (SOF ¶ 44.) The Resident Agreement and the Resident Manual set forth in detail the physician's obligations (SOF ¶¶ 51 – 93.) The Resident Manual includes

the policy as to persons with a disability per the GW Office of Equal Employment Opportunity

(the "EEO Office") as follows:

> **Residents Requesting an Accommodation**
> The George Washington University's commitment to equal employment
> opportunity and affirmative action includes a commitment to provide
> reasonable accommodations for residents' religious obligations and for
> residents who are qualified individuals with disabilities pursuant to the
> Americans with Disabilities Act. Should a resident need an
> accommodation, he or she should contact the Office of Equal Employment
> Opportunity at (202) 994-9656 or fax (202) 994-9658. All requests for
> accommodations are kept in confidence to the extent feasible by law and
> practice.

Among the policies is the University Policy on Equal Opportunity which specifically

notes that "[T]o request disability accommodations, students should contact the Office of

Disability . . . . Employees and other members of the university community should contact the

Office of Equal Employment Opportunity and Affirmative Action at (202) 994-9656 or

eeo@gwu.edu." (SOF ¶¶ 59-60.)

The major function of the EEO Office is the handling of all requests for reasonable

accommodation under the Americans with Disabilities Act for all University employees and

faculty. (SOF ¶ 64.) There are three ways that a GW employee can request an accommodation:

(1) Directly apply through the GW EEO website, (2) referral from the Human Resources Office

of the employee's department, or (3) referral from the University's Benefits Administration

department in the event that the employee is ineligible for or has exhausted FMLA leave. The

directions for requesting an accommodation under the ADA are located on the EEO Office

homepage. The EEO Office homepage is easily accessible from the GW Faculty and Staff

homepage. (SOF ¶ 63.) Once an employee has applied for an accommodation directly or has

been referred through one of the Human Resources department, the EEO Office handles the

processing and granting of that request. The employee's supervisors, managers, and/or

departmental Human Resources directors are not responsible for the decision to grant or deny requested accommodations. Once the EEO Office has determined that an employee has a qualifying disability requiring accommodation, the Office works with the employee's department to facilitate whatever accommodation has been requested. (SOF ¶ 65.)

The policies also include a Code of Conduct in the Learning Environment (the "Code") which sets forth norms to serve as guidelines for conduct in the GW community, the first three of which are: Honesty, Promise-Keeping, and Respect for Institution, Profession, and Patients. (SOF ¶ 85). The Appendix to the Code lists examples of "inappropriate" behavior as follows:

- Making belittling or berating statements
- Name calling
- Using profanity or disrespectful language
- Making degrading or demeaning comments regarding patients and their families, hospital personnel, other health professionals, other health professions and discipline specialties and/or the hospital
- Making threats of retribution
- Failing to return phone call, pages, or other messages
- Being unavailable while on call or on duty without arranging for appropriate coverage
- Being under the influence of alcohol or drugs or being otherwise unfit for participation in inpatient/client care, at work, or on call.

(SOF ¶ 86.)

### C. Dr. Waggel's Tenure in the Program

1. Dr. Waggel entered training in the GW Psychiatry Residency training program on July 1, 2014. (SOF ¶ 94.) Despite having been informed of the requirement to obtain a medical clearance before beginning clinical duties on that day, Dr. Waggel failed to obtain the necessary clearance, and, as a result, was removed from clinical duty on July 3 and could not return to clinical training until sometime after July 9, when she submitted TB test results to complete the processing of her medical clearance. (SOF ¶¶ 95 -97.) Issues with sub-standard performance by

Dr. Waggel surfaced when she returned to her first rotation as set forth in a report to Department faculty member, Dr. Lorenzo Norris, by Chief Resident, Stephanie H. Cho, M.D., as follows:

- Major lack of awareness of level of own abilities
- Significant resistance to feedback and shows little improvement following constructive criticism
- Significant deficits in Patient care:
- Fails to recognize severity of threat to patient safety with specific errors
  - Pt was to be given >50 units Lantus due to out of control blood sugars, but home oral diabetic medications had not been ordered (as had been communicated and written in signout)
  - Fails to complete orders/documentation prior to leaving work and does not ensure that it will be done by someone else
- Does not foster productive collaboration in team environment
- Demonstrates frequent unprofessional behaviors:
- Cites specific residents as more enjoyable to work with compared to other specific residents
- Does not take responsibility for errors/near misses that are significant safety patient issues
- When asked to help or to complete some patient care task (ie, prescriptions for a planned discharge) expresses open displeasure
- Is openly disrespectful to other team members
  - *Told staff to "think really hard" and "really try to not ask stupid questions" (I told Shemika* [Anthony, a Physician Assistant] *I would let you know about this. Though Shemika thought it was funny, I think it is completely inappropriate even in jest.)*

(SOF ¶ 98) (original emphasis).

In clear violation of Program policy, Dr. Waggel failed to report for duty on Monday December 15, 2014, and failed to notify the attending physician. (SOF ¶ 99.)

The problems identified by Dr. Cho during Dr. Waggel's first rotation in July 2014 continued. **Exh. A** (Catapano Dec), ¶ 101.

Dr. Waggel's attending physician for her rotation in November – December at INOVA Fairfax Hospital, Aditi Malik, M.D., contacted Chief Resident Elizabeth L. Greene, M.D., to share the following concerns about Dr. Waggel's performance on the rotation:

10

    ○     [Dr. Waggel] shows a lack of motivation, initiative, and interest in the care of her patients.

    ○     She has been seen using her phone during meetings or conversations with patients and staff.

    ○     She has been caught rolling her eyes during meetings or conversations with patients and staff.

    ○     She comes to work wearing provocative clothing, such as tight pants. This has made staff uncomfortable to the point that they have had to ask you [Dr. Malik] to talk to Dr. Waggle about it.

    ○     She sits in the resident room and doesn't check in with you for rounds or meetings. There is a lack of communication from Stephanie, so that you've felt the need to track her down to see what she's doing.

    ○     She shows up late daily.

    ○     She leaves a note at the nurses' station with patient assignments, as if she were the attending.

    ○     She walks out of meetings without permission.

(SOF ¶ 101.) Dr. Malik noted that another attending, Dr. [Cynthia L.] Gauss, was "having the exact same issues with [Dr. Waggel] at this time" and stated further that "[Dr. Waggel's] outpatient supervisor Dr. [Cynthia G.] Cohen has also expressed concern to Dr. Gauss." (SOF ¶ 102.)

       On Tuesday, March 3, 2015, Gary L. Little, M.D., Medical Director, George Washington University Hospital, emailed to James M. Gehring, M.D., Internal Medicine supervising attending for the Green Team, raising concerns about patient care and safety issues on the March 2 night shift including, among others, coordination between the Green Team and the ER, failure to carry out clinically significant orders, and inappropriate and unprofessional communication. (SOF ¶ 108.) Dr. Little specifically noted: "Staphanie [sic] Waggel, MD placed an order for PO Tylenol which clearly would not help a patient who needed a Dilaudid PCA. Multiple return phone calls were unanswered." (SOF ¶ 109.) Dr. Little's email further noted several complaints including one which involved Dr. Waggel "giving nurses information on the phone that clearly wasn't true ('medicine doesn't come to the ED')" and others involving her "being disrespectful, lack of responsiveness, etc." (SOF ¶ 110.)

Dr. Gehring asked Jason M. Prior, M.D., another IM attending who was on duty during

the night shift on March 2 to help look into the matter and Dr. Prior subsequently reported to Dr.

Little and to Dr. Gehring as follows:

> A couple of things were likely coming into play. First, the team was
> getting absolutely crushed and at one point was up to 30 patients while
> discharging another 6. Obviously that doesn't excuse any lack of
> response from anyone on the team but they were definitely just trying
> to stay afloat with a lot of sick people.
>
> A larger part of the issue likely had to do with a brand new psychiatry
> intern (Dr. Waggel noted below) who's first day on medicine was
> Monday. It became quickly apparent that she was not at the level one
> would anticipate of an intern in March and I already pulled the
> residents aside on Tuesday and asked them to essentially treat her as
> an A1. She has a very odd affect, I've already had to diffuse some
> patient complaints and her medical knowledge is pretty poor. With
> time and education she may get there but for right now I'll also ask the
> residents to not let her have sole control of the RF phone either. I think
> beyond her lack of knowledge, she just doesn't know the details of
> medicine. The combination of it being her first day, extremely busy
> and a bit odd with all of her interactions with people probably didn't
> help.

(SOF ¶ 111.)

Dr. Prior's efforts at improving Dr. Waggel's performance, however, were unsuccessful.

On Friday, March 6, 2015, the end of Dr. Waggel's first week on the Internal Medicine rotation,

Dr. Prior sent an email report to Jillian S. Catalanotti, M.D., Program Director for the Internal

Medicine Residency Training Program, and others, to say:

> I'm writing to everyone because the current situation on green team
> cannot safely continue, in my opinion. The current construct of the
> team started Monday 3/2. Since that time, I've fielded complaints from
> patients, nursing, consulting services, the ED and received an email
> from Gary Little regarding issues with the team. I know many of you
> have already received some of these complaints as well. I've spoke
> [sic] to the residents and the primary offending intern in question all
> week but last night was the last straw. It's gone beyond personal
> interactions and a lack of knowledge and affected patient safety.
> Fortunately, nothing happened, but I wanted to alert everyone to the

12

> issues, outline some performance plans I've put in place on the team as
> well as strategize how to possibly move forward.

Dr. Prior's email (nearly three pages of single-space text) recounted a series of events involving Dr. Waggel documenting in detail serious deficiencies in professionalism, interactions with nursing and consulting services, medical knowledge, and patient safety. (SOF ¶113.)  On the first day of the rotation, Dr. Prior fielded complaints from nursing and patients regarding Dr. Waggel's interactions with them and "patients were upset stating she didn't know what she was talking about." (SOF ¶ 114.)  On the second day, it became apparent that Dr. Waggel "had a hard time evaluating patients, presenting, knowing what medications did, etc. She didn't know the basics of medicine." (SOF ¶ 115.) On the third day, Dr. Prior received the aforementioned email from Dr. Little. (SOF ¶ 116.). The next day was initially uneventful, but at 5:00 p.m., several incidents occurred involving potentially disastrous outcomes for patients as to which it was clear Dr. Waggle was totally ignorant as to the medical issues. (SOF ¶ 117.)

On Friday night, Associate Program Director, Dr. Eindra Khin Khin, spoke with Dr. Waggel regarding the concerns on the Medicine Team and reported that "[I]nterestingly enough, [Dr. Waggel] had no idea there were concerns." (SOF ¶¶ 121-122.)  Dr. Khin Khin summarized Dr. Waggel's comments as follows:

> 1)  The residents on the team have "gone out of their way" to tell her
>     that she has been doing a great job.
> 2)  From the conversation with the attending, Dr. Prior, the main point
>     she took was that he told her she could ask for help whenever she
>     needs it from the team and himself.

(SOF ¶ 123.) Dr. Khin Khin further reported that when she told Dr. Waggel the concerns that the attending (Dr. Prior) had laid out briefly, "[Dr. Waggel] was completely in shock." (SOF ¶ 124.)

13

The next attending to work with Dr. Waggel, Nupur Mehta, M.D., reported some improvement in Dr. Waggel's performance, but noted that he continued "to be worried about her ability to function autonomously, especially with complicated medical patients." (SOF ¶ 135.) Dr. Mehta also stated there were matters of "ongoing concern" that he intended to address directly with Dr. Waggel, including:

1) she makes questionable decisions (choice of antibiotics, route)
2) her documentation is spotty and often inaccurate (e.g., carrying over previous plans from many days ago
3) she lacks attention to detail (does not order follow-up tests/labs when instructed)
4) she is at times very defensive and passive-aggressive. While the latter is understandable as I feel she is trying hard and wants to improve, she can respond to feedback in a more mature way.

(SOF ¶ 136.)

On March 26, 2015, Dr. Khin Khin had a follow-up meeting with Dr. Waggel who reported that she had met with Dr. Mehta on Friday, March 20, and that she had received the following feedback from Dr. Mehta:

1) That she is fine and doing well.
2) That the only thing [Dr. Mehta] recommended that she change/improve is that, when she puts in an order for I&Os, she should tell the nurse directly instead of putting it in the computer, as the computer order will disappear once a particular nurse views it and won't stay in the system.

(SOF ¶ 140.) Dr. Mehta responded to this email with surprise, stating "I must admit, I am very taken aback by this. Hard for me to believe she didn't catch the four things I listed, which I outlined to her very clearly." (SOF ¶ 141.)

In late April or early May, 2015, Dr. Waggel's colleagues became aware that she was having difficulty on the Internal Medicine rotation apparently as a result of pain she was having and that she was having some imaging studies done related to a kidney cyst that was being

14

evaluated. (SOF ¶ 152) Dr. Waggel reportedly began discussing her workup and diagnosis with members of the Internal Medicine team and actually brought copies of her imaging of a left kidney cyst to the hospital with a request that a resident or other physician review them for a second opinion. (SOF ¶ 153-155.)  On May 1, 2015, Dr. Catalanotti contacted Dr. Catapano to report that she and Dr. Waggel's supervising attending physician were concerned that Dr. Waggel's own health problems were causing her not to be able to focus on work and requested that someone close to Dr. Waggel check in on how she was doing. (SOF ¶ 159.) Dr. Catalanotti also commented that the clinical attending planned to give Dr. Waggel direct feedback "about avoiding inappropriate language on rounds (calling a patient an asshole in front of students and the team)" but perhaps not that very day. (SOF ¶ 160.)

When another attending reported similar concerns, Dr. Catapano called Dr. Waggel in for a meeting and discussed with Dr. Waggel that it is part of a physician's obligation to be aware of their own health status and to refrain from presenting themselves for clinical duties if there are any concerns that they are not safe to do so – this is a key element of Professionalism. (SOF ¶¶ 163-164.) Dr. Catapano also explained that physicians do become sick or get ill and need to alert others in advance and withdraw from clinical duties until they are safe to return – there is no shame, stigma, or penalty attached because it is the right thing to do. (SOF   ¶ 165.) In the meeting, Dr. Catapano also specifically recommended that Dr. Waggel take leave at least briefly to address her medical issues and be prepared to come back to work healthy and safe. (SOF ¶ 166.) One of the attendings had raised the issue of a fitness for duty exam for Dr. Waggel, and Dr. Catapano discouraged that as it would not be helpful to be declared unfit for duty when regular leave would be the better and usual option. (SOF ¶¶ 167-168.)  Dr. Waggel insisted that

she was fine and that she would be able to continue to perform the duties of her training, and she rejected the suggestion that she should take leave. (SOF ¶ 169.)

During the month of May on the Internal Medicine rotation, Dr. Suzanne Chang served as Dr. Waggel's attending physician, and she noted several red flags regarding Dr. Waggel's well being and professionalism soon after Dr. Waggel's return from a brief medical leave at the beginning of the month. (SOF ¶¶ 170-171.) Dr. Chang reported receiving at least three complaints from patients who said Dr. Waggel had been unprofessional or "mean" and the patients had become very angry or offended by her interaction with them. (SOF ¶ 172.) On at least one occasion, Dr. Waggel presented herself for duty dressed inappropriately (wearing a very form-fitting and high-cut skirt), and Dr. Chang received several comments from other staff and patients about Dr. Waggel's attire. (SOF ¶ 173.)

Dr. Chang also received reports from Dr. Waggel's team members that she seemed angry, was cursing loudly in the team room in front of the students and within earshot of patients, and her overall behavior seemed to be escalating. (SOF ¶ 174.) On May 14, Dr. Waggel appeared for pre-rounds, but was apparently sleepy and behaving strangely. When it came time for rounds, Dr. Waggel was not present and Dr. Chang, aware that Dr. Waggel was having medical appointments and related difficulties, became concerned that perhaps she had gotten sick or collapsed. (SOF ¶ 175.)  For an hour or so, various members of the medical team searched everywhere for Dr. Waggel, and she was eventually found by the Chief Resident asleep in a call room. (SOF ¶¶ 176-177.) Dr. Waggel subsequently stated that she had been out drinking late the night before and that morning had confused her Ativan and Ritalin and taken benzodiazepines accidentally before coming to work. (SOF ¶ 178.) Dr. Waggel was sent home for the day because

she was not safe to be participating in patient care and was asked not to return to the Internal Medicine service. (SOF ¶ 179.)

Later that afternoon, Dr. Catalanotti called Dr. Catapano to inform her that because of the recent issues related to Dr. Waggel's performance on the Internal Medicine service, which had culminated in the event of that morning, the medicine team had determined that Dr. Waggel could no longer practice safely and had asked her to no longer work on the service. (SOF ¶ 180.)

Later that evening, Dr. Waggel emailed Dr. Catapano regarding the morning incident and stated:

> I mistook my Ritalin pills for Ativan. It didn't kick in until about an hour into work when I got so sleepy. That's why I never take Ativan during work. I take them when I get anxious about my kidney or when I have to get a procedure done. It also didn't help that I didn't have my ADHD meds on board either. I feel so stupid and awful about the whole thing.

(SOF ¶ 181.)

Later that evening, Dr. Catapano emailed the administrative team and stated in part:

> [I] think by far her best option is to take a medical leave, as was recommend [sic] to her two weeks ago. Looking forward, this will impact her promotion date (she'll need to make up 1+ weeks of medicine) and when she can start her pgyii rotations – once we get a scope for the duration of leave [Dr. Greene] and [Dr. Emejuru] will have to work on that.

(SOF ¶¶ 182 – 183.)

On May 15, 2015, Dr. Catapano met with Dr. Waggel about these events and again recommended to her that she should take leave to address whatever issues she was having that were affecting her performance in the residency program and resulting in her dismissal from the Internal Medicine rotation. (SOF ¶185.) Dr. Waggel agreed to accept the recommendation and arranged for either leave or personal vacation time to be away from the Program from May 18 to

June 7, 2015. (SOF ¶ 186.) As a result of communications between Ms. Kimberly Vanlewen, the Administrator of the University's Leave of Absence Program, Ms. Vanlewen advised Dr. Waggel that she did not have sufficient length of service to qualify for FMLA leave but further advised Dr. Waggel if she believed she had a qualifying disability, she could request a reasonable accommodation such as medical leave under the Americans with Disabilities Act ("ADA"). (SOF ¶¶ 187-191.) Ms. Vanlewen provided Dr. Waggel with a phone number and email address for the EEO Office and actually recommended that she apply for ADA leave through that office. (SOF ¶ 192.) Ms. Tucker also provided the same information to Dr. Waggel. (SOF ¶ 193.) Dr. Waggel never pursued an accommodation through the EEO Office for medical leave related to a disability as recommended by both Ms. Vanlewen and Ms. Tucker. (SOF ¶ 194.)

In a report to Dr. Catapano about Dr. Waggel's rotation in May, Dr. Chang noted that when she first came on duty, Dr. Waggel had been given an opportunity to take a longer leave of absence but told the chiefs she felt ready to be back. (SOF ¶ 196.) Dr. Chang also recounted in detail the events of the morning of May 14 noting that when the Chief Resident found Dr. Waggel she was apparently impaired or intoxicated and that Dr. Waggel had since stated she was "out drinking late the night before, and that morning had confused her Ativan and Ritalin and taken benzos accidentally prior to coming to work." (SOF ¶ 197.) Dr. Chang also prepared a formal evaluation of Dr. Waggel's May 2015 Internal Medicine rotation and had scored Dr. Waggel at Level 1 ("Resident cannot perform this skill even with assistance") in three fundamental skill sets – patient interviews, shared decision-making with patients, and stabilizing patients with urgent or emergent medical conditions. (SOF ¶ 201.) The rating for Dr. Waggel's Overall Clinical Performance on the rotation was "Lowest – Inadequate performance/Significant

Deficiencies." (SOF ¶ 202.) Dr. Waggel was granted leave from May 18 to June 7, 2015, and went on a vacation to Italy and then visited her family in Pennsylvania. (SOF ¶¶ 203 – 205.)

On Dr. Waggel's return, her next rotation was on Emergency Medicine where the ED Residency Training Program Director, Colleen Roche, M.D., noted that as soon as Dr. Waggel began the rotation, it became clear that she had significant deficits in her medical knowledge and was far behind where she should have been. (SOF ¶¶ 209-211.) The ED rotation was at the end of Dr. Waggel's intern year but at best she exhibited the level of medical knowledge of a beginning intern. (SOF ¶ 212.)

On June 10, 2015, Dr. Waggel was a no show for her ED shift at 7:00 a.m., had not contacted anyone to alert them she would not be there, could not be reached during multiple attempts for several hours, and when she was finally reached by phone, she stated that she was not feeling well that day and had decided not to come to work. (SOF ¶¶ 213-217.) After further conversation, Dr. Waggel agreed to come to work for the remainder of her shift. (SOF ¶ 218.) According to Dr. Roche, Dr. Waggel had been made aware of the protocol for requesting time off in advance for scheduled appointments and for finding coverage for unexpected absences such that her actions on June 10 were a clear violation of the ED protocol. (SOF ¶ 219.)

As it turns out, Dr. Waggel had an appointment at 2:45 p.m. that day (which she also had not discussed with anyone and for which she had not sought leave or other authorized absence from duty) with a consulting urologist, Dr. Thomas W. Jarrett. (SOF ¶ 220.) She met with Dr. Jarrett whose review of the imaging studies led him to conclude that her left kidney cyst was a higher grade than her attending urologist had diagnosed with an increased risk of becoming malignant (30-50%). (SOF ¶ 221.) While Dr. Jarrett recommended to Dr. Waggel that she have the cyst surgically removed, he said it was not urgent and it would not be unreasonable to follow

the cyst via standard surveillance with repeat imaging in six months to a year. (SOF ¶¶ 222-223.) Dr. Waggel preferred surgical removal and given her age, overall healthy status, and the small size and peripheral nature of the cyst, Dr. Jarrett recommended a laparoscopic partial nephrectomy. (SOF ¶ 225.) Dr. Jarrett further advised that Dr. Waggel would likely be out of work for two weeks with a return to full duty in about a month. (SOF ¶ 226.) He also said that because this was not emergent, Dr. Waggel could coordinate with her residency program to schedule the surgery over the next three months. (SOF ¶ 227.)

Dr. Waggel emailed Dr. Catapano the next day stating she needed "a nephrectomy sooner rather than later. Dr. Jarrett (chair of urology) said I should only need about two weeks off." (SOF ¶ 228.) Dr. Catapano replied that she would have the full support of the Program with leave based on whatever date her surgeon selected for the surgery and the recovery time indicated by her surgeon of two weeks which she should coordinate through Chief Resident Dr. Emejuru. (SOF ¶¶ 229-230.) Over the ensuing weeks, Chief Resident Emejuru coordinated Dr. Waggel's schedule to match the date selected by her surgeon and the recovery time and also work her into rotations Dr. Waggel wanted to complete before the surgery and also schedule her for a night call rotation on her return to duty because that was usually lighter duty. (SOF ¶¶ 231-240.)

On June 24, 2015, Dr. Roche emailed Dr. Catapano to report further that Dr. Waggel "is struggling a lot clinically in the ED . . . her clinical knowledge is not up to par with what we would expect from an intern. * * * I have received multiple comments about her poor clinical performance. * * * [m]y sense is that she was so far behind because she was limited by her clinical knowledge." (SOF ¶ 241). Dr. Catapano also received a report from Dr. Cathy Crone, a faculty member sited at Inova Fairfax Hospital, regarding Dr. Waggel's lack of professionalism

during an inpatient psychiatry rotation there, including disrespectful attitude toward her supervising attending physician. (SOF ¶ 243.)

Dr. Waggel's PGY2 year began on July 1. On July 9, she missed the first meeting of a didactic curriculum course, Psychodynamic Thought, taught by Dr. Cheryl Collins, a volunteer faculty member, after Dr. Waggel had told Dr. Collins she would attend and then had provided Dr. Collins no notice of a change in plans. (SOF ¶ 245-248.) On August 2, Dr. Waggel emailed an apology to Dr. Collins for missing class for an undisclosed "emergency" claiming she thought the Program Administrator had reported that to Dr. Collins (SOF ¶ 248), ignoring the fact that she had been told by many people following the June 10 ED no show that such notification was an important, personal, non-delegable professional obligation.

On July 9, 2015, Dr. Catapano emailed Dr. Waggel on several matters including that she would be receiving a Letter of Deficiency for the June 10 ED no show and explaining that the letter was non-reportable. (SOF ¶¶ 249-250.) Dr. Waggel sent a reply email saying she had a doctor's excuse for that day (SOF ¶ 252), again ignoring the fact that having a doctor's excuse (after the fact) was no explanation of or justification for this clear departure from professional standards regarding proper notice.

On July 13, 2015, when Dr. Emejuru learned of the missed class with Dr. Collins, he emailed Dr. Waggel to remind her of the strict policy protecting didactics days and noted if appointments were necessary, she still needed to alert attending physicians and faculty members. (SOF ¶¶ 253-254.) Dr. Waggel responded that she was "actually very upset [she] was given such a hard time about going to this appointment." (SOF ¶ 255.) According to Dr. Emejuru, no one gave Dr. Waggel a hard time about her going to the appointment – no one knew she had the

appointment, she just went and no-showed Dr. Collins after saying she would be there. (SOF ¶ 256.) People had reminded her that that was unprofessional and unacceptable.

On July 18, 2015, Dr. Waggel had a "Kidney Party" at her apartment (SOF ¶ 257), and on July 20 underwent a robotic-assisted laparoscopic partial nephrectomy performed by Dr. Jarrett at GW Hospital to remove the entire 1.4 x 1.4 x 1.6 cm left kidney cyst later determined on pathology to be clear cell renal cell carcinoma. (SOF ¶ 258-260.) On July 22, Dr. Waggel was discharged from the hospital and on July 24 emailed Dr. Catapano to state that Dr. Jarrett had called to advise that he was pretty sure the cancer was all gone (SOF ¶¶ 263-264), and she emailed Dr. Emejuru, "Guess who had cancer but probably does not anymore. This gal!" (SOF ¶ 265.) On July 28, Dr. Waggel responded to an email from Dr. Griffith that he was sorry she had gone through this event but understood that there had been no surgical complications "and that this is expected to be curative." (SOF ¶ 266. Dr. Waggel responded, "I was very glad to receive your well wishes. Everything points to a good prognosis." (SOF ¶ 267.)

On July 29, 2015, Dr. Waggel emailed Dr. Catapano and stated, "I'm really lucky that I am at GW and in the psych program which I imagine is particularly good at getting residents time off. I can't imagine what may have happened if I were in a program like surgery somewhere and pushed off my work up like I was initially planning to do." (SOF ¶ 268.)

On July 30, 2015, Dr. Waggel was seen at the GW Department of Hematology/Oncology in consultation with Robert S. Siegel, M.D., who advised that based on all the medical information and the low stage of the tumor, the surgery should be "curative." (SOF ¶¶ 269-271.) He advised a genetic screening for a specific syndrome (which was done and was negative) (SOF ¶¶ 422-426) with a plan of care for Dr. Waggel to follow up with Dr. Jarrett and for a return visit

with Dr. Siegel on November 11, one week after a repeat kidney CT scan he would order. (SOF ¶¶ 272-273.)

On August 5, 2015, Dr. Waggel saw Dr. Jarrett for a post-op visit when he confirmed that there was "an excellent prognosis from this" and reviewed "the imaging follow-up recommended by the AUA" which was "yearly imaging of the chest and abdomen." (SOF ¶ 276.) On the same day, Dr. Waggel met with Dr. Catapano for her semi-annual review who advised Dr. Waggel that she was above Milestones in teaching but she was far below Program requirements in Patient Care and Professionalism and then reviewed specific instances regarding these evaluations. (SOF ¶ 277.) Dr. Catapano also presented Dr. Waggel with the Letter of Deficiency regarding the June 10 ED no show and advised her that the letter was not intended as a punitive measure but was remediation with formal written presentation of the issue and the opportunity and expectation for resolving the issue and moving on without any further consequences. (SOF ¶ 279.) Dr. Catapano also noted, however, that the issue did need to be remediated or there could be further action taken including termination from training. (SOF ¶¶ 280-282.)

The next day, August 6, Dr. Catapano received a lengthy email from Chief Resident Elizabeth Greene outlining a number of instances of very unprofessional communications and conduct directed by Dr. Waggel towards other members of the health care team who had been treated with disrespect – this took place the same afternoon Dr. Catapano had spoken with Dr. Waggel about issues related to Professionalism reflected in the Letter of Deficiency. (SOF ¶¶ 285-290).

The unacceptable behaviors and substandard performance continued over the next several months of Dr. Waggel's tenure: Dr. Waggel displayed very concerning deficiencies in Professionalism, Inter-Personal Communications, Medical Knowledge and Systems-Based

Practice on an overnight shift on August 25 where, although there were clear system based issues, Dr. Waggel's own performance was remarkably sub-standard both in the way she spoke to a patient (she told a very disturbed, combative patient with escalating aggression that she was going to call DC MPD and have the patient taken to another facility), the way she spoke to staff, her claim of having personally physically restrained the patient (which was unacceptable for a physician on the service and put the patient, herself, and others at risk), her inability to make cogent, well-structured patient presentations to two different faculty attendings who communicated with her in the middle of the night, and her own statements that she had failed to attend to minimum standards of self-care (not eating in four days) in order to present herself for duty adequately rested and nourished to provide safe and appropriate patient care. (SOF ¶¶ 347.) Dr. Waggel failed the second exam in Dr. Griffith's foundational course with a grade of 33 – lower than pure guessing would be expected to produce (SOF 449) (and she had already failed the first exam with a grade of 33, which was 30 points lower than anybody else in the class). (SOF ¶ 318.) When she attended Dr. Griffith's classes, she often distracted the class with irrelevant and tangential personal remarks. (SOF ¶¶ 453-454.) Dr. Waggel was "routinely absent" from Dr. Collins's course (SOF ¶ 480), failed to attend any group feedback sessions (SOF ¶ 482), was unprepared and unable to lead a class discussion on an assigned article even though she had seen other residents' presentations, and completely lacked understanding of the psychodynamic concepts in Dr. Collins's course (SOF ¶¶ 557-559), which she failed. (SOF ¶¶ 561, 673.)

Dr. Waggel continued her pattern of no show for both clinical and didactic commitments (SOF ¶¶ 490-491; 641-645; 647-649; 671-672). She failed to obtain mandated annual health clearance on time (SOF ¶ 462-464), or even to make an extended deadline. (SOF ¶¶ 465-467.)

She failed to comply with the requirement to enter her supervisors in MedHub so evaluations could be completed. (SOF ¶ 468.) She continued to claim that she did not understand the ACGME requirements for didactics and clinical training time. (SOF ¶¶ 537-539.) She continued to engage in inappropriate communication in violation of the Code. (SOF ¶ 653.) When placed on "buddy call" to provide her with more senior resident supervision to assist in transitioning back to independent call, she abused the call by insisting the more senior residents were there to do her work for her. (SOF ¶¶ 447, 456-457.) She continued to engage in disrespectful communications with faculty and colleagues. (SOF ¶¶ 500-501.) As a result of a number of these events, she received an unprecedented four Letters of Deficiency within an approximately 6-month period (First LOD, July 15, 2015 – SOF ¶ 279; Second LOD, October 28, 2015 – SOF ¶ 545; Third LOD – November 11 – SOF ¶ 602, and revised November 19 to provide higher levels of supervision and support – SOF ¶¶ 654-657, and Fourth LOD, December 10, 2015 – SOF ¶ 710.).

But perhaps most disconcerting was a continuing, even spiraling, pattern of dishonesty and outright lies to faculty (SOF ¶¶ 497-461; 605-609; 675; 659-668) which also lead to Dr. Catapano's issuance of the Notice of Concerns of Unprofessional Conduct (SOF ¶ 798-799), an instance of remarkably unprofessional behavior in holding onto a pager from Children's National Medical Center for use as a social lever (SOF Exhibit A, Catapano Decl., ¶ 709, Exhibit 172.), and an episode on March 1, 2016, involving Dr. Chappelle, a very experienced and respected psychotherapist who was consulting on a complicated case in which Dr. Waggel barged into the patient's room speaking in an elevated and abrasive voice thus upsetting the patient's mother. (SOF ¶¶ 831-835.) There are limits to what can be remediated.

The CCC properly took this entire record into consideration during its meeting on April 8, 2016, and, as is shown in the minutes of the meeting, conducted a careful review of significant events justifying its unanimous vote to recommend to the Program Director that Dr. Waggel be dismissed from the Program. (SOF ¶ 912-917, and Exhibit M, Dyer Decl., ¶ 112, and Exhibit 15 thereto (minutes)). That decision was accepted by Dr. Catapano who issued a letter of dismissal on May 2, 2016. (SOF ¶ 936.) Dr. Waggel appealed and Raymond Lucas, M.D., was appointed as the independent medical reviewer. (SOF ¶ 953.) Dr. Lucas conducted a full review (SOF ¶¶ 955-963), including an interview of Dr. Waggel (SOF ¶¶ 960-963), and issued his letter report on July 6, 2016. (SOF ¶ 964 and Exhibit S, Lucas Decl., ¶ 15 and Exhibit 1 thereto (letter report, dated July 6, 2016.) Dr. Waggel took a final appeal to Dr. Simons (SOF ¶ 967), conducted his own review (SOF ¶¶ 969-974), and concluded that both the Program and the GME Office had followed appropriate procedures outlined by the Academic Improvement Policy for the dismissal of Dr. Waggel from the Program and, therefore, determined to uphold the decision. (SOF ¶ 975, and Exhibit R, Simons Decl., ¶ 32 and Exhibit 5 thereto (dismissal letter).)

This lawsuit followed.

**STANDARD OF REVIEW**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  While all reasonable inferences that may be drawn from the facts are to be drawn in favor of the nonmoving party, the non-movant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Courts are particularly deferential to universities when considering motions for summary judgment in academic dismissal cases. "[I]n cases involving academic dismissal, educational institutions will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Alden v. Georgetown*, 734 A.2d 1103, 1109 (D.C. 1999) (*quoting Clements v. Nassau Cnty.*, 835 F.2d 1000, 1004 (2nd Cir. 1987). Courts do not interfere in the academic judgment of educational institutions and limit their review to determining whether action was taken in bad faith or in an arbitrary or capricious manner. Id. at 1008 ("judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference.").

The United States Supreme Court has spoken on the subject: "like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making." *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978). And the analysis applies with special force in cases, such as this, raising claims of improper discriminatory treatment in employment in a medical training program. *Hajjar-Nejad v. George Washington University*, *supra,* 37 F. Supp.3d at 116; *Bain v. Howard University*, 968 F.Supp.2d 294, 298 (D.D.C. 2013). To avoid summary judgment, Plaintiff must establish that there was no rational basis for her dismissal or that it was motivated by bad faith unrelated to academic performance, *i.e.,* that academic considerations were unrelated to the decision for dismissal.

III.    **ARGUMENT**

A.    **The Evidence Is Overwhelming That the Decision for Dismissal Was Based on Considerations of Academic Performance**

It would be difficult to conjure a record more filled with reasons for an academic medical training program to dismiss a student or trainee than the one invented by Dr. Waggel during her tenure in the GW Psychiatry Residency Training Program. Even before she began the Program, she failed to comply with a simple but important prerequisite to safe clinical practice – universally recognized – of a medical health clearance. Barely after stepping into the Program she had to be removed from duty. And upon her return to duty, it became apparent in her first rotation that there were significant deficiencies in multiple domains – lack of awareness of her limitations, resistance to feedback (the path forward in any training program), deficits in patient care, knowledge deficits directly impacting severity of threat to patient safety with specific errors, failure to complete documentation for continuity of care, failure to foster collaboration in an inherently inter-dependent and collaborative environment, interpersonal relationships skills that an adult would be expected to have, including behaviors to avoid (picking – and then announcing – favorites to work with among team members), not helping others when asked, and being "openly disrespectful" to other team members. (SOF ¶ 98.) This was a broadside assault on the  Code of Conduct in the Learning Environment in the first month. And it was remarkably revealing since these behaviors persisted.

Limitations on brief space prevent a full account of the multiple people, in multiple venues, under myriad circumstances who reported unprofessional behavior by Dr. Waggel. According to the report from Dr. Prior on March 6, 2015, during an Internal Medicine rotation – long before any discriminatory animus is said to have crept into GW's evaluation of Dr. Waggel – he had fielded complaints "from patients, nursing, consulting services" about Dr. Waggel.

(SOF ¶ 112.) When patients are reported to be complaining in March 2015, there can be no claim that the record is tainted by discrimination. Plaintiff's contention is that the problems started on June 10, 2015, when she received her diagnosis from Dr. Jarrett that her left kidney cyst was probably a higher grade than previously thought with an increased risk of potential cancer. The same would be true of the complaints Dr. Chang received in May 2015 involving "at least three complaints from patients" who reported that they had become "angry or offended by her [Dr. Waggel's] interaction with them." (SOF ¶ 172.)

The attached Declarations of Drs. Catapano, Emejuru, Griffith, Collins, and Dyer do establish the record in detail tied to contemporaneous accounts of events. The picture that emerges is one of Dr. Waggel's manipulation, abuse, deceitfulness, and remarkable unfairness to colleagues. Dr. Waggel even accused more senior residents, who had agreed to take buddy call as part of an effort to assist her back to independent call, of abandoning her in the middle of the night and then fabricating email reports to cover their tracks. There is absolutely no evidence Dr. Waggel has offered to support those allegations, and great reason to believe those statements were false. Defaming one's colleagues under any circumstances appears to run afoul of the Code.

The fact is that the thorough review of Dr. Waggel's tenure in the program conducted by the CCC during its meeting on April 8, 2016, and documented in the minutes, shows a focus on longstanding, thoroughly documented, objectively framed failures of performance on Dr. Waggel's part, her refusal to acknowledge the deficiencies, and her refusal to attempt to remediate them. As Dr. Catapano notes in her declaration, and as Dr. Gandhi documented at the time, the December 10 Letter of Deficiency essay was "a striking example of Dr. Waggel's lack of self-observation, failure to acknowledge her deficits, and accept the need for remediation." (SOF ¶¶ 785-788 and Catapano Decl., ¶¶ 701-705 and Exhibit #169.)

There is no basis in this record on which a reasonable juror could reasonably believe that the physicians who deliberated on the CCC and made the recommendation for dismissal, or Dr. Catapano who agreed with the recommendation and decided for dismissal, or Dr. Lucas, the independent physician reviewer who reviewed the matter and rendered his report (SOF ¶¶ 955-964, and Exhibit S, Lucas Decl., Exhibit 1, Letter report dated July 6, 2016) made a decision for which there was no rational basis or that was motivated by bad faith or ill will unrelated to academic performance. *Alden v. Georgetown,* 734 A.2d at 1109.

Defendant is entitled to summary judgment.

### B.      The Statutes Relied Upon Do Not Produce a Different Result

In addition to the reasons already noted, Plaintiff faces a further threshold barrier to the claims set forth in Counts I and II of the Complaint (ADA and DC HRA failure to accommodate and disability discrimination). Here the record shows that Plaintiff was told on multiple occasions how to apply for ADA disability relief if she believed herself entitled, or possibly entitled, to disability status and accommodation. The notice to Plaintiff came to her attention in the Resident Agreement (SOF ¶¶ 43-44), in the Resident Manual (SOF ¶¶ 55-57), and in the related University EEO Policy (SOF ¶¶ 59-66). In addition, Plaintiff was actually directly told how to apply and was encouraged to apply (SOF ¶¶ 189-193), but she chose never to follow up. There was nothing further the University was required to do. *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017). *See also Rossomando v. Board of Regents of University of Nebraska*, 2 F. Supp.2d 1223 (D. Neb. 1998).

The D.C. Circuit has noted that courts "routinely apply the same standards to evaluate Title VII claims as they do ADA claims, ADEA claims, and even ERISA claims." *Brown v. Brody*, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999), *abrogated on other grounds by Steele v.*

*Schafer*, 535 F.3d 689 (D.C. Cir 2008). *See also Walker v. Children's National Medical Center*, 236 F. Supp.2d 136 (D.D.C. 2017) (when the employer in an ADA retaliation action asserts a legitimate, nondiscriminatory reason for adverse employment action, the district court then considers whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff in a prohibited basis).

Plaintiff's claims in this case that the University made it difficult for her to schedule or keep medical appointments and "punished" Plaintiff for attending the appointments, without in any way showing what the alleged "punishment" was or how it proximately caused the behaviors on her part that led to the decision to terminate her, is insufficient to overcome the overwhelming evidence that the decision is entitled to judicial deference under *Alden v. Georgetown*. There is no evidence that the physician reviewers did not have a reasonable basis to reasonably believe that Dr. Waggel's dismissal from the Program was justified for academic reasons.

Furthermore, the allegedly retaliatory acts of the Defendant, such as interfering with Plaintiff's ability to get to medical appointments on time or missing appointments, do not constitute an "adverse personnel action" related to employment, proof of which is the second prong of the three-prong showing Dr. Waggel must make for a *prima facie* claim of retaliation. *Nichols v. Billington*, 402 F. Supp.2d 48, 71 (D.D.C. 2005).

## IV.    CONCLUSION

For all of the foregoing reasons and based on the entire record, Defendant George Washington University is entitled to summary judgment on all claims herein and this action should be dismissed with prejudice.

Dated: January 2, 2018

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

_/s/  Nicholas S. McConnell_____
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

DR. STEPHANIE WAGGEL,        )
                                 )
          Plaintiff,        )
                                 )  Civil Action No.: 1:16-cv01412-CKK
     v.                     )  Hon. Colleen Kollar-Kotelly
                                 )
GEORGE WASHINGTON UNIVERSITY, )
                                 )
          Defendant.     )

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE DISPUTE</u>**

Defendant George Washington University, by undersigned counsel, pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 7(h)(1), LCvR, hereby sets forth its Statement of Material Facts as to Which There Is No Genuine Dispute.

**<u>The Parties</u>**

1.     Plaintiff Stephanie Waggel is a former resident in the  Psychiatry Residency Training Program at the George Washington University School of Medicine and Health Sciences (hereinafter the "Program"). Plaintiff's Complaint. ¶ 5.

2.     Defendant George Washington University (the "University") is a private University operating in Washington, D.C. Compl. ¶ 4.

**<u>Structure and Organization of the GW Residency Training Program</u>**

3.     Residency training is the process by which medical school graduates are transformed to the level of being able to practice a medical specialty safely and effectively across generally encountered health care settings. A full description of the residency training process as provided by the Accreditation Council for Graduate Medical Education ("ACGME") is set forth in the Declaration of Dr. James Griffith, attached hereto as **Exhibit N**, at ¶ 6.

4.      Under the Medicare residency training program, the University receives payment for some of the administrative components and other indirect costs of conducting residency training. The payment for resident training is fixed by formulas such that an extension of a resident's time in a training program results in the cost of the additional training time being absorbed by the University. See **Exhibit A**, Declaration of Lisa A. Catapano, M.D., ¶ 12.

5.      The GW Psychiatry Residence Training Program, like all other post-medical school medical specialty training programs, is conducted under the auspices of the ACGME. **Exh. A** (Catapano Decl.) ¶ 13.

6.      ACGME is  is an independent, not-for-profit, physician-led organization that sets and monitors the professional educational standards for residency training programs which provide specialty medical training essential in preparing physicians to deliver safe, high-quality medical care to all Americans. **Exh. A** (Catapano Decl.) ¶ 14.

7.      The ACGME standards must be met both by the training program and by each resident within the program in order for each resident to be recognized as trained and qualified to practice in the particular medical specialty. **Exh. A** (Catapano Decl.) ¶ 15.

8.      ACGME sets standards and requirements for both didactic and clinical training which trainees must successfully complete over a four-year training program in order to become eligible for Board certification by the American Board of Psychiatry and Neurology which is a Member Board of the American Board of Medical Specialties. **Exh. N** (Griffith Decl.) ¶ 8.

9.      GW's Psychiatry Residency Training Program generally enrolls 26 to 28 students (6 to 7 students per enrolled "class") and has an attending faculty of 21 physicians based in the GW Medical Faculty Associates physician practice group. In addition, there are a number of other physicians specializing in psychiatry who hold GW faculty appointments and are based at

off-site training facilities such as INOVA Fairfax Hospital and Children's National Medical Center. GW psychiatry residents perform clinical training rotations at these sites to obtain exposure to a broad spectrum of psychiatric patients in a variety of clinical settings. **Exh. A** (Catapano Decl.) ¶ 10.

10.     Most of the institutional administrative responsibility for the Program, as well as that of the other residency programs operated by the University, is handled by the Office of Graduate Medical Education ("GME"). See **Exhibit B**, Declaration of Jeffrey Berger, M.D., ¶ 5.

11.     From November 2012 until July 2016, Dr. Lisa Catapano served as the Program Director for the GW Psychiatry Residency Training Program. **Exh. A** (Catapano Decl.) ¶ 3.

12.     Dr. Jeffrey Berger is the Dean for Graduate Medical Education and was in the role during the time of Dr. Waggel's tenure as a resident in the Program. **Exh. B** (Berger Decl.) ¶¶ 3, 8.

13.     The purpose of the GME Office is to assist residents in navigating administrative procedures within their programs and to assure that residents' responsibilities are met. It also works with program directors for each program to ensure that all University residency programs meet or exceed ACGME Institutional, Common, and Program Requirements. Id.

14.     The GME Office is not responsible for the day-to-day management and operation of each residency program. Likewise, the GME Office is not responsible for creating the individual training plans and/or curriculum for each residency program. **Exh. B** (Berger Decl.) ¶ 6.

15.     Resident physicians are paid a salary, generally about $50,000 per year, which is funded by the United States government through the Medicare program as part of a national

commitment to assure a supply of appropriately trained physician medical specialists to meet the nation's health care needs. **Exh. A** (Catapano Decl.) ¶ 11.

16.     Each resident's progress in training is tracked through Milestones which are descriptors and targets for resident performance as a resident progresses from entry into residency through graduation based on the resident's progress on all 22 psychiatry subcompetencies, such as Patient Care, Medical Knowledge, Interpersonal and Communications Skills, Professionalism, and Systems-Based Practice. **Exh. A** (Catapano Decl.) ¶ 16.

17.     Each residency training program is required to have a Program Director, the role Dr. Catapano filled during Dr. Waggel's tenure in the Program, whose duties, among others, are to administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas and to oversee and ensure the quality of didactic and clinical education in all sites that participate in the Program. The GW Program also had an Associate Director to assist in carrying out these duties. **Exh. A** (Catapano Decl.) ¶ 17.

18.     Another key role in the Program is that of Program Administrator. During the time Dr. Waggel was in the Program, Victoria H. Anderson was the Program Administrator. As such, Ms. Anderson's general administrative responsibility for the Program and her duties included organizing and tracking the residents' didactic and clinical schedules, coordinating clinical rotations through off-site facilities, monitoring the residents' attendance for matters on their schedules, obtaining the residents' completion of forms and reports to meet administrative and ACGME requirements, and serving as a general administrative resource for the residents and a channel of communications among the residents, faculty members, and off-site faculty or other personnel. **Exh. A** (Catapano Decl.) ¶ 18.

19.     The Program Administrator functions as the communications center and coordinator for residents and has frequent contact with residents, faculty, and off-site program personnel. **Exh. A** (Catapano Decl.) ¶ 18.

20.     As the Program Director, it was also Dr. Catapano's responsibility to appoint a group known as the Clinical Competency Committee ("CCC") which under ACGME guidelines must consist of no fewer than three members of the Program faculty and is responsible for reviewing all resident evaluations at least semi-annually, preparing and assuring the reporting of Milestones evaluations of each resident semi-annually to ACGME, and advising the Program Director regarding resident progress, including promotion, remediation, and dismissal. **Exh. A** (Catapano Decl.) ¶ 19.

21.     As Program Director, Dr. Catapano conducted weekly meetings, generally on Mondays, with a group including the Assistant Program Director, the Chief Residents, and the Program Administrator to review all aspects of the Program including a review of the residents in the Program and any problems or issues that needed to be addressed. **Exh. A** (Catapano Decl.) ¶ 20.

22.     Dr. Catapano also met weekly with the Chairman of the Department of Psychiatry and Behavioral Sciences, James L. Griffith, M.D., for a similar review with a focus on clinical practice and safety issues as Dr. Griffith, in his role as Department Chair, had ultimate responsibility for the clinical activities of the Department of Psychiatry and Behavioral Sciences, the quality of clinical practice by the Department, and especially matters related to patient safety. **Exh. A** (Catapano Decl.) ¶ 22.

23.     Per ACGME standards, psychiatry residency training is designated as a four-year program, the first year denominated as the intern year or PGY1, with trainees thereafter

designated as second-year (PGY2), third-year (PGY3), and fourth-year (PGY4) residents. **Exh. A** (Catapano Decl.) ¶ 23.

24.     Third-year residents who have shown particular aptitude and leadership skills are selected to serve in their fourth year as Chief Residents. **Exh. A** (Catapano Decl.) ¶ 24.

25.     The role and duties of a Chief Resident include maintaining regular contact with the Program Director and Associate Director to review the residency Program including resident performance and evaluation, serving as an advocate for the resident body and as a liaison between the residents and the faculty, developing on-call schedules for the residents and providing or assigning back up for on-call residents, participating in teaching junior residents, and being available as a sounding board when a resident raises concerns about the Program or his or her own performance. **Exh. A** (Catapano Decl.) ¶ 25.

26.     The overall role of a Chief Resident is to assist the faculty and resident trainees to assure a well functioning Program and the success of each resident within the Program. **Exh. A** (Catapano Decl.) ¶ 26.

27.     During Dr. Waggel's intern year, Dr. Elizabeth Greene served as the Chief Resident with oversight of Dr. Waggel, and during her PGY2 year, Dr. Jason Emejuru served as the Chief Resident. See **Exhibit C** Declaration of Jason Emejuru, M.D. ¶ 2, 8.

28.     As part of their training, each psychiatry resident must spend a stated minimum amount of actual clinical days on rotations in specific medical specialty services. Program Directors have some minimal leeway to grant waivers from the minimum training time standards in the case of residents who have shown exceptional ability. **Exh. A** (Catapano Decl.) ¶ 27.

29.     ACGME further requires each resident to attend a minimum of 70 percent of regularly scheduled didactic sessions. The standard at the GW Program for resident attendance in didactics classes is higher than the ACGME standard. **Exh. A** (Catapano Decl.) ¶ 28.

30.     On July 21, 2015, shortly after the beginning of PGY2 for Dr. Waggel, Dr. Catapano sent an email reminding residents of the Program requirements regarding didactics. **Exh. A** (Catapano Decl.), Exhibit 2 (Plaintiff Bates 695). In the email, Dr. Catapano noted that:

> In our Psychiatry Residency, <u>we protect one full day per week for all PGYIIs, IIIs, and IVs to be excused from clinical duties in order to participate in program didactics and Grand Rounds</u>. This is more protected educational time then most psychiatry residency programs dedicate for their residents. This comes at the cost of clinical coverage for our sites, and relies on the volunteer efforts of full-time and part-time faculty.

<u>Id.</u> at p. 1 (Plaintiff Bates 695) (emphasis added).

31.     The email further stated that "PGYII, III and IV residents are required to be available for didactics, Grand Rounds, or program-related meetings (including class meetings, RTC, Journal Club, and M&Ms) <u>every Thursday from 8:00 a.m. to 5:30 p.m.</u>" <u>Id.</u> (emphasis added).

32.     The email further instructed residents that:

> Residents may not schedule patients or supervision during this time. Personal time off or medical appointments scheduled on Thursdays are treated as vacation or sick time off, respectively, <u>and require the same process of alerting attending/instructors and administration as required on any other day of the week</u>.

<u>Id.</u> (emphasis added).

33.     Finally, the email reinforced the ACGME didactics requirement and alerted residents that the Program set an even higher standard for compliance with didactics training:

> Residents are expected to be present for all didactics unless they are sick, post-call, or on vacation. The ACGME requires that residents participate in at least 70% of all didactics, meaning that if a resident attends less than

70% of the classes in a particular seminar, they can be required to repeat the seminar (which could delay graduation). <u>In our program we believe the standard should be higher than 70% attendance, and any resident with enough absences to significantly interfere with their learning may be asked to repeat the course</u>.

Id. at pp. 1 – 2 (Plaintiff Bates 695 – 96) (emphasis added).

34.     The Clinical Neurosciences Seminar is the centerpiece around which the rest of our curriculum is organized. Mastery of the material in the Clinical Neurosciences Seminar is necessary in order to learn the material in subsequent courses and seminars in the Program. See **Exhibit N**, Declaration of James L. Griffith, M.D., ¶ 17.

35.     The course is taught over the entire PGY2 academic year (July 1 – June 30) in six segments, each ending with an exam to assess mastery of the material in the segment before students move onto the next segment. **Exh. N** (Griffith Decl.) ¶ 19.

36.     The seminar has three components, each consisting of a series of lectures:

(a)     Cognitive and Social Neuroscience: A basic understanding of the structure and physiology of the human nervous system as is required to understand the psychopathology of our psychiatric disorders and their treatments;

(b)     Neurobiology of Major Psychiatric Disorders: Current research on the neurobiology of psychotic, mood, and anxiety disorders as major psychiatric illnesses, and

(c)     Psychopharmacology for Major Psychiatric Disorders: Residents study clinical psychopharmacology for psychotic, mood, and anxiety disorders.

**Exh. N** (Griffith Decl.) ¶ 12.

8

37.     Residents are told at the beginning of the 35 session, ten-month long seminar that they are expected by the end of this seminar to be able to pass the psychopharmacology section of their American Board of Psychiatry and Neurology certification exam. **Exh. N** (Griffith Decl.) ¶ 13.

38.     The approximately 35 lectures span all the major psychiatric illnesses and their treatment and each has a detailed handout with learning objectives. **Exh. N** (Griffith Decl.) ¶ 14.

39.     This seminar is the most comprehensive and intensive component of their PGY2 residency year. **Exh. N** (Griffith Decl.) ¶15

40.     The course has three objectives:

(a)     Assuring that the residents will have sufficient knowledge of psychopharmacology for patient care during PGY2 rotations,

(b)     Providing the residents a sufficient knowledge base to enable them to score in the 50th percentile or higher on the Somatic Treatments subscale of the nationally-standardized PRITE In-Service Examination, and

(c)     Teaching a neurobiological model for the psychopathology of major psychiatric disorders that can guide psychopharmacological, psychotherapeutic, and psychoeducational therapies with outpatients

**Exh. N** (Griffith Decl.) ¶ 16.

## The Resident Physician Agreement

41.     Physicians accepted into GW SMHS residency training programs sign a Resident Physician Agreement ("Resident Agreement") regarding their appointment for training. **Exh. A** (Catapano Decl.) ¶ 33.

42.     Dr. Waggel's signed a Resident Agreement for her first year beginning July 1, 2014, and her second year beginning July 1, 2015.  **Exh. A** (Catapano Decl.), Exhibit 3 (GWU 000620 – 000625) and Exhibit 4 (GWU 000614 – 000619).

43.     Under the Resident Agreement, residents are notified that the Resident Manual "provides detailed information about the benefits and obligations of Resident Physicians who participate in the Program" and notes that the manual is posted to the GW SMHS GME website (giving the link to the website) and also notes that the GME Policies are posted to the GME website (again noting the link). **Exh. A** (Catapano Decl.) ¶ 35.

44.     The Resident Agreement further incorporates the policies, terms and conditions of the Resident Manual into the agreement with which the resident further agrees to abide. **Exh. A** (Catapano Decl.), Exhibit 3, p. 2 (GWU 000621) and Exhibit 4, p. 2 (GWU 000615).

45.     The Resident Agreement further sets forth the resident physician's obligations including a requirement that the resident "use his/her best efforts, judgment and diligence in fulfilling the duties, tasks, responsibilities and any other clinical and educational requirements . . . in a professional and appropriate manner . . . ." and further states that the resident "acknowledges that a failure to fulfill such requirements may result in disciplinary action, including but not limited to termination, as outlined in the Resident Manual. **Exh. A** (Catapano Decl.), Exhibit 3, p. 3 (GWU 000622) and Exhibit 4, p. 3 (GWU 000616).

46.     The Resident Agreement further requires the resident to "comply with duty hour requirements of the . . . . (ACGME) . . ." and "with reporting duty hours as required by the program and/or the GME Office." **Exh. A** (Catapano Decl.), Exhibit 3, pp. 3-4 (GWU 000622 – 000623) and Exhibit 4, p. 4 (GWU 000617).

47.     The Resident Agreement further states that the resident "shall obtain medical clearance from a physician prior to participating in any clinical activities . . . ." **Exh. A** (Catapano Decl.), Exhibit 3, p. 4 (GWU 000623) and Exhibit 4, p. 4 (GWU 000617).

48.     The Resident Agreement further provides that GW SMHS may terminate the agreement and the resident physician's appointment for the following reasons: "(a) upon the failure of the Resident Physician to comply with any of the terms and conditions of this Agreement . . . or (c) as the result of disciplinary action conducted pursuant to the Resident Manual. Resident Physician shall have no right to cure any violations of this Agreement." **Exh. A** (Catapano Decl.), Exhibit 3, p. 5 (GWU 000624) and Exhibit 4, p. 5 (GWU 000618).

## The Resident Manual

49.     As noted herein, a copy of the Resident Manual was incorporated into the Resident Agreements signed by Dr. Waggel. **Exh. A** (Catapano Decl.) ¶ 40.

50.     Relevant portions of the Resident Manual are included with **Exhibit A** hereto, (Catapano Decl.), as Exhibit 5 (GWU 000070 – 000117) dated July 1, 2014, and Exhibit 6 (GWU 000143 – 000190), dated July 1, 2015.

51.     The Resident Manual sets forth the obligations of each resident physician stating in relevant part that each physician is required:

- **Clinical and Educational Requirements.** To use his/her best efforts, judgment and diligence in fulfilling the duties, tasks, responsibilities and any other clinical and educational requirements, of whatever nature, in a professional and appropriate manner, as assigned to the Resident

Physician during the duration of the Program. **Exh. A** (Catapano Decl.), Exhibit 5, p. 4 (GWU 000077) and Exhibit 6, p. 4 (GWU 000150).

- **Policies and Procedures.** To comply with all policies and procedures set forth in the Manual, as well as the policies and procedures of all hospitals or facilities at which he or she rotates. <u>Id.</u>

- **Duty Hours.** To comply with duty hour requirements of the Accreditation Council for Graduate Medical Education (ACGME) and in accordance with the institutional policy outlined in the Manual. Resident Physician shall comply with reporting duty hours as required by the program director and/or the GME Office. **Exh. A** (Catapano Decl.), Exhibit 5, p. 5 (GWU 00007) and Exhibit 6, p. 5 (GWU 000151).

- **Dress code.** To comply with the dress code set forth in the Manual. <u>Id.</u>

52.     The Manual further reiterates that "[A]ll residents and programs must comply with the ACGME duty hour requirements as outlined in the policy of Resident Duty Hours and Work Environment in Section IX.," Exhibit 5, p. 13 (GWU 000086); Exhibit 6, p. 13 (GWU 000159), and notes that "[A] Duty Hour Hotline has been established for anonymous reporting of resident duty hour violations. The hotline number is 202-994-9760." <u>Id.</u>

53.     The Manual sets forth the requirement for residents to obtain medical clearance before performing any clinical duties and states: "We must be strict about compliance with this regulation in order to comply with D.C. law. It is the responsibility of each Resident to ensure that this medical clearance is completed within the requisite timeframes." **Exh. A** (Catapano Decl.), Exhibit 5, p. 19 (GWU 000092) and Exhibit 6, p. 19 (GWU 000165).

54.     The Manual further sets forth the employment benefits program, Exhibit 5, pp. 28 - 31 (GWU 000101 – 104); Exhibit 6, pp. 29 - 32 (GWU 000175 – 178), including a "Confidential Counseling" service as follows:

> This no-cost counseling service helps you address stress, relationship and other personal issues you and your family may face. It is staffed by highly trained master's and doctoral level clinicians who will listen to your concerns and quickly refer you to in-person counseling and other resources for stress, anxiety and depression, relationship/marital conflicts, problems with children, job pressures, grief and loss, and substance abuse.
>
> \*   \*   \*
>
> Take advantage of these programs and much more by calling toll-free 855-705-2471 or visiting http://hr.gwu.edu/colonial-community.

**Exh. A** (Catapano Decl.), Exhibit 5, p. 29 (GWU 000102) and Exhibit 6, p. 30 (GWU 000176).

55.     The Manual sets forth in detail the policies governing leave, including but not limited to, sick leave, family and medical leave, temporary disability leave, and leave of absence. **Exh. A** (Catapano Decl.), Exhibit 5, pp. 32 - 33 (GWU 000105 – 106) and Exhibit 6, p. 4 (GWU 000150).

56.     The Manual further notes that temporary disability leave or other extended leave may place a resident "out of cycle in completing the requirements of the training program" and that funding for such residents must be made in advance of the academic year in which the time will be made up. **Exh. A** (Catapano Decl.), Exhibit 5, p. 37 (GWU 000110) and Exhibit 6, p. 37 (GWU 000184).

57.     The Manual further sets forth the policy as to persons with a disability per the GW Office of Equal Employment Opportunity  (the "EEO Office") including the following:

> **Residents Requesting an Accommodation**
> The George Washington University's commitment to equal employment opportunity and affirmative action includes a commitment to provide reasonable accommodations for residents' religious obligations and for residents who are qualified individuals with disabilities pursuant to the Americans with Disabilities Act. Should a resident need an accommodation, he or she should contact the Office of Equal Employment Opportunity at (202) 994-9656 or fax (202) 994-9658. All requests for accommodations are kept in confidence to the extent feasible by law and practice.

13

**Exh. A** (Catapano Decl.) ¶ 47; <u>see also</u> Exhibit 5 thereto, p. 43 (GWU 000116) and Exhibit 6 thereto, p. 43 (GWU 000190). The 2015 Manual substituted an email link (<u>eeo@gwu.edu</u>) for the fax telephone number. <u>Id.</u>

58.     Reasonable accommodation under the Americans with Disabilities Act (the "ADA") encompasses a wide variety of things such as equipment modifications, job duty restructuring, work site modification, or reassignment. Modification of employee work schedule and flexible leave is also available as an accommodation under the ADA. Under the ADA an employee may be provided flexible leave in instances where an employee with a qualifying disability requires periodic time off for medical treatment. <u>See</u> **Exhibit P**, Declaration of Vickie Fair, ¶ 4.

<u>**Residency Training Program Policies and Procedures**</u>

59.     The University Policy on Equal Opportunity protects all faculty, staff and students against unlawful discrimination on a number of grounds, including disability. **Exh. A** (Catapano Decl.), Exhibit 7 (GWU 000366 - 000368).

60.     The policy specifically notes that "[T]o request disability accommodations, students should contact the Office of Disability . . . . Employees and other members of the university community should contact the Office of Equal Employment Opportunity and Affirmative Action at (202) 994-9656 or <u>eeo@gwu.edu</u>." **Exh. A** (Catapano Decl.), Exhibit 7, p. 2 (GWU 000367).

61.     The University Disabilities Policy notes that in accordance with the ADA, Section 504 of the Rehabilitation Act, and other applicable federal, state, and local laws, and as articulated in the University's Equal Opportunity Statement, the University does not discriminate

against any qualified individuals with a disability. **Exh. A** (Catapano Decl.), Exhibit 8, p. 2 (GWU 000067 – 000069).

62.     The policy further specifically directs any faculty or staff seeking additional information, "including a request for a reasonable accommodation on the basis of disability," to "refer to the Department of Equal Employment Opportunity website at http://hr.gwu.edu/eeo-statement, or contact EEO at (202) 994-9656." Id.

63.     There are three ways that an employee at GW can request an accommodation: (1) Directly apply through the GW EEO website, (2) referral from the Human Resources Office of the employee's department, or (3) referral from the University's Benefits Administration department in the event that the employee is ineligible for or has exhausted FMLA leave. The directions for requesting an accommodation under the ADA are located on the EEO Office homepage. The EEO Office homepage is easily accessible from the GW Faculty and Staff homepage. **Exh. P** (Fair Decl.) ¶ 5.

64.     The major function of the EEO Office is the handling of all requests for reasonable accommodation under the ADA for all University employees and faculty. **Exh. P** (Fair Decl.) ¶ 3.

65.     Once an employee has applied for an accommodation directly or has been referred through one of the Human Resources departments, the EEO Office handles the processing and granting of that request. The employee's supervisors, managers, and/or departmental Human Resources directors are not responsible for the decision to grant or deny requested accommodations. Once the EEO Office has determined that an employee has a qualifying disability requiring accommodation, it works with the employee's department to facilitate whatever accommodation has been requested. **Exh. P** (Fair Decl.) ¶ 6.

66.     The GW Psychiatry Residency Program Policy on Resident Time Off and Leave sets forth the terms and conditions for vacation, sick leave, educational/meeting leave, and personal/family leave. **Exh. A** (Catapano Decl.), Exhibit 9 (GWU 000413 – 000419).

67.     The policy states with particularity the requirements for notification for absence on a regular work day, a didactic day, or a call day/night shift. **Exh. A** (Catapano Decl.), Exhibit 9, p. 3 (GWU 00415).

68.     The policy further specifically advises with respect to personal/family leave, that regardless of the length of leave involving missed call, i.e., clinical service and training, all such time "must be made up in the course of the academic year to assure that the education provided by on-call experience is not compromised." **Exh. A** (Catapano Decl.), Exhibit 9, p. 4 (GWU 000416).

69.     The leave policy further notifies residents that "[T]ime away from the residency program for extended vacation leave, extended sick leave, FMLA, disability or any other reason may result in a resident having to spend additional time in the program beyond the anticipated date of completion. RRC [Residency Review Committee] and medical board requirements must be met before a resident can be certified as having completed a training program." **Exh. A** (Catapano Decl.), Exhibit 9, p. 5 (GWU 000417).

70.     The Resident Dismissal/Non-Renewal Policy grants the authority to the Program Director consistent with the Academic Improvement Policy and the Resident Misconduct Policy to dismiss a resident or not renew a resident's contract prior to completion of training. **Exh. A** (Catapano Decl.), Exhibit 10 (GWU 000441 – 000442).

71.     The policy states that "[T]he program director may elect to dismiss a Resident or not renew the Resident's contract prior to completion of training due to: a. Failure to

satisfactorily cure academic deficiencies, b. Misconduct, c. Failure to comply with any of the terms and conditions of the Resident contract, GME policies, or code of conduct" and sets forth the procedural and notice requirements for dismissal or non-renewal. **Exh. A** (Catapano Decl.), Exhibit 10, p. 2 (GWU 000442).

72.    The Resident Promotion Policy provides that "the decision to promote a Resident to the next level of post-graduate training will be the decision of the residency program director after review of the respective criteria outlined in the residency program's policy on Resident promotion." **Exh. A** (Catapano Decl.), Exhibit 11, p. 2 (GWU 00507 – 000508).

73.    The policy notes that the decision not to promote a resident "must be made in compliance with the GMEC institutional policy for Academic Improvement" and sets forth the procedure to be followed and the resident's due process rights. Id.

74.    The GME Academic Improvement Policy notes that residents should be provided routine feedback, including "verbal feedback, rotational evaluations, summative evaluations, and recommendations of a program's Clinical Competency Committee." **Exh. A** (Catapano Decl.), Exhibit 12, p. 2 (GWU 000446 – 000451).

75.    The policy provides for issuance of a "Letter of Deficiency" ("LOD") where routine structured feedback "is not resulting in a necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback . . . ." Id.

76.    The purpose of an LOD is that it "provides the Resident with (a) notice of the deficiency and (b) an opportunity to cure the deficiency." Id.

77.    The issuance of an LOD "does not trigger a report to any outside agencies such as credentialing organizations, hospitals, or licensing boards . . . ." and if the resident "satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of

unacceptable academic performance should not affect the Resident's progress in the program."

Id.

78.     If, however, a resident "fails to satisfactorily cure the deficiency and/or improve his/her overall performance to an acceptable level, the Program Director may elect to take further action" consisting of a range of responses including non-promotion to the next PGY [post-graduate year] level, repetition of a rotation, extension of the defined training period, denial or credit for previous rotations, and dismissal from the residency program. **Exh. A** (Catapano Decl.), Exhibit 12, p. 3 (GWU 000448).

79.     The Academic Improvement Policy further sets forth the procedures to be followed and the rights of review available to the resident in the event the Program Director decides that a "reportable action" is to be taken, i.e., non-promotion to the next PGY level, extension of the resident's contract or training period, denial of credit for a previously completed rotation, and/or termination of the resident's participation in the Program. Id.

80.     The Resident Misconduct Policy describes the behaviors constituting misconduct and sets forth the procedure to be followed, and the resident's due process rights, if an allegation of misconduct is made. Examples of misconduct include dishonesty and abusive or disruptive behavior. **Exh. A** (Catapano Decl.), Exhibit 13, p. 2 (GWU 000452 – 00456).

81.     The Policy on Medical Clearance notes that under District of Columbia law each individual involved in direct patient care "must have an occupational health clearance prior to the starting date of clinical care, and then annually thereafter." **Exh. A** (Catapano Decl.), Exhibit 14, p. 1 (GWU 000474 – 000476).

82. The policy specifically instructs that "[I]t is the responsibility of each Resident to ensure that this health clearance is completed within the requisite timeframe" and then further provides:

> *New Residents who do not have their health clearance completed will not be permitted to begin their training program. All returning Residents are required to renew their health clearance annually. All returning Residents must complete the requisite annual health clearance at the GWUH Occupational Health Office by* **August 31** *of the academic year or they will be suspended from clinical duties until medical clearance is obtained.*

Id. (original emphasis).

83. The Code of Conduct in the Learning Environment (the "Code") states that all members of the academic medical community are "committed to promoting and maintaining the highest standards of behavior in order to provide a healthy and safe learning environment and to better serve society." **Exh. A** (Catapano Decl.), Exhibit 15 (GWU 000429 – 000433).

84. The Code sets forth norms "intended to serve as guidelines for conduct for this community" and states that failure to adhere to them "may result in disciplinary action under applicable institutional policies." **Exh. A** (Catapano Decl.), Exhibit 15, p. 1.

85. The first three norms set forth in the Code, each of which Plaintiff violated during her tenure in the Program, are:

1. HONESTY

Honesty and integrity will be practiced by GW Professionals during all aspects of educational, research and clinical activities. GW Professionals will conduct themselves in an ethical and courteous manner.

2. PROMISE-KEEPING

Promise-keeping requires GW Professionals to fulfill commitments made at the beginning of any educational, research, and clinical activities. This includes attending required learning sessions, arriving on time, dressing appropriately and completing assigned tasks.

3.    RESPECT FOR INSTITUTION, PROFESSION,
AND PATIENTS

• In order to foster an environment of civility, GW Professionals will approach the educational, research, and clinical environments with mutual respect and respect for patients. This includes respect for race, religion, sexual orientation, disability, gender, age marital status cultural difference, political convictions and roles with the institution.

• It is expected that GW Professionals will show respect and common courtesy for each other and patients in an environment free from harassment and discrimination, exploitation, verbal abuse, physical violence and intimidation in any form.

• GW Professionals will strive to create a culture of safety and are committed to implementing changes that will promote a safe environment for patients and GW Professionals.

**Exh. A** (Catapano Decl.), Exhibit 15, p. 2.

86.    In the Appendix to the Code, examples of "inappropriate" behavior are listed and include, as to those violated by Plaintiff during her tenure in the Program, the following:

• Making belittling or berating statements
• Name calling
• Using profanity or disrespectful language
• Making degrading or demeaning comments regarding patients and their families, hospital personnel, other health professionals, other health professions and discipline specialties and/or the hospital
• Making threats of retribution
• Failing to return phone call, pages, or other messages
• Being unavailable while on call or on duty without arranging for appropriate coverage
• Being under the influence of alcohol or drugs or being otherwise unfit for participation in inpatient/client care, at work, or on call.

Id. at p. 4 (GWU 000432).

87.    The Dress Code Policy for Residents states that "[P]ersonal appearance is an important component of professional demeanor. Each resident shall be expected to dress in a manner which conveys a professional image and inspires confidence in patients and colleagues."

**Exh. A** (Catapano Decl.), Exhibit 16 (GWU 000443).

20

88.     The policy notes that the GW medical community and affiliated institutions "provide clinical service to a multi-cultural patient population, where clothing choices may convey different meanings for different populations." Id.

89.     The policy sets forth "Specific Standards" including a statement that "[J]eans, sport shirts, tee shirts, excessively short skirts . . . are inconsistent with a professional image." Id.

90.     The Social Media and Email Policy for School of Medicine and Health Sciences notes that there is widespread use of social media by faculty, residents, students and staff and a right to use them "as a medium of self-expression." **Exh. A** (Catapano Decl.), Exhibit 17, p. 1 (GWU 000523 – 000527).

91.     The policy further states, however, that "SMHS wishes to ensure that you understand that you may be held accountable personally for your electronic statements and representations." Id.

92.     The policy advises that individuals "are solely responsible for what you email or post online," id. at p. 2 (GWU 000524), and provides specific guidelines with which "faculty, residents, students, and staff must comply" when engaged in social media or other online activity including:

> 6.  Do not defame or otherwise discredit the products or services of GW, its physicians, affiliates or vendors.

**Exh. A** (Catapano Decl.), Exhibit 17, p. 3.

93.     The policy further notes that [S]uspected violations of this Policy may be subject to disciplinary action." **Exh. A** (Catapano Decl.), Exhibit 17, p. 5 (GWU 000527).

## Dr. Waggel's Tenure in the Program

94.     Dr. Waggel entered training in the GW Psychiatry Residency Training Program on July 1, 2014. **Exh. A** (Catapano Decl.) ¶ 94.

95.     Despite being informed of the requirement to obtain a medical clearance before beginning clinical duties on that day, however, Dr. Waggel failed to obtain the necessary clearance. **Exh. A** (Catapano Decl.) ¶ 96.

96.     As a result, she was removed from clinical duty on July 3, 2014. **Exh. A** (Catapano Decl.) ¶ 97; <u>see also</u> Exhibit 18 thereto (GWU 0003419), Email dated July 3, 2014 at 8:42 a.m., Dr. Eindra Khin Khin to Mary Tucker.

97.     Dr. Waggel could not return to her clinical training until sometime after July 9, 2014, when she submitted TB test results to complete the processing of her medical clearance. Exh. A (Catapano Decl.) ¶ 98; <u>see also</u> Exhibit 19 thereto (GWU 003456), Email dated July 9, 2014 at 3:52 p.m., Dr. Waggel to Dr. Greene.

98.     Issues with Dr. Waggel's performance surfaced within her very first rotation in the Program in July 2014. In a report to Department faculty member, Dr. Lorenzo Norris, another Chief Resident, Stephanie H. Cho, M.D. reported that while she had some general concerns about the intern class, she had the following detailed specific concerns about Dr. Waggel:

- o Major lack of awareness of level of own abilities
- o Significant resistance to feedback and shows little improvement following constructive criticism
- o Significant deficits in Patient care:
- o Fails to recognize severity of threat to patient safety with specific errors
  - ▪ Pt was to be given >50 units Lantus due to out of control blood sugars, but home oral diabetic medications had not been ordered (as had been communicated and written in signout)
  - ▪ Fails to complete orders/documentation prior to leaving work and does not ensure that it will be done by someone else
- o Does not foster productive collaboration in team environment
- o Demonstrates frequent unprofessional behaviors:
- o Cites specific residents as more enjoyable to work with compared to other specific residents

22

    o   Does not take responsibility for errors/near misses that are significant safety patient issues

    o   When asked to help or to complete some patient care task (ie, prescriptions for a planned discharge) expresses open displeasure

    o   Is openly disrespectful to other team members

        ▪   *Told staff to "think really hard" and "really try to not ask stupid questions" (I told Shemika I would let you know about this. Though Shemika thought it was funny, I think it is completely inappropriate even in jest.)*

**Exh. A** (Catapano Decl.), Exhibit 20 (GWU 000164 – 000165), Email dated July 31, 2014 at 11:29 p.m., Dr. Cho to Dr. Norris.

99.    In clear violation of Program policy, Dr. Waggel failed to report for duty on Monday, December 15, 2014, and failed to notify the attending physician, Aditi Malik, M.D. **Exh. A** (Catapano Decl.) ¶ 100; see also Exhibit 21 thereto (GWU 003420 – 003421), Email dated December 23, 2014 at 10:44 a.m., Ms. Crawford to Dr. Crone et al. and related emails.

100.    The problems identified by Dr. Cho during Dr. Waggel's first rotation in July 2014 continued. **Exh. A** (Catapano Decl.) ¶ 101.

101.    Dr. Waggel's attending physician for her rotation in November – December at INOVA Fairfax Hospital, Aditi Malik, M.D., contacted Chief Resident Elizabeth L. Greene, M.D., in late December to share the following concerns about Dr. Waggel's performance on the rotation:

    o   [Dr. Waggel] shows a lack of motivation, initiative, and interest in the care of her patients.

    o   She has been seen using her phone during meetings or conversations with patients and staff.

    o   She has been caught rolling her eyes during meetings or conversations with patients and staff.

    o   She comes to work wearing provocative clothing, such as tight pants. This has made staff uncomfortable to the point that they have had to ask you [Dr. Malik] to talk to Dr. Waggle about it.

    o   She sits in the resident room and doesn't check in with you for rounds or meetings. There is a lack of communication from Stephanie, so that you've felt the need to track her down to see what she's doing.

      o     She shows up late daily.
      o     She leaves a note at the nurses' station with patient assignments, as if she were the attending.
      o     She walks out of meetings without permission.

**Exh. A** (Catapano Decl.) ¶ 103; <u>see also</u> Exhibit 22 thereto (GWU 03426 – 003427), Emails dated January 2, 2015 at 11:51 a.m., Dr. Levine on behalf of Dr. Greene to Dr. Aditi, and dated January 16, 2015 at 1:00 p.m., Dr. Aditi to Dr. Greene (cc's to Dr. Khin Khin, Dr. Catapano, Ms. Anderson).

102.     In her response, Dr. Malik noted that Dr. Cynthia L. Gauss was "having the exact same issues with [Dr. Waggel] at this time" and stated further that "[Dr. Waggel's] outpatient supervisor Dr. [Cynthia G.] Cohen has also expressed concern to Dr. Gauss." <u>Id.</u>

103.     There were also favorable reports on Dr. Waggel from some of the attendings with whom she interacted during the INOVA Fairfax rotation, such as the Neurology Chief, Dr. Alissa Romano, and Dr. Saeed Alqahtani, Vascular Neurology. **Exh. A** (Catapano Decl.) ¶ 104.

104.     Dr. Alqahtani stated, "I worked with her, she is very hard worker, team player, and taking care of her patients." **Exh. A**. (Catapano Decl.) ¶ 105; <u>see also</u> Exhibit 23 thereto (GWU 001649), Email dated January 6, 2015 at 1:57 p.m., Dr. Alqahtani to Dr. Greene.

105.     Dr. Romano commented "on record, prompt, no problem with her work." **Exh. A** (Catapano Decl.) ¶ 106; <u>see also</u> Exhibit 24 thereto (GWU 003422), Email dated January 6, 2015 at 8:33 p.m., Dr. Romano to Dr. Greene.

106.     In a further conversation with Dr. Greene, however, Dr. Romano reported the following regarding Dr. Waggel:

- Great, excellent in terms of her clinical work with patients.
- On time to work.
- Did her work.
- At times, she was "too comfortable." [Dr. Romano] gave me 2 examples of this:

1. [Dr. Waggel] came to a party that was explicitly a "Neurology only" party.
2. [Dr. Waggel] asked a Neurology attending to teach her how to Instagram.

**Exh. A**. (Catapano Decl.) ¶ 107; <u>see also</u> Exhibit 25 thereto (GWU 001648), Email dated January 13, 2015 at 5:16 p.m., Dr. Levine on behalf of Dr. Greene to Dr. Khin Khin, Dr. Catapano, Ms. Anderson.

107. On Monday, March 2, 2015, Dr. Waggel started a rotation on the Internal Medicine Unit (the "Green Team"). **Exh. A**. (Catapano Decl.) ¶ 109.

108. On Tuesday, March 3, 2015, Gary L. Little, M.D., Medical Director, George Washington University Hospital, emailed to James M. Gehring, M.D., Internal Medicine supervising attending for the Green Team, raising concerns about patient care and safety issues on the March 2 night shift including, among others, coordination between the Green Team and the ER, failure to carry out clinically significant orders, and inappropriate and unprofessional communication. **Exh. A**. (Catapano Decl.) ¶ 110; <u>see also</u> Exhibit 26 thereto (GWU 003461), Email dated March 3, 2015 at 6:39 p.m., Dr. Little to Dr. Gehring.

109. The email specifically noted: "Staphanie [sic] Waggel, MD placed an order for PO Tylenol which clearly would not help a patient who needed a Dilaudid PCA. Multiple return phone calls were unanswered." **Exh. A.** (Catapano Decl.) ¶ 111; <u>see also</u> Exhibit 26 thereto.

110. Dr. Little's email further noted several complaints including one which involved Dr. Waggel "giving nurses information on the phone that clearly wasn't true ('medicine doesn't come to the ED')" and others involving her "being disrespectful, lack of responsiveness, etc." **Exh. A** (Catapano Decl.) ¶ 119; <u>see also</u> Exhibit 28 thereto, pp. 1 – 2 (GWU 000957 – 000958).

111.    Dr. Gehring asked Jason M. Prior, M.D., another IM attending who was on duty during the night shift on March 2 to help look into the matter, and Dr. Prior subsequently reported to Dr. Little and to Dr. Gehring as follows:

>   A couple of things were likely coming into play. First, the team was getting absolutely crushed and at one point was up to 30 patients while discharging another 6. Obviously that doesn't excuse any lack of response from anyone on the team but they were definitely just trying to stay afloat with a lot of sick people.
>
>   A larger part of the issue likely had to do with a brand new psychiatry intern (Dr. Waggel noted below) who's first day on medicine was Monday. It became quickly apparent that she was not at the level one would anticipate of an intern in March and I already pulled the residents aside on Tuesday and asked them to essentially treat her as an A1. She has a very odd affect, I've already had to diffuse some patient complaints and her medical knowledge is pretty poor. With time and education she may get there but for right now I'll also ask the residents to not let her have sole control of the RF phone either. I think beyond her lack of knowledge, she just doesn't know the details of medicine. The combination of it being her first day, extremely busy and a bit odd with all of her interactions with people probably didn't help.
>
>                        *   *   *
>
>   Please let me know if I can help any further. We're already trying to institute some performance plans for Stephanie to try to het her up to speed on medicine.

**Exh. A** (Catapano Decl.) ¶ 113; <u>see also</u> Exhibit 27 thereto (GWU 003460), Email dated March 4, 2015 at 3:20 p.m., Dr. Prior to Dr. Gehring, Dr. Little.

112.    Dr. Prior's efforts at improving Dr. Waggel's performance were unsuccessful, however. On Friday, March 6, 2015, the end of Dr. Waggel's first week on the Internal Medicine rotation, Dr. Prior reported to Jillian S. Catalanotti, M.D., Program Director for the Internal Medicine Residency Training Program, and others, to say:

> I'm writing to everyone because the current situation on green team cannot safely continue, in my opinion. The current construct of the team started Monday 3/2. Since that time, I've fielded complaints form patients, nursing, consulting services, the ED and received an email from Gary Little regarding issues with the team. I know many of you have already received some of these complaints as well. I've spoke to the residents and the primary offending intern in question all week but last night was the last straw. It's gone beyond personal interactions and a lack of knowledge and affected patient safety. Fortunately, nothing happened, but I wanted to alert everyone to the issues, outline some performance plans I've put in place on the team as well as strategize how to possibly move forward.

**Exh. A.** (Catapano Decl.) ¶¶ 114 – 115; <u>see also</u> Exhibit 28 thereto (GWU 000957 – 000959), Email dated Friday, March 6, 2015 at 1:42 p.m., Dr. Prior to Dr. Catalanotti (cc: Dr. Gehring, Dr. Fiser, Dr. Zweig, Ms. Anderson, Dr. Mehta).

113.    Dr. Prior's email (nearly three pages of single-space text) recounted a series of events regarding Dr. Waggel, documenting in detail serious deficiencies in professionalism, interactions with nursing and consulting services, medical knowledge, and patient safety. **Exh. A** (Catapano Decl.) ¶ 116.

114.    On the first day of the rotation, Dr. Prior fielded complaints from nursing and patients regarding Dr. Waggel's interactions with them and "patients were upset stating she didn't know what she was talking about." **Exh. A** (Catapano Decl.), Exhibit 28, p. 1 (GWU 000957 – 000959).

115.    On the second day, it became apparent that Dr. Waggel "had a hard time evaluating patients, presenting, knowing what medications did, etc. She didn't know the basics of medicine." <u>Id.</u>

116.    On Wednesday, Dr. Prior received the aforementioned email from Dr. Little. **Exh. A** (Catapano Decl.) ¶ 119.

117.    Thursday was initially uneventful, but at 5:00 p.m., several incidents occurred involving potentially disastrous outcomes for patients as to which it was clear Dr. Waggel was totally ignorant as to the medical issues. **Exh. A** (Catapano Decl.) ¶ 120; see also Exhibit 28 thereto, p. 2.

118.    Dr. Prior continued in the March 6 email to set forth remediation and safety plans he had implemented immediately to address Dr. Waggel's deficiencies and proposed other alternatives to try to assure both ongoing training for Dr. Waggel and patient safety. **Exh. A** (Catapano Decl.), Exhibit 28, p. 2.

119.    The final option Dr. Prior presented was to "[C]onsider removing Stephanie from medicine and have her complete her medicine months at a later date, to be determined based on re-evaluation." Id.

120.    Dr. Prior concluded the email stating, "I'm happy to discuss this further with anyone. I want [Dr. Waggel] to learn and experience medicine as part of her psychiatry curriculum while ensuring the safety and care of patients." **Exh. A** (Catapano Decl.), Exhibit 28, p. 3.

121.    On Friday night, Assistant Program Director, Dr. Eindra Khin Khin, spoke with Dr. Waggel regarding the concerns on the Green Team. **Exh. A** (Catapano Decl.) ¶ 127.

122.    Dr. Khin Khin reported that "[I]nterestingly enough, [Dr. Waggel] had no idea there were concerns." **Exh. A** (Catapano Decl.) ¶ 129; see also Exhibit 31 thereto (GWU 001639), Email dated Sunday, March 8, 2015 at 10:28 a.m.

123.    Dr. Khin Khin summarized Dr. Waggel's comments as follows:

    1)  The residents on the team have "gone out of their way" to tell her
        that she has been doing a great job.

> 2) From the conversation with the attending, Dr. Prior, the main point she took was that he told her she could ask for help whenever she needs it from the team and himself.

**Exh. A** (Catapano Decl.), Exhibit 31.

124. Dr. Khin Khin further reported that when she told Dr. Waggel the concerns that the attending (Dr. Prior) had laid out briefly, "[Dr. Waggel] was completely in shock." Id.

125. Dr. Khin Khin then discussed the issues of Dr. Waggel not being self-aware, the need to assist her to work on fixing the problem, other structural aspects of the Program that might have contributed to Dr. Waggel's problems, and then proposed to bring Dr. Waggel in early the following week to address these matters in a timely manner. Id.

126. Dr. Khin Khin closed the email with the observation:

> Solution-wise, the option of pulling her from medicine service is quite premature to me. Especially if she doesn't even have any idea that she is underperforming that much. I think the first step is coming up with a remediation-like plan to help her improve (reading, oversight, etc). Stephanie not doing medicine is not going to make her become better at medicine.

Id.

127. On Sunday, March 8, 2015, Dr. Catalanotti wrote to Dr. Khin Khin concerning Dr. Waggel noting that she was "concerned about the professionalism deficits [Dr. Prior] has mentioned" and suggesting that a "serious conversation about professionalism should come from her own program directors" and inquiring if this were something Dr. Catapano and Dr. Khin Khin could do. **Exh. A** (Catapano Decl.) ¶ 135; see also Exhibit 33 thereto (GWU 1595), Email dated Sunday, March 8, 2015 at 11:13 p.m.

128. Dr. Catapano and Dr. Khin Khin met with Dr. Waggel on Monday, March 9, 2015, to further review Dr. Prior's concerns and his plan of remediation to allow Dr. Waggel to continue training while still ensuring patient safety. **Exh. A** (Catapano Decl.) ¶ 136.

129.    Dr. Catapano reported back to Dr. Catalanotti about the meeting, noting that Dr. Waggel had generally received positive evaluations through the rotations up to that point, but Dr. Catapano had received vague negative feedback about her through other means. **Exh. A** (Catapano Decl.) ¶ 138; <u>see also</u> Exhibit 34 thereto (GWU 001630), Email dated March 9, 2015 at 4:06 p.m., Dr. Catapano to Dr. Catalanotti.

130.    Dr. Catapano went on to note that Dr. Waggel reported getting "nothing but positive feedback from her team and attendings, including in the current instance, where she states that the senior residents of her team have told her she is functioning on-par, and she did not receive any negative feedback from Dr. Prior." **Exh. A** (Catapano Decl.), Exhibit 34 thereto.

131.    She also noted that Dr. Waggel's lack of insight into issues might be the result of "indirect or vague" criticism which she "misses" and that people generally "like [Dr. Waggel] and are reluctant to give her hard feedback." <u>Id.</u>

132.    Dr. Catapano went on to state that she believed the best course of action would be for Dr. Waggel "to stay on the team, get concrete feedback and explicit goals, and see how she is able to respond to that" and that she would be meeting regularly with Dr. Waggel in the coming weeks to keep an eye on her. **Exh. A** (Catapano Decl.) ¶¶ 143 – 144; <u>see also</u> Exhibit 34 thereto. Dr. Catalanotti responded stating that she would pass this information on to the oncoming new attending, Nupur Mehta, M.D., "so he knows to be very concrete with [Dr. Waggel] and to contact you with any concerns about her hearing feedback." **Exh. A** (Catapano Decl.) ¶ 147; <u>see also</u> Exhibit 35 thereto (GWU 001611), Email dated March 9, 2015 at 6:35 p.m., Dr. Catalanotti to Dr. Catapano, Dr. Khin Khin.

133.    Approximately a week later Dr. Catapano emailed Dr. Catalanotti to inquire about Dr. Waggel's progress on the rotation. **Exh. A** (Catapano Decl.) ¶ 148; <u>see also</u> Exhibit 36

thereto (GWU 001593), Email dated March 17, 2015 at 12:35 p.m., Dr. Catapano to Dr. Catalanotti.

134.    Dr. Catalanotti responded by cc'ing Dr. Mehta who then responded by email stating that "[W]e have a good remediation plan in place and things are fairly stable." He also said that he had been providing Dr. Waggel direct feedback 1-2 times per week. **Exh. A** (Catapano Decl.) ¶¶ 149 – 150; <u>see also</u> Exhibit 37 thereto (GWU 001592 – 001593), Email dated March 19, 2015 at 12:36 p.m., Dr. Mehta to Dr. Catalanotti (cc: Dr. Catapano).

135.    Dr. Mehta noted, however, that he continued "to be worried about her ability to function autonomously, especially with complicated medical patients." **Exh. A** (Catapano Decl.), Exhibit 37 thereto, p. 1.

136.    Dr. Mehta also stated there were matters of "ongoing concern" that he asked Drs. Catalanotti and Catapano not to share with Dr. Waggel as he would do so directly, including:

> 1)  she makes questionable decisions (choice of antibiotics, route)
> 2)  her documentation is spotty and often inaccurate (e.g., carrying over previous plans from many days ago
> 3)  she lacks attention to detail (does not order follow-up tests/labs when instructed)
> 4)  she is at times very defensive and passive-aggressive. While then latter is understandable as I feel she is trying hard and wants to improve, she can respond to feedback in a more mature way.

<u>Id.</u> at pp. 1 – 2.

137.    By email about two hours later, Dr. Waggel responded to an email from Dr. Khin Khin that morning requesting a meeting within the next day or so. In the email, Dr. Waggel said that she could meet the next day and reported: "The past two weeks have been much better. Dr. Mehta said that I am much different than the email [Dr. Prior's email report of Friday March 6, 2015 at 1:42 p.m. to Dr. Catalanotti et al.] portrayed me to be. He said that if I continue this way he will let everyone know that I am not as described in the email." **Exh. A** (Catapano Decl.) ¶

153; see also Exhibit 38 thereto (GWU 001617), Email dated March 19, 2015 at 2:28 p.m., Dr. Waggel to Dr. Khin Khin (cc: Dr. Catapano).

138.     Following Dr. Waggel's response to Dr. Khin Khin, Dr. Catapano reached back out to Dr. Mehta noting that "[M]y sense from [Dr. Waggel] is that she believes she's doing much better, and that sounds like it is true, but a pattern I have noticed with her is that she tends to be very 'all-or-nothing' in hearing feedback  . . . ." **Exh. A** (Catapano Decl.) ¶ 154; see also Exhibit 39 thereto (GWU 001609), Email dated March 20, 2015 at 8:16 a.m., Dr. Catapano to Dr. Mehta.

139.     Dr. Catapano also encouraged Dr. Mehta to be explicit in his feedback about his continued reservations. **Exh. A** (Catapano Decl.) ¶ 155.

140.     On March 26, 2015, Dr. Khin Khin had a follow-up meeting with Dr. Waggel who reported that she had met with Dr. Mehta on Friday, March 20, and that she had received the following feedback from Dr. Mehta:

1)  That she is fine and doing well.
2)  That the only thing [Dr. Mehta] recommended that she change/improve is that, when she puts in an order for I&Os, she should tell the nurse directly instead of putting it in the computer, as the computer order will disappear once a particular nurse views it and won't stay in the system.

**Exh. A** (Catapano Decl.) ¶ 157; see also Exhibit 40 thereto (GWU 001591 – 001592), Email dated March 30, 2015 at 5:35 p.m., Dr. Khin Khin to Dr. Catapano, Dr. Catalanotti, Dr. Mehta.

141.     Dr. Mehta responded to this email with surprise, stating "I must admit, I am very taken aback by this. Hard for me to believe she didn't catch the four things I listed, which I outlined to her very clearly." **Exh. A** (Catapano Decl.) ¶ 158; see also Exhibit 40 thereto, p. 1, Email dated March 30, 2015 at 7:50 p.m.

142.     Dr. Mehta went on to say that another Internal Medicine attending, Shant Ayanian, M.D., had also provider Dr. Waggel with "very direct feedback" the prior week, and speculated that verbal feedback might "not be the best way to provide her with constructive and actionable feedback." **Exh. A** (Catapano Decl.) ¶¶ 159 - 160; see also Exhibit 40 thereto, p. 1.

143.     Dr. Mehta concluded his reply by stating, "She's right in that she is doing better but frankly came from a very poor baseline. It's interesting to note that she is only hearing the positive aspects (i.e., the improvement), but is missing the significant gaps and tactical guidance I (and I'm sure [Dr. Ayanian]) provided her. Please stay tuned." **Exh. A** (Catapano Decl.) ¶ 161; see also Exhibit 40 thereto, p. 1

144.     On March 31, 2015, Dr. Mehta submitted a further report based on a conversation with Dr. Ayanian. He said that it appeared that while Dr. Waggel was not able to verbalize feedback, she was actually acting on what had been discussed and appeared to be significantly improved in her performance although her "main weakness continues to be medical fund of knowledge" as to which Dr. Ayanian thought she was also improving somewhat. **Exh. A** (Catapano Decl.) ¶ 162; see also Exhibit 41 thereto (GWU 001590), Email dated March 31, 2015 at 1:11 p.m., Dr. Mehta to Drs. Catapano, Khin Khin, and Catalanotti.

145.     On April 3, 2015, just days after the email from Dr. Mehta, Dr. Waggel reported to Drs. Catapano and Khin Khin on a meeting she had with Dr. Ayanian, stating:

> I just wanted to update you that I had feedback with my new attending Dr. Ayanian said [sic] he did not notice any deficits in my medical knowledge. His feedback was to be more confident. This is similar to the feedback from Dr. Mehta. Please let me know if/when you want to meet in the future.

**Exh. A** (Catapano Decl.) ¶ 164; see also Exhibit 42 thereto (GWU 001589), Email dated April 3, 2015 at 12:46 p.m.

33

146.    On April 13, 2015, Dr. Waggel was seen by Dr. Marc Shepard, M.D. for a complaint of left lower quadrant abdominal pain. See **Exhibit D**, MedStar Health Records (000005 – 000007).

147.    Dr. Shepard ordered "CT Scan Abdomen & Pelvis w/ and w/o Contrast." Id. at p. 000006.

148.    On April 14, 2015, Dr. Ayanian submitted a favorable report regarding Dr. Waggel's performance during the preceding three weeks to Dr. Mehta and Dr. Catapano. **Exh. A** (Catapano Decl.) ¶ 165.

149.    On April 15, 2015, Dr. Waggel presented to Washington Radiology Associates for the CT ordered by Dr. Shepard. The imaging revealed a "complex cystic lesion in the midportion of the left kidney measuring 1.5 cm." See **Exhibit E**, George Washington University Hospital Records (GWUH 000071 – 000072). A MRI was recommended for better evaluation. Id. at p. 000072.

150.    On April 24, 2015, Dr. Waggel presented to Washington Radiology Associates for the recommended "MRI Abdomen Without and With Contrast." **Exh. E**, George Washington University Hospital Records (GWUH 000073).

151.    The results of the imaging were:

1.  1.3 cm left renal mid pole mildly complex cyst classified as Bosniak type 2F. Short term follow-up by CT or MRI in 6 months is recommended.
2.  0.5 cm hepatic cyst.

Id.

152.    In late April or early May, 2015, Dr. Waggel's colleagues became aware that she was having difficulty on the Internal Medicine rotation apparently as a result of pain she was

having and was having some imaging studies done related to a kidney cyst that was being further worked up. **Exh. A** (Catapano Decl.) ¶ 166; <u>see also</u> **Exh. C** (Emejuru Decl.) ¶ 11.

153.    Dr. Waggel reportedly began discussing her workup and diagnosis with members of the Internal Medicine team and actually brought copies of her imaging to the hospital with a request that a resident or other physician review them for a second opinion. **Exh. A** (Catapano Decl.) ¶ 168.

154.    Dr. Waggel was seen by a urologic surgeon, Dr. Jason Engel, on May 1, 2015, with a chief complaint of "complex renal cyst." <u>See</u> **Exhibit F**, Urologic Surgeons of Washington Records (USOW 000001 – 000003).

155.    Dr. Engel noted her history as follows:

> Mr. [sic] Waggel is a 28-year-old woman who is apparently a doctor who will [sic] looking into being a psychiatrist. She was having some vague abdominal pain and Dr. Shepard obtained a CT scan which showed her to have a left sided mildly complex cyst. An MRI was asked for and gotten. It is only 1.3 cm. It is in the mid pole when I see it. It is read as Bosniak IIF. This type of cyst carries with it perhaps a risk of malignancy of 3% - 5%. There is separation in the middle.

<u>Id.</u> at p. USOW 000001.

156.    Dr. Engel also noted that urinalysis showed heavy microscopic hematuria and ordered cytology. <u>Id.</u>

157.    Dr. Engel also noted the following:

> As for the cyst, although she would be in favor of me removing it, that really would be overly aggressive even [sic] it would give her a piece of mind. A lesion this small is actually difficult to remove and a cystic lesion may pop. I see no indication for a biopsy.

<u>Id.</u>

158.    The results of the cytology came back on May 5, 2015, and were normal. Dr. Engel determined that Dr. Waggel's hematuria was a likely a chronic problem unrelated to the

cyst and provided her with antibiotics and instructed her to return in three months for a repeat scan. Id. at p. USOW 000002.

159.   On May 1, 2015, Dr. Catalanotti reached out to Dr. Catapano to report that she and Dr. Waggel's supervising attending physician were concerned that Dr. Waggel's own health problems were causing her not to be able to focus as much on work and to be flustered and requested that someone close to Dr. Waggel check in on how she was doing. **Exh. A** (Catapano Decl.) ¶ 170; see also Exhibit 44 thereto, Email dated May 1, 2015 at 2:33 p.m., Dr. Catalanotti to Drs. Catapano and Khin Khin.

160.   Dr. Catalanotti also commented that the clinical attending also hoped to give Dr. Waggel direct feedback "about avoiding inappropriate language on rounds (calling a patient an asshole in front of students and the team)" but perhaps not that very day. **Exh. A** (Catapano Decl.) ¶ 171; see also Exhibit 44 thereto (GWU 001586), Email dated May 1, 2015 at 2:33 p.m., Dr. Catalanotti to Drs. Catapano and Khin Khin.

161.   Another Internal Medicine physician, Dr. Chad Henson, reported similar concerns to Dr. Catapano that same evening, stating that Dr. Waggel was being worked up for a renal mass requiring a number of appointments as well as procedures, was in a great deal of pain requiring narcotic medications, and had recently reportedly been unable to admit a patient while on call stating she was in too much pain. **Exh. A** (Catapano Decl.) ¶ 172; see also Exhibit 45 thereto (GWU 001587), Email dated May 1, 2015 at 8:16 p.m.

162.   Dr. Henson felt it might be prudent to have Dr. Waggel take a few days off work to have a medical evaluation for fitness for duty, noting that his main concern was Dr. Waggel's physical and mental health and a desire to make sure she felt supported from both programs. **Exh. A** (Catapano Decl.), Exhibit 45.

163.    In the days immediately thereafter, Dr. Catapano met with Dr. Waggel to review her circumstances and discuss the concerns of the Chief Resident and attending faculty that her ongoing pain and pain medication during her workup as well as apparent lack of focus raised issues of the quality of her work and patient safety. **Exh. A** (Catapano Decl.) ¶ 179.

164.    Dr. Catapano discussed with Dr. Waggel that it is part of a physician's obligation to be aware of their own health status and to refrain from presenting themselves for clinical duties if there are any concerns that they are not safe to do so – this is a key element of professionalism. **Exh. A** (Catapano Decl.) ¶ 180.

165.    Dr. Catapano also explained that physicians do become sick or get ill and need to alert others in advance and withdraw from clinical duties until they are safe to return – there is no shame, stigma, or penalty attached because it is the right thing to do. **Exh. A** (Catapano Decl.) ¶ 181.

166.    In the meeting, Dr. Catapano also specifically recommended that Dr. Waggel take leave at least briefly to address her medical issues and be prepared to come back to work healthy and safe. **Exh. A** (Catapano Decl.) ¶ 182.

167.    Dr. Catapano further specifically discussed with Dr. Waggel whether she should submit to a fitness for duty examination and discouraged her from doing that because the process is somewhat adversarial in that it is better not to have a formal medical evaluation declaring that one is medically unfit for duty. **Exh. A** (Catapano Decl.) ¶ 183.

168.    Dr. Catapano reiterated to Dr. Waggel that the far better route would be to take leave which was the ordinary, reasonable thing to do and would not have any negative consequences for her record. **Exh. A** (Catapano Decl.) ¶ 184.

169.     Dr. Waggel insisted that she was fine, that she would be able to continue to perform the duties of her training, and rejected the suggestion that she should take leave. **Exh. A** (Catapano Decl.) ¶ 185.

170.     During the month of May on the Internal Medicine rotation, Dr. Suzanne Chang served as Dr. Waggel's attending physician. See **Exhibit K**, Declaration of Suzanne W. Chang, M.D., ¶ 7.

171.     Dr. Chang noted that several red flags regarding Dr. Waggel's well being and professionalism were raised soon after her return from a brief medical leave at the beginning of the month. **Exh. K** (Chang Decl.) ¶ 9.

172.     Dr. Chang reported receiving at least three complaints from patients who reported she had been unprofessional or "mean" and the patients had become very angry or offended by her interaction with them. While Dr. Waggel's behavior did not result in any objectively bad outcomes, the poor communication resulted in delays in care, delays in discharges, and overall loss of trust of the medical team which took significant extra work for the rest of the team to correct. **Exh. K** (Chang Decl.) ¶ 10.

173.     On at least one occasion, Dr. Waggel presented herself for duty dressed inappropriately (wearing a very form-fitting and high-cut skirt) and Dr. Chang received several comments from other staff and patients about her attire. **Exh. K** (Chang Decl.) ¶ 11.

174.     Dr. Chang also received reports from Dr. Waggel's team members that she seemed angry, was cursing loudly in the team room in front of the students and within earshot of patients, and her overall behavior seemed to be escalating. **Exh. K** (Chang Decl.) ¶ 12.

175.     On May 14, 2015, while on the Internal Medicine rotation, Dr. Waggel appeared for pre-rounds, but was apparently sleepy and behaving strangely. When it came time for rounds,

38

Dr. Waggel was not present and Dr. Chang, aware that Dr. Waggel was having medical appointments and related difficulties, became concerned that perhaps she had gotten sick or collapsed. **Exh. K** (Chang Decl.) ¶ 13.

176.    For an hour or so, various members of the medical team searched everywhere for Dr. Waggel. **Exh. K** (Chang Decl.) ¶ 14.

177.    Dr. Waggel was eventually found by the Chief Resident asleep in a call room. Id.

178.    Dr. Waggel subsequently stated that she had been out drinking late the night before and that morning had confused her Ativan and Ritalin and taken benzodiazepines accidentally before coming to work. Id.

179.    Dr. Waggel was sent home for the day because she was not safe to be participating in patient care and was asked not to return to the Internal Medicine service. **Exh. K** (Chang Decl.) ¶ 15.

180.    Later that afternoon, Dr. Catalanotti called Dr. Catapano to inform her that because of the recent issues related to Dr. Waggel's performance on the Internal Medicine service, which had culminated in the event of that morning, the medicine team had determined that Dr. Waggel could no longer practice safely and they had asked her to no longer work on the service. **Exh. A** (Catapano Decl.) ¶ 186.

181.    Later that evening, Dr. Waggel emailed Dr. Catapano regarding the morning incident. She alleged:

> I mistook my Ritalin pills for Ativan. It didn't kick in until about an hour into work when I got so sleepy. That's why I never take Ativan during work. I take them when I get anxious about my kidney or when I have to get a procedure done. It also didn't help that I didn't have my ADHD meds on board either. I feel so stupid and awful about the whole thing.

**Exh. A** (Catapano Decl.) ¶¶ 192 – 193; see also Exhibit 48 thereto (GWU 001582).

182.     Later in the evening on May 14, 2015, Dr. Catapano emailed the Associate

Program Director, the Chief Residents, and the Program Coordinator to notify them that the

Internal Medicine team considered Dr. Waggel unfit to work and had asked her not to return to

the team, and that she would be discussing options with Dr. Waggel the following day. **Exh. A**

(Catapano Decl.) ¶ 194; <u>see also</u> Exhibit 49 thereto (GWU 001582).

183.     Dr. Catapano's email continued:

> [I] think by far her best option is to take a medical leave, as was
> recommend [sic] to her two weeks ago. Looking forward, this will impact
> her promotion date (she'll need to make up 1+ weeks of medicine) and
> when she can start her pgyii rotations – once we get a scope for the
> duration of leave [Dr. Greene] and [Dr. Emejuru] will have to work on
> that.

**Exh. A** (Catapano Decl.), Exhibit 49.

184.     The following morning, May 15, 2015, Dr. Catapano also asked Ms. Anderson,

the Program Coordinator, to figure out the necessary paperwork to be completed to put Dr.

Waggel on medical leave starting either that day (a Friday) or the following Monday. **Exh. A**

(Catapano Decl.), Exhibit 50 (GWU 001583), Email dated May 15, 2015 at 9:49 a.m., Dr.

Catapano to Ms. Anderson.

185.     On May 15, 2015, Dr. Catapano met with Dr. Waggel about these events and

again recommended to her that she should take leave to address whatever issues she was having

that were affecting her performance in the residency Program and resulting in her dismissal from

the Internal Medicine rotation. **Exh. A** (Catapano Decl.) ¶ 197.

186.     Dr. Waggel agreed to accept the recommendation and arranged for either leave or

personal vacation time to be away from the Program from May 18 to June 7, 2015. **Exh. A**

(Catapano Decl.) ¶ 198.

187.    On May 18, 2015, the GME Director, Ms. Mary Tucker, emailed the Ms. Kimberly Vanlewen, the administrator of the George Washington University Leave of Absence Program (the "LOA Program"), with notice that Dr. Waggel had requested three weeks of temporary disability leave for medical reasons for the period May 18 to June 8, 2015. See **Exhibit O**, Declaration of Kimberly Vanlewen, ¶¶ 2, 11.

188.    The LOA Program is a division within the University's Employee Benefits Office that handles requests for leaves of absence by University employees, including but not limited to requests made under the Family and Medical Leave Act ("FMLA"). **Exh. O** (Vanlewen Decl.) ¶ 3.

189.    After reviewing Dr. Waggel's employment information, however, Ms. Vanlewen discovered that due to her date of hire, she was ineligible for FMLA leave. FMLA requires that an employee have 12 months of service before being eligible for leave, which Dr. Waggel had not accomplished at that point. **Exh. O** (Vanlewen Decl.) ¶ 12.

190.    Later on May 18, 2015, Ms. Vanlewen sent Dr. Waggel an email notifying her that her request for FMLA leave had been received, but that she had not been employed long enough to qualify for leave and would not be eligible until June 16, 2015. **Exh. O** (Vanlewen Decl.) ¶ 13; see also Exhibit 2 thereto, Email dated May 18, 2015, Ms. Vanlewen to Dr. Waggel.

191.    Ms. Vanlewen also advised Dr. Waggel that if she believed she had a qualifying disability, she could request a reasonable accommodation such as medical leave under the ADA. **Exh. O** (Vanlewen Decl.) ¶ 14.

192.    Ms. Vanlewen further provided Dr. Waggel with a phone number and email for the EEO Office and actually recommended that she apply for ADA leave through that office. **Exh. O** (Vanlewen Decl.) ¶ 15.

193.    Ms. Tucker also provided the same information to Dr. Waggel. **Exh. O** (Vanlewen Decl.) ¶ 16.

194.    Dr. Waggel elected not to pursue an accommodation through the EEO Office for medical leave related to a disability as recommended by Ms. Tucker and Ms. Vanlewen. **Exh. P** (Fair Decl.) ¶ 12.

195.    On May 18, 2015, Dr. Catalanotti forwarded to Dr. Catapano an email report from Dr. Chang regarding Dr. Waggel's performance on the rotation in May 2015. **Exh. A** (Catapano Decl.) ¶ 200; see also Exhibit 52 thereto, (GWU 001580 – 001581), Email dated May 18, 2015 at 9:17 a.m., Dr. Catalanotti to Dr. Catapano.

196.    Dr. Chang reported that when she first arrived on service, Dr. Waggel had been away for two days of medical leave, had been given an opportunity to take a longer leave of absence but told the chiefs she felt ready to be back, and arrived back on service the third day Dr. Chang was on duty. **Exh. A** (Catapano Decl.), Exhibit 52, p. 1.

197.    Dr. Chang then recounted in detail the events on the morning of May 14 noting that when the Chief Resident found Dr. Waggel she was apparently impaired or intoxicated and that Dr. Waggel had since stated she was "out drinking late the night before, and that morning had confused her Ativan and Ritalin and taken benzos accidentally prior to coming to work." Id.

198.    Dr. Chang commented that Dr. Waggel "was clearly not fit/safe to be participating in patient care," was sent home after promising to see her therapist that afternoon, and was asked not to return to the medicine service. Id.

199.    Dr. Chang concluded:

>   Overall my concerns are a) that Stephanie is not emotionally or physically fit to be working and needs to take a leave of absence for her own safety and well-being, and b) that Stephanie is not currently fit to take care of patients and poses a significant risk to patient safety.

> I understand she has been going through a challenging time and this should be taken into consideration, but ultimately, if she is not safe to be taking care of patients right now she needs to be removed from the hospital until she gets treatment or counseling and is re-evaluated carefully and deemed safe. At this point I don't feel this has happened.

Id. at p. 2 (GWU 001581).

200.    Dr. Chang also prepared a formal evaluation of Dr. Waggel's May 2015 performance on the Internal Medicine rotation. **Exh. K** (Chang Decl.), Exhibit 2.

201.    At that point in her training, Dr. Waggel should have been performing at least at Level 2 in all categories as well as in Level 3 in one or more of the categories. Dr. Waggel did not score at Level 3 in any of the categories and was scored Level 1 ("Resident cannot perform this skill even with assistance") in three fundamental skill sets – patient interviews to obtain pertinent facts, shared decision-making with patients, and stabilizing patients with urgent or emergent medical conditions followed by transfer to a higher level of care when necessary. **Exh. K** (Chang Decl.) ¶ 27.

202.    The rating for Dr. Waggel's Overall Clinical Performance on the rotation was "Lowest – Inadequate performance/Significant Deficiencies." **Exh. K** (Chang Decl.) ¶ 28.

203.    Dr. Waggel was eventually granted leave from May 18 to June 7, 2015. **Exh. A** (Catapano Decl.) ¶ 208.

204.    On June 1, 2015, while still on leave, Dr. Waggel emailed Dr. Catapano to clarify her leave and confirm that she would be on medical leave May 18 to June 7 and that Dr. Waggel was voluntarily giving up her vacation days at the end of June. Dr. Catapano responded advising that she would inform Dr. Waggel of the number of Internal Medicine rotation days she would need to make up from her recently discontinued rotation. **Exh. A**. (Catapano Decl.) ¶ 209; see also Exhibit 53 thereto (Plaintiff Bates 409), Email dated May 26, 2015 at 10:12 a.m.

43

205.     On June 1, Dr. Waggel emailed Dr. Catapano a second time stating:

>  Dear Dr. Catapano,
>
>  I just wanted to check in. I went on a vacation to Italy with my friend from medicine Faryal and I am going to visit my family. My grandfather is having his 89th birthday party so I will be seeing many of my relatives. I am doing well. Have a nice day!
>
>  Stephanie

**Exh. A** (Catapano Decl.), Exhibit 54 (GWU 001393), Email dated June 1, 2015 at 1:51 p.m., Dr. Waggel to Dr. Catapano.

206.     During Dr. Waggel's leave, Dr. Catapano worked to re-schedule her Internal Medicine makeup week with Dr. Catalanotti and her Chief Residents, Dr. Wesley Fiser and Dr. Jessica Davis, and was able to get Dr. Waggel to be slotted to work with Dr. Ayanian, the attending with whom she had previously had good rapport. **Exh. A** (Catapano Decl.) ¶ 212; see also Exhibit 55 thereto (GWU 001579, 001573 – 001574).

207.     When Dr. Waggel returned from leave, she began her Emergency Medicine Rotation at the George Washington University Hospital Emergency Department (the ED) on June 8, 2015, which lasted until June 30, 2015. See **Exhibit G**, Declaration of Colleen Roche, M.D., ¶ 4.

208.     The Emergency Medicine team had been made aware of Dr. Waggel's health issues, and the Chief Resident, Dr. Katie Byrd, reached out to Dr. Waggel prior to her beginning the rotation to inquire about dates for medical appointments in order to properly modify her schedule. **Exh. G** (Roche Decl.) ¶¶ 6 – 7.

209.     Dr. Waggel was scheduled for 14 shifts over her three weeks in the Emergency Medicine rotation, which was less than the normal rotation of 20 shifts over four weeks that other non-ED residents are generally assigned. **Exh. G** (Roche Decl.) ¶ 5.

210.    10 of Dr. Waggel's 14 shifts were scheduled for overnight such that she had time during the day to attend medical appointments. **Exh. G** (Roche Decl.) ¶ 8.

211.    The Emergency Medicine Residency Training Program Director, Dr. Colleen Roche, noted that as soon as Dr. Waggel began the rotation, it became clear that she had significant deficits in her medical knowledge and was far behind where she should have been in that regard compared to other non-ED residents. **Exh. G** (Roche Decl.) ¶ 14.

212.    The ED rotation was at the end of Dr. Waggel's intern year, but at best she exhibited the level of medical knowledge that would have been expected from a beginning intern. **Exh. G** (Roche Decl.) ¶ 15.

213.    On June 10, 2015, Dr. Waggel was scheduled to work a shift in the ED beginning at 7:00 a.m., but she did not appear for work at the scheduled time. **Exh. G** (Roche Decl.) ¶ 20.

214.    When Dr. Waggel did not arrive, Dr. Roche and other members of the team on shift in the ED that day began calling, texting, and emailing her with no response. They attempted to contact her numerous times over the following hours to no avail. **Exh. G** (Roche Decl.) ¶21.

215.    Dr. Roche then checked with all member of the team to determine whether Dr. Waggel had alerted anyone that she would not be at work that day and discovered that she had not, nor had she contacted any of her colleagues in an attempt to find coverage for the shift. **Exh. G** (Roche Decl.) ¶ 25.

216.    Dr. Roche reached out to Mary Tucker, Director of Graduate Medical Education, for help in locating Dr. Waggel. **Exh. G** (Roche Decl.) ¶ 22.

217.    After several hours, Dr. Waggel was reached by phone and stated that she was not feeling well that day and decided not to come to work. **Exh. G** (Roche Decl.) ¶ 23.

218.    Finally, after further conversation, Dr. Waggel agreed to come to work for the rest of her shift. **Exh. G** (Roche Decl.) ¶ 24.

219.    According to Dr. Roche, Dr. Waggel had been made aware of the protocol for requesting off in advance for scheduled appointments and for finding coverage for an unexpected need for an absence, such that her actions on June 10 were a clear violation of the protocol established in the ED. **Exh. G** (Roche Decl.) ¶¶ 26 – 27.

220.    On June 10, 2015, Dr. Waggel was seen by Dr. Thomas Jarrett, urologist at George Washington University Medical Faculty Associates, for a second opinion on her cyst. See **Exhibit H**, Declaration of Thomas Jarrett, M.D., ¶ 3; see also Exhibit 1 thereto (MFA 0001 – 0003), Jarrett Office Note.

221.    From his review of the imaging, Dr. Jarrett discerned features of the cyst that pushed it closer to a classification of a Bosniak III cyst, which had an increased risk of becoming malignant (30-50%). **Exh. H** (Jarrett Decl.) ¶ 4.

222.    Based on that classification, Dr. Jarrett recommended to Dr. Waggel that, while it was not emergent, she should have the cyst surgically removed. **Exh. H** (Jarrett Decl.) ¶ 5.

223.    Dr. Jarrett also told Dr. Waggel that it would not be unreasonable to follow the cyst via standard surveillance protocol via repeat imaging to see if changes in the size or character occurred over the following six months to one year. Id.

224.    Dr. Waggel stated that she did not like the idea of any small chance of cancer and expressed the desire for surgery to remove the cyst. Id.

225.    In accordance with Dr. Waggel's wishes, based on Dr. Waggel's young age, overall healthy state, and the small size and peripheral nature of the cyst, Dr. Jarrett recommended a laparoscopic partial nephrectomy. **Exh. H** (Jarrett Decl.) ¶ 6.

226.    Dr. Jarrett further advised Dr. Waggel that she would likely be out of work for about two weeks with a return to full duty in about a month after the surgery if all went well. **Exh. H** (Jarrett Decl.) ¶ 8.

227.    Dr. Jarrett advised Dr. Waggel that because the surgery did not need to be done emergently, she could have time to think about it and to coordinate with her residency program as to when she could take time off from residency over the following three months. **Exh. H** (Jarrett Decl.) ¶ 7.

228.    The following day, June 11, Dr. Waggel emailed Dr. Catapano stating "[she] need[ed] a nephrectomy sooner rather than later. Dr. Jarrett (chair of urology) said I should only need about two weeks off." **Exh. A** (Catapano Decl.) ¶ 221; <u>see also</u>, Exhibit 60 thereto (Plaintiff Bates 418), Email dated June 11, 2015 at 7:23 a.m., Dr. Waggel to Dr. Catapano.

229.    Dr. Catapano assured Dr. Waggel that she would have the full support of the Program with respect to her request for leave based on whatever date her surgeon selected for the surgery and her recovery time, which Dr. Waggel had already indicated would be about two weeks." **Exh. A** (Catapano Decl.) ¶ 223.

230.    Dr. Catapano also advised Dr. Waggel to communicate her schedule needs with Dr. Emejuru so that he could coordinate her schedule with that of the other PGY2s regarding her upcoming sick leave. **Exh. A** (Catapano Decl.) ¶ 224.

231.    On June 12, 2015, Dr. Waggel texted Dr. Emejuru the following at 5:16 p.m.:

> I'm in bed. Have to get my kidney taken out soon. Dr. Catapano said I can go to second year and make up the week of medicine later but she told me to talk to you about the week I have left about emed.

**Exh. C** (Emejuru Decl.) ¶ 13; <u>see also</u> Exhibit 1 thereto (Plaintiff Bates 1111), Screen shot of text messages starting June 12, 2015 at 5:16 p.m.

232.    On June 15, 2015, Dr. Emejuru spoke to Dr. Waggel on the telephone and she stated that she would like to plan to take medical leave for the surgery in mid-July, to make up her required week of Emergency Medicine ("EM") rotation the first week of July, and to make up her Internal Medicine ("IM") rotation the first week in August. **Exh. C** (Emejuru Decl.) ¶ 14.

233.    On June 16, 2015 at 5:34 p.m., Dr. Waggel sent an email to the Chief Residents on the EM service (with a cc to Dr. Emejuru and Dr. Catapano) stating that she was "getting a nephrectomy the second week of July" and inquired if she could perform the one week of EM rotation that she needed to make up during the first week of July before her surgery. **Exh. C** (Emejuru Decl.) ¶ 15; see also Exhibit 2, thereto (Plaintiff Bates 424), Email dated June 16, 2015 at 5:34 p.m., Dr. Waggel to EM Chiefs.

234.    Dr.  Catapano responded to Dr. Waggel's email stating the EM Chiefs should disregard the email and again requested that Dr. Waggel contact Dr. Emejuru to work out her schedule, noting that they would need to make arrangements for Dr. Waggel's medical leave and then determine the rest of her schedule. **Exh. C** (Emejuru Decl.) ¶ 16.

235.    Dr. Emejuru followed up with Dr. Waggel requesting specific information for her surgery, including the actual dates she needed leave as well as the date of surgery and the expected recovery time so that he could work with her to develop an appropriate schedule. E**xh. C** (Emejuru Decl.) ¶ 18; see also Exhibit 4 thereto (GWU 001385), Email dated June 17, 2015 at 10:52 a.m., Dr. Emejuru to Dr. Waggel.

236.    On June 19, 2015, Dr. Waggel emailed Dr. Emejuru providing the information requested including the actual dates of the leave (Monday, July 20 to Monday, August 3), the date of the surgery (July 20) and the expected recovery time out of work (two weeks), and also attached a portion of her urology surgeon's office note explaining the need for the procedure

48

(removal of Bosniak III cyst). **Exh. C** (Emejuru Decl.) ¶ 20; <u>see also</u> Exhibit 5 thereto (GWU 001386 – 001387), Email dated June 19, 2015 at 2:03 p.m. and attachment.

237.     With the information about the surgery, Dr. Emejuru arranged for Dr. Waggel to complete her Internal Medicine rotation the week of July 13 – 19, with July 19 as an off day, and Dr. Ayanian as the supervising attending. **Exh. C** (Emejuru Decl.) ¶¶ 23 – 24; <u>see also</u> Exhibit 6 thereto (GWU 03567), Email dated June 22, 2015 at 1:34 p.m., Dr. Emejuru to Dr. Jessica Davis.

238.     Dr. Emejuru next arranged for Dr. Waggel to make up the time for her ED rotation July 1 – 7, 2015, before the surgery. **Exh. C** (Emejuru Decl.) ¶¶ 26 – 27; <u>see also</u> Exhibit 7 thereto (GWU 001569), iPhone message dated June 22, 2015 at 13:33, Dr. Emejuru to EM Chiefs.

239.     Based on Dr. Emejuru's work, the Program had arranged for Dr. Waggel to complete her EM rotation July 1 – 7 and her IM rotation from July 13 – 19 (with the 19th off) so she could go on her medical leave July 20 – August 3 and, if all went well, she could then return to her regularly scheduled rotation in August. **Exh. C** (Emejuru Decl.) ¶ 28.

240.     Dr. Waggel did not express any disagreement with the proposed schedule and thanked Dr. Emejuru for his work in arranging her schedule. **Exh. C** (Emejuru Decl.) ¶¶ 33 – 34; <u>see also</u> Exhibit 11 thereto (Plaintiff Bates 1115), Screen shot of text messages starting July 2, 2015 beginning at 1:24 p.m.

241.     On June 24, 2015, Dr. Roche emailed Dr. Catapano regarding Dr. Waggel's continued struggles in the ED due to her lack of medical knowledge. She stated as follows:

> Just so you know, she is struggling a lot clinically in the ED. I know that the practice of EM [emergency medicine] is a lot different than the practice of psychiatry, but her clinical knowledge/practiced is not up to par with what we would expect from an intern. I am not sure how that information translates to you, but you should know. I will try to get you more specifics, but I have received multiple comments about her poor clinical performance. I worked in the ED with

49

her yesterday, but she was being covered by another attending. She seemed to want to do a good job, but my sense is that she was so far behind because she was limited by her clinical knowledge. Let me know if I can help in any way, but I can see that she is not going to be an easy learner…

**Exh. G** (Roche Decl.), Exhibit 1.

242.     The senior ED residents who worked closely with Dr. Waggel attempted to address these concerns with her through informal feedback during her rotation. **Exh. G** (Roche Decl.) ¶ 19.

243.     Dr. Catapano also received communication from Dr. Cathy Crone, a faculty member sited primarily at Inova Fairfax Hospital, with a minor proposed edit to a draft Letter of Deficiency regarding the June 10 ED shift incident, followed by further comments on issues regarding Dr. Waggel's lack of professionalism during an inpatient psychiatry rotation there, including a disrespectful attitude toward her assigned supervising attending physician. **Exh. A** (Catapano Decl.); ¶ 244; <u>see also</u> Exhibit 69 thereto (GWU 001203), Email dated June 30, 2015 at 5:03 p.m., Dr. Crone to Dr. Catapano.

244.     Dr. Waggel's PGY2 year began on July 1, 2014. **Exh. A** (Catapano Decl.), Exhibit 4 (GWU 000614 – 000619).

245.     As part of the PGY2 didactic curriculum, Dr. Waggel was enrolled in a Introduction to Psychodynamic Thought class taught by Dr. Cheryl Collins, a volunteer faculty member. <u>See</u> **Exhibit I**, Declaration of Cheryl Collins, M.D., ¶¶ 2, 10.

246.     The first meeting of the class was July 9, 2015. Dr. Waggel did not attend the class and did not provide Dr. Collins with advance notice of her need to miss the class. **Exh. I** (Collins Decl.) ¶ 10.

247.     Dr. Collins noted that Dr. Waggel's absence was surprising because Dr. Waggel had told her by email that she would be present in class. **Exh. I** (Collins Decl.) ¶ 11.

248.     Dr. Waggel did not provide Dr. Collins with an explanation for her absence until August 2, 2015, when she emailed to apologize for missing class for an undisclosed "emergency" and said that she was under the impression that someone else had informed Dr. Collins. **Exh. I** (Collins Decl.) ¶ 12; <u>see also</u> Exhibit 2 thereto.

249.     Dr. Catapano emailed Dr. Waggel on July 9 to inquire about her health and upcoming surgery, to inform her that they would need to conduct her semi-annual evaluation and clarify her graduation date once it was determined how long she would actually be out on leave, and that she would receive a Letter of Deficiency for the June 10 ED shift incident which she would need to address with Program faculty member, Dr. Allen Dyer. **Exh. A** (Catapano Decl.) ¶¶ 245 – 247; <u>see also</u> Exhibit 70 thereto (Plaintiff Bates 689 – 690), Email dated July 9, 2015 at 3:54 p.m., Dr. Catapano to Dr. Waggel.

250.     Dr. Catapano assured Dr. Waggel that the Letter of Deficiency was not reportable, i.e., would not be disclosed to a licensing board or future employer as long as the issue was dealt with and not repeated. **Exh. A** (Catapano Decl.) ¶ 248.

251.     Dr. Waggel responded to Dr. Catapano's email stating, "Thank you for checking in. We can meet whenever you have time but I should probably not miss any of my medicine time though. I have a doctor's excuse for that day and I will be happy to talk about it with Dr. Dyer after my surgery. Have a nice evening." **Exh. A** (Catapano Decl.), Exhibit 70 thereto.

252.     It was clear from Dr. Waggel's response that she did not appreciate that the issue arose out of her failure to notify anyone in advance that she was not going to show up for clinical duty. A doctor's excuse was no explanation of or justification for this clear departure from professional standard. **Exh. A** (Catapano Decl.) ¶ 251.

253.     On July 13, 2015, after learning of Dr. Waggel's failure to appear for Dr. Collins' class, Dr. Emejuru emailed her stating that he was "sure [it] was a pretty important appointment with your surgery coming up and it may have been difficult to schedule it at another time," but that she needed to alert attending and faculty when she needed to miss class unexpectedly. **Exh. C** (Emejuru Decl.) ¶¶ 39 – 41; see also Exhibit 14 thereto (Stephanie Waggel Supp. Prod. [Oct.] 130 of 466), Email dated July 13, 2015 at 2:08 p.m., Dr. Emejuru to Dr. Waggel.

254.     Dr Emejuru reminded Dr. Waggel "that residents **are not** allowed to schedule any personal appointments or therapy patients during **8am-5pm** on Thursdays during didactics. This is a rule for all PGY-II-IV residents." **Exh. C** (Emejuru Decl.) ¶ 42; see also Exhibit 14 thereto. (original emphasis).

255.     Dr. Waggel responded to Dr. Emejuru's email as follows:

> I was actually very upset that I was given such a hard time about going to this appointment. One should be understanding I'm having major surgery and likely I have cancer. I had to fill out my Living Will and get a power of attorney. I also had to meet with the anesthesiologist at very short notice. This time was the only time available to do this and I explained that. It's not as if I chose for this to happen to me. I will [sic] feel a huge lack of support.

**Exh. C** (Emejuru Decl.), Exhibit 14. (emphasis added).

256.     According to Dr. Emejuru, no one gave Dr. Waggel any difficulty – much less "a hard time" – about going to the pre-surgery appointment. She did not advise anyone in the Program that she had the appointment or make a request for sick leave or other personal time off. She simply went to the appointment and no showed for didactics after telling Dr. Collins she would attend. **Exh. C** (Emejuru Decl.) ¶ 45.

257.    On Saturday, July 18, Dr. Waggel held a "Kidney Party" at her apartment to celebrate her impending surgery. **Exh. C** (Emejuru Decl.) ¶ 46; <u>see also</u> Exhibit 15 thereto (GWU 001383), Email dated July 14, 2015 at 11:39 a.m.

258.    On July 20, 2015, Dr. Waggel underwent a robotic-assisted laparoscopic partial nephrectomy performed by Dr. Jarrett at the George Washington University Hospital to remove the cyst on her left kidney. **Exh. H** (Jarrett Decl.) ¶ 11; <u>see also</u> Exhibit 2 thereto, the dictated operative report for the procedure.

259.    Dr. Jarrett removed the entire cyst in a specimen measuring 3 x 2 x 1.5 cm and submitted it to pathology for review. **Exh. H** (Jarrett Decl.) ¶ 13.

260.    Pathology determined that the cyst measured 1.6 x 1.4 x 1.4 cm, and based on immunohistochemistry stains and morphology was given the diagnosis of clear cell renal cell carcinoma. **Exh. H** (Jarrett Decl.) ¶ 14; <u>see also</u> Exhibit 4 thereto, GWUH Surgical Pathology Report.

261.    Under guidelines published by the American Urological Association ("AUA"), in light of the complete excision of the cyst, the size and location of the cyst, and the pathological diagnosis, there was no further adjuvant treatment such as radiation or chemo therapy that was either indicated or necessary. The recommendation for follow up care under the AUA guidelines was once-a-year imaging with a chest x-ray and either a CT scan or MRI of the abdomen for three years. **Exh. H** (Jarrett Decl.) ¶ 15.

262.    On July 21, 2015, the day after Dr. Waggel's surgery, Dr. Emejuru texted her stating, "Hope all is well Steph," she responded, "It is! Thanks," and he responded further hoping she did well on the recovery unit. **Exh. C** (Emejuru Decl.) ¶ 48; <u>see also</u> Exhibit 17 thereto (Plaintiff Bates 1117), Screen shot of text messages starting July 21, 2015 at 1:05 p.m.

263.    Dr. Waggel was discharged from the hospital on July 22, 2015, with instructions to contact Dr. Jarrett in 5-7 days to schedule a follow-up appointment. **Exh. H** (Jarrett Decl.) ¶ 16.

264.    On July 24, 2015, Dr. Waggel and Dr. Catapano had the following text message exchange:

> Jul 24, 2015, 1:31 pm
>
> Hi Dr. C I wanted you to know Dr. Jarrett called and said it was clear cell carcinoma but he's pretty sure it's all gone ☺
>
> Jul 24, 2015, 3:39 pm
>
> Hi Stephanie, thanks for sharing your news. I'm so glad he thinks it's all out of you. How is your recovery going?

**Exh. A** (Catapano Decl.), Exhibit 73 (Plaintiff Bates 1084), Screen shots of text messages beginning July 24, 2015 at 1:31 p.m., Dr. Waggel to Dr. Catapano

265.    Dr. Waggel also texted Dr. Emejuru on July 24 stating, "Guess who had cancer by probably doesn't anymore. This gal!" **Exh. C** (Emejuru Decl.), Exhibit 18 (Plaintiff Bates 1118).

266.    On July 28, 2017, Chair of the GW SMHS Department of Psychiatry and Behavioral Sciences, Dr. James Griffith emailed Dr. Waggel the following:

> Stephanie, I did not hear about your surgery until it had already happened. I am so sorry that you needed to go through this, but I understand that you had no surgical complications, and that this is expected to be curative. I do hope that is the case and that you heal quickly."

**Exh. N** (Griffith Decl.) ¶ 29; see also Exhibit 1 thereto (Plaintiff Bates 723), Email dated July 28, 2015 at 10:38 p.m., Dr. Griffith to Dr. Waggel.

267.    Dr. Waggel responded to Dr. Griffith's email as follows:

> I was very glad to receive your well wishes. Everything points to a good prognosis. I'm feeling much better and was able to visit with family. I'm pretty excited to get back to work especially because I will finally be on a

psychiatry rotation. I have been on medicine rotations since February. Thank you very much for thinking about me.

**Exh. N** (Griffith Decl.), Exhibit 1 thereto.

268.   Dr. Catapano texted Dr. Waggel again on July 29, 2015 to inquire about her recovery and received the following response:

Jul 29, 2015, 6:03 pm

Hi Dr. Catapano I'm feeling a little sick actually I'm debating on whether to go to the ER or not. I think I might wait because I'm afebrile and I have an appointment with my oncologist tomorrow at 830.

I've been looking into working with our GME to help make it easier for residents to get a medical work up in the future

I think I'm really lucky that I am at GW and in the psych program which I imagine is particularly good at getting residents time off. I cannot imagine what may have happened if I were in a program like surgery somewhere and pushed off my work up like I was initially planning to do. Apparently clear cell does not respond to chemo or radiation so it is really scary how close I came to waking. But I think if there were specific written guidelines it would help other residents in the future.

I am just going to type up some suggestions such as making sure each resident knows exactly to inform if they are going to leave and to make sure they get coverage. When I was in the ED the other resident who I asked to cover me and said yes did not come in so I almost missed my appointment. I'm not going to complain about anything I'm just going to make sure some of the hurdles I went through are addressed in case another resident gets sick with a chronic illness in the future.

Thank you for keeping in touch with me. Dr. Griffith emailed me too which I thought was really nice. I will let you know how my appointment goes tomorrow.

And as for coming up with some guidelines in the event another resident has a chronic issue that needs work up over a period of many months—I am not going to complain about any particular thing that happened to me (although if you read my paper from our first didactic session you are aware that one of the third year medicine residents gave me a very hard time) I am just going to propose some solutions that will make it easier for a sick resident and also ensure the safety of that resident's patients if they need to step out for an hour or two.

> Doctors naturally want to put others first so I think they have some outside encouragement they would be more likely to address their own health
>
> If you have any thought or want to meet with me depending on how my appointment goes tomorrow I may be able to speak with you Thursday or Friday. Thanks again for checking with me.

**Exh. A** (Catapano Decl.), Exhibit 74 (Plaintiff Bates 1084 – 1090), Screen shots of text messages beginning July 29, 2015 at 6:03 p.m. (emphasis added).

269.   On July 30, 2015, Dr. Waggel was seen at the George Washington University Department of Hematology/Oncology, by Dr. Robert Siegel, for evaluation of her renal cell carcinoma diagnosis. <u>See</u> **Exhibit J**, Declaration of Robert S. Siegel, M.D., ¶ 3.

270.   Dr. Siegel discussed his diagnostic impression with Dr. Waggel and agreed that she had had a localized Renal Cell Carcinoma, clear cell type and had undergone a successful partial nephrectomy. **Exh. J** (Siegel Decl.) ¶ 4.

271.   Dr. Siegel advised Dr. Waggel based on all of the information available and the low stage of her tumor, that the surgery she had received should be curative. **Exh. J** (Siegel Decl.) ¶ 5.

272.   Dr. Siegel also recommended to Dr. Waggel that she be evaluated by genetic screening for Von Hippel-Lindau syndrome, i.e., an inherited disorder characterized by the formation of tumors and fluid-filled cysts in different parts of the body which may be either noncancerous or cancerous. **Exh. J** (Siegel Decl.) ¶ 6.

273.   At the end of the July 30, 2015 office visit, the plan of care for Dr. Waggel was for a repeat kidney CT scan in four months, a referral for genetic screening, a follow up visit with Dr. Jarrett, and a return follow up visit with Siegel on November 11, 2015, one week after the CT scan. **Exh. J** (Siegel Decl.) ¶ 7.

274.     Dr. Waggel returned from her leave for surgery and recovery and resumed her training on August 3, 2015 with a night call shift on 6 South, the inpatient psychiatry unit at GW Hospital. **Exh. A** (Catapano Decl.) ¶ 266.

275.     She had been scheduled for night call duty upon immediately returning, because it is generally less demanding than other shifts and can provide significant over night rest time. **Exh. C** (Emejuru Decl.) ¶ 51.

276.     Dr. Waggel saw her urologist, Dr. Jarrett, on August 5, 2015, for a follow-up appointment, at which time he told her "there is an excellent prognosis from this" and "we then went over the imaging follow-up recommended by the AUA with yearly imaging of the chest and abdomen." He also said that the genetic testing recommended by Dr. Siegel would be worthwhile given her young age, but he did not expect any significant findings from the testing. **Exh. H** (Jarrett Decl.) ¶ 20.

277.     On August 5, 2015, Dr. Catapano met with Dr. Waggel for her semi-annual review, at which time she informed Dr. Waggel that she was above Milestones in Teaching but that she was far below Program requirements in Patient Care and Professionalism and reviewed with her specific instances regarding those evaluations. **Exh. A** (Catapano Decl.) ¶ 270.

278.     Dr. Catapano also discussed the substance of her earlier email that Dr. Waggel was receiving a Letter of Deficiency regarding the June 10 no show for the ED shift and reiterated the importance of advance notice to professional colleagues who were relying on her presence when she would be unable to show up for any reason and also discussed her problems with inter-personal communications as elements of professionalism that she needed to improve. **Exh. A** (Catapano Decl.) ¶ 271.

279.    Dr. Catapano presented Dr. Waggel with the Letter of Deficiency, dated July 15, 2015, and discussed with her again that this was not intended as a punitive measure but as remediation in the form of formal written notice with an opportunity and expectation for resolving the issue and moving on. **Exh. A** (Catapano Decl.) ¶ 272; <u>see also</u> **Exhibit L**, July 15 Letter of Deficiency to Dr. Waggel.

280.    Dr. Catapano explained further that if the issue identified – failure to provide notice to others that she would not be able to attend to duties so alternative arrangements could be made by those otherwise relying upon her – were resolved and there were no further occurrences, the matter would be over and there would be no further consequences. **Exh. A** (Catapano Decl.) ¶ 273.

281.    Dr. Waggel was to meet with Dr. Allen Dyer within two weeks to discuss strategies to prevent future lapses in professionalism and provide him with contact information for supervising physicians on upcoming rotations to obtain attendance reports for further review by the CCC. **Exh. A** (Catapano Decl.) ¶ 274.

282.    Dr. Catapano advised Dr. Waggel, however, that failure to resolve the issue or further instances of similar behavior could lead to further action including termination from training. **Exh. A** (Catapano Decl.) ¶ 275.

283.    Along with the Letter of Deficiency Dr. Catapano also provided Dr. Waggel with a copy of the GW Academic Improvement Policy. **Exh. A** (Catapano Decl.) ¶ 276.

284.    On August 6, 2015, Dr. Catapano received a lengthy email from Chief Resident Elizabeth Greene outlining a number of instances of very unprofessional communications and conduct directed by Dr. Waggel towards other members of the health care team on 6 South. **Exh.**

**A** (Catapano Decl.) ¶ 279; see also Exhibit 78 thereto (GWU001657 – 001658), Email dated August 6, 2015 at 9:32 a.m., Dr. Greene to Dr. Kels et al.

285.     One instance was reported by an intern, Dr. Carolyn Roberts, who reported that Dr. Waggel spoke to a Physician Assistant in a very disrespectful way during a consult call, and when the PA asked for her last name so she could report Dr. Waggel's behavior, Dr. Waggel refused to give her last name and "engaged in a back and forth of 'I'll give you my last name if you give me your last name.'" **Exh. A** (Catapano Decl.) ¶ 280.

286.     The PA immediately called back and got Dr. Roberts on the phone, who gave the PA Dr. Waggel's last name which upset Dr. Waggel very much and left the intern concerned that she would have difficulty with Dr. Waggel for the remainder of the rotation. Id. at ¶ 281.

287.     When Dr. Greene called the PA to get additional information it was noted that Dr. Waggel had later apologized for her actions, but that it was not the first negative interaction the PA team had encountered with Dr. Waggel as there had been incidents with her on two previous rotations. **Exh. A** (Catapano Decl.) ¶¶ 282 – 283.

288.     The PA reported that they found Dr. Waggel to be unprofessional in her attitude and not helpful, including hanging up the phone abruptly, not properly identifying herself on the phone, and generally was "not helpful" with consults. **Exh. A** (Catapano Decl.) ¶ 284.

289.     Dr. Greene got the sense that the PA was reporting that Dr. Waggel created a divisive atmosphere, which was why she brought the incident to her attention as well as that of Dr. Vanessa Torrez Llenza and Dr. Baiju Gandhi, two attendings on the inpatient psychiatric service. **Exh. A** (Catapano Decl.) ¶¶ 285, 287.

290.     The events reported by Dr. Greene had occurred on the afternoon of August 5, very shortly after Dr. Catapano had just met with Dr. Waggel for her semi-annual review and

specifically discussed her sub-standard performance in Professionalism and Inter-Personal Communications and the need for her to focus on improving in those areas. **Exh. A** (Catapano Decl.) ¶ 288.

291.    On August 6, 2015, Dr. Emejuru met with Dr. Waggel to discuss the incident. **Exh. C** (Emejuru Decl.) ¶ 61.

292.    On August 7, 2015 at 1:38 p.m., Dr. Waggel sent an email to Dr. Catapano, other members of the administrative team and Drs. Gandhi and Torres stating she had become aware of an email "about a situation that occurred on Wednesday" and said she "wanted to follow up and let you what [sic] that day." **Exh. A** (Catapano Decl.) ¶ 291; see also Exhibit 79 thereto (GWU 001513), Email dated August 7, 2015 at 1:38 p.m., Dr. Waggel to Dr. Catapano, et al.

293.    Dr. Waggel reported that she "had a stressful conversation with the orange team which I felt was unprofessional," but it was clear from her email that Dr. Waggel was not the one who thought the exchange was unprofessional, rather she became angry at the person who called her out on the conversation by reporting her name to the PA. **Exh. A** (Catapano Decl.) ¶¶ 292, 295.

294.    Dr. Waggel's lack of self-observation again was very concerning to the faculty. Id. at ¶ 297.

295.    Dr. Waggel also texted Dr. Emejuru on August 7 to complain that he did not alert her to Dr. Greene's email in their meeting the day before, to express frustration that Dr. Greene had not approached her first before sending the email, and to complain that she apologized to the PA and called you But still I get in trouble." **Exh. C** (Emejuru Decl.) ¶¶ 62, 65; see also Exhibit 22 thereto (Plaintiff Bates 1123 – 1127), Screen shot of text messages starting August 7, 2015 at 9:54 a.m.

296.    Dr. Emejuru apologized for not alerting her to the email and that Dr. Greene did not discuss the incident with her first, but noted that it could be "common thing that could happen with you being in the position you are in" referring to the reports of her behavior. **Exh. C** (Emejuru Decl.) ¶ 63; <u>see also</u> Exhibit 22 thereto.

297.    Dr. Emejuru also assured Dr. Waggel that she was not "in trouble" and that she "should come with a mindset of people trying ultimately see [sic] you do well, succeed, etc. NOBODY wants to see anything else." **Exh. C** (Emejuru Decl.) ¶¶ 64, 67; <u>see</u> <u>also</u> Exhibit 22 thereto.

298.    In the early hours of August 11, while on an overnight call shift, Dr. Waggel sent Dr. Emejuru a series of text messages detailing the difficulty she was having with an unexpectedly high patient load, the lack of response from the Social Work Service in providing backup, and the lack of response from the on-call assigned resident for back-up, Dr. Stephanie Cho. **Exh. C** (Emejuru Decl.) ¶ 7; <u>see also</u> Exhibit 25 thereto (Plaintiff Bates 1128 - 1145), Screen shot of text messages beginning August 11, 2015 at 12:50 a.m. – August 12, 2015 at 9:45 a.m.

299.    Dr. Emejuru agreed with Dr. Waggel that there had been a breakdown in backup support, particularly from the "SW" (Social Work) service and told her that she should discuss that directly with the oncoming MFA attending faculty, Dr. Norris, when he came in that morning, that he would follow up with two others but it was not necessary to take it to a higher level at that point, and she had done a "Good job!" **Exh. C** (Emejuru Decl.) ¶ 74; <u>see also</u> Exhibit 25 thereto (Plaintiff Bates 1137).

300.     Dr. Waggel objected that "everyone else allowed [sic] to take absolute nonsense up to Catapano about me but when I get screwed I can't tell anyone." **Exh. C** (Emejuru Decl.), Exhibit 25 (Plaintiff Bates 1137).

301.     Dr. Emejuru responded by explaining to Dr. Waggel that she had done what she was supposed to do, she had done well, and there was no need to add any flames. Id. (Plaintiff Bates 1138).

302.     Dr. Waggel further reported that she had received a text telling her to stay to complete an admission note for one of the patients seen that night although she had a scheduled appointment to get blood work done and Dr. Emejuru responded: "Just relax right now. I wouldn't do anything else beside take care of your appointment…" **Exh. C** (Emejuru Decl.); see also Exhibit 25 thereto (Plaintiff Bates 1140).

303.     Dr. Emejuru also encouraged her by stating "Hey all you can do is control what you can control. As long as you communicate and nobody dies or punched [sic] in the face, systemic issues will be taken care of by people who get six figs. And yeah, Ryan [the ER doctor on duty who had sent me an email supportive of Dr. Waggel] sent me an email. I forwarded it to you" and later added, "Good stuff! Rest up." **Exhibit C** (Emejuru Decl.) ¶ 81; see also Exhibit 25 thereto (Plaintiff Bates 1144 – 1145).

304.     Dr. Catapano also emailed Dr. Waggel to commend her efforts stating it sounded "like you made a heroic effort in the face of an awful night." **Exh. A** (Catapano Decl.) ¶ 308; see also Exhibit 80 thereto (Plaintiff Bates 748), Email dated August 17, 2015 at 6:27 p.m., Dr. Catapano to Dr. Waggel.

305.    Dr. Catapano also assured Dr. Waggel that the Program was looking into the things that went wrong that night to leave her with so little support and would be addressing those issues. **Exh. A** (Catapano Decl.) ¶ 309.

306.    Dr. Waggel then took a sick day on August 12, 2015, because she had lost her voice after her call day. **Exh. C** (Emejuru Decl.) ¶ 82; <u>see also</u> Exhibit 26 thereto (Plaintiff Bates 734), Email dated August 12, 2015 at 7:08 a.m.

307.    On August 12, 2015, Dr. Waggel emailed Dr. Allen Dyer, the faculty member assigned to supervise the remediation plan in her July 15 LOD, in response to an email from him regarding a request that she complete a document known as the Epstein Exploitation Index (which provides an early warning indicator of boundary violations in psychotherapy) and then compare the score on the index with the score recorded on the same index before she had taken the seminar, Dr. Waggel totally missed the point of the request (stating she did not change her answers because she was on medical leave at the time – a non sequitur) and then asked whether he had received a previous email from her about setting up a meeting to address the LOD. <u>See</u> **Exhibit M**, Declaration of Allen Dyer, M.D., ¶ 18; <u>see also</u> Exhibit 2 thereto (GWU 002830 – 002831), Email dated August 12, 2015.

308.    Dr. Dyer responded by noting that Dr. Waggel had not responded to the question posed about the Index and asked her to re-think her response. He then also said that he had not received an email about setting up a meeting and asked her to forward that email to him along with a copy of the LOD itself and then we could set up a time to meet. **Exh. M** (Dyer Decl.) ¶ 19; <u>see also</u> Exhibit 2 thereto.

309.    In the summer and fall of 2015, Dr. Waggel was enrolled the Clinical Neurosciences didactics course taught by department chair, Dr. James Griffith, on the Thursday didactics day at 9:30 – 10:30 a.m. **Exh. N** (Griffith Decl.) ¶¶ 26, 31.

310.    The residents are given reading assignments to complete prior to class each week. Each class period a lecture is given on the topic covered in the reading. At the beginning of the course, the students are instructed that the exam questions will be based on the learning objectives and the selected readings. **Exh. N** (Griffith Decl.) ¶ 20.

311.    The Clinical Neurosciences Seminar is part of a larger set of didactic training courses for residency training mandated by the ACGME. **Exh. N** (Griffith Decl.) ¶ 21.

312.    The courses are mandated to ensure that each resident has sufficient medical knowledge and adequate competencies to be able to provide safe and effective treatment to patients. **Exh. N** (Griffith Decl.) ¶ 22.

313.    ACGME requires each residency program to verify that standards for knowledge and clinical competencies are met. **Exh. N** (Griffith Decl.) ¶ 23.

314.    Verification of adequate mastery of medical knowledge lends itself to testing by written examinations, and as such Dr. Griffith has given regular written examinations in the course for the past 23 years. **Exh. N** (Griffith Decl.) ¶ 24.

315.    Residents are made aware of the ACGME requirements and the necessity for demonstrating mastery of the necessary skills and medical knowledge to be deemed clinically competent to provide patient care. As such, the residents recognize and appreciate the importance of performing well in the didactics courses. **Exh. N** (Griffith Decl.) ¶ 25.

316.    On August 15, 2015, Dr. Griffith emailed the class about the upcoming first exam on August 20, and provided them with a revised set of learning objectives, noted that the exam

was multiple choice, provided information about what would be covered on the exam, attached PowerPoint presentations that would be helpful in studying for the exam, and provided the students with additional copies of the handouts from class. **Exh. N** (Griffith Decl.) ¶ 32; <u>see also</u> Exhibit 3 thereto (GWU 1556), Email, Dr, Griffith to class.

317.    Dr. Waggel responded to Dr. Griffith's email the following day stating that she would be post call that day and asked if she still needed to take the exam that day, to which Dr. Griffith directed her to work with Ms. Anderson to find an alternative more suitable time for the exam. **Exh. N** (Griffith Decl.) ¶¶ 33 - 35; <u>see also</u> Exhibit 4 thereto (GWU 1555), Email, Dr. Griffith to Dr. Waggel.

318.    Dr. Waggel eventually took the exam and scored a 33, which was thirty points lower than anyone else in the class and is far lower than even random guessing would ordinarily be expected to produce and showed a total lack of comprehension of the material presented in that segment of the class. **Exh. N** (Griffith Decl.) ¶¶ 36.

319.    On August 25, 2015, Dr. Waggel again had an overnight on-call shift on the inpatient psychiatry unit where Dr. Waggel had encountered a belligerent patient with escalating violent behavior and had handled the situation very poorly. **Exh. A** (Catapano Decl.) ¶ 310.

320.    During the shift, the nursing staff, primarily Nurse Shemika Anthony, had called on Dr. Waggel for assistance with the patient. **Exh. A** (Catapano Decl.) ¶ 312.

321.    Dr. Waggel came to evaluate the patient, decided the patient should be on oral medication for her own safety which the patient refused, and as Dr. Waggel was leaving the room Dr. Waggel told the patient that it was "her choice" and to let  her or the staff know if the patient changed her mind. **Exh. A** (Catapano Decl.) ¶ 313; <u>see also</u> Exhibit 83 thereto (GWU 001489 – 001491), Email report by Nurse Anthony.

322.     After the patient had been administered IM medication but continued to be aggressive, Dr. Waggel threatened that if the patient continued to yell Dr. Waggel would call the police and have the patient escorted out of GW Hospital to another hospital immediately. **Exh. A** (Catapano Decl.) ¶ 314.

323.     When the patient continued to be disruptive, Dr. Waggel was called back to assist, was very slow in responding, and then suggested that because the patient was so noisy, a female sitter should be assigned to attend the patient in her room with the door closed, which was completely inappropriate as it would be dangerous for any staff member to be alone with a violent patient in a room with a closed door. **Exh. A** (Catapano Decl.) ¶ 315

324.     Dr. Waggel then once again suggested that the team members should contact the police department about the patient. **Exh. A** (Catapano Decl.) ¶ 316.

325.     When Dr. Waggel called Dr. Eindra Khin Khin about the patient at approximately 2:53 a.m., she started with a monologue of how unethical and wrong it was to "coerce" patients into signing into 6 South and an injustice to the patients and then told Dr. Khin Khin she was asking for an "administrative discharge" of the patient even though she had yet to convey any patient information to Dr. Khin Khin. **Exh. A** (Catapano Decl.), Exhibit 82 (GWU 003121 – 3122), Email report by Dr. Khin Khin.

326.     Dr. Waggel was then unable to give an organized presentation of the patient to Dr. Khin Khin but was rambling and disorganized. **Exh. A** (Catapano Decl.) ¶ 318.

327.     Dr. Khin Khin detailed in her email report the complete lack of ability on Dr. Waggel's part to communicate in a professional, appropriate way the necessary medical information regarding the patient despite Dr. Khin Khin's repeated direct questions. **Exh. A** (Catapano Decl.) ¶ 319.

328.    Dr. Khin Khin was so concerned that she was not getting the necessary information that she decided to call fellow faculty member Dr. Lorenzo Norris for guidance on appropriate discharge procedures and resources. **Exh. A** (Catapano Decl.) ¶ 320.

329.    After hearing Dr. Khin Khin's concerns, Dr. Norris then contacted Dr. Waggel directly. **Exh. A** (Catapano Decl.) ¶ 321; <u>see also</u> Exhibit 81 thereto (GWU 001503 – 001504), Email report by Dr. Norris.

330.    Dr. Norris later called Dr. Khin Khin back with a comprehensive account of the patient's hospital course, including a very recent serious suicide attempt a few days earlier and a significant medical condition, neither of which had been previously reported to Dr. Khin Khin. **Exh. A** (Catapano Decl.) ¶ 322.

331.    A decision was made to focus on securing the violent patient's behavior (Code Strong) for the safety of all concerned. **Exh. A** (Catapano Decl.) ¶ 323.

332.    In her report of these events, Dr. Khin Khin concluded with specific concerns she identified regarding Dr. Waggel's performance as follows:

> 1) Her very limited ability to present in a focused, organized manner, especially on an on-call situation, which can seriously jeopardize patient care and safety
>
> 2) Her very limited ability to provide the attending with the most basic, relevant, and pertinent clinical information (e.g. safety concerns especially when she was repeatedly asking me to administratively discharge the patient, active medical concerns, assaulting two staff members – which I only found out in subsequent phone calls, etc)
>
> 3) Her lack of appropriate boundaries (mentioning her own health issues in an acute patient care situation)
>
> 4) Her lack of self-awareness (no appreciation of her lack of appropriate boundaries)

5) Discrepancies between what she actually told me and what
she told Dr. Norris that she told me

**Exh. A** (Catapano Decl.) ¶ 324; <u>see also</u> Exhibit 82 thereto (GWU 003122).

333.     Dr. Norris noted in his report that over the preceding 3 – 4 weeks, multiple

clinicians had raised concerns regarding Dr. Waggel's skill and style on inter-professional

communication while taking overnight call. **Exh. A** (Catapano Decl.), Exhibit 81 thereto (GWU

001503).

334.     Dr. Norris noted that Dr. Waggel had attempted to contact him at 1:49 a.m. and

then left a text message at 1:52 a.m. as follows:

> Sorry Dr. Norris. I need someone administratively discharged.
> She was an fd12 who was told to come to six south bc
> [because] fd12 facility would be her only alternative. She has
> been hitting her head on the wall and screaming since 10pm.
> She was medicated twice with zero affect [sic]. No other
> patients can sleep and you can hear her screams from outside
> the unit <u>and I can only hold her head for so long</u> before she
> actually injures it. Sorry again to wake you

<u>Id.</u> (emphasis added)

335.     Dr. Norris reported that when he spoke directly with Dr. Waggel, "she needed 10

– 15 minutes to breakdown the case" and tell him the reason for the admission, the risk

assessment, and the hospital course. <u>Id.</u>

336.     Dr. Norris noted that since Dr. Waggel herself had admitted the patient from the

hospital floor and performed a detailed risk assessment, he was "somewhat surprised by the

length of time it took obtain [sic] clinical information." <u>Id.</u>

337.     Dr. Norris further noted that during Dr. Waggel's presentation "it was necessary

to help her redirect her focus on clinical priorities (patient safety, medical status, etc) and away

from system challenges." <u>Id.</u>

338.     Dr. Norris reported that he found Dr. Waggel's "casual style of presentation difficult at times to interpret, lacking linear cohesion, containing unnecessary digressions, and overall not concise." Id.

339.     Dr. Norris added, however, that Dr. Waggel's "efforts directed at patient care were apparent, and it should be taken into account that she was fatigued but even with these factors taken into account, her communication style still slowed the delivery of relevant information." Id.

340.     With respect to boundary issues, Dr. Norris commented that Dr. Waggel "did briefly mention that her kidney was just removed, and that she had to essentially restrain a patient by herself." Id.

341.     While noting a concern for any breakdown in Code Strong procedures, he further commented that he was "also concerned that Dr. Waggle [sic] may have trend [sic] of mentioning her own health issues in the context of patient care, and that she may have limited self awareness that she is actually making this [sic] comments." Id.

342.     Dr. Norris reported that he spent about an hour speaking with Dr. Waggel and had told her to complete her notes and not see any new patients. Id.

343.     Dr. Norris then further reported that he had received a text message from Dr. Slootsky who was concerned that Dr. Waggel had said she had not been eating for four days and just had her kidney removed. Id.

344.     Dr. Norris commented that these "statements were made in morning report a very public forum in which the focus is on patient care." Id.

345.     Dr. Norris also noted that Dr. Slootsky communicated that she was worried about Dr. Waggel's well being. Id.

346.    Dr. Norris concluded by stating that given Dr. Waggel's previous experience on call and on other hospital rotations, "I wanted to bring these considerations to the attention of the residency program" and that Drs. Khin Khin, Torres, and Slootsky should follow up with their own separate emails as needed "to correct or add more information to the current observations." Id.

347.    Dr. Veronica Slootsky also reported her concerns to Dr. Catapano noting that when Dr. Waggel had conducted the report at the beginning of the shift, she stated that she had not eaten for 4 days, and had recently had a kidney removed and had cancer in front of the whole group. **Exh. A** (Catapano Decl.) ¶ 339; see also Exhibit 84 thereto (GWU 001501), Email report of Dr. Slootsky.

348.    Dr. Slootsky also noted that Dr. Waggel reported that staff did not help her while a patient on anticoagulants was "banging her head against the wall, and she had to 'jump' on the patient to restrain the patient" and did not order a CT scan. **Exh. A** (Catapano Decl.), Exhibit 84.

349.    Instead going home that morning, Dr. Waggel went to Ms. Anderson's office and waited for Dr. Catapano. **Exh. A** (Catapano Decl.) ¶¶ 341 – 342.

350.    In the 45-minute meeting, Dr. Catapano noted that Dr. Waggel was very agitated, difficult to follow, starting in the middle of thoughts, skipping from topic to topic and describing events in a non-chronological order and several times losing her train of thought entirely. **Exh. A** (Catapano Decl.) ¶¶ 345 – 346; see also Exhibit 85 thereto (GWU 001487), Dr. Catapano Email report.

351.    Dr. Waggel described the challenging patient circumstances she faced overnight, and her difficulty managing them, mostly, in her opinion, because "she could not get staff to do what she wanted them to do" and "felt very unsupported." **Exh. A** (Catapano Decl.) ¶ 347.

352.     This was directly contrary to the information from several sources regarding her conduct over the shift, including her interactions with Drs. Khin Khin, Norris, and Slootsky as well as Nurse Anthony and again reflected Dr. Waggel's lack of insight into and ownership of her own responsibility in events. **Exh. A** (Catapano Decl.) ¶ 348.

353.     Dr. Catapano also reported that she was most concerned by Dr. Waggel's report that she herself, alone, physically restrained an out-of-control patient because that action put Dr. Waggel and the patient, and probably others, at risk of harm. **Exh. A** (Catapano Decl.) ¶¶ 349 – 350.

354.     Dr. Waggel also reported that she had worked a "30 hour shift" – which Dr. Catapano checked and found was not true, she worked something closer to 24 hours – and stated that she "did not once eat or go to the bathroom." **Exh. A** (Catapano Decl.) ¶ 354.

355.     Dr. Catapano advised Dr. Waggel that she was extremely concerned about her self care as it is a vital component of Professionalism and Patient Care and Dr. Waggel's behavior, if true, was completely unacceptable. **Exh. A** (Catapano Decl.) ¶¶ 353, 355.

356.     Dr. Catapano then advised Dr. Waggel that they would meet again in the next week, and repeatedly in the coming weeks and months, to look more closely at her decision regarding work and self care to help her make better choices about taking care of herself. **Exh. A** (Catapano Decl.) ¶ 356.

357.     Based on those considerations, Dr. Catapano alerted Dr. Waggel that if she were not able "to monitor her health and fatigue better, we will have to put restrictions on her work and/or call schedule to protect her." **Exh. A** (Catapano Decl.) ¶ 359.

358.     Later on August 26, Dr. Waggel emailed Dr. Catapano stating she noticed that her left pointer finger appeared to have gotten "caught in something" during the overnight shift,

inquired whether she should go to employee health to find out if the patient had hepatitis C or HIV. **Exh. A** (Catapano Decl.) ¶ 360; <u>see also</u> Exhibit 89 thereto (Plaintiff Bates 751 – 752), Email dated August 26, 2015 at 4:38 p.m., Dr. Waggel to Dr. Catapano.

359.    At 9:38 p.m., Dr. Waggel emailed Dr. Catapano again stating:

> I'm Sorry Dr. Catapano I shouldn't put you in that position. I decided myself that I will go and have the work up done tomorrow I think it would be good to have documentation and I would feel better knowing the patients [sic] blood borne illnesses. <u>Also, I am going to take advantage of the traumatic event therapy offered to me by admin staff.</u> I will email Tory and find the names of the lecturers and email them. I hope these are the right steps to take. Again, thank you for being supportive.

**Exh. A** (Catapano Decl.), Exhibit 89 (Plaintiff Bates 751). (emphasis added).

360.    Dr. Catapano responded the following morning stating only that if Dr. Waggel was worried about the issue, she should get it checked out and commending her for planning to use the trauma therapy. **Exh. A** (Catapano Decl.) ¶¶ 362 – 363.

361.    In the meantime, on August 26, 2015 at 7:18 p.m., Dr. Waggel had sent two emails to Caroline Roberts, M.D., an intern who had been on duty with her during the August 25 overnight shift, addressing Dr. Roberts in very disrespectful and demeaning language and tone regarding (a) a proposal by Dr. Waggel to educate Dr. Roberts and other interns on how to enter "PRN" orders (orders for interventions to be performed "as needed") and even directing Dr. Roberts to provide Dr. Waggel the email addresses of all of her classmates by noon the next day to carry out her proposed training session, and (b) reiterating the proposal stating "your entire class needs to learn this and asap" and setting forth two analogies including one as follows:

> 1.  Today you told me you knew how to add the PRN order set. Yet you never asked the name of it. Today Joe invited Dave to his party but Dave said he couldn't go. Dave never asked Joe when his party even was. Your above comment leads me to believe you have a disinterest in

learning this order set. Is this a correct assumption or did you somehow know the name of the order set I was referring to?"

**Exh. A** (Catapano Decl.) ¶ 364; <u>see also</u> Exhibit 88 thereto (GWU 001481 – 001483), Email dated August 26, 2015 at 8:17 p.m., Emejuru to Catapano, et al., forwarding attached emails.

362.    On August 27, 2016, Dr. Emejuru was instructed by the new Associate Program Director, Lori Kels, M.D., to contact Dr. Roberts and advise her that the faculty was aware of Dr. Waggel's email and considered it unacceptable and that he would follow up with Dr. Waggel regarding the matter. **Exh. C** (Emejuru Decl.) ¶ 89; <u>see also</u> Exhibit 29 thereto (GWU 001481), Email dated August 27, 2015 at 4:49 p.m., Dr. Kels to Dr. Emejuru.

363.    Later that evening Dr. Waggel emailed Dr. Slootsky, the MFA attending psychiatrist on duty on the August 25 – 26 shift complaining about her efforts to teach Dr. Caroline Roberts "about nighttime safety" on the psychiatry unit and Dr. Roberts' lack of responsiveness and about Dr. Roberts' alleged failure to order an HIV test on a patient with whom Dr. Waggel may have had body fluid contact and so claimed to be at risk of needing HIV prophylaxis. Dr. Waggel stated that she preferred "face to face feedback with just the person them-self but that has not worked" and added that she was "bringing this to the attention of others because it has now resulted in injury." **Exh. C** (Emejuru Decl.) ¶ 90; <u>see also</u> Exhibit 30 thereto (GWU 001485 – 001486), Email dated August 27, 2015 at 6:01 p.m., Dr. Waggel to Dr. Slootsky.

364.    Dr. Waggel then texted Dr. Roberts several times that evening expressing continued concerns about PRN orders and the HIV test she had wanted done on the patient, and questioning whether Dr. Roberts had been doing things to purposely antagonize her. **Exh. C** (Emejuru Decl.) ¶ 92; <u>see also</u> Exhibit 27 thereto (GWU 001472).

365.    Dr. Roberts texted Dr. Emejuru stating that she felt "bullied" by Dr. Waggel and did not "know the best way to handle the situation," but was concerned about having to continue to work with Dr. Waggel.  **Exh. C** (Emejuru Decl.) ¶¶ 93 – 95; see also Exhibit 27 thereto (GWU 001474).

366.    Dr. Emejuru called Dr. Waggel on the evening of August 26 to discuss the events of the previous day. She mentioned being involved in "multiple incidents on the unit that night without nursing support" and she had wanted to place one patient on 1:1 observation but said this had been denied by nursing for some reason. **Exh. C** (Emejuru Decl.) ¶ 97.

367.    Dr. Waggel also reported that the same patient had tried to commit suicide on the unit but she (Dr. Waggel) had physically prevented the person from doing this and that there had been multiple fights involving patients on the unit which she felt she had taken care of without support. **Exh. C** (Emejuru Decl.) ¶ 97.

368.    Dr. Waggel further reported that she was traumatized by the shift and thought she had PTSD and was unsure if she could return to the inpatient psychiatric unit again because of the trauma. **Exh. C** (Emejuru Decl.) ¶¶ 99 – 100.

369.    Dr. Waggel also reported that she had personally physically restrained a combative patient which is clearly outside the appropriate role of the psychiatrists and residents on the service. Any physical contact with a patient should be by the nurses, technicians, or security personnel. **Exh. C** (Emejuru Decl.) ¶ 103.

370.    In this conversation, however, Dr. Waggel did not mention her conversations with Dr. Khin Khin from that night when asked about what the attending physician had said about the events. **Exh. C** (Emejuru Decl.) ¶101.

371.    Dr. Waggel was scheduled to begin a rotation at Children's National Medical Center ("Children's) following her August inpatient psychiatry rotation. **Exh. A** (Catapano Decl.) ¶ 409.

372.    Following a Program administrative team meeting on August 31, 2015, in which concerns about Dr. Waggel's knowledge deficits, lack of professionalism, lack of interpersonal and professional communications skills, deficiency in systems-based practice, lack of awareness of appropriate boundaries, and failing to take minimal steps for her well being to be able to practice safely were discussed, Dr. Catapano reached out to the supervisor at Children's to assure appropriate workload and monitoring for Dr. Waggel and to withhold Dr. Waggel from taking call for the first two weeks to ensure she was meeting clinical expectations. Id.

373.    Dr. Catapano had a series of communications with the Director of the Training Program at Children's, Lisa M. Cullins, M.D., and various attending physicians there, including Drs. Dave, Solages, and Joshi., Exh. A (Catapano Decl.) ¶ 415; see also Exhibit 95 thereto (GWU 001469), Email dated August 31, 2015 at 4:04 p.m., Dr. Cullins to Dr. Catapano and various cc's.

374.    Based on the fact that Dr. Waggel had had a number of difficult recent call incidents, the plan for her rotation at Children's was to start on a unit with a manageable workload with two Fellows (the next step beyond residency training) on the unit and suspend her call duties for the first two weeks to ensure Dr. Waggel was meeting clinical expectations and was comfortable "with the workload, team members and patient population." Exh. A (Catapano Decl.) ¶ 416.

375.    Dr. Catapano also sought to make arrangements to ensure that during the rotation at Children's, Dr. Waggel would be able to keep weekly psychotherapy appointments. **Exh. A** (Catapano Decl.) ¶ 410.

376.    She emailed Dr. Cullins and her attendings a second time on August 31 to see if she could assure that Dr. Waggel would have a set weekly time for her psychotherapy as follows:

> Dear Paramjit, Lisa, Martine and Bhavin,
> Thanks so much for working with us to give Stephanie the best chance of success there. She really wants to do a good job, but as Lisa and I have been discussing, is not at 100% now. The one other recommendation I would propose, if it is possible to accommodate, is to allow her to go to weekly psychotherapy. If there is a way for her to do that that is the least inconvenient for you, please let her/me know.
> Thanks again,
> Lisa

**Exh. A** (Catapano Decl.) ¶ 419; see also Exhibit 96 thereto (GWU 001470), Email dated August 31, 2015 at 4:35 p.m., Dr. Catapano to Dr. Cullins, cc's to others.

377.    Dr. Cullins responded promptly: "We are in support of her going to psychotherapy. Any day would be manageable given our current treatment team except for Wednesday. Would that work? All we would need to know is the exact day and time each week and plan accordingly." **Exh. A** (Catapano Decl.)¶ 420; <u>see also</u> Exhibit 96 thereto.

378.    Dr. Catapano also continued to meet with Dr. Waggel to review how she was doing and at one point specifically discussed the importance of self-care, being aware of one's own health status and knowing when to withdraw from providing care. **Exh. A** (Catapano Decl.) ¶ 411.

379.    On August 31, 2015, Dr. Waggel exchanged texts with Dr. Emejuru in which she noted that Dr. Catapano would take steps to help assure that she would have time to attend her

weekly psychotherapy sessions during her shift at Children's and he provided advice on how she

could get back on track as follows:

> [SW] Dr Catapano said that she would help so that I can have time for therapy every week. I really need to talk to someone about all these stressful things. She told [me] something that really stuck with me. She said since we are doctors we ignore normal signs of exhaustion and keep pushing through. She said that when she was a resident one of the Chiefs said that his biggest clue that he was overwhelmed is when he would be frustrated at little old ladies. He loved old people so he knew that if he was irritated by a patient that was a little old lady that was a clue to take a breather. I think my clue that I'm exhausted is that I was starting to think people were doing these things to me on purpose. I realize it's highly unlikely that other people were purposely putting me into these situations. It just seems like my life has been a series of unfortunate events the past few months. These events make people watch me closer making me feel like I'm being treated unfairly. I feel it would really help if I was able to talk to a therapist once a week and continuing meeting regularly with dr [sic] Catapano. Can you think of anything else I could do to get back on track?

> [JE] Glad to hear all of that Stephanie. I think that is all perfect advice and something to keep in your 'back pocket' to hold on to for future reference. I'll always be there for anything you need this year. Just remember to communicate and ask yourself 'is this something I'd need to tell my chief or my chief would do' before you make any important decision. That's what I did when I came to GW

> [SW] WWJD What would Jason do!?!

> [JE] Please buy my wrist bands at wwjd.org. But seriously, it's good advice: you can sub that for Catapano, Kels, Norris, etc

Exh. C (Emejuru Decl.) ¶ 113; see also Exhibit 32 thereto (Plaintiff Bates 1148 – 1151), Screen

shot of text messages starting August 31, 2015 at 5:08 p.m. (emphasis added).

380.    On August 29, fifteen days after Dr. Dyer's email response, Dr. Waggel

responded to his email request for a copy of her LOD by stating she was having a hard time

scanning" the LOD and instead attached a photo she had taken with her cell phone of an illegible

document that appeared to be a letter on MFA letterhead. **Exh. M** (Dyer Decl.) ¶ 20; see also Exhibit 3 thereto (GWU 1274 – 1276), Email dated August 29, from Dr. Waggel to Dr. Dyer.

381.    Dr. Dyer responded to Dr. Waggel on August 31, 2015, stating "Let's find a time to get together. Perhaps we could meet Thursday at Grand Rounds time [which started at 10:30 a.m.] since GR doesn't start until next week. Will that work for you?" and also told Dr. Waggel that he had not been able to read the document she had attached to her earlier email and asked her to bring a hard copy so we could just photocopy it. **Exh. M** (Dyer Decl.) ¶ 21; see also Exhibit 4 thereto (Plaintiff Bates 1153), Screen shot of email, dated August 31, 2015, Dr. Dyer to Dr. Waggel.

382.    On September 2, 2015, in follow up to a previously held conversation between the two, the Director of GME, Mary Tucker, provided Dr. Waggel with a list of names of mental health professionals from which she could seek counseling as needed. She also provided Dr. Waggel with advice on how to attempt obtaining discounted services from those professionals. See **Exhibit T** (Plaintiff Bates 783), Email, dated September 2, 2015 at 10:58 a.m., Mary Tucker to Dr. Waggel.

383.    On Wednesday, September 2, 2015, at 1:21 p.m., Dr. Waggel responded to Dr. Dyer: "Tory [Program Administrator Victoria Anderson] said that I can meet with you tomorrow from 12 to 1230 at the mfa. I can bring a copy of the letter. Thank you." Exh. M (Dyer Decl.) ¶ 22.

384.    Dr. Dyer later asked Ms. Anderson about this interaction and she stated that Dr. Waggel had told her that Dr. Dyer had asked for the 12:00 – 12:30 p.m. time, which was clearly, false. **Exh. M** (Dyer Decl.) ¶ 23.

385.     Dr. Waggel then sent a text message to Dr. Emejuru complaining that she was having difficulty communicating with Dr. Dyer about setting a meeting with him which she had been required to schedule within two weeks of a letter of deficiency she had received regarding her failure to show up for an ED shift in June. **Exh. C** (Emejuru Decl.) ¶ 114; see also Exhibit 33 thereto (Plaintiff Bates 1152 – 1159), Screen shot of text messages beginning September 2, 2015 at 2:25 p.m.

386.     Dr. Waggel complained that "Dr. dyers [sic] emails seem strange to me and I wanted your opinion." **Exh. C** (Emejuru Decl.) ¶ 115.

387.     Dr. Emejuru responded to Dr. Waggel to say that she was the one not responding appropriately to Dr. Dyer's proposal of a specific time for their meeting. He observed that Dr. Dyer had asked Dr. Waggel a straightforward yes or no question (could she meet with him at a specific date and time) and she had deflected to a non-responsive answer. He also told her of a simple way to get the meeting scheduled. Exh. C (Emejuru Decl.) ¶ 116.

388.     Dr. Dyer replied at 2:12 p.m. to Dr. Waggel noting that she had not answered the question and stated: "I offered to meet you at 1030 Thursday morning. That is a yes/no question. Can you meet at that time? If not, we can look for another time." **Exh. M** (Dyer Decl.) ¶ 24; see also Exhibit 4 thereto at GWU 001270.

389.     At 2:41 p.m., Dr. Waggel responded further: "When I contacted Tory she stated that I would be free from 12-1230 but I will be in didactics for the rest of the day. I just called her again and she stated that I could be excused from class at 1030 if that is the only time you can meet. Thank you." **Exh. M** (Dyer Decl.) ¶ 26.

390.     Dr. Dyer eventually agreed to meet at noon. **Exh. M** (Dyer Decl.) ¶27.

391.    Dr. Dyer and Dr. Waggel met on September 3 to discuss the contents of the July 15 LOD. **Exh. M** (Dyer Decl.) ¶ 28.

392.    Dr. Waggel stated the following in the meeting:

- 90% of the LOD was false.

- She had cancer and was sick and vomiting that day and should not have been expected to come to work.

- She told an attending physician, but could not remember who.

- She asked another resident to cover for her, but also could not remember who.

- She did not recall getting any phone calls about her failure to report for duty at the beginning of the shift and did not think that anyone would care if she did not show up.

**Exh. M** (Dyer Decl.) ¶¶ 28 – 32.

393.    Dr. Waggel showed little awareness of the impact of her own behavior on interactions with others and explained at length the shortcomings of the environment in which she worked and lodged complaints about her fellow residents. **Exh. M** (Dyer Decl.) ¶¶ 33, 35.

394.    When Dr. Dyer pointed out repeatedly that she was not answering his questions about the incident itself, Dr. Waggel identified that she was being tangential, but then suggested she was being circumstantial in that she was trying to come back to the questions. Exh. M (Dyer Decl.) ¶¶ 36.

395.    Dr. Dyer asked Dr. Waggel if she felt overwhelmed in the Program, which she denied. **Exh. M** (Dyer Decl.) ¶ 38.

396.    Dr. Dyer also asked if she thought a leave of absence might help. She said she had taken a leave of absence, went to Italy, and felt much better. **Exh. M** (Dyer Decl.) ¶ 39.

397.    When discussing the requirement of the LOD that she provide Dr. Dyer with the names of her supervisors so that her attendance could be verified, Dr. Waggel was hesitant because she was "paranoid" about this because she felt this would prejudice them against her. **Exh. M** (Dyer Decl.) ¶¶ 40 – 41.

398.    Dr. Dyer responded that she should be on her best behavior and that working in psychiatry required "emotional intelligence" and an awareness of how one's behavior is being received by others. Dr. Waggel responded that this was an issue she would take to therapy. **Exh. M** (Dyer Decl.) ¶ 42.

399.    Dr. Dyer prepared a report of the meeting for Dr. Catapano's review in which he noted concern that Dr. Waggel's defensiveness, her entanglements with fellow residents and staff, and general lack of reflectiveness might be but the tip of a larger iceberg of problems. He also noted concern over her tendency to "triangulate" communications and say things that are not true or are only partially true. **Exh. M** (Dyer Decl.) ¶¶ 43 – 44; see also Exhibit 5 thereto (GWU 1118 – 1119), Dr. Dyer's report.

400.    Dr. Dyer went on to question whether Dr. Waggel had the ability to do the work that the specialty of psychiatry requires and that it was difficult to develop a remediation strategy because Dr. Waggel did not really understand that she had a problem but instead felt that there were many problems with the program. **Exh. M** (Dyer Decl.) ¶¶ 45, 49.

401.    On September 3, 2015, Dr. Waggel had her first session with Dr. Jelena Kecmanovic, a clinical psychologist. Dr. Kecmanovic noted the following:

> Stephanie is a 28-year old second-year resident at GWU psychiatry department. She presents as depressed and somewhat anxious. She reports anhedonia, insomnia, low appetite and weight loss, fatigue, and difficulty concentrating, worry, and rumination. She also reports frequent and fleeting suicidal ideation but denies plan or intent. Currently she takes

Viibryd (40 mg) for depression, Concerta for ADD, and Lorazepam (2 mg) as needed for anxiety.

See **Exh. U**, Dr. Kecmanovic Medical Records, p. Kecmanovic 000001.

402.    On September 8, 2015, Dr. Waggel emailed Dr. Emejuru and Dr. Catapano stating that she was scheduling her USMLE Step 3 licensing exam (a national exam physician's are required to take as part of the licensing process), that she wanted to confirm her rotation for the month of October, and that she "can take it [the USMLE Step 3 exam] whatever day <u>and use an administration day</u>." **Exh. C** (Emejuru Decl.) ¶ 117; <u>see also</u> Exhibit 34 thereto (Plaintiff Bates 786), Email, dated September 8, 2015 at 8:05 a.m. (emphasis added).

403.    Dr. Emejuru immediately confirmed her understanding was correct. **Exh. A** (Catapano Decl.) ¶ 436.

404.    On Thursday, September 10, 2015, Dr. Waggel was scheduled to present a reading assignment to the class in the Introduction to Psychodynamic Thought didactic seminar taught by Dr. Cheryl Collins. **Exh. I** (Collins Decl.) ¶ 19.

405.    The course is structured such that each week one resident is designated to lead the discussion of the assigned reading. Additionally, 1-2 other students are designated to present a 1-5 minute presentation based on a patient they have encountered during one of their rotations. Dr. Collins' allows the students to choose the order of the presentations in order to accommodate their post call schedules. **Exh. I** (Collins Decl.) ¶ 6.

406.    At the beginning of the semester, Dr. Collins gives the students a syllabus with weekly assigned readings that each student is expected to complete. **Exh. I** (Collins Decl.) ¶ 5.

407.    On September 10, the day Dr. Waggel was to lead the discussion, when Dr. Collins asked her if she was ready to present, Dr. Waggel borrowed a copy of the article from a classmate and rushed out of the room to make a copy. **Exh. I** (Collins Decl.) ¶ 21.

408.    When she returned, she asked if Dr. Collins wanted her to read it to the class. Dr. Collins responded no, and that Dr. Waggel was to summarize the material in the article as she had observed her classmates who had presented before her. **Exh. I** (Collins Decl.) ¶ 22.

409.    Instead of summarizing the article, however, Dr. Waggel stated she had difficulty with it because it reminded her of her own problems. She then proceeded to discuss problems that she was having with her attendings and some of the nurses on the unit during her work shifts. **Exh. I** (Collins Decl.) ¶ 23.

410.    The remainder of the class was spent discussing Dr. Waggel's personal issues instead of the assigned reading material, which Dr. Collins reported was detrimental to the other members of the class. **Exh. I** (Collins Decl.) ¶ 23.

411.    On Friday, September 11, 2015 at 4:58 p.m., Dr. Waggel sent an email informing the program and her attendings at Children's of the schedule for her doctor and therapy appointments on September 15th at 2:00 p.m. and 4:00 p.m.; September 18th at 3:00 p.m., and September 22 at 11:00 a.m. and 3:00 p.m. **Exh. C** (Emejuru Decl.) ¶ 119; see also Exhibit 35 thereto (Plaintiff Bates 788), Email, dated September 11, 2015 at 4:58 p.m.

412.    Dr. Waggel never informed Dr. Catapano or Dr. Emejuru of any difficulties scheduling these appointments. **Exh. A** (Catapano Decl.) ¶ 441, **Exh. C** (Emejuru Decl.) ¶ 120

413.    On September 11, 2015, Dr. Waggel attended a therapy appointment with Dr. Kecmanovic. **Exh. U** at p. 000001.

414.    On September 11, 2015, Dr. Waggel emailed Dr. Dyer and Dr. Catapano stating that she was finding her therapy very helpful and asking that the LOD not be shared with anyone else, particularly her attendings at the sites for her upcoming rotations, for fear it would be detrimental for her to start each new month with an attending that "only knows me from the

information on a letter of deficiency" and stated that was so "especially because of the circumstances" of the letter. **Exh. M** (Dyer Decl.) ¶ 50; <u>see</u> <u>also</u> Exhibit 6 thereto (GWU 2833), Email, Dr. Waggel to Drs. Catapano and Dyer.

415.    Dr. Waggel's reference to the "circumstances" of the letter involved the fact that she "submitted my doctor's excuse for the day referred to in the letter" as well as a copy of her phone records which she alleged proved that she did not receive calls that morning. **Exh. M** (Dyer Decl.) ¶ 51.

416.    Dr. Waggel added again that the letter was incorrect, but that she had chosen to accept it. **Exh. M** (Dyer Decl.) ¶ 52.

417.    Dr. Waggel's email ignored what had been pointed out to her by several faculty members on several occasions, the problem was not whether she was sick or whether she had submitted a "doctor's excuse for the day," the problem was that it is a serious breach of professionalism not to alert the supervising attending physician, the Chief Resident, and other members of the medical team and program administration required to be informed when one is not going to show up for clinical duty. **Exh. M** (Dyer Decl.) ¶ 55.

418.    Her email also ignored that Dr. Dyer had discussed with her that the issues were concerns that went beyond attendance and she should focus on Professionalism and Systems-Based Care for the reasons we had discussed. **Exh. M** (Dyer Decl.) ¶ 56.

419.    Dr. Catapano responded to Dr. Waggel's email and assured her that the LOD was confidential and not shared with anyone other than herself, the Assistant Program Director, Dr. Lori Kels, the GME Office, and Dr. Dyer as he was in charge of her remediation. **Exh. M** (Dyer Decl.) ¶ 57.

420.     Dr. Catapano reiterated that the point of the LOD was not that Dr. Waggel had been sick, but her failure to take appropriate action to alert her team, chief residents, and the attending in advance so that appropriate coverage could be arranged. **Exh. M** (Dyer Decl.) ¶ 58.

421.     It was clear from the email, however, Dr. Waggel's lack of insight into her behavior and the deficits reflected by the behavior made remediation problematic. **Exh. M** (Dyer Decl.) ¶ 55.

422.     Dr. Waggel attended therapy with Dr. Kecmanovic on September 11, 2015. See **Exh. U** at p. 000001.

423.     Dr. Waggel attended therapy with Dr. Kecmanovic on September 15, 2015. See **Exh. U** at p. 000001.

424.     On September 15, 2015, Dr. Waggel was seen by Dr. Elizabeth Stark of the Ruth Paul Cancer Prevention Program at the George Washington Medical Faculty Associates for genetic testing counseling. See **Exhibit W**, MFA Medical Records, pp. MFA 0010 – 0012

425.     A DNA sample that analyzed 19 genes associated with an increased rick of renal cancer was taken and tested. Id. at MFA 0011.

426.     "Genetic test results were negative for mutations in these 19 genes, meaning no mutation was identified." Id.

427.     Dr. Stark's note stated, "[a]t this time there is no additional genetic testing that we would recommend" and advised Dr. Waggel to stay in contact with the Ruth Paul Program in case any other additional diagnoses or major health changes impacted her eligibility for additional testing. Id.

428.     No follow up visit was scheduled. Id.

429.    On September 21, 2015 at 1:32 p.m., Dr. Catapano emailed Dr. Waggel to tell her that one of the topics she intended to discuss at a meeting they had scheduled for the September 24 was "the plan for you to have more support and supervision on call when you return to GW in October." **Exh. A** (Catapano Decl.) ¶ 467; see also Exhibit 110 thereto (Plaintiff Bates 800), Email dated September 21, 2015 at 1:32 p.m., Dr. Catapano to Dr. Waggel.

430.    Dr. Catapano's email explained further that she was giving Dr. Waggel a heads up because Chief Resident Darlinda Minor was about to distribute the next call schedule and the reasons why it should be helpful for Dr. Waggel:

> I believe the most effective way to achieve this is to have the back-up PGYIII residents plan to come in and take call side-by-side with you for your first several calls back. As I said, I planned to discuss this with you on Thursday, and we still should, but for various reasons Darlinda needs to send out an updated version of the call schedule before then, and I wanted to give you a heads-up that these joint calls are going to be on the schedule. I think when we meet it would be helpful to articulate exactly what I think you struggled most with in your last few GW calls, and how we hope that this will be helpful to you.

**Exh. A** (Catapano Decl.), Exhibit 110 thereto at Plaintiff Bates 800).

431.    Dr. Waggel responded, "Sounds like a plan. I will see you Thursday at 830." <u>Id.</u>

432.    Dr. Waggel attended therapy with Dr. Kecmanovic on September 22, 2015. <u>See</u> **Exh. U** at p. 000001.

433.    Also at 11:05 a.m., on September 22, 2015, Dr. Waggel underwent an elective laser liposuction surgery at American Lipo Centers. The surgery was a touch-up procedure on her lower abdominals done as a follow up to a previous elective liposuction procedure Dr. Waggel underwent on January 9, 2015. <u>See</u> **Exhibit X**, American Lipo Centers Records, pp. 8 – 15.

434.    On September 23, 2015, Dr. Waggel emailed Dr. Catapano and Tory Anderson at 8:59 a.m., stating that she was sick and could not keep food down and needed to take a sick day. **Exh. A** (Catapano Decl.) ¶ 470; <u>see also</u> Exhibit 111 thereto (Plaintiff Bates 237); Email dated September 23, 2015 at 8:59 a.m., Dr. Waggel to Dr. Catapano et al.

435.    At 2:58 p.m., however, Dr. Waggel emailed Dr. Bhavin Dave, one of her attendings at Children's, giving the impression that the previous day's medial appointment was related to her cancer treatment by stating:

> I am very sorry for the inconvenience I probably caused by taking a sick day today. Yesterday one of the two appointments I had was to get one of my scars resected because it was not healing properly. The medication they gave me made me vomit most of the night. I was just now able to eat a small meal with no problems so I don't think call will be an issue. Again, I'm very sorry for this I know how busy Wednesday's [sic] are.

<u>See</u> **Exhibit Y**, Email, dated 2:58 p.m., September 23, 2015, Dr. Waggel to Dr. Dave.

436.    Dr. Waggel attended therapy with Dr. Kecmanovic on September 26, 2015. <u>See</u> **Exh. U** at p. 000001.

437.    On October 1, 2015, Dr. Emejuru emailed Dr. Waggel to ask how she was doing on her new duty rotation at Inova Fairfax Hospital. **Exh. C** (Emejuru Decl.) ¶ 121; <u>see also</u> Exhibit 36 thereto (Plaintiff Bates 807 – 809), Email, dated October 1, 2015 at 2:38 p.m., Dr. Emejuru to Dr. Waggel.

438.    Dr. Waggel responded: "I'm trying my very hardest. Still not getting much useful or specific feedback. But I'm certainly asking for it. If you can offer any I would love to hear it." **Exh. C** (Emejuru Decl.), Exhibit 36 thereto.

439.    Dr. Emejuru offered the following advice in response:

> I'll be honest with you. Feedback will likely be to separate the way you interact with your friends vs the way you interact with your patients, attendings, residents, hospital staff, God, etc and respond on time to

emails. It's really as simple as that, but it's difficult to make the changes overnight. No doubt.

Know when to make jokes with folks and when not too [sic]. When to be sarcastic and when not too [sic].

When I step into a hospital or clinic, I know that people (whether you think it's corny or not) will look up to me. Its' true. Your [sic] a doctor. People will think you are suppose [sic] to act a certain way because of that MD. They have a personality for you already in their minds before you even talk to them. So it's not that hard to see why they can be so shocked (or put off) if you deviate from what they expect.

Your personality is fine. It's great being around you. But it's different and I'm sure you know it's not what people will expect the personality of their physician to be. So you have to watch out for that. People expect (whether you like it or not) physicians/psychiatrist to be that stereotypical Middle Aged male/female who reads Freud or the classics after work and is as vanilla as vanilla.

That's the reality.

You have to know when to switch it on and off. That's basically what people want.

**Exh. C**, Exhibit 36 thereto at Plaintiff Bates 808.

440.    Dr. Waggel was due to return for a rotation at GW Hospital after the Inova Fairfax Hospital rotation. **Exh. C** (Emejuru Decl.) ¶ 124.

441.    In light of the difficulties Dr. Waggel had experienced during her GW Hospital rotations in August, Dr. Catapano prepared a plan to provide more support and supervision for Dr. Waggel on her return. The plan was to have the back-up PGY3 residents come in and take "buddy call" with Dr. Waggel for her first several calls back, and Dr. Catapano would meet with Dr. Waggel in advance to discuss what she felt Dr. Waggel had struggled with most during the last GW calls so she could focus on them to improve her performance. **Exh. C** (Emejuru Decl.) ¶ 125.

442.    Buddy call" is a commonly understood clinical medical training procedure with a specifically assigned more senior physician available as a sounding board and consulting source for any difficulties the more junior physician may encounter during initial phases of a new level of clinical work. **Exh. C** (Emejuru Decl.) ¶ 126.

443.    After the intern year when residents begin taking independent call for the first time, all residents have a "buddy call" system in place while they are introduced to this new level of responsibility. **Exh. C** (Emejuru Decl.) ¶ 127.

444.    The purpose of "buddy call" is not for the more senior physician to take over – or even share – the work of the less experienced physician. That would defeat the purpose of the exercise. The purpose is to assure that the more junior physician is not left to sink-or-swim, has a safe place to take any concern or insecurity, and will be comfortable practicing within his or her limits. **Exh. C** (Emejuru Decl.) ¶ 128.

445.    Dr. Catapano met with Dr. Waggel to discuss with her the nature and purpose of the joint calls and in particular that more senior residents would be available so she could consult with them if she had any questions in the course of the rotation concerning patient care, communications with other members of the team or other health care personnel, procedures to be followed or any other matters where she felt she needed additional information. Dr. Catapano made it quite clear that these individuals were not being assigned to do her work for her but to serve as a resource so the difficulties she had experienced during her rotation on 6 South during August would not be repeated and she would have a further opportunity to improve her own knowledge and clinical skills. **Exh. A** (Catapano Decl.) ¶ 472.

446.    On October 5, Linda Ojo, M.D., PGY3, served as the more senior resident on the first "buddy call" for Dr. Waggel's return to GW Hospital. **Exh. C** (Emejuru Decl.) ¶ 129.

447.    The following afternoon Dr. Ojo submitted an email report of the events of the

shift. She noted the following:

> [T]here were stark differences in Stephanie v. my understanding of the
> purpose of this buddy call. She felt it was admins [sic] way of alleviating
> her workload and as a result seemed completely taken aback at the
> suggestion that she had things to work on. I mention this only to
> emphasize that I think her anger about this negatively affected our
> interactions. Since she lacks any insight to her shortcomings, I did my best
> to explain areas of weakness as I see them but ultimately I think it will
> have more credibility if it comes from one of you.
>
>   *    *    *
> Timing: she needs to work faster on early evening assessments. It took
> way too long to reassess the FD12 and get to the next waiting ED patient.
> If this was a busy night this alone would have caused the pile up. When I
> pointed this out to her she was very defensive eg [sic] 'If you think you
> can do it faster come and help me' 'you assess him' 'you called me 10
> minutes ago and nothing has changed, you're berating me" etc.
>
> FD12s: She signed an FD12 . . . does not have a license. Apparently has
> been doing this 'for a while', when told to re-do she was very resistant and
> moaned about how she had so much to do, so many notes to write (at this
> point total patients seen all night was 2 plus reassessment of FD12). She
> wanted me to rewrite it 'what was the point of me doing it' and I had to
> push back several times before she got the message.
>
> There did not seem to be any issues with her communication with staff,
> ED, etc. and was professional for the most part. She [sic] was able to
> handle the ED successfully when they questioned her assessment that a
> patent lacked capacity to sign in.
>
> Unfortunately I got a call at 630am that my daughter missed the school
> bus so I had to leave however at that point she had updated and printed
> sign out. She also gave good feedback and asked appropriate questions
> when receiving sign out.
>
> Side note: She wanted to leave her page with me so she could go to whole
> foods [sic] and buy treats for nursing. I told her no because this is not
> consistent with being on call. She managed to get them anyway and I
> didn't ask how. I am assuming she did not leave the hospital and perhaps
> someone got them on her behalf? . . .

**Exh. C** (Emejuru Decl.) ¶¶ 130 – 131; <u>see also</u> Exhibit 37 thereto (GWU 001458 – 001459), Email, dated October 6, 2015 at 12:03 p.m., Dr. Ojo to Dr. Kels, Dr. Emejeru.

448.    Dr. Waggel attended therapy with Dr. Kecmanovic on October 6, 2015. <u>See</u> **Exh. U** at p. 000001.

449.    The second exam in Dr. Griffith's Clinical Neurosciences course was given on October 8, 2015. Dr. Waggel scored a 33 on the exam. **Exh. N** (Griffith Decl.) ¶¶ 42 – 43; <u>see also</u> Exhibit 7 thereto (GWU 1516), a copy of Dr. Waggel's exam.

450.    This score again clearly signified that Dr. Waggel did not comprehend the significant material presented in the second segment of the course. Exh. N (Griffith Decl.) ¶ 44.

451.    According to Dr. Griffith, Dr. Waggel's poor performance in his class extended beyond failing test grades. **Exh. N** (Griffith Decl.) ¶ 45.

452.    Despite the ACGME requirements made known to all residents, she missed a number of class sessions. **Exh. N** (Griffith Decl.) ¶ 46.

453.    When Dr. Waggel did attend Dr. Griffith's class, she often distracted the entire class from the lecture and discussion of material being presented by tangential, inappropriate interruptions related to her personal problems that were completely unrelated to the Neuroscience topics presented in the course, were inappropriate in an academic setting, and revealed a lack of understanding of professional boundaries. **Exh. N** (Griffith Decl.) ¶¶ 47, 49.

454.    Dr. Waggel would make comments such as, "I have so many appointments with Dr. Catapano, there is no way I can study for the exam," and "Dr. Catapano won't let me go to doctor visits." **Exh. N** (Griffith Decl.) ¶ 48.

455.    As department chair, Dr. Griffith followed up with Dr. Catapano about Dr. Waggel's claims and was informed that it had never been the case that either she or anyone else

to her knowledge had ever prevented Dr. Waggel from attending medical appointments, any leave requested for that purpose had always been granted, Dr. Catapano's comments to Dr. Waggel regarding medical appointments was that she could not just leave work or not show up for clinical rotations or didactic sessions without telling people and letting them know in advance. **Exh. N** (Griffith Decl.) ¶¶ 51 – 52.

456.    October 12, 2015, was the next "buddy call" night for Dr. Waggel with PGY3 Shuo (Sally) He, M.D., as her buddy. **Exh. C** (Emejuru Decl.) ¶ 132.

457.    Dr. He reported several of the same issues noted by Dr. Ojo, particularly Dr. Waggel's lack of insight into why she was on buddy call and what she needed to work on, and that the PGY3 was not there to do her work for her. **Exh. C** (Emejuru Decl.) ¶ 132; see also Exhibit 38 thereto (GWU 001449 – 001450), Email, dated October 13, 2015 at 9:57 a.m., Dr. He to Dr Emejuru, Dr. Minor.

458.    On October 14, 2015, in response to this information and to try to get this situation back on track for Dr. Waggel given her professed lack of understanding as to why she was on buddy call, the matters she needed to work on, and the fact that the assigned PGY3s were not there to do her work for her, Dr. Catapano prepared a memo to Dr. Waggel about buddy call confirming what a physician in residency training presumably already knew but would perhaps become clearer for Dr. Waggel if presented in writing, which Dr. Emejuru forwarded to Dr. Waggel at 9:50 a.m. **Exh. C** (Emejuru Decl.) ¶¶ 135 – 137; <u>see</u> <u>also</u> Exhibit 39 thereto, a copy of the memorandum, and Exhibit 40 (Plaintiff Bated 001447), Email, dated October 14, 2015 at 9:50 a.m., Dr. Emejuru to Dr. Waggel .

459.    Dr. Waggel responded to Dr. Emejuru by text at 10:24 a.m. stating, "[I]'ve been on independent call as Linda [Dr. Ojo] slept the whole time then randomly left in the middle of

the night and Sally went to bed and got up at seven. Anyway as usual I'll just do as I'm not start a fuss [sic]. I'll gladly continue this 'buddy call.'" **Exh. C** (Emejuru Decl.) ¶¶ 138 – 139; see also Exhibit 41 thereto, Screen shot of text messages beginning October 14, 2015 at 10:24 a.m.

460.    It was clear from Dr. Ojo's report that these statements were not true. Dr. Ojo commented on a number of aspects of Dr. Waggel's performance across the entire shift and had voluntarily informed us that she left a half hour early at the end of the shift when she got a call at 6:30 a.m. that her daughter had missed her school bus so Dr. Ojo had had to go home. Dr. Ojo also reported that by the time she left, Dr. Waggel had already updated and printed the sign out materials. **Exh. C** (Emejuru Decl.) ¶ 140.

461.    It was also clear from Dr. He's report that she had been more involved in supervising Dr. Waggel's shift than simply arriving, going to bed and waking up at 7:00 a.m. **Exh. C** (Emejuru Decl.) ¶ 141.

462.    On October 13, 2015, Dr. Catapano emailed Dr. Waggel and one other resident stating that if they did not get their required health clearance process completed by the end of the next business day, "you will be pulled from duty" and would "likely get a letter of deficiency from the GME office" and would also "probably be asked to make up the days by having your graduation date delayed, not to mention disrupting the services who are depending on you." **Exh. A** (Catapano Decl.) ¶ 479; see also Exhibit 117 thereto (GWU 001414), Email dated October 13, 2015, Dr. Catapano to Dr. Waggel et al.

463.    Dr. Waggel had failed to complete that fundamental task required by District of Columbia law (and every other jurisdiction in the United States) within the well known deadline of September 30 each year requirement, despite many repeated requests and warnings. **Exh. A** (Catapano Decl.) ¶ 479.

464.    The Program Administrator, Ms. Anderson, had sent multiple reminders to Dr. Waggel and other residents in advance of the original deadline. Exh. A (Catapano Decl.) ¶ 480; see also Exhibits 114 thereto (GWU 001431), Email dated September 22, 2015 at 2:21 p.m., Ms. Anderson to Dr. Waggel, et al; and Exhibit 115 thereto (GWU 001428), Email dated September 25, 2015 at 11:02 a.m., Ms. Anderson to Dr. Waggel.

465.    When Dr. Waggel failed to meet the September 30 deadline, Dr. Gary Little, Medical Director of GW Hospital, assigned an extended deadline for Dr. Waggel of October 14. **Exh. A** (Catapano Decl.) ¶ 481.

466.    Dr. Catapano instructed Dr. Waggel to take care of the health clearance issue immediately. **Exh. A** (Catapano Decl.) ¶ 486.

467.    Dr. Waggel failed to meet the extended deadline. **Exh. A** (Catapano Decl.) ¶ 489.

468.    This instance of non-compliance occurred in the context of other ongoing non-compliance issues with Dr. Waggel and Program administration requirements, including a failure to comply with GMEC Mandatory Duty Hours for September and Failure to log into MedHub to identify supervisors on her clinical rotations as the attending physicians cannot access a resident's evaluation form until the resident first selects them as a supervising attending for each rotation. **Exh. A** (Catapano Decl.) ¶ 491; see also Exhibit 119 thereto, Email dated August 31, 2015 at 9:34 a.m., Ms. Anderson to all residents, Exhibit 120 thereto, Email dated Sunday September 13, 2015 at 11:42 p.m., Dr. Waggel to Ms. Anderson, et al., Exhibit 121 thereto, Email dated September 28, 2015 at 1:24 p.m., MedHub Notification to Dr. Catapano, Exhibit 122 thereto Email dated October 13, 2015 at 3:03 p.m., Ms. Anderson to Dr. Waggel.

469.    On October 14, Dr. Emejuru met with Dr. Waggel to again review the reasons why she was on buddy call and the matters addressed in the buddy call memo and note that this

was being done to assist her. Her opinion remained that it was unnecessary and unfair but that she would go along with it. **Exh. C** (Emejuru Decl.) ¶ 148.

470.    On or about August 15, 2015, as a result of the August 25 shift events, a Root Cause Analysis ("RCA") was being conducted to address the deficiencies in patient care that had occurred, both those related to healthcare system issues and personal performance issues. Exh. A (Catapano Decl.) ¶¶ 473, 476.

471.    An RCA is a process to identify "root causes" of problems or events and an approach to solve them. **Exh. A** (Catapano Decl.) ¶ 474.

472.    In this instance, Dr. Norris and Dr. Gandhi conducting the RCA and as part of the review interviewed Dr. Waggel regarding the events of that night. **Exh. A** (Catapano Decl.) ¶ 475.

473.    On October 15, 2015, 11:32 a.m., Dr. Waggel sent Dr. Emejuru a text stating she had "found out why I'm on buddy call and on track to 'repeat'" adding:

> Because one nurse named Shemika sent out an email with false information about that call night. Fortunately, I documented everything so I can show that she was lying. It's a shame that no one asked me what happened but instead took this nurses [sic] email as truth.
>
> Now instead of studying for the step I have to take screen shots of my orders and notes to show everyone what actually happened.

**Exh. C** (Emejuru Decl.) ¶ 149; see also Exhibit 42 thereto (Plaintiff Bates 1168 - 1172), Screen shot of text messages.

474.    Dr. Emejuru found the text message to represent a total mis-read by Dr. Waggel of what she had been told on a number of occasions by several faculty members and by me. A report by Nurse Shemika Anthony presented some of the events that occurred during the August

25 – 26 overnight shift that raised concerns about Dr. Waggel's performance, but the major concerns arose from matters directly participated in and observed by Dr. Khin Khin and Dr. Norris in their interactions with Dr. Waggel during the shift and in the report Dr. Catapano received from Dr. Waggel herself when they met immediately after the shift and Dr. Catapano reviewed the events with Dr. Waggel. **Exh. C** (Emejuru Decl.) ¶ 150.

475.    On October 15, 2015 at 12:44 p.m., Dr. Waggel sent an email to Dr. Catapano, Dr. Kels, and me stating, "I believe I was initially confused as to why I am on buddy call. I have been asking for the specific reason I am now on buddy call and informed that it is due to the events that occurred during my last two calls and the letter from the ED [referring to the Letter of Deficiency for her no show to the ED on June 10]. Is this correct?" Exh. C (Emejuru Decl.) ¶ 154; see also Exhibit 43 thereto (GWU 001446), Email, dated October 15, 2015 at 12:44 p.m., Dr. Waggel to Dr. Catapano, et al.

476.    On October 15, 2015 at 4:52 p.m., Dr. Catapano replied that Dr. Waggel was on buddy call "primarily because of [her] last August call. It has nothing to do with your not coming in for your ED shift." **Exh. C** (Emejuru Decl.) ¶ 155.

477.    Dr. Catapano further reminded Dr. Waggel that that she had specifically discussed with Dr. Waggel "several concerns about your management of pts and the unit during that call" and that she knew Dr. Waggel had gone over the same issues "in detail with Dr. Norris and Dr. Gandhi" which would lead to a further letter of deficiency outlining these matters. **Exh. C** (Emejuru Decl.) ¶ 156.

478.    Finally, Dr. Catapano confirmed that as Dr. Emejuru had discussed with Dr. Waggel and has been outlined in the buddy call memo, the purpose of the buddy calls for Dr. Waggel was "to provide extra support and supervision." **Exh. C** (Emejuru Decl.) ¶ 157.

479.    On October 17, 2015, in response to an email from Dr. Waggel two days earlier with notice that she was likely to miss a class due to a change in her schedule requiring her to prepare for a meeting, Dr. Collins told Dr. Waggel she understanding of her absence, but made clear that lack of attendance in class was affecting Dr. Waggel's performance in the class. **Exh. I** (Collins Decl.) ¶ 24.

480.    According to Dr. Collins, Dr. Waggel was routinely absent from her Psychodynamic Thought seminar during the summer – fall of 2015; missing more classes than she attended. **Exh. I** (Collins Decl.) ¶¶ 15 – 16.

481.    In Dr. Collins class, students were required to complete two written formulations based on patient interviews throughout the semester. They are provided anonymous feedback by the entire class on the first formulation and Dr. Collins provided one-on-one feedback for the second formulation. Exh. I (Collins Decl.) ¶ 7.

482.    Dr. Waggel also failed to attend any of the group feedback sessions. **Exh. I** (Collins Decl.) ¶¶ 7, 17.

483.    Dr. Collins noted that while it was clear that Dr. Waggel's absences affected her ability to apply the concepts that were covered in class as she attempted to prepare formulations, she was not critical of Dr. Waggel for missing class and did not chastise her in any way as she believed her absences to be related to her medical condition. **Exh. I** (Collins Decl.) ¶¶ 18, 24.

484.    To the contrary, following Dr. Waggel's email regarding her absence from class on November 17, Dr. Collins offered feedback on Dr. Waggel's most recent formulation and provided additional reading material to help supplement the discussion and instruction she had missed in class and to strengthen her next formulation. **Exh. I** (Collins Decl.) ¶ 25; see also Exhibit 4 thereto.

485.     Dr. Waggel's next buddy call was scheduled for October 17, 2015, with a PGY3,

Dr. Karen Wooten. **Exh. C** (Emejuru Decl.) ¶ 158.

486.     Prior to the shift, Dr. Emejuru texted Dr. Waggel to show support and offer

advice on how to succeed on the call as follows:

> [JE] Remember to talk with the upper level first to "set the tone" in terms
> of how you want to be supervised. But be sure to follow-up and ASK for
> feedback at the end of the shift and throughout
> Keep up the good work!
>
> [SW] I met w Karen about it earlier but that was when I thought it was bc
> I was overworked so I'll have to talk to her again
> Also a good bit of the things I'm to work on I've been told by many I
> excel at but I'll work to super excel. I can only get better!
> SUPER EXCEL
> Communication I think is one I agree I've been not good with so I'll put
> extra focus
>
> [EJ] Not being cliché when I say keep up the good work, I really mean it.
> Just do your work and think about each day being a job interview because
> at the end of the day, you will need LORs from these folks
> Glad to hear it!
>
> [SW] From Linda and Sally?! I hope not lol
> I don't think I'll be asking them for a letter
> And personally I don't think I could give them a good letter either
> Karen likes to teach so I think this will go better
> I don't think she'll randomly leave me either hahaha
> I bet Linda left for her kids or something that's my guess
>
> [JE] Steph, I'm talking about admin, attending
> Of course not residents
>
> [SW] They seem to think I'm doing well… At least from what they told to
> my face
> Even Dr Malik now! ☺
> ☺☺☺☺☺
> Dr Malik seems much happier at php and gives feedback so I'm really
> happy about that
> Maybe my email at the beginning helped
> I would give you a good letter Jason
> I felt like you were not biased and listened to me and gave actual advice
> and not vague advice

*thumbs up* *thumbs up*

[JE] I want to see you succeed!

**Exh. C** (Emejuru Decl.), Exhibit 44 thereto (Plaintiff Bates 1173 – 1179).

487.   Dr. Wooten produced a highly favorable report of her buddy call with Dr. Waggel. **Exh. C** (Emejuru Decl.) ¶ 161; <u>see</u> <u>also</u> Exhibit 45 thereto (GWU 001444 – 001445), Email, dated October 19, 2015 at 12:32 p.m., Dr. Wooten to Dr. Emejuru.

488.   She also commented that while she understood that the buddy call system is intended "not as a punitive measure but to improve Dr. Waggel's ability to function on call," she did believe it had been helpful for Dr. Waggel to receive written guidelines on the buddy call system and that having not done so for the preceding shifts put Dr. Waggel "at a severe disadvantage because it is difficult to meet standards when one has no idea what they are." **Exh. C** (Emejuru Decl.) ¶ 165.

489.   From Dr. Wooten's comments it was apparent that she was unaware of the very specific conversations had with Dr. Waggel in advance of the first buddy call regarding the reasons for the buddy call, specific matters Dr. Waggel needed to address, and how to go about addressing them and getting feedback. **Exh. C** (Emejuru Decl.) ¶ 167.

490.   On October 19, 2015 at 7:19 a.m., Dr. Waggel sent an email (but did not telephone) to an attending at Inova Fairfax Hospital where she was rotating, Dr. Aditi Malik, with copies to the administrative team, advising that she was feeling very ill and needed to take a sick day but if she started to feel better would try to come in during the afternoon. **Exh. C** (Emejuru Decl.) ¶ 169; see also exhibit 46 thereto (Plaintiff Bates 854), Email, dated October 19, 2015 at 7:19 a.m., Dr. Waggel to Dr. Malik et al.

491.    Dr. Waggel also did not telephone the supervising attending at Inova Fairfax Hospital, Dr. Cathy Crone, as was required. **Exh. C** (Emejuru Decl.) ¶ 170.

492.    At 4:20 p.m. that day, Dr. Waggel texted Dr. Emejuru reporting that she was very ill and vomiting and requesting what she should do. She stated she was worried "people will get upset at me if I take another sick day." Exh. C (Emejuru Decl.) ¶ 171; <u>see</u> <u>also</u> Exhibit 47 thereto (Plaintiff Bates 1180), Screen shot of text messages beginning October 19, 2015 at 4:20 p.m.

493.    Dr. Emejuru responded at 6:10 p.m. stating:

> Hi Steph, I'm going to email you and cc Tory [Ms Anderson, the Program Coordinator] so she is in the loop to keep track…honestly, if your [sic] too sick to come in you shouldn't and you know your body better than anyone. That's part of being a professional (not to be cliché, but it's true). I know because of your hx its [sic] not an easy decision.

**Exh. C** (Emejuru Decl.), Exhibit 47 thereto.

494.    The following morning at 9:51 a.m., the administrative assistant at Inova, Pamela Crawford, sent notice that the assigned attending for the program, Dr. Aditi Malik, had reported that Dr. Waggel did not show for the program the day before or that same day, that Dr. Malik had received a note from Dr. Waggel at 9:43 p.m., well after the shift had ended, and that she had received a text that morning from Dr. Waggel inquiring about prior emails concerning her sick day. **Exh. C** (Emejuru Decl.) ¶ 174; <u>see</u> <u>also</u> Exhibit 48 thereto (GWU 001365), Email, dated October 20, 2015 at 9:51 a.m., Ms. Crawford to Dr. Crone, et al.

495.    At this point, Dr. Waggel had missed sufficient time in her PGY2 year whether as a result of medical conditions or otherwise that there was a concern that if the absences continued, she would not meet requirements for sufficient actual on duty clinical days to receive credit for clinical rotations or for class time attendance and participation to receive credit for didactics courses. **Exh. C** (Emejuru Decl.) ¶ 173.

496.    Accordingly, Dr. Emejuru emailed Dr. Waggel stating with respect to sick leave that day and any future sick leave:

> I hope you are starting to feeling [sic] better.
>
> As you know, if you need to use another sick day, that will be just fine. Just make sure to let your attending, Tory [Ms. Anderson], and myself know. Also, based on the amount of sick days you have used so far this current academic year, you will need to provide a doctor's note for any future sick days taken.
>
> If you are not able to provide a note, vacation day(s) could be used for the day(s) you don't provide a note.
>
> Let me know if you have any questions and get well.

**Exh. C** (Emejuru Decl.) ¶ 177; see also Exhibit 49 thereto (GWU 001360), Email, dated October 20, 2015 at 11:17 a.m., Dr. Emejuru to Dr. Waggel. (emphasis added).

497.    Dr. Crone also emailed Dr. Waggel stating she had "been alerted to your need for sick days in the past 2 days" and the commenting further:

> Please note that it is not appropriate to send an e-mail to an attending to notify him or her that you will be out sick. It is particularly unacceptable to send a message late the evening after one has not shown up. Additionally, it is not helpful to send another e-mail the next day to notify the attending of an absence. Rather, you need to speak to that attending directly as soon as you think you might need to be off for a sick day. Attendings count on the help of residents when doing their patient care and they need to be able to gauge their workday depending on whether they might have assistance or not. This consideration and level of communication is necessary to maintain the level of professionalism expected of a physician. In addition to have needed to contact Dr. Malik [the attending], you also need to inform our office about any absence.

**Exh. C** (Emejuru Dec), Exhibit 50 thereto (Plaintiff Bates 443), Email, dated October 20, 2015 at 6:27 p.m., (emphasis added).

498.     Dr. Waggel responded the following morning to "apologize for this misunderstanding" and stated that "[O]n Monday October 19th at 7:19am I emailed Dr. Malik and administration to inform them that I was too ill to come into work later. I called Dr. Malik but there was no answer." **Exh. C** (Emejuru Decl.) ¶ 179, Exhibit 50 thereto.

499.     Dr. Waggel further described other subsequent communications she said she had had with Dr. Malik and attached a document purporting to show the communications. Id.

500.     Dr. Malik responded that she and her assistant, Valerie, had checked email and text messages and confirmed they had not received any notice from Dr. Waggel about her absence from clinical duties until October 21 and stated further: "I hope you are feeling better. My concern is not being informed in time." **Exh. C** (Emejuru Decl.) ¶181; see also Exhibit 51 thereto (GWU 001345), Email, dated October 21, 2015 at 9:49 a.m., Dr. Malik to Dr. Waggel.

501.     Dr. Waggel responded to Dr. Malik:

> That is unfortunate. Perhaps my initial email went to your spam box and my initial phone call did not go though [sic]. If you received at least some of my attempts to make contact, respectfully, one would have thought you would reply to those. I am happy to forward you the email from Monday morning. Have a nice day

**Exh. C** (Emejuru Decl.) ¶ 182, Exhibit 51 thereto.

502.     This was not a "misunderstanding." Dr. Waggel had failed to assure that the attending physicians and others actually knew she was not going to show for her clinical duties that morning before those duties began and in time for alternate arrangements for coverage to be made. **Exh. C** (Emejuru Decl.) ¶183.

503.     In the absence of direct contact either by speaking in person or by telephone with the attending and others requiring notification of absence for illness or any other reason, until there is confirmation of receipt of any other form of communication (voice mail message, email,

text message, etc.) by the attending physician and others, the notice has not been accomplished. **Exh. C.** (Emejuru Decl.) ¶ 184.

504.    Dr. Waggel attended therapy with Dr. Kecmanovic on October 20, 2015. <u>See</u> **Exh. U** at p. 000002.

505.    October 21, 2015 at 7:47 p.m., Dr. Waggel sent a text message to Dr. Emejuru stating she needed to talk with her parents and would then send him the dates she could not be on call during November. She was planning a trip to her parents' home in Pennsylvania and was also going to confirm any time off needed for medical appointments. **Exh. C** (Emejuru Decl.) ¶ 185; <u>see</u> <u>also</u> Exhibit 52 thereto (Plaintiff Bates 1187), Screen shot of text messages.

506.    Dr. Emejuru responded "Ok, I will do my best to make sure you are not on call those dates." **Exh. C** (Emejuru Decl.) ¶ 186, Exhibit 52 thereto.

507.    On October 21, 2015 at 10:58 p.m., Dr. Waggel emailed Dr. Emejuru stating she had appointments November 3, 10, 19, and 24 and had made arrangements to go home to Pennsylvania November 26 – 28 for legal documents to sign for her car inspection and insurance "that I can only do in PA" and she hoped to see her mother. **Exh. C** (Emejuru Decl.) ¶ 187; see also Exhibit 53 thereto.

508.    Dr. Emejuru responded the following day stating simply, "Ok thanks! Appreciate this." **Exh. C** (Emejuru Decl.) ¶ 188.

509.    On October 22, Dr. Emejuru emailed Pamela Crawford, the Program Administrator at Inova Fairfax, and Dr. Crone, Director of the residency training there, and Ms. Anderson forwarding a copy of an administrative leave form that had been submitted by Dr. Waggel on September 30 requesting four days administrative leave (October 27 – October 30) to

take the USMLE Step 3 exam. Exh. C (Emejuru Decl.) ¶ 189; see also Exhibit 54 thereto (GWU 001338 – 001339), Email, Dr. Emejuru to Ms. Crawford, et al.

510.     The attached leave form had been signed as approved by Dr. Malik, one of the Inova Fairfax attending physicians. **Exh. C** (Emejuru Decl.), Exhibit 54 thereto.

511.     Dr. Emejuru acknowledged that he had overlooked this leave form when he returned from an international elective but noted in the email forwarding the form that he had also already advised Dr. Waggel that she would need to have Dr. Crone sign off on any request as well moving forward. Id.

512.     Dr. Catapano later explained to Dr. Emejuru that the administrative time for the USMLE Step 3 exam is only two days because it is a two-day exam so administrative leave of four days should not have been approved and that Dr. Kels, the Associate Program Director, had offered Dr. Waggel two alternatives to correct the designation for the leave time. **Exh. C** (Emejuru Decl.) ¶ 192.

513.     In the interim, Dr. Kels, Associate Program Administrator, had already emailed Dr. Waggel at 12:02 p.m., regarding the incorrect approval of the administrative leave time including that the request had not been submitted to Dr. Crone as was required for all Inova Fairfax rotation sites as all residents had been reminded they were required to do as recently as September 14 by an email notice from Dr. Darlinda Minor, another of the Program's Chief Residents that year. **Exh. C** (Emejuru Decl.) ¶ 193, Exhibit 55 thereto (GWU 001325 – 001327, at GWU 001326).

514.     Dr. Kels further stated to Dr. Waggel that since Dr. Waggel was already scheduled to take the exam, she [Dr. Kels] wanted "to do everything possible from an administrative standpoint to facilitate your successful completion of the test." Id.

515.    Dr. Kels advised Dr. Waggel that she could take four days of leave as she had requested but that to be consistent and fair to all residents, approval would be confirmed for two days administrative leave for the exam (like everybody else in the Program for the USMLE Step 3 exam) and then decide whether to take two days of personal/vacation leave for the four-day leave, or take the 2 days of administrative leave for the exam and report for duty on the remaining 2 clinical days. The choice was Dr. Waggel's and would be approved either way. Id.

516.    Dr. Kels also alerted Dr. Waggel to the fact that while the Program would approve whichever option she selected for the requested leave, she should be aware in making the decision that her "attendance at PHP this month puts you in jeopardy of failing the rotation, based solely on the number of days worked/not worked." Id.

517.    On October 22, 2015 at 4:48 p.m., Dr. Waggel sent an email to Ms. Anderson, Dr. Catapano, Dr. Kels, Dr. Minor and Dr. Emejuru, regarding her response to an earlier email from Ms. Anderson at 12:53 p.m. explaining that Ms. Anderson had made a mistake in sending confirmation to Dr. Waggel of approval for the requested four days of administrative leave. Id. at GWU 001325.

518.    In her 4:48 p.m. email response to Ms. Anderson and others, Dr. Waggel stated she had been told the administrative leave was approved and then stated that "in regard to sick days for cancer follow up and taking administrative leave for my licensing exam . . . and receiving confirmation from multiple sources that I have done everything necessary, I still suffer negative consequences. The way I have been treated over the last five months has been inhumane." Id.

519.    Dr. Waggel's email was unresponsive as proposed change in administrative leave to two days for the USMLE Step 3 exam had nothing to do with a discussion of sick days and

discussion was solely about Dr. Waggel's choice in the use of administrative leave time and personal/vacation time. **Exh. C** (Emejuru Decl.) ¶¶ 199 – 200.

520.   Moreover, all of Dr. Waggel's previous requests for sick leave had been granted, were no "negative consequences" to Dr. Waggel in the Program's correction of the error in administrative leave time for the USMLE Step 3 exam, one held the error against Dr. Waggel. In fact, Ms. Anderson apologized for her mistake. **Exh. C** (Emejuru Decl.) ¶¶ 201 – 203.

521.   The correction to two days of administrative leave time was to assure that all residents would be treated the same. **Exh. C** (Emejuru Decl.) ¶ 204.

522.   At 2:33 p.m., on October 22, Dr. Waggel sent an email to Ms. Anderson, Dr. Emejuru, and Dr. Griffith stating there had been "negative repercussions" about taking a sick day for tests for "metastasis," she was going to need to take another sick day as she was "having extreme anxiety about the fact that was [sic] punished for this sick day despite" informing people in advance and reciting other matters. **Exh. C** (Emejuru Decl.) ¶ 209; see also Exhibit 58 thereto (Plaintiff Bates 861).

523.   There were no "negative repercussions" or "punishment" for Dr. Waggel related to the sick day she had taken. The only issue that arose was the matter previously addressed with Dr. Waggel on a number of occasions that it was her responsibility to assure that her attendings and program administrators received actual notice of an intended absence on a clinical shift, this time at Inova Fairfax, before the shift actually begins. **Exh. C** (Emejuru Decl.) ¶ 210.

524.   The medical appointment she had on October 20 was for a routine follow-up CT scan of the chest, abdomen and pelvis with contrast material performed at Washington Radiology Associates (which is only a few blocks from GW Hospital) as ordered by Dr. Siegel. The report

of the study noted "[N]o evidence of recurrent or residual disease. **Exh. J** (Siegel Decl.) ¶ 10; <u>see</u> <u>also</u> Exhibit 2, thereto, Report dated October 20, 2015.

525.    Dr. Waggel did not see Dr. Siegel on October 20, but his notes indicate that he reviewed the CT Scan report and the results of genetic testing Dr. Waggel underwent in September 2015, which were negative for any clinically significant variants in the genes associated with hereditary renal cell carcinoma. **Exh. J** (Siegel Decl.) ¶ 12; <u>see</u> <u>also</u> Exhibit 3 and Exhibit 4 thereto; Report of Genetics Consultation and Results of Genetic Testing.

526.    At approximately 5:00 p.m., on October 22, Dr. Waggel texted Dr. Emejuru to say that she was applying for sick leave beginning immediately until November 2, which would cover the time away for the USMLE Step 3 exam and the other two days for which administrative time had been incorrectly granted. **Exh. C** (Emejuru Decl.) ¶ 205; <u>see</u> <u>also</u> Exhibit 56 thereto (GWU 001319) Email, dated October 23, 2015 at 11:14 a.m., Dr. Emejuru to Dr. Catapano concerning events the day before.

527.    Later that day, Dr. Waggel called Dr. Emejuru to discuss what had happened and then emailed Dr. Kels, Dr. Catapano and others stating that "[Due] to my current condition, I will not be able to work tonight." **Exh. C** (Emejuru Decl.) ¶ 207; <u>see</u> <u>also</u> Exhibit 57 thereto (Plaintiff Bates 865), Email, dated October 22, 2015 at 5:14 p.m., Dr. Waggel to Dr. Kels, et al.

528.    She noted in the email that she had spoken to Dr. Emejuru over the phone on the matter, had arranged for another resident to cover her shift, and would submit a doctor's excuse for leave time. **Exh. C** (Emejuru Decl.) ¶ 208; <u>see</u> <u>also</u> Exhibit 57 thereto.

529.    On October 23, the LOA Program office was notified by Ms. Tucker that Dr. Waggel was requesting medical leave through November 2, beginning immediately. **Exh. O**

(Vanlewen Decl.) ¶ 18; see also Exhibit 4 thereto, October 23 Email, Mary Tucker to Kim Vanlewen.

530.    A benefits administrator immediately emailed Dr. Waggel with directions on how to access the website for The Standard, the University's third party benefits administrator, to apply for FMLA leave. **Exh. O** (Vanlewen Decl.) ¶ 19.

531.    Dr. Waggel submitted the necessary paperwork and was granted FMLA leave for the period October 26 – October 30, 2015. **Exh. O** (Vanlewen Decl.) ¶ 20.

532.    On October 23, 2015, the CCC held a regularly scheduled meeting to discuss the progress of each resident in the program. **Exh. M** (Dyer Decl.) ¶ 60; see also Exhibit 8 thereto, Minutes of October 23, 2015, Clinical Competency Committee Meeting.

533.    For approximately 30 minutes of the meeting the CCC discussed Dr. Waggel and noted that she was having problems in multiple aspects of the program resulting in further letters of deficiency either issued or to be issued, ongoing issues with medical leaves and professionalism and failure in program requisites (PROF2). **Exh. M** (Dyer Decl.) ¶ 61.

534.    It was further noted that two faculty members would be meeting with Dr. Waggel to discuss a Root Cause Analysis ("RCA" – a formal review of an unexpected or adverse event to determine the cause and set a plan for correction) of the overnight on call shift on August 25, 2015, in which Dr. Waggel had demonstrated significant lapses in the domains of Patient Care, Interpersonal Communications Skills, and Systems-Based Practice. ¶ **Exh. M** (Dyer Decl.) ¶ 62.

535.    It was further noted that Dr. Catapano was scheduled to meet with Associate Dean for Graduate Medical Education, Jeffrey Berger, M.D., to review Dr. Waggel's circumstances and determine the Program's next steps in her remediation. **Exh. M** (Dyer Decl.) ¶ 63.

536.    On October 23, 2015, at 11:44 a.m., Dr. Waggel sent an email to Ms. Anderson, Dr. Catapano, Dr. Kels, Dr. Minor and Dr. Emejuru stating that she had not been aware "of a policy stating a certain number of days missed despite have a doctors [sic] excuse would lead to failing the rotation." **Exh. C** (Emejuru Decl.) ¶ 216; see also Exhibit 59 thereto, Email, Dr. Waggel to Ms. Anderson et al.

537.    Dr. Waggel further stated in the email that, "[B]eing that this decision to fail me for missing days was not brought to my attention until the week before my exam I no longer have the ability to make such a study arrangement. It might be beneficial to clarify this policy and which residents it applies to." **Exh. C** (Emejuru Decl.) ¶ 217.

538.    The Program made clear to all residents that attendance at clinical training and didactics classes was required and that time missed from training, including for approved medical appointments or sick leave with a doctor's excuse, did not and could not count as actual training time. **Exh. C** (Emejuru Decl.) ¶ 218.

539.    Failing to meet the minimum training days required for each rotation, including sick leave and doctors' appointments, meant the rotation had to be repeated. **Exh. C** (Emejuru Decl.) ¶ 219.

540.    On Sunday, October 24, 2015 at 8:07 p.m., Dr. Waggel sent Dr. Emejuru a text message inquiring if he would be able to set her schedule for November to accommodate her doctor's appointments. **Exh. C** (Emejuru Decl.) ¶ 222; see also Exhibit 60 thereto (Plaintiff Bates 1199 – 1204); Screen shot of text messages beginning October 24, 2015 at 8:07 p.m.

541.    Dr. Emejuru responded noting that he was in the process of updating the call schedule and would let her know the schedule the following day. **Exh. C** (Emejuru Decl.) ¶¶ 221, 223.

542.    Dr. Waggel replied further:

> Ok thanks please remember I have therapy every Tuesday and
> one onc[cology] appt and one ext appt depending what onc
> says (appointment will prob be fertility specialist . . .   And the
> 25 – 28 I have to go home to sign Legal documents in PA. . . . .
> Thanks again Jason I'm sure it's time consuming to make this
> schedule.

**Exh. C** (Emejuru Decl.), Exhibit 60 thereto at Plaintiff Bates 1202.

543.    Dr. Emejuru responded further, "Stephanie, even though you said you will be out

from 26 – 28 during you [sic] last text, I will make this one exception and put you on call nov

22nd instead of 25th. Note that you will have to work around the call schedule and not the other

way around (like all residents have to) from here on out." Id. at Plaintiff Bates 1204.

544.    Dr. Waggel replied further: "Other residents can make switches and I cannot. You

can keep me on the 25 I'm having someone drive me to PA anyway I'll sleep in the car." Id.

545.    On October 28, 2015, Dr. Waggel was issued second Letter of Deficiency in the

area of Professionalism for her failure to get the required health clearance as she had been

instructed and reminded for several months by multiple parties. **Exh. B** (Berger Decl.) ¶¶ 11 –

12; see also Exhibit 1 thereto, a copy of the October 28, 2015 LOD.

546.    Dr. Waggel attended therapy with Dr. Kecmanovic on November 3, 2015. See

**Exh. U** at p. 000002.

547.    On November 3, 2015, Dr. Catapano emailed Dr. Dyer concerning the third Letter

of Deficiency she had begun drafting regarding Dr. Waggel's unprofessional performance during

the August 25 overnight call shift. **Exh. A** (Catapano Decl.) ¶ 547; see also Exhibit 138 thereto

(GWU 001202), Email dated November 3, 2015 at 3:01 p.m., Dr. Catapano to Dr. Dyer.

548.    She noted that a plan for remediation should start with a re-stating of the original

requirement that Dr. Waggel meet with Dr. Dyer regarding the first Letter of Deficiency and that

the plan should involve concrete remediation including review of Code Strong procedures. **Exh. A** (Catapano Decl.) ¶548.

549.    She also noted, however, that the greater concern was Dr. Waggel's lack of insight concerning issues related to professionalism, self-care, self-regulation and interpersonal communication. **Exh. A** (Catapano Decl.) ¶ 549.

550.    Dr. Catapano noted her upcoming meeting with Dr. Berger in a few days to make a plan in the coming months to address Dr. Waggel's deficiencies and to "clarify the degree to which she is or is not remediable" and that Dr. Berger might have a recommendation for more intensive remediation than the initially proposed weekly meetings with Dr. Dyer. **Exh. A** (Catapano Decl.) ¶¶ 550 – 551.

551.    Dr. Dyer responded that there was another deficiency that should be added to the list – failure to comply with the first Letter of Deficiency remediation plan which was "pretty basic" – meet with him in two weeks and notify him of her supervisors so he could verify attendance. **Exh. A** (Catapano Decl.) ¶¶ 552.

552.    He also noted that Dr. Waggel had not initiated an attempt to meet with him within the two weeks and when they did finally meet, she said that 90% of what was in the letter was wrong. **Exh. A** (Catapano Decl.) ¶ 553.

553.    Dr. Dyer commented further, given that the problems with Dr. Waggel were as basic as the ones identified at the recent CCC meeting, he was not sure what would be accomplished by his meeting with Dr. Waggel once a week even if he had the time to do that which he did not. **Exh. A** (Catapano Decl.) ¶ 554.

554.    On Thursday, November 5, 2015, Dr. Waggel turned in her third patient formulation to Dr. Collins in her Psychodynamic Thought didactics class. The formulation was

due on Sunday, November 1, 2015, but she failed to submit the assignment on that day. Exh. I (Collins Decl.) ¶¶ 26, 27.

555.    When Dr. Collins pointed out to her that the assignment was due several days earlier Dr. Waggel noted only that she "ended up needing more tests than [she] anticipated, that's why [she] sent [me] the doctor's slip." **Exh. I** (Collins Decl.) ¶ 27; **see also** Exhibit 5 thereto (Plaintiff Bates 475 – 476), Email, Dr. Waggel to Dr. Collins.

556.    Dr. Collins did not admonish or chastise Dr. Waggel about this issue, but instead simply inquired as to her health, to which Dr. Waggel responded that she was okay and thanked Dr. Collins for inquiring. Exh. I (Collins Decl.) ¶¶ 28 – 29.

557.    Upon review of the formulation, it was clear that Dr. Waggel completely lacked understanding of the psychodynamic concepts had covered in the class, due in large part to the fact she missed the majority of the class sessions. **Exh. I** (Collins Decl.) ¶¶ 30 – 31.

558.    Dr. Waggel's non-mastery of the class material was also evident from her participation in class, which was often off-topic, misguided, and did not express an understanding of the reading material assigned for that class period. **Exh. I** (Collins Decl.) ¶ 32.

559.    Dr. Collins reported that she often questioned whether Dr. Waggel had actually read the material based on the comments she made in class. **Exh. I** (Collins Decl.) ¶ 33.

560.    It was also evident to Dr. Collins that Dr. Waggel lacked the insight necessary to recognize the inappropriateness of her behavior and how it impeded the class or the frustration her behavior caused her classmates. **Exh. I** (Collins Decl.) ¶¶ 34 – 35.

561.    Because of Dr. Waggel's glaring interpersonal deficiencies and lack of understanding of the material, Dr. Collins did not feel that she was ready to move forward with seeing a patient to apply the psychodynamic principles the other students had learned, which was

the next step in the didactic training process. Dr. Collins provided this feedback to Dr. Waggel in writing on November 7, 2015. **Exh. I** (Collins Decl.) ¶¶ 9, 36; <u>see</u> <u>also</u> Exhibit 6 thereto.

562.    Dr. Collins also shared her feedback letter to Dr. Waggel with other members of the faculty: The Psychiatry Residency Program Director, Dr. Lisa Catapano; the Psychiatry Department Chair, Dr. James Griffith; the Associate Program Director, Dr. Lori Kels, and another Psychodynamic Thought Professor, Dr. John Zinner. **Exh. I** (Collins Decl.) ¶ 39.

563.    She noted: (1) That Dr. Waggel had missed most of the didactics sessions that semester, presumably due to her illness, and when she did come to class she was generally late; (2) on the day she was to present her article to the class she had no idea what to do and could not handle the simple task of summarizing the article, but instead launched into a personal story about how nurses and attendings on her unit had been complaining about her, and (3) that she did not believe she had demonstrated mastery of the material or the emotional stability to see a patient. **Exh. I** (Collins Decl.) ¶ 40; <u>see</u> <u>also</u> Exhibit 7 thereto.

564.    Dr. Catapano responded to the email stating that Dr. Waggel's performance in my class was quite similar to that of her other classes. **Exh. I** (Collins Decl.) ¶ 41

565.    Dr. Catapano further noted that Dr. Waggel had not formally requested any accommodation related to her medical condition, so there was no documented reason for her to miss class with such regularity for medical appointments. **Exh. I** (Collins Decl.) ¶ 42.

566.    Dr. Catapano also informed Dr. Collins that she would be speaking with Dr. Waggel in the coming week to recommend that Dr. Waggel extend her residency training by at least six months so that she could repeat those areas of PGY2 training she was unable to master, including the Introduction to Psychodynamic Thought course. **Exh. I** (Collins Decl.) ¶ 43.

567.    On Thursday, November 5, 2015, Dr. Catapano met with Dr. Berger to review Dr. Waggel's tenure in the program and all the concerns that had arisen about her failure to perform to Program requirements and the effort to come up with a remediation plan in addition to all the other steps already taken, including buddy call, the frequent meetings with her, Dr. Emejuru's work with Dr. Waggel to coordinate her schedule, arrangements for her medical appointments and psychotherapy therapy, encouraging supervising attendings to provide frequent concrete feedback, and the proposal to keep Dr. Waggel on buddy call with more senior resident supervision. **Exh. A** (Catapano Decl.) ¶ 555.

568.    Based on Dr. Waggel's then current Milestone evaluation, which was significantly below that expected for her level of training, Dr. Berger suggested that the Program consider extending Dr. Waggel's training by 6 months. **Exh. A** (Catapano Decl.) ¶ 556.

569.    Dr. Berger did not think there was sufficient justification for Dr. Waggel's termination from the Program at that point, but an extension would be a step in that direction if Dr. Waggel did not improve significantly. **Exh. A** (Catapano Decl.) ¶ 557.

570.    In the afternoon of November 5, 2015, Dr. Catapano emailed a report of her meeting with Dr. Berger to the CCC. **Exh. A** (Catapano Decl.) ¶ 560; see also Exhibit 139 thereto (GWU 00198), Email dated November 5, 2015 at 4:39 p.m., Dr. Catapano to CCC.

571.    In addition to the matters already noted as discussed with Dr. Berger, Dr. Catapano reported that a CCC decision to extend Dr. Waggel's time in training would be communicated to her within the Letter of Deficiency she was currently writing for the August 25 call night and that Dr. Waggel would be placed back on buddy call until her call performance improved. In closing, she requested the recommendation of the CCC members regarding the suggestion to extend Dr. Waggel's training. **Exh. A** (Catapano Decl.) ¶ 561.

572.    Dr. Crone responded that she had "serious doubts that extending [Dr. Waggel's] training will help but also cannot see her becoming a PGY3 in another 7-8 months. She needs oversight on professionalism, communication." **Exh. A** (Catapano Decl.) ¶562; see also Exhibit 139 thereto, Email dated November 5, 2015 at 7:01 p.m.

573.    Dr. Dyer responded that he also had doubts about Dr. Waggel becoming a PGY [sic] in 7-8 months if she needs to be on call with a buddy and we are still worrying if she will even show up for work." **Exh. A** (Catapano Decl.) ¶ 563; see also Exhibit 139 thereto, Email dated November 5, 2015 at 7:15 p.m.

574.    Dr. Dyer responded further:

> [W]hat . . . educational program could we design where we could confidently say she had the skills to practice this profession/specialty independently, which may not be a good choice for her. I wonder that we would renew her contract; or even since she has refused to comply with the most basic remediation plan, if there are grounds for terminating her contract –

**Exh. A** (Catapano Decl.) ¶ 564; see also Exhibit 139 thereto, Email dated November 5, 2015 at 7:15 p.m.

575.    Dr. Kels responded: "I agree with the stated concerns." **Exh. A** (Catapano Decl.) ¶ 56; see also Exhibit 140 thereto (GWU 001197), Email dated November 6, 2015 at 10:07 a.m.

576.    Dr. Catapano commented that extending Dr. Waggel's training was a step they could take at that time, which would communicate that Dr. Waggel had not been performing adequately for the first four months of the year, and "sets the groundwork for not renewing her contract next year, if she is to continue with this level of performance." **Exh. A** (Catapano Decl., Exhibit 140 thereto.

577.     She further proposed that, if they extended Dr. Waggel's training at that time "and she doesn't get either worse or significantly better, that she repeat the PGYII year in its entirety next year." Id.

578.     Dr. Catapano noted that Dr. Griffith, Dr. Collins, and Dr. Zinner had already documented that Dr. Waggel's performance in their didactic courses was insufficient, so Dr. Waggel would have to repeat all of them as well. Id.

579.     Dr. Catapano then commented that "[I]f things go very well for [Dr. Waggel], she could then be promoted to PGYIII the following year, but if not, then at least we've done everything we can to give her the opportunity to remediate." Id.

580.     Dr. Catapano closed by asking if the CCC members agreed with the proposal for the time being, noting that they would revisit Dr. Waggel's progress along the way and could recommend non-renewal of contract, or termination, if warranted. Id.

581.     At some time in early November, Associate Dean for Graduate Medical Education, Dr. Jeffrey Berger, was contacted regarding complaints from multiple tenants in Dr. Waggel's condominium building about Dr. Waggel having loud parties at all hours of the night, falling asleep in the common areas of the condo building while intoxicated, and exhibiting other erratic behaviors. Exh. B (Berger Decl.) ¶ 13.

582.     He also received copies of two Police Reports regarding such incidents that had occurred on October 10 and October 30, 2015, respectively. **Exh. B** (Berger Decl.) ¶ 13; see also Exhibit 3 (October 10, 2015 Police Report) and Exhibit 4 (October 30, 2015 Police Report) thereto.

583.     He was also forwarded a copy of an email complaint about the October 11, 2015, incident made by one of the building tenants through the GW Neighborhood website complaint

system. In the complaint Dr. Waggel's neighbor noted that in addition to the October 10 incident, Dr. Waggel had been found "drunk or drugged in the hallway before and became abusive when confronted." **Exh. B** (Berger Decl.) ¶ 15; see also Exhibit 5 thereto, Email complaint).

584.    These reports were concerning to Dr. Berger for multiple reasons. Obviously he was concerned about a GW resident exhibiting such inappropriate behavior in our community. He was also concerned; however, because that was the second time that he had received a report regarding Dr. Waggel behaving erratically while under the influence of a substance. **Exh. B** (Berger Decl.) ¶16.

585.    Prior to the condominium building incident, he had also received an informal report from Dr. Catapano about the instance where Dr. Waggel was found asleep in a call room during a shift, allegedly the result of a mistake she made in taking a prescription medication. **Exh. B** (Berger Decl.) ¶ 17.

586.    Dr. Berger became concerned that Dr. Waggel may have had a substance abuse issue and decided that he needed to investigate her personal stability as it was unsafe for her to see patients if she was unfit. **Exh. B** (Berger Decl.) ¶ 18.

587.    On or about, November 10, 2015, Dr. Berger contacted Dr. Catapano and directed that Dr. Waggel be placed on administrative leave pending an investigation of the community complaints. **Exh**. B (Berger Decl.) ¶ 19.

588.    He also asked for a meeting with Dr. Waggel to be arranged so that he could investigate the community complaints. **Exh. B** (Berger Decl.) ¶ 20.

589.    Dr. Catapano then phoned Dr. Waggel and told her that a matter had come to Dean Berger's attention that he would contact her about and discuss with her, that he would need

to investigate the matter briefly and in the meantime the decision had been made that she would be placed on administrative leave effective immediately. **Exh. A** (Catapano Decl.) ¶ 579.

590.    Dr. Catapano further told Dr. Waggel that she should continue with all of her other activities in the training program but that during the administrative leave she was not to report for any clinical duties, and confirmed that her status in the program otherwise remained unchanged including all pay and benefits. **Exh. A** (Catapano Decl.) ¶ 580.

591.    Dr. Catapano also told Dr. Waggel that she had discussed the issue with Dr. Crone and the personnel at Inova Fairfax Hospital were aware that she would not be there for work. **Exh. A** (Catapano Decl.) ¶ 581.

592.    Because she knew the matter was related to a community complaint about possible substance abuse, not Dr. Waggel's attendance in the program or use of sick leave Dr. Catapano did not mention or refer to sick leave during the conversation. Exh. A (Catapano Decl.) ¶ 582.

593.    Dr. Waggel responded to the request by suggesting that they meet several days later, which Dr. Berger found to be quite unusual given that she had been placed administrative leave. They eventually agreed to meet on November 18, 2015. **Exh. B** (Berger Decl.) ¶ 21.

594.    Dr. Catapano also notified Dr. Emejuru, the Chief Resident, and the administrative team that Waggel would be "put on administrative leave with pay effective immediately, pending an investigation of a complaint against her." **Exh. C** (Emejuru Decl.) ¶ 229; see also Exhibit 63 thereto, Email, dated November 10, 2015 at 6:28 p.m., Dr. Catapano to Ms. Crawford et al.

595.    Dr. Waggel then texted Dr. Emejuru "I request your return phone call as soon as you can please." **Exh. C** (Emejuru Decl.) ¶ 230; see also Exhibit 64 thereto, Screen shot of text message beginning November 10, 2015 at 8:06 p.m.

596.    Dr. Waggel then sent emails at 8:09 p.m., 8:50 p.m., and 9:27 p.m., to Dr. Catapano, Ms. Anderson and Dr. Emejuru stating she was sure that whatever was going on "has a good explanation, however, I would appreciate further communication on it." **Exh. C** (Emejuru Decl.) ¶ 232; <u>see</u> <u>also</u> Exhibit 65 thereto, Emails, dated November 10, 2015 at 8:09 p.m., 8:50 p.m., and 9:27 p.m., Dr. Waggel to Dr. Catapano et al.

597.    In the email at 9:27 p.m. asserted that Dr. Catapano had told Dr. Waggel that she was "being investigated by the 'deans' for taking medical leave multiple times." **Exh. C** (Emejuru Decl.), Exhibit 65.

598.    This was false as there had been no discussion of removing Dr. Waggel from the Inova Fairfax rotation because of leave she had taken during the rotation. Exh. C (Emejuru Decl.) ¶ 234.

599.    At no point did Dr. Catapano, or any other member of the administrative team, or anyone else ever discuss the administrative leave in terms of Dr. Waggel's attendance or sick leave at the Inova Fairfax rotation. **Exh. C** (Emejuru Decl.) ¶ 236.

600.    Dr. Waggel was scheduled for a November 11, 2015, follow-up appointment with Dr. Siegel to discuss the results of her October 20 CT scan, but she did not appear for that appointment, presumably to Dr. Siegel, because she had already received the favorable results. **Exh. J** (Siegel Decl.) ¶ 14.

601.    Dr. Waggel attended therapy with Dr. Kecmanovic on November 11, 2015. <u>See</u> **Exh. U** at p. 000002.

602.    On November 11, Dr. Catapano sent an email to Dr. Waggel with a third Letter of Deficiency related to the August 25 call shift incident, the substance of which she noted they had previously discussed during a meeting on October 1 and Dr. Waggel had also discussed during her prior meeting with Dr. Norris and Dr. Gandhi. **Exh. A** (Catapano Decl.) ¶ 584; <u>see</u> <u>also</u> Exhibit 143 thereto, Email dated November 11, 2015 at 11:54 a.m., Dr. Catapano to Dr. Waggel, and Exhibit 144 thereto November 11, 2015, Letter of Deficiency.

603.    On November 11, 2015 at 2:15 p.m., Dr. Waggel responded by email. **Exh. A** (Catapano Decl.), Exhibit 143 thereto.

604.    Dr. Waggel's email contained a series of statements with which Dr. Catapano disagreed and which confirmed the ongoing concern for Dr. Waggel's lack of self-observation and ability to acknowledge her deficiencies as well as her failure to understand that efforts at remediation were intended for her benefit, not as punishment or an attack on her. **Exh. A** (Catapano Decl.) ¶ 586.

605.    In the last paragraph of her email, Dr. Waggel contended that her current "buddies" had "no desire to help me" and "[t]hey try to leave or actually do leave in the middle of the night with no explanation as to were they are going, and they do not return." She also stated that these individuals, "[T]o cover for themselves, they lie to you about the call shift in emails knowing full well you will not ask for or listen to what I have to say – which you indeed haven't." Exh. A (Catapano Decl.) ¶ 587; see also Exhibit 143 thereto.

606.    A review of the email reports received from the residents, all of whom were doing well in the Program and were well respected, and in fact had been selected because it was thought they would be most helpful as training mentors for Dr. Waggel, it did not seem likely they had engaged in the dishonesty described by Dr. Waggel. **Exh. A** (Catapano Decl.) ¶588.

607.    The charges, however, were obviously concerning and Dr. Catapano asked Dr. Kels and the two Chief Residents to investigate the claims. **Exh. A** (Catapano Decl.) ¶ 589.

608.    Dr. Emejuru followed up and confirmed with the other residents that they had not left the hospital except Dr. Linda Ojo, who had provided a detailed report of the shift and noted herself that she had left about a half hour early when she received a telephone call that her daughter had missed the school bus. She clearly did not leave "in the middle of the night" and "with no explanation as to where" she was going. **Exh. A** (Catapano Decl.) ¶ 590.

609.    The statement by Dr. Waggel directly accusing her professional colleagues of lying and a lack of professionalism was clearly false. **Exh. C** (Emejuru Decl.) ¶240.

610.    On November 15, 2015 at 9:20 p.m., Dr. Catapano received a detailed email report from Dr. Thomas B. Shaver providing a very favorable report of his buddy call with Dr. Waggel on November 8 which appeared to provide confirmation that the buddy call remediation could be effective for Dr. Waggel with her cooperation. **Exh. A** (Catapano Decl.) ¶ 591; see also Exhibit 146 thereto, Email Dr. Shaver to Dr. Catapano, et al. (including Dr. Waggel).

611.    On November 17, 2015, an attorney named Gregory Care emailed Dr. Berger with notice that he had been retained to represent Dr. Waggel. **Exh. B** (Berger Decl.) ¶ 22.

612.    On November 18, 2015, Dr. Catapano emailed the members of the CCC to notify us that she was preparing a new LOD for Dr. Waggel regarding the fact Dr. Waggel had failed two didactics courses, Introduction to Psychodynamic Theory with Dr. Cheryl Collins, and Neuroscience with Dr. James Griffith. **Exh. M** (Dyer Decl.) ¶ 71; see also Exhibit 10 thereto.

613.    The email noted that Dr. Waggel had failed two exams in the Neuroscience course with a score of 33% on each. It also noted that Dr. Collins felt that Dr. Waggel had not

progressed enough in her understanding in the course to be able to start with a therapy patient the next month as expected. **Exh. M** (Dyer Decl.) ¶ 72.

614.    Dr. Catapano further noted that another faculty member, Dr. John Zinner, did not allow a resident who did not have a therapy patient assigned to take his course in Psychodynamic Psychotherapy which would run the entire rest of the current year because it is case-based. **Exh. M** (Dyer Decl.) ¶ 73.

615.    Both Dr. Collins and Dr. Griffith commented that tardiness, absences, and failure to do assigned work outside of class contributed to Dr. Waggel's poor performances. **Exh. M** (Dyer Decl.) ¶ 74.

616.    Dr. Catapano suggested that if Dr. Waggel returned to work that month or next, that she not be allowed to participate in PGY2 didactics for the rest of the year as they all build upon each other as the year goes forward and she had not learned enough in the first quarter of the year for her to be able to learn what she needed in the latter part of the year. **Exh. M** (Dyer Decl.) ¶ 75.

617.    If that were to occur, Dr. Catapano further noted that since Dr. Waggel would not be participating in the protected didactic time which was conducted all day each Thursday, she would be expected to report for clinical work on those days. **Exh. M** (Dyer Decl.) ¶ 76

618.    Finally, Dr. Catapano noted to the CCC that Dr. Waggel had already been informed that she would not be promoted to the PGY3 year the next July (2016) as the result of these deficiencies and she would be required to start the PGY2 didactic curriculum from the beginning the next year. **Exh. M** (Dyer Decl.) ¶ 77.

619.    Dr. Dyer responded to Dr. Catapano's email noting that there were two issues – (1) Dr. Waggel's deficiencies, and (2) what she would be allowed to do if she were to return to work. **Exh. M** (Dyer Decl.) ¶ 78

620.    As to the deficiencies, Dr. Dyer suggested that they be documented in the LOD and that the Program Director, the CCC, the GME dean, and the university counsel then determine a response to the repeated deficiencies, the fact that Dr. Waggel continued to fail to acknowledge that she had a problem, and the fact that Dr. Waggel had refused to comply with the remediative efforts already presented to her. **Exh. M** (Dyer Decl.) ¶ 79

621.    As to return to clinical rotations, Dr. Dyer stated that he did not see how she could be allowed to see patients independently or what could happen to make that a possibility. **Exh. M** (Dyer Decl.) ¶ 80.

622.    On November 18, 2015, Dr. Berger met with Dr. Waggel along with the Director of Graduate Medical Education, Mary Tucker. Dr. Waggel brought her father to the meeting at the suggestion of her attorney, but Dr. Berger was uncomfortable with him being part of the discussion and asked that he wait outside, which he agreed to do **Exh. B** (Berger Decl.) ¶ 23.

623.    Dr. Berger informed Dr. Waggel of the complaints from her neighbor and his concern regarding her behavior. She stated that she had a party, but it was not out of control and the neighbors only complained because they did not like her. She assured him that she did not have a substance problem. Exh. B (Berger Decl.) ¶ 24.

624.    As he did not have any further information to go on, he accepted her explanation. Id.

625.    In the meeting, Dr. Berger and Dr. Waggel discussed the other issues that Dr. Waggel had been having in the program up to that point. She contended that she was not being

allowed to take time off to get follow up appointments after her kidney surgery and Dr. Berger suggested that she go to University's Office of Equal Employment Opportunity to get an official accommodation if she felt her condition required it as the Program could not simply make special arrangements for her if she did not do so. **Exh. B** (Berger Decl.) ¶25.

626.    Mary Tucker, who was also present in the meeting, followed up on this with an email providing Dr. Waggel with instructions on how to contact the EEO office to inquire about getting an accommodation for a disability. <u>See</u> **Exhibit BB**, Email dated 2:58 p.m., November 19, 2015, from Mary Tucker to Dr. Waggel et al (Plaintiff Supp. Prod (Oct) 249 of 466).

627.    They also discussed the LODs she had received and that she was not on track to complete PGY2 year on time. She complained that she was not getting the assistance she needed to address the remediation plans the LODs and he offered to assist her with finding a new faculty mentor to work with on those issues. **Exh. B** (Berger Decl.) ¶ 26.

628.    Dr. Berger explained to Dr. Waggel that the purpose of a Letter of Deficiency is to help a resident identify an issue, improve upon that issue, and move on in the program and assured Dr. Waggel that the Program's goal was for her to complete her training. **Exh. B** (Berger Decl.) ¶ 27.

629.    Dr. Waggel acknowledged this and stated that she was constantly seeking feedback and appreciated the LODs because they address a problem and suggest how to fix it. **Exh. B** (Berger Decl.) ¶ 28.

630.    Dr. Berger also suggested to Dr. Waggel, that she might consider taking a leave of absence until the following July to take care of her health issues if they were affecting her ability to do her best in the Program. He went on to add that might be a good option considering the fact that, at the very least, she was going to be required to repeat some portions of her PGY2 year

given the time she had missed. He stressed to her that the goal was for her to complete her training, and that she should not worry about doing so "on time." **Exh. B** (Berger Decl.) ¶ 29.

631.    Dr. Berger expressed to Dr. Waggel that by extending her training so that she could have whatever time she needed to take care of herself and still be able to finish her training was the Program's way of investing in her as it was a financial investment for the University to extend her training because the United States government pays for resident training only for a certain portion of time and once the resident exceeds that amount of time, the cost of training goes to the Program and the University. **Exh. B** (Berger Decl.) ¶ 30.

632.    Extension of training for residents that miss time is not uncommon. Residency is not a regular job – it is job training. There are certain skills that a resident must master before he or she can move on to the next level of practice and it is the Program's responsibility to ensure that a resident has those skills. If a resident is unable to learn and master those skills, then the residency training time can be extended. **Exh. B** (Berger Decl.) ¶ 31.

633.    According to Dr. Berger, when he has had conversations with other residents in the past about extending training, it was met with acceptance and Dr. Waggel's refusal to acknowledge that she had any issues or that the Program was only trying to help was truly confusing to him. **Exh. B** (Berger Decl.) ¶ 32.

634.    During this meeting, Dr. Berger also discussed with Dr. Waggel the possibility of transferring to another program where she could have a fresh start if she felt that her training could not continue at George Washington University. **Exh. B** (Berger Decl.) ¶ 33.

635.    Following the meeting, Dr. Berger prepared a short memorandum summarizing the meeting and sent it to Dr. Catapano with a list of next steps to help Dr. Waggel. **Exh. B** (Berger Decl.) ¶ 35; see also Exhibit 8 thereto, Dr. Berger's memo.

636.   In his summary, Dr. Berger encouraged Dr. Catapano to reiterate to Dr. Waggel that the Program was committed to her success and the goal was for her to complete her residency training, and to reiterate to Dr. Waggel that prolonging her training was an investment of time and money that the Program was making in her. **Exh. B** (Berger Decl.) ¶ 35.

637.   Dr. Waggel also provided a summary of the meeting to Dr. Catapano by email, which made clear that she had misunderstood or misinterpreted points of our conversation **Exh. B** (Berger Decl.) ¶¶ 36 – 37.

638.   Despite the clear discussion that she would need to extend her training, Dr. Waggel stated that it was her goal to graduate "on time" and that she would have her attorney investigating that issue. **Exh. B** (Berger Decl.) ¶ 39.

639.   This was counter to the discussion held, and moreover, counter-productive to facilitating a relationship of trust and cooperation moving forward. Id.

640.   It was not constructive for Dr. Waggel to state that "her lawyer" had any role to play in the Program's assessment of her academic performance, educational objectives achieved, Milestones not met, need for remediation, and length of time in training. **Exh. A** (Catapano Decl.) ¶ 605.

641.   Dr. Waggel went on to state:

> I know there have been residents who have taken time off for medical reasons and have graduated on time. I also am still confused as to why I would have to repeat an entire month due to taking a licensing exam I was approved for and taking sick days I followed the protocol for and had doctor's notes.

**Exh. A** (Catapano Decl.) ¶ 597.

642.   These statements reflected Dr. Waggel's ongoing misunderstanding of information she had been provided. **Exh. A** (Catapano Decl.) ¶ 598.

643.    It is true that some residents take time off for medical reasons and graduate on time, when the time off is not so prolonged as to disqualify them for training time requirements. **Exh. A** (Catapano Decl.) ¶ 599.

644.    Residents are entitled to take allotted vacation and personal time, and whatever sick leave is required as documented by their medical providers and approved by Benefits Administration and/or the EEO Office. **Exh. A** (Catapano Decl.) ¶ 600.

645.    But following procedures for and taking approved leave – whether administrative time to take an exam, sick leave for medical care and treatment, or vacation or other personal leave time for any another other reason – is not a substitute for mandatory training time. **Exh. A** (Catapano Decl.) ¶ 601.

646.    Despite stating that she appreciated LODs because it gave her feedback to address, Dr. Waggel continued to dispute the contents of the LODs she received. **Exh. B** (Berger Decl.) ¶ 40.

647.    Dr. Waggel stated that she was not to be on buddy call, which was true, but incorrectly asserted that "[m]y 'buddies' are my peers" in that they "seem to have the same knowledge and experience as me." **Exh. A** (Catapano Decl.) ¶ 607.

648.    The doctors assigned as Dr. Waggel's buddies were ahead of her by a full year of clinical training and were all well in advance of Dr. Waggel in medical knowledge, professionalism, systems-based practice, interpersonal communications, and overall clinical knowledge and skills. **Exh. A** (Catapano Decl.) ¶ 608.

649.    Dr. Waggel again asserted the false claim that her first two buddies, Drs. Ojo and He, did not offer to help her and left hours before the call shift ended, and went on to state that

she was told not to disclose the information so they would not get in trouble. **Exh. A.** Catapano Decl.) ¶¶ 609 – 610.

650.    Dr. Berger responded to Dr. Waggel's email to highlight the areas he found to be incorrect and/or inappropriate, first noting that the tone of her email was inappropriately harsh and demanding and that she should soften her tone as she addressed her Program Director. **Exh. B** (Berger Decl.) ¶¶ 41 – 42.

651.    He also told Dr. Waggel that she misunderstood the conversation about the decision to delay her promotion to PGY III, and identified the steps that she could take if she wished to appeal that decision. **Exh. B** (Berger Decl.) ¶ 44.

652.    Dr. Berger ended by noting that it was everyone's goal to see her succeed in the Program and the Program was investing in her by asking her to delay promotion to ensure that she received all necessary training. **Exh. B** (Berger Decl.) ¶ 45.

653.    On the very same afternoon following Dr. Waggel's meeting with Dr. Berger, Program Coordinator, Ms. Tori Anderson, forwarded an email transcribing text message screen shots from a group text in which Dr. Waggel, among other statements, texted: "I love being unemployed" – "My lawyer just won a case for a surgical resident who sued his program" – "Ya'll need to start looking for other jobs this department gunna be out of business soon." **Exh. A** (Catapano Decl.) ¶ 592; <u>see also</u> Exhibit 147 thereto, Email dated November 18, 2015 at 2:12 p.m., Ms. Anderson to Dr. Berger, Dr. Catapano.

654.    Around this time, Dr. Berger and Dr. Catapano discussed that given Dr. Waggel's ongoing struggles, the remediation plan in the original Letter of Deficiency, dated November 11, could be strengthened further if Dr. Waggel's level of supervision were changed from buddy call to attending physician supervision and her work on improving patient clinical presentations be

changed from Dr. Dyer to the Associate Program Director, Dr. Kels. **Exh. A** (Catapano Decl.) ¶ 612.

655.    Dr. Catapano had already planned to incorporate those changes – and only those changes – in a revised Letter of Deficiency and issue that to Dr. Waggel. **Exh. A** (Catapano Decl.) ¶ 613.

656.    On November 19, 2015, Dr. Catapano met with Dr. Waggel late in the afternoon and provided her with a revised Letter of Deficiency to replace the November 11 version. **Exh. A** (Catapano Decl.) ¶¶ 614 – 615; <u>see</u> <u>also</u> Exhibit 149 thereto, an email memorandum of the meeting, and Exhibit 150 November 19 Letter of Deficiency (Revised version).

657.    The points discussed with Dr. Waggel during this meeting included:

(a)    Dr. Waggel's performance in the courses taught by Dr. Griffith and Dr. Collins was unsatisfactory, she may be required to repeat them the next year, she might not proceed with the rest of PGYII didactics, and she should meet with Dr. Griffith and Dr. Collins, finish any outstanding work with them, and finalize her evaluations for the courses;

(b)    Dr. Kels and Dr. Catapano would work with Dr. Waggel to establish a detailed plan regarding extra supervision by her attending physician for each call and also make appropriate changes to have Dr. Waggel on solo call with attending supervision by telephone);

(c)    Dr. Catapano would correct her earlier misimpression as to the time of the meeting Dr. Waggel had had with Dr. Norris and Dr. Gandhi concerning a review of the RCA;

(d)     Dr. Waggel had requested more information concerning the RCA and I suggested she contact Dr. Norris for that purpose, and

(e)     Dr. Waggel was to return to clinical rotation on Geriatrics the next day.

658.    Dr. Catapano closed the email: "Take good care of yourself, and as we discussed, let's plan to meet right after Thanksgiving next week." Id.

659.    On November 19, 2015, Dr. Waggel went to Dr. Griffith's office to discuss her performance in his class during which she asked if she could "retake" the first two exams. **Exh. N** (Griffith Decl.) ¶ 63.

660.    Dr. Griffith said no. **Exh. N** (Griffith Decl.) ¶ 64.

661.    He then explained very clearly to Dr. Waggel that the first segments of the Neurosciences course establish the basic foundation for the residents' knowledge of psychopharmacology that must be applied throughout the year-long course and the remainder of their psychiatry residency training. **Exh. N** (Griffith Decl.) ¶ 65.

662.    He also noted that the material from each segment of the course is a building block for the next segment so it was necessary to master each segment in sequence to move through the course successfully. **Exh. N** (Griffith Decl.) ¶ 66.

663.    He told her that she would not be allowed to simply "retake" the first two exams because she had received such low scores that it was clear she did not understand the material. **Exh. N** (Griffith Decl.) ¶ 67.

664.    He further told her that she had to repeat at least those two segments of the course, if not more, to ensure that she had learned the material. **Exh. N** (Griffith Decl.) ¶ 68.

665.   Following her meeting with Dr. Griffith, Dr. Waggel walked down the hall to Dr. Catapano's office and said that he had told her that the exams in his course are "cumulative" so that if she did well enough on the upcoming exam she could successfully complete the course and she was excited about that. **Exh. A** (Catapano Decl.) ¶ 618.

666.   Based on prior experience with residents who had to repeat portions of Dr. Griffith's course, Dr. Catapano did not believe Dr. Waggel's contentions to be correct, so when Dr. Waggel left she immediately walked the short distance to Dr. Griffith's office, told him what Dr. Waggel had just said about the exams being cumulative and she could pass his course, and asked him if that were true. **Exh. A** (Catapano Decl.) ¶¶ 619 – 620.

667.   Dr. Griffith responded immediately and without hesitation that that was absolutely untrue – he had not said that to Dr. Waggel, but in fact had told her the exact opposite – that she would have to repeat at least the two segments she had failed and probably should repeat the whole course. **Exh. A** (Catapano Decl.) ¶¶ 621 – 622.

668.   This was an instance of blatant lying. Dr. Waggel asked Dr. Griffith a straightforward yes/no question and he gave her a straightforward no answer. There was no room for misunderstanding in our conversation. **Exh. N** (Griffith Decl.) ¶ 72.

669.   Dr. Griffith was not singling Dr. Waggel out for different treatment than any other resident who had so clearly shown that they had not understood and absorbed the important information in this course. **Exh. N** (Griffith Decl.) ¶ 83.

670.   This was consistent with what other residents had been required to do in the past when they did not show evidence of having learned the material. **Exh. N** (Griffith Decl.) ¶ 82.

671.     On November 18, 2015, Dr. Waggel was scheduled to have her one-on-one feedback session with Dr. Collins regarding her most recent formulation in the class, but she did not attend the session or contact Dr. Collins to cancel in advance. **Exh. I** (Collins Decl.) ¶ 38.

672.     Dr. Waggel did not show up despite having confirmed with Dr. Collins by email on November 8, 2016, that she would do so. Id.

673.     Based on her earlier communication with Dr. Catapano about Dr. Waggel's training being extended, Dr. Collins emailed Dr. Waggel suggesting that she repeat the Psychodynamic Thought course as she was unable to master the essential concepts covered in class due in large part to her many absences. **Exh. I** (Collins Decl.) ¶ 45.

674.     Following the email, Dr. Collins spoke to Dr. Waggel on the phone and reiterated her position that Dr. Waggel should repeat the course, particularly in light of the fact that she was likely going to need to extend her training. **Exh. I** (Collins Decl.) ¶ 46.

675.     Dr. Waggel responded that she would not be repeating PGY2 and that having to repeat Dr. Collins' course would be the sole reason for her being held back. **Exh. I** (Collins. Decl.)¶ 47.

676.     On November 19, 2015 at 9:24 p.m., Dr. Collins emailed Dr. Catapano reporting she had sent an email to Dr. Waggel suggesting she repeat Dr. Collins's Psychodynamics course and they had then talked on the phone. **Exh. A** (Catapano Decl.) ¶ 630; see also Exhibit 153 thereto, Email Dr. Collins to Dr. Catapano.

677.     Dr. Collins reported that Dr. Waggel was stating that "she is not repeating the 2nd year and that if she has to repeat my course it will hold her back." **Exh. A** (Catapano Decl.), Exhibit 153 thereto.

678.    Dr. Collins stated further, "(I feel in the middle of something that perhaps I shouldn't be.) Optimally I think she should repeat the course however if you think that getting her a supervisor to remediate the course i [sic] sufficient, I will ask Rosa if she will do that. I will call you tomorrow – just wanted to give you a heads up." Id.

679.    At 10:00 p.m., Dr. Waggel emailed Dr. Catapano stating that in the last feedback from Dr. Collins she had been told she would be assigned a supervisor soon and said she had not heard otherwise from Dr. Collins until about an hour ago. **Exh. A** (Catapano Decl.) ¶ 633; see also Exhibit 154 thereto, Email dated November 19, 2015 at 10:00 p.m., Dr. Waggel to Dr. Catapano, et al.

680.    Dr. Waggel said she had asked Dr. Collins what had changed and Dr. Collins had stated she did not know if Dr. Waggel "was going to be in class and was upset that I did not inform her of my recent absences and I also missed class prior." **Exh. A** (Catapano Decl.), Exhibit 154 thereto.

681.    Dr. Waggel went on to state that she hoped it could be explained that her absence was FMLA time and her more recent one was "very complicated." Id.

682.    Dr. Waggel also claimed her understanding was that the need to repeat this class would result in her "going on technically as a PGY3 but redo the rotations of PGY2," she wanted to know if this was correct, and hoped very much this could be sorted out. Id.

683.    Dr. Waggel made this contention despite the fact that the November 19 Letter of Deficiency that she and Dr. Catapano had discussed earlier that afternoon stated explicitly that Dr. Waggel would not be promoted to the PGY3 year for the reasons stated in the letter – her conduct during the August 25 call shift involving deficiencies in Patient Care, Interpersonal

Communications Skills, and Systems-Based Practice with ongoing need for "buddy call" and then attending physician supervision for her on call shifts. **Exh. A** (Catapano Decl.) ¶ 637.

684. Dr. Catapano specifically discussed that with Dr. Waggel that afternoon and had made it very clear that decision had been made. **Exh. A** (Catapano Decl.) ¶ 638.

685. Further, Dr. Waggel had received written feedback from Dr. Collins telling Dr. Waggel that she did not understand psychodynamic concepts. **Exh. A** (Catapano Decl.) ¶ 639.

686. It was not truthful for Dr. Waggel to tell Dr. Collins that she was going to be promoted to PGY3. **Exh. A** (Catapano Decl.) ¶ 640.

687. There was no discussion with Dr. Waggel that she would be "going on technically as a PGY3" – she had been told she would not be promoted to PGY3. **Exh. A** (Catapano Decl.) ¶ 643.

688. It was not truthful for Dr. Waggel to tell Dr. Collins that if Dr. Waggel had to repeat Dr. Collins' course it would hold her back. **Exh. A** (Catapano Decl.) ¶ 641.

689. Dr. Waggel continued to take the position that FMLA leave was a substitute for obtaining required medical knowledge and training. **Exh. A** (Catapano Decl.) ¶ 642.

690. On November 20, Dr. Catapano spoke with Dr. Collins about the fact that a decision had been made for reasons related to Dr. Waggel's lack of preparedness for independent call duty and general failure to meet Milestones that she would not be promoted to PGY3 and it would make sense for Dr. Waggel to repeat the Psychodynamics course to be sure she learned the material. **Exh. A** (Catapano Decl.) ¶ 647.

691. Dr. Collins then emailed Dr. Waggel to let her know that the decision had been made that she would be required to repeat the course the following year and directed her to contact Dr. Catapano with any further questions. **Exh. I** (Collins Decl.) ¶ 49.

692.     On November 20, in response to a previous earlier assertion by Dr. Waggel that an attending at Inova Fairfax, Dr. Aditi Malik had made statements to two other residents indicating that Dr. Malik had seen an evaluation Dr. Waggel had submitted on Dr. Malik and Dr. Waggel had actually reported to Dr. Catapano that Dr. Malik had stated that Dr. Waggel's evaluation was the only negative evaluation she had received, Dr. Berger sent an email confirming that the evaluations remained confidential and that Dr. Waggel had actually never submitted an evaluation of Dr. Malik. **Exh. A** (Catapano Decl.) ¶ 649; see also Exhibit 157 thereto, Email dated November 20, 2015 at 5:07 p.m., Dr. Berger to Dr. Waggel, et al.

693.     On November 25, 2015, Dr. Catapano advised Dr. Waggel by email it was definite that she would not be ready to progress to PGY3 on July 1, 2016, as stated in the Letter of Deficiency of November 19 (and as had been stated in the earlier version of the letter, dated November 11, which had been given to her previously). **Exh. A** (Catapano Decl.) ¶ 652; see also Exhibit 151 thereto, Email dated November 25, 2015 at 10:34 a.m., Dr. Catapano to Dr. Waggel.

694.     Dr. Catapano also noted that she had received an email from Dr. Collins stating that she would have to retake that course. **Exh. A** (Catapano Decl.) ¶ 652; Exhibit 151 thereto.

695.     Dr. Catapano then pointed out that she did not know if Dr. Waggel had received anything in writing from Dr. Griffith, but based on her communication with him, it was her understanding was Dr. Waggel would need to retake that course as well. Id.

696.     Dr. Catapano agreed that she would work on a system for her absences that would not include last minute absences, which would remain her responsibility, that she would work on that and they would talk again the following week. Id.

697.     At 11:20 a.m., on November 20, Dr. Waggel sent an email to Dr. Waggel and Dr. Griffith, purporting to set forth her understanding of the conversation she had with Dr. Griffith in

his office on November 19 when he had told her clearly that she would have to retake at least the

two segments of the Neurosciences course she had failed. **Exh. A** (Catapano Decl.) ¶ 656; <u>see</u>

<u>also</u> Exhibit 158 thereto.

> 698.    In the email, Dr. Waggel stated:

> > After my meeting on Thursday, Nov 19th with Dr. Catapano, I stopped
> > by your office around 5pm and asked if I could make up the previous
> > exams in your neuroscience class. My understanding is that you stated
> > that that was not necessary and that I should focus on doing well on
> > the December exam as it is built on the prior material. As the tests are
> > cumulative, doing well on the December exam would give me the
> > chance to show I went back to build on information from the
> > beginning. Has there been any change to this since we last spoke?

**Exhibit N** (Griffith Decl.), Exhibit 11 thereto.

> 699.    Dr. Griffith responded by email at 4:03 p.m., with a cc to Dr. Catapano stating:

> > Stephanie, that is not what I said. I'll clarify and explain & also cc to Dr.
> > Catapano so there won't be confusion. The first section of the year-long
> > clinical neurosciences seminar provides the basic science foundation not
> > only for psychopharmacology, but for much of what you will be taught
> > during residency about use of language and relationships in psychotherapy
> > in several other seminars. You missed many of those sessions and also
> > scored 33 on each of the two examinations, which indicated you did not
> > acquire the needed level of knowledge needed to move forward. You need
> > to repeat the course next year, which is consistent with what residents
> > have been required to do in the past when they did not show evidence of
> > having learned the material.

> > The fundamental issue is one of accountability to your future patients. You
> > need to demonstrate that you have the knowledge and skills needed to
> > provide competent and effective care for your future patients. This is why
> > it matters that you learn this material. It likely is something you will later
> > appreciate for you to re-do the course and learn the material well. It is
> > okay for you to take the Dec 17 exam on psychotic disorders and their
> > treatment, but that does not mean you should not re-take at last the
> > summer section next year and possibly the course as a whole.

> > Best wishes,
> > Griff

**Exh. A** (Catapano Decl.) ¶ 657; see also Exhibit 158 thereto.

700.     Barely one half hour later, on November 25, 2015 at 4:39 p.m., Dr. Waggel sent a further email to Dr. Catapano responding to an earlier email of 10:34 a.m. that day stating:

> During our meeting on Thursday Nov, 19 you mentioned I speak with Dr. Griffith about my progress in his class. I stopped by his office before leaving the MFA and he said that as the exams are cumulative, I can demonstrate my neuroscience understanding by doing well on the next exam which is December 17. I remember sharing my excitement about this with you before leaving the MFA. Has something changed since then?

**Exh. A** (Catapano Decl.) ¶¶ 658 – 659; <u>see also</u> Exhibit 151 thereto, at p. 500.

701.     Dr. Waggel further said: "My specific time-sensitive question about Dr. Collin's [sic] class is, have I officially failed it despite being notified one week prior that I was passing and that Dr. Collin's [sic] has not graded my final paper?" **Exh. A** (Catapano Decl.) ¶ 660.

702.     This was false, as at no point did Dr. Collins indicate to Dr. Waggel that she was 'passing' the class, or even that her performance was satisfactory in any way. **Exh. I** (Collins Decl.) ¶ 37.

703.     Dr. Waggel had already been told unambiguously that she was required to repeat Dr. Collins's course. **Exh. A** (Catapano Decl.) ¶ 662; see also Exhibit 156 thereto, Email dated November 20, 2015, Dr. Collins to Dr. Waggel.

704.     Dr. Catapano had already confirmed in an email earlier <u>that day</u> that Dr. Waggel would have to repeat Dr. Collins's course. **Exh. A** (Catapano Decl.) ¶ 663; <u>see also</u> Email at 10:34 a.m., Dr. Catapano to Dr. Waggel.

705.     Dr. Waggel had just been told, again, by Dr. Griffith that she would have to repeat his course. Exh. A (Catapano Decl.) ¶ 664.

706.     Dr. Catapano responded on November 30, 2015 as follows:

> Regarding Dr. Griffith's course, what he told me after he spoke to you on November 19, and what he reiterated in his email to you today, is that he

is allowing you to take the Dec 17 exam, but because you failed the first two exams, you will need to at least retake the first section of his course. He will have to decide, after the next exam, whether you will continue in his course for the rest of this year.

Regarding Dr. Collins's course, her email from November 25 states that you did not pass her course, and will have to retake it next year. This means you will not get a supervisor or therapy patient this year, and cannot take Dr. Zinner's course or T-group.

Just to make sure everything's clear regarding your didactic schedule, for the next few weeks you will continue to be in Dr. Griffith's course, and continue in the Global Mental Health course.

Regarding your meeting with Dr. Kels, I understand that you attempted to contact her last week, and got a response from her on Wednesday. Although you were not able to meet with her within one week I know that you made a significant effort and that she got back to you to say she got your message. You will not be penalized for the fact that you have not met with her yet.

Please let me know if you have any questions about any of the above.

Take care

**Exh. A** (Catapano Decl.) ¶ 665.

707.    Dr. Waggel attended therapy with Dr. Kecmanovic on December 3, 2015. <u>See</u> **Exh. U** at p. 000002.

708.    On December 3, 2015, Dr. Waggel requested a Review of a Reportable Action related to her failure of an Introduction to Psychodynamic Theory course taught by Dr. Cheryl Collins for which she would be required to repeat the course the following year. **Exh. B** (Berger Decl.) ¶ 46.

709.    On December 10, 2015 at 1:03 p.m., Dr. Catapano confirmed by email that Dr. Waggel would not be "punished" for missing the first session of Dr. Zinner's class since she had already been told that she was not allowed to participate. **Exh. A** (Catapano Decl.) ¶ 666; <u>see also</u> Exhibit 159 thereto, Email Dr. Catapano to Dr. Waggel.

138

710.    On December 10, 2015, Dr. Waggel received a fourth Letter of Deficiency. Exh. A (Catapano Decl.) ¶ 667; <u>see</u> <u>also</u> Exhibit 160 thereto.

711.    The LOD noted the earlier November 19 Letter of Deficiency had informed Dr. Waggel that based on insufficient competencies in Patient Care, Interpersonal Communication Skills, and Systems-Based Practice she would not be promoted to the PGYIII year on July 1, 2016. **Exh. A** (Catapano Decl.) ¶ 668.

712.    The LOD further noted that Dr. Waggel had not demonstrated sufficient competency in Dr. Collins's Psychodynamic Theory course to pass it and to progress to having an individual psychotherapy patent assigned so she would not move on to Dr. Zinner's Psychodynamic Psychotherapy course. **Exh. A** (Catapano Decl.) ¶ 669.

713.    The LOD went on to note that Dr. Waggel had received failing grades of 33 on the first two exams and Dr. Griffith had stated Dr. Waggel had not acquired the needed level of knowledge to move forward. **Exh. A** (Catapano Decl.) ¶ 670.

714.    The LOD further stated that Dr. Waggel would be required to repeat Dr. Collins's Psychodynamic Theory course the next year and, if successful, would be assigned a psychotherapy patient and a supervisor. **Exh. A** (Catapano Decl.) ¶ 671.

715.    The LOD further stated that Dr. Waggel would be required to repeat at least the first part of Dr. Griffith's course the next year and could continue in the course to take the next exam in December before Dr. Griffith made a determination whether Dr. Waggel could continue in the class this year or withdraw and repeat it in its entirety the next year. **Exh. A** (Catapano Decl.) ¶ 672.

716.    Finally, the LOD set forth other terms and conditions related to the remediation set forth in the letter and noted that Dr. Waggel had a right of appeal and the time frames within which to appeal. **Exh. A** (Catapano Decl.) ¶ 673.

717.    On December 11, 2015, Dr. Waggel noted an appeal of these decisions and sent Dr. Catapano a confirming email.

718.    Upon receiving Dr. Waggel's request for a review of the Program's decision, pursuant to the GME Academic Improvement Policy, Dr. Berger contacted Dr. Anne Cioletti, to serve as an independent physician reviewer to review Dr. Waggel's appeal of the decision to deny her credit for both didactics classes and to delay her promotion to the PGY3 year in July 2016. **Exh. B** (Berger Decl.) ¶ 48.

719.    Dr. Cioletti was an Internal Medicine physician at George Washington University Hospital at the time. She had no connection to the Psychiatry Residency Training Program or Dr. Waggel. She was chosen precisely because she had no involvement with any of the events relating to the reportable action and could thus provide a truly independent review. **Exh. B** (Berger Decl.) ¶ 49.

720.    Dr. Berger informed Dr. Waggel that Dr. Cioletti had been assigned to her appeal on December 11, 2015. Exh. B (Berger Decl.) ¶ 50; see also Exhibit 13 thereto.

721.    Dr. Waggel attended therapy with Dr. Kecmanovic on December 15, 2015. See **Exh. U** at p. 000002.

722.    The third Clinical Neurosciences exam was given on December 17, 2015. Dr. Waggel scored 82. **Exh. N** (Griffith Decl.) ¶ 87; see also Exhibit 13 thereto, a copy of the score distribution reflecting her grade.

723.    On December 23, 2015, Dr. Waggel submitted a formal letter to Dr. Cioletti requesting a review of a reportable action. See **Exhibit Q**, Declaration of Anne Cioletti, M.D., ¶ 8.

724.    Dr. Waggel's letter sought to appeal the LOD from November 11, 2015, (later amended on November 19, 2015) related to her unsatisfactory performance on a call-shift on August 25, 2015, and informing her that as a result of the deficiencies noted, and her need for extra attending supervision on her call shifts, she would not be promoted to the PGY3 year on July 1, 2016. **Exh. Q** (Cioletti Decl.) ¶ 9.

725.    The letter contended: (1) The decision to delay her promotion was inconsistent with the feedback she had received prior to receiving the LOD, (2) the LOD was allegedly based on a meeting that had not taken place at the time the letter was written and without her participation in a Root Cause Analysis meeting ("RCA") related to the August 25 event, and (3) the decision to delay her promotion was made without providing her an opportunity to cure in violation of the GME Academic Improvement Policy. **Exh. Q** (Cioletti Decl.) ¶ 10.

726.    In late December 2015, because Dr. Waggel had not made progress in the remediation plan set forth in her third Letter of Deficiency concerning call duty, a decision was made that she would be removed from the call pool until there was satisfactory proof of progress in the remediation. **Exh. A** (Catapano Decl.) ¶ 675.

727.    It was expected that Dr. Kels would convey this information to Dr. Waggel and that Dr. Emejuru would adjust the call schedule to arrange for the remaining residents to provide coverage for the dates Dr. Waggel would otherwise have been on duty. **Exh. A** (Catapano Decl.) ¶ 676

728.    Unfortunately, Dr. Emejuru sent an email to the other residents concerning the revised call schedule before Dr. Kels had spoken with Dr. Waggel so Dr. Waggel first learned about this change from a fellow resident. **Exh. A** (Catapano Decl.) ¶ 677.

729.    On December 29, 2015 at 11:17 a.m., Dr. Waggel sent an email to Dr. Catapano, Dr. Kels, Ms. Anderson and me concerning the fact there had been multiple emails regarding the change in call shift on which she had not been copied, requesting information why she had been taken out of the call pool, and why she had found out about this through a classmate. **Exh. C** (Emejuru Decl.) ¶ 254; see also Exhibit 73 thereto (Plaintiff Bates 529 – 533, at 529), Email, Dr. Waggel to Dr. Catapano et al.

730.    On December 29, 2015 at 12:32 p.m., Dr. Kels emailed Dr. Waggel noting that Dr. Emejuru had updated the call schedule for January and February and that Dr. Waggel had not been scheduled for call pending completion of her remediation outlined in the Letter of Deficiency dated November 19, 2015. Emejuru Decl.), Exhibit 73 thereto at p. 530 – 531.

731.    Dr. Kels also noted that she had discussed the Letter of Deficiency with Dr. Waggel during their meeting earlier in the month. Id.

732.    On December 30, 2015 at 3:46 p.m., Dr. Kels sent Dr. Waggel a further email concerning Dr. Waggel's remediation of the November 19 Letter of Deficiency. **Exh. C** (Emejuru Dec.); see also Exhibit 74 thereto (Plaintiff Bates 540), Email, Dr. Kels to Dr. Waggel.

733.    In the email, Dr. Kels further noted that she had met with Dr. Waggel on December 10 including the specific details of a report that Dr. Waggel was to prepare addressing management for patient aggression in the inpatient setting and addressing disorganized and incomplete clinical presentations on call with a template for consistency and also practice presentations. **Exh. C** (Emejuru Dec.); Exhibit 74 thereto.

734.    Dr. Kels further noted that she and Dr. Catapano would assess Dr. Waggel's readiness to return to the call pool based on feedback from Dr. Gandhi who would be working with her on the remediation plan. Id.

735.    On December 30, 2015 at 3:51 p.m., Dr. Kels sent a further email to Dr. Waggel apologizing that the updated call schedule had been distributed before she had received notification from Dr. Kels concerning the fact she had not been included in the updated call schedule for January and February. **Exh. C** (Emejuru Decl.) ¶ 260; see also Exhibit 75 thereto (Plaintiff Bates 534), Email, Dr. Kels to Dr. Waggel et al.

736.    In the email, Dr. Kels noted that it was her intention that Dr. Waggel would know about the change before the updated schedule was posted. Exh. C (Emejuru Decl.)¶ 261.

737.    While this was a serious mistake, there was no intent to harm Dr. Waggel in any way. **Exh. C** (Emejuru Decl.) ¶ 253.

738.    Dr. Waggel attended therapy with Dr. Kecmanovic on December 29, 2015. See **Exh. U** at p. 000002.

739.    At 7:58 p.m. on January 5, 2016, Dr. Waggel submitted her essay to Dr. Gandhi in which the third Letter of Deficiency had called upon her to write a "description of management strategies and alternatives for management of patient aggression in the in-patient setting." **Exh. A** (Catapano Decl.) ¶ 679; see also Exhibit 162 thereto, Email, Dr. Waggel to Dr. Gandhi.

740.    On January 5, 2016, Dr. Catapano received a telephone call from Dr. Babak Sarani, M.D., Director of Trauma and Acute Care Surgery, GW Hospital and GW – MFA, who was a designated ombudsman for the GW SMHS residency training programs. **Exh. A** (Catapano

Decl.) ¶ 680; <u>see</u> <u>also</u> Exhibit 163 thereto, Email memorandum summarizing call dated January 5, 2016 at 2:59 p.m., Dr. Waggel to Dr. Griffith et al.

741.    The ombudsmen are attending staff physicians who agree to be advocates for residents in matters where there may be disputes, disagreements, or misunderstandings between a resident and program administration, hospital administration, or other components of the training program. **Exh. A** (Catapano Decl.) ¶ 682.

742.    Dr. Sarani reported that Dr. Waggel had gone to the ED at the GW Hospital presenting with panic symptoms and was seen by Dr. Colleen Roche and had told Dr. Roche that her symptoms had been precipitated by the email about being taken out of the call schedule in the context of having been provided no information that there were any concerns about her clinical performance. Dr. Roche advised her to speak to Dr. Sarani as an ombudsman, and when they met, Dr. Waggel repeated the information to him. **Exh. A** (Catapano Decl.) ¶ 682.

743.    Dr. Sarani further said Dr. Waggel had told him she had received no formal feedback or anything in writing (such as a Letter of Deficiency) letting her know where she stands and she was anxious about this because she might be held back next year and she did not know why. **Exh. A** (Catapano Decl.) ¶ 683.

744.    Dr. Catapano informed Dr. Sarani that Dr. Waggel had received four Letters of Deficiency over the last six months and that she was in the process of appealing one of them. **Exh. A** (Catapano Decl.) ¶ 684.

745.    Dr. Catapano also informed Dr. Sarani that Dr. Waggel had had multiple meetings with me and with Dr. Berger, and in the process of the appeal, the GME office had reviewed all of the Program's records and communication with and regarding Dr. Waggel. **Exh. A** (Catapano Decl.) ¶ 685.

746.     Dr. Sarani stated that his next step would be to confirm this information with Dean Berger, and if he were satisfied that the Program had followed the appropriate process for informing Dr. Waggel of her deficiencies, he would drop the matter from his end. **Exh**. **A** (Catapano Decl.) ¶ 686.

747.     On January 7, 2016, Dr. John Zinner reported an incident involving Dr. Waggel in which she claimed, despite the fact that her fourth Letter of Deficiency from December 10, 2015 had stated clearly in writing that she would not be allowed to progress to Dr. Zinner's course, that Dr. Catapano had told her that it would be left it up to Dr. Zinner to decide whether she could take his seminar. **Exh. A** (Catapano Decl.)¶ 687.

748.     Dr. Catapano corrected Dr. Waggel's false statement and made clear to Dr. Zinner that she had not told that to Dr. Waggel and had not indicated in any fashion that Dr. Waggel would be permitted to take his course. **Exh. A** (Catapano Decl.) ¶ 688.

749.     Dr. Waggel not only claimed that Dr. Catapano had told her she could take the course if Dr. Zinner agreed, which was false, she had also contended that because she was on a list of attendees for the class that that somehow authorized her to take the course despite all of the contrary discussion around and leading up to the December 10 Letter of Deficiency. **Exh. A** (Catapano Decl.) ¶ 689.

750.     On January 13, 2016 at 8:33 a.m., Dr. Catapano emailed Dr. Waggel to let her know that Dr. Gandhi had reviewed the essay she had submitted and was preparing his response which he would go over with her as soon as it was complete. **Exh. A** (Catapano Decl.) ¶ 690; see also Exhibit 165 thereto (Plaintiff Bates 566 – 568, at 566), Email Dr. Catapano to Dr. Waggel.

751.     Dr. Waggel thanked Dr. Catapano for her reply and then said she hoped this could be addressed soon "as I have been trying to complete this assignment for 8 weeks." **Exh. A** (Catapano Decl.), 165 thereto (Plaintiff Bates 566 – 568, at 566)

752.     Dr. Catapano responded that the situation was being addressed as quickly as possible, "but, just to be clear, you only handed in the assignment last week." Id. at 567.

753.     That same morning, at 9:44 a.m., Dr. Sarani emailed Dr. Waggel concerning an email he received from Dr. Waggel in which she claimed there had been a two-week delay in following up on the assignment she had submitted. **Exh. A** (Catapano Decl.) ¶ 693; see also Exhibit 165 thereto, Email dated January 13, 2016 Dr. Sarani to Dr. Griffith, Dr. Catapano.

754.     Dr. Catapano replied that she had already emailed Dr. Waggel earlier that morning to assure her the assignment was being reviewed and that Dr. Gandhi would meet with her to discuss it. Exh. A (Catapano Decl.) ¶ 694.

755.     Dr. Waggel attended therapy with Dr. Kecmanovic on January 12, 2016. See **Exh. U** at p. 000002.

756.     On January 13, 2016, Dr. Waggel sent Dr. Berger an email asking him to add a note to her appeal file that she received a grade of 82% on her cumulative final in Dr. Griffith's Neuroscience class, which was one of the highest grades in the class. **Exh. B** (Berger Decl.) ¶ 51.

757.     Dr. Berger forwarded the email immediately to Dr. Griffith to confirm Dr. Waggel's assertion. **Exh. B** (Berger Decl.) ¶ 52; see also Exhibit 15 thereto.

758.     Dr. Griffith wrote back to Dr. Berger stating: "Jeff, this is not an honest portrayal." **Exh. N** (Griffith Decl.) ¶ 92; see also Exhibit 14 thereto, Email from Dr. Griffith to Dr. Berger.

759.     Dr. Griffith then clarified Dr. Waggel's false statement by adding:

> I've attached the exam grades for the whole class for you to see where Stephanie's fits. Stephanie's grade on the last exam was middle of the class, with all the grades clustered (class average was 80, Stephanie made 82). <u>This was not a cumulative exam,</u> but an exam on a single section of a course -- the third of probably six exams over course [sic] of the year. <u>I have not prevented her from sitting in the class, but think she should re-do the whole course, which we did with a similar analogous situation with a different resident last year</u>.

**Exh. N** (Griffith Decl.), Exhibit 14 thereto (emphasis added).

760.    Dr. Waggel attended therapy with Dr. Kecmanovic on January 19, 2016. <u>See</u> **Exh. U** at p. 000002.

761.    On January 20, 2016, the independent physician reviewer, Dr. Cioletti met with Dr. Berger, Dr. Catapano, Dr. Kels, and Mary Tucker to discuss Dr. Waggel's appeal. **Exh. Q** (Cioletti Decl.) ¶ 11; <u>see also</u> Exhibit 4 thereto, of a summary report of this meeting prepared by Ms. Tucker.

762.    Prior to the meeting she had been given the Program's entire file on Dr. Waggel. **Exh. Q** (Cioletti Decl.) ¶ 26.

763.    She was informed that Dr. Waggel had requested appeal of two decisions: (1) The denial of credit for two Psychiatry courses, and (2) the decision to delay promotion to PGY3 due to clinical deficiencies. **Exh. Q** (Cioletti Decl.) ¶ 12.

764.    Dr. Berger began the meeting by noting that the GME Academic Improvement Policy required that a physician independent of the Program provide a neutral review of the facts surrounding the reportable action to determine whether Dr. Waggel was afforded due process under University policy. **Exh. Q** (Cioletti Decl.) ¶ 13.

765.    In this regard, due process required that: (1) Dr. Waggel be notified of a deficiency; (2) Dr. Waggel be given an opportunity to cure the deficiency, and (3) the Program's decision was reasonably made. **Exh. Q** (Cioletti Decl.) ¶ 14.

766.    During the meeting, Dr. Catapano provided Dr. Cioletti insight into the two didactics classes that Dr. Waggel failed – Dr. Griffith's Neuroscience course and Dr. Collins' Psychodynamic Thought course. **Exh. Q** (Cioletti Decl.) ¶ 15.

767.    Dr. Catapano noted that failure of Dr. Griffith's course did not necessitate repeating the entire PGY2 year, but failure of Dr. Collins' course did. **Exh. Q** (Cioletti Decl.) ¶¶ 16 – 17.

768.    Dr. Catapano advised Dr. Cioletti that departmental policy requires 70% attendance at didactics sessions over the course of the semester, this was known to the residents, and that Dr. Waggel failed to meet that standard. **Exh. Q** (Cioletti Decl.) ¶¶ 18 – 19.

769.    Dr. Cioletti was also advised of Dr. Waggel's health issues and that she had a health condition that required surgery for which she took approved medical leave. Exh. Q (Cioletti Decl.) ¶ 23.

770.    Dr. Catapano stated that the Program tried to be supportive of this and offered Dr. Waggel the opportunity to take extended time off to tend to her health without affecting her studies, but she declined. Dr. Catapano noted that Dr. Waggel did, however, take approved medical leave from July 20 to August 3, 2015, FMLA leave from October 26 to October 30, 2015, two weeks leave in May 2015, had been placed on administrative leave for three days in November 2015, took intermittent days at random for medical appointments, and attended psychotherapy and had genetic counseling as well. **Exh. Q** (Cioletti Decl.) ¶ 22.

771.    Dr. Waggel's difficulties in patient care and overall clinical performance were discussed with Dr. Cioletti. **Exh. Q** (Cioletti Decl.) ¶ 23.

772.    Dr. Waggel's numerous issues with professionalism were covered with Dr. Cioletti. **Exh. Q** (Cioletti Decl.) ¶ 24.

773.    Dr. Catapano also discussed the issues with untruthfulness that Dr. Waggel had displayed. **Exh. Q** (Cioletti Decl.) ¶ 25.

774.    Dr. Catapano stated that despite Dr. Waggel being counseled regarding the criticisms of her performance on multiple occasions, she did not seem to believe that she had any problems and believed that all of her evaluations were positive. She thought any criticism of her was unfair and was very defensive to any feedback. **Exh. Q** (Cioletti Decl.) ¶26.

775.    The following day, January 21, 2016, Dr. Waggel met with Dr. Cioletti to discuss her appeal, along with Dr. Berger and Ms. Tucker. **Exh. Q** (Cioletti Decl.) ¶ 28.

776.    The discussion began with the failure of Dr. Griffith's course in Neuroscience. Dr. Waggel said that the course requirements did not state that a certain score was needed to pass the exams, so she did not study to prepare for the exams. Dr. Waggel also said she took one of the exams following an overnight on-call shift. She felt that if she had taken time to study, she would have done better on the first two exams. **Exh. Q** (Cioletti Decl.) ¶ 29.

777.    Dr. Waggel claimed that she was told by the Residency Coordinator that the exam scores did not count and she was under the mistaken impression that the final exam was cumulative. **Exhibit Q** (Cioletti Decl.) ¶¶ 30 – 31.

778.    At that point Dr. Berger informed Dr. Waggel that the Program was requiring her to repeat Dr. Griffith's course because of the failed exams, but the failure in that one course did not affect her promotion to the next level of residency. **Exhibit Q** (Cioletti Decl.) ¶¶ 32.

779.     Dr. Waggel told Dr. Cioletti that she that she was under the impression that she was performing well in Dr. Collins' class and was surprised to receive an email on November 19, 2015, stating that she had failed the class because she had been told on November 7, that she was going to be assigned a supervisor for the class, which she believed to be an indicator that a student was passing the class. **Exhibit Q** (Cioletti Decl.) ¶ 33.

780.     Dr. Waggel also contended that the 70% attendance requirement was never communicated to the students and that several other students also missed several class sessions. She also contended that despite being prepared and submitting satisfactory work product, Dr. Collins refused to let her speak in class and refused to grade her final assignment. **Exhibit Q** (Cioletti Decl.) ¶ 34.

781.     They next discussed Dr. Waggel's performance in patient care. Dr. Cioletti noted that there were concerns from many of her attendings about her decision-making and patient care. Dr. Waggel responded that she felt she was fully capable and had not gotten clear feedback. **Exhibit Q** (Cioletti Decl.) ¶ 35,

782.     Dr. Berger then stated that the issues with her performance had been identified in evaluations over the previous two years and her Milestones were at scores of 1-2 in August 2015, which is below expected level and taking her off track to advance. **Exhibit Q** (Cioletti Decl.) ¶ 36.

783.     Dr. Waggel stated that she was under the impression that scores of 1-2 were appropriate for where she was in the program. Dr. Waggel also stated that she felt she was doing her part in her remediation, but the program was not helping her. **Exhibit Q** (Cioletti Decl.) ¶ 37.

784.     At the end of the meeting Dr. Cioletti asked Dr. Waggel if there were any extenuating circumstances that she should consider in addition to her medical condition, leaves

of absence, time off for physician appointments and also asked her if there were any issues involving drugs or alcohol. Dr. Waggel responded no. **Exhibit Q** (Cioletti Decl.) ¶ 37.

785.     On January 20, 2016, Dr. Gandhi completed his review of the essay that Dr. Waggel had written as part of the remediation plan outlined in the November 19, 2015 LOD, and provided written and verbal feedback to Dr. Waggel. **Exh. A** (Catapano Decl.) ¶¶ 700 – 701; see also Exhibit 169 thereto (GWU 001799 – 001801), Dr. Gandhi's written feedback.

786.     Dr. Gandhi's feedback noted that while the first paragraph reasonably set the tone for the essay, and the second paragraph was reasonably organized, the remainder of the essay was deficient in significant respects, but most importantly, it failed to discuss the key issue the Letter of Deficiency had directed Dr. Waggel to address, i.e., "deficits in management of code strong on a particular call night – essay should include ways resident could improve personal approach to agitation management." **Exh. A** (Catapano Decl.), Exhibit 169 at p. GWU 001801.

787.     The essay Dr. Waggel submitted had no discussion of the events of August 25, her participation in the events, the mistakes she had made, how she could have handled the situation better, and what she would do to assure she would perform better in future similar circumstances. **Exh. A** (Catapano Decl.) ¶ 704.

788.     On January 21, 2016 at 7:54 a.m., in light of this development, Dr. Catapano emailed Dr. Waggel that they needed to meet to discuss next steps and that "you will not be put back in the call schedule right now . . . ." **Exh. A** (Catapano Decl.) ¶ 705; see also Exhibit 170 thereto (Stephanie Waggel Supp. Prod. [Oct.] 380 – 382 of 466, at 380), Email, Dr. Catapano to Dr. Waggel.

789.     Dr. Waggel's response was to agree to meet that afternoon and to threaten Dr. Catapano "and the rest of the faculty in the department and hospital administrators" with her law

firm – "They specialize in resident cases so I have faith that if the psych department doesn't come through for me, my law firm certainly will." **Exh. A** (Catapano Decl.) ¶ 706; <u>see</u> <u>also</u> Exhibit 170 thereto at p. 381.

790.    Dr. Catapano and Dr. Kels met with Dr. Waggel for a half hour at 4:30 p.m. that day to discuss the essay and Dr. Waggel's remediation. Dr. Catapano prepared a synopsis of the meeting, which all parties reviewed and agreed to before the meeting ended. **Exh. A** (Catapano Decl.) ¶ 707; <u>see</u> <u>also</u> Exhibit 171 thereto (Plaintiff Bates 686 and GWU 001778), the written synopsis.

791.    Coming out of the meeting, Dr. Catapano told Dr. Waggel that she would review Dr. Gandhi's comments on her essay with the CCC and get back to her within 10 days regarding their recommendations. **Exh. A** (Catapano Decl.) ¶ 708.

792.    Dr. Waggel attended therapy with Dr. Kecmanovic on January 27, 2016. <u>See</u> **Exh. U** at p. 000002.

793.    On February 1, 2016, Dr. Catapano was informed of a situation in which Dr. Waggel had refused to turn over a Children's National Medical Center pager she had carried while on duty there in December 2015 and was insisting that people go out for drinks with her before she would turn it over. **Exh. A** (Catapano Decl.) ¶ 709; <u>see</u> <u>also</u> Exhibit 172 thereto (GWU 001750 – 001754), Email dated January 31, 2016 at 11:07 a.m., Dr. Emejuru to Dr. Catapano et al. and attached text messages.

794.    In late January – early February 2016, given the various issues that had arisen, Dr. Dyer, as Chair of the CCC, began preparing a summary of Dr. Waggel's entire residency for the CCC to use in evaluating her status in the Program and determining the next steps to take in light of those circumstances. **Exh. M** (Dyer Decl.) ¶ 82.

795.    He reviewed hundreds of pages of documentation related to Dr. Waggel's tenure.

Exh. M (Dyer Decl.) ¶ 83.

796.    He then synthesized that material along with the information he had obtained in

his role as Chair of the CCC, his direct interactions with Dr. Waggel, and his interactions with

other faculty and Program personnel into a document entitled "Clinical Competency Committee

Performance Review of Dr. Stephanie Waggel" (the "Performance Review") dated February 9,

2016. **Exh. M** (Dyer Decl.) ¶ 84; <u>see</u> <u>also</u> exhibit 11 thereto (GWU 1112 – 1117), the

Performance Review.

797.    After compiling the summary of all of the events of Dr. Waggel's residency,

including the Program's efforts to assist her in remediation, it was Dr. Dyer's opinion the

Program had exhausted attempts to help Dr. Waggel address these multiple and serious concerns,

that it was not safe to let her see patients independently, that she was not progressing toward

promotion, and therefore her employment and training should be terminated. **Exh. M** (Dyer

Decl.) ¶ 105.

798.    Given Dr. Waggel's pattern of unprofessional conduct, Dr. Catapano drafted a

Notice of Concerns of Unprofessional Conduct, dated February 15, 2016, to be pursued under

the GW Resident Misconduct Policy. **Exh. A** (Catapano Decl.) ¶ 710; <u>see</u> <u>also</u> Exhibit 173

thereto (GWU 000964 – 000966), a copy of the Notice.

799.    The Misconduct Notice, dated February 15, 2016, identified four issues of

unprofessional conduct on Dr. Waggel's part:

> (a)      Lying to Dr. John Zinner about being allowed to take his Psychotherapy
>
> class after failing the prerequisite class taught by Dr. Collins and being told that
>
> she could not advance to Dr. Zinner's class. This was in addition to the lie she

told Dr. Berger about her grade in Dr. Griffith's class being the "highest cumulative" grade, lying to the Hospital ombudsman about being removed from the call pool without ever having being given any prior feedback or any written warning, although the truth was she had received four letters of deficiency, and lying to Dr. Collins that failing her course was the only thing holding Dr. Waggel back from being promoted [to PGY3 the next July 1].

(b)     Failing to identify her supervising physicians in the student evaluation program, MedHub, despite repeated reminders and directions to do so which had resulted in a lack of clinical evaluations.

(c)     Failing to comply with the academic improvement plan she had been given as part of a Letter of Deficiency related to a June 10, 2015 incident where she did not show up for a shift in the Emergency Department, and failing to complete an annual legally mandated medical clearance exam before the original deadline, and even a subsequently extended deadline. The latter events had led to a further Letter of Deficiency.

(d)     Engaging in disruptive behavior such as sending hostile text messages and emails to the Program Director and her classmates threatening to "bring down the program."

**Exh. N** (Griffith Decl.) ¶ 98.

800.    On February 16, 2016, Dr. Griffith met with Dr. Waggel to discuss the contents of the Misconduct Notice. He conducted the meeting because Dr. Catapano was out of town at a conference, and the Chair of the CCC, Dr. Allen Dyer, had recused himself as he had been involved in drafting the notice. **Exh. N** (Griffith Decl.) ¶ 99.

801.     The point of the meeting was to present Dr. Waggel with the notice, provide an opportunity for any initial response on her part, and advise her that she had a further right to respond to the memo and address it to GME – Dr. Berger. **Exh. N** (Griffith Decl.) ¶ 100.

802.     Dr. Waggel disagreed with every point in the memo. **Exh. N** (Griffith Decl.) ¶ 101.

803.     She stated that she thought the letters of deficiency were "fraudulent" (with the exception of the letter for failing to complete her annual medical clearance on time) but otherwise the points were all "he said she said" and "gossip." **Exh. N** (Griffith Decl.) ¶ 102.

804.     She attempted to justify her communication to Dr. Berger about her grade in Dr. Griffith's class by stating that she said she had received "one of the highest in the class," completely ignoring the fact that she had referred to the exam as cumulative. **Exh. N** (Griffith Decl.) ¶ 103.

805.     The other matters discussed during the meeting are summarized in the memorandum and at the end of the meeting Dr. Griffith again suggested to Dr. Waggel that she should draft a response to the memo and send it to Dr. Berger. **Exh. N** (Griffith Decl.) ¶ 104.

806.     Later in the afternoon of February 16, Ms. Anderson emailed Dr. Waggel a draft version of the meeting minutes for her review, approval, or edits. **Exh. N** (Griffith Decl.) ¶ 105; see also Exhibit 18 thereto, a copy of Ms. Anderson's notes.

807.     Dr. Waggel made edits that Dr. Griffith reviewed and accepted and a final draft was created. **Exh. N** (Griffith Decl.) ¶ 106.

808.     Following Dr. Griffith's February 16, 2016 meeting with Dr. Waggel, Dr. Berger was notified of the Misconduct Notice and he instituted a Full Inquiry into the events outlined in the Notice. **Exh. N** (Griffith Decl.) ¶ 107.

809.    Dr. Waggel attended therapy with Dr. Kecmanovic on February 16, 2016. See **Exh. U** at p. 000002.

810.    On February 22, 2016, after a month of reviewing Dr. Waggel's case, Dr. Cioletti issued her findings to Dr. Waggel. **Exhibit Q** (Cioletti Decl.) ¶ 39; see also Exhibit 6 thereto, a detailed summary of Dr. Cioletti's review.

811.    In her report, Dr. Cioletti noted that as the independent physician reviewer, it was her role to determine not whether the Program made the correct decision in taking the actions under review, but rather that the decisions were reasonably made. **Exh. Q** (Cioletti Decl.) ¶ 40.

812.    Dr. Cioletti noted with regard to Dr. Waggel's performance in Dr. Griffith's Neuroscience class, her scores were significantly lower than the other students in the class on the first two exams. **Exh. Q** (Cioletti Decl.) ¶ 41.

813.    Dr. Cioletti felt that as the exam scores exist as feedback for performance, Dr. Waggel was aware of her deficiency in the class, and Dr. Waggel stated in her interview that she knew her grades on the two exams were below expectations. **Exh. Q** (Cioletti Decl.) ¶ 42.

814.    She found that in Dr. Collins' class, records showed that Dr. Waggel attended approximately 58% of the class sessions. Other students at lowest attended 76 – 82% of the classes. **Exh. Q** (Cioletti Decl.) ¶ 43.

815.    Dr. Cioletti also noted Dr. Waggel's evaluated work product in Dr. Collin's course demonstrated a below average comprehension of the subject material. This was made clear to Dr. Waggel in a five-page written feedback document provided to her by Dr. Collins. **Exh. Q** (Cioletti Decl.) ¶ 44.

816.    As such, Dr. Cioletti found no appearance of bias in Dr. Collins' feedback. **Exh. Q** (Cioletti Decl.) ¶ 45.

817.    Based on those considerations, Dr. Cioletti had no difficulty determining that Dr. Waggel had not demonstrated the requisite knowledge to have mastered the subject matter and the decision for the failure of the course was reasonably made. **Exh. Q** (Cioletti Decl.) ¶ 46.

818.    With respect to Dr. Waggel's patient care issues, Dr. Cioletti noted that there were documented areas of concern in Dr. Waggel's intern year well before the first formal Letter of Deficiency. **Exh. Q** (Cioletti Decl.) ¶ 47.

819.    Dr. Cioletti noted that she had reviewed the four LODs and the efforts at remediation and also noted there were many additional ongoing deficiencies documented in multiple emails in addition to the specific deficiencies raised in the LODs. Exh. Q (Cioletti Decl.) ¶ 48.

820.    Dr. Cioletti also found that there were well documented struggles in professionalism with respect to Dr. Waggel as well. **Exh. Q** (Cioletti Decl.) ¶ 50.

821.    She also observed that those issues continued into Dr. Waggel's PGY II year. **Exh. Q** (Cioletti Decl.) ¶ 53.

822.    Dr. Cioletti took into account the extenuating circumstance related to Dr. Waggel's need to get treatment for her medical condition and her medical leave. Dr. Cioletti stated that she did not identify any other extenuating circumstances in the meeting with her and did not find any evidence that Dr. Waggel had requested or received any type of accommodation related to her medical condition. **Exh. Q** (Cioletti Decl.) ¶ 56.

823.    Dr. Cioletti felt that it was apparent that the decision to delay Dr. Waggel's promotion was made based on concerns about her inability to meet the competencies required of a resident of her level before advancement and while her missed time was certainly considered by the program, it was not the driving factor in the decision regarding her need for a prolonged

residency and that there was genuine concern by the Program regarding Dr. Waggel's abilities. **Exh. Q** (Cioletti Decl.) ¶ 57.

824.    She also noted that those concerns had been shared with Dr. Waggel through informal verbal feedback, written evaluations, and the Letters of Deficiency and that as of August 5, 2015, Dr. Waggel had been made aware that further action, or even termination, was possible if the articulated issues were not addressed. **Exh. Q** (Cioletti Decl.) ¶¶ 57 – 58.

825.    Dr. Cioletti further noted that there were recorded reports of the ACGME required semi-annual meetings, Dr. Waggel and Dr. Catapano as the Program Director and that the semi-annual milestones reports to the ACGME noted that Dr. Waggel was rated below the standard for multiple Milestones her post-graduate year. **Exh. Q** (Cioletti Decl.) ¶ 60.

826.    Dr. Cioletti commented that the CCC minutes showed lengthy discussion about Dr. Waggel. **Exh. Q** (Cioletti Decl.) ¶ 61.

827.    For all of those reasons, Dr. Cioletti, the independent physician reviewer, concluded that the Program was adequately providing oversight of Dr. Waggel and the actions it took regarding Dr. Waggel were reasonably made. **Exh. Q** (Cioletti Decl.) ¶¶ 62 – 63.

828.    She also determined that the Academic Improvement Policy was appropriately followed. **Exh. Q** (Cioletti Decl.) ¶ 64.

829.    Dr. Waggel was notified of Dr. Cioletti's decision by letter from Dr. Berger on February 25, 2016. **Exh. B** (Berger Decl.) ¶ 63; see also Exhibit 20 thereto, Letter, Dr. Berger to Dr. Waggel.

830.    Dr. Waggel attended therapy with Dr. Kecmanovic on February 25, 2016. See **Exh. U** at p. 000002.

831.    On March 1, 2016, a further episode involving occurred in which Dr. Mary Chappelle, a very experienced and respected psychotherapist, had observed in an interaction between Dr. Waggel and a patient and family members in a complicated case of a young man with a serious self-injury requiring involvement of multiple surgical and medical teams. **Exh. A** (Catapano Decl.) ¶ 712.

832.    Dr. Chappelle was asked to be involved in the case to perform beside psychotherapy. When she and Dr. Waggel were going to the patient's room together, Dr. Waggel entered first in a very abrupt manner and spoke to the patient's mother in an elevated voice with an abrasive tone. **Exh. A** (Catapano Decl.) ¶ 713.

833.    When Dr. Waggel excused herself from the room, the patent's mother said she had requested that the psychiatry residents not visit her son anymore. **Exh. A** (Catapano Decl.) ¶ 714.

834.    Dr. Chappelle reported that Dr. Waggel's way of interacting with this family at what Dr. Chappelle considered to be an incredibly vulnerable point in their hospital experience and lives was a matter of concern. **Exh. A** (Catapano Decl.) ¶ 715.

835.    When this situation was brought to the attention of the attending psychiatrist, Dr. Gandhi, who had recently worked with Dr. Waggel on her December 10 Letter of Deficiency essay, he decided to make the case "attending only" because he was concerned that Dr. Waggel could potentially say something damaging to the therapeutic rapport in this delicate case. **Exh. A** (Catapano Decl.) ¶ 716.

836.    On March 9, 2015, Ms. Tucker emailed the LOA Program Administrator, Ms. Vanlewen advising that Dr. Waggel had sent an email the evening of March 8 stating that she had been approved for FMLA leave beginning March 9. Exh. O (Vanlewen Decl.) ¶ 21.

159

837.   Ms. Vanlewen responded to Ms. Tucker notifying her that Dr. Waggel had applied for leave on March 8 to begin the following day, but that her application was still pending. **Exh. O** (Vanlewen Decl.) ¶ 22.

838.   Dr. Waggel's leave was retroactively approved on March 18, 2016, for the period March 9 – 16, 2016. **Exh. O** (Vanlewen Decl.) ¶ 23; see also Exhibit 8 thereto, March 18 approval email.

839.   Dr. Waggel also applied for and was granted intermittent FMLA leave for the period March 8, 2016 – September 7, 2016. **Exh. O** (Vanlewen Decl.) ¶ 24; see also Exhibit 9 thereto, March 18 approval email.

840.   Intermittent leave is FMLA leave taken in separate blocks of time for a single illness or injury. It is designed to allow employees a reduced work schedule to deal with a "serious health condition" that renders the employee unable to perform his or her job. **Exh. O** (Vanlewen Decl.) ¶ 25.

841.   Dr. Waggel was granted leave of 2 times per month for 8 hours per day during the requested time period. **Exh. O** (Vanlewen Decl.) ¶ 26.

842.   Intermittent leave is available to all eligible employees and was available to Dr. Waggel at all times after she became eligible for FMLA leave on June 16, 2015. **Exh. O** (Vanlewen Decl.) ¶ 17.

843.   Once Dr. Waggel became eligible for leave under the FMLA, every request she submitted for FMLA leave was granted. **Exh. O** (Vanlewen Decl.) ¶ 30.

844.   In total, Dr. Waggel took 11 days FMLA leave during the 2015 – 2016 academic year. **Exh. O** (Vanlewen Decl.) ¶ 29; see also Exhibit 10 thereto, LOA summary report of Dr. Waggel's leave.

845.    On March 9, 2016, Dr. Waggel had a routine post-operative follow-up office visit with her urologist, Dr. Jarrett, in which he noted that the CT Scan done in October 15, 2015, showed no evidence of recurrent or residual disease, and the genetic testing showed no evidence of any genetic abnormality. **Exh. H** (Jarrett Decl.) ¶ 21.

846.    Dr. Jarrett concluded the visit by directing Dr. Waggel to come back in October 2016. The entire office visit lasted approximately 15 minutes. **Exh. H** (Jarrett Decl.) ¶22.

847.    Dr. Jarrett reported that at no point during the period in or around the March 9, 2016 visit, or at any time for that matter, did he ever have any thought that Dr. Waggel's cancer had spread elsewhere in her body.  **Exh. H** (Jarrett Decl.) ¶ 31.

848.    Likewise Dr. Siegel, Dr. Waggel's oncologist, reported that he never had any concern that Dr. Waggel's cancer had spread, including but not limited to the period February – March 2016. Exh. J (Siegel Decl.) ¶30.

849.    Dr. Jarrett agreed with Dr. Siegel's assessment that the July 20, 2015 surgery was "curative" of any cancer that Dr. Waggel had. **Exh. H** (Jarrett Decl.) ¶ 29.

850.    Dr. Jarrett did not order any further workup (imaging or otherwise) for Dr. Waggel in the February – March 2016 timeframe and certainly did not order any further workup in that timeframe out of a concern that her cancer may have spread. **Exh. H** (Jarrett Decl.) ¶ 32.

851.    Likewise Dr. Siegel did not order any additional workup during the February – March 2015 timeframe out of a concern that the cancer had spread, or for any other reason. **Exh. J** (Siegel Decl.) ¶ 31.

852.    There was never any disagreement between Dr. Siegel and Dr. Jarrett regarding the appropriate workup for Dr. Waggel's during the February – March 2016 time period, or at any time before or thereafter. **Exh. H** (Jarrett Decl.) ¶ 30; **Exh. J** (Siegel Decl.) ¶29.

853.    Dr. Waggel attended therapy with Dr. Kecmanovic on March 10, 2016. <u>See</u> **Exh. U** at p. 000002.

854.    On March 10, email notification was sent to Dr. Richard Simons, the Senior Associate Dean for M.D. Programs at GW SMHS, that Dr. Waggel wished to appeal the decision to delay her promotion to PGY III year beyond the end of the 2015-2016 academic school year. <u>See</u>, **Exhibit R**, Declaration of Richard Simons, M.D., ¶ 4.

855.    As the Senior Associate Dean for M.D. Programs, it was Dr. Simons' role to determine whether the process set forth in the Academic Improvement Policy was followed with respect to the way that the decision was made. **Exh. R** (Simons Decl.) ¶ 4.

856.    Dr. Simons had no involvement in the operation, management, or administration of the Program. He was not involved in the medical training of Dr. Waggel in any way **Exh. R** (Simons Decl.) ¶ 3.

857.    The purpose of Dr. Simons' review was only to determine whether the required process for delaying promotion under the Academic Improvement Policy was followed. It was not his role to examine the substance or the merits of the Program's decision. It was a purely procedural review and he did not look into whether the Program's decision was justified. **Exh. R** (Simons Decl.) ¶ 5.

858.    Along with her request for an appeal, Dr. Waggel sent Dr. Simons a 15-page letter she had prepared to accompany her request. **Exh. R** (Simons Decl.) ¶ 6.

859.    Dr. Waggel's letter acknowledged that the appeal was based on her contention that Academic Improvement Policy was not followed, however, it did not identify or allege any deviation from the required process, but instead focused on Dr. Waggel's allegations of mistreatment by the Program's faculty. **Exh. R** (Simons Decl.) ¶ 7.

860.    In addition to Dr. Waggel's letter, Dr. Simons reviewed the several LODs from the Program Director, the independent review report prepared by Dr. Anne Cioletti regarding Dr. Waggel's appeal of the decisions regarding failure of two courses and non-promotion to PGY3, the residency evaluations from the Program attending physicians, the documentation from Dr. Waggel's semi-annual reviews with the Program Director, and the minutes of the CCC meeting on October 23, 2015 during which the decision for the course failures and non-promotion was made. **Exh. R** (Simons Decl.) ¶ 8.

861.    On March 14, 2016, Dr. Simons had a 45-minute telephone call with Dr. Waggel, at which time she stated why she felt the decision not to promote her to PGY3 was unfair and how she felt mistreated by her program. **Exh. R** (Simons Decl.) ¶ 9.

862.    During this conversation, Dr. Waggel did not state or even mention that her performance in the program was in any way affected by an illness, medical condition, or any other extenuating circumstances. **Exh. R** (Simons Decl.) ¶ 10.

863.    Following the call with Dr. Waggel, Dr. Simons had a 30-minute phone call with Dr. Catapano, wherein the two discussed the numerous areas of clinical and professional deficiency Dr. Waggel had exhibited throughout her residency. **Exh. R** (Simons Decl.) ¶ 11.

864.    Dr. Simons next met with Dr. Dyer as Chair of the CCC, to discuss the process that the CCC undertook to reach its decision not to promote Dr. Waggel. **Exh. R** (Simons Decl.) ¶ 12.

865.    After conduct those interviews, Dr. Simons determined that the Program did not follow the procedural guidelines of the Academic Improvement Policy in reaching the decision that Dr. Waggel would not be promoted to PGY3. He reached this decision because he did not identify a point in the meeting minutes, or from his conversation with Dr. Dyer, at which the

CCC had made an actual recommendation to the Program Director, Dr. Catapano, to delay Dr. Waggel's promotion. Exh. R (Simons Decl.) ¶ 13.

866.    The Academic Improvement Policy requires that the Program Director consult with the CCC before making a decision on non-promotion and the CCC formally recommends such action. Id.

867.    Based on his review, Dr. Simons determined that the decision not to promote Dr. Waggel was not made in accordance with the required procedures and referred the matter back to the Program with the instruction that the CCC needed to meet and conduct a formal review of Dr. Waggel's performance and make a formal recommendation to Dr. Catapano in order to determine whether Dr. Waggel would be allowed to progress to the next level of training. **Exh. R.** (Simons Decl.) ¶ 14.

868.    Dr. Simons issued a letter to Dr. Waggel on March 25, 2016, with his decision. **Exh. R** (Simons Decl.) ¶ 15.

869.    The letter made clear that he did not review or make a determination on the merits of the Program Director's decision. **Exh. R** (Simons Decl.) ¶ 16.

870.    He also made clear in the letter that it was still within the CCC's discretion to recommend that Dr. Waggel not be promoted to PGY3 after meeting and conducting a formal evaluation of her performance. **Exh. R** (Simons Decl.) ¶ 17.

871.    There was nothing in the letter to suggest that Dr. Simons' decision was in anyway a final determination on the merits as to whether the Program Director was justified in the decision not to promote. **Exh. R** (Simons Decl.) ¶ 18.

872.    On March 16, as part of his investigation in the Notice of Unprofessional Conduct Dr. Waggel had received on February 16, Dr. Berger called Dr. Zinner to discuss the incident

involving Dr. Waggel in his class on January 7, 2016. **Exh. B** (Berger Decl.) ¶ 64; see also Exhibit 21 thereto, a summary of this phone call.

873.    Dr. Zinner stated that prior to beginning his Psychodynamic Psychotherapy class that day, he asked Dr. Waggel to leave the classroom because she was not in the class. It was his understanding that she was not to attend the class because she had failed Dr. Collins' Introduction to Psychodynamic Theory class the previous semester. **Exh. B** (Berger Decl.) ¶ 64.

874.    Dr. Waggel stated that Dr. Catapano had told her that she could stay in the class as long as Dr. Zinner said that it was okay. Dr. Zinner did not believe Dr. Waggel's claim to be truthful and asked her to leave the class. **Exh. B** (Berger Decl.) ¶ 65.

875.    Dr. Zinner confirmed with Dr. Catapano after the class that Dr. Waggel had lied about this and that she was going to be required to take Dr. Collins' class in the fall of 2016 before she could take his class. **Exh. B** (Berger Decl.) ¶ 66.

876.    Dr. Berger also called Dr. Cheryl Collins on March 16, 2016, to discuss Dr. Waggel's performance in her class. **Exh. B** (Berger Decl.) ¶ 68; see also Exhibit 22 thereto, a brief summary of this phone call.

877.    Dr. Collins told Dr. Berger that she felt despite her efforts to help Dr. Waggel learn the material, she did not master enough of the material and that she would need to repeat the course instead of progressing to the next step of taking Dr. Zinner's class. **Exh. B** (Berger Decl.) ¶ 70.

878.    Dr. Collins told Dr. Berger that she communicated this to Dr. Waggel, who stated that if she had to repeat the class she would have to repeat the entire PGY2 year. **Exh. B** (Berger Decl.) ¶ 71.

879.     Dr. Collins told Dr. Berger that she then followed up with Dr. Catapano about Dr. Waggel's claim and learned that Dr. Waggel was incorrect and was going to have to repeat her PGY II year for several other reasons in addition to her performance in Dr. Collins' class. **Exh. B** (Berger Decl.) ¶ 72.

880.     On March 17, 2016, Dr. Berger met with Dr. Waggel to discuss his investigation into the issues identified in the Notice of Unprofessional Conduct. **Exh. B** (Berger Decl.) ¶ 74.

881.     He began the meeting by asking Dr. Waggel about her health as she had alluded to what she called a "life-threatening" situation so he wanted to make sure that she was physically capable and comfortable meeting with me that day. She stated that she was comfortable moving forward. Id.

882.     Dr. Waggel then stated that her doctors thought that her cancer had possibly spread and that her oncologist and her urologist were disagreeing on what type of workup she needed as a result. Dr. Berger expressed sympathy and offered to do whatever he could to be supportive. **Exh. B** (Berger Decl.) ¶ 75.

883.     Dr. Berger let Dr. Waggel know that it was his goal to be a support and a mentor to her, but that it was more difficult to do so because she had retained an attorney and made multiple comments about taking the program down. **Exh. B** (Berger Decl.) ¶ 76.

884.     With regards to Dr. Zinner's class, Dr. Waggel contended that it was a misunderstanding. She admitted being told that she could not take the class, but contended that she asked Dr. Catapano if she could simply sit in and was told that was Dr. Zinner's decision. **Exh. B** (Berger Decl.) ¶ 77.

885.    She contended On January 7, she saw her name was on the class sign-in sheet so she thought she could stay. She only found out later that the sign-in sheet was a mistake. **Exh. B** (Berger Decl.) ¶ 78.

886.    With regards to Dr. Collins' class, she contended that she had received an email from Dr. Collins that she had not demonstrated competency in the course to have an individual patient assigned to her and that she understood that to mean she would have to repeat PGY2 year. **Exh. B** (Berger Decl.) ¶ 79.

887.    When Dr. Berger questioned Dr. Waggel about the issue regarding Dr. Griffith's class and that she had misled him to believe that the grade on the last final was cumulative, she responded by saying she told me that she got "one of" the highest grades in the class, but not the highest. She also contended that she thought the test was cumulative because there were some questions from the first and second test. **Exh. B** (Berger Decl.) ¶ 80.

888.    Dr. Berger found that Dr. Waggel continued her common refrain that she did not think she had any fault in creating the situation that she was in. She stated the LODs did not make sense. She alleged that all of her faculty evaluations were good, and as such, she thought she was doing well in the program. **Exh. B** (Berger Decl.) ¶ 81.

889.    Dr. Waggel also noted that she had been reaching out to other programs about a potential transfer. She was concerned that her chances of transferring would be damaged by the LODs. **Exh. B** (Berger Decl.) ¶ 82.

890.    Dr. Berger agreed to assist her in the transfer process if that was what she wanted to do. He told her that he would have to speak with Dr. Catapano and other Program about a recommendation as well. Id.

891.    Dr. Berger agreed to help Dr. Waggel in the process of transferring because he wanted to support her. He did not, however, make any judgment as to whether transferring was a good decision or the best course of action for Dr. Waggel. **Exh. B** (Berger Decl.) ¶ 85.

892.    Dr. Berger concluded the meeting by letting Dr. Waggel know that he would review everything from his investigation into the Notice of Misconduct and provide his findings to Dr. Catapano. **Exh. B** (Berger Decl.) ¶ 83; <u>see</u> <u>also</u> Exhibit 23 there, a summary of the meeting prepared for Dr. Waggel's file.

893.    Without Dr. Berger's knowledge, Dr. Waggel surreptitiously recorded the March 17, 2016 meeting, **Exh. B** (Berger Decl.) ¶ 84; <u>see</u> <u>also</u> **Exhibit Z**, a transcript of the recording.

894.    As part of his efforts to assist Dr. Waggel in transferring, Dr. Berger spoke to the Program Director for the Adolescent Psychiatry Program at Carillion Virginia Tech about Dr. Waggel after getting a release from her attorney to do so. In that conversation he did not mention the LODs, the Notice of Misconduct, or the community complaints. **Exh. B** (Berger Decl.) ¶ 86.

895.    In later discussing the transfer issue, however, Dr. Catapano expressed to Dr. Berger that she, the Program Director directly responsible for Dr. Waggel's training, could not recommend Dr. Waggel to another program because of serious concerns about her truthfulness and her insight into her deficiencies. Dr. Berger deferred to Dr. Catapano's judgment on whether she or the Program would attempt to facilitate a transfer for Dr. Waggel as he was not involved in Dr. Waggel's day-to-day training to make a determination on her fitness to continue on in another program. **Exh. B** (Berger Decl.) ¶ 87.

896.    By this point in March 2016, the consensus within the Program was that Dr. Waggel was not able to provide an appropriate quality of patient care. **Exh. N** (Griffith Decl.) ¶ 109.

897.    Dr. Griffith had received reports from multiple attending physicians that they did not think Dr. Waggel was capable of providing safe patient care and that she represented a danger to patient safety. **Exh. N** (Griffith Decl.) ¶ 110.

898.    This was important as the faculty and residents in the Program are called upon to attend to some of the most complicated and challenging patients in any psychiatry practice setting. **Exh. N** (Griffith Decl.) ¶ 114.

899.    A not atypical patient presenting to the GW Hospital ED would include a member of a minority population with a history of military service, Post Traumatic Stress Disorder, other psychiatric conditions, substance abuse issues, homelessness and inter-current medical illnesses. **Exh. N** (Griffith Decl.) ¶ 115.

900.    For those reasons, as the Chair of the Department, Dr. Griffith made the decision to remove Dr. Waggel from patient care unless and until the concerns about her professionalism and patient care abilities could be addressed. **Exh. N** (Griffith Decl.) ¶ 118.

901.    On March 17, 2016, Dr. Catapano and Dr. Griffith met with Dr. Waggel to notify her of this decision. **Exh. N** (Griffith Decl.) ¶ 119.

902.    Dr. Griffith informed her that he had made the decision as the Chair of the Department because it is his responsibility to ensure that faculty and residents can safely provide patient care. **Exh. N** (Griffith Decl.) ¶ 120

903.    Dr. Griffith noted that these matters had been presented to Dr. Waggel in the Letters of Deficiency and the Misconduct Notice as well as multiple meetings with Dr. Catapano and various meetings with Dr. Berger and that at least until Dr. Berger had addressed the Notice of Unprofessional Conduct issues through GME, he believed it was his duty both for patient care

and for Dr. Waggel's protection to remove her from patient care duties. **Exh. N** (Griffith Decl.) ¶ 121.

904.    Dr. Waggel stated that she did not know what the concerns were and Dr. Griffith pointed out that they had been presented to her in writing. He went on to tell her that her during the meeting when she kept claiming she did not understand why the action was being taken that the fact that she still claimed to have no understanding of her deficiencies was a part of the reason she should be removed from patient care. **Exh. N** (Griffith Decl.) ¶ 124.

905.    During the meeting, Dr. Waggel contended that she had consistently been evaluated by her supervisors at the level of a 3rd or 4th year resident. Dr. Griffith knew that to be incorrect and told her so. **Exh. N** (Griffith Decl.) ¶ 125

906.    Unbeknownst to everyone else in the meeting, Dr. Waggel also surreptitiously recorded this meeting on her cell phone without their knowledge or consent. **Exh. N** (Griffith Decl.) ¶ 127; see also Exhibit AA, a transcript of this secret recording.

907.    Dr. Waggel attended therapy with Dr. Kecmanovic on March 17, 2016. See **Exh. U** at p. 000002.

908.    Dr. Waggel attended therapy with Dr. Kecmanovic on March 24, 2016. See **Exh. U** at p. 000003.

909.    Dr. Waggel attended therapy with Dr. Kecmanovic on March 31, 2016. See **Exh. U** at p. 000003.

910.    On April 5, 2016, Dr. Catapano provided Dr. Dyer, as head of the CCC, with a memorandum "to highlight the most concerning issues" that had occurred following a misconduct memo regarding Dr. Waggel which had been presented by Dr. Griffith as Chair of the Department, stated that she intended to present her memo at the next CCC meeting, and

invited my comment regarding the memo. **Exh. M** (Dyer Decl.) ¶ 110; see also Exhibit 14 thereto a copy of Dr. Catapano's email and attached memorandum to Dr. Dyer.

911.    In the memo, Dr. Catapano identified three concerns: (1) Dr. Waggel had to be removed from a patient's care on March 1, 2016, because a psychotherapist found her interaction with the patient and his family to be odd and potentially damaging to them in their vulnerable circumstances, (2) a continuing pattern of dishonesty involving an episode in which Dr. Waggel had made multiple untruthful statements and misrepresentations to a number of individuals regarding her inability to meet with Dr. Berger because she was ostensibly on FMLA leave for medical reasons, and (3) Dr. Waggel's continued lack of insight into her deficiencies and lack of effort to remediate them, most clearly demonstrated in her essay for Dr. Gandhi on patient safety involving the August 25 on-call shift. **Exh. M** (Dyer Decl.) ¶ 111.

912.    On April 8, 2016, the CCC conducted a regularly scheduled meeting to review the residents in the Program. Present for the meeting were Dr. Catapano (*ex officio*), Dr. Khin Khin, Dr. Crone, Dr. Norris, Dr. Dyer, and the Program Coordinator, Victoria Anderson. **Exh. M** (Dyer Decl.) ¶ 112; see also Exhibit 15 thereto, official minutes of the April 8, 2016 CCC meeting.

913.    The meeting focused on a review of Dr. Waggel's performance in the Program. **Exh. M** (Dyer Decl.) ¶ 113.

914.    Based on Dr. Waggel's clear deficiencies and her refusal to acknowledge or address them, the group felt that it would no longer be possible to remediate Dr. Waggel. **Exh. M** (Dyer Decl.) ¶ 118.

915.    Dr. Khin Khin then moved to recommend to the Program Director that Dr. Waggel be dismissed from the Program. The motion was seconded and passed unanimously. The

Program Director attended the meeting *ex officio* and did not vote on the motion. **Exh. M** (Dyer Decl.) ¶ 119.

916.    Dr. Crone then moved that it was the consensus of the group that Dr. Waggel not be returned to clinical duties for the remainder of her time in the Program and should have no further contact with patients. The motion was seconded and passed unanimously, again the Program Director not voting. **Exh. M** (Dyer Decl.) ¶ 120.

917.    The CCC took painstaking effort to review all aspects of Dr. Waggel's performance and the issues that she had created. The Committee devoted approximately 1 hour 50 minutes to reviewing and discussing Dr. Waggel at this meeting. This was more than the time spent reviewing the remainder of the residents in the entire Program. **Exh. M** (Dyer Decl.) ¶ 121.

918.    On April 7, 2016, Dr. Berger prepared a letter report to Dr. Waggel and Dr. Catapano regarding the findings of my investigation into the Notice of Misconduct. **Exh. B** (Berger Decl.) ¶ 88; <u>see also</u> Exhibit 24 thereto, a copy of Dr. Berger's letter.

919.    In the letter Dr. Berger outlined the steps he took in his review of the Notice of Misconduct, the materials that were reviewed, and the information that was considered. <u>Id.</u>

920.    He found that Dr. Waggel's failures to report her supervisors in MedHub, obtain health clearance, and comply with the academic improvement plans were evidence of a lack of professionalism, but did not rise to the level of misconduct. **Exh. B** (Berger Decl.) ¶ 89.

921.    He found that the complaints of her neighbor regarding her behavior in her condominium building did not constitute misconduct in the GW learning environment, but advised Dr. Waggel of the importance of minding her behavior outside of work as she represents the Program and the University as a whole. **Exh. B** (Berger Decl.) ¶ 90.

922.    Finally, he found that Dr. Waggel's four instances of misrepresentations represented misconduct. Likewise her threatening texts and emails misrepresented misconduct. **Exh. B** (Berger Decl.) ¶ 91.

923.    Dr. Berger notified Dr. Waggel that she would be receiving a LOD with an improvement plan designed to address these behaviors. **Exh. B** (Berger Decl.) ¶ 92.

924.    Dr. Waggel attended therapy with Dr. Kecmanovic on April 7, 2016. See **Exh. U** at p. 000003.

925.    Dr. Waggel attended therapy with Dr. Kecmanovic on April 14, 2016. See **Exh. U** at p. 000003.

926.    On April 14, 2016, Dr. Catapano emailed Dr. Waggel to set up a meeting with herself and Dr. Dyer on April 18 to discuss the recommendations of the CCC. **Exh. M** (Dyer Decl.) ¶ 122.

927.    Dr. Waggel responded and stated that she would like to have her lawyer present for the meeting. **Exh. M** (Dyer Decl.) ¶ 123.

928.    Dr. Catapano agreed to this and advised that counsel for the University would be present as well. **Exh. M** (Dyer Decl.) ¶ 124

929.    The meeting scheduled for April 18, 2016, did not take place. **Exh. M** (Dyer Decl.) ¶ 125

930.    On April 17, 2015, the CCC met to discuss the Milestone evaluations of each resident. There was a 4-minute discussion of Dr. Waggel to address concerns expressed by one of her previous supervising physicians at Inova Fairfax Hospital, Dr. Aditi Malik. As the committee had already made a decision about Dr. Waggel, the conversation was brief. **Exh. M** (Dyer Decl.) ¶ 126; see also Exhibit 17 thereto, Minutes of the April 17 CCC meeting.

931.    On April 19, 2016, Ms. Vickie Fair, the Assistant Vice President of the Office of Equal Employment Opportunity and Employment Relations at The George Washington University, was forwarded an email Dr. Waggel had sent to the Interim Vice President of Human Resources for GW, Dale McLeod, in which she alleged she was the victim of discrimination by the University's Psychiatry Department. Per Mr. McLeod's directions Dr. Waggel contacted Ms. Fair directly, and they scheduled a time to meet to discuss her complaints. **Exh. P** (Fair Decl.) ¶¶ 2, 8.

932.    By April 27, 2016, Dr. Berger had prepared the LOD corresponding to the April 7 report, but the LOD was never provided to Dr. Waggel, because following the April 7 report the Psychiatry Residency Training Program Clinical Competency Committee met and made a recommendation to Dr. Catapano that Dr. Waggel be terminated. **Exh. B** (Berger Decl.) ¶93.

933.    Because he felt that the judgment of her direct clinical supervisors as to her remediability and ability to continue in the program superseded his ability to address these misconduct concerns, Dr. Berger did not oppose the decision of the Program. **Exh. B** (Berger Decl.) ¶ 94.

934.    On April 28, 2016, the Residency Coordinator, Victoria Anderson, emailed Dr. Waggel and requested that she meet with Dr. Catapano and Dr. Dyer on May 2.  **Exh. M** (Dyer Decl.) ¶ 127.

935.    Dr. Waggel again refused to meet without her attorney. Id. (GWU 003041). **Exh. M** (Dyer Decl.) ¶

936.    Because Dr. Waggel refused to meet, on May 2, 2016, Ms. Anderson sent Dr. Waggel a letter by email and first class mail notifying her of the recommendation of the CCC, which Dr. Catapano as Program Director had agreed with and decided to accept, so a decision

had been made for her dismissal from the Program. **Exh. M** (Dyer Decl.) ¶ 129; see also Exhibit 18 thereto, Email from Ms. Anderson to Dr. Waggel attaching Letter of Dismissal.

937.    On April 28, 2016, Dr. Waggel met with Vickie Fair of the EEO Office. Prior to the meeting, Dr. Waggel requested that her lawyer be present for the meeting, but Ms. Fair refused her request because she did not feel it was appropriate within the University's review process. **Exh. P** (Fair Declaration) ¶ 9.

938.    During the meeting, Dr. Waggel stated that the administration of the GW Psychiatry Residency Program began discriminating against her after she had surgery to remove a cancerous tumor from her kidney in July 2015. Id.

939.    Dr. Waggel stated that she found out she had a cancerous tumor on her kidney that required removal in the spring of 2015. She stated that she applied for FMLA leave at that time, but was deemed ineligible because she had not been employed for a full year. **Exh. P** (Fair Decl.) ¶ 10.

940.    Ms. Fair pointed out to her that she should have and could have come to the EEO Office and requested time off as an accommodation under the ADA. Id.

941.    Dr. Waggel went on to say that she had surgery to remove a portion of her kidney in July 2015, which required her to miss 10 days of work. She contended that once she returned from medical leave her department discriminated against her by not allowing her to take time off to attend follow-up medical appointments. **Exh. P** (Fair Decl.) ¶ 11.

942.    She stated that she had requested two days off per month, but her department would not allow her to take the time off because there were "issues" with most or all of the days she requested. She did not elaborate on what the alleged issues were. **Exh. P** (Fair Decl.) ¶ 11.

943.    Dr. Waggel made this claim despite Dr. Waggel having applied for and been granted intermittent FMLA leave of two days per month, 8 hours per day for the period March 8, 2016 – September 7, 2016. **Exh. O** (Vanlewen Decl.) ¶ 24; <u>see</u> <u>also</u> Exhibit 9 thereto.

944.    Following up on Dr. Waggel's allegation that she was not allowed to take off time for a purported disability, Ms. Fair reviewed The EEO Office's records for anything related to Dr. Waggel to determine if she had ever sought accommodation under the ADA. **Exh. P** (Fair Decl.) ¶ 12.

945.    Her search did not identify any record of any request of any kind by Dr. Waggel. There was no record of Dr. Waggel ever seeking an accommodation such as flexible leave or a modification of her schedule through the EEO Office. There were no requests for time off at all. <u>Id.</u>

946.    Likewise, there was no record of Dr. Waggel having ever gone to the EEO Office to report that she had a disability of any kind. <u>Id.</u>

947.    <u>Dr. Waggel never sought any protection under the ADA through the EEO Office at any point during her tenure at GW</u>. **Exh. P** (Fair Decl.) ¶ 13.

948.    According to Dr. Waggel's urologist, at no time after Dr. Waggel's surgery on July 20, 2015 and the brief two-week post-operative recovery period followed by return to work for light duty for another two weeks which allowed Dr. Waggel to return to her Psychiatry Residency Training Program beginning early August 2015, did her cancer diagnosis and treatment create any disability or impose any impediment to her pursuit of her further training or the performance of her duties within the Psychiatry Residency Training Program. **Exh. H** (Jarrett Decl.) ¶ 33; <u>see</u> <u>also</u> Exh. J (Siegel Decl.) ¶ 33.

949.    There was no adjuvant therapy of any kind was required such as chemotherapy or radiation therapy, and there were no physical or psychological limitations arising from the diagnosis and treatment that would have interfered with her training and duties within the program. Id.

950.    Dr. Waggel never raised any issues related to her residency training program or any difficulties she may have been having in the program with her oncologist, Dr. Siegel. Specifically, Dr. Waggel never raised or discussed that she had any physical, mental, or emotional problem related to her cancer diagnosis and treatment that was in any way affecting her performance in the program or for which she needed consideration for an accommodation to continue participating in her residency training. **Exh. J** (Siegel Decl.) ¶ 32.

951.    On May 12, 2016, Dr. Waggel attended a therapy session with Dr. Kecmanovic where "she reported feeling stronger and indicated that she does not need to come to weekly sessions any more." **Exh. U** at p. 000003.

952.    On May 15, 2016, Dr. Waggel notified Dr. Berger that she wished to appeal the decision to dismiss her from the Program. **Exh. B** (Berger Decl.) ¶ 96.

953.    Upon receipt of Dr. Waggel's appeal, Dr. Berger contacted Dr. Raymond Lucas, an Emergency Medicine physician at George Washington University Hospital, to serve as an independent physician reviewer. Dr. Lucas had no involvement or connection to the Psychiatry Department or its Residency Training Program. **Exh. B** (Berger Decl.) ¶ 97.

954.    Dr. Berger also alerted Dr. Lucas to Dr. Waggel's health issues prior to his review. See **Exhibit S**, Declaration of Raymond Lucas, M.D., ¶ 6.

955.   As the independent reviewer, Dr. Lucas was ultimately tasked with making a determination whether the resident received notice and an opportunity to cure, and the decision to take the Reportable Action was reasonably made. **Exh. S** (Lucas Decl.) ¶ 7.

956.   Dr. Lucas reviewed Dr. Waggel's entire resident file, which included but was not limited to, relevant GME policies on sick leave and academic discipline, four Letters of Deficiency received by Dr. Waggel, the minutes of the meetings of the Residency Program Clinical Competency Committee, milestones and evaluations of Dr. Waggel, documentation of issues arising on some of Dr. Waggel's call shifts, and all of the documents related to Dr. Waggel's multiple appeals. **Exh. S** (Lucas Decl.) ¶ 8.

957.   Dr. Lucas also reviewed an appeal letter prepared by Dr. Waggel in which she disputed each of the points in the Letter of Dismissal and asserted that a breach of protocol occurred in the decision to dismiss her. **Exh. S** (Lucas Decl.) ¶ 9.

958.   Dr. Lucas then met with Dr. Catapano and discussed (1) what feedback the program administration had received about Dr. Waggel's performance; (2) whether the specifics of the negative feedback had been communicated to Dr. Waggel; (3) whether remediation had been proposed and implemented, and (4) whether any extenuating circumstances existed. **Exh. S** (Lucas Decl.) ¶ 10.

959.   During that meeting, Dr. Catapano advised that Dr. Waggel had struggled in the program for the entirety of her residency, but her difficulties apparently significantly increased following her kidney surgery in July 2015. Upon returning from medical leave for the surgery, Dr. Waggel noted that she would need periodic time off to attend medical appointments. The program had encouraged her to go to the EEO Office and get an official accommodation for her schedule needs, but she chose not to. Id.

178

960.    Dr. Lucas next met with Dr. Waggel, along with Dr. Berger and Ms. Tucker, to discuss her side of the story. Prior to the meeting she asked if her attorney could attend, but Dr. Lucas declined. **Exh. S** (Lucas Decl.) ¶ 11.

961.    Dr. Waggel contended that she was excelling in the program until she got sick and then the program turned against her. Dr. Lucas attempted to ask her about her understanding of the many specific instances of alleged misconduct contained in her file, but she was unwilling to engage on those topics and dismissed them simply as vindictive actions by the faculty. Likewise she did not wish to discuss the many efforts the program had made to address her issues, but focused instead solely on what she considered the failures of the Program faculty in facilitating her remediation. Id.

962.    Dr. Lucas noted that it became apparent during his meeting with Dr. Waggel that she was unable to recognize her role in causing the situations that led to her dismissal, and felt that fault lay entirely with the Program. Id.; see also Exhibit 3 thereto, a summary of the meeting prepared by Mary Tucker.

963.    At the conclusion of the meeting, Dr. Lucas asked Dr. Waggel if there was anyone else that she would like for him to speak with. She did not provide him with any names. **Exh. S** (Lucas Decl.) ¶ 13.

964.    Based upon his review of the file, Dr. Lucas reached the determination that the decision to dismiss Dr. Waggel from the Psychiatry Residency Program was reasonably made and should be upheld. I provided my findings to Dr. Berger by letter on July 6, 2016. Dr. Lucas stated the following regarding his decision:

> It was very evident that Dr. Waggel had significant deficiencies in the areas of patient care, medical knowledge, professionalism, and interpersonal communication. She also failed two didactics courses. Furthermore, despite her contentions to the contrary, she was rated below

expectation in nearly all of her milestone evaluations. She received notice of her deficiencies through continued verbal and written feedback from multiple sources throughout her training, both during clinical rotations and in frequent meetings with Program staff, including the Program Director and Associate Director. The amount of formal evaluative feedback she received was limited, however, by her failure to input the names of her supervising faculty members into the program's student evaluation system as required by her program. Dr. Waggel acknowledged that she had received the feedback identified herein.

Dr. Waggel was given ample opportunity to cure the deficiencies identified by her supervisors over the course of her residency. She received multiple LODs with remediation plans included therein, she was placed on buddy-call for overnight call shifts so that more senior residents could help her organize her workflow and provide guidance, she was assigned a faculty mentor to assist with professionalism, and she was given assignments designed to help her learn how to deal with the types of situations in which she was struggling with. Dr. Catapano also worked with faculty at Dr. Waggel's off-campus clinical training rotation sites to adjust her schedule and responsibilities so that she would have more opportunities for observation and feedback. Finally, despite having failed two didactics courses, Dr. Waggel was given the opportunity to repeat that portion of her PGY2 year to learn the missed material with the opportunity for early promotion to PGY3 year.

I noted that there were genuine issues with the faculty members meeting with Dr. Waggel in a timely fashion to facilitate parts of her remediation plans. I pointed out that the program faculty should have done a better job in that area. I did not feel, however, that those issues created a barrier to Dr. Waggel recognizing and curing the many deficiencies which had been clearly presented to her.

While Dr. Waggel's health problems were entangled with her clinical performance problems, professionalism problems and misconduct, it did not appear that they were the source of any bias against her, and they certainly did not explain all the facts and circumstances related to her behavior and multiple deficiencies that led to the decision for her termination from the program. I also believed that the Program had taken her health issues seriously and based on the information available had made reasonable effort to assist Dr. Waggel and accommodate her needs to the extent that it could. Dr. Waggel complained of not being allowed to take medical leave to attend follow-up appointments, but a review of the file did not identify a single instance where she was prevented from attending a medical appointment because of the demands of the program. She was given information on how to take FMLA leave and did so successfully. Given the demands of scheduling in a residency program, the

Program faculty asked her to give timely advance notice of the need to attend medical appointments. I found that request to be reasonable and easy to be complied with. There also seemed to be significant problems with Dr. Waggel unexpectedly calling in sick and/or not showing up for work without ensuring that she got proper coverage per the Program's protocol. Dr. Waggel was also provided information on how to seek accommodations under the ADA, but opted to forego that option. Ultimately, Dr. Waggel's health issues were an extenuating circumstance, but were not a contributing factor nor an excuse or explanation regarding her difficulties in the program. These issues did not cause the multiple instances of lack of professionalism, failure of didactics courses, significant deficiencies in the areas of patient care, medical knowledge, interpersonal communication, and patient safety, and lack of insight into her deficiencies and failure to remediate.

From my review, it was clear to me that Dr. Waggel lacked the insight necessary to properly participate in the remediation process that would have been necessary to reinstate her to the program. She did not exhibit any insight into any of the very clear issues she had with professionalism, patient care, medical knowledge, and communication. For whatever reason, Dr. Waggel believed that the program was 'out to get her' because she had an illness and required accommodation in going to medical appointments. From my review of her file, I did not find evidence to support this claim. The offer to Dr. Waggel to repeat her PGY2 year was a genuine offer designed to help Dr. Waggel move past the issues that had plagued her for the entirety of her residency and try to move forward in the program. I believe that it would have truly been her best chance to attempt to remediate at least some of her deficiencies and ultimately succeed in her training. Unfortunately, Dr. Waggel saw this offer as punishment and refused to accept it. She then continued in behaviors that were unprofessional and a decision was ultimately made by the CCC recommending her dismissal.

Based on the ample evidence of significant deficiencies in multiple key areas, the well-documented issues with performance throughout her residency, 5 LODs (something I have never seen by one resident in one academic year in my more than 20-year career as a medical educator), her documented issues with truthfulness, and her skeptical and oppositional attitude towards the program, the Psychiatry Residency Program Clinical Competency Committee ("CCC") had sufficient reason to recommend Dr. Waggel's dismissal to the program director. I was satisfied by the April 8, 2016 meeting minutes that the CCC had given ample consideration to all issues related to Dr. Waggel's performance to make that recommendation. As such, the result of my review was the decision to dismiss was to be upheld.

**Exh. S** (Lucas Decl.) ¶ 15; <u>see also</u> Exhibit 1 thereto, Letter dated July 6, 2016, Dr. Lucas to Dr. Berger.

965.    Dr. Waggel was scheduled for a visit with her oncologist, Dr. Siegel, on May 23, 2016, at 11:30 a.m., but she did not show up. **Exh. J** (Siegel Decl.) ¶ 15.

966.    Dr. Berger provided Dr. Waggel with notice of Dr. Lucas' decision upholding the decision to dismiss her from the Program by letter dated July 13, 2016. ¶ **Exh. B** (Berger Decl.) ¶ 100; <u>see also</u> Exhibit 27 thereto, Letter from Dr. Berger to Dr. Waggel.

967.    On July 22, 2016, Dr. Richard Simons again received noticed of Dr. Waggel's request for a review of the decision to dismiss her from the Program. **Exh. R**. (Simons Decl.)¶20.

968.    His role was once again to determine whether the procedural guidelines of the Academic Improvement Policy had been followed. **Exh. R** (Simons Decl.) ¶ 21.

969.    Along with the notice of appeal, Dr. Waggel submitted a written submission. As with her earlier letter of appeal, the written submission failed to identify a procedural deficiency on the Program's part and simply outlined the ways in which she felt that she had been treated unfairly. **Exh. R** (Simons Decl.) ¶ 22.

970.    Dr. Simons reviewed Dr. Waggel's appeal by examining copies of Dr. Waggel's evaluations, the numerous Letters of Deficiency Dr. Waggel had received, the minutes from the April 8, 2016 meeting of the CCC during which her dismissal was discussed and a formal vote was taken (Dr. Catapano not participating as she attended the meeting <u>ex officio</u>) to recommend dismissal to the Program Director, and documentation of events related to Dr. Waggel's performance issues. **Exh. R** (Simons Decl.) ¶ 23.

971.    Dr. Simons also reviewed Dr. Lucas' report. **Exh. R** (Simons Decl.) ¶ 25.

972.    Dr. Simons noted that the materials he was provided and reviewed clearly showed that Dr. Waggel had received feedback on numerous occasions regarding unsatisfactory performance issues both verbally and in writing. Exh. R (Simons Decl.) ¶ 26.

973.    He further noted that the April 8, 2016 CCC meeting minutes outlined numerous performance and misconduct issues and there was a unanimous decision to recommend to the Program Director that Dr. Waggel be dismissed from the program. **Exh. R** (Simons Decl.) ¶ 28.

974.    Dr. Simons further noted that, per the Academic Improvement Policy, Dr. Waggel had received a formal review by an experienced and highly respected faculty member who had determined that the decision to dismiss was reasonably made and that on July 13, 2016, Dr. Waggel had received notification of Dr. Lucas' decision. **Exh. R** (Simons Decl.) ¶ 30.

975.    Based on his review, Dr. Simons' concluded that both the program and the GME office had followed appropriate procedures outlined by the Academic Improvement Policy for the dismissal of Dr. Waggel from the program and therefore decided to uphold the program's decision to dismiss Dr. Waggel from the program. **Exh. R** (Simons Decl.) ¶ 31.

976.    Dr. Waggel was provided with a report on Dr. Lucas' findings in writing on August 10, 2016. **Exh. R** (Simons Decl.) ¶ 32; see also Exhibit 5 thereto (GWU 2461 – 2462), Dr. Simon's letter.

977.    On August 12, 201, Dr. Berger sent Dr. Waggel a letter formally terminating her from the Program effective August 10, 2016.  **Exh. B** (Berger Decl.) ¶ 127.

Dated: January 2, 2018                          Respectfully submitted,


                                               JACKSON & CAMPBELL, P.C.

                                                 _/s/  Nicholas S. McConnell_____
                                               Nicholas S. McConnell (# 167742)
                                               Jackson & Campbell, P.C.
                                               1120 20th Street, N.W., Suite 300 South
                                               Washington, D.C.  20036
                                               (T) (202) 457-1600
                                               (F) (202) 457-1678
                                               nmcconnell@jackscamp.com
                                               *Counsel for Defendant*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by the court's electronic filing system [OR: by first class mail, postage prepaid, and via email] on this 2nd day of January, 2018, upon:

                    Jason H. Ehrenberg, Esq.
                    Peter K. Tompa, Esq.
                    Bailey & Ehrenberg PLLC
                    1015 18th Street, N.W.
                    Suite 204
                    Washington, D.C. 20036
                    jhe@becounsel.com
                    pkt@becounsel.com
                    *Counsel for Plaintiff*

                                 _/s/ Nicholas S. McConnell_____