# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,                      )
                                           )
                Plaintiff,                 )
                                           )        Civil Action No.: 1:16-cv-01412-CKK
        v.                                 )        Hon. Colleen Kollar-Kotelly
                                           )
GEORGE WASHINGTON UNIVERSITY,              )
                                           )
                Defendant.                 )

## <u>DECLARATION OF LISA A. CATAPANO, M.D.</u>

I, Lisa A. Catapano, M.D., hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters hereinafter set forth, except as to matters and information specifically identified by the context herein as obtained within my capacity as Program Director for the Psychiatry Residency Training Program (the "Program") at the George Washington University School of Medicine which was acquired for purposes of conducting and making decisions concerning the conduct of the Program, including but not limited to the decisions leading up to and culminating in the decision to terminate Dr. Waggel from the Program, and am competent to testify thereto.

## <u>Declarant's Personal Background</u>

2.      I am an Associate Professor of Psychiatry and Behavioral Sciences at The George Washington University School of Medicine and Health Sciences ("GW SMHS"). I graduated from Dartmouth College (Physics, *magna cum laude*, 1992) and Harvard Medical School/Massachusetts Institute of Technology (M.D. and Ph.D. [Neurobiology], 2003), and completed residency training in Psychiatry at GW SMHS (2003 – 2007). I completed a Clinical Fellowship in Clinical Research at NIH, Bethesda, MD (2007 – 2009), and a Master Educator Program, Association for Academic Psychiatry (2013 – 2015). I joined the faculty of GW SMHS

as a Clinical Instructor, Department of Psychiatry and Behavioral Sciences, GW Medical Faculty Associates (May – October 2009), then became Assistant Professor (October 2009 – March 2001), and Associate Director of Residency Training, Department of Psychiatry and Behavioral Sciences (the "Program") (March 2011 – November 2012).

3.      During the period of time relevant to the matters herein, I served as Director of Residency Training, Department of Psychiatry and Behavioral Sciences, having served in that position from November 2012 – July 2016. As the Program Director, I provided oversight for all administrative and clinical aspects of the Program.

4.      In addition to developing clinical specialty interests in mood disorders in women, particularly as related to infertility, pregnancy and the postpartum period, I have focused both in my training and in my University-related administrative duties on maintaining and enhancing programs for the education and training of physicians entering the field of psychiatry and behavioral sciences. I received multiple awards as a resident and fellow, including the NIMH Outstanding Resident Award, the Laughlin fellowship of the American College of Psychiatrists, and the American Psychiatric Association/Glaxo-SmithKline Fellowship.

5.      As noted, I completed a Master Educator Program of the Association for Academic Psychiatry (2013 – 2015).

6.      I was elected to the American College of Psychiatrists in 2014, and was selected to lead the workshop in 2015, 2016 and 2017 for "early program directors," i.e., physicians just stepping into the role of managing a psychiatry residency training program, at the 2015 annual meeting of the American Association of Directors of Psychiatry Residency Training.

7.      At GW SMHS, I have served in among other capacities as interviewer for Psychiatry Residency applicants (2010 – 2011), Psychiatry Residency Clinical Skills

Verification Examiner (2010), PGY1 Psychiatry Resident Mentor (2010 – 2012), a Member of the GW SMHS Graduate Medical Education Committee (2012 – 2016), a Member of the Program Evaluation Committee, Department of Psychiatry (2014 – present), and a Member of the Core Competency Committee, Department of Psychiatry (2014 – present).

8.      I have a particular interest in fostering compassionate care for chronically and terminally ill patients and am a Co-founder and Vice President of the Board, Neil Samuel Ghiso Foundation for Compassionate Care and have taken a leadership role in this foundation dedicated to fostering compassionate care for chronically and terminally ill patients through the granting of 2 – 5 scholarships annually to Harvard Medical students (2002 – present).

9.      A true and accurate copy of my professional *curriculum vitae* is attached as **EXHIBIT 1** (GWU 004079 – 004082).

<u>**Overview of GW SMHS Psychiatry Residency Training Program**</u>

10.      GW's Psychiatry Residency Training Program generally enrolls 26 to 28 students (6 to 7 students per enrolled "class") and has an attending faculty of 21 physicians based in the GW Medical Faculty Associates physician practice group. In addition, there are a number of other physicians specializing in psychiatry who hold GW faculty appointments and are based at off-site training facilities such as INOVA Fairfax Hospital and Children's National Medical Center. GW psychiatry residents perform clinical training rotations at these sites to obtain exposure to a broad spectrum of psychiatric patients in a variety of clinical settings.

11.      Resident physicians are paid a salary, generally about $50,000 per year, which is funded by the United States government through the Medicare program as part of a national commitment to assure a supply of appropriately trained physician medical specialists to meet the nation's health care needs.

12.     Under the Medicare residency training program, the University also receives payment for some of the administrative components and other indirect costs of conducting residency training. The payment for resident training is fixed by formulas such that an extension of a resident's time in a training program results in the cost of the additional training time being absorbed by the University.

13.     The GW Psychiatry Residence Training Program, like all other post-medical school medical specialty training programs, is conducted under the auspices of the Accreditation Council for Graduate Medical Education ("ACGME").

14.     ACGME is an independent, not-for-profit, physician-led organization that sets and monitors the professional educational standards for residency training programs which provide specialty medical training essential in preparing physicians to deliver safe, high-quality medical care to all Americans.

15.     The ACGME standards must be met both by the training program and by each resident within the program in order for each resident to be recognized as trained and qualified to practice in the particular medical specialty.

16.     Each resident's progress in training is tracked through Milestones which are descriptors and targets for resident performance as a resident progresses from entry into residency through graduation based on the resident's progress on all 22 psychiatry subcompetencies, such as Patient Care, Medical Knowledge, Interpersonal and Communications Skills, Professionalism, and Systems-Based Practice.

17.     Each residency training program is required to have a Program Director, the role I filled during Dr. Waggel's tenure in the program, whose duties, among others, are to administer and maintain an educational environment conducive to educating the residents in each of the

ACGME competency areas and to oversee and ensure the quality of didactic and clinical education in all sites that participate in the program. The GW Program also had an Associate Director to assist in carrying out these duties.

18.     Another key role in the Program is that of Program Administrator. During the time Dr. Waggel was in the program, Victoria H. Anderson was the Program Administrator. As such, Ms. Anderson's general administrative responsibility for the program and her duties included organizing and tracking the residents' didactic and clinical schedules, coordinating clinical rotations through off-site facilities, monitoring the residents' attendance for matters on their schedules, obtaining the residents' completion of forms and reports to meet administrative and Accreditation Council for Graduate Medical Education ("ACGME") requirements, and serving as a general administrative resource for the residents and a channel of communications among the residents, faculty members, and off-site faculty or other personnel. The Program Administrator functions as the communications center and coordinator for residents and has frequent contact with residents, faculty, and off-site program personnel.

19.     As the Program Director, it was also my responsibility to appoint a group known as the Clinical Competency Committee which under ACGME guidelines must consist of no fewer than three members of the Program faculty and is responsible to review all resident evaluations at least semi-annually, prepare and assure the reporting of Milestones evaluations of each resident semi-annually to ACGME, and advise the Program Director regarding resident progress, including promotion, remediation, and dismissal.

20.     As Program Director, I conducted weekly meetings, generally on Mondays, with a group including the Assistant Program Director, the Chief Residents, and the Program

5

Administrator to review all aspects of the Program including a review of the residents in the program and any problems or issues that needed to be addressed.

21.     These administrative team meetings generally lasted an hour to an hour and a half.

22.     I also met weekly with the Chairman of the Department, James L. Griffith, M.D., for a similar review with a focus on clinical practice and safety issues as Dr. Griffith, in his role as Department Chair, had ultimate responsibility for the clinical activities of the Department of Psychiatry and Behavioral Sciences, the quality of clinical practice by the Department, and especially matters related to patient safety.

23.     Per ACGME standards, psychiatry residency training is designated as a four-year program, the first year denominated as the Intern Year or PGY1, with trainees thereafter designated as second-year (PGY2), third-year (PGY3), and fourth-year (PGY4) residents.

24.     Third-year residents who have shown particular aptitude and leadership skills are selected to serve in their fourth year as Chief Residents.

25.     The role and duties of a Chief Resident include maintaining regular contact with the Program Director and Associate Director to review the residency program including resident performance and evaluation, serving as an advocate for the resident body and as a liaison between the residents and the faculty, developing on-call schedules for the residents and providing or assigning back up for on-call residents, participating in teaching junior residents, and being available as a sounding board when a resident raises concerns about the program or his or her own performance.

26.     The overall role of a Chief Resident is to assist the faculty and resident trainees to assure a well functioning program and the success of each resident within the program

27.     As part of their training, each psychiatry resident must spend a stated minimum amount of actual clinical days on rotations in specific medical specialty services. Program Directors have some minimal leeway to grant waivers from the minimum training time standards in the case of residents who have shown exceptional ability.

28.     ACGME further requires each resident to attend a minimum of 70 percent of regularly scheduled didactic sessions. The standard at the GW Program for resident attendance in didactics classes is higher than the ACGME standard.

29.     On July 21, 2015 shortly after the beginning of PGY2 for Dr. Waggel, I sent an email reminding residents of the Program requirements regarding didactics. A true and correct copy of the email, dated July 21 at 9:05 a.m. is attached as **EXHIBIT 2** (Plaintiff's Bates 695). In the email, I noted that:

> In our Psychiatry Residency, <u>we protect one full day per week for all PGYIIs, IIIs, and IVs to be excused from clinical duties in order to participate in program didactics and Grand Rounds</u>. This is more protected educational time then most psychiatry residency programs dedicate for their residents. This comes at the cost of clinical coverage for our sites, and relies on the volunteer efforts of full-time and part-time faculty.

<u>Id.</u>, p. 1 (Plaintiff Bates 695) (emphasis added).

30.     The email further stated that "PGYII, III and IV residents are required to be available for didactics, Grand Rounds, or program-related meetings (including class meetings, RTC, Journal Club, and M&Ms) <u>every Thursday from 8:00 a.m. to 5:30 p.m.</u>" <u>Id.</u> (emphasis added).

31.     The email further instructed residents that:

> Residents may not schedule patients or supervision during this time. Personal time off or medical appointments scheduled on Thursdays are treated as vacation or sick time off, respectively, <u>and require the same</u>

7

> process of alerting attending/instructors and administration as required
> on any other day of the week.

Id. (emphasis added).

32.    Finally, the email reinforced the ACGME didactics requirement and alerted residents that the Program set an even higher standard for compliance with didactics training:

> Residents are expected to be present for all didactics unless they are sick,
> post-call, or on vacation. The ACGME requires that residents participate
> in at least 70% of all didactics, meaning that if a resident attends less than
> 70% of the classes in a particular seminar, they can be required to repeat
> the seminar (which could delay graduation). In our program we believe the
> standard should be higher than 70% attendance, and any resident with
> enough absences to significantly interfere with their learning may be asked
> to repeat the course.

Id. at pp. 1 – 2 (Plaintiff Bates 695 – 96) (emphasis added).

### Residency Training Program Resident Physician Agreement

33.    Physicians accepted into GW SMHS residency training programs sign an agreement regarding their appointment for training.

34.    Dr. Waggel's signed agreement for her first year beginning July 1, 2014, is attached as **EXHIBIT 3** (GWU 000620 – 000625), and her agreement for the second year beginning July 1, 2015, is attached as **EXHIBIT 4** (GWU 000614 – 000619).

35.    Under the residency agreement, residents are notified that the Resident Manual "provides detailed information about the benefits and obligations of Resident Physicians who participate in the Program" and notes that the manual is posted to the GW SMHS GME website (giving the link to the website) and also notes that the GME Policies are posted to the GME website (again noting the link). The agreement further incorporates the policies, terms and conditions of the Resident Manual into the agreement with which the resident further agrees to abide. Exhibit 3, p. 2 (GWU 000621); Exhibit 4, p. 2 (GWU 000615).

36.     The agreement further sets forth the resident physician's obligations including a requirement that the resident "use his/her best efforts, judgment and diligence in fulfilling the duties, tasks, responsibilities and any other clinical and educational requirements . . . in a professional and appropriate manner . . . ." and further states that the resident "acknowledges that a failure to fulfill such requirements may result in disciplinary action, including but not limited to termination, as outlined in the Resident Manual. Exhibit 3, p. 3 (GWU 000622); Exhibit 4, p. (GWU 000616).

37.     The agreement further requires the resident to "comply with duty hour requirements of the . . . . (ACGME) . . ." and "with reporting duty hours as required by the program and/or the GME Office." Exhibit 3, pp. 3-4 (GWU 000622 – 000623); Exhibit 4, p. 4 (GWU 000617).

38.     The agreement further states that the resident "shall obtain medical clearance from a physician prior to participating in any clinical activities . . . ." Exhibit 3, p. 4 (GWU 000623); Exhibit 4, p. 4 (GWU 000617).

39.     The agreement further provides that GW SMHS may terminate the agreement and the resident physician's appointment for the following reasons: "(a) upon the failure of the Resident Physician to comply with any of the terms and conditions of this Agreement . . . or (c) as the result of disciplinary action conducted pursuant to the Resident Manual. Resident Physician shall have no right to cure any violations of this Agreement." Exhibit 3, p. 5 (GWU 000624); Exhibit 4, p. 5 (GWU 000618).

### GW Office of Graduate Medical Education – Resident Manual

40.     The Resident Manual, dated July 1, 2014, a copy of which in relevant parts is attached as **EXHIBIT 5** (GWU 000070 – 000117), and the Resident Manual, dated July 1, 2015,

a copy of which in relevant parts is attached as **EXHIBIT 6** (GWU 000143 – 000190), were incorporated into the resident agreements signed by Dr. Waggel (¶ 25, above).

41.    The Resident Manual sets forth the obligations of each Resident Physician stating in relevant part that each physician is required:

- **Clinical and Educational Requirements.** To use his/her best efforts, judgment and diligence in fulfilling the duties, tasks, responsibilities and any other clinical and educational requirements, of whatever nature, in a professional and appropriate manner, as assigned to the Resident Physician during the duration of the Program." Exhibit 5, at p. 4 (GWU 000077); Exhibit 6, at p. 4 (GWU 000150).

- **Policies and Procedures.** To comply with all policies and procedures set forth in the Manual, as well as the policies and procedures of all hospitals or facilities at which he or she rotates. Id.

- **Duty Hours.** To comply with duty hour requirements of the Accreditation Council for Graduate Medical Education (ACGME) and in accordance with the institutional policy outlined in the Manual. Resident Physician shall comply with reporting duty hours as required by the program director and/or the GME Office. Exhibit 5 at p. 5 (GWU 00007); Exhibit 6, at p. 5 (GWU 000151).

- **Dress code.** To comply with the dress code set forth in the Manual.

Id.

42.    The Manual further reiterates that "[A]ll residents and programs must comply with the ACGME duty hour requirements as outlined in the policy of Resident Duty Hours and Work Environment in Section IX.," Exhibit 5, at p. 13 (GWU 000086); Exhibit 6, at p. 13 (GWU 000159), and notes that "[A] Duty Hour Hotline has been established for anonymous reporting of resident duty hour violations. The hotline number is 202-994-9760." Id.

43.    The Manual sets forth the requirement for residents to obtain medical clearance before performing any clinical duties and states: "We must be strict about compliance with this

regulation in order to comply with D.C. law. It is the responsibility of each Resident to ensure that this medical clearance is completed within the requisite timeframes." Exhibit 5, at p. 19 (GWU 000092); Exhibit 6, at p. 19 (GWU 000165).

44.     The Manual further sets forth the employment benefits program, Exhibit 5, at pp. 28 - 31 (GWU 000101 – 104); Exhibit 6, at pp. 29 - 32 (GWU 000175 – 178), including a "Confidential Counseling" service as follows:

> This no-cost counseling service helps you address stress, relationship and other personal issues you and your family may face. It is staffed by highly trained master's and doctoral level clinicians who will listen to your concerns and quickly refer you to in-person counseling and other resources for stress, anxiety and depression, relationship/marital conflicts, problems with children, job pressures, grief and loss, and substance abuse.
>                    *   *   *
>
> Take advantage of these programs and much more by calling toll-free 855-705-2471 or visiting http://hr.gwu.edu/colonial-community.

 Exhibit 5, at p. 29 (GWU 000102); Exhibit 6, at p. 30 (GWU 000176).

45.     The Manual sets forth in detail the policies governing leave, including but not limited to, sick leave, family and medical leave, temporary disability leave, and leave of absence. Exhibit 5, at pp. 32 - 33 (GWU 000105 – 106); Exhibit 6, at p. 4 (GWU 000150).

46.     The Manual further notes that temporary disability leave or other extended leave may place a Resident "out of cycle in completing the requirements of the training program" and that funding for such Residents must be made in advance of the academic year in which the time will be made up. Exhibit 5, at p. 37 (GWU 000110); Exhibit 6, at p. 37 (GWU 000184).

47.     The Manual further sets forth the EEO Policy as to persons with disability including the following:

> **Residents Requesting an Accommodation**
> The George Washington University's commitment to equal
> employment opportunity and affirmative action includes a
> commitment to provide reasonable accommodations for residents'
> religious obligations and for residents who are qualified
> individuals with disabilities pursuant to the Americans with
> Disabilities Act. Should a resident need an accommodation, he or
> she should contact the Office of Equal Employment Opportunity at
> (202) 994-9656 or fax (202) 994-9658. All requests for
> accommodations are kept in confidence to the extent feasible by
> law and practice.

Exhibit 5, at p. 43 (GWU 000116); Exhibit 6, at p. 43 (GWU 000190). The 2015 Manual

substituted an email link (eeo@gwu.edu) for the fax telephone number.

### Residency Training Program Policies and Procedures

48.     The University Policy on Equal Opportunity, a copy of which is attached as

**EXHIBIT 7** (GWU 000366 – 000368), protects all faculty, staff and students against unlawful

discrimination on a number of grounds, including disability. The policy specifically notes that

"[T]o request disability accommodations, students should contact the Office of Disability . . . .

Employees and other members of the university community should contact the Office of Equal

Employment Opportunity and Affirmative Action at (202) 994-9656 or eeo@gwu.edu." Id. at p.

2 (GWU 000367).

49.     The University Disabilities Policy, a copy of which is attached as **EXHIBIT 8**

(GWU 000067 – 000069), notes that in accordance with the Americans with Disabilities Act

(ADA), Section 504 of the Rehabilitation Act, and other applicable federal, state, and local laws,

and as articulated in the University's Equal Opportunity Statement, the University does not

discriminate against any qualified individuals with a disability. Id. at p. 2.

50.     The policy further specifically directs any faculty or staff seeking additional

information, "including a request for a reasonable accommodation on the basis of disability," to

"refer to the Department of Equal Employment Opportunity website at http://hr.gwu.edu/eeo-statement, or contact EEO at (202) 994-9656." Id.

51.     The GW Psychiatry Residency Program Policy on Resident Time Off and Leave, a copy of which is attached as **EXHIBIT 9** (GWU 000413 – 000419), sets forth the terms and conditions for vacation, sick leave, educational/meeting leave, and personal/family leave.

52.      The policy states with particularity the requirements for notification for absence on a regular work day, a didactic day, or a call day/night shift. Id. at p. 3 (GWU 00415).

53.     The policy further specifically advises with respect to personal/family leave, that regardless of the length of leave involving missed call, i.e., clinical service and training, all such time "must be made up in the course of the academic year to assure that the education provided by on-call experience is not compromised." Id. at p. 4 (GWU 000416).

54.     The Leave Policy further notifies residents that "[T]ime away from the residency program for extended vacation leave, extended sick leave, FMLA, disability or any other reason may result in a resident having to spend additional time in the program beyond the anticipated date of completion. RRC [Residency Review Committee] and medical board requirements must be met before a resident can be certified as having completed a training program." Id. at p. 5 (GWU 000417).

55.     The Resident Dismissal/Non-Renewal Policy, a copy of which is attached as **EXHIBIT 10** (GWU 000441 – 000442), grants the authority to the Program Director consistent with the Academic Improvement Policy and the Resident Misconduct Policy to dismiss a resident or not renew a resident's contract prior to completion of training. The Policy states that "[T]he program director may elect to dismiss a Resident or not renew the Resident's contract prior to completion of training due to: a. Failure to satisfactorily cure academic deficiencies, b.

13

Misconduct, c. Failure to comply with any of the terms and conditions of the Resident contract, GME policies, or code of conduct" and sets forth the procedural and notice requirements for dismissal or non-renewal. Id. at p. 2 (GWU 000442).

56.     The Resident Promotion Policy, a copy of which is attached as **EXHIBIT 11** (GWU 000507 – 000508), provides that "the decision to promote a Resident to the next level of post-graduate training will be the decision of the residency program director after review of the respective criteria outlined in the residency program's policy on Resident promotion." Id. at p. 2 (GWU 000508). The policy notes that the decision not to promote a resident "must be made in compliance with the GMEC institutional policy for Academic Improvement" and sets forth the procedure to be followed and the resident's due process rights. Id.

57.     The GMEC Academic Improvement Policy, a copy of which is attached as **EXHIBIT 12** (GWU 000446 – 000451), notes that residents should be provided routine feedback, including "verbal feedback, rotational evaluations, summative evaluations, and recommendations of a program's Clinical Competency Committee." Id. at p. 2 (GWU 000447). The Policy provides for issuance of a "Letter of Deficiency" ("LOD") where routine structured feedback "is not resulting in a necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback . . . ." Id.

58.     The purpose of an LOD is that it "provides the Resident with (a) notice of the deficiency and (b) an opportunity to cure the deficiency." Id.

59.     The issuance of an LOD "does not trigger a report to any outside agencies such as credentialing organizations, hospitals, or licensing boards . . . ." and if the resident "satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of

unacceptable academic performance should not affect the Resident's progress in the program."
Id.

60.     If, however, a Resident "fails to satisfactorily cure the deficiency and/or improve his/her overall performance to an acceptable level, the Program Director may elect to take further action" consisting of a range of responses including non-promotion to the next PGY [post-graduate year] level, repetition of a rotation, extension of the defined training period, denial or credit for previous rotations, and dismissal from the residency program. Id. at p. 3 (GWU 000448).

61.     The Academic Improvement Policy further sets forth the procedures to be followed and the rights of review available to the resident in the event the Program Director decides that a "reportable action" is to be taken, i.e., non-promotion to the next PGY level, extension of the resident's contract or training period, denial of credit for a previously completed rotation, and/or termination of the resident's participation in the program. Id.

62.     The Resident Misconduct Policy, a copy of which is attached as **EXHIBIT 13** (GWU 000452 – 000456), describes the behaviors constituting misconduct and sets forth the procedure to be followed, and the resident's due process rights, if an allegation of misconduct is made. Examples of misconduct include dishonesty and abusive or disruptive behavior. Id. at p. 2 (GWU 000027).

63.     The Policy on Medical Clearance, a copy of which is attached as **EXHIBIT 14** (GWU 000474 – 000476), notes that under District of Columbia law each individual involved in direct patient care "must have an occupational health clearance prior to the starting date of clinical care, and then annually thereafter." Id. at p. 1.

15

64. The policy specifically instructs that "[I]t is the responsibility of each Resident to ensure that this health clearance is completed within the requisite timeframe" and then further provides:

> *New Residents who do not have their health clearance completed will not be permitted to begin their training program. All returning Residents are required to renew their health clearance annually. All returning Residents must complete the requisite annual health clearance at the GWUH Occupational Health Office by **August 31** of the academic year or they will be suspended from clinical duties until medical clearance is obtained.*

Id. (original emphasis).

65. The Code of Conduct in the Learning Environment, a copy of which is attached as **EXHIBIT 15** (GWU 000429 – 000433), states that all members of the academic medical community are "committed to promoting and maintaining the highest standards of behavior in order to provide a healthy and safe learning environment and to better serve society."

66. The Code sets forth norms "intended to serve as guidelines for conduct for this community" and states that failure to adhere to them "may result in disciplinary action under applicable institutional policies." Id. at p. 1 (GWU 000429).

67. The first three norms set forth in the Code, each of which Plaintiff violated during her tenure in the Program, are:

1. HONESTY

Honesty and integrity will be practiced by GW Professionals during all aspects of educational, research and clinical activities. GW Professionals will conduct themselves in an ethical and courteous manner.

2. PROMISE-KEEPING

Promise-keeping requires GW Professionals to fulfill commitments made at the beginning of any educational, research, and clinical activities. This includes attending required learning sessions, arriving on time, dressing appropriately and completing assigned tasks.

16

3.      RESPECT FOR INSTITUTION, PROFESSION, AND PATIENTS

•        In order to foster an environment of civility, GW Professionals will approach the educational, research, and clinical environments with mutual respect and respect for patients. This includes respect for race, religion, sexual orientation, disability, gender, age marital status cultural difference, political convictions and roles with the institution.

•        It is expected that GW Professionals will show respect and common courtesy for each other and patients in an environment free from harassment and discrimination, exploitation, verbal abuse, physical violence and intimidation in any form.

•        GW Professionals will strive to create a culture of safety and are committed to implementing changes that will promote a safe environment for patients and GW Professionals.

Id. at p. 2 (GWU 000430).

68.     In the Appendix to the Code, examples of "inappropriate" behavior are listed and

include, as to those violated by Plaintiff during her tenure in the program, the following:

- Making belittling or berating statements
- Name calling
- Using profanity or disrespectful language
- Making degrading or demeaning comments regarding patients and their families, hospital personnel, other health professionals, other health professions and discipline specialties and/or the hospital
- Making threats of retribution
- Failing to return phone call, pages, or other messages
- Being unavailable while on call or on duty without arranging for appropriate coverage
- Being under the influence of alcohol or drugs or being otherwise unfit for participation in inpatient/client care, at work, or on call.

Id. at p. 4 (GWU 000432).

69.     The Dress Code Policy for Residents, a copy of which is attached as **EXHIBIT**

**16** hereto (GWU 000443), states that "[P]ersonal appearance is an important component of

professional demeanor. Each resident shall be expected to dress in a manner which conveys a

professional image and inspires confidence in patients and colleagues." Id. at p. 1 (GWU 000443).

70.     The policy notes that the GW medical community and affiliated institutions "provide clinical service to a multi-cultural patient population, where clothing choices may convey different meanings for different populations." Id.

71.     The policy sets forth "Specific Standards" including a statement that "[J]eans, sport shirts, tee shirts, excessively short skirts . . . are inconsistent with a professional image." Id. Plaintiff violated this policy on multiple occasions during her tenure in the Program.

72.     The Social Media and Email Policy for School of Medicine and Health Sciences, a copy of which is attached as **EXHIBT 17** (GWU 000523 – 000527), notes that there is widespread use of social media by faculty, residents, students and staff and a right to use them "as a medium of self-expression." Id. at p. 1.

73.     The policy further states, however, that "SMHS wishes to ensure that you understand that you may be held accountable personally for your electronic statements and representations." Id.

74.     The policy advises that individuals "are solely responsible for what you email or post online," id. at p. 2 (GWU 000524), and provides specific guidelines with which "faculty, residents, students, and staff must comply" when engaged in social media or other online activity including:

> 6.   Do not defame or otherwise discredit the products or services of GW, its physicians, affiliates or vendors.

Id. at p. 3 (GWU 000525).

75.     The policy further notes that [S]uspected violations of this Policy may be subject to disciplinary action." Id. at p. 5 GWU 000527).

18

**<u>Overview of Dr. Waggel's Tenure in the Program and Grounds for Dismissal</u>**

76.     During the past 12 plus years which include my own residency training (2003 – 2007) and my position as a faculty member, the Assistant Program Director, and then Program Director of the GW SMHS Psychiatry Residency Training Program (2009 – 20016), I have observed hundreds of medical doctors entering and completing their residency specialty training in a variety of medical specialties, but primarily in psychiatry and behavioral sciences. Combined with two years of study in the Master Educator Program of the Association for Academic Psychiatry, I have developed a thorough knowledge and understanding of the fundamental requirements demanded of physicians to maintain their status in specialty training, and especially in psychiatry and behavioral sciences residency training, across all the relevant domains of the Accreditation Council for Graduate Medical Education ("ACGME"): Patient Care, Medical Knowledge, Practice-based Learning and Improvement, Interpersonal and Communications Skills, Professionalism, and Systems-based Practice.

77.     By the end of Dr. Waggel's tenure in the program, it had become clear unfortunately that in every respect, despite multiple efforts at remediation, Dr. Waggel was the most deficient, non-qualified resident I have ever encountered.

78.     My strong predisposition as a physician devoted to academic medicine is to mentor and support younger physicians who present themselves to our Program for medical specialty training.

79.     I do everything reasonable and appropriate within ACGME standards and requirements to extend the benefit of the doubt to physician trainees who may be struggling at some point with the higher demands of medical specialty training and the path toward the status of truly independent practitioners within the specialty.

80.     Further, our programs are rated in part on retention rates and on-time program completion so we have further incentives to reach out to struggling physicians with remediation, closer supervision, and, when necessary, accommodation through extension of their time in the training program, even when done at our expense.

81.     My biases, therefore, all lean in the direction of continuing to believe that a struggling physician can be brought back on track and move forward toward program completion and specialty certification.

82.     There comes a time, however, and fortunately very infrequently, when it finally becomes apparent that an individual is simply not able or willing to honestly accept that deficiencies exist and need to be corrected, that his or her training is not adequate and needs remediation, and that extended time will be required to become a fully trained, knowledgeable, competent, and safe independent practitioner.

83.     When such an individual also presents with a significant record over time in the training program of unprofessional conduct, disrespect for colleagues, and frank dishonesty, considerations of academic integrity as well as protection of public health, safety, and welfare outweigh all other considerations and require the trainee's dismissal from the Program.

84.     For all of these reasons, Dr. Waggel's dismissal from the Program was necessary and it would have been academically unconscionable to allow Dr. Waggel to complete residency training and present herself as a fully trained, competent psychiatrist worthy of being trusted and qualified to attend independently to the mental health needs of the health care consuming public.

85.     Dr. Waggel lacked significant medical knowledge, conducted herself unprofessionally in her communications with colleagues, patients and family members, reported for duty dressed inappropriately on multiple occasions at different clinical sites, reported for duty

or became incapacitated during duty as a result of an alleged self-medication mishap but failed to alert the clinical team to her condition and simply went to sleep in an on-call room, was dishonest and untrustworthy in failing to appear for assigned duties without proper notice, failed to comply with important basic public safety duties such as obtaining a timely annual physical clearance required by D.C. law, failed two foundational didactic courses and rather than accepting the need for remediation so that she could learn the material in the courses attempted to avoid the necessary education by appealing the decision, lied on repeated occasions to medical faculty and professional colleagues, received no fewer than four Letters of Deficiency over a relatively brief period of time but refused to recognize or accept responsibility for the deficiencies identified or the need for remediation set forth in the letters, and was issued a Notice of Unprofessional Conduct setting forth four specifications of misconduct including lying to faculty, failing to identify evaluating attending physicians in MedHub despite reminder to do so in order to have clinical evaluations completed by her supervisors, failing to comply with academic improvement plans, and disruptive behavior including threats and antagonistic emails and texts to the Program Director and to classmates.

86. Based on her entire record, Dr. Waggel's dismissal from the Program was clearly appropriate and unrelated to any claim of discriminatory treatment or retaliation related to her cancer diagnosis or any other medical or mental health condition.

87. Dr. Waggel viewed efforts at remediation as set forth in the Letters of Deficiency she received as "punishment" rather than as formal notice for her benefit of an identified problem that needed to be addressed and which could be addressed through the remediation plan set forth in each letter.

88.     Dr. Waggel showed nearly complete lack of insight into her deficiencies almost always denying they existed and deflecting her deficiencies by blaming others or inventing excuses.

89.     Given Dr. Waggel's inability or unwillingness to recognize her deficiencies, own up to them, and prepare to work with faculty and fellow residents to address them, she could not be remediated.

90.     Further, Dr. Waggel's behaviors and character traits were not subject to remediation in any event.

91.     As will be made clear from the detailed review of Dr. Waggel's tenure in the Program, the deficiencies leading to the decision for her dismissal were wholly unrelated to any medical issues or any other disability she may have had or any need for accommodation related to any medical issues or any disability of any kind.

92.     In fact, Dr. Waggel insisted at all times that she was fully capable of performing the duties of residency training and that she had done so.

93.     When suggestions were made that she consider taking time from the Program to address any issues she might have, Dr. Waggel always insisted – with one exception when she took time off for a vacation in Italy and a visit with her family in Pennsylvania – that she had no problems or disabilities of any kind needing accommodation and never acted upon information given to her in the contract she signed before entering the Program, in materials provided to her at the beginning of the Program, and by me, other faculty members, and the University EEO Office at multiple times during her tenure regarding how to access the University EEO Office to pursue any claim for disability or request for accommodation.

**Dr. Waggel's Tenure in the GW Psychiatry Residency Training Program**

94.     Dr. Waggel entered training in the GW Psychiatry Residency training program on July 1, 2014.

95.     The following matters involving Dr. Waggel's tenure in the Program were all brought to my attention during the weekly administrative team meetings so that we would be aware of them, could communicate with Dr. Waggel (as with any other resident) about them, and attempt to devise plans that would give Dr. Waggel an opportunity to address or correct them and stay on track in her training.

96.     Dr. Waggel failed to obtain the required medical clearance before beginning clinical duties on July 1, 2014, despite the fact that she had signed the Resident Physician Agreement on April 16, 2014 (Exhibit 3, p. 6) (GWU 000625), had been put on notice and agreed to obtain the medical clearance in advance of reporting for clinical duties as set forth in the Resident Manual, had been provided a link to the Resident Manual in the employment agreement (id. at p. 1) (GWU 000620), and had been advised that the University insisted on strict compliance with this legally mandated precondition to clinical service. Exhibit 5, at p. 19 (GWU 000092).

97.     As a result, Dr. Waggel had to be pulled from clinical duty on July 3, 2014. See Email, dated July 3, 2014 at 8:42 a.m., Dr. Khin Khin to Mary Tucker. **EXHIBIT 18** (GWU 003419).

98.     Dr. Waggel could not return to her clinical training until sometime after July 9, 2014, when she submitted TB test results to complete the processing of her medical clearance. See Email, dated July 9, 2014 at 3:52 p.m., Dr. Waggel to Dr. Greene. **EXHIBIT 19** (GWU 03546).

99.     Contrary to Plaintiff's allegation in the Complaint that "[A]t all times prior to notifying GW of her medical condition [in the Spring of 2015], Plaintiff was in good stead with her program and performed at or above expectations," (Complaint, ¶ 8), by the end of Dr. Waggel's very first clinical rotation in July 2014, a Chief Resident, Stephanie H. Cho, M.D., reported that while she had generalized concerns about the Intern Class, she had detailed specific concerns regarding Dr. Waggel:

- o Major lack of awareness of level of own abilities
- o Significant resistance to feedback and shows little improvement following constructive criticism
- o Significant deficits in Patient care:
- o Fails to recognize severity of threat to patient safety with specific errors
  - ▪ Pt was to be given >50 units Lantus due to out of control blood sugars, but home oral diabetic medications had not been ordered (as had been communicated and written in signout)
  - ▪ Fails to complete orders/documentation prior to leaving work and does not ensure that it will be done by someone else
- o Does not foster productive collaboration in team environment
- o Demonstrates frequent unprofessional behaviors:
  - o Cites specific residents as more enjoyable to work with compared to other specific residents
  - o Does not take responsibility for errors/near misses that are significant safety patient issues
  - o When asked to help or to complete some patient care task (ie, prescriptions for a planned discharge) expresses open displeasure
  - o Is openly disrespectful to other team members
    - ▪ *Told staff to "think really hard" and "really try to not ask stupid questions" (I told Shemika I would let you know about this. Though Shemika thought it was funny, I think it is completely inappropriate even in jest.)*

See Email, dated July 31, 2014 at 11:29 p.m., Dr. Cho to Dr. Norris, **EXHIBIT 20** (GWU 0001654-1655).

24

100.    Although all residents were aware of the importance of alerting attending physicians and others of any absences from clinical duties due to illness, Dr. Waggel failed to report for duty on Monday December 15, 2014, and failed to notify the attending physician, Aditi Malik, M.D. See Email, dated December 23, 2014 at 10:44 a.m., Ms. Crawford to Dr. Crone et al. and related emails, **EXHIBIT 21** (GWU 003420 – 003421).

101.    The problems identified by Dr. Cho during Dr. Waggel's first rotation in July 2014 continued.

102.    The supervising attending physician for Dr. Waggel's rotation in November – December at INOVA Fairfax Hospital, Aditi Malik, M.D., contacted Chief Resident Elizabeth L. Greene, M.D., in late December to share her concerns about Dr. Waggel's performance in the program. Those issues included the following:

> -   [Dr. Waggel] shows a lack of motivation, initiative, and interest in the care of her patients.
> -   She has been seen using her phone during meetings or conversations with patients and staff.
> -   She has been caught rolling her eyes during meetings or conversations with patients and staff.
> -   She comes to work wearing provocative clothing, such as tight pants. This has made staff uncomfortable to the point that they have had to ask you [Dr. Malik] to talk to Dr. Waggle [sic] about it.
> -   She sits in the resident room and doesn't check in with you for rounds or meetings. There is a lack of communication from Stephanie, so that you've felt the need to track her down to see what she's doing.
> -   She shows up late daily.
> -   She leaves a note at the nurses' station with patient assignments, as if she were the attending.
> -   She walks out of meetings without permission.

See Emails, dated January 2, 2015 at 11:51 a.m., Dr. Levine on behalf of Dr. Greene to Dr. Aditi, and dated January 16, 2015 at 1:00 p.m., Dr. Aditi to Dr. Greene (cc's to Dr. Khin Khin, Dr. Catapano, Ms. Anderson, **EXHIBIT 22** (GWU 003426 – 003427).

103.    In her response, Dr. Aditi Malik noted that Dr. [Cynthia L.] Gauss was "having the exact same issues with [Dr. Waggel] at this time" and stated further that "[Dr. Waggel's] outpatient supervisor Dr. [Cynthia G.] Cohen has also expressed concern to Dr. Gauss." Id.

104.    There were favorable reports on Dr. Waggel from some of the attendings with whom she interacted during the INOVA Fairfax rotation, such as the Neurology Chief Dr. Alissa Romano and Dr. Saeed Alqahtani, Vascular Neurology.

105.    Dr. Alqahtani stated, "I worked with her, she is very hard worker, team player, and taking care of her patients." See Email, dated January 6, 2015 at 1:57 p.m., Dr. Alqahtani to Dr. Greene, **EXHIBIT 23** (GWU 001649).

106.    Dr. Romano commented "on record, prompt, no problem with her work." See, Email, dated January 6, 2015 at 8:33 p.m., Dr. Romano to Dr. Green,  **EXHIBIT 24** (GWU 03422), but also stated she had some "off the record remarks." Id.

107.    In a further conversation with Dr. Greene, Dr. Romano commented further:

-    Great, excellent in terms of her clinical work with patients.
-    On time to work.
-    Did her work.
-    At times, she was "too comfortable." [Dr. Romano] gave me 2 examples of this:
    1.  [Dr. Waggel] came to a party that was explicitly a "Neurology only" party.
    2.  [Dr. Waggel] asked a Neurology attending to teach her how to Instagram.

See Email, dated January 13, 2015 at 5:16 p.m., Dr. Levine on behalf of Dr. Greene to Dr. Khin Khin, Dr. Catapano, Ms. Anderson, **EXHIBIT 25** (GWU 001648).

108.    It is not unusual to get "mixed" reviews from physicians who interact with a resident during an off site rotation, but the reviews that carry the significantly greater weight are those from the primary attending supervising physicians within the same discipline, here,

psychiatry, since they have primary responsibility for the resident's supervision during the rotation, generally have the greater degree of contact with the resident, and clearly have the better understanding of the training benchmarks for our specialty.

109.    On Monday, March 2, 2015, Dr. Waggel started a rotation on the Internal Medicine Unit ("the Green Team").

110.    On Tuesday, March 3, 2015, Gary L. Little, M.D., Medical Director, George Washington University Hospital, emailed to James M. Gehring, M.D., Internal Medicine supervising attending for the Green Team, raising concerns about patient care and safety issues on the March 2 night shift including, among others, coordination between the Green Team and the ER, failure to carry out clinically significant orders, and inappropriate and unprofessional communication. See Email, dated March 3, 2015 at 6:39 p.m., Dr. Little to Dr. Gehring, **EXHIBIT 26** (GWU 003461).

111.    The email specifically noted: "Staphanie [sic] Waggel, MD placed an order for PO Tylenol which clearly would not help a patient who needed a Dilaudid PCA. Multiple return phone calls were unanswered." Id.

112.    Dr. Little requested that Dr. Gehring check on the events and get back to him. Id.

113.    Dr. Gehring asked Jason M. Prior, M.D., another IM attending who was on duty during the night shift on March 2 to help look into the matter and Dr. Prior subsequently reported to Dr. Little and to Dr. Gehring as follows:

> A couple of things were likely coming into play. First, the team was getting absolutely crushed and at one point was up to 30 patients while discharging another 6. Obviously that doesn't excuse any lack of response from anyone on the team but they were definitely just trying to stay afloat with a lot of sick people.
>
> A larger part of the issue likely had to do with a brand new psychiatry intern (Dr. Waggel noted below) who's first day on medicine was

> Monday. It became quickly apparent that she was not at the level one would anticipate of an intern in March and I already pulled the residents aside on Tuesday and asked them to essentially treat her as an A1. She has a very odd affect, I've already had to diffuse some patient complaints and her medical knowledge is pretty poor. With time and education she may get there but for right now I'll also ask the residents to not let her have sole control of the RF phone either. I think beyond her lack of knowledge, she just doesn't know the details of medicine. The combination of it being her first day, extremely busy and a bit odd with all of her interactions with people probably didn't help.
>
> *   *   *
>
> Please let me know if I can help any further. We're already trying to institute some performance plans for Stephanie to try to het her up to speed on medicine.

<u>See</u> Email, dated March 4, 2015 at 3:20 p.m., Dr. Prior to Dr. Gehring, Dr. Little, **EXHIBIT 27**

(GWU 003460).

114.    The efforts to institute performance plans for Dr. Waggel were not successful.

115.    On Friday, March 6, 2015, the end of Dr. Waggel's first week on the Internal

Medicine rotation, Dr. Prior reported to Jillian S. Catalanotti, M.D., Program Director for the

Internal Medicine Residency Training Program, and others, to say:

> I'm writing to everyone because the current situation on green team cannot safely continue, in my opinion. The current construct of the team started Monday 3/2. Since that time, I've fielded complaints form patients, nursing, consulting services, the ED and received an email from Gary Little regarding issues with the team. I know many of you have already received some of these complaints as well. I've spoke to the residents and the primary offending intern in question all week but last night was the last straw. It's gone beyond personal interactions and a lack of knowledge and affected patient safety. Fortunately, nothing happened, but I wanted to alert everyone to the issues, outline some performance plans I've put in place on the team as well as strategize how to possibly move forward.

See Email, dated Friday March 6, 2015 at 1:42 p.m., Dr. Prior to Dr. Catalanotti (cc: Dr. Gehring, Dr. Fiser, Dr. Zweig, Ms. Anderson, Dr. Mehta), **EXHIBIT 28** (GWU 000957 – 000959).

116.    Dr. Prior's email (nearly three pages of single-space text) recounted a series of events regarding Dr. Waggel documenting in detail serious deficiencies in professionalism, interactions with nursing and consulting services, medical knowledge, and patient safety. Id.

117.    On the first day of the rotation, Dr. Prior fielded complaints from nursing and patients regarding her interactions with them and "patients were upset stating she didn't know what she was talking about." Id. at p. 1 (GWU 000957).

118.    On the second day, it became apparent that Dr. Waggel "had a hard time evaluating patients, presenting, knowing what medications did, etc. She didn't know the basics of medicine." Id.

119.    On Wednesday, Dr. Prior received the email from Dr. Little outlining several complaints including one which involved Dr. Waggel "giving nurses information on the phone that clearly wasn't true ('medicine doesn't come to the ED')" and others involving her "being disrespectful, lack of responsiveness, etc." Id. at pp. 1 – 2 (GWU 000957 – 000958).

120.    Thursday was initially uneventful but at 5:00 p.m., several incidents occurred involving potentially disastrous outcomes for patients as to which it was clear Dr. Waggel was totally ignorant as to the medical issues. Id. at p. 2 (GWU 000958).

121.    Dr. Prior continued in the March 6 email to set forth remediation and safety plans he had implemented immediately to address Dr. Waggel's deficiencies and proposed other alternatives to try to assure both ongoing training for Dr. Waggel and patient safety. Id.

122.    The final option Dr. Prior presented was to "[C]onsider removing Stephanie from medicine and have her complete her medicine months at a later date, to be determined based on re-evaluation." Id.

123.    Dr. Prior concluded the email stating, "I'm happy to discuss this further with anyone. I want [Dr. Waggel] to learn and experience medicine as part of her psychiatry curriculum while ensuring the safety and care of patients." Id. at p. 3 (GWU 000959).

124.    Ms. Anderson promptly forwarded the email to Dr. Khin Khin. See Email, dated Friday, March 6, 2015 at 2:10 p.m., Ms. Anderson to Dr. Khin Khin. **EXHIBIT 29** (GWU 001604).

125.    Dr. Khin Khin then promptly emailed Dr. Catalanotti to state that she apologized for the conditions on the Green Team "and the part Stephanie has played" noting she could see "how big a strain her knowledge [sic] and professionalism issues are placing on the team." Id. Dr. Catalanotti noted that she would reach out to Dr. Waggel to address these concerns and that Dr. Catapano was out of town until Monday. Id.

126.    Dr. Khin Khin then also followed up promptly with an email to Dr. Waggel noting that she was aware of the difficulties Dr. Waggel was experiencing on the Medicine green team and that Dr. Prior had discussed this with Dr. Waggel to arrange for team functioning and patient safety, that she [Dr. Khin Khin] had attempted to call Dr. Waggel earlier but her mailbox was full and then gave her telephone number so they could touch base regarding the matter. See Email, dated Friday, March 6, 2015 at 4:04 p.m., Dr. Khin Khin to Dr. Waggel (and also to me, Dr. Greene and Ms. Anderson), **EXHIBIT 30** (GWU 001631).

127.    Dr. Khin Khin was then able to speak with Dr. Waggel that Friday night.

128.    Dr. Khin Khin then reported the substance of the phone call to me in an email dated Sunday, March 8, 2015 at 10:28 a.m. **EXHIBIT 31** (GWU 001630).

129.    Dr. Khin Khin stated that "[I]nterestingly enough, [Dr. Waggel] had no idea there were concerns." Id.

130.    The summary of what Dr. Waggel said was:

> 1)  The residents on the team have "gone out of their way" to tell her that she has been doing a great job.
> 2)  From the conversation with the attending, Dr. Prior, the main point she took was that he told her she could ask for help whenever she needs it from the team and himself.

Id.

131.    Dr. Khin Khin further reported that when she told Dr. Waggel the concerns that the attending (Dr. Prior) had laid out briefly, "[Dr. Waggel] was completely in shock." Id.

132.    Dr. Khin Khin then discussed the issues of Dr. Waggel not being self-aware, the need to assist her to work on fixing the problem, and other structural aspects of the program that might have contributed to Dr. Waggel's problems, and then proposed to bring Dr. Waggel in early the following week to address these matters in a timely manner. Id.

133.    Dr. Khin Khin closed the email with the observation:

> Solution-wise, the option of pulling her from medicine service is quite premature to me. Especially if she doesn't even have any idea that she is underperforming that much. I think the first step is coming up with a remediation-like plan to help her improve (reading, oversight, etc). Stephanie not doing medicine is not going to make her become better at medicine.

Id.

134.    By email, dated Sunday, March 8, 2015 at 11:10 p.m., Dr. Catalanotti followed up with Dr. Prior noting it appeared he had developed a great plan in terms of patient safety as well as appropriate oversight and feedback for Dr. Waggel, and discussed further staffing issues given

31

the circumstances. See Email, dated Sunday, March 8, 2015 at 11:10 p.m., Dr. Catalanotti to Dr. Fiser, Dr. Prior (cc: Dr. Gehring, Dr. Zweig, Ms. Anderson, Dr. Mehta), **EXHIBIT 32** (GWU 001624). Dr. Catalanotti also noted that she had spoken with Dr. Khin Khin who had said she was going to discuss the issues raised with Dr. Waggel. Id.

135.     By email, dated Sunday, March 8, 2015 at 11:13 p.m., Dr. Catalanotti also followed up with Dr. Khin Khin noting that she was "concerned about the professionalism deficits [Dr. Prior] has mentioned" and suggesting that a "serious conversation about professionalism should come from her own program directors" and inquiring if this were something Dr. Catapano and Dr. Khin Khin could do. See Email, dated Sunday, March 8, 2015 at 11:13 p.m., **EXHIBIT 33** (GWU 001595).

136.     Dr. Khin Khin and I met with Dr. Waggel on Monday, March 9, 2015, sometime before 4:06 p.m. to review the concerns Dr. Prior had raised and his plan of remediation for Dr. Waggel's continued training while assuring patient safety. I later reported on this meeting to Dr. Catalanotti. See Email, dated March 9, 2015 at 4:06 p.m., Dr. Catapano to Dr. Catalanotti, **EXHIBIT 34** (GWU 001603).

137.     In the email report, I noted that Dr. Waggel stated she was very motivated to do better and was hoping she would be "given the chance to stay with the team and receive some concrete feedback about how to function better on the rotation." Id.

138.     I further noted that as a medical student at GW and during her first 8 months of rotations, Dr. Waggel had generally gotten "very positive evaluations for her rotations" although there "has been a pattern of vague negative feedback that makes it back to me or [Dr. Khin Khin], but every on-paper evaluation is entirely complimentary." Id.

139.    I further noted that Dr. Waggel reported that "she's gotten nothing but positive feedback from her team and attendings, including in the current instance, where she states that the senior residents of her team have told her she is functioning on-par, and she did not receive any negative feedback from Dr. Prior." Id.

140.    I suggested that this lack of insight might be the result of "indirect or vague" criticism which she "misses." Id.

141.    I also commented that people generally "like [Dr. Waggel] and are reluctant to give her hard feedback." Id.

142.    I further suggested that we have a meeting with Dr. Waggel, Dr. Prior, and me or Dr. Khin Khin to observe feedback given to her and see how she processed the information. Id.

143.    In closing the email, I offered my opinion that it would be better for Dr. Waggel "to stay on the team, get concrete feedback and explicit goals, and see how she is able to respond to that." Id.

144.    I also stated that we would plan to meet with Dr. Waggel on a regular basis in the coming weeks to keep an eye on her. Id.

145.    Dr. Catalanotti responded promptly to my email, thanking us for meeting so quickly with Dr. Waggel and stating her agreement that Dr. Waggel should remain on the team "with very close supervision and direct feedback for now." See, Email, dated March 9, 2015 at 6:35 p.m., Dr. Catalanotti to Dr. Catapano, Dr. Khin Khin, **EXHIBIT 35** (GWU 001611).

146.    Dr. Catalanotti further stated that Dr. Prior had given Dr. Waggel "very concrete feedback last week (including the remediation plan), so hopefully she has heard that. . . ." Id.

147.    Dr. Catalanotti stated further that she would pass this information on to the oncoming new attending, Nupe Mehta, M.D., "so he knows to be very concrete with [Dr. Waggel and to contact you with any concerns about her hearing feedback." Id.

148.    On March 17, 2015, I sent an email to Dr. Catalanotti to see how Dr. Waggel was doing. See Email, dated March 17, 2015 at 12:35 p.m., Dr. Catapano to Dr. Catalanotti, **EXHIBIT 36** (GWU 01593).

149.    Dr. Catalanotti responded that she had not received an update but was cc'ing Dr. Mehta who had been Dr. Waggel's supervising attending for the past two weeks. Id.

150.    On March 19, 2015, Dr. Mehta responded by email stating that "[W]e have a good remediation plan in place and things are fairly stable." He also said that he had been providing Dr. Waggel direct feedback 1-2 times per week. See Email, dated March 19, 2015 at 12:36 p.m., Dr. Mehta to Dr. Catalanotti (cc: Dr. Catapano), **EXHIBIT 37** (GWU 001592 – 001593).

151.    Dr. Mehta noted, however, that he continued "to be worried about her ability to function autonomously, especially with complicated medical patients." Id. at p. 1 (GWU001592).

152.    Dr. Mehta also stated there were matters of "ongoing concern" that he asked Drs. Catalanotti and Catapano not to share with Dr. Waggel as he would do so directly, including:

> 1) she makes questionable decisions (choice of antibiotics, route)
> 2) her documentation is spotty and often inaccurate (e.g., carrying over previous plans from many days ago
> 3) she lacks attention to detail (does not order follow-up tests/labs when instructed)
> 4) she is at times very defensive and passive-aggressive. While the latter is understandable as I feel she is trying hard and wants to improve, she can respond to feedback in a more mature way.

Id. at pp. 1 – 2 (GWU 001592 – 001593).

153.    By email about two hours later, Dr. Waggel responded to an email from Dr. Khin Khin that morning requesting a meeting within the next day or so. In the email, Dr. Waggel said that she could meet the next day and reported: "The past two weeks have been much better. Dr. Mehta said that I am much different than the email [Dr. Prior's email report of Friday March 6, 2015 at 1:42 p.m. to Dr. Catalanotti et al.] portrayed me to be. He said that if I continue this way he will let everyone know that I am not as described in the email." See Email, dated March 19, 2015 at 2:28 p.m., Dr. Waggel to Dr. Khin Khin (cc: Dr. Catapano), **EXHIBIT 38** (GWU 001617).

154.    By email, dated March 20, 2015 at 8:16 a.m., I followed up with Dr. Mehta thanking him for the feedback and noting that "[M]y sense from [Dr. Waggel] is that she believes she's doing much better, and that sounds like it is true, but a pattern I have noticed with her is that she tends to be very 'all-or-nothing' in hearing feedback  . . . ." **EXHIBIT 39** (GWU 001609).

155.    I stated further that I encouraged Dr. Mehta "to be explicit (as you are in your email) [Exhibit 37, above] about the points on which you have continued reservations." Id.

156.    I further offered that if he requested, we would follow up with Dr. Waggel to reinforce the points he was making with her and thanked him "for working so hard to help her improve." Id.

157.    On March 26, 2015, Dr. Khin Khin had a follow-up meeting with Dr. Waggel who reported that she had met with Dr. Mehta on Friday, March 20, and that she had received the following feedback from Dr. Mehta:

> 1)  That she is fine and doing well.
> 2)  That the only thing [Dr. Mehta] recommended that she change/improve is that, when she puts in an order for I&Os, she should tell the nurse directly instead of putting it in the computer,

> as the computer order will disappear once a particular nurse views
> it and won't stay in the system.

See Email, dated March 30, 2015 at 5:35 p.m., Dr. Khin Khin to Dr. Catapano, Dr. Catalanotti, Dr. Mehta, **EXHIBIT 40** (GWU 001591 – 001592).

158.    Dr. Mehta responded to the email (Exhibit 40) by reply email, dated March 30, 2015 at 7:50 p.m. See Exhibit 40, p. 1 (GWU 001591). Dr. Mehta reported: "I must admit, I am very taken aback by this. Hard for me to believe she didn't catch the four things I listed, which I outlined to her very clearly." Id. (emphasis added).

159.    Dr. Mehta also reported that another Internal Medicine attending, Shant Ayanian, M.D., had also provider Dr. Waggel with "very direct feedback last week." Id.

160.    Dr. Mehta noted that he was no longer on the Green Team but would discuss with Dr. Ayanian how best to convey information to Dr. Waggel, stating, "I think verbal messaging may not be the best way to provide her with constructive and actionable feedback." Id.

161.    Dr. Mehta concluded his reply by stating, "She's right in that she is doing better but frankly came from a very poor baseline. It's interesting to note that she is only hearing the positive aspects (i.e., the improvement), but is missing the significant gaps and tactical guidance I (and I'm sure [Dr. Ayanian]) provided her. Please stay tuned." Id.

162.    On March 31, 2015, Dr. Mehta submitted a further report based on a conversation with Dr. Ayanian. He said that it appeared that while Dr. Waggel was not able to verbalize feedback, she was actually acting on what had been discussed and appeared to be significantly improved in her performance although her "main weakness continues to be medical fund of knowledge" as to which Dr. Ayanian thought she was also improving somewhat. See Email, dated March 31, 2015 at 1:11 p.m., Dr. Mehta to Drs. Catapano, Khin Khin, and Catalanotti, **EXHIBIT 41** (GWU 001590).

163.    Dr. Mehta concluded that Dr. Waggel was doing much better and added that while " [s]he still merits significant oversight . . . the good news" was that she appeared to be internalizing feedback and was doing a better job. Id.

164.    On April 3, 2015, Dr. Waggel reported to me and Dr. Khin Khin as follows:

> I just wanted to update you that I had feedback with my new attending Dr. Ayanian [sic] he did not notice any deficits in my medical knowledge. His feedback was to be more confident. This is similar to the feedback from Dr. Mehta. Please let me know if/when you want to meet in the future.

See Email, dated April 3, 2015 at 12:46 p.m., Dr. Waggel to Drs. Catapano and Khin Khin, **EXHIBIT 42** (GWU 001589).

165.    On April 14, 2015, Dr. Ayanian submitted a further report based on Dr. Waggel's performance during the preceding three weeks on the Green Team and commented very favorably on her progress as follows: (1) While Dr. Waggel knows she has some significant gaps in medical knowledge, she was actively working on that issue, (2) Dr. Waggel's medical decision making was "probably her weakest point" and she was not able initially to "connect the dots," but she had shown significant improvement after numerous feedback sessions and constant supervision from the third year resident, (3) documentation was noted as "the major improvement" for Dr. Waggel, (4) her communication skills had improved as "she does communicate better with the nursing staff and she has been more respectful and professional" and there had been no complaints from nurses during the three-week period, (5) her patient care skills were improved with better follow up but she was still struggling with calling consults on time and "still has difficulty with dealing with difficult patients or taking herself out of difficult situations for which she had been given direct feedback, (6) her team work was much better and she was described as "a true team player," and (7) her professional had improved as "she has

been doing an effort to be more self cognizant and try to be as courteous as possible with the patients and nurses." See Email, dated April 14, 2015 at 7:02 p.m., Dr. Mehta to Drs. Catapano and Khin Khin (cc: Dr. Catalanotti), **EXHIBIT 43** (GWU 001588).

166.    In late April or early May 2015, I became aware that Dr. Waggel was having difficulty on the Internal Medicine rotation apparently as a result of pain she was having and I also had heard she had had some imaging studies done related to a kidney cyst that was being further worked up.

167.    On deposition I described this timeframe as during the March 2015 Internal Medicine rotation but a review of the imaging studies that were performed at the time shows they were done on April 15 (CT scan) and April 24 (MRI) so this would have been shortly after those studies.

168.    It was reported to me that Dr. Waggel had discussed her workup and diagnosis with members of the Green Team and had actually brought copies of her images to the hospital with a request that a resident or other physician review them for a second opinion.

169.    I also heard reports from multiple people working with Dr. Waggel that she was suffering from pain and it was interfering with her work.

170.    On April 1, 2015, Dr. Catalanotti informed me of concerns that she and Dr. Waggel's supervising attending physician were having that Dr. Waggel's own health problems were causing her not to be able to focus as much on work and to be flustered and requested that someone close to Dr. Waggel check in on how she was doing. See, Email, dated May 1, 2015 at 2:33 p.m., Dr. Catalanotti to Drs. Catapano and Khin Khin, **EXHIBIT 44** (GWU 001586).

171.    Dr. Catalanotti also commented that the clinical attending also hoped to give Dr. Waggel direct feedback "about avoiding inappropriate language on rounds (calling a patient an asshole in front of students and the team)" but perhaps not that very day. Id.

172.    On the evening that same day, I received an email from Chad Henson, M.D., Chief Resident on the Internal Medicine service, reporting concerns about Dr. Waggel that she was being worked up for a renal mass requiring a number of appointments as well as procedures. He reported that Dr. Waggel was in a great deal of pain requiring narcotic medications and had recently reportedly been unable to admit a patient while on call stating she was in too much pain. See Email, dated May 1, 2015 at 8:16 p.m., Dr. Henson to Dr. Catapano, **EXHIBIT 45** (GWU 001587).

173.    Dr. Henson stated he was concerned that Dr. Waggel was reaching her physical limits and he had discussed the situation with Dr. Karolyn Teufel, the MFA supervising attending on the Internal Medicine service, who reported that there had not been any "near misses." Id.

174.    Dr. Henson then stated it might be prudent to have Dr. Waggel take a few days off work to have a medical evaluation for fitness for duty, which he said the Internal Medicine service would cover, noted that his main concern was Dr. Waggel's physical and mental health and a desire to make sure she felt supported from both programs, and requested that I contact him at my earliest convenience for further discussion. Id.

175.    This was the first I had heard from several members of the Internal Medicine service that Dr. Waggel was having medical issues and pain sufficient to raise concerns about her ability to perform her duties.

176.     I immediately phoned Dr. Henson and asked that he contact our Chief Resident, Elizabeth Greene, which he did by email at 8:17 p.m. See Email, dated May 1, 2015 at 8:17 p.m., Dr. Henson to Dr. Greene, **EXHIBIT 46** (GWU 003440).

177.     At 9:50 p.m. that same evening, Dr. Greene emailed me to report she had just spoken with Dr. Henson who had said that he and I would handle the matter, and Dr. Greene then asked if I needed her to do anything. Dr. Greene noted that Dr. Waggel "did mention her condition to me [Dr. Greene]" when she had met with the interns a few weeks earlier but "it didn't seem that she [Dr. Waggel] wanted me to mention it to the administration since she hadn't even received a diagnosis yet (she was going for a CT scan or MRI the next day)" and the matter had then "completely slipped my mind" so she did not follow up with Dr. Waggel. See Email, dated May 1, 2015 at 9:50 p.m., Dr. Greene to Dr. Catapano, **EXHIBIT 47** (GUW 003439 - 003440).

178.     Dr. Greene then apologized if I did not know about the matter and said she should have asked Dr. Waggel explicitly if Dr. Greene could let "you both" (myself and Dr. Khin Khin) know. Id., p. 2 (GWU 003440).

179.     Within the next day or so, I arranged to meet promptly with Dr. Waggel to review her circumstances during which we discussed the concerns of the Chief Resident and attending faculty that her ongoing pain and pain medication during her workup as well as apparent lack of focus raised issues of the quality of her work and patient safety.

180.     I discussed with Dr. Waggel that it is part of a physician's obligation to be aware of their own health status and to refrain from presenting themselves for clinical duties if there are any concerns that they are not safe to do so – this is a key element of Professionalism.

181.   I explained that physicians do become sick or get ill and need to alert others in advance and withdraw from clinical duties until they are safe to return – there is no shame, stigma, or penalty attached because it is the right thing to do.

182.   I specifically recommended that Dr. Waggel take leave at least briefly to address her medical issues and be prepared to come back to work healthy and safe.

183.   I further specifically discussed with Dr. Waggel whether she should submit to a fitness for duty examination and discouraged her from doing that because the process is somewhat adversarial in that it is better not to have a formal medical evaluation declaring that one is medically unfit for duty.

184.   I reiterated to Dr. Waggel that the far better route would be to take leave which was the ordinary, reasonable thing to do and would not have any negative consequences for her record.

185.   Dr. Waggel insisted that she was fine, that she would be able to continue to perform the duties of her training, and rejected the suggestion that she should take leave.

186.   On May 14, 2015 in the afternoon, I received a telephone call from Dr. Catalanotti reporting on recent issues related to Dr. Waggel's performance on the Internal Medicine service culminating in an event that morning that had led them to conclude that Dr. Waggel could no longer practice safely and they were asking Dr. Waggel to no longer work on the service.

187.   The report I received from Dr. Catalanotti was that Dr. Waggel had appeared that morning for pre-rounds but was apparently sleepy and behaving strangely. When it came time for rounds, Dr. Waggel was not present and Dr. Suzanne Chang, the attending on duty, who was

aware that Dr. Waggel was having medical appointments and related difficulties, became concerned that perhaps she had gotten sick or collapsed.

188.    For an hour or so, various members of the medical team searched everywhere for Dr. Waggel.

189.    Dr. Waggel was eventually found by the Chief Resident asleep in a call room.

190.    The Chief Resident thought Dr. Waggel appeared impaired or intoxicated.

191.    Dr. Waggel had then been sent home for the day with the understanding she would see her therapist and had been asked not to return to the medicine service.

192.    On May 14, 2015 at 6:48 p.m., Dr. Waggel sent me an email asking me to call her when I had some free time. The email stated she had "figured out what happened this morning and I [Dr. Waggel] feel so stupid about it." See Email, dated May 14, 2015 at 6:48 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 48** (GWU 001582).

193.    In the email, Dr. Waggel further explained:

> I mistook my Ritalin pills for Ativan. It didn't kick in until about an hour into work when I got so sleepy. That's why I never take Ativan during work. I take them when I get anxious about my kidney or when I have to get a procedure done. It also didn't help that I didn't have my ADHD meds on board either. I feel so stupid and awful about the whole thing.

Id.

194.    On the evening of May 14, 2015, I notified the Associate Program Director, the Chief Residents, and the Program Coordinator that the Internal Medicine team considered Dr. Waggel unfit to work and had asked her not to return to the team and that I would talk to Dr. Waggel the next day to discuss her options. See Email, dated May 14, 2015 at 9:11 p.m., Dr. Catapano and Reply Email, dated May 14, 2015 at 9:11 p.m., Dr. Greene to Dr. Catapano (cc: Dr. Kels, Ms. Anderson, Dr. Emejuru), **EXHIBIT 49** (GWU 001585).

195.    In my email, I further stated:

> [I] think by far her best option is to take a medical leave, as was recommend [sic] to her two weeks ago. Looking forward, this will impact her promotion date (she'll need to make up 1+ weeks of medicine) and when she can start her pgyii rotations – once we get a scope for the duration of leave [Dr. Greene] and [Dr. Emejuru] will have to work on that.

Id.

196.    On May 15, 2015 at 9:49 a.m., I asked Ms. Anderson to speak with GME to figure out what paperwork needed to be done to put Dr. Waggel on medical leave starting either that day (a Friday) or the following Monday. See Email, Dr. Catapano to Ms. Anderson, dated May 15, 2015 at 9:49 a.m., **EXHIBIT 50** (GWU 001583).

197.    On May 15, 2015, I met with Dr. Waggel about these events and again recommended to her that she should take leave to address whatever issues she was having that were affecting her performance in the residency program and resulting in her dismissal from the Internal Medicine rotation.

198.    At this time Dr. Waggel agreed to accept my recommendation and she then arranged for either leave or personal vacation time to be away from the Program from May 18 to June 7, 2015.

199.    On May 15, 2015, I sent an iPhone message to and received an email response from Dr. Catalanotti noting that Dr. Greene and I had already spoken with Dr. Waggel and we would stay in touch on how Dr. Waggel was doing and how she could make up the leave time on the Internal Medicine rotation when she returned. See iPhone message, dated May 15, 2015 at 12:47 p.m., Dr. Catapano and email response, Dr. Catalanotti to Dr. Catapano, May 15, 2015 at 1:03 p.m., **EXHIBIT 51** hereto (GWU 001584).

200.    On May 18, 2015, I received a detailed email report forwarded by Dr. Catalanotti from Dr. Chang regarding Dr. Waggel's Internal Medicine rotation for the month of May 2015. See Email, dated May 18, 2015 at 9:17 a.m., Dr. Catalanotti to Dr. Catapano, **EXHIBIT 52** (GWU 001580 – 001581).

201.    Dr. Chang reported that when she first arrived on service, Dr. Waggel had been away for two days of medical leave, had been given an opportunity to take a longer leave of absence but told the chiefs she felt ready to be back, and arrived back on service the third day Dr. Chang was on duty. Id. at p. 1 (GWU 001580).

202.    Dr. Chang reported that over the next week or so, there were small incidents that raised red flags about Dr. Waggel's well-being and professionalism, including at least three patient complaints calling Dr. Waggel unprofessional or "mean" and Dr. Waggel becoming very angry or offended by her interaction with them. These incidents did not produce bad outcomes but as a result of the poor communication resulted in delays in care, delays in discharges, and overall loss of trust of the medical team which too a lot of extra work to correct. Id.

203.    Dr. Chang further reported that on at least one occasion Dr. Waggel was dressed inappropriately (wearing a very form-fitting and high-cut skirt). Dr. Chang received several comments from other staff and patients about her attire. Id.

204.    Dr. Chang also received reports from Dr. Waggel's team members that Dr. Waggel seemed angry, cursing loudly in the team room in front of the students and within earshot of patients, and her behavior seemed to be escalating. Id.

205.    Dr. Chang then recounted in detail the events on the morning of May 14 noting that when the Chief Resident found Dr. Waggel she was apparently impaired or intoxicated and

that Dr. Waggel had since stated she was "out drinking late the night before, and that morning had confused her Ativan and Ritalin and taken benzos accidentally prior to coming to work." Id.

206.    Dr. Chang commented that Dr. Waggel "was clearly not fit/safe to be participating in patient care," was sent home after promising to see her therapist that afternoon, and was asked not to return to the medicine service. Id.

207.    Dr. Chang concluded:

> Overall my concerns are a) that Stephanie is not emotionally or physically fit to be working and needs to take a leave of absence for her own safety and well-being, and b) that Stephanie is not currently fit to take care of patients and poses a significant risk to patient safety. I understand she has been going through a challenging time and this should be taken into consideration, but ultimately, if she is not safe to be taking care of patients right now she needs to be removed from the hospital until she gets treatment or counseling and is re-evaluated carefully and deemed safe. At this point I don't feel this has happened.

Id. at p. 2 (GWU 001581).

208.    As noted, Dr. Waggel requested and was granted leave from May 18 – June 7, 2015.

209.    On June 1, 2015, while she was on leave, Dr. Waggel emailed me to clarify her leave and I confirmed that she would be on medical leave May 18 to June 7 and that Dr. Waggel was voluntarily giving up her vacation days at the end of June. I also advised that I would inform Dr. Waggel of the number of Internal Medicine rotation days she would need to make up from her recently discontinued rotation. See Email, dated May 26, 2015 at 10:12 a.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 53** (Plaintiff Bates 409).

210.    Again, I did everything I could to be supportive of Dr. Waggel in her need to take this leave.

211.    On June 1, 2015, Dr Waggel emailed me to "check in" and reported:

> Dear Dr. Catapano,
>
> I just wanted to check in. I went on a vacation to Italy with my friend from medicine Faryal and I am going to visit my family. My grandfather is having his 89th birthday party so I will be seeing many of my relatives. I am doing well. Have a nice day!
>
> Stephanie

See Email, dated June 1, 2015 at 1:51 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 54** GWU 001393).

212.     While Dr. Waggel was away, I worked to re-schedule her Internal Medicine makeup week with Dr. Catalanotti and her Chief Residents, Dr. Wesley Fiser and Dr. Jessica Davis, and was particularly pleased that Dr. Waggel could be slotted in with Dr. Ayanian, the attending with whom she had previously had good rapport. See Emails exchanged June 2, 2015 – June 4, 2015, Drs. Catapano, Catalanotti, Fiser and Davis, **EXHIBIT 55** (GWU 001579, 001573 and 001574).

213.     On June 5, 2015, Dr. Waggel again reported about her time away and resuming her schedule as follows:

> Dear Dr. Catapano,
>
> My week was beautiful and relaxing. I just wanted you to know I've been trying to find info about my shift on Monday. If I don't hear anything I will go in at 7 as scheduled.
>
> Thank you,
> Stephanie

See Email, dated June 5, 2015 at 2:30 p.m., Dr. Waggel to Dr Catapano, **EXHIBIT 56** (GWU 001390).

214.     On Monday, June 8, 2015, I emailed the residents reminding them of the options they had for reduced fee or GME-subsidized psychotherapy and attached the most up-to-date

version of the policy, specifically pointing out the section on "Accessing Psychotherapy" and paraphrased relevant points, including that (1) an intake and four follow up sessions were covered for any resident who has an acute and serious psychiatric issue, and (2) for psychiatry residents, there is a list of local providers willing to see trainees for psychotherapy at reduced rates. See Email, dated June 8, 2015 at 4:07 p.m., Dr. Catapano to Psychiatry Program List Serve, **EXHIBIT 57** (GWU 003444 – 003445).

215.    The then current Residency Policy on Personal Psychotherapy, dated June 1, 2015, is attached as **EXHIBIT 58** (GWU 003446 – 003448). The policy specifically notified residents as follows regarding accessing psychotherapy:

> *Accessing Psychotherapy*
>
> A resident with a medical or psychiatric disorder is responsible for obtaining psychiatric or medical treatment needed to prevent symptoms of the disorder from adversely affecting his or her professional performance. The program director may point out concerns to a resident and recommend (or require) a psychiatric or medical evaluation. Should this occur, it is the resident's responsibility:
> - To obtain needed medical or psychiatric evaluations and any subsequent treatment;
> - To provide to the program documentation from medical or psychiatric evaluations as needed to assist the program in determining whether special accommodations for the medical or psychiatric disorder are warranted.

Id. at p. 3 (GWU 003448) (original italics, underscoring added).

216.    On June 10, 2015 at 9:06 a.m., I was informed by Elizabeth Greene, M.D., Chief Resident, that Dr. Waggel had not showed up for her ED shift (which began at 7:00 a.m.) and that the EM Chief Residents had emailed stating they needed to get in touch with Dr. Waggel ASAP. See Email, dated June 10, 2015 at 9:06 a.m., Dr. Greene to Dr. Catapano et al., **EXHIBIT 59** (GWU 001440 – 001441, at 001441).

217.    Dr. Waggel could not be reached for nearly two hours.

218.    When Dr. Waggel was finally reached sometime after 9:00 a.m., she said she had not been feeling well but had not called anyone to make arrangements for coverage. Id. at GWU 001440.

219.    This was a major breach in professionalism with respect to any clinical duty assignment and certainly no less so given the nature of the work performed in an Emergency Department.

220.    I asked Dr. Greene to speak with Dr. Waggel promptly to convey the message that this was unacceptable and noted that I would meet with Dr. Waggel as well. Id.

221.    On June 11, 2015 at 7:23 a.m., Dr. Waggel emailed me stating she had learned the day before that she "need[ed] a nephrectomy sooner rather than later. Dr. Jarrett (chair of urology) said I should only need about two weeks off." See Email dated June 11, 2015 at 7:23 a.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 60** (Plaintiff Bates 418).

222.    We met within the next several days and I again reinforced that failing to show up for any professional commitment, but particularly clinical duties, without directly notifying the attending physician, Chief Resident, and Program Coordinator and making alternative arrangements for coverage in advance was unacceptable and would not be tolerated.

223.    We also discussed Dr. Waggel's surgery and I assured her that she would have our full support with respect to her request for leave based on whatever date her surgeon selected for the surgery and her recovery time, which Dr. Waggel had already indicated would be about two weeks.

224.    I advised Dr. Waggel that she should arrange her schedule through Dr. Emejuru as her Chief Resident so he could coordinate her schedule with that of the other PGY2s regarding her upcoming sick leave.

225.    As a cancer survivor myself, I was very attuned to what Dr. Waggel was experiencing and wanted to be as reassuring and supportive as possible.

226.    On June 16, 2015, I received an email from Dr. Waggel to the Chief Residents on the ED service inquiring directly about a rotation during the first week of July before her surgery. See Email dated June 16, 2015 at 5:34 p.m., Dr. Waggel to 2014gwemchiefs, et al., **EXHIBIT 61** (Plaintiff Bates 424 – 426).

227.    I responded the next morning reminding Dr. Waggel that she should contact Dr. Emejuru to work out her schedule.

228.    I asked Dr. Waggel to contact Dr. Emejuru that day so arrangements could be made for her medical leave followed by arrangements for the rest of her schedule. Id. at 424.

229.    Very shortly afterwards, Dr. Emejuru confirmed that that process was already under way but he had not yet reported that to me. Id. at 25 (email dated June 17, 2015 at 10:14 a.m.).

230.    During our weekly administrative team meetings, I was advised that a date had been selected for Dr. Waggel's surgery and leave arranged for the surgery and two-week recovery period.

231.    I was also advised that Dr. Emejuru had worked closely with Dr. Waggel to secure the rotations she had requested both before and immediately after the surgery.

232.    I knew from copies of email traffic forwarded to me that Dr. Emejuru was also working diligently with Chief Residents on both Internal Medicine and Emergency Medicine to

get the clinical schedule Dr. Waggel had requested before her surgery which had been set for July 20. See Emails dated June 22, 2015 at 1:34 p.m. and 2:00 p.m., **EXHIBIT 62** (GWU 03567) and June 22, 2015 at 1:45 p.m. and 1:55 p.m., **EXHIBIT 63** (GWU 001571 – 001572).

233.    We also received a brief report from the ED Chief Residents that Dr. Waggel was "doing fairly well" in the ED, was receptive to feedback, and was asking for help as appropriate although they also noted "some slight deficiencies in her clinical knowledge." Exhibit 63 at GWU 001571.

234.    Dr. Emejuru forwarded to me the plans he had prepared for Dr. Waggel's rotations immediately before and after her scheduled surgery and postoperative recovery leave. See Email dated June 22, 2015 at 5:32 p.m., Dr. Emejuru to Dr. Catapano, **EXHIBIT 64** (GWU 001569).

235.    I responded the next morning noting, "Agreed. Sounds like a good plan. Thanks, Jason." See Email dated June 23, 2015 at 10:52 a.m., Dr. Catapano to Dr. Emejuru, **EXHIBIT 65** (GWU 003449).

236.    On June 23, 2015 at 1:01 p.m., Dr. Emejuru emailed Dr. Waggel advising her of the rotation schedule that had been set for her as she had requested and closing, "Take care and let me know if you have any questions." See Email dated June 23, 2015 at 1:01 p.m., Dr. Emejuru to Dr. Waggel, **EXHIBIT 66** (Plaintiff Bates 435).

237.    On June 24, 2015 at 12:25 p.m., I emailed Dr. Colleen Roche, the Residency Program Director, Department of Emergency Medicine, advising her that I was writing a Letter of Deficiency regarding Dr. Waggel's not showing up for work at the ED two weeks earlier on June 10 and asked Dr. Roche to fact check the statements in the draft. See Email dated June 24, 2015 at 12:25 p.m., Dr. Catapano to Dr. Roche, **EXHIBIT 67** (GWU001204 – 001205).

238.   The draft fact statement concerning the events on June 10 was as follows:

> According Dr. Colleen Roche, attending physician in the Emergency Department, you were scheduled to work in the ED on June 10 starting at 7:00 am. Based on conversations you had had the previous day with ED residents, Dr. Roche understood you to be aware of your shift assignment. You did not come to work at 7:00 am that day as expected, and for the next two hours, members of the ED attempted to reach you by phone. You did not answer your phone or return their calls. You had not alerted anyone in the ED (nor anyone in the Department of Psychiatry) that you were not planning to come to work that day. According to Dr. Roche, when you were finally reached by phone, you stated you were not feeling well and decided not to come to work. You did not acknowledge that you had not followed any reasonable procedure to alert the ED and make arrangements to cover your absence.  In the end, you agreed to, and did come into work for the rest of your shift that day.

239.   On June 24, 2015 at 12:41, Dr. Roche responded: "Yes, that is correct." Id.

240.   Dr. Roche then commented further, so that I would know, that Dr. Waggel was "struggling a lot clinically in the ED." Id.

241.   Dr. Roche stated that, "I know the practice of EM is a lot different than the practice of psychiatry, but her clinical knowledge/practice is not up to par with what we would expect from an intern." Id.

242.   Dr. Roche reported further as follows:

> I will try to get you more specifics, but I have received multiple comments about her poor clinical performance. I worked in the ED with her yesterday, but she was being covered by another attending. She seemed to want to do a good job, but my sense is that she was so far behind because she was limited by her clinical knowledge.

Id.

243.   On June 30, 2015, I circulated the proposed draft Letter of Deficiency to the members of the Clinical Competency Committee ("CCC") for their review and comment. See

Email dated June 30, 2015 at 1:37 p.m., Dr. Catapano to Dr. Dyer et al. and attachment, **EXHIBIT 68** (GWU 002826 – 002828).

244.    I soon received a response from Dr. Cathy Crone, a faculty member sited primarily at Inova Fairfax Hospital, with a minor proposed edit of the letter followed by further comments on issues regarding Dr. Waggel's lack of professionalism during an inpatient psychiatry rotation there, including a disrespectful attitude toward her assigned supervising attending physician. See Email dated June 30, 2015 at 5:03 p.m., Dr. Crone to Dr. Catapano, **EXHIBIT 69** (GWU 001203).

245.    On July 9, 2015, I emailed Dr. Waggel to check on how she was doing with her health and upcoming surgery. See Email dated July 9, 2015 at 3:54 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 70** (Plaintiff Bates 689 – 691).

246.    I noted in the email that after Dr. Waggel's surgery, we needed to conduct her semi-annual evaluation and clarify her graduation date once we knew how long she would actually be out on leave. Id.

247.    I also alerted her that she would receive a Letter of Deficiency regarding the June 10 ED shift and she would be required to meet with another faculty member, Dr. Allen Dyer, on a remediation plan. Id.

248.    I also assured Dr. Waggel that the letter was not reportable, i.e., would not be disclosed to a licensing board or future employer as long as the issue was dealt with and not repeated. Id.

249.    I also invited Dr. Waggel to talk with me about any of these matters before her surgery and closed, "[I]n the meantime, take good care of yourself." Id.

250.     Dr. Waggel soon responded: "Thank you for checking in. We can meet whenever you have time but I should probably not miss any of my medicine time though. I have a doctor's excuse for that day and I will be happy to talk about it with Dr. Dyer after my surgery. Have a nice evening." Id. (Email, dated July 9, 2015 at 6:32 p.m.).

251.     Dr. Waggel's response showed that she was totally missing the point that her lack of professionalism arose out of her failure to notify anyone in advance that she was not going to show up for clinical duty. A doctor's excuse was no explanation of or justification for this clear departure from professional standards.

252.     I responded by noting that she would be having a busy week before surgery, I did not want to make it any more stressful, and hoped all would go smoothly. Id. at 690 (Email dated July 10, 2015 at 11:17 a.m.).

253.     Shortly afterwards, I was notified that Dr. Waggel had "no showed" for a didactics course taught by Dr. Cheryl Collins on July 9 even though Dr. Waggel had assured Dr. Collins that she would attend the class. See Email dated July 20, 2015 at 9:07 a.m., Dr. Minor to Dr. Kels, Dr. Catapano, et al., forwarding an email exchange, **EXHIBIT 71** (GWU 001559 – 001560).

254.     Dr. Waggel had apparently noted that she did not show up for the class because of a doctor's appointment related to her upcoming surgery. Id.

255.     Dr. Emejuru had pointed out to Dr. Waggel that he was sure this was an important appointment in light of her upcoming surgery but then reminded her that she needed to notify people if things changed suddenly." Id.

256.    Dr. Emejuru also reminded her that the Program policy for all PGY-II-IV residents was that personal appointments were not to be scheduled on Thursdays during didactics classes. Id.

257.    Dr. Emejuru did not criticize Dr. Waggel for attending the appointment but for scheduling it on a didactics day and then not notifying Dr. Collins.

258.    Dr. Waggel responded that she was "actually very upset that I was given such a hard time about going to this appointment." Id.

259.    She added that one should understand that "I'm having major surgery and likely I have cancer." Id.

260.    She further added: "It's not as if I chose for this to happen to me. I will feel a huge lack of support." Id.

261.    Dr. Waggel's lack of self-observation throughout her brief response to Dr. Emejuru was disappointing and concerning.

262.    On July 21, 2015, as a reminder to all residents of the Program's emphasis on protected didactic time, I sent an email forwarding our policy and specifically the Program's expectations regarding attendance at didactics. See Email dated July 21, 2015 at 9:05 a.m., Dr. Catapano to Dr. Lewis et al., **EXHIBIT 72** (Plaintiff Bates 695 – 696).

263.    The policy specifically states that:

> The ACGME requires that residents participate in at least 70% of all didactics, meaning if a resident attends less than 70% of the classes in a particular seminar, they can be required to repeat the seminar (which could delay graduation). In our program we believe the standard should be higher than 70% attendance, and any resident with enough absences to significantly interfere with their learning may be asked to repeat a course.

Id. (emphasis added).

264.     On July 24, 2015, I had the following text message exchange with Dr. Waggel:

> Jul 24, 2015, 1:31 pm
>
> Hi Dr. C I wanted you to know Dr. Jarrett called and said it was clear
> cell carcinoma but he's pretty sure it's all gone  ☺
>
> Jul 24, 2015, 3:39 pm
>
> Hi Stephanie, thanks for sharing your news. I'm so glad he thinks it's
> all out of you. How is your recovery going?

See Screen shots of text messages beginning July 24, 2015 at 1:31 p.m., Dr. Waggel to Dr.

Catapano, **EXHIBIT 73** (Plaintiff Bates 1084).

265.     On July 29, 2015, I texted further to Dr Waggel to ask how she was doing and

received the following response:

> Jul 29, 2015, 6:03 pm
>
> Hi Stephanie, how are you doing? LC
>
>
> Hi Dr. Catapano I'm feeling a little sick actually I'm debating on
> whether to go to the ER or not. I think I might wait because I'm
> afebrile and I have an appointment with my oncologist tomorrow at
> 830.
>
> I've been looking into working with our GME to help make it easier
> for residents to get a medical work up in the future
>
> I think I'm really lucky that I am at GW and in the psych program
> which I imagine is particularly good at getting residents time off. I
> cannot imagine what may have happened if I were in a program like
> surgery somewhere and pushed off my work up like I was initially
> planning to do. Apparently clear cell does not respond to chemo or
> radiation so it is really scary how close I came to waking [sic]. But I
> think if there were specific written guidelines it would help other
> residents in the future.
>
> I am just going to type up some suggestions such as making sure each
> resident knows exactly to inform [sic] if they are going to leave and to
> make sure they get coverage. When I was in the ED the other resident
> who I asked to cover me and said yes did not come in so I almost
> missed my appointment. I'm not going to complain about anything I'm
> just going to make sure some of the hurdles I went through are

55

addressed in case another resident gets sick with a chronic illness in the future.

Thank you for keeping in touch with me. Dr. Griffith emailed me too which I thought was really nice. I will let you know how my appointment goes tomorrow.

And as for coming up with some guidelines in the event another resident has a chronic issue that needs work up over a period of many months—I am not going to complain about any particular thing that happened to me (although if you read my paper from our first didactic session you are aware that one of the third year medicine residents gave me a very hard time) I am just going to propose some solutions that will make it easier for a sick resident and also ensure the safety of that resident's patients if they need to step out for an hour or two.

Doctors naturally want to put others first so I think they have some outside encouragement they would be more likely to address their own health

If you have any thought or want to meet with me depending on how my appointment goes tomorrow I may be able to speak with you Thursday or Friday. Thanks again for checking with me.

See Screen shots of text messages beginning July 29, 2015 at 6:03 p.m., **EXHIBIT 74** (Plaintiff

Bates 1084 – 1090 (emphasis added).

266.    Dr. Waggel returned from her leave for surgery and recovery and resumed her

training on August 3, 2015 with a night call shift on 6 South, the inpatient psychiatry unit at GW

Hospital.

267.    Dr. Emejuru had specifically scheduled Dr. Waggel for the night call duty

because it is generally less demanding than other shifts and can provide significant over night

rest time.

268.    On August 4, 2015 at 10:58 a.m., I emailed Dr. Waggel to see how she was doing

and suggested we meet for lunch the next day. See Email dated August 4, 2015 at 10:58 a.m., Dr.

Catapano to Dr. Waggel, **EXHIBIT 75** (GWU 001381).

269.    On August 5, 2015, I met with Dr. Waggel for her semi-annual review.

270.     I reviewed with Dr. Waggel that she was above Milestones in Teaching but that she was far below Program requirements in Patient Care and Professionalism and reviewed with her specific instances regarding those evaluations.

271.     I also discussed with Dr. Waggel as I had notified her by earlier email that she was receiving a Letter of Deficiency regarding the June 10 no show for the ED shift and I reiterated the importance of advance notice to professional colleagues who were relying on her presence when she would be unable to show up for any reason and also discussed her problems with inter-personal communications as elements of Professionalism that she needed to improve.

272.     I provided Dr. Waggel with the Letter of Deficiency, dated July 15, 2015, and discussed with her again that this was not intended as a punitive measure but as remediation in the form of formal written notice with an opportunity and expectation for resolving the issue and moving on.

273.     I explained further that if the issue identified – failure to provide notice to others that she would not be able to attend to duties so alternative arrangements could be made by those otherwise relying upon her – were resolved and there were no further occurrences, the matter would be over and there would be no further consequences.

274.     Dr. Waggel was to meet with Dr. Allen Dyer within two weeks to discuss strategies to prevent future lapses in professionalism and provide him with contact information for supervising physicians on upcoming rotations to obtain attendance reports for further review by the CCC.

275.     I also discussed with Dr. Waggel, however, that failure to resolve the issue or further instances of similar behavior could lead to further action including termination from training.

276. Along with the Letter of Deficiency I also provided Dr. Waggel with a copy of the GW Academic Improvement Policy.

277. Other matters discussed during this meeting were noted briefly in the Semi-Annual Review, dated August 5, 2015, which we both signed, and a copy of which is attached as **EXHIBIT 76** (GWU 001169).

278. A copy of the Letter of Deficiency, dated July 15, 2015, is attached as **EXHIBIT 77** (GWU 001223 – 001224).

279. The next day at 9:32 a.m., I received a lengthy email from Chief Resident Elizabeth Greene outlining a number of instances of very unprofessional communications and conduct directed by Dr. Waggel towards other members of the health care team on 6 South. See Email dated August 6, 2015 at 9:32 a.m., Dr. Greene to Dr. Kels et al., **EXHIBIT 78** (GWU 001657 – 001658).

280. Among the instances cited were talking to a Physician Assistant in a disrespectful way and when the PA asked for her last name so she could report Dr. Waggel's behavior, Dr. Waggel refused to give her last name and "engaged in a back and forth of 'I'll give you my last name if you give me your last name.'" Id. at GWU 001657.

281. When the PA called the intern, Carolyn Roberts, M.D., she gave the PA Dr. Waggel's last name which upset Dr. Waggel very much and left the intern concerned that she would have difficulty with Dr. Waggel for the remainder of the rotation. Id.

282. Dr. Greene noted that Dr. Waggel had later gone to apologize to the intern, but she (Dr. Greene) had also phoned the PA team to get additional information. Id.

283.    The PA informed Dr. Greene that this was not the first negative interaction the team had had with Dr. Waggel and they had had incidents with her on at least two different rotations. Id.

284.    The PA reported that they found Dr. Waggel to be unprofessional in her attitude and not helpful, including hanging up the phone abruptly, not properly identifying herself on the phone, and generally was "not helpful" with consults. Id.

285.    Dr. Greene got the sense that the PA was reporting that Dr. Waggel created a divisive atmosphere. Id.

286.    Dr. Greene noted that she had not worked directly with Dr. Waggel but had observed that she may come across as dismissive and could sometimes give the attitude of "Your questions is [sic] silly" to other teams that called for consults. Id. at GWU 001658

287.    Finally, Dr. Greene noted that she had brought this to the attention of Dr. Gandhi and Dr. Torres, two attendings on the service so they could observe Dr. Waggel's interactions with others and "that might be helpful in order to comment on her demeanor, tone, and attitude."

288.    Dr. Greene reported that the events first noted in her email had occurred "yesterday afternoon," that is, the afternoon of August 5, which was shortly after I had met with Dr. Waggel for her semi-annual review and we had specifically discussed her sub-standard performance in Professionalism and Inter-Personal Communications and the need for her to focus on improving in those areas.

289.    I thanked Dr. Greene for bringing this to everyone's attention and starting a group conversation, and I asked Dr. Gandhi and Dr. Torres to observe and report their impressions over the next several weeks. Id. at GWU 001657.

59

290.    My concern at the time was that the incidents of unprofessional behavior reported from the two recent rotations were part of a larger and now extended pattern of such behavior and I wanted two experienced clinicians working closely with Dr. Waggel to have a chance to look for this and seek to intervene to correct the behavior if possible.

291.    On August 7, 2015 at 1:38 p.m., Dr. Waggel sent an email to me, other members of the administrative team and Drs. Gandhi and Torres stating she had become aware of an email "about a situation that occurred on Wednesday" and said she "wanted to follow up and let you what [sic] that day." See Email dated August 7, 2015 at 1:38 p.m., Dr. Waggel to Dr. Catapano, et al., **EXHIBIT 79** (GWU 001513).

292.    Dr. Waggel reported that she "had a stressful conversation with the orange team which I felt was unprofessional" and that to "resolve this issue I did three things." Id.

293.    Dr. Waggel's lack of self-observation again was disappointing and unacceptable.

294.    Her email report made it sound as if she had been distressed by a conversation which she "felt was unprofessional" as if someone else in the conversation had acted unprofessionally.

295.    It seemed clear that Dr. Waggel was not the one who thought the exchange was unprofessional, rather she became angry at the person who called her out on the conversation by reporting her name to the PA.

296.    Dr. Waggel also reported that she had "resolved" the issue by going to apologize in person for her behavior during the earlier telephone call and asked "for her ideas on how the conversation could have been better." Id.

297.    Again, Dr. Waggel's lack of self-observation was very concerning.

298.    An individual with a true sense of professionalism would not need to have asked another person "how the conversation might have gone better."

299.    No reasonable adult would make the statements in a conversation with another adult that Dr. Waggel had made to the PA, and particularly in a medical clinical setting with information being communicated among fellow professionals on a health care team engaged in important clinical decision-making, the lack of professionalism did not require clarification.

300.    Dr. Waggel then reported that after exchanging "suggestions" with the other individual to help with future conversations, they "agreed that this issue was resolved."

301.    The fact that this episode occurred in conjunction with her semi-annual evaluation noting an ongoing problem with Professionalism meant that this issue would not be resolved with one conversation with an individual whom she had just verbally abused.

302.    This attempt by Dr. Waggel to deny and bury a significant issue with Professionalism was further concerning evidence of her lack of insight into and acceptance of responsibility for wrongdoing.

303.    Dr. Waggel then tried to deflect further attention from her behaviors by stating that she "would appreciate being spoken to directly before emails were sent." Id.

304.    Chief Residents are expected to report incidents of this kind directly to the Program Director and it was incorrect for Dr. Waggel to fault Dr. Greene for doing so and for reporting to Dr. Waggel's supervising attendings so they could observe for themselves whether the behavior was recurring "which might be helpful to comment on [Dr. Waggel's] demeanor, tone, and attitude." Id. at GWU 001658.

305.    I was out of the office during the week of August 10, 2015, and learned, upon my return that Dr. Waggel had been on overnight call on August 10 when an unexpectedly heavy

caseload of patients had resulted in a need to call for backup, the on call resident on duty mistakenly believed she was not on duty and was not available, the Chief Resident apparently also did not respond to Dr. Waggel's calls for assistance in the matter, and the nursing support was not what was expected.

306.    I was informed that there appeared to be several systems issues involved in the breakdown in communication and support on the shift and that Dr. Norris and Dr. Torres were already reviewing those matters.

307.    I had been copied on an email from Dr. Waggel on August 12 reporting that she was going to take a sick day as she said she had lost her voice on her call day and I assumed Dr. Waggel did take the sick day as I did not hear to the contrary.

308.    On August 17, 2015 at 6:27 p.m., I emailed Dr. Waggel noting that I had been out of the office, had just heard about this incident, and that it sounded "like you made a heroic effort in the face of an awful night." See Email dated August 17, 2015 at 6:27 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 80** (Plaintiff Bates 748).

309.    I assured Dr. Waggel that we were "looking into all the things that went wrong that night to leave you with so little support, and will be addressing each of them" and further noted:

> An email about resident backup and chief availability is one part, and that email should come out pretty soon. Other aspects, like social work support, are being addressed as well. I will keep you in the loop.
>
> Take care.

Id.

310. On August 25, 2015, Dr. Waggel again had an overnight on call shift on the inpatient psychiatry unit where Dr. Waggel had encountered a belligerent patient with escalating violent behavior and had handled the situation very poorly.

311. The events during the shift were reported in detail by Dr. Khin Khin and Dr. Norris, both of whom spoke with Dr. Waggel during the shift, and by a nurse who was on duty with Dr. Waggel during the shift, Shemika Anthony, RN, BSN, as well as by another attending physician, Veronica Slootsky, M.D., who was concerned about matters that Dr. Waggel had reported to her regarding Dr. Waggel's condition and actions during the shift. A copy of the email report by Dr. Norris is attached as **EXHIBIT 81** (GWU 001503 – 001504). A copy of the email report by Dr. Khin Khin is attached as **EXHIBIT 82** (GWU 003121 – 003122). A copy of the email report by Nurse Anthony is attached as **EXHIBIT 83** (GWU 001489 – 001491). A copy of the email report by Veronica Slootsky, M.D., is attached as **EXHIBIT 84** (GWU 001501).

312. During the shift, the nursing staff (Nurse Anthony) had called on Dr. Waggel for assistance with the patient.

313. Dr. Waggel came to evaluate the patient, decided the patient should be on oral medication for her own safety which the patient refused, and as Dr. Waggel was leaving the room Dr. Waggel told the patient that it was "her choice" and to let her or the staff know if the patient changed her mind. See Exhibit 83 at GWU 001490.

314. After the patient had been administered IM medication but continued to be aggressive, Dr. Waggel threatened that if the patient continued to yell, Dr. Waggel would call the police and have the patient escorted out of GW Hospital to another hospital immediately. Id.

315.    When the patient continued to be disruptive, Dr. Waggel was called back to assist, was very slow in responding, and then suggested that because the patient was so noisy a female sitter should be assigned to attend the patient in her room with the door closed, which was completely inappropriate as it would be dangerous for any staff member to be alone with a violent patient in a room with a closed door. Id. at GWU 001490 – 001491.

316.    Dr. Waggel then once again suggested that the team members should contact the police department about the patient. Id.

317.    When Dr. Waggel telephoned Dr. Khin Khin about the patient at about 2:53 a.m., she started with a monologue of how unethical and wrong it was to "coerce" patients into signing into 6 South and an injustice to the patients and then told Dr. Khin Khin she was asking for an "administrative discharge" of the patient even though she had yet to convey any patient information to Dr. Khin Khin. See Exhibit 82 at GWU 003121.

318.    Dr. Waggel was then unable to give an organized presentation of the patient to Dr. Khin Khin but was rambling and disorganized. Id.

319.    Dr. Khin Khin detailed in her email report the complete lack of ability on Dr. Waggel's part to communicate in a professional, appropriate way the necessary medical information regarding the patient despite Dr. Khin Khin's repeated direct questions. Id.

320.    Dr. Khin Khin was so concerned that she was not getting the necessary information that she decided to call Dr. Norris for guidance on appropriate discharge procedures and resources. Id.

321.    After hearing Dr. Khin Khin's concerns, Dr. Norris then contacted Dr. Waggel directly.

322.    Dr. Norris later called Dr. Khin Khin back with a comprehensive account of the patient's hospital course, including a very recent serious suicide attempt a few days earlier and a significant medical condition, neither of which had been previously reported to Dr. Khin Khin. Id.

323.    A decision was made to focus on securing the violent patient's behavior (Code Strong) for the safety of all concerned. Id.

324.    In her report of these events, Dr. Khin Khin concluded with specific concerns she identified regarding Dr. Waggel's performance as follows:

> 1)  Her very limited ability to present in a focused, organized manner, especially on an on-call situation, which can seriously jeopardize patient care and safety
> 2)  Her very limited ability to provide the attending with the most basic, relevant, and pertinent clinical information (e.g. safety concerns especially when she was repeatedly asking me to administratively discharge the patient, active medical concerns, assaulting two staff members – which I only found out in subsequent phone calls, etc)
> 3)  Her lack of appropriate boundaries (mentioning her own health issues in an acute patient care situation)
> 4)  Her lack of self-awareness (no appreciation of her lack of appropriate boundaries)
> 5)  Discrepancies between what she actually told me and what she told Dr. Norris that she told me

Id. at GWU 003122.

325.    Dr. Norris noted in his report that over the preceding 3 – 4 weeks, multiple clinicians had raised concerns regarding Dr. Waggel's skill and style on inter-professional communication while taking overnight call. See Exhibit 81 at GWU 001503.

326.    Dr. Norris noted that Dr. Waggel had attempted to contact him at 1:49 a.m. and then left a text message at 1:52 a.m. as follows:

> Sorry Dr. Norris. I need someone administratively discharged. She was an fd12 who was told to come to six south bc [because] fd12 facility

would be her only alternative. She has been hitting her head on the wall and screaming since 10pm. She was medicated twice with zero affect [sic]. No other patients can sleep and you can hear her screams from outside the unit <u>and I can only hold her head for so long</u> before she actually injures it. Sorry again to wake you

Id. (emphasis added).

327.    Dr. Norris reported that when he spoke directly with Dr. Waggel, "she needed 10 – 15 minutes to breakdown the case" and to tell him the reason for the admission, the risk assessment, and the hospital course. Id.

328.    Dr. Norris noted that since Dr. Waggel herself had admitted the patient from the hospital floor and performed a detailed risk assessment, he was "somewhat surprised by the length of time it took obtain [sic] clinical information." Id.

329.    Dr. Norris further noted that during Dr. Waggel's presentation "it was necessary to help her redirect her focus on clinical priorities (patient safety, medical status, etc) and away from system challenges." Id.

330.    Dr. Norris reported that he found Dr. Waggel's "casual style of presentation difficult at times to interpret, lacking linear cohesion, containing unnecessary digressions, and overall not concise." Id.

331.    Dr. Norris added, however, that Dr. Waggel's "efforts directed at patient care were apparent, and it should be taken into account that she was fatigued but even with these factors taken into account, her communication style still slowed the delivery of relevant information." Id.

332.    With respect to boundary issues, Dr. Norris commented that Dr. Waggel "did briefly mention that her kidney was just removed, and that she had to essentially restrain a patient by herself." Id.

66

333.    While noting a concern for any breakdown in Code Strong procedures, he further commented that he was "also concerned that Dr. Waggle [sic] may have trend [sic] of mentioning her own health issues in the context of patient care, and that she may have limited self awareness that she is actually making this [sic] comments." Id.

334.    Dr. Norris reported that he spent about an hour speaking with Dr. Waggel and had told her to complete her notes and not see any new patients. Id.

335.    Dr. Norris then further reported that he had received a text message from Dr. Slootsky who was concerned that Dr. Waggel had said she had not been eating for four days and just had her kidney removed. Id.

336.    Dr. Norris commented that these "statements were made in morning report a very public forum in which the focus is on patient care." Id.

337.    Dr. Norris also noted that Dr. Slootsky communicated that she was worried about Dr. Waggel's well being. Id.

338.    Dr. Norris concluded by stating that given Dr. Waggel's previous experience on call and on other hospital rotations, "I wanted to bring these considerations to the attention of the residency program" and that Drs. Khin Khin, Torres, and Slootsky should follow up with their own separate emails as needed "to correct or add more information to the current observations." Id.

339.    Dr. Slootsky did report her concerns noting that when Dr. Waggel had conducted the report at the beginning of the shift, she stated that she had not eaten for 4 days, and had recently had a kidney removed and had cancer in front of the whole group." See Exhibit 84.

67

340.     Dr. Slootsky also noted that Dr. Waggel reported that staff did not help her while a patient on anticoagulants was "banging her head against the wall, and she had to 'jump' on the patient to restrain the patient" and did not order a CT scan. Id.

341.     When I arrived at the office that morning, Dr. Waggel was there although Dr. Slootsky had sent her home early because she was so obviously exhausted and disorganized from her night call.

342.     Instead of going home, Dr. Waggel went to Ms. Anderson's office where she was still sitting when I arrived.

343.     According to Ms. Anderson, Dr. Waggel was disorganized and hard to follow.

344.     I then met with Dr. Waggel for about 45 minutes and later prepared an email memorandum of the meeting, a copy of which is attached as **EXHIBIT 85** (GWU 001487).

345.     Dr. Waggel was very agitated and the conversation was mostly to calm her down and to reassure her that she had done her best, with "best" being a situation where she should have called for more help.

346.     Dr. Waggel was difficult to follow, starting in the middle of thoughts, skipping from topic to topic and describing events in a non-chronological order and several times loosing her train of thought entirely.

347.     Dr. Waggel described the challenging patient circumstances she faced overnight, and her difficulty managing them, mostly, in her opinion, because "she could not get staff to do what she wanted them to do" and "felt very unsupported." Id.

348.     This was directly contrary to the information from several sources regarding her conduct over the shift, including her interactions with Drs. Khin Khin, Norris, and Slootsky as well as Nurse Anthony and again reflected Dr. Waggel's lack of insight into and ownership of

her own responsibility in events, but given her mental, emotional, and physical status at the time that was not the focus of our conversation.

349.    In my view at the time, the most concerning thing Dr. Waggel reported was that she herself, alone, physically restrained an out-of-control patient.

350.    This is absolutely unacceptable and put both Dr. Waggel and the patient, and probably others, at risk of harm.

351.    As an element of Professionalism, Patient Care, and Systems-Based Practice she should have known how and been able to manage this situation without resorting to her own physical interaction with the patient.

352.    I told Dr. Waggel that I understood there were many things about the way the system worked that she was frustrated with, and probably many of them legitimately could have worked better, but given her level of "agitation/dysregulation" at the time, it did not seem that this session was an appropriate opportunity to discuss how she might have handled things better.

353.    As noted in my memo, however, I did tell Dr. Waggel that I was "extremely concerned about her self-care." Id.

354.    Dr. Waggel reported that she had worked a "30 hour shift" – which I checked and found was not true, she worked something closer to 24 hours – and stated that she "did not once eat or go to the bathroom." Id.

355.    Self-care is a vital component of Professionalism and Patient Care, and I told Dr. Waggel that what she had just reported to me was unacceptable.

356.    With respect to self-care, I noted further in the memo that I discussed with Dr. Waggel, "[T]hat we would meet again in the next week, and also repeatedly in the coming weeks

and months, to look more closely at her decisions regarding work and self-care, and help her make better choices about taking care of herself." Id.

357.    I commented in the memo that this would include helping her to see when her self-care has been compromised to such an extent that it impairs her ability to make good decisions, work effectively with the team, and deliver good care to patients.

358.    I also commented in the memo that I believed that her being overwhelmed during the shift was a "combination of fatigue and also some level of traumatization following a recent very difficult call, in which she also felt unsupported, and having witnessed a patient suicide attempt earlier this week." Id.

359.    With all of these considerations in mind, I then told Dr. Waggel that if she were not able "to monitor her health and fatigue better, we will have to put restrictions on her work and/or call schedule to protect her."

360.     Later that same day, Dr. Waggel emailed me stating she noticed that her left pointer finger appeared to have gotten "caught in something" during the overnight shift, inquired whether she should go to employee health to find out if the patient had hepatitis C or HIV, and closed, "Thank you again for your time today." See Email, dated August 26, 2015 at 4:38 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 86** (Plaintiff Bates 751 - 752).

361.    At 9:38 p.m., Dr. Waggel emailed to me further stating:

> I'm Sorry Dr. Catapano I shouldn't put you in that position. I decided myself that I will go and have the work up done tomorrow I think it would be good to have documentation and I would feel better knowing the patients [sic] blood borne illnesses. Also, I am going to take advantage of the traumatic event therapy offered to me by admin staff. I will email Tory and find the names of the lecturers and email them. I hope these are the right steps to take. Again, thank you for being supportive.

Id. at 751 (Email dated August 26, 2015 at 9:08 p.m., Dr. Waggel to Dr. Catapano).

362.    I replied the next morning at 9:46 a.m. stating: "If it's something you're worried about, I think you should have it checked out. Let me know how it goes. Hope you got some sleep." Id. (Email, dated August 27, 2015 at 9:46 a.m., Dr. Catapano to Dr. Waggel).

363.    I then followed up with a further email at 9:48 a.m. stating: "Thanks for the follow-up email, Stephanie. I'm glad you will go check it out, and I'm very glad you will use the traumatic event therapy. I hope it helps you. I do hope you spent the day yesterday sleeping." Id. at 752 (Email dated August 27, 2015 at 9:48 a.m., Dr. Catapano to Dr. Waggel).

364.    In the meantime, on August 26, 2015 at 7:18 p.m., Dr. Waggel had sent two emails to Caroline Roberts, M.D., an intern who had been on duty with her during the August 25 overnight shift, addressing Dr. Roberts in very disrespectful and demeaning language and tone regarding (a) a proposal by Dr. Waggel to educate Dr. Roberts and other interns on how to enter "PRN" orders (orders for interventions to be performed "as needed") and even directing Dr. Roberts to provide Dr. Waggel the email addresses of all of her classmates by noon the next day to carry out her proposed training session, and (b) reiterating the proposal stating "your entire class needs to learn this and asap" and setting forth two analogies including one as follows:

> 1.  Today you told me you knew how to add the PRN order set. Yet you never asked the name of it. Today Joe invited Dave to his party but Dave said he couldn't go. Dave never asked Joe when his party even was. Your above comment leads me to believe you have a disinterest in learning this order set. Is this a correct assumption or did you somehow know the name of the order set I was referring to?"

See Email dated August 26, 2015 at 8:17 p.m., Emejuru to Catapano, et al., forwarding attached emails, **EXHIBIT 88** (GWU 001481 – 001484, at GWU 001483 and GWU 0001482, respectively).

365.    Dr. Roberts had emailed Dr. Emejuru to complain that she had received the emails from Dr. Waggel which she felt were "overly aggressive" and wanted Dr. Emejuru to be aware of the matter. Id. at GWU 001481 (Email dated August 26, 2015 at 7:32 p.m., Dr. Roberts to Dr. Emejuru).

366.    The emails represented unacceptable communications by Dr. Waggel to a colleague.

367.    On August 27, 2015 at 10:57 a.m., I received an email from Dr. Griffith forwarding an email he had received from Dr. Waggel on August 26 at 11:57 p.m. stating, "I experienced a trauma on six south today and I have to go to employee health tomorrow for testing. I'm really upset to be missing didactics but I've learned that I need to take care of my health." See Email dated August 27, 2015 at 10:57 a.m., Dr. Griffith to Dr. Catapano et al., **EXHIBIT 87** (GWU 001378).

368.    The statement by Dr. Waggel that she had to go to employee health the next day – Thursday, a protected didactics day – was not true, and even if she did go to employee health that day she could have done so without needing to miss Dr. Griffith's foundational course in Clinical Neurosciences.

369.    In his email, Dr. Griffith stated: "I heard . . . about Stephanie's difficulties on call. She also didn't take her exam a week ago. I gather she is really struggling." Id.

370.    On August 27, 2015 at 4:31 p.m., I directed Dr. Emejuru to put "Stephanie Waggel 8.25 call" on the agenda for the next Monday's administrative team meeting. See Email dated August 27, 2015 at 4:31 p.m., Dr. Catapano to Dr. Emejuru, **EXHIBIT 88** (GWU 001481 – 001484, at GWU 001484).

371.    On August 27, 2015 at 5:12 p.m., I scheduled a meeting with Dr. Waggel the next Monday at 3:30 p.m. See Email dated August 27, 2015 at 5:12 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 89** (Plaintiff Bates 757).

372.    On August 27, 2015 at 6:01 p.m., Dr. Waggel emailed Dr. Slootsky, with a cc to Dr. Emejuru, to follow up on her "attempts to teach Caroline [Roberts] about nighttime safety on six south." See Email dated August 27, 2015 at 6:01 p.m., Dr. Waggel to Dr. Slootsky, **EXHIBIT 90** (GWU 001485 – 001486).

373.    In the email, Dr. Waggel claimed that Dr. Roberts's delay in placing PRN orders was the reason the patient who had become overly aggressive and combative on the August 25 shift, and whose presentation Dr. Waggel had so poorly managed, was the cause of Dr. Waggel's potential blood exposure. Id. at GWU 001485.

374.    Dr. Waggel also claimed that Dr. Roberts had improperly failed to order an HIV test on the patient. Id.

375.    It was clear from the information already provided that Dr. Waggel's exposure, if any, to the patient's body fluids was the result of her own unprofessional and sub-standard performance – which had already been brought to her attention by me and others – during the shift.

376.    Blaming these circumstances on the first year resident was factually incorrect and improper disparagement of a professional colleague.

377.    Further, in suggesting to Dr. Slootsky that Dr. Roberts had not responded to Dr. Waggel's volunteered instruction on patient safety issues, Dr. Waggel failed to mention the demeaning and disparaging way in which she had communicated with Dr. Roberts.

378.    This email exchange was promptly forwarded to me by Dr. Emejuru. Id. (Email

dated August 27, 2015 at 6:38 p.m., Dr. Emejuru to Dr. Catapano, et al.).

379.    As part of the follow up related to the events of the August 25 overnight shift, Dr.

Kels inquired of Dr. Gandhi, then the attending on Dr. Waggel's C/L (Consult/Liaison Service, a

sub-specialty in psychiatry), how she was performing. See Email dated August 27, 2015 at 4:37

p.m., Dr. Kels to Dr. Gandhi, **EXHIBIT 91** (GWU 001661 – 001662).

380.    Dr. Gandhi replied as follows:

> One of the major concerns with Dr. Waggle [sic] identified in the
> beginning of her rotation was her interpersonal style, which tends to be
> overly casual, excitable, and at times rude in tone. I gave her direct
> feedback on this issue, and it improved to some degree, but I would
> not say fully. Her interpersonal style does effect [sic] her rapport with
> colleagues, supervisors, and students. Regarding clinical skills, she
> works hard, and is empathic toward patients, but I do feel that she
> requires further training in regards to clinical efficiency and
> developing the assessment style that I want to see the residents
> working toward: concise yet thorough and cerebral. These issues
> combined with the issues of being on call and noted concerns about
> her self-care, give me serious concern about Dr. Waggle's [sic] ability
> to function effectively as a resident currently.

Id. at GWU 001661 (emphasis added).

381.    Dr. Kels forwarded this exchange to me for my information that evening. Id.

(Email dated August 27, 2015 at 9:39 p.m., Dr. Kels to Dr. Catapano).

382.    On August 28, 2015 at 9:42 a.m., I received an email from Dr. Emejuru detailing

his interactions regarding Dr. Waggel over the last several days. See Email dated August 28,

2015 at 9:42 a.m., Dr. Emejuru to Dr. Catapano et al., **EXHIBIT 92** (GWU 001472 – 001473).

383.    Dr. Emejuru recounted that on Wednesday morning, he had a telephone call with

Dr. Khin Khin concerning her interactions with Dr. Waggel on the August 25 shift including

disappointment with Dr. Waggel's delivery, overall presentation and discrepancies in the story of

a patient she was trying to administratively discharge as well as Dr. Waggel's failure to report other highly acute incidents on the floor. Id. at GWU 001472.

384.    Dr. Emejuru reported that on Wednesday evening he received the email from Dr. Roberts regarding Dr. Waggel's offer to assist "in an unconventional manner, for sure" Dr. Roberts in placing PRN orders in her order set. Id.

385.    Dr. Emejuru noted again that Dr. Roberts felt "bullied" by the emails from Dr. Waggel, especially after Dr. Waggel thought Dr. Roberts was purposefully engaging in PRN miscommunication and not ordering a further HIV test on the patient. Id.

386.    Dr. Emejuru further reported that he had phoned Dr. Roberts on Thursday evening and Dr. Roberts reported that she specifically told Dr. Waggel that the patient had already had an HIV test that was negative but Dr. Waggel claimed the lab was not able to use this result. Id.

387.    During that telephone call, Dr. Emejuru had told Dr. Roberts that she had the Program's full support and that he, Dr. Emejuru, would speak with Dr. Waggel about these matters. Id.

388.    Dr. Emejuru then reported that he telephoned Dr. Waggel that same evening to see how she was doing and Dr. Waggel reported that she had been involved in multiple incidents on the unit that night without nursing support. Id.

389.    Dr. Waggel reported that she had requested a 1:1 sitter for a patient but "this was denied by nursing for some reason." Id.

390.    Dr. Waggel had requested a 1:1 sitter with the door closed so the patient's screaming would not be heard on the unit but the nurses had explained quite clearly why that would not be acceptable as it would place the patient and the sitter at undue risk.

391.   Dr. Waggel further said there was a patient who tried to commit suicide on the unit "but she physically prevented this person from doing this." Id.

392.   This was an incorrect report of the events as the patient had had a serious threatened suicide incident, but that had been four days earlier, and the events Dr. Waggel had described previously to all faculty members as confirmed by other health care personnel present at the time involved the patient's behavior relating solely to escalating aggression and combativeness.

393.   Dr. Waggel further reported that there were multiple fights involving patients in different areas throughout the unit that she was taking care of without support. Id.

394.   This had not been reported by Dr. Waggel to anyone previously.

395.   Dr. Waggel reported that she felt traumatized by the call, said she had "PTSD," and was unsure if she could go to 6 south again. Id.

396.   Dr. Waggel had mentioned that this was a traumatic sequence of events but had also stated she was accessing free trauma counseling.

397.   Dr. Waggel did not mention her conversation with Dr. Khin Khin even though Dr. Emejuru asked her what the attending had said about these events. Id.

398.   Dr. Waggel also said that she "passed out" the rest of the night and did not attend morning report. Id.

399.   Again this was incorrect. Dr. Waggel had been taken out for food because she reported she had not eaten for four days and was then told to go home early.

400.   Dr. Emejuru's overall assessment was that Dr. Waggel seemed to have had "good intentions throughout this entire situation but as we all know, her communications skills and delivery can be very poor." Id. at GWU 001473.

401.    Dr. Emejuru also commented that Dr. Waggel "felt she could handle the situation with Caroline [Roberts] by herself and with other PGY-2s and did not discuss this with me at any time, which is surprising." Id.

402.    He added that he thought "she worried that 'Administration' involvement would result in negative consequences for her." Id.

403.    On August 28, 2015 at 9:16 p.m., I received an email from Dr. Kels forwarding an email from Dr. Vanessa Torres-Llenza reporting her concerns regarding Dr. Waggel and the work she had done with Dr. Waggel to provide feedback regarding the concerns. See Email dated August 28, 2015 at 916 p.m., Dr. Kels to Dr. Catapano, forwarding Dr. Torres-Llenza's email, **EXHIBIT 93** (GWU 003463 – 003464).

404.    On August 31, 2015 at the administrative team meeting, the team discussed at length the issues that had arisen with respect to Dr. Waggel's performance during the August 25 – 26 shift.

405.    The information reviewed during the August 31 administrative team meeting is reflected in the detailed email reports that members of the team had prepared or received, including the reports of Dr. Norris (Exhibit 81), Dr. Khin Khin (Exhibit 82), Nurse Anthony (Exhibit 83), Dr. Slootsky (Exhibit 84), my memo of my meeting with Dr. Waggel (Exhibit 85), Dr. Gandhi (Exhibit 91), Dr. Emejuru (Exhibit 92, and Dr. Torres-Llenza (Exhibit 93).

406.    At the August 31 meeting, I reported on my meeting with Dr. Waggel on the morning of August 26 right after the shift and my further meetings with Dr. Waggel thereafter.

407.    It was apparent to all members of the team from a review of the information regarding the August 25 shift that Dr. Waggel's performance raised substantial concerns, including issues of knowledge deficits, lack of professionalism, lack of interpersonal and

professional communications skills, deficiency in systems-based practice, lack of awareness of appropriate boundaries, and failing to take minimal steps for her well being to be able to practice safely.

408.     We were also mindful of Dr. Gandhi's recently stated concerns as to whether Dr. Waggel was functioning at a level to continue her residency training.

409.     Following the administrative team meeting on August 31 and in light of the fact that Dr. Waggel was scheduled to start a rotation at Children's National Medical Center, a plan was discussed that I would speak directly with the supervisor at Children's to assure appropriate workload and monitoring for Dr. Waggel and to withhold Dr. Waggel from taking call for the first two weeks to ensure she was meeting clinical expectations.

410.     It was agreed that I would also seek to make arrangements to assure that during the rotation at Children's, Dr. Waggel would be able to keep weekly psychotherapy appointments which I had previously discussed with Dr. Waggel.

411.     During this timeframe, I had meetings with Dr. Waggel to review how she was doing and at one point specifically discussed the importance of self-care, being aware of one's own health status and knowing when to withdraw from providing care.

412.     Dr. Waggel confirmed this conversation in a text message exchange with Dr. Emejuru as follows:

> [SW] Dr Catapano said that she would help so that I can have time for therapy every week. I really need to talk to someone about all these stressful things. She told [me] something that really stuck with me. She said since we are doctors we ignore normal signs of exhaustion and keep pushing through. She said that when she was a resident one of the Chiefs said that his biggest clue that he was overwhelmed is when he would be frustrated at little old ladies. He loved old people so he knew that if he was irritated by a patient that was a little old lady that was a clue to take a breather. I think my clue that I'm exhausted is that I was starting to think people were doing these things to me on

purpose. I realize it's highly unlikely that other people were purposely putting me into these situations. It just seems like my life has been a series of unfortunate events the past few months. These events make people watch me closer making me feel like I'm being treated unfairly. I feel it would really help if I was able to talk to a therapist once a week and continuing meeting regularly with dr [sic] Catapano. Can you think of anything else I could do to get back on track?

[JE] Glad to hear all of that Stephanie. I think that is all perfect advice and something to keep in your 'back pocket' to hold on to for future reference. I'll always be there for anything you need this year. Just remember to communicate and ask yourself 'is this something I'd need to tell my chief or my chief would do' before you make any important decision. That's what I did when I came to GW

[SW] WWJD What would Jason do!?!

[JE] Please buy my wrist bands at wwjd.org. But seriously, it's good advice: you can sub that for Catapano, Kels, Norris, etc

See Screen shot of text messages starting August 31, 2015 at 5:08 p.m., **EXHIBIT 94** (Plaintiff Bates 1148 – 1151) (emphasis added).

413.    I did meet with Dr. Waggel regularly and I did try to give her feedback, support, and encouragement to improve her self-awareness.

414.    Dr. Waggel also mentioned that it would be helpful to maintain a regular weekly schedule with her therapist during her upcoming rotation in September at Children's National Medical Center ("Children's").

415.    Following the administrative team meeting, I had a series of communications with the Director of the Training Program at Children's, Lisa M. Cullins, M.D., and various attending physicians there, including Drs. Dave, Solages, and Joshi. See Email dated August 31, 2015 at 4:04 p.m., Dr. Cullins to Dr. Catapano and various cc's, **EXHIBIT 95** (GWU 001469).

416.    Based on the fact that Dr. Waggel had had a number of difficult recent call incidents, the plan for her rotation at Children's was to start on a unit with a manageable

workload with two Fellows (the next step beyond residency training) on the unit and suspend her

call duties for the first two weeks to ensure Dr. Waggel was meeting clinical expectations and

was comfortable "with the workload, team members and patient population." Id.

417.    Dr. Cullins further noted that they would appreciate "at least weekly

supervision/check ins with" me and the GW Chief Resident "regarding her performance and

experience and any direct communication" that I might need to provide to the attending, Dr.

Dave. Id.

418.    Dr. Cullins noted that she thought Dr. Waggel would do just fine with the

structure and supervision on the unit and thanked me for my phone call. Id.

419.    On August 31, 2015 at 4:35 p.m., I then followed up further with Dr. Cullins and

her attendings to see if I could assure that Dr. Waggel would have a set weekly time for her

psychotherapy as follows:

> Dear Paramjit, Lisa, Martine and Bhavin,
> Thanks so much for working with us to give Stephanie the best chance
> of success there. She really wants to do a good job, but as Lisa and I
> have been discussing, is not at 100% now. The one other
> recommendation I would propose, if it is possible to accommodate, is
> to allow her to go to weekly psychotherapy. If there is a way for her to
> do that that is the least inconvenient for you, please let her/me know.
> Thanks again,
> Lisa

See Email dated August 31, 2015 at 4:35 p.m., Dr. Catapano to Dr. Cullins, cc's to others,

**EXHIBIT 96** (GWU 001470).

420.    Dr. Cullins responded promptly: "We are in support of her going to

psychotherapy. Any day would be manageable given our current treatment team except for

Wednesday. Would that work? All we would need to know is the exact day and time each week

and plan accordingly." Id. (Email dated August 31, 2015 at 4:38 p.m., Dr. Cullins to Dr. Catapano, cc's to others).

421.    On August 31, 2015 at 4:42 p.m., I received an email from Dr. Allen Dyer that Dr. Waggel had not yet had their first meeting, Dr. Waggel had not provided a copy of the Letter of Deficiency and instead had scanned and sent a copy of a document apparently on MFA letterhead but otherwise illegible, and that Dr. Dyer planned to meet with Dr. Waggel "now." See Email dated August 31, 2015 at 4:42 p.m., Dr. Dyer to Dr. Catapano and attached scan, **EXHIBIT 97** (GWU 001274 – 001276).

422.    This all seemed strange as Dr. Dyer was regularly and routinely available at the MFA Psychiatry Department offices located at 2120 L Street, N.W., maybe 3-1/2 blocks from GW Hospital, there is always a receptionist at the front desk with whom documents can be left, and Dr. Dyer is generally accessible and responsive.

423.    On September 3, 2015 at 8:52 a.m., I received an email from Dr. Slootsky saying she had met with Dr. Waggel for about an hour after Dr. Slootky's lecture and said it "went quite well." See Email dated September 3, 2015 at 8:52 p.m., Dr. Slootsky to Dr. Catapano, **EXHIBIT 98** (GWU 001463 – 001464, at 001463).

424.    Dr. Slootsky stated that Dr. Waggel "is going through a very serious health crisis (renal cancer, and awaiting genetic testing) and I feel this might be contributing to the issues going on. I strongly recommend that she have the time to attend therapy and to her appointments to address these issues." Id.

425.    Dr. Slootsky further reported that Dr. Waggel had said she wants to repair relationships "with those who may have a bad impression of her" and that Dr. Slootsky believed that Dr. Waggel "cares a lot about her patients, and wants to do well." Id.

426.   Dr. Slootsky further commented that "if she [Dr. Waggel] didn't have the personal crisis going on, coaching/therapy might have been sufficient to help with the interpersonal communication skills issues as she is caring and asks for feedback." Id.

427.   Dr. Slootsky then concluded that she was concerned that Dr. Waggel was "somewhat underestimating (this might be a defensive reaction) how serious her situation is, and it might be the best thing would be to continue to support her through the health crisis, and perhaps offer some extra support so that she can make the calls up later." Id.

428.   She added that she "would continue to work with her and support her at this time." Id.

429.   I responded that I appreciated Dr. Slootky's feedback but I suspected that Dr. Waggel "misled you somewhat about her medical condition; that has been a pattern with her." Id. at GWU 001463 (Email dated September 8, 2015 at 10:51 a.m., Dr. Catapano to Dr. Slootsky).

430.   I commented further that Dr. Waggel "certainly has gone through something, but at this time she does not have a critical medical condition." Id.

431.   Dr. Waggel had told me that all the cancer had been removed and never said there were needs for adjuvant therapy of any kind (such as chemotherapy or radiation therapy) or other ongoing regular care needed with respect to the cancer.

432.   As far as I knew Dr. Waggel was attending any medical appointments she might need for any reason and we had assured that she would be able to maintain a regular schedule for her psychotherapy.

433.     In further response to Dr. Slootsky, I stated that I appreciated her giving Dr. Waggel "straight feedback about her interpersonal difficulties" and that this was something we would have to continue to work on with Dr. Waggel. Id.

434.     I also noted that when Dr. Waggel returned to GW call, we would have to make a plan to support her and I would keep Dr. Slootsky in the loop. Id.

435.     On September 8, 2015, I received an email from Dr. Waggel (cc: Dr. Emejuru) stating she was about to schedule her USMLE [United States Medical Licensing Examination] Step 3 Exam (a standard national exam physicians take to secure licensure) and wanted to assure that she could schedule it on any day during her next rotation in October and use an administration day. See Email dated September 8, 2015 at 8:05 a.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 99** (Plaintiff Bates 786).

436.     Dr. Emejuru promptly responded yes. Id.

437.     On September 8, 2015, I sent an email to Dr. Cullins and Dr. Joshi at Children's to check to see how things had gone with Dr. Waggel the first week. See Email dated September 8, 2015 at 10:36 a.m., Dr. Catapano to Dr. Cullins et al., **EXHIBIT 100** (GWU 001375).

438.     Dr. Joshi responded that Dr. Waggel's rotation "[F]or the most part from my stand point . . . was OK." Id. (Email dated September 8, 2015 at 10:57 a.m., Dr. Joshi to Dr. Catapano.

439.     Dr. Joshi further reported that Dr. Waggel's write up of a patient was good, there were no complaints from other staff, and that had spoken about when Dr. Waggel would go for therapy and "we agreed upon Monday late afternoon." Id.

440.     On September 11, 2015 at 4:58 p.m., Dr. Waggel sent an email with requested dates for doctor and therapy appointments through September. See Email dated September 11, 2015 at 4:58 p.m., Dr. Waggel to Dr. Cho et al., **EXHIBIT 101** (Plaintiff Bates 788).

441.     I believe she received leave or made other arrangements to attend the appointments as I did not hear otherwise from Dr. Waggel or any other source.

442.     On September 11, 2015 at 7:24 p.m., I received an email addressed to me and to Dr. Dyer in which Dr. Waggel stated she was finding her therapy very helpful and then mentioned an earlier meeting that day during which we had discussed the status of her Letter of Deficiency and her preparation for her rotation the next month. See Email dated September 11, 2015 at 7:24 p.m., Dr. Waggel to Dr. Catapano, Dr. Dyer, **EXHIBIT 102** (GWU 002833).

443.     Dr. Waggel said she had "submitted my doctor's excuse for the day referred to in the letter as well as copy of [her] phone records to Dr. Dyer and attached them again to the email." Id.

444.     Dr. Waggel further said she would like to "start each rotation neutral and prove myself and not start off on a bad foot" so she was asking that the Letter of Deficiency "not be shared with anyone else."

445.     Dr. Waggel continued to take the position that she believed and had "evidence" to support the fact "that the majority of the letter is incorrect, I have chosen to accept it." Id.

446.     She added that she could not accept the letter "coloring other's perceptions of me when I am trying my hardest to improve" and closed with: "Please let me now the status of this letter when you can. Have a great weekend." Id.

447.     The email was very discouraging in terms of Dr. Waggel's ongoing lack of insight into her unprofessional behavior that had caused the letter to be issued, her non-acceptance of

responsibility for her behavior, her effort to pretend that irrelevant evidence (a doctor's note) somehow erased the behavior, and her non-absorption of the information I had given her about the nature, purpose, use and extent of disclosure of such a letter.

448.    While stating that she had "chosen to accept it [the letter]," her email was a clear statement to the contrary.

449.    Dr. Waggel's email showed that she still did not understand what a fundamental violation of professional standards it was to "no show" for clinical rounds in the Emergency Department and not tell anyone in advance, that having a "doctor's excuse" (produced many months later) had nothing to do with her lack of professionalism, and that telephone records were a red herring – too many people had tried to reach her and others, with no reason to recount the matter other than correctly, had stated exactly when she had been contacted, by what means and at what number, where she said she was at the time, what she said had happened, and that she had then been persuaded to come to the ED to finish what was left of her shift.

450.    The doctor's excuse letter Dr. Waggel produced on September 3, 2015 from Dr. Jarrett is attached as **EXHIBIT 103** (GWU 002834).

451.    As noted, Dr. Waggel's "no show" behaviors had a long history beginning with her November – December rotation at Inova Fairfax where she was reported to be late to work on a daily basis (¶ 102 above), she was a no show on December 15, 2014 (¶ 100 above), she had fallen asleep in the middle of a shift without telling anyone on May 14, 2015 (¶¶ 186 – 190 above) and even after the June 10 ED incident with immediate counseling and warning, she then was a "no show" for Dr. Collins's class after expressly assuring Dr. Collins that she would attend.

452.    For these reasons, Dr. Waggel's continued resistance to acknowledging what had happened with respect to the Letter of Deficiency and her continued "the majority of the letter is incorrect" posturing was discouraging with regard to any hope for remediation.

453.    She also had forgotten or not absorbed that I had told her that the letter was not a reportable event and was not distributed to others and that this was an opportunity to cure and move on.

454.    On September 14, 2015 at 1:57 p.m., I reminded Dr. Waggel of these facts and tried to continue to be supportive given the circumstances by stating, "[W]e all appreciate how hard you are trying to improve." See Email dated September 14, 2015 at 1:57 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 104** (GWU 02835).

455.    Dr. Waggel responded further that the Letter of Deficiency included a statement that reports of her attendance would be obtained from her supervising attending physicians and that "would indicate to them I am being watched for some reason." See Email dated September 14, 2015 at 1:57 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 105** (Stephanie Waggel Supp. Prod. [Oct.] 259 - 260 of 466, at 259).

456.    I replied that this was a matter best discussed directly with Dr. Dyer (who I was sure would communicate with the attending physicians in a neutral manner concerning Dr. Waggel's attendance as confirmation of her benefit from the rotation) and also noted that we needed to meet to discuss Dr. Waggel's return to call on 6 South. Id.

457.    Dr. Waggel and I arranged a further meeting on September 24. Id. at 259 – 260.

458.    On Friday, September 11, 2015 at 7:43 p.m., I received a further email from Dr. Waggel requesting not to work with Dr. Malik during her upcoming rotation on PHP at Inova Fairfax Hospital. She said she understood that she had to be able to get along with everybody but

believed Dr. Malik would be prejudiced against her "given the fact my anonymity was compromised" in that, Dr. Waggel asserted, her "private evaluations" of Dr. Malik as a member of the teaching faculty had been "shared . . . with multiple people in my class. Please let me know." See Email dated September 11, 2015 at 7:43 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 106** (Plaintiff Bates 789).

459.   Dr. Waggel had previously mentioned to me that she did not want to work with Dr. Malik during the PHP rotation (although I do not recall that Dr. Waggel gave as her initial reason an alleged concern about breach of a confidential faculty evaluation) and I had already had a discussion with Dr. Crone about the matter.

460.   I responded to Dr. Waggel's email stating I had already made her request to Dr. Crone and did not know whether it was feasible to work with a different attending the next month and also said, "I am not sure what you are referring to regarding your private evaluations being shared. If that is something you would like to talk to me (or Dr. Crone) more about, please feel free. Id. (Email dated September 14, 2015 at 1:40 p.m., Dr. Catapano to Dr. Waggel).

461.   Dr. Waggel emailed back that she appreciated my having spoken to Dr. Crone, and then stated:

> Thank you for speaking with Dr. Crone. In regards to my privacy, Dr. Malik made statements to two other residents indicating that she saw my evaluation of her. In our meeting I spoke about the fact Dr. Malik stated that my evaluation was the only negative evaluation she has received. This makes me feel uncomfortable both in working with Dr. Malik and in completing evaluations in the future. I hope something can be worked out.

See Email dated September 14, 2013 at 2:03 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 107** (GWU 001640).

462.    Given Dr. Waggel's September 11 emails raising the confidentiality issue and even asserting that there had been conversations about her evaluation of Dr. Malik, and even though I knew that trainee evaluations of faculty done through the GW SMHS web facilities were confidential and evaluators were not identified to faculty, I nonetheless followed up with an email to Dr. Crone reminding her of our earlier discussion about Dr. Waggel not wanting to work with Dr. Malik and noted Dr. Waggel's assertion of an alleged breach in confidentiality of a faculty evaluation as the reason for her request. See Email dated September 14, 2015 at 2:27 p.m., Dr. Catapano to Dr. Crone, **EXHIBIT 108** (GWU 001642).

463.    At 2:34 p.m., Dr. Crone responded: "There is no other attending for PHP and I am not aware that an anonymous evaluation was shared with Dr. Malik. I definitely did not do this." Id. (Email dated September 14, 2015 at 2:34 p.m., Dr. Crone to Dr. Catapano).

464.    This issue was later raised with Dean of Graduate Medical Education, Jeffrey S. Berger, M.D., who confirmed that all faculty evaluations remain anonymous and who also examined the faculty evaluations submitted for the PHP program and determined that Dr. Waggel had not even submitted an evaluation for Dr. Malik.

465.    On September 14, 2015 at 3:36 p.m., I received an email from Dr. Kels noting that we had received a generally favorable report from Dr. Dave at Children's regarding Dr. Waggel's most recent performance there, including that Dr. Dave had provided feedback to Dr. Waggel that day, she had been doing pretty well with good rapport with patients although having a more difficult time with some of the more challenging patients (but not unexpected for her level of training or inconsistent with peers) and had an empathic interview style. See Email dated September 14, 2015 at 3:36 p.m., Dr. Kels to Dr. Catapano, **EXHIBIT 109** (GWU 01643).

466.     Per Dr. Kels report, Dr. Dave had also mentioned that Dr. Waggel "expressed feeling anxious that she was being scrutinized and that everyone knows about the letter of deficiency (though Bhavin [Dr. Dave] did <u>not until she mentioned it</u>)." <u>Id.</u> (emphasis added).

467.     On September 21, 2015 at 1:32 p.m., I emailed Dr. Waggel to tell her that one of the topics I intended to discuss at the meeting we had scheduled for the September 24 was "the plan for you to have more support and supervision on call when you return to GW in October." <u>See</u> Email dated September 21, 2015 at 1:32 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 110** (Plaintiff Bates 800).

468.     In the email, I explained further that I was giving Dr. Waggel the heads up because Chief Resident Darlinda Minor was about to distribute the next call schedule and the reasons why this should be helpful for Dr. Waggel:

> I believe the most effective way to achieve this is to have the back-up PGYIII residents plan to come in and take call side-by-side with you for your first several calls back. As I said, I planned to discuss this with you on Thursday, and we still should, but for various reasons Darlinda needs to send out an updated version of the call schedule before then, and I wanted to give you a heads-up that these joint calls are going to be on the schedule. I think when we meet it would be helpful to articulate exactly what I think you struggled most with in your last few GW calls, and how we hope that this will be helpful to you.

<u>Id.</u>

469.     Dr. Waggel responded, "Sounds like a plan. I will see you Thursday at 830." <u>Id.</u>

470.     On September 23, Dr. Waggel emailed that she was taking sick leave that day. <u>See</u> Email dated September 23, 2015 at 8:59 a.m., Dr. Waggel to Dr. Catapano et al., **EXHIBIT 111** (Plaintiff Bates 237).

471.     Because I was ill, the meeting scheduled for September 24 did not take place, and I emailed Dr. Waggel to re-schedule to the next Thursday – October 1 – at 8:30 a.m. which she

accepted. See Email dated September 28, 2015 at 11:05 a.m., Dr. Catapano to Dr. Waggel and Dr. Waggel's reply email at 11:41 a.m., **EXHIBIT 112** (Plaintiff Bates 804).

472.     I recall meeting with Dr. Waggel in this time frame and discussing with her the nature and purpose of the joint calls and in particular that more senior residents would be available so she could consult with them if she had any questions in the course of the rotation concerning patient care, communications with other members of the team or other health care personnel, procedures to be followed or any other matters where she felt she needed additional information. I made it quite clear that these individuals were not being assigned to do her work for her but to serve as a resource so the difficulties she had experienced during her rotation on 6 South during August would not be repeated and she would have a further opportunity to improve her own knowledge and clinical skills.

473.     As a result of the August 25 shift events, a Root Cause Analysis ("RCA") was being conducted to address the deficiencies in patient care that had occurred, both those related to healthcare system issues and personal performance issues.

474.     An RCA is a process to identify "root causes" of problems or events and an approach to solve them.

475.     In this instance, Dr. Norris and Dr. Gandhi were conducting the RCA and as part of the review were interviewing persons involved in the events, including Dr. Waggel.

476.     In that regard, I received a copy of an email from Dr. Norris to Dr. Waggel setting her interview regarding the matter for October 15. See Email dated October 5, 2015 at 2:09 p.m., Dr. Norris to Dr. Catapano et al., forwarding email Dr. Norris to Dr. Waggel, et al., **EXHIBIT 113** (GWU 001263).

477.    During this timeframe, I learned in our weekly administrative meetings that the Associate Program Director, Dr. Kels, had also provided specific guidance to Dr. Waggel on areas she needed to work on during the buddy calls

478.    I further learned in the administrative meetings that Dr. Waggel was not participating constructively in the buddy call shifts and was actually abusing the buddy call by insisting that the more senior residents were there to do her work for her and that she lacked any insight into her shortcomings for which the more senior residents had been assigned to provide supervision and guidance.

479.    During this timeframe, I also became aware that Dr. Waggel had not complied with a fundamental requirement, despite many repeated requests and warnings, to complete the annual health clearance process required by District of Columbia law (and every other jurisdiction in the United States) within the well known deadline of September 30 each year.

480.    I knew that the Program Administrator, Ms. Anderson, had sent multiple reminders to Dr. Waggel and other residents in advance of the original deadline. See e.g., Email dated September 22, 2015 at 2:21 p.m., Ms. Anderson to Dr. Waggel, et al. **EXHIBIT 114** (GWU 001431); Email dated September 25, 2015 at 11:02 a.m., Ms. Anderson to Dr. Waggel, **EXHIBIT 115** (GWU 001428).

481.    When Dr. Waggel failed to meet the September 30 deadline, Dr. Gary Little, Medical Director of GW Hospital, assigned an extended deadline for Dr. Waggel of October 14.

482.    On October 13, 2015, Dr. Waggel (and one other psychiatry resident) had still not complied.

483.    I knew the Program Administrator had sent further multiple reminders and had spoken directly with Dr. Waggel about the extended deadline and the fact that Dr. Waggel

91

needed to go to Employee Health to get this done. See Email dated October 13, 2015 at 1:36 p.m., Ms. Anderson to Dr. Catapano, et al., **EXHIBIT 116** (GWU 001422).

484.    Because Dr. Waggel had not responded to Ms. Anderson's emails and verbal instructions, Ms. Anderson suggested that it would be appropriate for me to send an email. Id.

485.    On October 13, 2015, I then emailed Dr. Waggel and the one other resident stating that if they had not cleared the health clearance process by the end of the next business day, "you will be pulled from duty" and would "likely get a letter of deficiency from the GME office" and would also "probably be asked to make up the days by having your graduation date delayed, not to mention disrupting the services who are depending on you." See Email dated October 13, 2015, Dr. Catapano to Dr. Waggel et al., **EXHIBIT 117** (GWU 001414).

486.    I further asked Dr. Waggel and the other resident to take care of this immediately and inform me and Ms. Anderson "when it's done." Id.

487.    Dr. Waggel responded with an email to me, Dr. Kels and Ms. Anderson inquiring, at this late date well beyond the original deadline, on the eve of the extended deadline, and despite earlier emails from and conversations with Ms. Anderson on how to comply with this requirement, "Who should I send these records to?" Id. (Email dated October 13, 2015 at 6:01 p.m., Dr. Waggel to Dr. Catapano, et al.).

488.    Ms. Anderson responded, "Please go to Employee Health on the main level of the GW Hospital to submit these documents. Thanks!" Id. (Email dated October 14, 2015 at 8:20 a.m., Ms. Anderson to Dr. Waggel).

489.    Dr. Waggel failed to meet the extended deadline.

490.    Two weeks later, on October 28, 2015, Dean of GME Dr. Berger issued Dr. Waggel the second Letter of Deficiency based on the fact that her non-compliance with the

medical health clearance law demonstrated "deficiency in the competency of Professionalism." See Letter, dated October 28, 2015, Dr. Berger to Dr. Waggel, **EXHIBIT 118** (GWU 001226).

491.   This instance of non-compliance occurred in the context of other ongoing non-compliance issues with Dr. Waggel and Program administration requirements, including:

(a)   Failure to comply with the GMEC Mandatory Duty Hour Month for September. See Email dated August 31, 2015 at 9:34 a.m., Ms. Anderson to all residents, **EXHIBIT 119** (GWU 001437) (advising all residents of GME mandated duty hours reporting for September); Email dated Sunday September 13, 2015 at 11:42 p.m., Dr. Waggel to Ms. Anderson, et al., **EXHIBIT 120** (GWU 001432 - 001433); Email dated September 28, 2015 at 1:24 p.m., MedHub Notification to Dr. Catapano, **EXHIBIT 121** (GWU 001427);

(b)   Failure to log into Medhub to identify supervisors on her clinical rotations as the attending physicians cannot access a resident's evaluation form until the resident first selects them as a supervising attending for each rotation. See Email dated October 13, 2015 at 3:03 p.m., Ms. Anderson to Dr. Waggel, **EXHIBIT 122** (GWU 001409).

492.   At our weekly administrative meeting, Dr. Waggel's misuse of buddy call and claimed misunderstanding as to the nature and purpose of the buddy call was discussed and we considered how to provide any further clarity and support for Dr. Waggel under the circumstances.

493.   Dr. Waggel's misunderstanding of the buddy call was concerning since I had emailed to her and met with her during which we discussed this in detail, and it was known that others, including Dr. Kels, had done so as well.

494.     It was decided, however, that a written memorandum should be prepared setting forth explicitly the reason Dr. Waggel was on buddy call, the areas she was to work on, the specific reason she was on buddy call, and the hoped for outcome of this remediation.

495.     A memorandum, dated October 14, 2015, addressed to Dr. Waggel from the administrative team was then prepared entitled "On-call Supervision ('Buddy Call') Expectations." A copy of the memorandum is attached as **EXHIBIT 123** (GWU 001448).

496.     The memorandum explained that the purpose of the buddy call was to ensure that Dr. Waggel would "take full advantage of the supervision/guidance/teaching provided" by the assigned senior residents while on call and again delineated specific areas she needed to improve upon including:

- organization/prioritizing work/triage
- communication with staff (physicians to nurses/techs/administrators, ED/medical floors/6S)
- fatigue management
- transition of care/sign out
- managing/leading in acute clinical situations

Id.

497.     The memorandum further explicitly reminded Dr. Waggel that the reason she was receiving extra supervision and oversight on-call was "because you have not performed at the level that is expected of a PGY-2 resident taking independent calls, per GWU Psychiatry and ACGME expectations." Id.

498.     The memorandum further reminded Dr. Waggel that the "supervising ('buddy') resident's role historically and in [her] specific case is not to split the call duties evenly, but to provide guidance." Id.

499.     The memorandum noted that the objective of the buddy call was to prepare Dr. Waggel for independent call as soon as possible and that she "cannot be promoted back to

independent call until you are able to demonstrate your ability to handle all call responsibilities by yourself." Id.

500.    Finally, the memorandum noted that Dr. Waggel should not hesitate "to ask any questions regarding these on-call clarifications and expectations." Id.

501.    The memorandum was dated October 14, 2015, because that was the date Chief Resident Jason Emejuru had an appointment to meet with Dr. Waggel to review how she was doing and specifically to discuss the buddy call.

502.    Dr. Emejuru emailed the memorandum to Dr. Waggel on the morning they were scheduled to meet and attached the memorandum stating it "is a document we will go over that will help clarify roles and expectations on 'buddy call'." See Email dated October 14, 2015 at 9:50 a.m., Dr. Emejuru to Dr. Waggel, **EXHIBIT 124** (GWU 01447).

503.    I understood from Dr. Emejuru that the meeting with Dr. Waggel did take place, they reviewed the memorandum in detail, and he explained its contents and answered any further questions Dr. Waggel had at the time.

504.    On October 15, 2015 at 12:44 p.m., Dr. Waggel emailed me and others stating: "I believe I was initially confused as to why I am on buddy call. I have been asking for the specific reason I am now on buddy call and informed that it is due to the events that occurred during my last two calls and the letter from the ED. Is this correct?" See Email dated October 15, 2015 at 12:44 p.m., Dr. Waggel to Dr. Catapano, et al., **EXHIBIT 125** (GWU 001446).

505.    Dr. Waggel should have had no "initial confusion" as to why she was on buddy call because when I initially met with her to inform her that this was the plan for her return to duty on 6 South I explained clearly that the reason was because she had struggled with her call during her last rotation there and failed to perform to expected standards.

506.     In light of the memorandum she had been given and the meeting with Dr. Emejuru 24 hours earlier, there should have been no question that the reason for the buddy call was her performance during the last rotation on 6 South and had nothing to do with her no show for ED clinical duty on June 10 which had resulted in the Letter of Deficiency.

507.     On October 15, 2015 at 4:51 p.m., I emailed a response to Dr. Waggel as follows:

> Stephanie,
> You are on buddy call primarily because of your last August call. It has nothing to do with you not coming in for your ED shift.
> As you and I talked about, there were several concerns about your management of pts and the unit during that call. I know you've gone over it in detail with Dr. Norris and Dr. Gandhi. A letter of deficiency will be coming which will outline what you spoke to them about. As Jason discussed with you, and outlined in a memo, the purpose of buddy calls for you is to provide extra support and supervision.

Id. (Email dated October 15, 2015 at 4:52 p.m., Dr. Catapano to Dr. Waggel, et al.).

508.     In my email I referred to a meeting that Dr. Waggel had already had with Drs. Norris and Gandhi since I knew the date and time for the meeting and had discussed with them the matters they expected to discuss with Dr. Waggel concerning the RCA they were conducting.

509.     As it turned out, the meeting was rescheduled so it had not actually taken place at the time of my October 15 (4:51 p.m.) email to Dr. Waggel, but I knew that such a meeting was going to occur and that these matters would be discussed in detail by Drs. Norris and Gandhi with Dr. Waggel.

510.     On October 19, 2015 at 7:20 a.m., Dr. Waggel emailed her attending, Dr. Malik, and others, stating that she was feeling very ill and needed to take a sick day – if she started to feel better, she would try to come in during the afternoon. See Email dated October 19, 2015 at 7:20 a.m., Dr. Waggel to Dr. Malik, et al., **EXHIBIT 126** (GWU 001368).

511.     On October 20, 2015 at 9:51 a.m., I received an email from Ms. Crawford, the

Program Administrator at Inova Fairfax Hospital advising that the attending, Dr. Malik, had

received an email from Dr. Waggel at 9:43 p.m. the night before regarding Dr. Waggel's failure

to show for the shift beginning early that morning. See Email Ms. Crawford to Dr. Crone et al,

dated October 20, 2015 at 9:51 a.m. forwarding attached emails from Dr. Malik, Dr. Waggel,

**EXHIBIT 127** (GWU 001365 - 01366).

512.     On October 20, 2015 at 11:14 a.m., I emailed a response to Ms. Crawford, et al.,

as follows:

> A few thoughts.
> It would be appropriate to let Stephanie know that an email is not a
> proper or reliable way to inform the attending of the need for a sick
> day.
> At this point, it is reasonable to ask her for a doctor's note whenever
> she misses any work.
> If any resident misses enough days on a rotation that they are judged to
> not have learned/progressed sufficiently, they can be failed for the
> rotation. We need to be as objective and fair as possible, of course, but
> this number is going to be different for different residents, depending
> on their performance level.

Id. (Email dated October 20, 2015 at 11:14 a.m., Dr. Catapano to Ms. Crawford, et al.).

513.     Dr. Emejuru then followed up with Dr. Waggel stating he hoped Dr. Waggel was

starting to feel better and that it "will be just fine" if she needed to use another sick day. See

Email dated October 20, 2015 at 7:52 a.m., Dr. Emejuru to Dr. Waggel, **EXHIBIT 128** (GWU

001360).

514.     Dr. Emejuru further reminded Dr. Waggel, "Just make sure to let your attending,

Tory, and myself know" and added that based on the sick days she had used thus far during the

current academic year, she would need to provide a doctor's note for any future sick days taken.

Id.

515.   Dr. Emejuru added that if Dr. Waggel were unable to provide a note, she could use a vacation day and closed, "Let me know if you have any questions and get well." Id.

516.   On October 20, 2015 at 6:27 p.m., Dr. Crone emailed Dr. Waggel concerning the two sick days taken on October 19 and 20 and noted that it was not appropriate to send the attending an email as notification that she would be out sick. See Email dated October 20, 2015 at 6:27 p.m., Dr. Crone to Dr. Waggel, et al., **EXHIBIT 129** (Plaintiff Bates 443).

517.   Dr. Crone pointed out that Dr. Waggel needed to "speak to that attending directly as soon as you think you might need to be off for a sick day that day" and that "[A]ttendings count on the help of residents when doing their patient care and they need to be able to gauge their workday depending on whether they might have assistance or not." Id.

518.   Dr. Crone added that, "[T]his consideration and level of communication is necessary to maintain the level of professionalism expected of a physician." Id.

519.   Dr. Waggel then responded apologizing for the "misunderstanding" but failed to address the point Dr. Crone had made that Dr. Waggel had an obligation to keep pursuing direct communication with the attending physician until that had been accomplished. Id. (Email dated October 21, 2015 at 6:27 a.m., Dr. Waggel to Dr. Crone et al.).

520.   On October 22, 2015 at 9:19 a.m., I was informed that Dr. Waggel had been incorrectly approved by her attending, Dr. Malik, for four days of administrative leave to take the two-day USMLE Step 3 exam. See Email dated October 22, 2015 at 9:19 a.m., Dr. Kels to Dr. Catapano forwarding earlier emails re the leave, **EXHIBIT 130** (GWU 001338 – 001339).

521.   The policy applied to all residents was to approve only two days administrative leave for this exam. Id.

522.     It appeared that Dr. Malik was not aware of this when she signed the approval and I raised a concern that Dr. Waggel would tell other residents she had gotten four days which would create a problem. See Email dated October 22, 2015 at 10:46 a.m., Dr. Catapano to Dr. Kels, **EXHIBIT 131** (GWU 001337).

523.     Dr. Kels agreed that the leave should not be approved for four days – and in any event had not been approved by the Director at Inova Fairfax, Dr. Crone, which the residents had been informed was required in a recent email on September 14. Id. (Email dated October 22, 2015 at 10:55 a.m., Dr. Kels to Dr. Catapano).

524.     Since the four days of leave had already been approved, however, Dr. Kels suggested in fairness that Dr. Waggel should be allowed to take the four days of leave if she wished with 2 days as administrative leave (per policy) and 2 days as vacation, or to take the 2 days administrative leave and return to her clinical rotation the other 2 days since Dr. Waggel was in danger of losing credit for the rotation given the number of absences she had already accrued. Id.

525.     I agreed with Dr. Kels' proposal and she then emailed Dr. Waggel noting that the leave request had not been submitted to Dr. Crone as required and therefore could not be approved. See Email dated October 22, 2015 at 12:02 p.m., Dr. Kels to Dr. Waggel, **EXHIBIT 132** (GWU 001323).

526.     Dr. Kels further pointed out that the policy was to approve only two days administrative leave for the USMLE Step 3 exam and to be consistent and fair to all residents, the program could not approve 4 days leave. Id.

527.     Because Dr. Waggel planned on four days of leave, Dr. Kels said that the fairest way to resolve the matter was to offer Dr. Waggel the choice of taking 2 days administrative

leave and 2 days of personal/vacation leave, or taking the 2 days of administrative leave for the exam and returning to the clinical rotation for the other 2 days. Id.

528.   Dr. Kels further noted that the choice was entirely up to Dr. Waggel but she should also be aware that "your attendance at PHP this month puts you in jeopardy of failing the rotation based solely on the number of days worked/not worked. Id.

529.   Dr. Kels closed with a request for Dr. Waggel to advise her of the decision regarding leave for the following week. Id.

530.   On October 22, 2015 at 2:35 p.m., I received notice that at 2:34 p.m., Dr. Waggel had emailed Ms. Anderson, Dr. Emejuru, and Dr. Griffith stating that, "[B]ecause of the negative repercussions I experienced this week as a result of my taking a sick day to have tests for metastasis, I now have to take another sick day." See Email dated October 22, 2015 at 2:35 p.m., Ms. Anderson to Dr. Catapano, Dr. Kels, forwarding Dr. Waggel's email, **EXHIBIT 133** (GWU 001336).

531.   In her email, Dr. Waggel stated that she had been "punished" for taking sick leave to get "tests for metastasis" although she said she had informed multiple people in advance, had asked multiple people if she had done everything that was appropriate, had provided a doctors note and had been told she would be "given time for one or two doctors appointments a month for the ongoing cancer screening that I will have to have for at least the next few years." Id.

532.   Dr. Waggel further stated that she had "extreme anxiety necessitating an emergency session with [her] psychologist" and would provide a doctor's note for October 22. Id.

533.    There had been no "punishment" of Dr. Waggel regarding her sick leave – Dr. Emejuru had told her that the sick leave she was taking would be "just fine" and she should provide a note.

534.    I had instructed Dr. Emejuru to remind Dr. Waggel that any sick leave required actual notice to the attending physician and others in the Program, which Dr. Waggel had not done, and which Dr. Emejuru conveyed to Dr. Waggel.

535.    Dr. Crone had re-emphasized that point for Dr. Waggel.

536.    That was vital information and Dr. Waggel needed to be reminded of it since her failure to actually communicate with her attending physician on October 19 – 20 before failing to show for work was another instance of lack of professionalism on exactly the point which was the subject of her still pending first Letter of Deficiency.

537.    On October 22, 2015 at 5:14 p.m., Dr. Waggel notified me directly that due to her current condition she would not be able to work that night, had spoken with Dr. Emejuru, had arranged coverage through another resident, would submit a doctor's excuse, and requested to be advised if there were anything else she should do. See Email dated October 22, 2015 at 5:14 p.m., Dr. Waggel to Dr. Kels, et al., **EXHIBIT 134** (GWU 001334).

538.    By October 23, 2015 at 10:59 a.m., I was aware that Dr. Waggel had gone to HR and asked for medical leave until November 2. See Email dated October 23, 2015 at 10:59 a.m., Dr. Catapano to Dr. Emejuru, **EXHIBIT 135** (GWU 001318).

539.    The medical leave requested was approved through November 2 and Dr. Waggel was away from the Program during that time.

540.    On October 23, 2015, the Clinical Competency Committee ("CCC") met for the semi-annual review of the residents in the Program. See Minutes of meeting of Clinical

Competency Committee, October 23, 2015, 1:00 – 4:08 p.m., **EXHIBIT 136** (GWU 001137 – 001138).

541.    The meeting lasted three hours to include the review of all of the approximately 28 resident physicians in the Program.

542.    The minutes show that the CCC spent 30 minutes discussing Dr. Waggel.

543.    There was an extended discussion of the many instances of Dr. Waggel's failure to perform to Program standards in multiple domains throughout her tenure in the Program but becoming even more apparent as she attempted to transition from first year intern fairly highly supervised clinical settings to more independent practice beginning with the PGY2 year.

544.    Also, by this time I had been informed that Dean Berger had prepared a second Letter of Deficiency to be issued to Dr. Waggel for lack of Professionalism in not completing the health clearance process in a timely fashion, and I had begun drafting a third Letter of Deficiency to be issued to Dr. Waggel for her substandard performance on the August 25 overnight call shift.

545.    At the CCC meeting, I reported to the CCC that I had a meeting already scheduled with Dean Berger in two weeks to discuss what would by then be Dr. Waggel's three Letters of Deficiency as well as the impact of Dr. Waggel's medical leaves on her time in the program and issues concerning Professionalism.

546.    On October 28, 2015, Ms. Tucker of the GME Office forwarded to Dr. Waggel by email the second Letter of Deficiency, dated October 28, 2015 (Exhibit 118, above). See Email dated October 28, 2015 at 4:13 p.m., Ms. Tucker to Dr. Waggel, **EXHIBIT 137** (Plaintiff Bates 442).

547.    On November 3, 2015, I emailed Dr. Dyer concerning the third Letter of Deficiency I was drafting regarding Dr. Waggel's unprofessional performance during the August 25 overnight call shift. See Email dated November 3, 2015 at 3:01 p.m., Dr. Catapano to Dr. Dyer, **EXHIBIT 138** (GWU 001202).

548.    I noted that a plan for remediation should start with a re-stating of the original requirement that Dr. Waggel meet with Dr. Dyer regarding the first Letter of Deficiency and that the plan should involve concrete remediation including review of Code Strong procedures. Id.

549.    I also noted, however, that the greater concern was Dr. Waggel's lack of insight concerning issues related to professionalism, self-care, self-regulation and interpersonal communication. Id.

550.    I also noted that I had the previously scheduled meeting with Dr. Berger in a few days to make a plan in the coming months to address Dr. Waggel's deficiencies and to "clarify the degree to which she is or is not remediable." Id.

551.    I further noted that Dr. Berger might have a recommendation for more intensive remediation than we initially proposed for the weekly meetings with Dr. Dyer.

552.    Dr. Dyer responded that there was another deficiency that should be added to the list – failure to comply with the first Letter of Deficiency remediation plan which was "pretty basic" – meet with him in two weeks and notify him of her supervisors so he could verify attendance. Id. (Email dated November 4, 2015 at 9:12 a.m., Dr. Dyer to Dr. Catapano).

553.    Dr. Dyer noted that Dr. Waggel had not initiated an attempt to meet with him within the two weeks and when they did finally meet, she said that 90% of what was in the letter was wrong. Id.

554.    Dr. Dyer commented further, given that the problems with Dr. Waggel were as basic as the ones identified at the recent CCC meeting, he was not sure what would be accomplished by his meeting with Dr. Waggel once a week even if he had the time to do that which he did not. Id.

555.    On Thursday, November 5, 2015, I met with Dr. Berger to review Dr. Waggel's tenure in the Program and all the concerns that had arisen about her failure to perform to Program requirements and the effort to come up with a remediation plan in addition to all the other steps already taken, including buddy call, my frequent meetings with her, Dr. Emejuru's work with Dr. Waggel to coordinate her schedule, arrangements for her medical appointments and psychotherapy therapy, encouraging supervising attendings to provide frequent concrete feedback, and the proposal to keep Dr. Waggel on buddy call with more senior resident supervision.

556.    Based on Dr. Waggel's then current Milestone evaluation, which was significantly below that expected for her level of training, Dr. Berger suggested that the Program consider extending Dr. Waggel's training by 6 months.

557.    Dr. Berger did not think there was sufficient justification for Dr. Waggel's termination from the Program at that point, but an extension would be a step in that direction if Dr. Waggel did not improve significantly.

558.    Dr. Berger also stated that the decision for extended time in the Program must come from the CCC.

559.    We also discussed briefly the third draft Letter of Deficiency.

560.    On November 5, 2015 at 4:39 p.m., I then emailed a report of my meeting with Dr. Berger to the CCC. See Email dated November 5, 2015 at 4:39 p.m., Dr. Catapano to CCC, **EXHIBIT 139** (GWU 01198).

561.    In addition to the matters already noted as discussed with Dr. Berger, I reported that a CCC decision to extend Dr. Waggel's time in training would be communicated to her within the Letter of Deficiency I was currently writing for the August 25 call night and that Dr. Waggel would be placed back on buddy call until her call performance improved. In closing, I requested the recommendation of the CCC members regarding the suggestion to extend Dr. Waggel's training. Id.

562.    Dr. Crone responded that she had "serious doubts that extending [Dr. Waggel's] training will help but also cannot see her becoming a PGY3 in another 7-8 months. She needs oversight on professionalism, communication." Id. (Email dated November 5, 2015 at 7:01 p.m.).

563.    Dr. Dyer responded that he also had doubts about Dr. Waggel becoming a PGY [sic] in 7-8 months if she needs to be on call with a buddy and we are still worrying if she will even show up for work." Id. (Email dated November 5, 2015 at 7:15 p.m.).

564.    Dr. Dyer responded further:

> [W]hat . . . educational program could we design where we could confidently say she had the skills to practice this profession/specialty independently, which may not be a good choice for her. I wonder that we would renew her contract; or even since she has refused to comply with the most basic remediation plan, if there are grounds for terminating her contract –

Id.

565.    Dr. Kels responded: "I agree with the stated concerns." See Email dated November 6, 2015 at 10:07 a.m., **EXHIBIT 140** (GWU 001197).

566.    On November 7, 2015 at 4:16 p.m., I received an extended report from Dr. Collins concerning Dr. Waggel's performance in Dr. Collins' Psychodynamic Theory course which Dr. Collins summarized as: "[Dr. Waggel] hasn't learned the material at all, nor is she emotionally available to see a patient." See Email dated November 7, 2015 at 4:16 p.m., Dr. Collins to Dr. Zinner, et al., and attachments thereto, **EXHIBIT 141** (GWU 001546 – 001552).

567.    On November 10, 2015 at 1:05 p.m., I commented further that extending Dr. Waggel's training was a step we could take at that time, would communicate that Dr. Waggel had not been performing adequately for the first four months of the year, and "sets the groundwork for not renewing her contract next year, if she is to continue with this level of performance." See Email dated November 10, 2015 at 1:05 p.m., Dr. Catapano to Dr. Kels, et al., **EXHIBIT 141-A** (GWU 001197 - 001198).

568.    I further proposed that, if we extended Dr. Waggel's training at that time "and she doesn't get either worse or significantly better, that she repeat the PGYII year in its entirety next year." Id.

569.    I noted that Dr. Griffith, Dr. Collins, and Dr. Zinner had already documented that Dr. Waggel's performance in their didactic courses was insufficient, so Dr. Waggel would have to repeat all of them as well. Id.

570.    I then commented that "[I]f things go very well for [Dr. Waggel], she could then be promoted to PGYIII the following year, but if not, then at least we've done everything we can to give her the opportunity to remediate." Id.

571.    I closed by asking if the CCC members agreed with this proposal for the time being noting that we would revisit Dr. Waggel's progress along the way and could recommend non-renewal of contract, or termination, if warranted. Id.

572.     On November 10, 2015, I had a discussion with Dr. Berger, Dean of GME, that he had received very disturbing reports from a community member who lived in Dr. Waggel's apartment building that she had engaged in repeated and constant instances of extremely loud music, disorderly conduct, and screaming at all hours of the day and night, the DC Metropolitan Police had been called and knocked on Dr. Waggel's apartment door for 5 minutes on at least two occasions, but she did not respond, and about 15 minutes after the police had left, she resumed the behavior.

573.     Dean Berger had a report submitted by a community member on a GW Neighborhood submission form reporting these matters and stating further that the resident of the apartment, Stephanie Waggel, had been drunk or drugged in the hallway and had become abusive when confronted.

574.     Dr. Berger had also received copies of Metropolitan Police Department Public Incident Reports concerning these matters.

575.     During the meeting we discussed Dr. Waggel's performance in the program and any behavior relating to the complaints from the community and I discussed the one fairly remote incident when Dr. Waggel had been found asleep in the on call room after which she had given several different explanations of what had happened to different people at different times – one explanation was she had been out drinking the night before, the other (to me) was a medication mix-up, and at least one other was that she had been too sick to report for duty.

576.     I told Dean Berger that I was not aware of any other incidents of this nature.

577.     Dr. Berger was sufficiently concerned by the community report and its implications for patient safety and for Dr. Waggel's own well being that he thought the best course would be a brief administrative leave for Dr. Waggel from clinical activity with her

continued participation in the training program in all other respects including continued pay and benefits while he and the University community liaison office looked into the matter further.

578.   After this discussion with Dr. Berger, I spoke with Dr. Crone where Dr. Waggel was currently on rotation, we agreed with Dr. Berger's recommendation, and decided that Dr. Waggel would be put on administrative leave with pay, effective immediately, pending an investigation of the complaint Dr. Berger had received.

579.   I then phoned Dr. Waggel and told her that a matter had come to Dean Berger's attention that he would contact her about and discuss with her, that he would need to investigate the matter briefly and in the meantime the decision had been made that she would be placed on administrative leave effective immediately.

580.   I further told Dr. Waggel that she should continue with all of her other activities in the training program but that during the administrative leave she was not to report for any clinical duties, and I confirmed that her status in the program otherwise remained unchanged including all pay and benefits.

581.   I also told Dr. Waggel that I had discussed this with Dr. Crone and the personnel at Inova Fairfax Hospital were aware that she would not be there.

582.   As I knew this matter related to a community complaint about possible substance abuse, not Dr. Waggel's attendance in the program or use of sick leave, I did not mention or refer to sick leave during the conversation.

583.   On November 10, 2015 at 6:28 p.m., I then emailed the administrative team to alert them to this matter. See Email dated November 10, 2015 at 6:28 p.m., Dr. Catapano to Ms. Crawford, et al., **EXHIBIT 142** (GWU 001311).

584.    On November 11, 2015 at 11:54 a.m., I sent an email to Dr. Waggel with the third Letter of Deficiency, the substance of which I noted we had previously discussed during our meeting on October 1 and she had also discussed during her prior meeting with Dr. Norris and Dr. Gandhi. See Email dated November 11, 2015 at 11:54 a.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 143** (Plaintiff Bates 485 – 486), and attached November 11, 2015, Letter of Deficiency, **EXHIBIT 144** (GWU 001127 – 001128).

585.    On November 11, 2015 at 2:15 p.m., Dr. Waggel responded by email. Id.

586.    Dr. Waggel's email contained a series of statements with which I obviously disagreed and which confirmed my ongoing concern for her lack of self-observation and ability to acknowledge her deficiencies as well as her failure to understand that efforts at remediation were intended for her benefit, not as punishment or an attack on her.

587.    I noted in the last paragraph of her email that she contended that her current "buddies" had "no desire to help me" and "[t]hey try to leave or actually do leave in the middle of the night with no explanation as to were they are going, and they do not return." She also stated that these individuals, "[T]o cover for themselves, they lie to you about the call shift in emails knowing full well you will not ask for or listen to what I have to say – which you indeed haven't." Id. at 486.

588.    From my review of the email reports we had received from the residents, all of whom were doing well in the Program and were well respected, and in fact had been selected because it was thought they would be most helpful as training mentors for Dr. Waggel, it did not seem likely they had engaged in the dishonesty described by Dr. Waggel.

589.    The charges, however, were obviously concerning and I asked Dr. Kels and the two Chief Residents to investigate these claims. See Email dated November 12, 2015 at 10:11 a.m., Dr. Catapano to Dr. Kels, et al., **EXHIBIT 145** (GWU 001248 – 001250, at 001250).

590.    Dr. Emejuru followed up and confirmed with the other residents that they had not left the hospital except Dr. Linda Ojo, but she had provided a detailed report of the shift and told us, herself, in the report that she had left about a half hour early when she received a telephone call that her daughter had missed the school bus. She clearly did not leave "in the middle of the night" and "with no explanation as to where" she was going. Id. at GWU 001248 – 001249).

591.    On November 15, 2015 at 9:20 p.m., I received an email detailed report from Dr. Thomas B. Shaver providing a very favorable report of his buddy call with Dr. Waggel on November 8 which appeared to provide confirmation that the buddy call remediation could be effective for Dr. Waggel with her cooperation. See Email dated November 15, 2015 at 9:20 p.m., Dr. Shaver to Dr. Catapano, et al. (including Dr. Waggel), **EXHIBIT 146** (Stephanie Waggel Supp. Prod. [Oct.] 7 of 466).

592.    On November 18, 2015 at 2:12 p.m., I received an email from Ms. Anderson transcribing text message screen shots from a group text in which Dr. Waggel, among other statements, texted: "I love being unemployed" – "My lawyer just won a case for a surgical resident who sued his program" – "Ya'll need to start looking for other jobs this department gunna be out of business soon." See Email dated November 18, 2015 at 2:12 p.m., Ms. Anderson to Dr. Berger, Dr. Catapano, **EXHIBIT 147** (GWU 001666 - 001667).

593.    On November 18, 2015 at 7:18 p.m., I received an email from Dr. Waggel concerning her meeting that day with Dr. Berger. See Email dated November 18, 2015 at 7:18 p.m., Dr. Waggel to Dr. Catapano, **EXHIBIT 148** (GWU 001306 – 001308).

594.     Dr. Waggel referred to the meeting as "highly productive" and that I should meet with her to talk about her return to work (clinical duty) and "formulating a plan for the future." Id. at 1306.

595.     The email discussed a number of items including that "Dr. Berger's goal is for me to graduate. My goal is to graduate on time." Id.

596.     Dr. Waggel then added: "I would like to straighten out a number of things in this regard. My lawyer is also looking into this."

597.     Dr. Waggel further stated:

> I know there have been residents who have taken time off for medical reasons and have graduated on time. I also am still confused as to why I would have to repeat an entire month due to taking a licensing exam I was approved for and taking sick days I followed the protocol for and had doctor's notes.

Id.

598.     These statements reflected Dr. Waggel's ongoing misunderstanding of information she had been provided.

599.     It is true that some residents take time off for medical reasons and graduate on time, when the time off is not so prolonged as to disqualify them for training time requirements.

600.     Residents are entitled to take allotted vacation and personal time, and whatever sick leave is required as documented by their medical providers and approved by Benefits Administration and/or the EEO Office.

601.     But following procedures for and taking approved leave – whether administrative time to take an exam, sick leave for medical care and treatment, or vacation or other personal leave time for any another other reason – is not a substitute for mandatory training time.

602.    This point is made clear to all residents, and, for Dr. Waggel, was brought back to her attention by Dr. Kels when Dr. Waggel sought four days of leave for a two-day exam when her absences during the rotation already put her in jeopardy of needing to repeat the rotation.

603.    It was also not reassuring that Dr. Waggel continued to believe based on her performance during PGY2 that a goal "to graduate on time" was appropriate.

604.    Dr. Waggel had already been informed that there were fundamental knowledge deficits that she needed to remediate.

605.    It was not constructive for Dr. Waggel to state that "her lawyer" had any role to play in the Program's assessment of her academic performance, educational objectives achieved, ACGME Milestones not met, need for remediation, and length of time in training.

606.    In her email, Dr. Waggel correctly noted that she would no longer be on "buddy call," but not for the reasons she then set forth. Id. at GWU 001307.

607.    Dr. Waggel incorrectly asserted that "[m]y 'buddies' are my peers" in that they "seem to have the same knowledge and experience as me." Id.

608.    The doctors assigned as Dr. Waggel's buddies were ahead of her by a full year of clinical training and were all well in advance of Dr. Waggel in medical knowledge, professionalism, systems-based practice, interpersonal communications, and overall clinical knowledge and skills.

609.    Dr. Waggel repeated the statement that the first two buddies – Dr. Linda Ojo and Dr. Shuo (Sally) He – "did not offer help or feedback and left hours before the call shift was over." Id.

610.    Dr. Waggel then stated further that, "I was told to not disclose this information to you so that they wouldn't get in trouble, however, this is at a cost to me as I was not receiving any kind of support during my 'buddy call.'" Id.

611.    Dr. Waggel then said she felt "it would be more helpful to learn from an attending" followed by unrelated statements concerning her being "overwhelmed on call" and policies related to social workers. Id.

612.    Dr. Berger and I had already discussed that given Dr. Waggel's ongoing struggles, the remediation plan in the original Letter of Deficiency, dated November 11, could be strengthened further if Dr. Waggel's level of supervision were changed from buddy call to attending physician supervision and her work on improving patient clinical presentations be changed from Dr. Dyer to the Associate Program Director, Dr. Kels.

613.    I had already planned to incorporate those changes – and only those changes – in a revised Letter of Deficiency and issue that to Dr. Waggel.

614.    On November 19, 2015, I met with Dr. Waggel late in the afternoon and then prepared an email memorandum of the meeting, a copy of which is attached as **EXHIBIT 149** (Plaintiff Bates 498).

615.    During the meeting I provided Dr. Waggel a copy of the revised third Letter of Deficiency, dated November 19, 2015, a copy of which is attached as **EXHIBIT 150** (GWU 001123 – 001124).

616.    The points discussed with Dr. Waggel during this meeting included:

(a)    Dr. Waggel's performance in the courses taught by Dr. Griffith and Dr. Collins was unsatisfactory, she may be required to repeat them the next year, she might not proceed with the rest of PGYII didactics, and she should meet with Dr. Griffith and

Dr. Collins, finish any outstanding work with them, and finalize her evaluations for the courses;

(b)     Dr. Kels and I would work with Dr. Waggel to establish a detailed plan regarding extra supervision by her attending physician for each call and also make appropriate changes to have Dr. Waggel on solo call (with attending supervision by telephone);

(c)     We agreed to correct my earlier misimpression as to the time of the meeting Dr. Waggel had had with Dr. Norris and Dr. Gandhi concerning a review of the RCA;

(d)     Dr. Waggel had requested more information concerning the RCA and I suggested she contact Dr. Norris for that purpose, and

(e)     Dr. Waggel was to return to clinical rotation on Geriatrics the next day.

617.    I closed the email: "Take good care of yourself, and as we discussed, let's plan to meet right after Thanksgiving next week." Id.

618.    That same evening, Dr. Waggel came back to my office, reported that she had already met with Dr. Griffith, and said that he had told her that the exams in his course are "cumulative" so that if she did well enough on the upcoming exam she could successfully complete the course and she was excited about that.

619.    I knew from prior experience with residents who had had to repeat portions of Dr. Griffith's course – or the whole course – that what Dr. Waggel had just said to me did not sound correct.

620.     As soon as Dr. Waggel left my office, I walked the very short distance to Dr. Griffith's office, told him what Dr. Waggel had just said about the exams being cumulative and she could pass his course, and asked him if that were true.

621.     Dr. Griffith responded immediately and without hesitation that that was absolutely untrue – he had not said that to Dr. Waggel

622.     Dr. Griffith said that he had told Dr. Waggel just the opposite: That she would have to repeat at least the two segments she had failed and probably should repeat the whole course.

623.     Dr. Griffith said he also told Dr. Waggel that she could continue attending the course for at least a while longer, take the next exam, and he would see how she was doing.

624.     On November 19, 2015 at 8:51 p.m., I received an email from Dr. Waggel stating she was glad that we had had our meeting that day. See Email dated November 19, 2015 at 8:51 p.m., Dr. Waggel to Cr. Catapano, **EXHIBIT 151** (Plaintiff Bates 499 – 501, at 499).

625.     Dr. Waggel further discussed reasons why she hoped she would not need to repeat the Inova Fairfax Hospital PHP rotation and her communications with Dr. Emejuru to arrange her call schedule to avoid interference with her requests for days not to be on call. Id.

626.     Dr. Waggel then suggested that Ms. Anderson become her "point person" so if she needed to alert people to an unexpected absence from work she would have someone to contact to be sure she followed protocol. Id.

627.     The notion that there would be a "point person" for Dr. Waggel's duty to alert others about absences from work so she could check to be sure she had followed protocol was inappropriate.

628.    The notice procedures are straightforward and are each physician's personal professional responsibility – there is no place for a "point person" regarding that issue.

629.    On November 19, 2015 at 8:58 p.m., Dr. Waggel sent an email to me and Ms. Anderson forwarding the information she had previously provided to Dr. Emejuru for non-call days in November in case there were to be any further changes in her call schedule under the new supervision plan. See Email dated November 19, 2015 at 8:58 p.m., Dr. Waggel to Dr. Catapano, Ms. Anderson, **EXHIBIT 152** (GWU 001354).

630.    On November 19, 2015 at 9:24 p.m., I received an email from Dr. Collins reporting she had sent an email to Dr. Waggel suggesting she repeat Dr. Collins's Psychodynamics course and they had then talked on the phone. See Email dated November 19, 2015 at 9:24 p.m., Dr. Collins to Dr. Catapano, **EXHIBIT 153** (GWU 001531).

631.    Dr. Collins reported that Dr. Waggel was stating that "she is not repeating the 2nd year and that if she has to repeat my course it will hold her back." Id.

632.    Dr. Collins stated further, "(I feel in the middle of something that perhaps I shouldn't be.) Optimally I think she should repeat the course however if you think that getting her a supervisor to remediate the course i [sic] sufficient, I will ask Rosa if she will do that. I will call you tomorrow – just wanted to give you a heads up." Id.

633.    On November 19, 2015 at 10:00 p.m., I received an email from Dr. Waggel stating that in the last feedback from Dr. Collins she had been told she would be assigned a supervisor soon and said she had not heard otherwise from Dr. Collins until about an hour ago. See Email dated November 19, 2015 at 10:00 p.m., Dr. Waggel to Dr. Catapano, et al., **EXHIBIT 154** (GWU 001530).

634.    Dr. Waggel said she had asked Dr. Collins what had changed and Dr. Collins had stated she did not know if Dr. Waggel "was going to be in class and was upset that I did not inform her of my recent absences and I also missed class prior." Id.

635.    Dr. Waggel went on to state that she hoped it could be explained that her absence was FMLA time and her more recent one was "very complicated."

636.    Dr. Waggel also claimed her understanding was that the need to repeat this class would result in her "going on technically as a PGY3 but redo the rotations of PGY2," she wanted to know if this was correct, and hoped very much this could be sorted out. Id.

637.    The November 19 Letter of Deficiency that I had discussed with Dr. Waggel earlier that afternoon stated explicitly that Dr. Waggel would not be promoted to the PGY3 year for the reasons stated in the letter – her conduct during the August 25 call shift involving deficiencies in Patient Care, Interpersonal Communications Skills, and Systems-Based Practice with ongoing need for "buddy call" and then attending physician supervision for her on call shifts.

638.    I specifically discussed that with Dr. Waggel that afternoon and had made it very clear that decision had been made.

639.    Further, Dr. Waggel had received written feedback from Dr. Collins telling Dr. Waggel that she did not understand psychodynamic concepts.

640.    It was not truthful for Dr. Waggel to tell Dr. Collins that she was going to be promoted to PGY3.

641.    It was not truthful for Dr. Waggel to tell Dr. Collins that if Dr. Waggel had to repeat Dr. Collins' course it would hold her back.

642.    Dr. Waggel continued to take the position that FMLA leave was a substitute for obtaining required medical knowledge and training.

643.    There was no discussion with Dr. Waggel that she would be "going on technically as a PGY3" – she had been told she would not be promoted to PGY3.

644.    On November 19, 2015 at 10:23 p.m., I emailed back to Dr. Collins and said I looked forward to speaking with her the next day. See Exhibit 153 (Email dated November 19, 2015 at 10:23 p.m., Dr. Catapano to Dr. Collins).

645.    On November 19, 2015, Dr. Berger responded to Dr. Waggel's email report [¶ 591 above, Exhibit 148] to Dr. Catapano of their meeting on November 18. Dr. Berger stated that there were "a few things that don't jive with my intent from our meeting" and then reviewed those matters. See Email dated November 19, 2015, Dr. Berger to Dr. Waggel, **EXHIBIT 155** (GWU 003504).

646.    In his concluding remarks, Dr. Berger reiterated other conversations I had had with Dr. Waggel that delaying promotion or asking her to repeat a course "are significant costs that reflect our commitment to your success." Dr. Berger further commented, "Doing your part is going to require some effort, and I am hopeful that you will succeed." Id.

647.    On November 20, 2015, I spoke with Dr. Collins about the fact that a decision had been made for reasons related to Dr. Waggel's lack of preparedness for independent call duty and general failure to meet Milestones that she would not be promoted to PGY3 and it would make sense for Dr. Waggel to repeat the Psychodynamics course to be sure she learned the material.

648.    On November 20, 2015 at 8:58 a.m., Dr. Collins sent Dr. Waggel (cc: Dr. Catapano) an email as follows:

> The decision has been made that you will be repeating my course beginning next July as other remediation options are not available. While that may be difficult to take in now, I trust that by July you will be ready to learn and it will be a more rewarding experience. Any other questions about this can be directed to Dr. Catapano. I will see you in July.

See Email dated November 20, 2015 at 8:58 a.m., Dr. Collins to Dr. Waggel, **EXHIBIT 156** (Stephanie Waggel Supp. Prod. [Oct.] 232 of 466).

649.    On November 20, 2015 at 5:07 p.m., in response to Dr. Waggel's earlier assertions that Dr. Malik had made statements to two other residents indicating that Dr. Malik had seen an evaluation Dr. Waggel had submitted on Dr. Malik and Dr. Waggel had actually reported to me that Dr. Malik had stated that Dr. Waggel's evaluation was the only negative evaluation she had received, Dr. Berger sent an email confirming that the evaluations remained confidential and that Dr. Waggel had never submitted an evaluation of Dr. Malik. See Email dated November 20, 2015 at 5:07 p.m., Dr. Berger to Dr. Waggel, et al., **EXHIBIT 157** (GWU 003503).

650.    Dr. Waggel responded, in part, "Thank you for clarifying this." Id. (Email dated November 20, 2015 at 4:42 p.m.).

651.    On November 25, 2015 at 10:34 a.m., I responded to Dr. Waggel's email [¶ 622, Exhibit 151] noting that we had discussed a need to work out a system for her absences including a point person and I would probably take that role. Exhibit 151 (Email dated November 25, 2015 at 10:34 a.m., Dr. Catapano to Dr. Waggel).

652.    I also advised Dr. Waggel that it was definite that she would not be ready to progress to PGY3 on July 1, 2016, as stated in the Letter of Deficiency I had given her at our meeting on November 19 (and as had been stated in the earlier version of the letter, dated November 11, which I had given to her previously). Id.

653.    I also noted that she had received an email from Dr. Collins stating that she would have to retake that course. Id.

654.    I then pointed out that I did not know if she had received anything in writing from Dr. Griffith, but based on my communication with him, my understanding was she would need to retake that course as well. Id.

655.    I agreed that I would work on a system for her absences that would not include last minute absences, which would remain her responsibility, that I would work on that and we would talk again the following week. Id.

656.    On November 25, 2015 at 4:03 p.m., I was copied on an email from Dr. Griffith to Dr. Waggel responding to an email earlier that day in which Dr. Waggel asserted that during their conversation on November 19, Dr. Griffith had told her that the tests in his course were "cumulative" and a good result on the December exam would show she had gone "back to build on information from the beginning" and asking: "Has there been any change to this since we last spoke?" See Email dated November 25, 2015 at 4:03 p.m., Dr. Griffith to Dr. Waggel (cc Dr. Catapano) responding to earlier attached email at 11:20 a.m., Dr. Waggel to Dr. Griffith, **EXHIBIT 158** (Stephanie Waggel Supp. Prod [Oct.] 188 – 189 of 466).

657.    Dr. Griffith replied:

> Stephanie, that is not what I said. I'll clarify and explain & also cc to Dr. Catapano so there won't be confusion. The first section of the year-long clinical neurosciences seminar provides the basic science foundation not only for psychopharmacology, but for much of what you will be taught during residency about use of language and relationships in psychotherapy in several other seminars. You missed many of those sessions and also scored 33 on each of the two examinations, which indicated you did not acquire the needed level of knowledge needed to move forward. You need to repeat the course next year, which is consistent with what residents have been required to do in the past when they did not show evidence of having learned the material.

> The fundamental issue is one of accountability to your future patients. You need to demonstrate that you have the knowledge and skills needed to provide competent and effective care for your future patients. This is why it matters that you learn this material. It likely is something you will later appreciate for you to re-do the course and learn the material well. It is okay for you to take the Dec 17 exam on psychotic disorders and their treatment, but that does not mean you should not re-take at last the summer section next year and possibly the course as a whole.
> Best wishes,
> Griff

Id.

658.     Barely one half hour later, on November 25, 2015 at 4:39 p.m., Dr. Waggel sent a further email to me responding to my email of 10:34 a.m. that day [Exhibit 151, p. 499] thanking me for my reply stating that I would help her find a "point person." Id. at 500.

659.     Dr. Waggel then added:

> During our meeting on Thursday Nov, 19 you mentioned I speak with Dr. Griffith about my progress in his class. I stopped by his office before leaving the MFA and he said that as the exams are cumulative, I can demonstrate my neuroscience understanding by doing well on the next exam which is December 17. I remember sharing my excitement about this with you before leaving the MFA. Has something changed since then?

Id.

660.     Dr. Waggel further said: "My specific time-sensitive question about Dr. Collins's [sic] class is, have I officially failed it despite being notified one week prior that I was passing and that Dr. Collin's [sic] has not graded my final paper?" Id.

661.     Dr. Waggel also said that she had contacted Dr. Kels who had not been able to meet with her within the one-week period set forth in the Letter of Deficiency and wanted to know if there would be any adverse consequences. Id.

662.    Dr. Waggel had already been told unambiguously that she was required to repeat Dr. Collins's course. (See ¶ 645, Exhibit 156, Email dated November 20, 2015, Dr. Collins to Dr. Waggel).

663.    I had confirmed in my email earlier that day that Dr. Waggel would have to repeat Dr. Collins's course. (See ¶ 650, Email at 10:34 a.m., Dr. Catapano to Dr. Waggel.)

664.    Dr. Waggel had just been told, again, by Dr. Griffith that she would have to repeat his course.

665.    On November 30, 2015, I responded further to Dr. Waggel's inquiries:

> Regarding Dr. Griffith's course, what he told me after he spoke to you on November 19, and what he reiterated in his email to you today, is that he is allowing you to take the Dec 17 exam, but because you failed the first two exams, you will need to at least retake the first section of his course. He will have to decide, after the next exam, whether you will continue in his course for the rest of this year.

> Regarding Dr. Collins's course, her email from November 25 states that you did not pass her course, and will have to retake it next year. This means you will not get a supervisor or therapy patient this year, and cannot take Dr. Zinner's course or T-group.

> Just to make sure everything's clear regarding your didactic schedule, for the next few weeks you will continue to be in Dr. Griffith's course, and continue in the Global Mental Health course.

> Regarding your meeting with Dr. Kels, I understand that you attempted to contact her last week, and got a response from her on Wednesday. Although you were not able to meet with her within one week I know that you made a significant effort and that she got back to you to say she got your message. You will not be penalized for the fact that you have not met with her yet.

> Please let me know if you have any questions about any of the above.

> Take care,

666.    On December 10, 2015 at 1:03 p.m., I confirmed that Dr. Waggel would not be "punished" for missing the first session of Dr. Zinner's class since we had already told her that

she was not allowed to participate. <u>See</u> Email dated December 10, 2015 at 1:03 p.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 159** (Stephanie Waggel Supp. Prod. [Oct.] 169 of 466).

667.    On December 10, 2015, I had the fourth Letter of Deficiency, dated December 10, 2015, delivered to Dr. Waggel. A copy of the letter is attached as **EXHIBIT 160** (GWU 001125 – 00126).

668.    The December 10 Letter of Deficiency noted that the earlier November 19 Letter of Deficiency had informed Dr. Waggel that based on insufficient competencies in Patient Care, Interpersonal Communication Skills, and Systems-Based Practice she would not be promoted to the PGYIII year on July 1, 2016. <u>Id.</u>

669.    The Letter further noted that Dr. Waggel had not demonstrated sufficient competency in Dr. Collins's Psychodynamic Theory course to pass it and to progress to having an individual psychotherapy patent assigned so she would not move on to Dr. Zinner's Psychodynamic Psychotherapy course. <u>Id.</u>

670.    The Letter further noted that Dr. Waggel had received failing grades of 33 on the first two exams and Dr. Griffith had stated Dr. Waggel had not acquired the needed level of knowledge to move forward. <u>Id.</u>

671.    The Letter therefore stated that Dr. Waggel would be required to repeat Dr. Collins's Psychodynamic Theory course the next year and, if successful, would be assigned a psychotherapy patient and a supervisor. <u>Id.</u>

672.    The Letter further stated that Dr. Waggel would be required to repeat at least the first part of Dr. Griffith's course the next year and could continue in the course to take the next exam in December before Dr. Griffith made a determination whether Dr. Waggel could continue in the class this year or withdraw and repeat it in its entirety the next year.

673.    The Letter set forth other terms and conditions related to the remediation set forth in the letter and noted that Dr. Waggel had a right of appeal and the time frames within which to appeal. Id.

674.    On December 11, 2015, Dr. Waggel noted an appeal of these decisions and sent me a confirming email. Id.

675.    In late December 2015, because Dr. Waggel had not made progress in the remediation plan set forth in her third Letter of Deficiency concerning call duty, a decision was made that she would be removed from the call pool until there was satisfactory proof of progress in the remediation.

676.    It was expected that Dr. Kels would convey this information to Dr. Waggel and that Dr. Emejuru would adjust the call schedule to arrange for the remaining residents to provide coverage for the dates Dr. Waggel would otherwise have been on duty.

677.    Unfortunately, Dr. Emejuru sent an email to the other residents concerning the revised call schedule before Dr. Kels had spoken with Dr. Waggel so Dr. Waggel first learned about this change from a fellow resident.

678.    This was a mistake and Dr. Kels apologized to Dr. Waggel that it had occurred. See Email dated December 30, 2015 at 3:51 p.m., Dr. Kels to Dr. Catapano, **EXHIBIT 161** (Plaintiff Bates 534).

679.    On January 5, 2016, Dr. Waggel submitted her essay to Dr. Gandhi in which the third Letter of Deficiency had called upon her to write a "description of management strategies and alternatives for management of patient aggression in the in-patient setting." See Email dated January 5, 2016 at 7:58 p.m., Dr. Waggel to Dr. Gandhi, a copy of which Dr. Kels provided to me, **EXHIBIT 162** (GWU 003516 – 003519).

680.    On January 5, 2016, I received a telephone call from Dr. Babak Sarani, M.D., Director of Trauma and Acute Care Surgery, GW Hospital and GW – MFA, who was a designated ombudsman for the GW SMHS residency training programs. After the telephone call, I prepared an email memorandum of the call. See Email dated January 5, 2016 at 2:59 p.m., Dr. Waggel to Dr. Griffith et al., **EXHIBIT 163** (GWU 002843),

681.    The ombudsmen are attending staff physicians who agree to be advocates for residents in matters where there may be disputes, disagreements, or misunderstandings between a resident and program administration, hospital administration, or other components of the training program.

682.    Dr. Sarani reported that Dr. Waggel had gone to the ED at the GW Hospital presenting with panic symptoms and was seen by Dr. Colleen Roche and had told Dr. Roche that her symptoms had been precipitated by the email about being taken out of the call schedule in the context of having been provided no information that there were any concerns about her clinical performance. Dr. Roche advised her to speak to Dr. Sarani as an ombudsman, and when they met, Dr. Waggel repeated the information to him.

683.    Dr. Sarani further said Dr. Waggel had told him she had received no formal feedback or anything in writing (such as a Letter of Deficiency) letting her know where she stands and she was anxious about this because she might be held back next year and she did not know why.

684.    I told Dr. Sarani that Dr. Waggel had received four Letters of Deficiency over the last six months and that she was in the process of appealing one of them.

685.     I told Dr. Sarani that Dr. Waggel had had multiple meetings with me and with Dr. Berger, and in the process of the appeal, the GME office has reviewed all of our records and communication with and regarding Dr. Waggel.

686.     Dr. Sarani stated that his next step would be to confirm this information with Dean Berger, and if he were satisfied that we had followed the appropriate process for informing Dr. Waggel of her deficiencies, he would drop the matter from his end.

687.     On January 7, 2016, Dr. John Zinner came to my office to report an incident involving Dr. Waggel in which she claimed, despite the fact that her fourth December 10, 2015 Letter of Deficiency had stated clearly in writing that she would not be allowed to progress to Dr. Zinner's course, that I had told her that I would leave it up to Dr. Zinner to decide whether she could take the seminar.

688.     After the discussion with Dr. Zinner when I made it clear that I had not said this to Dr. Waggel and had not indicated in any fashion that Dr. Waggel would be permitted to take his course, I followed up with an email to Dr. Zinner several days later to establish what had occurred. See Email dated January 11, 2016 at 1:58 p.m., Dr. Catapano to Dr. Zinner, **EXHIBIT 164** (GWU 001781).

689.     Dr. Waggel not only claimed I had told her she could take the course if Dr. Zinner agreed, which was false, she apparently also contended that because she was on a list of attendees for the class that that somehow authorized her to take the course despite all of the contrary discussion around and leading up to the December 10 Letter of Deficiency.

690.     On January 13, 2016 at 8:33 a.m., I emailed Dr. Waggel to let her know that Dr. Gandhi had reviewed the essay she had submitted and was preparing his response which he

would go over with her as soon as it was complete. See Email dated January 13, 2016 at 8:33 a.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 165** (Plaintiff Bates 566 – 568, at 566).

691.   Dr. Waggel thanked me for my reply and then said she hoped this could be addressed soon "as I have been trying to complete this assignment for 8 weeks." Id.

692.   I responded that we were addressing this as quickly as we could "but, just to be clear, you only handed in the assignment last week." Id. at 567.

693.   On January 13, 2016 at 9:44 a.m., I received an email from Dr. Sarani concerning an email from Dr. Waggel in which she claimed there had been a two-week delay in following up on the assignment she had submitted. See Email dated January 13, 2016 at 9:44 a.m., Dr. Sarani to Dr. Griffith, Dr. Catapano, **EXHIBIT 166** (GWU 000697).

694.   I replied that I had already emailed Dr. Waggel earlier that morning to assure her the assignment was being reviewed and that Dr. Gandhi would meet with her to discuss it. Id.

695.   On January 13, 2016 at 3:33 p.m., I received a cc of an email from Dr. Griffith to Dean Berger, who was administering the review of Dr. Waggel's appeal of the December 10 Letter of Deficiency, regarding an email Dr. Waggel had sent to Dean Berger. See Email dated January 13, 2016 at 3:33 p.m., Dr. Griffith to Dr. Berger, **EXHIBIT 167** (GWU 001712 – 001715).

696.   In her email, Dr. Waggel had stated: "Would you be able to add to my grade appeal a new piece of information I was just made aware of? I received an 82% on my cumulative final for the neuroscience course they chose to fail me in. Please also add the fact that this was one of the highest scores in the class." Id. at GWU 001713.

697.   Dr. Griffith replied:

> Jeff, this is not an honest portrayal. I've attached the exam grades for the whole class for you to see where Stephanie's fits. Stephanie's grade

127

> on the last exam was middle of the class, with all the grades clustered (class average was 80, Stephanie made 82). This was not a cumulative exam, but an exam on a single section of a course -- the third of probably six exams over course of the year. I have not prevented her from sitting in the class; but think she should re-do the whole course, which we did with a similar analagous [sic] situation with a different resident last year.

Id. at GWU 001712.

698.     Given all the previous discussion between Dr. Waggel and Dr. Griffith, and later with me about the nature of the exams in Dr. Griffith's course, it was dishonest of Dr. Waggel to submit the test score as a "cumulative" grade.

699.     On January 20, 2016, I met with Dr. Anne Cioletti, who had been appointed as the independent reviewer for Dr. Waggel's appeal of the December 10 Letter of Deficiency, and Dr. Berger, Dr. Kels, and Ms. Tucker. A memorandum of the substance of the meeting was prepared and accurately reflects the discussion. A copy of the memorandum is attached as **EXHIBIT 168** (GWU 002481 – 002483).

700.     On January 20, 2016, I received an email from Dr. Gandhi attaching his written review of Dr. Waggel's December 10 Letter of Deficiency essay, a copy of which is attached as **EXHIBIT 169** (GWU 001799 – 001801).

701.     Dr. Gandhi reported that he had just finished speaking with Dr. Waggel and providing verbal feedback which was essentially the same as his written documented feedback.

702.     Dr. Gandhi's written feedback noted that while the first paragraph reasonably set the tone for the essay, and the second paragraph was reasonably organized, the remainder of the essay was deficient in significant respects, but most importantly, it failed to discuss the key issue the Letter of Deficiency had directed Dr. Waggel to address, i.e., "deficits in management of

code strong on a particular call night – essay should include ways resident could improve personal approach to agitation management." Id. at GWU 001801.

703.    The essay Dr. Waggel submitted had no discussion of the events of August 25, her participation in the events, the mistakes she had made, how she could have handled the situation better, and what she would do to assure she would perform better in future similar circumstances.

704.    The essay was a further striking example of Dr. Waggel's lack of self-observation, failure to acknowledge her deficits, and accept the need for remediation.

705.    On January 21, 2016 at 7:54 a.m., in light of this development, I emailed Dr. Waggel that we needed to meet to discuss next steps and that "you will not be put back in the call schedule right now . . . ." See Email dated January 21, 2016 at 7:54 a.m., Dr. Catapano to Dr. Waggel, **EXHIBIT 170** (Stephanie Waggel Supp. Prod. [Oct.] 380 – 382 of 466, at 380).

706.    Dr. Waggel's response was to agree to meet that afternoon and to threaten me "and the rest of the faculty in the department and hospital administrators" with her law firm – "They specialize in resident cases so I have faith that if the psych department doesn't come through for me, my law firm certainly will." Id. at 381.

707.    On January 21, 2016 at 4:30 p.m., Dr. Kels and I met with Dr. Waggel for half an hour. I typed up notes of the meeting which we all reviewed before the meeting ended and agreed represented a reasonable synopsis of the discussion. See Email dated January 21, 2016 at 5:14 p.m., Dr. Catapano to Dr. Waggel and attachment, **EXHIBIT 171** (Plaintiff Bates 686 and GWU 001778).

708.    I told Dr. Waggel, I would review Dr. Gandhi's comments with the CCC and plan to get back to her within 10 days regarding their recommendations. Id. at 686.

129

709.     On February 1, 2016, I became aware of a situation in which Dr. Waggel had refused to turn over a Children's National Medical Center pager she had carried while on duty there in December and was insisting that people go out for drinks with her before she would turn it over. See Email dated January 31, 2016 at 11:07 a.m., Dr. Emejuru to Dr. Catapano et al. and attached text messages, **EXHIBIT 172** (GWU 001750 – 001754).

710.     Given the ongoing pattern of unprofessional conduct, I drafted a Notice of Concerns of Unprofessional Conduct, dated February 15, 2016, to be pursued under the GW Resident Misconduct Policy. A copy of the Notice is attached as **EXHIBIT 173** (GWU 000964 – 000966).

711.     On February 25, 2016, I received the results of the independent physician review conducted by Dr. Ciolletti which upheld the decisions set forth in the December 10 Letter of Deficiency. A copy of the letter from Dean Berger to Dr. Waggel is attached as **EXHIBIT 174** (GWU 003716 – 003718). A copy of the report prepared by Dr. Cioletti is attached as **EXHIBIT 175** (GWU 003719 – 003725).

712.     On or about March 1, 2016, a further episode involving Dr. Waggel came to my attention that Dr. Mary Chappelle, a very experienced and respected psychotherapist, had observed in an interaction between Dr. Waggel and a patient and family members in a complicated case of a young man with a serious self-injury requiring involvement of multiple surgical and medical teams.

713.     Dr. Chappelle was asked to be involved in the case to perform beside psychotherapy. When she and Dr. Waggel were going to the patient's room together, Dr. Waggel entered first in a very abrupt manner and spoke to the patient's mother in an elevated voice with an abrasive tone.

714.    When Dr. Waggel excused herself from the room, the patent's mother said she had requested that the psychiatry residents not visit her son anymore.

715.    Dr. Chappelle reported that Dr. Waggel's way of interacting with this family at what Dr. Chappelle considered to be an incredibly vulnerable point in their hospital experience and lives was a matter of concern.

716.    When this situation was brought to the attention of the attending psychiatrist, Dr. Gandhi, who had recently worked with Dr. Waggel on her December 10 Letter of Deficiency essay, he decided to make the case "attending only" because he was concerned that Dr. Waggel could potentially say something damaging to the therapeutic rapport in this delicate case.

717.    With the many months of attempts to remediate Dr. Waggel's Professionalism, Patient Care and Interpersonal and Communications Skills apparently having resulted in no improvement in her self-awareness or behavior, along with now repeatedly documented instances of untrustworthiness and dishonesty, Dr. Griffith informed me that as Chair of the Department of Psychiatry with the final responsibility for quality of care and patient safety, he had decided that Dr. Waggel must be removed from all clinical activity.

718.    On March 17, 2016, Dr. Griffith and I had a meeting with Dr. Waggel during which he informed Dr. Waggel of his decision that she be removed from all clinical duties effective immediately.

719.    Despite the four Letters of Deficiency, the Notice of concerns of professional misconduct, and all the other instances of misconduct, lack of professionalism, mistreatment of colleagues, and non-adherence to basic requirements of professional behavior over the entire PGY2 year to date, Dr. Waggel insisted during the meeting that she was confused and did not

understand what was happening and that while she had been given information concerning her deficiencies in writing, she just did not understand it.

720.   Dr. Griffith explained that her lack of understanding was a significant reason why she needed to be removed from clinical care for patient safety reasons and that she was removed from those duties.

721.   In the course of the pending lawsuit, I learned that Dr. Waggel had surreptitiously recorded the meeting, which I understand to be legal, but I consider very unprofessional and unethical.

722.   I have reviewed a transcript of the audible portions of Dr. Waggel's recording which appears to accord with my memory of the statements made during the meeting.

723.   On March 25, 2016 at 12:19 p.m., I received an email from Richard J. Simons, M.D., Senior Associate Dean for MD Programs, forwarding his letter regarding his final review of Dr. Waggel's appeal of the December 10 Letter of Deficiency. See Email dated March 25, 2016 at 12:19 p.m., Dr. Simons to Dr. Catapano, **EXHIBIT 176** (GWU 002568). A copy of Dr. Simons letter, dated March 25, 2016, to Dr. Waggel regarding the appeal is attached as **EXHIBIT 177** (GWU 002569 – 002570).

724.   Dr. Simons decided that the matter should be referred back to the CCC because of a procedural error in the proceedings. Dr. Simons concluded that pursuant to the Academic Improvement Policy, the Program Director is to consult with the CCC on any decisions to not promote a resident to the next year of training, and while that discussion did take place among CCC members, there was no formal recommendation by the CCC to me on the matter and none recorded in the minutes of a CCC meeting. Id. at GWU 002569.

725.    For that reason, Dr. Simons determined that he was "referring this matter back to your [Dr. Waggel's] department and Program Director. The Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." Id. at GWU 002570.

726.    On April 8, 2016, the CCC met and conducted a review of Dr. Waggel's performance in the Program. See Minutes of CCC Meeting, Friday, April 8, 2016, a copy of which is attached as **EXHIBIT 178** (GWU 001156 – 001161)

727.    As noted in the minutes, I reviewed the chronology of Dr. Waggel's tenure in the Program. Id. at GWU 001156 – 001158.

728.    The CCC deliberated the matter further and then voted unanimously (as the Program Director, I abstained) to recommend to the Program Director that the previous letters of deficiency and associated recommendation for non-promotion be re-affirmed and based on all of the documented concerns and the additional concerns to further recommend dismissal from the program. Id. at GWU 001159.

729.    On May 2, 2016, I issued a letter to Dr. Waggel advising her that I had adopted the CCC's recommendation that she not be promoted to PGYIII status in July 2016 and further accepted the CCC's recommendation and thus was providing notice that Dr. Waggel was dismissed from the Program. See Letter dated May 2, 2016, Dr. Catapano to Dr. Waggel, **EXHIBIT 179** (GWU 001050 – 001051).

730.    I was advised that Dr. Waggel appealed that action in a letter to Dr. Berger dated May 15, 2016.

731.    On June 23, 2016, as part of the appeal process, I was interviewed by Raymond H. Lucas, M.D., Associate Dean for Faculty Affairs and Professional Development, Associate

133

Professor of Emergency Medicine, who had been appointed as the independent physician reviewer for the appeal.

732.    A memorandum of the interview was prepared and accurately sets forth the substance of the interview and the information I provided to Dr. Lucas. A copy of the memorandum is attached as **EXHIBIT 180** (GWU 003174 – 003176)

733.    During the interview, I was asked about some of the more significant events during Dr. Waggel's tenure in the Program, but given my extensive attention to the many episodes involving issues with Dr. Waggel's performance, my many meetings with her across many months trying to get her back on track and keep her there, there was not time to discuss all of those interactions.

734.    During the interview I was asked about any extenuating circumstances and stated that Dr. Waggel's health issues may have played a role in her progress as they led to absences, by which I meant the absences detracted from her ability to acquire information presented during didactics courses and to obtain actual clinical training time necessary for her professional development and to meet minimum ACGME training standards.

735.    The interview memorandum correctly notes that I told Dr. Lucas that "the most difficult thing has been the level of destruction related to the dishonesty of Dr. Waggel, which [I believe] is relevant to her capacity to be a physician." Id. at GWU 003176.

736.    The interview memorandum also correctly notes that my experience with Dr. Waggel was a factor in my decision to resign as Program Director. Id.

737.    In July 2016, I was advised that Dr. Lucas had determined that the decision for dismissal would be sustained and I received copies of the relevant correspondence, including Dr. Lucas's letter report, dated July 6, 2016, a copy of which is attached as **EXHIBIT 181** (GWU

003476 – 003480), and Dr. Berger's letter of formal notification to Dr. Waggel, dated July 13, 2016, a copy of which is attached as **EXHIBIT 182** (GWU 003486 – 003487).

738.    I was advised that Dr. Waggel took a final appeal on July 22, 2016, to Dean Simons.

739.    I was later informed that Dean Simons denied the appeal in a letter, dated August 10, 2016, addressed to Dr. Waggel and to Eindra Khin Khin, M.D., then serving as the Program Director, a copy of which is maintained in the Program's records. A copy of the July 22 letter is attached as **EXHIBIT 183** (GWU 003500 – 003501).

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____1/2/18_____          _____*ell le*  MD_____
                                       Lisa A. Catapano, M.D.

135