# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF JEFFREY BERGER, M.D.

I, Jeffrey Berger, M.D., hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters hereinafter set forth and am competent to testify thereto.

2.      I am a Professor of Anesthesiology at the George Washington University School of Medicine and Health Sciences ("GW SMHS") and its affiliated physician practice group, Medical Faculty Associates ("GW MFA").

3.      I also serve as the Associate Dean for Graduate Medical Education ("GME"). The GME Office provides oversight for all Accreditation Council for Graduate Medical Education ("ACGME") approved residency training programs at GW SMHS. Graduate Medical Education refers to post-medical school internships, residencies, and fellowships.

4.      GW SMHS currently has approximately 40 residency training programs with approximately 450 trainees.

5.      The GME Office handles most of the institutional administrative responsibility for all of those programs. The purpose of the Office is to assist residents in navigating administrative procedures within their programs and to assure that residents' responsibilities are met. We also

work with program directors for each program to ensure that all of our residency programs meet or exceed ACGME Institutional, Common, and Program Requirements.

6.      The GME Office is not responsible for the day-to-day management and operation of each residency program. Likewise, the GME Office is not responsible for creating the individual training plans and/or curriculum for each residency program.

7.      In my role as Associate Dean for GME, I serve as GW SMHS's point of contact with the ACGME. I am responsible for facilitating the accreditation of our programs. I assist all of the residency program directors in ensuring that their programs are in compliance with all necessary requirements. I also act as the liaison between the University's graduate programs, the School of Medicine, and the undergraduate programs.

8.      My service as the Associate Dean for GME has included the period July 2014 – August 2016 when Dr. Stephanie Waggel was a resident in the George Washington University Psychiatry Residency Training Program (the "Program").

9.      Through my connection to the Program as Associate Dean for GME, I was generally aware that Dr. Waggel developed a medical condition in the spring of 2015 that required her to have surgery to remove a cyst from her kidney, that the surgery was then scheduled and performed, that the cyst was found to have been cancerous but the surgery had been curative, and that Dr. Waggel did not need to have any further treatment such as radiation or chemotherapy.

10.      I was also aware that Dr. Waggel required medical leave for her surgery and recovery following the surgery which was provided for her.

11.     On October 28, 2015, I issued a Letter of Deficiency ("LOD") to Dr. Waggel for a deficiency in the area of Professionalism, a true and correct copy of which is attached hereto as **EXHIBIT 1**.

12.     Dr. Waggel received the LOD for failing to complete her annual health clearance.

13.     Dr. Waggel was notified of the requirement in April 2015, well in advance of the compliance deadline of September 30, 2015.

14.     Dr. Waggel received multiple further notices and reminders of the need to comply.  Residents are advised that this requirement is imposed by District of Columbia law as a public health safety measure, is considered a serious matter, and is to be strictly enforced.

15.     Dr. Waggel failed to meet the September 30th deadline which was then extended to October 14.

16.     Dr. Waggel then failed to meet the extended deadline. As a result, I issued the LOD dated October 28, 2015. See **EXHIBIT 1**.

17.     In early November 2015, I was contacted regarding complaints from multiple tenants in Dr. Waggel's condominium building about Dr. Waggel having loud parties at all hours of the night, falling asleep in the common areas of the condo building while intoxicated, and exhibiting other erratic behaviors.

18.     I also received copies of two Police Reports regarding such incidents that had occurred on October 11 and October 30, 2015. True and correct copies of those reports are attached hereto as **EXHIBIT 2** and **EXHIBIT 3**, respectively.

19.     I was also forwarded a copy of an email complaint about the October 11, 2015, incident made by one of the building tenants through the GW Neighborhood website complaint system, a true and correct copy of which is attached hereto as **EXHIBIT 4**. In the complaint, the

neighbor notes that in addition to the October 10 incident, Dr. Waggel had been found "drunk or drugged in the hallway before and became abusive when confronted."

20.     These reports were concerning to me for multiple reasons. I was concerned about Dr. Waggel's health and safety. I was concerned that one of our residents was exhibiting such inappropriate behavior in our community. And, perhaps most importantly, I was concerned about the safety of any patients who might come under the care of the resident.

21.     I was further concerned because this was the second time I had received a report regarding Dr. Waggel behaving erratically while apparently under the influence of a substance.

22.     Prior to the condominium building incident, I had received a report from Dr. Catapano about an instance in which Dr. Waggel had been found asleep in a call room during a shift and had given multiple reasons for the episode, one of which was that she had mistaken her prescription medications and had accidentally taken a benzodiazepine before coming to work.

23.     These events caused me to be concerned that Dr. Waggel may have a substance abuse problem, and I decided that I needed to investigate her personal stability and determine whether she was fit to see patients.

24.     On or about, November 10, 2015, I contacted Dr. Catapano and directed that Dr. Waggel be placed immediately on administrative leave pending an investigation of the community complaints and was later informed that that had been done.

25.     I then contacted Dr. Waggel and attempted to schedule a meeting with her promptly so I could decide if she was safe to get back to duty right away or needed referral for further evaluation.

26.     Dr. Waggel responded to my request by suggesting that we meet several days later, which I found to be quite unusual given that she had been placed on administrative leave.

4

Most residents want to get out from under an administrative suspension from clinical duties as quickly as possible. We eventually agreed to meet on November 18, 2015.

27.     On November 17, 2015, I received a letter from attorney Gregory Care, notifying me that he had been retained as counsel for Dr. Waggel.

28.     On November 18, 2015, I met with Dr. Waggel along with the Director of Graduate Medical Education, Mary Tucker. Dr. Waggel brought her father to the meeting at the suggestion of her attorney. I was uncomfortable with him being part of our discussion so I asked that he wait outside, which he agreed to do.

29.     I informed Dr. Waggel of the complaints from her neighbor and my multiple concerns regarding her behavior. She stated that the party was not out of control and the neighbors only complained because they did not like her. She assured me that she did not have a substance abuse problem.

30.     Based on my interview with Dr. Waggel, her assurances to me, and the absence of any further information regarding the matter, I accepted Dr. Waggel's explanation.

31.     During the interview, we also discussed the other issues that Dr. Waggel had been having in the program.  She stated that she was not being allowed to take time off to get follow up appointments after her kidney surgery. I informed her that if she had any issues regarding access to healthcare, she should go to the University's Office of Equal Employment Opportunity to get an official accommodation, particularly if she felt her condition required it.

32.     I further advised Dr. Waggel that the Program could not simply make special arrangements for her if she did not follow the required procedures.

33.     During the meeting, Dr. Waggel and I also discussed the LODs she had received and that she was not on track to complete the PGY2 year on time. She said that she was not

5

getting the assistance she needed to address the remediation plans set forth in the LODs, and I offered to assist her with finding a new faculty mentor to work with her on those issues.

34.     I explained to Dr. Waggel that the purpose of a Letter of Deficiency is to help a resident identify an issue, improve upon that issue, and move on in the program. I assured Dr. Waggel that the Program's goal was for her to complete her training.

35.     Dr. Waggel acknowledged this and said that she was constantly seeking feedback and appreciated the LODs because they identified a problem and suggested how to fix it.

36.     I also specifically raised with Dr. Waggel that she might consider taking a leave of absence until the following July to focus on her health issues if they were affecting her ability to do her best in the Program and we would allow her that time off.

37.     I also knew that Dr. Catapano was very supportive of that approach for Dr. Waggel.

38.     I commented further that that might be a good option in light of the fact that, at the very least, she was going to be required to repeat some portions of her PGY2 year given the time she had already missed. I also stressed to her that the goal was for her to complete her training, and that she should not worry about doing so "on time."

39.     With respect to extending her time in the training program, I emphasized that this would provide time for her to take care of herself and still be able to finish her training and was the Program's way of investing in her.

40.     Dr. Waggel was insistent that she would not take time off that would extend her training.

41.     Dr. Waggel's response to the suggestion was something that I never succeeded in understanding.

6

42.     I tried my best to explain to her in several meetings, both in person and on the phone, that this type of leave time and extension in the Program represented our institution investing in her so that she could be well trained and have a successful career.

43.     In using the term investing, I explained that the United States government pays for resident training for a particular time, and any training beyond the allotted time in the program was on us. So for us to extend her training meant that we were financially investing in her because we would absorb the cost.

44.     I also discussed with Dr. Waggel that extension of training for residents that miss time is not uncommon. Residency is not a regular job. It is job training. There are certain skills that a resident must master before moving on to the next level of practice. It is the Program's responsibility to ensure that a resident has those skills. If a resident is unable to learn or has not mastered those skills, then the residency training time needs to be extended.

45.     I have had this same conversation many times over the years with residents and have never had a reaction that, "no, there's nothing wrong with me, no thanks."

46.     The reaction on other occasions to the suggestion has always been, "Thank you. I will try to do better."

47.     Dr. Waggel's refusal to acknowledge that she had any issues, that she should extend her training to address them, and that the Program was only trying to help was truly confusing to me.

48.     I was very concerned to see that she was not willing to work with the Program leaders or with me to support her own improvement.

49.     I also discussed with Dr. Waggel the possibility of her transferring to another program where she could have a fresh start if she felt that her training could not continue at George Washington University.

50.     Ms. Tucker kept detailed notes of the meeting that were added to Dr. Waggel's file. A true and correct copy of those notes is attached hereto as **EXHIBIT 5**.

51.     Following the meeting, I prepared a short memorandum summarizing our discussion and sent it to Dr. Catapano with a list of next steps for us to assist Dr. Waggel. A true and correct copy of that memo is attached hereto as **EXHIBIT 6**.

52.     In my summary, I encouraged Dr. Catapano to reiterate to Dr. Waggel that the Program was committed to her success and that the goal was for her to complete her residency training. I also encouraged Dr. Catapano to reiterate to Dr. Waggel that prolonging her training was an investment of time and money that the Program was offering to make in her.

53.     Dr. Waggel also provided her version of a summary of our meeting to Dr. Catapano by email, a true and correct copy of which is attached hereto as **EXHIBIT 7**.

54.     Upon reviewing Dr. Waggel's summary, it was clear to me that Dr. Waggel had misunderstood or misinterpreted points of our conversation.

55.     Despite my making it clear that she would need to extend her training, Dr. Waggel stated that it was her goal to graduate "on time" and that she would have her attorney investigating that issue. This was counter to our discussion, and moreover, counter-productive to facilitating a relationship of trust and cooperation moving forward.

56.     Despite stating to me that she appreciated LODs because they gave her feedback to address, Dr. Waggel continued to dispute the contents of the LODs she had received.

8

57.     I responded with a reply email to Dr. Waggel highlighting the areas I found to be incorrect and/or inappropriate and to further advise her on how she could most productively proceed under the circumstances. A true and correct copy of my email response is attached hereto as **EXHIBIT 8**.

58.     I first noted that Dr. Waggel's tone was inappropriately harsh and demanding. I felt that she should soften her tone as she addressed her Program Director.

59.     I noted that her continued reference of the role of her attorney was not productive.

60.     I also advised her that she misunderstood our conversation about the decision to delay her promotion to PGY3, and identified the steps that she could take if she wished to appeal that decision.

61.     Finally, I again noted that it was our goal to see her succeed in the Program and that we were prepared to invest in her by asking her to delay promotion to ensure that she received all necessary training.

62.     Rather than accepting the suggestion that she take the time to extend her training and repeat the course materials so she could show she had mastered the subject matter, Dr. Waggel, who had the right to do so if she wished, decided to take an appeal.

63.     On December 3, 2015, Dr. Waggel requested a Review of a Reportable Action related to the fact she had been notified by Dr. Collins that she had failed Dr. Collins's Introduction to Psychodynamic Theory course and that she would be required to repeat the course the following year. A true and correct copy of her written request is attached hereto as **EXHIBIT 9**.

64.     On December 10, 2015, Dr. Waggel received a Letter of Deficiency further notifying her that she had failed Dr. Collins's course and that she had failed the Neuroscience

didactics course taught by Dr. James Griffith, which she would also be required to repeat the following year, and that she would not be promoted to PGY3 otherwise scheduled for July 1, 2016. A true and correct copy of the LOD is attached hereto as **EXHIBIT 10**.

65.    Upon receiving Dr. Waggel's request for a review of the Program's decisions, pursuant to the GME Academic Improvement Policy, I contacted Dr. Anne Cioletti and requested that she serve as the independent physician reviewer to review Dr. Waggel's appeal of the decisions.

66.    Dr. Cioletti was an Internal Medicine physician at George Washington University School of Medicine and Health Sciences and Vice Chair for the Graduate Medicine Education Committee at the time. She had no connection to the Psychiatry Residency Training Program or to Dr. Waggel. She was chosen because of her knowledge of graduate medical education, and her lack of involvement with any of the events relating to the reportable actions and could thus provide an independent review.

67.    On December 11, 2015, I informed Dr. Waggel that Dr. Cioletti had been assigned to her appeal. A true and correct copy of that correspondence is attached hereto as **EXHIBIT 11**.

68.    On January 13, 2015, I received an email from Dr. Waggel asking me to add a note to her appeal file that she had received a grade of 82% on her "cumulative" final in Dr. Griffith's Neuroscience class, which was one of the highest grades in the class. A true and correct copy of the email is attached hereto as **EXHIBIT 12**.

69.    Upon receiving Dr. Waggel's email, I contacted Dr. Griffith to confirm the details. Dr. Griffith informed me that Dr. Waggel's portrayal of the situation was not honest. The

exam was not cumulative as she said, but instead was one of three exams that tested her knowledge of one-third of the class material.

70.     Dr. Griffith further confirmed that Dr. Waggel had failed a significant portion of the course and needed to repeat the course. A true and correct copy of this email exchange is attached hereto as **EXHIBIT 13**.

71.     I met with Dr. Cioletti, along with Dr. Catapano and the Program's Assistant Director, Dr. Lori Kels, on January 20, 2016. I explained to Dr. Cioletti that her role was to determine whether, according to the GME Academic Improvement Policy, the Program had afforded Dr. Waggel due process. Due Process meant: (1) Notice of the deficiency; (2) an opportunity to cure the deficiency, and (3) a finding that the Program's decision was reasonably made. A summary of that meeting prepared by Ms. Tucker as part of Dr. Waggel's file is attached hereto as **EXHIBIT 14**.

72.     On January 21, 2016, Dr. Cioletti interviewed Dr. Waggel as part of her independent investigation of the appeal. I was also present for that meeting. A summary of that meeting prepared by Ms. Tucker as part of Dr. Waggel's file is attached hereto as **EXHIBIT 15**.

73.     On February 16, 2016, Dr. Griffith presented Dr. Waggel with a letter entitled "Notice of Concerns of Unprofessional Conduct" ("Unprofessional Conduct Letter"), a true and correct copy of which is attached hereto as **EXHIBIT 16**.

74.     The Unprofessional Conduct Letter stated that Dr. Waggel had lied to Dr. John Zinner on January 7, 2016, when despite having been told on more than one occasion that she was not allowed to take his Psychodynamic Psychotherapy class because of her failure of Dr. Collins's course, Dr. Waggel told Dr. Zinner that Dr. Catapano had stated that she could take the class if Dr. Zinner allowed her to.

75.     The Unprofessional Conduct Letter further stated that Dr. Waggel had lied to me by alleging that the third exam in Dr. Griffith's class was cumulative, when it was not.

76.     The Unprofessional Conduct Letter further stated that following a panic attack allegedly resulting from Dr, Waggel's having been removed from the call schedule without advance notice in December 2015, Dr. Waggel lied to the GW SMHS ombudsman, Dr. Babak Sarani, in stating that she had never been given any feedback and did not know why she had been removed from the call schedule despite having been issued four prior LODs.

77.     Finally, the Unprofessional Conduct Letter stated that Dr. Waggel had lied to Dr. Cheryl Collins by Dr. Waggel's assertion to Dr. Collins that the only thing holding Dr. Waggel back from being promoted to PGY3 was Dr. Collins's decision to fail her.

78.     In addition to those alleged lies, the Unprofessional Conduct Letter noted that Dr. Waggel had failed to identify her attending physicians in the MedHub resident evaluation system as all residents were required to do so she could be timely and properly evaluated, had failed to timely obtain employee health clearance, and had failed to properly comply with the Academic Improvement Plan set forth in the LOD dated July 15, 2015.

79.     The Unprofessional Conduct Letter also noted that Dr. Waggel had sent hostile and antagonistic text messages and emails to residents and to Dr. Catapano threatening to bring down the program with a lawsuit.

80.     On February 22, 2016, I received a letter from Dr. Cioletti stating that after her review of the issues involved in the Program's decisions to fail Dr. Waggel in two courses and delay her promotion, she had determined that the Program had afforded Dr. Waggel due process in reaching those decisions and that the decisions were reasonably made. A true and correct copy of that letter is attached hereto as **EXHIBIT 17**.

81.     By letter dated February 25, 2016, I notified Dr. Waggel of Dr. Cioletti's decision. A true and correct copy of the letter is attached hereto as **EXHIBIT 18**.

82.     Dr. Waggel requested a final appeal of the Appeal Decision upholding the Program's decision to fail Dr. Waggel in two courses and delay her promotion.

83.     I notified Dr. Richard Simons, the Senior Associate Dean for MD Programs, that, as the Dean's designee, he would be responsible for conducting the final review.

84.     Dr. Simons reviewed policies and documentation and talked with relevant parties, and issued a decision letter on March 25, 2016 that noted that the Academic Improvement Policy was not followed because the Clinical Competency Committee (the "CCC") minutes did not make any mention of consideration to delay promotion.

85.     The CCC minutes only mentioned that the CCC spent 30 minutes discussing Dr. Waggel.

86.     The decision letter referred the matter back to the CCC for a review of performance and to make recommendations to the Program Director.  A true and correct copy of the letter is attached hereto as **EXHIBIT 28** (GWU 2495 – 2496).

87.     On March 16, 2016, I called Dr. John Zinner to discuss the incident involving Dr. Waggel in his class on January 7, 2016. He stated that prior to beginning his Psychodynamic Psychotherapy class that day he had asked Dr. Waggel to leave the classroom because she was not in the class. It was his understanding that Dr. Waggel was not to attend the class because she had failed Dr. Collins's Introduction to Psychodynamic Theory class the previous semester.

88.     Dr. Waggel stated that Dr. Catapano had told her that she could stay in the class as long as Dr. Zinner said that it was okay. Dr. Zinner did not believe Dr. Waggel's claim to be truthful and asked her to leave the class.

89.     Dr. Zinner then confirmed with Dr. Catapano after the class that Dr. Waggel had lied about this and that she was going to be required to take Dr. Collins's class in the fall of 2016 before she could take his class.

90.     A true and correct copy of a brief summary of my conversation with Dr. Zinner prepared as part of my investigation is attached hereto as **EXHIBIT 19**.

91.     I also called Dr. Cheryl Collins on March 16, 2016, to discuss Dr. Waggel's performance in her class.

92.     Dr. Collins informed me that Dr. Waggel's attendance in her class was poor. Dr. Waggel was often absent, and when she did attend she was rarely prepared. Dr. Collins added that Dr. Waggel had been asked to present an article to the class on one occasion, but was unprepared to do so and instead re-directed the class to a discussion of her personal issues she was having at work.

93.     Dr. Collins stated that despite her efforts to help Dr. Waggel learn the material, Dr. Waggel had not mastered enough of the material and should be required to repeat the course as a result of which she could not progress to the next step of taking Dr. Zinner's class.

94.     Dr. Collins communicated this to Dr. Waggel, who stated that if she had to repeat the course, she would have to repeat the entire PGY2 year, and the course failure was the only reason she would have to repeat the year.

95.     Dr. Collins stated that after speaking to Dr. Waggel, she called Dr. Catapano to confirm the facts. She learned from Dr. Catapano that Dr. Waggel's claim was incorrect and that Dr. Waggel was struggling in many aspects of her training and would have had to extend the PGY2 year for many other reasons beyond the failure of Dr. Collins's course.

96.     A true and correct copy of a brief summary of my conversation with Dr. Collins prepared as part of my investigation is attached hereto as **EXHIBIT 20**.

97.     On March 17, 2016, I met with Dr. Waggel to discuss my investigation of issues identified in the Unprofessional Conduct Letter. I began the meeting by asking Dr. Waggel about her health as she alluded to what she called a "life-threatening" situation, so I wanted to make sure that she was physically capable and comfortable meeting with me that day. She stated that she was comfortable moving forward.

98.     She told me that her doctors thought that her cancer had possibly spread and that her oncologist and her urologist were disagreeing on what type of workup she needed as a result. I expressed sympathy and offered to do whatever I could to be supportive.

99.     I also let Dr. Waggel know that it was my goal to be a support and a mentor to her, but that it was more difficult to do so because she had retained an attorney and had made multiple comments about taking the program down, thus putting the relationship between her and the Program on an adversarial rather than collegial footing.

100.    With regards to attendance in Dr. Zinner's class, Dr. Waggel contended that it was all a "misunderstanding." She admitted being told that she could not take the class, but contended that she asked Dr. Catapano if she could simply sit in the class and was told that that was Dr. Zinner's decision.

101.    Dr. Waggel further said that because her name was on the class sign-in sheet on January 7, she thought she could stay.  She only found out later that the sign-in sheet was a standard form for the entire class that does not get modified to reflect those not taking a particular course.

102.    With regards to Dr. Collins's course, she contended that she had received an email from Dr. Collins that she had not demonstrated competency in the course to have an individual patient assigned to her and that she understood that that alone meant she would have to repeat the PGY2 year.

103.    When I questioned Dr. Waggel about the issue regarding Dr. Griffith's class and that she had misled me to believe that the grade on the last final was cumulative, she responded by saying she had told me that she got "one of" the highest grades in the class, but not the highest. She also contended that she thought the test was cumulative because there were some questions from the first and second test on the third test.

104.    Dr. Waggel continued her consistent position that in all of these instances she did not think she had any fault in creating the circumstances leading to her tenuous status in the Program. She stated that the LODs did not make sense. She asserted that all of her faculty evaluations were good, and, as such, she had done well in the Program, and the charges against her were all unfounded and based on everyone else's misunderstanding of the facts.

105.    Dr. Waggel also stated that she had been reaching out to other programs about a potential transfer. She was concerned that her chances of transferring would be damaged by the LODs. I agreed to assist her in the transfer process if that was what she wanted to do. I told her that I would have to speak with Dr. Catapano and other Program faculty about a recommendation as well.

106.    I concluded our meeting by letting Dr. Waggel know that I would review everything from my investigation regarding the Unprofessional Conduct Letter and report my findings to Dr. Catapano. A true and correct copy of a summary of the meeting prepared for Dr. Waggel's file is attached hereto as **EXHIBIT 21**.

16

107.   Since that meeting, I have discovered that Dr. Waggel surreptitiously recorded the entire conversation. She never stated to me before the meeting that she wished to record it (and I would not have agreed to as it would be completely inappropriate) or during the meeting that she was recording it.

108.   As noted, during the March 17 meeting, I agreed to help Dr. Waggel in the process of transferring to another institution if she wished. I agreed to do this because I wanted to support her. I did not, however, make any judgment as to whether the Program could ethically endorse a transfer given its evaluation of Dr. Waggel's performance during her tenure with the Program.

109.   My role is purely administrative and I defer, as I must, to the clinical judgment of the attending faculty in each program who have had direct and regular professional clinical contact with and supervision over a trainee's performance in the training program and who have the specific medical specialty expertise to determine whether a trainee is qualified to remain in a Program or transfer to another program. I am not qualified to make that judgment.

110.   As part of my efforts from an administrative perspective regarding a possible transfer, and after obtaining a release from Dr. Waggel's attorney to do so, I spoke to the Program Director for the Adolescent Psychiatry Program at Carillion Virginia Tech. In that conversation, I did my best to highlight Dr. Waggel's positive attributes and downplay her many struggles in the Program. I did not mention the LODs, the Unprofessional Conduct Letter, or the community complaints.

111.   In speaking with Dr. Catapano about this, however, she stated that, as the Program Director directly responsible for Dr. Waggel's training, she could not ethically endorse Dr. Waggel to another program because of serious concerns about her truthfulness, her multiple

17

substantial deficits across many domains, her complete lack of insight into her deficiencies, and her consequent inability to be remediated.

112.    As noted, I do not have the expertise to make this determination and properly deferred to the Program Director regarding whether it was appropriate to endorse Dr. Waggel for a transfer.

113.    On April 7, 2016, I prepared a letter to report to Dr. Waggel and Dr. Catapano regarding the findings of my investigation into the Notice of Misconduct, a true and correct copy of which is attached hereto as **EXHIBIT 22**. In the letter I outlined the steps I had taken in my review, the materials that were reviewed, and the information that was considered.

114.    I found that Dr. Waggel's failures to report her supervisors in MedHub, obtain health clearance, and comply with the academic improvement plans were evidence of a lack of professionalism, but did not rise to the level of misconduct.

115.    I found that the complaints of her neighbor regarding her behavior in her condominium building did not constitute misconduct in the GW learning environment, but advised Dr. Waggel of the importance of minding her behavior outside of work as she represents the Program and the University as a whole.

116.    Finally, I found that Dr. Waggel's four instances of misrepresentations to faculty members represented misconduct. Likewise, her threatening texts and emails misrepresented misconduct.

117.    I notified Dr. Waggel that she would be receiving a LOD with an improvement plan designed to address these behaviors.

118.    By April 27, 2016, I had prepared the LOD corresponding to the April 7 report, a copy of which is attached hereto as **EXHIBIT 23**. This LOD was never formally issued because

I became aware that the Psychiatry Residency Training Program CCC had made a recommendation to Dr. Catapano that Dr. Waggel be terminated from the Program.

119.    In my view, my role at that point was to defer to the judgment of her direct clinical supervisors as to her remediability and ability to continue in the program and thus to await the final outcome of their decision before taking any further action. I therefore withheld the draft LOD pending the outcome of the recommendation for dismissal.

120.    By letter dated May 2, 2016, Dr. Catapano advised Dr. Waggel that Dr. Catapano was accepting the CCC's recommendation for dismissal and that Dr. Waggel was dismissed from the Program.

121.    On May 15, 2016, I received a letter from Dr. Waggel stating that she was appealing the decision to dismiss her from the program, a true and correct copy of which is attached hereto as **EXHIBIT 24**.

122.    Upon receipt of Dr. Waggel's appeal, I contacted Dr. Raymond Lucas, an Emergency Medicine physician, an Associate Dean for Faculty Affairs, and a former Program Director at George Washington University School of Medicine and Health Sciences, to serve as an independent physician reviewer for the appeal. Dr. Lucas had no involvement in or connection with the Psychiatry Department or its Residency Training Program other than occasional contact with Psychiatry residents in the Emergency Department at GW University Hospital.

123.    On June 23, 2016, I attended a meeting with Dr. Lucas, Dr. Waggel, and Ms. Tucker as part of Dr. Lucas's review. I noted that the purpose of the review was for Dr. Lucas to determine whether the Program had afforded Dr. Waggel due process in reaching its decision to dismiss her. As with her first appeal this entailed: (1) Notice of the deficiency; (2) an opportunity

to cure the deficiency, and (3) a determination whether the Program's decision was reasonably made.

124.   On July 6, 2016, I received a letter report from Dr. Lucas setting forth in detail the extensive review he had conducted, the information he had obtained, his evaluation of the information, including whether there were any extenuating circumstances, and his conclusions that the decision to dismiss Dr. Waggel complied with due process and had been reasonably made, and he was, therefore, upholding the decision. A true copy of the letter is attached as **EXHIBIT 25**.

125.   On July 13, 2016, I notified Dr. Waggel of Dr. Lucas's decision by letter, a true and correct copy of which is attached hereto as **EXHIBIT 26**.

126.   Dr. Waggel appealed Dr. Lucas's decision to Dr. Richard Simons, the GW SMHS Senior Associate Dean for M.D. Programs. Dr. Simons upheld the Program's decision as well and denied Dr. Waggel's appeal.

127.   On August 10, 2016, I sent Dr. Waggel a letter finalizing her termination effective August 10, 2016, and notifying her of the termination of her salary and benefits. A true and correct copy of that letter is attached hereto as **EXHIBIT 27**.

128.   I did not know Dr. Waggel personally, was not involved directly in her clinical training, and never bore any animus or ill will toward her at any time, and, particularly never held any animus toward her related to her cancer, treatment for the cancer, or her diagnosis and treatment of any other medical, substance abuse, mental health or any other similar problem she might have.

129.   To my knowledge, Dr. Waggel did not have a disability, never claimed to have a disability, and did not appear to have a disability or a record of a disability.

130.    To the contrary, Dr. Waggel always claimed that she had fully performed all the duties of her residency training program and denied that there were any extenuating circumstances which would justify an extension of her training as an accommodation.

131.    On multiple occasions when Dr. Waggel was offered, indeed, encouraged to accept leave from the Program and extend her time in training at the University's expense so she could show her mastery of the information and skills necessary to complete the Program, Dr. Waggel always rejected the proposal and refused to accept that this would help her.


I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on: _____12·22-17_____          _____
                                          Jeffrey Berger, M.D.

21

3685436v.1



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

**Office of Graduate Medical Education**

<u>**VIA EMAIL**</u>

October 28, 2015

Stephanie Waggel, MD
Resident in Psychiatry

Dear Dr. Waggel:

This letter serves as a Letter of Deficiency under the current policy for academic improvement for Graduate Medical Education at the George Washington University. You are receiving this letter because you have shown deficiency in the competency of Professionalism.

In April 2015, Residents and Fellows were notified by email to log in to the MedHub system to sign their contracts and to complete other requirements for the new academic year. One of the requirements was that all residents and fellows complete the annual health clearance with the GW Hospital Employee Health Office no later than September 30, 2015. Despite an extension granted by Dr. Gary Little, Medical Director of GW Hospital, you were not cleared by Employee Health by the extended deadline of October 14th.

It is our expectation that you will adhere to all administrative responsibilities prior to the deadline going forward. Thank you for your attention to this important matter.

If you have questions, please contact me or Mary Tucker.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Dean for Graduate Medical Education

cc: Lisa Catapano, MD

---

**School of Medicine & Health Sciences**
2300 Eye Street NW | Ross Hall Suite 718 | Washington, DC 20037
t 202-994-3737 | f 202-994-1604 | gwgme@gwu.edu | smhs.gwu.edu/academics/gme

**GWU 001122**



**DR. BERGER DECLARATION
EXHIBIT #1**

CCN #15161324  –  Event # 15161324 Public Incident Packet                    Metropolitan Police Department

## CCN #15161324 – PUBLIC INCIDENT REPORT

| REPORT TAKEN DATE / TIME | DISTRICT / PSA | EVENT START DATE / TIME - EVENT END DATE / TIME | INCIDENT STATISTICS | |
|---|---|---|---|---|
| Oct 11, 2015 04:58 | Second District / 207 | Oct 11, 2015 04:11 - Oct 11, 2015 04:59 | | |
| RESPONDING OFFICER | | WEATHER | | |
| HOMERE WHYTE (#10001) – MPD | | Clear | | |

ASSISTING OFFICER (ASSIST TYPE)
YASSINE BAHAMMOU (#9782) (Assisting Officer)

| TELETYPE DATE / TIME | TELETYPE # | WHO NOTIFIED TELETYPE | SHOTS FIRED | SHOTS EFFECT |
|---|---|---|---|---|
| | | | ☐ YES ☑ NO | ☐ YES ☑ NO |

LOCATION REPORT TAKEN
METROPOLITAN CONDOMINIUM, 1230 23RD ST NW, B/T M ST NW & N ST NW, WASHINGTON, DC 20037  Unit: APT 909  Public/Private: Private  PSA: 207  District: Second District

| POSITION (BEHIND,FRONT,INSIDE,SIDE) | LOCATION DESCRIPTION |
|---|---|
| Inside | : @METROPOLITAN CONDOMINIUM |

## REPORTING PERSON

COMPLAINANT-1 (INITIALS)
R-1 A. B.

## PROPERTY & ITEMS

## CCN #15161324 – PUBLIC NARRATIVE

On the listed date and time, the reporting officers responded to the listed location for a noise complaint. Upon arriving to the scene, loud music and talking was heard. The officers knocked on the door for several minutes with no answer. Evenutally the talking and music ceased but the resident of the location refused to answer the door.

DR. BERGER DECLARATION
EXHIBIT #2

CCN #15173157  –  Event # 15173157 Public Incident Packet                                   Metropolitan Police Department

## CCN #15173157 – PUBLIC INCIDENT REPORT

| REPORT TAKEN DATE / TIME | DISTRICT / PSA | EVENT START DATE / TIME - EVENT END DATE / TIME | INCIDENT STATISTICS | |
|---|---|---|---|---|
| Oct 30, 2015 23:34 | Second District / 207 | Oct 30, 2015 23:09 - Oct 30, 2015 23:36 | | |
| RESPONDING OFFICER | | WEATHER | | |
| DIANE BROOKS (#9496) – MPD | | Clear | | |

ASSISTING OFFICER (ASSIST TYPE)

STEVEN BAROCK (#9849) (Assisting Officer)

| TELETYPE DATE / TIME | TELETYPE # | WHO NOTIFIED TELETYPE | SHOTS FIRED | SHOTS EFFECT |
|---|---|---|---|---|
| | | | ☐ YES ☑ NO | ☐ YES ☑ NO |

LOCATION REPORT TAKEN

METROPOLITAN CONDOMINIUM, 1230 23RD ST NW, B/T M ST NW & N ST NW, WASHINGTON, DC 20037  **Public/Private:** Private  **PSA:** 207  **District:**
**Second District**

| POSITION (BEHIND,FRONT,INSIDE,SIDE) | LOCATION DESCRIPTION |
|---|---|
| Inside | : @METROPOLITAN CONDOMINIUM,909 |

## REPORTING PERSON

COMPLAINANT-1 (INITIALS)

R-1 A. B.

## PROPERTY & ITEMS

## CCN #15173157 – PUBLIC NARRATIVE

On the listed date and time, the reporting officers responded to the listed location for a noise complaint. Upon arriving to apt#909 there was audible loud music and talking. The officers knocked on the door for several minutes with no answer. The resident of the location refused to answer the door.

R-1 was advised to notify the reisdential manager.

---

DR. BERGER DECLARATION
EXHIBIT #3



**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

Livingstone, Richard <rliving@email.gwu.edu>

---

## Form submission from:

**The GW Neighborhood** <noreply-cms@gwu.edu>
To: rliving@gwu.edu

Sun, Oct 11, 2015 at 5:07 AM

Submitted on Sunday, October 11, 2015 - 5:07am
Submitted by anonymous user: [[2601:143:8201:96aa:f54d:ad58:d6aa:3d4e]]
Submitted values are:

Name: Amalia Bruchez
Telephone: 202-735-5418
Address: 1230 23rd St. NW #908, 20037
E-Mail: ambruchez@health-mgt.com
Was your concern reported to the GW Police Department? No
Was your concern reported to the Metropolitan Police Department (MPD)? Yes
Date of concern/incident? 10/11/2015
Time of concern/incident? 4:00 am
Location/Address of concern or incident? 1230 23rd St. NW #909 20037, The
Metropolitan Bldg.
Is this location a...? Apartment Building
What type of incident are you reporting? Noise Complaint
Please describe with specificity the reported behavior or concern: This
neighbor plays loud, disturbing music at all hours of day or night. I believe
other individuals have called the DC Metro Police, they responded promptly,
knocked on her dor for about 5 minuites but she refused to open the door. She
turned the music down when they knocked, but about 15 minutes after they
left, the music started again, Obviously this person has no regard for the
police or any consideration of her neighbors, She has been drunk or drugged
in the hallway before and became abusive when confronted
Please provide the full names of individuals, if you know them, involved in
the reported behavior or concern: Stephanie Waggel, I understand that she is
a "Resident" but don't know what department
Do you have photographs that support your concerns?

The results of this submission may be viewed at:
http://neighborhood.gwu.edu/node/757/submission/191

Meeting w/ Stephenie Waggel
          PG 2 Resident, Psychiatry
Wed, Nov 18, 2015

Present: Dr Jeffrey Berger
         Dr Stephenie Waggel
         Mary Tucker

DR. BERGER DECLARATION
EXHIBIT #5

GWU 003156

~~Meeter~~

Eval of faculty Dr Malek
was given to
Perfect run check on
evals for psych

Step 3

brought Dad
attorneys She had someone with her
JB not comfortable
looking at it as someone who has best in
mind for our trainees

med school here
successful exp
issues? No - Class council,
good grades on general ISCOPES
international work laser for plates was used in
Olympics

matched at GW
internship happiest time of life
when did things unravel
~~top pas~~ JB has seen record, has spoken to PD
knows that she was ill w/ cancer
saw instances from medicine
only thing reported is final eval & adverse actions
When did physical symptoms occur
off & on 4th yr, ~~nd~~ nothing found
became more frequent
Jan 15 - got worse       pain
found new dr. had to have surgery
was not cancer that was issue
issue -- couldn't take time off - needed MRI
residents gave her a hard time

GWU 003157

disruptive to teammates

EEO office -- can make a formal plan
to work things out

she went to EEO

her 3rd yr res refused to see pts

Worked 120 hrs - 20 hrs a day as an intern
reported it to chiefs
worked harder because she had taken time. off

EEO - asked deals w/ ADA can request accom.
Went to ACGME — over the summer, told too them
dept did not give her options

FMLA did not work here 12 mos for FMLA
we cannot consider cend unless you have
plan in place -- have to hold her to
same standards until get the plan from those—
Cant give special consid w/o formal plan

July LOD — what is your ?
— lots of people get them  formal notice there is
about a problem

explained purpose of LOD - enable res to improve &
move on

SW - constantly asks for feedback, appreciates LODs because
they address problem & suggest how to fix

JB - On call that ended up on Roche Cause Analysis
was supposed to meet w/ Dr Dwyer     GWU 003158
didn't happen ,  new letter  re-iterated

JB - No plan that includes co-residents, Should be her
improvement plan, done with faculty
& if agreed, work up family not res
LOD states not on track to complete PbD year
she was told this in Aug

JB CCC met

SW who is CCC? - members of Psych dept

JB Dr fac + leading bar reviews each trainee
every 6 mos - mandatory

SW Milestones say she is on track can't give her
reason why she is not on track
at Semi ann mtg will have

JB Saw responses to 1st LOD v to 2nd one
when gets feedback
JB does not have sense She will be working on improvement
plan

SW what if she had tried to talk to him
+ he has not responded

SotPoP find diff person to work with

SW - feels everyone is biased against her

JB - no reason to think that way
we make investment if we say she is not on
track we have a formal impact
we are putting money on you...

CCC + PD saying they care about you

They are putting lots of effort into working
with her

GWU 003159

hope is she will get thru + graduate

Sw fine w/ complying with things
    Dr D yes only replied 2x when meet did not
        talk about LOD
            90% of what is in letter is false
            talked about class
    telling her to fix
    — never apologized for having to take 1/2 for dr appt
    — called at home

— Counselor called, not amenable on phone
— if need too evidence
    Point is to get better + work w/ people
    List of people is growing
    LOD - 40% med known
        the interpersonal Skills - outlyer
    must be adaptable, willing to learn
    daily goal she has to do something
        that will make them not mad at her
        goes w/ person will be most mad at her
JB her responses need work
    multiple conflicting plans
        trying to make everyone happy

JB frustrated because she feels she has
    exhausted all efforts

GWU 003160

JB mtg w/ LOD Dyer
  other scenarios when wanted time off for
    boards
    needs better fit for someone else for her
    to meet with.
SW does not want to fight. will do whatever it takes

JB needs plan that is clear
  SW - Dr Dyer very diff to meet with her
  JB - happy to help her find someone

  JB - needs to work to get back on track
  SW - wants to do what she need to do
  JB needs to accept some ownership
    formalizing plan for accomm. @ EO
  MT will get her info
  SW sounds good, practical?

  JB - complaint via email from someone in
    community - from her neighbor sent to Dr El-Bayoumi
  SW  neighbors fight all the time. GW students all fight
    everyone fights
  JB - no substantiation of claim. not related to
    employment, is there any validity to it
  SW had party, played music, they are angry neighbors
    have done this to everyone
  JB sleeping in call room during rounds
    retires for long time advan—

GWU 003161

JB - do you have substance abuse issue
SW takes pan killers ha 1/2 bottle left from surg
~~JB~~ SW -
Good opp to hear from her
JB fitness for duty test before coming back to work
    comfortable not necessary to pursue this route
needs to release frustrat + anger
    program cares + counseling on me
    + I appreciate ~~that~~

1 - no buddy call
2 - no Dr Dyer
3 - has missed didactics
4 - re-start in July w/ CA2 didactic schedule
    work on that w/ Lisa C.
    will need to modify training
JB leave of absence till July ?
        to get out + take time till healthy
    resolve physical health
    fresh start in July
JB - diff training program ?
    starting fresh
    used example of anesth rea.

① can work with us ?
① take leave off ?
③ diff program ?
④ termination - not best choice
    not at this point yet

GWU 003162

Need intervention Now

Has had attorney following / watching

RCA - was she interviewed ? NO

SW [illegible] there is

excellent pt care

Covid [illegible] : did great [illegible] -

2 LODs -

1st LOD correct late for work

2nd - LOD correct - if she keeps talking

to her mind pretty [illegible]

[illegible]

[illegible] time in [illegible]

- go w/ program

- we will try to help you

-

SW what if she makes a mistake ?

- Can't think because [illegible]

- take one day at a time

- [illegible]

- when this is [illegible] we will be fine

Email EEO info

narrow email focus dont send to so many people - keep it simple, [illegible] should be point person

feels she is being harassed / abused
- called + texts all hrs of night
- Dr Malik spreading rumors & lies to Dr Crone
- ~~Dea~~ dont realize these are lies slander
- faking cancer
- prepant on drugs
- gossip - jvrote to
- admin is gossiping about her
  → Khen Khen, Kella
     ~~Gov~~ Who is admin? She cant say
     Jason + Darlinda - Chiefs
        Greene - now attending
  reprimanded for things She didnt do
  ask who reported her, no one admits
     gives circular runaround
     cant figure out who's punishing her
  stressed low quality of life
  people constantly talking about her
        harassing her

JB have only Dr Cat . communicate
SW - Dr C is part of it

Nothing:
1. No buddy call, faculty supervisors
2. replace Dr Dyer, IB will request
3. Yearly comm thru Dr C, minimize
   communication, have Dr C as point person!
   to whatever extent possible
   ↓ # people involved

SW will commit to
① if possible  She will write 600 word paper
GOAL: graduate from program on time
      (may not be possible) GOAL Shd be to
      graduate
   our commitment is to her to have her graduate
   get her thru program

Lisa working on grad dates
   related to didactics
plan to makes sense
No answer yet to PGY 3 promotion
② EEO
③ needs time off for dr visits
   EEO v. FMLA

meet up here to figure out the plan — for getting
back                                  back to work

GWU 003165

Lisa:

Here's a summary of meeting.  Overall went well - I think Stephanie and I left the meeting hopeful.
I told her that you spoke very highly of her as a hard-working resident who cared about patients.

Discussed her record, LoDs, and improvement plan. Also discussed email from community member.

Explained that the goal is graduation.  Noted that she should not be so focused on time - if there is a delay or prolongation of training, that actually represents the program investing in her as it costs GW to keep trainees beyond their CMS-approved training time.

Plan:
1. Stephanie will accept some responsibility for her situation
2. Stephanie will work to successfully improve according to the plan laid out in the LoDs and is interested in specific actions that she can take to continue to improve.
3. Stephanie will get information from Mary Tucker to contact the Equal Employment Opportunities Office at GW and work on a plan for accommodation.  I told her that legally, you are not permitted to give her any special treatment for missing time, etc, without such an accommodation.  Stephanie is going to look into that.
4. Stephanie will not report for a "fitness for duty evaluation."  After discussing the complaint from the member of the community, it was clear that this complaint did not merit impinging on her employment with us at GW and represented a community matter that should remain as such.  Stephanie denied having a substance abuse or impairment problem.  She said that she would not report to work within 10 hours of requiring a pain medication.
5. I am requesting that you offer a new faculty member to meet with Stephanie to work on her LoDs (Not Dr. Dyer).
6. I am requesting that you minimize the residents, including chief residents, in the process of oversight and evaluation of Stephanie.  I understand that call changes require chief involvement.
7. Ranjeet will look into our MedHub system and report to me to confirm that the new system is indeed confidential for trainees who evaluate faculty.

Next steps:
1. Stephanie will reach out to you to meet.  Hopefully tomorrow (Thursday).  At that time, the corrected LoD can be given and you can discuss the plan for didactics and a LoD for time missed.  I am hopeful that some sort of compromise plan can be worked out for her that is acceptable to all parties.  Please reinforce the notion that we are investing in her to graduate; finishing "on time" shouldn't necessarily be the goal in light of important time missed.
2. Please clarify with her the status of her last rotation that she took time off for medical leave (and step III).



DR. BERGER DECLARATION
EXHIBIT #6

GWU 002212

We discussed options:
1. Return to work and comply with Improvement Plans.
2. Take extended Leave of Absence and start again as PGY2 in July 2016.
3. Seek another program for a fresh start.
I mentioned that at this point, all three are viable options.

Thank you for your efforts.
-Jeff

GWU 002213

To:
Lisa Catapano;

Cc:
Jeffrey Berger <jberger2@email.gwu.edu>;

Wed 11/18/2015 7:18 PM
Inbox

You replied on 11/19/2015 8:03 AM.

Dear Dr. Catapano,

I have just returned from a highly productive meeting with Dr. Berger. He had asked that I meet with you when you are available to talk about my return to work and formulating a plan for the future. I am willing to work toward improvement, as long as the plan is clear. My goals are to be the best doctor I can be, take care of my health, and avoid further misunderstandings with the administration as this has caused a recent decline in my quality of life. The following are some solutions so that I can meet these goals:

1. Sort out my periodic leave for follow up appointments. This is currently being handled by the Standard and the benefits department and filed as FMLA leave. I was given the option of contacting the EEO as well.

2. Find a new adviser to work with on my improvement plan as I was having difficulty meeting with Dr. Dyer.

3. Filter information through one individual so that each time I need approval or have a question I do not get directed in circles. Ideally, I would like to hear about issues through the person who has the issues and not their messenger. I am hoping you could be the point person for these emails.

4. I will strive to not be so focused on what I believe was detrimental to me in the past. I stated that although I do not agree with the majority of the information in the two LODs, I will move on from that and work to make improvements.

5. Dr. Berger's goal is for me to graduate. My goal is to graduate on time. I would like to straighten out a number of things in this regard. My lawyer is also looking into this. I know there have been residents who have taken time off for medical reasons and have graduated on time. I also am still confused as to why I would have to repeat an entire month due to taking a licensing exam I was approved for and taking sick days I followed the protocol for and had doctor's notes for.

6. A check on the evaluation system will be conducted to see how it was Dr. Malik got a hold of my evaluation of her. I have been trying to resolve this issue for months and I am hopeful that this check will allow me to feel comfortable completing evaluations again.



**DR. BERGER DECLARATION**
**EXHIBIT #7**

GWU 002209

7. It is still unclear to me what the issues are with the Aug 25th call. I have received a large amount of conflicting information. I believe it would be helpful for me to see the information from the RCA. I also would like to point out that this LOD about my meeting with Dr. Norris was said to be written before the meeting with Dr. Norris even took place. This meeting was rescheduled for a later time. I am wondering who was made aware of the details of that meeting. I can bring you the document that explains what was discussed in the meeting. It does not reflect the contents of the LOD.

8. I am willing to accept feedback. As we stated at the retreat, our class would appreciate feedback in a timely manner. Dr. Berger provided me with a great strategy for taking feedback given that my concern has been that my feedback has been conflicting. He stated that there will be people asking for different things and progress changes day to day. I will pick out the best "nuggets" of feedback to formulate the best strategy for improvement. I also think it would be helpful to receive clear and specific feedback. For example, I was told to "improve my organization." What I would find more helpful for example: "Morning report presentations were not clear. You should organize the signout sheets in a way that covers the main points that people want to know in morning report so that you can quickly transition from signout to morning report." I would certainly put in the effort to do what is requested as long as I can understand what is being requested and if completing these tasks requires working with another person, I would request that person be someone who is willing to work with me.

9. Condo owners don't seem to like condo renters in their building. My retired neighbors complain to the condo board about everything from cars being parked out front to dogs barking to babies crying to people having parties. This neighbor has even kicked my car door in because he did not like where I was parked. They have never spoken to me directly but seem to be angry that the majority of the people on my floor are college students and also have parties. I'm considering moving. I do not have a problem and I am hoping this email about me has not been circulated.

10. I am no longer to be on buddy call. My "buddies" are my peers and seem to have the same knowledge and experience as me. I have not found this to be an educational or helpful experience. The first two buddies did not offer help or feedback and left hours before the call shift was over. I was told to not disclose this information to you so that they wouldn't get in trouble, however, this is at a cost to me as I was not receiving any kind of support during my "buddy call." I feel it would be more helpful to learn from an attending. If I am overwhelmed on call, it seems policies were sent to the social workers stating they have to see every 3rd patient (which when I was on there were not) and email was sent saying if the backup resident is needed they should come in (which this person did not when I needed her) after my difficult call night. Hopefully people now understand these policies.

Please let me know when you have time to meet. I look forward to making a plan with you.


Sincerely,

Stephanie


--
Stephanie E. Waggel M.D, M.S.

GWU 002211

Stephanie:

Please note that there are a few things that you wrote that don't jive with my intent from our meeting:

1. You should not be so forceful in dictating your plans with Dr. Catapano.  Your tone should soften.

2. Please do not reference your attorney going forward, particularly to the people in your Department.  It does not make for a safe working environment. It is your choice to continue to pursue this avenue.

3. Your point in number 5 is not consistent with our conversation.  You may appeal the decision to delay your promotion - as noted in the most recent Letter of Deficiency - to the PGY3 level, or a decision to deny credit for a rotation (as may be the case that you mentioned at our meeting) according to our Academic Improvement Policy.  If you choose to appeal, we will follow our GME policy.  You can easily find this policy on the website.  Note that there is a 14 day time limit to appeal following notification.

4. Point 7 is inconsistent with point 4.

5. I believe you misunderstood my point about feedback.  I stated that trainees get feedback all the time and don't necessarily appreciate the value of the feedback.  Later practice will naturally incorporate feedback (best-practice) from all of the faculty.  I did not suggest that the current feedback you were getting was in any way deficient.  On the contrary, I was suggesting that it is up to you, the trainee, to extract value from your interactions with your faculty and advocate for yourself as an adult learner.

6. A decision about "buddy call" is Dr. Catapano's to make.  I made the recommendation to her.  The rest of your comments are not necessary for your continued development.

I really had a good feeling from our meeting and I know that many members of your Department believe that you can succeed in completing the program.  Remember that we are investing in you - delaying promotion or asking you to repeat a course are significant costs that reflect our commitment to your success.  Doing your part is going to require some effort, and I am hopeful that you will succeed.

-Jeff
Assoc. Dean for GME


Waggel, Stephanie <swaggel@email.gwu.edu>


Reply all



DR. BERGER DECLARATION
EXHIBIT #8

GWU 002208

Requesting a Review of a Reportable Action

12/3/15

To whom it may concern,

I am a PGY2 psychiatry resident writing to request a review of the decision for me to repeat the course Introduction to Psychodynamic Thought taught by Dr. Cheryl Collins. I was not given advanced notice of failure or an opportunity to make improvements in this course. This decision negatively affects my progress in the psychiatry residency program by preventing me from being assigned a psychodynamic supervisor which is needed to continue with psychodynamic cases this year.

I was not given notice that I may fail the course until after the decision was made. On Nov 7th, I received an email from Dr. Collins stating that I would be assigned a psychodynamic supervisor indicating that I would be advancing.  On Nov 10th, I began administrative leave due to a situation that was out of my control. I was instructed by my program director to not attend lectures during this time. Because of this extenuating circumstance, I was told that I would have the opportunity to make up the assignments missed during my leave. When I was informed I may return to work the evening of Nov 19th, Dr. Collins informed me that I would not be assigned a psychodynamic supervisor and that I would not be advancing.

I was not given an opportunity to improve on my deficiencies or have my final assignment in this course evaluated. On Nov 7th, the email from Dr. Collins stated that I review articles to help with my final psychodynamic formulation. I worked hard to gain a deeper understanding of the material. When I returned from administrative leave on Nov 19th, my program director sent me an email at 6:00pm stating I could have some time to meet with my instructors, finish the remaining assignments, and then my course evaluations would be finalized. Three hours later at 9:00pm, Dr. Collins informed me she would not be grading my final psychodynamic formulation as she no longer had time. I was not able to show my improvement in psychodynamic formulation or what I had learned from studying the articles as my final psychodynamic formulation has not been graded. I can provide the emails referred to and any other information that may be needed. Thank you for your consideration.


Sincerely,

Stephanie Waggel



**DR. BERGER DECLARATION**
**EXHIBIT #9**

GWU 003235



**PSYCHIATRY & BEHAVIORAL SCIENCES**
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org

HAND DELIVERED

Stephanie Waggel, MD

Department of Psychiatry

The George Washington School of Medicine & Health Sciences

Re: Letter of Deficiency, Notification of Reportable Action

December 10, 2015

Dear Dr. Waggel:

This Letter of Deficiency follows your earlier Letter of Deficiency dated 11/19/15, in which you were informed that based on insufficient competencies in Patient Care, Interpersonal Communication Skills and Systems-Based Practice, that you will not be promoted to the PGYIII year on July 1, 2016. You are receiving this current Letter of Deficiency under the current policy for academic improvement for Graduate Medical Education at the George Washington University. According to a review of your clinical standing by the Department of Psychiatry Clinical Competency Committee (CCC), you have shown deficiency in the competency of Medical Knowledge.

As per Dr. Cheryl Collins's email to you on November 25, 2015, as well as phone conversations between Dr. Collins and you on November 24 and November 25, 2015, you did not demonstrate sufficient competency in her Psychodynamic Theory course to pass it and to progress to having an individual psychotherapy patient assigned to you this month. As a result, you will not move on to Dr. Zinner's Psychodynamic Psychotherapy course. Dr. Zinner does not permit residents who have not demonstrated sufficient competency in Psychodynamic Theory to participate in his course, part of which includes the assignment of psychotherapy patients.

Additionally, in Dr. Griffith's Neuroscience course, you received failing grades of 33 on both of the first two exams. In Dr. Griffith's email to you dated November 25, 2015, he stated that you "did not acquire the needed level of knowledge needed to move forward. You need to repeat the course next year, which is consistent with what residents have been required to do in the past when they did not show evidence of having learned the material."

Consequently, you will be required to repeat Dr. Collins's Psychodynamic Theory course next year. If you pass the course at that time, you will be permitted to participate in Dr. Zinner's Psychodynamic Psychotherapy course, and will be assigned a psychotherapy patient and a supervisor.

1



DR. BERGER DECLARATION
EXHIBIT #10

GWU 001231

In the meantime, if you would like to further your understanding of psychodynamic theory and better prepare yourself to be successful in Dr. Collins's class next year, you are welcome to contact her and request extra reading materials.

You will also be required to repeat at least the first part of his course next year in which the content of the first two exams is covered. Pursuant to your conversation with Dr. Griffith on November 19, 2015, he is allowing you to take the next exam on December 17 before determining whether you may continue in the class this year, or withdraw from the class and repeat it in its entirety next year.

The Medical Knowledge deficiencies outlined above further demonstrate that you are not prepared to be promoted to the PGYIII year in July, 2016. In accordance with your Letter of Deficiency dated November 19, 2015, , you will be required to continue in PGYII clinical rotations when the next academic year starts, and, as referenced above, repeat the PGYII didactic courses. You will be eligible to be promoted to PGYIII standing at any time during the academic year, once the Clinical Competency Committee determines that you have satisfactorily completed all of your PGYII rotations, and, at least, successfully repeated both Dr. Collins's Psychodynamic Theory course and the first section of Dr. Griffith's Neurobiology course.

Please note that, given the way our program is structured, any resident who is promoted to PGYIII standing significantly after the academic year has started is required to continue in inpatient rotations until the following July.

The GW Academic Improvement Policy can be found at the following link: http://smhs.gwu.edu/sites/default/files/GW%20GME%20Academic%20Improvment%20Policy.jb.6.27.pdf.

According to this policy, if you wish to appeal your non-promotion as set forth in your Letter of Deficiency dated November 19, 2015, your appeal must be submitted no later than December 11, 2015. The appeal of the course failures must be submitted no later than 14 days after receipt of this Letter.

A review and update of your progress will be reported at the next CCC meeting and will be reviewed in your next Semi-Annual Meeting with me. If you have any further questions, please feel free to discuss them with me.

Lisa A. Catapano, MD, PhD

Director, Psychiatry Residency Program

GWU 001232

 **Gmail**                                    Stephanie Waggel <sewaggel@gmail.com>

## Fwd: Appeal
2 messages

**Waggel, Stephanie** <swaggel@email.gwu.edu>                Mon, Jan 11, 2016 at 12:51 PM
To: Stephanie Waggel <sewaggel@gmail.com>

———— Forwarded message ————
From: **Waggel, Stephanie** <swaggel@email.gwu.edu>
Date: Wednesday, December 23, 2015
Subject: Appeal
To: Jeffrey Berger <jberger@mfa.gwu.edu>

Dear Dr. Berger,

I have attached my appeal for the course failures to give to Dr. Cioletti. Can I contact her directly? Have a nice Holiday.

Stephanie

On Thu, Dec 17, 2015 at 10:47 AM, Waggel, Stephanie <swaggel@email.gwu.edu> wrote:
Thank you

On Thursday, December 17, 2015, Jeffrey Berger <jberger@mfa.gwu.edu> wrote:

Stephanie:

A reviewer has been designated for your Appeal of the 2 Reportable Actions: Non-Promotion and Course Failures

The reviewer will be Anne Cioletti, MD. She is an Internist with our Primary Care Program at GW. The Psychiatry Coordinator is preparing copies of your file for her and for myself at this time. I am also awaiting your brief statement of appeal to describe your reason for appeal to be included with the file for review. Dr. Cioletti and I will require some time to review the file in addition to the ACGME Program Requirements over the holidays and will begin interviews with you and program leadership in January.

Should you have any questions, please do not hesitate to contact me.

Thank you,

-Jeff

Jeffrey S. Berger, MD, MBA
Associate Dean for Graduate Medical Education & Designated Institutional Official

DR. BERGER DECLARATION
EXHIBIT #11

The George Washington University Mail - Final grade                    Page 1 of 1



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Tucker, Mary <mtucker@email.gwu.edu>

---

## Final grade
1 message

**Waggel, Stephanie** <swaggel@email.gwu.edu>                    Wed, Jan 13, 2016 at 1:07 PM
To: Jeffrey Berger <jberger@mfa.gwu.edu>
Cc: Mary Tucker <mtucker@gwu.edu>

Dear Dr. Berger,

Would you be able to add to my grade appeal a new piece of information I was just made aware of? I
received an 82% on my cumulative final for the neuroscience course they chose to fail me in. Please also
add the fact that this was one of the highest scores in the class.

Thank you,
Stephanie

---

Stephanie E. Waggel M.D, M.S.



**DR. BERGER DECLARATION
EXHIBIT #12**                                      GWU 001713

## Victoria H. Anderson

| | |
|---|---|
| 'om: | James Griffith |
| **Sent:** | Wednesday, January 13, 2016 3:33 PM |
| **To:** | Jeffrey Berger |
| **Cc:** | Lisa Catapano |
| **Subject:** | Re: Final grade |
| **Attachments:** | 2015 Clinical Neurosciences Exam Scores.docx |

Jeff, this is not an honest portrayal.  I've attached the exam grades for the whole class for you to see where Stephanie's fits.  Stephanie's grade on the last exam was middle of the class, with all the grades clustered (class average was 80, Stephanie made 82).  This was not a cumulative exam, but an exam on a single section of a course-- the third of probably six exams over course of the year.  I have not prevented her from sitting in the class, but think she should re-do the whole course, which we did with a similar analagous situation with a different resident last year.

Griff

James L. Griffith, M.D.
Leon M. Yochelson Professor and Chair
Dept. of Psychiatry and Behavioral Sciences
2120 L Street, N.W.
~uite 600
 Jashington, DC 20037
Phone:    (202) 741-2879
FAX:       (202) 741-2891
E-Mail:    jgriffith@mfa.gwu.edu
Web:      www.gwupsychiatry.org

**From:** Jeffrey Berger
**Sent:** Wednesday, January 13, 2016 1:25 PM
**To:** James Griffith
**Cc:** Lisa Catapano
**Subject:** Fw: Final grade

griff:

is the below email accurate (before I add it to her file for the appeal of the failed course)?

if so, has a decision been made to allow her to continue on in the course and only redo the first part?

 ff



**DR. BERGER DECLARATION
EXHIBIT #13**

GWU 001712

# 2015 1ˢᵗ Clinical Neurosciences Exam

**Average Score =   65**



Stephanie Waggel  33

**Average Score =   65**
(77, 73, 70, 70, 70, 63, 33)

## 2015 2ⁿᵈ   Clinical Neurosciences Exam

**Average Score =   64**



Stephanie Waggel  33

REDACTED

**Average Score =   64**
(91, 76, 67, 64, 58, 33)

GWU 001714

**2015 3rd  Clinical Neurosciences Exam**

**Average Score =     80**



REDACTED

Stephanie Waggel     82

REDACTED

**Average Score =     80**
(86, 82, 82, 80, 80, 78, 72))

**PRIVILEGED AND CONFIDENTIAL**

Resident Request for Review of Reportable Action

Resident:  Stephanie Waggel, MD, PGY 2, Psychiatry
Reportable Action:  Non-promotion to PGY 3; Denial of credit for required courses

Physician Reviewer:  Anne Cioletti, MD, Assistant Professor of Medicine, Vice Chair, GME

Interviews conducted by Dr. Anne Cioletti for the Resident Request for Review of the
Reportable Action in accordance with GME Academic Improvement Policy

---

**January 20, 2016**

Present at meeting: Dr. Jeffrey Berger, Associate Dean for GME; Dr. Anne Cioletti, Physician
Reviewer; Dr. Lisa Catapano, Program Director, Psychiatry; Dr. Lork Kels, Associate Program
Director, Psychiatry; Ms. Mary Tucker, GME Director.

Dr. Berger opened the session, stating that per our GME Academic Improvement Policy, this
interview is part of the appeal requested by Stephanie Waggel as a result of the two reportable
actions taken by the residency program.  Dr. Berger reviewed the policy, including the
requirement for structured feedback to the resident and the Letter of Deficiency with the
opportunity for a resident to correct identified deficiencies.  He explained that the two reportable
actions are the determination that Dr. Waggel is being denied credit for two psychiatry courses
and that the Psychiatry Clinical Competency Committee (CCC) has determined that she should
not be promoted to the next level of training at the end of the academic year because of clinical
deficiencies.  He clarified that courses in psychiatry are counted as rotations, so under our policy,
failure of the courses and denial of credit would be considered a reportable action.

Dr. Berger went on to explain in detail the requirements of the policy, including his role and that
of Dr. Cioletti, who he has appointed as the neutral physican reviewer.  Her role is to determine
whether Dr. Waggel was afforded due process according to the GW policy, which requires notice
of the deficiency, the opportunity to cure the deficiency, and a reasonably made decision by the
program to deny credit for the courses and not to promote Dr. Waggel.

Dr. Berger explained that Cioletti has been given Dr. Waggel's file for review and that in the
meeting with Dr. Waggel she will inquire about extenuating circumstances, such as illness and
drug use.  She may also consult with others (such as program directors) as needed, and finally
relay her determination to Dr. Berger.  If either the resident or the program director disagrees
with her decision, either can request a final review by the Senior Associate Dean for MD

1



**DR. BERGER DECLARATION
EXHIBIT #14**                    GWU 002481

Programs, Dr. Richard Simons, who will review the process to ensure that the requirements for due process according to the GME policy were met.

Dr. Cioletti began by asking Dr. Catapano about the expectations for the psychiatry courses. Dr. Catapano responded that residents must attend 70% of the classes and that some have reports and exams that are graded. The Neuroscience course, conducted by Dr. James Griffith, has 3 exams in the first half of the academic year. Two exams were the basis for the reportable action. Dr. Waggel failed the first two of these and scored in the median range for the third. Failure of the course does not mean you have to repeat the entire year. The Psychodynamic theory course, under the direction of Dr. Cheryl Collins, also requires reports, and attendance and participation are counted. Residents who demonstrate competency in this course are assigned a psychotherapy patient. Dr. Catapano explained that in order to progress to the next course (Dr. Zinner's Psychodynamic Psyhotherapy course) the resident must pass the course and be assigned a patient. The 3rd and 4th year of psychiatry training are all psychotherapy, so having to repeat the course impacts on the resident's promotion date. Dr. Cioletti asked if residents have failed the course in the past. Dr. Catapano responded that two years ago a resident failed the course, but then went out on extended leave and returned the following July and repeated the course.

Department policies are in place that require 70% attendance and outline the expectations for passing the course and for participation. Residents can see the course outline a year in advance and it is put on the Google calendar by the residency coordinator. Residents have a full day of protected didactic time. Dr. Berger inquired about ACGME requirements and it was reported that the program requirements mention categories of didactics but there is no instruction regarding pass/fail. He stated that as a follow-up a copy of the syllabus for each of the courses should be provided. (Note: this was emailed to Dr. Berger by Dr. Waggel)

Dr. Cioletti then discussed the issues with patient care, as outlined in the first Letter of Deficiency. Dr. Catapano reported that she received emails expressing concerns from Dr. Malik (Inova Fairfax) in July and in January. There were additional concerns in February and March from attendings. Dr. Waggel believed she was receiving positive feedback and did not appear to be hearing criticisms. On February 10, she could not be located at Fairfax. In March, the medicine attendings expressed concerns. When the concerns were brought to Dr. Catapano's attention, she met with Dr. Waggel and asked if there was a medical issue. Dr. Waggel stated this was private. In March, Dr. Waggel brought her MRIs to rounds an asked the residents to read them. She missed a shift in the ER while on that rotation. Per Dr. Catapano, she took 2 weeks leave in May, 2-3 weeks in July, administrative leave in November for 3 days – 1 week. She has taken random days for doctor appointments and has weekly psychotherapy and genetic counseling. This is recorded on a spreadsheet kept by the coordinator.

Note: per GME records on MedHub and University HR, Dr. Waggel was on approved medical leave 7/20-8/3/15 and FMLA 10/26-10/30.

GWU 002482

Dr. Catapano reported that Dr. Waggel received feedback at her semi-annual evaluation held in late August/early September. She was given a summary sheet and notes were discussed with her. The July 15 Letter of Deficiency was delivered August 15 (she had been on leave). It detailed deficiencies in Professionalism and indicated that he was below level for the Milestones. Drs. Malik and Crone (both Inova Fairfax) are members of the CCC. It was noted that Dr. Waggel never completed an evaluation on MedHub for Dr. Mailk.

The most concerning incident occurred last fall, resulting in the RCA. She was given very direct feedback by Veronica on 6 South. Dr. Waggel continued to take intermittent time off. In September she was assigned side-by-side/joint/buddy call. After the RCA she was put on attending-supervised call and received the Letter of Deficiency. During her CNMC rotation she took home call, which did not entail as much responsibility. Beginning January 1, she was taken off the call schedule.

Dr. Catapano reported that Dr. Waggel was notified of her deficiencies regarding clinical duties multiple times. She is not progressing as far as the Milestones and she is not able to fit into the call pool without supervision. She has not satisfied the requirements of the Letters of Deficiency to the satisfaction of the attendings or the CCC. She is not focused on them. She is not on track with her peers clinically. At this time it is the decision of the CCC that she is not able to take independent call.

Dr. Waggel had a medical condition but received support from the program and the opportunity to take time off to take care of herself. She was encouraged to take extended time off until she recovered, but she did not do so. The program has tried to be fair and ethical. Dr. Waggel is very stressed and defensive when given feedback. She believes the criticisms to be unfair. Dr. Catapano reported that Dr. Waggel was dishonest in stating that she had permission from her to attend Dr. Zinner's psychotherapy course. In addition, she misunderstood the grading of the neuroscience course, believing that the final test was cumulative. When she was taken off the call schedule, she went to the ER as a patient, where she was referred to Dr. Babak Sarani, one of the Resident Ombudspersons. She stated that she never received the Letter of Deficiency taking her off the call schedule.

3

GWU 002483

**PRIVILEGED AND CONFIDENTIAL**

Resident Request for Review of Reportable Action

Resident:  Stephanie Waggel, MD, PGY 2, Psychiatry
Reportable Action:  Non-promotion to PGY 3; Denial of credit for required courses

Physician Reviewer:  Anne Cioletti, MD, Assistant Professor of Medicine, Vice Chair, GME

Interviews conducted by Dr. Anne Cioletti for the Resident Request for Review of the
Reportable Action in accordance with GME Academic Improvement Policy

**January 21, 2016**

Present at meeting: Dr. Jeffrey Berger, Associate Dean for GME; Dr. Anne Cioletti, Physician
Reviewer; Dr. Stephanie Waggel, PGY 2, Psychiatry; Ms. Mary Tucker, GME Director.

Dr. Berger began the meeting with a review of the GME Academic Improvement Policy,
including the requirement for structured feedback and Letters of Deficiency.  He explained that
the purpose of this interview was to provide an opportunity for Dr. Waggel to be heard and to be
afforded due process in response to the reportable actions taken by the Psychiatry program that
include non-promotion to the PGY 3 level and denial of credit for the Neuroscience and the
Psychodynamic Theory courses.  He explained that courses in psychiatry are counted as
rotations, so under our policy failure of the courses and denial of credit would be considered a
reportable action.

Dr. Berger went on to explain his role according to the policy and the role of Dr. Anne Cioletti,
who he appointed as physician reviewer for this appeal.  He explained that Dr. Cioletti was given
Dr. Waggel's file for review and that her role was to meet with relevant individuals, consider
extenuating circumstances, and determine if Dr. Waggel received notice and the opportunity to
cure the deficiencies and if the decision made by the program director was reasonable.  Dr.
Cioletti will relay her decision to Dr. Berger who will notify Dr. Waggel and Dr. Catapano.  If
either of them does not agree with the decision, a final appeal may be made to Dr. Richard
Simons, the Senior Associate Dean for MD Programs, who will then review the process to
determine if it was followed according to the policy.

Dr. Cioletti began by recognizing that Dr. Waggel has had a difficult semester.  She stated that
she would be reviewing the courses and then the promotion decision with Dr. Waggel.

Dr. Cioletti asked Dr. Waggel about her understanding of the requirements for passing the
courses.  Regarding the Neuroscience course, Dr. Waggel stated that she was aware that there

<div style="text-align:center">1</div>



**DR. BERGER DECLARATION**
**EXHIBIT #15**                                GWU 002484

were exams but that the course requirements did not state that a certain score was needed to pass. She took the first exam post-call. She asked how much the score counted for and was told by the residency coordinator that it did not count. She stated that she did not study for the Neuroscience course because she was studying for Step 3. If she had known she needed a certain score, she would have studied. She did not take the test with the rest of the class and was not aware that she had done worse than the other residents. She was given the first test back, but not the second. She met with Dr. Griffith about her score to ask if she could retake the test. When asked by Dr. Cioletti, Dr. Waggel stated that she feels that if she had taken time to study she could have scored better. She took the second test in October. She stated that she believed that the scores were cumulative and that by doing well on the third test she could pass the course. Dr. Berger relayed that he had followed up with Dr. Griffith about this and that he was told that the exams are not cumulative. The program is saying that she scored poorly and she needs to repeat the course; the program is not saying that failing this course is related to non-promotion. Dr. Waggel can go back and repeat the first half of the course and this will not affect her PGY level.

Dr. Cioletti asked Dr. Waggel what she needed to do to pass Dr. Collins' Psychodynamic Theory course. Dr. Waggel responded that there were articles assigned every week and that residents had to write formulations and present patients. She received good feedback that seemed on par with the rest of the class. On November 7th she was told that she would get a psychodynamic supervisor, on November 10th she was on leave, and on November 19th she was told that she had failed. Dr. Cioletti asked about the attendance requirement. Dr. Waggel reported that this was not on the syllabus but that she took pictures of the attendance sheets. When asked if she remembered how many attended, Dr. Waggel said she did not remember. She also stated that she had issues with the chiefs on call the night before didactics every week. Dr. Cioletti told Dr. Waggel that the expectation for attendance was 70% of the sessions and that there was concern that she had missed a number of classes and a formulation assignment. Dr. Waggel stated that she did not receive feedback about the second formulation, that she was prepared for class and read the articles and assigned readings and contributed to class like the other residents, but that Dr. Collins refused to allow her to speak in class. After notifying her that she had failed the course, Dr. Collins told Dr. Waggel that she would not grade the third formulation, that she did not have time to do this and this was not up for discussion.

Dr. Waggel felt that she had attended enough classes and that her formulations were acceptable. She was not permitted to submit the third formulation. Dr. Waggel admitted that prior to Nov. 19 she had missed classes because she was on FMLA or because she had been on call the night before. Dr. Berger told Dr. Waggel that the program is saying that she did not get what she needed out of this course and that this is a legitimate reason for not passing. She will be given the opportunity to take the course again. Dr. Waggel responded that she feels that she is ready to go on and stated that she felt she was passing the course because she was told that she would be assigned a supervisor; this supposedly indicates that a resident is passing the class.

Dr. Berger told Dr. Waggel that Dr. Collins feels that she did not pass the course. He went on to say that clarification on what happened between the time she was told that she would get a

2

supervisor and then told that she had failed is needed.  Was notice given of the risk of failure, or was the notice too subtle to be clear needs to be clarified.

Dr. Cioletti then asked Dr. Waggel about her performance regarding patient care, professionalism, management with work and fatigue, and her ability to manage patients independently.  Dr. Waggel responded that she tries to follow protocols and that she can handle violence, decision making, medications, and her helath issues but that emails from psychiatry administration are stressful.  She heard from the residents that she was removed from the call pool and this resulted in a panic attach with a heart rate of 150 and a visit to the ER.

Dr. Cioletti stated that there are concerns from medicine and non-administration attendings about how Dr. Waggel handles decisions and details of patient care.  Dr. Waggel responded that she is not getting clear information about this and wanted more information.

Dr. Berger stated that this has been reported in rotation evaluations over the last two years and that Dr. Waggel's Milestones data indicate that she was below the expected level in August and also in the July – October timeframe and is not on track to advance.  The Clinical Competency Committee has recommended to the program director that her promotion be delayed and that she follow through on the improvement plan.  Dr. Waggel stated that at the August review she thought that the Milestones scores of 1-2 meant that she was where she was supposed to be in the program.

Dr. Berger suggested that perhaps Dr. Catapano could work out a way for Dr. Waggel to be here at GW under her direct supervision providing consistent direct feedback in front of key decision makers as a way to help her to get to the next point where she could be integrated into the call pool.

Dr. Waggel stated she is open to working in any way possible and feels like she is being treated unfairly and differently from the other residents.  She feels she is doing her part to follow the improvement plan and that someone needs to agree to evaluate her essay.  She stated that Dr. Dyer was not responsive to her and that Dr. Kels did not reply to her emails.  She repeatedly left voice emails and received no response.  She wanted assurance that she was not being fired.  She stated that she was scheduled to meet with Dr. Kels on December 10th but that Dr. Kels did not come.  Dr. Waggle tried to contact Dr. Gandhi, but was told he was too busy.  He provided feedback on her essay.  She is unclear about next steps and would like to be informed if her essay is acceptable or if she needs to re-write it, which she is willing to do.

Dr. Berger suggested that Dr. Waggel might wish to adopt a tone that is respectful when dealing with others and to give the other party the benefit of the doubt.

Dr. Cioletti then asked Dr. Waggel if there were any extenuating circumstances that should be considered in addition to her medical condition, leave of absences, and time off for physician

3

GWU 002486

appointments.  Dr. Cioletti asked if there were any issues involving drugs or alcohol, to which Dr. Waggel responded no.

Dr. Berger asked if there are others that Dr. Cioletti should speak with.  Dr. Waggel stated that other residents will say that Dr. Collins yelled at her and called her "grandiose."

Note:  After the interview, Dr. Waggel provided the syllabus for each of the two courses.

4

To: Dr. Stephanie Waggel

CC: Dr. Jeffrey Berger, Associate Dean for GME

From: Dr. Lisa Catapano, Program Director

Dr. James Griffith, Chair, Department of Psychiatry and Behavioral Sciences

Re: Notice of concerns of unprofessional conduct

Date: February 15, 2016

---

In accord with the GW Resident Misconduct Policy, we are providing you this notice of deficiency of professionalism, based on a number of incidents of concern.

#1) On January 7, 2016, you were in the classroom when Dr. John Zinner's Psychodynamic Psychotherapy class was supposed to start. Prior to that date, you had been informed several times, both in person and in writing, that you were not allowed to take this class, because you had failed to pass Dr. Cheryl Collins's precedent class on psychodynamic theory. At the start of class on January 7, Dr. Zinner let you know he was waiting for you to leave in order to begin. Per Dr. Zinner, "I told her I could not begin the class because she was not in the class and she replied that [Dr. Catapano] had left it up to me [Dr. Zinner] to decide whether she could take the seminar." You told Dr. Zinner, falsely, that [Dr. Catapano] had approved of you taking the class. According to Dr. Zinner, you left the classroom, and soon after texted one of the residents in the class saying that you had spoken to [Dr. Catapano] and [she] had confirmed that you could take the class. For the record, Dr. Catapano reports that you and she did not meet or speak on that day.

**DR. BERGER DECLARATION EXHIBIT #16**   **GWU 003084**

This is perhaps the most flagrant of a series of mistruths including lying to Dr. Berger that you had passed Dr. Griffith's neuroscience course with the highest cumulative grade, which in fact you had not; stating that you had never been given any feedback about your performance, the four letters of deficiency notwithstanding, and telling Dr. Collins that failing her course was the only thing holding you back from being promoted.

#2) A second concern regarding Professionalism and Systems-Based Practice is based on your failure to identify your evaluating attendings in MedHub. In order to receive clinical evaluations for your monthly rotations. As you know, you must enter your supervisors into the system. You are prompted by the system to identify your supervisors on the 21st of each month. You have not identified your supervisors for December, 2015, or January 2016, and did not respond to Residency Coordinator Tory Anderson's reminder on February 1 to do so. As a result, you do not have clinical evaluations completed by your supervisors for these months.

#3) You have failed to comply with the academic improvement plans and other requirements of the program. You did not comply with the first letter of deficiency (July 15, 2015) for not showing up for an Emergency Medicine shift on June 10. The requirement of this LOD asked you simply to contact Dr. Dyer within two weeks and notify him of your supervisors, so he could check with them about your attendance. It took six weeks to schedule that meeting and you never followed up with notification of supervisors.

Also, you failed to comply with the GW Hospital requirement for a health clearance by September 30, 2015. Despite an extension granted by Dr. Gary Little, Hospital Director, you were not cleared by the extended deadline of October 14, 2015. This resulted in another letter of deficiency from Dr. Berger (October 28, 2015).

4) Your behavior has been disruptive in a number of ways. Most

flagrant have been a series of hostile and antagonistic emails and texts to the program director and to your classmates, threatening to "bring down the program".  This has been alarming to them as they try to focus on their own clinical and educational responsibilities, no less conducive to your own professional development.

These issues, individually and cumulatively, as well as issues documented in other Letters of Deficiency (November 19, 2015 and December 14, 2015) demonstrate a deficiency in Professionalism. To be deliberately untruthful in the workplace raises very serious concerns about your integrity and reliability.   These are serious concerns as Professionalism is foundational to the practice of medicine.

In accord with the Policy on Resident misconduct, we are notifying the Associate Dean for GME, who will receive a copy of this memo and will review these concerns to determine what further steps will may be warranted and necessary.

GWU 003086



DEPARTMENT OF MEDICINE
at The GW Medical Faculty Associates

Division of General Internal Medicine
2150 Pennsylvania Avenue, NW, Suite 5-416 n
Washington, DC 20037

Phone: 202.741.2200        Fax: 202.741.2185

<u>**Privileged and Confidential**</u>

February 22, 2016

Dr. Jeffery Berger, MD, MBA
Associate Dean for Graduate Medical Education
The George Washington School of Medicine and Health Sciences
Washington DC

Dear Dr Berger:

This letter is meant to serve as a summary of my review of two decisions by the
Psychiatry Residency Training Program in regards to Dr Stephanie Waggel, MD: to
extend Dr. Waggel's training period and repeat neuroscience and psychodynamic
courses.  These letters were given to Dr Waggel on November 19, 2015 and
December 10, 2015 respectively, and she submitted a request to appeal these
decisions to the Associate Dean of Graduate Medical Education within the fourteen-
day time period specified in the Academic Improvement Policy.
The aforementioned policy states the reviewer will:

- Review the request of the Resident
- Meet with the Resident
- Review the Resident's file
- Talk with the Program Director
- Consider extenuating circumstances
- Consult with others, as appropriate, to assist in the decision making process;
  and
- Make a determination whether the Resident received notice and an
  opportunity to cure, and the decision to take the Reportable Action was
  reasonably made.

I have reviewed all the documents provided to me, and I have met with Drs. Lisa
Catapano and Lori Kels (the Program Director and Associate Program Director) and
Dr. Stephanie Waggel.  In addition, I also discussed additional clarifications with Dr.
Cheryl Collins regarding class expectations and evaluations as well as ACGME
recommendations in terms of rotation attendance.



**DR. BERGER DECLARATION
EXHIBIT #17**

GWU 003228

Regarding the two courses, neither syllabus explicitly addresses expectations for passing the class. In the Neuroscience class, Dr. Waggel scored significantly lower than her peers on the first two exams (if her scores are removed, class averages for both exams increase to 70 and 72). As the scores of the tests exist as feedback for performance, she had the opportunity to realize her deficit. Based on my interview with Dr. Waggel, it was clear to her that her grades on these two exams were below expectations.

The psychodynamic class syllabus discusses three mandatory classes, required readings, and that the course will be evaluated by attendance and performance feedback. According to the ACGME, residents are expected to attend 70% of a rotation; this was relayed to the residents by the program coordinator. In this case Dr. Waggel attended 58% (only one potentially explained by being post-call and four potentially due to her being on a leave of absence) while others missed at most three or four classes (76-82%). In addition, her graded formulations suggest below average comprehension of this subject material, with specific feedback given within a five-page feedback document to illustrate her deficiencies and need for improvements, including: lack of understanding of psychodynamic concepts, missed class time, inability to facilitate class discussion on assigned readings, class contributions that did not demonstrate comprehension of the psychodynamic points – preventing learning in weakness areas, core psychodynamic principles in formulations are not addressed satisfactorily (an example of a fully formulated assignment was provided for contrast), such as applying psychodynamic ideas and addressing emotions and behaviors in addition to thoughts. In my reading of this comprehensive feedback document, it does not appear bias is playing a part in Dr. Collins's grading since so many specific examples of deficiencies were provided. Therefore, adequate comprehension and display of the knowledge and skills set in this course were not met.

Finally, I will address the clinical-based letters of deficiency. Prior to her first letter of deficiency, Dr. Waggel had documentation of concern in the following areas:

- Patient care:
    - Deficits in patient care—fails to recognize severity of threat to patient safety with specific errors (gave a patient >50 units of Lantus but not home meds); fails to complete orders/documentation prior to leaving work/does not ensure someone else will do it (email documentation from Dr. Malik on July 31, 2014)
    - Lack of motivation, initiative and interest in the care of her patients (email documentation from Dr. Malik on January 2, 2015)
    - Not ready to be in the hospital alone managing medicine patients. Serious medical errors, including management of CT findings and troponin results. Unable to triage phone calls and required redesign of entire team to remove Dr. Waggel from responsibilities (verbal feedback from Dr. Prior to Dr. Waggel documented in email on March 6, 2015)

GWU 003229

- o Worry about her ability to function autonomously and manage complicated patients (verbal feedback from Dr. Mehta to Dr. Waggel documented in email on March 19, 2015 and "remediation plan" discussed)
- o Still has difficulty dealing with difficult patients and taking herself out of difficult situations (verbal feedback from Dr. Ayanian to Dr. Waggel documented in email on April 14, 2015)
- Professionalism:
  - o Demonstrates frequent unprofessional behavior—cites specific residents are more enjoyable to work with, does not take responsibility for errors/near misses that are significant patient safety issues, expresses open displeasure when asked to complete a patient care tasks, resistance to feedback and little improvement following constructive criticism (email documentation from Dr. Malik on July 31, 2014)
  - o Has come to work wearing provocative clothing, making staff uncomfortable (email documentation from Dr. Malik on January 2, 2015)
  - o Sits in resident room and doesn't check in for rounds or meetings; needed to be tracked down; shows up late daily and leaves meetings without permission (email documentation from Dr. Malik on January 2, 2015)
  - o Concerns for inappropriate attire.  At least 3 complaints from patients, calling Dr. Waggel unprofessional or "mean" and becoming very angry or offended by her interaction with them.  Noted to be sleeping, impaired in call room (email documentation from Dr. Chang on May 18, 2015; Dr. Waggel acknowledged feedback in determining that she had taken benzodiazapines accidentally on that day with follow-up email to Dr. Catapano)
- Medical knowledge:
  - o Worry about her ability to function autonomously and manage complicated patients (verbal feedback from Dr. Mehta documented in email on March 19, 2015)
  - o Significant gaps in med knowledge, medical decision making—her weakest point; required numerous feedback sessions, constant supervision from resident, and did show some improvement—"if progresses on the same tract, she might be able to do this skill independently from a resident" (verbal feedback from Dr. Ayanian to Dr. Waggel documented in email on April 14, 2015)
- Interpersonal communication:
  - o Is openly disrespectful to other care team members (told staff to "think really hard" and "try not to ask stupid questions") (email documentation from Dr. Malik on July 31, 2014)
  - o Using phone and been caught rolling eyes during meetings/conversations with patients and staff (email documentation from Dr. Malik on January 2, 2015)
  - o Communication with nursing and consult services (verbal feedback from

Dr Prior documented in email on March 6, 2015)
- Fatigue management:
  - o Trouble focusing at work (email documentation on May 1, 2015 between program directors)
  - o Came to work impaired and found passed out in the call room; reportedly took Ativan instead of her Ritalin. She was asked to leave medicine service and not return (May 14, 2015).

These email documentations of verbal feedback (and some written feedback in evaluations) spans psychiatry and internal medicine.  There is additionally an email from emergency medicine with concern regarding poor clinical performance and that she was not on par for an intern, despite seeming like she wanted to do a good job.  Her first letter of deficiency was written on July 15, 2015 for a missed ED shift on June 10, 2015 when Dr. Waggel did not give proper notification of her absence.  A plan at that time was made for remediation and the right to seek further action if not remediated, including the potential for the Program to seek further action (including termination) if she should continue to exhibit deficiencies.  This letter was written shortly before a medical leave of absence and was not given to Dr. Waggel until August 5, 2015 during her semi-annual meeting, which also reviewed concerns about her professionalism and patient care.  Reportedly, there was trouble arranging a meeting with Dr. Dyer (part of her remediation plan), initially meeting six weeks after the letter of deficiency (September 3, 2015), with evaluations from Dr. Dyer stating concerns regarding remediation due to lack of insight, potentially inaccurate accounts, and lack of recognition that she is deficient in the competencies noted in the letter of deficiency.  Similar concerns for lack of insight into feedback were echoed by several psychiatry faculty independently in email documentation.

Additional concerns that were raised about Dr. Waggel's performance included:

- Patient Care
  - o CL service attending call from August 10, 2015: Notes were lacking information, disregarded plan to not discharge patient until exam could be performed and recommended discharge noted by EMed physician in chart, and interpersonal issues with other services. (email documentation from Dr. Torres-Llenza, noting "I did speak with her about most of these and gave her feedback." on August 28, 2015)
  - o "...The plan for you to have more support and supervision on call when you return to GW in October." (email documentation from Dr. Catapano to give notice of deficiency on September 21, 2015)
- Professionalism
  - o Dr. Waggel claimed she, alone, physically restrained an out of control patient.  Dr. Catapano told her that, "if she is not able to monitor her health and fatigue better, we will have to put restrictions on her work and/or call schedule to protect her.  (email documentation from Dr. Catapano meeting on August 26, 2015 re: Dr. Waggel call on August 25,

  2015)
- o  Dr. Waggel to Intern: "...I instead received a lengthy lecture about the
     tone of my voice and how it can be negative." (email documentation
     August 26, 2015).  This noted to be unacceptable by Dr. Kels (email
     documentation August 27, 2015) and the Chief Residents were instructed
     to, "... follow up with Stephanie about it."
- Interpersonal Communications
  - o  Email from Dr. Waggel on August 7, 2015: "...I immediately went to the
       Orange Team to apologize in person for the conversation we had on the
       phone," regarding a poor interaction with a PA on August 5, 2015.
  - o  Text messages between Dr. Waggel and Intern: Dr. Waggel: "I have to take
       HIV prophylaxis because the HIV test was not ordered yesterday." "Thank
       you" "I really hope you aren't doing these things to me on..."  Intern noted
       to Dr. Waggel that the patient had HIV testing 3 days prior to the possible
       incident and she is feeling "bullied" by Dr. Waggel. (email documentation
       on August 28, 2015)

Concerns were raised in August 2015 regarding Dr. Waggel's ability to manage busy
nights, including a call night on August 25, 2015 that led to a root cause analysis by
the George Washington University Hospital.  Dr. Waggel was first notified, in a
September email, that she would need additional oversight on-call at GW when Dr.
Waggel returned October, in an email correspondence from Dr. Catapano.  Three
calls with senior oversight ensued and Dr. Waggel received extensive feedback on
each occasion.  Dr. Waggel did not appreciate the feedback value of the experience
and complained on several occasions that the additional resident should be to split
the workload necessitating a formal letter from Dr. Catapano on October 10, 2015,
clarifying the improvement areas for feedback to be covered during these calls.

Following the completion of the root cause analysis in November, Dr. Waggel
received a letter of deficiency on November 19, 2015, to formally outline an
improvement plan for the previously noted deficiencies discussed with Dr. Waggel
in August and September that had not been successfully remediated to this point.
The improvement plan associated with this letter required Dr. Waggel reiterated
that Dr. Waggel be put on "buddy call" to be given assistance by a senior resident,
eventually changing to supervision by an attending. She is also held accountable for
meeting with Dr. Dyer and producing a plan for improvement.  In the November 19,
2015 letter of deficiency, Dr. Waggel is informed of continued deficiencies in the
following areas:

- Patient care: management of patient aggression, including recognizing
  escalating aggression and demonstrating leadership in a Code Strong; use of
  1:1 sitters; use of IM versus PO medications
- Interpersonal communication skills: presentations were disorganized and
  incomplete with presentations missing key information (timeline, reason for
  agitation, dose of medications, or medical condition).  Communication with

the patient exacerbated situation instead of contained it. Of note, other documentations expresses concern with communication between Dr. Waggel and nurses/social work.
* System-based care: lack understanding of inpatient discharge procedures (administrative discharge) and protocols for Code Strong.

There is also recognition of inadequate follow through in her remediation plan outlined in the November 19, 2015 letter of deficiency, with late and inconsistent follow up with chosen advisor Dr. Allen Dyer. Because of these reasons, this letter addresses that she will not be advancing to her PGY3 year on time.

It is also important to note that Dr. Waggel did have an extenuating circumstance during this time in question. Dr. Waggel did require medical attention, including a recommended time for recovery in July 2015, ending August 3, 2015. Also, the Psychiatry RRC does allow up to six weeks of leave without requiring a delay in promotion. This has been taken into account in this review; however, it is important that Dr. Waggel be at an appropriate level for promotion in the aforementioned competencies, illustrating that the missed time alone is not reason for postponed advancement. Her delay in promotion is due to concerns with meeting the expected competencies at this level and not the time missed (which may have contributed to the delay). At this time, it does not appear this extenuating circumstance would be reason to change her need for a prolonged residency. When asked if additional extenuating circumstances existed, she stated there were none. To my knowledge, Dr. Waggel has neither requested nor received accommodation from the University for any extenuating circumstance that need be considered.

Dr. Waggel did provide additional documents that were added to this appeal process:

* Communication efforts with Drs. Dyer and Kels to meet as part of her remediation plan.
* Concerns of bias from her psychodynamics professor, Dr. Cheryl Collins
* Concerns regarding inadequate notification and the inability to cure the deficiency regarding the decision to extend her promotion.

On review of these documents, Dr. Waggel does show considerable effort in attempts to meet with Drs. Dyer and Kels, and this reason alone should not be a reason to delay promotion. Dr. Waggel also raised concerns about bias from Dr. Collins; however, these concerns are not supported by the sheer amount of work Dr. Collins put in to help Dr. Waggel with her second formulation and detailed accounts of classroom deficiencies, demonstrating areas for improvement with examples. Dr. Waggel brought up concerns regarding inadequate notification; she did receive three prior letters of deficiency, including recognition that continued deficiencies in these areas could result in further action, "including termination." As Dr. Waggel's feedback and evaluations continued to have concerns with patient care, medical

GWU 003233

knowledge (through her courses), system-based care, and interpersonal communication skills, she has not met expectations for her post-graduate level, and these documents do not change this decision.

Dr. Catapano has recorded reports in her record of semi-annual meetings with Dr. Waggel as required by the ACGME. The notes of one of the meetings include professionalism weaknesses and a plan to follow-up with Dr. Dyer. In addition, semi-annual milestone reports to the ACGME note that Dr. Waggel is rated below the standard for her post-graduate year in Professionalism for multiple Milestones and for a Milestone in Interpersonal Skills and Communication. Notes from the Clinical Competency Committee suggest that Dr. Waggel was discussed for 30 minutes at the October 15, 2015 meeting. Dr. Catapano was to discuss concerns with Dr. Berger from GME following the meeting. With the semi-annual meetings, the clinical competency committee discussions and the consistent reporting of Milestones deficiencies to match the academic struggles, the program was adequately performing its oversight of the trainee.

In summary, I determine the following conclusions:

1.  Neuroscience course fail: course failure decision and requirement to retake at least the first two exams upheld;
2.  Psychodynamics course fail: course failure and requirement to repeat upheld;
3.  Non-promotion to PGY3 year in July 2016: upheld.
4.  Extenuating circumstances were considered and were not deemed to have impacted the decision to take Reportable Actions.
5.  The decisions to take Reportable Actions were reasonably made, taking core competencies, as defined by the ACGME, into consideration and coursework performance.

It is not my role as the physician reviewer to determine whether the Psychiatry Program made the correct decision in extending Dr. Stephanie Waggel's training or requiring the two courses to be repeated, but that the decision was reasonably made. In reviewing this case, I was charged with determining that the Academic Improvement Policy was appropriately followed and whether there were any extenuating circumstances that affected her potential correction.

Sincerely,

Anne Cioletti, MD, FACP
Assistant Professor of Medicine
Associate Program Director, Internal Medicine Residency
Division of General Internal Medicine
acioletti@mfa.gwu.edu

GWU 003234

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

February 25, 2016

Federal Express

Stephanie Waggel, MD
1230 23rd Street, NW Apt 909
Washington, DC 20037

Dr. Waggel:

This letter serves as formal notification of the determination of Anne Cioletti, M.D., who was appointed as the physician reviewer, pursuant to the GME Academic Improvement Policy ("Policy") to review the following decisions by your Program Director, Lisa Catapano, M.D: 1) notification of non-promotion to the 3rd year of post-graduate training (PGY3) in July 2016; 2) psychodynamic theory course failure (Course Director: Dr. Collins); and 3) neuroscience course failure (Course Director: Dr. Griffith), at least the first two sections.

After a careful and thorough review, Dr. Cioletti has determined that you were notified of academic deficiencies, and given structured feedback and the opportunity to cure in the form of meetings and discussions with supervising faculty and the program director, examination score reporting, course syllabi requirements and discussions of expectations, formulation review and comments, as well as electronic mail and written correspondence, including, but not limited to letters of deficiency. The Program exercised oversight through the introduction of an improvement plan with faculty oversight, regular review of your performance by a clinical competency committee, and semi-annual meetings with you to review progress.

Therefore, Dr. Cioletti concluded that the decision of the Program Director not to promote you to the 3rd year of post-graduate training in July 2016 was reasonably made. In addition, Dr. Cioletti's review of the decision made to fail you for the psychodynamic theory course did not substantiate claims of instructor bias. Finally, the decision to fail you for at least the first two sections of the neuroscience course was also deemed a reasonable decision.

Accordingly, the decision to not promote you to the PGY3 year in July 2016, the decision to fail you in the psychodynamic theory course, and the decision to fail you for at least the first two sections of the neurosciences course are all upheld.

The GME Academic Improvement Policy states that the physician reviewer will:

1



**DR. BERGER DECLARATION
EXHIBIT #18**

GWU 003225

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

- Review the request of the Resident
- Meet with the Resident
- Review the Resident's file
- Talk with the Program Director
- Consider extenuating circumstances
- Consult with others, as appropriate, to assist in the decision making process; and
- Make a determination whether the Resident received notice and an opportunity to cure, and the decision to take the Reportable Action (in this case, non-promotion) was reasonably made.

Dr. Cioletti reviewed all documents, including the following documents submitted by you: 1) a request to review the non-promotion decision on January 8, 2016; 2) a request to review the course failures on December 3, 2015; 3) a detailed response to the course failures on December 23, 2015; 4) attempts to meet with Dr. Dyer; 5) attempts to meet with Dr. Kels; 6) e-mails from Dr. Collins excluding you; and 7) PHP October attempts to communicate. Dr. Cioletti met with you on January 21, 2016 and Dr. Catapano on January 20, 2016. You were offered to suggest additional people for Dr. Cioletti to meet with at your meeting. Dr. Cioletti researched the history of the psychodynamic theory course director's involvement in the course to follow-up claims of bias.

In addition, Dr. Cioletti consulted with Dr. Catalanotti, Internal Medicine Program Director, to review aspects of the program decisions while maintaining the residents' anonymity. Consultation was requested because Dr. Catalanotti is involved with graduate medical training, she is not part of the psychiatry department, and has a history of being a strong resident advocate.

The Reportable Action for Non-Promotion states that the Psychiatry Clinical Competency Committee determined that you were deficient in three core competency areas:
- Professionalism
- Interpersonal skills and Communication, and
- Systems-based Practice

The Reportable Action for Course Failures states that the Psychiatry Clinical Competency Committee determined that you were deficient in the additional area:
- Medical Knowledge

Dr. Cioletti verified that you had received notice of deficiencies in core competency areas during her review and interviews. Dr. Cioletti's document review revealed that your file is replete with

2

GWU 003226

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

documented instances of unprofessional behavior, medical knowledge gaps and interpersonal difficulties.  The review noted your responses to these faculty concerns, many of which you deny, but some you admit to.

In consideration of any extenuating circumstances that may have impacted the decision to issue the Letter of Non-Promotion, Dr. Cioletti inquired of you as to whether there were any physical, medical or emotional issues that may have affected your performance, and was advised by you that there was nothing significant in this regard. Inquires made to faculty members noted that you had missed time due to a medical illness, but you had not sought accommodation from the University, and the illness did not determine your reportable actions.

Under the Academic Improvement Policy, you have the right to request a final review by Jeffrey Akman, M.D., Vice President for Health Affairs and Dean of the School of Medicine and Health Sciences or his designee, within fourteen (14) days of the date of this letter. The final review is solely to determine whether the process set forth in the Policy was followed. Attached is a copy of the Policy.

If you have any questions, please feel free to let me know.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & DIO, Graduate Medical Education

3

Minutes:

Phone conversation with Dr. Zinner

Full Inquiry: Misconduct

Resident: Stephanie Waggel

Date: 3/16/16

Time: 10:52AM

Dr. Zinner summarized his understanding of Dr. Waggel's standing for his course: 1. She was not going to receive a patient; 2. She was not going to attend his course (since passing the pre-requisite course by Dr. Collins is required for being assigned a patient and only residents with a patient were allowed to attend). Dr. Zinner said this has been the case for trainees in the past who have failed the pre-requisite.

For the first class, Dr. Waggel showed up to the class. Dr. Zinner took her into the hallway and told her that she could not attend the class.

Dr. Zinner had an email to Dr. Catapano from 1/11/2016 in which he summarized the events of class from 1/7/2016. He recounted that Dr. Waggel stayed in her seat from a previous class and filled out evaluations even though his class was beginning. Dr. Zinner asked Dr. Waggel to "wrap it up," and she said that he could go ahead and start the class. She believed she could be in the class because she was on the sign-in sheet for attendance that day. Dr. Zinner told her that he could not begin the class because she was not in the class and she replied that Dr. Catapano had left it up to [him], Dr. Zinner, to decide whether she could take the seminar. The idea Dr. Waggel was positing was that Dr. Catapano was okay with her attendance if [he], Dr. Zinner, was as well. He told her she couldn't remain in class. She slowly left and texted TJ saying that Dr. Catapano had given permission if Dr. Zinner agreed. Dr. Zinner knew that Dr. Catapano was not likely to have said that and confirmed with Dr. Catapano later on.

Dr. Zinner noted that this situation with Dr. Waggel is taking a toll on the entire residency. Other trainees are taking more call, morale is low, and not being able to talk about the situation has added stress to the entire program.

DR. BERGER DECLARATION
EXHIBIT #19

Waggel GWU 003167.002

Minutes:

Phone conversation with Dr. Collins

Full Inquiry: Misconduct

Resident: Stephanie Waggel

Date: 3/16/16

Time: 14:15

Dr. Collins reviewed her interactions with Dr. Waggel. She noted that Dr. Waggel did not attend many classes for her course. When she did attend, she was rarely prepared. In particular, she noted a class session where Dr. Waggel was supposed to present an article. Dr. Waggel was not prepared and instead redirected the entire class to discuss a stressful personal experience on the inpatient unit at GW Hospital. Dr. Collins was pleased to be able to help what she viewed as a troubled resident with peer support during class; however, she noted that course was not intended as a group therapy session.

Dr. Collins noted working very hard to assist Dr. Waggel to learn the material, but that Dr. Waggel was very difficult. At times, Dr. Collins had to shut her down because her comments were so far off track. For example, Dr. Collins would say, "You need to hold your thought." At times, she needed to be more direct and say, "It's clear you don't understand the material."

Dr. Collins recommended to Dr. Catapano that Dr. Waggel should repeat the course after initally offering to Dr. Catapano that perhaps a supervisor could tutor her despite not being in Dr. Zinner's course and not having a patient. Dr. Waggel then spoke with Dr. Collins by phone and stated that she is not repeating the second year, and that if she has to repeat Dr. Collins course it will hold her back. When Dr. Collins circled back with Dr. Catapano, she was told that Dr. Waggel was not just struggling in her course and, without specifics, noted that there were multiple other issues.

<u>PRIVILEGED AND CONFIDENTIAL</u>

Interviews conducted by Dr. Jeffrey Berger, Associate Dean, GME, for the Full Inquiry in accordance with GME Resident Misconduct Policy, in the case of Stephanie Waggel, PGY 2 Psychiatry Resident

**March 17, 2016:**

Meeting with Dr. Stephanie Waggel
Present at Meeting:  Dr. Jeffrey Berger, Associate Dean, GME, and Mary Tucker, GME Director

Dr. Berger noted that Dr. Waggel had returned to work from FMLA leave and that Dr. Waggel had submitted appropriate documentation to HR.  He asked Dr. Waggel if this was a good time to have this discussion with her.  Dr. Waggel responded yes.

Dr. Berger stated that based on the letter from Dr. Griffith, he decided to conduct a Full Inquiry for Misconduct and that this discussion was part of the Full Inquiry.  Dr. Waggel had prepared a written response to each of the areas under review and presented this to Dr. Berger at the beginning of the meeting.

Dr. Berger began with the issue of the Psychodynamic Psychotherapy class and question of Dr. Waggel's participation.  Dr. Berger asked Dr. Waggel for her recollection of her interaction about the class.  Dr. Waggel felt initially that it had been a case of miscommunication.  She was told that she could not attend class.  She asked if she could sit in on the class and was told by Dr. Catapano that it was Dr. Zinner's decision.  On January 7th, her name was on the sign in sheet, so she went to class.  Dr. Zinner said that she could not attend and that the decision was Dr. Catapano's.  She was then informed that her name had been put on the sign-in sheet by mistake by the program coordinator.

Dr. Waggel received an email from Dr. Collins that stated she had not demonstrated competency in the course to pass and to have an individual patient assigned to her.  Dr. Berger asked her about her understanding of what it meant if she did not pass the course.  Dr. Waggel said that she understood failing would mean she had to repeat all of the PGY 2 year.

Dr. Waggel's email to Dr. Berger said that she had received 82% from on the 3rd exam for the Neuroscience course and that the final was cumulative.  Dr. Berger was not aware the final was cumulative and sent an email to Dr. Griffith to clarify.  Dr. Griffith responded that the final was not cumulative.  Dr. Waggel asked if she could take the test again, but Dr. Griffith would not permit this and stated that it was not necessary for her to repeat the test; she needed to show that she had an understanding of things cumulatively.  Dr. Griffith said that she needed to understand the first part in order to go on to the second part of the course.  Dr. Waggel reiterated in her

written response that she did not tell Dr. Berger that she received the highest grade, but that she had one of the highest scores in the class. Dr. Berger responded that his only focus in this regard was Dr. Waggel's use of the word "cumulative."

Dr. Waggel stated she started consulting with Dr. Sarani as ombudsman after the call schedule issue. Nothing has been resolved yet about the call schedule.

Dr. Waggel stated she still doesn't know what she did wrong. The letters of deficiency still do not make sense to her; they are inconsistent, circular, and she has to keep asking.

Dr. Berger questioned Dr. Waggel about her references to "administration". She responded that this is a term used frequently by her department.

Dr. Waggel stated that the tone of the letter of misconduct does not sound right to her. She believes she has not done anything wrong and that she had not been given an opportunity to explain or correct. She has to chase everyone down. She does not feel she is being treated fairly and those who have been assigned to work with her have been avoiding her.

Dr. Waggel presented a written response to the question of her professionalism along with a list of evaluation scores from faculty members who evaluated her in the competency. She also responded that she did now realize that failing to identify her supervisor for the rotation warranted a letter of misconduct.

Dr. Berger stated he is playing the role of mentor and trying to be helpful in explaining everything to Dr. Waggel. However, since Dr. Waggel has retained an attorney, he must communicate in a way that is protective of the institution,. He cannot share certain things because she has an attorney; he does not have as much leeway to work with her and cannot be as supportive in some areas because of this.

Dr. Waggel responded that she retained an attorney because she thought she was fired. She and Dr. Berger discussed how she can move on from here. Dr. Waggel responded that the main thing is that she would like to finish training.

In response to allegations that Dr. Waggel wanted to harm the program, she stated that her discussion about a lawsuit was with peers and her comments were made in jest. She stated she does not want to sue.

Dr. Waggel contends that ever since the first letter of deficiency, she keeps receiving letters of deficiency despite the fact that all of her evaluations from faculty are good. She has not seen her milestone evaluations yet.

Dr. Waggel is talking to other programs, but now fears someone will mention the Letter of Misconduct.  Dr. Berger relayed that GW's attorney can negotiate with Dr. Waggel's attorney regarding a final letter and who would be appropriate to provide a recommendation.

Dr. Berger and Dr. Waggel discussed next steps:
- Dr. Waggel has interviews with other programs.  She would like to speak with Dr. Catapano about what she might say to a prospective program and whether the appeal or misconduct would be mentioned.
- The final summative evaluation needs to be written and everyone needs to agree on what it will say.
- The program must decide how much credit will be given for her training; the CCC will weigh in on this.  What is Dr. Dyer's role?
- Determine Dr. Waggel's status between now and the end of the academic year.
- Dr. Berger will confer with legal counsel and the program director.

Dr. Berger stated that the MedHub issue is not misconduct but that he needs to think about the other allegations.  He will decide if misconduct has occurred and relay the findings back to the program director and CCC so that they can decide what action should be taken.  Dr. Waggel would have the right to appeal the decision, and in this case the appeal would go directly to Dr. Simons for a final decision.

GWU 003170

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & Designated Institutional Official, Graduate Medical Education
The George Washington University School of Medicine
& Health Sciences
2300 Eye Street, NW
Ross Hall, Suite 718
Washington, DC 20037

April 7, 2016

RE: Full inquiry for Misconduct

Drs. Waggel and Catapano:

This letter is being written in accordance with the GW Graduate Medical Education Policy on Resident Misconduct: http://smhs.gwu.edu/sites/default/files/GW%20GME%20Misconduct%20Policy.jb.6.27.pdf. The Program Chair, Dr. Griffith, acting as proxy for the Program Director, Dr. Catapano, who was away at a meeting and gave authority to Dr. Griffith to act on her behalf, presented Dr. Waggel with an allegation of misconduct document and allowed Dr. Waggel to respond on February 16th, 2016 at an 11:00 meeting.

Drs. Catapano and Griffith notified me, as the Associate Dean for GME, of the alleged misconduct in a written communication on February 16th, 2016 following the meeting with Dr. Waggel. On February 18th, 2016 I notified Drs. Waggel and Catapano that I was requesting a Full Inquiry to investigate the allegations of misconduct.

As part of the misconduct inquiry, I interviewed Dr. Collins [Phone interview 03/16/2016], Dr. Zinner [Phone interview 03/16/2016], Dr. Waggel [Meeting 03/17/2016], and reviewed email documentation of correspondence from Dr. Waggel's file. In addition, I reviewed a rebuttal document submitted by Dr. Waggel at the time of our meeting.

The allegations of misconduct presented by Dr. Griffith on behalf the program were: 1. Failure to comply with non-participation in Dr. Zinner's Psychodynamic Psychotherapy course – showing up to the course and stating that Dr. Catapano was okay with Dr. Waggel's participation; 2. Promoting to Dr. Berger that the 3rd neurosciences examination was a cumulative examination in an email on January 13, 2016 despite being explicitly told that it was not in an email from Dr. Griffith on November 25, 2015; 3. Failure to identify attendings for evaluation via the MedHub system; 4. Failure to comply with academic improvement plans and a compliance deadline for health clearance; and 5. Disruptive behavior, notably hostile emails and texts to Dr. Catapano and classmates, threatening to "bring down the program."

In my review, I also considered several complaints from a member of the Foggy Bottom community related to Dr. Waggel's behavior in the community. The complaints noted disruptive behavior by Dr. Waggel at her apartment building. In addition, I considered a complaint from Dr. Catapano that Dr. Waggel misrepresented




DR. BERGER DECLARATION
EXHIBIT #22

GWU 002427

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

her notification of deficiencies in reporting to Dr. Sarani, a GW GME Ombudsperson, her concerns with program leadership. Dr. Sarani told Dr. Catapano that Dr. Waggel stated that she had not been informed of any deficiencies when she in fact had been presented with several letters of deficiency and had several discussions with Dr. Catapano about her deficiencies. Finally, I considered a concern that Dr. Waggel misrepresented her current academic shortcomings when she told Dr. Collins, in a phone conversation, that if she had to repeat Dr. Collin's course, it would be the only reason that would hold her back from progressing to the next year of training.

I interviewed Dr. Waggel and afforded her an opportunity to respond to each of the allegations noted. In the case of Dr. Zinner's course, she states that she was confused by her name showing up on the attendance sheet. For Dr. Collin's course, she states that it is what she believed at the time. For Dr. Griffith's 3rd exam being stated as cumulative to Dr. Berger, Dr. Waggel stated that the exam seemed to be cumulative as there were some questions that were from the first and second sections. For the community member complaints, Dr. Waggel states that she has a neighbor who is out to get her and she assumes that is who made the complaints. She explains that, for the claim to Dr. Sarani that she had not received any notification about a deficit, she was explicitly talking about being taken off the call schedule without warning and not any other notification of deficiency. Finally, in response to the claim that Dr. Waggel was hostile in email and text communication with the Program Director and residents, threatening to "bring down the program," Dr. Waggel responded that any inflammatory comments were just made in jest and that this type of texting was common among residents.

Based on my review of the allegations and my interviews with several parties, I have concluded that the concern for: 1. MedHub reporting of supervisors and 2. Failure to comply with academic improvement plans and hospital requirements for health clearance both represent a lack of professionalism that does not rise to the level of misconduct. Both of these concerns should be considered by the Clinical Competency Committee under the Academic Improvement Policy for Professionalism.

The complaints of the Foggy Bottom community member will not be considered misconduct in the GW learning environment. However, Dr. Waggel is advised to mind her behavior outside the work environment and recognize her responsibility to represent GW well, both inside and outside the learning environment. Further complaints will merit additional scrutiny in the future.

The 4 misrepresentations include: 1. attempting to remain in Dr. Zinner's class; 2. telling Dr. Collins that she would be the only reason for non-promotion to the next year of training; 3. Emailing Dr. Berger that the 3rd neurosciences examination was "cumulative;" and 4. telling Dr. Sarani that she had not received any notification from the program related to deficiencies that would explain being removed from the call schedule. Taken together, these 4 misrepresentations represent misconduct in that they do not uphold the spirit of Code of Conduct in the Learning Environment at GW. Finally, emails and texts in which Dr. Waggel threatened to "bring down the program," were likewise misconduct in that they do not foster an environment of civility, nor do they demonstrate respect for the institution.

As a result of the misconduct determination, I will be crafting a Letter of Deficiency for Dr. Waggel that will include an improvement plan. The Letter of Deficiency, as drafted, will not be a Reportable Action. Since this

**School of Medicine & Health Sciences**
2300 Eye Street NW | Ross Hall Suite 718 | Washington, DC 20037 | t  202-994-3737 | f  202-994-1604 | gwgme@gwu.edu | smhs.gwu.edu/academics/gme

GWU 002428



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

**Office of Graduate Medical Education**

Full Inquiry did not result in a Reportable Action, the findings of misconduct are not subject to appeal.  It is my hope that Dr. Waggel will use this opportunity to correct behaviors that will allow for future growth, learning, and development into a competent professional in the field.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & DIO, Graduate Medical Education

---

**School of Medicine & Health Sciences**
2300 Eye Street NW | Ross Hall Suite 718 | Washington, DC 20037 | t  202-994-3737 | f  202-994-1604 | gwgme@gwu.edu | smhs.gwu.edu/academics/gme

**GWU 002429**

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

**Office of Graduate Medical Education**

Stephanie Waggel, MD
Resident, Psychiatry
The George Washington University
School of Medicine & Health Sciences

April 27, 2016

RE: Letter of Deficiency for Misconduct in the Clinical Learning Environment

Dear Dr. Waggel:

This letter is meant to inform you of your professional deficiencies related to misconduct findings as the result of a *Full Inquiry* reported on April 7, 2016 related to a notification and opportunity to respond provided to you by your program leadership on February 16, 2016.

Specifically, you were cited for 4 misrepresentations: 1. attempting to remain in Dr. Zinner's class; 2. telling Dr. Collins that she would be the only reason for non-promotion to the next year of training; 3. Emailing Dr. Berger that the 3rd neurosciences examination was "cumulative;" and 4. telling Dr. Sarani that she had not received any notification from the program related to deficiencies that would explain being removed from the call schedule.  Additionally, emails and texts in which you threatened to "bring down the program," were likewise determined to be misconduct.  A detailed description of the rationale for the misconduct findings can be found in the April 7, 2016 Full Inquiry for Misconduct.

Please note the GW Graduate Medical Education Policy on Resident Misconduct:
http://smhs.gwu.edu/sites/default/files/GW%20GME%20Misconduct%20Policy.jb.6.27.pdf

According to the policy, I have the discretion to issue a Letter of Deficiency based on these findings.  In order to improve in these areas, I require the following:

1. You make a good faith effort to apologize to the confusion caused by the aforementioned misrpesentations with those involved.

DR. BERGER DECLARATION
EXHIBIT #23

GWU 002430



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

**Office of Graduate Medical Education**

2. You take immediate steps to improve your professional behavior as it pertains to text and email communication in order to foster a safe learning environment.

3. You read the book, "Crucial Conversations," and have a book review discussion with Dr. Berger by June 30, 2016.  You can set up an exact time for the review discussion by email with Stephanie Morgan: semorgan@email.gwu.edu

Any further action to improve upon this deficiency is left to the discretion of the Psychiatry Residency Program, the Program Director and the Clinical Competency Committee.  Should professional competency continue to be an issue, or additional misconduct concerns be raised, GW policy will be followed for academic and misconduct issues, which may lead to further action, including dismissal from training.

Thank you for your attention.

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & DIO, Graduate Medical Education

**School of Medicine & Health Sciences**
2300 Eye Street NW | Ross Hall Suite 718 | Washington, DC 20037 | t  202-994-3737 | f  202-994-1604 | gwgme@gwu.edu | smhs.gwu.edu/academics/gme

GWU 002431

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & Designated Institutional Official, Graduate Medical Education
The George Washington University School of Medicine & Health Sciences
2300 Eye Street, NW
Ross Hall, Suite 718
Washington, DC 20037


May 15, 2016

Re: Stephanie Waggel, MD Letter of Reportable Action-Dismissal

Dear Dr. Berger:

I am writing to appeal the dismissal decision presented in the May 2nd, 2016 letter from the Residency Training Director, Dr. Lisa Catapano. Attached is a copy of that letter for your convenience. I first address the five points given as the information used to review my current standing and then I will address the breach of protocol that was made in the decision for my dismissal.

1.  Concerning the Four letters of Deficiency and the acceptance of improvement plans.

    I have gone to great lengths to satisfy all the recommendations made in the improvement plans provided to me by Dr. Catapano, but have been met with what appears to be indifference and in some cases resistance by the faculty members that she instructed me to contact to supervise my fulfillment of those plans. My understanding was that the purpose of the improvement plans was to correct the deficiencies listed in those letters. My many attempts to contact and meet with Dr. Dyer, who Dr. Catapano initially assigned me to work with on the improvement plan, ended with disappointment and delay as he was non responsive to my requests for assistance. Despite bringing this to Dr. Catapano's attention, and ultimately asking Ms. Anderson and Dr. Emejuru (chief resident) for help in arranging a meeting with Dr. Dyer, I was still unable to do so. Only after my meeting with you on November 19, 2015, did Dr. Catapano assign a different supervisor, Dr. Kels, for me to work with on the corrective actions. Unfortunately, she too was difficult to contact and my frustration led me to request additional assistance from both, Ms. Anderson and you to help in arranging a meeting with Dr. Kels. After continued failed attempts to meet with Dr. Kels, I was assigned a third mentor, Dr. Gandhi, on December 10, 2015. To avoid further delay and given the fact that Dr. Gandhi was instructing one of our didactics sessions that day, I was able to meet with him immediately after being assigned to him. We formulated a plan that I would call him when he was available and practice presentations over the phone and write an essay addressing acute issues that may be encountered on call. I gave my presentations to Dr. Gandhi when he was available on Jan 3. I again informed Dr. Catapano that I had been attempting to satisfy the improvement plan and for the last 8 weeks the limiting factor in completing this task had been the inability to obtain the needed guidance from the supervisors who she assigned to would work with me. At that time I also expressed my concern as to the inconsistent instructions I had been given on this improvement plan. She did not reply my communication. Communication with Dr. Gandhi was proving to be difficult just as it was with Dr. Dyer and Dr. Kels. He even stated that he could not talk to me because his "phone was broken." He was using a new phone number but did not answer my calls. I had to ask hospital ombudsperson, Dr. Sarani, for help in getting Dr. Gandhi to respond to me. After Dr. Gandhi was contacted by Dr. Sarani, he called me and provided me with some feedback on my essay. Although he stated I did not have to, I took the initiative to implement his feedback and rewrote the essay.

DR. BERGER DECLARATION
EXHIBIT #24

GWU 002442



I have compiled additional documentation that supports what is outlined above, including the attempts made to contact and arrange meetings with faculty members assigned to assist me in the completion of my task. If need be I can provide that information on request. I stated many times via email I wished to do all that was asked of me but that I needed to have someone willing to communicate with me. Despite my completing all tasks given to me and my many attempts to follow up, the last communication I received on completion of the improvement plan was from Dr. Catapano on Jan 22nd, 2016 stating she appreciates the effort and she will be in touch with the next steps. When I followed up further, I was continuously told that they were "working on it" and "hang in there." The following email is my follow up to Dr. Catapano informing here that I have completed the tasks and expressing my willingness to do what is required assigned to resolve any issues.



2.  The memo of misconduct

    As indicated in your letter dated April 7th the full inquiry of misconduct allegations did not result in a reportable action.

3.  Clinical evaluations

    My clinical evaluations are at or above expected level.

    Please note that our new Milestones-based evaluations use a different rating scale than traditional evaluation forms. Based on the Psychiatry Milestones published by the ACGME and ABPN, this evaluation sets a standard for residents at each stage of their training. For example, PGYII residents are expected to be around a "Level 2" for each Milestone. Below we have selected the subset of Milestones most relevant to this rotation. The Milestones are organized according to the Core Competencies: Patient Care, Medical Knowledge, Systems-Based Practice, Practice-Based Learning and Improvement, Professionalism, and Interpersonal Communication Skills. Thank you for working with and providing feedback for our residents!

    Below are my scores from PGY2 year. As I am a PGY2 a score of "2" is expected for my level. I received at or above 2s in all areas.

GWU 002443

| | | | |
|---|---|---|---|
| Patient Care | PC-1 | Psychiatric Evaluation: A: General interview skills B: Collateral information gathering and use C: Safety assessment D: Use of clinician's emotional response | 2.0 |
| | PC-2 | Psychiatric Formulation and Differential Diagnosis: A: Organizes and summarizes findings and generates differential diagnosis B: Identifies contributing factors and contextual features and creates a formulation | 2.0 |
| | PC-3 | Treatment Planning and Management: A: Creates treatment plan B: Manages patient crises, recognizing need for supervision when indicated C: Monitors and revises treatment when indicated | 2.0 |
| | PC-4 | Psychotherapy: Refers to I) the practice and delivery of psychotherapies, including psychodynamic, cognitive-behavioral, and supportive therapies, 2) exposure to couples, family, and group therapies, and 3) integrating psychotherapy with psychopharmacology. A: Empathy and process B: Boundaries C: The alliance and provision of psychotherapies D: Seeking and providing psychotherapy supervision | |
| | PC-5 | Somatic therapies including psychopharmacology, electroconvulsive therapy (ECT), and emerging neuromodulation therapies. A: Using psychopharmacologic agents in treatment B: Education of patient about medications C: Monitoring of patient response to treatment and adjusting accordingly D: Other somatic treatments | 2.0 |
| Medical Knowledge | MK-1 | Development through the life cycle (describing the impact of development on the trajectory of development and development on the expression of psychopathology) A: Knowledge of human development B: Knowledge of pathological and environmental influences on development C: Incorporation of developmental concepts in understanding | 2.0 |
| | MK-2 | Psychopathology: basic knowledge of diagnostic criteria, epidemiologic pathophysiology, course of illness, co-morbidities, and differential diagnosis of psychiatric disorders, including substance use disorders and presentation of psychiatric disorders across the life cycle and in diverse patient populations. A: Knowledge to identify and treat psychiatric conditions B: Knowledge to assess risk and determine level of care C: Knowledge at the interface of psychiatry and the rest of medicine | 3.0 |
| | MK-3 | Clinical Neuroscience: includes knowledge of neurology, neuropsychiatry, neurodiagnostic testing and relevant neuroscience and their application in clinical settings. A: Neurodiagnostic testing B: Neurobiological testing C: Neuropsychiatric co-morbidity D: Neurobiology E: Applied neuroscience | |
| | MK-4 | Psychotherapy: Refers to knowledge regarding: 1) individual psychotherapies, including but not limited to psychodynamic, cognitive-behavioral and supportive therapies 2) couples, family, and group therapies, and, 3) integrating psychotherapy and psychopharmacology. A: Knowledge of psychotherapy theories B: Knowledge of psychotherapy practice C: Knowledge of psychotherapy, evidence base | |
| | MK-5 | Somatic Therapies: Medical Knowledge of somatic therapies, including psychopharmacology, ECT, and emerging somatic therapies, such as transcranial magnetic stimulation (TMS) and vagus nerve stimulation (VNS). A: Knowledge of indications, metabolism and mechanism of action for medications B: Knowledge of ECT and other emerging somatic treatments C: knowledge of lab studies and measures in monitoring treatment | 2.0 |
| | MK-6 | Practice of Psychiatry. A: Ethics B: Regulatory compliance C: Professional development and frameworks | |
| Systems-based Practice | SBP-1 | Patient Safety and the Health Care Team. A: Medical errors and improvement activities B: Communication and patient safety C: Regulatory and educational activities related to patient safety | 2.0 |
| | SBP-2 | Resource Management (may include diagnostics, medications, level of care, other treatment providers, access to community assistance) A: Costs of care and resource management | |
| | SBP-3 | Community-Based Care. A: Community-based programs B: Self-help groups C: Prevention D: Recovery and rehabilitation | |
| | SBP-4 | Consultation to non-psychiatric medical providers and non-medical systems (e.g., military, schools, businesses, forensic). A: Distinguishes care provider roles related to consultation B: Provides care as a consultant and collaborator C: Specific consultative activities | |
| Practice-based Learning and Improvement | PBLI-1 | Development and execution of lifelong learning through constant self-evaluation, including critical evaluation of research and clinical evidence. A: Self-Assessment and self-improvement B: Evidence in the clinical workflow | 2.0 |
| | PBLI-2 | Formal practice-based quality improvement based on established and accepted methodologies. A: Specific quality improvement project B: Quality improvement didactic knowledge | |
| | PBLI-3 | Teaching. A: Development as a teacher B: Observable teaching skills | 2.0 |
| Professionalism | PROF-1 | Compassion, integrity, respect for others, sensitivity to diverse patient populations, adherence to ethical principles. A: Compassion, reflection, sensitivity to diversity B: Ethics | 3.0 |

4. **Dr. Griffith's action to remove me from patient care**

The first that I heard of this decision was in the March 17th, 2016 meeting with both Dr. Griffith and Dr. Catapano in which Dr. Griffith informed me that I was to be removed from patient care. I was surprised to hear of this decision, since there had been no prior consultation with me or an indication that this was under consideration. At a loss for this decision, I tried to gain some clarity from Dr. Griffith but no specific reason was provided. His response was the action to remove me from patient care was "not a punishment or formal." When I asked why I was being removed from patient care, Dr. Griffith stated "because I'm saying so." I asked many times if I did anything specific to demonstrate that I cannot care for patients. I was told by Dr. Griffith, "I'm not here to tell you what you've done wrong." I then stated that I needed to know what I have done wrong in order to improve. Dr. Griffith stated that I will need to work with the GME office on that. This action by Dr. Griffith does not give rise to a cause or reason for dismissal but appears to be a response to the situation at hand.

5. This LOD states that I have had a "continued pattern of unprofessional behaviors since the memo of misconduct in February." However, only one example was given and that example was inaccurate. The example states "telling Dr. Berger, in an email Tuesday, March 8, you were on medical leave and had notified all relevant parties (attendings, chief residents, coordinator, Program Director) when you had not yet applied for medical leave at that time and had not notified the Program Director." Regarding this specific instance below are emails from March 8th indicating that those allegations are unfounded and in particular the emails indicate that notification was provided.



Below is confirmation that I did inform my attending, the chief, and Tory on Feb 23rd of my March 9th doctor's appointments as I stated in my email to you on March 8th.



March 8th 4:49pm I received confirmation of FMLA leave.



March 8th 7:20 I informed Dr. Catapano, Ms. Tucker, and Tory of my FMLA leave.



March 8th 7:27pm I informed you of my FMLA leave.



The CCC expressed concern that I have not substantively engaged in a good faith effort to improve my clinical and professional performance over the last 6 months, however as indicated above I have extensive documentation of my

attempts to do so which I am willing to provide. I have, in good faith efforts sought help to meet the requests of the improvement plans from my chief, program coordinator, program director, GME, hospital ombudspersons and members of the CCC. I completed the tasks in the improvement plan as outlined to me by Dr. Gandhi and, although I attempted to do so, did not receive follow up feedback on whether this had met the objectives set out by Dr. Catapano. I further expressed to Dr. Catapano that I was working hard to improve but needed clearer communication. The evaluations I was able to see (on MedHub) indicated my performance were at or above expected level, and therefore, I attempted many times to gain insight into what areas were thought to be unsatisfactory and why. In an effort to find the answers to my questions I sought the assistance of Dr. Bathgate, hospital ombudsperson and asked her help with in improving communication. Unfortunately, this was unsuccessful.

As another example of lack of guidance for improvement, I also point out that although the other residents received their semiannual at the 6 month period (Jan/Feb, 2016). As of May 2016, I have yet to receive my review nor any follow up on reviews. The last review I received was on Aug 5th, 2015 and that was a review for my performance for the PGYI year. Therefore, I have never received a review for PGYII year, the very year that the CCC claims my performance warrants termination. Had these reviews been timely conducted, they could have provided the opportunity for Dr. Catapano to discuss the status of, or any concerns about, my clinical and professional performance and provide me with any necessary guidance to avert the current situation. I have gone to great effort on my part to make improvements and strengthen communication however it is necessary for both parties to take an active role.

Further, the punishment given to me was increased from non-progression to dismissal. This is particularly unjustifiable because the new allegation that I had not been truthful about my doctor's appointments and FMLA leave is untrue. Prior to receiving this letter of dismissal, I was under the impression that my previous letters of deficiency, that I had appealed, were void as Dr. Simons stated in his March 25th, 2016 decision that the letter should not have been issued to me. You informed me on April 8th that there were no reportable actions against me. Therefore, a leap was made from good standing with no reportable actions to this letter of dismissal. As stated above in point 5, the only change that has occurred from the letter of deficiency to the letter of dismissal was an accusation that I was untruthful in stating that I had told relevant parties about my FMLA leave. As the above screenshots demonstrate that I was not untruthful, there is no evidence to warrant a change from a letter of deficiency to a letter of dismissal. Even if there were evidence that I had committed an act grave enough to merit termination, I was not given notice that a decision of dismissal was being considered or an opportunity to remedy it. As it stands, my evaluations are at or above expected level and I have completed all that was asked of me in regard to my improvement plan.

I am at a loss to understand how the CCC could impartially evaluate the information provided in Dr. Catapano's letter and determine that these items contribute to cause for dismissal. I have dedicated my life to becoming a physician and despite my illness I have put much time and effort in my attempts to satisfy the requests put before me. I will do whatever it takes to continue, however, this requires the cooperation of those making the requests.

I ask that you to take into consideration the information provided in this letter and the good faith efforts I have made to address the issues when making your decision regarding this appeal.

Sincerely,

*Stephanie Waggel*

Stephanie Waggel, MD

GWU 002446



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

SCHOOL OF MEDICINE AND HEALTH SCIENCES

OFFICE OF FACULTY AFFAIRS

PRIVILEGED AND CONFIDENTIAL

July 6, 2016

Dr. Jeffrey Berger
Associate Dean for Graduate Medical Education
School of Medicine and Health Sciences
The George Washington University

Dear Dr. Berger,

This letter is my review of the appeal request from Stephanie Waggel, MD, on May 15, 2016 regarding the decision to dismiss her from the Psychiatry residency program (Dismissal Letter of Notification on May 2, 2016). As outlined in the GW Graduate Medical Education Academic Improvement and Due Process policies, the following items formed the basis of my review:

1. A review of the file of Dr. Waggel provided by your office.  This included copies of relevant policies; Dr. Waggel's residency application and contract; Letters of Deficiency, DIO correspondence and Reportable Actions; appeal requests (including the current one), supporting documents and decisions; misconduct investigation and decision; Department of Psychiatry clinical competency committee (CCC) minutes, milestones and related correspondence; evaluations of Dr. Waggel; documentation of feedback related to issues arising on call, during seminars and other components of the program; leaves of absence; documentation of non-compliance issues related to didactics attendance, duty hours, health clearance procedures and the MedHub evaluation process; copies of cell phone texts and emails between Dr. Waggel and chief-residents and co-residents in the Psychiatry program; and complaints from  a citizen of the Foggy Bottom community.

2. An interview with Lisa Catapano, MD, Psychiatry residency program director (PD) at the time of the decision to dismiss Dr. Waggel. Dr. Berger and Mary Tucker, Director of Office of Graduate Medical Education, were present for this meeting. In addition to clarifying information, I specifically inquired about extenuating circumstances.

3. An interview with Stephanie Waggel, MD, the appellant. Dr. Berger and Mary Tucker were present for this meeting. In addition to clarifying information, I specifically inquired about extenuating circumstances.

Pursuant to the above referenced policies, this formed the basis of my determination of whether Dr. Waggel received sufficient notice and an opportunity to cure any deficiencies and if the decision to dismiss was reasonably made.



DR. BERGER DECLARATION
EXHIBIT #25

1

GWU 003297

ROSS HALL, SUITE 719 • 2300 EYE STREET, NW • WASHINGTON, DC 20037 • 202-994-3266 • FAX 202-994-9994

**Evidence of Notice**
According to the related policies, residents shall initially receive structured feedback in the forms of verbal feedback, regular rotation evaluations, recommendations from the CCC and the like.  In summary, her structured feedback is mixed. There are rotation evaluations that rate her at or above the level of expected performance in nearly all domains. She has been rated at level 1 (expected for entry into program) or 1.5 in nearly all of her milestone evaluations.  However, the number of evaluations in MedHub is limited and it is documented that Dr. Waggel's failure to input the names of her supervising attendings hampered the ability to obtain a larger number of evaluations, and at times the CCC relied on verbal and emailed evaluations to the faculty and PD.

There is ample documentation in the file that Dr. Waggel received verbal and other direct feedback about performance deficiencies related to patient care, medical knowledge, professionalism and interpersonal communication. Furthermore, there is a formal memo from the Department Chair to Dr. Waggel dated February 15, 2016, detailing several concerns of unprofessional conduct.  And finally there are a total of five formal letters of deficiency delivered to Dr. Waggel from the GME office and Program Director.

In my interview with Dr. Waggel she acknowledged getting the above feedback; however, Dr. Waggel felt she was overly scrutinized by the faculty compared to other residents. She believes the content of the letters of deficiency to be false.

Based on my review, the requirement of sufficient *notice* of performance deficiencies has been met.

**Evidence of opportunity to cure**
The formal letters of deficiencies and other communications to Dr. Waggel described expected behaviors and/or described an improvement plan for Dr. Waggel to have an opportunity to cure her performance deficiencies. The improvement strategies offered by the department over the past year have included:

- A buddy-call program where chief residents would help her organize workflow, improve communication, optimize patient hand-offs and provide coaching on how to manage acute situations on call

- Assignment of extra attending supervision while on call with a requirement to check in frequently throughout the night

- Removal from night call with enhanced level of attending supervision during daytime patient care activities for enhanced monitoring and feedback

- Assignment of a faculty mentor to discuss strategies for improvement with regards to professionalism

- Writing an essay on the topic of managing patient aggression in the inpatient setting with follow up to discuss the learning points

- Assignment of a faculty mentor to assist in how to organize patient presentations

2

GWU 003298

- Non-promotion to the third postgraduate year (PGY) level to allow re-taking of the failed didactic courses, with an opportunity for early promotion once she demonstrated competency of all PGY 2 level rotations.

It should be noted that portions of these remediation strategies were difficult to implement. Dr. Waggel has documented difficulties in arranging meetings with her assigned faculty mentors, Dr. Dyer, Dr. Kels and then Dr. Gandhi, despite her efforts. Dr. Dyer documents eventually meeting with Dr. Waggel, albeit late, according to the terms of the first letter of deficiency, to discuss improvement strategies related to professionalism. He documents in writing that she seemed to have little insight on the impact of her behaviors and frequently digressed to describe shortcomings of others and of the program. He felt that further remediation attempts related to professionalism would be difficult to develop due to Dr. Waggel's inability to understand that she even has a problem with professionalism.

Dr. Kels and Dr. Waggel never met as planned. Dr. Gandhi did meet with Dr. Waggel to review her essay and to practice patient presentations as outlined in her remediation plan.

The buddy call system and enhanced faculty oversight on call eventually were not successful strategies because the program director ultimately decided to take Dr. Waggel off the overnight call schedule completely. According to Dr. Catapano, this decision was made because of growing concerns over Dr. Waggel's truthfulness. Faculty was uncomfortable with the extra call-ins to the overnight attending as a viable strategy because they did not trust what she was saying anyway. Therefore Dr. Waggel was removed from call duty altogether and only performed patient care closely supervised by attending physicians during the day, with the hope of ultimately reintroducing Dr. Waggel to overnight call when performance improved sufficiently.

Although not documented as part of her remediation plans, Dr. Catapano described modifications of Dr. Waggel's work assignment to continue to allow for enhanced observation and feedback on other rotations in hopes of successful remediation. At the Northern Virginia Mental Health Institute rotation the medical director raised concerns to Dr. Catapano regarding Dr. Waggel's patient care. Her assignment was modified such that she was not allowed to perform patient intake assessments as residents normally do there and received increased supervision. She received an acceptable end-of-rotation evaluation from another faculty member there, although the work on which she was evaluated was less independent and more highly supervised than typical for residents at her level.

Additionally, modifications were made on the Children's National Medical Center rotation. Dr. Waggel was not allowed to take overnight call on the first two weeks of the rotation to ensure she was meeting clinical expectations before giving her more patient care responsibility. It is documented that Dr. Catapano pro-actively reached out to the director of the Children's rotation to request them to accommodate Dr. Waggel's weekly psychotherapy, and Dr. Cullins at Children's indicated she was happy to do it. The correspondence documenting this suggests the program sincerely wanted Dr. Waggel to succeed and was trying to find ways to accomplish that.

Although the decision for non-promotion to the PGY-3 level is viewed as "punishment" by Dr. Waggel, the opportunity to repeat failed didactic portions of the PGY-2 year and to be promoted early and off-cycle had she been able to demonstrate certain competencies was a major opportunity for her to cure her deficiencies. However, given Dr. Waggle's inability to have insight into her deficiencies she appealed this decision. Her appeal was upheld by the Dean's office based upon a procedural error in due process

3

GWU 003299

despite the judgement by an independent faculty reviewer that it was entirely reasonable. It is my opinion that the delayed promotion and opportunity to retake failed coursework was a sincere offer by the program to remediate and probably was the single best chance for Dr. Waggel to move forward and ultimately to succeed in her psychiatry training at GW.

The program offered numerous opportunities to cure deficiencies related to patient care and medical knowledge as described above. The strategies to deal with deficiencies in professionalism, and particularly perceptions that Dr. Waggel was untruthful were: 1) point them out to Dr. Waggel, 2) articulate expected behavior, 3) to meet with Dr. Dyer, and 4) refer to the GME office for a misconduct investigation and further recommendations. The strategy to meet with Dyer was sound, as he is a national expert in ethics and quite qualified to coach someone on these issues. However, their inability to meet in a timely fashion, and Dr. Waggel's inability to have insights and acceptance that she has problems related to professionalism stymied this strategy. The GME office conducted a misconduct investigation, concluded that misconduct had indeed occurred and drafted another letter of deficiency to Dr. Waggel that included a remediation plan on this matter. However, it was during this timeframe that Dr. Waggel was dismissed from the program on the recommendation of the CCC, so the letter of deficiency and remediation plan was never delivered to her and is pending the outcome of this current appeal.

I believe the program faculty can be faulted for not meeting with Dr. Waggel in a timely fashion in order to accomplish parts of her remediation plans. However, when evaluating the overall attempts and accommodations that the program afforded to Dr. Waggel in the past year, I believe that the requirement to provide sufficient opportunity to cure her deficiencies was met.

**Evidence of extenuating circumstances**
Both Dr. Catapano and Dr. Waggel suggested that Dr. Waggel's health issues may be an extenuating circumstance. From Dr. Waggel's perspective she believes that the program was 'resentful' of her missed time off to deal with her health issues and that this is the basis of her enhanced scrutiny compared to other residents and was a source of bias by the administrators of the program against her. She seems to feel demoralized by her attempts to stick up for herself to attend to her health needs. These perceptions seem to be the source of her assertions that the information in her letters of deficiency is false and that everything is 'stacked against her.'

Dr. Catapano described, and Dr. Berger and Ms. Tucker corroborated, that Dr. Waggel applied for time off under the federal Family and Medical Leave Act (FMLA) and was granted it. Part of her FMLA leave was intermittent. While the program fully intended to comply with Dr. Waggel's granted leave, they notified Dr. Waggel that, given the patient care responsibilities inherent in clinical training and the impact of one resident's leave on other residents' schedules, she would need to inform the program in a timely manner of scheduled appointments, and that she would also be required to follow usual procedures if she unexpectedly needed to call in sick. There seems to have been much misunderstanding between the program and Dr. Waggel on how this was to be accomplished and communication on these matters was a continual source of tension. Nevertheless, it does not appear that Dr. Waggel ever missed a single health appointment due to demands of the program. And as evidenced by the email from Dr. Catapano to Dr. Cullens at Children's hospital, it appears that the program was earnestly trying to accommodate Dr. Waggel's health appointments.

Dr. Berger and Ms. Tucker indicated that Dr. Waggel was given information on how to apply to the Equal Employment Opportunity (EEO) office for work accommodations if she or her doctor felt they were

4

GWU 003300

necessary in light of her health problems. She never applied for any accommodations under this mechanism.

While I feel that Dr. Waggel's health problems were clearly an issue entangled with her clinical performance problems, professionalism problems and misconduct, it does not appear to me that they were the source of any bias against her. The language and tone of email communications to Dr. Waggel from the program were very caring and supportive and the PD accommodated her needs to take medical leave when required. In that regard they are not an extenuating circumstance that materially justifies overturning the CCC decision to recommend dismissal.

### Reasonableness

Having a career as a medical educator for over twenty years, and having served as a residency program director myself, I feel well-qualified to render an opinion on the reasonableness of the decision by the CCC to recommend, and the PD to carry out, dismissal of Dr. Waggel from the residency program.

In short, the recommendation is entirely reasonable. From her intern year and well into the PGY-2 year, there is an abundance of documentation of performance deficiencies related to patient care, medical knowledge, professionalism and communication. Receiving up to 5 letters of deficiencies in a single academic year is unprecedented at GW in my experience. The plans to remediate were sufficient and reasonable in my opinion for the typical resident who has insight and is amenable to remediation.

Unfortunately, Dr. Waggel seems to lack insight and was not amenable to feedback and remediation, particularly related to issues of professionalism. This further hampered sincere and sufficient efforts by the program to remediate her in other areas of patient care, medical knowledge and communication. This is apparent to me based upon the documentation provided and upon my meeting with her. Dr. Griffith, the Department Chair, formally accused her of being deliberately untruthful in the workplace. Dr. Dyer, assigned as a mentor, documents that she says things that are not true or only partially true. Copies of text messages sent by Dr. Waggel to her co-residents are disturbing and disruptive. Professional lapses were identified and expected behaviors were described to Dr. Waggel and documented thoroughly. That should be sufficient remediation for someone who has insight and sees herself as a professional. Dr. Waggel's unchanging patterns of behavior related to professionalism are beyond the expectation of what can be reasonably remediated by a clinical training program.

The CCC minutes from April 8, 2016 clearly document that they gave ample consideration to Dr. Waggel's performance and her inability to remediate as a basis for the reasonable decision to recommend to the PD to dismiss her from the program.

Respectfully submitted,

Ray Lucas, MD
Associate Professor, Emergency Medicine
Associate Dean for Faculty Affairs and Professional Development

5

GWU 003301

**THE GEORGE
WASHINGTON
UNIVERSITY**
WASHINGTON, DC

**Office of Graduate Medical Education**

July 13, 2016

Stephanie Waggel, MD
1230 23rd Street, NW Apt 909
Washington, DC 20037

Dr. Waggel:

This letter serves as formal notification of the determination of Ray Lucus, M.D., who was appointed as the physician reviewer following your appeal request on May 15, 2016, pursuant to the GME Academic Improvement Policy ("Policy"), to review the following decision by your Program Director, Lisa Catapano, M.D on May 2, 2016: *notification of dismissal*.

The GME Academic Improvement Policy states that the physician reviewer will:

- Review the request of the Resident
- Meet with the Resident
- Review the Resident's file
- Talk with the Program Director
- Consider extenuating circumstances
- Consult with others, as appropriate, to assist in the decision making process; and
- Make a determination whether the Resident received notice and an opportunity to cure, and the decision to take the Reportable Action was reasonably made.

Dr. Lucas reviewed all documents provided, including your request to review and your file. He conducted interviews with you and Dr. Catapano in the presence of Dr. Berger and Mary Tucker. Pursuant to the above referenced policy, the documents and interviews, as noted, formed the basis of Dr. Lucas' determination of whether you received sufficient notice and an opportunity to cure any deficiencies and if the decision to dismiss was reasonably made.

After a careful and thorough review, Dr. Lucas has determined that you were notified of academic deficiencies on numerous occasions. Further, he has determined that you were given structured feedback and sufficient opportunity to cure deficiencies. Dr. Lucas examined the possibility of extenuating circumstances and, failing to attribute an extenuating circumstance to the reasons for the decision to dismiss, concluded that the decision of the Program Director to dismiss you was reasonably made. Please refer to the attached Reviewer Decision document.

Under the Academic Improvement Policy, you have the right to request a final review by Jeffrey

1



DR. BERGER DECLARATION
EXHIBIT #26

GWU 002454



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

**Office of Graduate Medical Education**

Akman, M.D., Vice President for Health Affairs and Dean of the School of Medicine and Health Sciences or his designee, within fourteen (14) days of the date of this letter. The final review is solely to determine whether the process set forth in the Policy was followed. Attached is a copy of the Policy, or it can be found at the following website:

http://smhs.gwu.edu/sites/default/files/GW%20GME%20Academic%20Improvment%20Policy.jb.6.27.pdf

If you have any questions, please feel free to let me know.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & DIO, Graduate Medical Education

GWU 002455

**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

**Office of Graduate Medical Education**

August 12, 2016

Via Email and Federal Express Delivery

Stephanie Waggel, MD
1230 23rd Street, NW Apt 909
Washington, DC 20037

Dear Dr. Waggel:

This will confirm my receipt of Dean Simons' letter dated August 10, 2016, setting forth his
determination on the final appeal regarding your dismissal from the Psychiatry Residency
Program upholding the decision for your dismissal.  This will further confirm pursuant to the
Resident Physician Agreement signed by you on June 14, 2016, specifically Para.7.A. and D., that
effective as of the date of your termination from the program, i.e., August 10, 2016, your salary
is terminated.  Your benefits will be terminated in accordance with University policy.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Professor of Anesthesiology
Associate Dean & DIO, Graduate Medical Education

cc:     Eindra Khin Khin, MD, Program Director
        James Griffith, MD, Chair

3324452v.1



**DR. BERGER DECLARATION
EXHIBIT #27**

**GWU 003502**

THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Office of the Dean

March 25, 2016

Stephanie Waggel, M.D, M.S.
1230 23ʳᵈ Street, NW 909
Washington DC, 20037

        RE: Appeal

Dear Dr. Waggel,

On March 10, 2016, I received email notice that you were appealing the recent decision of the
physician reviewer appointed by the Associate Dean for Graduate Medical Education Office
which upheld the decision of your program director that you were not on track to be promoted
to PGY 3 in July 2016. In my role as Senior Associate Dean for MD Programs, I must determine
whether the process set forth in the Academic Improvement Policy was followed.

I reviewed your email correspondence of March 10, 2016, and your attached appeal letter to
me. In addition, I reviewed the letters of deficiencies from your Program Director, the report of
Dr. Cioletti, your residency evaluations from your attendings, the documentation from your
semi-annual reviews with your Program Director, and the minutes of the department's Clinical
Competency Committee. Also, you and I spoke by telephone on March 14, 2016, at 8 am at
which time we discussed this issue for approximately 45 minutes. I also had a 30 minute phone
call with your Program Director, Lisa Catapano MD, and met in person with the Chair of the
Clinical Competency Committee, Allen Dyer MD, MPH.

As outlined in the Academic Improvement Policy, the program director is to consult with the
Clinical Competency Committee when deciding not to promote a resident to the next PGY level.
However, the minutes of the department's Clinical Competency Committee meeting on
October 23, 2016, do not include any mention of consideration to delay your promotion. In
addition, Dr. Dyer confirmed that the Clinical Competency Committee made no
recommendations about the status of your promotion during the meeting on October 23, 2016.
Furthermore, there was no other meeting of the Clinical Competency Committee prior to your
Program Director issuing the letter of deficiency dated November 11, 2016.

Accordingly, it is my opinion that the Program Director did not follow the Academic
Improvement Policy in issuing the letter of deficiency informing you that you were not on track
to be promoted in July 2016. Based on this, the letter of deficiency dated November 11, 2016,
notifying you that you were not on track to be promoted should not have been issued in the
absence of a recommendation by the clinical competency committee.

DR. BERGER DECLARATION
EXHIBIT #28

GWU 002495

I am referring this matter back to your department and Program Director. The Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program.

Sincerely yours,

Richard J. Simons MD MACP
Senior Associate Dean for MD Programs
Professor of Medicine

GWU 002496