# EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,              )
                                   )
        Plaintiff,                 )
                                   )   Civil Action No.: 1:16-cv-01412-CKK
    v.                             )   Hon. Colleen Kollar-Kotelly
                                   )
GEORGE WASHINGTON UNIVERSITY,      )
                                   )
        Defendant.                 )

## DECLARATION OF ALLEN DYER, M.D.

I, Allen Dyer, M.D., hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters hereinafter set forth and am competent to testify thereto.

2.      I am a Professor of Psychiatry at the George Washington University School of Medicine and Health Sciences (GW SMHS) and its affiliated physician practice group, Medical Faculty Associates ("GW MFA"). I am also the Vice-Chair for Education in the GW SMHS Department of Psychiatry. I maintain a clinical Psychiatry practice based out of the offices of GW MFA. I have been employed at GW SMHS since 2012.

3.      I currently serve as the Chair of the Clinical Competency Committee (the "CCC") of the Psychiatry Residency Training Program (the "Program").

4.      The CCC meets at least twice a year to review the progress of each resident in the Program according to a scale of 21 defined "milestones" established by the Accreditation Council for Graduate Medical Education (the "ACGME"). The ACMGE milestones are based on six core competencies on which Psychiatry residents are evaluated.

5.      The CCC reviews are conducted to assure that residents stay on track during the four years of their training and that any residents encountering difficulty of any kind will have the difficulty identified and plans implemented to get the resident back on track.

6.      The CCC then reports to the Program Director on the evaluation of each resident, any concerns that may have been identified, and proposed steps to be taken to address the concerns.

7.      I was the Chair of the CCC during the period July 2014 – May 2016. In 2015, the CCC was comprised of Program Director, Dr. Lisa Catapano; Assistant Program Director, Dr. Eindra Khin Khin; Dr. Lorenzo Norris, Dr. Catherine Crone, and Dr. Lori Kels who took over as Assistant Program Director and replaced Dr. Khin Khin on the CCC when Dr. Khin Khin became the Director of Medical Student Education.

8.      Most concerns about a resident's performance can be addressed by a plan of routine structured feedback during clinical training by direct supervisors.

9.      When the Program Director, in consultation with members of the CCC, determines that routine structured feedback is not resulting in the necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback, the Program Director, in consultation with the CCC, may issue a "Letter of Deficiency" ("LOD") to the resident. The Associate Dean for Graduate Medical Education must be notified prior to the issuance of an LOD.

10.      LODs are not disciplinary or punitive in nature. They do not constitute a "reportable action" – for example, they are not required to be reported to a credentialing organization, hospital, or licensing board. They are intended to assure that residents have

2

received in writing a clear statement of a concern and an explicit plan of correction to assist them so they can address and resolve the matter and move on.

11.     LODs were implemented to avoid the circumstance where a resident would complain, after multiple more informal structured efforts to remediate an issue had not succeeded, that they had not received a clear statement of the problem or the steps needed to be taken to correct the problem. LODs provide a resident with formal notice and opportunity to cure and are used to ameliorate any unfair ambiguity regarding problems that have been identified and expectations for correction.

12.     If the resident satisfactorily resolves the deficiency identified in an LOD and continues to perform acceptably thereafter, the period of unacceptable academic performance should not affect the resident's progress in the Program.

13.     If the Program Director, in consultation with members of the CCC and Associate Dean for GME, determines that a resident has failed to satisfactorily cure the deficiency and/or improve his/her overall performance to an acceptable level, the Program Director may elect to take further action which may include one or more of the following: Issuance of a new LOD, non-promotion to the next PGY level; repetition of a rotation that results in extension of the required period of training; extension of contract, which may include extension of the defined training period; denial of credit for previously completed rotations, and dismissal from the residency program.

14.     Dr. Stephanie Waggel, then a second year resident (PGY2) in the Program, received an LOD, dated July 15, 2015, based on a CCC review of an incident involving her failure to appear for a 7:00 a.m. shift on June 10, 2015 in the Emergency Department ("ED")

3

during her ED rotation without notifying anyone on her shift. A true and correct copy of the LOD is attached hereto as **EXHIBIT 1** (GWU 1223-1224).

15.    The LOD noted that Dr. Waggel was deficient in the area of Professionalism for failing to report to work on time without alerting anyone, causing inconvenience to her co-workers. She was also noted to be deficient in the area of Systems-Based Practice for failing to take the proper steps of alerting her co-workers that she would be absent, thus exhibiting a lack of understanding in the way the ED operates and its reliance on each staff member's reliability and promptness.

16.    The LOD directed Dr. Waggel to contact me within two weeks of receipt to address the deficiencies identified therein and to develop a plan for improvement.

17.    Dr. Waggel took medical leave beginning July 20, 2015. She returned to work on August 3, 2015.

18.    On August 12, 2015, Dr. Waggel, in response to an email from me regarding a request that she complete a document known as the Epstein Exploitation Index (which provides an early warning indicator of boundary violations in psychotherapy) and then compare the score on the index with the score recorded on the same index before she had taken the seminar, Dr. Waggel totally missed the point of my request (stating she did not change her answers because she was on medical leave at the time – a non sequitur) and she then asked whether I had received a previous email from her about setting up a meeting to address the LOD. A true and correct copy of that email exchange is attached hereto as **EXHIBIT 2** (GWU 2830 - 2831).

19.    I responded by noting that she had not responded to the question I had posed about the Index and asked her to re-think her response. I then also said that I had not received an

email about setting up a meeting and asked her to forward that email to me along with a copy of the LOD itself and then we could set up a time to meet. Id.

20.     Fifteen days later, on August 29, 2015, in response to my request that she forward her prior email and provide a copy of the LOD, Dr. Waggel sent a further email (she did not forward the alleged earlier email about setting up a meeting) stating that she was "having a hard time scanning" the LOD and instead attached a photo she had taken with her cell phone of an illegible document that appeared to be a letter on MFA letterhead. A true and correct copy of this email is attached hereto as **EXHIBIT 3** (GWU 1274 – 1276).

21.     On Monday, August 31, 2015 at 4:46 p.m., I sent an email to Dr. Waggel stating: "Let's find a time to get together. Perhaps we could meet Thursday at Grand Rounds time [which started at 10:30 a.m.] since GR doesn't start until next week. Will that work for you?" I also told Dr. Waggel that I had not been able to read the document she had attached to her earlier email and asked her to bring a hard copy so we could just photocopy it. See Screen shot of email, dated August 31, 2015, Dr. Dyer to Dr. Waggel, **EXHIBIT** 4, p. 1 (Plaintiff Bates 1153).

22.     On Wednesday, September 2, 2015, at 1:21 p.m., Dr. Waggel responded: "Tory [Program Administrator Victoria Anderson] said that I can meet with you tomorrow from 12 to 1230 at the mfa. I can bring a copy of the letter. Thank you." Id., pp. 2 – 3 (GWU 001270 – 1271).

23.     I later asked Ms. Anderson about this interaction and she stated that Dr. Waggel had told her that I had asked for the 12:00 – 12:30 p.m. time. That was, of course, false as shown by my email exchanges with Dr. Waggel.

5

24.     I then replied at 2:12 p.m. to Dr. Waggel noting that she had not answered the question and stated: "I offered to meet you at 1030 Thursday morning. That is a yes/no question. Can you meet at that time? If not, we can look for another time." Id., p. 2 (GWU 001270).

25.     At 2:41 p.m., Dr. Waggel responded further: "When I contacted Tory she stated that I would be free from 12-1230 but I will be in didactics for the rest of the day. I just called her again and she stated that I could be excused from class at 1030 if that is the only time you can meet. Thank you." Id.

26.     On Thursday, September 3 at 7:35 a.m., I responded that "[W]e can do the noon time." Id.

27.     On September 3, 2015, I met with Dr. Waggel to discuss the July 15 LOD.  A summary of that meeting that I prepared for Dr. Catapano's review is attached hereto as **EXHIBIT 5** (GWU 1118 – 1119).

28.     In the meeting, Dr. Waggel and I went over the July 15 LOD together. She began by stating that "90% of it was false." Id. at p. 1 (GWU 001118).

29.     Dr. Waggel said that she had cancer and was sick and vomiting that day and should not have been expected to come to work. Id.

30.     Dr. Waggel said she had told an attending physician, but could not remember who. Id.

31.     She said she had asked another resident to cover for her, but could not remember who. Id.

32.     She said she did not remember getting any calls about her failure to report for duty at the beginning of the shift and did not think that anyone would care that she did not show up for work. Id.

33.     She then said she loved the program at first, but had a lot of complaints about her fellow residents, the way the hospital is run, and not getting the feedback she needs to make improvements. Id.

34.     In my view, and I so reported to Dr. Catapano, Dr. Waggel tended to focus on other's deficiencies and had to be re-directed to look at her own issues. Id.

35.     Dr. Waggel showed little awareness of the impact of her own behavior on interactions with others and explained at length the shortcomings of the environment in which she worked. Id.

36.     I pointed out repeatedly that she was not answering my questions and she identified that she was being tangential, but she then suggested she was being circumstantial in that she was trying to come back to the questions. Id.

37.     I asked Dr. Waggel if she had any second thoughts about the specialty she had chosen or this program in particular. Id.

38.     I asked her if she felt overwhelmed in the Program, which she denied. Id.

39.     I also asked if she thought a leave of absence might help. She said she had taken a leave of absence, went to Italy, and felt much better. Id.

40.     We then discussed the LOD requirement that she inform me of her supervisors so we could verify her attendance on clinical assignments. Id.

41.     She said she was "paranoid" about this because she felt this would prejudice them against her. Id.

42.     I responded that she should be on her best behavior and that working in psychiatry required "emotional intelligence" and an awareness of how one's behavior is being received by others. Dr. Waggel responded that this was an issue she would take to therapy. Id.

43.     In my report I noted my concern that Dr. Waggel's defensiveness, her entanglements with fellow residents and staff, and general lack of reflectiveness might be but the tip of a larger iceberg of problems. Id.

44.     I also noted my concern about her tendency to "triangulate" communications and to say things that are not true or are only partially true. Id.

45.     I noted that while therapy might be helpful to her in time, I was concerned about her ability to do the work that the specialty of psychiatry requires. Id.

46.     I also wondered if psychological assessment might benefit Dr. Waggel in identifying maladaptive defenses more quickly than might otherwise occur in more open-ended therapy.

47.     I commented further that a review of her evaluations might be helpful to Dr. Waggel in appreciating the impact of her behavior on others and helpful to the CCC in determining whether she would be capable to successfully complete a psychiatry residency.

48.     I reiterated to Dr. Waggel that I thought there were concerns that went beyond attendance and that she should pay particular attention to (1) Professionalism, and (2) Systems-Based Care.

49.     In conclusion, I reported to Dr. Catapano that it was difficult to develop a remediation strategy because Dr. Waggel did not really understand that she had a problem but instead felt that there were many problems with the program. Id.

50.     On September 11, 2015, Dr. Waggel emailed Dr. Catapano and me stating that she was finding her therapy very helpful and asking that the LOD not be shared with anyone else, particularly her attendings at the sites for her upcoming rotations, for fear it would be detrimental for her to start each new month with an attending that "only knows me from the

8

information on a letter of deficiency" and stated that was so "especially because of the circumstances" of the letter. A true and correct copy of this email is attached hereto as **EXHIBIT 6** (GWU 2833).

51.     Dr. Waggel's reference to the "circumstances" of the letter involved the fact that she "submitted my doctor's excuse for the day referred to in the letter" as well as a copy of her phone records she had sent to me and again attached to the email. Id.

52.     Dr. Waggel continued by stating again that "the majority of the letter is incorrect" but then added, "I have chosen to accept it." Id.

53.     Dr. Waggel concluded the email by requesting that we let her "know the status of this letter when you can." Id.

54.     This email again reflected Dr. Waggel's lack of insight into her behavior and the deficits reflected by the behavior so that remediation was problematic.

55.     As had been pointed out to Dr. Waggel by several faculty members on several occasions, the problem was not whether she was sick or whether she had submitted a "doctor's excuse for the day," the problem was that it is a serious breach of professionalism not to alert the supervising attending physician, the Chief Resident, and other members of the medical team and program administration required to be informed when one is not going to show up for clinical duty. That is true for any clinical service but certainly very obviously true for an Emergency Department rotation.

56.     Further, I had discussed with Dr. Waggel that the issues were concerns that went beyond attendance and she should focus on Professionalism and Systems-Based Care for the reasons we had discussed.

9

57.     Dr. Catapano responded to Dr. Waggel's email and assured her that the LOD was confidential and not shared with anyone other than herself, the Assistant Program Director, Dr. Lori Kels, the GME Office, and me because I was in charge of her remediation. A true and correct copy of this email is attached hereto as **EXHIBIT** 7 (GWU 2835).

58.     Dr. Catapano reiterated that the point of the LOD was not that Dr. Waggel had been sick, but her failure to take appropriate action to alert her team, chief residents, and the attending in advance so that appropriate coverage could be arranged. Id.

59.     Dr. Catapano closed her email: "We all appreciate how hard you are trying to improve." Id.

60.     On October 23, 2015, the CCC held a regularly scheduled meeting to discuss the progress of each resident in the program. A true and correct copy of the minutes of that meeting is attached hereto as **EXHIBIT 8** (GWU 1137 – 1138).

61.     For approximately 30 minutes of the meeting we discussed Dr. Waggel and noted that she was having problems in multiple aspects of the program resulting in further letters of deficiency either issued or to be issued, ongoing issues with medical leaves and professionalism and failure in program requisites (PROF2). Id. (GWU 1138).

62.     It was further noted that two faculty members would be meeting with Dr. Waggel to discuss a Root Cause Analysis ("RCA" – a formal review of an unexpected or adverse event to determine the cause and set a plan for correction) of an overnight on call shift on August 25, 2015, in which Dr. Waggel had been involved in apparent significant lapses in the domains of Patient Care, Interpersonal Communications Skills, and Systems-Based Practice. Id.

63.     It was further noted that Dr. Catapano was scheduled to meet with Associate Dean for Graduate Medical Education, Jeffrey Berger, M.D., to review Dr. Waggel's circumstances and determine the Program's next steps in her remediation. Id.

64.     On November 5, 2015, Dr. Catapano emailed members of the CCC regarding her meeting with Dr. Berger that day. A true and correct copy of this email is attached hereto as **EXHIBIT 9** (GWU 1198).

65.     Dr. Berger had suggested that based on Dr. Waggel's current Milestone evaluation, which was significantly below that expected for her level of training, the Program consider extending Dr. Waggel's training by 6 months. Id.

66.     Dr. Catapano then noted that any decision in that regard must come from the CCC and, if that action were taken, would be communicated to Dr. Waggel within the LOD she was currently drafting to address Dr. Waggel's performance on the August 25 shift. The LOD would also note that Dr. Waggel had not been compliant with the Improvement Plan set forth in her last LOD and that Dr. Waggel would be placed back on "buddy call" (a method of providing an extra level of support and feedback by designating a more senior resident to be specifically available to the more junior resident for consultation in the event the resident is unsure of what to do or has any concerns about staying within their scope of ability) until her performance had improved. Id.

67.     As the decision to extend training had to come from the CCC, Dr. Catapano asked for our opinion on the matter. Id.

68.     In response to Dr. Catapano's email, I noted my concerns about Dr. Waggel being promoted to the next level of clinical training, PGY3, in 7 – 8 months if she still needed to be on buddy call and there were still concerns as to whether she would even show up for work. Id.

11

69.     I also raised the question of what educational program could be designed where the Program could confidently say Dr. Waggel had the skills to practice psychiatry independently and noted that the specialty may not have been a good choice for her. Id.

70.     Finally, I stated that I wondered whether the Program would renew her contract or whether, since she had refused to comply with the most basic remediation plan, if there were grounds for terminating her contract. Id.

71.     On November 18, 2015, Dr. Catapano emailed the members of the CCC to notify us that she was preparing a new LOD for Dr. Waggel regarding the fact Dr. Waggel had failed two didactics courses, Introduction to Psychodynamic Theory with Dr. Cheryl Collins, and Neuroscience with Dr. James Griffith. A true and correct copy of this email is attached hereto as **EXHIBIT 10** (GWU 1195).

72.     The email noted that Dr. Waggel had failed two exams in the Neuroscience course with a score of 33% on each. It also noted that Dr. Collins felt that Dr. Waggel had not progressed enough in her understanding in the course to be able to start with a therapy patient the next month as expected. Id.

73.     Dr. Catapano further noted that another faculty member, Dr. John Zinner, did not allow a resident who did not have a therapy patient assigned to take his course in Psychodynamic Psychotherapy which would run the entire rest of the current year because it is case-based. Id.

74.     Both Dr. Collins and Dr. Griffith commented that tardiness, absences, and failure to do assigned work outside of class contributed to Dr. Waggel's poor performances. Id.

75.     Dr. Catapano suggested that if Dr. Waggel returned to work that month or next, that she not be allowed to participate in PGY2 didactics for the rest of the year as they all build

12

upon each other as the year goes forward and she had not learned enough in the frst quarter of the year for her to be able to learn what she needed in the latter part of the year. Id.

76.     If that were to occur, Dr. Catapano further noted that since Dr. Waggel would not be participating in the protected didactic time which was conducted all day each Thursday, she would be expected to report for clinical work on those days. Id.

77.     Finally, Dr. Catapano noted that Dr. Waggel had already been informed that she would not be promoted to the PGY3 year the next July (2016) as the result of these deficiencies and she would be required to start the PGY2 didactic curriculum from the beginning the next year. Id.

78.     I responded to Dr. Catapano's email noting that there were two issues – (1) Dr. Waggel's deficiencies, and (2) what she would be allowed to do if she were to return to work. Id.

79.     As to the deficiencies, I suggested that they be documented in the LOD and that the Program Director, the CCC, the GME dean, and the university counsel then determine a response to the repeated deficiencies, the fact that Dr. Waggel continued to fail to acknowledge that she had a problem, and the fact that Dr. Waggel had refused to comply with the remediations already presented to her.

80.     As to return to clinical rotations, I stated that I did not see how she could be allowed to see patients independently or what could happen to make that a possibility. Id.

81.     On December 10, 2015, Dr. Waggel was issued a Letter of Deficiency for failing the two didactics classes and was advised that these failures further demonstrated that she was not prepared to be promoted to the PGY3 year in July, 2016.

82.     In late January – early February 2016, given the various issues that had arisen, I took it upon myself as Chair of the CCC to prepare a summary of Dr. Waggel's entire residency

for the CCC to use in evaluating her status in the Program and determining the next steps to take in light of those circumstances.

83.     I reviewed hundreds of pages of documentation related to Dr. Waggel's tenure.

84.     I then synthesized that material along with the information I had obtained in my role as Chair of the CCC, my direct interactions with Dr. Waggel, and my interactions with other faculty and Program personnel into a document entitled "Clinical Competency Committee Performance Review of Dr. Stephanie Waggel" (the "Performance Review") dated February 9, 2016, a true and correct copy of which is attached hereto as **EXHIBIT 11** (GWU 1112 – 1117).

85.     I began the Performance Review noting that concerns with Dr. Waggel began as early as the first month of her residency. Id. (GWU 001112).

86.     On July 31, 2014, then rising Chief Resident Stephanie Cho reported that Dr. Waggel: (1) exhibited resistance to feed back or constructive criticism; (2) exhibited significant deficits in patient care, including failure to recognize the severity of threat to patient safety with specific errors, and failure to complete orders/documentation prior to leaving work and then failing to ensure that it would be done by someone else; (3) did not foster productive collaboration in a team environment, and (4) demonstrated frequent unprofessional behaviors, including failing to take responsibility for errors/near misses that constituted significant patient safety issues, expressed open displeasure when asked to help or to complete some patient care task, e.g., prescriptions for a planned discharge, and was openly disrespectful to other care team members. Id. (GWU 001112 – 001113).

87.     The concerns continued during Dr. Waggel's rotation at Inova Fairfax Hospital where in January 2015, the supervising attending physician, Dr. Aditi Malik, reported to the

14

Chief Resident, Dr. Greene, that Dr. Waggel "show[ed] a lack of motivation, initiative, and interest in the care of her patients." Id. (GWU 001113). This was manifested in multiple ways:

      a.    Dr. Waggel had been seen using her phone and rolling her eyes during meetings or conversations with patients and staff.

      b.    She had come to work wearing provocative clothing, such as tight pants which had made staff uncomfortable to the point that they had asked Dr. Greene to speak to Dr. Waggel about it.

      c.    Dr. Waggle would sit in the resident call room and fail to check in with Dr. Greene for rounds or meetings – there was a lack of communication such that Dr. Greene had felt the need to track Dr. Waggel down to see what she was doing.

      d.    Dr. Waggel showed up late daily.

      e.    Dr. Waggel would leave a note at the nurses' station with patient assignments, as if she were the attending physician.

      f.    She walked out of meetings without permission.

Id. (GWU 001113).

88.    On February 10, 2015 at Inova Fairfax Hospital, Dr. Waggel's whereabouts were unknown – she was absent and unreachable. Id.

89.    I noted that issues of high alarm surfaced on Dr. Waggel's Internal Medicine rotation in March – June 2015, involving complaints from patients, nursing, consulting services, the Emergency Department, and even from Dr. Gary Little, the hospital director. Id.

90.    In March 2015, her supervising attending, Dr. Jason Prior, reported that on his very first day covering the rotation he was "fielding complaints from nursing and patients

regarding her interactions with them and patients were upset stating she didn't know what she was talking about." Id. (GWU 00114).

91.    Dr. Prior reported that during post-call on Tuesday, the second day of his coverage on the rotation, it became apparent that Dr. Waggel "had a hard time evaluating patients, presenting [a patient case], knowing what medications did, etc. She didn't know the basics of medicine." Id.

92.    On March 6, 2015, Dr. Prior reported to Jillian Catalanotti, M.D., Program Director of the Internal Medicine Residency Training Program, "[i]t's gone beyond personal interactions and a lack of knowledge and affected patient safety." Id.

93.    Dr. Prior reported further to Dr. Catalanotti that, "The primary issues center on Stephanie and her professionalism, interactions with nursing and consulting services, her medical knowledge and patient safety." Id.

94.    Dr. Prior reported specific detailed examples and it was determined that Dr. Waggel could not see patients independently and was to function as a medical student with her orders reviewed. Id.

95.    I then noted in the Performance Review that subsequently there had been ongoing concerns which had been documented in a series of letters of deficiency. Id.

96.    The LODs were briefly summarized as follows:

    a.    LOD #1: Dr. Waggel received an LOD dated July 15, 2015, for failing to appear for an ED shift on June 10, 2015.

    b.    LOD #2: Dr. Waggel received a second LOD on October 28, 2015, for failing to submit required documentation for a legally mandated hospital health clearance despite numerous reminders and an extension of the deadline to do so.

      c.     LOD #3: Dr. Waggel received a third LOD on November 19, 2015, for deficiencies during an August 25, 2015, overnight call shift involving the domains of Patient Care, Interpersonal Communication Skills, and Systems-Based Practice related to "disorganized and incomplete" presentations to the on-call attending and others regarding a severely agitated patient as well as angry and aggressive behavior (including threatening to have the patient arrested or administratively discharged).

      d.     LOD #4: Dr. Waggel received a fourth LOD on December 10, 2015, for failing two didactics courses – Neuroscience and Psychotherapy.

Id. (GWU 001114 – 001115).

97.     The Performance Review discussed the fact that Dr. Waggel had failed to comply with the improvement plans set forth in the LODs in that Dr. Waggel had failed to meet with me in a timely fashion and failed to comply with the requirement to notify me of her supervising attendings so we could confirm she was reporting to work and doing so in a timely fashion. Id.

98.     It was further noted that even with an extended deadline, Dr. Waggel had failed to comply with D.C. law which mandates annual physician medical clearance exams on a date certain or requires residents – or any other physician – to be removed from clinical duty. Id.

99.     Despite these deficiencies, Dr. Waggel never acknowledged that she had problems that needed to be addressed. Id.

100.     I also noted that another faculty member, Baiju Gandhi, M.D., who reviewed the report that Dr. Waggel was required to submit as part of the remediation plan under LOD #3 for the August 25 call shift, again observed that Dr. Waggel showed "[L]ack of insight into personal deficits regarding clinical and professional behavior" such as "passing out in a call room, being found inebriated and disorderly in her apartment, frank lying regarding the remediation process"

17

and "being tempestuous/frantic/erratic when interacting with a dangerously agitated patient" as well as engaging in threats to the Program itself. Id. (GWU 001115).

101.    Finally, I discussed the repeated issues with truthfulness that Dr. Waggel had demonstrated. I noted that she had: (a) Lied to Dr. Zinner that she was allowed to take his class despite being told she could not by Dr. Catapano, (b) misrepresented to the Hospital ombudsman that she had not been given notice or feedback about any problems despite having received four LODs and verbal feedback on multiple occasions, and (c) lied to Dr. Berger about her grade on a test in Dr. Griffith's Neuroscience class. Id. (GWU 001116).

102.    After reviewing the entire course of events over Dr. Waggel's tenure in the Program, I then addressed the possibility for Dr. Waggel's remediation given the lack of acknowledgement on her part of any problems, the failure to comply with previous remediation plans with very direct and explicit instructions, the failure of compliance with the Program's work and educational expectations, including even at the level of showing up for work in a timely fashion or not at all on occasion, and particularly problematic, her dishonest and incomplete communications. Id.

103.    I then noted that despite these misbehaviors, the Program had made repeated efforts to help Dr. Waggel understand what is expected of her to be successful but her approach had generally been to deny that she had any problems. Id. (GWU 001116 – 001117).

104.    I further noted that the possibility of impairment, such as substance use or a thought disorder which might make it challenging to organize her thinking, had been considered and Dr. Waggel had been asked if there were any mitigating circumstances or help she might need and she had always rejected that idea and had not asked for any accommodations.

18

105.    In light of those efforts, it was my opinion and I drafted as a conclusion for the Performance Review that the Program had exhausted attempts to help Dr. Waggel address these multiple and serious concerns, that we felt if was not safe to let her see patients independently, that she was not progressing toward promotion, and therefore her employment and training should be terminated. Id.

106.    On February 2, 2016, I received an email from Dr. Catapano forwarding me a document that Dr. Waggel had prepared summarizing the events of the August 25, 2015, call shift. Dr. Waggel asked that the CCC consider the document in preparing her remediation plan. A true and correct copy of that document is attached hereto as **EXHIBIT 12** (GWU 1206 – 1222).

107.    On March 25, 2016, Dr. Simons emailed Dr. Catapano, Dr. Berger, and me regarding his findings on Dr. Waggel's appeal of her failing grades in Dr. Collins's course and Dr. Griffith's course, and the decision not to promote her to PGY3 at the end of the academic year. A true and correct copy of this correspondence is attached hereto as **EXHIBIT 13** (GWU 2875-2877).

108.    Dr. Simons found that the GME Academic Improvement Policy was not followed because the minutes of the CCC meeting on October 23, 2016 [sic] did not include any mention of consideration to delay Dr. Waggel's promotion (which was one of the actions taken by Dr. Catapano as the Program Director) and Dr. Dyer had confirmed that the CCC had made no recommendations in that regard. As the Academic Improvement Policy states that the Program Director is to consult with the CCC when deciding not to promote, Dr. Simons concluded the policy had not been followed. Id. (GWU 002876).

109.    Dr. Simons stated further that he was "referring this matter back to your department and Program Director" and that "[T]he Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." Id. (GWU 002877).

110.    On April 5, 2016, Dr. Catapano provided me with a memorandum "to highlight the most concerning issues" that had occurred following a misconduct memo regarding Dr. Waggel which had been prepared by Dr. Griffith as Chair of the Department, stated that she intended to present her memo at the next CCC meeting, and invited my comment regarding the memo. A true and correct copy of Dr. Catapano's email and attached memorandum is attached hereto as **EXHIBIT 14** (GWU 2885-2886).

111.    In her memo, Dr. Catapano identified three concerns: (1) Dr. Waggel had to be removed from a patient's care on March 1, 2016, because a psychotherapist found her interaction with the patient and his family to be odd and potentially damaging to them in their vulnerable circumstances, (2) a continuing pattern of dishonesty involving an episode in which Dr. Waggel had made multiple untruthful statements and misrepresentations to a number of individuals regarding her inability to meet with Dr. Berger because she was ostensibly on FMLA leave for medical reasons, and (3) Dr. Waggel's continued lack of insight into her deficiencies and lack of effort to remediate them, most clearly demonstrated in her essay for Dr. Gandhi on patient safety involving the August 25 on-call shift. Id. (GWU 002886).

112.    On April 8, 2016, the CCC conducted a regularly scheduled meeting to review the residents in the Program. Present for the meeting were Dr. Catapano (*ex officio*), Dr. Khin Khin, Dr. Crone, Dr. Norris, me, and the Program Coordinator, Victoria Anderson. A true and correct copy of the minutes of the meeting is attached hereto as **EXHIBIT 15** (GWU 002904-002908).

113.    The meeting focused on a review of Dr. Waggel's performance in the Program. Id.

114.    Dr. Catapano reviewed the chronology relating to Dr. Waggel's performance through December 2015 including:

a.    July, 15, 2015: An LOD for her failing to show for a June 10, 2015 ER shift and failing to alert anyone to her non-attendance.

b.    October 28, 2015: Another LOD for failing to obtain health clearance timely, even with an extension of the deadline which she also missed.

c.    November 19, 2015: A third LOD related to the August 25 call shift.

d.    2015 – Fall: Dr. Waggel failed two courses – Neuroscience and Psychotherapy.

e.    December 10, 2015: A fourth LOD for the course failures and also noting Dr. Waggel's non-promotion to PGY3 the following July 1.

f.    Dr. Waggel had failed to comply with the LOD remediation plans.

g.    2015 – December: Because of concerns for patient safety as well as professionalism, Dr. Waggel was taken off call duties.

h.    Dr. Waggel appealed her non-promotion and course failures which were reviewed by an independent reviewer, Anne Cioletti, M.D., who determined that the decisions were reasonably made. Dr. Waggel then appealed further to Dr. Simons who sent the matter back to the Program Director and the CCC for procedural reasons.

Id. (GWU 002904 – 002905).

21

115.    Dr. Catapano also reviewed and we discussed additional performance and misconduct issues that had arisen since January 2016, including:

a.      Numerous examples of misrepresentation by Dr. Waggel to various faculty members.

b.      Significant problems with conducting evaluations of Dr. Waggel because she failed to identify her supervisors in the Medhub system.

c.      Dr. Waggel had claimed persecution from supervising attendings at Inova Fairfax Hospital based on prejudice in the evaluation system (even though she had not been evaluated there because she had not entered those supervisors into the system). Further, Dr. Berger had independently confirmed that the Medhub system was secure and confidential.

d.      On February 15, 2016, Dr. Waggel was presented a notice of unprofessional conduct from Dr. Griffith as Department Chair. As a result of the notice, Dr. Berger conducted a formal inquiry and concluded that some of the instances described in the notice constituted lapses in professionalism while others rose to the level of misconduct.

e.      There had been a subsequent patient care/patient safety concern raised by psychotherapist Mary Chappell who had consulted with Dr. Gandhi who agreed that Dr. Waggel should be removed from any further interaction with the patient and his family.

f.      There had been additional concerns regarding misrepresentations by Dr. Waggel including a statement to Dr. Berger concerning her FMLA leave status.

Id. (GWU 002905 – 002906).

22

116. The CCC then further discussed all of the incidents identified by Dr. Catapano and reviewed all of the supporting documentation.

117. After reviewing the highly problematic issues Dr. Waggel had during her residency to that point, we then discussed the fact that many attempts to remediate Dr. Waggel had been made and she had received a great deal of feedback about the problems with her clinical skills and her behavior, but she remained obstinate and unwilling to address any of her deficiencies. It was the observation of everyone in the group that Dr. Waggel refused to take responsibility for or recognize her role in creating the issues that had gotten her to the point of receiving 4 LODs, receiving a Notice of Misconduct, and being removed from patient care on multiple occasions.

118. Based on Dr. Waggel's clear deficiencies and her refusal to acknowledge or address them, the group felt that it would no longer be possible to remediate Dr. Waggel.

119. Dr. Khin Khin then moved to recommend to the Program Director that Dr. Waggel be dismissed from the Program. The motion was seconded and passed unanimously. The Program Director attended the meeting *ex officio* and did not vote on the motion.

120. Dr. Crone then moved that it was the consensus of the group that Dr. Waggel not be returned to clinical duties for the remainder of her time in the Program and should have no further contact with patients. The motion was seconded and passed unanimously, again the Program Director not voting.

121. The CCC took painstaking effort to review all aspects of Dr. Waggel's performance and the issues that she had created. The Committee devoted approximately 1 hour 50 minutes to reviewing and discussing Dr. Waggel at this meeting. This was more than the time spent reviewing the remainder of the residents in the entire Program.

23

122.   On April 14, 2016, Dr. Catapano emailed Dr. Waggel asking her to meet with her and me on April 18 to discuss the recommendations of the CCC. A true and correct copy of this email is attached hereto as **EXHIBIT 16** (GWU 002924 – 002925, at 002925).

123.   Dr. Waggel responded and stated that she would like to have her lawyer present for the meeting. Id.

124.   Dr. Catapano agreed to this and advised that counsel for the University would be present as well. Id. (002924).

125.   The meeting scheduled for April 18, 2016, did not take place.

126.   On April 17, 2015, the CCC met to discuss the Milestone evaluations of each resident. There was a 4-minute discussion of Dr. Waggel to address concerns expressed by one of her previous supervising physicians at Inova Fairfax Hospital, Dr. Aditi Malik. As the committee had already made a decision about Dr. Waggel, the conversation was brief. A true and correct copy of the minutes of this meeting is attached hereto as **EXHIBIT 17** (GWU 001139-001140)

127.   On April 28, 2016, the Residency Coordinator, Victoria Anderson, emailed Dr. Waggel and requested that she meet with Dr. Catapano and me on May 2.  A true and correct copy of that email is attached hereto as **EXHIBIT 18** (GWU 003041-003042 and GWU 002440-002441, at GWU 003402).).

128.   Dr. Waggel again refused to meet without her attorney. Id. (GWU 003041).

129.   Because we were unable to meet with Dr. Waggel, on May 2, 2016, Ms. Anderson sent Dr. Waggel a letter by email and first class mail notifying her of the recommendation of the CCC, which Dr. Catapano as Program Director had agreed with and

24

decided to accept, so a decision had been made for her dismissal from the Program. Id. (GWU 003041 and GWU 002440 – 002441).

130.   I never bore any animus or ill will toward Dr. Waggel at any time, and, particularly never held any animus toward her related to her cancer, treatment for the cancer, or her diagnosis and treatment of any other medical, substance abuse, mental health or any other similar problem she might have.

131.   To my knowledge, Dr. Waggel did not have a disability, never claimed to have a disability, and did not appear to have a disability or a record of a disability.

132.   To the contrary, Dr. Waggel always claimed that she had fully performed all the duties of her residency training program and denied that there were any extenuating circumstances which would justify an extension of her training as an accommodation.

133.   On multiple occasions when Dr. Waggel was offered, indeed, encouraged to accept leave from the Program and extend her time in training at the University's expense so she could show her mastery of the information and skills necessary to complete the Program, Dr. Waggel always rejected the proposal and refused to accept that this would help her.

134.   Instead she sought special treatment from the Program in the form of being allowed to progress to the next level of training despite having not attended the requisite number of classes, having demonstrated lack of understanding of the material in two significant didactics courses, having not logged the requisite number of clinical training hours, having consistently made dangerous clinical mistakes, and having exhibited a level of medical knowledge below that expected of a resident of her level.

135.   Dr. Waggel's insistence on this special treatment, unwillingness to work with the Program, and penchant for lies and misrepresentation made her irremediable.

25

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _December 21, 2017_                    _Allen Dyer_
                                              Allen Dyer, M.D.

3683883v.1



PSYCHIATRY & BEHAVIORAL SCIENCES
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org

July 15, 2015

Dear Dr. Waggel,

Based on the recommendation of the Clinical Competency Committee, I am sending you this Letter of Deficiency to address your unprofessional behavior on June 10, 2015.

Specifically, you were schedule to work an Emergency Medicine shift on June 10 starting at 7:00 am. Despite being aware of your shift assignment, you did not come to work at 7:00 am, and for approximately two hours, members of the ED attempted to reach you by phone. You did not answer your phone or return their calls. You had not alerted anyone in the ED (nor anyone in the Department of Psychiatry) that you were not planning to come to work that day. When you were finally reached by phone, you stated you were not feeling well and decided not to come to work as a result. You did not follow any reasonable procedure to alert the ED and make arrangements to cover your absence. In the end, you agreed to, and did, come into work for the rest of your shift that day.

This event demonstrates deficiencies in (1) Professionalism, and (2) Systems-Based Practice.

(1) Professionalism: Not arriving at the time you are expected to report to work, not alerting the ER chiefs or attendings to your tardiness or absence, and not taking responsibility for this lapse, for example, by acknowledging the inconvenience you caused in the ED that morning, are examples of poor professional behavior.

(2) Systems-Based Care: Not taking the proper steps to alert others of your tardiness or absence indicates a lack of understanding about how the ED operates, and its dependence on your reliability and promptness.

You are expected to exhibit professional behavior, which includes, at minimum, reporting for duty when scheduled, and taking appropriate measures to alert co-workers (and your program director) and make arrangements for coverage if it is absolutely necessary to be tardy or absent. You are also expected to work in complex systems of care and to communicate effectively with co-workers.

To address the deficiencies outlined above, you will participate in the following Improvement Plan with Dr. Allen Dyer, Vice-Chair for Education in the Department of Psychiatry: within two weeks of receiving this letter (excluding time off for medical leave), you must set up a meeting with Dr. Dyer to discuss strategies to prevent future lapses in professionalism. You must provide Dr. Dyer with the

**DR. DYER DECLARATION
EXHIBIT #1**

GWU 001223

contact information for your supervising physician for each rotation such that he may obtain attendance reports to report to the CCC.

Regarding your overall performance during the course of the year, the CCC recognizes your obvious dedication to your work and significant capacity to form positive and productive relationships with co-workers. However, your difficulty managing your responsibilities and appropriately handling your absences ultimately impede your ability to deliver proper care to your patients and work within our system of care. Given your work ethic and dedication to patient case, we expect that with attention to these concerns you will successfully be able to remediate these deficiencies and progress in our training program. The CCC will reassess your progress at regularly scheduled meetings and a determination as to when you will resume your prior status without an active Improvement Plan will be communicated to you at your next Semi-Annual Meeting with the Program Director. Should you continue to exhibit deficiencies, the Program reserves the right to seek further action, including termination from training as set forth in the GW Academic Improvement Policy (attached).


_____ MD

Dr. Lisa Catapano

Residency Training Director

GWU 001224

**Allen Dyer**

| | |
|---|---|
| **From:** | sewaggel@gmail.com |
| **Sent:** | Friday, August 14, 2015 11:09 AM |
| **To:** | Allen Dyer |
| **Subject:** | Re: Ethics follow up |

Dear Dr. Dyer,

My apologies. I thought the activity was to complete the index, have the seminar, and complete the index again to see if our answers changed after the seminar. I was trying to say in my email that because I missed the seminar, my answers to the index have not changed. I apologize for explaining it poorly. I will forward my other email to you and try to scan the letter. Thank you.

Sent from my iPhone

On Aug 14, 2015, at 10:25 AM, Allen Dyer <adyer@mfa.gwu.edu> wrote:

> Dear Stephanie,
> This email is not a response to the question I posed.
> I am not sure if you didn't understand my email or you chose to respond to it the way you did.
> I am tempted to explain, but it might be more useful to you to re-read what I wrote and re-think your response.
> In response to your question about the email about setting up a meeting for your letter of deficiency, I did not get an email.
> Could you forward that to me (along with a copy of the letter itself) and then we can set up a time to meet.
> **Allen R. Dyer, MD, PhD**
> Professor of Psychiatry and Behavioral Sciences
> The George Washington University
> 2120 L Street NW, Suite 600
> Washington, DC 20037
> Tel: (202) 741-3434
> FAX: (202) 741-2891
> **From:** Stephanie Waggel [mailto:sewaggel@gmail.com]
> **Sent:** Wednesday, August 12, 2015 4:50 PM
> **To:** Allen Dyer
> **Subject:** Re: Ethics follow up
> Dear Dr. Dyer,
> I would be happy to respond to your email although I unfortunately did not change my answers as I was on medical leave at that time. Also, did you happen to get the email about setting up a meeting for my letter of deficiency? Thank you for your time.
> Stephanie
> On Tue, Aug 11, 2015 at 1:11 PM, Allen Dyer <adyer@mfa.gwu.edu> wrote:
>
> > I have attached the Epstein Exploitation Index here (again).
> >
> > I would be interested in how (if) your responses changed after the seminar.

1

**DR. DYER DECLARATION
EXHIBIT #2**

GWU 002830

Would you mind taking a few minutes to take this again and let me know whether your score changed from the first time you took it?

I realize you may not remember exactly unless you kept the initial form. (!?)

Just report the change as in +3 or -2 – something like that.

I don't need to know your score or which items you felt how about.

Thanks.

**Allen R. Dyer, MD, PhD**

Professor of Psychiatry and Behavioral Sciences

The George Washington University

2120 L Street NW, Suite 600

Washington, DC 20037

Tel: (202) 741-3434

FAX: (202) 741-2891

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

GWU 002831

## Victoria H. Anderson

| | |
|---|---|
| om: | Allen Dyer |
| ent: | Monday, August 31, 2015 4:42 PM |
| To: | Lisa Catapano |
| Subject: | FW: Letter |
| Attachments: | IMG_4237.JPG; ATT00001.txt; IMG_4238.JPG; ATT00002.txt |

Lisa,
As you can see, Stephanie has been unable to scan the letter of deficiency and has sent these illegible cell phone photos.
As I recall when we talked about her several weeks ago, you indicated that she didn't seem to understand that there was a problem or what the problem was.
I'll plan to meet with her now.
Perhaps we can chat soon.
(Great to see you at the game.)
Allen


-----Original Message-----
From: Stephanie Waggel [mailto:sewaggel@gmail.com]
Sent: Saturday, August 29, 2015 11:51 AM
To: Allen Dyer; Jason Emejuru
Subject: Letter

ar Dr. Dyer,

Good morning. I've been having a hard time scanning the letter so I hope this photo will suffice. Please let me know if I can do anything else.

Thank you,
Stephanie

**DR. DYER DECLARATION
EXHIBIT #3**

GWU 001274



GWU 001275



GWU 001276

✈ 📶         **11:06 AM**       12% 🔋

‹ Messages     **Jason**     Details

> Dr dyers emails seem strange to me and I wanted your opinion

Send them to me

Not sure which ones you are talking about

On Aug 31, 2015, at 4:46 PM, Allen Dyer
<adyer@mfa.gwu.edu> wrote:

Dear Stephanie,
Let's find a time to get together.
Perhaps we could meet Thursday at Grand
Rounds time since GR doesn't start until
next week.  Will that work for you?
Actually I wasn't able to read this.  Perhaps
you can bring a hard copy and we can just
photocopy it.
Allen R. Dyer, MD, PhD
Professor of Psychiatry and Behavioral
Sciences
The George Washington University
2120 L Street NW, Suite 600
Washington, DC 20037
Tel:  (202) 741-3434
FAX:  (202) 741-2891

To: Allen Dyer ›

From: Stephanie Waggel ›

 iMessage 

**DR. DYER DECLARATION
EXHIBIT #4**

## Victoria H. Anderson

| | |
|---|---|
| **From:** | Allen Dyer |
| **Sent:** | Thursday, September 03, 2015 7:35 AM |
| **To:** | sewaggel@gmail.com |
| **Cc:** | Victoria H. Anderson |
| **Subject:** | Re: Meeting tomorrow |

We can do the noon time.

---

From: sewaggel@gmail.com <sewaggel@gmail.com>
Sent: Wednesday, September 02, 2015 2:41 PM
To: Allen Dyer
Subject: Re: Meeting tomorrow

Dear Dr. Dyer,

When I contacted Tory she stated that I would be free from 12-1230 but I will be in didactics for the rest of the day. I just called her again and she stated that I could be excused from class at 1030 if that is the only time you can meet. Thank you.

Sent from my iPhone

On Sep 2, 2015, at 2:12 PM, Allen Dyer <adyer@mfa.gwu.edu> wrote:

> Stephanie,
> This again is not an answer to the question I asked.
> I offered to meet you at 1030 Thursday morning.
> That is a yes/no question.
> Can you meet at that time?
> If not, we can look for another time.
> Allen R. Dyer, MD, PhD
> Professor of Psychiatry and Behavioral Sciences The George Washington
> University
> 2120 L Street NW, Suite 600
> Washington, DC 20037
> Tel:  (202) 741-3434
> FAX:  (202) 741-2891
>
>
>
> -----Original Message-----
> From: sewaggel@gmail.com [mailto:sewaggel@gmail.com]
> Sent: Wednesday, September 02, 2015 1:21 PM
> To: Allen Dyer
> Subject: Meeting tomorrow

 Dear Dr. Dyer,
>

1

GWU 001270

> Tory said that I can meet with you tomorrow from 12 to 1230 at the mfa. I can bring a copy of the letter. Thank you.
>
> Sent from my iPhone


> Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

2

GWU 001271

**To:** Lisa Catapano

**From:** Allen Dyer

**Re:** Stephanie Waggel

September 3, 2015

I met with Dr. Waggel today to address the letter of deficiency of July 15, 2015.

Of note that letter states that she was to meet with me within two weeks and it is now six weeks later.

Also to note that it was extraordinarily difficult to schedule the meeting.  I asked her for a copy of the letter of deficiency.  She said he couldn't figure out how to scan it, then sent a photo of it that was blurred and illegible.  Finally I sent her an email suggesting that we meet today at grand rounds time.  She replied that Tory told her she could meet from 12-1230.  I inquired of Tory what had transpired.  Tory said that Stephanie told her that I had asked for that time.

This was the second tangential communication I had received from Dr. Waggel.  After the ethics seminar, I invited all the PGY2s to do a post-test on the Epstein Index to see if their scores had changed.  She replied she had been on medical leave for the third session and didn't have to do it.

We looked at the July 15 letter together.  She said 90% of it was false.  She said she had cancer, was sick and vomiting that day, and shouldn't have been expected to come to work.  She said she had told an attending (She couldn't remember who).  She said she had asked another resident to cover for her (She couldn't remember who).  She said she didn't remember getting any calls, and didn't think anyone would care.

She said she loved the program at first, but had a lot of complaints about her fellow residents, the way the hospital is run, and not getting the feedback she needs to make improvements.  She tended to focus on other's deficiencies and had to be re-directed to look at her own issues.

She showed little awareness of the impact of her own behavior on interactions with others and explained at length the shortcomings of the environment in which she works.  When I pointed out repeatedly that she was not answering my questions, she identified that she was being tangential, then suggested circumstantial in that she was trying to come back to the questions.

I asked if she had any second thoughts about the specialty she had chosen or this program.  I asked if she felt overwhelmed, which she denied, or if she felt a leave of absence might help.  She said she had taken a leave of absence, went to Italy, and felt much better.

The July 15 letter requires that she inform me of her supervisors so I can verify attendance.  She said she would do this, but said now she was "paranoid" about this and felt that this would prejudice them against her.  What could be done about that?  I suggested that she should be on her best behavior; that one of the aspects of this work required "emotional intelligence" and an awareness of how one's behavior is being received by others.

She indicated that this was an issue she could take to therapy.

My concern about her defensiveness, her entanglements with fellow residents and staff, and general lack of reflectiveness is that attendance is but the tip of a larger iceberg of problems.  I am concerned



**DR. DYER DECLARATION EXHIBIT #5**     GWU 001118

about her tendency to triangulate communications and to say things that aren't true or are only partially true.

I think therapy may be helpful to her in time, but I am concerned about her ability to do the work that this specialty requires.

I wonder if psychological assessment such as MMPI, Millon Personality Inventory, and Meyers-Briggs might provide her and her therapist some concrete issues to work on and identify maladaptive defenses more quickly than might otherwise occur in more open-ended therapy.

I would also like to see what her evaluations have reflected and to get more specific information from her rotations and supervisors -- particularly Inova-Fairfax -- that might be helpful to her in appreciating the impact of her behavior on others -- and helpful to the CCC in determining whether she will be capable to successfully completing a psychiatry residency.

I reiterated to her that I thought there were concerns that went beyond attendance and that she should pay particularly attention to

1) Professionalism
2) Systems-Based Care

It was difficult to develop a remediation strategy because Dr. Waggel doesn't really understand that she has a problem, but felt that there were many problems with the program.

GWU 001119

**Allen Dyer**

| | |
|---|---|
| **From:** | Stephanie Waggel <swaggel@gwmail.gwu.edu> |
| **Sent:** | Friday, September 11, 2015 7:24 PM |
| **To:** | Lisa Catapano; Allen Dyer |
| **Subject:** | Status of my letter |
| **Attachments:** | patient letter.pdf |

Dear Dr. Catapano and Dr. Dyer,

Good afternoon. I am finding my therapy very helpful. Today we talked about how I can prepare for next month on a new rotation and minimize anxiety. I believe it would be detrimental for me to start off each new month with an attending that only knows me from the information on a letter of deficiency, especially given the circumstances of this letter. I submitted my doctor's excuse for the day referred to in the letter as well as a copy of my phone records to Dr. Dyer and attached below. I would like to start each rotation neutrally and prove myself rather than start off on a bad foot and work to improve from an already low point. I am therefore asking that this letter not be shared with anyone else. While I believe and have evidence to support the fact that the majority of this letter is incorrect, I have chosen to accept it. However, I do not believe I can accept it coloring other's perceptions of me when I am trying my hardest to improve. Please let me know the status of this letter when you can. Have a great weekend.

Stephanie

--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

1

GWU 002833

**Allen Dyer**

| | |
|---|---|
| **From:** | Stephanie Waggel <swaggel@gwmail.gwu.edu> |
| **Sent:** | Monday, September 14, 2015 1:57 PM |
| **To:** | Lisa Catapano; Allen Dyer |
| **Subject:** | Re: Status of my letter |

Dear Dr. Catapano,

Thank you for the reply. My letter states that each attending must report my attendance which would indicate to them I am being watched for some reason. Is this not the case?

Stephanie

On Monday, September 14, 2015, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Stephanie,

Your letter of deficiency is confidential, and has not been shared with anyone other than me, Dr. Kels, the GME office (who, by requirement, sees all letters of deficiency), and Dr. Dyer, as he is in charge of your remediation. No attendings have had, or will have, access to your LOD.

With regard to your letter from Dr. Jarrett, I will remind you that the point of issue regarding June 10, 2015, was not whether or not you had a doctor's appointment, or were sick, but that you did not take appropriate action to alert your team, chiefs, and attending, in advance so that appropriate coverage could be arranged.

We all appreciate how hard you are trying to improve.

Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Friday, September 11, 2015 7:24 PM
**To:** Lisa Catapano; Allen Dyer
**Subject:** Status of my letter

1



**DR. DYER DECLARATION
EXHIBIT #7**

GWU 002835

Clinical Competency Committee (CCC) Meeting The Department of Psychiatry
2120 L Street, NW Suite 600
Wiener Conference Room
October 23, 2015
1:00pm



REDACTED



Stephanie Waggel: debriefed Dr. Crone about the entire Stephanie Waggel chronicles. Lisa will be meeting with Dr. Berger in two weeks to review her 3 LOD's and medical leaves and professionalism. Spent 30 minute discussing Dr. Waggel, PROF1 she scored 1 and PROF2 she failed. Dr. Norris did not comment on anything about Stephanie Waggel other than confirming his meeting with Dr. Gandhi and Dr. Waggel for RCA.



Concluded: 4:08pm

**From:** Allen Dyer
**Sent:** Thursday, November 5, 2015 7:15 PM
**To:** Crone, Cathy; Lisa Catapano
: Lorenzo Norris; Lori Kels
ubject: Re: CCC communication re: SW

I also have doubts about her becoming a PGY in 7-8 months if she needs to be on call with a buddy and we are still worrying if she will even show up for work.  Or what an educational program could we design where we could confidently say she had the skills to practice this profession/specialty independently, which may not be a good choice for her.  I wonder that we would renew her contract ,or even since she has refused to comply with the most basic remediation plan, if there are grounds for terminating her contract --

**From:** Crone, Cathy <Cathy.Crone@inova.org>
**Sent:** Thursday, November 05, 2015 7:01 PM
**To:** Lisa Catapano
**Cc:** Allen Dyer; Lorenzo Norris; Lori Kels; Victoria H. Anderson
**Subject:** Re: CCC communication re: SW

I have serious doubts that extending her training will help but also cannot see her becoming a PGY 3 in another 7-8 months.  She needs oversight on professionalism, communication

Sent from my iPhone

Nov 5, 2015, at 4:39 PM, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Hi all,
I'm emailing to follow up on the discussion we had at our last meeting on October 23 regarding Stephanie Waggel. I met with Jeff Berger today and reviewed her performance to date.  Based on her current Milestone evaluation, which is significantly below that expected for her level of training, he suggested we consider extending her training by 6 months.  This decision must come from the CCC, and would be communicated to her within the Letter of Deficiency I'm currently writing to address her performance on the call night of Aug 25.  The Letter also notes that she has not been compliant with her Improvement Plan laid out in her last Letter of Deficiency, and also requires, as we have discussed, that she be placed back on buddy call until her call performance improves.
Please let me know your recommendation with regard to the suggestion of extending her training.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for

2



**DR. DYER DECLARATION
EXHIBIT #9**

GWU 001198

**Victoria H. Anderson**

| | |
|---|---|
| om: | Allen Dyer |
| ent: | Thursday, November 19, 2015 9:30 AM |
| To: | Lisa Catapano; Crone, Cathy; Lori Kels; Lorenzo Norris; Victoria H. Anderson |
| Subject: | RE: CCC communication |

My suggestion is since there are two issues here 1) the deficiencies and 2) what she might or might not be allowed to do IF she were to return to work, is this:
Simply document the deficiencies in the LOD.
The we, you, the CCC, the GME dean, and the university counsel determine how we should respond to the repeated deficiencies, the fact that she does not acknowledge that she has a problem and refuses to comply with the remediations we have already laid out.
I do not see how she can be allowed to see patients independently or what could happen to make that a possibility.

**Allen R. Dyer, MD, PhD**
Professor of Psychiatry and Behavioral Sciences
  Vice Chair for Education
The George Washington University
2120 L Street NW, Suite 600
Washington, DC 20037
Tel: (202) 741-3434
FAX: (202) 741-2891

**From:** Lisa Catapano
**Sent:** Wednesday, November 18, 2015 2:30 PM
**To:** Allen Dyer; Crone, Cathy; Lori Kels; Lorenzo Norris; Victoria H. Anderson
**Subject:** CCC communication

Dear all,
I am drafting new LOD for Stephanie Waggel to address her deficiencies in didactics for the first quarter of this year. She failed her two Neuroscience exams (33 on each) and last week Dr. Cheryl Collins provided feedback to her that she had not progressed sufficiently in her understanding of psychodynamic theory to be able to start with a therapy patient next month as expected. Dr. John Zinner's policy is that when a resident does not have a therapy patient assigned to them, they may not take his Psychodynamic Psychotherapy class (which runs the entire rest of the year), because it is case-based. Both Griff and Cheryl commented that tardiness, absences and not doing assigned outside work contributed to her poor performances.
It is my suggestion at this point, if Stephanie returns to work this month or next, that she not be allowed to participate in the pgyii didactics for the rest of this year, as they all build upon each other as the year goes forward and she did not learn enough in the first quarter of the year for her to be able to learn what she needs to in the latter part of the year. As she will not be participating in the protected didactic time, she will be expected to report for work on Thursdays. She has already been informed that she will not be promoted to the pgyiii year in July, and as the result of these deficiencies, she will be required to start the pgyii didactic curriculum from the beginning next year.
  ase let me know your thoughts about this proposal.

Lisa Catapano, MD, PhD

1



DR. DYER DECLARATION
EXHIBIT #10

GWU 001195

**Clinical Competence Committee**
**Performance Review of Dr. Stephanie Waggel**
**February 9, 2016**

Dr. Waggel is currently in her second post-graduate year of training in psychiatry.  She started post graduate training in July, 2014.  Since joining this residency, there have been a number of concerns of her performance and her professionalism, which have been carefully documented.  Individually and cumulatively, they have raised concerns about her ability to do the work required of this specialty.  This review is undertaken to look at the total picture of her time in this residency and to make recommendations as to whether a remediation plan can be devised to correct deficiencies or whether the CCC should recommend termination of employment / training to the Program Director upon review of the Dean for Graduate Medical Education and the General Counsel.

Concerns about her performance were identified in the first month on 6S ( rising chief resident Stephanie Cho to Service Chief Lorenzo Norris, July 31, 2014):

"Major lack of awareness of level of own abilities:

- Significant resistance to feedback and shows little improvement following constructive criticism.
- Significant deficits in Patient care:
    - Fails to recognize severity of threat to patient safety with specific errors
        - Pt was to be given>50 units Lantus insulin due to out of control blood sugars, but home oral diabetic medications had not been ordered (as had been communicated and written in sign-out).  This action could have resulted in further harmful fluctuations of blood sugar levels.
    - Fails to complete orders/documentation prior to leaving work and does not ensure that it will be done by someone else.
- Does not foster productive collaboration in team environment
- Demonstrates frequent unprofessional behaviors:



1

GWU 001112

DR. DYER DECLARATION
EXHIBIT #11

31      ○   Does not take responsibility for errors/near misses that are significant patient
32          safety issues
33      ○   When asked to help or to complete some patient care task (ie, prescriptions for a
34          planned discharge) expresses open displeasure
35      ○   Is openly disrespectful to other care team members."
36
37      Concerns about her performance at Inova Fairfax, where she was noted to come to
38  classes late and unprepared, and that there were times when her whereabouts were unknown.
39  (Feb 10, 2015, absent and unreachable).
40
41      Fairfax concerns by attending Dr. Malik expressed to chief resident Dr. Greene,
42  summarized in email of January 2, 2015:
43          ○   "Stephanie shows a lack of motivation, initiative, and interest in the care of her
44              patients.
45      •   She has been seen using her phone during meetings or conversations with patients and
46          staff.
47      •   She has been caught rolling her eyes during meetings or conversations with patients and
48          staff.
49      •   She comes to work wearing provocative clothing, such as tight pants.  This has made
50          staff uncomfortable to the point that they have had to ask you to talk to Stephanie
51          about it.
52      •   She sits in the resident room and doesn't check in with you for rounds or meetings.
53          There is a lack of communication from Stephanie, so that you've felt the need to track
54          her down to see what she's doing
55      •   She shows up late daily
56      •   She leaves a note at the nurses' station with patient assignments, as if she were the
57          attending.
58      •   She walks out of meetings without permission. "
59

GWU 001113

60    Issues of high alarm surfaced on her medicine rotation (March-June, 2015) involving
61    complaints from patients, nursing, consulting services, the ED and even an email from Gary
62    Little, the hospital director. "It's gone beyond personal interactions and a lack of knowledge
63    and affected patient safety." (Chief resident Jason Prior to Program Director Jillian Catalanotti,
64    March 6, 2015) "The primary issues center on Stephanie and her professionalism, interactions
65    with nursing and consulting services, her medical knowledge and patient safety." Dr. Prior
66    noted that "On her first day though, I was fielding complaints from nursing and patients
67    regarding her interactions with them and patients were upset stating she didn't know what she
68    was talking about. Post-call on Tuesday, it became apparent that she had a hard time
69    evaluating patients, presenting, knowing what medications did, etc. She didn't know the basics
70    of medicine." Specific detailed examples were given and it was determined that she could not
71    see patients independently and was to function as a medical student with her orders reviewed.
72
73    Subsequently there have been on-going concerns, which have been documented in a
74    series of letters of deficiency (LOD):
75
76    #1) LOD July 15, 2014 for not reporting to work on an Emergency Medicine shift on June 10.
77
78    #2) LOD October 28, 2015 from Jeffrey S Berger for deficiency in the competency of
79    Professionalism for failure to complete the annual health clearance with the GW Hospital
80    Employee Health Office no later than September 30, 2015. Despite an extension granted by Dr.
81    Gary Little, Medical Director, she was not cleared by the extended deadline of October 14,
82    2015.
83
84    #3) LOD November 19, 2015 – deficiencies in competencies of Patient Care, Interpersonal
85    Communications Skills and Systems-Based Practice based on events on call August 25, 2015,
86    managing an agitated patient. Dr. Norris and Dr. Gandhi conducted a root- cause analysis,
87    which demonstrated a number of deficiencies of knowledge and behavior. Dr. Khin Khin, the
88    attending on call noted that her presentation to her was "disorganized and incomplete". Angry

3

GWU 001114

89    and aggressive behavior (threatening to have patient arrested or administratively discharged)

90    may have contributed to an escalation rather than de-escalation of his behavior.

91

92    RCA Root Cause Analysis Hospitalist Memo:  Review of 8/25/15-RCA noted knowledge

93    deficiencies and communication deficiencies on the part of Dr. Waggle including Dr. Waggle's

94    acknowledgement that "she might have used language that included profanity when she was

95    communicating a nursing order.")

96

97    #4) LOD December 10, 2015 – Deficiency of Medical Knowledge based on (1) failure of Dr.

98    Collins' Psychodynamic Theory Course and (2) failure of Dr. Griffith's Neuroscience course.

99

100        It should be noted that Dr. Waggle has not complied with the Improvement Plans that

101    have been identified in the LODs.  As noted in Dr. Dyer's memo of September 3, 2015 regarding

102    the LOD of July 15, she was required to meet with him within two weeks, and only six weeks

103    later was a meeting arranged.  She never complied with the requirement to notify Dr. Dyer of

104    her supervisors so we could assure she reported to work and in a timely fashion.  As noted in

105    Dr. Berger's LOD of October 28, she had not complied with the Hospital requirement of a health

106    clearance even with an extended deadline.

107        She has never acknowledged that she has problems that need to be addressed.

108        Dr. Baiju Gandhi reviewed her presentation of the August 15, 2015 call night and noted:

109    A.  "Lack of insight into personal deficits regarding clinical and professional behavior

110          e.g. passing out in a call room, being found inebriated and disorderly in her

111          apartment, frank lying regarding the remediation process [e.g. psychotherapy

112          pass/fail situation], being tempestuous/frantic/erratic when interacting with a

113          dangerously agitated patient on the particular call night in question, making threats

114          to 'bring down the administration')."

115    B.  "Unprofessional or overly lax language and style.

116          a.  –e.g. in the past should would present as if giving a "play-by-play" – 'well, fist

117             I said this, then the patient said this, so I was like. . .' etc."

4

GWU 001115

118          C.   "Clinically, my recollection is that she had room for improvement with regards to
119               knowledge, thoroughness, and organization of evaluations. "
120
121
122     Furthermore, there have been continued and on-going examples of unprofessional behavior
123     including a number of instances of blatant dishonesty.  Among them
124          (1) Lying to Dr. Zinner that Dr. Catapano had OK'd her attendance in his psychotherapy
125               seminar
126          (2) Lying to Dr. Berger that she had passed Dr. Griffith's Neuroscience course with the
127               cumulative highest grade, when she had not.
128          (3) Stating that she had never been given any feedback about her performance as a
129               resident, the four Letters of Deficiency notwithstanding.
130
131     Problems identified early in the residency have only become amplified over the past year.
132     These include major deficiencies in medical knowledge, deficiencies in ability to communicate
133     including knowing how to present a medical history in a coherent fashion, and perhaps most
134     glaringly problems with professionalism including incomplete and blatantly dishonest
135     communications.
136
137     The question we now face is there any possibility of remediation, given the lack of
138     acknowledgement on her part of any problems, given the failure to comply with previous
139     remediation plan given very direct and explicit instructions, the failure of compliance with the
140     work and educational expectations, including even at the level of showing up for work in a
141     timely fashion or even at all on occasion, and particularly problematic, dishonest and
142     incomplete communications.
143
144     In spite of all these misbehaviors, the program has made every effort to help her
145     understand what is expected of her to be successful.  At each step, faculty and program
146     directors have looked for remediation plans, to help her understand and address the multiple

GWU 001116

147  problems identified.  Her approach has generally been to deny that she has any problems.  In
148  face of possible impairments, such as a substance use or a thought disorder, which might make
149  it challenging to organize her thinking, both Dr. Berger and Dr. Dyer have asked if there are any
150  mitigating circumstances, or help she might need.   She has rejected the idea and has not asked
151  for any accommodations.
152
153       At this point, the CCC feels that we have exhausted attempts to help her address these
154  multiple and serious concerns.
155       We feel that it is not safe to let her see patients independently, that she is not progressing
156  toward promotion, and therefore that her employment and training should be terminated.
157
158
159
160
161
162
163
164
165
166
167

GWU 001117

| | |
|---|---|
| **From:** | Lisa Catapano |
| **Sent:** | Tuesday, February 02, 2016 10:04 AM |
| **To:** | Allen Dyer |
| **Subject:** | FW: meeting summary |
| **Attachments:** | Aug 25th 2015 Detailed Events.pdf |

Allen,

Stephanie has asked me to ask the CCC to review her account of the call night of August 25 in formulating her Improvement Plan, so I am attaching it here.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Thursday, January 21, 2016 7:21 PM
**To:** Lisa Catapano
**Cc:** Lori Kels; Victoria H. Anderson
**Subject:** Re: meeting summary

Dear Dr. Catapano,

Thank you for meeting with me. This document is really helpful and clear. I attached the details from the night of Aug 25th. I hope it helps guide the remediation process as my deficiency is based on my performance of that night. Perhaps the CCC could look at it? I know it is long but it documents in detail the events of the night that is preventing me from returning to a normal work life.

Thank you,
Stephanie

On Thu, Jan 21, 2016 at 5:14 PM, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Hi Stephanie,

Thanks for coming to meet with us today.  I'm attaching the notes we typed up during the meeting … since we all reviewed it before we left, I think it's a reasonable synopsis of everything we covered.  As we discussed, I will review Dr. Gandhi's comments with the CCC, and plan to get back to you within 10 days to let you know their recommendations.  In the meantime, if you have any questions or further issues to discuss, you can always email me (and I will respond as per #4).

Take care of yourself.

Lisa Catapano, MD, PhD

1



**DR. DYER DECLARATION**
**EXHIBIT #12**

GWU 001206

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

GWU 001207

Aug 25th note from the patient's nurse, Ronnie Griffin, which is the official documentation in the EMR:

Nursing Note   Assumed patient's care at 1930.   At approximately 2030 pt reported intermittent SI, and could not contract for safety on the unit.   Dr. Waggel was informed of patient's statement endorsing SI, and the patient then required 1:1 observation.   At approximately 0200, the patient was observed by staff banging her head, an attempt to harm herself.   Dr. Waggel was notified of this action, and it was recommended that the patient be offered medication.   Patient was offered PO medication but refused it.   Security was called to assist in the administration on IM medications.   Pt became agitated, and combative when IM medications were going to be administered.   Pt received IM Haldol 5mg, IM Ativan 2mg, and IM Benadryl 50mg.   After medications were administered, the patient's cane was removed from room for safety as the patient continued to be combative with staff.   The patient was offered assistance to the bathroom by staff with a wheelchair but declined the assistance, offered the patient insisted on using the cane.   At approximatey 0250 the patient again insisted on having the cane, and began exiting the room to obtain it.   The cane was positioned just outside of pt's door, and upon seeing this, the patient lunged for the cane.   It required two staff members to prevent the patient from obtaining the cane in an effort to prevent the patient from using the cane to harm herself or staff.   As this writer, and another staff member held on to the cane, the patient attempted to harm staff by biting at the hands and arms of staff repeatedly.   The patient was then separated from staff, and returned to her room.   Security was called again, and Dr. Waggel was notified of this incident.   Dr. Waggel recommended that the patient be placed in the quiet room, and receive additional IM medications.   The pt again became combative with staff and security, when asked to go to the quiet room.   The patient was transported to the quiet room by wheelchair, but continued to be combative with staff.   At this time it was recommended that the patient be placed in restraints.   The patient was given IM Haldol 5mg, IM Ativan 2mg, and IM Benadryl 50mg.   The patient was placed in restraints at approximately 0315.   Upon assessment, pt was observed sleeping in the quiet room, and restraints were removed at approximately 0404.   Will continue to monitor pt

The order of events listed here: Pt could not contract for safety endorsing SI → 1:1 observation → banging head → patient offered PO medication → refusal of PO medication → Security present when IM given → cane removed for safety → lunged outside of room to get cane → two staff members preventing patient from obtaining cane outside of room → patient in altercation with staff bites them repeatedly → patient is separated from altercation with staff → security was called for altercation → MD recommends quiet room and IM meds (as patient refused PO) → patient continued to be combative while being escorted to quiet room → patient placed in restraints and given IM medications → restraints removed when she fell asleep. Total restraint time 54 minutes.

Email to Dr. Norris about the meeting we had about my performance from Aug 25th

GWU 001208

## Meeting about call night

🖨  ▨

 **sewaggel@gmail.com**                                              2:21 pm (1 day ago)      ↩
to Lorenzo  ▾

Dear Dr. Norris,

I placed the printout of the events of the night of Aug 25 and morning Aug 26 in your mailbox. I have found it helpful to do a teach-back method of improvement that I learned recently to work on communication. It has helped me with clarification and I have been doing it with my meetings with the chiefs and other attendings. I will state facts about the main points of our meeting uninfluenced by emotions. If you feel there is a point that I misunderstood or a key part I am missing would you be able to let me know? My understanding of our meeting is that it was to discuss what happened on Six South the night of Aug 25. You stated that you wanted to hear from me what happened that night. I stated that I had heard there was an email from the nurses and that the only specific piece I was told is that they had an issue with the fact that I had threatened to call 911. You sent me the email I was referring to and it was from a nurse named Shemika. I read it and addressed the content with my understanding of what had happened and screenshots to be as accurate as possible. Some positive aspects of my performance that night that you mentioned were my patient care, my putting the safety of patients and staff first, my asking for feedback, and managing multiple acute medical emergencies simultaneously. Some areas you mentioned that I could improve upon were managing my stress level and speaking in a more organized, slow manner, not confusing FD12 with administrative discharge, watching my language, and waiting until the situation has resolved to mention calling the police. You then stated that we could speak again if needed. Thank you again for making the time to meet with me about this night. I found the feedback very helpful especially on my last call night. I remembered that one of my problems was speaking too fast so I made a conscious effort to speak slowly and in an organized manner. I appreciate your help in making me a better resident.

Sincerely,
Stephanie

## Shemika's email:

From: Anthony, Shemika
Sent: Wednesday, August 26, 2015 8:01 AM
To: Burton, Shirley; Ohemeddiwe, Sophie
Cc: James, Scott; [redacted]; [redacted]; Cooley, Kay
Subject: 08/26/15 PM shift

A banging sound was heard from down the hallway. Staff went to assess the situation to find that patient had been banging her head on the wall. Attempts to further assess causes of harm then unsuccessful as patient refused to divulge more information. She continued to bang her head against the wall, biting herself, pulling out strands of her hair. PO medications offered to patient she refused.

Dr. Waggle contacted and informed that patient had been head banging redirected by staff and offered PO medications to assist with anxiety yet refused. Dr. Waggle went to assess patient and offered PO medications, which patient again refused at that time. As Dr. Waggle left the room she told patient that it was "her choice" and to let her or staff know if she changed her mind or thought of any other suggestions as to what we could do to assist her at this time.

Dr. Waggle then asked staff if we could give IM medications to patient because she wasn't going to be dealing with this or get all night. Verbal order continued for IM Haloidol 5mg, Ativan 1mg, Haldol 1mg with report that orders would be entered immediately as Dr. Waggle was not willing to assist with explaining to the patient its overuse administration. After medications shown up when Dr. Waggle was asked if she would be accompanying nursing staff and security to assist in medication administration she stated no because patient would likely do some type of borderline attention seeking behavior with her present.

Staff prevented as patients room informing her that upon further evaluation with MD it is decided that for her safety as she continues to bang her head on the wall and is refusing PO medications that IM medications will have to be administered to assist her in relating to prevent her from injuring herself. Patient became belligerent yelling screaming IM administered by Rosa Griffin RN with the assistance of tech/usher Jasmine McFadden PT and security. It was reiterated to patient that these medications were not given to hurt her but rather to prevent her from further being able to hurt herself. Patient continued to yell and scream and began throwing things she had at the bedside. As staff began to leave bedside we reassured patients care from beside as she was still very angry and has a history of making threatening gestures towards staff with care. Patient was informed that care was taken away because she was angry for her safety and for the safety of others and that when she was able to display calm appropriate behaviors as needed that care. Immediately after patient requested that she needed the care to go to the bathroom. Patient offered to be taken via wheelchair to bathroom as staff still did not feel patients affect at that time was appropriate for care usage. Patient refused stating that she would just get up and wander in her bed. MD contacted and consulted regarding restoring care from patient. Call made to HOS with no response at that time. Dr. Waggle came to see patient again and reiterated that she did not feel that it was appropriate at that time to give patient care. She went on to tell patient that this is a hospital and there is no ICU with sick people on this floor who are dying and all they can hear is her yelling and that if she continued to yell that she would call the police and have her escorted out of here to another hospital immediately.

Shortly thereafter staff was contacted by sitter reporting that patient was requesting her belongings as the doctor told her that she was leaving. Staff went to talk to patient and explain that while she ought be able to leave the hospital, there is a process and protocols that needed to be followed prior. Patient began yelling "This bitch lied to me twice now first she told me that taking the medications were my choice and then sent people to DI me, the she told me I would be unnecessarily escorted by police out of the hospital." Staff went on to apologize for any miscommunications, yet reiterated that it was a process that likely would not be completed tonight and encouraged patient to get some rest. Patient got up and rushed towards staff demanding to have her care. Staff proceded to hold onto as patient. While attempting to remove care from staff patient attempted to kick, bite, and scratch as well as pulling her teeth into staff's skin and pinching staff (no bruises were noted). Security called, Dr. Waggle HOS contacted. Care removed. After running extensive amount of time for Dr. Waggle to arrive. She began to ask suggestions as to what we could do for patient. She expressed that she felt it was appropriate for patient to be in room with bedside sitter with door closed because her yelling was disruptive to the unit. Dr. Waggle was informed that she only would staffing not allow for that it would be inappropriate for any staff to be in patients room with her with the door closed due to her unpredictable, aggressive behavior towards staff. She went on to suggest that we contact the police on patient. While we were discussing care just outside of patients room. Patient proceeded to attempt to take trash can and hit PT Jermaine McFadden. PT McFadden along with the assistance of numerous security officers had to assist with restraining patient. While staff were continuing patient Dr. Waggle asked if every one was going to come back to finish our discussion. Patient given second round of IM medication. Benadryl 50mg. Ativan 2mg. Haldol 5mg case removed patient put in quiet room in 4 point restraints.

Dr. Waggle contacted numerous times during the night regarding Benadryl order being executed as the stated 50mg yet order was place for 25mg. After contacting Dr. Waggle numerous times regarding orders and requesting that the order be placed before 07:30pm she reiterated that she received that she stated previously that she will not be entering the orders until 07:20pm

Shemika Anthony RN, BSN

Psychiatric Nurse
Department of Psychiatry
Shemika.Anthony@mstu.hospital.com

<u>Chronological order of events from Aug 25th, 2015:</u>

My note on the chest pain workup:

| Res/Int/Fellow Name: Waggel, Stephanie | Pgr. Number: | Contact #: |
|---|---|---|
| PT | | |

Note:
Pt is a 34 yo female with c/o chest pain starting 8/25/2015 after lunchtime. She has a PMH of PE dx of mild arrhythmia towards the end of her stay on the medicine floor, and a VSD. She also reported some SOB that is no longer apparent. She says that the current chest pain is located on the left side of the chest, with some radiation towards her L neck and L shoulder. The pain is described as "pressure" the pain and tells us that the pain is not consistent with the sharp pains during inspiration she felt with her previous PE. Nausea and some dizziness upon standing up was reported as well. While being transferred to psych she missed 2 doses of pradaxa. she did not receive a dose for approx 24 hours but was able to get it around 4pm 3/25/2015 .

Per medicine: pt complains of chest pain frequently with negative work up. Appears to be engaging in activities without trouble while also stating she has chest pain

General: alert and  well appearing... in no apparent distress
HEENT: atraumatic
Pulmonary: lungs clear to auscultation bilaterally, no wheezing or rhonchi appreciated
Cardiac: regular rate and rhythm, normal S1 and S2, no murmurs, rubs or gallops
Extremities: no peripheral edema appreciated
Neurologic: no gross deficits
Neurological: grossly intact
Psychiatric: Cooperative,  mood not assessed & affect blunted

EKG stat -WNL
review ed prior EKG
orthotic vitals WNL

At 18:08 I did a chest pain work up on this patient and consulted medicine. I had an extensive conversation with this patient. She shared stories about being an EMS worker.

According to the nursing note above by Ronni Griffin, Pt reported SI at 2030 (first sentence above). I evaluated the patient and she complained about seizures in the past. After my evaluation, at 2047 (last order in photo below) I put an order in for seizure precautions. I asked staff for a 1:1 sitter. Staff stated there were no 1:1 sitters available. I reassessed patient and asked her if she would be able to tell staff if she had SI again and she stated she would be able to. We then talked about her work in psychology and EMS and she contracted for safety.  PT and I had at least three 15 minute conversations about her goals in life and work in the healthcare field.

GWU 001210



At 2200 pt endorsed SI again. <u>Because there were no sitters available,</u> I placed an order to have her go to the quiet room at 2207.

Nursing Communication

Order by Waggel, Stephanie MD on 08/25/15 22:07

Order Details:

08/25/15 22:06:00 EDT, please place pt in the quiet room, 08/25/15

22:06:00 EDT

Order Comments:

Order Date/Time: 08/25/2015 22:06

Start Date/Time: 08/25/2015 22:06

Status: Ordered

Ordered by: Waggel, Stephanie MD

Per Shemika's e-mail: "A banging sound was heard from down the hallway. Staff went to assess the situation to find that patient had been hanging her head on the wall. Attempts to further assess causes of frustration unsuccessful as patient refused to devulge more information. She continued to bang her head against the wall, biting herself, pulling out strands of her hair. PO medications offered to patient she refused."

I was the staff who found the patient hitting her head. She was alone in the day room, not the quiet room. I called for help and while I was waiting for someone to arrive I attempted to keep her from hitting her head. I asked her what had changed since we last spoke and she said she couldn't take it anymore. When I asked why she was alone in the day room and not in the quiet room as per my order, I was informed that the camera in the quiet room was broken. I asked if someone from IT could fix it as it is very dangerous to have this patient unwatched, especially given her history of brain injury and bleed. I then checked her chart and found that, despite being signed out that PRNs were on, none were. At 2300 I added the PRNs.



After entering the PRNs, I requested a 1:1 sitter again, I was very worried for a brain bleed. I again informed staff of the severity of this case and asked if we could please find a sitter. Again, I was told there were none. Shemika yelled over the phone "No" and then hung up on me.  At 2314 (shown below) I put in the order for a sitter and attempted to speak with staff in person again about the severity of the situation.

Sitter at Bedside

Order by Waggel, Stephanie MD on 08/25/15 23:14

Order Details:

08/25/15 23:14:00 EDT, Stat, Stop date 08/25/15 23:14:00 EDT, Sitter at all times

Order Comments:

Order Date/Time: 08/25/2015 23:14

Start Date/Time: 08/25/2015 23:14

Status: Ordered

Per Shemika's email:  "Dr Waggle contacted and informed that patient had been head banging redirected by staff and offered PO medications to assist with anxiety yet refused. Dr. Waggle went to assess patient and offered PO medications, which patient again refused at that time. As Dr. Waggle left the room she told patient that it was "her choice" and to let her or staff know if she changed her mind or thought of any other suggestions as to what we could do to assist her at this time."

At this time patient was calm but still with SI. 1:1 sitter was in the room. I offered PO but did not feel her behavior warranted IM medications. She was sitting on the floor quietly and there was no threat of violence. I believed it was her choice to refuse PO meds. I asked to be informed if patient decided she wanted meds. I then asked staff for their ideas on the situation. They stated they would inform me if patient's behavior escalated to the point where she needed IM and let me know if she asked for PO.

Per Shemika's e-mail: "Dr. Waggel then asked staff if we could give IM medications to patient because she wasnt going to be dealing with this crap alll night. Verbal order confirmed for IM Benadryl 50mg, Ativan 2mg, Haldol 5mg with report that orderes would be entered immediately as Dr. Waggle was not coming to assist with explaining to the patient or oversee administration. After medications drawn up when Dr. Waggle was asked if she would be accompaning nursing staff and security to assist in medication administration she stated no because patient would likely do some type of borderline attention seeking behavior with her present."

I was informed that the patient was beginning to be agitated and again banging her head at 0200. This is documented in the nursing note by Ronni Griffin. IM meds were already in the computer (shown two screen shots above) but I was told to reorder them. While attempting to keep pt from again hitting her head, nursing staff stated that they could not even draw the medication until another order was in. At 0210 I reordered the PRNs as requested. I did not refuse to be present during the PRN administration. I asked for it to be given while I was in the room. Since a verbal order was refused, I had to leave the room to put the order in the computer for a second time. I try not to put in repeat orders in effort to limit unaccounted for medication but it was demanded.



Per Shemik's e-mail: "Staff presented in patients room informing her that upon further evaluation with MD it was decided that for her safety as she continues to bang her head on the wall and is refusing PO medications that IM medications will have to be admistered to assist her

GWU 001213

in relaxing to prevent her from further injuring herself. Patient became beligierent yelling screaming. IM administered by Ronni Griffin RN with the assistance of tech/ sitter Jermaine McFadden PT and security. It was reiterated to patient that these medications were not given to hurt her, but rather to prevenet her from further being able to hurt herself.  Patient continued to yell and scream and began throwing things she had at the bedside. As staff begain to leave bedside we removed patients cane from beside as she was still very angry and has a history of making threatening gestures towards staff with cain. Patient was informed that cane was taken away because she was angry and for the safety of others and that when she is able to display calm, appropriate behaviors or needded the cane. Immediately after patient requesed that she needed the cane to go to the bathroom. Patient offered to be taken via wheelchair to bathroom as staff still did not feel patients affect at that time was appropriate for cane usage. Patient refused stating that she would just not go and urinate in her bed. MD contacted and consulted rearding removing cane from patient. Call made to HOS with no response at that time. Dr Waggle came to see patient again and reiterated that she did not feel that it was appropriate at that time to give patient cane. She went on to tell patient that this is a hospital and there is an ICU with sick people on this floor who are dying and all they can hear is her yelling and that if she continued to yell that she would call the police and have her escorted out of here to another hospital immediately."

In regard to my earlier conversation with patient about her career in psychology, we discussed patient care. I used this as a means of trying to explain to the patient why her yelling may disrupt patient care. I told the patient that there are other patients on this floor who need rest to get better. Pt actually seemed to be understanding and remorseful for yelling, however, then became upset about her cane and quickly reverted to yelling again. I was aware that patient had been throwing objects at staff and trying to hit people with her cane. Another approach I tried was explaining to her the repercussions of her actions. During one of our prior discussions, we talked about making good choices to avoid trouble. I told her assault is a crime and that I would be forced to call the police if she injures someone. It was at this time I considered FD12 but mistakenly used the phrase administrative discharge. I discovered later that an administrative discharge may actually be an appropriate action. An administrative discharge is discharge by a hospital administrator that is likely to result in a significance improvement. In most states this is a matter of condition, improvement or when release would be in the patient's best interest or for the interest of the hospital. The most current Psychiatry Resident Official Call Manual, 2013-2014 Policy states only one fact about an administrative discharge and that it must be discussed with an attending. I had attempted to discuss this discharge with my attending. I told the patient that many people would be involved if such a discharge was deemed necessary.

Per Shemika's email: "Shortly thereafter staff was contacted by sitter reporting that patient was requesting her belongings as the doctor told her that she was leaving. Staff went to talk to patient and explain that while she might be able to leave the hospital, there is a process and protocals that needed to be followed prior. Patient begain yelling "That bitch lied to me twice now first she told me that taking the medications were my choice and then sent people to IM me, the she told me I would be immediately escorted by police out of the hospital". Staff went on to apologize for any miscommunications, yet reiterated that it was a process that likely would not be completed tonight and encouraged patient to get some rest. Patient got up and stormed towards staff demanding to have her cane. Staff proceded to hold cain as patient from patient. While

attempting to remove cane from staff patient attempted to kick, bite, staff and went as far as putting her teeth into staffs skin and pinching staff (no broken skin noted). Security called, Dr. Waggle, HOS contacted. Cane removed.  After waiting extensive amount of time for Dr. Waggle to arrive. She began to ask suggestions as to what we could do for patient. She experessed that she felt it was appropriate for patient to be in room with female sitter with door closed because her yelling was disruptive to the unit. Dr. Waggle was informed that not only would staffing not allow for that, it would be inappropriate for any staff to be in patients room with her with the door closed due to her unpredictable, aggressive behavior towards staff. She went on to suggest that we contact the police on patient." (please see paragraph at the end of this document in reference to highlight).

I explained to the patient that for any discharge to happen I must first speak with my attending physicians and it would likely not occur until the next doctors came on shift. Four other patients had woken up, some complaining of nightmares, and some afraid due to yelling. When I was informed of the biting, kicking, and being hit with a cane, I told staff if they feel they have been injured they should be examined and could call the police if they felt the assult was serious enough. GW Annual Security and Fire Safety Report stated that a person reporting a crime to GW police has the right to report the crime to the Metropolitan Police Department. I placed an order to have a female sitter as I was afraid the patient may try something dangerous in the restroom but staff disagreed with this order. The patient was yelling through a wide open doorway to a sitter outside the room and my goal was to somehow change this to decrease the noise level in this area of the hallway. This showed to be detramental to the milieu. When staff explained they could not get a female sitter due to understaffing or shut the door, I decided that the patient would be less disrupting to the unit in the quiet room as an alternative. At 0322 (shown below) I placed an order to have the patient taken to the quiet room. I capitalized "keep" as my last order to have this patient in the quiet room was not followed through with.



Per Shemika's e-mail: "While we were discussing case just outside of patients room. Patient proceedded to attempt to take trash can and hit PT Jermaine McFadded. PT McFadden along with the assistance of nurmerous security officers had to assist with restraing patient. While staff

were restraining patient Dr. Waggle asked if every one was going to come back to finish our discussion. Patient given second round of IM medications, Benadryl 50mg, Ativan 2mg, Haldol 5mg cane removed, patient put in quiet room in 4 point restraints."

Despite computer orders, nursing communications, and speaking to the nurses in person, it seemed the 1:1 sitters were only watching patients intermittently, at times not even in the patient's rooms. At 0322 (shown below) I placed another order for 1:1 and capitalized "at all times." I felt as if the majority of the staff were very stressed and frustrated. This is why I then called for a group meeting.



My logic was that perhaps discussing their ideas and what their thoughts were on my suggestions would allow everyone to feel heard. I was genuinely open to any ideas. I gathered the nurses, sitters, security, and HOS in a circle and asked if they had any suggestions for handling this. Nurse Shemika voiced that this discussion in itself wasn't a good idea. Nurse Griffin however agreed with the idea of having the patient in the quiet room. During this meeting other staff also recommended another round of PRNs. We then decided, as a group, to place restraints as it seemed PRNs were not working to calm the patient. I placed this order at 0325 (shown below). I also added a nursing communication at 0325 (shown below) and spoke with them in person on restraints.



[redacted]

Last 1272 Hours More...

| Order | Action |
|---|---|
| diphenhydrAMINE (Benadryl) | Order |
| diphenhydrAMINE (Benadryl) | Order |
| Nursing Communication | Order |
| Restraint Violent Behavior 18 Years and | Order |
| Nursing Communication | Order |

Waggel, Stephanie MD

Waggel, S

Restraint Violent Behavior 18 Years and
Order by Waggel, Stephanie MD on 08/26/15 03:25
Order Details:
08/26/15 3:24:00 EDT, q15min, 4, hr, Reason: Violence toward environment, Locking Right Lower Extremity, 4 point
Order Comments:
Order Date/Time: 08/26/2015 03:24
Start Date/Time: 08/26/2015 03:24
Status: Ordered
Ordered by: Waggel, Stephanie MD
Order ID: 1343047347

Microbiology (0)
Last 10 days for all visits

DISORDER

Order History (95)

Physician Notifications

Last 1272 Hours More...

Selected Visit

| Order | Action | By |
|---|---|---|
| on | r | MD |
| diphenhydrAMINE (Benadryl) | Order | MD |
| diphenhydrAMINE (Benadryl) | Order | MD |
| Nursing Communication | Order | tephanie MD |
| Restraint Violent Behavior 18 Years and | Order | Waggel, Stephanie |

Nursing Communication
Order by Waggel, Stephanie MD on 08/26/15 03:25
Order Details:
08/26/15 3:24:00 EDT, four point restraints, 08/26/15 3:24:00 EDT
Order Comments:
Order Date/Time: 08/26/2015 03:24
Start Date/Time: 08/26/2015 03:24
Status: Ordered
Ordered by: Waggel, Stephanie MD
Order ID: 1343047393

Microbiology (0)
Last 10 days for all visits

The patient later fell asleep and her restraints were removed. At 0514 (shown below) I placed a communication to call me when she woke up so that I could reassess her.



One minute later I realized that explaining to staff the reasons for my orders seemed to be more effective in getting them to follow the orders. So at that same minute 0515 (shown below) I added another communication explaining that the patient cannot have restraints on while sleeping and that is the reason I need to be called.



Per Shemika's e-mail: "Dr. Waggle contacted numerous times during the night regarding Benadryl order being incorrect as she stated 50mg yet order was place for 25mg. After contacting Dr. Waggle numerous times regarding orders and requesting that the order be placed

before 07:30am she retroted that she stated previously that she will not be entering the orders until 07:29am."

I placed the order for 50mg of Benadryl at 0325 (shown below). When Shemika called and told me to order it again, I did so again at 0513 (also shown below). Shemika called and asked me to put the Benadryl order in for a third time stating she couldn't see it. I explained that I had ordered it twice and that perhaps something was wrong with my account. I was also worried that placing it again would result in three unaccounted for IM Benadryls available for someone to get ahold of. I informed Shemika that the other resident would be coming in before 0730 and that we could try putting the order in under her name, if indeed there was a problem with my account. Shemika hung up the phone on me once again. I went in person to the nurse's station and explained to them in person that I had twice put this order and not sure why Shemika could not see it. I also let them know that the day shift resident was going to try to place the order before 0730.





[redacted]

DISORDER

Order History (95)

Last 1272 Hours More...

| Order | | |
|---|---|---|
| Nursing Communication | My | |
| Nursing Communication | Or | |
| Nursing Communication | Or | |
| diphenhydrAMINE (Benadryl) | Or | MD |
| diphenhydrAMINE (Benadryl) | Orde | Waggel, S |

diphenhydrAMINE (Benadryl) 50 mg, 1 mL, IntraMuscular, Once

Order by Waggel, Stephanie MD on 08/26/15 05:13

Order Details:

50 mg = 1 mL, Vial, IntraMuscular, Once, First Dose: Routine, Start date: 08/26/15 6:00:00 EDT, Stop date: 08/26/15 6:00:00 EDT, Indication: agitation

Order Comments:

only to be given with b52 and not within another hour of another benadryl order thank you

Order Date/Time: 08/26/2015 05:12

Start Date/Time: 08/26/2015 06:00

Status: Ordered

Ordered by: Waggel, Stephanie MD

Order ID: 1343090761

Microbiology (0)

Last 10 days for all visits

---

Ten minutes after patient endorsed SI and I ordered patient to be placed in quiet room, another patient began having a seizure. I was told that Ativan was on for this patient but I discovered it was not. At 2216 (shown below) I was dealing with that situation.



I explained to the sitter the seriousness of this patient's previous attempt and the importance of not letting her in the restroom alone. Soon after, another sitter came on and I explained the situation again. I asked the sitters for their names so that I could record that I explained to each of them how serious this was but they declined. One stated that she wasn't even technically a sitter. I asked her what training she had to cover a sitter's position and she said she didn't really have any and that she was told to "sit and watch the patient." I informed administration of this.

At the time Shemika noted "After waiting extensive amount of time for Dr. Waggle to arrive." I was with the other patient (Pt B) whom I was very concerned about as she had attempted to hang herself the day before was stating she had a plan to sneak to the bathroom and try again to attempt suicide. I informed nursing staff that I was addressing Pt B and would quickly come to the other patient. When I went to evaluate this Pt B I noticed another new sitter was on and he was male. At 0237 (shown below) I again requested that she not be alone in the restroom. This new sitter was not aware that the pt had tried killing herself in the restroom the day before. He did give me his name. I explained this to him and wrote a note about it shown below.

Nursing Communication
Order by Waggel, Stephanie MD on 08/26/15 02:37
Order Details
08/26/15 2 37:00 EDT, 1:1 sitter MUST follow pt into rest room, if male
must stop pt then get female staff to help her, 08/26/15 2 37:00 EDT
Order Comments:
Order Date/Time  08/26/2015 02:37
Start Date/Time  08/26/2015 02:37
Status: Ordered

---

## DAILY PROGRESS NOTE - PSYCHIATRY

| | | Y | PSYCH ATTENDING MD Dr. Gandhi |
|---|---|---|---|
| Res/Int/Fellow Name: Waggel, Stephanie | Pgr. Number: | | Contact #: |

PT# 127728947

**Note:**
1:46 am pt voiced a desire to kill herself in the rest room. I instructed sitter to follow pt into the rest room in the event she had to go. I also put a nursing communication in for this. Sitter Jeremy communicated an understanding of the need to do this an the severity of the situation. Female staff will accompany pt to rest room

In addition to the situation with the patient Shemika emailed about, I also dealt with cardiac chest pain involving a medicine consult, a seizure incident involving a neurology consult, an acute abdomen, an obgyn issue,  Pt B (who attempted to hang herself the day before) voicing a plan to do so again, the four floor patients who had woken up with nightmares and afraid, and many ED consults.

I am concerned that the lack of communication on Six South at night and the training and availability of 1:1 sitters negatively affects the safety of patients and staff.

I am referring this matter back to your department and Program Director. The Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program.

Sincerely yours,

Richard J. Simons MD MACP
Senior Associate Dean for MD Programs
Professor of Medicine

GWU 002877

**Allen Dyer**

| | |
|---|---|
| **From:** | Simons, Richard <rsimons@email.gwu.edu> |
| **Sent:** | Friday, March 25, 2016 12:19 PM |
| **To:** | Lisa Catapano |
| **Cc:** | Allen Dyer; Jeffrey Berger |
| **Subject:** | Waggel appeal |
| **Attachments:** | Waggel appeal final.pdf |

Lisa, please find attached my letter to Dr. Waggel regaring her appeal. I am referring this matter back to you and your department. The clinical competency committee will need to meet, review this resident's evaluations/concerns and make specific recommendations regarding this resident's progress. Following that, I urge you to meet in person with the resdent to review the committee's recommendations and any formal actions. Thanks
Rich

Richard J. Simons, MD MACP
Senior Associate Dean for MD Programs
Professor of Medicine
The George Washington University School of Medicine and Health Sciences
2300 Eye Street, NW
Ross Hall, Suite 709
Washington, DC 20037

**DR. DYER DECLARATION
EXHIBIT #13**

**GWU 002875**



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Office of the Dean

March 25, 2016

Stephanie Waggel, M.D, M.S.
1230 23Rd Street, NW 909
Washington DC, 20037

RE: Appeal

Dear Dr. Waggel,

On March 10, 2016, I received email notice that you were appealing the recent decision of the
physician reviewer appointed by the Associate Dean for Graduate Medical Education Office
which upheld the decision of your program director that you were not on track to be promoted
to PGY 3 in July 2016. In my role as Senior Associate Dean for MD Programs, I must determine
whether the process set forth in the Academic Improvement Policy was followed.

I reviewed your email correspondence of March 10, 2016, and your attached appeal letter to
me. In addition, I reviewed the letters of deficiencies from your Program Director, the report of
Dr. Cioletti, your residency evaluations from your attendings, the documentation from your
semi-annual reviews with your Program Director, and the minutes of the department's Clinical
Competency Committee. Also, you and I spoke by telephone on March 14, 2016, at 8 am at
which time we discussed this issue for approximately 45 minutes. I also had a 30 minute phone
call with your Program Director, Lisa Catapano MD, and met in person with the Chair of the
Clinical Competency Committee, Allen Dyer MD, MPH.

As outlined in the Academic Improvement Policy, the program director is to consult with the
Clinical Competency Committee when deciding not to promote a resident to the next PGY level.
However, the minutes of the department's Clinical Competency Committee meeting on
October 23, 2016, do not include any mention of consideration to delay your promotion. In
addition, Dr. Dyer confirmed that the Clinical Competency Committee made no
recommendations about the status of your promotion during the meeting on October 23, 2016.
Furthermore, there was no other meeting of the Clinical Competency Committee prior to your
Program Director issuing the letter of deficiency dated November 11, 2016.

Accordingly, It is my opinion that the Program Director did not follow the Academic
Improvement Policy in issuing the letter of deficiency informing you that you were not on track
to be promoted in July 2016. Based on this, the letter of deficiency dated November 11, 2016,
notifying you that you were not on track to be promoted should not have been issued in the
absence of a recommendation by the clinical competency committee.

School of Medicine & Health Sciences
2300 Eye Street, NW | Ross Hall, Suite 708 | Washington, DC 20037
t 202-994-2987 | f 202-994-0926 | www.smhs.gwu.edu

GWU 002876

**Allen Dyer**

| | |
|---|---|
| **From:** | Lisa Catapano |
| **Sent:** | Tuesday, April 05, 2016 4:59 PM |
| **To:** | Allen Dyer |
| **Subject:** | memo for CCC |
| **Attachments:** | MEMO April 8 2016 SW.docx |

Allen,

I've put together a memo to highlight the most concerning issues regarding Stephanie since Griff's misconduct memo, which I will present to the CCC on Friday. Please let me know if you have any comments/suggestions.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

DR. DYER DECLARATION
EXHIBIT #14

GWU 002885

TO: Clinical Competency Committee

FROM: Lisa Catapano, Program Director

DATE: April 8, 2016

SUBJECT: Update re: Stephanie Waggel; concerns regarding unprofessional conduct

Since Dr. Griffith's memo regarding concerns about Stephanie Waggel's unprofessional conduct from February 15, 2016, the following events have occurred, or continued to occur:

1. Patient care/safety concerns: As per Dr. Gandhi's email, Dr. Waggel was prevented from seeing a patient on the Psychiatry Consult service on March 1, 2016 due to an observation by Dr. Mary Chappelle, psychotherapist, that her interaction with the patient and his family was odd and potentially damaging to them in their vulnerable circumstances.

2. Continued pattern of dishonesty: On Tuesday, March 8, 2016, in response to Dr. Berger's email requesting a meeting that day to discuss the misconduct concerns, Dr. Waggel replied that she was not able to meet because she was on FMLA leave for medical reasons. Dr. Berger told me verbally that he later determined from a conversation with Human Resources that she had not requested FMLA leave until after she sent the email to him. In her email to him, she explicitly stated that she had told her attending, chief resident, and coordinator of her FMLA leave. She had, in fact, not notified any of the above of her decision to take medical leave. In a separate email, she told Dr. Berger that she had sent me confirmation of her FMLA leave as soon as she received it. She had not notified me of her intention to take leave before she left work, and did not at any time send me documentation of her approval to take FMLA leave.

3. Lack of insight/improvement: Dr. Waggel has continued to demonstrate a lack of capacity to recognize her deficiencies and make an attempt to remediate them. She has not at any point accepted feedback on a point on which she could improve, admitted room for improvement, and then put forth effort to do better. The clearest example of this is in her essay for Dr. Gandhi on patient safety on 6 South, but the curiosity and commitment to insight and self-improvement is lacking in every communication and face-to-face meeting with her.

GWU 002886

*PEER REVIEW PRIVILEGED*

### Clinical Competence Committee
Friday, April 8, 2016
Department of Psychiatry
2120 L Street NW

Attendance:
Allen R. Dyer, MD, PhD, chair
Lisa Catapano, MD, PhD, Program Director, *ex-officio*
Eindra Khin Khin, MD,
Catherine Crone, MD
Lorenzo Norris, MD
Lori Kels, MD, absent on maternity leave
Victoria Anderson, Residency coordinator

The meeting came to order at 1:23PM

1. Dr. Dyer presented Dr. Catapano a Thanks-for-Doing-a-Thankless-Job award for four years of outstanding service.
2. Dr. Dyer announced changes in the structure of the CCC, making the Program Director an *ex-officio* member of the committee.
3. Minutes of the last CCC meeting held on October 23, 2013 were unanimously approved.
4. The CCC again considered the performance review of Stephanie Waggel PGY-II resident. Dated February 9, 2016 and unanimously voted approval (Program Director, abstaining).
5. The Program Director, Dr. Catapano, reviewed the chronology relating to Dr. Waggel's performance through December 2015:
   a. Dr. Waggel received a Letter of Deficiency (LOD) from the Department of Psychiatry on July 15, 2015, for not showing up for an ER shift June 10, 2015.
   b. Dr. Waggel received another LOD on October 28, 2015 from Dr. Jeffrey Berger, Associate Dean for GME, for failing to submit required documentation for hospital health forms despite having been granted extension of the deadline for submission.
   c. Dr. Waggel received a third letter of deficiency on November 19, 2015, relating to an incident involving her handling of an agitated patient while she was on call. The incident resulted in a root cause analysis which identified deficiencies of knowledge, disorganized thought, and lack of insight.
   d. In the fall of 2015, Dr. Waggel failed two courses, Neuroscience and Psychotherapy courses, resulting in a fourth LOD on December 10, 2015. This LOD informed Dr. Waggel that she would not be promoted to the PGY-III year.
   e. Dr. Waggel failed to comply with the improvement plans of the LODs.
   f. Because of concerns about patient safety as well as professionalism, Dr. Waggel was taken off call duties in December, 2015.



**DR. DYER DECLARATION EXHIBIT #15**

GWU 002904

*PEER REVIEW PRIVILEGED*

6. Pursuant to the Office of Graduate Medical Education Academic Improvement Policy, Dr. Waggel appealed her non-promotion and failures of Neuroscience and Psychotherapy courses. Dr. Berger appointed a physician reviewer, Dr. Ann Coletti, who conducted an investigation and, on February 22, 2016, determined that the recommendation that the decision not to promote Dr. Waggel to the PGY-III year was reasonably made, and that the decisions not to pass her for the Neuroscience and Psychotherapy courses were also reasonably made. Dr. Waggel subsequently appealed Dr. Coletti's determination to Richard Simons, M.D., Senior Associate Dean for M.D. Programs. On March 25, 2016, Dr. Simons determined that a decision not to promote Dr. Waggel to the PGY-III year should not have been issued in the absence of documentation that the CCC made a specific recommendation to the Program Director to do so. (At the time the program director was a member of the CCC and participated in the consensus decision; the PD is now an *ex-officio* member.)

7. The following additional performance and misconduct issues have arisen since January 2016:

   a. There have been numerous examples of misrepresentation by Dr. Waggel, including telling a faculty member that she had been given permission by Dr. Catapano to attend his course, when she had not met the pre-requisite for the course and had not received permission from Dr. Catapano; misrepresenting to Dr. Berger that she had passed the Neuroscience course, when she had failed it; and stating that she had not been given any feedback about her performance, even though she had received four letters of deficiency, as well as numerous other written and verbal communications regarding her performance.

   b. There have been significant problems with getting Dr. Waggel's performance evaluations because she did not identify her supervisors in the Medhub system, resulting in the inability for her evaluation forms to be sent to her supervisors for each rotation. To the extent available, the CCC reviewed the evaluations of Dr. Waggel along with the other residents. She did not have evaluations from all of her supervisors because, as noted, she did not enter them into the MedHub system. Those that we did have were not particularly informative in either a positive or negative way because it wasn't clear which supervisors were using the Likert scale and which were using the new Milestones scale. However, the continued misbehavior was of serious concern and formed the basis for these recommendations.

   c. Dr. Waggel claimed persecution from Fairfax based on prejudice in the evaluation system (even though she had not been evaluated there because she had not entered those supervisors into the system). Dr. Berger investigated and assured her that the Medhub system was secure and confidential.

   d. On February 15, 2016, Dr. Waggel was presented a notice of unprofessional conduct from Dr. Griffith, Department Chair, and Dr. Catapano. (Dr. Catapano was at a professional meeting and unable to attend the meeting with Dr. Waggel and Dr. Griffith.) As a result of the notice of unprofessional conduct, Dr. Berger initiated an inquiry under the Office of Graduate Medical Education Resident Misconduct Policy. After a complete review, Dr. Berger concluded that some of

2

GWU 002905

*PEER REVIEW PRIVILEGED*

the instances described in Dr. Griffith's notice of unprofessional conduct constituted lapses in professionalism, while others rose to the level of misconduct. He recommended that this CCC consider the incidents set forth in the notice of unprofessional conduct.

e.  There have also been patient care/ patient safety concerns regarding Dr. Waggel. For example, Dr. Mary Chappell, a psychotherapist on the inpatient unit, became concerned that Dr. Waggel's interaction with a patient and his family was odd and potentially damaging to them in their vulnerable circumstances. Dr. Chappell conferred with Dr. Gandhi, who agreed with the concerns and decided that Dr. Waggel should not interact with the patient or his family.

f.  There have also been additional concerns regarding misrepresentations by Dr. Waggel. For example, on March 8, 2016, Dr. Waggel informed Dr. Berger that she was unable to meet that day to discuss misconduct concerns because she was on FMLA leave when, in fact, she had not yet requested FMLA leave. She also told Dr. Berger that she had informed Dr. Catapano that she intended to take medical leave when Dr. Catapano had not been informed of her intent.

8.  The CCC reviewed all of these incidents and the supporting documentation. The CCC discussed that Dr. Waggel continues to demonstrate a lack of capacity to recognize her deficiencies and to make any attempt to remediate them. She has not at any point accepted feedback on a point on which she could improve, admitted room for improvement, and then put forth effort to do better. The clearest example of this was in her essay for Dr. Gandhi on patient safety on 6 South, but the curiosity and commitment to insight and self-improvement is lacking in every communication and face-to-face meeting.

9.  Based on these significant deficiencies in performance and inability or unwillingness to remediate them, Dr. Khin Khin moved to recommend to the program director that the previous letters of deficiency and associated recommendation for non-promotion be re-affirmed and based on all of the documented concerns and the additional concerns to further recommend dismissal from the program. The motion was seconded and passed unanimously (program director abstaining).

10. Dr. Crone moved that it was the consensus of the committee that Dr. Waggel should not return to clinical duties for the remainder of her time here. She should have no further contact with patients. The motion was seconded and passed unanimously (program director not voting).

11. Dr. Norris inquired about the threat that Dr. Waggel made against Dr. Kels. Dr. Norris was very concerned and asked Dr. Catapano to elaborate. Dr. Catapano detailed that Dr. Waggel stated that she was going to find out her address so she could come to her house to force her to talk to her. Dr. Norris felt that (though this may have been an idle threat) it raised significant concerns for safety of staff and faculty and that upon dismissal, security should be notified at GW Hospital, SMHS, Fairfax, and MFA.

This portion of the meeting concluded at 3:21 PM

REDACTED

3

GWU 002906

*PEER REVIEW PRIVILEGED*





PGY II



Stephanie Waggel



4

GWU 002907

*PEER REVIEW PRIVILEGED*





Meeting adjourned at 5:16PM

5

GWU 002908

**Allen Dyer**

| | |
|---|---|
| **From:** | Allen Dyer |
| **Sent:** | Monday, April 18, 2016 12:07 PM |
| **To:** | Jeffrey Berger |
| **Cc:** | Lisa Catapano |
| **Subject:** | FW: meeting |

Jeff,

Here are the times we have offered Stephanie et al.

It looks like Mary Lynn also has them already.

Allen

I will send you and Mary Lynn the draft of CCC minutes

Lisa or I will send the LOD

And Lisa will send the form certifying the 18 months and the failure of psychotherapy and neurosciences.

**Allen R. Dyer, MD, PhD**
Professor of Psychiatry and Behavioral Sciences
Vice Chair for Education
The George Washington University
2120 L Street NW, Suite 600
Washington, DC 20037
Tel: (202) 741-3434
FAX: (202) 741-2891

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, April 18, 2016 12:01 PM
**To:** Lisa Catapano
**Cc:** mlreed@gwu.edu; Allen Dyer
**Subject:** Re: meeting

I have passed this information on. Is it possible to know what will be addressed during this meeting and what the goal is?

On Monday, April 18, 2016, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Hi Stephanie,

That's fine. I believe that means our lawyer, Mary Lynn Reed, will be present as well. Here are the times Dr. Dyer and I are available this week:

today at 245

Tuesday at 12

Thursday at 12 or 5

Let us know what works for you and the rest of the group.

1



DR. DYER DECLARATION
EXHIBIT #16

GWU 002924

Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Friday, April 15, 2016 4:15 PM
**To:** Lisa Catapano <lcatapano@mfa.gwu.edu>
**Cc:** Allen Dyer <adyer@mfa.gwu.edu>
**Subject:** Re: meeting

Dear Dr. Catapano,

My lawyer would like to be present for this meeting. He has been in contact with Ms. Reed about this.

Thank you,

Stephanie

On Thursday, April 14, 2016, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Hi Stephanie,

Dr. Dyer and I would like to meet with you to give you feedback and present to you the recommendations made by the Clinical Competency Committee last Friday. We are available to meet next Monday April 18 at 9:00 am or 2:45 pm. Would you let us know which time works best for you?

Lisa Catapano, MD, PhD

GWU 002925

**Clinical Competency Committee (CCC) Meeting**
The Department of Psychiatry
2120 L Street, NW Suite 600
Wiener Conference Room
April 17, 2015
1:00pm

Present: Lorenzo Norris, MD, Lisa Catapano, MD, PhD, Eindra Khin Khin, MD, Allen Dyer, MD, Catherine Crone, MD



PGY-1 started at 1:30pm
Reviewed each milestone by reviewing each resident in the following order (per milestone):



Stephanie Waggel



Stephanie Waggel started at 3:03pm
Dr. Aditi Malik had concerns about Waggel, Catherine Crone wanted to clarify.
Ended: 3:07pm



Do you have a confirmation of receipt of the Letter that you sent to SW from the FedEx people (can you log in to get the tracking info)? Did she sign for it? If so, what date did she receive it?
Thanks - Mary Lynn and I are trying to determine when the appeal time period will be exhausted.
-Jeff

**From:** Victoria H. Anderson
**Sent:** Monday, May 2, 2016 3:24 PM
**To:** Waggel, Stephanie
**Cc:** Stephanie Waggel (swaggel@gwu.edu); Allen Dyer; Lisa Catapano; Jeffrey Berger; mtucker@gwu.edu
**Subject:** RE: Meeting Requested

Dear Dr. Waggel:

The requested meeting scheduled for today, May 2, 2016, was only to present you with this letter. Because you chose not to attend, I have attached a pdf of the letter and have also mailed it to your address of 1230 23rd St, NW Apt 909 Washington, DC.

Regards,

**Tory Anderson**
Residency Coordinator
Department of Psychiatry
George Washington University
2120 L Street, NW Suite 600
Washington, DC 20037
Office: (202) 741-2893
Fax: (202) 741-2891

**From:** Waggel, Stephanie [mailto:swaggel@email.gwu.edu]
**Sent:** Thursday, April 28, 2016 6:11 PM
**To:** Victoria H. Anderson <vhanderson@mfa.gwu.edu>
**Cc:** Stephanie Waggel (swaggel@gwu.edu) <swaggel@gwu.edu>; Allen Dyer <adyer@mfa.gwu.edu>; Lisa Catapano <lcatapano@mfa.gwu.edu>
**Subject:** Re: Meeting Requested

Dear Tory,

I hope you are doing well. I am advised to not attend this meeting without my attorney. He is available 5/9 PM, 5/10, 5/13, 5/16 PM, 5/17 PM, 5/18-20. I understand Ms. Reed is not available until that week as well. Please let me know what day and time works best.

Sincerely,
Stephanie

On Thursday, April 28, 2016, Victoria H. Anderson <vhanderson@mfa.gwu.edu> wrote:

Dear Dr. Waggel:

2

DR. DYER DECLARATION
EXHIBIT #18

GWU 003041

Dr. Dyer and Dr. Catapano have requested to meet with you on **Monday, May 2nd at 2pm** here at 2120 L Street in the Freud conference room. This meeting is to discuss the CCC recommendations and decisions. This will be a brief meeting, and, there will be no need to have attorneys present.

Please confirm that you have received this email and will be attending.

Thank you,

**Tory Anderson**
Residency Coordinator
Department of Psychiatry
George Washington University
2120 L Street, NW Suite 600
Washington, DC 20037
Office: (202) 741-2893
Fax: (202) 741-2891

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

GWU 003042



**PSYCHIATRY & BEHAVIORAL SCIENCES**
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900 fax: 202.741.2891
www.gwupsychiatry.org

Stephanie Waggel, MD
1230 23rd St NW Apt 909
Washington, D.C. 20037

RE: Stephanie Waggel, MD Letter of Reportable Action- Dismissal

Delivery method: E-mail and registered mail

May 2, 2016

Dear Dr. Waggel,

The Clinical Competency Committee met at their regular semi-annual meeting on Friday, April 8, 2016. At this meeting, the Committee reviewed your current standing in the program, and progress to-date in your training, including:

-Four Letters of Deficiency; your acceptance of the improvement plans recommended within them; any progress or lack thereof in effectuating the improvement plans; and the subsequent appeals decisions;
-the memo of misconduct presented to you by Dr. Griffith on February 15, 2016, and Dr. Berger's April 11, 2016 letter evaluating those allegations;
-clinical evaluations;
-Dr. Griffith's action to remove you from patient care duties on March 17, 2016; and
-a continued pattern of unprofessional behaviors since the memo of misconduct in February, such as telling Dr. Berger, in an email on Tuesday, March 8, you were on medical leave and had notified all relevant parties (attendings, chief residents, coordinator, Program Director) when you had not yet applied for medical leave at that time and had not notified the Program Director.

The Committee reviewed Dr. Simons' appeal decision, which stated that, in his opinion, the Committee did not follow the Academic Improvement Policy when it recommended non-promotion in your Letter of Deficiency from November 19, 2016, because it is not documented that the Committee made a recommendation (to me, as the Program Director) that you not be promoted to PGYIII status next academic year. Following careful review of the original Letter of Deficiency from November 19, 2015, Dr. Berger's appeal review, and Dr. Simons' decision, the Committee recommended that the decision in that Letter of Deficiency be re-issued; specifically, that you not be promoted to PGYIII status in July, 2016.

GWU 002440



**PSYCHIATRY & BEHAVIORAL SCIENCES**
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org

The Committee further reviewed all of the above documentation, and expressed concern that you have not substantively engaged in a good faith effort to improve your clinical and professional performance over the last 6 months.  Based on grave concerns about on-going deficiencies that fall both within Academic Improvement and also Misconduct that have been detailed in the aforementioned documents, the Clinical Competency Committee made a formal and unanimous recommendation to me that you be dismissed from our Psychiatry Residency Program.

The letter is to advise you that I have accepted the CCC's recommendation and to provide notice that you are hereby dismissed from the Psychiatry Residency Program.

The GW Misconduct Policy can be found at the following link:
http://smhs.gwu.edu/sites/default/files/GW%20GME%20Misconduct%20Policy.jb.6.27.pdf

The GW Academic Improvement Policy can be found at the following link:
http://smhs.gwu.edu/sites/default/files/GW%20GME%20Academic%20Improvment%20Policy.jb.6.27.pdf

You have 14 days from today, May 2, 2016 to appeal the dismissal decision under the Academic Improvement Policy.  It is my sincere hope that you are able to overcome this professional setback and, at a future date, to realize your goals and have a meaningful career.

Lisa Catapano, MD, PhD
Residency Training Director