**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment**

Jason H. Ehrenberg (D.D.C. # 469077)
Peter K. Tompa (D.D.C. # 413752)
BAILEY & EHRENBERG PLLC
1015 18th Street, NW, Suite 204
Washington, DC 20036
T: 202-331-1331
F: 202-318-7071
jhe@becounsel.com
pkt@becounsel.com
*Counsel for Plaintiff*

# **Table of Contents**

I.  Introduction ................................................................................................................ 1

II.  Factual Background ................................................................................................... 2

III.  Argument .................................................................................................................. 13

   A.  Defendant Fails to Contest Plaintiff's *Prima Facie* Case of Disability Discrimination. ..... 13

      1.  Cancer in Remission is Still a Disability ................................................. 14

      2.  Plaintiff Went to the EEO Office Which Directed Her to Take FMLA Leave. ......... 14

      3.  Plaintiff Could Perform Her Job with a Reasonable Accommodation. ...................... 15

   B.  Violation of the Federal and District Family and Medical Leave Acts "FMLA" and "DCFMLA", Respectively) (Interference and Retaliation). .................................................... 19

      1.  Introduction to FMLA and DCFMLA Claims, and Intersection with ADAAA ........ 20

      2.  Legal Analysis for FMLA and DC FMLA Retaliation and Interference .................. 22

         i.  Retaliation ......................................................................................... 23

         ii.  Interference ...................................................................................... 23

      3.  Factual Disputes Preclude Summary Judgment With Respect to Plaintiff's FMLA and DCFMLA Claims. ............................................................................................. 24

         i.  Evidence of Retaliation. ................................................................... 24

         ii.  Direct Evidence of Retaliation. ....................................................... 26

         iii.  Direct Evidence of Interference. .................................................... 35

   C.  There Were Procedural Irregularities In The Clinical Competency Committee's Decision To Delay Dr. Waggel's Promotion and Terminate Her, Such That Judicial Scrutiny Is Appropriate, Even If *Hajjar-Nejad*  Is Applicable. ................................................................ 40

IV.  Conclusion ............................................................................................................... 44

## **TABLE OF AUTHORITIES**

### **Cases**

*Angel v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242 (D. Colo. 2012)............................... 14

*Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43 (D.C. Cir. 2011) ............................................ 24

*Burke v. Emory Univ.*, 338 S.E.2d 500 (GA Ct. App. 1985) ....................................................... 38

*Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ........... 38

*Cifra v. General Electric Co.*, 252 F.3d 205 (2d Cir. 2001)....................................................... 26

*Clark County School District v. Breeden*, 532 U.S. 268  (2001)................................................. 26

*Davis v. Mann,* 882 F.2d 967 (5th Cir. 1989). .......................................................................... 38

*Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d 193  (S.D.N.Y. 2009) .................. 22

*Donnelly v. St. John's Mercy Medical Center*, 635 F. Supp. 2d 955 (E.D. Mo. 2009) ............... 39

*Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009)...................................................... 24

*Fleck v. Wilmac Corporation*, Civ. Action No. 10-05562, 2011 WL 1899198, at *1,2, 4-7, 2011

    US Dist. Lexis 54039 (E.D. Pa. May 19, 2011)....................................................... 21

*Gleklen v. Democratic Con. Campaign Comm., Inc.*, 199 F. 3d 1365 (D.C. Cir. 2000)........ 23, 24

*Gordon v. Unites States Capitol Police,* 778 F.3d 158 (2015)…………………………...23,24, 35

*Hajjar-Nejad v. George Washington University*, *et. al.*, 37 F. Supp.3d 90 (D.D.C. 2014).......... 38

*Haley v. Cmty. Mercy Health Partners*, 2013 U.S. Dist. LEXIS 11193, 2013 WL 322493 (S.D.

    Ohio 2013) ...................................................................................................... 14

*Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277 (4th Cir. 2004)…………………44

*Hoffman v. Carefirst*, 737 F. Supp. 536 (N.D. Ind. 2010) .......................................................... 14

*James v. Hyatt Regency Chi.*, 707 F.3d 775 (7th Cir. 2013) ....................................................... 24

*Joyce v. Office of the Architect of the Capitol*, 966 F. Supp. 2d 15 (D.D.C. 2013)............... 23, 24

*Katz v. Adecco United States Inc.*, 845 F. Supp. 2d 539 (S.D.N.Y. 2012) .................................. 14

*Mayo Foundation for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011).................. 38

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1 (D.C. Cir. 2010)............... 24

*Millea v. Metro-N. R.R. Co.*, 658 F.3d 154 (2d Cir. 2011) .......................................................... 24

*Minter v. District of Columbia,* 809 F.3d 66 (D.C. Cir. 2015) ............................................... 15, 17

*Mogenhan v. Napolitano*, 613 F.3d 1162 (D.C. Cir. 2010) ......................................................... 17

*Norton v. Assisted Living Concepts Inc.*, 786 F. Supp. 1173 (E.D. Tex. 2011) .......................... 14

*Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775 (7th Cir. 2002) .......... 19

*Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196 (D.D.C. 2009)........................................... 20

*Quinn v. St. Louis County*, 653 F.3d 745 (8th Cir. 2011) ........................................................... 24

*Scruggs v. Pulaski County*, 817 F. 3d 1087 (8th Cir. 2016) ........................................................ 20

*Sista v. CDC Ixis N. Amer., Inc.*, 445 F.3d 161 (2d Cir. 2006).................................................... 22

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)……………………………………………………44

*Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305 (D.C. Cir. 2010)................................................ 17

*Ward v. McDonald*, 762 F.3d 24 (D.C. Cir. 2014) ..................................................................... 17

*Williams v. AT&T Mobility Services LLC*, 2016 WL 3172917, 2016 U.S. Dist. Lexis 73017

   (W.D. Tenn. June 6, 2016)...................................................................................................... 20

*Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)................................................ 17

## **Statutes**

29 U.S.C. § 2612(a)(1) -(3)......................................................................................................... 20

The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADAAA")

   ................................................................................................................................. passim

D.C. Human Rights Act (the "DCHRA"), D.C. Code § 32-501 *et seq* .......................... 1, 2, 13, 22

District of Columbia Family and Medical Leave Act ("DC FMLA"). D.C. Code § 2- 1401.01 *et seq.* .................................................................................................... 1, 2, 20, 35

Family Medical Leave Act, 28 U.S.C. § 2601 *et. seq.* (the "FMLA") ................................. passim

## Other Authorities

ACGME Program Requirements for Graduate Medical Education in Psychiatry ("ACGME Program Requirements") § IV, available at https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/400_psychiatry_2017-07-01.pdf. ........................................................................................................... 28

Press Release, Equal Employment Opportunity Commission, Brookdale Senior Living to Pay $112,500 to Settle EEOC Disability Discrimination Lawsuit (Aug. 17, 2015) ....................... 21

## Regulations

29 C.F.R. § 825.220(c) ............................................................................................ 24

29 C.F.R. § 825.702(b) ........................................................................................... 20

29 C.F.R. §§ 1614.203(c)(1) .................................................................................... 19

29 CFR § 2615(a)(1) ............................................................................................... 24

4 D.C. Municipal Reg. § 1604 ................................................................................... 20

EEOC  No.915.002, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002) at Question 40 ........................... 39

**<u>Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment</u>**

Plaintiff Dr. Stephanie Waggel ("Dr. Waggel"), by and through her undersigned counsel, submit the following Memorandum in Opposition to Defendant The George Washington University's ("Defendant" or "GW") Motion for Summary Judgment (the "Motion"):

## I.     Introduction

In its Motion, Defendant argues that the Court should not scrutinize its decision to take negative employment actions against Dr. Waggel or its failure to accommodate her disability.  In doing so, it cites an alleged precedent of "judicial non-intervention" regarding the employment decisions of residency training programs. Essentially, the Defendant argues GW's decision-making process cannot be second-guessed, because the residency program is educational in nature, shielding it from judicial scrutiny. This argument is a red herring and need not detain the Court long.

Plaintiff seeks redress under four statutes that provide protections to employees, including residents of hospitals such as GW. Counts I and II plead claims under the Americans with Disabilities Act as amended, 42 U.S.C. § 12101 et seq. (the "ADAAA"), and the D.C. Human Rights Act (the "DCHRA"), D.C. Code § 32-501 *et seq* – for a failure to accommodate and disability discrimination. In Counts III and IV, Plaintiff claims violations under the Family Medical Leave Act, 28 U.S.C. § 2601 et. seq. (the "FMLA") and, its local corollary, the District of Columbia Family and Medical Leave Act ("DC FMLA"). D.C. Code § 2- 1401.01 et seq., for retaliating against her for taking approved FMLA leave and otherwise enforcing her rights under those statutes.

Consistent with this statutory framework, Dr. Waggel opposes summary judgment because myriad of material facts in dispute prove (or at least raise questions of fact) that Defendant failed

to accommodate Plaintiff's known medical conditions, discriminated against her, and terminated her in retaliation for exercising her rights under the ADAAA, FMLA, DCHRA, DC FMLA, and under Defendant's own policies and procedures. Moreover, as also set forth below, even if GW's argument for some sort of academic exemption from the civil rights laws was credible (it is not), Defendant's academic due process argument fails because GW did not provide Dr. Waggel with the requisite process and failed to exercise the requisite discretion, rendering any such process a sham.

## II.     Factual Background

Dr. Waggel was nearing the end of her first year as a psychiatric resident at GW when she developed a life-threatening illness, renal cancer. (Pl. Dr. Stephanie Waggel's Statement of Material Facts For Which There Are No Genuine Disputes In Support of Her Mot. for Partial Summ. J. ("ECF 32-2"), ECF 32-2 at pp. 6-31.) This diagnosis caused her enormous anxiety and necessitated unpredictable breaks in her schedule to attend medical appointments. (*Id.*; *see also* Resp. to Def.'s Statement of Material Facts As To Which There Is No Genuine Dispute ("RSOF"), ¶ 995.) In the context of this litigation, Defendant has claimed that Dr. Waggel should have asked for extended time off to deal with any medical issues (necessitating delays in her graduation), but all she really needed was time to schedule follow up appointments that would take an hour or two at the most. (RSOF ¶ 995.)

Pursuant to the ADAAA, her residency program should have created a "comprehensive plan of accommodation, collaboratively worked out by the Program and the resident together." (Ex. in Supp. of Pl. Mot. for Partial Summ. J., Ex. Z ("Deborah Spitz, M.D., Report on Dr. Stephanie Waggel v. GW  (ECF 32-4 at p. 407) (hereinafter, "Spitz Report, ECF 32-4"); *see also Minter v. District of Columbia,* 809 F.3d 66, 69 (D.C. Cir. 2015).  This requirement is incorporated

into the Defendant's University and Program Policies (Def.'s Statement of Material Facts As To Which There Is No Genuine Dispute ("SOF"), ¶ 41, 44, 51, 93.) In fact, even if Dr. Waggel had not formally requested such an accommodation from the Residency Program's EEO office - the difficulties she would face as she tried to negotiate her treatment needs while at the same time attending to her clinical service and educational obligations were foreseeable. (Spitz Report, ECF 32-4 at p. 407).

Nonetheless, Defendant failed to engage Dr. Waggel in an interactive process, so that it might modify Dr. Waggel's weekly schedule. It did not even arrange for one meeting between the program administrator, program director, EEO office, and supervising attending to create a coordinated plan. (*See, e.g.,* RSOF ¶¶ 995, 997, 1010, 1022.)  Instead, each time Dr. Waggel requested a few hours off work to attend medical appointments, the program provided her with different protocols and points of contact for her to make her request. (*See, e.g.,* RSOF ¶ 1019.) Because of the failure to coordinate and communicate reasonable protocol to Dr. Waggel, miscommunications about her schedule between her supervising attending (Dr. Jason Emejuru), her program director (Dr. Lisa Catapano), and her program administrators often occurred. (*See, e.g.,* RSOF ¶ 1019.) This was particularly problematic for Dr. Waggel, for her medical appointments sometimes took months to schedule in advance. (RSOF ¶ 994, 995, 997, 998); (Ex. 4 of Decl. of Dr. Jason Emejuru (hereinafter, "ECF 34-7"), ECF 34-7 at p. 61.) Nonetheless, Dr. Waggel tried in good faith to comply with the shifting requirements and continued requesting accommodation, such as asking for a pre-planned and designated day each week to schedule medical appointments. (RSOF ¶ 994, 995, 997, 998); (Def. GW's Mem. of Points and Authorities in Support of Mot. For Summ. J. (hereinafter "GW's Mem., ECF 34), ECF 34 AT P. 3 ("In the course of her residency training, Plaintiff did request leave time of Program personnel to attend

medical appointments, take vacations, or other personal leave as all residents must do so the Program can coordinate coverage for residents to be available for important ongoing clinical care in hospitals and other sites where their presence is essential to delivery of care.").) Ultimately, Dr. Waggel became the subject of criticism from the Program, who alleged she was unprofessional or having interpersonal communication issues every time she requested a few hours off work to attend medical appointments, or that she violated protocol,[1] even when she properly applied for and was granted FMLA protected leave. (RSOF ¶ 1014.) In sum, Defendant not only failed to accommodate Plaintiff's known disability, Defendant did not even engage in the interactive process required by the ADAAA and relevant case law.

Dr. Waggel underwent surgery to remove the cancerous tumor from her kidney in July 2015, at the beginning of her second year as a resident (as a "PGY-2"). (SOF ¶ 258.) Dr. Waggel provided Defendant with a note from her physician requesting time off for surgery, and consistent with the instructions of her doctor, she also expressed a need for light duty for her first two weeks back. (SOF ¶ 994); (RSOF ¶¶ 994, 1008.) Defendant ignored that request and retaliated against Dr. Waggel for taking FMLA leave and missing work the previous two weeks to have and recover from her surgery by immediately placing her on grueling day to night double shifts. (RSOF ¶¶ 1008, 1012-13.)[2] This refusal to place Waggel on light duty as requested by her doctor amounted

---

[1] *See, e.g.,* Ex. 7 to Ex. M ("Dr. Dyer Declaration") of Def.'s Mot. Sum. J. (hereinafter, "ECF34-17"), ECF 34-17 at p. 41.

[2] Dr. Waggel also received a discriminatory and untimely notice of deficient performance for one such night shift. (RSOF ¶¶ 1000-1002, 1008). The letter of deficiency was discriminatory because it failed to take into account how her performance was affected by her disability (cancer). It also was unfair because it shifted the responsibility for problems that night onto Dr. Waggel, who was in the first weeks of the second year of her residency. That night, there was an unexpected influx of patients. (ECF 32-2, ¶¶ 55-56).  Two attendings, who were supposed to be on-call to provide extra support, failed to show up to work. *Id.*  There were also systemic failures, such that Defendant conducted an investigation (though Dr. Waggel was not invited to participate). (SOF ¶ 470.)

to a violation of the ADAAA, including a failure to accommodate under that Act and discrimination under that Act.

In September 2015, Dr. Waggel went to the Defendant's EEO office to ensure she could make necessary follow up medical appointments without being harassed. (RSOF ¶ 1017.) The EEO office still did not offer Dr. Waggel a coordinated plan to accommodate her need to attend medical appointments moving forward. It did however suggest an alternative: Dr. Waggel was told to apply for protected leave pursuant to its FMLA policies.[3] (RSOF ¶ 1048.) Plaintiff did so, and was granted leave in October 2015 and March 2016. (RSOF ¶¶ 1027, 1090.)

Dr. Lisa Catapano, the program director, and Dr. James Griffith, the Chair of the department, took a dim view of doctors who sought to prioritize their own health. Dr. Griffith would later testify that it was his position that doctors get sick all the time and should cope with the problem on their own without requesting the help of their employer. (ECF 32-2 ¶¶ 93, 96.) He stated he did not meaningfully consider how Dr. Waggel's cancer diagnosis would impact her performance, stating he was "agnostic." (ECF 32-2 ¶ 94.) Dr. Catapano's attitude that doctors ought not exercise disability rights may have been the result of more than just Dr. Griffith's example. It may have also been due to her own experience being mistreated while undergoing cancer as a doctor at GWU. (Ex. OOO at 3 (Waggel Dep. at 54:13-16); (Ex. OOO at 7 (Waggel Dep. at 237:1-21).)

With this mind set, it is no wonder Defendant retaliated against Dr. Waggel for seeking protected medical leave and other reasonable workplace accommodations for her known

---

Defendant's systematic failures were the main cause of problems that night. (SOF ¶ 470); (ECF 32-2 ¶ 56.)

[3] This advice was consistent with the content of a form produced in this litigation that treats requests for accommodation for medical leave as a FMLA leave request. (Ex. CCC.)

disabilities. Soon after she requested leave on October 23, 2015, the Clinical Competency Committee ("CCC") met and decided to hold Dr. Waggel back from advancing to her PGY3 year, one day after Dr. Waggel had sent an email expressing concern the she was receiving repercussions for taking sick days and the same day as Dr. Waggel's first request for FMLA leave. (ECF 34-17 at p. 42); (SOF ¶ 522); (RSOF ¶ 1034).

Dr. Lisa Catapano also called Dr. Waggel to inform her she was being placed on "forced administrative leave" (prohibited from attending didactics training and seeing patients) because she had "taken too much sick leave" and "the deans were going to have a legal meeting about [her]." (RSOF ¶ 1038.) Dr. Waggel was careful to document Dr. Catapano's admission that she was being punished for taking too much time off. (RSOF ¶ 1039.)

Then in November 2016, members of the CCC again treated Dr. Waggel's medical leave as symptomatic of poor performance that included "tardiness, absences, and not doing assigned outside work." (Ex. RRR) On February 9, 2016, the CCC concluded that Dr. Waggel's medical absences and related performance issues were a basis for her termination without regard to ADAAA and FMLA protections. (ECF 34-17 at pp. 49-51.)[4]

---

[4] The CCC report reveals discriminatory and retaliatory reasons for terminating Dr. Waggel, as follows: "(#1)" cites to her absence on June 10, the day she was diagnosed with cancer. Dr. Waggel provided a doctor's note to Dr. Dyer in support; "(#2)" cites to her failure to file a health clearance while she was on FMLA leave, (#3) cites her performance on the August 25 call shift (see supra n. 1); (#4) cites to her absences in Dr. Griffith's class while on medical leave (see supra n. 18); it also alleges she was lying about attendance in seminars and receiving feedback, despite clear evidence that her attendance was for medical leave; finally, it alleges she lied about receiving feedback, even though she never in fact received Milestone evaluations, and Dr. Simons did reprimand the CCC that it failed to provide her clear notice of deficiencies and an improvement plan. (ECF 34-17 at pp. 49-51.)

Dr. Waggel also received a letter of deficiency, written by Dr. Catapano, notifying her that she was not on track to graduate due, at least in part, to her absences from training seminars ("didactics") while on FMLA protected medical leave in October. (RSOF ¶¶ 1038, 1041, 1049.)

Dr. Waggel testified, "[i]t was obvious to me it was in retaliation of taking FMLA leave. It was when I came back. And she said that's why it was. I was very upset and confused to say the least." (Ex. OOO at p. 6 (Waggel Dep. at 207:2-5).) Dr. Catapano's comments are direct evidence of Defendant's retaliatory motivation for placing her on administrative leave (preventing her from attending clinical rotations and training seminars) and denying Dr. Waggel a promotion.

Dr. Waggel would question these decisions and even filed internal appeals in compliance with Defendant's Academic Improvement Policy and internal grievance procedures. (RSOF ¶¶ 1058, 1104.) The more Dr. Waggel complained, the more letters of deficiency the program issued. While her appeals were pending, Dr. Waggel did seek to improve her performance and remediate alleged deficiencies. (RSOF ¶¶ 1011, 1014, 1015, 1050-52, 1058-63, 1064-67, 1071.)  But the program never gave her a fair opportunity to improve and achieve her promotion. (RSOF ¶¶ 1003, 1011-16, 1050-52, 1058-60-67, 1071.)

For example, Dr. Waggel was the only resident not to be issued Milestones (formal performance reviews) in her second year. (RSOF ¶ 978-79.)

Also, Dr. Waggel alleged in one of her internal appeals that the decision to delay her promotion was made in violation of Defendant's Academic Improvement Policy, since it did not allow her an opportunity to correct alleged deficiencies, and because the decision to delay her promotion was based on her medical absences from didactics seminars. (SOF ¶¶ 717, 720, 723, 725, 769, 770.) In reviewing Dr. Waggel's appeal, Dr. Cioletti observed that Dr. Waggel was absent from didactics because of her medical leave, and that FMLA policy protected her leave.

(SOF ¶ 770.) Further, Dr. Simons reviewed her appeal. (SOF ¶¶ 854, 858, 860, 861.) Defendant admits, "The purpose of Dr. Simons' review was only to determine whether the required process for delaying promotion under the Academic Improvement Policy was followed." (SOF ¶ 857.) He overturned the decision to delay Dr. Waggel's promotion to her third year. (SOF ¶¶ 865-67.) He directed the CCC to create an Improvement Plan for Dr. Waggel, in order to provide her with a remediation opportunity. (RSOF ¶ 1099.) Thus, there was much evidence of procedural irregularities and unfair decision-making. Dr. Berger even scolded the CCC and Dr. Lisa Catapano, telling them to slow down with regard to determinations about Dr. Waggel's employment status. (RSOF ¶ 1082.)

Based on the above, Defendant has all but admitted that the Program failed to provide Dr. Waggel with clear feedback, notice of alleged deficiencies, an opportunity to cure, and due process. In fact, the Program provided her positive feedback about her performance, and when she was criticized, it was generally vague. (SOF ¶¶ 129-32); (Exh. 63 (Catapano Decl.), ECF 34-4 at pp. 35-36); (Ex. 71 (Catapano Decl.), ECF 34-4 at p. 37.)

The CCC and Dr. Catapano did not follow Dr. Simons's and Dr. Berger's directions. Instead, the Program provided arbitrary and unexplained changes in responsibilities, abrupt decisions without sequential steps preceding or explaining them, and made Draconian decisions without clear justification. (Spitz Report at 2, ECF 32:4 at p. 407.)

Plaintiff's expert witness, Dr. Deborah Spitz, a psychiatrist at the venerable University of Chicago and a doctor who has vast experience in medical residency programs and their management, as well as knowledge of national standards promulgated by the Accreditation Council for Academic Graduate Medical Education, offered that "[t]he job of a residency training program is to meet each resident where he or she is, to create individual training plans suitable to

the strengths and weaknesses of each resident, to work collaboratively on remediation plans, and to model collaborative, clear problem-solving precisely because we are educators and educational planning is where our expertise lies." (Spitz Report at 2, ECF 32:4 at p. 407.) Even when (as noted above) Dr. Simons identified the Program's failures to adhere to its own policies and provide Dr. Waggel opportunities for success, the CCC refused to ensure careful and deliberate decision making. In fact, they continued to deprive Dr. Waggel a fair opportunity for remediation.

For example, a November 19, 2015 letter of deficiency ordered Dr. Waggel to meet with Dr. Lori Kels. (RSOF ¶ 1051.) Dr. Lori Kels was assigned to supervise Dr. Waggel as part of her improvement plan to address alleged performance deficiencies. (RSOF ¶ 1051.)

Dr. Waggel sought to comply with this order. However, Dr. Kels and the CCC were unresponsive to Dr. Waggel's good faith emails asking to schedule a meeting and comply with the improvement plan.[5] (RSOF ¶ 1052.)

On or about January 8, 2016, Victoria Anderson, the residency program coordinator, confirmed Dr. Waggel's suspicion that she was taken off call for reasons other than her remediation assignments. Anderson stated this was done in retaliation for Dr. Waggel filing an appeal regarding

---

[5] (Waggel Declaration ¶¶ 162-163.) Eventually, Dr. Waggel was assigned a remediation essay and oral presentation, which Dr. Gandhi was supposed to review. (RSOF ¶ 1060.) But, Dr. Gandhi dodged her attempts to meet, delaying her presentation of her project for more than a month. (RSOF ¶ 1052.) On January 3, 2016, Dr. Gandhi finally spoke to Dr. Waggel about remediation assignment on the phone, and Dr. Waggel emailed him the essay she was required to submit as part of her remediation plan that day as well. (RSOF ¶ 1062.) Having completed her remediation project, Dr. Waggel began inquiring about when she would be returned to call. (RSOF ¶ 1064) She did not receive a clear response. On or about January 21, 2016, Dr. Waggel received a communication from Dr. Catapano that she would review Dr. Gandhi's comments about Dr. Waggel's essay with the CCC and then get back to Dr. Waggel to let her know about their recommendations for remediation or promotion going forward. (RSOF ¶ 1067.) But Dr. Waggel never received the CCC's feedback for her remediation assignments.

her delay in promotion, since the administration was frustrated they had to do more work to address her concerns.  (Waggel Declaration ¶ 1063.)

Nearly a month passed, and even though she had completed her remediation assignments, Dr. Waggel still was not allowed to see patients on call. (RSOF ¶¶ 1060-1064.) On January 19, 2016, Dr. Sarani promised Dr. Waggel that he would press Dr. Berger and Dr. Catapano to move the process along. (RSOF ¶ 1065.)

From October 2015 until her termination, Dr. Waggel was making good faith efforts to improve alleged deficiencies and await the CCC's deliberations regarding her internal grievances and appeals. (RSOF ¶¶ 1051-65.) She complied with Defendant's policies. (RSOF ¶ 1106.)

In contrast, Defendant was acting in bad faith, attempting to stop her from filing appeals, and delaying the process. For example, despite the CCC's obligation to allow Dr. Waggel an opportunity to improve her performance, pursuant to the Program's own Academic Improvement Policy, the CCC acted hastily. (SOF ¶¶ 865-867); (RSOF ¶¶ 1099, 1082).

It mined her employment history for months, searching for reasons to justify her termination, other than her medical absences. For example, Dr. Simons' email to Dr. Catapano about the decision directed the CCC to meet about the resident's evaluations/concerns and make specific recommendations about Dr. Waggel's progress before meeting with her again to convey its recommendations. (RSOF ¶ 1100.) But, Dr. Dyer, the CCC Chair, was less interested in remediating Dr. Waggel than in "fixing" technical problems with CCC's structure, presumably so its decisions about Dr. Waggel would be upheld. (RSOF ¶ 1101); (Ex. WW). And, on April 8, 2016, the same day Dr. Berger rejected Dr. Griffith's and Dr. Catapano's effort to use a misconduct allegation as the basis of a reportable action against Dr. Waggel, the CCC met on remand from Dr. Simons' decision and decided to increase Dr. Waggel's punishment from non-progression to

PGY3 year to dismissal. (RSOF ¶ 1101.) A few days later Dr. Dyer secured Dr. Berger's promise that Graduate Medical Education would uphold the decision to dismiss Dr. Waggel from the program against any appeal and further would support any decision to deny her credit for rotations necessary to effectuate a transfer to another residency program. (RSOF ¶ 1103); (Ex. WW). Although Dr. Waggel did appeal her dismissal from the program, those appeals were denied (as Dr. Berger promised Dr. Dyer to rubber stamp their decision). (RSOF ¶ 1104); (Ex. WW). Defendants' representatives and agents have an obligation to ensure that the institution follows in own policies. (RSOF ¶ 1105.) The requirements for academic due process, according to the Defendant's policies are notice, opportunity to cure, and a careful and deliberate decision-making process. (RSOF ¶ 1106.) GW fails to provide due process if it does not meet its obligations for all three elements of academic due process. (RSOF ¶ 1107.)

All the while, Dr. Catapano lied to Dr. Waggel, telling her that the CCC was working on an improvement plan instead of engineering her termination. (RSOF ¶¶ 1076, 1079, 1080.) Moreover, the CCC's ultimate decision was based on its complaints regarding her absences and promotions, without regard to her disability and medical leave. *See supra* n. 2.

All of the deficiency letters and criticisms of Dr. Waggel's lack of professionalism, as well as their denial that Dr. Waggel ever properly requested medical leave, was the Defendant's attempt to shift the blame from Defendant to Dr. Waggel for "prolonged and unexplained delays in developing, communicating and implementing both feedback and a remediation plan". (Spitz Report at 2, ECF 32:4 at p. 407).

Dr. Waggel hired an attorney to help protect her rights pursuant to the ADAAA and FMLA. (RSOF ¶ 1043.) With assistance, she raised appeals and complaints regarding the program's mistreatment of her through internal processes, and in conversations, meetings and emails with the

Program's administration. (RSOF ¶¶ 1043, 1044.) Her attorney told her that Defendant's General Counsel was handling the matter. (RSOF ¶ 1043.)

In response to Dr. Waggel attempting to exercise her rights under the ADAAA and FMLA, and follow its own internal grievance procedures, Defendant ruined Dr. Waggel's career.

As Plaintiff's expert observes, "[h]ad the GW Program considered or acknowledged its own possible role in worsening the problem, it might have been willing to entertain the possibility that Dr. Waggel might do better in a different Program without the same history of conflict. This might have enabled the Program to support her in transferring. Instead, the Department did not even consider Dr. Berger's plan to help Dr. Waggel transfer." (Spitz Report at 2, ECF 32:4 at 407.)

Instead, they were unwilling to give Dr. Waggel her twenty (20) months of credit, which would have made her transfer possible; refused to speak to other residency programs so that she lost the opportunity to transfer; and they rushed to dismiss her when a fair process would have resulted in her placement in another Program where she might have had a chance to succeed. *Id.*

Dr. Berger revealed the underlying motivation for the Program's decisions: in a conversation taking place not long before the CCC made its decision to terminate Dr. Waggel, he admitted that the Program would not support her because she had retained counsel and pursued her rights to an internal appeal regarding mistreatment related to her disability. (RSOF ¶ 1091.) This was not the first time Dr. Berger warned Dr. Waggel against using an attorney. (RSOF ¶¶ 1044-1047.) And, he delivered on his threat. The Program terminated Dr. Waggel and prevented her from transferring to another residency program. (RSOF ¶¶ 1103-4, 1098.)

### III.     Argument

### A.  Defendant Fails to Contest Plaintiff's *Prima Facie* Case of Disability Discrimination.

As set forth above, Counts I and II plead claims under the ADAAA and the DCHRA for a failure to accommodate and for discrimination. Plaintiff discussed these claims in depth in its own Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment as to Counts I & II (hereinafter "Plaintiff's Mem."). (ECF 32-1.)  There, Dr. Waggel demonstrated that Plaintiff had established a *prima facie* case under these disability discrimination statutes.  She also detailed how Defendant failed to provide Dr. Waggel with an accommodated work schedule and subjected her to negative employment actions, including failing to promote her, terminating her, and sabotaging her efforts to transfer to another program.  We incorporate those same arguments here.

Although GW fails to focus on Plaintiff's discrimination claims, Defendant does make three assertions that require some response. First, Defendant contends that Plaintiff's cancer surgery was "curative."  (ECF 34 at p. 27.)  Second, Defendant states, "Plaintiff was explicitly directed to the University's EEO Office on multiple occasions to pursue any request she might have for a claim of disability or for an accommodation for any disability, but Plaintiff never pursued the procedure the GW University offered all residents and other employees for obtaining any reasonable accommodation they might need." (ECF 34:2.) Third, Defendant maintains that Dr. Waggel should have been dismissed in any case because of substandard performance.  (ECF 34 at 28-30.) All these arguments may be quickly dispatched.

1.      **Cancer in Remission is Still a Disability.**

Relying on the declarations of Dr. Jarett and Dr. Siegel, [6] Defendant claims Plaintiff's

cancer surgery was "curative." However, neither doctor actually states that Dr. Waggel was

"cured." Presumably, they know full well that Dr. Waggel's cancer is not "cured" but in remission.

*See* Decl. Dr. Marc Shephard ¶ 12.  Such cancer in remission is still considered a disability under

applicable laws. applicable laws. *See Hoffman v. Carefirst*, 737 F. Supp. 536 (N.D. Ind. 2010)

(renal cancer in remission); *Angel v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242 (D. Colo.

2012); *Katz v. Adecco United States Inc.*, 845 F. Supp. 2d 539 (S.D.N.Y. 2012); *Norton v. Assisted

Living Concepts Inc.*, 786 F. Supp. 1173 (E.D. Tex. 2011); *Haley v. Cmty. Mercy Health Partners*,

2013 U.S. Dist. LEXIS 11193, 2013 WL 322493 (S.D. Ohio 2013). *See also* 29 C.F.R.

§§1630.2(j)(3)(iii) and 1630.2(j) (1)(vii).

2.      **Plaintiff Went to the EEO Office Which Directed Her to Take FMLA Leave.**

 Defendant's claims that Plaintiff was directed to the EEO office but never went there to

seek an accommodation also fail.  Plaintiff did in fact visit the EEO office in September 2015, but

was directed by that office to take FMLA leave for needed medical leave.  (RSOF ¶ 118.)  Plaintiff

did in fact take such leave in October 2015 and March 2016.  (RSOF ¶¶ 1027, 1090.) In any event,

as set forth more fully in Plaintiff's Mem., Plaintiff submits that Defendant had a duty under the

law to engage in an "interactive process" to determine whether a reasonable accommodation could

---

[6] In addition, the Jarett and Siegel declarations may violate medical ethics rules and federal law.
Physicians are to obtain a patient's consent before writing documents to third parties, and Dr.
Waggel received no such request from her physicians. (Declaration of Dr. Stephanie Waggel M.D.
("Waggel Decl.") ¶¶ 279-80).  *See also* <u>AMA Code of Medical Ethics Opinion 3.2.3</u> *AMA
Principles of Medical Ethics: IV.* Further, Physicians are to limit and narrow their information
disclosure under subpoena according to <u>Code of Medical Ethics Opinion 3.2.1.</u>  As such, the Court
should discount Doctor Jarett's and Siegel's declarations, particularly claims that Dr. Waggel's
surgery was "curative."

have helped Plaintiff's needs. (ECF 32-1 at pp. 13,19- 20, citing *Minter v. District of Columbia,* 809 F.3d 66, 69 (D.C. Cir. 2015).)  That simply was never done here.

### 3.    Plaintiff Could Perform Her Job with a Reasonable Accommodation.

As discussed in Plaintiff's Mem., Dr. Waggel was employed by the Defendant, had a disability, was entitled to a reasonable accommodation, and also was faced negative employment action based on her disability. (ECF 32:1.) In response, Defendant claims that Dr. Waggel should have been dismissed in any case because of substandard performance. (ECF 34:33.) With reasonable accommodation, however, Dr. Waggel could perform the essential functions of the position.

Plaintiff asked for a modified work schedule, including a couple of hours off each week to attend medical appointments for her cancer and related-anxiety and a modified work schedule when she returned from surgery. With reasonable accommodation, as requested by Dr. Waggel, she would not have faced undue hardship, but would have done well in her program. Her performance was positively reviewed in her Milestone evaluations,[7] her program director commented that her performance was "heroic",[8] Dr. Collins' suggestion that Dr. Waggel was

---

[7] Plaintiff provides ample evidence in support of her more-than adequate on-the-job performance. Dr. Waggel received excellent "Milestone" (performance reviews) from attending physicians who supervised her work on a day to day basis. (RSOF ¶¶ 978, 980, 1009, 1091.) The CCC knew about, but chose to discount these positive reviews. (*Id.*) Before a March 2016 meeting approving Dr. Waggel's termination, Dr. Catapano asked her assistant, Tory Anderson, to locate the performance reviews Dr. Waggel received in her PGY 2 year. (ECF 32-2 at ¶ 89.) These evaluations showed that Plaintiff was working at or above the level of a second- year medical resident. (Pl.'s SOF ¶ 90.) Even just before the CCC issued its decision to terminate Dr. Waggel, Dr. Berger later agreed that Dr. Waggel's milestones were more than adequate to support her transfer to another program. (Ex. NN, (Transcript of Interview at 79:10-15).)

[8] Def.'s Exh. 80 (Catapano Decl.), ECF 34-4:56.

passing her course, (SOF ¶ 258), and she met the ACGME national hourly requirements for clinical duty and didactics training. (RSOF ¶ 984); (Waggel. Decl. ¶¶ 14-15.)

In its Statement of Material Facts, Defendant hopes that by presenting nearly **1000** facts regarding the whole tenure of Dr. Waggel's employment as a medical resident, the Defendant will show the Court, *post hoc*, that Dr. Waggel did not have a pristine employment record, in order to make the case that they were justified in terminating her as a medical resident and not support her transfer to other, less hostile, residency programs. This contrivance is brimming with red herring. And, it spawns misinformation. A vast number of the facts presented concern Dr. Waggel's first year of residency and her performance therein. It may be true that during her first year Dr. Waggel struggled in a handful of incidents in the first weeks as a first- year resident, or failed to exceed expectations in some areas of medicine (namely, in emergency medicine she was rated as having first-year level knowledge, while in her practice specialty areas (neurology and psychiatry) she had a second-year level knowledge). Yet, the record makes clear, and Dr. Waggel's expert witness corroborates, that Dr. Waggel received satisfactory marks on her Milestones and performance reviews by the end of the year. (SOF ¶¶ 978-980, 10009, 1091, 1101.) Even Defendant must have thought her performance met expectations, since she was promoted to her second year. (SOF 42.)

Moreover, it was clear that absences, not performance, were the real cause of alleged deficiencies. (*See, e.g.,* Def.'s Ex. 132 (Catapano Decl.), ECF 34-4 at p. 129 (Email from Dr. Lori Kels to Dr. Waggel, stating, "I do think it is relevant for you to be aware that your attendance at PHP this month puts you in jeopardy of failing the rotation, based solely on the number of days worked/not worked.").)

Dr. Waggel has thus offered sufficient factual disputes showing she was a 'qualified individual' for the employment in question, since she was more than capable of performing

"essential functions" of the position with or without accommodation. 42 U.S.C. § 12111(8); *see also Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

Defendant failed to engage Dr. Waggel in an interactive process, let alone provide her with reasonable accommodation in violation of the ADAAA. *See* 29 C.F.R. § 1630(o)(3). In the District of Columbia, engaging in an "interactive process . . . is often necessary to determine a reasonable accommodation." *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (citing *Mogenhan v. Napolitano*, 613 F.3d 1162, 1167-68 (D.C. Cir. 2010) (quoting 29 C.F.R. § 1630.2(o)(3))); (*see also Ward v. McDonald*, 762 F.3d 24, 31-33 (D.C. Cir. 2014); *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308-09 (D.C. Cir. 2010). In its Memorandum, Defendant also failed to provide evidence that reasonable accommodation was somehow unduly burdensome. 29 C.F.R. § 1630(o)(3).

**During his deposition, Dr. James Griffith, the Chair of the Department of Psychiatry and Behavioral Science, testified he did not believe Defendant had any responsibilities to accommodate Dr. Waggel's illness or related-anxiety.** (Pl. Dr. Stephanie Waggel's S. of Material Facts For Which There Are No Genuine Disputes In Support of Her Mot. for Partial Summ. ¶ 93-94, ECF 32-2 at p. 16.) **He also testified that that neither he, nor the CCC charged with making determinations about Dr. Waggel's employment status, considered the fact that Plaintiff may have suffered from cancer as relevant to judgment of her job performance.** (Pl. Dr. Stephanie Waggel's S. of Material Facts For Which There Are No Genuine Disputes In Support of Her Mot. for Partial Summ. J. at ¶ 93-94, ECF 32-2 at p. 16.) **Therefore, it is clear that, not only did he fail to accommodate Dr. Waggel for cancer, the Program failed to entertain the idea of accommodating her. Following suit, his deputy, the Residency Program's Director, Dr. Lisa Catapano, also made clear that doctors often get sick and ought**

**to deal with their illness without expectation of accommodation.** (Ex. OOO, Waggel Dep. at 54:13-16, 237:1-12.)

Even when Dr. Waggel spoke with the EEO office, it failed to provide her an accommodated schedule or coordinate accommodations with her program director, attending, and other administrators. (RSOF ¶¶ 995, 997, 1010, 1022, 1017.) Instead, it simply suggested that Dr. Waggel apply for FMLA protection every time she took leave. And then, when Dr. Waggel complied with this suggestion, Dr. Berger, Dr. Emejuru, and Dr. Catapano gave her a hard time. (RSOF ¶ 1019); (Ex. ZZ ("GWU 001386")); (ECF 34-7 at p.72); (Def.'s Exh. 61 (Catapano Decl.), ECF 34-4 at pp. 19-20); (Waggel Decl. ¶ 207-208). It was clear there was terrible mismanagement and miscommunication, a total lack of coordination, in this respect. (Spitz Report at 2, ECF 32:4 at p. 407.) Based on the above, Dr. Waggel has supported her *prima facie* case for failure to accommodate pursuant to the ADAAA.

In failing to accommodate Dr. Waggel, Defendant created an unmanageable work environment. (ECF 32-4 at pp. 406-414.) That is, it was impossible for Dr. Waggel to attend all her medical appointments and work shifts. Dr. Waggel has provided evidence of the medical appointments she missed or was late for.[9] And, Plaintiff was specifically penalized for attending doctor's appointments – even when she clearly followed proper protocol as requested by her

---

[9] (*See* Pl.'s SOF ¶¶ 35, 37-38.) Plaintiff did not get a follow-up renal ultrasound to check her kidney function because of scheduling difficulties. (Pl.'s SOF ¶ 35.) Plaintiff was late for a genetic testing work-up because she was not allowed to leave work. (Pl.'s SOF ¶ 35.) Plaintiff had difficulty making a follow-up appointment with Dr. Jared because GW scheduled her for a meeting with Dean Berger the same day. (Pl.'s SOF ¶ 35.) Because GW failed to engage with her, Plaintiff ultimately had to take FMLA leave because it was so difficult to schedule time for follow-up medical appointments. (Pl.'s SOF ¶ 35.) Plaintiff was unable to schedule certain medical appointments in a timely manner due to not having a schedule on 7/18/15, 10/22/15, 11/23/15, 12/1/15, 12/2/15, 12/3/15, 1/24/2016, 1/26/16, and two appointments in February 2016. (Pl.'s SOF ¶ 37.)

supervisor.  (*See, e.g.*, Def.'s Exh. 132 (Catapano Decl.), ECF 34-4 at p. 129 (Email from Dr. Lori Kels to Dr. Waggel, stating, "I do think it is relevant for you to be aware that your attendance at PHP this month puts you in jeopardy of failing the rotation, based solely on the number of days worked/not worked.").)

And, when Dr. Waggel chose to prioritize her health, she missed work shifts, training/didactics, and didactics assignments. *Supra* n. 9. This is supported by Defendant in its motion for summary judgment, since it alleges absenteeism. *Supra* n. 2.

Because GWU failed to accommodate Dr. Waggel, it cannot not win, much less survive, summary judgment unless it "demonstrate(s) that such accommodations would constitute an undue hardship on the business under the particular circumstances." 29 C.F.R. § 1630.9(a). That is, the employer bears the burden to prove that reasonable accommodation would have created an undue hardship on the Defendant. *See* 29 C.F.R. §§ 1614.203(c)(1), 1614.102(a)(8)); *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). Defendant has offered no facts or arguments in its Motion, Memorandum in Support, or Statement of Material Facts specifically about undue burden. As such, GW's summary judgment motion should be denied.

**B.  Violation of the Federal and District Family and Medical Leave Acts "FMLA" and "DCFMLA", Respectively) (Interference and Retaliation).**

Defendant fails to offer facts and legal argument to support its motion with respect to Plaintiff's FMLA and DCFMLA claims.[10] In contrast, Plaintiff provides supporting facts and law supporting its FMLA and DCFMLA interference and retaliation claims, as follows:

---

[10] Indeed, the Court should treat Defendant as having conceded the issue.  Though Defendant filed a motion for summary judgment as to all claims, in its opening memorandum, Defendant fails to offer any legal arguments or facts in support of its motion as to Plaintiff's FMLA and DC FMLA

1.      **Introduction to FMLA and DCFMLA Claims, and Intersection with ADAAA**

The Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.,* and District of Columbia FMLA, D.C. Code § 2- 1401.01 *et seq.,* provide certain rights to employees who take leave for medical purposes. For example, Plaintiffs may request FMLA leave, and if it is granted, they may take that leave for up to 12 weeks (FMLA), 29 U.S.C. § 2612(a)(1) -(3) or 16 weeks (4 D.C. Municipal Reg. § 1604).

The FMLA and ADAAA intersect in this case. For example, FMLA carves out time away from the workplace for qualified employees and requires an employer to keep their position available on return without any regard to the burden imposed, while the ADA reasonable accommodation requirement does allow employers to take the impact of employee absence into account in determining their employee status. *See Scruggs v. Pulaski County*, 817 F. 3d 1087 (8th Cir. 2016). So, if Plaintiff takes leave protected by the FMLA, employers may not take negative employment action against them, including delaying promotion, or terminating an employee, in retaliation, regardless of whether the absence imposes a hardship on her employer. 29 C.F.R. § 825.702(b) ("FMLA entitles eligible employees to 12 weeks of leave in any 12-month period, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation.").

Also, in many ADAAA cases, Courts recognize attendance as an essential job function. See, e.g., *Williams v. AT&T Mobility Services LLC*, 2016 WL 3172917, 2016 U.S. Dist. Lexis 73017 (W.D. Tenn. June 6, 2016) (granting summary judgment where an employer showed attendance was essential for a call service center employee who did not qualify for FMLA coverage

---

claims. Pursuant to Local Civil Rule 7(b), and the Court's Scheduling Order Rule 5(c), the Court may treat the motion as to these claims as conceded, since the party fails to respond in its opposition papers. *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009).

for numerous absences, and had requested a flexible schedule as a reasonable accommodation). Therefore, in comparison to the limitations to ADAAA rights, FMLA leave provides additional protection since employees cannot be penalized for absences. *Id.*[11]

Further, FMLA leave might be construed as an ADAAA reasonable accommodation, but it does not relieve the employer from responsibility of engaging in an interactive process to help an employee perform her job under ADA. Indeed, employees may still request reasonable accommodation when they return to work after FMLA leave. (*See* Press Release, Equal Employment Opportunity Commission, Brookdale Senior Living to Pay $112,500 to Settle EEOC Disability Discrimination Lawsuit (Aug. 17, 2015) (*available at* https://www.eeoc.gov/eeoc/newsroom/release/8-17-15.cfm)( discussing consent decree in *EEOC v. Brookdale Senior Living Communities, Inc.* (D. Colo. No. 14-cv-02643-KMT) (resolved August 17, 2015) wherein EEOC alleged that the company refused an employee's request to return to work after leave for fibromyalgia because she was unable to return to work without restrictions or accommodations. ); *See also Fleck v. Wilmac Corporation*, Civ. Action No. 10-05562, 2011 WL 1899198, at *1,2, 4-7, 2011 US Dist. Lexis 54039 (E.D. Pa. May 19, 2011) (also involving both FMLA and ADA claims).

---

[11] Of course, in this case, Dr. Waggel qualified for FMLA leave, which was granted by Defendant in October 2015 and in March 2015. To the extent she was absent towards the end of her first year as a resident (and in July 2015), prior to qualifying for FMLA, she requested only a handful of hours off (during didactics or otherwise) to attend medical appoints, and two weeks of leave for surgery. She also requested to work only 40-50 hours a week, and on lighter shifts, upon her return while she recovered, an amount of time that was in compliance with ACGME residency training standards. She was denied that latter request, since she was scheduled for exhausting overnight shifts upon her return and one 30-hour shift (ending in the night of August 25, 2015). Defendant has failed to offer evidence that this time caused an unreasonable burden on the program or disqualified her from promotion to her second year as an attorney. As such, regardless of her FMLA claims, her lack of attendance is not a legitimate basis for her termination).

Thus, for example, when Defendant's EEO Office allowed Dr. Waggel to take FMLA leave, it did not adequately accommodate her. Even when she returned, she required a few hours off each week to schedule and attend follow-up medical appointments to treat her cancer and related- anxiety.  Defendant provided no such accommodation.

## 2.  Legal Analysis for FMLA and DC FMLA Retaliation and Interference

In this case, there is no dispute that Dr. Waggel qualified for and received FMLA leave in October 2015 and March 2016. (RSOF ¶¶ 1017, 1027, 1090.); (SOF ¶¶ 531, 838.) Instead, there is a dispute as to whether Defendant retaliated against her FMLA and DCFMLA protected leave and attempted to interfere with her attempts to exercise rights under FMLA and DCFMLA. (Compl., ECF 2.)

In its Motion for Summary Judgment, Defendant has offered a series of alternative justifications for its negative employment actions with respect to its ADAAA and DCHRA defenses. These defenses and omissions preclude summary judgment since they are disputed in fact and are generally illegitimate.

Regardless of these alternative justifications, to prevail in a FMLA claim, Plaintiff need not prove defendant's proffered reasons played no role in its actions, "but only that they were not the only reasons, and that filing for FMLA leave was at least one motivating factor." *Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009). Instead, Plaintiff may offer direct or circumstantial evidence, such as the proximity of Dr. Waggel's FMLA leave and the negative employment actions, or the direct admissions of Dr. Berger regarding Defendant's retaliatory intent, to avoid summary judgment. *See Sista v. CDC Ixis N. Amer., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006). She does so, below.

22

### i. Retaliation

Employees are protected against retaliation for protected activity, including taking leave under the FMLA, opposing employment practices that violate the FMLA, and giving information, testifying, preparing to testify, or filing a charge or claim about an FMLA violation. *See* 29 CFR § 2612. Prohibited retaliatory acts include termination, demotion, or denying an employee the same or an equivalent position upon returning from leave. *Id.*

The elements of a retaliation claim are (1) the employee engaged in a protected activity; (2) the employer took a "materially adverse" employment action against the employee, meaning the action is likely to dissuade a reasonable employee from engaging in FMLA-protected activity; and (3) the employee's protected activity caused the employer to take the adverse action (the causal element). *Gordon v United States Capitol Police*, 778 F.3d 158, 161 (2015), citing *Gleklen v. Democratic Con. Campaign Comm., Inc.*, 199 F. 3d 1365, 1368 (D.C. Cir. 2000).

### ii. Interference

In addition, it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the FMLA. 29 CFR § 2615 (a)(1). Thus, in order to make a claim for interference, the employee has to show the employer denied him or her of an FMLA entitlement. While other interference cases may allege that an employer refused to authorize FMLA leave, Dr. Waggel's claims assert that Defendant attempted to dissuade and discourage her from taking leave, opposing its employment practices that violated the FMLA, and preparing to file a charge or claim about FMLA violations.

Action likely to dissuade a reasonable employee from engaging in FMLA-protected activity should be construed broadly. *See, e.g., Joyce v. Office of the Architect of the Capitol*, 966 F. Supp. 2d 15, 28-29 (D.D.C. 2013) ("'Opposing' an unlawful practice normally means objecting when the employer breaks the law, not exercising the underlying right. Courts nonetheless often

23

count penalizing protected leave as FMLA retaliation."); *Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43, 49, (D.C. Cir. 2011); *Gleklen*, 199 F.3d at 1368 & n.3; *James v. Hyatt Regency Chi.*, 707 F.3d 775, 781 (7th Cir. 2013); *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). "Whether called "retaliation" or something else, the FMLA clearly prohibits adverse actions motivated by FMLA-protected leave." *See Joyce*, 966 F. Supp.2d at 28-29, citing *Quinn v. St. Louis County*, 653 F.3d 745, 754 n.7 (8th Cir. 2011) (claim should be brought under § 2615(a)(1)); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) (claim should be brought under 29 C.F.R. § 825.220(c)).

"An employer action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right may give rise to a valid interference claim under 29 CFR § 2615(a)(1) even where the action fails to actually prevent such exercise or attempt. *Gordon*, 78 F.3d at 165; *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010).

### 3.   Factual Disputes Preclude Summary Judgment With Respect to Plaintiff's FMLA and DCFMLA Claims.

#### i.  Evidence of Retaliation

On September 17, 2015, Dr. Waggel visited the GW EEO office.  (RSOF ¶ 1017.)  She had recently returned from medical leave, having undergone surgery to remove a cancerous tumor from her kidney. (RSOF ¶ 10005.) She was motivated to visit the EEO office because her Program Director, Dr. Catapano, had refused to provide her with an adjusted work schedule to accommodate her need to attend medical appointments. Instead, she had been assigned an extremely busy call schedule upon her return from medical leave. (RSOF ¶¶ 1008, 1010-12.)  Her exhaustion, and the program's failure to accommodate her with an adjusted work schedule, had begun to affect her

performance and she was missing medical appointments. (RSOF ¶¶ 1010, 1012, 1017.)  She had attempted to raise her concerns regarding her exhaustion and lack of support from the program directly with Dr. Catapano and her assistant, Dr. Kels, but they disregarded her complaints, or tried to shift their responsibility to address her concerns on to others. (RSOF ¶¶ 1011-15); (Waggel Decl. 74-100.)

Given the difficulty, it is no surprise that Dr. Waggel sought out support from Defendant's EEO office on her own. In response to Dr. Waggel's question about policies to protect residents in need of medical leave, the EEO office did not offer Dr. Waggel a coordinated plan to accommodate her need to attend medical appointments moving forward, but rather an alternative: Dr. Waggel was told to apply for protected leave pursuant to its FMLA policies. (RSOF ¶ 1048.) Defendant did so, and she was granted leave in October 2015 and March 2016. (RSOF ¶¶ 836, 1027, 1090.)  This was protected activity. 9 U.S.C. § 2615.

When she returned from her first FMLA leave, Dr. Waggel was denied sick leave benefits. Specifically, on November 10, 2015, shortly after Dr. Waggel returned from her October FMLA leave, Dr. Waggel requested sick leave to attend a medical appointment but was not allowed to leave work, so she missed an appointment. (Waggel Decl. ¶ 136.) Dr. Catapano called to tell her she had "taken too much sick leave" and "the deans were going to have a legal meeting" about her. (Waggel Decl. ¶ 136.) It is clear that GWU's retaliation could have reasonably dissuaded Dr. Waggel from requesting FMLA leave in the future.

These facts support Plaintiff's interference claim and are predicates to Defendant's FMLA and DCFMLA violations, because they constitute protected activity. As such, she should not have been punished for engaging in these activities. Yet, Defendant did retaliate against her.

Hereunder, Plaintiff offers additional direct and circumstantial evidence of Defendant's retaliatory motivations and interference with FMLA leave.

### ii.  Direct Evidence of Retaliation

#### Termination

There is direct evidence that the CCC based its decision to terminate Dr. Waggel in retaliation for taking FMLA leave. As noted above, *supra n.3*, in February 9, 2016, the CCC found that Dr. Waggel's medical absences and performance were a basis for her termination without regard to ADAAA and FMLA protections. (ECF 34-17 at pp. 49-51.) As such, there is direct evidence that Dr. Waggel's disability, including her FMLA and ADAAA protected medical leave related to that disability, were the reasons she was terminated.

#### When she returned from FMLA leave, Dr. Waggel was denied sick leave benefits.

On November 10, 2015, shortly after Dr. Waggel returned from her October FMLA leave, Dr. Waggel requested sick leave to attend a medical appointment. The request was denied and Dr. Waggel missed her appointment. (RSOF ¶ 1010); (Waggel Decl. ¶ 136.)  The temporal proximity of this denial of sick leave benefit is circumstantial evidence of retaliatory intent.

#### When she returned from FMLA leave, Dr. Waggel was removed from call schedules, prohibited from attending training (didactics) seminars, and her promotion to her third year was delayed.

The proximity of Dr. Waggel's FMLA leave and these negative employment actions are strong circumstantial evidence of retaliation. Strong temporal proximity between the plaintiff's protected action and the employer's adverse employment action establishes a causal connection between a protected activity and retaliatory action. *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001); *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001).

Soon after Dr. Waggel returned from her first FMLA leave, she was first placed on administrative leave, and prohibited from attending didactics seminars, which led to her non-promotion to PGY3.  (RSOF ¶¶ 1038-1053.)

Defendant's decision to not award her credit for didactics training, thus delaying her promotion, occurred shortly after she returned from FMLA leave. (RSOF ¶ 1053.)  This decision was in direct violation of the FMLA. She should not have been penalized for her absences. *See supra* B (1).

Dr. Catapano informed Dr. Waggel that she had received feedback from Dr. Griffith and Dr. Collins that her performance in didactics class had been unsatisfactory in retaliation for Dr. Waggel taking FMLA leave. (Waggel Decl. ¶ 144.) Dr. Collins confirmed that she would require Dr. Waggel to repeat her class starting in July, 2016. (Waggel Decl. ¶ 164.). Dr. Collins made clear her refusal to allow Dr. Waggel to make up didactics courses she had missed while on forced administrative leave during the CCC's deliberations regarding her employment status. (Ex. OOO, Waggel Dep. 209:13-18.) Dr. Collins told Dr. Waggel she would not grade Dr. Waggel's final assignment, which was due while Dr. Waggel was on administrative leave, because "she's not being paid" to do so. (Waggel Decl. ¶ 260.) Dr. Collins also revealed that the Program Chair, Dr. Griffith, would be failing Dr. Waggel in his didactics course, even though there was a month remaining in the course, and a final exam pending. *Id.*

There was no legitimate basis for withholding Dr. Waggel's promotion based on her didactics absences. Those offered are pretextual. The justification for delaying Dr. Waggel's promotion is obviously pretextual. Until she took medical leave, Dr. Waggel had never before received negative feedback or deficiency letters for her performance in didactics, though she had been taking the course since the previous summer. In fact, prior to taking FMLA leave, Dr. Collins

wrote to Dr. Waggel to tell her she was passing the class. Dr. Collins also knew, throughout the year, that Dr. Waggel's occasional absences in the seminar were due to her need to attend medical appointments. (Def.'s Exh. I (Collins Decl.) ¶ 24, ECF 34-13 at ¶¶ 13-14, 25). She also knew that the Program was ignoring Dr. Waggel's requests for an accommodated schedule so that she could attend appointments during clinical rotations, instead of during didactics. (*Id.*) Yet, her absences were obviously being counted against her for the purposes of delaying her promotion and withholding credit for didactics training.  The appointment of a tutor was discussed as an option, but not followed up upon. (RSOF ¶ 557.)   Likewise, Dr. Waggel should not have failed Dr. Griffith's course.  Instead, Dr. Waggel should have been given the option of retaking the first two didactics tests.   In any event, Dr. Waggel scored above the national average on her licensing exam in neuroscience, the subject matter of Dr. Griffith's didactics course, in her second year. (Waggel Decl. ¶ 126.)  Her Milestones were also strong in that specialty. (Ex. C; Ex. I.)

Even ACGME national standards do not require any particular performance achievements in didactics, other than attendance.[12] Indeed, the ACGME measures resident experience based on unit measurements of "month(s)," and not hours or days. The only exception to this unit of measurements is the ACGME prescription that residents "must be provided at least two hours of faculty preceptorship weekly, one hour of which must be individual." (IV.A.6.b). Since Dr. Waggel attended the all-day Thursday training seminars throughout the year, except for stepping out for a couple of hours for medical treatment, she complied with the ACGME requirements.

---

[12] Ex. WWW, ACGME Program Requirements for Graduate Medical Education in Psychiatry ("ACGME      Program      Requirements")      §      IV,      available      at https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/400_psychiatry_2017-07-01.pdf.

Thus, there was no reason Dr. Waggel could not be promoted.[13] Given the above rules and procedures, as well as Dr. Waggel's performance, Dr. Catapano and Griffith's decision to deny Dr. Waggel credit was arbitrary.

Again, the above decisions to deny Dr. Waggel credit for her didactics training were made days after Dr. Waggel's return from FMLA leave. The temporal proximity and the vague justifications offered by Defendant suggest it harbored retaliatory motivations.

**Other Retaliation for Engaging in Protected Activity**

On December 11, 2015, Dr. Waggel managed to file the request for an appeal of the decisions to make her repeat her didactics training and delay her promotion to PGY3. (RSOF ¶ 1058.) On December 23, 2017, she provided the assigned reviewer, Dr. Cioletti, with documentation in support of her appeal. (RSOF ¶ 1059.) On December 28, 2015, Dr. Waggel learned from another resident that she had been taken off the call schedule. (RSOF ¶ 1060.) The proximity of these decisions is circumstantial evidence that she was removed from call schedule in retaliation for her filing an appeal and raising grievances related to her disability.

Moreover, not only was Dr. Waggel taken off work shifts (RSOF ¶ 1060), but Defendant made it impossible for her to do her job. Specifically, she learned of these allegations through a

---

[13] Even if Dr. Waggel fell short of the training hours she needed under ACGME standards, Defendant has admitted that "Program Directors have some minimal leeway to grant waivers from the minimum training time standards." (Def.'s Exh. A (Catapano Decl.) ¶ 27, ECF 34-2 at p. 8.) Such leeway should have been granted as a reasonable accommodation and in light of Dr. Waggel's outstanding national licensing scores in the subject areas covered by the didactics courses. (Waggel Decl. ¶ 126.) Or, she should have been allowed to make up missed assignments, not terminated. Dr. Catapano, Griffith, and Collins refused to provide Dr. Waggel an opportunity to make up missed assignments, let alone ask the CCC for a reasonable variance. Further, these three doctors should not have made the choice to fail Dr. Waggel. According to the ACGME, it is not the Program Director's choice, but the decision of the Graduate Medical Education Committee, to approve or reject, or make exceptions, to the rules. (Ex. QQQ.) The Program Director should raise a request with the Committee, and the request must be made "after discussion and vote by membership and shall be recorded in the minutes of the meeting." (Ex. QQQ.)

letter of deficiency she had received shortly after her visit to the EEO office in September and subsequent FMLA leave in October. She received one letter on November 11, 2015 and a revised version on November 19, 2015. (RSOF ¶ 1049.)  Those letters vaguely alleged her professionalism and performance was deficient.  The letters stated that her deficiencies would not result in her termination if she met with Dr. Lori Kels in order to receive an improvement plan to address alleged performance deficiencies. (RSOF ¶ 1051.) Dr. Waggel sought to comply with this order. (RSOF ¶ 1052.) However, Dr. Kels was unresponsive to Dr. Waggel's good faith emails asking to schedule a meeting.  (Waggel Declaration ¶¶ 162-163.) After finally tracking Dr. Kels down, Dr. Kels fobbed Dr. Waggel off on Dr. Gandhi. (RSOF ¶ 1052.) Dr. Gandhi was just as difficult to meet in order to accomplish the required remediation.  Eventually, Dr. Waggel was assigned a remediation essay and oral presentation, which Dr. Gandhi was supposed to review. But, Dr. Gandhi dodged her attempts to meet, delaying her presentation of her project for more than a month. (RSOF ¶¶ 1051-65); (*see also supra* n. 3).

On December 28, 2015, Dr. Waggel learned from another resident that she had been taken off the call schedule. (RSOF ¶ 1060.) This was shortly after Dr. Waggel had filed her appeal of the didactics decision and just a month after she had been taken off forced administrative leave, and so Dr. Waggel reasonably believed this measure was taken in retaliation. Victoria Anderson, the residency program coordinator, confirmed Dr. Waggel's suspicion (RSOF ¶ 1063.)

Dr. Waggel did ask Dr. Kels for her explanation as to why she was removed from call schedule. Dr. Kels denied it had to do with the appeal. Dr. Kels stated Dr. Waggel was taken off call until she finished her remediation essay and made an oral presentation to Dr. Gandhi. (RSOF ¶ 1060.) Yet, Dr. Gandhi continued to avoid meeting with Dr. Waggel.  This shifting explanation raises questions about Defendant's true motivation.

On January 3, 2016, Dr. Gandhi finally spoke to Dr. Waggel about remediation assignment on the phone, and Dr. Waggel emailed him the essay she was required to submit as part of her remediation plan that day as well.  (RSOF ¶ 1062.) Having completed her remediation project, Dr. Waggel began inquiring about when she would be returned to call. (RSOF ¶ 1064.) She did not receive a clear response.

Nearly a month passed, and even though she had completed her remediation assignments, Dr. Waggel still was not allowed to see patients on call. On January 19, 2016, Dr. Sarani promised Dr. Waggel that he would press Dr. Berger and Dr. Catapano to move the process along.  (RSOF ¶¶ 1064-65.)

On or about January 21, 2016, Dr. Waggel received a communication from Dr. Catapano that she would review Dr. Gandhi's comments about Dr. Waggel's essay with the CCC and then get back to Dr. Waggel to let her know about their recommendations for remediation or promotion going forward. (RSOF ¶ 1067.)  But Dr. Waggel never received the CCC's feedback for her remediation assignments.

Defendant's administration was ostracizing and isolating Dr. Waggel, obstructing her ability to do her job and ruining her reputation among colleagues. (RSOF ¶ 999.) (Waggel Decl. ¶¶ 43; 55; 105; 251; 264.)  Dr. Waggel would later attempt to explain to Dr. Berger that she wanted to return to work, and had been trying to meet with faculty and develop an improvement plan, so that she could be promoted, but that she was being avoided. (Ex. NN, Transcript of Interview at 29:11-30:7.) In the same conversation, Dr. Berger suggested that her insistence on pursuing an internal grievance and hiring an attorney meant the Program would not support her in moving forward in her job, or seek to transfer to another residency program. (Ex. NN, Transcript of Interview at 30:8-70:4.)

The delay tactics of Dr. Kels, Dr. Gandhi, and the CCC with respect to Dr. Waggel's improvement plan, as well as Dr. Berger's blatant admissions, reveal the Defendant's retaliatory motivation for obstructing her ability to do her job such that she would not be provided remediation opportunities and be promoted to her third year. Indeed, this unsupportive and dishonest behavior supports Plaintiff's FMLA retaliation claim.

### Retaliation for Continued Protected Activity

All the while, Dr. Waggel continued her battle to schedule time for medical appointments.

On February 12, 2016, Dr. Waggel underwent an endoscopy for stomach pain under general anesthesia at 12:15 p.m. at MedStar Surgery Center. They found "duodenal intraepithelial lymphocytosis" and a "lesion in the antrum" of my stomach with "heaped up tissue." Dr. Waggel was informed that it could be cancer metastasis, a concern that has persisted and has needed to be dealt with while Plaintiff has been in remission.  (RSOF ¶ 1087, citing Waggel Decl. ¶¶ 200, 205, 207.)

As such, on February 21, 2016, Dr. Waggel submitted a vacation request for March 21, 2016 through March 25, 2016. (Exh. SSS.)  In the request, she explained that she needed those days for medical appointments, but she was too afraid to use FMLA leave because the Program had retaliated against her in the past for doing so. (*Id.*) She informed her Program Administrator (Ms. Anderson), her chief resident (Dr. Emejuru), and her attending (Dr. Gandhi) that she needed time off to attend an appointment with her urologist. (*Id.*); (Waggel Decl. ¶ 207.) Dr. Gandhi resisted giving her vacation, ultimately only granting one day of leave. (Exh. SSS.)

After again being frustrated by the program's unwillingness to accommodate her, on March 8, 2016, Dr. Waggel applied for FMLA leave for the period of March 9, 2016- March 16, 2016. In lieu of vacation (Waggel Decl. ¶ 207.) She was found eligible and granted FMLA leave. (Waggel

Decl. ¶ 206-07.) Dr. Waggel promptly forwarded the notification to her attendings and the program administration. *Id.*

That day Dr. Berger interfered with Dr. Waggel's leave, again, by requesting to meet with her on the first day of her FMLA leave (March 9, 2016). (RSOF ¶ 1090.) Dr. Waggel responded that she had informed her program administrator, chief, and attending that she had an appointment with her urologist on March 9, 2016, and therefore could not make the meeting. (Waggel Decl. 207.) Dr. Berger confirmed that Dr. Waggel's FMLA request had been submitted, but alleged that she had not informed the proper people (despite the email evidence that she had informed all the responsible parties on the day she received the notification). (Exh. TTT.) On March 10, 2016, Dr. Catapano interfered with Dr. Waggel's FMLA leave. *Id.* Specifically, Dr. Catapano emailed Dr. Waggel stating she was not aware of that Dr. Waggel was on medical leave and did not receive any confirmation from the University regarding the email. *Id.* This response again disregarded Dr. Waggel's March 8th email forwarding the leave notification form to her and other responsible parties. *Id.*

As noted above, on March 17th 2016, Dr. Waggel was not allowed to return to work after her FMLA leave. When she returned from leave, she met with Dr. Berger to discuss her employment status. During the meeting, the parties discussed Dr. Waggel's illness. (Ex. NN, Transcript of Interview at 5); (RSOF ¶ 1090). Dr. Waggel also attempted to explain to Dr. Berger that she wanted to return to work, and had been trying to meet with faculty and develop an improvement plan, so that she could be promoted, but that she was being avoided. (Ex. NN, Transcript of Interview at 29:11-30:7); (RSOF ¶¶ 1090-1092).

Dr. Berger shifted the conversation, making clear that he had no intention of addressing Dr. Waggel's complaints about the Program's behavior. (Ex. NN, Transcript of Interview at 30:8-

16); (RSOF ¶¶ 1090-1092).) Instead, he intended to trade the Program's support for her transfer to a new medical program in return for Dr. Waggel firing her attorney and dropping her appeal. (Ex. NN, Transcript of Interview at 30:8-70:4.) He explained that he could not treat Dr. Waggel to the "best case scenario" to resolve matters related to her employment status. (Ex. NN, Transcript of Interview at 30:8-18.) He could not supply Dr. Waggel with helpful explanations about "what the program is thinking and this is why and this is how." (Ex. NN, Transcript of Interview at 30:17-18.) Instead, Dr. Waggel would be treated poorly, "on the other end of that spectrum… because from… time minus-one, you know, I find out that there's an attorney tracking everything." (Ex. NN, Transcript of Interview at 30:20-32:5.) Dr. Berger referred to Dr. Waggel's retention of counsel and pursuit of complaints related to her disability and violations of the FMLA as creating *"a wall of attorneys between"* them. (Ex. NN, Transcript of Interview at 36:7.) This statement was meant to dissuade Dr. Waggel from asserting her FMLA rights, and submitting to the program's unlawful acts.

Dr. Waggel, realizing Dr. Berger had remedial power, then began to negotiate with Dr. Berger. (Ex. NN, Transcript of Interview at 36:9-11.) They discussed the credit she had earned from the Program for the year. (Ex. NN, Transcript of Interview at 60:5-65:7.) He admitted that according to her milestones she seemed on track for graduation, and that the Program was willing to support her transfer, but only if she didn't consult with an attorney about these matters. (Ex. NN, Transcript of Interview at 79:10-15.)

Despite Dr. Berger's attempts to dissuade Dr. Waggel from asserting her rights under the FMLA, including by hiring an attorney, pursuing an internal grievance, and complaining about ill-treatment by the program based on her disability, Dr. Waggel decided not to give up her right to counsel or drop her internal appeals. Though these statements would have persuaded a reasonable

34

employee not to seek FMLA protection, Dr. Waggel was not deterred. This was because she needed accommodation and protection under the FMLA, because she didn't want her cancer to ruin her dream of being a psychiatrist. Nonetheless, this behavior still constitutes unlawful interference. *See Gordon,* 778 F.3d at 161.

Subsequently, Dr. Dyer revealed in an email that Dr. Berger would uphold whatever the decision of the CCC was regarding Dr. Waggel, thereafter, even if it meant termination. (Ex. WW.) And, because Dr. Waggel would not quietly accept the delay in her promotion and continued to insist she receive an accommodated work schedule, Dr. Berger remained true to his word. The Program did worse than simply uphold its previous non-promotion decisions. It terminated her.

And then, fulfilling Dr. Berger's threats, the Program refused to support her transfer. Discovery in this litigation demonstrates that Dr. Catapano and/or Dr. Griffith were directly responsible for damaging Plaintiff's prospects to continue to practice psychiatry.  (Exh. UUU); (Ex. VVV.)

These facts support Dr. Waggel's FMLA and DCFMLA claims.  It is clear that complaining about FMLA violations, appealing the decision to fail her due to her work absences while on medical leave, and retaining counsel to enforce rights under the DC FMLA and FMLA are all protected activity. Further, it is clear that Dean Berger's acts to pressure Dr. Waggel to drop her attorney are explicit violations of the law. They also reveal the Program's animus towards those who seek protection under FMLA and DCFMLA. Moreover, Defendant's shifting justifications and explanations call into question its true motivation. As such not only is summary judgment appropriate, but at trial, punitive damages are likely to be awarded.

### iii.  Direct Evidence of Interference

### GW Sought to Interfere With Rights to Counsel.

Dr. Waggel engaged in protected activity when on November 12, 2015, Dr. Waggel hired Greg Care, an attorney. Care told Dr. Waggel that GWU's general counsel was handling her employment concerns. (RSOF ¶ 1043.)

In an attempt to interfere with her from pursuing this right, Dr. Jeffrey Berger, Dean of Graduate Medical Education, warned Dr. Waggel against retaining counsel. He wrote to Dr. Waggel, stating: "Please do not reference your attorney going forward, particularly to the people in your Department. It does not make for a safe working environment. It is your choice to continue to pursue this avenue." (RSOF ¶ 1047.)

**Defendant Purposefully Interfered With Dr. Waggel's Ability to File an Appeal Regarding Delays in Her Promotion**

Dr. Waggel sought to file an internal grievance, appealing the decision of Drs. Catapano, Griffith and Collin to make Dr. Waggel repeat didactics training, which precluded her from progressing to PGY3 (and potentially repeat all of PGY2 year). Dr. Berger attempted to prevent her from filing her appeal. In fact, he did not inform her she had a right to appeal the decision. (Waggel Decl. ¶ 165.) To the contrary, on December 4, 2015, Dr. Berger informed Dr. Waggel that, "[a] course cannot be appealed to GME." (Waggel Decl. ¶ 166.)

In response, Dr. Waggel pointed out that the decision to have Dr. Waggel repeat Dr. Collins's class meant that Dr. Waggel would be denied credit for previously completed rotations, which constituted an appealable reportable action. To this, Dr. Berger replied, "I hope to have that information by mid-week next week." (Waggel Decl. ¶ 166.) He never responded.

Instead, without prior notice, on December 10, 2015, the GW Administration placed a letter, dated December 10, 2015, in Dr. Waggel's mailbox. (Waggel Decl. ¶ 167.) The letter stated that she had until the next day, December 11th to appeal the decision regarding didactics credit.

(Ex. W.) This gave Dr. Waggel less than 24-hours to file an appeal, especially since it was placed in her mailbox after Dr. Waggel left work for the day at 5:00 p.m. (Waggel Decl. ¶ 167.) By chance, Dr. Waggel returned to the building that evening and found the letter in her box. (Waggel Decl. ¶ 167.) Her subsequent appeal directly asked that she be given an opportunity to make up for didactics assignments she missed while on leave related to her medical absences in light of ADAAA, FMLA and Defendant's Academic Improvement Policy (Waggel Decl. ¶ 168); (Ex. Y); (Ex. YY.)

Defendant's lies and tactical behavior, obstructing her ability to file a timely appeal request, were clear attempts to interfere with Dr. Waggel's ability to exercise her right to file a grievance in relation to her disability rights. Defendant delivered the letter so late, even though the Program, including Dr. Catapano, knew that Dr. Waggel was on rotation at Children's Hospital, off campus, and that she would not be back in the building until the next Thursday didactics day. Had Dr. Waggel not visited her mailbox that evening, by luck, she would have missed the less than 24-hour deadline to submit her appeal as provided in the letter. (*Id.*)

## B.  Defendant's Reliance of The Rule of Judicial Non-Intervention Is Misplaced.

Defendant attempts to district the Court from the real legal argument (disability and family medical leave employment law) by arguing that the Court should not scrutinize its decision to take negative employment action against Dr. Waggel or its failure to accommodate her schedule at all. In doing so, GW cites an alleged precedent of "judicial non-intervention" regarding the employment decisions of residency training programs. (ECF 34 at p.7). Essentially, argues Defendant, the CCC's decision-making process cannot be second-guessed, because the residency program is educational in nature, shielding it from scrutiny. *Id.* Defendant's argument inflates the non-intervention rule applied by the court, which only states that judicial restraint is "particularly

appropriate in the health care field" where **students** who receive a medical credential will provide

care to the public. *Hajjar-Nejad v. George Washington University*, *et. al.*, 37 F. Supp.3d 90, 116

(D.D.C. 2014) (emphasis added), citing *Burke v. Emory Univ.*, 338 S.E.2d 500 (GA Ct. App.

1985), including post-medical school residency training programs, *Davis v. Mann,* 882 F.2d 967

(5th Cir. 1989).

This argument is deeply flawed and ill-fitting for many reasons.

First, GW's reliance on *Hajjar-Nejad* is particularly ill-fitting with respect to Plaintiff's

failure to accommodate claim. Here, Dr. Waggel's failure to accommodate claim is well outside

the scope of *Hajjar-Nejad*, a case in which the Plaintiff merely asserted negative employment

actions by a defendant-hospital were broadly motivated by discriminatory intent. *Hajjar-Nejad*,

37 F. Supp.3d at 124.

Second, at the heart of this debate is the question of whether ***doctors***, serving in residency

programs, are properly viewed as **students** whose service Congress or an authorized Agency has

exempted from disability rights protections. *See Chevron U.S. A. Inc. v. Natural Resources*

*Defense Council, Inc.,* 467 U.S. 837 (1984) (Under Chevron step two, a court may not disturb an

agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute.)

They are not.

While some residents may pursue their careers as if they are students perfecting their craft,

and some residency programs may require residents to attend an extreme amount of training

seminar hours, "[t]he question [is] whether they are 'students' for purposes of" the statutes at

issue." *Mayo Foundation for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011).

Because Congress has not directly spoken to this issue, it is necessary to look at the Equal

Employment Opportunity Commissions' rules and guidelines. Here the EEOC guidelines are a

reasonable construction of what Congress has said, and they make clear residents ought to be thought of as employees. **The EEOC has explicitly stated that health care providers have the responsibility to ascertain whether an employee's disability exists.** *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, No. 915.002 (Oct. 17, 2002), at Question 40.

Thus, in another case, a defendant-hospital escaped liability for failure to accommodate a disabled resident not because it was exempt from the ADAAA, but because it made a good-faith effort to engage with the employee-plaintiff in a process, and the employee-plaintiff did not cooperate. *Donnelly v. St. John's Mercy Medical Center*, 635 F. Supp. 2d 955-96 (E.D. Mo. 2009). That case is distinguished here as there is ample evidence that Dr. Waggel continually complained about the difficulties she was having scheduling appointments in advance to her program director, attendings, and program administration, and even went to the EEO office in September to complain about the lack of accommodation after she returned from sick leave surgery. (*See, e.g.* ECF 34-4 at pp. 130-135.) The Defendant did not make any good-faith effort to accommodate Dr. Waggel. In fact, it often gave Plaintiff mixed orders regarding her request for sick leave and generally ignored her complaints about the lack of coordination in the Department.

Third, the application of academic decision-making would be misplaced in this case, because Defendant's alternative justifications have little to do with academic performance and GW did not exercise any academic discretion in its decision making vis-à-vis Dr. Waggel. That is, most of the reasons offered by the Defendant as alleged alternative justifications for her termination have nothing to do with academics. For example, Defendant argues that Dr. Waggel was unprofessional; Defendant attempts to justify her termination by stating since the length of Dr.

Waggel's skirt was incompatible with its policies vague sexual standards. (SOF ¶ 87-89.) This is hardly an academic judgment, let alone legitimate.  (ECF. 34 at p. 21, citing SOF ¶ 173.)

**C.  There Were Procedural Irregularities In The Clinical Competency Committee's Decision To Delay Dr. Waggel's Promotion and Terminate Her, Such That Judicial Scrutiny Is Appropriate, Even If *Hajjar-Nejad* Is Applicable.**

Even if residency training programs are academic in nature and the rule of judiciary restraint discussed in *Hajjar-Nejad* generally applies to the decisions of the CCC and GME deans, there is clear precedent that courts may scrutinize those decisions. Indeed, this court held in *Hajjar-Nejad* that the decision-making processes leading to an academic termination can be second-guessed when there is clear evidence of ill-will, or no legitimate, rational basis for the decision. *Hajjar-Nejad*, 37 F. Supp.3d. at 116 ("Decisions involving academic dismissal do not merit summary judgment if "the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance."). Clear evidence, precluding summary judgment, may take the form of Defendant's admissions or omissions, as well as evidence of procedural irregularity. *Id.* at 119.

Here, there is ample evidence that Defendant failed to follow its published policies with respect to Dr. Waggel's employment status by its own admission. (*See, e.g.,* RSOF ¶¶ 857, 865-867 (discussing Dr. Simons' findings of procedural deficiencies.)) Those policies require the program to provide notice to residents that their performance is deficient. (SOF ¶ 765.)  Then, the policies require the program to provide an improvement plan. (SOF ¶ 765.)  Finally, the policies require a fair opportunity for residents to cure their deficiencies according to the improvement plan. (SOF ¶ 765.)  The CCC is likewise governed by Defendant's policies and the ACGME. (SOF

¶ 5.) The requirements are that the CCC provide residents notice of alleged deficiencies and a fair opportunity to cure, based on careful and deliberate investigation of the employee's full performance record. (RSOF ¶ 1106.)

The CCC violated this policy when, in November 2015, Dr. Catapano issued a letter of deficiency about Dr. Waggel's performance one night on an August 25 call-shift. (SOF ¶ 547). The letter ordered her to write an essay and meet with Dr. Kels to discuss the essay as part of her improvement plan. (SOF ¶ 547); (Waggel. Decl. ¶ 158.). After, the CCC was meant to review Dr. Kels feedback to affirm Dr. Waggel's compliance with the plan and full remediation. (RSOF ¶ 1051, 1069.) Dr. Kels avoided meeting with Dr. Waggel and eventually fobbed off the responsibilities to Dr. Gandhi. (Waggel Decl. ¶¶ 158- 163.) Dr. Gandhi also delayed meeting with Dr. Waggel. (Waggel Decl. ¶¶ 158- 163.)

Meanwhile, Dr. Waggel also learned that her promotion would be delayed because of her absences during didactics courses while on medical leave. (Waggel Decl. ¶¶ 145.) She sought to file an appeal of the decision to delay her promotion since she thought she could not be penalized for this leave under the FMLA and should be allowed to make up for assignments missed, rather than be delayed in her promotion. (ECF 34-6 at p. 55 (Def.'s Exh. B (Berger Decl.) at Exhibit 15, thereto GWU 002485).) Dr. Berger tried to stop her from doing so, telling her she couldn't appeal failing a class. (RSOF 1055.) This was not true, and Dr. Waggel did in fact appeal the decision in adherence with Defendant's internal procedures. (RSOF ¶ 1055-1058.)

On December 28, 2015, Dr. Waggel learned from another resident that she had been taken off the call schedule.  (RSOF ¶ 1060.)  This was shortly after Dr. Waggel had filed her appeal of the didactics decision, giving reason to suspect this measure was taken in retaliation. Therefore, she asked Dr. Kels for an explanation why she was removed from call schedule. (Waggel Decl. ¶

41

171.) Dr. Kels denied it had to do with the appeal. Dr. Kels stated Dr. Waggel was taken off call until she finished her remediation essay and made an oral presentation to Dr. Gandhi.  (Waggel Declaration ¶ 171.) This explanation was inconsistent with the November 19th LOD, which stated Plaintiff would remain on call with extra attending supervision. (Waggel Declaration ¶ 171.)

Dr. Gandhi continued to avoid meeting with Dr. Waggel. On January 3, 2016, Dr. Gandhi finally spoke to Dr. Waggel about remediation assignment on the phone, and Dr. Waggel emailed him the essay she was required to submit as part of her remediation plan that day as well.  (Waggel Declaration ¶ 163.)  Having completed her remediation project, Dr. Waggel began inquiring about when the CCC would review her assignments and allow her to work on-call shifts. (Waggel Declaration ¶¶ 176, 178, 181.)  The CCC never responded.

Dr. Waggel was not given a fair opportunity to remediate because after completing her improvement plan, the CCC refused to review Dr. Gandhi's feedback and grant Dr. Waggel remediation based on her full compliance with the improvement plan. (RSOF ¶ 1069.)

In fact, the CCC never intended to provide her an improvement plan and fair opportunity to cure alleged deficiencies. That is, on around February 9, 2016, the CCC met and decided Dr. Waggel would be terminated.  (RSOF ¶ 1080.) In his deposition, Dr. Berger testified that the CCC acted too hasty and in violation of its Academic Improvement Policy in making this decision. He ordered the CCC to "put the brakes on" this decision. (RSOF ¶ 1081.)

Dr. Waggel appealed the decision through Defendant's internal process, and Dr. Simons ultimately reversed the CCC decision to delay her promotion. He remanded it back to the CCC, ordering them to meet with her and craft a remediation plan to address any new deficiencies identified. (RSOF ¶¶ 857, 865-867.)

The CCC ignored Dr. Simons order and raised the stakes. That is, it merely affirmed the decision to hold her back, and then upped the punishment to termination. Critically, shortly after coming to its termination decision in April, Dr. Dyer wrote an email revealing that Dr. Berger had promised to rubber-stamp the decision as well as any decision to deny Dr. Waggel credit for rotations she would need to transfer to another program. (Ex. WW.)

During this process, Dr. Berger previously told Dr. Waggel that if she continued to pursue an appeal based on the violations of the Academic Improvement Policy and retain counsel (to address her complaints that the decision not to promote her was based on her disability and medical leave in violation of the FMLA) the Program would not support her transfer. (Ex. NN.) Thus, it was clear that the CCC's decisions violating its obligation of fair decision making was retaliatory.

**Finally, Dr. Dyer, the Chair of the CCC, admitted that when deciding to terminate Dr. Waggel, the CCC cherry-picked Dr. Waggel's mistakes, discounting her positive Milestone performance evaluations, improvements and accomplishments, and the effects of her disability and the program's failure to accommodate her. (Ex. DDD.)**

It was clear that the CCC did not act in good-faith to provide Dr. Waggel with timely notice of alleged deficiencies, an Improvement Plan, or opportunity to cure. These procedural irregularities preclude summary judgment.

And also, significant procedural irregularities emerge from the fact that the Graduate Medical Education Dean, Dr. Berger, who was charged to ensure compliance with policies and procedures, rubber-stamped the CCC's decisions with respect to Dr. Waggel's employment status. (RSOF ¶ 1103-04); (Ex. WW.). Under well-establish precedent, Courts recognizes a 'cat's paw' theory of employment discrimination. That is, where the formal decision-maker operates as a 'rubber stamp', effectively abdicating decision-making authority to some lower-level subordinate,"

summary judgment is precluded. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 290-91 (4th Cir. 2004); *see also Staub v. Proctor Hospital,* 562 U.S. 411 (2011). (The cats' paw theory described in *Hill* and *Staub* applies here because evidence established that Dr. Berger and Dr. Simons, who were responsible for reviewing the CCC's decisions, acted as rubber-stamps. (Ex. WW.)

In sum, direct evidence of unlawful motivation and procedural irregularities with respect to Defendant's decisions to delay Dr. Waggel's promotion (particularly, by giving her significantly delayed notice of deficiencies and refusing to implement an Improvement Plan in good faith), terminating Dr. Waggel, and not support her transfer to a new program show the CCC's decision-making process is highly suspect, precluding summary judgment.

## IV.    Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Dated: February 12, 2018                           Respectfully submitted,

                                   */s/ Peter K. Tompa*
                                   Jason H. Ehrenberg (D.D.C. # 469077)
                                   Peter K. Tompa (D.D.C. # 413752)
                                   BAILEY & EHRENBERG PLLC
                                   1015 18th Street, NW, Suite 204
                                   Washington, DC 20036
                                   T: 202-331-1331
                                   F: 202-318-7071
                                   jhe@becounsel.com
                                   pkt@becounsel.com
                                   *Counsel for Plaintiff*