**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 1:16-cv-01412 |
| | : | |
| THE GEORGE WASHINGTON UNIVERSITY | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF DR. STEPHANIE WAGGEL, M.D.**

Dr. Stephanie Waggel, MD, pursuant to 18 U.S.C. § 1746, declares as follows:

1.      I have personal knowledge of the matters set forth below and am competent to testify to them.

2.      I am a *summa cum laude* graduate of Chatham University holding a Bachelor of Science degree in Psychology with a Medical Concentration. I also hold a Master of Science degree in Biology, graduating *magna cum laude,* from the same University. I earned a Medical Degree from the George Washington University (GWU) School of Medicine and Health Sciences, where I had a seat on Student Council. While I was in medical school, I also coached high school students to higher education and health careers at Anacostia High School, in Washington, DC and was on the advisory board for the Interdisciplinary Student Community-Oriented Prevention Enhancement Service (ISCOPES), serving the Washington, DC community. I received a GWU School of Medicine and Health Sciences Health Services Scholarship Award. I have worked in medicine in six countries and completed the Global Health Track at GWU. I have previously worked with scientists across several disciplines to create an aviation laser exposure self-assessment (ALESA) and later published the tool in a world renowned international aviation magazine.

1

3.      I was employed as a resident physician by Defendant GWU from July 1, 2014 to August 10, 2016.

4.      In 2013, during my interview for the Psychiatry Residency Program I inquired about maternity leave and its impact on graduation date. I was told that residents have taken 3 months off and graduated on time. After entering residency, I was told that residents had been able to take up to six months off and graduate on time.

PGY1 Year

5.      I began my medical residency on July 1, 2014.  Residency is a training program where new doctors get critiqued often by more senior residents and other physicians. I understood that receiving harsh criticism was common for first year residents also known as Post Graduate Year 1s (PGY1s) and that it was part of the learning process. Nevertheless, the first six months of my PGY1 year was a very positive experience.

6.      Dr. Browne, my psychiatry rotation attending for PGY1 year, indicated in her final written evaluation that I was in the top 5% of residents in the categories of physical and neurological patient examination, mental status examination, behavioral management, relationship with inpatient staff, and relationship with supervisors, and that I was above average in all other categories.

7.      According to "The Psychiatry Milestone Project, A Joint Initiative of The Accreditation Council for Graduate Medical Education and The American Board of Psychiatry and Neurology" Milestones are to be conducted semiannually. Additionally, the "George Washington University Department of Psychiatry "Common Program Requirements" states "V.A.1.b) (1) The Clinical Competency Committee should: V.A.1.b). (1).(a) review all resident evaluations semi-annually; (Core) V.A.1.b).(1).(b) prepare and ensure the reporting of Milestones evaluations of each resident

semi-annually to ACGME. I was the only PGY2 resident to not receive any Milestone evaluations during my PGY2 year.

8.     The Milestone document states "Level 1 Expected of incoming resident, Level 2 Advancing; not yet at mid-residency level, Level 3 Demonstrates majority of competencies; mid-level, Level 4 Substantially demonstrates expected competencies *Target for Graduation*, Level 5 Beyond performance targets for residency."

9.     On January 13, 2015, I received the first of only two Milestone evaluations I received during my entire residency. Both were Milestone evaluations for PGY1 year.  I received 21 scores of Level 1 and one score of Level 1.5 in the category of problem-based learning: Teaching, Development as a teacher, Observable teaching skills.

10.     After conferring with other PGY1s, I believe these scores put me above the expected level. The PGY1 class compared scores with each other and many of my scores were higher as some residents scored 0s, indicating I was ahead of my peers in these areas.

11.      On January 15, 2015, I was notified that the International Journal of Geriatric Psychiatry published an article I authored entitled, "Neuroticism Scores Increase with Late Life Cognitive Decline."

12.     On March 2, 2015, I began my first day of a rotation on internal medicine. Other residents had warned me that attending internal medicine doctors regularly berated psychiatry residents on this rotation. Moreover, this was my first rotation through internal medicine so that other residents who had done a prior rotation were more advanced in their internal medicine skills than I was. Indeed, at that time, I had the internal medicine experience equivalent of a medical student.

13.     On my first day on this rotation, I left GWU Hospital around 1:00 a.m., having worked approximately 19 consecutive hours.

14.     It is my understanding that the Accreditation Council for Graduate Medical Education (ACGME) has stated that duty hours for PGY1s should not exceed 16 hours. However, I regularly worked far longer hours, along with my PGY1 colleagues. I alerted senior residents of these violations, but they indicated I must be working too slowly. They disregarded the fact that my patient load was much higher than ACGME regulations allow. Internal Medicine I.A.2.h).(6).(c) states "a first-year resident must not be responsible for the ongoing care of more than 10 patients." I had to care for more than 16 at one time.

15.     On March 5, 2015, I arrived at GWU Hospital at approximately 6:30 a.m. Based on my calculations, I had in the last two days spent 35 hours at the hospital. At the time, I was having severe left side pain exacerbated by exhaustion. Due to a snow storm, all physicians on Green team (except me) left the hospital. I was independently responsible for the 17 patients on the Green team. I became overwhelmed with the number of phone calls, pages, and requests. I called the attending, Dr. Prior but he did not answer. I asked staff if anyone had seen him and no one had. I had a patient with an emergency which I suspected was cauda equina syndrome, which I knew was a surgical emergency. At 5:22 p.m. I sent a text message to my co-intern, Dr. Bryan Senisi that Dr. Prior was not answering his hospital phone and asked for Dr. Prior's personal cell phone number. Because Dr. Prior did not answer his cell phone either, I contacted a surgery resident for help with the suspected cauda equina syndrome. I informed them that my team was gone and that I was trying to get in contact with my attending. They said that attendings hate being called at home and that I should instead call my PGY2, Dr. Tyler Bayson. Around 6:00 p.m. I sent a text to Dr. Senisi stating that I needed to call Dr. Bayson. I returned to the call room, relieved to see that Dr. Prior was there. I informed him that I was overwhelmed and that I had been putting in 16 – 20 hours each day. He sat down with me at a computer station in the hallway and together we reviewed

patient issues. He told me that given that I was an off-service psychiatry resident and that this was the first week of internal medicine since medical school, he could understand why I felt overwhelmed. He reassured me with words to the effect that, "if they put me on the psychiatry floor, I too would have a difficult time during my first week." He went on to tell me that Dr. Bayson would return to the hospital to provide me with extra help. At no point in this conversation did Dr. Prior indicate to me that I was expected to know how to handle over 17 internal medicine patients singlehandedly.

16.     Dr. Prior's absence on March 5, 2015, was a violation according to the ACGME Program Requirements for Graduate Medical Education in Psychiatry VI.D. Supervision of Residents VI.D.1, "in the clinical learning environment each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee). The attending is ultimately responsible for that patient's care." Further, according to Resident Duty Hours in the Learning and Working Environment Comparison of 2003 and 2011 Standards VI.D.5.a).(1), PGY- 1, "residents should be supervised either directly or indirectly with direct supervision immediately available." Not only was Dr. Prior in violation of these rules and procedures for being absent and unreachable, but his absence caused me great anxiety. Nonetheless, I rose to the occasion and managed the patients responsibly with no adverse patient outcomes to my knowledge.

17.     On March 6, 2015, Dr. Eindra Khin Khin, associate program director of the psychiatry residency program, presented me with cryptic information that it had been reported to her that I had "poor internal medical knowledge." I informed her it was only my third day on this rotation, therefore, I wasn't sure how much internal medical knowledge I was expected to have. She told me "someone" told her I should take time off to study internal medicine.

18.     On March 9, 2015, before going to work the next day, I reviewed my notes, and time stamps for medication orders, and phone GPS from which I concluded that I had worked approximately 127 hours that week. I arrived at work that day at approximately 6:33 a.m. I was exhausted.

19.     On or around March 9, 2015, I met with Dr. Lisa Catapano, the psychiatry residency program director and Dr. Khin Khin to complain about being over-worked and under-supported. We discussed the long duty hours in violation of ACGME guidelines and the report that "someone" had told Dr. Khin Khin that I should take time off to study internal medicine. I later learned that "someone" was Dr. Prior. They told me that this type of patient load was just something I would need to deal with. Dr. Catapano added that as I was a psychiatry resident, it would not be appropriate for me to take time off to study up on internal medicine. Neither Drs. Catapano nor Khin Khin addressed my duty hour violation complaint. I then went back to the hospital where I worked until 10:45 p.m. that evening.

Cancer Diagnosis

20.     On March 14, 2015, I had my first day off since February. I could not go to the doctor on this day as it was the weekend. Based on timestamps and GPS tracking I estimate that I worked more than 230 hours in these two weeks. The inhumane hours continued, but were made tolerable by the understanding of Dr. Mehta, a new Green team attending doctor. I attempted to make an appointment with Dr. Marc Shepard, my primary care doctor, to have my left sided pain worked up but could not find time in my schedule.

21.     On April 10, 2015, I finally had an appointment scheduled with Dr. Shepard to have the pain in my left side evaluated. However, I had a meeting with an attending which I was not permitted to leave, and I therefore missed the appointment.

22.     A supportive PGY3, Dr. Suliman Alamro, came on around April 13, 2015. After explaining multiple times that I was in excruciating pain, I was finally permitted to attend my long-awaited appointment with Dr. Shepard. Dr. Shepard wrote in my note that I was working very long hours and had lower left quadrant abdominal pain. He ordered a CT scan.

23.     On April 12, 2015, I learned that a medical resident who was 30 years old had died of gastric cancer. I heard that he could not get off time to get a workup. This news caused me to be terrified about my pain given the surgical indication of pain waking me up from my sleep.

24.     On April 12, 2015, Dr. Shant Ayanian informed me that I was doing well overall in the internal medicine rotation.

25.     On April 15, 2015, I had a CT at Washington Radiology Associates. On April 16, Dr. Shepard called me to tell me the CT results showed a kidney mass. I began crying. My co-resident, Dr. Pavle, took the phone to talk to Dr. Shepard. The PGY3 resident walked me to the call room so that no one would see me cry. I remember saying, "no, I can't be late for rounds, I will get in so much trouble. I will get another email like Dr. Prior's." My co-intern took the phone call and stated Dr. Shepard recommended an MRI. I informed one of the internal medicine chiefs, Dr. Wesley Fiser, of my kidney mass. I asked him to help me get off work during my appointments and not to let anyone gossip about my medical issues, because I feared I would be stigmatized as an ill resident.

26.     On April 20, 2015, I met with Dr. Catapano about the fact I was being sexually harassed by another PGY1 (which she never followed up with me on). Of note, that resident later became the chief of the GWU psychiatry residency program in 2017. During this meeting Dr. Catapano asked me, "how are you, really?" as she had apparently learned from Dr. Catalanotti that I had a

kidney tumor. I said it was hard to get worked up due to the grueling duty hours. I returned to work.

27.     Dr. Alamro recommended that I see an urologist at GWU. I initially declined as I heard that residents that go to GWU doctors end up being the topics of grand rounds. I did not want everyone knowing my personal medical history.

28.     On April 24, 2015, I had an MRI at Washington Radiology. I had to go into work at 3:00 a.m. so that I could leave to have this done. The MRI machine malfunctioned half way through, but as I had already been given iodine they were not able to obtain the non-contrast portion of the MRI. I rescheduled the MRI for April 27, 2015.

29.     On April 27, 2015, I had a second MRI. Again, I went into work at 3:00 a.m. so I could leave to have this done. I was bullied by senior residents for having to have 2 MRIs and I was made to be late.

30.     On May 1, 2015, I had a 12:30 p.m. appointment with urologist Dr. Engel at Urologic Surgeons of Washington. I asked the medicine chiefs via email for time off during the afternoon of May 4 and 5. I also provided them with my doctor's excuse for seeing Dr. Engel that day. I almost missed it because a PGY3 refused to cover her patients, requiring me to care for both my patients and hers, which was an inappropriate on her part. Dr. Fiser was able to find another intern to come in, so I was finally allowed to leave.

31.     I found it disconcerting that the urologist did not order a urinalysis given that I was visibly urinating blood. He was very dismissive of the tumor stating, "A 28-year-old female does not get kidney cancer." I asked him to do a urinalysis anyway and blood was found in my urine.

32.     On May 4, 2015, I had an appointment with Dr. Anita Sikand, an OBGYN. Dr. Sikand was very worried about my health and abnormal lab results.

33.     On May 5, 2015, I had a cystoscopy at Urologic Surgeons of Washington.

34.     On May 8, 2015, I had another appointment with Dr. Sikand. Despite my condition and request for a schedule that did not go over the duty hour limit, I was still forced to cover a PGY3's patients. This necessitated me putting in 20-hour work days when duty hour policy stated interns (such as myself at this time) are not to work over 16 hours.

35.     On May 14, 2015, I felt ill and went to the call room to lie down and passed out. When I woke, one of the chief residents was standing over me. He asked me if I was suicidal. I said no, but I really needed some water. Again, I was told I did not look well. I was not sure what had happened. He told me to go home. When I arrived home, I realized I took the wrong medication in the morning. Of note, I went to bed, with my boyfriend (now my husband), around 11:30 p.m. the night before. I was not "out late drinking" as Dr. Catapano later claimed.

36.     On May 19, 2015, I had another appointment with Dr. Sikand. She also found blood in my urine and was very worried about me and did not think my current urologist had made the right diagnosis.

37.     Although I was worried about my medical records being in the GWU system as I heard staff would probably look me up, I made an appointment with Dr. Thomas Jarrett, Chair of the GWU Urology Department, to get a second opinion in the hopes that my relationship with GWU would prompt him to do a more thorough work up than Dr. Engel.

38.     On June 10, 2015, I had a 3:00 p.m. appointment with Dr. Jarrett. (I tried to get an appointment later in the day, but could not do so). As I was afraid I would be late for this appointment even though it was after my shift was supposed to end, on June 9th, I asked another resident, Dr. Katherine Newell, if she could cover for me if I left at 2:30 p.m. and then returned after my shift was over to finish my paperwork. My appointment was on a Wednesday. Emergency

medicine has grand rounds on Wednesdays in the morning until 9:00 a.m. I was told that off-service residents did not have to attend.

39.     I found that morning that I had to physically pick up my imaging from the radiology office and bring it to Dr. Jarrett. I had to call different offices to arrange that. I arrived at the emergency room at approximately 9:00 a.m. I did not receive a call from anyone until after 9:00 a.m., as shown in the phone bill I gave to Dr. Dyer later on. At 2:30 p.m., Dr. Newell, the resident who was supposed to cover for me, did not come in. Therefore, I worked my entire shift and left for my appointment late. Dr. Jarrett stated that my tumor did not look good and said that, "if you were my daughter I would want you to get this removed as soon as possible."

Difficulties Scheduling Surgery, Getting Light Duty and Scheduling Follow Up Appointments

40.     Consistent with a note Dr. Jarrett provided in advance of scheduling surgery, I indicated to Dr. Catapano, Victoria Anderson, the program coordinator, and Dr. Emejuru that I needed to take 2 weeks off for the surgery, 2 weeks light duty, and set days in advance where I could schedule follow up appointments with my doctors.

41.     In the context of this litigation, it has been suggested I should have asked for extended time off to deal with my medical issues, but all I really needed was time to schedule follow up appointments that would take an hour or two at most. I am aware that Dr. Catapano had a rule that to take time off one needed to get sequential approvals from on-site supervising attending physicians, Victoria Anderson, the program coordinator, and Dr. Emejuru, the chief resident. This was difficult to accomplish in practice for appointments with specialists which needed to be made sometimes months in advance. A major problem was getting approvals from on-site supervising attending physicians. For example, when I informed my attending physician, Andrew Meltzer, that I had cancer, he responded by saying that I needed to pick between being a doctor or a patient.

Because of this difficulty in addressing my health concerns, I requested set days in advance when I could schedule follow up appointments, a request that was never honored.

42.     Scheduling my surgery was difficult. Dr. Catapano directed me to Mary Tucker of the Graduate Medical Education Office and Mary Tucker directed me back to Dr. Catapano. I was given conflicting information. I was made to do an extra week of emergency medicine, even though I had completed the rotation. In regard to emergency medicine I was told to "either grab a hold of someone and ask for the senior resident on duty or look lost and innocent and someone will point you in the right direction." I was also told that I could not take time off for my surgery unless I could find another resident to cover me, even though Program administration knew this would not be possible as all of the other residents were working on their own rotations. Dr. Emejuru told me, "You will go through the entire week on medicine and not be at didactics." I am not sure why I was not permitted to attend didactics as the other residents were.

43.     On June 17, 2015, Dr. Catapano emailed the emergency medicine chiefs to disregard my email about my surgery, even though Dr. Emejuru had instructed me to email this to them. I was embarrassed about this. I also felt harassed when she requested I contact Dr. Emejuru even though I had contacted him several times.

44.     The emergency medicine chiefs informed me that my rotation was over on June 30, 2015. Although, because Dr. Catapano stated I had to do an additional week, I had assumed that was at the request of the emergency medicine department. I later discovered it was not and that Dr. Catapano had arbitrarily decided to force me to do another week before my surgery. The entire process of scheduling my surgery was stressful.

45.     On June 30, 2015, the emergency medicine chiefs emailed me stating my rotation ended on June 30th. However, Dr. Catapano made me do an extra week when she knew I needed to schedule this surgery.

46.     I do not remember and cannot find any evidence of ever having spoken to Dr. Roche while I was on emergency medicine. She was clearly unfamiliar with my schedule as I worked more days than the emergency residents. I worked 20 days in four weeks: June 8, 9, 10, 11, 14, 16, 17, 18, 22, 23, 26, 27, 29, 30 July 1, 2, 4, 5, 6, 7. According to the schedule, some other residents had anywhere from 15 to 17 shifts in four weeks. This is inconsistent with Dr. Roche's claim that I worked less than the other residents. She falsely claimed that I had done only 14 shifts when I had, in fact, done 20.

47.     On July 9, 2015, I was called by the hospital to come in, that day, to complete the Living Will and speak with the nurse anesthesiologist. I alerted Victoria Anderson, the psychiatry residency program coordinator, who was the go-to person for didactics. Victoria Anderson scolded me for scheduling an appointment on a didactic day. I reiterated that this was a last-minute appointment that was out of my control. She gave me permission to go and said she would inform Dr. Collins when Dr. Collins arrived. I never told Dr. Collins I was attending that class.

48.     Dr. Emejuru, the Chief Resident, emailed me later stating he was informed by Ms. Anderson that I was absent, so clearly Ms. Anderson had this information, but chose not to inform Dr. Collins of it. Instead of receiving support, I was antagonized. I was told we "are not allowed to schedule any personal appointments or therapy patients during 8:00 a.m.-5:00 p.m. on Thursdays during didactics." I found this strange as I explained multiple times I was called in last minute. The GWU psychiatry administration did not take my surgery seriously, and acted as if I was simply skipping class, rather than receiving a life-saving intervention.

First Letter of Deficiency

49.     On July 15, 2015, I was issued a letter of deficiency for missing time on the day I was told I likely had cancer. The event that triggered the letter of deficiency took place on June 10, 2015, over a month before.

50.     Although I had informed Dr. Catapano that I was to have surgery in 5 days and would be recovering for 2 weeks, she told me to remediate with Dr. Dyer within 2 weeks. The letter had a number of inaccuracies. For example, it stated that I told someone over the phone that morning that I was not coming in and that I did not acknowledge the inconvenience I caused. As the first phone call I received occurred after I had already started work for the day, these allegations were not possible to have occurred. Amidst anxiety about being diagnosed with cancer and having to have a major surgery, I felt was being harassed by my superiors.

Surgery and More Scheduling Difficulties

51.     On July 18, 2015, I informed Dr. Emejuru, "I was actually very upset that I was given such a hard time about going to this appointment. One should be understanding I'm having major surgery and likely I have cancer. I had to fill out my Living Will and get a power of attorney. I also had to meet with the anesthesiologist at very short notice. This time was the only time available to do this and I explained that. It's not as if I chose for this to happen to me. I will feel a huge lack of support." At 28 years old, I was making plans in the case of my own death yet I was being treated like I was a delinquent simply trying to get out of class.

52.     I was upset about having a potentially cancerous tumor. I invited my friends over to comfort me about my illness and calm my nerves about my upcoming surgery. We jokingly referred to this gathering as a "Kidney Party."

53.     On July 20, 2015, I underwent a laparoscopic partial nephrectomy.

54.     On July 24, 2015, I informed Dr. Catapano that I had kidney cancer based on a pathology report.

55.     Since my surgery, Dr. Catapano, Dr. Greene, Dr. Griffith, and others in the administration, made clear to me and my colleagues, supervisors, and coworkers through email and conversations that they did not believe that I had cancer, and that it was all "in my head." As a result, I was ostracized when my colleagues, supervisors, and coworkers discussed the administrations' doubts of my illness with me. As a result of this administrative action, which pressured my colleagues to distrust me, I lost the respect of my colleagues. I have since learned that Dr. James Griffith, the psychiatry department chair, has testified under oath that he was "agnostic" as to whether I had cancer. During my tenure as a resident, I certainly felt this lack of support and resentment held by Dr. Griffith and his administration.

56.     Even though the administration knew that I had cancer, they never asked for medical documentation, which I would have readily provided. At no time short of this litigation did anyone associated with the GWU Administration ask me to document the fact that I had cancer.

57.     On July 27, 2015, I sent an email to the ACGME resident services department to express concerns about the difficulty in scheduling appointments. My goal was not to harm GWU, but to apprise ACGME of what appeared to be a systemic problem in the hopes of making it easier for future residents to have their health cared for. Amy Beane from ACGME resident services replied stating, "[T]he culture of medicine needs to change and it will be a difficult road." She also invited me to a symposium on physician well-being.

58.     On July 21, 2015, while I was still in the hospital (as a patient), Dr. Catapano stated, via email, that medical appointments on Thursdays would be counted as sick days. This is different

14

than what Dr. Emejuru told me in an email from July 18, that I "cannot schedule appointments on Thursdays."

59.     On August 3, 2015, I returned to work. I had a follow up appointment with Dr. Shepard but was not permitted to leave the hospital as no one would take my pager or cover my patients.

Post-Surgery Difficulties When Supposedly on Light Duty

60.     Shortly after I returned to work (post-surgery), Dr. Catapano issued my second and last Milestone evaluation of residency, formally reviewing my work for PGY1. This evaluation placed me at and above the PGY1 level for the second half of my PGY1 year. Though I received a promotion, and continued to work as a resident at GWU for over a year thereafter, I never received another Milestone evaluation, although per ACGME policy I should have received at least two more.

61.     At 9:49 p.m. on August 5, 2015, I sent Dr. Dyer an email stating, "Good evening. Would you be able to meet with me sometime to discuss my letter of deficiency? Thank you for your time." I later prepared a document called "Attempts to Contact Dr. Dyer" that outlined all my efforts to reach him in order to comply with my first letter of deficiency.

62.     On August 7, 2015, I emailed Doctors Catapano, Kels, Minor, Gandhi, Torres, Greene and Emejuru to alert them to my efforts to address an exchange I had with a member of the Orange team. I informed them that I went to meet with the person in question and had a discussion with her about how the situation could be addressed in the future and that she and I worked out a solution. I received no response from any of them to my email. Yet, this incident is now being used to attack my professionalism.

63.     On August 10 night/August 11 morning, 2015, I had an extremely taxing call night. A "call" or "call night" is a 12 to 15-hour night shift that occurs immediately after a 12 to 15-hour

day shift. Although I was recovering from surgery and supposedly on light duty under doctor's orders, no backup came in. A "backup" is to come to the hospital if the "on call" resident requires assistance. I received a record number of admissions during this call night. The backup resident who is required to come in at such times, Dr. Sally He, had refused. I was unable to get in touch with the next back up resident or the chief resident, Dr. Emejuru. The attending, Dr. Torres, also refused to come in. Dr. Emejuru did not answer the phone or respond to my messages. I informed a number of people including Program administration, about the disorganized state of the call shift and the unsafe environment of care on the psychiatry unit, Six South. Dr. Emejuru messaged me saying that I did the right thing. He told me not to report that he and the backup didn't answer the phone as it would get her, and him, in trouble.

64.     I had signed out my patients at 8:00 a.m. before I was about to leave but I was still working on some notes that morning. The day-time attending, Dr. Greene, told me that I was not to leave until all the orders, phone calls, transfer forms, and notes had been completed. I informed her that 11:00 a.m. would be the appropriate time for me to leave as it would be my 28th hour and I had an appointment with my geneticist.

65.     Dr. Greene proceeded to explain that because she was not present the night before and as I was, I was required to stay until everything was done for each new patient, no matter how long it took. As a result, I arrived late to my appointment with my geneticist. The geneticist commented that I did not look well and they were having difficulty getting my blood because I was so dehydrated.

66.     I received many texts and phone calls from the psychiatry ward on Six South during my geneticist appointment. Dr. Lewis informed me that Dr. Greene was gone and left a pile of work for her to do and instructed her to call me. She told me I needed to get back to the hospital

immediately, or we would all be in trouble. After my appointment, I worked on notes until later that night such that, excluding the short time when I was at my geneticist appointment, I worked for nearly 35 consecutive hours.

More Efforts at Communications with Dr. Dyer and Double Shifts Instead of Light Duty

67.    On August 11, 2015, Dr. Dyer sent an email to the class about answers to an index (questionnarrie) he expected to receive. The index was given before a one-hour seminar. The same index was given at a later date after the seminar. His goal was to see if the answers to the index changed after learning information from the one-hour seminar.

68.    On August 12, 2015, I emailed Dr. Dyer explaining that as I had missed the one-hour seminar due being on medical leave during the one-hour seminar (I was having surgery), the answers I gave before the seminar would remain the same. He seemed not to have understood what I was explaining and rather than asking for clarification, he answered me in a rude and harsh manner.  I also asked if he received my request to meet with him. I informed Dr. Emejuru of my attempts to meet with Dr. Dyer and Dr. Emejuru stated I could go to Dr. Dyer's office. Dr. Emejuru said, "lets (sic) see if he follows up." I did visit Dr. Dyer's office, but he was never there when I went.

69.    On the evening of August 11, 2015, I had interviewed so many patients that night, I lost my voice and actually felt like I could not physically continue. The next day, I took a sick day and followed the appropriate protocol, in doing so. It is important to  realize that these night call shifts are in addition to working normal day shifts as well. I was working over 80 hours a week at  the time I asked to be given light duty based on my urologist, Dr. Jarrett's note. Moreover, like my colleagues, I was also expected to read 100 page articles, give presentations, attend class, take didactic exams (which I was scheduled to take after working over 24 consecutive hours with no

sleep), and licensing exams. As GWU administration (which includes Dr. Catapano) were the ones making the schedule, I can only conclude that they were purposely making me work double shifts to make up for lost time rather than giving me the light duty I requested based on my doctor's orders.

70.     On August 14, 2015, I again tried to explain to Dr. Dyer that having me complete the index again would result in no change as I did not attend the one-hour seminar (as I was having surgery). He did not reply so I forwarded my email to Dr. Emejuru to inform him of my continued efforts to meet with Dr. Dyer.

71.     On August 17, 2015, Dr. Emejuru emailed me to inform me he was keeping track of my attempts to meet with Dr. Dyer.

72.     On August 19, 2015, I had another grueling call night, working approximately 28 consecutive hours.

73.     On August 20, 2015, after I had worked over 24 consecutive hours with no sleep, our class had our first neuroscience exam.

The August 25, 2015 Call on Six South

74.     On August 25, 2015, after a full day of work (where I found a patient who had hanged herself), I immediately started my call night, with no break in-between. At 18:08 I did a chest pain work up on this patient and consulted medicine. I had an extensive conversation with this patient (PtA). She shared stories about being an EMS worker. According to the nursing note by RN Ronni Griffin, PtA reported suicidal ideation (SI) at 20:30. I evaluated PtA and she complained about seizures in the past.

75.     After my evaluation, at 20:47, I put an order in for seizure precautions. I put in an order for a 1:1 sitter. A 1:1 sitter is a hospital employee that sits in a patient's room at all times to ensure

their safety. Staff stated there were no 1:1 sitters available. I reassessed PtA and determined that she would be able to tell staff if she had SI again. We then talked about her work in psychology and EMS and she contracted for safety. PtA and I had at least three 15-minute conversations about her goals in life and work in the healthcare field.

76.      At 22:00 PtA endorsed SI again. Because there were no 1:1 sitters available, I placed an order to have her go to the quiet room at 22:07. I later found PtA hitting her head violently. She was alone in the day room, not the quiet room. I called for help and while I was waiting for someone to arrive I attempted to keep her from hitting her head. I asked her what had changed since we last spoke and she said she "couldn't take it anymore." When I asked the nurse why she was alone in the day room and not in the quiet room as per my order, I was informed that the camera in the quiet room was broken. I asked if someone from IT could fix it as it is very dangerous to have this patient unwatched, especially given her history of brain injury and bleed. I then checked her computer chart and found that, despite being signed out that "as needed medications," ("as needed medications" are known as PRNs) were already ordered in the computer, none were. Dr. Caroline Roberts had been untruthful to me during sign-out when she informed me she added the PRNs.

77.      At 23:00 I added the PRNs. After entering the PRNs, I requested a 1:1 sitter again because I was very worried PtA would get a brain bleed if she tried to hit her head again, given the PtA's history of blood dyscrasia. I again informed staff of the severity of this case and asked if we could please find a 1:1 sitter. Again, I was told there were none. Nurse Shemika Anthony yelled over the phone "No" and then hung up on me. At 23:14, I put in the order for a 1:1 sitter and attempted to speak with staff in person again about the severity of the situation. Later, PtA was calm but still with SI. The 1:1 sitter was in the room. I offered PO (oral medication) but did not feel her behavior

warranted IM (involuntary injections – a shot) medications. She was sitting on the floor quietly and there was no threat of violence. I believed it was her choice to refuse PO medications. I asked to be informed if PtA decided she wanted medications. I then asked staff for their ideas on the situation. They stated they would inform me if PtA's behavior escalated to the point where she needed IM and let me know if she asked for PO. At 02:00 I was informed that PtA was beginning to be agitated and again banging her head. This is documented in the nursing note by Ronni Griffin. IM medications were already in the computer but I was told to reorder them. While attempting to keep PtA from again hitting her head, nursing staff stated that they could not even draw the medication until another order was in. At 02:10 I reordered the PRNs as requested. I did not refuse to be present during the PRN administration. I asked for it to be given while I was in the room. Since a verbal order was refused (verbal orders are to be taken as orders during an emergency situation, as logging onto the computer would be time-consuming), I had to leave the room to put the order in the computer for a second time.

78.      I try not to put in repeat orders in an effort to limit unaccounted-for medication but it was demanded. In regard to my earlier conversation with PtA about her career in psychology, we discussed patient care. I used this as a means of trying to explain to PtA why her yelling may disrupt patient care. I told PtA that there are other patients on this floor who need rest to get better. PtA actually seemed to be understanding and remorseful for yelling, however, then became upset about her cane and quickly reverted to yelling again. I was aware that PtA had been throwing objects at staff and trying to hit people with her cane. Another approach I tried was explaining to her the repercussions of her actions. During one of our prior discussions, we talked about making good choices to avoid trouble. I told her assault is a crime and that I would be forced to call the police if she injures someone. It was at this time I considered FD12 but used the phrase

20

"administrative discharge." I discovered later (while doing the essay I was assigned) that an administrative discharge may actually be an appropriate action. An administrative discharge is a "discharge by a hospital administrator that is likely to result in a significant improvement. In most states this is a matter of condition, improvement or when release would be in the patient's best interest or for the interest of the hospital." The most current Psychiatry Resident Official Call Manual, 2013-2014 Policy states only one fact about an administrative discharge and that it must be discussed with an attending. I had attempted to discuss this discharge with my attending (who was not in the hospital), Dr. Khin Khin. I told PtA that many people would be involved if such a discharge was deemed necessary. I explained to PtA that for any discharge to happen I must first speak with my attending physician and it would likely not occur until the next doctors came on shift. Four other patients had woken up, some complaining of nightmares, and some afraid due to PtA yelling.

79.    I was informed that PtA was biting, kicking, and  hitting staff with a cane. I told staff if they feel they have been injured they should be examined and could call the police if they felt the assault was serious enough. The GWU Annual Security and Fire Safety Report stated that a person reporting a crime to GWU police has the right to report the crime to the Metropolitan Police Department. I placed an order to have a female 1:1 sitter as I was afraid PtA may try something dangerous in the restroom but staff disagreed with this order. PtA was yelling through a wide open doorway to a 1:1 sitter outside the room and my goal was to somehow change this to decrease the noise level in this area of the hallway. This showed to be detrimental to the other patients. When staff explained they could not get a female 1:1 sitter due to understaffing, I decided that PtA would be less disrupting to the unit in the quiet room as an alternative. At 03:22, I placed another order to have PtA taken to the quiet room. I capitalized "KEEP" on this order, as my last order to have

21

PtA in the quiet room was not followed through with. Despite computer orders, nursing communications, and speaking to the nurses in person, it seemed the 1:1 sitters were only watching patients intermittently, at times not even in the patients' rooms. At the same time, 03:22 I placed another order for a 1:1sitter and capitalized "AT ALL TIMES." I felt as if the majority of the staff were very stressed and frustrated. This is why I then called for a group meeting. My logic was that perhaps discussing their ideas and what their thoughts were on my suggestions would allow everyone to feel heard. I was genuinely open to any ideas. I gathered the nurses, 1:1 sitters, security, and HOS (House Operation Supervisor) in a circle and asked if they had any suggestions for handling this. Nurse Shemika Anthony voiced that this discussion in itself wasn't a good idea. Nurse Ronnie Griffin however agreed with the idea of having PtA in the quiet room. During this meeting other staff also recommended another round of PRNs. We then decided, as a group, to place restraints as it seemed PRNs were not working to calm PtA. I placed this order at 03:25. I also added a nursing communication at 03:25 and spoke with them in person about restraints. PtA later fell asleep and her restraints were removed.

80.     At 05:14 I placed a communication to call me when she woke up so that I could reassess her. One minute later I realized that explaining to staff the reasons for my orders seemed to be more effective in getting them to follow the orders. So, at that same minute 05:15, I added another communication explaining that PtA cannot have restraints on while sleeping and that is the reason I need to be called. Of note, I had placed the order for 50 mg of Benadryl at 03:25. When Nurse Shemika Anthony called and told me to order it again, I did so again at 05:13 (again, multiple repeat orders). Nurse Shemika Anthony called and asked me to put the Benadryl order in for a third time stating she couldn't see it. I explained that I had ordered it twice and that perhaps something was wrong with my account. I was also worried that placing it again would result in

three unaccounted for IM Benadryls available for someone to steal or inappropriately obtain. I informed Nurse Shemika Anthony that the other resident would be coming in before 07:30 and that we could try putting the order in under her name, if indeed there was a problem with my account. Nurse Shemika Anthony hung up the phone on me once again. I went to the nurse's station and explained to them in person that I had twice put this order in the computer and was not sure why Nurse Shemika Anthony could not see it. I also let them know that the day shift resident was going to try to place the order before 07:30. Of note, at 22:16, ten minutes after PtA endorsed SI and I ordered PtA to be placed in quiet room, another patient (PtB) began having a seizure. I was told that Ativan was in the computer on order as a PRN medication for PtB but I discovered it was not as Dr. Caroline Roberts had been untruthful about having put on PRN medications. I explained to the 1:1 sitter the seriousness of PtB's previous suicide attempt and the importance of not letting her in the restroom alone. Soon after, another 1:1 sitter came on and I explained the situation once again. I asked the 1:1 sitters for their names so that I could record that I explained to each of them how serious this was but they declined. One stated that she wasn't even technically a 1:1 sitter. I asked her what training she had to cover a 1:1 sitter's position and she said she did not really have any and that she was told to "sit and watch the patient." I informed Psychiatry administration of this as it is extremely dangerous.

81.      Nurse Shemika Anthony noted later in an email, that she had waited an extensive amount of time for me. However, at the time that she was referring to, I was with PtB, whom I was very concerned about as she had attempted to hang herself the day before and was stating she had a plan to sneak to the bathroom and try again to attempt suicide. I informed nursing staff that I was addressing PtB and would quickly come to the violent and suicidal patient (PtA). When I went to evaluate PtB I noticed another new 1:1 sitter was on and he was male. At 02:37 I again requested

that she not be alone in the restroom. This new 1:1 sitter was not aware that PtB had tried killing herself in the restroom the day before. This 1:1 sitter did give me his name. I explained this to him and wrote a note about it in the electronic medical record (EMR). In addition to the situation with the violent and suicidal patient (PtA) I was simultaneously dealing with patients having issues with; cardiac chest pain involving a medicine consult, a seizure incident involving a neurology consult, an acute abdomen, an OBGYN issue, PtB (who attempted to hang herself the day before) voicing a plan to do so again, the four floor patients who had woken up with nightmares and were afraid, and many ER consults. I was singlehandedly responsible (as a physician) for the care of approximately 30 ER and psychiatry patients on this night, and partially responsible for approximately 10 psychiatry consult patients on the medicine floors (which are located elsewhere in the hospital).

82.    At no point did the on-call attending, Dr. Khin Khin, come in to the hospital, or even manage orders remotely. When I contacted her, the reception was bad and she told me to "call someone else." I did inform her that I felt patients were being coerced to sign in to Six South, especially given the large percentage of them demanding to be released. I told Dr. Khin Khin that a higher level of care would be safer for many of the patients. Dr. Khin Khin demonstrated no interest in coming in to the hospital or even put in orders remotely from home, which is something I have never known of an on-call attending doing. It was common knowledge that attendings did not answer the phone during their call shift, hence the instructions to "go down the list." I then called Dr. Slootsky but she did not answer. I called Dr. Norris who was helpful and stated that as the unit was so acute (dangerous), I would not be required to see additional patients in the ER.

83.    I was offered trauma counseling for having witnessed a patient who had hanged herself, before the start of my call shift on the morning of August, 24, 2015. When I stated I wanted trauma

24

counseling, I was informed that it actually was not available to me. I called the hospital risk management to take them up on the offer for trauma therapy. She said there was no such thing available to me. I asked her to email me that in writing but she only said, "Thank you for taking a few minutes today to speak with me regarding the event on 4N on 8/24/15. As stated in our conversation, the Root Cause Analysis will be held at 11:00 AM at the GWUH conference room on the lobby level."

84.     After having worked over consecutive 27 hours and experiencing this traumatizing series of events, I was expected to attend a Root Cause Analysis (RCA). This was not the RCA for the violent and suicidal patient, PtA mentioned above, but for the patient who had hanged herself the day before. This would mean I would have been at work from 7:00 a.m. on August 24th to about 2:00 p.m. on August 25th. I was recovering from surgery and worked to the brink of collapsing.

85.     The social worker noted that I did not look good, something that I was frequently told. I explained that I had emergency after emergency that night and I had not any time to eat or drink. I had not had a proper meal in four days. She helped me walk to the cafeteria, which was not serving food at that time. As I have celiac disease, the food I can eat was limited. She then helped me walk to Whole Foods, across the street. When we arrived, I fainted. She told me I needed to go home. I stated that I was expected to finish notes and attend an RCA meeting.

86.     She stated she did not think that would be physically possible and I agreed. I had left to walk home from Whole Foods without returning to Six South to get my belongings and cell phone, as I knew if I went back I would be forced to stay by the morning attending.

87.     On my walk home, I stopped to explain to Dr. Catapano what had happened, as I knew I would get in trouble for not returning to work. I was very concerned that the lack of communication on Six South at night and the training and availability of 1:1 sitters negatively affects the safety of

patients and staff on an ongoing basis. I said that I had asked Dr. Emejuru to help with the situation

of the backup residents and attendings not coming in during emergencies. Although he attempted

to remedy this with an email, it obviously had no effect as I was again left completely alone as the

only psychiatry physician in the entire hospital. I stated that I felt that patients that were being

admitted by attending physician, Dr. Gandhi, to Six South were too high acuity for our facility.

Six South was a voluntary facility and patients were being coerced to sign in when they should be

FD12ed (sent to a higher level involuntary facility).

88.     Dr. Catapano appeared to be offended at my suggestion. She stated that "Six South is

dangerous and residents just have to deal with that." I found it shocking that she acknowledged it

was dangerous, yet, allowed it to continue. She told me to work on "fatigue management." She

then went on to state that due to my medical condition and the acuity of the unit, that I would

receive extra help.

89.     When I returned home, I noticed a cut that made me concerned that I had received an HIV

exposure from the violent and suicidal patient (PtA) who had tried to commit suicide.  Because

PtA's main (day-time) doctor, Dr. Caroline Roberts (the same doctor who had not ordered PRN

medications as described above) also failed to order an HIV test for PtA as I asked, (and as the

blood exposure protocol requires), I found myself personally having to ask the lab to look to see

if her blood was on file and could be tested for HIV. Although I completed the appropriate blood

exposure paperwork on my end, I was not informed as to whether I was exposed to HIV because

the blood exposure protocol was not completed by GWU hospital staff before the patient was later

discharged from the hospital. This missing information was vital because if I had been exposed to

HIV, I would have needed to take prophylactic HIV medication at that time. To this day, I still do

not know the answer to the question of whether I was exposed to HIV on August 25, 2015.

90.     I understand that a RCA was held with regard to the August 25th call, but I was not invited

to attend. Instead, months later in October 2015, this event formed the basis for another letter of

deficiency (LOD) issued to me.

Finally Meeting with Dr. Dyer

91.     On August 29, 2015, I sent Dr. Dyer an electronic copy of the July 15th letter of deficiency

(LOD) as he asked in his only email to me. As he is the Chair of the Clinical Competency

Committee (CCC), one would have thought he would have had his own copy.

92.     On September 2, 2015, I asked Victoria Anderson if I could meet with Dr. Dyer at

lunchtime. My class has lectures during grand rounds. In September of 2015, I was not even sure

of the timing of psychiatry grand rounds as PGY1s do not go to grand rounds and it had not started

for PGY2s yet (I was a PGY2 at this time). I had been to internal medicine grand rounds and those

are at noon. I thought that if I met with Dr. Dyer during my lunch break it would result in the least

amount of people getting upset for missing time on a Thursday. I informed Dr. Dyer I could meet

with him from 12:00 p.m. to 12:30 p.m. I knew I would get in trouble for missing class. However,

I did not want to imply to him that my attending class was a higher priority than meeting with him

so I offered my lunchtime.

93.     Dr. Dyer stated he offered to meet with me at 10:30 a.m., which indirectly he did as it turns

out psychiatry grand rounds was at 10:30 a.m. He then stated he is looking for a yes or no answer

but his email began with "Let's find a time to get together" which is not a yes or no question. I did

not even know what to say to this. I felt he was giving me an unnecessary amount of grief about

making a simple appointment.

94.     On September 3, 2015, Dr. Dyer decided that he could, in fact, meet at noon. We met and

he spent the time talking about my alleged "inappropriate response" to his asking me to complete

his index. He was unable to understand the fact that I did not attend the one-hour seminar because I was on leave to have surgery. I delicately tried to explain that my purpose of meeting with him was to focus on the LOD. During the discussion, Dr. Dyer made an offensive comment to me to the effect that I may not have what it takes to be a psychiatrist. I found this insulting, because prior to this meeting, I had only met him once, and I was committed to becoming a psychiatrist. I gave him a copy of my phone records showing that the emergency room did not call me on June 10th the way it was stated in the LOD, that I never said I wasn't coming in, and that multiple people knew I was sick. I showed him my doctor's excuse for June 10th. He told me to send him the doctor's excuse and he would look into that and my phone records and get back to me at a later date. I gave him these records and he never responded to me.

95.     Later, on September 3, 2015, I had my first meeting with my therapist, Dr. Kecmanovic. I felt depressed about the fact that the faculty, who I used to look up to, had so little regard for my health.

96.      I was prepared to lead a discussion in Dr. Collins' didactics course. I spent hours preparing for her classes because I knew she would give me harsh criticism. Subsequently, another resident, Dr. Seth Rosenblatt, complimented my performance in the class to me. He also informed me that he wrote to Dr. Berger about Dr. Collins' unfair treatment towards me.

Visit to Equal Employment Opportunity (EEO) Office

97.     On September 17, 2015, I saw a Facebook status from a GWU employee saying his views do not represent the views of the George Washington University. I became afraid that this disclaimer was something I would get in trouble for not posting, or for posting, I was unsure. It was a didactics day but neuroscience had been canceled. I had some free time on the GWU campus.

98.     I went to Rice Hall, Suite 101 to make sure I was following every rule, as I did not want to give administration something to write another LOD about. They stated when it comes to social media, I must be clear to my readers that the views I express are mine and mine alone. Rice Hall, Suite 101, was also the EEO office. I asked them if they knew of any policies to protect residents who needed time off for medical leave. They stated that I should apply for Family Medical Leave Act (FMLA) leave. I also asked them if they knew any rules similar the media policy in that, they might not be that obvious, and explained to him that I was under scrutiny and needed to make sure that I was doing nothing that violated a policy that I was unaware of. They said I should be fine as long as I post a disclaimer on my Facebook page, which I did.

99.     From my experience, I learned that whatever the University Policy on Equal Opportunity may be, in practice it fails to protect all faculty, staff and students against unlawful discrimination on a number of grounds, including disability.

Buddy Call

100.    On September 21, 2015, Dr. Catapano informed me I would be put on "buddy call" with other residents. On September 22, 2015 Dr. Catapano canceled a meeting with me to discuss the "buddy call." As of September 28, 2015 I still did not know why I was on buddy call, what it meant, or how to change call shifts.

101.    On September 29, 2015, I completed a survey regarding my experience working in the residency program, and rated everything poorly including my health. I was scheduled to be on call October 2, 5, 12, 15, 17 and 22. The other residents had 3-5 calls a month and I had 6. It was exceedingly difficult to schedule doctor's appointments with all the schedule changes.

102.    On October 1, 2015, at 8:20 a.m. Dr. Catapano messaged me that she would be late for our meeting. I felt GWU psychiatry administration was purposely avoiding me.

103.    On October 15, 2015, I received a formal notification that I would be assigned to "buddy calls." The "buddy calls" were presumably designed to help me, but in practice my "buddies" either micromanaged me, added to my work, or were entirely absent.

104.    The "buddy calls" undermined my ability to achieve as a resident. For example, the Program selected Dr. He as one "buddy." Though I learned through litigation that Dr. He emailed Dr. Catapano her comments about my performance, I never received this feedback during my time as a resident. Further, the Program's selection of Dr. He was antagonizing and humiliating. In fact, Dr. Emejuru, my Chief, agreed that Dr. He had failed to provide appropriate support to me in the past as a backup resident, and neglected her responsibilities. Moreover, Dr. He continued her pattern of neglecting her responsibilities. While on "buddy call" with me, for example, she slept during this shift rather than provide me advice and support.

105.    In addition, the "buddy call" assignment was ostracizing. My "buddies" complained to me about this assignment, and made clear they resented having to come into the hospital from home to be my "buddy."

Licensing Exam, More Problems with Appointments, and Request for FMLA Leave

106.    Around September 2015, I learned that in the following month I would begin a new rotation at the Partial Hospitalization Program (PHP) at INOVA Fairfax Hospital and that Dr. Malik was assigned to be my attending.

107.    I was concerned that Dr. Malik was assigned to be my attending as she obtained my anonymous evaluation of her on a prior rotation. I emailed Dr. Catapano explaining my concerns, stated that my therapist recommended that I not work with Dr. Malik. In the email, I also wrote: "I understand that everyone has to work with people they do not get along with. However, given the fact my anonymity was compromised I'm hoping there can be an alternative. It makes me

uncomfortable to work under someone who knows what I put on my private evaluations [of her] and then shared it with multiple people in my class. Please let me know." This request was denied by Dr. Catapano.

108.    In October, 2015, I began the new rotation at INOVA Fairfax. At the start of this rotation, Dr. Crone, the director at INOVA Fairfax, refused to meet with me to discuss my schedule and accommodate my need to attend medical appointments. Instead, I met with Dr. Malik, my rotation attending, to discuss my work schedule. Of note, I do not recall seeing Dr. Crone in person at all during my PGY2 year.

109.    In my meeting with Dr. Malik, I informed her that I was suffering from cancer and would need to take off a few hours during the work-week to attend medical appointments. In addition, I noted that I needed to sit for the 2-day United States Medical Licensing (USMLE) Step 3 exam, which was necessary for me to practice medicine. Therefore, in addition to scheduling time for attending medical appointments, I also requested administrative leave so that I could take 2 days off to study and 2 days to sit for the exam. Dr. Malik responded positively, noting that the amount of time I requested off from work (less than a week) was the same amount of time, or less, than other residents took during their rotation. Many residents took as much or more time off to study for the USMLE. After speaking to me about the time other residents took off, Dr. Malik readily signed my leave form.

110.    On October 6, 2015, I informed Dr. Malik that I had a therapy appointment the next day at 2:00 p.m., and requested that I be allowed to come in early that day, and stay late Friday to make up for it. Although I made this request, I was still assigned work at that time, which made me late for my appointment.

111.    My geneticist had stated that I am to have a workup for pain lasting longer than two weeks as it might indicate cancer metastasis. I had had chest pain for longer than two weeks. I was also overdue on imaging ordered by my oncologist. As the pain became worse over the weekend, on Monday October 19, at 7:19 a.m., I informed my attending Dr. Malik, my supervising attending, the program director Dr. Catapano, the chiefs (Dr. Jason Emejuru and Dr. Darlinda Minor), and the program coordinator, Ms. Tory Anderson, that I was ill. This was before I was scheduled to be in on the day I was sick. As it was not a Thursday (a didactics day), I emailed Ms. Anderson, Dr. Emejuru, Dr. Kels, Dr. Catapano, and Dr. Malik my attending, exactly as the protocol in the policy asks. I called Dr. Malik but there was no answer. Ms. Anderson emailed me, "thank you for notifying all the appropriate people."

112.    Though I had notified all the appropriate parties in compliance with GWU policy, on October 20, 2015, I received an email from Dr. Crone stating I did not follow proper protocol. I did not understand why this was the case because as instructed, I had sought sequential approvals. I found these changing requirements and standards frustrating.

113.    On October 21, 2015, I received an email from Dr. Kels revoking the approval that I had received weeks prior (from Dr. Malik), for my leave request for 4 days of leave to take and to study for my licensing exam. She stated I had sought and received approval from my supervising attending, Dr. Malik, rather than Dr. Crone (who had refused to meet with me). Apparently, on September 14, 2015 before my rotation began, an email had gone out informing residents that INOVA Fairfax leave requests must also be approved by Dr. Crone. However, the form given to me by Victoria Anderson only required Dr. Malik's signature. This form was the exact form I submitted nearly a month before my USMLE. Yet, with the USMLE just a week away, I was now told by the Program that my administrative leave was denied, and that I would only be permitted

two days off. As the USMLE itself was a two-day exam, this would leave me no time to study for the exam.

114.    The administrative delays, changing standards, and Dr. Crone's refusal to meet with me made clear that the Program was hindering my performance potential on the USMLE. Nonetheless, I performed adequately on this exam based on national standards.

115.    On October 21, 2015, at 10:58 p.m. I emailed Dr. Emejuru, "I have appointments November 3rd, 10th, 17th, 19th and 24th. I have already made arrangements to go home 26-27. This is something that I need to do as I have legal documents to sign for my car inspection and insurance that I can only do in PA. It would also be nice to see my mother. I do not know exactly when my other appointment will be as it depends on the results of my recent tests. Based on my previous call schedule, it did not matter what day of the week my follow up appointments were as previously I was only scheduled on the weekend."

116.    On October 22, 2015, I indicated to Dr. Collins that I had to leave right after her class to make it to a therapy appointment at 3:30 p.m. Dr. Collins forbid me from speaking, and therefore, participating in class, and seemed to take my speaking as a personal insult.

117.    I went to the restroom and sent an email to Dr. Griffith, Dr. Emejuru, and Ms. Anderson which stated, "Because of the negative repercussions I experienced this week as a result of my taking a sick day to have tests for metastasis, I now have to take another sick day. I am having extreme anxiety about the fact that [I] was punished for this sick day despite: 1. informing multiple people in advance via phone and email 2. Asking multiple people if I did everything that was appropriate to handle taking a sick day 3. providing a doctors (sic) note 4. Being told that I would be given time to have one or two doctors (sic) appointments a month for the ongoing cancer screening that I will have to have for at least the next few years. I am now having extreme anxiety

necessitating an emergency session with my psychologist. I will provide a doctors (sic) note for today. If there is someone else I need to contact, a specific document I need to provide or anything else I can do to avoid upsetting anyone please let me know. Please inform me via email as soon as you can if you think of any negative repercussions that may occur as a result of my absence today so that I can address it in advance and not have this happen again. As I have stated many times, my goal is to care for my health while upsetting the least number of people possible. Thank you."

118.    I returned to class because Dr. Emejuru told me I could not miss didactics although I informed him I could provide him a doctor's excuse. Dr. Collins purposely kept us over time. At 3:22 p.m. I messaged my therapist, "I told the lecturer [Dr. Collins] I had an appointment at 3:30 but she went past 3:15." At 4:45 p.m. I emailed Dr. Catapano, Dr. Kels, Dr. Emejuru, Dr. Minor, and Ms. Anderson, "I submitted this administrative leave request one month ago and was told it was approved. It would appear that in regard to sick days for cancer follow up and taking administrative leave for my licensing exam, despite taking all steps necessary, asking if there is anything more I need to do and receiving confirmation from multiple sources that I have done everything necessary, I still suffer negative consequences. The way I have been treated over the last five months has been inhumane. It has lead (sic) to a decline in my physical and mental health. I am currently having a medical emergency. My doctor will be submitting a letter for my medical leave from October 22 until November 2nd." Despite all of this, I was still called by the senior resident who demanded I report to my night shift duty that night. At 5:14 p.m. I emailed Dr. Kels, Dr. Catapano, Dr. Emejuru, Dr. Minor and Dr. Goodwin, "Due to my current condition, I will not be able to work tonight. I have spoken with Dr. Emejuru over the phone on this matter. I also spoke with Ross over the phone. I will submit my doctors excuse once it is written. Please let me know if there is something else I need to do."

119.    At 5:21 p.m. I emailed my therapist, "Not surprisingly, I am being given a difficult time about this. I was even told I had to go into call tonight despite my informing them I could provide an excuse." And "Ironically, I feel my I may be stigmatized for any mental illness. Although it is no secret I have anxiety and depression. Again, thank you for seeing me at such short notice." I felt completely at my wits' end. She replied, "Stephanie came today complaining of the following symptoms: nausea and vomiting, no appetite, difficulty sleeping, and intermittent chest pain. Her affect was flat and she reported depressed mood and increased anxiety."

120.    At 6:29 p.m., I emailed Ms. Tucker, "Good evening. I have become very ill. I am requesting medical leave until Nov 2. I will provide a doctor's letter for this. Please let me know what I need to do to complete this. Thank you."

121.    At 7:39 p.m. that day I emailed Dr. Griffith asking him to meet to discuss my concerns. At 10:44 p.m. Dr. Griffith told me he would not meet with me to address my concerns at all.

122.    Later that night, at 12:49 a.m. on October 23, 2015, I emailed Dr. Griffith, Dr. Emejuru, Dr. Minor, Ms. Anderson, and Dr. Goodwin, "I have attached my doctor's excuse for today. Please let me know if there is someone else I should send it to or anything else I should do. Thank you." I had not had a moment to myself that entire day. The reaction from GWU psychiatry administration on this day is an example of why I had to miss so many appointments. The time and energy required to take a sick day or even an hour off for a personal medical appointment only made me sicker.

123.    On top of all of this, I was waiting to hear word on whether my cancer had metastasized. On October 23, 2015, I emailed Victoria Anderson, Dr. Catapano, Dr. Kels, Dr. Minor, Dr. Emejuru, "When I asked Dr. Malik to sign the form I apologized for having to miss work for the exam. She listed specific names of residents who "missed more days than came." I then asked if it

was okay for me to take the study days and she replied that it would be fine. If I was aware of a policy stating a certain number of days missed despite having a doctors (sic) excuse would lead to failing the rotation I would have not taken the study days and worked something out where I would find two other days or perhaps four evenings to study. Being that this decision to fail me for missing days was not brought to my attention until the week before my exam I no longer have the ability to make such a study arrangement. It might be beneficial to clarify this policy and which residents it applies to." Of note, to my knowledge, there was no such policy.

124.    I was sick and in a constant state of anxiety. I thought that the only way I could take care of my health was to take FMLA leave, although, I suspected I would be punished for it (which they did when I returned, by putting me on forced leave November 10 for "taking too many sick days").

125.    On October 25, 2015, the Program changed the call schedule again although I had informed the Program many times that these changes prevented me from attending my doctor's appointments. I took FMLA leave from October 25- 30, 2015. My primary care doctor completed the paperwork. He knew that I had missed many appointments with him because I was unable to leave work. He wrote on the paper work that I was to have time off every two weeks to attend appointments, specifically, 2 hours off twice a month or one afternoon off every three weeks. Not only was my doctor's request not honored, I was still called and emailed and instructed to write notes and do work while I was on FMLA leave.

126.    I finally received some good news when I learned that I received a score of 206 on my USMLE Step 3 exam that I took on October 29, 2015. Despite all the stress, I was happy since most residents scores fall between 140 and 260. With regard to neuroscience knowledge, the Score Report showed I received scores above the national average.

LOD for Failure to Get Medical Clearance

127.    On October 13, 2015, while I was 45 minutes away from GWU hospital working at PHP I received an email, telling me to take care of my health clearance by the next day. There was a list attached with the names of 17 other residents who did not have their health clearance either. I replied to Victoria Anderson that I had copies of my recent flu shot, physical, and PPD. I asked who I should send these records to. I was told I have to bring them to GWU hospital employee health. I was made late for my appointment with my therapist. I had also been having chest pain.

128.    On October 28, 2015, I received yet another letter of deficiency. This time it was for not completing my health clearance on time. I asked the other residents on this list if they received a LOD. They did not. There was no time to create yet another document explaining why my TB test (PPD) was one day late (employee health lost it) as I was taking the USMLE at this time.

LOD for August 25, 2015 Call

129.    As stated above, I was never invited to participate in a RCA concerning the August 25, 2015 call. On or about October 14, 2015, which was nearly two months after the August 25th event, I was told I did not "perform at the level expected" during the August 25th call. When I asked Dr. Catapano what I did to demonstrate I was not "performing at the level expected" she stated something to the effect that "I know you've gone over it with Dr. Norris and Dr. Gandhi and a letter of deficiency will be coming which will outline what you spoke to them about." Dr. Norris and Dr. Gandhi were the psychiatry attendings on staff during August 25th call. Dr. Catapano was under the impression that I had a meeting with them. However, this meeting had been rescheduled. Therefore, a letter of deficiency was written outlining a meeting that had never occurred.

130.    Dr. Catapano obviously knew the predetermined outcome of the meeting indicating that the meeting was not arranged to get my side of the events nor allow me to provide a defense against

the allegations. When eventually I did have the meeting on October 15, I showed Dr. Norris and

Dr. Gandhi my detailed documentation of the night of August 25th. They said I had excellent

patient care and put safety first. It was an overall positive feedback session and did not question

my level of performance. Dr. Norris and Dr. Gandhi told me they knew nothing of a letter of

deficiency. For the remainder of October, I attempted to find out from Dr. Catapano what she

based her decision on and my questions of what I had done to deserve a letter of deficiency went

unanswered.

131.    As of this time, I had not actually received this letter of deficiency. I had only heard of its

existence. I finally had my meeting with Dr. Norris and Dr. Gandhi about the August 25th call shift

on October 15, 2015, at 5:00 p.m. For this meeting I prepared a detailed 3000-word document that

also included 22 screen shots from the electronic medical record to show that what Nurse Shemika

Anthony said had occurred that night, in fact, did not. It took me approximately 16 hours to create

this document.

132.    Before I met with Dr. Norris, Dr. Catapano emailed me at 4:51 p.m., "Stephanie, You are

on buddy call primarily because of your last August call. It has nothing to do with you not coming

in for your ED shift. As you and I talked about, there were several concerns about your

management of pts and the unit during that call. I know you've gone over it in detail with Dr.

Norris and Dr. Gandhi. A letter of deficiency will be coming which will outline what you spoke to

them about. As Jason [Emejuru] discussed with you, and outlined in a memo, the purpose of buddy

calls for you is to provide extra support and supervision." Of note, it appeared that Dr. Catapano

was still stating I did not come in for my June 10 ED (ER) shift, even though I had explained to

her and Dr. Dyer that I had.

133.    The letter of deficiency was not issued until November 11, 2015. That letter stated, "Because of the above listed deficiencies, and need for extra supervision, the Clinical Compeitency (sic) Committee's assessment is that you are not on track to be promoted to the PGYIII year on July 1, 2016." It was then retracted in favor of an amended letter dated November 19, 2015. That letter changed the wording to indicate that the CCC's assessment was that I would not be promoted, but the final decision was left open.

134.    I still have never personally seen documentation from the August 25th RCA itself, although I understand some related documents were produced to my attorneys under a protective order.

Grand Rounds

135.    On November 2, 2015, the department newsletter published the grand rounds schedule. I was apparently scheduled to present an M & M (morbidity and mortality) grand rounds in two days. I was never told about this. I was never assigned a case or given any information regarding this. This is something residents spend weeks preparing for. Dr. Emejuru said this was an oversight. I suspect that had I not read the newsletter, which few residents do, I would have been made a public spectacle on November 5th.

You Have Taken Too Much Sick Leave; Placement on Administrative Leave

136.    On November 10, 2015, I missed my appointment with my therapist because I could not leave work. At 6:05 p.m. I received a phone call from Dr. Catapano stating I was to begin forced administrative leave because I had "taken too much sick leave" and "the deans were going to have a legal meeting about [me]." I thought, well this is what they have been trying so hard for, it's finally here, I am terminated. I asked her when this meeting would be. When could I come back to work? Who should I inform? What should I tell them? Who will cover my patients on geriatrics?

39

Dr. Catapano attempted to end the call but I persisted to ask questions, none of which she answered. She said it would be outlined in a letter of deficiency.

137.    This was a new challenge for me as typically, these types of things were in email format that I could simply screenshot. Now, there would be no written documentation of this occurring. I decided to write myself a note with as much as I could remember about this phone call. My documentation stated, "On Tuesday November 10, 2015 at 6:05 p.m. she called me from [her mobile phone]. We spoke for 11 minutes about a future meeting pertaining to me. I asked questions such as "what is this meeting about?" "Who are the 'deans' that are meeting?" "When will the meeting take place?"[.] [H]er reply was that "legal" would be at the meeting and she could not give me further information. She appeared to be intentionally causing me anxiety. She will probably say it was a mix up. I wondered how much sick leave was too much. If there is a meeting I probably will not be invited to it. This abuse has gone on since May."

138.    After numerous other efforts to find out what was going on, I emailed Dr. Catapano, Dr. Emejuru, and Ms. Anderson at 9:27 p.m. "Good evening. I noticed that when I tried to get in touch with someone from administration from a different number after calling with my number, I then got a call back. I'm sure whatever is going on has a good explanation, however, I would appreciate further communication on it. There seems to be a continuing theme with miscommunication, therefore, I will explain my current understanding of the situation and invite you to correct it if need be. The phone conversation that occurred when Dr. Catapano around 6:00 p.m. indicated that I am being investigated by the "deans" for taking medical leave multiple times. As I still do not have written information as to what is going on, or that Fairfax is aware of it, and have no desire to upset Dr. Crone or my attendings at Fairfax, I will be going to work. I will leave work if they tell me they were informed I should not be there, or if I receive a written confirmation that I should

not be at work. Again, I apologize for emailing at this hour, but it was late when I was informed. Have a nice evening."

139.    On November 11, 2015, at 9:00 a.m. I called the geriatrics department and asked them if they knew anything about me not coming to work. They said I was off the schedule and hung up the phone before I could ask any more questions. Dr. Catapano emailed me at 10:38 a.m., well after my shift started, "I will get the Letter of Deficiency to you shortly. In the meantime, as you asked, this email serves as written notification that you are currently on Administrative Leave with Pay until further notice, as we discussed when we spoke on the phone last night. With regard to your performance on call on August 25, and your need for buddy call now, we did talk about this at our meeting on October 1. I would be happy to go over it again with you if that would be helpful." Of note, Dr. Catapano did not provide me with clarification during our October 1st meeting.

140.    I began emailing other residency programs and started looking for an attorney to represent me. I did not know how I would afford my apartment if I was unemployed. I did not know I could ever pay back my $230,000 in loans. I was shaking and sweaty. I was experiencing such extreme anxiety that I could barely walk. I missed my oncology appointment at 11:30 a.m. Dr. Collins sent another email to all residents excluding me, regarding supervisors and psychodynamic patients.

141.    At 11:54 a.m. Dr. Catapano emailed, "Attached please find the Letter of Deficiency regarding your call night on August 25, 2015. I think you will find that we've already covered all or most of the content in the meeting you and I had on October 1, and the meeting you had with Dr. Norris and Dr. Gandhi on September 24. Please let me know if you have any questions." I did not meet with them on September 24. She did not explain this on October 1 either. None of this made any sense to me.

142.    On November 12, 2015, I hired Greg Care, a lawyer who specializes in residency issues. He told me that GWU's general counsel was handling my matter.

143.    On November 18, 2015, I had a positive meeting with Dr. Berger, a Graduate Medical Education Dean, and Mary Tucker, an administrator. I left the meeting hopeful that solutions could be worked out that would sort out my periodic leave requests and allow me to graduate on time. One area we explicitly discussed was having one contact point when I needed an accommodation to go to a medical appointment. I had hoped Victoria Anderson would serve in this role; she did not.

144.    As a follow up to this meeting, Mary Tucker emailed me the phone number to the EEO office, but I had already gone to that office which told me to apply for FMLA leave, which I did as instructed in October 2015. I was still concerned that I was forced to send notes to multiple individuals in order to take leave for medical appointments but I hoped things would get better after I hired a lawyer and reached out to Dr. Berger for help.

<u>Informed Failing Drs. Collins' and Griffith's Classes so Will Not Progress to PGY3; Impediments to Remediation with Dr. Kels</u>

145.    On November 19, 2015, Dr. Catapano informed me that she had received feedback from Dr. Griffith and Dr. Collins that my performance had been unsatisfactory. I was told Dr. Catapano discussed with them the possibility that they may recommend that I repeat their classes next year. Failing Dr. Collins' class would mean that I would not proceed with the rest of PGY2 didactics, and would need to repeat the year. I was also told that I needed to meet with Dr. Kels to work on an improvement plan as part of my Letter of Deficiency (LOD) for the August 25, 2015 call. On the bright side, Dr. Catapano also told me I would return to my regular duties with geriatrics. My administrative leave was evidently over.

42

146.    Nevertheless, I wondered if the Administration was using the requirement that I repeat didactics as a convenient way to justify a delay in my completion of the program, and possible termination. Drs. Collins' and Griffith's classes were but two didactics lectures I regularly attended. There were other lectures, including ones on child and adolescent psychiatry, global mental health, cultural psychiatry, grand rounds, journal club, and hope modules. These lectures were not formal classes like those in college or medical school. Attendance was not taken seriously. Attendance sheets were regularly thrown in the trash after class was over.

147.    Dr. Griffith has claimed in his declaration that his clinical neuroscience seminar is the "centerpiece" around which the rest of the curriculum is organized. Yet, there was never a clear syllabus stating what was required to pass the course. There were 16 hour-long neuroscience classes. Three of the classes were dedicated to in-class examinations. Of note, I was only given 30 minutes to take my exam while other residents were given a full 60 minutes. I missed one class due to surgery and two for FMLA leave. I missed four classes because I was not permitted to go by GWU psychiatry administration who either put me on another assignment or put me on forced leave. Dr. Griffith missed four of his own lectures.

148.    Taking a conservative average of 80 duty hours a week, for 48 weeks, PGY2 year would require residents to work 3,840 hours. Dr. Griffith's neuroscience course was 16 hours of the 3,840 hours. There were many other lectures including, child and adolescent psychiatry, global mental health, Cultural Psychiatry/GMH, Grand Rounds, Journal Club, Hope Modules residents needed to attend.

149.    Further, I was able to achieve great scores and do well in neuroscience, even though I missed Dr. Griffith's seminars from time to time, either because I was prohibited from attending by the Program, on FMLA leave, or undergoing surgery to remove my cancerous tumor. In fact, I

possess above average knowledge in neuroscience based on national standards. That is, according to the United States Medical Licensing Examination Content Description and General Information (http://www.usmle.org/pdfs/step-3/2017content_Step3.pdf), "[t]he Step 3 examination devotes attention to the importance of assessing the knowledge and skills of physicians who are assuming independent responsibility for providing general medical care to patients," and "[t]he expected outcome of the USMLE process is a general unrestricted license to practice medicine without supervision." According to the United States Medical Licensing Examination Step 3 Score Report Waggel, Stephanie Ellen, Test Date: October 29, 2015, I received a score of 206, and "most scores falling between 140 and 260." The Score Report also showed I received scores above the national average in "Behavioral Health/Nervous System/Special Senses." Thus, by national standards, I had above average knowledge in neuroscience making it clear Dr. Griffith's seminars were not necessary to develop resident's knowledge or training in the area of neuroscience.

150.    There were 16 hour-long neuroscience classes, three of which were dedicated to exams. I missed one class due to surgery (July 30, 2015), and two classes while on FMLA leave (October 22 and 29). I was also told by Dr. Emejuru, my supervisor and chief resident, not to attend didactics during my medicine rotation on July 23rd. I also missed classes because I was prohibited from attending the courses while on forced leave (November 12 & 19).

151.    Also, the course was not intensive, given that Dr. Griffith missed or canceled at least four of the weekly lectures with short notice. For example, on July 9, 2015, Dr. Emejuru, my chief resident and supervisor, explained to me that I was to "go through the entire week on medicine and not be at didactics." Then, on August 13, 2015, Dr. Griffith's seminar was canceled. At 10:35 p.m. on September 16, 2015, Dr. Griffith, canceled class for the next morning on September 17th. This was less than 12 hours' notice.

152.    On October 8, 2015, Dr. Griffith emailed, "I cancelled (sic) the seminar today because most of the class would be absent."

153.    On November 25, 2015, at 1:08 p.m. Dr. Rosenblatt emailed Dr. Griffith stating our class was unsure what would be on the December 17th neuroscience exam. Dr. Griffith replied at 3:41 p.m. to say he would not be there for the next two neuroscience lectures and he did not have the presentation materials for those days.

154.    It was rare that all 7 residents attending the seminar were present for class. Attendance sheets were not maintained. Moreover, residents often talked about topics unrelated to neuroscience while in class.

155.    Further, the exams were not difficult nor taken as requisites to passing the course. Ms. Anderson stated to me not to worry about taking the first exam in the seminar, but rather that I "just needed to get it out of the way." On August 20, 2015, after I worked over 24 consecutive hours, I had my first neuroscience exam, which would cover 6, hour-long, classes. This would not have been difficult for me to pass, except that I was ordered by Ms. Anderson to come "30 minutes early on the 27th and take it then." Therefore, I was assigned half the time (30 minutes) to take the exam, rather than the hour my classmates enjoyed.

156.    On November 19, 2015, Dr. Griffith told me that I did not need to retake the first two exams, as doing well on the final would demonstrate that I obtained the knowledge covered in those exams.

157.    Although I did poorly on my initial exams for Dr. Griffith's class (in part due to being given only 30 minutes to take them rather than the full hour the residents were given), I received an 82% on the final exam, one of the highest (not the highest) grades in the class.

158.    My November 19th LOD told me to meet with Dr. Kels within one week to discuss a remediation plan. This was easier said than done.

159.    On December 10, 2015, I was finally able to track down Dr. Kels. At 12:40 p.m., I went to Dr. Kels' office. I was informed that she was not there but I could find her in a different meeting and they stated I was allowed to enter that meeting. When I entered that meeting Dr. Kels left the room. She saw me but avoided eye contact with me and then proceeded to physically avoid me by leaving the room. Confused, I emailed her asking if I should follow her. She then told me she had a patient scheduled at 1:00 p.m. To clarify, she made an appointment to see me at 12:45, but at 12:45 she was in another meeting and had a patient scheduled for 1:00 p.m. It was at this time she informed me she could not work with me.

160.    Of note, my November 19th LOD stated I had 7 days to meet with Dr. Kels or face possible termination. Since November 20th, I emailed Dr. Kels approximately 8 times, sent over 15 emails to 6 other people asking for help in meeting with her (including, Dr. Emejuru, Ms. Anderson, Dr. Berger, Dr. Catapano, and Ms. Tucker), called 5 her times, left her 2 voicemails, and went to her office on 3 occasions.  I only succeeded in meeting her by catching her while she was in another meeting after physically following her, only for her to tell me she could not work with me.

161.    The notion that I was not complying with my remediation is absurd. I spent hours each week just attempting to meet those assigned to me. Just as I had done with my attempts to meet Dr. Dyer, I made a document called "Attempts to Meet Dr. Kels" which I also I emailed to Dr. Jeffrey Berger and many others.

162.    Dr. Kels told me to work with Dr. Gandhi on the "improvement plan." This same day (12/10/15) Dr. Gandhi was teaching a lecture so I was able to ask him about it in person. He stated he would be busy with research. I told him it was extremely important and he said to contact him

46

later about it. He also ignored my attempts to meet with him. As I did with Dr. Dyer and Dr. Kels I created a document "Attempts to Meet with Dr. Gandhi" which I emailed to many GWU faculty members.

163.    On January 3, 2016, Dr. Gandhi finally spoke to me about remediation on the phone, and I emailed him the essay I was required to submit as well.

Efforts to Thwart Appeal of Decision Not to Progress to PGY3

164.    On November 19, 2015, Dr. Collins informed me I would be repeating her class starting in July, 2016. On November 30, 2015, Dr. Catapano informed me I could take Dr. Griffith's December 17, 2015 exam, but would need to repeat the first half of the course.  The effect of these decisions was to preclude me from progressing to my PGY3 year on July 1, 2016.

165.    Although Drs. Catapano, Griffith and Collins made a decision to make me repeat coursework which precluded me from progressing to PGY3 (and potentially repeat all of PGY2 year), they did not inform me whether I could appeal the decisions internally.

166.    On December 4, 2015, Dr. Berger informed me that, "A course cannot be appealed to GME." In other words, because Dean Berger erroneously thought a decision to require me to repeat a class was not a reportable action, I could not appeal it. I replied at 9:28 a.m., "Thank you for your reply. The academic improvement policy states denying a resident credit for a previously completed rotation is a reportable action. The decision to have me repeat Dr. Collins' class means denying me credit for previously completed rotations. I wish to appeal this decision. I also wanted to appeal the decision made in the November 18th Letter of Deficiency but I have not gained the clarification that I need in order to do this. I have been attempting to contact Dr. Catapano and Dr. Kels via email, phone calls, and going to their offices. Would you be able to meet with me at your earliest convenience?" Dr. Berger replied, "I hope to have that information by mid-week next

week." Therefore, Dr. Berger incorrectly told me that I could not appeal my class failure when, in fact, I should have been able to according to GWU policy.

167.    December 10, 2015, was a didactics day, when we go to the MFA for lectures. Our mailboxes are in this building. In December, I was working at Children's Hospital. Although Dr. Catapano knew that I would not be back in the MFA building until the next Thursday didactics day, the Administration placed the December 10, 2015 LOD in my mailbox after I exited the building after class ended around 5:00 p.m. I went to eat with some of the residents but I forgot some of my belongings so I went back in the building, and found this LOD stating I had until the next day, December 11th to appeal. Had I not returned to the building, I would have missed the less than 24-hour deadline to submit my appeal provided in the letter.

168.    On December 11, 2015, I appealed the decisions to make me repeat coursework as repeating this coursework would prevent me from progressing to PGY3 with my peers (or potentially necessitate me to having to repeat my entire PGY2 year).

169.    On December 17, 2015, Dr. Berger informed me that Dr. Cioletti would be my appeal reviewer. On December 23, 2015, I submitted my appeal documents to Dr. Cioletti. My appeal to Dr. Cioletti consisted of 5 main points: (1) I was led to believe I was passing; (2) I was told by my program director that I would have time to meet with my instructors and finish my assignments at 6:00 p.m. November 19th but at 9:00 p.m. November 19th I was informed I failed; (3) I made multiple attempts to obtain feedback and clarity that were unsuccessful; (4). The reasons given to me for this failure were not made clear to me or mentioned in the syllabus for either class; and (5). I was informed of my failure in these classes before my final assignments were graded.

Taken Off the Call Schedule

170.    On December 28, 2015, I learned from another resident that I had been taken off the call schedule.

171.    In response to my inquiry as to why I was taken off of the call schedule without being informed, Dr. Kels responded, "I wanted to let you know that Jason [Emejuru] updated the call schedule for January and February. You are not scheduled for calls in that version, pending completion of your remediation with Dr. Gandhi as outlined in your Letter of Deficiency dated 11/19/15. As we discussed at our meeting earlier this month, this includes submission of the 600-word description and also completion of on-call style presentations to Dr. Gandhi. Once I have heard from Dr. Gandhi that you have successfully completed those tasks, we will update the call schedule to include you in the call pool."

172.    Dr. Kels' response was inconsistent with the November 19th LOD which stated I would remain on call with extra attending supervision.

173.    Given that I was previously told I would be getting extra help on call and not removed from call, I became dizzy and could hardly stand up. I took some medication and meditated but my vital signs still indicated a cardiac arrhythmia so my boyfriend (now husband) took me to the ER. In the emergency room I was found to have a heart arrhythmia and my blood pressure had doubled. I was seen by the ER attending Dr. Roche.

174.    I stated the reason for my medical emergency is that I thought I had been fired. She asked the hospital ombudsman, Dr. Sarani to meet with me. I explained to him that I was told I would be working call with extra attending help and that I had scheduled my doctor's appointments according to this schedule. I informed him that I had been unexpectedly removed and only found out when another resident asked me why he had to cover my call. I told him that most days I had

to spend hours emailing and calling GWU psychiatry administration asking them for information on my remediation plan and that when I was assigned someone to work with they would ignore me. He stated he would help me to figure out what was going on.

<u>Efforts to Return to on Call Status and to Promote Patient Safety</u>

175.    On or about January 8, 2016, I was at MFA because it was Thursday, a didactics day. At that time, I saw Victoria Anderson, who was the coordinator. She indicated  that I was taken off call in retaliation because I had filed an appeal that was causing the administration to do more work.

176.    On January 8, 2016, I also emailed Dr. Kels to request that I be put back on a call shift since I had completed my remediation project with Dr. Gandhi.

177.    She ultimately replied stating that she and Dr. Catapano had a meeting scheduled the next week with Dr. Gandhi to discuss my work with him on a remediation plan.

178.    On January 13, 2016, I again informed Dr. Catapano, Dr. Kels, Dr. Emejuru, Dr. Berger and Ms. Tucker that I completed my assignments with Dr. Gandhi 2 weekends ago and that I could not finalize my day call schedule at my current institution NVMHI (Northern Virginia Mental Health Institute) until I had information about my night call schedule at GWU (as it might so happen I placed on all day at NVMHI, all night at GWU, then on all day again at NVMHI which would be a lot of overlap, not to mention the institutions are an hour away from each other). I told Dr. Catapano that I had been trying to complete this assignment for 8 weeks and that the rate limiting factor since November 19th was finding a staff member willing to take the position of listening to my presentation. I did not receive a reply which made it very difficult to schedule my doctors' appointments and day call at NVMHI with the NVMHI residents (who are from many other hospitals).

179.    Of note, I was independently working on a project to improve safety on the psych unit with the use of a "high risk management template" to help manage the sort of patient aggression that prompted problems on my August 25, 2015 night call. The hospital safety director replied by saying "it was amazing. I could not do it any better. I do not have any feedback." However, when I presented it to the psych department, Dr. Griffith pooh-poohed my idea, stating it was "for nurses." I felt he and the other department leaders appeared to enjoy shooting me down in front of my peers.

CCC "Working" on Improvement Plan; NVHMI and CATS Were Told I am a "Problem" Resident Who Must be Closely Watched; Ombudsman Suggests Transfer

180.    I was told that Dr. Collins' class was a prerequisite for Dr. Zinner's class. So, on January 7, 2016, when one didactics class ended and Dr. Zinner came into the room, I knew that this was my cue to exit the room and wait out in the hallway, as if I was the class dunce. I noticed my name was on his sign in sheet. As I had pointed out to Dr. Catapano that people that were not even in the class were allowed to sit in on the class I asked her if I could at least sit in rather than wait outside the room, which was humiliating. I thought that as my name was on the sheet I was allowed to stay. Dr. Zinner told me to "get out." To be clear, I was in the classroom the entire day for classes, then when Dr. Zinner came in to teach his class I was required to exit the room and wait on the other side of the door until his class was over, and then return to my seat for the next class.

181.    On January 19, 2016, I emailed Dr. Sarani, to express concern that the administration was punishing me for my appeal by delaying my return to call. Dr. Sarani replied at 3:22 p.m., "Hi Stephanie. I agree with you that this process needs to move forward more expeditiously. I just contacted Dr. Berger and Catapano. Let me know if you don't get forward movement by the end of the week."

182.    Dr. Gandhi emailed me at 8:07 p.m., "Hi Stephanie - Are you available tomorrow from 5:30-6 p.m. to do feedback? We could talk on the phone or you could meet me in Dr. Norris office on 6S." I was so happy to hear from Dr. Gandhi. Dr. Sarani must have finally reached him. I replied at 9:30 p.m.., "Great news! I'm on call at NVMHI but I can call you at 530 (sic). Thank you for your reply." At 9:56 p.m. I emailed Dr. Catapano, Dr. Kels and Dr. Berger, "Thank you for this information. I will finalize my January call schedule at NVMHI with the residents there. I have a doctor's appointment Friday so I will keep that as well."

183.    On January 20, 2016, I emailed the other hospital ombudsman, Dr. Bathgate about my plight.

184.    I then received an email from Dr. Gandhi stating he could not meet as planned. He also stated his phone was broken and therefore could not even speak with me over the phone.  I found this odd as there were many phones located throughout the hospital.

185.    On or about January 21, 2016, Dr. Catapano emailed me a summary of a meeting that I had with her and Dr. Kels where they told me that Dr. Catapano would review Dr. Gandhi's comments about my essay with the CCC and then get back to me within 10 days to let me know their recommendations.

186.    On January 22, 2016, I was working at NVMHI and Dr. Rashid called me in for a meeting. He asked me why I missed work on January 21, 2016, and did not come in to do admissions. I stated that it is known that GWU residents are at the GWU MFA on Thursdays for didactics. This is the way it had been for all GWU residents all year, yet, for some reason, I was expected to be both at GWU MFA in DC and at NVMHI in Fairfax, Virginia doing admissions at the same time. He explained that I was at a disadvantage from other residents because the GWU psychiatry department had called and emailed NVMHI saying strange things about me even before I arrived.

He stated the things they said were very vague, inappropriate, and indicated that I should not be allowed to take sick days or miss my time at NVMHI, even to go to my own classes at the MFA. They asked to be notified if I ever left early for any reason. Of note, this was not required for any of the other residents. He stated that I was being picked on and asked that I tell this to no one. He stated it would be best for me to resign.

187.    Dr. Rashid said if I was to continue working then I would have to cancel the rest of my personal medical appointments. I informed him that my work was a priority but that I needed off for an appointment on January 26, 2015, that I was having stomach pain, vomiting, and anxiety. He replied by saying he had to report any of my medical appointments to GWU, which he felt was unfair as he did not have to report to them about the other residents. I said, "thank you for talking directly to my face and not behind my back in emails." He said he was sorry that all this was happening and that I deserved to know about it.

188.    On January 24, 2016, I missed my personal medical appointment with Dr. Kecmanovic as staff told me doctor's appointments are not an excuse. I tried to reschedule with Dr. Kecmanovic for January 26th which I missed as I was not permitted to leave for that appointment either.

189.    On February 2, 2016, Dr. Catapano stated the CCC was still working on my "improvement plan." I pointed out that she stated that the meeting intended to come to a conclusion about my call schedule was to occur the day before or that day and that the staff at my February rotation site would like to know my call schedule so they can plan accordingly.

190.    At 8:40 a.m. Ms. Anderson emailed me to tell me that because I was not permitted to go to Dr. Zinner's class, I had to return to work on Thursdays. Thus, because I was forced to miss a one-hour class I had to spend an hour driving to Fairfax and work the rest of the day, and spend another hour driving back while the others stayed one hour for that class and had the rest of the afternoon

off (as at this point the instructor who taught after his class had canceled their class). This made it exceedingly difficult to attend personal medical appointments. Of note, Dr. Zinner taught one, one-hour class, every Thursday.

191.    Then, I found out there was an email going around telling staff at my new location (CATS at Fairfax) that I am a "problem resident," they should "watch out" and to "keep track of me." The nurse who showed it to me said this email was disgusting. I was not even assigned to work with this particular nurse, which indicated that this email was sent to many people. She told me she "was not my babysitter" and she "did not understand why this woman [Dr. Catapano] wanted her to report [my] whereabouts to her." She only briefly allowed me to see the email as she did not want to get caught. I asked her to forward it to me but she, understandably, did not do so.

192.    On February 3, 2016, Dr. Catapano sent me an email at 10:19 a.m., "The CCC did not yet come to a conclusion about next steps regarding your Improvement Plan or return to call. If/when you do return to call, you will have plenty of notice to arrange your schedule. For now, I will say we would not put you into the schedule until, at the earliest, February 19th."

193.    On February 3, 2016, at 5:13 p.m., I emailed Dr. Sarani, the hospital ombudsman, "Good afternoon. Administration met yesterday to discuss my call schedule. Dr. Catapano stated the result was "The CCC did not yet come to a conclusion about next steps regarding your Improvement Plan or return to call. If/when you do return to call." I do not understand why this process is taking so long. Is there anything that can be done about this?" Dr. Sarani asked me to call him. Over the phone he told me he did not think the atmosphere with GWU psychiatry department was beneficial to my medical education and that I would have an opportunity at success if I went to a different program.

Added Stress

194.   On February 3, 2016, I began my February rotation at the Comprehensive Addiction Treatment Services (CATS) in Fairfax, VA, but had to leave to go to a personal medical appointment with Dr. Shepard. This is when he referred me to Dr. Frank for evaluation of abdominal pain in the setting of renal cell carcinoma. I was having stomach pain and vomiting almost daily. He stated it was likely due to all this stress caused by Program administration but wanted to make sure it was not a symptom of cancer metastasis.

195.   On February 4, 2016, Dr. Catapano accused me of not turning in my keys from my Children's rotation. In an email, she subsequently recanted after confirming I had not received a key in the first place. In that email, also dated February 4, 2016, she also stated, "I am sorry that it takes as long as it does for the CCC to come up with their recommendations for improvement (not punishment). They take the time to be careful to put together a plan that is substantive and reasonable, makes sense in terms of your improvement, and is appropriately supervised. I am very sorry that you continue to experience so much stress-related illness, and do hope you are taking care of yourself and getting appropriate care. I will continue to support you taking the time you need to go to your doctor's appointments." I did not at all feel Dr. Catapano supported me taking time for doctor's appointments.

196.   At 4:49 p.m. on February 8, 2016, Dr. Catapano emailed me, "The CCC is working on their recommendations, and the plan is to get them together and review them with Dr. Berger this Thursday. I'll give you an update when I know more. Take care of yourself."

197.   At 4:04 p.m. on February 9, 2016, I emailed Ms. Anderson, "If I need to leave early to go to a doctors (sic) appointment and have been given permission to do so by my attending, do I have to inform others?" She replied at 4:06 p.m., "No. If your attending has given you permission,

you're allowed to leave early for a doctor's appointment. Thank you for checking!" I did not understand why every preceding doctor's appointment required me to email numerous people for permission but now simply asking my attending was sufficient.

198.    On February 11, 2016, at 3:45 p.m., Dr. Catapano emailed me, "I just wanted to check in with you. The CCC is working on recommendations for your Improvement Plan … they are not ready yet but will be presented to you in due course. I'll keep you updated. Hope you are well."

199.    I later learned that the CCC was not "working on recommendations" for "an improvement plan." Instead, according to minutes of a CCC meeting dated February 9, 2016 produced in this litigation, my employment and training was to be terminated.

200.    On February 12, 2016, I underwent an endoscopy for stomach pain under general anesthesia at 12:15 p.m. at MedStar Surgery Center. They found "duodenal intraepithelial lymphocytosis" and a "lesion in the antrum" of my stomach with "heaped up tissue." I was informed that it could be cancer metastasis. "Numerous biopsies" were sent away to pathology to evaluate for the spread of cancer.

201.    On February 13, 2016, the new March - June call schedule was finally released. Instead of being on call 4 times a month as originally scheduled, I was only scheduled for June 9, 2016. When I asked Dr. Emejuru (the chief who makes the call schedule) about this he replied by saying "sorry I changed it" and sent out a new schedule where I was not scheduled to be on call once. Dr. Sarani stated "I truly do not understand what the problem is. I have again sent a very directly worded letter to Drs. Catapano and Berger asking for an explanation as to why the CCC and the appeals processes are taking so long and urging them to move things forward. I'll let you know what they say. Between you and me, I strongly encourage you to look for other programs - the

atmosphere at GW is no longer conducive to your education. I'll be in touch as soon as I hear something."

202.    On February 15, 2016, I received a call from Ms. Anderson telling me to not go to work the next day but instead attend a meeting with Dr. Dyer, Dr. Griffith, and Dr. Catapano. At 9:54 a.m., Ms. Anderson emailed me, "Dr. Dyer and Dr. Griffith would like to set up a meeting with you tomorrow. They are both available to meet at 11am or noon. I understand that you are scheduled to work at CATS, however, this meeting is very important. We will arrange for you to be excused during your meeting time."

203.    On February 16, 2016, I attended this meeting but neither Dr. Dyer nor Dr. Catapano showed up. Instead, Dr. Griffith and Ms. Anderson presented me with a letter of misconduct. Of note, I later saw Dr. Bathgate in the hospital hallway. She came up to me, gave me a hug, handed me a folded piece of paper and walked away. When I opened the paper, the contact information for a GWU in-house attorney, Mary Lynn Reed, was on it.

204.    The letter I was given on this day stated I did not attempt to meet with Dr. Dyer or any of his replacements about my past letter of deficiency to work on my improvement plan. This would be the fifth letter I received and the fourth somehow speaking about Dr. Dyer. Therefore, Dr. Dyer did even not show up to a meeting to talk about the fact that had not been able to meet with Dr. Dyer. The reason given for Dr. Catapano not being there is that she was at a conference, which considering I was only told about this meeting one day prior, one would think she would have been aware of the fact she would be at a conference this day.

205.    In the midst of all this, I was waiting for biopsy results to see if my cancer spread to my stomach. I had to deal with this meeting for misconduct, preparing for grand rounds, an exam for the second part of Dr. Griffith's neuroscience class (which I was told I already failed four months

ago November 19th by Dr. Collins), working at Fairfax, and potential cancer metastasis. I tried to move my grand rounds but that was made impossible.

206.    On February 25, 2016, I received notice that my appeal had been denied. The notice included added new areas, which were not the subject of the original appeal. The new charges were that I was believed to be deficient in areas such as professionalism and systems-based practice. This is not consistent with my evaluations or the opinions of the attendings I worked with as demonstrated by their positive evaluations of me. The notice also stated that I did not seek help from the university for my medical absence which is false as I went to GWU's EEO office and applied for FMLA as they instructed. I applied for and was approved by The Standard Benefit Administration for the George Washington University. I was granted Family/Medical leave for my health condition and my physician requested I have time off every 2 weeks to attend appointments.

207.    On March 8, 2016, I asked for and was granted a second FMLA leave to attend an appointment with my urologist and to take leave from March 9-16. Dr. Berger then sought to set up a meeting for his misconduct inquiry for March 9th.  Despite the fact I had alerted Dr. Gandhi, Dr. Emejuru, and Ms. Anderson (which Ms. Anderson stated followed protocol), I was scheduled for this meeting on the same day I was supposed to have a urology appointment. Preparing for these meetings required hours of preparation. It was very difficult to schedule a urology appointment and I refused to miss yet another doctor's appointment that I followed proper protocol for. I had another panic attack. Although I already had FMLA leave to take time off every two weeks for appointments I thought it might help me to apply again. When I told Dr. Berger that I was on FMLA leave on March 9th, he stated in an email that if I was lying he would go forward with the meeting on that day but otherwise the meeting would take place the day after I returned from leave.

208.    On March 9, 2016, I applied to 18 residency programs. Residency programs fill their positions years in advance, so it was unlikely I could find an open position. Emory University expressed in interest in my transfer, and requested to speak with my Program Director. In addition, Virginia Tech was very interested and I was in communication with them nearly every day from March 9, 2016, until April 7, 2016. I spoke to Dr. Adams from Virginia Tech over the phone who wanted me to come for an interview. Dr. Berger belatedly confirmed that my FMLA request has been submitted to HR for time off from March 9-16, 2016, but claimed that I had not informed the proper people of this fact (which I did). He also told me to report to his office on March 17, 2016, for a meeting about the misconduct allegations.

209.    On March 9, 2016, as instructed by Dr. Berger, I also filed a second level appeal with Dean Akman. My appeal reiterated the prior concerns I had raised about being punished for taking time off to address my health problems, my difficulties in meeting with Dr. Dyer, and the fact I was not provided the opportunity to cure any deficiency with regards to missing Dr. Collins' class.

210.    Although Dr. Berger instructed me to appeal to Dr. Akman, I remembered the GWU organizational chart I found online and that Dr. Sarani had recommended I speak to Dean Simons. Therefore, I sent Dean Simons the same email that I sent to Dr. Akman. Dr. Berger replied at 5:52 p.m. and copied Dean Simons, "Stephanie: It has come to my attention that, despite the Appeal Decision Letter from February 25, 2016 stating that it was an appeal of the "Reportable Action for Non-Promotion" and stating that this concerned the decision for non-promotion in July 2016 in 4 locations, I made an error in parenthetically writing "non-renewal" in one section of the letter. A corrected letter is attached. Please note that the Reportable Action and the Appeal did not address non-renewal." I wondered if that meant I wasn't fired anymore.

211.    I then emailed Dean Simons with my appeal. On March 11, 2016, Dean Simons confirmed

he was the proper person to receive any appeal (and not Dr. Akman as Dr. Berger stated). He also

spoke to me about my appeal over the telephone. He promised he would meet with the program

leadership and get back to me shortly.

Berger Offers Help; Griffith Removes Me from Patient Care

212.    On March 17, 2016, I met with Dr. Berger and had a very positive meeting. I explained to

him that the alleged misrepresentations that formed the basis of the misconduct allegation against

me were really examples of miscommunication.  He questioned me about my hiring a lawyer and

suggested he could not treat me the same way as others because I had legal representation. He

stated he would help me transfer and he would not mention my current appeals and misconduct

accusations. He said he would negotiate a final evaluation and that I would finally be able to see

my semiannual Milestone evaluation which should have been conducted in December, 2015 (that

the other residents had already received). He said he could work on getting me credit for the time

in residency I had completed and that he would not be not discussing my health condition but

focusing on the fact I do not feel safe in DC as a reason for transfer. He stated I should not meet

with Dr. Catapano until he had a chance to speak with her first.

213.    I emailed Dr. Catapano at 2:31 p.m., "I had a very nice meeting with Dr. Berger. We came

up with a few ideas that he would like to discuss with you. He stated that he would like to speak

with you before we meet. I will follow up later to arrange a time to meet with you after he has had

spoken with you." She called me and told me to come to the MFA right away. Although I had

explained to Dr. Catapano that Dr. Berger wanted to speak with her before she met with me, she

called me to meet with her anyway. When I got there, Dr. Griffith was with her. Dr. Griffith

informed me that I was to be removed from patient care. I was surprised to hear of this decision,

since there had been no prior consultation with me or an indication that this was under consideration. It did not make sense to remove me from patient care as I had never done anything, to my knowledge that resulted in an adverse patient outcome, which was quite an accomplishment for a resident. His response was that the action to remove me from patient care was "not a punishment or formal."

214.    When I asked why I was being removed from patient care, Dr. Griffith stated "because I'm saying so." I asked many times during this meeting if I did anything specific to demonstrate that I cannot care for patients. I was told by Dr. Griffith, "I'm not here to tell you what you've done wrong." I then stated that I needed to know what I have done wrong in order to improve. Dr. Griffith stated that I will need to work with the GME office (Dr. Berger) on that. I stated his answers were vague and he replied by saying "the vagueness is inside of you." Dr. Griffith telling me the vagueness was inside me gave me chills. Dr. Griffith later said all residents do research, and said this would be a good time for me to work on research.

215.    GWU has taken issue with the fact I have recorded some of these meetings. Given the fact that I was not allowed to bring representatives to these meetings and that I had been lied to at every meeting I had attended, I began recording them, which I understand was perfectly legal in DC. I knew other residents were recording meetings as well.

216.    On March 22, 2016, I received notice from Ms. Harris at the District of Columbia Department of Health (DOH) that I needed a new letter of good standing to get my license. I asked the other residents and none of the other residents were required to do that. Dr. Kels emailed me, "At this time, I could meet with you either Wednesday 3/23 at 11:30a, Friday 3/25 at 3p, or Tuesday 3/29 at 10:30a. Please let me know which of those might work for you." At 2:41p.m., Dr. Catapano emailed me, "You are on a research elective ... I heard you've already gotten in touch

with Dr. Kels to start working on it. Thank you. We are working on changes to the schedule for next month ... we will contact Children's to let them know, so you don't need to worry about that. Take care of yourself." At 2:28 p.m. I emailed Dr. Kels, "Tuesday 3/29 at 10:30 a.m. please." She replied, "I plan to meet you next Tuesday at 10:30."

217.    On March 25, 2016, at 7:28 a.m. Dean Simons emailed me "would you be able to have a brief phone call around 8 am this morning concerning your appeal? Thanks." Dean Simons informed me that I had won my appeal. At 12:15 p.m., he emailed me, "Dr. Waggel, please find attached my letter regarding your appeal."

218.    On March 29, 2016, I met with Dr. Kels (who was back in her office before maternity leave) who said she could not work with me, provided me no guidance, and made no suggestions for an alternative advisor for this "research elective." Of note, it was my understanding that Dr. Catapano was aware that Dr. Kels would be on maternity leave when Dr. Catapano assigned me to work with her. Additionally, it was known that I had extreme difficulty meeting with Dr. Kels in the past, making her a poor choice for my research mentor. I told Dr. Kels that I had already been working on my own independent quality improvement project, which later became the Physician Wellness Program that programs around the country have contacted me about. Dr. Kels told me to find my own mentors for this project and check in with Dr. Catapano.

219.    On March 31, 2016, Dr. Catapano and Dr. Kels announced that they would be resigning from their posts.

220.    On April 4, 2016, Virginia Tech emailed me a release form so that they could talk to my program and they were also still asking for a letter of recommendation. Ms. Reed did not seem to understand that the forms that were sent to her needed to be completed and signed. I explained that the CAP form was the main form keeping my application to Virginia tech incomplete and that I

also needed to be licensed in the state of Virginia to work at Virginia Tech. I also stated that the

person replacing Dr. Catapano would need to give me a letter of recommendation. Ms. Reed stated

Dr. Catapano had not yet officially resigned. Ms. Reed emailed my letters of deficiency (one was

actually not a letter of deficiency but simply an email they copy and pasted onto letterhead). It was

clear that none of these letters pre-date my cancer diagnosis although Dr. Catapano apparently had

told Ms. Reed they did.

221.   On April 6, 2016, Howard University expressed interest in my application. Dr. Berger

stated in his meeting with me that he would write me a letter of recommendation. I expressed my

fear that a delay would lose me the spot as such spots are rare and do not stay open for long.

222.   So that Virginia Tech would not think I forgot about them, on April 7, 2016, I asked Dr.

Berger to email the program coordinator at the other institution that my transfer is currently being

reviewed and that he will contact them later when progress is made. He said he could do this. I

asked Dr. Berger to sign the CAP form in lieu of Dr. Catapano and for him to write me a letter of

recommendation as he stated he would during our March 17th meeting. I stated I would like to be

assured if he does speak with them, there is no mention of disciplinary action, given that I won my

appeal to Dean Simons.

223.   I informed Dr. Catapano that on March 29, 2016, Dr. Kels stated I had to do research with

someone in the department and it could not be her. I also informed Dr. Catapano that I had asked

Dr. Gandhi, Dr. Torres, and Dr. Stasko but none of them were available to work with me on this

research. I asked her to define for me what a successful completion of this research elective would

be and if there were specific guidelines for this research. I also mentioned I still have not been

allowed to take vacation days. She did not answer my question of guidelines for research. I

informed her that my idea was to create a wellness program for residents and promote mental

health awareness to prevent resident suicide which was the same topic as the Quality Improvement (QI) project I proposed in July of 2015. Dr. Adams from Virginia Tech informed me that she generally speaks to program directors of residents applying to transfer (i.e. people like Dr. Catapano rather than people like Dr. Berger).

224.    The District of Columbia Department of Health (DOH) called me to tell me that someone from GWU (who did not give a name) told them to not give me a license without first providing a letter from the chair. They said this call was very bizarre and felt it had no merit. I was sure to document this phone call and who I was speaking with. The woman who called from the licensing department at the department of health information was Mary Harris. No other resident had to do this. We all applied at the same time with the same application materials and I was only one with this issue. I was also informed that physicians at other hospitals were told I am not fit to see patients.

225.    My phone interview with Virginia Tech did not go well because they seemed to be very concerned as to why I didn't sign a release for them to talk to the program director. I informed them that she had resigned and they stated that someone has to be acting as program director and then asked for my permission to call over and see if they could locate such a person. She said they could not hire me until they have spoken with someone in the psychiatry department at GWU. They needed to confirm the rotations I have completed. I did not even know what rotations Dr. Catapano considered me to have completed given she said I had to repeat the one in October for taking three sick days (which I have still never heard back from my questions on that). Dr. Catapano filled out the CAP form but took away four months of credit. Of note, she did not even sign the form at the bottom.

226.    On April 8, 2016, I informed Dr. Berger that there was an issue with the number of rotations I received credit for and there was an issue of who would be communicating with the other program. I also made Dean Simons aware of this. I made the point that most residents took 15 vacation days plus 2-4 for our license exam plus 10 - 15 sick days or conference days. I had 0 vacation plus 4 for my license exam, 25 sick days and 0 conference days. Therefore, each resident took about 30 days off (same number as me) for various reasons this year. I asked if the other residents were also considered to only have completed 18 months. I asked that Ms. Reed provide me with which 4 months/rotations Dr. Catapano considers me to have missed and if the ACGME guidelines for determining which months to not give me credit for were followed. If these rules were followed, I would have liked to know the date that the CCC met to determine which months I did not get credit for.

227.    Although Dr. Berger had previously promised these letters of deficiency would not be spoken of with an outside institution, I still reminded him that as Dean Simons granted my appeal. Therefore, letters of deficiency should not even be brought up in a communication with another program. Dr. Berger replied by asking if there was anyone in the psychiatry department who would speak on my behalf. I had asked Dr. Torres, Dr. Stasko, Dr. Khin Khin and Dr. Norris who all eventually declined. I knew Dr. Norris and Dr. Stasko had a high opinion of me as they told me this themselves. Only attendings from other institutions were willing to speak on my behalf but no one from GWU, as requested from Virginia Tech. It had been apparent for quite some time that employees from GWU psychiatry, including both attendings and residents, were afraid to be seen speaking to me. Additionally, I received the verdict of Dr. Berger's investigation into my alleged misconduct by Dr. Catapano and he found that there were no reportable actions. Although the misconduct accusation letter written by Dr. Griffith and Dr. Catapano did not address it, Dr.

Berger's verdict letter brought up a complaint from my neighbor stating that this complaint from my neighbor was not misconduct either. He stated that I would receive a letter of deficiency (lesser offense than a letter of misconduct) for the allegations in the letter of misconduct, and no reportable actions would be made. Of note, I never received such a letter. I was yet again informed by another resident that they had changed my schedule without informing me. I signed the release for Carilion Clinic (Virginia Tech). I informed Dr. Adams and Ms. Kirby from Virginia Tech that I have not yet received a reply from Ms. Anderson and that while my program determined who would be taking over this role in the program director and associate program director's absence, I invited them to speak with my attendings Dr. Dierich Kaiser and Dr. Mark Stevens, and the GME dean Dr. Berger.

228.    On April 9, 2016, I signed a release form for Dr. Norris to talk to Virginia Tech on my behalf. I began reaching out to residency rights activists and anyone I could find online to have written articles on resident or medical student abuse. On April 11, 2016, I informed Dr. Berger that I still had not heard back from Dr. Norris. I sent Dr. Berger an updated version of the release form and sent a release to Dr. Norris as well. I stated that the reasons given for taking away my credit for four months were inaccurate. For example, regarding my July 2015, rotation per Ms. Reed/GWU, "instead of starting her first psychiatry rotation in July, she had to make up one month of internal medicine that she missed in her internship year when she was on sick leave." However, what actually occurred was that I did start my psychiatry rotation in July rather than making up a month of internal medicine in July as Ms. Reed/GWU erroneously stated. From 7/1/15 to 7/7/15 I was working in the ER. From 7/8/15 to 7/12/15 I was on in-patient psychiatry. From 7/13/15 to 7/19/15 I was on internal medicine (not a month). From 7/20/15 to 7/30/15 I was on medical leave for surgery. I worked three 18-hour overnight shifts on psychiatry 7/8, 7/16, 7/31 (two days of

which I worked approximately 30 consecutive hours in the psychiatry unit).Regarding October 2015, per Ms. Reed/GWU, "the faculty member responsible for evaluating her would not do an evaluation because she missed so much of the rotation." What actually happened in October 2015 was that I missed only a few days for approved sick leave and approved time to take the USMLE. In September 2015, I was told by the chief Dr. Emejuru that the rotation I was on in October 2015 (Partial Hospitalization Program PHP) would be a good time to take my licensing exam. At the beginning of October 2015, I was approved by Dr. Malik (the same faculty member to refuse to do the evaluation mentioned by Ms. Reed/GWU above) to take 3 or 4 sick days plus four days to take my licensing exam at the end of October 2015. Right before my exam, at the end of the month, they stated they made a mistake in approving me for this and that I would have to repeat the month. I have attempted to get information on how this is possible from many people since October 2015 with no reply.

229.    Of note, Dr. Malik verbally stated there have been many residents who have missed more than me but did not have to repeat the rotation. Regarding my March 2016, rotation, per Ms. Reed/GWU, "she was to do a consult/liaison rotation at GW and was only here for 5 days. She was on FMLA for part of this month and did not show up for the most of the remaining days." What actually happened was that I was on approved FMLA leave and on return from leave was instructed by Dr. Griffith not work for the rest of the month. I was on FMLA leave from 3/8/16 to 3/16/16. Dr. Berger told me not to go to work on 3/17/16 and Dr. Griffith told me not to go to work on 3/18/16 and gave no reason or timeline. Statements such as "did not show up" when I was, in fact, instructed not to come to work, give a negative impression of me and it is precisely this type of phrasing that snowballs into situations such as this. Regarding my April 2016, rotation, per Ms. Reed/GWU, "this month was not included in the calculation as it is only the beginning of the

month." What actually happened was that I could have been spending this time making up for one of the months they were denying me credit for, however, I remained on a forced leave which they referred to as a "research elective."

230.    On April 18, 2016, I told Dr. Berger that the denial of four months of credit was creating an obstacle in my transfer. I asked him if I could be placed back on clinicals so that I can get in some of the requirements for other programs and to see if I can get credit for the Partial Hospitalization Program (PHP) rotation I did in October, 2015 (as I had been asking him to do for months). He told me to ask my program. Virginia Tech, Emory, and Howard must have lost interest in me in the meantime, or filled their positions, as I did not hear more from them.

231.    Ms. Anderson informed me that Dr. Dyer and Dr. Catapano requested me to meet with them on Monday, May 2, 2016, at 2:00 p.m. and there would be no need to have attorneys present. I informed her I was advised to not attend this meeting without an attorney and provided the dates of availability. I did not receive a reply. On May 2, 2016, I received an email from Ms. Anderson stating, "because you chose not to attend, I have attached a pdf of the letter." I received a letter of dismissal.

232.    I appealed this decision which increased my punishment from non-progression to PGY3 to dismissal, but my appeals were ultimately denied.

Dr. Catapano's Declaration

233.    I have reviewed Dr. Catapano's declaration and have contested many of the facts she alleges above. In addition, I note the following disagreements with her testimony.

234.    At paragraph 27 of her declaration, Dr. Catapano maintains that residents must spend a stated minimum amount of clinical days on rotations. However, I am not aware of any such

minimum amount of clinical days being stated, and according to Dr. Malik, Dr. John Tarim and Dr. Bruce Shaver "missed more days than they came" and still evidently graduated on time.

235.    At paragraph 28, Dr. Catapano states that ACGME requires each resident to attend a minimum of 70% of regularly scheduled didactics sessions. If so, there was no way to check if everyone attended 70% of the lectures. Attendance sheets were regularly thrown away at the end of the class.  I monitored who was there and who was not and many times other residents also missed didactics sessions.

236.    At paragraph 32, the email cited indicates that residents can be asked to repeat didactics, but I am not aware of anyone else who was required to repeat such lectures.

237.    At paragraphs 69-71, Dr. Catapano discusses the dress code.  Although I now know my dress was the subject of criticism, this concern was not brought directly to my attention at the time, and, in any case, such criticism seems misplaced as I always wore a long lab coat over my dress while on duty.

238.    At paragraph 93, Dr. Catapano suggests that taking a large block of time off would have accommodated me. In fact, all I needed and requested was periodic time off to attend medical appointments that would take at most an hour or two. Taking a block of time off would not satisfy this need which was and is ongoing.

239.    At paragraph 97, Dr. Catapano states I was pulled from clinical duty on July 3, 2014. I was in fact on duty during this timeframe based on my recollection and work emails created during this timeframe.

240.    At paragraph 99, Dr. Catapano cites an email from Dr. Stephanie Cho expressing some concerns about my actions. I do not believe these concerns were ever brought to my attention.

241.    At paragraph 107, Dr. Catapano even takes issue as to whether I was invited to a "Neurology Only" party and to my knowledge of Instagram. I was in fact invited to that party (which took place in a public establishment called "District Common"). As I have had an Instagram account since May 20, 2012, it is highly unlikely that I would have asked the attending to teach me how to use Instagram in the year 2014.

242.    At paragraph 111, Dr. Catapano takes issue with me placing an order for Tylenol rather than Dilaudid, but I wanted to speak to a more senior physician before dispensing such a drug. Unfortunately, everyone else left for the day and Dr. Prior did not answer his phone.

243.    At paragraph 139, Dr. Catapano notes that I stated that I had only received positive reviews. At the time, Dr. Prior did not say anything negative to me personally.

244.    At paragraph 205, Dr. Catapano, citing Dr. Chang, claims that I was "out drinking late the night before." In fact, I went to bed with my boyfriend (now husband) around 11:30 p.m.

245.    At paragraph 215, Dr. Catapano cites a psychotherapy program available to residents, but this therapy was not available to me.

246.    At paragraph 265, Dr. Catapano cites a text where I tried to defuse the resentment I was receiving for taking time off and reporting my concerns to the ACGME. While I was ultimately able to schedule my surgery, I never received the requested two weeks of light duty and set time to schedule follow up appointments.

247.    At paragraph 709, Dr. Catapano claims I was holding a pager "hostage" until people went out for drinks with me. This is another petty allegation against me that is false. Here are the facts as I recall them. On January 13, 2016 at 4:55 p.m., I sent a text message to Dr. Lisa Adler, "Wanna meet up so I can give you the pager?" She said I could give it to her at grand rounds the next day. On January 14, 2016 at 1:53 p.m. I sent a text message to Dr. Adler, "Didn't see you after to give

you the pager." She did not reply. On January 29, 2016, at 6:22 p.m. I sent another text message to Dr. Lewis, "Yo I have the pager for you been trying to give it to Lisa but she's been really busy. I can drop it at your apartment this weekend. I'll put it in your mailbox if you aren't home." I was not aware that she sent a text message to Dr. Emejuru stating there has been a huge issue getting me to return the pager, especially as I offered to drive it to her home to give the pager to her. On January 30, 2016, Dr. Adler asked me if I wanted to get Thai food the next day. I said yes. We made arrangements for 7:00 p.m. She told me over the phone that she has been very stressed recently which is why she could not meet me before to get the pager. On January 31, 2016, at 3:52 p.m. I sent Dr. Emejuru a text to inform him that Dr. Adler had not met me to get the pager the last time I tried to give it to her because she told me she was too stressed. Additionally, I emailed Dr. Emejuru, Dr. Solages, Dr. Kels, and Dr. Cho at 3:46 p.m. to say that I had been trying to give the pager back to Dr. Adler but she was really busy with preparing for her grand rounds presentation. At 7:00 p.m., Dr. Adler called me to tell me she might not be able to come because she was stuck in sign-out. I knew that she had already left for the day so this was not truthful. After I learned Dr. Adler might not be coming to get the pager, on January 31, 2016 at 7:01 p.m. I sent a text message to Dr. Valentina Cimolai that "I'm trying to give Lisa the pager again. We were supposed to meet at 7 but she says she is signing out. How is she still at work? Carrie is. I tried to give it to her [Dr. Carrie Lewis] yesterday but told me to give it to Lisa." Dr. Cimolai informed me that Dr. Adler was not being truthful as she was not in sign-out. I responded, "I told Carrie [Dr. Carrie Lewis] I would drive to her place in freaking Virginia and she said no." On January 31, 2016, at 7:07 p.m., I sent Dr. Aidith Flores a text message stating "no one will get this pager from me, even if I drive it to them" and sent the screenshots of the texts as evidence. I told her that I knew Lisa was lying about being stuck in sign-out and that she was again avoiding getting the pager from me. She told

me to email Dr. Cho. I called Dr. Adler and stated I was tired of having this pager and that she needed to take it. She came to meet me and my now husband over one hour late and I gave her the pager.

248.    At paragraph 470, Dr. Catapano notes that I requested a sick day on September 23, 2015. The purpose for the sick day was related to a surgery to fix the appearance of my abdomen. The doctor repaired a scar that had formed an adhesion. This scar was a result of the laparoscopic partial nephrectomy I underwent for cancer removal in July of 2015.

Dr. Collins' Declaration

249.    I have reviewed Dr.Collins' declaration and have contested certain facts she alleges above. In addition, I note the following disagreements with her testimony.

250.    At paragraph 10-12, Dr. Collins suggests I missed her first class without providing notice. In fact, GWU hospital called me to come in that day to complete the Living Will and speak with the nurse anesthesiologist about my upcoming surgery. I alerted Victoria Anderson, the psychiatry residency program coordinator about this last-minute appointment that was out of my control. She gave me permission to go and said she would inform Dr. Collins when Dr. Collins arrived. I never told Dr. Collins I was attending that class.

251.    With regard to paragraph 14, Dr. Collins asked me embarrassing personal medical questions implying that I was lying about being sick. I informed her that I did not feel comfortable answering these questions in front of the whole class.

252.    On October 17, 2015, Dr. Collins sent an email to the PGY2 class, however, I was not included as a recipient for this email. This was forwarded to me from another resident. I would have benefited from receiving this email as it included an attachment of psychodynamic formulation examples and due dates.

253.    On October 25, 2015, another email from Dr. Collins to the PGY2 class was sent to all but me. She continued to not include me on her emails. I was also only made aware of this email as one of my co-residents, again, forwarded it to me. This email contained formulations and times to meet with her to discuss them. Every resident was assigned a time to meet with her but me.

254.    On November 11, 2015, Dr. Collins sent another email to all residents but me, regarding supervisors.

255.    At paragraph 17, Dr. Collins suggests I did not attend any feedback sessions. She failed to state that I did not attend feedback sessions because, at that time, I had been ordered not to go to work or attend didactics by Dr. Catapano.

256.    At paragraphs 22-23, Dr. Collins suggests I wanted to discuss my personal issues. In fact, Dr. Collins continued to ask me personal questions even though I asked her not to do so.

257.    At paragraphs 26-27, Dr. Collins suggests I had unexcused absences. In fact, I was on approved FMLA leave at the time.

258.    At paragraph 37, Dr. Collins states that she never indicated I was passing her class or that my performance was satisfactory. In fact, she indicated I would be assigned a supervisor (as all PGY2s were), which suggested to me that I would be allowed to move on to the second half of the course with the rest of my PGY2 class.

259.    At paragraphs 38 and 42, Dr. Collins suggests I missed the class due to unapproved absences. However, I believe I was on forced or FMLA leave at the specified times.

260.    Dr. Collins' statement at paragraph 47 is false. In fact, I stated to Dr. Collins that my understanding was that having to retake her class meant having to repeat the entire year. I stated that I was originally under the impression that my start date for PGY3 was delayed, but not that I was going to have to repeat the entire PGY2 year. I explained to Dr. Collins that because having

to repeat her class would be the only thing to necessitate my repeating the entire PGY2 year (as opposed to merely delaying my PGY3 start date), that I would very much appreciate if Dr. Collins would grade my final exam as Dr. Collins graded all of the other residents' final assignments. Dr. Collins replied in a harsh tone by stating I was "grandiose" for making such a request. Dr. Collins proceeded to yell at me, "I am not being paid to grade your assignment!" Dr. Collins went on to add that Dr. Griffith would also fail me. I replied that I did not understand why Dr. Collins would say this as Dr. Griffith's class was less than halfway over and Dr. Collins has no role in Dr. Griffith's class. Dr. Collins stated I better get used to the fact I was repeating PGY2 year one way or another. She taunted me by laughing "See you [again] in July!"

Dr. Emejuru's Declaration

261.    I have reviewed Dr. Emejuru's declaration and have contested certain facts he has alleged above.  In addition, I note the following disagreements with his testimony.

262.    At paragraph 10, Dr. Emejuru suggests he only had a professional interest in my career development, and that he only met my acquaintance as a first-year resident or intern. This is false. In fact, Dr. Emejuru met me in May of 2014 when I was a fourth-year medical student at GWU. That month, I met resident Dr. Jason Emejuru for the first time, on the elevator at GWU hospital. I did not know at the time he was a resident. He had been pursuing my best friend Dr. Kirsten Norell (a third-year medical student at the time) for a date which she turned him down for. He continued to follow me around the hospital asking me about her.

263.    On May 6, 2014, Dr. Emejuru approached me in the GWU hospital cafeteria. On that day, he asked me out and gave me his phone number. I politely declined his invitation and informed him that I had a boyfriend. I did not yet know he was a resident and I felt awkward that he was both interested in my friend and I at the same time. Note, my friend and I were both students (not

residents) at the time. He then informed me that he was a resident and that he wanted to drive me to the resident retreat.

264.    When I learned he was a psychiatry resident in the program I was accepted to, I felt embarrassed. On May 11, 2014, he said he no longer wished to drive me to the retreat. I was afraid to work with him in the future, as he might hold a grudge against me for not accepting his advances. Dr. Emejuru asked me out again on July 25, 2014 around 7:00 p.m. I, again, reminded him that I had a boyfriend. Around September 2014, my relationship with my boyfriend ended. Dr. Emejuru frequently called me on the phone between the hours of 10:00 p.m. and midnight asking me to come over. On January 4, 2015, Dr. Emejuru asked me out again at 9:22 p.m. stating he wanted to take me to a restaurant called "Thip Khao" to which I declined.

265.    On January 28, 2015, he informed me he would be my chief resident and I told him I was extremely happy for him. We exchanged in several hundred text messages prior to August 31, 2015 (the first text message he submitted in his declaration).

Dr. Griffith's Declaration

266.    I have reviewed Dr. Griffith's declaration and have contested certain facts he alleges above. In addition, I note the following disagreements with his testimony.

267.    At paragraphs 33-36, Dr. Griffith suggests I received a 33 on his exam after being accommodated as to when I could take it.  In fact, I was scheduled to take the exam after having worked 24 consecutive hours and given half the time as the other PGY2s to take the exam.

268.    At paragraph 39, Dr. Griffith suggests that it was "unheard of" for a student to just not show up for class. In fact, I monitored the sign-in sheets and it was rare for all seven residents to be present for class at the same time.

269.     Didactics consisted of many different topics for lectures and presentations, typically, from 8:00 a.m. to 5:30 p.m. (although many were canceled).

270.     We had approximately 20 different didactics instructors. Only two instructors, Dr. Griffith and Dr. Collins, complained about my absence, when I stepped out for a few hours on certain Thursdays to attend medical appointments.

271.     At paragraph 49, Dr. Griffith suggests "unrelated" comments were inappropriate, but all residents at one time or another spoke about unrelated topics during this lecture.

272.     As outlined above in other papers my attorneys have filed in this litigation, the claim at paragraph 51, that all my leave requests to attend medical appointments were granted is false.

273.     The claim that I just left my post or did not show up for work made at paragraph 52 is also false. As further outlined above and in other papers my attorneys have filed in this litigation, I was denied leave despite following protocol on numerous occasions.

274.     At paragraph 62, Dr. Griffith claims that a tutor was arranged for me as a "remediation effort." In fact, all PGY2 residents receive a "tutor."

275.     My recollection differs from that of Dr. Griffith with regard to the conversation discussed at paragraphs 63-71, 77-79. On November 19, 2015, I recall that Dr. Griffith told me I did not need to retake the first two exams, as doing well on the final would demonstrate I obtained the knowledge covered in those exams.

276.     I set forth in detail my response to Dr. Griffith's "notification of misconduct." Dr. Berger adjudicated them and his ruling suggests he believed that my alleged "misrepresentations" were in fact mutual misunderstandings.

277.     Dr. Griffith is misinformed in paragraph 132. Had Dr. Griffith troubled to seek EEO training given his role as Chair of the Psychiatry Department, he would have learned that cancer is a disability.

278.     At paragraph 137-138, Dr. Griffith wrongfully takes issue with my rights to appeal granted by GWU as a matter of academic due process. I believe taking an appeal of the decision not to allow me to progress to the PGY3 year and hiring a lawyer to help assert my EEO and FMLA rights contributed to GWU's decision to terminate me.

Jarrett and Siegel Declarations

279.     I was surprised and disappointed to learn that two of my doctors, who also work at the same GWU MFA practice as Drs. Griffith and Catapano, filed declarations on GWU's behalf in this litigation.

280.     While I signed an authorization for Drs. Jarrett and Siegel to release medical records for purposes of this case, I never authorized them to file declarations voluntarily on GWU's behalf and against my interests. I believe in doing so, they have breached medical ethics.

281.     I also take issue with their claims that my surgery was "curative." As a medical doctor myself, I agree with the views of my own primary care doctor Dr. Shepard, that my cancer has not been "cured," but rather is in remission. Dr. Syed Ali, my current oncologist, who is not an employee of GWU, also told me that my cancer is not cured, but is in remission.

I declare under the penalties of perjury that this declaration is true and correct and that it was executed in Washington, D.C. on   2/1/2018   .

Dr. Stephanie Waggel, MD