## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,               )
                                    )
            Plaintiff,              )
                                    )    Civil Action No.: 1:16-cv01412-CKK
        v.                          )    Hon. Colleen Kollar-Kotelly
                                    )
GEORGE WASHINGTON UNIVERSITY,  )
                                    )
            Defendant.              )
_____ )

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES AND OF COUNTERVEILING FACTS

### I.    Preliminary Statement.

Pursuant to LCvR7(h)(1) and this Court's Fourth Amended Scheduling and Procedures order (December 28, 2017), Plaintiff Stephanie Waggel ("Dr. Waggel") respectfully submits the following response to the statement of alleged material facts of defendant George Washington University ("GWU"). (Docket No. 34). In this response, Dr. Waggel contends material facts and genuine disputes exist precluding summary judgment in favor of defendant. This statement is followed by the additional facts that she contends must be considered in evaluating GWU's motion for summary judgment.

In sum, the vast majority of GWU's purported statement of material facts not in dispute ("SUMF") are, in fact, not material to the issues in dispute in this case. What remains is a slew of disputed facts pertinent to the claims at issue in this case. Based on the myriad of disputed facts in the SUMF that are relevant, as well as those facts Plaintiff left unaddressed that are relevant to the claims, summary judgment in favor of defendants is not appropriate. That is, the SUMF makes clear that there is much for a jury to weigh and consider at trial.

In addition, Defendant's statements of fact misrepresents various documents (including medical records and performance reviews) and emails, and the SUMF is at times written in the first person and error ridden, making it confusing to understand and respond to. Finally, Defendant provides pages of declarations from persons who did not witness the relevant events at issue in this claim and/or were not named during the discovery process by defendant as persons with knowledge of the events.

Therefore, on a global basis, Plaintiff objects to, and denies, each and every characterization of a document that is not fairly representative of the statement(s) contained in such documents.  Further, inasmuch as most of the documents referred to in the SUMF were not vetted through the discovery process, Plaintiff reserves the right to object to, and indeed objects to, such documents on the basis of foundation, authenticity, hearsay, lack of basis for knowledge, and any other applicable objection, including relevance.  Plaintiff incorporates these objections into each and every SUMF to which it applies (i.e., a SUMF that is based upon a dictation of a case document, and to which Plaintiff asserts is immaterial to a determination on the District's Motion for Summary Judgment).

By presenting a detailed timeline of Dr. Waggel's employment as a medical resident, the Defendant is attempting to show the Court, in retrospect, that Dr. Waggel did not have a pristine employment record, in order to make the case that they were justified in terminating her as a medical resident nearly two years later. This contrivance is brimming with red herring. And, it spawns misinformation.

For example, several hundred facts presented concern Dr. Waggel's first year of residency and her performance therein. GWU implies her performance justified termination. Yet, the record makes clear, and Dr. Waggel's expert corroborates, that Dr. Waggel received satisfactory marks

on her milestones and performance reviews, and that her performance met expectations such that she was promoted by GWU to her second year. It is also true that during her first year, Dr. Waggel struggled in a handful of incidents as a first year resident, or failed to exceed expectations in some areas of medicine (namely, in emergency medicine she was rated as having first-year level knowledge, while in her practice areas (neurology and psychiatry) she had a second-year level knowledge).

While Defendant does not get the benefit of the doubt at summary judgment, it asks the Court to assume based on declarations of her physicians regarding her performance now almost 4 years ago, that Dr. Waggel's performance came up short on those few occasions during her first year, and that her supervisors simply failed to act on them. Even if at some point Dr. Waggel's performance came up short, it is clear that GWU determined her performance met expectations enough to be promoted. Certainly, Plaintiff's expert, Dr. Spitz, points out, she showed marked improvement after being provided support and mentorship by GWU and ended the first year strong.

It is clear that Dr. Waggel's performance during her first year is no justification for her termination over a year later, because of the distance in time between those events and the termination decision  (2 years), because she received satisfactory performance reviews that year overall and criticism levied against her were never shared except in declarations composed for the instant litigation; and more saliently, GWU had the opportunity to review and consider her performance in the summer of 2014, *and chose to promote her to her second year.*  Obviously, given that she was promoted and allowed to continue working at GWU for a year shows that those two hundred or so facts asserted as grounds for her termination are pretextual at worst, and

irrelevant at best. Defendant is fishing but comes up with an empty net since it relies on her performance records over a year before her cancer diagnosis and events relevant to her termination.

Conspicuously, in nearly one thousand facts GWU puts in evidence,[1] GWU fails to provide much information about the relevant time period at the end of Dr. Waggel's time as a resident. Specifically, at the end of the second year, Dr. Catapano warned Dr. Waggel that because of her absences for work, the deans were reviewing her employment status. Dr. Waggel hired an attorney and began to complain that the Letters of Deficiency she received, as well as the lack of support she was receiving during her diagnosis and recovery, were based on disability discrimination and retaliation for taking FMLA leave. GWU's Dr. Lisa Catapano composed and sent a letter to Dr. Waggel informing her she was not going to be promoted. That is, Dr. Catapano determined that Dr. Waggel's performance was **not grounds for termination**, but that she would have to repeat her second year.

Dr. Waggel used GWU's own policies and procedures to appeal this decision. In response, Dr. Catapano, who supervised the psychiatry residency program, Dr. Griffith, its chair, and Dr. Dyer, the Chair of the Clinical Competency Committee (CCC) retaliated against her not for insisting to be allowed to address her health issues, but in taking advantage of the due process GWU's procedures purport to provide.  Incredibly, after Dr. Waggel successfully appealed the decision to make her repeat her second year of residency, the CCC upped her punishment to termination, and then Dr. Dyer sought and received Dr. Berger, a Graduate Medical Education Dean's assurances that any further appeals would be denied and that GME would back up

---

[1] At a November 17, 2017 status conference, the Court explicitly warned the parties about filing over length statements of undisputed fact.  Here, after receiving a one week extension of time to file its Motion and supporting documents, GWU has filed a grossly over long statement, with its heft exacerbated to a significant extent by the repetition of the same facts over and again in different guises.

Catapano's and Griffith's efforts to preclude Dr. Waggel from transferring to another program. So, when Dr. Waggel did indeed appeal her termination, her fate had already been sealed.

In sum, enough material facts remain that are in dispute, which suggest GWU's decision to terminate Dr. Waggel was not based on her performance or professionalism, but unlawfully on her disability or in retaliation for her appealing those discriminatory decisions and asserting her rights under the American With Disability Acts and FMLA, and the schools' own policies and procedures. The remaining relevant facts support Plaintiff's claims.

**II.    GWU's Factual Allegations and Dr. Waggel's Responses.**

### The Parties

**Paragraphs 1-9.  Paragraphs 1-9.  Undisputed.**

**Paragraph 10.  Disputed in part.** Plaintiff objects to the assertion that "most of the institutional administrative responsibility for the Program, as well as that of the other residency programs operated by the University, is handled by the Office of Graduate Medical Education ("GME")." The GME shares significant responsibility with the Program, such that "[t]he GME Office is not responsible for the day-to-day management of each residency program; the GME Office is not responsible for creating the individual curriculum for each residency program." (Def's Ex. B at ¶ 6).

**Paragraph 11.  Undisputed.**

**Paragraph 12.  Undisputed.**

**Paragraph 13.  Undisputed, subject to clarification.** Plaintiff does not dispute the purpose of the GME Office as described by Dr. Berger. This is not an admission, however, that the GME fulfilled its purpose with respect to Plaintiff's tenure as a resident. In fact, Plaintiff contends that the GME Office failed to work with the Plaintiff's Program to navigate

administrative procedures, assure that residents' responsibilities are met, work with program directors, and ensure that all University residency programs meet or exceed ACGME Institutional, Common, and Program Requirements. Id. While these may be its assigned responsibilities, Defendant has failed to offer adequate evidence that it performed these activities and met ACGME requirements with respect to Plaintiff's employment as a resident.

Paragraph 14.  Disputed. Plaintiff objects to this assertion to the extent it implies "the GME Office is not responsible for creating the individual training plans and/or curriculum for each residency program." The purpose of the GME Office is to work with program directors for each program to ensure that all University residency programs meet or exceed ACGME Institutional, Common, and Program Requirements. (Def's Ex. B at ¶¶ 3, 8). Therefore, it shares responsibility with program directors to create training plans and/or curriculum. Plaintiff also disputes that "the GME Office is not responsible for the day-to-day management and operation of each residency program." The GME Office may not micromanage the office, but it is responsible for assuring that programs and residents can navigate administrative procedures, assure that residents' responsibilities are met, work with program directors, and ensure that all University residency programs meet or exceed ACGME Institutional, Common, and Program Requirements on a daily basis. Id.

Paragraph 15.  Undisputed.

Paragraph 16.  Undisputed, subject to clarification. Plaintiff does not dispute that Milestones "are descriptors and targets for resident performance as a resident progresses from entry into residency through graduation based on the resident's progress on all 22 psychiatry subcompetencies, such as Patient Care, Medical Knowledge, Interpersonal and Communications Skills, Professionalism, and Systems-Based Practice." (Def's Ex. A at ¶ 16), nor does she dispute

that resident's progress in training should be tracked through Milestones. Id. However, this is not

an admission that Plaintiff's progress in training was consistently tracked through Milestones.  To

the contrary, Plaintiff only received reviews for the PGY1 year. (Waggel Declaration ¶ 9.)  She

received no Milestone reviews during her second year when she was terminated, suggesting

disparate treatment (since residents normally receive those reviews) and that GWU's performance-

based justification for her termination is pretextual.

        **Paragraph 17.  Undisputed, subject to clarification.** This fact is not disputed, but does

fail to enumerate all of the Program Director's duties. Omissions include the Program Director's

responsibility to address resident performance deficiencies and design performance improvement

plans for residents pursuant to Defendant's academic improvement policy. (Def.'s Ex. A at p. 7, l.

8-13, Exh. 1.)

        **Paragraph 18.  Undisputed.**

        **Paragraph 19.  Disputed in part.** Plaintiff does not dispute the Program Administrator

had frequent contact with residents, faculty, and off-site program personnel during her residency.

However, Plaintiff disputes that during her tenure the Program Administrator effectively

functioned as a communications center and coordinator for residents. In fact, Plaintiff's Chief

Resident (Dr. Jason Emeruju) frequently acted as the communications center, coordinating

Plaintiff's schedule, acting as the communication center.   (*See* Waggel Decl. ¶¶ 40-41.)  Further,

"the role and duties of a Chief Resident include maintaining regular contact with the Program

Director and Associate Director to review the residency Program including resident performance

and evaluation, serving as an advocate for the resident body and as a liaison between the residents

and the faculty, developing on-call schedules for the residents and providing or assisting back up

for on-call residents, participating in teaching junior residents, and being available as a sounding

board when a resident raises concerns about the Program or his or her own performance." (Def's Ex. A at ¶ 25).

**Paragraph 20.  Undisputed.**

**Paragraph 21. Disputed.** Plaintiff lacks personal knowledge sufficient to agree or disagree with this assertion. Instead, Plaintiff disputes its accuracy to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 22. Disputed.** Plaintiff lacks personal knowledge sufficient to agree or disagree with this assertion. Instead, Plaintiff disputes its accuracy to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 23.  Undisputed.**

**Paragraph 24. Disputed in part.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. In addition, Defendant has failed to show the relevancy of this assertion.

**Paragraph 25.  Undisputed.**

**Paragraph 26.  Undisputed, subject to clarification.** Several people, including the Chief Resident, Program Director and GME, are responsibility for assuring the Program functions well and each resident is successful. In addition, this is not an admission that the Chief Residents successfully performed their job during Plaintiff's residency.

**Paragraph 27.  Undisputed.**

**Paragraph 28.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed that "[a]s part of their training, each psychiatry resident must spend a stated minimum amount of actual clinical days on rotations in specific medical specialty services." (Ex. WWW.)

The ACGME measures resident experience based on unit measurements of "month(s)," and not hours or days. (*Id.*) The only exception to this unit of measurements is the ACGME prescription that residents "must be provided at least two hours of faculty preceptorship weekly, one hour of which must be individual." (Ex. WWW at IV.A.6.b)

Further, Plaintiff disputes the assertion that, "Program Directors have some minimal leeway to grant waivers from the minimum training time standards in the case of residents who have shown exceptional ability." (Def's Ex. A at ¶ 27). Per ACGME Policy, GWU provides a duty hour limit, including no more than 80 hours per week averaged over a four- week period, and does not prescribe duty hour minimums. (Ex. QQQ.) Further, requests for changes to duty hours are to be made to the GME. (*Id.*) It is not the Program Director's choice, but the decision of the GME Committee, to approve or reject, or make exceptions, to duty hour rules. (*Id.*) The Program Director should raise a request, and the request must be made "after discussion and vote by membership and shall be recorded in the minutes of the meeting." (*Id.*) Plaintiff argues that pursuant to the Americans with Disabilities Act and the Family Medical Leave Act, disability is a reasonable justification for such waivers in addition to exceptional performance.  Moreover, it appears that

the program could have considered unused vacation time in determining the hours of credit Dr. Waggel could have received for her residency.

      **Paragraph 29.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, Plaintiff disputes that ACGME requires 70 percent attendance to didactics and that that GW Program standard for resident attendance is higher than the ACGME standard. ACGME does not **require** residents attend 70 percent of regularly schedule didactic sessions, but provides it as a **suggested guideline**.  (Ex. WWW, ACGME Program Requirements § IV.A.3.a (stating "each resident should attend" not shall attend). In addition, Plaintiff disputes the assertion that GW Program standards are higher than ACGME standards. The GW Program's standards are more lax. The GW Program does not track attendance, an assertion supported by the fact that attendance reports were not produced during discovery. Further, didactics instructors rarely complained about student absences. In fact, "the GW Program's didactics instruction takes place every Thursday from 8:00 a.m. to 5:30 p.m." Id. (emphasis added). (Def's Ex. A at Ex. 2). During those days, Dr. Waggel was trained by several instructors. (Waggel Decl. ¶ 146.) Only two instructors complained she missed classes when she stepped out for a few hours on certain Thursdays to attend medical appointments and cancer treatment, Dr. Griffith and Dr. Collins. Moreover, she was told by her chief resident to skip didactics on at least one occasion.  (Waggel Decl. ¶ 42.)

      **Paragraph 30. Disputed.** During Dr. Waggel's residency, she was not excused from clinical duties in order to participate in program didactics. Specifically, Dr. Emeruju ordered her to miss didactics and perform clinical duties before her surgery. (Waggel Decl. ¶ 42.)   Absences due to orders, medical appointments  or recovery from surgery subsequently was used as a

pretextual basis for accusing Dr. Waggel of lacking professionalism, and not promoting Dr. Waggel to her third year of the residency program. (Waggel Decl. ¶¶ 42, 47).

**Paragraph 31. Undisputed, subject to clarification.** Plaintiff does not dispute the assertion to the extent it accurately portrays the words in an email. However, this is not an admittance that residents were required to be available and present for didactics, Grand Rounds, or program-related meetings. In fact, Dr. Waggel was ordered to tend to clinical duties. See response to Paragraph 30, *supra*.

**Paragraph 32. Undisputed, subject to clarification.** Plaintiff does not dispute the assertion to the extent it accurately portrays the words in an email. Further, Plaintiff emphasizes the email instructs residents to alert the appropriate official of their time off as they would any other day of the week. Dr. Waggel appropriately alerted her attending, instructors, and administration when she required time for medical appointments as vacation or sick time on Thursdays. She was denied this accommodation. (Waggel Decl. ¶ 47).

**Paragraph 33. Disputed in part.** It is disputed that "the email reinforced the ACGME didactics requirement and alerted residents that the Program set an even higher standard for compliance with didactics training." Instead, the email made clear that students who are sick, ill, or on vacation are not expected to be present for didactics, stating: "Residents are expected to be present for all didactics <u>unless</u> they are sick, post-call, or on vacation." (Def's Ex. A at Ex. 2) However, Plaintiff does not dispute the email comports with ACGME requirements in stating that that 70% didactics attendance is **<u>not</u>** mandatory. The email states that resident's graduation "**<u>can</u>** [but need not] required to repeat seminars (which **<u>could</u>** delay graduation). *Id.* (emphasis added).

In fact, the ACGME standard for didactics is not mandatory, and provides no indication of whether residents can be required to repeat seminars or be delayed in graduation for failing to

attend 70% of courses. (Ex. WWW at § IV. A.3.) Further, ACGME standards acknowledge, "There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, and family emergencies. Each program must have policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities. These policies must be implemented without fear of negative consequences for the resident who is unable to provide the clinical work." (Ex. WWW § IV.C.2.) Also, decisions including promotion, remediation, and dismissal of a resident cannot be based on the failure to attend didactics, but instead must take into account resident performance based on the recommendation of the CCC. (Ex. WWW § V.A.1.b) Such decisions must also be in compliance with GME standards. (Def's Ex. A at ¶ 19). Plaintiff contends that Defendant violated these policies with respect to her residency and in its decision to not promote, and then terminate, her from the Program.

**Paragraph 34.  Disputed.** It is disputed that "the Clinical Neurosciences Seminar is the centerpiece around which the rest of our curriculum is organized" and that "[m]astery of the material in the Clinical Neurosciences Seminar is necessary in order to learn the material in subsequent courses and seminars in the Program." This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff also disputes that the course was it the centerpiece around which the GW Program Curriculum is organized. (Waggel Decl. ¶¶ 269-270.)

**Paragraph 35.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

Further, Plaintiff points out that Dr. Griffith's representation of his course curriculum is vague, and it is difficult to understand whether the Clinical Neuroscience Seminar is cumulative or segmented. At times, he represents that the segments are necessary to learn subsequent material. (Def's Ex. N at ¶ 17). And, he also states that students may not "move onto the next segment" with "mastery of the material in the segment before." (Def's Ex. N at ¶ 19). However, Dr. Waggel was accused of being a liar by Defendant when she stated that her understanding of the course was that it was "cumulative." (Waggel Decl. ¶ 212.)

    **Paragraph 36.   Undisputed, subject to clarification.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

    **Paragraph 37.   Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. In addition, Dr. Griffith scheduled 16 classes, three of which were dedicated to in-class examinations. Moreover, Dr. Griffith cancelled several lectures. See response to Paragraph 39, *infra*.

    **Paragraph 38.   Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. In addition, Dr. Griffith scheduled 16 classes, three of which were dedicated to in-class examinations. Moreover, Dr. Griffith cancelled several lectures. See response to Paragraph 39, *infra*.

    **Paragraph 39.   Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is

improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed that Dr. Griffith's seminar is "the most comprehensive and intensive component of their PGY2 residency year. Instead, residents find long duty hours learning on the job to be the most comprehensive component of their PGY 2 residency year. (Waggel Decl.¶ 148.) Further, Dr. Waggel was able to pass the USMLE Step 3 licensing exam with above average scores. (Waggel Decl. ¶ 126.) In addition, given frequent cancellations and resident absences, this course was neither comprehensive nor intense. (Waggel Decl. ¶ 147.)

**Paragraph 40. Disputed. It is disputed that Dr. Griffith's course had three objectives.** Paragraph 40 is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Moreover, Griffith's class never had a clear syllabus stating what was required to pass the course. (Waggel Decl. ¶ 147.) Therefore, even if Griffith now says his course has three objectives, these were never clearly communicated to the class.

**The Resident Physician Agreement**

**Paragraphs 41- 47 are not in dispute.**

**Paragraph 48. Disputed.** This paragraph is disputed to the extent it states that the Resident Agreement provides that GW SMHS may terminate the agreement and that the "Resident Physician shall have no right to cure any violations of this Agreement." Instead, the Resident Agreement specifically incorporates the terms of the Resident Manual. (Def's Ex. A at ¶ 40).That Resident Manual makes clear that Residents have a right to notice, an opportunity to remediate or cure, and appeals procedures prior to notice of termination. *(Id.)* In addition, the Resident

Agreement is subject to federal and state law, including those regulating discrimination, accommodation, and leave.

Finally, the Resident Agreement states that the resident "shall obtain medical clearance from a physician prior to participating in any clinical activities in accordance with SMHS policy as set forth in the Resident Manual." (Def's Ex. A at Ex. 3, p. 4 and Ex. 4, p. 4). However, the Resident Manual, as incorporated, further states that health clearance is required annually, except for first year residents and is due by September 30, 2018. (Def's Ex. A at Ex. 6, p. 19). And further, the Resident Manual states that consequences for not submitting a health clearance is suspension from clinical duties until the clearance is obtained, and no other disciplinary action (thus, excluding termination). (Def's Ex. A at Ex. 6, p. 20). Thus, Defendant's implication that Dr. Waggel's failure to timely turn in her health clearance

## The Resident Manual

**Paragraph 49.  Undisputed.**

**Paragraph 50.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. In addition, many portions cited are not relevant and so are inadmissible. The Catapano Declaration contains several statements of hearsay, and as such are not admissible at trial. Those statements that are hearsay are contained in Def.'s Exh. A at ¶¶  100- 135; 188-191; 217; 218; 274;  281-288; 310; 312-324; 392; 399; 453; 502; 503; 516-519; 533;535; 602; 639-642; 649-650;662; 664; 676-677; 678; 712-716; These lines contain information of which Dr. Catapano has no firsthand knowledge.

**Paragraph 51.  Undisputed.**

**Paragraph 52.  Undisputed.**

**Paragraph 53.  Disputed.** The Manual states that it is the Program's obligation to comply with D.C. law regarding medical clearance. (Def's Ex. A at Ex. 5, p. 19; Def's Ex. A at Ex. 6, p.19). Further, the Resident Manual states that consequences for not submitting a health clearance is suspension from clinical duties until the clearance is obtained, and no other disciplinary action, thus excluding termination. (Def's Ex. A at Ex. 6, p. 20).

**Paragraph 54.  Undisputed.**

**Paragraph 55.  Undisputed.**

**Paragraph 56.  Undisputed.**

**Paragraph 57.  Disputed.** The Defendant's policy and practice, as applied to Dr. Waggel, was not to provide any reasonable accommodation to Plaintiff, though she contacted the Office of Equal Employment Opportunity, her colleagues and her supervisors knew about her disability, and everyone at the program knew or should have known her need for accommodation. Therefore, this fact is disputed to the extent it implies the Manual states the adopted policy and practice of the Program. (Waggel Decl. ¶¶ 98-99.)

**Paragraph 58.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness. Further, it is disputed as a statement of law not fact.

### Residency Training Program Policies and Procedures

**Paragraph 59.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

16

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, Defendant's Policy on Equal Opportunity fails to protect all faculty, staff and students against unlawful discrimination on a number of grounds, including disability. (Waggel Decl. ¶ 99).

**Paragraph 60.  Undisputed.**

**Paragraph 61.** Disputed. While it is true the University Disabilities Policy notes that the University does not discriminate against any qualified individuals with a disability, this statement is disputed to the extent it implies the University does not discriminate against any qualified individuals with a disability.  (Waggel Decl. ¶ 99).

**Paragraph 62.  Undisputed.**

**Paragraph 63.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness.

**Paragraph 64.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness.  Moreover, Dr. Waggel has testified that she went to the EEO office, but was directed to take FMLA leave for absences related to medical appointments.  (Waggel Decl. ¶ 98).

**Paragraph 65.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness.  Moreover, Dr. Waggel has testified that she went to the EEO office, but was directed to take FMLA leave for absences related to medical appointments.  (Waggel Decl. ¶ 98).

**Paragraph 66.  Disputed.** This fact is disputed to the extent it asserts that "The GW Psychiatry Residency Program Policy on Resident Time Off and Leave sets forth the terms and conditions for vacation, sick leave, educational/meeting leave, and personal/family leave" with respect to Dr. Waggel. (Def's Ex. A at Ex. 9). Further, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness.

**Paragraphs 67-84 are not in dispute.**

**Paragraph 85.  Disputed.** This long paragraph and each of the facts asserted therein are disputed by the Plaintiff, as follows: Plaintiff did not violate the norms of honesty, promise-keeping, respect for institution, profession, and patients during the tenure in the Program. (*See* Spitz Report, Tompa Declaration (as attached to Pl's Mot. for Sum. J), Exhibit Z).  Further, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, it is disputed to the extent it relies on a declaration of a witness not disclosed before the close of discovery, and/or is an improper expert witness.

18

**Paragraph 86.  Disputed.** This fact is disputed to the extent it asserts that Plaintiff committed inappropriate behavior as listed in the cited Appendix to the Code. Moreover, the cited evidence does not support or suggest that Plaintiff committed the inappropriate behavior, but merely is an excerpt of the Appendix to the code. (Def's Ex. A at Ex 15, p. 4).

**Paragraph 87.  Disputed as applied.** Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC. These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since sexual harassment and gender discrimination are unlawful. In addition, this justification is obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.)

**Paragraph 88.  Disputed as applied.** Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since sexual harassment and gender discrimination are unlawful. In addition, this justification is

obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.)

**Paragraph 89. Disputed as applied.** Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since sexual harassment and gender discrimination are unlawful. In addition, this justification is obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.) Further, Plaintiff asserts that this policy is evidence that the Defendant uses its own policies in violation of residents' civil rights under Title VII and related law. *Id.*

**Paragraph 90. Disputed as applied.** Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since instead describe potential violations of Plaintiff's First Amendment rights and thus would be unlawful grounds for her termination. In addition, this justification is obviously pretextual, as

20

discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.). Further, Plaintiff asserts that this policy is evidence that the Defendant uses its own policies in discriminatory and unlawful ways.

**Paragraph 91.  Disputed as applied.** Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since instead describe potential violations of Plaintiff's First Amendment rights and thus would be unlawful grounds for her termination.  In addition, this justification is obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.). Further, Plaintiff asserts that this policy is evidence that the Defendant uses its own policies in discriminatory and unlawful ways.

**Paragraph 92.  Disputed as applied.**  Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since instead describe potential violations of Plaintiff's First Amendment rights and thus would be

unlawful grounds for her termination. In addition, this justification is obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.). Further, Plaintiff asserts that this policy is evidence that the Defendant uses its own policies in discriminatory and unlawful ways.

**Paragraph 93. Disputed as applied.**  Plaintiff emphasizes that the Defendant now asserts this policy as relevant in order to provide an alternative justification for their decision to terminate Plaintiff, other than based on her disability and in retaliation under the Family Medical Leave Act, to the Court. The policy and related facts are relevant here to the extent that they exemplify the Defendant's many attempts to seek alternative justifications for her ultimate termination ex post facto of the decision of Dr. Catapano and the CCC.   These attempts are fool-hearty because they do not describe reasonable alternative justifications for the decision to terminate Dr. Waggel, since instead describe potential violations of Plaintiff's First Amendment rights and thus would be unlawful grounds for her termination. In addition, this justification is obviously pretextual, as discussed in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Memo. in Opp'n Def.'s Mot. for Summ. J.). Further, Plaintiff asserts that this policy is evidence that the Defendant uses its own policies in discriminatory and unlawful ways.

### Dr. Waggel's Tenure in the Program

**Paragraphs 94-95 are not in dispute.**

**Paragraph 96.  Disputed.**  Based Plaintiff's recollection and work emails created that day, Dr. Waggel believes she was on duty on July 3, 2014.  (Waggel Decl. ¶ 239.)

**Paragraph 97.  Undisputed.**

**Paragraph 98. Disputed as to relevance.** This series of facts is not relevant and therefore inappropriate for the purposes of determining summary judgment. Defendant has failed to

establish at any point during this litigation that events and concerns arising nearly two years before her dismissal and a year before her cancer are relevant to the instant litigation. Even if viewed in a favorable light to the moving party (which is inappropriate during summary judgment), one might assume that Defendant raises these records and hearsay allegations as reasonable alternative justifications to their decision to not promote and terminate her from the Program over two years later.  In any event, Dr. Waggel also notes that she does not believe Dr. Cho ever brought these concerns to Dr. Waggel's attention at the time.  (Waggel Decl. ¶ 239.)

**Paragraph 99.  Disputed as to relevance.** This fact is disputed to the extent it asserts Plaintiff was in clear violation of Program policy and that she failed to report for duty on Monday, December 15, 2014, and failed to notify the attending physician, Aditi Malik, M.D. (Def's Ex. A at ¶ 100; *see also* Def.'s Ex. A at Ex. 21). First, Defendant fails to specify which, if any policy, Plaintiff violated. Second, the emails cited do not support the factual assertion that Dr. Waggel failed to report her absence. Instead, they suggest that Dr. Malik failed to report her absence to Pamela Crawford on the day of the incident. And, Dr. Waggel reported her illness to John Tarim as well as Pamela Crawford, directly. (Def.'s Ex. A at Ex. 21). Moreover, Dr. Waggel did not receive an LOD, suggesting she did not clearly violate any policy. Further, this fact is disputed because it relies on a declaration from Dr. Catapano, who had no first- hand knowledge of the facts asserted and so is inadmissible pursuant to Rule 56(c).

**Paragraph 100.  Disputed as to relevance.** Defendant has failed to establish at any point during this litigation that events and concerns arising nearly two years before her dismissal and a year before her cancer are relevant to the instant litigation. Even if viewed in a favorable light to the moving party (which is inappropriate during summary judgment), one might assume that Defendant raises these records and hearsay allegations as reasonable alternative justifications to

their decision to not promote and terminate her from the Program over two years later. But even so, such an attempt to establish relevancy is faulty. Plaintiff received positive milestones and reviews noting her above-average performance, and the Program promoted her to her second year. (Waggel Decl. ¶¶ 9, 60.)  Dr. Alqahtani stated, "I worked with her, she is very hard worker, team player, and taking care of her patients." (Def's Ex. A at ¶ 105-106; *see also* Def.'s Ex. A at Ex. 23; *see also* Def.'s Ex. A  Ex. 24).

**Paragraph 101.  Disputed as to hearsay and relevance.** This fact is disputed to the extent it is supported by hearsay evidence, since Dr. Catapano has no first- hand knowledge of Dr. Malik making any report to Dr. Greene regarding Plaintiff's performance. Further, it is disputed that events in Plaintiff's PGY1 year as alleged in this fact are relevant in relation her termination decision which occurred after she was promoted over a year later, or any matter at issue in this action.  Further, the fact that "Dr. Waggel's attending physician contacted a Chief resident in late December" is not support by the evidence, which suggests the emails at issue were not shared until after the conclusion of her November-December rotation, in early January and mid-January. (Def.'s Ex. A at Ex. 22).

**Paragraph 102.  Disputed as to hearsay and relevance.** This fact is disputed to the extent it is supported by hearsay evidence, since Dr. Catapano and Dr. Malik have no first- hand knowledge of Dr. Gauss and Dr. Cohen's concerns. Further, it is disputed that this alleged fact is relevant in relation Defendant's termination decision, which occurred over a year later after she was promoted to PGY2 year, or any matter at issue in this action.

**Paragraph 103.  Undisputed.**

**Paragraph 104.  Undisputed.**

**Paragraph 105.  Undisputed.**

24

**Paragraph 106. Disputed as to hearsay and relevance.** These facts are disputed as to foundation as Dr. Catapano had no first- hand knowledge of the cited hearsay conversation. Moreover, while it is true that Dr. Greene's comments reported that Dr. Waggel was "Great, excellent in terms of her clinical work with patients; On time to work; Did her work", Defendant fails to establish how many of these facts are relevant to the instant action, including  Dr. Greene's comments that she was "too comfortable" given that she attended a "neurology only" party, and engaged with her peers on Instagram.   Indeed, Dr. Waggel dispenses with these petty allegations about party crashing and Instagram in her own Declaration.  (Waggel Decl. ¶ 241.)

**Paragraph 107.  Undisputed.**

**Paragraph 108.  Disputed and irrelevant.** This fact is disputed because it is unsupported by the evidence and is not relevant to the claims at issue in this case. Dr. Little did not assert that Dr. Waggel's behavior compromised safety issues on the March 2 night shift, nor did Dr. Little write that Dr. Waggel contributed to the failure of coordination between the Green Team and the ER, failed to carry out clinically significant orders, and was inappropriate and unprofessional communication (Def.'s Ex. A at Ex. 26), Email dated March 3, 2015 at 6:39 p.m., Dr. Little to Dr. Gehring. Instead, the email at issue reported to Dr. Gehring that unidentified members of the Green Team behaved in that way. With respect to Dr. Waggel, the email only notes that she failed to identify the correct prescription for a patient, but that this did not harm the patient. *Id.* In addition, the email from Dr. Gehring suggests that many residents were "overwhelmed", several residents and an attending were responsible, and that Dr. Waggel's prescription of Tylenol was necessary in light of the Green Team failing to start the Dilaudid PCA. *Id.* Further, this fact is disputed because Defendant has failed to establish the relevancy of minor errors occurring during Dr.

Waggel's first emergency room shift early in residency, occurring over a year before her termination.

**Paragraph 109.  Disputed and irrelevant.**  Dr. Waggel was just being prudent in not placing an order for Dilaudid without speaking to more senior physician; unfortunately none were available. (Waggel Decl. ¶ 242.)  This paragraph is also disputed to the extent it asserts that Dr. Waggel left multiple return phone calls unanswered.  Instead, the emails suggest the Green Team left multiple return phone calls unanswered. (Def.'s Ex. A at 26). Further the fact is disputed because it is irrelevant to the decision to terminate Dr. Waggel that the Defendant made over a year later.

**Paragraph 110.  Disputed and irrelevant.** This fact is disputed because the email cited does not support the factual assertion and the facts are irrelevant to the decision to terminate her made over a year later. First, the cited email is not an email from Dr. Little but instead is from Dr. Prior. (Def.'s Ex. A at Ex. 28).  Second, contrary to the factual assertions made by Defendant, the email at issue does not state Dr. Waggel was "being disrespectful, lack of responsiveness, etc." (Def.'s Ex. A at Ex. 28). To the contrary, the email establishes that the Green Team abandoned Dr. Waggel during her first day of her emergency medical rotation and that she made efforts to cope with this overwhelming situation. *Id.* Indeed, Dr. Prior's email states Dr. Waggel was the only resident member of the Green Team that was responsive to his pages, and that other residents "left" to meet "with Dr. Wasserman regarding fellowship and went home after the meeting…and Stephanie was on her own." *Id.* Further, the email establishes that though Dr. Waggel was making efforts to manage on her own, including by asking questions about patients, while other residents were not at work. *Id.* In the email, Dr. Little demands the Program provide her support from her peers, team, and supervisors, and states that it was inappropriate for her to work unsupervised. *Id.* Further, the email makes clear that the events at issue were isolated to the first two days of her experience in

emergency medicine, and that she had the potential to learn and grow. *Id.* Further, Dr. Waggel was not characterized as "being disrespectful, lack of responsiveness, etc." In fact, Dr. Prior's characterization was that she was "a bit odd with all of her interactions with people." (Def.'s Ex. A at Ex. 27). Nonetheless, Dr. Prior reported to Dr. Little and to Dr. Gehring about the events on the ER shift, defending Dr. Waggel's performance. He reported that, "A couple of things were likely coming into play. First, the team was getting absolutely crushed and at one point was up to 30 patients while discharging another 6. Obviously, that doesn't excuse any lack of response from anyone on the team but they were definitely just trying to stay afloat with a lot of sick people." (Def.'s Ex. A at Ex. 27). Further, Dr. Prior pointed out that Dr. Waggel was "a brand new psychiatry intern…who's first day on medicine was Monday." Id. Dr. Prior then stated that "The combination of it being her first day, extremely busy and a bit odd with all of her interactions with people probably didn't help." Moreover, Dr. Prior reports that he believes Dr. Waggel will improve with performance plans and support. *Id.*

 **Paragraph 111.  Undisputed, but irrelevant.**  Again, the relevance of this event is questionable because it occurred in Dr. Waggel's PGY1 year and the Administration promoted her to PGY2 without any reported qualms.  Moreover, even if it were relevant, it is important to note that this event occurred at the beginning of Doctor Waggel's first rotation on internal medicine.  At that time, she would have had the knowledge of a medical student.  (Waggel Decl. ¶ 12.)

**Paragraph 112. Disputed and irrelevant.** The fact that efforts to improve Dr. Waggel's performance after her first two days of her emergency medical rotation were unsuccessful is disputed. In fact, Dr. Prior reported at the end of Dr. Waggel's first week of her medical emergency rotation that he began to implement a performance plan, and that by the end of the first week "nothing happened" (presumably, meaning nothing bad or significant happened as a result of Dr.

Waggel's performance after the first two days).  (Def.'s Ex. A at Ex. 28). Moreover, Dr. Catapano wrote after her first week on emergency medicine that Dr. Waggel "[is] very motivated to do better, and is hoping she'll be given the chance to, stay with the team and receive some concrete feedback about how to function better on the rotation- For context, I'll say that both as a medical student at GW, and in her first months of internship [first year], Stephanie generally gets very positive evaluations for her rotations. There has been a pattern of vague negative feedback that makes it back to me or Eindra, but every on-paper evaluation is entirely complimentary." (Def.'s Ex. A at Ex. 35). Moreover, Dr. Waggel completed her emergency medical rotation, and was promoted to her second year. Therefore, the relevancy of the facts here to Defendant's termination decision and other claims, concerning events over a year later are also disputed.

**Paragraph 113.  Disputed and irrelevant.** This fact is disputed to the extent that it is vague, unsupported by the evidence, relies on inadmissible hearsay, and because it is not relevant to Defendant's decision to terminate Plaintiff (which occurred over a year later) nor is it relevant to any other issue in this case. First, Defendant has failed to establish the relevancy of this fact to the claims in this case. Second, the substantive assertion is unsupported by the evidence. It is unclear which email Dr. Catapano relied on to make her assertion, and how she came to have firsthand knowledge regarding an email written by Dr. Prior that was not addressed to her. Moreover, Dr. Prior's emails overwhelmingly suggest that a performance plan implemented after Dr. Waggel's first two days of as an emergency resident addressed any problems with her performance and that she improved thereafter. (Def.'s Ex. A at Ex. 28; *see also* Def.'s Ex. A at 27).

**Paragraph 114.  Disputed and irrelevant.** This fact is disputed to the extent it is not relevant to the claims at issue in this case (which concern events occurring nearly a year later). It is also disputed to the extent it implies Plaintiff did not understand the basics of medicine, but instead that

the Dr. Waggel struggled with emergency medicine in her first two days of the rotation. Dr. Catapano herself wrote after Dr. Waggel's first week in emergency medicine that Dr. Waggel "[is] very motivated to do better, and is hoping she'll be given the chance to,stay with the team and receive some concrete feedback about how to function better on the rotation- For context, I'll say that both as a medical student at GW, and in her first months of internship [first year], Stephanie generally gets very positive evaluations for her rotations. There has been a pattern of vague negative feedback that makes it back to me or Eindra, but every on-paper evaluation is entirely complimentary." (Def.'s Ex. A at Ex. 35).

**Paragraph 115. Disputed and irrelevant.** This fact is disputed to the extent it relies on inadmissible hearsay declarant, Dr. Catapano, and is not relevant to the claims at issue in this case (which concern events occurring nearly a year later). Again, the relevance of this event is questionable because it occurred in Dr. Waggel's PGY1 year and the Administration promoted her to PGY2 without any reported qualms. Moreover, even if it were relevant, it is important to note that this event occurred at the beginning of Doctor Waggel's first rotation on internal medicine. At that time, she would have had the knowledge of a medical student. (Waggel Decl. ¶ 12.)

**Paragraph 116. Disputed and irrelevant.** See response to Paragraph 115 above. Moreover, this fact is disputed to the extent that it is vague, unsubstantiated, and because Dr. Prior did not receive an email from Dr. Little. In fact, Dr. Little received an email from Dr. Prior defending Dr. Waggel's performance during her first two days of the ER rotation. (Def.'s Ex. A at 27). That Dr. Catapano's declaration makes an assertion that is contrary to facts speaks to her lack of firsthand knowledge of the events at issue, and that she never fairly reviewed Dr. Waggel's performance record prior to her decision to not promote her and terminate her nearly a year later.

**Paragraph 117.  Disputed and irrelevant.** It is disputed that **"**Thursday was initially uneventful, but at 5:00 p.m., several incidents occurred involving potentially disastrous outcomes for patients as to which it was clear Dr. Waggel was totally ignorant as to the medical issues." (Def.'s Ex. A at ¶ 120; *see also* Def.'s Ex. A at Exhibit 28, p. 2). The evidence does not support that Dr. Waggel was totally ignorant to medical issues nor caused disastrous outcomes. *Id.*  Instead, the evidence shows that Dr. Prior reported at the end of Dr. Waggel's first week of her emergency medicine rotation that he began to implement a performance plan, and that by the end of the first week "nothing happened" (presumably, meaning nothing bad or significant happened as a result of Dr. Waggel's performance after the first two days).  (Def.'s Ex. A at Ex. 28). Dr. Catapano wrote after her first week on emergency medicine that Dr. Waggel "[is] very motivated to do better, and is hoping she'll be given the chance to, stay with the team and receive some concrete feedback about how to function better on the rotation- For context, I'll say that both as a medical student at GW, and in her first months of internship [first year], Stephanie generally gets very positive evaluations for her rotations. There has been a pattern of vague negative feedback that makes it back to me or Eindra, but every on-paper evaluation is entirely complimentary." (Def.'s Ex. A at Ex. 35). Finally, the relevancy of the facts here to Defendant's termination decision over a year later are also in dispute.

Moreover, Dr. Prior reported that during her first week, Dr. Waggel was the only resident member of the Green Team that was responsive to his pages, and that other residents "left" to meet "with Dr. Wasserman regarding fellowship and went home after the meeting…and Stephanie was on her own." *Id.* Further, the email establishes that though Dr. Waggel was making efforts to manage on her own, including by asking questions about patients, while other residents were not at work. *Id.* In the email, Dr. Little demands the Program provide her support from her peers, team,

and supervisors, and states that it was inappropriate for her to work unsupervised. *Id.* Further, the email makes clear that the events at issue were isolated to the first two days of her experience in emergency medicine, and that she had the potential to learn and grow. *Id.*

Further, Dr. Prior's characterization was that she was "a bit odd with all of her interactions with people." (Def.'s Ex. A at Ex. 27). Nonetheless, Dr. Prior reported to Dr. Little and to Dr. Gehring about the events on the ER shift, defending Dr. Waggel's performance. He reported that, "A couple of things were likely coming into play. First, the team was getting absolutely crushed and at one point was up to 30 patients while discharging another 6. Obviously, that doesn't excuse any lack of response from anyone on the team but they were definitely just trying to stay afloat with a lot of sick people." *Id.* Further, Dr. Prior pointed out that Dr. Waggel was "a brand new psychiatry intern…who's first day on medicine was Monday." *Id.* Dr. Prior then stated that "The combination of it being her first day, extremely busy and a bit odd with all of her interactions with people probably didn't help." Moreover, Dr. Prior reports that he believes Dr. Waggel will improve with performance plans and support. *Id.* Dr. Waggel did improve thereafter and displayed knowledge in many areas of medicine, including above what was expected in her first year as a resident as set forth in her Milestones.  (Waggel Decl. ¶¶ 8-9, 60.)

**Paragraph 118.  Undisputed but not relevant.**  As set forth above, Dr. Waggel progressed to a PGY2 with good Milestone reviews. (Waggel Decl. ¶¶ 8-9, 60.)  Moreover, this event needs to be placed in the context of a residency training program where new doctors often get critiqued by more senior residents and other physicians.  (Waggel Decl. ¶ 5.)

**Paragraph 119.  Disputed and not relevant.** See response to Paragraph 118 above.  Moreover, it is disputed that "[t]he final option Dr. Prior presented was to "[C]onsider removing Stephanie from medicine and have her complete her medicine months at a later date, to be determined based

31

on re-evaluation." The emails Dr. Catapano relies upon in support of this assertion are contradictory. They do not discuss a "final option" but merely discuss the "good plan" Dr. Prior was implementing "in terms of getting productive and timely feedback to Stephanie to improve her patient care skills in [emergency] medicine." (Def.'s Exh. A at Ex. 28 thereto 000959-60.) Further, Dr. Khin Khin states she will likewise reach out to support Dr. Waggel and expects Dr. Catapano to do the same. *Id.* Further, Dr. Khin Khin reported that "Solution-wise, the option of pulling her from medicine service is quite premature." (Def.'s Ex. A at Ex. 34). Finally, this paragraph is disputed because it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case.

**Paragraph 120.  Disputed and irrelevant.** See response to Paragraph 118 above.  This paragraph is disputed to the extent it is irrelevant because it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case.

**Paragraph 121.  Undisputed but irrelevant.** See response to Paragraph 118 above.  Dr. Waggel has a somewhat different recollection of this meeting where Dr.  Khin Khin only provided cryptic information not identifying Dr. Prior. (Waggel Decl. ¶ 17.)  She also has her own recollections of her days on the Green Team and her interactions with Dr. Prior.   (Waggel Decl. ¶¶ 15-16). Moreover, Plaintiff points out that Dr. Khin Khin reported of Dr. Waggel's reponse to that meeting: "To her credit, she was quite receptive of our conversation. She expressed a willingness to learn what the problem is' and to make improvements." (Def.'s Ex. A at Ex. 34).

**Paragraph 122.  Disputed and irrelevant.** See response to Paragraphs 118 and 121 above. Moreover, this fact is disputed because in fact, Dr. Khin Khin reported that Dr. Waggel was "in shock" (Def.'s Ex. A at Ex. 34). Further, Dr. Khin Khin reported that, "the attending [was] not being direct with [Dr. Waggel] in terms of his feedback." *Id.* Further, Dr. Khin Khin requested that

Dr. Waggel receive, "clear feedback" in the future. *Id.* Further, Dr. Khin Khin reported that, "there appear to be other factors contributing to this (seniors leaving early, seniors not being aware of Stephanis's limitations and therefore oversight being inadequate, etc). Those are of course things that they will have to address on their part." *Id.*  Dr. Khin Khin reported, "To her credit, she was quite receptíve of our conversation. She expressed a willingness to learn what the problem is' and to make improvements." *Id.* Finally, Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 123.  Disputed and irrelevant.** See response to Paragraphs 118 and 121 above. Moreover, this fact is disputed because Dr. Khin Khin summarized Dr. Waggel's comments, as follows: "To her credit, she was quite receptive of our conversation. She expressed a willingness to learn what the problem is' and to make improvements." (Def.'s Ex. A at Ex. 34; *see also* Def.'s Ex. A at Ex. 30). Finally, Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 124.  Disputed and irrelevant.** See response to Paragraphs 118 and 121 above.  This fact is disputed to the extent Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 125.  Disputed and irrelevant**. See response to Paragraphs 118 and 121 above.  This fact is in dispute because Dr. Khin Khin proposed to bring Dr. Waggel in early the same week, not the following week. (Def.'s Ex. A at Ex. 34). Further, Defendant has failed to establish how these

facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 126.  Disputed and irrelevant.**  See response to Paragraphs 118 and 121 above. This fact is disputed to the extent that Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 127.  Disputed and irrelevant.**  See responses to Paragraphs 118 and 121 above. This fact is disputed to the extent that Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later.

**Paragraph 128.  Disputed and irrelevant.**  See responses to Paragraphs 118 and 121 above.  This fact is disputed to the extent that Defendant has failed to establish how these facts (which are about her first week of emergency medical rotation in March 2015) are relevant to the Plaintiff's claims, which concern her termination over a year later. Moreover, during this meeting, Dr. Waggel raised violations of patient load and duty hour limitations, which were not addressed.  (Waggel Decl. ¶¶ 15-16, 19.)  In any event, as set forth in the documentation Defendant cites in support of this paragraph, Dr. Catapano wrote, "She's very motivated to do better, and is hoping she'll be given the chance to stay with the team and receive some concrete feedback about how to function better on the rotation-For context, I'll say that both as a medical student at GW, and in her first months of internship [first year], Stephanie generally gets very positive evaluations for her rotations. There has been a pattern of vague negative feedback that makes it back to me or Eindra, but every on-paper evaluation is entirely complimentary." (Def.'s Ex. A at Ex. 35; *see also* Def.'s Ex. A at Ex. 34).

**Paragraph 129.  Disputed and irrelevant.** See response to Paragraph 128 above.

**Paragraph 130.  Disputed and irrelevant.** See response to Paragraph 128 above.

**Paragraph 131.  Disputed and irrelevant.** See response to Paragraph 128 above.

**Paragraph 132.  Disputed and irrelevant.**  See response to Paragraph 128 above**.**

**Paragraph 133.  Undisputed but irrelevant.**  See response to paragraph 118 above.  As set forth there, despite any concerns that may have been expressed, Dr. Waggel progressed to a PGY2 with good Milestone reviews. (Waggel Decl. ¶¶ 8-9, 60.) Thus, this paragraph is disputed to the extent that it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case.   Moreover, this event needs to be placed in the context of a residency training program where new doctors often get critiqued by more senior residents and other physicians.  (Waggel Decl. ¶ 5.)

**Paragraph 134.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 135.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 136.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 137.  Undisputed but irrelevant.**  See response to paragraph 133 above.  .

**Paragraph 138.  Undisputed but irrelevant.**   See response to paragraph 133 above.

**Paragraph 139.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 140.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 141.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 142.  Undisputed but irrelevant.**  See response to paragraph 133 above.

**Paragraph 143.  Disputed and irrelevant.** This paragraph is disputed to the extent that it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case. Further, this paragraph is disputed to the extent that it asserts that "[Dr. Waggel] is

only hearing the positive aspects (i.e., the improvement)." In fact, Dr. Khin Khin reported that Dr. Waggel reported Dr. Mehta told her to improve with regard to putting in orders for I&Os. (Def.'s Ex. A at ¶ 157; *see also* Def.'s Ex. A at Ex. 40). Further, this paragraph is disputed to the extent that it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case. Further, the fact is inadmissible hearsay.

**Paragraph 144.  Disputed and irrelevant.** This paragraph is disputed to the extent that it is not relevant to the Defendant's decision to terminate the Plaintiff over a year later, nor any other claim in this case. In addition, on April 14, 2015, Dr. Ayanian submitted a favorable report regarding Dr. Waggel's performance during the preceding three weeks to Dr. Mehta and Dr. Catapano. (Def.'s Ex. A at ¶ 165). In addition, on April 12, 2015, Dr. Ayanian informed Dr. Waggel that she was overall performing well on the internal medicine rotation.  (Waggel Decl. ¶ 24.)

**Paragraphs 146- 157** are not in dispute.

**Paragraph 158.  Disputed.** This fact is disputed because the cystology report generated on May 1, 2015 revealed heavy microscopic hematuria (Def.'s Ex. F). Subsequently, a cystoscopy was conducted on May 5, 2015. (Def.'s Ex. F). A left-sided complex cyst was detected and at the time reported as not "related to her hematuria" by Dr. Engel. (Def.'s Ex. F). The cyst was diagnosed as "benign and essential." Id. Then, Dr. Waggel scheduled a follow up appointment to discuss the results on May 8, 2015 with Dr. Anita Sikand OBGYN because she found it disconcerting that a urologist would not order a uranalysis given the fact Dr. Waggel was visibly urinating blood. (Waggel Decl. ¶¶ 31-39).  This prompted Dr. Waggel to seek a second opinion from Dr. Jarrett, who advised her "If you were my daughter, I would want you to get this removed as soon as possible."  (Waggel Decl. ¶ 39.)

**Paragraphs 158- 162 are not in dispute.**

**Paragraph 165.  Disputed.** It is disputed that "there is no shame, stigma, or penalty attached because it is the right thing to do." (Def.'s Ex. A at ¶ 181). In fact, due to her cyst, Dr. Waggel was instantly stigmatized. Specifically, in the days immediately after Dr. Catapano and Dr Henson learned of Dr. Waggel's illness, Dr. Waggel was required to attend an embarrassing and intimidating meeting with Dr. Catapano wherein Dr. Catapano reviewed her performance, raising issues of her quality of work, and pressuring Dr. Waggel to take leave, though Dr. Waggel made no request at that point. (Def.'s Ex. A at ¶ 172; *see also* Def.'s Ex. A at Ex. 45; *see also* Def.'s Ex. A at ¶¶ 179-180, 182).

**Paragraph 166.  Disputed**. This fact is disputed because in the meeting, Dr. Catapano pressured Dr. Waggel to take leave at least briefly to address her medical issues, refusing to give Dr. Waggel periodic leave to seek follow-up treatment. (Def.'s Ex. A at ¶ 182; *see also* Waggel Decl. ¶¶ 41-42.)

**Paragraph 167.  Undisputed.**

**Paragraph 168.  Disputed.** This fact is disputed because Dr. Catapano pressured Dr. Waggel to take extended leave rather than allow her what she requested, set days off where she could schedule follow up medical appointments.  (Waggel Decl. ¶ 41.)

**Paragraph 169.  Disputed.**  This fact is disputed because Dr. Waggel – who was suffering from cancer—was not "fine."   In addition, extended leave would have done nothing to address Dr. Waggel's needs.  It would have left her with no work and nothing to do between her periodic medical appointments.  That is why Dr. Waggel requested set days off where she could schedule follow up medical appointments, a request that was denied.  (Waggel Decl. ¶¶ 41, 238.)

**Paragraph 170.  Undisputed.**

**Paragraph 171.  Undisputed.**  However, there is no indication that Dr. Waggel was apprised of Dr. Chang's concerns.

**Paragraph 172.  Undisputed.**  However, there is no indication that Dr. Waggel was apprised of Dr. Chang's concerns.

**Paragraph 173.  Disputed.** It is disputed that Dr. Waggel ever presented herself for duty dressed inappropriately (wearing a very form-fitting and high-cut skirt). Dr. Waggel wore a doctors' coat over her outfit every day. (Waggel Decl. ¶ 237.)  Moreover, this fact constitutes gender discrimination and sexual harassment. Though Dr. Waggel has not asserted these claims, the fact remains an illegitimate justification for the Defendant's decision to not promote, ostracize, and terminate Plaintiff.

**Paragraph 174.  Disputed.** This fact is in dispute as it is hearsay, since Dr. Chang did not witness Dr. Waggel cursing loudly in the team room in front of the students and within earshot of patients, and her overall behavior seemed to be escalating. Defendant has offered no firsthand testimony that Dr. Waggel behaved in this way in front of patients.

**Paragraph 175.  Undisputed.**  However, Dr. Waggel notes that her views of what happened that day are set forth in her declaration.  (Waggel Decl. ¶ 35.)

**Paragraph 176.  Undisputed.**  However, Dr. Waggel notes that her views of what happened that day are set forth in her declaration.  (Waggel Decl. ¶ 35.)

**Paragraph 177.  Undisputed.**  However, Dr. Waggel notes that her views of what happened that day are set forth in her declaration.  (Waggel Decl. ¶ 35.)

**Paragraph 178.  Disputed in part.** It is disputed that Dr. Waggel stated that she had been out drinking late the night before. .  (Waggel Decl. ¶ 35.)

**Paragraph 179.  Undisputed.**

**Paragraph 180.  Undisputed.**  However, there is no indication Dr. Waggel was informed of this decision.

**Paragraph 181.  Undisputed.**

**Paragraph 182.  Undisputed.**

**Paragraph 183.  Undisputed.**

**Paragraph 184.  Undisputed.**

**Paragraph 185.  Disputed in part.** It is disputed that Dr. Catapano discussed with Dr. Waggel a "dismissal from the Internal Medicine rotation." Instead, on May 15, 2015, the conversation suggested that Dr. Waggel take personal vacation time to be away from the Program from May 18 to June 7, 2015 in order to avoid termination. In fact, Dr. Catapano later acknowledged that she discussed with Dr. Waggel "giving up vacation days at the end of June" and that she hadn't "heard back yet" about days to make up.  (Def.'s Ex. A at Exh. 53).

**Paragraph 186.   Disputed. This fact is disputed because** Dr. Waggel did not agree to take personal vacation time to be away from the Program. Instead, she decided to seek disability leave from May 18 to June 7, 2015. (Def.'s Ex. A at ¶ 198). That leave was denied. (Def.'s Ex. O at ¶ 13; *see also* Def.'s Ex. O at Ex. 2). Then, Dr. Waggel requested medical leave from May 18 to May 28, and twice asked to meet with Dr. Catapano to discuss the matter. (Def.'s Ex. A at Ex. 53). Eventually, Dr. Waggel took personal vacation to visit Italy and her grandfather. She then took medical leave from May 18 to May 28. (Def.'s Ex. A at Ex. 54).

**Paragraph 187.  Undisputed.**

**Paragraph 188.  Undisputed.**

**Paragraph 189.  Undisputed.**

**Paragraph 190.  Undisputed.**

**Paragraph 191.  Undisputed, but irrelevant.**  As set forth in Plaintiff's Memorandum in Support of its Motion for Summary Judgment at 15, Defendant had a legal obligation to initiate an "interactive process" with regards to Plaintiff's request for an accommodation.  Plaintiff submits that sending an email noting that an ADA accommodation may be available does not satisfy this legal obligation.  In any event, the GWU EEO office also told Dr. Waggel that applying for FMLA leave was the proper course to take time off for medical leave, advice which she followed. (Waggel Decl. ¶ 98, 124-125, 206-207.)  Moreover, Dr. Waggel was granted medical leave from May 18 to May 28. (Def.'s Ex. A at Ex. 54).

**Paragraph 192.  Undisputed, but irrelevant.** See response to Paragraph 191 above.

**Paragraph 193.  Disputed and irrelevant.** See response to Paragraph 191 above. This paragraph is also disputed to the extent what Ms. Turker allegedly told Ms. Vanlewen is hearsay.

**Paragraph 194.  Undisputed, but irrelevant.** See response to Paragraph 191 above.

**Paragraph 195.  Undisputed.**

**Paragraph 196.  Undisputed.**

**Paragraph 197.  Disputed in part.**   It is disputed that Dr. Waggel stated that she had been out drinking late the night before. .  (Waggel Decl. ¶ 35.)

**Paragraph 198.  Disputed in part.** These facts are disputed to the extent they assert that Dr. Chang commented that Dr. Waggel remained "not fit/safe to be participating in patient care," since Dr. Chang's comments that Dr. Waggel was sent home for the day of May 14, 2015, and was asked not to return to the medicine service for the day. (Def.'s Ex. A at Ex. 52).  See Paragraph 185 above.

**Paragraph 199.  Disputed.** This fact is in dispute because Dr. Chang did not prepare a formal evaluation. Instead, Dr. Chang drafted an informal evaluation that was "NOT A MILESTONE." (Def.'s Ex. K at Ex. 2).

**Paragraph 200.  Disputed.** It is disputed that at the point in her training that Dr. Chang completed her evaluation of Dr. Waggel's Internal Medicine performance that she "should have been performing at least at Level 2 in all categories as well as in Level 3 in one or more of the categories." According to the evaluation, "Most interns will start at a Level 2 and progress to a Level 3 on **most** measures by the end of the PGY-1 year." (Def.'s Ex. K at Ex. 2) (emphasis added). As a first-year intern, Dr. Waggel was given Level-2 in nearly every category categories (17), but was rated to need assistance from upper level residents to complete tasks related to patient-interaction in about 4 areas.  (Def.'s Ex. K at Ex. 2).

**Paragraph 201.  Disputed.**  See response to paragraphs 199-200 above. In addition, Plaintiff objects to the Chang declaration because Plaintiff does not believe that Dr. Chang was ever identified as a possible witness.

**Paragraph 202.  Disputed.**  See response to paragraphs 199-200 above.  In addition, Plaintiff objects to the Chang declaration because Plaintiff does not believe that Dr. Chang was ever identified as a possible witness.

**Paragraph 203.  Disputed.** Dr. Waggel took vacation from May 29-June 7, and then medical leave from May 18- May 28.  (Def.'s Ex. A at Ex. 54).

**Paragraph 204.  Disputed.** It is disputed that Dr. Waggel emailed Dr. Catapano on June 1, 2015 to clarify her leave. Dr. Waggel emailed Dr. Catapano while on personal vacation visiting her grandfather for his 89th birthday, after those vacation days had been granted to her. (Def.'s Ex. A at Ex. 54; *see also* Def.'s Ex. A at Ex. 53). In that email, she did not "voluntarily" gave up her

vacation days at the end of June. *Id.* Instead, Dr. Waggel asked about whether she could change her vacation days from the end of June to the beginning of June. *Id.* Dr. Catapano then requested that Dr. Waggel come in during her requested vacation days to discuss arranging medical leave. *Id.*

**Paragraph 205.  Undisputed.**

**Paragraph 206.  Undisputed.**

**Paragraph 207.  Undisputed.**

**Paragraph 208.  Disputed in part.** This paragraph is disputed in part even if Dr. Katie Byrd reached out to Plaintiff because Dr. Waggel struggled to arrange for appointments in this period. (Waggel Decl. ¶¶ 42-45.)

**Paragraph 209.  Disputed.** The fact that Dr. Waggel was scheduled for 14 shifts during her Emergency Medicine rotation is disputed. Dr. Waggel worked 20 shifts.  (Waggel Decl. ¶ 46.) Dr. Waggel was initially scheduled to end her Emergency Medicine rotation on June 30. (Waggel Decl. ¶ 44.)   This is because Dr. Catapano scheduled her to work an extra week in the Emergency Medicine rotation. (Waggel Decl. ¶ 44.) In the end, Dr. Waggel worked 20 shifts: June 8-11, June 14, June 16-18, June 22-23, June 26-27, June 29-30, July 1-2, and July 4-7. (Waggel Decl. ¶ 46.)

**Paragraph 210.  Disputed in part.** This fact is disputed to the extent it asserts that Dr. Waggel "had time during the day to attend medical appointments."  (Waggel Decl. ¶ 42.)

**Paragraph 211.  Disputed.** This fact is disputed because it is a self- interested declaration and therefore inadmissible at trial. At no time during Dr. Waggel's tenure as a medical resident did the Emergency Medicine Residency Training Program Director, Dr. Colleen Roche, note that when Dr. Waggel began the rotation it was clear that she had significant deficits in her medical

knowledge, and was far behind where she should have been in that regard compared to other non-ED residents.

**Paragraph 212.  Disputed.** This fact is disputed because it is a self- interested declaration of opinion not fact and therefore inadmissible.

**Paragraph 213.  Disputed.** This fact is disputed because Dr. Waggel was not scheduled to work a shift in the ED beginning at 7:00 a.m. on June 10, 2015. Dr. Waggel was told that off service residents like her are not required to attend grand rounds, so she arrived at the emergency room at approximately 9:00 a.m. after grand rounds were completed.  (Waggel Decl. ¶ 38.)

**Paragraph 214.  Disputed.** This fact is disputed because Dr. Waggel arrived at 9:00 a.m. for her shift, and also because Dr. Roche and other members of the team on shift in the ED that day did not call, text, and email her without response. In fact, Dr. Waggel later submitted her phone bill to Dr. Dyer, which shows that on June 10, 2015, she did not receive a single call from Dr. Roche, the Defendant, or other team members until after she arrived at the hospital (after 9:00 a.m..). (Waggel Decl. ¶ 39.)

**Paragraph 215.  Disputed.** This fact is a self-interested declaration that is inadmissible. It is further disputed that "Dr. Roche checked with all member of the team to determine whether Dr. Waggel had alerted anyone that she would not be at work that day and discovered that she had not, nor had she contacted any of her colleagues in an attempt to find coverage for the shift." (Def.'s Ex. G at ¶ 25). In fact, Dr. Waggel corresponded with fellow resident Dr. Katherine Newell and also was told by Defendant that she would receive coverage around 2:30 p.m. so that she could attend her medical appointment with Dr. Jarrett. Instead, Dr. Waggel worked her whole shift and went to her appointment after work, late. (Waggel Decl. ¶ 39.)

**Paragraph 216.  Disputed.** This fact is disputed because it is a self-interested declaration and so is inadmissible.

**Paragraph 217.  Disputed.** It is disputed that "[a]fter several hours, Dr. Waggel was reached by phone and stated that she was not feeling well that day and decided not to come to work." (Def.'s Ex. G at ¶ 23).  This fact is disputed because it is a self-interested declaration. Dr. Waggel worked her full shift on June 10, 2015, and received no phone calls prior to her arrival at approximately 9:00 a.m. (Waggel Decl. ¶ 39.)

**Paragraph 218.  Disputed.** It is disputed that Dr. Roche engaged in a conversation with Dr. Waggel in which she agreed "to come to work for the rest of her shift." (Def.'s Ex. G at ¶ 24). Dr. Waggel received no phone calls in the morning prior to her voluntary arrival after grand rounds on June 10, 2015 at approximately 9:00 a.m. (Waggel Decl. ¶ 39.)   However, Dr. Waggel submits that she had been previously told that it was not necessary for off shift residents to attend grand rounds.  (Waggel Decl. ¶ 38.)

**Paragraph 219. Disputed.** This fact is disputed as a self-interested declaration and is inadmissible. Though Waggel had been made aware of the protocol for requesting off in advance for scheduled appointments and for finding coverage for an unexpected need for an absence, she followed that protocol and her actions on June 10 were clearly compliant with that protocol. (Waggel Decl. ¶¶ 38-39.)

**Paragraph 220.  Undisputed.**

**Paragraph 221.  Undisputed.**

**Paragraph 222.  Undisputed.**

**Paragraph 223. Disputed in part.**  This fact is disputed to the extent that it relies on an inadmissible and self-interested declaration. Defendant counsel obtained this declaration in

44

violation of patient confidentiality, since it was sought without Dr. Waggel's permission. (Waggel Decl. ¶¶ 279-280.)   This serious violation was enabled by Defendant because Dr. Jarrett is Defendant's employee. This declaration is inappropriate, and potentially in violation of medical ethics, as such no reasonable jury will be persuaded by this ex post facto declaration. Further, when Dr. Waggel met with Dr. Jarret, he stated that Dr. Waggel's tumor did not look good and she that "if you were my daughter I would want you to get this removed as soon as possible." (Waggel Decl. ¶ 39.)

**Paragraph 224. Disputed in part.** This fact is disputed to the extent that it relies on an inadmissible and self-interested declaration. Defendant counsel obtained this declaration in violation of patient confidentiality, since it was sought without Dr. Waggel's permission. (Waggel Decl. ¶¶ 279-280.) This serious violation was enabled by Defendant because Dr. Jarrett is Defendant's employee. This declaration is inappropriate, and potentially in violation of medical ethics, as such no reasonable jury will be persuaded by this ex post facto declaration. Further, when Dr. Waggel met with Dr. Jarret, he stated that Dr. Waggel's tumor did not look good and she that "if you were my daughter I would want you to get this removed as soon as possible." (Waggel Decl. ¶ 39.)

**Paragraph 225. Disputed in part.** This fact is disputed to the extent that it relies on an inadmissible and self-interested declaration. Defendant counsel obtained this declaration in violation of patient confidentiality, since it was sought without Dr. Waggel's permission. (Waggel Decl. ¶¶ 279-280.) This serious violation was enabled by Defendant because Dr. Jarrett is Defendant's employee. This declaration is inappropriate, and potentially in violation of medical ethics, as such no reasonable jury will be persuaded by this ex post facto declaration. Further, when Dr. Waggel met with Dr. Jarret, he stated that Dr. Waggel's tumor did not look good and she that

"if you were my daughter I would want you to get this removed as soon as possible." (Waggel Decl. ¶ 39.).

**Paragraph 226.  Undisputed.**

**Paragraph 227. Disputed in part.**   This fact is disputed to the extent that it relies on an inadmissible and self-interested declaration. Defendant counsel obtained this declaration in violation of patient confidentiality, since it was sought without Dr. Waggel's permission. (Waggel Decl. ¶¶ 279-280.) This serious violation was enabled by Defendant because Dr. Jarrett is Defendant's employee. This declaration is inappropriate, and potentially in violation of medical ethics, as such no reasonable jury will be persuaded by this ex post facto declaration. Further, when Dr. Waggel met with Dr. Jarret, he stated that Dr. Waggel's tumor did not look good and she that "if you were my daughter I would want you to get this removed as soon as possible."  (Waggel Decl. ¶ 39.)

**Paragraph 228.  Undisputed.**

**Paragraph 229.  Disputed.** This is a self-interested declaration and therefore inadmissible. Dr. Catapano did not assure Dr. Waggel that she would have the full support of the Program with respect to her request for leave based on whatever date her surgeon selected for the surgery and her recovery time. Instead, Dr. Catapano worked against Dr. Waggel, and ostracized her from the Program. For example, when Dr. Waggel attempted to work with Dr. Emejuru and her emergency medical chiefs to arrange her post-surgery schedule, Dr. Catapano emailed them to tell her to "disregard" Dr. Waggel's request. (Def.'s Ex. C at ¶ 15; *see also* Def.'s Ex. C at Ex. 2)

**Paragraph 230.  Undisputed.** It is not disputed that Dr. Catapano advised Dr. Waggel to communicate her schedule needs with Dr. Emejuru so that he could coordinate her schedule with that of the other PGY2s regarding her upcoming sick leave. (Def.'s Ex. A at ¶ 224.)

**Paragraph 231.  Undisputed.**

**Paragraph 232.  Undisputed.**

**Paragraph 233.  Undisputed.**

**Paragraph 234.  Disputed in part.** These facts are disputed to the extent they assert Dr. Waggel had not contact Dr. Emejuru to work out her schedule. In fact, Dr. Waggel contacted Dr. Emejuru on June 12, 2015, (Def.'s Ex. C at ¶ 13; *see also* Def.'s Ex. C at Ex. 1). Dr. Emejuru and Dr. Waggel also spoke on the phone on June 15, 2015 to about her surgery and medical leave plans. (Def.'s Ex. C at ¶ 14). Subsequently, Dr. Waggel emailed her emergency medical Chiefs and Dr. Emeguru to work out her schedule (copying Dr. Catapano) to arrange her schedule. (Def.'s Ex. C at ¶ 15; *see also* Def.'s Ex. C at Ex. 2). Dr. Catapano ostracized and embarrassed Dr. Waggel by writing to all of the emergency medical chiefs and Dr. Emejuru that they "should disregard the email," and harassed Dr. Waggel by "again request[ing] that Dr. Waggel contact Dr. Emejuru to work out her schedule," failing to note that Dr. Emejuru was copied on the email and disregarding their earlier contact about the matter. (Waggel Decl. ¶¶ 42-43.)

**Paragraph 235.  Undisputed.**

**Paragraph 236.  Undisputed.**

**Paragraph 237.  Undisputed.**

**Paragraph 238.  Undisputed.**

**Paragraph 239.  Undisputed.**

**Paragraph 240.  Undisputed subject to clarification.**  However, it should be noted in discussing the proposed schedule for surgery, Dr. Emerjuru also appears to corroborate Dr. Waggel's statement that she requested two weeks light duty on her return from surgery, something that was

evidently promised, but certainly was not provided.   (*Compare* Def.'s Ex. C at ¶ 36 with Waggel Decl. ¶¶ 40, 63-66, 69, 72-73.)

**Paragraph 241.  Disputed.** This fact is disputed because Dr. Roche failed to convey that Dr. Waggel's continued struggle in the ED were due to anything specifically, and failed to convey firsthand knowledge. Instead, she wrote, "I will try to get you more specifics but I have received multiple comments about her poor clinical performance." (Def.'s Ex. G at Ex. 1). Further, this fact is disputed because Defendant has failed to establish its relevancy to the decision to terminate Dr. Waggel at the end of her PGYII year. Dr. Waggel's PGY2 year began on July 1, 2014. (Def.'s Ex. A at Ex. 4). Therefore, her performance during her PGYI year is not justification for termination, since if it raised valid concerns, than she would not have been promoted.

**Paragraph 242.  Disputed.** This fact is disputed because it relies on a self-interested declaration that is inadmissible and because it is hearsay. The fact is further disputed because Dr. Waggel's senior ED residents who worked closely with Dr. Waggel never attempted to address these concerns with her for formal or informal feedback during her rotation. Further, this fact is disputed because Defendant has failed to establish its relevancy to the decision to terminate Dr. Waggel at the end of her PGYII year. Dr. Waggel's PGY2 year began on July 1, 2014. (Def.'s Ex. A at Ex. 4). Therefore, Dr. Waggel's performance during her PGYI year is not justification for termination, since if it raised valid concerns, than she would not have been promoted.

**Paragraph 243.  Disputed.** This fact is disputed because Defendant has failed to establish its relevancy to the decision to terminate Dr. Waggel at the end of her PGYII year. Dr. Waggel's PGY2 year began on July 1, 2014. (Def.'s Ex. A at Ex. 4). Therefore, her performance during her PGYI year is not justification for termination, since if it raised valid concerns, than she would not

have been promoted. Moreover, all of Dr. Crone's comments in a short email appear to be based on inadmissible hearsay.

**Paragraph 244.  Undisputed.**

**Paragraph 245.  Undisputed.**

**Paragraph 246.  Disputed.** This fact is disputed because it relies on a self-interested declaration and is inadmissible. Further, it is disputed that Dr. Waggel's first class with Dr. Collins was to be on July 9, 2015. In fact, Dr. Waggel was specifically ordered by her supervisor, Dr. Emejuru, that "she should perform the internal medicine clinical rotation and not be at didactics." (*See* Def.'s Ex. C at Ex. 13; *See also* Def.'s Ex. C at ¶ 38). When she learned Dr. Collins was upset that she had missed didactics, Dr. Waggel emailed Dr. Collins stating that "she was under the impression that someone else had informed Dr. Collins." (Def.'s Ex. I at ¶ 12; *see also* Def.'s Ex. I at Ex. 2). Indeed, Dr. Waggel was previously directed by Dr. Catapano, at least twice, directed Dr. Waggel to coordinate her schedule through Dr. Emejuru, and not contact others in the program directly. (Def.'s Ex. A at ¶ 224; Def.'s Ex. C at ¶ 16). Therefore, when Dr. Waggel learned Dr. Emejuru failed to notify Dr. Collins that Dr. Waggel would be missing didactics, she wrote to Dr. Emejuru that "I was actually very upset that I was given such a hard time about going to this appointment. One should be understanding I'm having major surgery and likely I have cancer. I had to fill out my Living Will and get a power of attorney. I also had to meet with the anesthesiologist at very short notice. This time was the only time available to do this and I explained that. It's not as if I chose for this to happen to me. I will [sic] feel a huge lack of support." Ex. G. Moreover, Dr. Waggel also mentioned the absence to Victoria Anderson, who was the go-to person for didactics, but she apparently did not tell Dr. Collins Dr. Waggel would be absent either. (*See* Waggel Declaration ¶¶ 47-48.)

**Paragraph 247.  Undisputed.**

**Paragraph 248.  Undisputed.**

**Paragraph 249.  Undisputed.**

**Paragraph 250.  Undisputed.**

**Paragraph 251.  Undisputed.**

**Paragraph 252.  Disputed.** This fact is disputed because it is a self-interested declaration and inadmissible. It was not clear from Dr. Waggel's response that she did not appreciate that the issue arose out of her failure to notify anyone in advance that she was not going to show up for clinical duty. Dr. Waggel responded to Dr. Catapano's email stating, "Thank you for checking in. We can meet whenever you have time but I should probably not miss any of my medicine time though. I have a doctor's excuse for that day and I will be happy to talk about it with Dr. Dyer after my surgery. Have a nice evening." (Def.'s Ex. A at Ex. 70; *See also* Def.'s SOF at ¶ 251, supra). Further, it is disputed that "a doctor's excuse was no explanation of or justification for this clear departure from professional standard." (Def.'s Ex. A at ¶ 251). In fact, a doctor's excuse is an explanation and justification for missing work, if requested by the Program, per Defendant's resident manual.  Also, a reasonable jury would believe that receiving a cancer diagnosis, as described in the doctors' note, is explanation and justification for sub- par performance or missing work. Finally, Plaintiff disputes that the LOD accurately depicted what happened that day. (Waggel Decl. ¶¶ 38-39.)

**Paragraphs 254 – 255. Undisputed**.  However, also see response to Paragraph 246 above.

**Paragraph 256.  Disputed.** See response to Paragraph 246 above.  This fact is disputed as a self-interested declaration and is inadmissible. Dr. Emeruju gave Dr. Waggel difficulty. First, it appears that Emejuru had ordered Waggel to stay on clinical duties that day.  Moreover, Dr. Waggel did

advise Victoria Anderson of her last minute appointment, given the facts that it related to didactics, but Anderson did not advise Dr. Collins about the appointment.  She was tending to clinical duties as ordered by Dr. Emeruju. Therefore, Dr. Waggel did not "simply [go] to the appointment and no showed for didactics after telling Dr. Collins she would attend."

**Paragraph 257.  Undisputed, subject to clarification.** Dr. Waggel hosted friends and colleagues at her house. This was an opportunity for friends to comfort her regarding her prognosis and upcoming surgery. They jokingly referred to this party as the "Kidney Party."   (Waggel Declaration ¶ 52.)

**Paragraphs 258-267.  Undisputed.**

**Paragraph 268.  Undisputed, subject to clarification.**  Dr. Waggel wrote this email to blunt any negative ramifications from communications Dr. Waggel had with ACGME resident services department about the difficulty residents have in scheduling medical appointments.  (Waggel Declaration ¶ 57.)

**Paragraphs 269-270.  Undisputed.**

**Paragraph 271. Disputed in part.**  This fact is disputed to the extent that it relies on an inadmissible and self-interested declaration. Defendant counsel obtained this declaration in violation of patient confidentiality, since it was sought without Dr. Waggel's permission. (Waggel Decl. ¶¶ 279-280.) This serious violation was enabled by Defendant because Dr. Siegel is Defendant's employee. This declaration is inappropriate, and potentially in violation of medical ethics, as such no reasonable jury will be persuaded by this ex post facto declaration. Further, Plaintiff disputes that her surgery was "curative" to the extent this term is meant to suggest Plaintiff's cancer has been "cured" rather than being in remission. (Waggel Decl. at ¶ 281; *See also* Shephard Decl. at ¶ 12.)

**Paragraph 272.  Undisputed subject to clarification.**  See concerns expressed in Paragraph 271 above about Dr. Siegel's divulgence of medical information without authorization.

**Paragraph 273.  Undisputed subject to clarification.**  See concerns expressed in Paragraph 271 above about Dr. Siegel's divulgence of medical information without authorization.

**Paragraph 274. Disputed in part.**  Plaintiff disputes this paragraph to the extent it asserts without foundation that Plaintiff was "recovered."

**Paragraph 275. Disputed in part.** While it is true Plaintiff was scheduled for night call duty immediately upon her return from surgery, it is disputed that the night shift is "less demanding than other shifts and can provide significant over-night rest time."   Indeed, Plaintiff pulled day and night shifts during the period, which included the two weeks she was supposedly on "light duty."  (Waggel Decl. at ¶¶ 69, 72, 74.)

**Paragraph 276.  Undisputed subject to clarification.**   These allegations are disputed to the extent they are supported by a self-serving declaration that was obtained in violation of Plaintiff's privacy under federal law. (Waggel Decl. at ¶¶ 279-280.)

**Paragraph 277. Disputed.** Shortly after Dr. Waggel returned to work (post-surgery), Dr. Catapano issued her second and last Milestone evaluation of residency, formally reviewing her work for PGY1. This evaluation placed Dr. Waggel at and above the PGY1 level for the second half of her PGY1 year. She also received a promotion thereafter, and continued to work as a resident at GWU for over a year. She never received another Milestone evaluation, although per ACGME policy she should have received at least two more. (Waggel Decl. ¶ 60.)

**Paragraph 278.  Disputed.** Dr. Waggel received a Letter of Deficiency regarding her June 10 no show for an ED shift. Dr. Catapano accused her of failing to provide notice to her colleagues, and not showing up for her shift. Dr. Waggel responded that she did show up for the shift and the letter

was in error. (Waggel Decl. at ¶¶ 38-39.)  On the day in question, Dr. Jarett said her tumor did not look good and that "if you were my daughter I would want you to get this removed as soon as possible." *Id.*

**Paragraph 279.  Undisputed, subject to clarification.** While it is true that Dr. Catapano presented Dr. Waggel with the Letter of Deficiency, dated July 15, 2015, and may have discussed with her that this was not intended as a punitive measure, the LOD was in fact used as a basis to punish Dr. Waggel for taking time off to address her health issues.  The meeting was intimidating since Dr. Catapano ordered Dr. Waggel to meet with the CCC Chair, Dr. Dyer, refused to listen to Dr. Waggel's complaints that the letter was inaccurate, and threatened to terminate Dr. Waggel. (Def.'s Ex. A at ¶ 275). In fact, the letter was punitive, and no plan for resolution was provided to Dr. Waggel. The letter was issued because Dr. Waggel attended a medical appointment, the medical appointment wherein she received upsetting news of her cancer diagnosis. Dr. Waggel informed Dr. Catapano of this fact, and was eager to provide a doctors' note, per the faculty manual, in order to clear up the matter, and in the hopes of being treated with compassion. Instead, although Dr. Catapano knew she was to have surgery in five days and be on leave for recovery for two weeks after, Dr. Catapano ordered Dr. Waggel to meet with the Program Chair, Dr. Dyer, within two weeks, interfering with her medical leave. (Waggel Decl. at ¶¶ 49-50.)

**Paragraph 280.  Disputed.** Dr. Catapano did not make the statements alleged, but instead asked Dr. Waggel to come in to work during her medical leave (within two weeks) in order to remediate the matter with the CCC Chair, Dr. Dyer.  The asserted statement is supported by a self-interested declaration. (Waggel Decl. at ¶¶ 49-50.)

**Paragraph 281.  Undisputed, subject to clarification.** While Dr. Catapano ordered Dr. Waggel to meet with Dr. Allen Dyer within two weeks, she led Dr. Waggel to believe the discussion would

be in order to clarify and correct inaccuracies in the second deficiency letter. Moreover, this order interfered with Dr. Waggel's medical leave, since those two weeks were during her recovery for surgery. (Waggel Declaration ¶¶ 49-50.)

**Paragraph 282. Undisputed.**

**Paragraph 283. Disputed.** This allegation was disputed to the extent that it is supported by a self-interest declaration submitted after the close of discovery.

**Paragraph 284. Undisputed, subject to clarification.** Dr. Waggel never received notice of Dr. Greene's complaints. She does recall that on or around August 7, 2015, she emailed Doctors Catapano, Kels, Minor, Gandhi, Torres, Greene and Emejuru to alert them about her efforts to address an exchange with a member of the Orange team. (Waggel Decl. at ¶ 62.) Dr. Waggel informed them that she met the person in question and had a discussion with her about how the situation could be addressed in the future. (*Id.*) They worked out their tensions and formed a solution. (*Id.*) No one responded to her email, and this incident was not raised again with Dr. Waggel. (*Id.*) She received no notice that this interaction or any other would be used to attack her professionalism for the purposes of terminating her several months later.

**Paragraph 285. Disputed.** This statement is disputed to the extent it relies on a self-interested declaration offered after the close of discovery. See response to Paragraph 284.

**Paragraph 286. Disputed.** See response to Paragraph 284-5.

**Paragraph 287. Disputed.** See response to Paragraph 284-5.

**Paragraph 288. Disputed.** See response to Paragraph 284-5.

**Paragraph 289. Disputed.** See response to Paragraph 284-5.

**Paragraph 290. Undisputed, subject to clarification.** See response to Paragraph 284-5.

**Paragraph 291.  Disputed.** This statement is disputed to the extent that it is supported by a self-interested declaration submitted after the close of discovery, and is therefore inadmissible. See also response to Paragraph 284-5.

**Paragraph 292.  Undisputed, subject to clarification.** See response to Paragraph 284.

**Paragraph 293.  Disputed.** See response to Paragraph 284. Further, Dr. Waggel reported that she "had a stressful conversation with the orange team which [she] felt was unprofessional," and it was clear that Dr. Waggel was the one who thought the intern's behavior was unprofessional, and that she dealt with it professionally with the intern and that no intervention by any supervisor was necessary.

**Paragraph 294. Disputed.**  This statement is a self-interested declaration, hearsay, and inadmissible. Further, it is disputed that Dr. Waggel lacked self-observation. In fact, Dr. Waggel was making frequent efforts to work with the Program, which were met with hostility or no response at all.

**Paragraph 295.  Undisputed, subject to clarification.** Text message was a frequent and accepted method of communication between employees of the Defendant.  See also response to Paragraphs 284-285.

**Paragraph 296.  Disputed in part.** Though it is true that "Dr. Emejuru apologized for not alerting [Dr. Waggel] to the email and that Dr. Greene did not discuss the incident with her first, but noted that it could be 'common thing that could happen with you being in the position you are in'", it is not clear that he was referring to the reports of Dr. Waggel's behavior. In fact, it is more probable that Dr. Emeruju was referring to the fact that he had observed Dr. Waggel was subjected to particularly harsh scrutiny by Dr. Catapano because of her absences from work related to medical leave, and her complaints to the Program about this mistreatment.

55

**Paragraph 297.  Undisputed, subject to clarification.** Though Dr. Emejuru claimed Dr. Waggel was not "in trouble" and that she "should come with a mindset of people trying ultimately see [sic] you do well, succeed, etc. NOBODY wants to see anything else." (Def.'s Ex. C at ¶¶ 64, 67; *see also* Def.'s Ex. C at Ex. 22)

**Paragraph 298.  Undisputed.**

**Paragraph 299.  Undisputed.**

**Paragraph 300.  Undisputed.**

**Paragraph 301.  Undisputed, subject to clarification.** Dr. Waggel was complaining about being mistreated and not "adding flames to the fire."  It also important to note that this event occurred when Dr. Waggel was supposedly on "light duty."  (Waggel Decl. at ¶¶ 63-66.)

**Paragraph 302.  Undisputed.**

**Paragraph 303.  Undisputed.**

**Paragraph 304.  Undisputed.**

**Paragraph 305.  Undisputed.**

**Paragraph 306.  Undisputed.**

**Paragraph 307.  Disputed in part.** It is true that on August 12, 2015, Dr. Waggel emailed Dr. Allen Dyer, the faculty member assigned to supervise the remediation plan in her July 15 LOD, in response to an email from him regarding a request that she complete a document known as the Epstein Exploitation Index (which provides an early warning indicator of boundary violations in psychotherapy) and then compare the score on the index with the score recorded on the same index before she had taken the seminar. However, Dr. Waggel did not "totally missed the point of the request." In fact, Dr. Dyer was oblivious to the fact that Dr. Waggel did not attend the seminar because she was on leave for medical reasons. Dr. Dyer, the Program Chair, did not understand

her response because he took no responsibility in assuring Dr. Waggel's residency accommodated her disability. Moreover, rather than asking for clarification regarding Dr. Waggel's response, he answered in a derisive manner that betrayed a lack of fairness in the remediation process. (See Spitz Report at 8, Tompa Declaration (as attached to Pl's Mot. for Sum. J.), Exhibit Z.)

Further, it is not a 'non sequitur' that Dr. Waggel could not "compare the score on the index with the score recorded on the same index before she had taken the seminar" because   of her medical leave. She could not conduct the comparison because she missed the exercise while on medical leave.  (*Id.*)  Moreover, due to Dr. Dyer's clear misunderstanding, hostility, or ignorance, it made sense that she would respond by requesting a meeting with him. Dr. Dyer remains, to this day, irresponsibly unaware and disinterested in Dr. Waggel's disability, performance and her need to take medical leave, and despite his ignorance as to the circumstances, supported her eventual termination. (Def.'s Ex. M at ¶ 18; *see also* Def.'s Ex. M at Ex. 2).

**Paragraph 308. Undisputed, subject to clarification.**   Dr. Dyer's condescending and hostile attitude also shows that Dr. Dyer was not fulfilling his responsibilities to meet with Dr. Waggel to discuss her disability, medical leave, and assure she was properly accommodated. The LOD was issued by the Program, and as CCC Chair he should have been in possession of the LOD. It was also disingenuous to deny he was in receipt of her request for a meeting, since Dr. Waggel successfully sent them to his inbox by email. (*See also* Waggel Decl. at ¶¶ 61, 67-68, 70-71, 91-94)

**Paragraph 309.  Undisputed, subject to clarification.** Dr. Griffith's course did not meet every Thursday, as Dr. Griffith cancelled or missed class during Dr. Waggel's attendance on four occasions.  (Waggel Decl. at ¶¶ 151-152).

**Paragraph 310.  Undisputed.**

**Paragraph 311.  Undisputed, subject to clarification.** While the ACGME requires training, the Defendant is responsible for designing training course curriculum and requirements.

**Paragraph 312.  Undisputed.**

**Paragraph 313.  Undisputed.**

**Paragraph 314.  Undisputed.**

**Paragraph 315. Dispute in part.** While residents are generally aware of the ACGME requirements and the necessity for demonstrating mastery of the necessary skills and medical knowledge to be deemed clinically competent to provide patient care, residents do not generally recognize and appreciate the importance of performing well in the didactics courses. To the contrary, residents frequently skipped courses. (Waggel Decl. at ¶ 152.)  Dr. Waggel was encouraged to prioritize studying for licensing boards over didactics, and was once ordered to miss didactics in order to conduct clinical work by her attending. (Waggel Decl. at ¶ 42.)  Moreover, despite Dr. Griffith's allegation that Dr. Waggel did not perform well in his course, she passed the national licensing exam with above average scores in neuroscience. (Waggel Decl. at ¶ 126.)

**Paragraph 316.  Undisputed.**

**Paragraph 317.  Undisputed.**

**Paragraph 318. Undisputed, subject to clarification.**   Defendant suggests that Plaintiff received a 33 on Griffith's exam after being accommodated as to when she could take it. In fact, Dr. Waggel was scheduled to take the exam after having worked 24 consecutive hours and given half the time as the other PGY2s to take the exam.  (Waggel Decl. at ¶ 267.)  Moreover, despite Dr. Griffith's allegation that Dr. Waggel did not perform well in his course, she passed the national licensing exam with above average scores in neuroscience. (Waggel Decl. at ¶ 126.)

**Paragraph 319.  Disputed.** It is disputed that Dr. Waggel handled the patient on August 25, 2015 poorly. (Waggel Decl. at ¶¶ 74-81). Further, the attending who was assigned to assist Dr. Waggel in the incident did not show up, but the Program did not reprimand that attending (Dr. Khin Khin). (Waggel Decl. at ¶ 82;  *see also* Spitiz Report at 6, Tompa Declaration (as attached to Pl.'s Mot. for Sum. J.), Exhibit Z.).  This statement is also disputed to the extent it is inadmissible hearsay.

**Paragraph 320.  Disputed. See response to Paragraph 319.**

**Paragraph 321.  Undisputed subject to clarification.** Dr. Waggel's patient care style is not unethical nor ineffective, generally. In fact, her ability to handle crises have been called "heroic" by Dr. Catapano in the past. (Def.'s Ex. A at ¶ 308.)

**Paragraph 322.  Undisputed, subject to clarification.** See response to Paragraph 319.

**Paragraph 323.  Disputed.** See response to Paragraph 319.

**Paragraph 324.  Undisputed, subject to clarification.** See response to Paragraph 319.

**Paragraph 325.  Disputed.** See response to Paragraph 319.

**Paragraph 326.  Disputed.** See response to Paragraph 319.

**Paragraph 327.  Disputed.** See response to Paragraph 319.

**Paragraph 328.  Disputed.** See response to Paragraph 319.

**Paragraph 329.  Disputed.** See response to Paragraph 319.

**Paragraph 330.  Undisputed, subject to clarification.**  See response to Paragraph 319.

**Paragraph 331.  Disputed.** See response to Paragraph 319.

**Paragraph 332. Disputed  in  part.**   While  Dr.  Khin  Khin's  report  may  have  stated  these allegations, in fact Dr. Khin Khin refused to come in to assist Dr. Waggel on the call question. Further, Dr. Khin Khin's behavior, refusing to come in or assist in any meaningful way over the

phone, violated ACGME guidelines, but she was not subject to discipline. (Spitz Report at 6, Tompa Declaration (as attached to Pl.'s Mot. for Sum. J), Exhibit Z.)

**Paragraph 333.  Disputed.**  Plaintiff objects that the claim that "multiple clinicians had raised concerns regarding Dr. Waggel's skill and style on inter-professional communication while taking overnight call" is heresay.  (Def.'s Ex. A at Ex. 81).

**Paragraph 334.  Undisputed, subject to clarification.** Dr. Waggel contacted Dr. Norris because Dr. Khin Khin failed to make herself available as required by ACGME guidelines, endangering the staff and patient. (Spitz Report at 6, Tompa Declaration (as attached to Pl.'s Mot. for Sum. J), Exhibit Z.)  Further, Dr. Waggel was fatigued because she was overworked and under-supported by the program. Even Dr. Norris noted her fatigue. (Def.'s Ex. A at Ex. 81).

**Paragraph 335.  Undisputed, subject to clarification.** Dr. Waggel was fatigued because she was pulling sequential day and night shifts instead of light duty after surgery.  Even Dr. Norris noted her fatigue. (Def.'s Ex. A at Ex. 81).

**Paragraph 336.  Undisputed, subject to clarification.**  See response to paragraph 335 above.

**Paragraph 337.  Undisputed, subject to clarification.**  See response to paragraph 335 above.

**Paragraph 338.  Undisputed, subject to clarification.**  See response to paragraph 335 above.  .

**Paragraph 339.  Undisputed, subject to clarification.**   See response to paragraph 335 above.

**Paragraph 340.  Undisputed, subject to clarification.**  Dr. Norris may have misunderstood Dr. Waggel as she had a cancerous cyst in her kidney removed.

**Paragraph 341.  Undisputed, subject to clarification.**  See response to paragraph 335 above.

**Paragraph 342.   Undisputed.**

**Paragraph 343.  Undisputed, subject to clarification.**  See response to paragraph 335 above.

**Paragraph 344- 351. Undisputed.**

**Paragraph 352.  Undisputed, subject to clarification.**  (See Waggel Decl. at ¶¶ 74-86.)

**Paragraph 353.  Undisputed, subject to clarification.**  (See Waggel Decl. at ¶¶ 74-86.)

**Paragraph 354.  Disputed.** Dr. Waggel worked about 27 consecutive hours and had not had a proper meal in four days. (Waggel Decl. at ¶¶ 84- 85.)

**Paragraph 355.  Disputed.** This statement is denied and moreover the allegation is inadmissible as a self-interested statement. Moreover, Dr. Catapano did not formally advise Dr. Waggel. On Dr. Waggel's walk home after the incident on Sixth South, she stopped to explain to Dr. Catapano what had happened, and to notify her that she was going home to eat and sleep, instead of returning to work. (Waggel Decl. at ¶¶ 87- 88.)   She also expressed her concerns about the lack of communication on Six South at night. (*Id.*) Dr. Catapano reacted with hostility to Dr. Waggel's complaint. Dr. Catapano stated, "Six South is dangerous and residents just have to deal with that." She told Dr. Waggel to work on "fatigue management." (*Id.*)

**Paragraph 356. Disputed in  part.** Plaintiff disputes this paragraph as self- serving.   Dr. Catapano did not provide Dr. Waggel with adequate support or help thereafter. Her requirement that Dr. Waggel pull sequential day and night shifts rather than light duty after returning from surgery and then criticize her for lack of "fatigue management" speaks volumes.  (Waggel Decl. at ¶ 69.)

**Paragraph 357.  Disputed in part.** Plaintiff disputes this paragraph as self- serving.   Dr. Catapano did not provide Dr. Waggel with adequate support or help thereafter. Her requirement that Dr. Waggel pull sequential day and night shifts rather than light duty after returning from surgery and then criticize her for lack of "fatigue management" speaks volumes.  (Waggel Decl. at ¶ 69.)

**Paragraph 358.  Undisputed.**

**Paragraph 359.  Undisputed.**

**Paragraph 360.  Undisputed, subject to clarification.** Though she sought support, Dr. Waggel never received trauma counseling nor did she ever learn whether she had a HIV exposure because patient A's daytime doctor, Dr. Caroline Roberts (the same doctor who did not order PRN medications) also failed to order a HIV test as Dr. Waggel asked.  (Waggel Decl. at ¶¶ 83, 89.)

**Paragraph 361.  Disputed.** The email sent by Dr. Waggel about Dr. Roberts' putting PtA and Dr. Waggel at risk by her failure to order PRN medications and an HIV test was entirely appropriate given Dr. Roberts' (an intern's) refusal to accept feedback from a PGY2.  The fact that Roberts' apparently was not disciplined for her negligence while Dr. Waggel's efforts to address this issue are cited as a lack of her professionalism also speaks volumes about GWU's psychiatry administration and its efforts to ostracize Dr. Waggel.

**Paragraph 362.  Undisputed, subject to clarification.**  See response to Paragraph 361 above.

**Paragraph 363.  Undisputed, subject to clarification.**  See response to Paragraph 361 above.

**Paragraph 364.  Undisputed, subject to clarification.**  See response to Paragraph 361 above.

**Paragraph 365.  Undisputed, subject to clarification.** Dr. Roberts' reaction was inappropriate since she was a PGY1 intern, while Dr. Waggel was a PGY2. The Program's insistence on discrediting Dr. Waggel, embarrassing her, and undermining the respect she had among her peers speaks to the way in which the program disregarded her complaints about mistreatment. See also response to Paragraph 361 above.

**Paragraph 366.  Undisputed.**

**Paragraph 367.  Undisputed.**

**Paragraph 368.  Undisputed.**

**Paragraph 369.  Undisputed.**

**Paragraph 370.  Undisputed, subject to clarification.** Given Dr. Khin Khin's lack of interest in coming in and instruction to "call someone else" it's not surprising that Dr. Waggel did not mention conversations with Dr. Khin Khin to Dr. Emejuru given Dr. Khin Khin's unresponsiveness.  (Waggel Decl. at ¶ 82.)

**Paragraph 371.  Undisputed.**

**Paragraph 372.  Undisputed, subject to clarification.** Plaintiff does not have personal knowledge about these conversations such that she is unable to dispute the allegation for the purposes of summary judgment.

**Paragraph 373.  Undisputed, subject to clarification.** Plaintiff does not have personal knowledge about these conversations such that she is unable to dispute the allegation for the purposes of summary judgment.

**Paragraph 374.  Undisputed, subject to clarification.** Plaintiff does not have personal knowledge about these conversations such that she is unable to dispute the allegation for the purposes of summary judgment.

**Paragraph 375.  Undisputed, subject to clarification.** Plaintiff does not have personal knowledge about these conversations such that she is unable to dispute the allegation for the purposes of summary judgment.  Moreover, even assuming Dr. Catapano's efforts were sincere, Dr. Waggel it appears Plaintiff was still made later for appointments during this rotation in September 2015.  (ECF 32-4:16-22 (Pl.'s Resp. to Interr. No. 5.))

**Paragraph 376.  Undisputed, subject to clarification.** See response to Paragraph 375 above.

**Paragraph 377.  Undisputed, subject to clarification.**  See response to Paragraph 375 above.

**Paragraph 378.  Undisputed, subject to clarification.**  See response to Paragraph 375 above.

**Paragraph 379.  Undisputed, subject to clarification.**  See response to Paragraph 375 above.

**Paragraph 380.  Undisputed, subject to clarification.** Dr. Dyer should have had easy access to the LOD as CCC Chair, while Dr. Waggel had enormous difficulty scanning her copy of the LOD. This exchange represents the petty obstacles and aggravations the Program put in place to obstruct Dr. Waggel's ability to succeed. (*See* Waggel Decl. at ¶¶ 91-94.)

**Paragraph 381.  Undisputed, subject to clarification.**  (*See* Waggel Decl. at ¶¶ 91-94.)

**Paragraph 382.  Undisputed, subject to clarification.**

**Paragraph 383.  Undisputed, subject to clarification.**  (*See* Waggel Decl. at ¶¶ 91-94.)

**Paragraph 384.  Disputed.** On September 2, 2015, Dr. Waggel asked Victoria Anderson if she could meet with Dr. Dyer at lunchtime, after her unsuccessful attempts to schedule the meeting directly with Dr. Dyer.  She made this request hoping that meeting with Dr. Dyer during lunch would result in the least amount of people getting upset for missing Grand Rounds and class time on Thursday, something the Program complained about in the past. After confirming that Dr. Dyer's schedule was open at noon with Victoria Anderson, she emailed Dr. Dyer a second time to request the meeting. (Def.'s Ex. M at ¶ 26).

She also informed Dr. Dyer that she was available to meet with him from 12:00 p.m. to 12:30 p.m. Dr. Waggel then sent a text message to Dr. Emejuru complaining that she was having difficulty communicating with Dr. Dyer about setting a meeting with him which she had been required to schedule within two weeks of a letter of deficiency she had received regarding her failure to show up for an ED shift in June. (Def.'s Ex. C at ¶ 114; *see also* Def.'s Ex. C at Ex. 33). Dr. Dyer responded to Dr. Waggel's request with hostility. He stated his offer was for 10:30 a.m., and that he wanted a "yes or no" response. Dr. Waggel was shocked and upset. (Waggel Decl. at ¶ 93). .

**Paragraph 385.  Undisputed, subject to clarification.**  See response to Paragraph 384 above.

**Paragraph 386.  Undisputed, subject to clarification.**  See response to Paragraph 384 above.

**Paragraph 387.  Undisputed, subject to clarification.**  See response to Paragraph 384 above.

**Paragraph 388.  Undisputed, subject to clarification.** See response to Paragraph 384 above.  Dr. Waggel made clear in her email that she was available to meet at noon. Dr. Dyer's response was hostile, and also unnecessary since he was available to meet at noon.

**Paragraph 389.  Undisputed.**

**Paragraph 390.  Undisputed.**

**Paragraph 391.  Undisputed.**

**Paragraph 392.  Disputed.** On September 3, 2015, Dr. Dyer decided that he could, in fact, meet at noon with Dr. Waggel. They met and he spent the time talking about her allegedly "inappropriate response" to his asking her to complete his index. He ignored her attempt to explain that she could not complete the index because she had not attended the prerequisite seminar, since she was on leave to undergo surgery related to her cancer. Moreover, Dr. Waggel attempted to ask about her Letter of Deficiency. Dr. Dyer responded offensively, stating that she Dr. Waggel may not have what it takes to be a psychiatrist. Dr. Waggel was insulted. In addition, Dr. Waggel gave copies of her phone records to dispute allegations in the letter of deficiency. Further, she provided him a doctors' excuse in compliance with the faculty manual. Dr. Dyer stated he would examine the matter, but he never followed up. (Waggel Decl. at ¶ 94.)

**Paragraph 393.  Disputed.** This fact is disputed. It is unclear how Dr. Dyer could form an accurate opinion of Dr. Waggel as prior to this meeting, he had only met her once.   (Waggel Decl. at ¶ 94.)

**Paragraph 394.  Disputed.**  Dr. Waggel provided her recollection of the incident in question.  She provided him with a Doctors' excuse and provided phone records as back up for her version of the events.  Dr. Dyer took these, but never responded further.  (Waggel Decl. at ¶ 94.)

**Paragraph 395.  Undisputed, subject to clarification.**  Dr. Waggel recalls Dr. Dyer insultingly stating that she may not have what it takes to be a psychiatrist.  She also questions his ability to judge her fairly as they had just met once before.  (Waggel Decl. at ¶ 94.)

**Paragraph 396.  Undisputed, subject to clarification.**  Dr. Waggel requested an accommodated work schedule and support of the program for her while she attended medical appointments related to her disability. (Waggel Decl. at ¶ 41.)

**Paragraph 397.  Undisputed, subject to clarification.**  Dr. Dyer, the declarant, does not possess knowledge of Dr. Waggel's feelings and motivations. In fact, she had already experienced prejudice and hostility from peers, colleagues, and the Program.

**Paragraph 398.  Undisputed, subject to clarification.**  Dr. Dyer's comments were hostile, and Dr. Waggel would take those comments to therapy as they were distressing, unhelpful, and hostile.

**Paragraph 399.  Undisputed, subject to clarification.**  (Waggel Decl. at ¶ 94.)

**Paragraph 400.  Disputed.**  See response to Paragraph 395 above.

**Paragraph 401.  Undisputed.**

**Paragraph 402.  Undisputed.**

**Paragraph 403.  Undisputed subject to clarification.**  The email was a scheduling request (a question), and not a statement. (Def.'s Ex. C at Ex. 34). Dr. Emejuru immediately confirmed. (Def.'s Ex. A, Catapano Decl. at ¶ 436).  Moreover, closer in time to the exam, she asked for and received initial approval to take two days off to study and two days off for the exam itself.  (Waggel

Declaration ¶ 109.)  Given the fact that the exam was two days long, one administrative day off would not be sufficient.

**Paragraph 404.  Undisputed.**

**Paragraph 405.  Undisputed.**

**Paragraph 406.  Undisputed.**

**Paragraph 407.  Undisputed, subject to clarification.**  Dr. Waggel was prepared to lead a discussion in Dr. Collins' didactics course and spent hours preparing for her classes because she knew Dr. Collins would give her harsh criticism. (Waggel Declaration ¶ 96.) Subsequently, another resident, Dr. Seth Rosenblatt, complimented Dr. Waggel's in class performance. *Id.*

**Paragraph 408.  Undisputed, subject to clarification.**  See response to Paragraph 407 above.

**Paragraph 409.  Undisputed, subject to clarification.**  See response to Paragraph 407 above.

**Paragraph 410.  Undisputed, subject to clarification.**  See response to Paragraph 407 above.

**Paragraph 411.  Undisputed.**

**Paragraph 412.  Undisputed, subject to clarification.**  While Dr. Waggel may have not informed Dr. Catapano and Dr. Emejuru that there were problems with scheduling these particular appointments, they were generally aware of her difficulty in scheduling appointments, and actively impeded Dr. Waggel's efforts to get medical treatment themselves either directly or by scheduling Dr. Waggel in such a way that it was difficult to make appointments.  (Waggel Declaration ¶¶ 48, 58, 101, 115, 117, 125, 178, 187.)

**Paragraph 413.  Undisputed.**

**Paragraph 414.  Undisputed.**

**Paragraph 415.  Undisputed.**

**Paragraph 416.  Undisputed, subject to clarification.** Dr. Waggel clearly did not accept the allegations of the letter of true, but accepted that the Program was refusing to retract the letter.

**Paragraph 417.  Disputed.** The Letter of Deficiency clearly stated that it was issued because she was sick, missed work, and had not submitted a doctor's excuse for the day. Further, Dr. Waggel did show up for clinical duty on the day cited to in the letter of deficiency, contrary to Dr. Dyer's allegation that she acted unprofessionally for failing to show up.  (Waggel Declaration ¶¶ 38-39, 94.)

**Paragraph 418.  Disputed as irrelevant.** Dr. Waggel simply addressed her Letter of Deficiency, and her hopes that it would not be mentioned to her new rotations.  On its face it should be apparent that the email was not designed to recount what happened at Dr. Waggel's meeting with Dr. Dyer.

**Paragraph 419.  Undisputed.**

**Paragraph 420.  Undisputed, subject to clarification.**   Dr. Catapano's statement is reported accurately, but it is not accurate substantively with regard to what happed that day and because it is inadmissible hearsay.  (Waggel Declaration ¶¶ 38-39, 94.)  In any event, it is also worth noting that Dr. Catpano also states, "We also appreciate how hard you are trying to improve." (Def.'s Ex. M at Ex. 7.)

**Paragraph 421.  Disputed.** It was not clear from the email that Dr. Waggel was unaware of her behavior or deficits, and her email did not make remediation problematic. In fact, it is also worth noting that Dr. Catpano also states, "We also appreciate how hard you are trying to improve." (Def.'s Ex. M at Ex. 7.)

**Paragraph 422.  Undisputed.**

**Paragraph 423.  Undisputed.**

**Paragraph 424.  Undisputed, subject to clarification.** It appears during the appointment, Dr. Waggel's medical leave was interrupted when she received texts and phone calls from the psychiatry ward on Six South. (Waggel Declaration ¶ 66.)

**Paragraph 425.  Undisputed.**

**Paragraph 426.  Undisputed.**

**Paragraph 427.  Undisputed.**

**Paragraph 428.  Undisputed.**

**Paragraph 429.  Undisputed.**

**Paragraph 430.  Undisputed.**

**Paragraph 431.  Undisputed.**

**Paragraph 432.  Undisputed.**

**Paragraph 433.  Disputed in part.** Dr. Waggel requested a sick day on September 23, 2015. The purpose for the sick day was related to a surgery to fix the appearance of her abdomen. (Waggel Declaration ¶ 248.)  During the procedure, the doctor repaired a scar that had formed an adhesion. (*Id.*)  This scar was a result of the laparoscopic partial nephrectomy Dr. Waggel underwent for cancer removal in July of 2015.  (*Id.*)

**Paragraph 434.  Undisputed.**

**Paragraph 435.  Disputed.** See Plaintiff's response to Paragraph 433.

**Paragraph 436.  Undisputed.**

**Paragraph 437.  Undisputed.**

**Paragraph 438.  Undisputed.**

**Paragraph 439.  Undisputed.**

**Paragraph 440.  Undisputed.**

**Paragraph 441. Disputed.** Dr. Catapano did not prepare a plan that provided support and supervision for Dr. Waggel. The buddy call plan was humiliating and her buddies often left shifts to sleep, and generally refused to provide her direct feedback and help. In addition, Dr. Catapano never met with Dr. Waggel to discuss the purpose of buddy call. Instead, she canceled the meeting. (Waggel Decl. ¶¶ 100,103-105.) Moreover, the "buddies" left early and did not provide their feedback to Dr. Waggel directly. (*See, e.g.*, Def.'s Ex. C at ¶¶ 130 – 131, Def.'s Ex. C. at Exhibit 37; Waggel Declaration ¶¶ 103-105.)

**Paragraph 442. Undisputed.**

**Paragraph 443. Undisputed.**

**Paragraph 444. Undisputed.**

**Paragraph 445. Disputed.** Dr. Catapano cancelled the meeting to discuss the purpose of buddy call with Dr. Waggel. (Waggel Declaration ¶ 100).

**Paragraph 446. Undisputed.**

**Paragraph 447. Undisputed.**

**Paragraph 448. Undisputed.**

**Paragraph 449. Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 145-157.)

**Paragraph 450. Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 145-157.)

**Paragraph 451. Disputed.** Dr. Griffith did not express any concerns regarding Dr. Waggel other than her low grade on the exam and absences from the course she missed while attending medical appointments. This statement is inadmissible and self-interested. (See Waggel Declaration ¶¶ 145-157.)

**Paragraph 452. Disputed in part.** The ACGME does not require that she attend Dr. Griffith's course. (Ex. WWW.) Further, Dr. Waggel only missed a handful of hours over the course of the

year to attend medical appointments or because she was ordered to do so by Dr. Emejuru. (See Waggel Declaration ¶¶ 150-152.)  Meanwhile, Dr. Griffith cancelled or missed four of his own lectures. (See Waggel Declaration ¶¶ 151-152.)

**Paragraph 453.  Disputed.** This statement is disputed. At no point during Dr. Waggel's residency did Dr. Griffith raise these concerns. In fact, these concerns were not alleged until Dr. Griffith submitted this self-interested declaration for the purpose of supporting the Defendant's Motion for Summary Judgment. Therefore, it is inadmissible as self-interested testimony.

**Paragraph 454.  Undisputed, subject to clarification.** If Dr. Waggel made these comments, she did so in order to request that Dr. Griffith address the hostility and lack of accommodation she was coping with as a result of her disability.

**Paragraph 455.  Disputed.** This statement is disputed. Dr. Waggel was never made aware that Dr. Griffith made any effort to hold Dr. Catapano or anyone else to account. Dr. Catapano's declaration mentions no such conversation. Further, this is a self-interested declaration and inadmissible at summary judgment. In addition, Dr. Catapano's purported assurance that Dr. Waggel was not prevented from attending any medical appointments is false. See response to Paragraph 412 above.

**Paragraph 456.  Undisputed.**

**Paragraph 457.  Undisputed, subject to clarification.**  Dr. Waggel never received any feedback from Dr. He during her residency. Further, the Program's selection of Dr. He was antagonizing and humiliating for Dr. Waggel (Waggel Declaration ¶ 104.)  Dr. Emejuru agreed that Dr. He had failed to provide appropriate support to Dr. Waggel in the past as a backup resident, and neglected her responsibilities. (*Id.*)  Dr. He continued her pattern of neglecting her responsibilities. While on

"buddy call" with Dr. Waggel, for example, she slept during this shift rather than provide advice or support. (*Id.*)

**Paragraph 458.   Disputed in part.** This paragraph is disputed to the extent that it implies that on October 14, 2015 Dr. Emejuru responded to Dr. He's report, tried to get a situation back on track for Dr. Waggel, or address matters she needed to work on. In fact, he agreed with Dr. Waggel that Dr. He had not provided adequate support. (Waggel Declaration ¶ 104.)  And, he simply forwarded a memo from Dr. Catapano, which for the first time explained to Dr. Waggel her alleged purpose for buddy call. (Def.'s Ex. C at ¶¶ 135 – 137, Def.'s Ex. C at Exhibit 39.)

**Paragraph 459.   Undisputed.**

**Paragraph 460.   Disputed.** It was clear from Dr. Ojo's report that these statements **were** true. Dr. Ojo informed the program the next day that she left the "buddy call" late night shift early without notice. Def.'s Ex. C at ¶ 140.) Further, Dr. Sally He did sleep during the shift. (Waggel Declaration ¶ 104.)

**Paragraph 461.   Disputed.** This statement is disputed and is self-interested. There is little reason why Dr. He would admit to her attending that she neglected her duties by sleeping. (Waggel Declaration ¶ 104.)

**Paragraph 462.   Undisputed.**

**Paragraph 463.   Undisputed, subject to clarification.** Dr. Waggel received notification of the need to complete the clearance report twenty-four hours before the deadline. Seventeen other residents failed to file their health clearance according to that notification. (Waggel Declaration ¶¶ 127-128.)

**Paragraph 464.   Undisputed, subject to clarification.** See response to Paragraph 463 above.

**Paragraph 465.   Undisputed, subject to clarification.**  See response to Paragraph 463 above.

**Paragraph 466.  Undisputed.**

**Paragraph 467.  Undisputed, subject to clarification.**  See response to Paragraph 463 above.

**Paragraph 468. Disputed in part.**  Dr. Waggel complied with the medical clearance requirements, and any incomplete paperwork was the fault of the Program since they lost her submitted TB tests results. (Waggel Declaration ¶¶ 127-128.)   Moreover, while Dr. Waggel had problems logging into Medhub (as did other residents), most programs make the program director take responsibility for identifying supervising physicians.  (Spitz Expert Report at 6, Tompa Declaration (as attached to Pl's Mot. for Sum. J.), Exhibit Z.)

**Paragraph 469.  Undisputed.**

**Paragraph 470.  Undisputed, subject to clarification.** Dr. Waggel was not invited to participate in the RCA, though she was present during the shift.  (Waggel Declaration ¶ 129.)

**Paragraph 471.  Undisputed.**

**Paragraph 472.  Disputed.** Dr. Waggel was not invited to participate in a RCA concerning the August 25, 2015 call. (Waggel Declaration ¶ 129.)  Moreover, on or about October 14, 2015, which was nearly two months after the August 25th event, Dr. Waggel was simply informed that she did not "perform at the level expected" during the August 25th call. (*Id.*) Dr. Norris and Dr. Gandhi were the psychiatry attendings on staff during August 25th call, and Dr. Catapano may have been under the impression that Dr. Waggel met with them. (*Id.*)  However, this meeting did not take place until October 15, 2015.  (Waggel Declaration ¶ 132.)

**Paragraph 473.  Undisputed.**

**Paragraph 474.  Disputed.** This statement is disputed as vague and ridden with typos, making it difficult to respond to. It is also an opinion, and not a fact, and is a self-interested declaration. Further, Dr. Waggel's email properly interpreted that "a report by Nurse Shemika Anthony

73

presented some of the events that occurred during the August 25 – 26 overnight shift that raised concerns about Dr. Waggel's performance" that led to her "buddy call" assignment. Further, Dr. Khin Khin and Dr. Norris never observed interactions with Dr. Waggel during the shift first hand. In particular, Dr. Khin Khin was not in attendance at the shift, and Dr. Norris was at home when he received a call from Dr. Waggel requesting assistance. (Waggel Declaration ¶ 82.)

**Paragraph 475.  Undisputed.**

**Paragraph 476.  Undisputed.**

**Paragraph 477.  Disputed.**  At the time Dr. Waggel received Dr. Catapano's email, she had not met with Dr. Norris and Dr. Gandhi about her performance, though Dr. Catapano may have been under that impression at the time she replied to Dr. Waggel's inquiry regarding buddy call. (Waggel Declaration ¶ 132.)

**Paragraph 478.  Disputed in part.** This statement is disputed to the extent it is self-interested and implies the buddy calls "provide[d] extra support and supervision."

**Paragraph 479.  Disputed**. This fact is disputed as it appears to be made without any foundation.

**Paragraph 480.  Disputed.** Dr. Waggel missed one session of Dr. Collins seminar based on Dr. Emeruju's order to work instead of attending the class. (Waggel Declaration ¶¶ 47-48.)   In addition, no attendance reports were kept for this course, evidence that course attendance was not tracked or taken seriously by Defendant. (Waggel Declaration ¶ 146.)

**Paragraph 481.  Undisputed.**

**Paragraph 482.  Undisputed, subject to clarification.** Dr. Collins suggests that Dr. Waggel did not attend any feedback sessions, but fails to note that she was prevented from attending the sessions by Defendant when Dr. Catapano ordered her to stop attending didactics. (Waggel Declaration ¶ 255.)

**Paragraph 483.   Disputed.** Dr. Collins was critical of Dr. Waggel and humiliated her based on her knowledge about Dr. Waggel's medical condition. (Waggel Declaration ¶¶ 249-257.)

**Paragraph 484.  Undisputed.**

**Paragraph 485.  Undisputed.**

**Paragraph 486.  Undisputed.**

**Paragraph 487.  Undisputed.**

**Paragraph 488.  Undisputed.**

**Paragraph 489.  Undisputed, subject to clarification.** Dr. Wooten was unaware of specific conversations because no such conversations had occurred. Dr. Waggel's understanding of buddy call was mainly learned from emails and text messages with Dr. Emejuru and Dr. Catapano. Those conversations lacked clarity. (*See* (Waggel Declaration ¶ 100.)

**Paragraph 490.  Undisputed.**

**Paragraph 491. Disputed.** Dr. Waggel sent copies to her attending, Dr. Malik, and the administrative team notifying them of her absence, as required. Plaintif Btes 854. She was never directed to inform Dr. Crone of her need to take leave. In fact, even Dr. Emejuru did not think it was necessary to inform Dr. Crone of her need to take leave.  (Def.'s Ex. C at Exhibit 47, Def.'s Ex. C at ¶ 177; Def.'s Ex. C at Exhibit 49.)

**Paragraph 492.  Undisputed.**

**Paragraph 493.  Undisputed.**

**Paragraph 494.  Undisputed, subject to clarification.** Dr. Waggel informed the proper parties as to her absence according to Dr. Catapano's rules, and this notification was thus an administrative error that failed to record Dr. Waggel had sent notice of her absence to the proper parties. (Def.'s

Ex. C at Exhibit 47, Def.'s Ex. C at ¶ 169; see also Def.'s Ex. C at Exhibit 46, Def.'s Ex C at Exhibit 47, Waggel Declaration ¶ 120.)

**Paragraph 495. Undisputed, subject to clarification.** Dr. Waggel did not miss enough time in her PGY2 year that there should have been a concern that if the absences continued, she would not meet requirements for sufficient actual on duty clinical days to receive credit for clinical rotations or for class time attendance and participation to receive credit for didactics courses. She had met ACGME requirements. (Waggel Declaration ¶ 226.)

**Paragraph 496. Undisputed.**

**Paragraph 497. Undisputed, subject to clarification.** Dr. Crone's email exemplifies the inconsistent standards and obstacles created by the Program regarding Dr. Waggel's requirements for requesting and reporting sick leave. Dr. Emejuru told her to report sick leave to her attending, and the administration regarding absences. (Def.'s Ex. C at ¶ 177; see also Def.'s Ex. C at Exhibit 49.) Dr Crone not only contradicted this direction, but did so with unprofessional and unnecessary hostility. (Def.'s Ex. C at Exhibit 50.)

**Paragraph 498. Undisputed, subject to clarification.** Dr. Waggel's response was her effort to communicate professionally in the face of uncalled for hostility and constantly changing standards. She also attempted to clarify her efforts to report her leave. (Def.'s Ex. C at ¶ 179, Def.'s Ex. C at Exhibit 50.)

**Paragraph 499. Undisputed.**

**Paragraph 500. Undisputed, subject to clarification.** Dr. Malik did, in fact, receive notice from Dr. Waggel about her absence from clinical duties.  (Def.'s Ex. C at Exhibit 46.)

**Paragraph 501. Undisputed.**

**Paragraph 502.  Disputed.** Dr. Waggel did inform the appropriate parties of her illness in advance. (Def.'s Ex. C at Exhibit 46, Def.'s Ex. C at ¶ 179, Def.'s Ex. C at Exhibit 50, Waggel Declaration ¶ 111.)

**Paragraph 503.  Disputed.** Dr. Emejuru made clear that Dr. Waggel provided adequate notice by informing her attending, Tory [Ms. Anderson], and him of absences. (Def.'s Ex. C at ¶ 177; see also Def.'s Ex. C at Exhibit 49.)

**Paragraph 504.  Undisputed.**

**Paragraph 505.  Undisputed.**

**Paragraph 506.  Undisputed.**

**Paragraph 507.  Undisputed.**

**Paragraph 508.  Undisputed.**

**Paragraph 509.  Undisputed.**

**Paragraph 510.  Undisputed, subject to clarification.** The leave form itself called for the signature of Dr. Malik, the attending, not Dr. Crone (who in any case had refused to meet with Dr. Waggel).  (See Waggel Declaration ¶¶ 108-109, 113.)

**Paragraph 511.  Undisputed, subject to clarification.** The leave form itself called for the signature of Dr. Malik, the attending, not Dr. Crone (who in any case had refused to meet with Dr. Waggel).  (See Waggel Declaration ¶¶ 108-109, 113.)

**Paragraph 512.  Undisputed, subject to clarification.** The USMLE was a two day exam but other residents had been given additional days to study for this important licensing exam.  (See Waggel Declaration ¶¶ 108-109, 113.)  The fact that Dr. Catapano and Dr. Kels revoked Dr. Waggel's previously approved administrative request is another example of the program's animosity to Dr. Waggel, not an example of the program trying to accommodate her.

**Paragraph 513.  Undisputed, subject to clarification.**  See response to Paragraph 512 above.

**Paragraph 514.  Undisputed, subject to clarification.**  See response to Paragraph 512 above.

**Paragraph 515.  Undisputed, subject to clarification.**  See response to Paragraph 512 above.

**Paragraph 516.  Undisputed, subject to clarification.** See response to Paragraph 512 above. This administrative decision was not in the interests of fairness. In fact, many residents took off more leave for the exam. (See Waggel Declaration ¶ 109.)  Further, there was no rule or reason to why previously approved administrative leave could not be extended for Dr. Waggel. Further, this decision was made despite the fact that it would put her "in jeopardy of failing the rotation." (Def.'s Ex. C at ¶ 193, Def.'s Ex. C at Exhibit 55.)

**Paragraph 517.  Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 113-120.)

**Paragraph 518.  Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 113-120.)

**Paragraph 519.  Disputed.** Dr. Waggel's email was very responsive to the proposed change, objecting to the options offered to her and the threat of failing her rotation as a result of the change, both were made without taking into consideration her disability and Family and Medical Leave.

**Paragraph 520.  Disputed.** Dr. Kels threatened Dr. Waggel that she would fail her rotation based solely on the number of days worked/not worked. (Def.'s Ex. C at ¶ 193, Def.'s Ex. C at Exhibit 55.)

**Paragraph 521.  Disputed.** See response to Paragraph 512.

**Paragraph 522.  Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 113-120.)

**Paragraph 523.  Disputed.**  See response to Paragraph 520 above.

**Paragraph 524.  Undisputed, subject to clarification.**  While Defendant seeks to belittle this visit to Dr. Siegel, this appointment was made because Dr. Waggel was suffering chest pain for over two weeks.  (Waggel Declaration ¶ 111.)  Dr. Shephard, Dr. Waggel's primary doctor,

ultimately signed a note requesting FMLA leave on Dr. Waggel's behalf because of the difficulty she was having scheduling appointments.  (Waggel Declaration ¶¶ 111, 118, 123-125.)

**Paragraph 525.  Undisputed, subject to clarification.**  See response to Paragraph 524 above.

**Paragraph 526.  Undisputed, subject to clarification.**  See response to Paragraph 524 above.

**Paragraph 527.  Undisputed, subject to clarification.**  See response to Paragraph 524 above.

**Paragraph 528.  Undisputed, subject to clarification.**  See response to Paragraph 524 above.

**Paragraph 529.  Undisputed, subject to clarification.**  See response to Paragraph 524 above.

**Paragraph 530.  Undisputed.**

**Paragraph 531.  Undisputed.**

**Paragraph 532.  Undisputed, subject to clarification.**  The cited documentation confirms that the CCC decided to preclude Dr. Waggel from progressing to her PGY3 year based on her medical leave because it occurred on the same day she took FMLA leave and only one day after her email to Ms. Anderson, Dr. Griffith and Dr. Emejuru on Oct. 22, 2015 where she expressed the fact that she was suffering "negative repercussions" for taking leave.

**Paragraph 533.**  See response to Paragraph 532 above.

**Paragraph 534.  Undisputed.**

**Paragraph 535.  Undisputed**.

**Paragraph 536.  Undisputed.**

**Paragraph 537.  Undisputed.**

**Paragraph 538.  Disputed.**  Plaintiff disputes this self-serving statement that is not confirmed by any citation to the record.   As set forth in the contemporaneous email cited above in Paragraph 536 above, Plaintiff was aware of no such policy.

**Paragraph 539.  Disputed.**  See response to Paragraph 538 above.

**Paragraph 540.  Undisputed.**

**Paragraph 541.  Undisputed.**

**Paragraph 542.  Undisputed.**

**Paragraph 543.  Undisputed.**

**Paragraph 544.  Undisputed.**

**Paragraph 545.  Undisputed, subject to clarification.** (See Waggel Declaration ¶¶ 127-128.)

**Paragraph 546.  Undisputed.**

**Paragraph 547.  Undisputed, subject to clarification.** As stated above at Paragraphs 307, 308, 384, 392-398, Dr. Waggel's recollections about her efforts to meet with Dr. Dyer and what actually transpired at the meeting differ considerably from those of Dr. Dyer.

**Paragraph 548.**  See response to Paragraph 547 above.

**Paragraph 549.  Undisputed.**

**Paragraph 550.  Undisputed.**

**Paragraph 551.  Undisputed, subject to clarification.**   See response to Paragraph 547 above.

**Paragraph 552.  Undisputed, subject to clarification.**   See response to Paragraph 547 above.

**Paragraph 553.  Undisputed, subject to clarification.**   See response to Paragraph 547 above.

**Paragraph 554.  Undisputed, subject to clarification.**   Dr. Waggel only returned from FMLA leave on October 31, 2015, which presumably explains the delay. (Waggel Declaration ¶ 125.)

**Paragraph 555.  Undisputed.**

**Paragraph 556.  Undisputed.**

**Paragraph 557.  Disputed in part.**  Dr. Waggel believes some effort could have been made to accommodate her absences in the class caused by orders from Dr. Emerjuru, as well as medical

and forced absences.   For example, Dr. Collins herself proposed but did not follow up on assigning

a tutor for Dr. Waggel.  (Def.'s Ex. I at Exhibit 8; See also Waggel Declaration ¶¶ 249-260.)

**Paragraph 558.  Disputed in part.**  See response to Paragraph 557 above.

**Paragraph 559.  Disputed in part.**  See response to Paragraph 557 above.

**Paragraph 560.  Disputed in part.**  See response to Paragraph 557 above.

**Paragraph 561.  Undisputed.**

**Paragraph 562.  Undisputed.**

**Paragraph 563.  Disputed in part.**  See response to Paragraph 557 above.

**Paragraph 564.  Disputed.**   Plaintiff objects to this self-serving hearsay statement ascribed to

Dr. Catapano. Dr. Waggel notes the only other class where she allegedly had problems was that of

Dr. Griffith.

**Paragraph 565.  Disputed.**  Dr. Waggel requested accommodation, asking for a modified work

schedule and time off to attend medical appointments. (Waggel Declaration ¶¶ 40-41.)   Dr.

Catapano's statement betrays a fundamental misunderstanding of GWU's obligations to engage in

an interactive process with regards to offering Dr. Waggel an accommodation.   Indeed, this

statement should be taken as an admission that Dr. Catapano was aware that Dr. Waggel suffered

from a disability that would trigger such an obligation on GWU's part.   Here, as set forth in

Paragraph 557 above, Dr. Collins herself suggested such an accommodation—a tutor—but that

suggestion was never followed up upon.

**Paragraph 566.  Undisputed.**

**Paragraph 567.  Undisputed.**

**Paragraph 568.  Disputed.**   Dr. Waggel disputes this Paragraph as hearsay of a declarant who

prepared his own declaration.   Dr. Waggel also notes that the only Milestones evaluations she

81

received covered her PGY1 year and that these Milestones put her at or above her expected level of training.  (Waggel Declaration ¶¶ 9, 60.)

**Paragraph 569.  Undisputed.**

**Paragraph 570.  Undisputed.**

**Paragraph 571.  Undisputed.**

**Paragraph 572.  Undisputed.**

**Paragraph 573.  Undisputed.**

**Paragraph 574.  Undisputed, subject to clarification.** As stated above at Paragraphs 307, 308, 384, 392-398, Dr. Waggel's recollections about her efforts to meet with Dr. Dyer and what actually transpired at the meeting differ considerably from those of Dr. Dyer.

**Paragraph 575.  Undisputed.**

**Paragraph 576.  Undisputed.**

**Paragraph 577.  Undisputed.**

**Paragraph 578.  Undisputed subject to clarification.**  Dr. Waggel notes she was not allowed to prove herself in Dr. Zinner's class as she was not even allowed to attend that class.  (Waggel Declaration ¶ 180.)

**Paragraph 579.  Disputed.**  Dr. Waggel disputes she was given a meaningful opportunity to remediate.  (See Spitz Report at 8-9, Tompa Declaration (as attached to Pl's Mot. for Sum. J), Exhibit Z.)

**Paragraph 580.  Undisputed.**

**Paragraph 581.  Undisputed subject to clarification.**  Dr. Berger ultimately accepted Dr. Waggel's explanation about her interactions with her neighbors.  (Def.'s Ex. B at ¶ 30.)

**Paragraph 582.  Undisputed subject to clarification.**  See response to paragraph 581 above.

**Paragraph 583.  Undisputed subject to clarification.** See response to paragraph 581 above.

**Paragraph 584.  Undisputed subject to clarification.** See response to paragraph 581 above.

**Paragraph 585.  Undisputed subject to clarification.** See response to paragraph 581 above.

**Paragraph 586.  Undisputed subject to clarification.** See response to paragraph 581 above.

**Paragraph 587.  Disputed in part.** See response to paragraph 581 above.  Moreover, the fact that Dr. Waggel may have been placed on administrative leave due to community complaints does not foreclose the fact that Dr. Waggel may also have been placed on administrative leave because Dr. Waggel had "taken too much sick leave" and "the deans were going to have a legal meeting about [her]."  (Waggel Declaration ¶ 138.)

**Paragraph 588.  Undisputed.**

**Paragraph 589.  Disputed in part.**   See response to Paragraph 587 above.

**Paragraph 590.  Disputed in part.** See response to paragraph 587 above.

**Paragraph 591.  Undisputed.**

**Paragraph 592.  Disputed in part.** See response to paragraph 587 above.

**Paragraph 593.  Undisputed, subject to clarification.**  The fact that Dr. Waggel wanted some additional time to think things over before meeting with Dr. Berger in circumstances she thought she might get fired is not quite "unusual."

**Paragraph 594.  Undisputed.**

**Paragraph 595.  Undisputed.**

**Paragraph 596.  Undisputed.**

**Paragraph 597.  Undisputed.**

**Paragraph 598. Disputed.**    Dr. Waggel's contemporaneous email that she was "being investigated by the 'deans' for taking medical leave multiple times." is consistent with the CCC's

October 23, 2015 decision to take action against her because of her medical leave.  See response to Paragraph 532-533.  (See Def.'s Ex. C at Exhibit 65; *See also* Waggel Declaration ¶ 138.)

**Paragraph 599. Disputed.**  See response to Paragraph 598 above.  Moreover, Defendant cites the Emjuru Declaration for support for this contention even though Dr. Waggel was reporting what she learned from Dr. Catapano.  Plaintiff submits Dr. Emejuru is in no position to swear to the contents of a phone call he was not privy to.  Nor is he in a position to speak for the rest of the administrative team.

**Paragraph 600. Disputed in part.**  Plaintiff disputes the assumption as to why she did not attend this appointment.  As set forth in the preceding and subsequent paragraphs, Dr. Waggel was dealing with a very stressful work situation at the time.

**Paragraph 601. Undisputed subject to clarification.**  The cited document confirms that Dr. Waggel was under great stress from how GWU Administration was treating her for taking time off from work to address her health situation.

**Paragraph 602. Undisputed.**

**Paragraph 603. Undisputed.**

**Paragraph 604. Disputed in part.**  Plaintiff disputes the contention that she lacked "self-observation" and further notes that that document again brings to Dr. Catapano's attention dangerous conditions on Six South the Administration would rather ignore.  (See Waggel Declaration ¶ 88.)

**Paragraph 605. Undisputed.**

**Paragraph 606. Disputed in part.**  Plaintiff disputes the contention that all the "buddies" selected were "well respected" or some did not do what Dr. Waggel alleged. (See Waggel Declaration ¶ 104.)

**Paragraph 607.  Disputed in part.**  As discussed in the next paragraph and cited documents, Dr. Emejuru is the only person who actually investigated the matter, and his entire investigation appears to have consisted of asking the residents in question whether they remained on their posts. As further set forth therein, only one admitted leaving her night shift early in order to attend to a family matter. (Def.'s Ex. A at Exhibit 145.)

**Paragraph 608.  Disputed in part.**  See Paragraph 607 above.

**Paragraph 609.  Disputed.**  See response to Paragraphs 607 above.  (See Waggel Declaration ¶ 104.)

**Paragraph 610.  Undisputed.**

**Paragraph 611.  Undisputed.**

**Paragraph 612.  Undisputed.**

**Paragraph 613.  Undisputed, subject to clarification.**  (See Waggel Declaration ¶¶ 249, 260, 267-271, 274-275.)

**Paragraph 614.  Undisputed, subject to clarification.**  (See Waggel Declaration ¶ 180.)

**Paragraph 615.  Disputed.**  Plaintiff submits Defendant's failure to accommodate her was the reason for any poor performance.  For example, a tutor was discussed for Dr. Collins' class but the idea was discarded for no apparent reason.  See response to Paragraph 557 above.

**Paragraph 616.  Undisputed.**

**Paragraph 617.  Undisputed.**

**Paragraph 618.  Undisputed.**

**Paragraph 619.  Undisputed.**

**Paragraph 620.  Disputed in part.**  Plaintiff disputes that she was ever given a meaningful opportunity to remediate.  (See Spitz Expert Report at 8-9, Tompa Declaration (as attached to Pl's Partial Mot. for Sum. J., Exhibit Z.)

**Paragraph 621.  Undisputed.**

**Paragraph 622.  Undisputed.**

**Paragraph 623.  Undisputed.**

**Paragraph 624.  Undisputed.**

**Paragraph 625.  Undisputed subject to clarification.**  Dr. Waggel, Mary Tucker and Dr. Berger also discussed having one point person to contact when Dr. Waggel had a medical appointment to schedule. (Waggel Declaration ¶ 144.)  In any event, Dr. Waggel did go to the EEO office which instructed her that FMLA leave was the proper vehicle for seeking time off to attend to medical appointments. (Waggel Declaration ¶ 97.)  Dr. Waggel subsequently made use of FMLA leave, which was granted. (Waggel Declaration ¶¶ 206-207.)  In any event, as set forth in Plaintiff's motion papers, GWU has a duty to engage in an interactive process which is not satisfied by merely directing those who require accommodations to an EEO office.

**Paragraph 626.  Undisputed, subject to clarification.**  See response to Paragraph 625 above.

**Paragraph 627.  Undisputed.**

**Paragraph 628.  Undisputed.**

**Paragraph 629.  Undisputed, subject to clarification.**  While Dr. Waggel sought to engage Dr. Berger and Mary Tucker in a positive fashion, this does not change her view that the LODs were based on erroneous information and that remediation under them was made impossible by MFA staff not willing to take responsibility in helping Dr. Waggel to remediate her problems.

**Paragraph 630.  Undisputed, subject to clarification.**  A leave of absence would have put Dr. Waggel out of work, potentially without insurance, and would have left her with little to do between her periodic appointments.  (See Waggel Declaration ¶ 41.)

**Paragraph 631.  Undisputed, subject to clarification.**  See response to Paragraph 630 above.

**Paragraph 632.  Undisputed, subject to clarification.**  See response to Paragraph 630 above.

**Paragraph 633.  Undisputed, subject to clarification.**  This paragraph does not describe the circumstances those other residents faced so they may not be applicable here.  See also response to Paragraph 630 above.

**Paragraph 634.  Undisputed.**

**Paragraph 635.  Undisputed.**

**Paragraph 636.  Undisputed.**

**Paragraph 637.  Disputed in part.**   Dr. Berger's memo assumes that Dr. Waggel only misunderstood points of the conversation, but it is equally possible that Dr. Berger misunderstood points Dr. Waggel sought to make.  For example, it is unclear why Dr. Berger thought Dr. Waggel's seventh point wanting to learn more about the RCA on the August 25th call is inconsistent with her fourth point.

**Paragraph 638.  Undisputed.**

**Paragraph 639.  Disputed.**  See response to Paragraph 630 above.

**Paragraph 640.  Disputed.**  Dr. Berger's and GWU's efforts to suppress Dr. Waggel's rights to retain counsel to assist her to negotiate a reasonable accommodation or a transfer in itself may be an ADA violation and evidence of retaliation.

**Paragraph 641.  Undisputed.**

**Paragraph 642. Disputed.**  Dr. Waggel's questions and concerns were well founded. (Waggel Declaration ¶¶ 4, 113-115.)

**Paragraph 643. Undisputed.**

**Paragraph 644. Undisputed.**

**Paragraph 645. Disputed in part.**  The GWU Psychiatry Administration considered, but failed to pursue alternatives such as providing Dr. Waggel with a tutor in order to catch up for lost time. See response to Paragraph 557 above.

**Paragraph 646. Undisputed.**

**Paragraph 647. Undisputed.**

**Paragraph 648. Disputed in part.**  Dr. Waggel disputes this Paragraph's claim that her assigned buddies "were all well in advance of Dr. Waggel in medical knowledge, professionalism, systems-based practice, interpersonal communications, and overall clinical knowledge and skills" as an unsupported opinion.

**Paragraph 649. Disputed in part.**  See response to Paragraph 607 above. (See also Waggel Declaration ¶ 104.)

**Paragraph 650. Disputed in part.**  Dr. Waggel disputes that there was anything harsh or demanding in Dr. Waggel's report to Dr. Catapano.   While direct, the email was polite.

**Paragraph 651. Undisputed.**

**Paragraph 652. Undisputed.**

**Paragraph 653. Disputed.**  Plaintiff objects to the document attributed to an anonymous source as lacking in foundation, including as to its authenticity and the time the texts were actually made. It also is unclear whether the transcription of a "group text" includes all related text entries or only "cherry picks' certain of Dr. Waggel's texts and that of "AGM1" who may just be "playing along."

In any event, at best, this text displays Dr. Waggel's "gallows humor" which is understandable given the treatment she received.

**Paragraph 654.  Undisputed.**

**Paragraph 655.  Undisputed.**

**Paragraph 656.  Undisputed, subject to clarification:**  (See Waggel Declaration ¶ 145.)

**Paragraph 657.  Undisputed.**

**Paragraph 658.  Undisputed.**

**Paragraph 659.  Undisputed.**

**Paragraph 660.  Undisputed, subject to clarification.**  Dr. Waggel recalls Dr. Griffith also stating she could take the third test because it would demonstrate that she obtained the knowledge covered in the first two exams (which explains Dr. Waggel's view that the third test was in fact "cumulative."). (See Waggel Declaration ¶ 156.)  Moreover, Dr. Waggel did in fact achieve a score of 82% on this third test, which was one of the highest grades in the class.  (See Waggel Declaration ¶ 157.)

**Paragraph 661.  Disputed.**  Dr. Waggel notes Dr. Griffith's agreement to allow her to take the third exam is inconsistent with the claim set forth in this paragraph.  See response to Paragraph 660 above.

**Paragraph 662.  Disputed.**  See responses to Paragraphs 660 and 661 above.

**Paragraph 663.  Disputed in part.**  See responses to Paragraphs 660 and 661 above.

**Paragraph 664.  Disputed in part.**  See responses to Paragraphs 660 and 661 above.

**Paragraph 665.  Undisputed.**

**Paragraph 666.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 667.  Undisputed, subject to clarification.**  This paragraph shows how there could be a misunderstanding between Dr. Waggel and Dr. Griffith.  The fact that Dr. Waggel might have to repeat the entire course is not mutually exclusive with the fact that Dr. Waggel reasonably thought the third exam builds on knowledge gathered in the first two courses and hence was "cumulative."  And indeed, the fact that she scored an 82% on that exam only underscores that point.  See responses to Paragraphs 660 and 661 above.

**Paragraph 668.  Denied.**  See response to Paragraph 666 above.

**Paragraph 669.  Denied.**  There is substantial evidence that Dr. Griffith showed animosity towards Dr. Waggel, beginning with his "agnostic" attitude to whether Dr. Waggel even had cancer and hence needed an accommodation. (See Plaintiff's Statement of Facts in Support of its Motion for Partial Summary Judgment ¶ 94.)

**Paragraph 670.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 671.  Undisputed, subject to clarification.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Moreover, on November 18, 2015, Dr. Waggel was still on forced administrative leave. (See Waggel Declaration ¶¶ 145, 225.)  In any event, it is also unclear why Dr. Collins would think

90

that Dr. Waggel would attend her class when she already decided that Dr. Waggel would have to repeat it.

**Paragraph 672.  Undisputed, subject to clarification.**  See response to Paragraph 671 above.

**Paragraph 673.  Undisputed.**

**Paragraph 674.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Moreover, Dr. Waggel's purported statement is contradictory as it both states Dr. Waggel will be and will not be repeating her PGY2 year at the same time.

**Paragraph 675.  Disputed.**  See response to Paragraph 674 above.

**Paragraph 676.  Undisputed.**

**Paragraph 677.  Undisputed.**

**Paragraph 678.  Undisputed.**

**Paragraph 679.  Undisputed.**

**Paragraph 680.  Undisputed.**

**Paragraph 681.  Undisputed, subject to clarification.**  The "very complicated" reference presumably relates to the administrative leave Dr. Waggel had been placed on. See response to Paragraph 671 above.

**Paragraph 682.  Undisputed.**

**Paragraph 683.  Disputed.**  The November 19th LOD attributed any decision to hold back Dr. Waggel not to failing Dr. Collins' class but to the August 25th call.  Moreover, the letter holds out the possibility that Dr. Waggel could become a PGY3 at some time during the next year. Given the lack of clarity, it was reasonable for Dr. Waggel to ask if her understanding was correct and

express a hope that the matter could be sorted out.  The fact that Dr. Waggel would be held back

for failure to pass Dr. Collins class was only made explicit to Dr. Waggel in a November 25 email

to from Dr. Catapano to Dr. Waggel (*see* Def.'s Ex. A at Exhibit 151) and a subsequent LOD,

dated December 10, 2015. (Def.'s Ex. A at Exhibit 160.)

**Paragraph 684.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was

not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   See also

response to paragraph 683 above.

**Paragraph 685.  Undisputed.**

**Paragraph 686.  Disputed.**  See response to Paragraph 683 above.

**Paragraph 687.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was

not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   See also

response to paragraph 683 above.

**Paragraph 688.  Disputed.**  See response to Paragraph 683 above.

**Paragraph 689.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was

not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. For any leave,

Defendant had an obligation to provide Dr. Waggel with an accommodation, and the use of tutor

was suggested, but never followed up upon.  See also response to paragraphs 557 and 683 above.

**Paragraph 690.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was

not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper

summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   See also response to paragraph 683 above.

**Paragraph 691.  Undisputed.**

**Paragraph 692.  Disputed.**  (See Waggel Declaration ¶ 107.)

**Paragraph 693.  Disputed in part.**  Plaintiff submits the Nov. 19th LOD was not clear, which is why this follow up email was necessary.  See response to Paragraph 683 above.

**Paragraph 694.  Undisputed.**

**Paragraph 695.  Undisputed.**

**Paragraph 696.  Undisputed, subject to clarification.**  In this November 25, 2015 email, Dr. Catapano also indicates that she will probably take on the job of being Dr. Waggel's point person for absences.  (Def.'s Ex. A at Exhibit 151.)  This of course is the exact accommodation Dr. Waggel sought from the beginning, but which was never realized.  (See Waggel Declaration ¶¶ 40-41, 143.)

**Paragraph 697.   Disputed.**  This paragraph seeks to mischaracterize an honest question from Dr. Waggel without foundation.  See response to Paragraph 667 above.

**Paragraph 698.  Disputed.**  This paragraph seeks to mischaracterize an honest question from Dr. Waggel without foundation.  See response to Paragraph 667 above.

**Paragraph 699.  Undisputed.**

**Paragraph 700.  Disputed.**  This paragraph seeks to mischaracterize an honest question from Dr. Waggel without foundation.  See response to Paragraph 667 above.

**Paragraph 701.  Undisputed.**

**Paragraph 702.  Disputed.**  (See Waggel Declaration ¶ 258.)

**Paragraph 703. Disputed.**   As indicated by the cited email exchange, the matter was not unambiguous, and hence required clarification.

**Paragraph 704. Disputed.** See response to Paragraph 703 above.

**Paragraph 705. Disputed.** See response to Paragraph 703 above.

**Paragraph 706. Undisputed.**

**Paragraph 707. Undisputed.**

**Paragraph 708. Undisputed.**

**Paragraph 709. Undisputed.**

**Paragraph 710. Undisputed.**

**Paragraph 711. Undisputed.**

**Paragraph 712. Undisputed.**  .

**Paragraph 713. Undisputed.**

**Paragraph 714. Undisputed.**

**Paragraph 715. Undisputed.**

**Paragraph 716. Undisputed.**

**Paragraph 717. Undisputed.**

**Paragraph 718. Undisputed.**

**Paragraph 719. Undisputed.**

**Paragraph 720. Undisputed.**

**Paragraph 721. Undisputed.**

**Paragraph 722. Undisputed.**

**Paragraph 723. Undisputed.**

**Paragraph 724. Undisputed.**

**Paragraph 725.  Undisputed, subject to clarification.**  (See Waggel Declaration ¶ 168.)

**Paragraph 726.  Disputed in part.**  Plaintiff does not dispute she was taken off the call schedule in late December 2015, but believes the decision could not have been made "because she made not made progress in the remediation plan set forth in her third Letter of Deficiency" as claimed.  In fact, this appears to be a nothing more than a pretext as Plaintiff had made every effort to remediate, but was stymied by Dr. Kels' and Dr. Gandhi's efforts to avoid meeting her about the required essay and remediation plan.  (Waggel Declaration ¶¶ 158-163.)  In fact, Plaintiff believes this decision was punitive given its temporal proximity to her decision to hire a lawyer to assist her in asserting assert her EEO rights, taking FMLA leave, and her decision to file an appeal to the GWU Psychiatry Administration's decision not to let her progress to PGY3.  (Waggel Declaration ¶¶ 125,142, 144, 165-169.)

**Paragraph 727.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 728.  Undisputed.**

**Paragraph 729.  Undisputed.**

**Paragraph 730.  Undisputed.**

**Paragraph 731.  Disputed in part.**  Dr. Waggel disputes any implication that remediation was discussed in any detail or that Dr. Kels provided any meaningful guidance on the issue.  In fact, Dr. Kels avoided accepting her responsibility under the LOD to be a point person for remediation, and ultimately fobbed off the assignment to Dr. Gandhi, who was as unwilling to help.  (Waggel Declaration ¶¶ 158-163.)

**Paragraph 732.  Disputed in part.**  See response to Paragraph 731 above.

**Paragraph 733.  Disputed in part.**   See response to Paragraph 731 above.

**Paragraph 734.  Undisputed.**

**Paragraph 735.  Undisputed.**

**Paragraph 736.  Undisputed.**

**Paragraph 737.  Disputed in part.**  Plaintiff accepts that Dr. Emejuru's failure to notify Plaintiff was a mistake, but believes the decision itself was punitive.  See response to Paragraph 726 above.

**Paragraph 738.  Undisputed.**

**Paragraph 739.  Undisputed.**

**Paragraph 740.  Undisputed.**

**Paragraph 741.  Undisputed.**

**Paragraph 742.  Undisputed.**

**Paragraph 743.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Plaintiff also objects to this document to the extent it mischaracterizes what Dr. Waggel actually stated to Dr. Sarani.  Plaintiff also notes that in the cited document Dr. Sarani indicated he would drop the matter if he was satisfied after a conversation with Dr. Berger.  The fact that he did not drop the matter suggests that Dr. Sarani had continued concern about the Psychiatry Program's treatment of Dr. Waggel.

**Paragraph 744.  Undisputed.**

**Paragraph 745.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 746.  Undisputed.**

**Paragraph 747.  Undisputed, subject to clarification.**  Dr. Waggel saw her name printed on the sign-in sheet and thought she was allowed to at least audit the class.  (See Waggel Declaration ¶ 180.)  Instead, the Psychiatry Administration sought to humiliate her by forcing her to leave her peers for that class only, stand outside like a dunce outside, and then return for other didactics courses after that class was over. (*Id.*)  After this incident, the Administration punished Dr. Waggel more by requiring her to commute back to her rotation in Fairfax rather than getting the rest of the day off as her peers did.  (See Waggel Declaration ¶ 190.)

**Paragraph 748.  Disputed.**  See response to Paragraph 747 above.

**Paragraph 749.  Disputed.**  See response to Paragraph 747 above.

**Paragraph 750.  Undisputed.**

**Paragraph 751.  Undisputed.**

**Paragraph 752.  Undisputed, subject to clarification.**  Dr. Catapano's response is misleading because the LOD required Dr. Waggel to meet with Dr. Kels <u>before</u> she started the assignment, and the failures of both Dr. Kels and Dr. Gandhi to meet promptly meant Dr. Waggel's remediation had already been considerably delayed.  (See Waggel Declaration ¶¶ 158-163.)  .

**Paragraph 753.  Undisputed, subject to clarification.**  The pejorative term that Dr. Waggel "claimed" there was a delay is misleading because Dr. Waggel was absolutely correct about the delays.  See response to Paragraph 752 above.

**Paragraph 754.  Undisputed.**

**Paragraph 755.  Undisputed.**

**Paragraph 756.  Undisputed.**

**Paragraph 757.  Disputed.**

**Paragraph 758.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Plaintiff also objects to this document to the extent it mischaracterizes what Dr. Waggel actually stated to Dr. Berger.  The exam could be considered "cumulative."  See Paragraph 660 above. Moreover, as the cited documents show, Dr. Waggel did indeed get one of the highest grades in the third test.

**Paragraph 759.  Disputed.**  See response to Paragraph 758 above.

**Paragraph 760.  Undisputed.**

**Paragraph 761.  Undisputed.**

**Paragraph 762.  Undisputed.**

**Paragraph 763.  Undisputed.**

**Paragraph 764.  Undisputed.**

**Paragraph 765.  Undisputed.**

**Paragraph 766.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 767.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 768.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Moreover, whatever the Departmental policy on attendance, there was no monitoring of attendance and Dr.

Waggel was only singled out because of her medical leave.  Finally, no thought was seriously given to providing her with an accommodation such as a tutor and the ability to retake tests. (See Waggel Declaration ¶ 235.)

**Paragraph 769.  Undisputed.**

**Paragraph 770.  Undisputed.**

**Paragraph 771.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 772.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 773.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 774.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 775.  Undisputed.**

**Paragraph 776.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 777.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 778.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 779.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 780.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 781.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 782.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff also specifically takes issue with Dr. Berger's view of her Milestones.  Although Dr. Waggel received her August Milestones in her PGY2 year, they related to her PGY1 year, and were certainly satisfactory enough for the program to progress her to the PGY2 year.

**Paragraph 783.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 784.  Disputed.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 785.  Undisputed.**

**Paragraph 786.  Undisputed.**

**Paragraph 787.   Undisputed, subject to clarification.**  The essay did not explicitly critique Dr. Waggel's own actions the night of August 25th, and the assignment asks for no such criticism. Moreover, Dr. Waggel subsequently added Dr. Gandhi's suggestions to her essay even though it was not necessary.  Dr. Catapano simply thanked her for the effort and indicated she would be in touch regarding next steps.  (Def.'s Ex. A at Exhibit 170.)

**Paragraph 788.  Undisputed.**

**Paragraph 789.  Undisputed, subject to clarification.**   The cited document merely references the fact that she had remediated as requested, despite obstacles placed in her way, but was still being put off, so she was ready to bring the matter to the attention of her law firm at the time.

**Paragraph 790.  Undisputed.**

**Paragraph 791.  Undisputed.**

**Paragraph 792.  Undisputed.**

**Paragraph 793.  Disputed.**   In fact, Dr. Waggel sought to return the pager, but was precluded from doing so.  (*See* Waggel Declaration ¶ 247).

**Paragraph 794.  Undisputed.**

**Paragraph 795. Undisputed.**

**Paragraph 796. Disputed.** At deposition, Dr. Dyer, as a GWU Rule 30(b)(6) witness, was forced to admit that he only "cherry picked" negative information about Dr. Waggel for purposes of the CCC's performance review and ignored her appeals of the decision to hold her back as a PGY2. (See Deposition of Dr. Dyer, Rule 30(b)(6) deponent, dated August 28, 2017, at 16:7-37:20, Exhibit DDD.)

**Paragraph 797. Undisputed, subject to clarification.** See response to Paragraph 796 above. 5.

**Paragraph 798. Disputed in part.** Plaintiff submits the "Notice of Concerns of Professional Conduct" was drafted as a punitive measure to punish Dr. Waggel for taking medical leave, hiring a lawyer to protect her interests, and appealing the decision to make her repeat her PGY2 year.

**Paragraph 799. Undisputed.**

**Paragraph 800. Undisputed.**

**Paragraph 801. Undisputed.**

**Paragraph 802. Undisputed.**

**Paragraph 803. Undisputed.**

**Paragraph 804. Undisputed.**

**Paragraph 805. Undisputed.**

**Paragraph 806. Undisputed.**

**Paragraph 807. Undisputed.**

**Paragraph 808. Undisputed.**

**Paragraph 809. Undisputed.**

**Paragraph 810. Undisputed.**

**Paragraph 811. Undisputed.**

**Paragraph 812.  Undisputed, subject to clarification.**  (See Waggel Declaration ¶¶ 145-157.)

**Paragraph 813.  Undisputed, subject to clarification.**  (See Waggel Declaration ¶¶ 145-157.)

**Paragraph 814.  Disputed.**  Dr. Waggel disputes that accurate attendance figures existed for any of the didactics courses as attendance was not regularly taken and attendance sheets were regularly thrown in the trash. (See Waggel Declaration ¶¶ 154, 235.)

**Paragraph 815.  Undisputed, subject to clarification.**  Dr. Waggel submits given her medical and forced absences, Dr. Collins could have asked a tutor to assist Dr. Waggel.  As set forth above at Paragraph 557, while this idea was considered, it was not acted on thought it would have served as a reasonable accommodation for Dr. Waggel given her ongoing medical problems.

**Paragraph 816.  Undisputed.**

**Paragraph 817.  Undisputed.**

**Paragraph 818.  Undisputed.**

**Paragraph 819.  Undisputed.**

**Paragraph 820.  Undisputed.**

**Paragraph 821.  Undisputed.**

**Paragraph 822.  Disputed in part.**  Dr. Cioletti does not appear to have taken into account GWU's obligation to enter into an interactive process to accommodate Plaintiff.  With regard to didactics classes, this could have taken the form of retesting and appointment of tutors. (Def.'s Ex. Q at ¶ 56.)

**Paragraph 823.  Undisputed.**

**Paragraph 824.  Undisputed.**

**Paragraph 825. Disputed in part.** It is unclear what Milestones reports Dr. Cioletti was reviewing.  Dr. Waggel only received Milestones for her PGY1 year which appear satisfactory. (Waggel Declaration ¶¶ 9, 60.)

**Paragraph 826.  Undisputed.**

**Paragraph 827.  Undisputed.**

**Paragraph 828.  Undisputed.**

**Paragraph 829.  Undisputed.**

**Paragraph 830.  Undisputed.**

**Paragraph 831.  Undisputed, subject to clarification.**   Plaintiff's expert points to this incident as an example of its poor mentoring GWU exhibited with respect to Dr. Waggel. (Spitz Expert Report at 8-9, Tompa Declaration (as attached to Pl.'s Mot. for Partial Sum J.), Exhibit Z.)

**Paragraph 832.  Undisputed, subject to clarification**.  See response to Paragraph 831 above.

**Paragraph 833.  Undisputed, subject to clarification**.  See response to Paragraph 831 above.

**Paragraph 834.  Undisputed, subject to clarification**.  See response to Paragraph 831 above.

**Paragraph 835.  Undisputed, subject to clarification**.  See response to Paragraph 831 above.

**Paragraph 836.  Undisputed.**

**Paragraph 837.  Undisputed.**

**Paragraph 838.  Undisputed.**

**Paragraph 839.  Undisputed.**

**Paragraph 840.  Undisputed.**

**Paragraph 841.  Undisputed.**

**Paragraph 842.  Undisputed.**

**Paragraph 843.  Undisputed.**

**Paragraph 844.  Undisputed.**

**Paragraph 845.  Disputed.**   Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 846.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 847.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.  Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.) She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 848.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also

disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 849.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 850.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 851.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow

up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 852.**  This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.   Dr. Waggel objects to Dr. Jarrett's Declaration as violative of medical ethics.  (Waggel Declaration ¶ 280.)  She also disputes that she has been "cured" as opposed to being in remission, and asserts she required follow up appointments.  (Waggel Declaration ¶ 281.)  (See also Declaration of Marc Shephard, M.D. ¶ 12.)

**Paragraph 853.  Undisputed.**

**Paragraph 854.  Undisputed.**

**Paragraph 855.  Undisputed.**

**Paragraph 856.  Undisputed.**

**Paragraph 857.  Undisputed.**

**Paragraph 858.  Undisputed.** Dr. Waggel

**Paragraph 859.  Disputed in part.** Dr. Waggel's letter acknowledged that the appeal was based on her contention that Academic Improvement Policy was not followed. And, it did identify and allege deviations from the required process, stating, "There is evidence that the process set forth in the Academic Improvement Policy was not followed due to the number of inconsistencies in the response to my appeal."  Def.'s Ex. R at 9; ECF No. 34-22 ("GWU 003277").  It also enumerated instances in which Dr. Waggel was not given notice and an opportunity to cure her deficiencies. *Id.*

**Paragraph 860. Disputed.** Plaintiff does not recall this conversation and therefore does not possess the knowledge to dispute or not dispute this fact. However, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 861. Dispute.** Plaintiff does not recall this conversation and therefore does not possess the knowledge to dispute or not dispute this fact. However, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.  Moreover, Dr. Waggel raised issues regarding her illness and medical leave in her appeal, including discussing her cancer diagnosis and seeking accommodation, making it highly unlikely that Dr. Simons was not aware that "her performance in the program was in any way affected by an illness, medical condition, or any other extenuating circumstances." Def.'s Ex. R 18-22; ECF No. 34-22 ("GWU 003286-90").

**Paragraph 862. Disputed.** Plaintiff does not possess knowledge regarding this conversation to dispute or not dispute the accuracy of this fact. However, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 863. Disputed.** Plaintiff does not possess knowledge regarding this conversation to dispute or not dispute the accuracy of this fact. However, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-

serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 864.  Disputed.** Plaintiff does not possess knowledge regarding this conversation to dispute or not dispute the accuracy of this fact. However, this fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 865.  Undisputed.**

**Paragraph 866.  Undisputed.**

**Paragraph 867.  Undisputed.**

**Paragraph 868.  Undisputed.**

**Paragraph 869.  Undisputed.**

**Paragraph 870.  Undisputed.**

**Paragraph 871.  Disputed.** The letter made clear that the Program Director should not have made a decision not to promote Dr. Waggel, but that the decision to do so is upon the recommendation of the CCC after a thorough performance review. Thus, the letter made clear that the Program Director did not make the decision based on a robust performance review conducted by the CCC. Def.'s Ex. R at 26-27; ECF No. 34-22 ("GWU 002495-96").

**Paragraph 872.  Disputed.** The evidence cited in support of this fact (Exhibit 21) does not contain notes about any conversation between Dr. Zinner and Dr. Berger, and therefore this fact is disputed. This fact is also disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.

**Paragraph 873.  Disputed.** This fact is disputed as hearsay evidence and is therefore inadmissible. This fact is also disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure.  Further, the facts on disputed on their merit. On January 7, 2016, when one didactics class ended and Dr. Zinner came into the room, Dr. Waggel knew she should leave, and did so. She waited in the hallway, feeling embarrassed. She also noticed that her name was on the attendance sheet for the course. She pointed out to Dr. Catapano that people that were not even in the class were allowed to sit in on the class, as if auditing, and so Dr. Waggel asked Dr. Zinner for permission to at least sit in the class, rather than wait outside the room. In addition, Dr. Waggel thought that since her name was on the sheet, the decision had been made to allow her to stay in the course.  Dr. Zinner told Dr. Waggel to "get out." In sum, Dr. Waggel was in the classroom the entire day for didactics classes, and then when Dr. Zinner came in to teach his class, she was forced to exit the room and wait on the other side of the door until his class was over, and then return to her seat for the next class. The situation was hostile. (Waggel Decl. 180.)

**Paragraph 874.  Disputed.** Plaintiff's Response to Paragraph 873 is herein incorporated.

**Paragraph 875.  Disputed in part.** It is disputed that Dr. Waggel is a liar, and Plaintiff's response to Paragraph 873 is herein incorporated. However, Dr. Waggel has little doubt that Dr. Catapano called her a liar and made efforts to ruin her reputation in the medical profession.

**Paragraph 876.  Disputed.** This facts is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, the evidence cited in support does not contain a brief summary of the alleged phone call.

**Paragraph 877.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, Dr. Collins told Dr. Waggel that she was doing well in the course and implied she would progress, prior to Dr. Waggel taking FMLA and being subsequently prohibited from attending the class. (Waggel Decl. 258.) In addition, Dr. Collins retaliated against Dr. Waggel for taking sick leave and attending medical appointments. (Waggel Decl. 249- 260.)

**Paragraph 878.  Disputed.** This fact is disputed to the extent it relies on a declaration that was not produced before the close of discovery, is hearsay, and self-serving, and therefore is improper summary judgment evidence under Rule 56 of the Federal Rules of Civil Procedure. Further, Dr. Waggel stated to Dr. Collins her impression of the consequences for failing the course, which was that her start date for PGY3 would be delayed, but not that she was going to repeat the entire PGY2 year. (Waggel Decl. 260.) In the same conversation, Dr. Waggel stated that she "would very much appreciate if Dr. Collins would grade [her] final exam as Dr. Collins graded all of the other residents' final assignments." Dr. Waggel recalled that "Dr. Collins replied in a harsh tone by stating [she] was "grandiose" for making such a request. Dr. Collins proceeded to yell at [her], "I am not being paid to grade your assignment!" Dr. Collins went on to add that Dr. Griffith would also fail [Dr. Waggel]. I replied that I did not understand why Dr. Collins would say this as Dr. Griffith's class was less than halfway over and Dr. Collins has no role in Dr. Griffith's class. Dr. Collins stated [that Dr. Waggel] better get used to the fact [she] was repeating PGY2 year one way or another." Dr. Collins "taunted" Dr. Waggel, laughing at her, and saying: "See you [again] in July!" (Waggel Decl. 260.)

**Paragraph 879.  Disputed.** Plaintiff's response to Paragraph 878 is herein incorporated.

**Paragraph 880.  Undisputed.**

**Paragraph 881.  Disputed.** This fact is disputed to the extent it is vague and ambiguous in stating Dr. Waggel replied "she was physically capable and comfortable…moving forward." Dr. Waggel stated, "I mean, I'm hanging in there, I guess." A transcript of the meeting is provided. (Transcript of meeting with Dean Berger, dated March 17, 2016 at 4:18, Exhibit NN.)

**Paragraph 882.  Undisputed.**

**Paragraph 883.  Undisputed.**

**Paragraph 884.  Undisputed.**

**Paragraph 885.  Undisputed.**

**Paragraph 886.  Undisputed.**

**Paragraph 887.  Undisputed.**

**Paragraph 888.  Undisputed.**

**Paragraph 889.  Undisputed.**

**Paragraph 890.  Disputed in part.** Dr. Berger agreed to support her transfer, but only if she did not involve her attorney. He stated that she would "not get the best out of [Dr. Berger], as far as [his] ability to be supportive… there's all kinds of ways that I try to be helpful with different trainees. And that when [they] start off with, you know, the wall of attorneys…it's tricky." (Transcript of meeting with Dean Berger, dated March 17, 2016 at 4:18, Exhibit NN.) When Dr. Waggel asked about getting help from a lawyer, Dr. Berger said, "No." (Transcript of meeting with Dean Berger, dated March 17, 2016 at 4:18, Exhibit NN.)

**Paragraph 891.  Disputed.** Dr. Berger did not agree to help Dr. Waggel in the process of transferring unless she fired her legal counsel. Response to Paragraph 890 is herein incorporated.

**Paragraph 892.** Dr. Berger concluded the meeting by letting Dr. Waggel know that he would review everything from his investigation into the Notice of Misconduct and provide his findings to Dr. Catapano. (Def.'s Ex. B at ¶ 83; *see also* Def.'s Ex. B at Exhibit 23.)

**Paragraph 893.** Without Dr. Berger's knowledge, Dr. Waggel surreptitiously recorded the March 17, 2016 meeting. (Def.'s Ex. B at ¶ 84; *see also* Def.'s Ex. Z.)

**Paragraph 894.** As part of his efforts to assist Dr. Waggel in transferring, Dr. Berger spoke to the Program Director for the Adolescent Psychiatry Program at Carillion Virginia Tech about Dr. Waggel after getting a release from her attorney to do so. In that conversation he did not mention the LODs, the Notice of Misconduct, or the community complaints. (Def.'s Ex. B at ¶ 86.)

**Paragraph 895.** In later discussing the transfer issue, however, Dr. Catapano expressed to Dr. Berger that she, the Program Director directly responsible for Dr. Waggel's training, could not recommend Dr. Waggel to another program because of serious concerns about her truthfulness and her insight into her deficiencies. Dr. Berger deferred to Dr. Catapano's judgment on whether she or the Program would attempt to facilitate a transfer for Dr. Waggel as he was not involved in Dr. Waggel's day-to-day training to make a determination on her fitness to continue on in another program. (Def.'s Ex. B at ¶ 87.)

**Paragraph 896.** By this point in March 2016, the consensus within the Program was that Dr. Waggel was not able to provide an appropriate quality of patient care. (Def.'s Ex. N at ¶ 109.)

**Paragraph 897.** Dr. Griffith had received reports from multiple attending physicians that they did not think Dr. Waggel was capable of providing safe patient care and that she represented a danger to patient safety. (Def.'s Ex. N at ¶ 110.)

**Paragraph 898.**  This was important as the faculty and residents in the Program are called upon to attend to some of the most complicated and challenging patients in any psychiatry practice setting. (Def.'s Ex. N at ¶ 114.)

**Paragraph 899.**  A not atypical patient presenting to the GW Hospital ED would include a member of a minority population with a history of military service, Post-Traumatic Stress Disorder, other psychiatric conditions, substance abuse issues, homelessness and inter-current medical illnesses. (Def.'s Ex. N at ¶ 115.)

**Paragraph 900.**  For those reasons, as the Chair of the Department, Dr. Griffith made the decision to remove Dr. Waggel from patient care unless and until the concerns about her professionalism and patient care abilities could be addressed. (Def.'s Ex. N at ¶ 118.)

**Paragraph 901.**  On March 17, 2016, Dr. Catapano and Dr. Griffith met with Dr. Waggel to notify her of this decision. (Def.'s Ex. N at ¶ 119.)

**Paragraph 902.**  Dr. Griffith informed her that he had made the decision as the Chair of the Department because it is his responsibility to ensure that faculty and residents can safely provide patient care. (Def.'s Ex. N at ¶ 120.)

**Paragraph 903.**  Dr. Griffith noted that these matters had been presented to Dr. Waggel in the Letters of Deficiency and the Misconduct Notice as well as multiple meetings with Dr. Catapano and various meetings with Dr. Berger and that at least until Dr. Berger had addressed the Notice of Unprofessional Conduct issues through GME, he believed it was his duty both for patient care and for Dr. Waggel's protection to remove her from patient care duties. (Def.'s Ex. N at ¶ 121.)

**Paragraph 904.**  Dr. Waggel stated that she did not know what the concerns were and Dr. Griffith pointed out that they had been presented to her in writing. He went on to tell her that her during

the meeting when she kept claiming she did not understand why the action was being taken that the fact that she still claimed to have no understanding of her deficiencies was a part of the reason she should be removed from patient care. (Def.'s Ex. N at ¶ 124.)

**Paragraph 905.** During the meeting, Dr. Waggel contended that she had consistently been evaluated by her supervisors at the level of a 3rd or 4th year resident. Dr. Griffith knew that to be incorrect and told her so. (Def.'s Ex. N at ¶ 125.)

**Paragraph 906.** Unbeknownst to everyone else in the meeting, Dr. Waggel also surreptitiously recorded this meeting on her cell phone without their knowledge or consent. (Def.'s Ex. N at ¶ 127); *see also* Def.'s Ex. AA.)

**Paragraph 907.** Dr. Waggel attended therapy with Dr. Kecmanovic on March 17, 2016. (*See* Def.'s Ex. U at 2.)

**Paragraph 908.** Dr. Waggel attended therapy with Dr. Kecmanovic on March 24, 2016. (*See* Def.'s Ex. U at 3.)

**Paragraph 909.** Dr. Waggel attended therapy with Dr. Kecmanovic on March 31, 2016. (*See* Def.'s Ex. U at 3.)

**Paragraph 910.** On April 5, 2016, Dr. Catapano provided Dr. Dyer, as head of the CCC, with a memorandum "to highlight the most concerning issues" that had occurred following a misconduct memo regarding Dr. Waggel which had been presented by Dr. Griffith as Chair of the Department, stated that she intended to present her memo at the next CCC meeting, and invited her comment regarding the memo. (Def.'s Ex. M at ¶ 110; *see also* Def.'s Ex. M at Exhibit 14.)

**Paragraph 911.** In the memo, Dr. Catapano identified three concerns: (1) Dr. Waggel had to be removed from a patient's care on March 1, 2016, because a psychotherapist found her

interaction with the patient and his family to be odd and potentially damaging to them in their vulnerable circumstances, (2) a continuing pattern of dishonesty involving an episode in which Dr. Waggel had made multiple untruthful statements and misrepresentations to a number of individuals regarding her inability to meet with Dr. Berger because she was ostensibly on FMLA leave for medical reasons, and (3) Dr. Waggel's continued lack of insight into her deficiencies and lack of effort to remediate them, most clearly demonstrated in her essay for Dr. Gandhi on patient safety involving the August 25 on-call shift. (Def.'s Ex. M at ¶ 111.)

**Paragraph 912.**  On April 8, 2016, the CCC conducted a regularly scheduled meeting to review the residents in the Program. Present for the meeting were Dr. Catapano (*ex officio*), Dr. Khin Khin, Dr. Crone, Dr. Norris, Dr. Dyer, and the Program Coordinator, Victoria Anderson. (Def.'s Ex. M at ¶ 112; Def.'s Ex. M at Exhibit 15.)

**Paragraph 913.**  The meeting focused on a review of Dr. Waggel's performance in the Program. (Def.'s Ex. M at ¶ 113.)

**Paragraph 914.**  Based on Dr. Waggel's clear deficiencies and her refusal to acknowledge or address them, the group felt that it would no longer be possible to remediate Dr. Waggel. (Def.'s Ex. M at ¶ 118.)

**Paragraph 915.**  Dr. Khin Khin then moved to recommend to the Program Director that Dr. Waggel be dismissed from the Program. The motion was seconded and passed unanimously. The Program Director attended the meeting *ex officio* and did not vote on the motion. (Def.'s Ex. M at ¶ 119.)

**Paragraph 916.**  Dr. Crone then moved that it was the consensus of the group that Dr. Waggel not be returned to clinical duties for the remainder of her time in the Program and should have

no further contact with patients. The motion was seconded and passed unanimously, again the Program Director not voting. (Def.'s Ex. M at ¶ 120.)

**Paragraph 917.** The CCC took painstaking effort to review all aspects of Dr. Waggel's performance and the issues that she had created. The Committee devoted approximately 1 hour 50 minutes to reviewing and discussing Dr. Waggel at this meeting. This was more than the time spent reviewing the remainder of the residents in the entire Program. (Def.'s Ex. M at ¶ 121.)

**Paragraph 918.** On April 7, 2016, Dr. Berger prepared a letter report to Dr. Waggel and Dr. Catapano regarding the findings of her investigation into the Notice of Misconduct. (Def.'s Ex. B at ¶ 88; Def.'s Ex. B at Exhibit 24.)

**Paragraph 919.** In the letter Dr. Berger outlined the steps he took in his review of the Notice of Misconduct, the materials that were reviewed, and the information that was considered. *Id.*

**Paragraph 920.** He found that Dr. Waggel's failures to report her supervisors in MedHub, obtain health clearance, and comply with the academic improvement plans were evidence of a lack of professionalism, but did not rise to the level of misconduct. (Def.'s Ex. B at ¶ 89.)

**Paragraph 921.** He found that the complaints of her neighbor regarding her behavior in her condominium building did not constitute misconduct in the GW learning environment, but advised Dr. Waggel of the importance of minding her behavior outside of work as she represents the Program and the University as a whole. (Def.'s Ex. B at ¶ 90.)

**Paragraph 922.** Finally, he found that Dr. Waggel's four instances of misrepresentations represented misconduct. Likewise her threatening texts and emails misrepresented misconduct. (Def.'s Ex. B at ¶ 91.)

**Paragraph 923.**  Dr. Berger notified Dr. Waggel that she would be receiving a LOD with an improvement plan designed to address these behaviors. (Def.'s Ex. B at ¶ 92.)

**Paragraph 924.**  Dr. Waggel attended therapy with Dr. Kecmanovic on April 7, 2016. (*See* Def.'s Ex. U at 3.)

**Paragraph 925.**  Dr. Waggel attended therapy with Dr. Kecmanovic on April 14, 2016. (*See* Def.'s Ex. U at 3.)

**Paragraph 926.**  On April 14, 2016, Dr. Catapano emailed Dr. Waggel to set up a meeting with herself and Dr. Dyer on April 18 to discuss the recommendations of the CCC. (Def.'s Ex. M at ¶ 122.)

**Paragraph 927.**  Dr. Waggel responded and stated that she would like to have her lawyer present for the meeting. (Def.'s Ex. M at ¶ 123.)

**Paragraph 928.**  Dr. Catapano agreed to this and advised that counsel for the University would be present as well. (Def.'s Ex. M at ¶ 124.)

**Paragraph 929.**  The meeting scheduled for April 18, 2016, did not take place. (Def.'s Ex. M at ¶ 125.)

**Paragraph 930.**  On April 17, 2015, the CCC met to discuss the Milestone evaluations of each resident. There was a 4-minute discussion of Dr. Waggel to address concerns expressed by one of her previous supervising physicians at Inova Fairfax Hospital, Dr. Aditi Malik. As the committee had already made a decision about Dr. Waggel, the conversation was brief. (Def.'s Ex. M at ¶ 126; *see also* Def.'s Ex. M at Exhibit 17.)

**Paragraph 931.**  On April 19, 2016, Ms. Vickie Fair, the Assistant Vice President of the Office of Equal Employment Opportunity and Employment Relations at The George Washington University, was forwarded an email Dr. Waggel had sent to the Interim Vice President of

Human Resources for GW, Dale McLeod, in which she alleged she was the victim of discrimination by the University's Psychiatry Department. Per Mr. McLeod's directions Dr. Waggel contacted Ms. Fair directly, and they scheduled a time to meet to discuss her complaints. (Def.'s Ex. P at ¶¶ 2, 8.)

**Paragraph 932.**  By April 27, 2016, Dr. Berger had prepared the LOD corresponding to the April 7 report, but the LOD was never provided to Dr. Waggel, because following the April 7 report the Psychiatry Residency Training Program Clinical Competency Committee met and made a recommendation to Dr. Catapano that Dr. Waggel be terminated. (Def.'s Ex. B at ¶93.)

**Paragraph 933.**  Because he felt that the judgment of her direct clinical supervisors as to her remediability and ability to continue in the program superseded his ability to address these misconduct concerns, Dr. Berger did not oppose the decision of the Program. (Def.'s Ex. B at ¶ 94.)

**Paragraph 934.**  On April 28, 2016, the Residency Coordinator, Victoria Anderson, emailed Dr. Waggel and requested that she meet with Dr. Catapano and Dr. Dyer on May 2.  (Def.'s Ex. M at ¶ 127.)

**Paragraph 935.**  Dr. Waggel again refused to meet without her attorney. *Id.*

**Paragraph 936.**  Because Dr. Waggel refused to meet, on May 2, 2016, Ms. Anderson sent Dr. Waggel a letter by email and first class mail notifying her of the recommendation of the CCC, which Dr. Catapano as Program Director had agreed with and decided to accept, so a decision had been made for her dismissal from the Program. (Def.'s Ex. M at ¶ 129; see also Def.'s Ex. M at Exhibit 18.)

**Paragraph 937.**  On April 28, 2016, Dr. Waggel met with Vickie Fair of the EEO Office. Prior to the meeting, Dr. Waggel requested that her lawyer be present for the meeting, but Ms. Fair

refused her request because she did not feel it was appropriate within the University's review process. (Def.'s Ex. P at ¶ 9.)

**Paragraph 938.** During the meeting, Dr. Waggel stated that the administration of the GW Psychiatry Residency Program began discriminating against her after she had surgery to remove a cancerous tumor from her kidney in July 2015. *Id.*

**Paragraph 939.** Dr. Waggel stated that she found out she had a cancerous tumor on her kidney that required removal in the spring of 2015. She stated that she applied for FMLA leave at that time, but was deemed ineligible because she had not been employed for a full year. Def.'s Ex. P at ¶ 10.)

**Paragraph 940.** Ms. Fair pointed out to her that she should have and could have come to the EEO Office and requested time off as an accommodation under the ADA. *Id.*

**Paragraph 941.** Dr. Waggel went on to say that she had surgery to remove a portion of her kidney in July 2015, which required her to miss 10 days of work. She contended that once she returned from medical leave her department discriminated against her by not allowing her to take time off to attend follow-up medical appointments. (Def.'s Ex. P at ¶ 11.)

**Paragraph 942.** She stated that she had requested two days off per month, but her department would not allow her to take the time off because there were "issues" with most or all of the days she requested. She did not elaborate on what the alleged issues were. (Def.'s Ex. P at ¶ 11.)

**Paragraph 943.** Dr. Waggel made this claim despite Dr. Waggel having applied for and been granted intermittent FMLA leave of two days per month, 8 hours per day for the period March 8, 2016 – September 7, 2016. (Def.'s Ex. O at ¶ 24; *see also* (Def.'s Ex. O at Exhibit 9.)

**Paragraph 944.** Following up on Dr. Waggel's allegation that she was not allowed to take off time for a purported disability, Ms. Fair reviewed The EEO Office's records for anything related to Dr. Waggel to determine if she had ever sought accommodation under the ADA. (Def.'s Ex. P at ¶ 12.)

**Paragraph 945.** Her search did not identify any record of any request of any kind by Dr. Waggel. There was no record of Dr. Waggel ever seeking an accommodation such as flexible leave or a modification of her schedule through the EEO Office. There were no requests for time off at all. *Id.*

**Paragraph 946.** Likewise, there was no record of Dr. Waggel having ever gone to the EEO Office to report that she had a disability of any kind. *Id.*

**Paragraph 947.** Dr. Waggel never sought any protection under the ADA through the EEO Office at any point during her tenure at GW. (Def.'s Ex. P at ¶ 13.)

**Paragraph 948.** According to Dr. Waggel's urologist, at no time after Dr. Waggel's surgery on July 20, 2015 and the brief two-week post-operative recovery period followed by return to work for light duty for another two weeks which allowed Dr. Waggel to return to her Psychiatry Residency Training Program beginning early August 2015, did her cancer diagnosis and treatment create any disability or impose any impediment to her pursuit of her further training or the performance of her duties within the Psychiatry Residency Training Program. (Def.'s Ex. H at ¶ 33; *see also* Def.'s Ex. J at ¶ 33.)

**Paragraph 949.** There was no adjuvant therapy of any kind was required such as chemotherapy or radiation therapy, and there were no physical or psychological limitations arising from the diagnosis and treatment that would have interfered with her training and duties within the program. (Def.'s Ex. H at ¶ 33; *see also* Def.'s Ex. J at ¶ 33.)

**Paragraph 950.**  Dr. Waggel never raised any issues related to her residency training program or any difficulties she may have been having in the program with her oncologist, Dr. Siegel. Specifically, Dr. Waggel never raised or discussed that she had any physical, mental, or emotional problem related to her cancer diagnosis and treatment that was in any way affecting her performance in the program or for which she needed consideration for an accommodation to continue participating in her residency training. (Def.'s Ex. J at ¶ 32.)

**Paragraph 951.**  On May 12, 2016, Dr. Waggel attended a therapy session with Dr. Kecmanovic where "she reported feeling stronger and indicated that she does not need to come to weekly sessions any more." (Def.'s Ex. U at 3.)

**Paragraph 952.**  On May 15, 2016, Dr. Waggel notified Dr. Berger that she wished to appeal the decision to dismiss her from the Program. (Def.'s Ex. B at ¶ 96.)

**Paragraph 953.**  Upon receipt of Dr. Waggel's appeal, Dr. Berger contacted Dr. Raymond Lucas, an Emergency Medicine physician at George Washington University Hospital, to serve as an independent physician reviewer. Dr. Lucas had no involvement or connection to the Psychiatry Department or its Residency Training Program. (Def.'s Ex. B at ¶ 97.)

**Paragraph 954.**  Dr. Berger also alerted Dr. Lucas to Dr. Waggel's health issues prior to his review. (*See* Def.'s Ex. S at ¶ 6.)

**Paragraph 955.**  As the independent reviewer, Dr. Lucas was ultimately tasked with making a determination whether the resident received notice and an opportunity to cure, and the decision to take the Reportable Action was reasonably made. (Def.'s Ex. S at ¶ 7.)

**Paragraph 956.**  Dr. Lucas reviewed Dr. Waggel's entire resident file, which included but was not limited to, relevant GME policies on sick leave and academic discipline, four Letters of Deficiency received by Dr. Waggel, the minutes of the meetings of the Residency Program

Clinical Competency Committee, milestones and evaluations of Dr. Waggel, documentation of issues arising on some of Dr. Waggel's call shifts, and all of the documents related to Dr. Waggel's multiple appeals. (Def.'s Ex. S at ¶ 8.)

**Paragraph 957.**  Dr. Lucas also reviewed an appeal letter prepared by Dr. Waggel in which she disputed each of the points in the Letter of Dismissal and asserted that a breach of protocol occurred in the decision to dismiss her. (Def.'s Ex. S at ¶ 9.)

**Paragraph 958.**  Dr. Lucas then met with Dr. Catapano and discussed (1) what feedback the program administration had received about Dr. Waggel's performance; (2) whether the specifics of the negative feedback had been communicated to Dr. Waggel; (3) whether remediation had been proposed and implemented, and (4) whether any extenuating circumstances existed. (Def.'s Ex. S at ¶ 10.)

**Paragraph 959.**  During that meeting, Dr. Catapano advised that Dr. Waggel had struggled in the program for the entirety of her residency, but her difficulties apparently significantly increased following her kidney surgery in July 2015. Upon returning from medical leave for the surgery, Dr. Waggel noted that she would need periodic time off to attend medical appointments. The program had encouraged her to go to the EEO Office and get an official accommodation for her schedule needs, but she chose not to. *Id.*

**Paragraph 960.**  Dr. Lucas next met with Dr. Waggel, along with Dr. Berger and Ms. Tucker, to discuss her side of the story. Prior to the meeting she asked if her attorney could attend, but Dr. Lucas declined. (Def.'s Ex. S at ¶ 11.)

**Paragraph 961.**  Dr. Waggel contended that she was excelling in the program until she got sick and then the program turned against her. Dr. Lucas attempted to ask her about her understanding of the many specific instances of alleged misconduct contained in her file, but

she was unwilling to engage on those topics and dismissed them simply as vindictive actions

by the faculty. Likewise she did not wish to discuss the many efforts the program had made to

address her issues, but focused instead solely on what she considered the failures of the

Program faculty in facilitating her remediation. *Id.*

**Paragraph 962.**   Dr. Lucas noted that it became apparent during his meeting with Dr. Waggel

that she was unable to recognize her role in causing the situations that led to her dismissal, and

felt that fault lay entirely with the Program. (*Id.*; *see also* Def.'s Ex. S at Exhibit 3.)

**Paragraph 963.**   At the conclusion of the meeting, Dr. Lucas asked Dr. Waggel if there was

anyone else that she would like for him to speak with. She did not provide him with any names.

(Def.'s Ex. S at ¶ 13.)

**Paragraph 964.**   Based upon his review of the file, Dr. Lucas reached the determination that the

decision to dismiss Dr. Waggel from the Psychiatry Residency Program was reasonably made

and should be upheld. Dr. Waggel provided her findings to Dr. Berger by letter on July 6, 2016.

Dr. Lucas stated the following regarding his decision:

> It was very evident that Dr. Waggel had significant deficiencies in the areas of
> patient care, medical knowledge, professionalism, and interpersonal
> communication. She also failed two didactics courses. Furthermore, despite her
> contentions to the contrary, she was rated below expectation in nearly all of her
> milestone evaluations. She received notice of her deficiencies through continued
> verbal and written feedback from multiple sources throughout her training, both
> during clinical rotations and in frequent meetings with Program staff, including the
> Program Director and Associate Director. The amount of formal evaluative
> feedback she received was limited, however, by her failure to input the names of
> her supervising faculty members into the program's student evaluation system as
> required by her program. Dr. Waggel acknowledged that she had received the
> feedback identified herein.
>
> Dr. Waggel was given ample opportunity to cure the deficiencies identified by her
> supervisors over the course of her residency. She received multiple LODs with
> remediation plans included therein, she was placed on buddy-call for overnight call
> shifts so that more senior residents could help her organize her workflow and
> provide guidance, she was assigned a faculty mentor to assist with professionalism,

and she was given assignments designed to help her learn how to deal with the types of situations in which she was struggling with. Dr. Catapano also worked with faculty at Dr. Waggel's off-campus clinical training rotation sites to adjust her schedule and responsibilities so that she would have more opportunities for observation and feedback. Finally, despite having failed two didactics courses, Dr. Waggel was given the opportunity to repeat that portion of her PGY2 year to learn the missed material with the opportunity for early promotion to PGY3 year.

I noted that there were genuine issues with the faculty members meeting with Dr. Waggel in a timely fashion to facilitate parts of her remediation plans. I pointed out that the program faculty should have done a better job in that area. I did not feel, however, that those issues created a barrier to Dr. Waggel recognizing and curing the many deficiencies which had been clearly presented to her.

While Dr. Waggel's health problems were entangled with her clinical performance problems, professionalism problems and misconduct, it did not appear that they were the source of any bias against her, and they certainly did not explain all the facts and circumstances related to her behavior and multiple deficiencies that led to the decision for her termination from the program. I also believed that the Program had taken her health issues seriously and based on the information available had made reasonable effort to assist Dr. Waggel and accommodate her needs to the extent that it could. Dr. Waggel complained of not being allowed to take medical leave to attend follow-up appointments, but a review of the file did not identify a single instance where she was prevented from attending a medical appointment because of the demands of the program. She was given information on how to take FMLA leave and did so successfully. Given the demands of scheduling in a residency program, the Program faculty asked her to give timely advance notice of the need to attend medical appointments. I found that request to be reasonable and easy to be complied with. There also seemed to be significant problems with Dr. Waggel unexpectedly calling in sick and/or not showing up for work without ensuring that she got proper coverage per the Program's protocol. Dr. Waggel was also provided information on how to seek accommodations under the ADA, but opted to forego that option. Ultimately, Dr. Waggel's health issues were an extenuating circumstance, but were not a contributing factor nor an excuse or explanation regarding her difficulties in the program. These issues did not cause the multiple instances of lack of professionalism, failure of didactics courses, significant deficiencies in the areas of patient care, medical knowledge, interpersonal communication, and patient safety, and lack of insight into her deficiencies and failure to remediate.

From my review, it was clear to me that Dr. Waggel lacked the insight necessary to properly participate in the remediation process that would have been necessary to reinstate her to the program. She did not exhibit any insight into any of the very clear issues she had with professionalism, patient care, medical knowledge, and communication. For whatever reason, Dr. Waggel believed that the program was 'out to get her' because she had an illness and required accommodation in going to

medical appointments. From my review of her file, I did not find evidence to support this claim. The offer to Dr. Waggel to repeat her PGY2 year was a genuine offer designed to help Dr. Waggel move past the issues that had plagued her for the entirety of her residency and try to move forward in the program. I believe that it would have truly been her best chance to attempt to remediate at least some of her deficiencies and ultimately succeed in her training. Unfortunately, Dr. Waggel saw this offer as punishment and refused to accept it. She then continued in behaviors that were unprofessional and a decision was ultimately made by the CCC recommending her dismissal.

Based on the ample evidence of significant deficiencies in multiple key areas, the well-documented issues with performance throughout her residency, 5 LODs (something I have never seen by one resident in one academic year in my more than 20-year career as a medical educator), her documented issues with truthfulness, and her skeptical and oppositional attitude towards the program, the Psychiatry Residency Program Clinical Competency Committee ("CCC") had sufficient reason to recommend Dr. Waggel's dismissal to the program director. I was satisfied by the April 8, 2016 meeting minutes that the CCC had given ample consideration to all issues related to Dr. Waggel's performance to make that recommendation. As such, the result of my review was the decision to dismiss was to be upheld.

(Def.'s Ex. S at ¶ 15; *see also* Def.'s Ex. S at Exhibit 1.)

**Paragraph 965.**  Dr. Waggel was scheduled for a visit with her oncologist, Dr. Siegel, on May 23, 2016, at 11:30 a.m., but she did not show up. (Def.'s Ex. J at ¶ 15.)

**Paragraph 966.**  Dr. Berger provided Dr. Waggel with notice of Dr. Lucas' decision upholding the decision to dismiss her from the Program by letter dated July 13, 2016. (Def.'s Ex. B at ¶ 100; *see also* Def.'s Ex. B at Exhibit 27.)

**Paragraph 967.**  On July 22, 2016, Dr. Richard Simons again received noticed of Dr. Waggel's request for a review of the decision to dismiss her from the Program. (Def.'s Ex. R at ¶20.)

**Paragraph 968.**  His role was once again to determine whether the procedural guidelines of the Academic Improvement Policy had been followed. (Def.'s Ex. R at ¶ 21.)

**Paragraph 969.**  Along with the notice of appeal, Dr. Waggel submitted a written submission. As with her earlier letter of appeal, the written submission failed to identify a procedural

deficiency on the Program's part and simply outlined the ways in which she felt that she had been treated unfairly. (Def.'s Ex. R at ¶ 22.)

**Paragraph 970.**   Dr. Simons reviewed Dr. Waggel's appeal by examining copies of Dr. Waggel's evaluations, the numerous Letters of Deficiency Dr. Waggel had received, the minutes from the April 8, 2016 meeting of the CCC during which her dismissal was discussed and a formal vote was taken (Dr. Catapano not participating as she attended the meeting exofficio) to recommend dismissal to the Program Director, and documentation of events related to Dr. Waggel's performance issues. (Def.'s Ex. R at ¶ 23.)

**Paragraph 971.**   Dr. Simons also reviewed Dr. Lucas' report. (Def.'s Ex. R at ¶ 25.)

**Paragraph 972.**   Dr. Simons noted that the materials he was provided and reviewed clearly showed that Dr. Waggel had received feedback on numerous occasions regarding unsatisfactory performance issues both verbally and in writing. (Def.'s Ex. R at ¶ 26.)

**Paragraph 973.**   He further noted that the April 8, 2016 CCC meeting minutes outlined numerous performance and misconduct issues and there was a unanimous decision to recommend to the Program Director that Dr. Waggel be dismissed from the program. (Def.'s Ex. R at ¶ 28.)

**Paragraph 974.**   Dr. Simons further noted that, per the Academic Improvement Policy, Dr. Waggel had received a formal review by an experienced and highly respected faculty member who had determined that the decision to dismiss was reasonably made and that on July 13, 2016, Dr. Waggel had received notification of Dr. Lucas' decision. (Def.'s Ex. R at ¶ 30.)

**Paragraph 975.**   Based on his review, Dr. Simons' concluded that both the program and the GME office had followed appropriate procedures outlined by the Academic Improvement Policy for the dismissal of Dr. Waggel from the program and therefore decided to uphold the program's decision to dismiss Dr. Waggel from the program. (Def.'s Ex. R at ¶ 31.)

**Paragraph 976.**  Dr. Waggel was provided with a report on Dr. Lucas' findings in writing on August 10, 2016. (Def.'s Ex. R at ¶ 32; *see also* Def.'s Ex. R at Exhibit 5.)

**Paragraph 977.**  On August 12, 201, Dr. Berger sent Dr. Waggel a letter formally terminating her from the Program effective August 10, 2016.  (Def.'s Ex. B at ¶ 127).

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

In addition to the undisputed facts set forth in its own Motion for Partial Summary Judgment, Plaintiff Dr. Stephanie Waggel offers the following additional material facts:

**Paragraph 978.**  According to guidelines issued by the Accreditation Council for Graduate Medical Education (AGGME) and the American Board of Psychiatry and Neurology, residents are to receive "Milestones" evaluations semi-annually. (Declaration of Stephanie Waggel, dated Feb. 1, 2018 (Waggel Declaration) ¶ 7.)

**Paragraph 979.**  On January 13, 2015, Plaintiff received the first of only two Milestone evaluations she received during her entire residency. Both covered her Post Graduate Year 1 (PGY1) year. (Waggel Decl. ¶ 9.)

**Paragraph 980.**  In this first Milestone evaluation, Plaintiff received 21 scores of Level 1 and one score of Level 1.5 in the category of problem-based learning: Teaching, Development as a teacher, Observable teaching skills. (Waggel Declaration ¶ 9.) These scores are considered satisfactory, and placed Plaintiff ahead of at least some of her peers. (Waggel Decl. ¶ 10.)

**Paragraph 981.**  On March 2, 2015, Dr. Waggel began her first day of a rotation on internal medicine. Other residents had warned her that attending internal medicine doctors regularly berated psychiatry residents on this rotation. (Waggel Declaration ¶ 12.)

**Paragraph 982.**  Moreover, this was Dr. Waggel's first rotation through internal medicine. (Waggel Declaration ¶ 12.) Other residents who had done a prior rotation were more advanced in their internal medicine skills than she was. (*Id.*)

**Paragraph 983.**  On her first day on this rotation, Dr. Waggel left George Washington University (GWU) Hospital around 1:00 a.m., having worked approximately 19 consecutive hours. (Waggel Declaration ¶ 13.)

**Paragraph 984.**  The grueling hours on the internal medicine rotation often exceeded the duty hour and patient load guidelines issued by ACGME. (Waggel Declaration ¶¶ 14-15, 18, 20.)

**Paragraph 985.**  When Dr. Waggel brought these duty hour and patient load violations to the attention of two of her supervisors, Dr. Lisa Catapano, her residency program director, and Dr. Khin Khin, they told Dr. Waggel that she would need to deal with her patient load and did not address Dr. Waggel's duty hour complaints. (Waggel Declaration ¶ 19.)

**Paragraph 986.**  Given the grueling hours, Dr. Waggel had difficulty finding the time to have her primary care Doctor, Doctor Shephard, examine the excruciating left side pain she was suffering. (Waggel Declaration ¶¶ 20-21.)

**Paragraph 987.**  When Dr. Waggel was finally allowed to make and to attend an appointment, Dr. Shephard noted that Dr. Waggel was working long hours, and he ordered a CT scan which took place on April 15, 2015. (Waggel Declaration ¶¶ 22, 25.)

**Paragraph 988.**  On April 16, 2015, Dr. Waggel learned that the CT results showed a kidney mass. (Waggel Declaration ¶ 25.)

**Paragraph 989.**  On April 20, 2015, Dr. Waggel learned that Dr. Catapano already knew about her medical problems. (Waggel Declaration ¶ 26.)

**Paragraph 990.**   On May 14, 2015, Dr. Waggel felt ill, went to the call room to lie down, and

passed out. (Waggel Declaration ¶ 35.) One of the chief residents told her to go home. (*Id.*)

When she arrived, she realized that she had taken the wrong medication in the morning. . (*Id.*)

Of note, she went to bed around 11:30 p.m. the night before. She was not "out late drinking"

as Dr. Catapano later claimed. (*Id.*)

**Paragraph 991.**   After a number of difficult to schedule follow up appointments for a MRI and

additional consultations, Dr. Waggel made a 3:00 P.M. June 10, 2015 appointment with Dr.

Thomas Jarett, the Chair of the GWU Urology Department. (Waggel Declaration ¶¶ 27-38.)

**Paragraph 992.**   On June 10, 2015, Plaintiff went to work as required and arrived late for her

appointment with Jarett because the resident who promised to cover for Dr. Waggel if she

needed to work overtime never came in as promised. (Waggel Declaration ¶¶ 38-39.)

**Paragraph 993.**   During Dr. Waggel's appointment, Dr. Jarrett stated that her tumor did not look

good and further said that, "if you were my daughter I would want you to get this removed as

soon as possible." (Waggel Declaration ¶ 39.)

**Paragraph 994.**   Consistent with a note Dr. Jarrett provided in advance of scheduling surgery, Dr.

Waggel requested to Dr. Catapano, Victoria Anderson, the psychiatry residency program

coordinator, and Dr. Emejuru, the chief resident that she be allowed to take 2 weeks off for the

surgery, 2 weeks for light duty, and that she further needed set days in advance where she could

schedule follow up doctors' appointments. (Waggel Declaration ¶ 40.)

**Paragraph 995.**   In the context of this litigation, GWU has claimed that Dr. Waggel should have

asked for extended time off to deal with her medical issues, but all she really needed was time

to schedule follow up appointments that would take an hour or two at most. (Waggel

Declaration ¶ 41.)

**Paragraph 996.** Dr. Waggel was aware that Dr. Catapano had a rule that to take time off one needed to get sequential approvals from on-site supervising attending physicians, Victoria Anderson, the program coordinator, and Dr. Emejuru, the chief resident. (Waggel Declaration ¶ 41.)

**Paragraph 997.** This was difficult to accomplish in practice for appointments with specialists which needed to be made sometimes months in advance. (Waggel Declaration ¶ 41.) A major problem was getting approvals from on-site supervising attending physicians. This is why Dr. Waggel requested set days in advance when she could schedule follow up appointments, a request that was never honored. (*Id.*)

**Paragraph 998.** Dr. Waggel had difficulty scheduling her surgery because she received conflicting information from Dr. Catapano and Mary Tucker of the Graduate Medical Education office. (Waggel Declaration ¶ 42.)

**Paragraph 999.** Although Dr. Waggel sought to comply with Dr. Catapano's procedures for seeking time off for surgery, Dr. Catapano ostracized Dr. Waggel and punished her with an additional week in the emergency medicine rotation before her surgery. (Waggel Declaration ¶¶ 43-45; Email from Catapano to Medicine Chiefs, telling them to disregard email about surgery, dated June 17, 2015, Exhibit E.)

**Paragraph 1000.** On July 15, 2015, Dr. Waggel was issued a letter of deficiency (LOD) for missing time on the day she received her cancer diagnosis. The event that triggered the letter of deficiency took place on June 10, 2015, over a month before. (Waggel Declaration ¶ 49; Letter of Deficiency, dated July 15, 2015, Exhibit F.)

**Paragraph 1001.**  The LOD inaccurately stated that Plaintiff did not appear for her shift on July 10, 2015. Dr. Waggel in fact did appear for her July 10, 2015 shift and left on time to address her medical condition. (Waggel Declaration ¶¶ 38-39; Waggel Dep. 145:8-149:15, Ex. OOO.)

**Paragraph 1002.**  Moreover, the LOD claimed that Dr. Waggel told someone over the phone that morning that she was not coming in and that she did not acknowledge the inconvenience she caused. As the first phone call Dr. Waggel received occurred after she had already started work for the day, these allegations were not possible to have occurred. (Waggel Declaration ¶ 50.)

**Paragraph 1003.**  Although Dr. Waggel had informed Dr. Catapano that she was to have surgery in 5 days and would be recovering for 2 weeks, the LOD told Dr. Waggel to remediate with Dr. Dyer within 2 weeks. (Waggel Declaration ¶ 50.)

**Paragraph 1004.**  Based on the tenor of communications she received from Dr. Catapano, Dr. Emejuru and the psychiatry program administrator, Victoria Anderson, as she tried to schedule her surgery, Dr. Waggel felt that GWU psychiatry administration did not take her surgery seriously, and acted as if she was simply skipping class, rather than receiving a life-saving intervention. (Waggel Declaration ¶¶ 48, 51, 55, 58; Email from Dr. Emejuru, dated July 18, 2015, disallowing appointments on Thursdays after Waggel goes for pre operation appointment, Exhibit G.)

**Paragraph 1005.**  On July 20, 2015, Dr. Waggel underwent a laparoscopic partial nephrectomy. (Waggel Declaration ¶ 53.)

**Paragraph 1006.**  On July 24, 2015, Dr. Waggel informed Dr. Catapano that she had kidney cancer based on a pathology report. (Waggel Declaration ¶ 54.)

**Paragraph 1007.** Even though it seemed as if some in the administration doubted whether Dr. Waggel had cancer, no one associated with GWU asked for medical documentation, which she would have readily provided. (Waggel Declaration ¶ 56.)

**Paragraph 1008.** When Dr. Waggel returned from surgery, she was supposed to be placed on light duty, but instead worked grueling hours as she was required to attend extra shifts at night. (Waggel Declaration ¶ 63, 64, 66, 69, 72.)

**Paragraph 1009.** Shortly after Dr. Waggel returned to work (post-surgery), Dr. Catapano issued Dr. Waggel her second and last Milestone evaluation of her residency, formally reviewing her work for PGY1. This evaluation placed Dr. Waggel at and above the PGY1 level for the second half of her PGY1 year. (Waggel Declaration ¶ 60; August 5, 2015, Second Milestone evaluation, Exhibit I.)

**Paragraph 1010.** Because of an uncaring GWU administration, it continued to be difficult for Dr. Waggel to schedule follow-up medical appointments related to her cancer surgery and as a result Dr. Waggel missed or was late for these appointments. (Waggel Declaration ¶¶ 59, 64-66, 110, 136)

**Paragraph 1011.** During this same period, Dr. Waggel was trying without success to meet with Dr. Dyer as required by her first LOD. (Waggel Declaration ¶¶ 61, 68, 70.)

**Paragraph 1012.** On August 25, 2015, after a full day of work, Dr. Waggel experienced a very difficult night call on Six South, a psychiatric ward. Problems with a violent and potentially suicidal patient that evening were exacerbated by staff shortages, delayed medication orders, and the lack of back up or responsive on-call attending doctors. (Waggel Declaration ¶¶ 74-90.)

**Paragraph 1013.**  Dr. Waggel understood that a Root Cause Analysis (RCA) was held with regard to the August 25th night call, but she was not invited to attend or recount her version of what happened that night. (Waggel Declaration ¶ 90.)

**Paragraph 1014.**  After additional efforts, Dr. Waggel finally met with Dr. Dyer on September 2, 2015. (Waggel Declaration ¶¶ 91-94.)

**Paragraph 1015.**  Although the meeting was supposed to address issues related to the first LOD, Dr. Dyer was more interested in discussing an alleged "inappropriate response" Dr. Waggel made to an assignment. (Waggel Declaration ¶ 94.)

**Paragraph 1016.**  During this meeting, Dr. Dyer also made an offensive comment to Dr. Waggel to the effect that she might not have what it takes to be a psychiatrist. (Waggel Declaration ¶ 94.) Dr. Waggel found this comment to be particularly insulting because prior to this meeting, Dr. Waggel had only met Dr. Dyer once before. (*Id.*)

**Paragraph 1017.**  On September 17, 2015, Dr. Waggel visited the GWU EEO office located in Rice Hall, Suite 101. (Waggel Declaration ¶ 98.) At that time, in response to Dr. Waggel's question about policies to protect residents in need of medical leave, Dr. Waggel was told to apply for such leave under the Family Medical Leave Act. (FMLA). (*Id.*)

**Paragraph 1018.**  A GWU form produced in this litigation entitled, "Request for Medical Accommodation," corroborates this advice because it refers to FMLA leave as an accommodation. (GWU Medical Accommodation form, Exhibit CCC.)

**Paragraph 1019.**  However, Defendant also provided Dr. Waggel with conflicting instructions for obtaining leave, and then blamed Dr. Waggel for not following proper policy. More specifically, Dr. Emerjuru, Plaintiff chief resident, instructed Plaintiff that she need only inform him, the attending, and Tory Anderson of her need for leave, but later GW punished

Dr. Waggel for not also notifying other individuals of her leave requests. (Catapano 30(b)(6) 64:10-17, 69:8-70:15, Exhibit HHH; Catapano 30(b)(6) Ex. 12, Exhibit JJJ.)

**Paragraph 1020.** On September 21, 2015, Dr. Catapano informed Dr. Waggel that she would be put on "buddy call" with other residents as a remediation measure. (Waggel Declaration ¶ 100.)

**Paragraph 1021.** The "buddy calls" were presumably designed to help Dr. Waggel, but in practice the "buddies" either micromanaged Dr. Waggel, added to her work or were entirely absent. (Waggel Declaration ¶ 103.) Moreover, Dr. Waggel's "buddies" resented having to come into the hospital from home to act as a "buddy." (Waggel Declaration ¶ 104.)

**Paragraph 1022.** In October 2015, Dr. Waggel began a new rotation at INOVA Fairfax. At the start of that rotation, Dr. Crone, its director, refused to meet with Dr. Waggel to discuss her schedule and need for medical appointments. (Waggel Declaration ¶ 108.)

**Paragraph 1023.** Instead, Dr. Waggel discussed her needs with the attending, Dr. Malik. Dr. Malik responded positively and also approved 2 days off to study for and 2 days off to take the United States Medical Licensing (USMLE) Step 3 exam necessary for Dr. Waggel to practice medicine. (Waggel Declaration ¶ 109.)

**Paragraph 1024.** On October 19, 2015, Dr. Waggel, who was suffering from chest pain, consistent with Dr. Catapano's procedures, emailed Dr. Malik, her attending, her chief residents, and Ms. Anderson, the program coordinator that she was ill and would not be coming to work the next day. (Waggel Declaration ¶ 111.)

**Paragraph 1025.** Nevertheless, on the next day, Oct. 20, 2015, Dr. Waggel received an email from Dr. Crone stating that Dr. Waggel had not followed proper procedures. (Waggel Declaration ¶ 112.)

**Paragraph 1026.**   Moreover, on Oct. 20, 2015, Dr. Waggel received another email from Dr. Kels stating that the prior approval for time off to study for and take the upcoming USMLE Step 3 exam had been revoked, again for supposedly not following proper procedures. (Waggel Declaration ¶ 113.) With the USMLE just a week away, Dr. Waggel had been told that her administrative leave had been denied and she would only be allowed two administrative days off to take (but not study for) the USMLE exam. (*Id.*)

**Paragraph 1027.**   Exasperated, Dr. Waggel emailed Dr. Catapano, Dr. Griffith, Ms. Anderson, and her chief residents about her problems. (Waggel Declaration ¶¶ 114-122.) She also applied for FMLA leave from Oct. 25-30, 2015, which was granted. (Waggel Declaration ¶¶ 124-125.)

**Paragraph 1028.**   Dr. Waggel, given her growing frustration, also sought a meeting with Dr. Griffith, the Psychiatry Department Chair, to discuss her problems, but he denied her request. (Waggel Declaration ¶ 121.)

**Paragraph 1029.**   Despite all this personal turmoil, Dr. Waggel learned that she passed her USMLE Step 3 exam. (Waggel Declaration ¶ 126.)

**Paragraph 1030.**   On or about October 14, 2015, which was nearly two months after the August 25th event, Dr. Waggel was informed that she did not "perform at the level expected" during the August 25th call on Six South. (Waggel Declaration ¶ 129.)

**Paragraph 1031.**   When Dr. Waggel asked Dr. Catapano what she did to demonstrate she was not "performing at the level expected" Dr. Catapano stated something to the effect that "I know you've gone over it with Dr. Norris and Dr. Gandhi and a letter of deficiency will be coming which will outline what you spoke to them about." (Waggel Declaration ¶ 129.) Dr. Norris and Dr. Gandhi were the psychiatry attendings on staff during August 25th call. (*Id.*) Dr. Catapano was under the impression that Dr. Waggel had a meeting with them. (*Id.*) However, this

meeting had been rescheduled. Therefore, a letter of deficiency was been written outlining a meeting that had never occurred. (*Id.*)

**Paragraph 1032.**  When Dr. Waggel eventually had a meeting with Dr. Norris and Dr. Gandhi on October 15, she showed them her detailed documentation of the night of August 25th. (Waggel Declaration ¶ 130.) Dr. Waggel recalls them telling her that she had excellent patient care and put safety first. It was an overall positive feedback session that did not question Dr. Waggel's level of performance. (*Id.*) Dr. Norris and Dr. Gandhi also told Dr. Waggel that they did not know anything about a letter of deficiency. (*Id.*)

**Paragraph 1033.**  For the remainder of October, Dr. Waggel attempted to find out from Dr. Catapano what she based her decision on, but her questions went unanswered. (Waggel Declaration ¶ 130.)

**Paragraph 1034.**  On October 23, 2015, the CCC met and decided to hold Dr. Waggel back from advancing to her PGY3 year based on taking medical leave, one day after Dr. Waggel had sent an email expressing concern the she was receiving repercussions for taking sick days and the same day as Dr. Waggel's first request for FMLA leave. (*See* Ex. 8, 9 to Def.'s Mot. Sum. J. Ex. M; *see also* Def.'s SOF ¶ 522.)

**Paragraph 1035.**  On October 28, 2015, Dr. Waggel received her second LOD for failing to provide all the medical documentation necessary for her health clearance. (Waggel Declaration ¶ 128; LOD, dated Oct. 28, 2015, Exhibit N.)

**Paragraph 1036.**  Although 17 other residents also failed to provide their documentation in time, only Dr. Waggel received a LOD for this oversight. (Waggel Declaration ¶ 127.)

**Paragraph 1037.**  On November 2, 2015, Dr. Waggel learned from a department newsletter that she was set to present grand rounds on Nov. 5, 2015.  When she asked Dr. Emejuru about it,

Emejuru stated that the failure to inform Dr. Waggel about this assignment was an "oversight." (Waggel Declaration ¶ 135.)

**Paragraph 1038.**  On November 10, 2015, Dr. Waggel received a phone call from Dr. Catapano who stated that Dr. Waggel was to begin forced administrative leave because she had "taken too much sick leave" and "the deans were going to have a legal meeting about [her]." (Waggel Declaration ¶ 136.)

**Paragraph 1039.**  Dr. Waggel was careful to document Dr. Catapano's admission that she was being punished for taking too much time off. (Waggel Declaration ¶¶ 137-138; Emails about Catapano telephone call, Exhibit Q, R.)

**Paragraph 1040.**  On November 11, 2015, Dr. Waggel called the geriatrics department and was told she had been taken off their schedule. Later that day, Dr. Catapano sent an email confirming that Dr. Waggel had been placed on administrative leave. (Waggel Declaration ¶ 139.)

**Paragraph 1041.**  On November 11, 2015, Dr. Catapano also emailed Dr. Waggel a LOD for the August 25th call. (Waggel Declaration ¶ 141.) That letter stated, "Because of the above listed deficiencies, and need for extra supervision, the Clinical Compeitency (sic) Committee's assessment is that you are not on track to be promoted to the PGYIII year on July 1, 2016." (Waggel Declaration ¶ 133; LOD, dated November 11, 2015, Exhibit O.)

**Paragraph 1042.**  The Psychiatry Program did not consider mitigating factors or extenuating circumstances, such as Plaintiff's illness, in the decision-making process that led to the November 11, 2015 LOD. (Catapano 30(b)(6) Dep. 40:18-41:4, 43:11-44:13, Exhibit HHH; Catapano 30(b)(6) Ex. 7, Exhibit III.)

**Paragraph 1043.**  On November 12, 2015, Dr. Waggel hired Greg Care, a lawyer who specializes in residency issues to help her with her problems. Care told Dr. Waggel that GWU's general counsel was handling her matter. (Waggel Declaration ¶ 142.)

**Paragraph 1044.**  On November 18, 2015, Dr. Waggel had a positive meeting with Dr. Jeffrey Berger, a Graduate Medical Education Dean, and Mary Tucker, an administrator. (Waggel Declaration ¶ 143; Email exchanges about November 18, 2015 meeting with Dean Berger, Exhibit T, U.)

**Paragraph 1045.**  At this meeting, Plaintiff made Dr. Berger aware of her cancer diagnosis, and Defendant was therefore definitely aware of her condition at that time, to the extent that it was not already aware beforehand. (Berger Dep. 69:1-70:11, Exhibit GGG.)

**Paragraph 1046.**  Dr. Waggel left the meeting hopeful that solutions could be worked out that would sort out her periodic leave requests and allow her to graduate on time. One area Dr. Waggel explicitly discussed was having one contact point when she needed an accommodation to go to a medical appointment. (Waggel Declaration ¶ 143; Email exchanges about November 18, 2015 meeting with Dean Berger, Exhibit T, U.)

**Paragraph 1047.**  Significantly, in their meeting Dr. Berger also warned Dr. Waggel about her hiring of an attorney. He stated, "Please do not reference your attorney going forward, particularly to the people in your Department. It does not make for a safe working environment. It is your choice to continue to pursue this avenue." (Email exchange about November 18, 2015 meeting with Dean Berger, Exhibit T.)

**Paragraph 1048.**  As a follow up to this meeting, Mary Tucker emailed Dr. Waggel he phone number to the EEO office, but Dr. Waggel had already gone to that office which told her to

139

apply for FMLA leave, which she did as instructed in October 2015. (Waggel Declaration ¶ 144.)

**Paragraph 1049.** On November 19, 2015, Dr. Catapano issued a revised LOD. That letter changed the wording from the November 11th letter to indicate that the CCC's assessment was that Dr. Waggel would not be promoted, but the final decision was left open. Waggel Declaration ¶ 133; LOD, dated November 19, 2015, Exhibit P.)

**Paragraph 1050.** On November 19, 2015, Dr. Catapano also informed Dr. Waggel that she had received feedback from Dr. Griffith and Dr. Collins that her performance in didactics class had been unsatisfactory. (Waggel Declaration ¶ 145.) Dr. Waggel was told Dr. Catapano discussed with them the possibility that they may recommend that she repeat their classes next year. Failing Dr. Collins' class would mean that Dr. Waggel would not proceed with the rest of PGY2 didactics, and would need to repeat the year. (*Id.*) Dr. Waggl was also told to meet with Dr. Kels to work on an improvement plan as part of her Letter of Deficiency (LOD) for the August 25, 2015 call. (*Id.*) On the bright side, Dr. Catapano also allowed Dr. Waggel to return to her regular duties with geriatrics. (*Id.*) Her administrative leave was evidently over. (*Id.*)

**Paragraph 1051.** The November 19th LOD told Dr. Waggel she had 7 days to meet with Dr. Kels or face possible termination, but once again the designated Psychiatry Department representative was unresponsive to efforts to meet. (Waggel Declaration ¶¶ 158-161.)

**Paragraph 1052.** After finally tracking Dr. Kels down, Kels fobbed Dr. Waggel off on Dr. Gandhi, but he was just as difficult to meet in order to accomplish the required remediation. (Waggel Declaration ¶¶ 162-163.)

**Paragraph 1053.** On November 19, 2015, Dr. Collins informed Dr. Waggel she would be repeating her class starting in July, 2016. (Waggel Declaration ¶ 164.) On November 30, 2015,

Dr. Catapano informed Dr. Waggel that she could take Dr. Griffith's December 17, 2015 exam, but would need to repeat the first half of the course. (*Id.*) The effect of these decisions was to preclude Dr. Waggel from progressing to her PGY3 year on July 1, 2016.  (*Id.*)

**Paragraph 1054.**  Although Drs. Catapano, Griffith and Collins made a decision to make Dr. Waggel repeat coursework which precluded her from progressing to PGY3 (and potentially repeat all of PGY2 year), they did not inform her whether she could appeal the decisions internally. (Waggel Declaration ¶ 165.)

**Paragraph 1055.**  On December 4, 2015, Dr. Berger informed Dr. Waggel that, "A course cannot be appealed to GME." In other words, because Dean Berger erroneously thought a decision to require her to repeat a class was not a reportable action, she could not appeal it. (Waggel Declaration ¶ 166.)

**Paragraph 1056.**  In response, Dr. Waggel pointed out that the decision to have Dr. Waggel repeat Dr. Collins class meant that Dr. Waggel, would be denied credit for previously completed rotations, which constituted an appealable reportable action. To this, Dr. Berger replied, "I hope to have that information by mid-week next week." (Waggel Declaration ¶ 166.)

**Paragraph 1057.**  On December 10, 2015, Dr. Waggel was at the MFA for didactics lectures. Her mailbox was also in that building. (Waggel Declaration ¶ 167.) In December, Dr. Waggel had been working at Children's Hospital. (*Id.*) Although Dr. Catapano knew that she would not be back in the MFA building until the next Thursday didactics day, the GWU Administration placed the December 10, 2015 LOD in Dr. Waggel's mailbox after class ended around 5:00 p.m. (*Id.*) Dr. Waggel only found the LOD in her box when she unexpectedly returned to the building that evening. (*Id.*) The letter stated that she had until the next day, December 11th to appeal. LOD, dated December 10, 2015, Exhibit W.) Had Dr. Waggel not returned to the

building unexpectedly, she would have missed the less than 24-hour deadline to submit her appeal as provided in the letter. (Waggel Declaration ¶ 166.)

**Paragraph 1058.** On December 11, 2015, Dr. Waggel appealed the decisions to make her repeat coursework as repeating this coursework would prevent her from progressing to PGY3 with her peers (or potentially necessitate her to having to repeat her entire PGY2 year). (Waggel Declaration ¶ 168.)

**Paragraph 1059.** On December 23, 2017, she provided the reviewer, Dr. Cioletti, with documentation in support of her appeal. (Waggel Declaration ¶ 169.)

**Paragraph 1060.** On December 28, 2015, Dr. Waggel learned from another resident that she had been taken off the call schedule. (Waggel Declaration ¶ 170.) When queried, Dr. Kels stated Dr. Waggel was taken off call until she finished her essay and made an oral presentation to Dr. Gandhi. (Waggel Declaration ¶ 171.)

**Paragraph 1061.** Given the stress from this news, Dr. Waggel went to the emergency room for treatment. There, the hospital attending directed Dr. Waggel to Dr. Sarani, who acted as an ombudsman. (Waggel Declaration ¶ 174.)

**Paragraph 1062.** On January 3, 2016 after more prompts, Dr. Gandhi finally spoke to Dr. Waggel about remediation on the phone, and Dr. Waggel emailed him the essay she was required to submit as part of her remediation plan that day as well. (Waggel Declaration ¶¶163.)

**Paragraph 1063.** On or about January 8, 2016, Dr. Waggel was at MFA because it was Thursday, a didactics day. At that time, Victoria Anderson, the residency program coordinator, indicated that Dr. Waggel was taken off call in retaliation because she had filed an appeal that was causing the administration to do more work. (Waggel Declaration ¶ 175.)

**Paragraph 1064.**  After completing her remediation project, Dr. Waggel began inquiring about when she would be returned to call. (Waggel Declaration ¶¶ 176, 178, 181.)

**Paragraph 1065.**  On January 19, 2016, Dr. Sarani promised Dr. Waggel that he would press Dr. Berger and Dr. Catapano to move the process along. (Waggel Declaration ¶ 181.)

**Paragraph 1066.**  Later that evening, Dr. Gandhi finally reached out to Dr. Waggel to set up a time when he would hear the presentation she was required to give as part of her remediation, but then later inexplicably backed off from that commitment.  (Waggel Declaration ¶¶ 182, 183.)

**Paragraph 1067.**  On or about January 21, 2016, Dr. Waggel received a communication from Dr. Catapano that she would review Dr. Gandhi's comments about Dr. Waggel's essay with the CCC and then get back to Dr. Waggel to let her know about their recommendations. (Waggel Declaration ¶ 185.)

**Paragraph 1068.**  From this point forward, Dr. Waggel was subject to additional scrutiny from staff, had far more difficulties attending medical appointments, and was branded as a "problem resident" by the GWU Administration. (Waggel Declaration ¶¶ 186-191.)

**Paragraph 1069.**  On February 3, 2016, Dr. Catapano sent Dr. Waggel an email at 10:19 a.m., "The CCC did not yet come to a conclusion about next steps regarding your Improvement Plan or return to call. If/when you do return to call, you will have plenty of notice to arrange your schedule. For now, I will say we would not put you into the schedule until, at the earliest, February 19th." (Waggel Declaration ¶ 192.)

**Paragraph 1070.**  On February 3, 2016, at 5:13 p.m., Dr. Waggel emailed Dr. Sarani, the hospital ombudsman, "Good afternoon. Administration met yesterday to discuss her call schedule. Dr. Catapano stated the result was "The CCC did not yet come to a conclusion about next steps

regarding your Improvement Plan or return to call. If/when you do return to call." I do not understand why this process is taking so long. Is there anything that can be done about this?" (Waggel Declaration ¶ 193.)

**Paragraph 1071.**   In response, Dr. Sarani asked Dr. Waggel to call him. Over the phone he told her that he did not think the atmosphere with GWU psychiatry department was beneficial to her medical education and suggested she would have an opportunity at success if she went to a different program. (Waggel Declaration ¶ 193.)

**Paragraph 1072.**   On February 3, 2016, Dr. Waggel began a rotation at the Comprehensive Addiction Treatment Services (CATS) in Fairfax, VA, but had to leave to go to a personal medical appointment with Dr. Shepard. (Waggel Declaration ¶ 194.)

**Paragraph 1073.**   Dr. Shepard referred Dr. Waggel to Dr. Frank for evaluation of abdominal pain in the setting of renal cell carcinoma. He stated it was likely due to all this stress caused by Program administration but wanted to make sure it was not a symptom of cancer metastasis. (Waggel Declaration ¶ 194.)

**Paragraph 1074.**   On February 4, 2016, Dr. Catapano accused Dr. Waggel of not turning in her keys from her prior rotation. (Waggel Declaration ¶ 195.) Later, Dr. Catapano subsequently recanted after confirming that Dr. Waggel had not received a key in the first place. (*Id.*)

**Paragraph 1075.**   In that email, also dated February 4, 2016, Dr. Catapano stated, "I am sorry that it takes as long as it does for the CCC to come up with their recommendations for improvement (not punishment). They take the time to be careful to put together a plan that is substantive and reasonable, makes sense in terms of your improvement, and is appropriately supervised. I am very sorry that you continue to experience so much stress-related illness, and do hope you are taking care of yourself and getting appropriate care. I will continue to support you taking the

time you need to go to your doctor's appointments." (Waggel Declaration ¶ 195; Email exchange with Dr. Catapano, dated February 4-8, 2016, regarding return of keys and awaited CCC improvement plan, Exhibit II.)

**Paragraph 1076.**   On February 8, 2016, Dr. Catapano emailed Dr. Waggel, "The CCC is working on their recommendations, and the plan is to get them together and review them with Dr. Berger this Thursday. I'll give you an update when I know more. Take care of yourself." (Waggel Declaration ¶ 196; ; Email exchange with Dr. Catapano, dated February 4-8, 2016, regarding return of keys and awaited CCC improvement plan, Exhibit II.)

**Paragraph 1077.**   At 4:04 p.m. on February 9, 2016, Dr. Waggel emailed Ms. Anderson, "If I need to leave early to go to a doctors (sic) appointment and have been given permission to do so by my attending, do I have to inform others?" She replied at 4:06 p.m., "No. If your attending has given you permission, you're allowed to leave early for a doctor's appointment. Thank you for checking!" (Waggel Declaration ¶ 197; Email exchange with Victoria Anderson regarding doctors' appointment, dated February 9, 2016, Exhibit JJ.)

**Paragraph 1078.**   Dr. Waggel did not understand why every preceding doctor's appointment required her to email numerous people for permission but now simply asking her attending was sufficient. (*Id.*)

**Paragraph 1079.**   On February 11, 2016, at 3:45 p.m., Dr. Catapano emailed Dr. Waggel, "I just wanted to check in with you. The CCC is working on recommendations for your Improvement Plan … they are not ready yet but will be presented to you in due course. I'll keep you updated. Hope you are well." (Waggel Declaration ¶ 198; Email from Dr. Catapano, dated February 11, 2016, regarding CCC "improvement plan," Exhibit KK.)

**Paragraph 1080.** In fact, CCC was not "working on recommendations" for "an improvement plan." Instead, according to minutes of a CCC meeting dated February 9, 2016 produced in this litigation, Dr. Waggel's employment and training was to be terminated. (Minutes of February 9, 2016 CCC meeting, Exhibit LL.)

**Paragraph 1081.** As part of the due process afforded to residents, the CCC was required to consider mitigating circumstances that were favorable to Plaintiff. (Berger Dep. 100:13-21, Exhibit GGG.)

**Paragraph 1082.** In fact, Dr. Berger felt he needed to "put the brakes on" the CCC's discussions about Plaintiff because they were not following proper procedures or allowing Plaintiff proper due process, including the opportunity that Plaintiff should have been given to respond to new allegations brought against her by members of the CCC. (Berger Dep. 83:21-84:1, Exhibit GGG.)

**Paragraph 1083.** Plaintiff's health issues are among the mitigating factors that should have been considered. (Berger Dep. 100:13-21, Exhibit GGG.)

**Paragraph 1084.** Although Plaintiff's cancer and its resulting impact on Plaintiff was an important factor that should be considered, the CCC did not consider Plaintiff's medical condition as a mitigating factor when they decided to terminate her residency. (Dyer Dep. 23:9-24:19, Exhibit DDD; Dyer Dep. Ex. 3, Exhibit FFF; Catapano 30(b)(6) Dep. 15:9-17, Exhibit HHH.)

**Paragraph 1085.** The CCC also did not consider the positive performance evaluations that Plaintiff had received when they determined to terminate her residency. (Dyer Dep. 23:9-25:1, Exhibit DDD; Dyer Dep. Ex. 3, Exhibit FFF; *see also* Catapano 30(b)(6) 80:3-82:3, 91:6-13, 91:19-92:14, Exhibit _; Catapano 30(b)(6) Ex. 13, 16, 17, Exhibit KKK, LLL, MMM.)

**Paragraph 1086.** The CCC did not consider the mitigating facts that had been provided in Plaintiff's prior appeal, even though the information was available to the CCC. (Dyer Dep. 35:15-37:20, Exhibit DDD.)

**Paragraph 1087.** On February 12, 2016, Dr. Waggel underwent an endoscopy for stomach pain under general anesthesia at 12:15 p.m. at MedStar Surgery Center. They found "duodenal intraepithelial lymphocytosis" and a "lesion in the antrum" of her stomach with "heaped up tissue." Dr. Waggel was informed that it could be cancer metastasis, a concern that has persisted and has needed to be dealt with while Plaintiff has been in remission. (*See* Waggel Declaration ¶¶ 200, 205, 207.)

**Paragraph 1088.** On February 16, 2016, Dr. Griffith presented Dr. Waggel with a "letter of misconduct" that concerning purported misrepresentations Dr. Waggel made about didactics tests and her position in the program. (*See* Waggel Declaration ¶¶ 202-204.)

**Paragraph 1089.** On February 25, 2016, Dr. Waggel received notice the first level appeal of the decision to no allow her to progress to the PGY3 year was denied. After receiving misinformation from Dean Berger, Dr. Waggel ultimately perfected a second level appeal to Dean Simons. (*See* Waggel Declaration ¶¶ 206, 209-211.)

**Paragraph 1090.** Dr. Waggel applied for and was approved for FMLA leave from March 9-16, before she received notice from Dr. Berger that he wanted to conduct his misconduct inquiry on March 9th. Given Dr. Waggel's leave, Dr. Berger relented and rescheduled the matter for March 17th, the day Dr. Waggel returned from leave. (Waggel Declaration ¶ 207.)

**Paragraph 1091.** On March 17, 2016, Dr. Waggel was given an opportunity to present her side of the story to Dean Berger. (*See* Waggel Declaration ¶ 212; Transcript of meeting with Dean Berger, dated March 17, 2016, Exhibit NN.) At that time, Dr Waggel explained to him that the

alleged misrepresentations that formed the basis of the misconduct allegation against her were really examples of miscommunication. (*Id.*) He questioned her about hiring a lawyer and suggested he could not treat her the same way as others because she had legal representation. (*Id.*) He stated he would help her transfer and he would not mention her current appeals and misconduct accusations. (*Id.*) He said he would negotiate a final evaluation and that she would finally be able to see her semiannual Milestone evaluation which should have been conducted in December, 2015 (that the other residents had already received). (*Id.*) He also said he could work on getting Dr. Waggel credit for the time in residency she had completed and that he would not be not discussing her health condition. (*Id.*)

**Paragraph 1092.** After conducting an inquiry, Dr. Berger adjudicated the misrepresentation claim not as a reportable action, but rather as the basis for another letter of deficiency. (*See* Waggel Declaration ¶ 212, 227; Dean Berger's adjudication of misconduct investigation, dated April 8, 2016, Exhibit UU.)

**Paragraph 1093.** Immediately following her positive meeting with Dean Berger, Dr. Waggel met with Dr. Griffith and Dr. Catapano who removed her from patient care. (*See* Waggel Declaration ¶¶ 213-215.)

**Paragraph 1094.** When Dr. Waggel asked Griffith for a concrete reason for such an action given that there had be no adverse patient outcomes, Griffith only responded that the "vagueness was inside" Plaintiff. (*See* Waggel Declaration ¶¶ 213-215; Transcript of meeting with Dr. Griffith and Dr. Catapano regarding removal from patient care, dated March 17, 2016, Exhibit OO) Griffith's odd statement gave Plaintiff chills. (Waggel Decl. ¶ 214.)

**Paragraph 1095.** During this period, Dr. Waggel was put on a research elective, but no one would agree to serve as her advisor. (*See* Waggel Declaration ¶¶ 218, 223.)

**Paragraph 1096.**  Moreover, Dr. Waggel sought to transfer to another residency program, but although Emory, Virginia Tech and Howard expressed interest, this effort came to nothing because GWU administration failed to provide necessary documentation and disallowed credit for Dr. Waggel's PGY2 year. (*See* Waggel Declaration ¶¶ 208, 220-222, 225-230.)

**Paragraph 1097.**  In addition, Dr. Waggel became aware of efforts to interfere with her license to practice medicine. (*See* Waggel Declaration ¶¶ 216, 224.)

**Paragraph 1098.**  Discovery in this litigation demonstrates that Dr. Catapano and/or Dr. Griffith were directly responsible for damaging Plaintiff's prospects to continue to practice psychiatry. (Griffith Dep. 63:19-66:17, Exhibit NNN; March 21, 2016 Memorandum from Dr. Griffith re instructions not to assist Dr. Waggel in procuring a transfer and threatening her medical license, Exhibit PP.)

**Paragraph 1099.**  On March 25, 2016, Dean Simons informed Dr. Waggel that she had won her appeal and that he had remanded the decision not to allow Dr. Waggel to progress to the PGY3 year to the CCC. (Waggel Declaration ¶ 217; Appeal decision from Dr. Simons, dated March 25, 2016, Exhibit QQ.)

**Paragraph 1100.**  Dr. Simons' email to Dr. Catapano about the decision directed the CCC to meet about the resident's evaluations/concern and make specific recommendations about Dr. Waggel's progress before meeting with her again to convey its recommendations. (March 25, 2016 Email from Dr. Simons to Dr. Dyer and Catapano re appeal decision, Exhibit RR.)

**Paragraph 1101.**  In contrast, Dr. Dyer was less interested in remediating Dr. Waggel than in "fixing" technical problems with CCC's structure, presumably so its decisions about Dr. Waggel would be upheld. (March 25, 2016 Email from Dyer regarding Simons decision and

Waggel's draft milestones, Exhibit SS; March 25, 2016 Email from Dyer to Catapano regarding how to fix the problem, Exhibit TT.)

**Paragraph 1102.** On April 8, 2016, the same day Dr. Berger rejected Dr. Griffith's and Dr. Catapano's effort to use a misconduct allegation as the basis of a reportable action against Dr. Waggel, the CCC met on remand from Dr. Simons and decided to increase Dr. Waggel's punishment from non-progression to PGY3 year to dismissal. (April 8, 2016 CCC Minutes regarding dismissal, Exhibit VV.)

**Paragraph 1103.** A few days later Dr. Dyer secured Dr. Berger's promise that Graduate Medical Education would uphold the decision to dismiss Dr. Waggel from the program against any appeal and further would support any decision to deny her credit for rotations necessary to effectuate a transfer to another residency program. (April 11, 2016 Email from Dyer to Catpano noting GME promise to affirm decision to terminate Dr. Waggel and back up any decision on credit for residency, Exhibit WW.).

**Paragraph 1104.** Although Dr. Waggel did appeal her dismissal from the program, as Dr. Berger promised Dr. Dyer, those appeals were denied. (*See* Waggel Declaration ¶¶ 231-232; Letter of dismissal, dated May 2, 2016, Exhibit XX; Appeals of dismissal, Exhibit YY.)

**Paragraph 1105.** Defendants representatives and agents have an obligation to ensure that the institution follows in own policies. (Berger Dep. 27:16-18, Exhibit GGG.)

**Paragraph 1106.** The requirements for academic due process, according to the Defendant's policies are notice, opportunity to cure, and a careful and deliberate decision-making process. (Dyer Dep. 15:20-18:8, Exhibit DDD; Dyer Dep. Ex. 2, Exhibit EEE; *see generally* Academic Improvement Policy, Exhibit A; *see generally* ACGME Clinical Competency Committees: A Guidebook for Programs, Exhibit B.)

**Paragraph 1107.**  GW fails to provide due process if it does not meet its obligations for all three elements of academic due process. (Dyer Dep. 15:20-18:8, Exhibit DDD.)

**Paragraph 1108.**  Plaintiff's decision to hire an attorney should not have affected the decision-making of by the CCC or any other GW decision-maker. (Berger Dep. 87:19-89:6, Exhibit GGG.)

Dated: February 12, 2018                    Respectfully submitted,

                                            /s/ Peter K. Tompa
                                            Peter K. Tompa, Esq.
                                            Jason H. Ehrenberg, Esq.
                                            Bailey & Ehrenberg PLLC
                                            1015 18th Street, N.W.
                                            Suite 204
                                            Washington, D.C. 20036
                                            Tel: (202.331.1331)
                                            Fax: (202.318.7071)
                                            E:pkt@becounsel.com
                                            jhe@becounsel.com
                                            www.becounsel.com

                                            Counsel for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was served by the court's electronic filing system and electronic mail on this 12th day of February, 2018, upon:

Nicholas S. McConnell
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
nmcconnell@jackscamp.com
*Counsel for Defendant*

 /s/ Peter K. Tompa