# EXHIBIT A



**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

| |
|---|
| Responsible University Official: Associate Dean for Graduate Medical Education, DIO |
| Responsible Office: SMHS Office of GME |
| Most recent revision: |

# ACADEMIC IMPROVEMENT POLICY

## Policy Statement

The purpose of this policy is to establish a process for evaluating and assessing the competence and progress of Residents enrolled in ACGME-accredited post-graduate training programs at The George Washington University School of Medicine and Health Sciences.   Specifically, this policy addresses the process to be utilized when a Resident/fellow is not meeting the academic expectations of a program.

## Who Needs to Know This Policy

All Accreditation Council for Graduate Medical Education (ACGME)-accredited residency and fellowship programs sponsored by the GW School of Medicine and Health Sciences (SMHS)

## Policy Contact

Associate Dean for Graduate Medical Education, DIO

## Who Approved This Policy

Graduate Medical Education Committee (GMEC)

## History/Revision Dates

Created: May 16, 2011
Amended: June, 2015



EXHIBIT
Catapano
7-27-17
PENGAD 800-631-6989

1

## Definitions

Resident – refers to all Interns, Residents and Fellows participating in an ACGME-accredited program of post-graduate medical education.

Post-Graduate Training Program – refers to an ACGME-sponsored residency or fellowship educational program.

## Process

### *Structured Feedback*

All Residents and fellows should be provided routine feedback that is consistent with the educational program. Feedback techniques may include verbal feedback, rotational evaluations, summative evaluations, and recommendations of a program's Clinical Competency Committee. Each residency program must have a Clinical Competency Committee ("CCC"),[1] that is charged with routinely assessing Resident performance.

### *Letter of Deficiency*

When the Program Director, in consultation with members of the CCC, determines that routine structured feedback is not resulting in the necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback, the Program Director, may elect to issue a "Letter of Deficiency" to the Resident. The Associate Dean for Graduate Medical Education must be notified prior to the issuance of a Letter of Deficiency. A Letter of Deficiency provides the Resident with: (a) notice of the deficiency: and (b) an opportunity to cure the deficiency. The issuance of a Letter of Deficiency does not trigger a report to any outside agencies such as credentialing organizations, hospitals, or licensing boards.

After a Letter of Deficiency has been issued, the Program Director will provide the Resident with feedback consistent with the Letter of Deficiency. If the Resident satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of unacceptable academic performance should not affect the Resident's progress in the program.

### *Failure to Cure the Deficiency*

If the Program Director, in consultation with members of the CCC and Associate Dean for GME, determines that a Resident has failed to satisfactorily cure the deficiency and/or

---

[1] The Clinical Competency Committee may be referred to as the "Progress and Promotions Committee" or such other nomenclature as the Program Director may select. This is a departmental committee that consists of the faculty and others as deemed appropriate by the department. This committee should meet regularly to assess Resident/fellow performance and make recommendations to the program director regarding further action.

improve his/her overall performance to an acceptable level, the Program Director may elect to take further action, which may include one or more of the following: Issuance of a new Letter of Deficiency; Non-promotion to the next PGY level; Repetition of a rotation that results in extension of the required period of training; Extension of contract, which may include extension of the defined training period; Denial of credit for previously completed rotations; and Dismissal from the residency or fellowship program

### *Reportable Actions*

A decision not to promote a Resident to the next PGY level, to extend a Resident's contract, to extend a Resident's period of training, to deny a Resident credit for a previously completed rotation, and/or to terminate a Resident's participation in a residency or fellowship program are each considered "Reportable Actions." Reportable Actions are those actions that the program must disclose upon request to certain individuals or entities such as future employers hospitals, credentialing organizations, and licensing and specialty boards. Residents who are subject to a Reportable Action may request a review as provided in this Policy.

## Review

### *Request for Review*

A Resident may request a review of a decision to take a Reportable Action. This request must be submitted by the Resident to the Associate Dean for GME within fourteen (14) days of notification by the Program Director of the Reportable Action. Upon receipt of a request for review, the Associate Dean for GME will first determine whether the matter is reviewable under this Policy. If so, the Associate Dean for GME shall appoint a neutral physician reviewer to conduct the review. The physician reviewer may be a neutral program director from another program or a core faculty member. The purpose of the review is to determine whether the Resident received notice and an opportunity to cure his/her deficiencies, and that the decision to take the Reportable Action was reasonably made.

*The Associate Dean for GME will:*
1. appoint the physician reviewer;
2. assist the physician reviewer to identify other potential participants, if warranted;
3. attend meetings held by the physician reviewer;
4. coordinate communications between the physician reviewer and the Resident;
5. monitor timely completion of the review process;
6. notify the Resident and the Program Director of the determination of the reviewer; and
7. notify the Dean of the School of Medicine and Health Sciences of the determination of the reviewer.

*The physician reviewer will:*

3

## Definitions

Resident – refers to all Interns, Residents and Fellows participating in an ACGME-accredited program of post-graduate medical education.

Post-Graduate Training Program – refers to an ACGME-sponsored residency or fellowship educational program.

## Process

### *Structured Feedback*

All Residents and fellows should be provided routine feedback that is consistent with the educational program. Feedback techniques may include verbal feedback, rotational evaluations, summative evaluations, and recommendations of a program's Clinical Competency Committee. Each residency program must have a Clinical Competency Committee ("CCC"),[1] that is charged with routinely assessing Resident performance.

### *Letter of Deficiency*

When the Program Director, in consultation with members of the CCC, determines that routine structured feedback is not resulting in the necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback, the Program Director, may elect to issue a "Letter of Deficiency" to the Resident. The Associate Dean for Graduate Medical Education must be notified prior to the issuance of a Letter of Deficiency. A Letter of Deficiency provides the Resident with: (a) notice of the deficiency: and (b) an opportunity to cure the deficiency. The issuance of a Letter of Deficiency does not trigger a report to any outside agencies such as credentialing organizations, hospitals, or licensing boards.

After a Letter of Deficiency has been issued, the Program Director will provide the Resident with feedback consistent with the Letter of Deficiency. If the Resident satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of unacceptable academic performance should not affect the Resident's progress in the program.

### *Failure to Cure the Deficiency*

If the Program Director, in consultation with members of the CCC and Associate Dean for GME, determines that a Resident has failed to satisfactorily cure the deficiency and/or

---

[1] The Clinical Competency Committee may be referred to as the "Progress and Promotions Committee" or such other nomenclature as the Program Director may select. This is a departmental committee that consists of the faculty and others as deemed appropriate by the department. This committee should meet regularly to assess Resident/fellow performance and make recommendations to the program director regarding further action.

improve his/her overall performance to an acceptable level, the Program Director may elect to take further action, which may include one or more of the following: Issuance of a new Letter of Deficiency; Non-promotion to the next PGY level; Repetition of a rotation that results in extension of the required period of training; Extension of contract, which may include extension of the defined training period; Denial of credit for previously completed rotations; and Dismissal from the residency or fellowship program

### *Reportable Actions*

A decision not to promote a Resident to the next PGY level, to extend a Resident's contract, to extend a Resident's period of training, to deny a Resident credit for a previously completed rotation, and/or to terminate a Resident's participation in a residency or fellowship program are each considered "Reportable Actions." Reportable Actions are those actions that the program must disclose upon request to certain individuals or entities such as future employers hospitals, credentialing organizations, and licensing and specialty boards. Residents who are subject to a Reportable Action may request a review as provided in this Policy.

### Review

### *Request for Review*

A Resident may request a review of a decision to take a Reportable Action. This request must be submitted by the Resident to the Associate Dean for GME within fourteen (14) days of notification by the Program Director of the Reportable Action. Upon receipt of a request for review, the Associate Dean for GME will first determine whether the matter is reviewable under this Policy. If so, the Associate Dean for GME shall appoint a neutral physician reviewer to conduct the review. The physician reviewer may be a neutral program director from another program or a core faculty member. The purpose of the review is to determine whether the Resident received notice and an opportunity to cure his/her deficiencies, and that the decision to take the Reportable Action was reasonably made.

*The Associate Dean for GME will:*
1. appoint the physician reviewer;
2. assist the physician reviewer to identify other potential participants, if warranted;
3. attend meetings held by the physician reviewer;
4. coordinate communications between the physician reviewer and the Resident;
5. monitor timely completion of the review process;
6. notify the Resident and the Program Director of the determination of the reviewer; and
7. notify the Dean of the School of Medicine and Health Sciences of the determination of the reviewer.

*The physician reviewer will:*

1. review the request of the Resident;
2. meet with the Resident;
3. review the Resident's file;
4. talk with the Program Director;
5. consider any extenuating circumstances;
6. consult with others, as appropriate, to assist in the decision making process; and
7. make a determination whether the Resident received notice and an opportunity to cure, and the decision to take the Reportable Action was reasonably made.

### *Opportunity for a Final Review*

If either the Resident or the Program Director disagrees with the decision of the physician reviewer, either can request a final review by the Dean of the School of Medicine and Health Sciences of the decision to take a Reportable Action.  A request for final review shall be submitted to the Dean of the School of Medicine and Health Sciences within fourteen (14) days of notification by the Associate Dean for GME of the decision of the physician reviewer.   The final review by the Dean of the School of Medicine and Health Sciences or his/her designee will be based solely upon whether the process set forth in this Policy was followed. The decision of the Dean of the School of Medicine and Health Sciences or his/her designee will be the final review. The decision of the Dean of the School of Medicine and Health Sciences or his/her designee will be provided to the Resident, Program Director, and Associate Dean for GME.

4



**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON, DC

| Responsible University Official: Associate Dean for Graduate Medical Education, DIO |
| Responsible Office: SMHS Office of GME |
| Most recent revision: June 2015 |

## GME PROCESS: ACADEMIC IMPROVEMENT

### STRUCTURED FEEDBACK

- Routine feedback consistent with educational programs;
- Verbal feedback, rotational and summative evaluations;
- Discussion and recommendations of the Program's Clinical Competency Committee



### LETTER OF DEFICIENCY
(This is not a reportable action.)

- A Letter of Deficiency may be issued by the Program Director (after the Associate Dean for GME is notified) when there are concerns that routine feedback is not resulting or would not result in necessary improvement in performance.
- A Letter of Deficiency provides Resident with formal notice and opportunity to cure.
- A Letter of Deficiency is not required to be reported to a credentialing organization, hospital, or licensing board.



### ACTIONS OTHER THAN LETTER OF DEFICIENCY
(These are reportable actions.)

In the event that the Program Director, in consultation with the Clinical Competency Committee and Associate Dean for GME, determines that a Resident has not remediated the deficiencies set forth in the Letter of Deficiency or that a deficiency is significant enough to warrant action more than a Letter of Deficiency, the Program Director may:

- Elect not to promote to next PGY level;
- Extend a contract/training period/repeat of rotation;
- Deny credit; or
- Terminate.

1

Any of these actions is required to be reported to future employers, hospitals, credentialing organizations, and licensing and specialty boards upon request.



### REQUEST FOR REVIEW
(This is a review to assure that the Resident received notice and opportunity to cure, and that the decision to take the reportable action was reasonably made)

- Resident may request that the Associate Dean for GME conduct a review of the process leading to the reportable action.

- Associate Dean for GME appoints a physician reviewer (neutral program director or core faculty member)

| Role of Physician Reviewer: | Role of Associate Dean, GME: |
|---|---|
| 1. Review Resident request<br>2. Meet with Resident<br>3. Review the File<br>4. Talk to Program Director<br>5. Consider extenuating circumstances<br>6. Include others, as appropriate, to assist in the decision making process<br>7. Determine if sufficient notice and opportunity to cure, and reasonableness of decision. | 1. Appoint Physician Reviewer<br>2. Assist Physician Reviewer to identify other potential participants, if warranted<br>3. Attend meetings with Resident and reviewer<br>4. Coordinate communication on behalf of reviewer back to the Resident and Program Director<br>5. Monitor timely completion of process<br>6. Notify Resident and Program Director of determination of Reviewer<br>7. Notify Dean of action |

- Physician reviewer communicates decision to Associate Dean for GME who will notify Resident and Program Director.



### FINAL REVIEW BY DEAN, SCHOOL OF MEDICINE AND HEALTH SCIENCES OR HIS/HER DESIGNEE
(This is a review to determine that the process set forth in this Policy was followed.)

- Either Resident or Program Director may request a final review by the Dean of the School of Medicine and Health Sciences.

- This review is to determine only whether the process set forth in this Policy was followed.

- Dean of the School of Medicine and Health Sciences or his/her designee communicates decision to Associate Dean for GME who will notify Resident and Program Director.

Approved by GMEC: May 16, 2011
Reviewed and approved by GMEC: June, 2015

2



**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

| |
|---|
| Responsible University Official: Associate Dean for Graduate Medical Education, DIO |
| Responsible Office: SMHS Office of GME |
| Most recent revision: |

# ACADEMIC IMPROVEMENT POLICY

## Policy Statement

The purpose of this policy is to establish a process for evaluating and assessing the competence and progress of Residents enrolled in ACGME-accredited post-graduate training programs at The George Washington University School of Medicine and Health Sciences.   Specifically, this policy addresses the process to be utilized when a Resident/fellow is not meeting the academic expectations of a program.

## Who Needs to Know This Policy

All Accreditation Council for Graduate Medical Education (ACGME)-accredited residency and fellowship programs sponsored by the GW School of Medicine and Health Sciences (SMHS)

## Policy Contact

Associate Dean for Graduate Medical Education, DIO

## Who Approved This Policy

Graduate Medical Education Committee (GMEC)

## History/Revision Dates

Created: May 16, 2011
Amended: June, 2015

## Definitions

Resident – refers to all Interns, Residents and Fellows participating in an ACGME-accredited program of post-graduate medical education.

Post-Graduate Training Program – refers to an ACGME-sponsored residency or fellowship educational program.

## Process

### *Structured Feedback*

All Residents and fellows should be provided routine feedback that is consistent with the educational program.  Feedback techniques may include verbal feedback, rotational evaluations, summative evaluations, and recommendations of a program's Clinical Competency Committee.  Each residency program must have a Clinical Competency Committee ("CCC"),[1] that is charged with routinely assessing Resident performance.

### *Letter of Deficiency*

When the Program Director, in consultation with members of the CCC, determines that routine structured feedback is not resulting in the necessary improvement or that a deficiency is significant enough to warrant something more than routine feedback, the Program Director, may elect to issue a "Letter of Deficiency" to the Resident. The Associate Dean for Graduate Medical Education must be notified prior to the issuance of a Letter of Deficiency. A Letter of Deficiency provides the Resident with: (a) notice of the deficiency: and (b) an opportunity to cure the deficiency.  The issuance of a Letter of Deficiency does not trigger a report to any outside agencies such as credentialing organizations, hospitals, or licensing boards.

After a Letter of Deficiency has been issued, the Program Director will provide the Resident with feedback consistent with the Letter of Deficiency. If the Resident satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of unacceptable academic performance should not affect the Resident's progress in the program.

### *Failure to Cure the Deficiency*

If the Program Director, in consultation with members of the CCC and Associate Dean for GME, determines that a Resident has failed to satisfactorily cure the deficiency and/or

---

[1] The Clinical Competency Committee may be referred to as the "Progress and Promotions Committee" or such other nomenclature as the Program Director may select.  This is a departmental committee that consists of the faculty and others as deemed appropriate by the department.  This committee should meet regularly to assess Resident/fellow performance and make recommendations to the program director regarding further action.

2

improve his/her overall performance to an acceptable level, the Program Director may elect to take further action, which may include one or more of the following: Issuance of a new Letter of Deficiency; Non-promotion to the next PGY level; Repetition of a rotation that results in extension of the required period of training; Extension of contract, which may include extension of the defined training period; Denial of credit for previously completed rotations; and Dismissal from the residency or fellowship program

### Reportable Actions

A decision not to promote a Resident to the next PGY level, to extend a Resident's contract, to extend a Resident's period of training,  to deny a Resident credit for a previously completed rotation, and/or to terminate a Resident's participation in a residency or fellowship program are each considered "Reportable Actions."  Reportable Actions are those actions that the program must disclose upon request to certain individuals or entities such as future employers hospitals, credentialing organizations, and licensing and specialty boards.  Residents who are subject to a Reportable Action may request a review as provided in this Policy.

### Review

### Request for Review

A Resident may request a review of a decision to take a Reportable Action.  This request must be submitted by the Resident to the Associate Dean for GME within fourteen (14) days of notification by the Program Director of the Reportable Action.  Upon receipt of a request for review, the Associate Dean for GME will first determine whether the matter is reviewable under this Policy. If so, the Associate Dean for GME shall appoint a neutral physician reviewer to conduct the review. The physician reviewer may be a neutral program director from another program or a core faculty member.  The purpose of the review is to determine whether the Resident received notice and an opportunity to cure his/her deficiencies, and that the decision to take the Reportable Action was reasonably made.

*The Associate Dean for GME will:*
1. appoint the physician reviewer;
2. assist the physician reviewer to identify other potential participants, if warranted;
3. attend meetings held by the physician reviewer;
4. coordinate communications between the physician reviewer and the Resident;
5. monitor timely completion of the review process;
6. notify the Resident and the Program Director of the determination of the reviewer; and
7. notify the Dean of the School of Medicine and Health Sciences of the determination of the reviewer.

*The physician reviewer will:*

3

1. review the request of the Resident;
2. meet with the Resident;
3. review the Resident's file;
4. talk with the Program Director;
5. consider any extenuating circumstances;
6. consult with others, as appropriate, to assist in the decision making process; and
7. make a determination whether the Resident received notice and an opportunity to cure, and the decision to take the Reportable Action was reasonably made.

*Opportunity for a Final Review*

If either the Resident or the Program Director disagrees with the decision of the physician reviewer, either can request a final review by the Dean of the School of Medicine and Health Sciences of the decision to take a Reportable Action. A request for final review shall be submitted to the Dean of the School of Medicine and Health Sciences within fourteen (14) days of notification by the Associate Dean for GME of the decision of the physician reviewer. The final review by the Dean of the School of Medicine and Health Sciences or his/her designee will be based solely upon whether the process set forth in this Policy was followed. The decision of the Dean of the School of Medicine and Health Sciences or his/her designee will be the final review. The decision of the Dean of the School of Medicine and Health Sciences or his/her designee will be provided to the Resident, Program Director, and Associate Dean for GME.

4

10


**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON, DC

| |
| --- |
| Responsible University Official: Associate Dean for Graduate Medical Education, DIO |
| Responsible Office: SMHS Office of GME |
| Most recent revision: · |

# DUE PROCESS POLICY

## Policy Statement

This policy is intended to provide all Residents with due process in the event that any action is taken by a post-graduate training program of The George Washington University School of Medicine and Health Sciences that results in dismissal or that negatively affects the progress of the Resident in the program.

## Who Needs to Know This Policy

This policy applies to all Residents who participate in an ACGME-accredited post graduate medical education (GME) training program within The George Washington University School of Medicine and Health Sciences. All Residents shall be provided with due process for actions that are taken pursuant to the Academic Improvement Policy or Resident Misconduct Policy.

## Policy Contact

Associate Dean for Graduate Medical Education, DIO

## Who Approved This Policy

Graduate Medical Education Committee (GMEC)

## History/Revision Dates

Created: May 16, 2011
Amended: June, 2015

1

## Definitions

Resident – refers to all Interns, Residents and Fellows enrolled in an ACGME-accredited post-graduate training program.

Post-Graduate Training Program – refers to a residency or fellowship educational program.

Dismissal – The act of terminating a Resident's participation in a post-graduate training program prior to the successful completion of the course of training, whether by early termination of a contract or by non-renewal of a contract.

## Academic Matters

The School of Medicine and Health Sciences Academic Improvement Policy affords due process to Residents who are dismissed from a residency program or whose progress in the post-graduate training program is altered by an academic decision of a program.   The specific processes afforded to each Resident are sent forth in the Academic Improvement Policy.

## Misconduct Matters

The School of Medicine and Health Sciences Resident Misconduct Policy affords due process to Residents who are disciplined or dismissed from a post-graduate training program in a manner that alters their progress in the program.  The specific processes afforded to each Resident are set forth in the Resident Misconduct Policy.

2


THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Responsible University Official: Associate Dean for Graduate
Medical Education, DIO
Responsible Office: SMHS Office of GME
Most recent revision:

# POLICY ON GW RESIDENT/FELLOW DUTY HOURS IN THE LEARNING AND WORK ENVIRONMENT

## Policy Statement

This policy is designed to establish an institutional policy to ensure an appropriate work environment for all residents of The George Washington University School of Medicine and Health Sciences and to assist program directors in the development of their individual program policy governing the learning and working environment and duty hours.

## Who Needs to Know This Policy

All Accreditation Council for Graduate Medical Education (ACGME)-accredited residency and fellowship programs sponsored by the GW School of Medicine and Health Sciences (SMHS)

## Policy Contact

Associate Dean for Graduate Medical Education, DIO

## Who Approved This Policy

Graduate Medical Education Committee (GMEC)

## History/Revision Dates

APPROVED BY GMEC: November 20, 1995
REVIEWED BY GMEC: March 18, 2002
REVIEWED AND APPROVED BY GMEC: Feb. 24, 2003
REVISED, REVIEWED AND APPROVED BY GMEC: May 16, 2011
REVISED, REVIEWED AND APPROVED BY GMEC: February 2, 2015

## Policy

Each residency/fellowship program must have a formal, written policy governing resident duty hour limits that is consistent with ACGME Institutional and Program-specific Requirements.

1. Program policies must be approved by the GME Committee and distributed to residents, fellows and faculty.
2. The educational goals of the program and learning objectives of trainees must not be compromised by excessive reliance on trainees to fulfill service obligations. Monitoring of duty hours is required with frequency sufficient to ensure an appropriate balance between education and service. Didactic and clinical education must have priority in the allotment of trainees' time and energies.
3. The program must provide services and develop systems to minimize the work of residents/fellows that is extraneous to their educational programs. Trainees must be provided with appropriate backup support when patient care responsibilities are especially difficult or prolonged.
4. Program policies must document that all participating institutions used by the residents/fellows assure that the duty hour requirements are met.

## Requirements

*Mandatory Time Free of Duty*
Trainees must be scheduled for a minimum of **one day free of duty every week** (when averaged over four weeks). At-home call cannot be assigned on these free days.

*Maximum Weekly Duty Hours*
1. Duty hours must be **limited to 80 hours per week,** averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.
2. Duty periods of **PGY 1 residents must not exceed 16 hours** in duration.
3. Duty periods of **PGY 2 residents and above may be scheduled to a maximum of 24 hours** of continuous duty in the hospital. Programs must encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 pm and 8:00 am is strongly suggested.
    a. Residents may be allowed to remain on-site in order to accomplish effective transitions in patient care; this period of time must not exceed an additional four hours.
    b. Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.
    c. In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family. In these circumstances, the resident must:
        i. Appropriately hand over care of all other patients to the team responsible for their continuing care; and
        ii. Document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director,

14

which must review each submission of additional service and track both individual resident and program-wide episodes of additional duty.

*Minimum Time Off between Scheduled Duty Periods*

1. **PGY 1 residents should have 10 hours,** and must have 8 hours, free of duty between scheduled duty periods.
2. **Intermediate-level residents** (as defined by the Review Committee) **should have 10 hours free of duty, and must have 8 hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty.**
3. Residents in the final years of education (as defined by the Review Committee) must be prepared to enter the unsupervised practice of medicine and care for patients over irregular or extended periods.
   a. This preparation must occur within the context of the 80-hour, maximum duty period length, and one-day-off-in-seven standards.  While it is desirable that residents in their final years of education have 8 hours free of duty between scheduled duty periods, there may be circumstances (as defined by the Review Committee) when these residents must stay on duty to care for their patients or return to the hospital with fewer than 8 hours free of duty.
   b. Circumstances of return-to-hospital activities with fewer than 8 hours away from the hospital by residents in their final years of education must be monitored by the program director.

*Maximum Frequency of In-House Night Float*

Residents must **not be scheduled for more than six consecutive nights of night float.**  The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.

*Maximum In-House On-Call Frequency*

PGY 2 residents and above must be scheduled for in-house call **no more frequently than every 3rd night,** when averaged over a 4-week period, or as specified by the Review Committee.

*At-Home Call*

1. **Time spent in the hospital by residents on at-home call must count** towards the 80-hour maximum weekly hour limit.  The frequency of at-home call is not subject to the every-third-night limitation, but **must satisfy the requirement for one-day-in-seven free** of duty when averaged over four weeks.
2. At home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.
3. Residents are permitted to return to the hospital while on at-home call to care for new or established patients. Each episode of this type of care, while it must be included in the 80-hour weekly maximum, will not initiate a new "off-duty period".

*Moonlighting*

1. Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.
2. Time spent by residents in internal and external **moonlighting must be counted towards the 80-hour Maximum Weekly Hour Limit.**
3. **PGY 1 residents are not permitted to moonlight.**

15

4. Please refer to the Institutional and Departmental Policies on Moonlighting for additional requirements.

## Monitoring and Oversight

*Requirements*

As the sponsoring institution, The George Washington University School of Medicine and Health Sciences, through its Graduate Medical Education Committee, is responsible for promoting education and for ensuring that the working environment and duty hours are appropriate and in compliance with Institutional and Program Requirements.   This is accomplished by the GMEC through the following methods:

1. Review of programs' policies on duty hours and resident working environment as part of the GMEC Annual Program Review (APE).
2. Review of monthly duty hour reports from the MedHub system.
3. Monitoring the duty hour hotline in the GME Office which allows anonymous reporting of duty hour violations.  The hotline number is 202-994-9760.
4. Review of call schedules, OR schedules, and medical records as needed.

Residents and Fellows are required to log duty hours using the MedHub system during reporting periods according to program requirements for yearly vs. sampling.

*Process*

1. The Program Director and DIO (or designee) will review monthly duty hour reports from the MedHub system and address any violations.  This will be reported to the GMEC at the monthly meeting.
2. The Program Director will report duty hours annually through the ACGME Web Accreditation System as part of the Annual Update.  The DIO will review results of the duty hour section of the ACGME Resident Survey as part of the Annual Program Evaluation.  Program Directors will be required to provide a response to any areas of non compliance related to duty hours.
3. All residents/fellows, Program Directors, and designated faculty are required to complete the sleep education training program developed and adapted from the SAFER program of the American Academy of Sleep Medicine.  Compliance will be monitored by the GMEC.

## Requests for increases/changes

1. A request to increase/change trainee duty hours must be made to the GME Committee.
2. Programs selected to participate in duty hour-related studies are subject to the rules of the study.
3. Study requirements for duty hours must be shared with all affected programs, residents and fellows in advance of rotations, and presented to the GME Committee for approval.
4. The decision of the GME Committee to approve/reject study participation or otherwise exceptions to the duty hour rules shall be made after discussion and vote by the membership and shall be recorded in the minutes of the meeting.

 **THE GEORGE WASHINGTON UNIVERSITY** WASHINGTON, DC

| Responsible University Official: Associate Dean for Graduate Medical Education, DIO |
|---|
| Responsible Office: SMHS Office of GME |
| Most recent revision: |

# RESIDENT MISCONDUCT POLICY

## Policy Statement

The purpose of this policy is to establish a process for the investigation and determination of allegations of Resident misconduct raised in the post-graduate training programs at The George Washington University School of Medicine and Health Sciences.

## Who Needs to Know This Policy

All Accreditation Council for Graduate Medical Education (ACGME)-accredited residency and fellowship programs sponsored by the GW School of Medicine and Health Sciences (SMHS)

## Policy Contact

Associate Dean for Graduate Medical Education, DIO

## Who Approved This Policy

Graduate Medical Education Committee (GMEC)

## History/Revision Dates

Created: May 16, 2011
Amended: June, 2015

1

## Definitions

Resident – refers to all Interns, Residents and Fellows participating in an ACGME-accredited program of post-graduate medical education.

Post-Graduate Training Program – refers to an ACGME-accredited residency or fellowship educational program.

Reportable Actions – The decision not to promote a Resident, not to renew a Resident's contract, to suspend a Resident from the program, or to dismiss a Resident from the program, are each considered "Reportable Actions."   Reportable Actions are those actions that the program must disclose to others upon request, including future employers, credentialing organizations, hospitals, and licensing and specialty boards.

## Process

Examples of misconduct include, but are not limited to theft, fighting, dishonesty, abusive or disruptive behavior, and breach of confidentiality.

If an allegation of misconduct or an incident occurs, the Program Director will:

1. Speak with the Resident to provide notice of the allegations and afford the Resident an opportunity to respond and determine what, if any, response is appropriate, including whether any Reportable Actions should be taken. If the Program Directs elects to pursue a Reportable Action, the Associate Dean for GME must first be notified.
2. Document the meeting and determine whether the Associate Dean for GME should be notified.  If notified by the Program Director, the Associate Dean for GME should speak with the Resident.  The Associate Dean for GME, in consultation with the Program Director, will determine whether to notify the Dean of the School of Medicine and Health Sciences, the Department Chair, Office of the General Counsel, or Human Resources, depending upon the nature of the allegations.
3. Decide IF a full investigation of the allegations ("Full Inquiry") is warranted. The Associate Dean for GME must be notified if the Program Director elects to conduct a Full Inquiry.  In addition to the Program Director, a Full Inquiry shall also be conducted if requested by a Resident, Department Chair, Associate Dean for GME, Dean of the School of Medicine and Health Sciences, Office of the General Counsel, and/or Human Resources.

### *Full Inquiry*

The Full Inquiry provides formal notice of the allegation and affords the Resident with an opportunity to respond.  The Full Inquiry is overseen by the Associate Dean for GME and may be conducted by the Program Director, Department Chair, Human Resources, Office of General Counsel, or others, depending upon the nature of the allegations.  Results of the Full Inquiry will be documented by the Associate Dean for GME and reported to the Resident and Program Director.

2

*Determination of Misconduct*

If the Full Inquiry results in a determination that misconduct has occurred, the Associate Dean for GME may elect to take further action, including:

1. Issuance of a Letter of Deficiency;
2. Non-promotion to the next PGY level;
3. Non-renewal of the Resident's contract;
4. Suspension from the program for a defined period of time; or
5. Dismissal from the residency or fellowship program.

## Review

Upon request of a Resident within fourteen (14) days of notification of a decision to take a Reportable Action, the Dean of the School of Medicine and Health Sciences or his/her designee will review the decision to determine whether all processes and policies were followed and if the resulting decision was reasonably made. The Dean of the School of Medicine and Health Sciences or his/her designee will notify the Resident, Program Director, and Associate Dean for GME of the decision. There will be no further reviews.

3

# EXHIBIT B



ACGME

# ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION

# Clinical Competency Committees

## A Guidebook for Programs

**Kathryn Andolsek**
**Duke University**

**Jamie Padmore**
**Medstar- Georgetown**

**Karen E. Hauer**
**UCSF**

**Eric Holmboe**
**ACGME**

This information is current as of January 2015



Δ π EXHIBIT 2
Deponent PYER
Date 8/28/17 Rptr SEA
WWW.DEPOBOOK.COM

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002934

*ACGME CCC Guidebook*

## Executive Summary

The Clinical Competency Committee (CCC) is a structure that has emerged as an essential component of the evaluation process in graduate medical education. While some specialties and programs have utilized CCCs for years, this structure is new to many others. Likewise, with the emergence of the CCC as a required component of accreditation (ACGME Common Program Requirements), even seasoned programs and committees are facing questions regarding structure, function, and process.

The purpose of this manual is to provide designated institutional officials (DIOs), program directors, faculty members, CCC members, coordinators, and residents and fellows with information and practical advice regarding the structure, implementation, function, and utility of a well-functioning CCC. The materials were prepared for both individual learning and application in a group setting. It is our intent that programs will be able to utilize these materials to have meaningful faculty conversations and development on CCC functions and outcomes, and greater transparency with residents and fellows on the nature of assessment in competency-based education.

This manual provides information related to the following topics:
1. CCC purpose
2. Structure and membership
3. Meeting preparation
4. Running the meeting
5. Post-meeting documentation and follow-up
6. Legal issues and considerations
7. Annotated bibliography
8. Q&A

There are several appendices included that contain tools for programs and CCCs to utilize. We have also provided a robust reference list to support the various aspects of CCCs, including assessment, feedback, documentation, group dynamics, and outcomes.

We look forward to your feedback, and hope this manual provides you and your faculty with valuable information and tools to enhance your GME program.

1

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002935

*ACGME CCC Guidebook*

## Introduction

A **Clinical Competency Committee** (CCC) is the Accreditation Council for Graduate Medical Education (ACGME)–*"required body comprising three or more members of the active teaching faculty who is advisory to the program director and reviews the progress of all residents in the program."*[1]

While some specialties have used a CCC for a number of years, the CCC represents a new structure and process to many other programs. The objectives of these materials are to help programs:

1. Recognize the role and purpose of the CCC for individual programs and in the ACGME's Next Accreditation System (NAS)
2. Design, create, and implement a CCC
3. Run an effective CCC meeting
4. Provide feedback to residents or fellows
5. Anticipate process questions and academic law considerations
6. Analyze evidence supporting CCCs to make the best choices for their own CCC process

This guidebook is intended to be a practical and useful resource and professional development tool to help institutional and program leadership, coordinator(s), faculty members, and residents/fellows understand all aspects of CCCs. We encourage you to share these materials with your residency or fellowship program faculty and leadership, and use the exercises as part of faculty and coordinator professional development. These materials can be completed individually or in a group meeting. The guidebook also provides some suggestions for faculty development.

The CCC is an essential component, but still only one part, of a high performing residency or fellowship program. It contributes to an effective resident/fellow assessment "system" as outlined in Figure 1. In this figure, the CCC serves the important function to synthesize the multiple quantitative and qualitative assessments. This figure highlights several important points:

1. The CCC process will depend on the quality of the assessment program that includes a combination of assessment methods.[2]
2. Residents and fellows must be active agents in this system; guided self-directed assessment behaviors by the resident or fellow should be strongly encouraged.
3. The program director within a residency or fellowship program is the ultimate arbiter of whether a resident or fellow will enter unsupervised practice. The program will perform the majority of the assessments that will inform the final entrustment decision to graduate a resident or fellow from the program. This accountability cannot be over-emphasized: professional self-regulation depends heavily on the judgment of training programs, as manifest by the final evaluation and entrustment made by the program director.

2

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002936

*ACGME CCC Guidebook*

Figure 1 *Structure of a High Performing Resident/Fellow Assessment System*



Residents = both residents and fellows
FB = Feedback loops
D = Assessment data and information
The model is more fully described in *Appendix A*

3

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002937

*ACGME CCC Guidebook*

## Part 1: Purpose of the CCC

### Purpose of the Clinical Competency Committee (CCC) for the Program and the Next Accreditation System (NAS)

The CCC serves several purposes, for the program director, the program itself, the faculty, the residents/fellows, the ACGME, and the specialty. **See Table 1.** The ultimate purpose is to demonstrate our accountability as medical educators to the public, that our graduates will provide high quality, safe care to our patients and maintain the standards of the health care system.

Table 1 Purposes of a CCC

| Purpose of CCC | |
|---|---|
| Program Director | ⊓ Fulfill Public Accountability by ensuring:<br> • Residents/fellows who successfully complete program can practice the specialty-specific core professional activities without supervision<br>⊓ Create greater "buy-in" from a group of faculty members to make decisions regarding performance<br>⊓ Enhance credibility of judgments about resident/fellow performance<br>⊔ Facilitate role of "advocate" for the resident/fellow |
| Program | ⊓ Develop shared mental model of what resident/fellow performance should "look like" and how it should be measured and assessed<br>⊔ Ensure assessment tools sufficient to effectively determine performance across the competencies<br>⊓ Increase quality, standardize expectations, and reduce variability in performance assessment<br>⊔ Contribute to aggregate data that will allow programs to learn from each other by comparing residents' and fellows' judgments against national data<br>⊔ Improve individual residents/fellows along developmental trajectory<br>⊔ Serve as system for early identification of residents/fellows who are challenged<br>⊔ Improve program<br>⊓ Model "real time" faculty development |
| Faculty | ⊔ Facilitate more effective assessment that may be easier for evaluators<br>⊓ Help faculty develop a shared mental model of the competencies<br>⊔ May result in simplified "more actionable" assessment tools to help faculty document more effectively and efficiently what they observe trainees doing in clinical settings |
| Resident/Fellow | ⊓ Improve quality and amount of feedback; normalize constructive feedback<br>⊔ Offer insight and perspectives of a group of faculty members<br>⊔ Compare performance against established competency benchmarks (rather than only against peers in the same program)<br>⊔ Allow earlier identification of sub-optimal performance that can improve remedial intervention<br>⊔ Improve stretch goals for residents/fellows to achieve higher levels of performance<br>⊔ Provide transparency around performance expectations |

4

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002938

*ACGME CCC Guidebook*

| ACGME | ⊔ Enhance progress toward competency-based education with outcomes data |
| | ⊔ Establish national benchmarks for trajectory of resident/fellow skill acquisition |
| | ⊔ Enhance identification of programs that need to improve (programs whose residents/fellows aren't making progress as compared to national peer group) |
| | ⊔ Provide better measures for public accountability |
| | ⊔ Provide feedback loop as to whether -- and when -- programs are able to meet expectations of the specialty RRC, thus enabling reasonable expectations |
| | ⊔ Enable continuous quality improvement of residency/fellowship programs |
| | ⊓ Document the effectiveness of the nation's GME efforts in provision of graduates prepared to meet the needs of the public. |

The concept of CCCs is not just a US phenomenon. The United Kingdom instituted an *Annual Review of Competence Progression* in 2007.[3-4] The Canadian system also uses Residency Program Committees (RPC) and is exploring how to use a group process as part of its new Milestones-based GME system. CCCs are not new in the US; some programs, such as in internal medicine, used them in the 1980s, in concept, if not in name. The specialty of anesthesiology has implemented them within its residencies for many years and required, in collaboration with the American Board of Anesthesiology, that these programs participate in the submission of an evaluation of clinical competency of each resident twice yearly.

A program's creation of a CCC is, in itself, a "developmental" process. We will start with a brief review of current ACGME requirements for a CCC. Programs that already have a CCC may identify gaps and potential enhancements by comparing what they have in place to the requirements. For programs just beginning to institute a CCC, the next few pages offer a practical roadmap.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)

GWU 002939

*ACGME CCC Guidebook*

## Part 2:  CCC Structure and Membership

### Designing and Creating a CCC

To design and create a CCC, it is useful to start with "the requirements." The ACGME's requirements for a CCC are in the Program Requirements—both the Common Program Requirements and all of the specialty Program Requirements. The ACGME Common Program Requirements (CPRs) stipulate the minimum requirements for CCCs in <u>every</u> residency and fellowship program. These are defined in the first section of CPR Section V, Evaluation. If a specialty has developed additional expectations for the CCC, they will be found in Section V.A. of the specialty-specific requirements. Other entities, such as the relevant American Board of Medical Specialties' boards, may add requirements as well. Once the CCC fulfills the Common and any core specialty-specific and Board requirements, programs are free to innovate!

Review Section V.A of your **specialty-specific Program Requirements** carefully. Compare them to **CPR** Section V.A.1., noting any differences. In addition to the Common and the specialty Program Requirements, the ACGME has provided additional guidance for CCCs in documents such as its Frequently Asked Questions (FAQs).

While there are no specific requirements for the CCC found in the Institutional Requirements (IR), there is at least one institutional requirement that may be useful to consider:

The sponsoring institution is responsible for programs' developing "promotion criteria" and criteria for non-renewal. In IR Section IV.B.2.d), it is required that the "conditions for reappointment and promotion to a subsequent PGY level" are elements necessary in an agreement of appointment.

CCCs may be an excellent mechanism to identify those criteria or, at the very least, to align Milestone performance with them. It is important to recognize that Milestones do not represent the totality of any discipline, but rather form a robust foundational core. Consider how Milestones fit into your program's criteria for promotion and/or renewal of a resident's/fellow's appointment, a Core Requirement. Remember, Milestones are intended to be used as a *formative* framework to guide curricula, assessment, and CCC deliberations in programs. Milestones will also ultimately guide and inform CCC deliberations that lead to a *summative* judgment for a resident's/fellow's promotion and graduation. However, Milestones *should not* be used as the sole criteria for these important decisions.

Questions to ask of your program include:
- Are any clarifications or adjustments in your criteria for promotion and/or non-renewal required?
- Are any changes in your agreement of appointment necessary to reflect Milestone reporting to the ACGME?

6

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

- Are any changes in your grievance policy necessary?

You may find you do not need to make any changes at all, but the development of a CCC provides an excellent opportunity to review your current performance standards, promotion criteria, and assessment processes, and align the Milestones and the CCC with them. Your DIO, Office of GME, Legal and HR resources may provide useful guidance.

## How well do you know the CCC Requirements?

**Appendix B** is a multiple choice "quiz" on the current ACGME requirements for a CCC. Consider having your CCC members and key faculty leadership take this quiz as a fun faculty development exercise!

The ACGME's CCC requirements are fairly minimal (See Table 2). There are only **eight** requirements. Seven are "core" requirements, mandatory for all programs; one is a "detail" requirement, necessary only for new programs receiving Initial Accreditation and those with a status of Accreditation with Warning or Probationary Accreditation.

Table 2. CPR Requirements of a CCC

| | Core | Detail | CPR Requirement |
|---|---|---|---|
| The program director must appoint CCC | X | | V.A.1 |
| Minimum of three program faculty members | X | | V.A.1.a) |
| May include additional members: physician faculty members from same/other programs or other health professions with extensive contact and experience with residents/fellows in patient care and other health care settings | X | | V.A.1.a).(1) V.A.1.a).(1).(a) |
| Chief residents who have completed a core residency program and are board-eligible in their specialty MAY be on CCC | X | | V.A.1.a).(1).(b) |
| Must have written description of responsibilities | X | | V.A.1.b) |
| Should review all resident/fellow evaluations semi-annually | X | | V.a.1.b).(1).(a) |
| Should prepare and ensure reporting of Milestone evaluations of each resident/fellow semi-annually to the ACGME | X | | V.a.1.b).(1).(b) |
| Should advise the program director regarding resident/fellow progress, including promotion, remediation, dismissal | | X | V.a.1.b).(1).(c) |

**Appendix C** contains a template which may help you design your CCC, by "walking you through" its various components. By "filling in the blanks" provided, you can generate a draft document that will help you fulfill the CPR for a "written description of the responsibilities" of the CCC. Some program directors may develop the written description of the CCC "on their own." Others will ask the CCC to create it as one of its initial activities as a group. Others may appoint a subset of the faculty, with or without resident/fellow representation. The template provides a checklist of items to consider.

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002941

*ACGME CCC Guidebook*

Creating, developing and improving a CCC does require time and effort. Sharing best practices across programs and institutions, having strong institutional support from the DIO for shared resources across programs within an institution, and appreciating that there will be a 'learning curve for programs just now starting can facilitate the long term effectiveness of a CCC . Ultimately the CCC process will help residencies do what they have always been responsible for doing, but now with more structure and clearer purpose.

Creating and implementing a CCC provides the program with excellent opportunities to enhance two other ACGME requirements: 1) Annual Program Evaluation and Improvement; and, 2) Faculty Development. Faculty development will be needed at three levels: 1) the program director; 2) the engaged faculty members who join the CCC or Program Evaluation Committee (PEC); and, 3) the faculty members in the trenches who are not fully involved in educational programming or administration, but who are actively teaching and assessing. Each group will have different needs. Program directors and CCC members will need a deeper understanding of the Milestones, assessment, group process, and program evaluation; faculty members in the trenches need to understand what key elements of assessment information they need to contribute to the larger "whole" the program director and CCC will consider, and must be trained to use assessment methods and tools aligned with the purpose of the curricular experience they are supervising or overseeing.

Your PEC, which undertakes the annual program evaluation resulting in one or more improvements, may select implementing and/or improving the CCC as one of its enhancements for the academic year. If so, be certain the CCC improvement plan is reflected in the PEC's analysis and action plan(s).

The ACGME also expects program engagement in faculty development. Faculty development is one of the required program components reviewed by the PEC in the Annual Program Evaluation and Improvement process. The CCC faculty role will typically include the need for much faculty development. The ACGME has recognized that though "evaluation is a core faculty competency.... most (faculty) will need additional training in (the) evaluation process," to include evaluation process training (how to interpret aggregated evaluation data), understanding how many assessments are needed for each Milestone, assurance of data quality, and application of QI methods to the evaluation processes.[6] The CCC provides an opportunity for faculty development for other program faculty members, as well: to understand the CCC process and how its evaluations of residents/fellows fit into the overall assessment of resident/fellow performance using the Milestones.

General Principles:

The size of the residency or fellowship will affect constructing and running a CCC meeting. For purposes of this guidebook, "small programs" are considered to be those with fewer than 15 total learners; "medium programs" are considered to be those with 15-to-75 learners; "large programs" have more than 75 learners.

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002942

*ACGME CCC Guidebook*

*One committee or more:*
- Large programs: may need to have several CCCs ("sub-CCCs"); some may become experts in one "year" of the program (i.e., oversee all PGY-1s,), while others might focus on a program activity (i.e., responsible for the research component or the quality improvement component)
- If "sub-CCCs" are used, it is essential that they still have robust membership and review processes to ensure all residents and fellows are thoroughly reviewed, discussed, and provided with an opportunity to receive high quality feedback. There also needs to be a mechanism to integrate information from sub-CCCs, and ensure each sub-CCC is using the same standards and procedures.
- Medium or small programs: one CCC can likely oversee all residents/fellows, but again, it will depend on the curricular design of the program and local resources.

*Committee membership:*
- The program director must appoint the CCC, which at a minimum has three program physician faculty members as its members. Three is considered the smallest number essential for a good discussion. The program director should select faculty members who teach and observe residents/fellows, but also consider how non-physician faculty members can provide valuable input.
- The program director may appoint additional members who must be **physician faculty members** (CPR V.A.1.a.(1).(a)) for the same or other programs, or other "health professionals who have extensive experience with the program's residents in patient care and other health care settings (e.g., nurses, physician assistants, nurse practitioners, social workers, etc.)."
- Chief residents who have completed a core residency program and are board-eligible in their specialty may serve on the CCC (CPR V.A.1.a)/(1).(b)). Chiefs who are residents within the same ACGME program (the chief title distinguishing their final year of training) should not serve on the CCC. It is important to make sure any chief who is selected is comfortable with this role. The chief may be too personally close to residents to be candid and objective in this summative evaluation activity.
- Role of advisors/mentors: an ACGME-hosted webinar indicated advisors and mentors should be "excluded" from CCC deliberations. This prohibition is not reflected in the CPRs. Program directors may want to consider whether there is an inherent conflict of interest in a faculty member being an advocate for a resident/fellow (as his/her advisor mentor) and "judging" performance (as a CCC member). On the other hand, advisors and mentors may benefit from being observers to the CCC and hearing or contributing information to the discussion. They may also be able to convey the impressions of the CCC to their residents/fellows.
- "Right size" – large enough to reflect diversity of perspectives; small enough to be "manageable" in terms of faculty development about CCC role, and participation in meeting discussions

9

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

- "Right people" – CCC members must be committed and able to attend all or nearly all meetings; erratic attendance will not allow the continuity critical to assess resident/fellow performance over time. Each member must be willing to make honest decisions, even when it's tough.
- Term limits: Consider whether appointments should be "in perpetuity," or for a defined term limit. "In perpetuity" appointments should be coupled with regular addition of new members for fresh perspectives; if enacting term limits, consider staggering appointments so that not everyone turns over at once.
- Residents cannot serve on the CCC unless, in your program, a "chief resident" is really a member of the faculty and "not a resident." Having residents responsible for the high-stakes decisions regarding their colleagues is not allowed. On the other hand, residents have a major role in providing input into the competencies of their peers through the multi-source/multi-rater assessment process (previously also called "360-degree feedback").
- Non-physician program staff members cannot serve on the CCC, but can attend to provide support to the CCC. Special considerations:
  - Small programs may have a challenging time identifying individuals for the CCC as many of these programs also have a limited number of faculty members. Many fellowships will find themselves in this position. In addition to program faculty members, consider inviting faculty members from other disciplines or settings for which the learner provides substantial consultation. Many small programs are also tied to specific clinical settings; consider inviting non-physician faculty members from these settings who have ongoing contact with the learner to sit on the CCC (e.g., a nurse leader from a dialysis unit for a nephrology fellowship program, a nurse anesthetist for a surgery fellowship, or a discharge planner from a specific clinical unit).
  - Medium programs may also encounter some of the same problems as small programs, and may still need to use a sub-committee process to facilitate CCC deliberations.
- Role/responsibility of each CCC member: French et. al. present Guidelines for Committee Members:[7]
  - Know role on the committee
  - Follow-through with assigned tasks
  - Be educated on purpose and responsibilities of the committee, Milestones, the review process, and committee guidelines
  - Do "one's part" to maintain a collegial atmosphere within the committee
  - Ensure own "voice" is heard

**Appendix D** lists additional details. These include the essential requirement for confidentiality. Larger CCCs may assign members a subset of the residents/fellows to review in advance of a meeting. It will be important to identify **who** will convey the CCC results to the program director (if not in attendance) and to the resident/fellow.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)

**GWU 002944**

*ACGME CCC Guidebook*

*Committee chair:*
Some Boards or Review Committees may place restrictions on "who can chair." The American Board of Anesthesiology, for example, doesn't allow the program director to chair the CCC.[8] Others are silent on this issue. Think through who would be the right chair for your program: the program director? the associate program director? another faculty member? a rotating responsibility among members? Select the individual who will best solicit broad input regarding resident/fellow performance and ensure all voices are heard. French et. al. present Guidelines for Committee Chairs:[9]

- Be Milestones expert for the committee
- Encourage a positive working environment and open communication from all members
- Ensure members know their roles, as well as the Milestones and the review process/guidelines
- Keep meetings on task and move towards the common goal
- Make certain the coordinator or designated member maintains documentation and meeting minutes

In addition, the CCC chair should be familiar and comfortable with effective group process (see Part 4, *Running the CCC Meeting,* below) and major assessment methods.

*Program director role:*
There is no mandatory role for the program director, and he or she can be chair (unless the program is in anesthesia), member, or observer, or not attend at all.[10] If present, he or she should not "detract" from the participation of other team members by prematurely inserting his or her perspective on a given resident's/fellow's performance. In the same way, the program director shouldn't determine the Milestone performance of each resident/fellow and then bring these to the CCC for ratification. The CCC should be able to perform its assessment of resident/fellow competency, judged against the Milestones, to convey to the program director. If the program director is present at CCC meetings, he or she should make sure other CCC members' voices are encouraged (e.g., asking other members to discuss residents/fellows and reach consensus decisions before adding his or her own comments). Some program directors find it very useful to have another faculty chair the CCC; so they can function better as the resident advocate and mentor and avoid the resident viewing the CCC judgments as "only" those of the program director. On the other hand, the program director indeed has the final responsibility for reporting and determining the Milestone developmental level for each resident/fellow. The program director should also ensure the residents/fellows are aware of the Milestones which have been reported to the ACGME. The program director has the final responsibility for determining Milestone acquisition, and reporting to the ACGME.

*Coordinator Role:*
The coordinator is not a CCC member, and will not be "judging" resident performance. Nonetheless, a coordinator can have a major role before, during, and following a CCC meeting. Before the meeting, the coordinator can help

11

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002945

*ACGME CCC Guidebook*

prepare and organize the data for the CCC. During the meeting, he/she may take minutes and capture key aspects of the discussion. Following the meeting, he/she can be part of communicating the results to the program director (if not in attendance), scheduling meetings with residents/fellows and the program director or the designated faculty member to review the decisions, including Milestone status, and assisting the Program Director in submitting Milestone information on each resident/fellow to the ACGME. Coordinators can also provide feedback through the program's assessment system, such as participating in multi-source assessment instruments.

*Meetings*:
Logistics of meetings should include location frequency and length. CCCs may wish to meet more frequently than the minimum CPR requirement of "twice yearly," especially during the committee's developmental phase.

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002946

*ACGME CCC Guidebook*

# Part 3:  Preparing for Effective CCC Meetings

## Preparing for a CCC Meeting

### Developing a Shared Mental Model
Perhaps the most important aspect of preparing for a CCC meeting is to make sure the members develop a shared mental model of what resident/fellow performance looks like, and understand their roles and responsibilities on the committee, as well as how the CCC operates to judge resident/fellow performance. This may necessitate a "meeting before the meeting," or allocating sufficient time at the beginning of the first CCC meeting for this discussion. Having a written description of the CCC process, and providing faculty development for committee members will facilitate this process. Some programs find it useful to discuss a relevant article at the CCC meeting as part of faculty development.. See the references and annotated bibliography for some suggestions.

Faculty members should reach a common understanding on the meaning of the narratives of each milestone in the context of their specialty. This will almost always require group conversation. It may be worthwhile to have each faculty member perform self-assessment using the specialty-specific Milestones as a faculty development exercise. Faculty members should be trained to compare each resident's/fellow's performance to the Milestones as a whole, not just to the performance of other or 'typical' residents/fellows in the program. The committee may also benefit from individually assessing one or more recent program graduates using the Milestones, and then discussing as a CCC to determine a group consensus.

### Inventory Where Milestones are Represented in the Program
CCCs should inventory (or review an inventory conducted by others) where each milestone is currently taught and assessed in the program. Teaching may occur on a specific rotation, or in the context of a program activity, such as "leading a Morbidity & Mortality rounds."

The inventory should help to identify gaps in both curriculum and assessment: 1) milestones for which the program has no good learning opportunities or assessment tool in place at the present time; 2) rotations/activities the program believes add value, but for which there is no milestone. The CCC can identify how to best address these gaps, perhaps by delegating the review to a designated faculty member.

The assessment information and data that inform CCC deliberations should follow several key principles:
* The assessment program will need to include multiple forms of assessment and utilize multiple assessors. No single assessment method or tool is sufficient to judge something as varied and complex as clinical competence.
* The combination of assessments will depend to some extent on the specific needs of the specialty and the local context.

13

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002947

*ACGME CCC Guidebook*

- Core methods of assessments should include direct observation of a specific component (e.g., care of individual patients, procedures, etc.), multi-source feedback, multiple choice test/in-service examination, longitudinal evaluations (e.g., rotational evaluation forms), audit of clinical performance, and simulation. The specific assessment tools used will depend on the specialty and local context. The key point to remember is that the true assessment "instrument" is not the tool or form itself, but rather the individual using it. The tool or form simply guides the individual performing the assessment.
- Faculty members and others involved in assessing residents/fellows will need training in the use of the selected assessment tools.

## Preparing for specific CCC Meetings

Another key pre-meeting activity is preparing the assessment data for review. It is important to plan how all assessment information, including information that occurs at the meeting, and from information gained through hallway conversations or other informal sources, will be collected and summarized. Larger CCCs may assign members a subset of the residents/fellows for whom to review the assessment information in advance and prepare a preliminary review. That member may be responsible for reviewing all measures of the assigned residents'/fellows' performance, and preparing a synopsis that is brought to the meeting and discussed among all members. Some programs have individual members complete milestones assessments on each resident and have the coordinator aggregate the information in advance of the meeting.

Suggested practices:
1. synthesize performance information (done by the coordinator or assigned CCC member) in advance of meeting
2. share written performance information about individual residents'/fellows' performance during the CCC meeting (e.g., in a handout, a projection in the room)
3. train CCC members on how to interpret aggregated, synthesized performance information about individual residents/fellows

Coordinators can have key roles in scheduling and coordinating CCC meetings. They may aggregate data sources on each resident/fellow electronically or on paper and create resident/fellow summaries or snapshots of performance, which may be easier for committee members to use in the meetings. Coordinators can prepare and distribute any necessary information to CCC members in advance. However, if this occurs, it is critical that CCC members maintain the confidentiality of the information. Failure to do so will undermine trust in the Milestones and the CCC process.

Many resident management systems (RMS) have tools available to aggregate evaluations, such as spider graphs and dashboards. Some programs document their CCC deliberations through their RMS. The RMS can create a Milestone evaluation composite, which can be shared electronically with the resident/fellow and stored with all of the other resident/fellow evaluations.

14

(1/2015)

GWU 002948

*ACGME CCC Guidebook*

**Key Point:** Whatever method is used to "pre-digest" and organize the data for review, programs should ensure processes and/or standard protocols are in place to ensure a systematic, consistent approach to the pre-review and the meeting preparation process. Programs ***should not*** simply use statistical means (i.e., averages) or a single type of data to make CCC determinations. As noted above, the Milestones do not represent the totality of the discipline, and informed human judgment is still a critical component of the CCC process. Much important and useful assessment information is attained through effective group discussion at the CCC meeting.

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002949

*ACGME CCC Guidebook*

## Part 4: The CCC Meeting

### Running a CCC Meeting

How a CCC meeting is conducted can have a significant impact on decisions and judgments. Effective group process has been shown in multiple fields, including medical education, to produce better decisions. For example, Schwind and colleagues found a significant proportion of problematic performances among surgery residents were only uncovered through group discussion.[11] Hemmer and colleagues found important professionalism deficiencies of medical students during internal medicine clerkships were only discovered during formal, planned group discussions.[12] Thomas and colleagues found that group discussion before completing rotational evaluation forms for internal medicine residents produced higher reliability and better discrimination of performance.[13]

Provided below is guidance on running a successful meeting and pitfalls to avoid.

1. Diverse, more heterogeneous groups tend to make better decisions (see *Part 2: CCC Structure and Membership*)

2. The "starting point" of the CCC will have a significant impact on the ultimate judgment and decision. There are several processes that can affect that starting point:

   a. The committee should have a clear sense of purpose and of the charge of the CCC, and understand the group's role in the assessment system.
   b. It is very important to avoid coming to the meeting with a decision already pre-determined; i.e. using the CCC to simply confirm a "verdict" about a resident or fellow from one's opinion or a set of data. This undermines group process.
   c. Shared mental models are very helpful in group process (see *Part 3: Preparing for Effective CCC Meetings*). The CCC should spend time discussing each committee member's interpretation of the Milestones and be able to describe examples of performance.
   d. Spend time discussing how the group will work together so as to develop group cohesiveness. One simple technique is to create group "touchstones." Touchstones are simply principles of engagement the group agrees to observe and to which members hold each other accountable. For example, one touchstone might be "all member opinions will be considered respectfully."

3. The CCC should use a consistent, systematic process for each meeting.
   a. Diverse opinions should be invited and encouraged. Research shows that minority opinions, even when "wrong," can lead to better decisions.
   b. Issues of hierarchy and psychological size can negatively affect group decision-making. This is particularly a risk when a more senior faculty

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002950

*ACGME CCC Guidebook*

member serves as CCC chair. It is critical to minimize effects of hierarchy. One clear measure of the effectiveness of the CCC is the willingness of all members to speak up.

    i. A simple technique to reduce the negative effects of hierarchy is to always start with the most "junior" person or the person most at risk in the hierarchical chain.

    ii. The CCC chair should, as a general rule, state his/her opinion last.

    iii. The PD should avoid stating his/her opinion early on, if at all, depending on their role with the CCC

c. Research shows that the more performance information that is available to groups the better the quality of the decisions.

    i. The CCC should carefully consider how information is prepared and presented in the group (see *Part 3: Preparing for Effective CCC Meetings*). While some pre-synthesis is necessary and important, the underlying data that informed the pre-synthesis should be available to the committee for discussion if needed.

d. Longer discussions tend to produce better decisions and will also likely produce better feedback. Time pressure or trying to cover too many residents/fellows in one meeting can produce lower quality decisions. Be sure to give the CCC adequate time for discussion, especially for residents/fellows-in-difficulty. However, even the best residents/fellows can grow professionally and improve, so be careful not to short-change your more talented learners who will also benefit from robust feedback and the committee's providing them with some "stretch goals."

e. Have a structure to the meeting discussions rather than only an open forum for members to share their general comments about each resident/fellow.

f. If possible, share information in multiple formats, not just verbally. Projecting data at the meeting or having a written summary can be helpful.

g. If a resident has not rotated through an experience over the past six months that hinders the CCC in making a determination on one of the milestones, the CCC should maintain the milestone judgment from the previous reporting period.

h. Committee members will likely bring information about many residents and fellows not captured on completed assessment tools and forms. The CCC provides a forum to hear this previously unshared information. This information is critical to making a robust overall assessment of each resident's or fellow's progress. However, if a program finds that most of the useful information comes from CCC discussion and is not written down on any assessment forms, it should consider revising its assessment tools or processes and/or faculty development to solicit better written/recorded information.

i. Consider asking one person to offer an opposing or different view, to help represent all possible perspectives.

j. A quick debrief at the end of each CCC meeting can also help to improve group process. The leader can simply ask: "What worked well

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002951

*ACGME CCC Guidebook*

in today's meeting?" "What did not work well during this meeting?" "What would you improve and how?" This technique builds continuous quality improvement into the CCC process, and can help encourage relationships and trust.

4. Post-meeting
    a. The discussion about each resident/fellow should be captured and documented. The discussion and judgments of the CCC are legitimate and important assessment information and should become part of the resident's/fellow's record. This information should also serve as the template for the feedback session with each resident/fellow.
    b. Transparency is an important principle in the Next Accreditation System and the Milestones. Accurately documenting and sharing the key components and judgments with residents and fellows is a critical aspect of this principle.
    c. All residents/fellows should receive timely feedback after CCC meetings, not just those for whom the CCC has concerns.

5. Cautions
    a. Good group process can clearly lead to better decisions and judgments. However, as expected, poor group process can lead to suboptimal decisions.
    b. One risk is the phenomenon of "group think." Group think can occur when the group overly favors cohesiveness, unanimity, and the desire to avoid confrontation. Group think can also occur with more senior leaders or committee chairs with strong opinions, especially if they suppress other opinions and discussion. As noted above, it is desirable for the CCC chair to state his/her opinion last.
    c. Do not allow the program director and/or Department Chair to share his/her preformed decisions regarding residents'/fellows' performance on the Milestones before all of the other group members have had an opportunity to discuss

It will be beneficial to identify the process used to obtain feedback from the CCC regarding the process itself. Early on, there will be quick "Aha" moments. A few minutes of debriefing at the end of the meeting can identify how the next meeting might be modified. CCCs will increasingly assess the program's performance as well as individual residents/fellows. In assessing resident/fellow performance against the Milestones, it will become clear what's missing from the program's assessment "tool kit" and the utility of the tools the program has in place. CCC deliberations can generate behaviorally-specific feedback that will be useful to learners. But CCCs will also identify feedback useful for faculty. Some faculty members will be recognized as role models for the timeliness, quality, and quantity of their evaluations. The CCC can help these faculty members be recognized, perhaps as part of promotion and tenure or through incentives. Others may be tapped to coach faculty members whose evaluations could be improved. The CCC, therefore, has an important role in the continuous educational quality improvement of faculty members and the program, in addition to its role in assessing resident/fellow performance.

18

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002952

*ACGME CCC Guidebook*

In conclusion, research supports the importance of well-structured, systematic processes for groups such as a CCC. Effective group process, capturing the "wisdom of the crowd," enhances the probability of better judgments around resident and fellow professional development. Systematic process can also help develop shared mental models among committee members, a condition that will be important in most effectively using the Milestones to judge learner development with the competencies.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002953

*ACGME CCC Guidebook*

## Part 5: After the CCC Meeting Concludes

### Providing Feedback to the Resident or Fellow

Feedback to the resident or fellow is an essential activity of the Milestones assessment system. Research has clearly shown that feedback is one of the most effective educational tools faculty members and programs have to help residents and fellows learn and improve.[14] Milestones should be used to help residents and fellows develop action plans and adjustments to their learning activities and curriculum. Feedback sessions should be conducted in person. Research is clear that interpreting and understanding multi-source performance data, as represented by the Milestones, should be facilitated and guided by a trusted advisor.[14]

Basic features of high quality feedback:

1. <u>Timeliness.</u> The results of the CCC deliberations and Milestone determinations should be shared with the resident or fellow soon after the meeting has occurred.
2. <u>Specificity.</u> The Milestones help to facilitate this criterion by providing descriptive narrative. However, as noted above, the Milestones do not represent the totality of a discipline, and many other important points of feedback will likely arise in the CCC meeting that should also be captured and shared with the resident or fellow. Generalities (often called "minimal" feedback), such as "you're doing great," or, "should read more," etc., are not helpful in promoting professional development, especially in the context of Milestones data.
3. <u>Balance reinforcing ("positive") and corrective ("negative") feedback.</u> It is important to include both in specific terms. An imbalance between too much reinforcing or conversely corrective feedback can undermine the effectiveness. The popular feedback sandwich (*positive-negative-positive*) is actually not very effective and not routinely recommended (see *Ask-Discuss-Ask* below). Models for giving feedback are provided below.
4. <u>Learner reaction and reflection.</u> It is very important to allow the resident or fellow to react to and reflect on the feedback and Milestones data. The two models provided below are excellent ways to facilitate this process. Reaction and reflection help garner resident/fellow buy-in and development of action plans.
5. <u>Action plans.</u> Creating and executing an action plan after Milestones review is critical to professional development and is often neglected in feedback. As Boud and Molloy argue, feedback hasn't occurred until the learner has actually attempted an action or change with the information. Feedback is more than just information giving and dissemination.[14]
6. feedback should start with where the resident/fellow was at the last feedback meeting and a review of the action plans created then.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

**GWU 002954**

*ACGME CCC Guidebook*

**Models for Milestones Feedback**

Ask-Discuss-Ask (Konopasek)
Developed by Dr. Lyuba Konopasek of New York-Presbyterian Hospital, this is a nice feedback model building on the basic principles above that can also be routinely used with other assessments. It improves on the feedback sandwich model using a more interactive approach. To set up this conversation, a resident/fellow can complete his/her own self-assessment using the Milestones prior to the feedback session. The feedback session begins with the faculty member *asking* the learner to assess how he/she thinks he/she is doing. The faculty advisor then shares ("*discusses*") the results and determinations of the CCC and compares and contrasts the resident's/fellow's self-assessment with that of the CCC to facilitate a conversation about strengths and weaknesses. The "discuss" stage should be a two-way interactive dialogue between the faculty advisor and resident/fellow; it should not be just an "information dump" from faculty advisor to learner. The advisor then *asks* the resident/fellow for his/her impressions, reflections, and reactions. The final and essential activity is for the faculty advisor and learner to work together to create and complete an action plan.

R2C2 Model (Sargeant)
This model was developed by Joan Sargeant and colleagues, who specifically included feedback sessions that involved the review of multi-source performance data, such as multi-source feedback and clinical performance measures, in their research. The model builds on robust educational theory. The steps of the model are:

> **R**apport Building: In this initial stage the faculty member should build rapport and establish the relationship; if the same person is delivering the feedback after each CCC meeting, this step is facilitated and can be abbreviated in subsequent feedback meetings. The goal of this stage is to explain the purpose of the assessment (e.g., the Milestones), engage the resident/fellow, and establish the credibility of the assessment. At this stage you want to outline and negotiate the agenda with the learner to ensure issues he/she wishes to discuss are surfaced during the review of the Milestones data, discuss what the process means to him/her, and confirm that the session should lead to an action plan.

> Explore **R**eaction: The next stage is to explore reactions, emotions, and perceptions of the Milestones report. If the resident/fellow has completed a self-assessment of the Milestones (see above), emotion and reaction are likely around areas of both concordance and especially discordance between his/her impressions of his/her performance and those of the CCC and program. These concordances and especially discordances should be explored. The goal of this stage is to ensure the resident/fellow feels heard and that his/her views are respected, even if there is disagreement.

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002955

*ACGME CCC Guidebook*

Explore Content: In this stage explore how and what the resident/fellow understands about the Milestones data. In this stage you want to ensure the resident/fellow fully understands the meaning of the data and how he/she can use it for action plans and professional development. Helping the resident/fellow also understand how the various assessments are used to inform the Milestones may also be helpful.

Coach for Performance Change: In this last stage, the faculty member facilitates and engages the resident/fellow in "change talk" and the creation of an action plan.

One more observation of the R2C2 model – emotion, reaction, or misinterpretation can arise at any time during a session, so you may need to "loop back" to explore reactions or content.[15]

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002956

*ACGME CCC Guidebook*

# Part 6:  Legal Issues and Considerations

The CCC can be an extremely beneficial structure to support legal constructs required for academic decision-making. There are two Supreme Court decisions that provide the context and framework for academic due process (See **Key Legal Cases Supporting Professional Judgment in GME**).

Academic Due Process consists of three components:
1.  Notice (of deficiencies); and,
2.  Opportunity to cure; and,
3.  A careful and deliberate decision-making process.

The reasonable decision-making process *is* the CCC; that is, a regularly called meeting of the faculty for the purpose of discussing student (resident/fellow) performance. In both *Missouri v. Horowitz* ("Horowitz") and *Michigan v. Ewing* ("Ewing"), the faculty evaluation committee was identified as being a core component of the reasonable decision-making process. The Ewing case further supported the idea that a faculty decision-making committee providing academic performance decisions that are conscientious and made with careful deliberation (i.e., they are not arbitrary or capricious) constitutes reasonable decision-making. When making academic decisions regarding resident/fellow performance, promotion, or dismissal, the CCC provides the structure recognized by the highest court in academic cases.

### Documentation
When defending a legal case, temporal documentation of events, actions, or conversations is very helpful in proving whether or not something actually happened. While there is no law that requires evaluations or performance feedback to be written, the ACGME requires written rotational evaluations and semi-annual evaluations of performance. Of course, it is natural within an academic clinical setting that a faculty member provides a resident/fellow with routine verbal feedback. Although it is not recorded, this verbal feedback constitutes notice and opportunity to cure.

While it is always helpful to have written performance documentation, lack thereof should not deter evaluators from doing the right thing and utilizing this information as part of the overall evaluation process. One critical role of the CCC is to elicit feedback from faculty members regarding performance in a variety of settings and situations, and for the faculty to discuss performance based on individual experiences and opinions. This discussion is the heart of the CCC, and should not be discounted just because there is not a rotational evaluation or other assessment tool or form to support the discussion. Research shows that the discussion among the faculty members in the CCC often provides more accurate and robust information regarding learner performance than the written evaluation alone, which may not represent a complete view of actual performance.[11-13]

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002957

*ACGME CCC Guidebook*

These discussions are not only valuable to the formation of individual performance evaluations, but also to demonstrate a "fair and reasonable decision-making process" by the program.

The documentation of the CCC meeting itself can be one of the most valuable documents to an institution when defending a resident/fellow dismissal or adverse action. The ACGME does not have any requirement as to how the CCC meeting should be documented.   However, many programs will find it worthwhile to retain minutes of the CCC meeting. These minutes may include::

1. A written document reflecting the discussion of each resident's/fellow's performance.
2. A concise summary of each resident's/fellow's performance and any action or follow-up items.
3. Confidential (i.e., not shared with anyone other than the resident/fellow, CCC, and program leadership).
4. Archived in accordance with the institution's document retention policy in consultation with legal counsel.

Some institutions may prefer #1 to be brief and use the milestones reported to ACCGME as  #2.

**Decision Process**

The ACGME requires the CCC to make recommendations on resident/fellow performance to the program director for review and action; thus, the CCC is not the final decision maker. The program director is the final decision maker. However, in most situations, the feedback and consensus of the CCC is critical in informing the program director of the faculty's expert opinion regarding progress and promotion.

In general, discussions of the CCC will lead to a "consensus" decision. That is, after presentation of all data, and engagement of the members in a discussion of their experience with, and opinion regarding, the progress of a resident/fellow, the Milestone assessment will be reached by "consensus." As Milestones are designed to guide a developmental judgment, CCCs should not vote on individual subcompetencies and milestones.

However the CCC may find a situation in which strongly held differing opinions that are not modified through discussion fails to result in consensus. The Chair must recognize and be prepared for this circumstance. The CCC should discuss this at the outset and consider describing how they will proceed in the written description of the CCC. The ACGME provides no specific guidance in this setting. The committee should establish its own policy in this regard, and apply it consistently taking into account input from the DIO and legal office.  We strongly discourage voting as a decisional approach, we recognize decisions regarding remediation, probation and promotion can be difficult and programs may resort to voting. If programs do choose to use voting, it is very important to be clear about what exactly the vote means from the outset. Is the vote that the performance is not at expected competence or is the vote to recommend a disciplinary action,

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002958

*ACGME CCC Guidebook*

remediation or dismissal? With these mechanisms in place and followed, fundamental fairness to both residents/fellows and committee members is provided, and challenges to process consistency and fairness are prospectively addressed.

## Peer-Review Privilege
Peer-review statutes fall under state law, and thus vary from state to state. However, in general, peer-review privilege has some common tenets that generally do not apply to CCCs and resident/fellow performance evaluation.

Generally speaking, peer-review privilege:
- protects discussion of clinical performance for the purpose of internal quality assessment, not evaluation and decisions communicated to external parties; and,
- Applies to in-person meetings where the information is maintained internally, not communicated outside of the peer-review process (such as to clinical advisors, other departments, or external agencies).

Each institution should review its peer-review statute with its legal counsel to determine if it should be applied to the CCC.

Notwithstanding a program's natural tendency to want to maintain strict confidentiality, if conducted in accordance with these Guidelines, the discussions and recommendations of the CCC are generally helpful when defending a program's decision to dismiss a resident/fellow. Carefully prepared CCC minutes can provide one of the strongest legal defenses to support dismissal actions.

## Appeals and Due Process
The members of the faculty must be encouraged to provide candid and robust evaluations that are reflective of actual performance. Evaluations are based on each faculty member's observations, judgments, and expectations. A faculty member should complete evaluations in an honest and good-faith effort to provide feedback to the resident/fellow with the goal of identifying both strengths and deficiencies in order for the resident/fellow to improve academic performance.

Programs should be aware that allowing residents/fellows to appeal performance evaluations (rotational evaluations, semi-annual evaluations, etc.) can send a message to the residents/fellows that faculty or program director feedback is negotiable. It can also suggest to faculty members and program directors that their feedback, usually critical feedback, can be subject to scrutiny and overturned if a resident/fellow complains. Programs should discuss with legal counsel the impact of allowing residents/fellows to appeal performance evaluations or academic evaluation decisions.

The ACGME does encourage programs to allow actions such as probation, termination, or non-promotion, resulting from CCC decisions to be eligible for

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002959

*ACGME CCC Guidebook*

appeal to ensure the department and institution follows the policies they have in place regarding the decision-making process.

## Key Legal Cases Supporting Professional Judgment in GME

### University of Missouri v. Horowitz (1978)

*Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978).

*Case Summary*: Ms. Horowitz excelled in her first two years of medical school, but received criticism from the faculty as she began her clinical rotations. She was provided feedback in her rotational evaluations regarding her attendance, slovenly appearance, hygiene, and bedside manner. Despite feedback, Ms. Horowitz's behavior did not improve. The school's faculty evaluation committee ultimately recommended her dismissal from medical school. Ms. Horowitz appealed the decision to the Dean. The Dean allowed Ms. Horowitz the opportunity to be evaluated by seven independent physicians. At the conclusion of the rotations, the faculty provided feedback to the Dean of varied opinion. Based on the feedback of the independent faculty evaluators, the Dean upheld the dismissal decision. This case and the issue of academic due process were ultimately argued in front of the Supreme Court. The Court supported the University's decision based on the following:

- Ms. Horowitz was provided **notice** of her deficiencies through private verbal feedback and her rotational evaluations.
- Ms. Horowitz was provided an **opportunity to cure** her deficiencies.
- The **decision was made carefully and deliberately**. The regularly called meeting of the faculty, called for the purpose of evaluating academic performance, was noted as being a reasonable decision-making process consisting of faculty members, expected to evaluate student performance.
- The Court decision noted that under this particular set of circumstances the rotation with the seven physicians was much more process than was due.

### University of Michigan vs. Ewing, (1985)

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985).

*Case summary*: Mr. Ewing was enrolled in the six-year BS/MD program. After four years, he was eligible to write the NBME Step 1 exam. Mr. Ewing failed the exam and was subsequently dismissed from medical school. He sued, citing at least 11 other students who failed the exam and were allowed to stay enrolled in school and retake the test; some were allowed to retake the exam three and four times. The decision to dismiss Mr. Ewing was made by the faculty committee charged with reviewing academic performance. This committee reviewed Mr. Ewing's entire academic record and determined that based on his overall performance (including several incompletes, required repeats of courses, and the lowest score ever recorded on the NBME exam at this school), he did not have the ability or aptitude required of a physician and had no chance of succeeding. The Court sided with the school noting:

1. "The narrow avenue for judicial review of the substance of academic decisions precludes any conclusion that such decision was a substantial

26

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

    departure from accepted academic norms as to demonstrate the faculty did not exercise professional judgment";

2. The decision-making process was "**conscientious and made with careful deliberation**," citing the regularly called faculty meeting structure, the *Promotion & Review Board*;

3. The faculty rightly reviewed Mr. Ewing's **entire academic record**, not just a single test, rotation, or incident, to provide context to the decision.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

## Part 7: Opportunities

The CCC offers many excellent opportunities for continuous educational quality improvement. For the resident/fellow, it offers insight and perspectives of a group of faculty members, and comparison of an individual's performance to a national standard, the Milestones. For the entire program, the CCC serves as an early warning system should a resident/fellow fail to progress, and therefore identifies an opportunity for remediation. For the faculty, CCCs can be an opportunity to balance out the "hawks" and the "doves," and to develop a more standardized, consistent explicit approach to expectations of resident/fellow performance. More importantly, through longitudinal dialogue and repeated sessions, faculty members can develop a better shared mental model of competence and reduce the variability in assessment judgments.

CCCs can present an excellent opportunity to simplify a program's assessment tools. It will quickly identify which assessments are most useful, and where there are gaps. A program may be able to eliminate administrative burden. It may not be feasible or necessary for faculty members to complete multipage evaluation forms, for example. The CCC can identify what is useful for to arrive at faculty consensus. As said earlier, **the true assessment instrument is not the tool or form, it is the faculty member(s) or others using it**. CCCs can help to identify barriers and impediments to effective faculty evaluations and create faculty development or other interventions.

The CCC will also help identify gaps in a program, as well as opportunities to improve program components (e.g., curricula, rotation schedules, supervision, and mentorship).

We welcome feedback on this Guidebook and encourage you to share your own best practices regarding your CCC with your colleagues so we can continue to learn.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002962

*ACGME CCC Guidebook*

# References

1. ACGME Glossary of Terms July 1, 2014 accessed July 6, 2014 http://acgme.org/acgmeweb/Portals/0/PFAssets/ProgramRequirements/ab_ACGMEglossary.pdf
2. Van der Vleuten CPM, Schuwirth LWT, Driessen EW, Dijkstra J, Tigelaar D, Baartman LKJ, van Tartwijk J. A model for programmatic assessment fit for purpose. Med Teach. 2012; 34: 205–214
3. Annual Review of Competence Progression http://www.gmc-uk.org/education/competence_progression_review.asp
4. Black D. Clinical Medicine 2013, Vol 13, No 6: 570–2
5. ACGME Institutional Requirements
6. Faculty development for CCC members Accessed February 20th, 2013 at http://www.acgme-nas.org/assets/pdf/NASFAQs.pdf
7. French JC Dannefer EF Colbert CY. Figure 2. Guidelines for Committee Members. A Systematic Approach Toward Building a Fully Operational Clinical Competency Committee. J Surg Educ. 2014 May 27. pii: S1931-7204(14)00107-X. doi: 10.1016/j.jsurg.2014.04.005. [Epub ahead of print]
8. Cohen NH. "Assessing Clinical Competence What is the Role for the Anesthesia Board info "ABA requires each residency to file an Evaluation of Clinical Competency in January & July to ABA for any resident who spent any portion of prior 6 months in clinical anesthesia training …"Certificate of Clinical Competency" attesting to satisfactory clinical competence during final period of training"
The residency must:
   • Develop & manage evaluation system from multiple sources
   • Manage faculty advisor system (mentorship and feedback)
Neal H Cohen MD MPH MS "Assessing Clinical Competence What is the Role for the Program Director"
9. Figure 2. Guidelines for Committee Members. A Systematic Approach Toward Building a Fully Operational Clinical Competency Committee. J Surg Educ. 2014 May 27. pii: S1931-7204(14)00107-X. doi: 10.1016/j.jsurg.2014.04.005. [Epub ahead of print]
10. Role of Program Director. Frequency Asked Questions accessed ACGME website:http://www.acgme.org/acgmeweb/Portals/0/PDFs/FAQ/CCC_PEC_FAQs.pdf
11. Schwind CJ, Williams RG, Boehler ML, Dunnington GL. Do individual attendings' post-rotation performance ratings detect residents' clinical performance deficiencies? Acad Med. 2004 May;79(5):453-7.
12. Hemmer PA, Hawkins R, Jackson JL, Pangaro LN. Assessing how well three evaluation methods detect deficiencies in medical students' professionalism in two settings of an internal medicine clerkship. Acad Med. 2000;75:167-73.
13. Thomas MR, Beckman TJ, Mauck KF, Cha SS, Thomas KG. Group assessments of resident physicians improve reliability and decrease halo error. J Gen Intern Med. 2011; 26: 759-64.
14. Boud D and Molloy E. Feedback in Higher and Professional Education. Routledge. Sydney. 2013.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002963

*ACGME CCC Guidebook*

15. Sargeant J, et; al. Evidence-based facilitated feedback: Using the R-2 C-2 model to enhance feedback acceptance and use. Presented at the Association for Medical Education in Europe. Prague, 2013.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002964

*ACGME CCC Guidebook*

## Part 7: Annotated Bibliography

- Hemmer PA, Hawkins R, Jackson JL, Pangaro LN. Assessing how well three evaluation methods detect deficiencies in medical students' professionalism in two settings of an internal medicine clerkship. Acad Med. 2000 Feb;75(2):167-73.

This study compared three methods (standard checklists, written comments, and comments from formal evaluation sessions) in detecting student deficiencies in internal medicine clerkships at the Uniformed Services University of the Health Systems (USUHS). The framework for the formal evaluation sessions is RIME (Reporter-Interpreter-Manager-Educator). The authors found the face-to-face, formal evaluation sessions significantly improved the detection of unprofessional behavior, and that 25% of professionalism concerns were only identified at the formal evaluation session.

- Battistone MJ, Milne C, Sande MA, Pangaro LN, Hemmer PA, Shomaker TS. The feasibility and acceptability of implementing formal evaluation sessions and using descriptive vocabulary to assess student performance on a clinical clerkship. Teach Learn Med. 2002 Winter;14(1):5-10.

This study tested the group evaluation technique used in the USUHS RIME model (see Hemmer) in a setting outside of the military, and found the residents and faculty members who participated in the descriptive evaluation sessions provided more valid evaluations and the majority of students found the RIME system helpful or more helpful compared to their previous evaluation system.

- Schwind CJ, Williams RG, Boehler ML, Dunnington GL. Do individual attendings' post-rotation performance ratings detect residents' clinical performance deficiencies? Acad Med. 2004 May;79(5):453-7.

In this study the authors found in a surgery program that only 0.7% of evaluation form ratings (of 1,986 individual post-rotation ratings) nominally noted a deficit. Eighteen percent (18%) of residents determined to have some deficiency requiring remediation received no post-rotation performance ratings indicating that deficiency. Written comments on post-rotation evaluation forms detected deficits more accurately than did numeric ratings. The largest percentage of performance deficiencies only became apparent when the attending physicians discussed performance at the annual evaluation meetings. The conclusion of the authors was that, "annual evaluation meetings may help identifying patterns of residents' behavior not previously apparent to individual faculty and provide additional information about residents' performance deficiencies."

- Williams RG, Schwind CJ, Dunnington GL, Fortune J, Rogers D, Boehler M. The effects of group dynamics on resident progress committee deliberations. Teach Learn Med. 2005 Spring;17(2):96-100.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002965

*ACGME CCC Guidebook*

This study in a single surgery residency found no evidence of "feeding frenzy" or piling on (problem of negative group think) in committee deliberations about residents.

• Regehr G, Ginsburg S, Herold J, Hatala R, Eva K, Oulanova O. Using "standardized narratives" to explore new ways to represent faculty opinions of resident performance. Acad Med. 2012 Apr;87(4):419-27.

While not directly related to group process and Clinical Competency Committees, this study used narratives to describe levels of performance and asked faculty members to rank residents using the narrative performance profiles. The authors found a small group of faculty members (14 after initial development) that used a set of 16 narratives led to better discrimination of "excellent," "competent," and "problematic" performance. This provides some indirect support for using narratives in the Milestones, although it should be noted that these were more holistic, combined narratives and not de-aggregated narratives.

• Surowiecki J. The Wisdom of Crowds. Why the many are smarter than the few. Anchor Books. 2004. New York.

This is a fun book highlighting the research and evidence of how good group process can lead to better decisions. A number of important principles are discussed, such as the need for diversity of members of a committee, allowing for minority opinions to be heard, and using an evidence-based group process to avoid problems such as confirmation bias.

• Sanfey H, DaRosa DA, Hickson GB, Williams B, Sudan R, Boehler ML, Klingensmith ME, Klamen D, Mellinger J, Hebert JC, Richard KM, Roberts NK, Schwind CJ, Williams RG, Sachdeva AK, Dunnington GI. Pursing Professional Accountability: An Evidence Based Approach to Addressing Residents with Behavioral Problems . Arch Surg. 2012;147(7):642-647.

This presents practical highlights from a think tank held at the American College of Surgeons by medical and nursing leaders involved in resident education; individuals with expertise in academic law, mental health issues, learning deficiencies, and disruptive physicians; and surgical residents. The value of a CCC is emphasized. Meeting participants noted that the amount of time spent discussing a resident is frequently a measure of the severity of the problem.

• Yao DC, Wright SM. National survey of internal medicine residency program directors regarding problem residents. JAMA. 2000;284(9):1099-1104

An internal medicine study in which only 31% of program directors identified a problem resident from a written evaluation; in 75% of cases, program directors first became aware through verbal complaints by faculty members.

• Dudek NL Marks MB Wood TJ Dojeiji S Bandiera G Hatala R Cooke L Sandownik L. Quality evaluation reports: Can a faculty development program make a difference? Med Teach 2012;34:e725-731

*ACGME CCC Guidebook*

In this study, a three-hour interactive faculty development program improved the quality of faculty written evaluations. The authors noted, "assessor training is a key component of high quality assessment... there is evidence to suggest that faculty can be trained to improve the quality of their assessments."

- George BC. Teitelbaum EN, Darosa DA,  Hungness ES, Meyerson SL, Fryer JP, Schuller M, Zwischenberger JB. Duration of faculty training needed to ensure reliable performance ratings. J Surg Educ 2013 Nov-Dec;70(6):703-8. Epub 2013 Aug 15.

One good hour of faculty development may be as good as four in helping faculty members improve their evaluations. This study adapted "frame of reference" (FOR) training, a process used in other fields to improve raters assessing performance indicators associated with points along a rating scale. The authors compared two faculty development programs for surgical faculty: one was a one-hour program; the second was a four-hour program. The groups were not significantly different in their subsequent ratings of video clips of residents at different levels.

- Williams RG, Sanfey H, Chen X, Dunnington GL. A controlled study to determine measurement conditions necessary for a reliable and collaborative formative assessment. Annals of Surgery 2012:177-187.

This study found that five-to-seven members appear to make up an effective size for group process when making formative assessments. As noted by the authors, this group size helps "balance out idiosyncrasies in judges' ratings." Rater idiosyncrasies affect all raters to a degree, and group process can help maximize the strengths and weaknesses of rater idiosyncrasy.

©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002967

*ACGME CCC Guidebook*

## Appendix A: The High Performing Residency Assessment System

### The Assessment System



At the program level, residents/fellows are assessed routinely through a combination of many assessment tools. These include: direct observations; global evaluation; audits and review of clinical performance data; multisource feedback from team members, including peers, nurses, patients, and family; simulation; in-service training examinations (ITE); self-assessment; and others. Increasingly, Milestones and entrustable professional activities (EPAs) are used as a guiding framework and "blueprint" for expected performance. Assessment tools are selected intentionally to allow routine, frequent, formative feedback to the resident/fellow to affirm areas of successful performance and to highlight those aspects they need to improve. The CCC is the committee which synthesizes data; quantitative from in-service exams and clinical performance audits, and qualitative from observers and co-workers. Using the Milestones, the committee forms a consensus decision, or a judgment, regarding each resident's/fellow's performance. The CCC provides those conclusions to the program director, which makes the final determination on residents'/fellows' Milestone "level" at least twice yearly. These are provided to the pertinent ACGME Review Committee and, in some cases, the pertinent specialty boards. The ACGME's unit of analysis is the *program*, and the Review Committees use aggregate Milestone information comparing a program with all residents/fellows in the given specialty. The comparison against these benchmarks serves as one source of input into the ACGME's determination of program quality and accreditation decisions. The Unit of Analysis is the "individual" for certification and credentialing entities. Collectively, all of us—residents/fellows, faculty members/program directors/programs, the ACGME, and certification and credentialing entities—are accountable to the public for honest assessments of resident/fellow performance and truthful verification of their readiness to progress

34

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

to independent practice. Data (D) is essential for the entire system in engage in continuous quality improvement, especially to create meaningful feedback (FB) loops within the program and also back to programs from the ACGME. Programs and residents and fellows can currently download their Milestone report after each reporting period.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002969

*ACGME CCC Guidebook*

## Appendix B: CCC Quiz

1. Requirements for a CCC are found in:

   A. The ACGME Common Program Requirements
   B. The ACGME Institutional Requirements
   C. Both
   D. Neither

2. Which of the following requirements of CCCs is an ACGME "core requirement"?

   A. Include faculty from other programs and non-physician members of the health care team
   B. Advise the program director regarding resident progress, including promotions, remediation and dismissal
   C. Have a written description of the CCCs responsibilities
   D. Allow residents to exercise a grievance process if they disagree with the milestone determination of the CCC

3. The minimum number of CCC members is

   A. 1
   B. 2
   C. 3
   D. 4
   E. All divisions/subspecialties must be represented
   F. None of the above; there are no specific requirements on the numbers needed

4. Who of the following should ALWAYS Chair the CCC?

   A. Program Director
   B. Associate Program Director
   C. Department Chair
   D. DIO
   E. Head, GMEC
   F. Most senior faculty member on the committee
   G. None of the above

5. The CCC must include:

   A. Patients
   B. Nurses
   C. Peer-selected residents or fellows
   D. Members of the program faculty
   E. Program director
   F. All of the above
   G. None of the above

(1/2015)
©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002970

*ACGME CCC Guidebook*

6. How many residents/fellows **must** participate on the CCC?

    A. 0
    B. 1
    C. At least one peer-selected resident or fellow
    D. At least one from every year of the program
    E. At least one chief resident

7. CCC members:

    A. Provide a consensus on each resident/fellows' performance
    B. Only consider residents/fellows who need remediation
    C. Only review residents/fellows in their final year of the program
    D. Only review some of the competencies and not others
    E. None of the above

8. According to the ACGME, faculty development for CCC members includes (more than one correct answer is possible):

    A. Knowing their potential legal liability
    B. Giving "bad news" to the resident/fellow after the Milestone determination has been made
    C. Reaching a common agreement of Milestone narrative meaning
    D. Determining how many assessments are needed for any given milestone
    E. Applying QI principles to the evaluation process
    F. Knowing the best remediation strategies for certain Milestone performance deficits

9. A specialist (different specialty than the resident) evaluates a resident on a specialty service as performing poorly. The CCC should:

    A. Use the grade provided by the specialist
    B. Not consider the evaluation as it came from a different specialty as the program
    C. Take the evaluation and apply it with other data to judge the resident's performance on the program-specific Milestones
    D. Vote whether the evaluation seems accurate and should be included in the overall review of the resident's performance

10. The CCC must:

    A. Review all resident/fellow evaluations semiannually
    B. Submit milestones summaries to the ACGME
    C. Meet with each resident/fellow to discuss his/her progress on the Milestones
    D. Design and implement any remediation plan necessary (and mentor the resident/fellow throughout)

37

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

11. According to the ACGME, the minutes of the CCC must be:

   A. Fully transcribed
   B. Retained as a summary of all residents/fellows
   C. Retained only as a summary of the sub-optimally performing residents/fellows
   D. None of the above

12. According to the ACGME, a resident must be able to exercise a grievance process/due process ("appeal") if he/she disagrees with the CCC regarding the Milestones determination it plans to report to the ACGME.

   A. True
   B. False
   C. It depends

13. A resident has not rotated through an experience over the past six months that hinders the CCC in making a determination on one of the milestones. The CCC should:

   A. Leave that milestone blank
   B. Drop back a level from the resident's prior rating
   C. Indicate the same level as the previous reporting period,
   D. Report that level as an "average" of the milestone levels that can be determined.

14. Who makes the final decision on a resident's/fellow's Milestone level?

   A. The CCC
   B. The resident's/fellow's advisor
   C. The resident/fellow him- or herself
   D. The ACGME
   E. The program director

15. In order to serve on a CCC, a chief resident MUST:

   A. Have completed the core program and be board-*eligible* or board certified in the specialty
   B. Have completed the core program and be board-*certified* in the specialty
   C. Still be in the core program and in the last year of training
   D. None of the above; a chief resident CANNOT be on a CCC

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002972

*ACGME CCC Guidebook*

16. Program coordinators:

    A. Should serve as voting members of CCCs
    B. Can manage submission of Milestone data for the ACGME
    C. Should NOT attend the CCC meeting
    D. None of the above

*Modified from an earlier table presented by Andolsek KM and Nagler A at the 2013 ACGME Annual Educational Conference*

(1/2015)

©2015 Accreditation Council for Graduate Medical Education (ACGME)

GWU 002973

*ACGME CCC Guidebook*

## Appendix B: Quiz Answers

1. A
2. C
3. C
4. G
5. D
6. A
7. A
8. C, D, E
9. C
10. A
11. D
12. B
13. C
14. E
15. A
16. B

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

## Appendix C: Design your CCC: Creating and Describing your CCC

| Element | Describe your CCC on this element |
|---|---|
| **Committee Membership**<br>• Appointed by program director<br>• Minimum of three faculty members<br>• Size—"enough" but committed and able to get to meetings<br>• Who on your faculty is best able to take on this role? (i.e., sufficient resident/fellow contact; need for subspecialty representation)<br><br>• Other members? (at the prerogative of and appointed by program director)<br>• Physician faculty members from same or other program(s)<br>• Health professions with extensive contact and experience with the program's residents/fellows in patient care and other health care settings<br>• Chief residents who have completed core program and are board-eligible/certified in the specialty<br><br>• Term Limits? (Two years? The duration of the residency/fellowship?)<br>• Staggered appointments? (May be useful to plan overlap among those joining the committee and leaving it) | |
| **Chair**<br>• Are there requirements/restrictions imposed from the specialty board or Review Committee regarding who can chair (or not; e.g., anesthesiology program director cannot chair per American Board of Anesthesiology)?<br><br>If no external requirements/restrictions:<br>• Consider pros and cons of who is best positioned for this role (goal is to ensure all voices are heard—if program director chairs, will everyone simply defer to him/her)<br>• Program director?<br>• Associate program director?<br>• Another faculty member?<br>• Rotating among members? | |
| **Role/Responsibility of *each* member**<br>• Where is this information summarized/documented, and how is it conveyed to CCC members?<br>• Confidentiality<br>• Meeting attendance<br>• Term length<br>• Participation in required professional development around this role<br>• Necessary preparation in advance of meeting (is each member assigned a subset of residents/fellows to review in advance?)<br>• How do members "prepare and assure the reporting of Milestones evaluations of each resident semi-annually to ACGME" (CPR V.A.1.b).(1).(b))<br>• Who conveys results to program director (if the program director is not in attendance at a meeting)? | |

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)

GWU 002975

*ACGME CCC Guidebook*

| | |
|---|---|
| • Who conveys results to each resident/fellow?<br>• Who is responsible for any remediation plan (a member of CCC, or is this referred to another individual or group within residency/fellowship?) | |
| **Role of the Program Director**<br>• Chair (or not)<br>• A member<br>• An observer (perhaps he/she only attends but refrains from providing input)<br>• Not present<br>• Provides feedback from CCC to the residents/fellows (or not) | |
| **Role of Residents/Fellows**<br>• Residents are <u>not</u> members of the CCC<br>• In some programs chief residents are faculty members, and not considered trainees; in this case it may be appropriate to include them<br>• Residents/fellows are commonly asked to provide multi-rater feedback on their peers; this information is typically used by the CCC as one assessment of resident/fellow performance on the competencies of Interpersonal and Communication Skills and Professionalism | |
| **(Potential) Role of the Coordinator**<br><u>Pre-meeting</u><br>Schedule meeting and location<br>Notify attendees<br>Aggregating data sources (electronically or on paper)<br>Providing information to members before the meeting so they can engage in any pre-work<br>Summarizing data, preparing "scorecards" or "snapshots"<br><br><u>At the meeting</u><br>Provide any information needed by committee members<br>Take minutes<br>Document any necessary information to resident/fellow record<br>Record recommendations on each resident/fellow by milestone<br><br><u>Post-meeting</u><br>Communicate results to program director (if not present)<br>Schedule meetings with residents/fellows and program director and/or designated faculty member(s) to review CCC decisions, including Milestone status<br>With program director, submit Milestone information on each resident/fellow to the ACGME | |
| **Shared Mental Model**<br>• How do CCC members develop a shared mental model of performance?<br><br>• <u>What faculty development needs do they have</u>?<br>• Reaching a common agreement of milestones narrative meanings<br>• Determining how many assessments (and of what type) are needed for any given milestone<br>• Determining how to aggregate/interpret data<br>• Applying QI principles to the evaluation process<br>• How is this provided? Documented?<br>• Who is responsible for providing?<br>• How is any lack of consensus among members managed? | |

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)

**GWU 002976**

*ACGME CCC Guidebook*

| | |
|---|---|
| *Consider asking CCC members to self-assess their own performance using your specialty's milestones.* | |
| **Meetings**<br>• When?<br>• Where?<br>• How frequently? at least twice yearly for most specialties; could be more frequently, e.g., monthly, quarterly<br>• How long are meetings?<br>• What is necessary prep to be completed ahead of meetings, and who contributes to it? What is deliverable and who is responsible? | |
| **How the work of the CCC will be distributed?**<br>Some CCCs may be responsible for all the residents/fellows<br>Others may be responsible for a subset of the residents/fellows, (e.g., all PGY-1s, or the research component of all of the fellows)<br>In a large program, there may be CCCs that each review a specific subset of the residents/fellows (e.g., three sub-committees of the CCCs each review 1/3 of the residents/fellows) | |
| **Consensus vs. Voting**<br>• Preferable to have CCC reach consensus and not vote<br>• How are disagreements among CCC members managed? Documents?<br>• program director is the final decision maker<br>• Guidance from institutional Human Resources/Legal on how this is managed/reflected | |
| **Integrating assessments from faculty members external to the program**<br>If a faculty member not from the program makes an assessment on resident/fellow performance with which the CCC disagrees, it is expected that CCC will take data from evaluations and apply them to the Milestones to judge the progress of residents/fellows<br>The CCC will have the advantage of knowing how each of the specialists evaluated the residents/fellows and can apply that knowledge as it marks residents'/fellows' progress on the Milestones | |
| **Minutes**<br>• What information is captured at the meeting electronically vs. in writing? How is it retained?<br>• Are there institutional policies that address how this information is retained (i.e., where? In what format/ for what duration?)? | |
| **Measures of Assessment/Tools used by the CCC**<br>• Existing resident assessment data<br>• What are these?<br>• How many different types of tools (e.g., multirater, in-service training exam, chart audit of clinical performance)<br>• How are these assessments documented?<br>• How are these assessment shared with residents/fellows?<br>• Are there challenges (e.g., faculty members not completing assessments; milestones for which no assessment is currently done)? Can the CCC work with the program to solve these issues? | |

43

©2015 Accreditation Council for Graduate Medical Education (ACGME)

**GWU 002977**

*ACGME CCC Guidebook*

| | |
|---|---|
| • Faculty observations<br>• How are these organized (global end-of-rotation evaluation, checklist from a procedure, simulation, standardized patient)?<br>• How are these documented?<br>• Used in provision of feedback to residents/fellows?<br>• Data from Milestone assessments<br>• Are these observations captured in such a way that they provide useful input in Milestone assessments | |
| **Inventory of milestones**<br>• Where is each taught in the curriculum?<br>• How/where/by whom/ is each assessed?<br>• What are the gaps in teaching and assessment and what are the plans for addressing them? | |
| **Are there expectations the program has of residents/fellows that aren't captured in current specialty milestone(s)?**<br>• How are these communicated to residents/fellows? To faculty members?<br>• How are these assessed and documented? | |
| **If a resident/fellow is performing sub-optimally:**<br>• Is the CCC (or a member of the CCC) responsible for a remediation plan? Another member/group of faculty members?<br><br>What are the options for remediation?<br>• Intensify mentoring<br>• Additional readings/structured reading plan<br>• Skill lab/simulation experiences<br>• Added rotations<br>• Repeat rotations/activities<br>• Extend education<br>• Counseling to consider another specialty/profession<br><br>• If the CCC is responsible for remediation, how does it avoid conflicts of interest in "judging" the success of its own educational intervention(s)? | |
| **Transparency of the CCC process**<br>• How do you describe the CCC process to your residents/fellows and faculty members (e.g., program manual, web page)?<br>• Is the description of the CCC process up to date and reflective of actual process? | |
| **If a resident/fellow disagrees with a CCC assessment:**<br>Review with Human Resources and Legal the desirability of a grievance process in this instance (not required by the ACGME)<br><br>Courts (in general) support faculty decisions<br>"Made at routine meeting for the purpose of evaluation"<br>"Shared understanding of performance"<br>"Reasonable process"<br>Residents given notice (of deficiency) and "opportunity to cure" (ameliorates)<br>Conscientious decision making<br>Take into account the entire performance record | |
| **How do the Milestones fit into promotion** | |

44

(1/2015)
GWU 002978

*ACGME CCC Guidebook*

| | |
|---|---|
| criteria?<br>ACGME institutional requirement IV.C.1:<br>*"sponsoring institution must have a policy" that*<br>*requires each of its programs to determine the*<br>*criteria for promotion and/or renewal of*<br>*appointment…"*<br><br>How do the Milestones fits into your program's criteria for<br>promotion and/or renewal of a resident's/fellow's<br>appointment? Based upon your review:<br>• Do you need to make any adjustments in your<br>  criteria for promotion and/or non-renewal?<br>• Do you need to change your agreement of<br>  appointment to reflect Milestone reporting to the<br>  ACGME?<br>• Do you wish to modify your grievance policy?<br><br>  *You may not need to make any changes at all,*<br>  *but this is an excellent opportunity to review your*<br>  *current processes and ensure they align.* | |
| **Using the CCC in continuous educational quality**<br>**improvement**<br>• Following the CCC meeting, it may be useful to<br>  debrief<br>• What types of assessments were particularly<br>  helpful to the CCC in making decisions on<br>  resident/fellow performance?<br>• Who among the faculty members generated the<br>  most useful assessments (e.g., from explicit<br>  behaviorally-specific narrative comments)<br>• Do the residents/fellows consistently<br>  demonstrate challenges in their performance on<br>  a small subset of the Milestones? (If so, this may<br>  be either a curricular issue or the lack of an<br>  effective assessment tool)<br>• What did the program learn from the CCC<br>  experience to help improve the overall<br>  educational and assessment process? (e.g.,<br>  simplifying the assessment system; applying<br>  examples from the most useful assessment<br>  formats to those that were least useful)<br>• What can the program learn from its best<br>  assessors? How can they<br>  acknowledge/reward/use these faculty members<br>  as role models? How can these faculty members'<br>  practices be transferred to other faculty<br>  members?<br>• Based on this debrief, identify at least one way to<br>  improve assessment in your program<br>• Specify who will do what with, and what exact<br>  timeline to implement the change<br>• Follow up on results of the improvement at the<br>  next CCC meeting<br>• Did all faculty members feel able to honestly<br>  represent their views on each resident/fellow?<br>  What impeded/facilitated this ability, and can<br>  enhancements be identified? | |

*Modified from an earlier table presented by Andolsek KM and Nagler A at the*
*2013 ACGME Annual Educational Conference*

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)
**GWU 002979**

*ACGME CCC Guidebook*

*Appendix D: Additional CBME References*

1. Amin Z. Purposeful Assessment Medical Education 2012 Jan 46(1)::4-7
2. Aagaard E Kane GC Conforti L Hood S. Caverzagie KM Smith C Chick DA Holmboe ES Iobst WF. Early feedback on the use of the internal medicine reporting milestones in assessment of resident performance J Grad Educ. 2013 Sep;5(3):433-8
3. Albanese MA. Challenges in using rater judgments in medical education. J Eval Clin Pract. 2000;6:305–19.
4. Baker K. Determining resident clinical performance: Getting beyond the noise. Anesthesiology. 2011;115(4):862-878.
5. Black D. Revalidation for trainees and the annual review of Competency Progression (ARCP) Clinical Medicine 2013;13 (6):570-2
6. Bonnema RA, Spencer AL. Remediating residents: Determining when enough is enough. *Academic Internal Medicine Insight* 2012;10(4):6-7.
7. Carr SJ. Assessing clinical competency in medical house officers: how and why should we do it? Postgrad Med J. 2004;80(940):63-6.
8. Carraccio C, Wolfsthal SD, Englander R, Ferentz K, Martin C. Shifting paradigms: From Flexner to competencies. Acad Med. 2002; 77(5):361-367.
9. Cohen GS, Henry NL, Dodd PE. A self-study of clinical evaluation in the McMaster clerkship. *Med Teach* 1990;12:265-272
10. Cohen GS, Blumberg P, Ryan NC, Sullivan PL. Do final grades reflect written qualitative evaluation of student performance? *Teach Learn Med* 1993;5:10-15.
11. David DA, Mazmanian PE, Fordis M, Van Harrison R, Thorpe KE, Perrier L. Accuracy of physician self-assessment compared with observed measures of competence: A systematic review. JAMA. 2006;296(9):1094-102.
12. Downing SM. Threats to the validity of clinical teaching assessments: What about rater error? Med Educ. 2005;39:353–5
13. Dudek NL Marks MB Regehr G. Failure to fail: the perspectives of clinical supervisors. Acad Med 2005 Oct;80(10 Suppl)S84-7
14. Dudek NL, Marks MB, Wood TJ, et al. Quality evaluation reports: Can a faculty development program make a difference? *Med Teach* 2012; 34:e725-e731.
15. Friedlander RB Green V Padmore J Richard K. Legal Issues in Residency Training. (Pps. 8-35). The Life Curriculum Teachers Guide 2
16. Gaglione MM, Moores L, Pangaro L, & Hemmer P. Does group discussion of student clerkship performance at an education committee affect an individual committee member's decisions?  *Acad Med* 2005;80(10):S55-S58.
17. Gifford KA Fall LH Doctor coach: a deliberate practice approach to teaching and learning clinical skills. Acad Med 2014; feb;89(2):272-6
18. Ginsburg S, McIlroy J, Oulanova O, Eva K, Regehr G. Toward authentic clinical evaluation: Pitfalls in the pursuit of competency. Acad Med. 2010;85:780–6.
19. Ginsburg S Eva K Regehr G. Do in-training evaluation reports deserve their bad reputations? A study of the reliability and predictive ability of ITER scores and narrative comments. Acad Med 2013 Oct;88(10):1539-44

46

©2015 Accreditation Council for Graduate Medical Education (ACGME)

*ACGME CCC Guidebook*

20. Ginsburg S McIllroy J Oulanova O Eva K Regehr G. Toward authentic clinical evaluation: pitfalls in the pursue of competency. Acad Med 2010 May;85(5):780-6
21. Greaves JD, Grant J: Watching anesthetists work: Using the professional judgment of consultants to assess the developing clinical competence of trainees. Br J Anaesth. 2000;84:525–33
22. Govaerts MJ, van der Vleuten CP, Schuwirth LW, Muijtiens AM. Broadening perspectives on clinical performance assessment: Rethinking the nature of in-training assessment. Adv Health Sc Educ Theory Pract. 2007;12(2):239-260.
23. Hamdy H, Prasad K, Anderson MB, Scherpbier A, Williams R, Zwierstra R, Cuddihy H. BEME systematic review: Predictive values of measurements obtained in medical schools and future performance in medical practice. Med Teach. 2006;28:103–16
24. Hamby H Prasad K Williams R Salih FA. Reliability and validity of the direct observation clinical encounter validation (DOCEE) Med Ed 2003:37:205-212
25. Hattie J, Timperley H. The power of feedback. Rev Educ Res. 2007;77(1):81-112.
26. Hatala R, Norman GR. In-training evaluation during an internal medicine clerkship. *Acad Med* 1999;74(10):S118-S120.
27. Hauer KE, Mazotti L, O'Brien B, Hemmer PA, Tong L. Faculty verbal evaluations reveal strategies used to promote medical student performance. Med Educ Online. 2011; 10.3402/meo.v16i0.6354. Epub 2011
28. Hemmer PA, Hawkins R, Jackson JL. Assessing how well three evaluation methods detect deficiencies in medical students' professionalism in two settings of an internal medicine clerkship. Acad Med. 2000;75(2):167-73
29. Herbers JE Jr, Noel GL, Cooper GS, Harvey J, Pangaro LN, Weaver MJ. How accurate are faculty evaluations of clinical competence? J Gen Intern Med. 1989;4:202–8
30. Hodges B. Assessment in the post-psychometric ear: Learning to love the subjective and collective , Medical Teacher 2013; Jul 35(7):564-8
31. Holmboe ES: Faculty and the observation of trainees' clinical skills: Problems and opportunities. Acad Med. 2004;79:16–22
32. Holmboe ES, Hawkins RE. Methods for revaluating the clinical competence of residents in internal medicine: a review. Ann Intern Med. 1998;129(1):42-8.
33. Holmboe ES, Sherbino J, Long DM, Swing SR, Frank JR. The role of assessing in competency-based medical education. Med Teach. 2010;32:676-682.
34. Holmboe ES, Ward DS, Reznick RK, Katsufrakis PJ, Leslie KM, Patel VL, Ray DD, Nelson EA. Faculty Development in Assessment: Noel GL, The missing link in competency-based medical education. Acad Med. 2011;86(4):460-467.
35. Herbert JE Jr, Caplow MP, Cooper GS, Pangaro LN, Harvey J. How well do internal medicine faculty members evaluate the clinical skills of residents? Ann Intern Med. 1992;117:757–65.
36. Iobst WF Caverzagie KJ Milestones and Competency Based Medical Education AGA Institute hkttp://dx.doi.org/10.1053.j.gastro.2013.09.029
37. Issenberg SB, McGaghie WC, Waugh RA. Computers and evaluation of clinical competence. Ann Intern Med. 1999;130(3):244-5.

©2015 Accreditation Council for Graduate Medical Education (ACGME)    (1/2015)    GWU 002981

*ACGME CCC Guidebook*

38. Ketteler ER Auyang ED Beard KE McBride EL McKee R Russell JC Szoka NL Nelson MT Competency Champions in the clinical competency committee: a successful strategy to implement milestone evaluations and competency coaching. J Surg Educ. 2014 Jan-Feb;71(1):36-8

39. Kogan JR, Holmboe ES, Hauer KE. Tools for direct observation and assessment of clinical skills of medical trainees: A systematic review. JAMA. 2009;302:1316–26..

40. Langsley DG. Medical competence and performance assessment. A new era. JAMA. 1991;266(7):977-80.

41. Lavin B, Pangaro L. Internship ratings as a validity outcome measure for an evaluation system to identify inadequate clerkship performance. Acad Med 1998;73(9):998-1002.

42. Littlefield JH, DaRosa DA, Anderson KD, Bell RM, Nicholas GG, Wolfson PJ. Accuracy of surgery clerkship performance raters. *Acad Med* 1991;66:S16-S18.

43. Lurie SJ, Mooney CJ, Lyness JM. Measurement of the general competencies of the accreditation council for graduate medical education: A systematic review. Acad Med. 2009;84:301–9.

44. Miller A, Archer J. Impact of workplace based assessment on doctors' education and performance: a systematic review. BMJ. 2010; 341:c5064.

45. Miller A, Archer J. Impact of workplace based assessment on doctors' education and performance: a systematic review. *BMJ* 2010;341:c5064

46. Nasca TJ, Philibert I, Brigham T, Flynn TC. The Next Accreditation System – Rationale and Benefits. N Engl J Med. 2012;366(11):1051-1056.

47. Pangaro L. A new vocabulary and other innovations for improving descriptive in-training evaluations. Acad Med.1999;74(11):1203-7.

48. Regehr G, Ginsburg S, Herold J, Hatala R, Eva K, Oulanova O. Using "standardized narratives" to explore new ways to represent faculty opinions of resident performance. Acad Med. 2012;87(4):419-27.

49. Sanfey H Ketchum J Bartlett J Markwell S Meier A Williams R Dunnington G Verification of proficiency in basic skills for postgraduate year 1 residents. Surgery 2010;148:759-67

50. Scavone BM, Sproviero MT, McCarthy RJ, Wong CA, Sullivan JT, Siddall VJ, Wade LD. Development of an objective scoring system for measurement of resident performance on the human patient simulator. Anesthesiology. 2006;105:260–6.

51. Schwind CJ, Williams RG, Boehler ML, Dunnington GL. Do individual attending post-rotation performance ratings detect resident clinical performance deficiencies? *Acad Med* 2004;79:453-457.

52. Stillman PL, Swanson DB, Smee S, Stillman AE, Ebert TH, Emmel VS, Caslowitz J, Greene HL, Hamolsky M, Hatem C, Levenson DJ, Levin R, Levinson G, Ley B, Morgan GJ, Parrino T, Robinson S, Willms J. Assessing clinical skills of residents with standardized patients. Ann Intern Med. 1986;105:762–71.

53. Swing SR, Clyman SG, Holmboe ES, Williams RG. Advancing Resident Assessment in Graduate Medical Education. J Grad Med Educ. 2009;1(2):278-86.

©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002982

*ACGME CCC Guidebook*

54. Swing SR; International CBME Collaborators. Perspectives on competency-based medical education from the learning sciences. Med Teach. 2010;32(8):663-8.

55. Tesser A, Rosen S. The reluctance to transmit bad news. In: Berkowitz L (ed). *Advances in Experiential Social Psychology*, vol. 8. New York: Academic Press, 1975. P. 193-232.

56. Tonesk X, Buchanan RG. An AAMC pilot study by 10 medical schools of clinical evaluation of students. *J Med Educ* 1987;62:707-718.

57. Wilkinson JR, Crossley JG, Wragg A, Mills P, Cowan G, Wade W. Implementing workplace-based assessment across the medical specialties in the United Kingdom. Med Educ. 2008;42(4):364-73.

58. Williams RG, Klamen DA, McGaghie WC. Cognitive, social and environmental sources of bias in clinical performance ratings  Teaching and Learning in  Med. 2003;15(4):270-292.

59. Williams RG, Sanfey H, Chen X, Dunnington GL. A controlled study to determine measurement conditions necessary for a reliable and valid operative performance assessment. Annals of Surg. 2012;256(1):177-187

60. Williams RG, Verhulst SJ, Colliver JA, Dunnington GL. Assuring the reliability of resident performance appraisals: More items or more observations? *Surgery* 2005;137:141-147.

61. Williams RG, Dunnington GL, Klamen DL. Forecasting resident performance – Partly cloudy. *Acad Med* 2005;80(5):415-422.

62. Williams RG, Klamen DA, McGaghie WC. Cognitive, social and environmental sources of bias in clinical performance ratings. *Learn Med* 2003;15(4):270-292.

63. Williams RG, Sanfey H, Chen X, Dunnington GL. A controlled study to determine measurement conditions necessary for a reliable and collaborative formative assessment. *Annals of Surgery* 2012:177-187

64. Williams RG, Schwind CJ, Dunnington GL, Fortune J, Rogers DA, Boehler ML. The effects of group dynamics on resident progress committee deliberations. *Teach Learn Med* 2005;17:96-100.

©2015 Accreditation Council for Graduate Medical Education (ACGME)

(1/2015)
**GWU 002983**

*ACGME CCC Guidebook*

*Appendix E: Case Studies*

*Mini case studies/FAQs/common dilemmas/challenging situations/promising practices*

1. **Program director, "Dr. C," is an accomplished clinician and well regarded educator. Dr. C recruits several faculty members to the newly-constituted CCC, but decides to chair the committee to ensure everything occurs correctly and meets ACGME expectations.**

Program directors and programs should think carefully about the role of the program director in the CCC. The American Board of Anesthesiology precludes the program director from serving as chair. The other Boards and the ACGME are silent on this issue. Even if there are no rules, it is worthwhile to think through the role of the program director on the committee. The intent of the CCC is to ensure all faculty members feel comfortable discussing each resident's/fellow's performance. If the program director is the chair, how comfortable and motivated are the faculty members expressing their own opinions, versus deferring to the program director who may "know" many more details about the residents/fellows. Do the faculty members essentially rubber-stamp the program director's view? Or can they provide independent and important judgments necessary to create a valid consensus, maximizing the strengths of the process, which depend on several, independent, thoughtful faculty members weighing in?

As with any group process, the program should think strategically about how to create an atmosphere in the CCC in which all participants feel they can and should speak candidly and that their opinions will be valued. This committee should be one of the most important committees in a department, and should be known as a place where faculty members can speak freely and honestly regarding learner performance in a setting that is supportive, confidential, and structured. Think intentionally about ways to reduce a hierarchy, perhaps having more junior faculty members speak first. A faculty chair other than the program director may help facilitate this process.

In situations where the program director needs to chair the committee, consider having him/her speak last, after all committee members have provided meaningful input based on their own observations and experiences. The program director can be a participant or an observer or not present at all, although many programs will find it beneficial for the program director to be present to at least observe and hear the conversations regarding resident/fellow performance.

2. **The residency program has 90 residents in a three-year program. The CCC has its first meeting and can't imagine faculty members having sufficient time to meaningfully review all 90 residents in a practical manner.**

There are several options for CCC structure, and since structure is not dictated by the ACGME, this is an area for programs to be flexible and innovative.

50

*ACGME CCC Guidebook*

- Some CCCs accomplish this by meeting more frequently—perhaps three separate meetings at which 30 residents each are considered.
- Large programs may have separate CCCs for each PGY cohort (i.e., one for the first-years, one for the PGY-2s, and one for the PGY-3s). Programs using this model may have the individual CCCs follow their cohort across all years of the program, or develop expertise in the particular curriculum year.
- Some programs may organize their CCCs around specific activities (e.g., one CCC to assess the QI activities, one for the research activities, one for ambulatory versus inpatient activities, etc.).
- Some CCCs have organized similarly to an Institutional Review Board (IRB), where one or two members will review a resident's/fellow's performance in detail prior to the meeting and present their assessments and recommendations to the committee at the meeting, soliciting feedback from the group.

Programs will gain efficiency by having the CCC think through its expectations of performance and identify what program assessments best speak to these. When gaps in assessment tools are identified, it can help the program address them. CCC members will benefit from faculty development on the Milestones, and on how best to assess resident/fellow performance. Whatever methods are chosen, the program coordinator plays a critical role in organizing and providing the right information to the CCC and its members.

3. **The program wants to "democratize" the CCC to reflect resident input by inviting its chief resident to attend.**

Some chiefs are still considered residents, while other chiefs are considered faculty members. The ACGME precludes a ***resident*** (whether or not a chief) from being on the committee. The rationale is that residents are colleagues of their fellow residents, and it can be challenging to have them in a situation in which they engage in high-stakes performance evaluation of these colleagues. The ACGME allows a chief who has completed a core residency and is eligible for board certification in his/her specialty to be a CCC member.

Though technically possible to have a faculty-level chief resident as part of the CCC, the same concern may lead the program to not include such a resident— they are often just a year away from being a resident themselves and know the residents very well, and it may be too challenging to engage in the required tasks of the CCC. On the other hand, input from all residents on their peers is desirable and may be an important source of data for CCCs, particularly in resident Professionalism and Communication and Interpersonal Skills milestones. The program can accomplish this by having regular resident peer feedback as part of its multi-source/multi-rater evaluation process. Likewise, residents can have a forum to discuss peer performance and/or send concerns or accolades to the CCC for review and inclusion in the faculty process.

4. **The CCC wants to thoroughly document its process and keep extensive minutes.**

51

*ACGME CCC Guidebook*

At a minimum, the program director will record the CCC consensus and report resident/fellow performance on the Milestones to the ACGME. How much of the discussion that informs the Milestones decision is up to the individual program. Specific, behavioral feedback that would help a resident/fellow improve can be conveyed as with any program evaluation. This information can be shared with the resident/fellow as part of his/her twice-yearly evaluation meeting with the program director, an assigned CCC member, or his/her advisor. The assessment data used by the CCC to develop its consensus should already be available to the resident/fellow for review. A written document reflecting the discussion of each resident's/fellow's performance should be:

1. A concise summary of each resident's/fellow's performance and any action or follow-up items
2. Confidential
3. Archived for several years*

*The program should consult with its Human Resources and Legal experts to understand what should be retained, where it should be archived, and for how long.

5. **The CCC and the program director disagree on the Milestone performance of a particular resident/fellow.**

The ACGME Common Program Requirements expect the CCC to provide input, but the program director to make the final decision on resident/fellow performance against the specialty-specific Milestones.

6. **The CCC wants its faculty members to be more comfortable and candid in their deliberations, and decides not to share its decision on resident/fellow performance on the Milestones with the residents themselves.**

Residents/fellows should be informed and aware of the Milestones performance summary the program director is submitting to the ACGME. Currently, the ACGME requires programs to have the resident/fellow sign a copy of what is submitted, and to keep that in the resident's/fellow's performance file. It is expected that programs will use this as an opportunity to provide feedback to residents/fellows on their performance, and to discuss what is needed to get them to the next level.

7. **A resident doesn't agree with the CCC, and asks it to change its assessment.**

**See text on appeals, p. 22
The ACGME expects the program to have a written description of its CCC and its process. This example is an important item that should be included in the description so that residents/fellows and the faculty are clear on what a resident/fellow should do if he/she disagrees with the CCC or the program assessment. Program policies and procedures should differentiate the situations

©2015 Accreditation Council for Graduate Medical Education (ACGME)
(1/2015)
**GWU 002986**

*ACGME CCC Guidebook*

in which a resident/fellow can exercise due process and grievance procedures. Some would separate an evaluation, such as the CCC consensus, from a program decision. For instance, a resident/fellow may not be able to have the CCC decision reviewed, but should be able to appeal any program decision regarding non-promotion, non-renewal, or dismissal that arose from a CCC decision.

©2015 Accreditation Council for Graduate Medical Education (ACGME)
GWU 002987

# EXHIBIT C

**GEORGE WASHINGTON UNIVERSITY**
**DEPARTMENT OF PSYCHIATRY**
**SEMI_ANNUAL MILESTONES-BASED RESIDENT EVALUATION**

RESIDENT   Stephanie Waggel       PGY ① 11   111   IV

DATE OF REVIEW   1/16/15       PERIOD COVERED   Jul - Oct 2014

| O | O | O | O | O |
|---|---|---|---|---|
| **Level 1** | **Level 2** | **Level 3** | **Level 4** | **Level 5** |
| Expected of incoming resident | Advancing; not yet at mid-residency level | Demonstrates majority of competencies; mid-level | Substantially demonstrates expected competencies; *Target for Graduation* | Beyond performance targets for residency |

1. **PATIENT CARE 1**. Psychiatric evaluation. A.general interview skills; B.collateral information gathering and use, safety assessment, use of clinician's emotional response.

        Level 1       Level 2       Level 3       Level 4       Level 5
    O---------Ø--------O--------O--------O--------O--------O--------O--------O

2. **PATIENT CARE 2.**  Psychiatric formation and differential diagnosis. A.organizes and summarizes findings and generates differential diagnosis; B. identifies contributing factors and contextual features and creates a formulation.

        Level 1       Level 2       Level 3       Level 4       Level 5
    O---------Ø--------O--------O--------O--------O--------O--------O--------O

3. **PATIENT CARE 3**. Treatment planning and management: A.creates treatment plan; B. manages patient crises, recognizing need for supervision when indicated, C. monitors and revises treatment when indicated.

        Level 1       Level 2       Level 3       Level 4       Level 5
    O---------Ø--------O--------O--------O--------O--------O--------O--------O

4. **PATIENT CARE 4**.  Psychotherapy: the practice and delivery of psychotherapies and integrating psychotherapy with psychopharmacology.  A. empathy and process; B. boundaries; C. alliance; D. seeking and providing psychotherapy supervision.

        Level 1       Level 2       Level 3       Level 4       Level 5
    O---------Ø--------O--------O--------O--------O--------O--------O--------O

GWU 001085

5. **PATIENT CARE 5**. Somatic therapies. A. using psychopharmacologic agents in treatment; B. education of patient about medications; C. monitoring of patient response to medications and adjusting accordingly; D. other somatic treatments.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O-------O-------O-------O-------O-------O-------O-------O-------O-------O | | | | |

6. **MEDICAL KNOWLEDGE 1**. Development through the life cycle. A. knowledge of human development; B. knowledge of pathological and environmental influences on development; C. incorporation of developmental concepts in understanding.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O-------O-------O-------O-------O-------O-------O-------O-------O-------O-------O | | | | |

7. **MEDICAL KNOWLEDGE 2**. Psychopathology, including diagnostic criteria, epidemiology, pathophysiology, course of illness, co-morbidities and differential diagnosis. A. knowledge to identify and treat psychiatric conditions; B. knowledge to assess risk and determine level of care; C. knowledge at the interface of psychiatry and the rest of medicine.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O-------O-------O-------O-------O-------O-------O-------O-------O-------O-------O | | | | |

8. **MEDICAL KNOWLEDGE 3**. Clinical neuroscience. A. neurodiagnostic testing; B. neuropsychological testing; C. neuropsychiatric co-morbidity; D. neuroscience; E. applied neuroscience

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O-------O-------O-------O-------O-------O-------O-------O-------O-------O-------O | | | | |

9. **MEDICAL KNOWLEDGE 4**. Psychotherapy, including psychodynamic, cognitive-behavioral and supportive psychotherapies; couples, family and group therapies; and integrating psychotherapy and psychopharmacology. A. knowledge of theories; B. knowledge of practice; C. knowledge of evidence base.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O-------O-------O-------O-------O-------O-------O-------O-------O-------O-------O | | | | |

GWU 001086

10. **MEDICAL KNOWLEDGE 5**. Somatic therapies. A. knowledge of indications, metabolism and mechanism of action for medications; B. knowledge of ECT and other emerging somatic treatments; C. knowledge of lab studies and measures in monitoring treatment.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

11. **MEDICAL KNOWLEDGE 6**. Practice of psychiatry: A. ethics; B. regulatory compliance; C. professional development and frameworks.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

12. **SYSTEMS-BASED PRACTICE 1**. Patient safety and the health care team: A. medical errors and improvement activities; B. communication and patient safety; C. regulatory and educational activities related to patient safety.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

13. **SYSTEMS-BASED PRACTICE 2**. Resource management: A. costs of care and resource management.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

14. **SYSTEMS-BASED PRACTICE 3**. Community-based care: A. community-based programs; B. self-help groups; C. prevention; D. recovery and rehabilitation.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

15. **SYSTEMS-BASED PRACTICE 4**. Consultation to non-psychiatric medical providers and non-medical systems: A. distinguishes care provider roles related to consultation; B. provides care as a consultant and collaborator; C. specific consultative activities.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001087

16. **PROBLEM-BASED LEARNING 1**. Development and execution of lifelong learning through self-evaluation and critical evaluation of research and clinical evidence. A. self-assessment and self-improvement; B. evidence in clinical workflow.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

17. **PROBLEM-BASED LEARNING 2**.  Formal practice-based quality improvement based on established and accepted methodologies: A. specific QI project; B. quality improvement didactic knowledge.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

18. **PROBLEM-BASED LEARNING 3**. Teaching: A. development as teacher; B. observable teaching skills

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

19. **PROFESSIONALISM 1**. Compassion, integrity, respect for others, sensitivity to diverse patient populations, adherence to ethical principles

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

20. **PROFESSIONALISM 2**. Accountability to self, patients, colleagues, and the profession. A. Fatigue management and work balance; B. professional behavior and participation in professional community; C. ownership of patient care.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

21. **INTERPERSONAL AND COMMUNICATION SKILLS 1**.  Relationship development and conflict management with patients, families, colleagues, and members of the health care team.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001088

22. **INTERPERSONAL AND COMMUNICATION SKILLS 2**. Information sharing and record keeping. A: effective communication with health care team; B. effective communication with patients; C. maintaining professional boundaries in communication

Level 1          Level 2          Level 3          Level 4          Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

Reviewer additional comments:

_____
_____
_____
_____
_____

Resident additional comments:

_____
_____
_____
_____
_____
_____

Reviewer signature: _____   Name: ___CATARANO___

Resident signature: _____/Date: __1/13/15__

GWU 001089

# EXHIBIT D

From: **Lisa Catapano** <lcatapano@mfa.gwu.edu>
Date: Mon, May 4, 2015 at 1:26 PM
Subject: RE: Stephanie Waggel
To: "Elizabeth L. Greene" <elizabethlgreene@gmail.com>, Eindra Khin Khin <khinkhin@gwmail.gwu.edu>
Cc: "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>


Many things to say about this issue, and I know I'm not caught up.  But one observation is that it seems we all allowed ourselves to get caught up in her wanting to keep this issue secret.  In this case it's particularly inappropriate because she then told everybody individually.  But as a more general issue, the four of us need to communicate with each other, and there are few issues that are appropriate to withhold from our small team, and certainly a major medical issue that is likely to lead to medical leave is not one of them.  It might not have played out differently on Friday, but either way, we should have been talking more with each other about this.



Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886



**From:** Elizabeth L. Greene [mailto:elizabethlgreene@gmail.com]
**Sent:** Friday, May 01, 2015 9:50 PM
**To:** Lisa Catapano; Eindra Khin Khin
**Subject:** Fwd: Stephanie Waggel



I just spoke to Chad, and he told me that you two would handle this.  Do you need me to do anything?

GWU 003439

Stephanie did mention her condition to me when I met with the interns a few weeks ago, but it didn't seem that she wanted me to mention it to the administration since she hadn't even received a diagnosis yet (she was going for a CT scan or MRI the next day).  It then completely slipped my mind, so I didn't follow up with her.  Were you aware of this?  I'm sorry if you didn't know.  I should have asked her explicitly if I could let you both know.  Please let me know if there's anything I can help with.


Elizabeth

Sent from my iPad


Begin forwarded message:

> **From:** Chad Henson <chenson@mfa.gwu.edu>
> **Date:** May 1, 2015 at 8:17:44 PM EDT
> **To:** "elizabethlgreene@gmail.com" <elizabethlgreene@gmail.com>
> **Subject: Fw: Stephanie Waggel**
>
> Dr. Catapano said to ask you. Can you call me?

---

**From:** Chad Henson
**Sent:** Friday, May 1, 2015 8:15:34 PM
**To:** Lisa Catapano
**Subject:** Re: Stephanie Waggel


Hi Dr. Catapano,

I am sorry to bother you on a Friday night but I wanted to give you an update and seek guidance regarding one of your residents, Stephanie Waggel. I believe you are aware that she is currently being evaluated for a renal mass, requiring a number of appointments as well as procedures. She also is in a great deal of pain requiring narcotic medications.

It recently came to my attention that she was unable to admit a patient while on call citing that she was in too much pain, and I am concerned that she is reaching her physical limits.

I have discussed with her attending, Dr. Teufel, who reports that she has not had any near misses, but I am concerned with the concomitant burden of being an inpatient wards intern while dealing with this medical concern. Dr. Teufel and I think it might be prudent to have her take a few days off of work to have a medical evaluation for fitness for duty (which we can cover).

Ultimately my main concern is her physical and mental health and want to make sure that she feels supported from both programs.

GWU 003440

Please contact me at your earliest convenience so that we can discuss further.

Chad Henson
3305183312

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

GWU 003441

# EXHIBIT E

 **Gmail**

**Stephanie Waggel <sewaggel@gmail.com>**

## July 1-8
4 messages

**sewaggel@gmail.com** <sewaggel@gmail.com>                                    Tue, Jun 16, 2015 at 5:34 PM
To: "2014gwemchiefs@gmail.com" <2014gwemchiefs@gmail.com>
Cc: Jason Emejuru <jemejuru@gwu.edu>, Lisa Catapano <lcatapano@mfa.gwu.edu>

Hello Emed Chiefs!

I am getting a nephrectomy the second week of July and I was wondering if I can finish the one week of emed I have left during the first week in July before my surgery. I am on the rotation right now but I'm not sure what the schedule is like in July. Thank you for your time.

Stephanie

---

**Lisa Catapano** <lcatapano@mfa.gwu.edu>                                    Wed, Jun 17, 2015 at 10:04 AM
To: "sewaggel@gmail.com" <sewaggel@gmail.com>, "2014gwemchiefs@gmail.com" <2014gwemchiefs@gmail.com>
Cc: Jason Emejuru <jemejuru@gwu.edu>

Emed chiefs - you may disregard the email below.

Stephanie,
Please contact Jason, our Chief, to work out your schedule.  We will need to make arrangements for your medical leave first, and then determine the rest of your schedule.
Please call him today so we can started with the planning.

Thank you.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

-----Original Message-----
From: sewaggel@gmail.com [mailto:sewaggel@gmail.com]
Sent: Tuesday, June 16, 2015 5:35 PM
To: 2014gwemchiefs@gmail.com
Cc: Jason Emejuru; Lisa Catapano
Subject: July 1-8

Hello Emed Chiefs!

I am getting a nephrectomy the second week of July and I was wondering if I can finish the one week of emed I have left during the first week in July before my surgery. I am on the rotation right now but I'm not sure what the schedule is like in July. Thank you for your time.

Stephanie

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain

information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

---

**Jason** <jemejuru@gmail.com>                                            Wed, Jun 17, 2015 at 10:14 AM
To: Lisa Catapano <lcatapano@mfa.gwu.edu>
Cc: "sewaggel@gmail.com" <sewaggel@gmail.com>, Lori Kels <lkels@mfa.gwu.edu>

Hi Dr. C,

Apologies for the confusion. Stephanie and I discussed her plans over the phone on Monday evening. She told me she would like to plan to take medical leave in mid-July and would like to complete the remainder of her EM rotation the first week of July and then complete her IM rotation that first week in August.

I was going to mention this during next weeks admin meeting, but now realize I should have email you about this before.

Let me know what you think,

Jason

Jason Emejuru, MD
Department of Psychiatry & Behavioral Sciences
George Washington University
2120 L street NW suite 600
Washington DC 20037
202-630-4273
jemejuru@gwu.edu


Jason Emejuru, MD
Department of Psychiatry & Behavioral Sciences
George Washington University

> On Jun 17, 2015, at 10:04 AM, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:
>
> Emed chiefs - you may disregard the email below.
>
> Stephanie,
> Please contact Jason, our Chief, to work out your schedule.  We will need to make arrangements for your medical leave first, and then determine the rest of your schedule.
> Please call him today so we can started with the planning.
>
> Thank you.
>
> Lisa Catapano, MD, PhD
> Director, Residency Training Program
> Associate Professor of Psychiatry
> Department of Psychiatry
> George Washington University
> 2120 L Street NW
> Washington DC 20037
> (202) 741-2886
>
> -----Original Message-----
> From: sewaggel@gmail.com [mailto:sewaggel@gmail.com]
> Sent: Tuesday, June 16, 2015 5:35 PM
> To: 2014gwemchiefs@gmail.com
> Cc: Jason Emejuru; Lisa Catapano
> Subject: July 1-8
>
> Hello Emed Chiefs!
>
> I am getting a nephrectomy the second week of July and I was wondering if I can finish the one week of emed I have

left during the first week in July before my surgery. I am on the rotation right now but I'm not sure what the schedule is like in July. Thank you for your time.
>
> Stephanie
>
>
>
>
> Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

---

**GW EM Chiefs 2014** <2014gwemchiefs@gmail.com>                          Wed, Jun 17, 2015 at 11:01 AM
To: "sewaggel@gmail.com" <sewaggel@gmail.com>
Cc: Jason Emejuru <jemejuru@gwu.edu>, Lisa Catapano <lcatapano@mfa.gwu.edu>

Thanks all.
Stephanie- your rotation with us ends on 6/30. Let us know if you have any questions about the schedule during that time.
PKL

On Tuesday, June 16, 2015, <sewaggel@gmail.com> wrote:
  Hello Emed Chiefs!

  I am getting a nephrectomy the second week of July and I was wondering if I can finish the one week of emed I have left during the first week in July before my surgery. I am on the rotation right now but I'm not sure what the schedule is like in July. Thank you for your time.

  Stephanie

--
Paige Armstrong, Katie Byrd, and Liz Phillips
GW Emergency Medicine Chiefs 2014

# EXHIBIT F



PSYCHIATRY & BEHAVIORAL SCIENCES
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900 fax: 202.741.2891
www.gwupsychiatry.org

July 15, 2015

Dear Dr. Waggel,

Based on the recommendation of the Clinical Competency Committee, I am sending you this Letter of Deficiency to address your unprofessional behavior on June 10, 2015.

Specifically, you were schedule to work an Emergency Medicine shift on June 10 starting at 7:00 am. Despite being aware of your shift assignment, you did not come to work at 7:00 am, and for approximately two hours, members of the ED attempted to reach you by phone. You did not answer your phone or return their calls. You had not alerted anyone in the ED (nor anyone in the Department of Psychiatry) that you were not planning to come to work that day. When you were finally reached by phone, you stated you were not feeling well and decided not to come to work as a result. You did not follow any reasonable procedure to alert the ED and make arrangements to cover your absence. In the end, you agreed to, and did, come into work for the rest of your shift that day.

This event demonstrates deficiencies in (1) Professionalism, and (2) Systems-Based Practice.

(1) Professionalism: Not arriving at the time you are expected to report to work, not alerting the ER chiefs or attendings to your tardiness or absence, and not taking responsibility for this lapse, for example, by acknowledging the inconvenience you caused in the ED that morning, are examples of poor professional behavior.

(2) Systems-Based Care: Not taking the proper steps to alert others of your tardiness or absence indicates a lack of understanding about how the ED operates, and its dependence on your reliability and promptness.

You are expected to exhibit professional behavior, which includes, at minimum, reporting for duty when scheduled, and taking appropriate measures to alert co-workers (and your program director) and make arrangements for coverage if it is absolutely necessary to be tardy or absent. You are also expected to work in complex systems of care and to communicate effectively with co-workers.

To address the deficiencies outlined above, you will participate in the following Improvement Plan with Dr. Allen Dyer, Vice-Chair for Education in the Department of Psychiatry: within two weeks of receiving this letter (excluding time off for medical leave), you must set up a meeting with Dr. Dyer to discuss strategies to prevent future lapses in professionalism. You must provide Dr. Dyer with the

773

contact information for your supervising physician for each rotation such that he may obtain attendance reports to report to the CCC.

Regarding your overall performance during the course of the year, the CCC recognizes your obvious dedication to your work and significant capacity to form positive and productive relationships with co-workers. However, your difficulty managing your responsibilities and appropriately handling your absences ultimately impede your ability to deliver proper care to your patients and work within our system of care. Given your work ethic and dedication to patient case, we expect that with attention to these concerns you will successfully be able to remediate these deficiencies and progress in our training program. The CCC will reassess your progress at regularly scheduled meetings and a determination as to when you will resume your prior status without an active Improvement Plan will be communicated to you at your next Semi-Annual Meeting with the Program Director. Should you continue to exhibit deficiencies, the Program reserves the right to seek further action, including termination from training as set forth in the GW Academic Improvement Policy (attached).


_____ MD

Dr. Lisa Catapano

Residency Training Director

# EXHIBIT G

## Victoria H. Anderson

| | |
|---|---|
| _rom: | Victoria H. Anderson |
| ~ent: | Monday, July 20, 2015 9:07 AM |
| To: | Lori Kels; Lisa Catapano; Darlinda Minor; Jason Emejuru |
| Subject: | FW: 7/2/15 Didactics - 2pm session with Dr. Collins |

This email was sent from Stephanie Waggel to myself and Jason. We can talk about this during our meeting today, however, I'd like to also mention that she texted Jason that I was "really mean" to her on the first day of didactics. This goes hand-in-hand with the fact that she doesn't understand that the point of Jason's email was not because she had this doctor's appointment, it was that she didn't alert Dr. Collins.

**Tory Anderson**
Residency Coordinator
Department of Psychiatry
George Washington University
2120 L Street, NW Suite 600
Washington, DC 20037
Office: (202) 741-2893
Fax: (202) 741-2891

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Saturday, July 18, 2015 4:49 PM
**To:** Jason Emejuru
**Subject:** Re: 7/2/15 Didactics - 2pm session with Dr. Collins

…was actually very upset that I was given such a hard time about going to this appointment. One should be …nderstanding I'm having major surgery and likely I have cancer. I had to fill out my Living Will and get a power of attorney. I also had to meet with the anesthesiologist at very short notice. This time was the only time available to do this and I explained that. It's not as if I chose for this to happen to me. I will feel a huge lack of support.

On Jul 13, 2015, at 2:08 PM, Jason Emejuru <jemejuru@gmail.com> wrote:

Hi Stephanie,

I was informed by Tory that you were absent during the 2pm session of Didactics last Thursday due to a Doctors appointment. I'm sure this was a pretty important appointment with your surgery coming up and it may have been difficult to schedule it at another time.
However, Dr. Collins informed us that she was surprised to not see you there after you responded to her email informing her you would be there. If things change suddenly, she would appreciate you emailing her to let her know about it.

**Also, just for future reference, be aware that residents **are not** allowed to schedule any personal appointments or therapy patients during **8am-5pm** on Thursdays during didactics. This is a rule for all PGY-II-IV residents. You can use one of your vacation or administration days (i.e for conference presentations, etc).**

Let me know if you have any questions and hope you are well,

GWU 001559

Jason

--
Jason Emejuru, MD
Department of Psychiatry & Behavioral Sciences
George Washington University

GWU 001560

# EXHIBIT H

THE GEORGE WASHINGTON UNIVERSITY WASHINGTON, DC

Stephanie Waggel <swaggel@gwmail.gwu.edu>

# sick policy

11 messages

**Stephanie Waggel** <swaggel@gwmail.gwu.edu> Mon, Jul 27, 2015 at 1:01 PM
To: residentservices@acgme.org

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,
Stephanie

--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

**Resident Services** <residentservices@acgme.org> Mon, Jul 27, 2015 at 1:19 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,

Stephanie

--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                    Mon, Jul 27, 2015 at 1:41 PM
To: Resident Services <residentservices@acgme.org>

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,

Stephanie

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Resident Services** <residentservices@acgme.org>                        Mon, Jul 27, 2015 at 2:06 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Dear Stephanie,


This is a real concern and one that needs to be addressed at a program/institutional level <u>and</u> at a national level.  The
culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture
and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how
the organization can best address physician well-being.


The ACGME is hosting an invitational symposium on physician well-being in the fall this year.  Your story in absolutely
in line with topics that are up for discussion.  I know that the invitation list is larger than expected, so I am doubtful
that we could include you at this late date.  I report directly to the ACGME's Chief of Staff and Senior VP or Education,
Tim Brigham.  I am meeting with him tomorrow and can bring his attention to your email.  I will do what I can to
ensure this topic is brought into the symposium.  If there is an opportunity for further dialogue with you, I will
certainly let you know.



Thanks,

Amy


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy


Dear Ms. Beane,


Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor.
However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to
go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am
wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting
this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The
type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to

waiting until after intem year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,

Stephanie

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                    Mon, Jul 27, 2015 at 2:15 PM
To: Resident Services <residentservices@acgme.org>

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.

On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

This is a real concern and one that needs to be addressed at a program/institutional level <u>and</u> at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.

The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story is absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. I report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

> Dear Stephanie,
>
> I am so sorry to hear about your diagnosis.
>
> The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?
>
> My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).
>
> I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

The George Washington University Mail - sick policy

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy


Dear Resident Services,


I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.


Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital



--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital


---

**Resident Services** <residentservices@acgme.org>                                    Mon, Jul 27, 2015 at 2:29 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Stephanie,

We are holding the symposium in order to determine what steps need to be taken. There will likely be a lot more information published on our website after the symposium this fall. Small working groups will be formed to synthesize the findings from the symposium and the ACGME's Board will use this information to determine actionable steps.

I will alert Dr. Brigham to your concerns. As I said, I am not sure we can include any more participants in the symposium, but I will ask the best way to pass along your ideas.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 1:16 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.

On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

This is a real concern and one that needs to be addressed at a program/institutional level and at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.

The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story in absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. I report directly to the ACGME's Chief of Staff and Senior VP of Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

> Dear Stephanie,
>
> I am so sorry to hear about your diagnosis.
>
> The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?
>
> My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).
>
> I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy


Dear Resident Services,


I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.


Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                    Mon, Jul 27, 2015 at 3:46 PM
To: briana.wessell@gmail.com

———— Forwarded message ————
From: **Resident Services** <residentservices@acgme.org>
Date: Mon, Jul 27, 2015 at 2:06 PM
Subject: RE: sick policy
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>


Dear Stephanie,


This is a real concern and one that needs to be addressed at a program/institutional level <u>and</u> at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.


The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story in absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. I report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.


Thanks,

Amy


From: Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
Sent: Monday, July 27, 2015 12:41 PM
To: Resident Services <residentservices@acgme.org>
Subject: Re: sick policy


Dear Ms. Beane,


Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.


Stephanie


On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Resident Services** <residentservices@acgme.org>                    Fri, Jul 31, 2015 at 2:34 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Dear Stephanie,


I spoke with Dr. Brigham this morning and shared your email with him. He agrees that you bring up such an
important topic and was very distressed to read your story.


I suggested that perhaps you could write something a bit longer about your story and experience. If you were
comfortable with this idea, we could share the story during the Symposium (or before it as part of required pre-
meeting reading materials). We would not name you or your institution (unless you wanted your name shared). Let
me know if this is at all interesting to you. I do think that this is a hugely important piece of physician well-being and
sharing your experience as another way to frame the problem may be very helpful to the work in the Symposium.


Thanks,

Amy Beane


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 1:16 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.


On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,


This is a real concern and one that needs to be addressed at a program/institutional level and at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.


The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story in absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. I report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.


Thanks,

Amy


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy


Dear Ms. Beane,


Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.


Stephanie


On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.

Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                    Mon, Aug 3, 2015 at 12:59 PM
To: Resident Services <residentservices@acgme.org>

That sound like a great idea. I will get back to you. Is there a specific timeline?

On Fri, Jul 31, 2015 at 2:34 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,


I spoke with Dr. Brigham this morning and shared your email with him.  He agrees that you bring up such an important topic and was very distressed to read your story.


I suggested that perhaps you could write something a bit longer about your story and experience.  If you were comfortable with this idea, we could share the story during the Symposium (or before it as part of required pre-meeting reading materials).  We would not name you or your institution (unless you wanted your name shared). Let me know if this is at all interesting to you.  I do think that this is a hugely important piece of physician well-being and sharing your experience as another way to frame the problem may be very helpful to the work in the Symposium.


Thanks,

Amy Beane


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 1:16 PM

**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.

On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

This is a real concern and one that needs to be addressed at a program/institutional level <u>and</u> at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.

The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story in absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. I report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract).  I would advise you to talk with your program director to help you determine the impact of time away on your training.  Each specialty board has requirements about time away and what you may need to make up upon your return.  You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence.  You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice.  I think all of these conversations are important.  Perhaps there is one party who would be willing to help set up a meeting with all parties at one time?  Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health.  Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

Dear Resident Services,

Case 1:16-cv-01412-CKK   Document 35-6   Filed 02/12/18   Page 118 of 210

I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.


Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital


--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Resident Services** <residentservices@acgme.org>                                   Mon, Aug 3, 2015 at 1:24 PM
To: Stephanie Waggel <swaggel@gmail.gwu.edu>

Do you think you could send me something by early September?  I think that would give us ample time to ensure we can include it in the materials or to help Dr. Brigham determine how best to introduce it as an example during the symposium.  Thanks for your willingness to share this!


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, August 03, 2015 12:00 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy


That sound like a great idea. I will get back to you. Is there a specific timeline?

On Fri, Jul 31, 2015 at 2:34 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I spoke with Dr. Brigham this morning and shared your email with him.  He agrees that you bring up such an important topic and was very distressed to read your story.

I suggested that perhaps you could write something a bit longer about your story and experience.  If you were comfortable with this idea, we could share the story during the Symposium (or before it as part of required pre-meeting reading materials).  We would not name you or your institution (unless you wanted your name shared).  Let me know if this is at all interesting to you.  I do think that this is a hugely important piece of physician well-being and sharing your experience as another way to frame the problem may be very helpful to the work in the Symposium.

Thanks,

Amy Beane

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 1:16 PM

**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.

On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

This is a real concern and one that needs to be addressed at a program/institutional level <u>and</u> at a national level.  The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.

The ACGME is hosting an invitational symposium on physician well-being in the fall this year.  Your story in absolutely in line with topics that are up for discussion.  I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date.  I report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham.  I am meeting with him tomorrow and can bring his attention to your email.  I will do what I can to ensure this topic is brought into the symposium.  If there is an opportunity for further dialogue with you, I will certainly let you know.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

> Dear Stephanie,
>
> I am so sorry to hear about your diagnosis.
>
> The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?
>
> My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

Case 1:16-cv-01412-CKK    Document 35-6    Filed 02/12/18    Page 121 of 210

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.


Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy


Dear Resident Services,


I am a PGY2 at the George Washington University. I was recently diagnosed with cancer. I was hoping you could send me any information you have on resident sick leave or resources in place for sick residents. This would be very helpful to me. Thank you for your time.


Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital




--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                                     Mon, Aug 3, 2015 at 6:09 PM
To: Resident Services <residentservices@acgme.org>

Yes, thank you

On Mon, Aug 3, 2015 at 1:24 PM, Resident Services <residentservices@acgme.org> wrote:

> Do you think you could send me something by early September? I think that would give us ample time to ensure
> we can include it in the materials or to help Dr. Brigham determine how best to introduce it as an example during
> the symposium. Thanks for your willingness to share this!
>
>
> **From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
> **Sent:** Monday, August 03, 2015 12:00 PM
>
>
> **To:** Resident Services <residentservices@acgme.org>
> **Subject:** Re: sick policy
>
>
> That sound like a great idea. I will get back to you. Is there a specific timeline?
>
>
> On Fri, Jul 31, 2015 at 2:34 PM, Resident Services <residentservices@acgme.org> wrote:
>
> > Dear Stephanie,
> >
> >
> > I spoke with Dr. Brigham this morning and shared your email with him. He agrees that you bring up such an
> > important topic and was very distressed to read your story.
> >
> >
> > I suggested that perhaps you could write something a bit longer about your story and experience. If you were
> > comfortable with this idea, we could share the story during the Symposium (or before it as part of required pre-
> > meeting reading materials). We would not name you or your institution (unless you wanted your name shared).
> > Let me know if this is at all interesting to you. I do think that this is a hugely important piece of physician well-
> > being and sharing your experience as another way to frame the problem may be very helpful to the work in the
> > Symposium.
> >
> >
> > Thanks,
> >
> > Amy Beane

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 1:16 PM

**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

That would be great. If you could let me know exactly what steps are being taken and get me in contact with Mr. Brigham it would be appreciated.

On Mon, Jul 27, 2015 at 2:06 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

This is a real concern and one that needs to be addressed at a program/institutional level and at a national level. The culture of medicine needs to change, and it will be a difficult road. The ACGME is taking steps to examine this culture and seeking advice from program directors, DIO's, residents, fellows, nurses and experts outside of medicine on how the organization can best address physician well-being.

The ACGME is hosting an invitational symposium on physician well-being in the fall this year. Your story in absolutely in line with topics that are up for discussion. I know that the invitation list is larger than expected, so I am doubtful that we could include you at this late date. It report directly to the ACGME's Chief of Staff and Senior VP or Education, Tim Brigham. I am meeting with him tomorrow and can bring his attention to your email. I will do what I can to ensure this topic is brought into the symposium. If there is an opportunity for further dialogue with you, I will certainly let you know.

Thanks,

Amy

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:41 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** Re: sick policy

Dear Ms. Beane,

Thank you for your fast reply. I was given two weeks off by my program to have the surgery to remove my tumor. However, the workup to discover the cancer took over a year. It was very difficult as an intern to get even an hour off to go to my appointments. I know acgme has rules to protect residents through duty hour policies and such but I am wondering is there anything to protect our health? Is this only a program specific issue? If so how can I go about getting this recognized on a national level? My goal is to make it easier for future residents to have their health cared for. The type of cancer I have does not respond to any treatment but surgery so I can't help but think of how close I came to waiting until after intern year to have it worked up. It is in our nature to put

others first and I want to create an awareness that doctors also get sick and require health care. Would you be able to offer any advice? Thank you again for your time.

Stephanie

On Mon, Jul 27, 2015 at 1:19 PM, Resident Services <residentservices@acgme.org> wrote:

Dear Stephanie,

I am so sorry to hear about your diagnosis.

The ACGME's requirements do not reference sick leave (except to say that it must be referenced in your contract). I would advise you to talk with your program director to help you determine the impact of time away on your training. Each specialty board has requirements about time away and what you may need to make up upon your return. You should also speak with Human Resources at your institution (this is very likely since they will need to advise you of your legal rights for FMLA time or other leaves of absence. You may also want to speak to the designated institutional official (DIO) in your GME office to seek advice. I think all of these conversations are important. Perhaps there is one party who would be willing to help set up a meeting with all parties at one time? Would your program coordinator be able to help with this?

My guess is that you will want to seek assistance from your program director and DIO regarding the educational impact (board requirements, make-up time, what they advise in terms of a leave of absence) and Human Resources regarding your legal rights and what options exist within these rights for time away (this would also include anything that the institution may offer in your contract).

I hope that you get all of the answers that you need and that you find excellent care so that you can have a speedy return in good health. Sending healing thoughts your way.

Best,

Amy Beane

Senior Associate

Office of Resident Services

ACGME

abeane@acgme.org

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Monday, July 27, 2015 12:01 PM
**To:** Resident Services <residentservices@acgme.org>
**Subject:** sick policy

# EXHIBIT I

GWU Adult Psychiatry Residency Training Program
Semi-Annual Review

Resident: _Stephanie Waggel_    DATE: _8/5/15_
PGY _II_

**Milestones evaluation:**
  Milestones above residency level: ✓ Teaching

  Milestones below residency level: lowest PC, Professionalism

**Letters of Commendation or Deficiency:** LOD for tardiness to ER shift in June 2015
  delivered 8/5/15

**Accomplishments:**
  Publications: Review: Neuroticism + dementia/cognitive impairment
                                              J. Int'l Geri Psych

  Posters or other presentations:

  Meetings attended:

  QI projects: planning a project to create pathways for residents
                                      needing medical leave

  Teaching: ++

  Committee work:

  PRITE scores:

  CSVs completed:                              Graduation
                                          date July 14, 2018

**Issues of concern or training goals for the next 6 months:**
      Program ¿ Dr Dyer rc: professionalism
      Career planning: considering rypt +/- private practice

**Resident Comment:**




_Stephanie Waggel_                    _Mlle_
Resident's Signature                  Training Director's Signature/Associate
                                      Training Director Signature

                                              **GWU 001169**

GEORGE WASHINGTON UNIVERSITY
DEPARTMENT OF PSYCHIATRY
MILESTONES-BASED RESIDENT EVALUATION (2015)

RESIDENT _Spencer Wooten_        PGY   1   (II)   III   IV   (Circle one)

PERIOD COVERED _11/14 - 4/15_     DATE REVIEWED _8/5/15_

REVIEWER _Catapane_              RESIDENT INITIALS _SW_

| O | O | O | O | O |
|---|---|---|---|---|
| **Level 1** | **Level 2** | **Level 3** | **Level 4** | **Level 5** |
| Expected of incoming resident | Advancing; not yet at mid-residency level | Demonstrates majority of competencies; Mid-level | Substantially demonstrates expected competencies; *Target for Graduation* | Beyond performance targets for residency; equivalent to early career practitioner |

1. **PATIENT CARE 1.** Psychiatric evaluation. A.general interview skills; B.collateral information gathering and use, safety assessment, use of clinician's emotional response.

Level 1        Level 2        Level 3        Level 4        Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

2. **PATIENT CARE 2.** Psychiatric formation and differential diagnosis. A.organizes and summarizes findings and generates differential diagnosis; B. identifies contributing factors and contextual features and creates a formulation.

Level 1        Level 2        Level 3        Level 4        Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

3. **PATIENT CARE 3.** Treatment planning and management: A.creates treatment plan; B. manages patient crises, recognizing need for supervision when indicated, C. monitors and revises treatment when indicated.

Level 1        Level 2        Level 3        Level 4        Level 5
O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001170

4. PATIENT CARE 4.  Psychotherapy: the practice and delivery of psychotherapies and integrating psychotherapy with psychopharmacology.  A. empathy and process; B. boundaries; C. alliance; D. seeking and providing psychotherapy supervision.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

5. PATIENT CARE 5.  Somatic therapies.  A. using psychopharmacologic agents in treatment; B. education of patient about medications; C. monitoring of patient response to medications and adjusting accordingly; D. other somatic treatments.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

6. MEDICAL KNOWLEDGE 1.  Development through the life cycle.  A. knowledge of human development; B. knowledge of pathological and environmental influences on development; C. incorporation of developmental concepts in understanding.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

7. MEDICAL KNOWLEDGE 2.  Psychopathology, including diagnostic criteria, epidemiology, pathophysiology, course of illness, co-morbidities and differential diagnosis.  A. knowledge to identify and treat psychiatric conditions; B. knowledge to assess risk and determine level of care; C. knowledge at the interface of psychiatry and the rest of medicine.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

8. MEDICAL KNOWLEDGE 3.  Clinical neuroscience.  A. neurodiagnostic testing; B. neuropsychological testing; C. neuropsychiatric co-morbidity; D. neuroscience; E. applied neuroscience

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

9. MEDICAL KNOWLEDGE 4.  Psychotherapy, including psychodynamic, cognitive-behavioral and supportive psychotherapies; couples, family and group therapies; and integrating psychotherapy and psychopharmacology.  A. knowledge of theories; B. knowledge of practice; C. knowledge of evidence base.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001171

10. **MEDICAL KNOWLEDGE 5.** Somatic therapies. A. knowledge of indications, metabolism and mechanism of action for medications; B. knowledge of ECT and other emerging somatic treatments; C. knowledge of lab studies and measures in monitoring treatment.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

11. **MEDICAL KNOWLEDGE 6.** Practice of psychiatry: A. ethics; B. regulatory compliance; C. professional development and frameworks.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

12. **SYSTEMS-BASED PRACTICE 1.** Patient safety and the health care team: A. medical errors and improvement activities; B. communication and patient safety; C. regulatory and educational activities related to patient safety.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

13. **SYSTEMS-BASED PRACTICE 2.** Resource management: A. costs of care and resource management.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

14. **SYSTEMS-BASED PRACTICE 3.** Community-based care: A. community-based programs; B. self-help groups; C. prevention; D. recovery and rehabilitation.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

15. **SYSTEMS-BASED PRACTICE 4.** Consultation to non-psychiatric medical providers and non-medical systems: A. distinguishes care provider roles related to consultation; B. provides care as a consultant and collaborator; C. specific consultative activities.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001172

16. PRACTICE-BASED LEARNING 1. Development and execution of lifelong learning through self-evaluation and critical evaluation of research and clinical evidence. A. self-assessment and self-improvement; B. evidence in clinical workflow.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

17. PRACTICE-BASED LEARNING 2. Formal practice-based quality improvement based on established and accepted methodologies: A. specific QI project; B. quality improvement didactic knowledge.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

18. PRACTICE-BASED LEARNING 3. Teaching: A. development as teacher; B. observable teaching skills

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

19. PROFESSIONALISM 1. Compassion, integrity, respect for others, sensitivity to diverse patient populations, adherence to ethical principles

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

20. PROFESSIONALISM 2. Accountability to self, patients, colleagues, and the profession. A. Fatigue management and work balance; B. professional behavior and participation in professional community; C. ownership of patient care.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

21. INTERPERSONAL AND COMMUNICATION SKILLS 1. Relationship development and conflict management with patients, families, colleagues, and members of the health care team.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

22. INTERPERSONAL AND COMMUNICATION SKILLS 2. Information sharing and record keeping. A: effective communication with health care team; B. effective communication with patients; C. maintaining professional boundaries in communication

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O

GWU 001173

GEORGE WASHINGTON UNIVERSITY
DEPARTMENT OF PSYCHIATRY
SEMI_ANNUAL MILESTONES-BASED RESIDENT EVALUATION

RESIDENT  Stephanie Waggel        PGY ①  11   111   IV

DATE OF REVIEW  1/16/15          PERIOD COVERED  Jul - Oct 2014

| O | O | O | O | O |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Expected of incoming resident | Advancing; not yet at mid-residency level | Demonstrates majority of competencies; mid-level | Substantially demonstrates expected competencies; *Target for Graduation* | Beyond performance targets for residency |

1. PATIENT CARE 1. Psychiatric evaluation. A.general interview skills; B.collateral information gathering and use, safety assessment, use of clinician's emotional response.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------⊘---------O---------O---------O---------O---------O---------O---------O

2. PATIENT CARE 2. Psychiatric formation and differential diagnosis. A.organizes and summarizes findings and generates differential diagnosis; B. identifies contributing factors and contextual features and creates a formulation.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------⊘---------O---------O---------O---------O---------O---------O---------O

3. PATIENT CARE 3. Treatment planning and management: A.creates treatment plan; B. manages patient crises, recognizing need for supervision when indicated, C. monitors and revises treatment when indicated.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------⊘---------O---------O---------O---------O---------O---------O---------O

4. PATIENT CARE 4. Psychotherapy: the practice and delivery of psychotherapies and integrating psychotherapy with psychopharmacology. A. empathy and process; B. boundaries; C. alliance; D. seeking and providing psychotherapy supervision.

Level 1          Level 2          Level 3          Level 4          Level 5
O---------⊘---------O---------O---------O---------O---------O---------O---------O

GWU 001174

5. PATIENT CARE 5. Somatic therapies. A. using psychopharmacologic agents in treatment; B. education of patient about medications; C. monitoring of patient response to medications and adjusting accordingly; D. other somatic treatments.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O--------O--------O--------O--------O--------O--------O--------O--------O--------O | | | | |

6. MEDICAL KNOWLEDGE 1. Development through the life cycle. A. knowledge of human development; B. knowledge of pathological and environmental influences on development; C. incorporation of developmental concepts in understanding.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O--------O--------O--------O--------O--------O--------O--------O--------O--------O | | | | |

7. MEDICAL KNOWLEDGE 2. Psychopathology, including diagnostic criteria, epidemiology, pathophysiology, course of illness, co-morbidities and differential diagnosis. A. knowledge to identify and treat psychiatric conditions; B. knowledge to assess risk and determine level of care; C. knowledge at the interface of psychiatry and the rest of medicine.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O--------O--------O--------O--------O--------O--------O--------O--------O--------O | | | | |

8. MEDICAL KNOWLEDGE 3. Clinical neuroscience. A. neurodiagnostic testing; B. neuropsychological testing; C. neuropsychiatric co-morbidity; D. neuroscience; E. applied neuroscience

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O--------O--------O--------O--------O--------O--------O--------O--------O--------O | | | | |

9. MEDICAL KNOWLEDGE 4. Psychotherapy, including psychodynamic, cognitive-behavioral and supportive psychotherapies; couples, family and group therapies; and integrating psychotherapy and psychopharmacology. A. knowledge of theories; B. knowledge of practice; C. knowledge of evidence base.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O--------O--------O--------O--------O--------O--------O--------O--------O--------O | | | | |

10. **MEDICAL KNOWLEDGE 5.** Somatic therapies. A. knowledge of indications, metabolism and mechanism of action for medications; B. knowledge of ECT and other emerging somatic treatments; C. knowledge of lab studies and measures in monitoring treatment.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

11. **MEDICAL KNOWLEDGE 6.** Practice of psychiatry: A. ethics; B. regulatory compliance; C. professional development and frameworks.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

12. **SYSTEMS-BASED PRACTICE 1.** Patient safety and the health care team: A. medical errors and improvement activities; B. communication and patient safety; C. regulatory and educational activities related to patient safety.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

13. **SYSTEMS-BASED PRACTICE 2.** Resource management: A. costs of care and resource management.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

14. **SYSTEMS-BASED PRACTICE 3.** Community-based care: A. community-based programs; B. self-help groups; C. prevention; D. recovery and rehabilitation.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

15. **SYSTEMS-BASED PRACTICE 4.** Consultation to non-psychiatric medical providers and non-medical systems: A. distinguishes care provider roles related to consultation; B. provides care as a consultant and collaborator; C. specific consultative activities.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O--------Ø--------O--------O--------O--------O--------O--------O--------O

GWU 001176

16. PROBLEM-BASED LEARNING 1. Development and execution of lifelong learning through self-evaluation and critical evaluation of research and clinical evidence. A. self-assessment and self-improvement; B. evidence in clinical workflow.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O----------Ø----------O---------O---------O---------O---------O--------O---------O---------O | | | | |

17. PROBLEM-BASED LEARNING 2. Formal practice-based quality improvement based on established and accepted methodologies: A. specific QI project; B. quality improvement didactic knowledge.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O----------Ø----------O---------O---------O---------O---------O--------O---------O---------O | | | | |

18. PROBLEM-BASED LEARNING 3. Teaching: A. development as teacher; B. observable teaching skills

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O---------O--------Ø---------O--------O---------O---------O--------O---------O--------O | | | | |

19. PROFESSIONALISM 1. Compassion, integrity, respect for others, sensitivity to diverse patient populations, adherence to ethical principles

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O----------Ø----------O---------O---------O---------O---------O--------O---------O--------O | | | | |

20. PROFESSIONALISM 2. Accountability to self, patients, colleagues, and the profession. A. Fatigue management and work balance; B. professional behavior and participation in professional community; C. ownership of patient care.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O----------Ø---------O---------O---------O---------O---------O---------O--------O---------O | | | | |

21. INTERPERSONAL AND COMMUNICATION SKILLS 1. Relationship development and conflict management with patients, families, colleagues, and members of the health care team.

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|
| O----------Ø---------O---------O---------O---------O---------O---------O--------O---------O | | | | |

GWU 001177

22. INTERPERSONAL AND COMMUNICATION SKILLS 2. Information sharing
and record keeping. A: effective communication with health care team; B. effective
communication with patients; C. maintaining professional boundaries in communication

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---------|---------|---------|---------|---------|

O---------O---------O---------O---------O---------O---------O---------O---------O---------O

Reviewer additional comments:

_____

_____

_____

_____

_____

Resident additional comments:

_____

_____

_____

_____

_____

_____

Reviewer signature: _____ Name: _____ CATARANO _____

Resident signature: _____ Date: _1/ 13 / 15_

Soprano - Jaggi

LF ... 030/0200
Pt ol copy
11/15/2013

# PSYCHIATRY MILESTONES
## ACGME Report Worksheet

10 October 2015

PC1. Psychiatric Evaluation
A. General interview skills
B. Collateral information gathering and synthesis
C. Safety assessment
D. Use of clinician's emotional response

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Obtains general medical and psychiatric history and completes a mental status examination | 2.1/A Acquires efficient, accurate, and relevant history customized to the patient's complaints | 3.1/A Consistently obtains complete, accurate, and relevant history | 4.1/A Routinely identifies subtle and unusual findings | 5.1/A Serves as a role model for gathering subtle and reliable information from the patient |
| | | 2.2/A Performs a targeted examination, including neurological examination, relevant to the patient's complaints | 3.2/A Performs efficient interview and examination with flexibility appropriate to the clinical setting and workload demands | | 5.2/A, B Teaches and supervises other learners in clinical evaluation |
| | 1.2/B Obtains relevant collateral information from secondary sources | 2.3/B Obtains information that is sensitive and not readily offered by the patient | 3.3/B Selects laboratory and diagnostic tests appropriate to the clinical presentation | 4.2/B Follows clues to identify relevant historical findings in complex clinical situations and unfamiliar circumstances | |
| | | | 3.4/B Uses hypothesis-driven information gathering techniques[2] | | |
| | 1.3/C Screens for patient safety, including suicidal and homicidal ideation | 2.4/C Assesses patient safety, including suicidal and homicidal ideation | | | |
| | | 2.5/D Recognizes that the clinician's emotional responses have diagnostic value[1] | | 4.3/D Begins to use the clinician's emotional responses to the patient as a diagnostic tool | |

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

1

GWU 001179

11/15/20_

SW

3

**PC3. Treatment Planning and Management**
A: Creates treatment plan
B: Manages patient crises, recognizing need for supervision when indicated
C: Monitors and revises treatment when indicated

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Identifies potential treatment options | 2.1/A Sets treatment goals in collaboration with the patient<br><br>2.2/A Incorporates a clinical practice guideline or treatment algorithm when available<br><br>2.3/A Recognizes co-morbid conditions and side effects' impact on treatment | 3.1/A Incorporates manual-based treatment[1] when appropriate<br><br>3.2/A Applies an understanding of psychiatric, neurologic, and medical co-morbidities to treatment selection[2]<br><br>3.3/A Links treatment to formulation | 4.1/A Devises individualized treatment plan for complex presentations<br><br>4.2/A Integrates multiple modalities and providers in comprehensive approach[3] | 5.1/A Supervises treatment planning of other learners and multidisciplinary providers<br><br>5.2/A Integrates emerging neurobiological and genetic knowledge into treatment plan[4] |
| | 1.2/B Recognizes patient in crisis or acute presentation | 2.4/B Manages patient crises with supervision | 3.4/B Recognizes need for consultation and supervision for complicated or refractory cases | | |
| | 1.3/C Recognizes patient readiness for treatment | 2.5/C Monitors treatment adherence and response | 3.5/C Re-evaluates and revises treatment approach based on new information and or response to treatment | 4.3/C Appropriately modifies treatment techniques and flexibly applies practice guidelines to fit patient need | |
| ☐ | ☐ ☑ | ☑ (circled) ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ |

Comments:

Footnotes:
[1]Manual-based treatment is any psychotherapy that relies on written instructions for the therapist on the steps and conduct of treatment, often including specific indications, techniques, goals, and objectives. Manual-based treatments are frequently theory-driven and evidence-based. Examples of manual-based treatments include Interpersonal Psychotherapy, Dialectical-Behavioral Therapy, and many Cognitive-Behavioral Therapies.
[2]Examples might include psychopharmacology in the presence of neurodegenerative disorders, traumatic brain injury, critical medical illness, and cancer treatment, as well as understanding the family, systems, and multidisciplinary team efforts for the best outcome for treatment.
[3]Understanding and use of an array of modalities and providers may include consideration of complementary and alternative medicine, occupational therapy, and

11/15/2013

PC – Psychotherapy
Refers to: 1. the practice or provision of either of any psychotherapies, including psychodynamic, cognitive-behavioral, and supportive therapies; 2) exposure to complex and a variety of forms of therapy(ies); and 3) integrating psychotherapy with medication with psychopharmacology.
A: Empathy and process
B: Boundaries
C: The alliance and provision of psychotherapies
D: Seeking and providing psychotherapy supervision

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Accurately identifies patient emotions, particularly sadness, anger, and fear [4] | 2.1/A Identifies and reflects the core feeling and key issue for the patient during a session | 3.1/A Identifies and reflects the core feeling, key issue, and what the issue means to the patient | 4.1/A Links feelings, behavior, recurrent/central themes/schemas, and their meaning to the patient as they shift within and across sessions | |
| | 1.2/B Maintains appropriate professional boundaries | 2.2/B Maintains appropriate professional boundaries in psychotherapeutic relationships while being responsive to the patient [5] | 3.2/B Recognizes and avoids potential boundary violations | 4.2/B Anticipates and appropriately manages potential boundary crossings and avoids boundary violations | |
| | 1.3/C Demonstrates a professional interest and curiosity in a patient's story | 2.3/C Establishes and maintains a therapeutic alliance with patients with uncomplicated problems [6] | 3.3/C Establishes and maintains a therapeutic alliance with, and provides psychotherapy (at least supportive, psychodynamic, and cognitive-behavioral) to, patients with uncomplicated problems | 4.3/C Provides different modalities of psychotherapy (including supportive therapy and at least one of psychodynamic or cognitive behavioral therapies) to patients with moderately complicated problems | 5.1/C Provides psychotherapies to patients with very complicated and/or refractory disorders/problems |
| | | 2.4/C Utilizes elements of supportive therapy in treatment of patients | 3.4/C Manages the emotional content of, and feelings aroused during, sessions | 4.4/C Selects a psychotherapeutic modality and tailors the selected psychotherapy to the patient on the basis of an appropriate case formulation | 5.2/C Personalizes treatment based on awareness of one's own skill sets, strengths, and limitations |
| | | | 3.5/C Integrates the selected psychotherapy with other treatment modalities and other treatment providers [7] | 4.5/C Successfully guides | |

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

GWU 001181

11/15/2013

PC3. Somatic Therapies
Evaluate and use somatic therapies, including psychopharmacology, electroconvulsive therapy (ECT), and emerging neuromodulation therapies
A: Using psychopharmacologic agents in treatment
B: Education of patient about medications
C: Monitoring of patient response to treatment and adjusting accordingly
D: Other somatic treatments

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Lists commonly used psychopharmacologic agents and their indications to target specific psychiatric symptoms (e.g., depression, psychosis) | 2.1/A Appropriately prescribes commonly used psychopharmacologic agents | 3.1/A Manages pharmacokinetic and pharmacodynamic drug interactions when using multiple medications concurrently | 4.1/A Titrates dosage and manages side effects of multiple medications | |
| | 1.2/B Reviews with the patient/family general indications, dosing parameters, and common side effects for commonly prescribed psychopharmacologic agents | 2.2/B Incorporates basic knowledge of proposed mechanisms of action and metabolism of commonly prescribed psychopharmacologic agents in treatment selection, and explains rationale to patients/families | | | 5.1/B Explains less common somatic treatment choices to patients/families in terms of proposed mechanisms of action. |
| | | 2.3/C Obtains basic physical exam and lab studies necessary to initiate treatment with commonly prescribed medications | 3.2/C Monitors relevant lab studies throughout treatment, and incorporates emerging physical and laboratory findings into somatic treatment strategy | 4.2/C Appropriately selects evidence-based somatic treatment options (including second and third line agents and other somatic treatments[2]) for patients whose symptoms are partially responsive or not responsive to treatment | 5.2/C Integrates emerging studies of somatic treatments into clinical practice |
| | | 2.4/D Seeks consultation and | 3.3/C Uses augmentation strategies, with supervision, when primary pharmacological interventions are only partially successful[1] | | |

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

8

GWU 001182

11/15/2013

**VIII. Development across the life cycle (including the impact of psychopathology on the trajectory of development and development on the expression of psychopathology)**
A. Knowledge of human development
B. Knowledge of pathological and environmental influences on development
C. Incorporation of developmental concepts in understanding

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Describes the basic stages of normal physical, social, and cognitive development through the life cycle[1] | 2.1/A Describes neural development across the life cycle[2]<br><br>2.2/A Recognizes deviation from normal development, including arrests and regressions at a basic level<br><br>2.3/B Describes the effects of emotional and sexual abuse on the development of personality and psychiatric disorders in infancy, childhood, adolescence, and adulthood at a basic level<br><br>2.4/C Utilizes developmental concepts in case formulation | 3.1/A Explains developmental tasks and transitions throughout the life cycle, utilizing multiple conceptual models[3]<br><br>3.2/B Describes the influence of psychosocial factors (gender, ethnic, cultural, economic), general medical, and neurological illness on personality development<br><br>3.3/C Utilizes appropriate conceptual models of development in case formulation | 4.1/B Describes the influence of acquisition and loss of specific capacities in the expression of psychopathology across the life cycle<br><br>4.2/B Gives examples of gene-environment interaction influences on development and psychopathology[4] | 5.1/A Incorporates new neuroscientific knowledge into his or her understanding of development |

Comments: improving

Footnotes:
[1] Includes knowledge of motoric, linguistic, and cognitive development at the level required to pass the United States Medical Licensing Examination (USMLE) Step 2, and also knowledge of developmental milestones in infancy through senescence, such as language acquisition, Piagetian cognitive development, and social and emotional development, such as the emergence of stranger wariness in infancy and the theme of independence versus dependence in adolescence.

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

GWU 001183

10

11/15/2013

| hyperlipidemia, diabetes) in psychiatric patients | and neurological conditions in the differential diagnoses of psychiatric patients | common medical conditions in psychiatric patients, and to ensure appropriate further evaluation and treatment of these conditions in collaboration with other medical providers | uncommon medical conditions in patients with psychiatric disorders |
|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ |

Comments:

Footnotes:
[1]This milestone focuses on knowledge needed for patient care. Thus, knowledge of psychopathology can be assessed through multiple choice knowledge examinations (e.g., the Psychiatry Resident In-Training Examination (PRITE)), and/or through evaluations of the application of knowledge of psychopathology to patient care, such as standardized patients or case vignettes, clinical skills evaluations, and knowledge evidenced during clinical rotations and the routine, supervised care of patients during residency.

[2]This level includes identification and treatment of a wider array of conditions, across the life cycle (including childhood, adolescent, adult, and geriatric conditions), and in a variety of settings (e.g., outpatient, consultation liaison, subspecialty settings).

[3]"Atypical" and "complex" psychiatric conditions refer to unusual presentations of common disorders, co-occurring disorders in patients with multiple co-morbid conditions, and diagnostically challenging clinical presentations.

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

GWU 001184

15

11/15/2013

| | 2.4/E Identifies the brain areas thought to be important in social and emotional behavior[5] | | 4.5/E Demonstrates sufficient knowledge to incorporate leading neuroscientific hypotheses of emotions and social behaviors[10] into case formulation | | 5.4/D Integrates knowledge of neurobiology into advocacy for psychiatric patient care and stigma reduction[12] |
|---|---|---|---|---|---|

Comments:

Footnotes:

[1] This milestone focuses on knowledge needed for patient care. Thus, knowledge of clinical neuroscience can be assessed through multiple choice knowledge examination (e.g., PRITE), and/or through evaluations of the application of knowledge of clinical neuroscience to patient care, such as standardized patients or case vignettes, clinical skills evaluations, and knowledge evidenced during clinical rotations and the routine, supervised care of patients during residency.

[2] Common neuropsychological tests include the Montreal Cognitive Assessment (or Mini Mental State Examination), Wechsler Adult Intelligence Scale (or Halstead-Reitan battery), Wechsler Memory Scale, Wide Range Achievement Test, Wisconsin Card Sorting Test, Clock Drawing Test.

[3] Examples include psychosis, mood disorders, personality changes, and cognitive impairments seen in common neurological disorders.

[4] These include drug-induced and idiopathic extrapyramidal syndromes, neuropathies, traumatic brain injury (TBI), vascular lesions, dementias, and encephalopathies.

[5] Areas might include dorsolateral prefrontal cortex, anterior cingulate, amygdala, hippocampus, etc.

[6] These include structural imaging and electrophysiologic testing.

[7] For example, positron emission tomography (PET)/single-photon emission computed tomography (SPECT) in the diagnosis of Alzheimer's disease (supportive but non-diagnostic); functional magnetic resonance imaging (fMRI) is not yet reimbursable for clinical use.

[8] Examples include: mood disorder due to neurological condition, manic type, in right hemisphere or orbitofrontal strokes/tumors; depression in peri-basal ganglionic infarcts; manic behavior in limbic encephalitis.

[9] Examples include: neuroleptic malignant syndrome; lethal catatonia; "Parkinson plus" syndromes (e.g., multisystem atrophy, dementia with Lewy bodies, etc).

[10] Social behaviors might include attachment, empathy, attraction, reward/addiction, aggression, appetites, etc.

[11] Examples include : Obsessive-Compulsive Disorder (OCD); eating disorders ; Gilles de la Tourette syndrome.

[12] Uses neurobiologic hypotheses of psychiatric disorders to advocate for health coverage, treatment availability, etc.

GWU 001185

11/15/2013

**PC5: Somatic Therapies**

Medical knowledge of somatic therapies, including psychopharmacology, ECT, and emerging somatic therapies, such as transcranial magnetic stimulation (TMS) etc. Regards these subsections within (MK):
A. Knowledge of indications, metabolism and mechanism of action for medications
B. Knowledge of ECT and other emerging somatic treatments
C. Knowledge of lab studies and measures in monitoring treatment

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Describes general indications and common side effects for commonly prescribed psychopharmacologic agents | 2.1/A Describes hypothesized mechanisms of action and metabolism for commonly prescribed psychopharmacologic agents | 3.1/A Demonstrates an understanding of pharmacokinetic and pharmacodynamic drug interactions | 4.1/A Describes the evidence supporting the use of multiple medications in certain treatment situations (e.g., polypharmacy and augmentation) | 5.1/A Integrates emerging studies of somatic treatments into knowledge base |
| | | 2.2/A Describes indications for second- and third-line pharmacologic agents | 3.2/A Demonstrates an understanding of psychotropic selection based on current practice guidelines or treatment algorithms for common psychiatric disorders | | 5.2/A Effectively teaches at a post-graduate level evidence-based or best somatic treatment practices |
| | | 2.3/A Describes less frequent but potentially serious/dangerous adverse effects for commonly prescribed psychopharmacological agents | | | |
| | | 2.4/A Describes expected time course of response for commonly prescribed classes of psychotropic agents | | | |
| | 1.2/B Describes indications for ECT | 2.5/B Describes length and frequency of ECT treatments, as well as relative contraindications | 3.3/B Describes specific techniques in ECT | | |
| | | 2.6/C Describes the physical | 3.4/B Lists emerging neuro-modulation therapies[1] | 4.2/C Integrates knowledge | |

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

18

GWU 001186

11/15/2013

**III.G: Practice of Psychiatry**
**A: Ethics**
**B: Regulatory compliance**
**C: Professional development and frameworks**

| Has not Achieved Level 1 | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| | 1.1/A Lists common ethical issues in psychiatry | 2.1/A Lists and discusses sources of professional standards of ethical practice | 3.1/A Discusses conflict of interest and management | | |
| | | 2.2/A Lists situations that mandate reporting or breach of confidentiality | | | |
| | 1.2/B Recognizes and describes institutional policies and procedures[1] | | 3.2/B Describes applicable regulations for billing and reimbursement | 4.1/B Describes the existence of state and regional variations regarding practice, involuntary treatment, health regulations, and psychiatric forensic evaluation | 5.1/B Describes international variations regarding practice, involuntary treatment, and health regulations |
| | 1.3/C Lists ACGME Competencies | 2.3/C Describes how to keep current on regulatory and practice management issues | | 4.2/C Describes professional advocacy[2] | 5.2/C Proposes advocacy activities, policy development, or scholarly contributions related to professional standards |
| | | | | 4.3/C Describes how to seek out and integrate new information on the practice of psychiatry | |

**Comments:**

Footnotes:
[1] "Institutional policies and procedures" refers to those related to the practice of medicine and psychiatry at the specific institution where the resident is credentialed. These include a Code of Conduct (addressing gifts, etc.) and privacy policies (related to HIPAA, etc.), but not patient safety policies. These are usually covered during an orientation to the institution and program.

[2] Advocacy includes efforts to promote the wellbeing and interests of patients and their families, the mental health care system, and the profession of psychiatry. While advocacy can include work on behalf of specific individuals, it is usually focused on broader system issues, such as access to mental health care services or public

The Milestones are a product of the Psychiatry Milestone Project, a joint initiative of the Accreditation Council for Graduate Medical Education and the American Board of Psychiatry and Neurology.

20

GWU 001187

# EXHIBIT J

## Victoria H. Anderson

| | |
|---|---|
| ,om: | Jason <jemejuru@gmail.com> |
| ent: | Monday, October 19, 2015 6:27 PM |
| To: | Lisa Catapano; Lori Kels; Darlinda Minor; Victoria H. Anderson |
| Subject: | Fwd: sewaggel@gmail.com |

Here is Karen's evaluation of Stephanie for her most recent Saturday buddy call.


Jason Emejuru, MD
Chief Resident
Department of Psychiatry & Behavioral Sciences

George Washington University


Begin forwarded message:

> **From:** "Wooten, Karen" <kwooten@email.gwu.edu>
> **Date:** October 19, 2015 at 12:32:47 PM EDT
> **To:** Jason Emejuru <jemejuru@gmail.com>
> **Subject:** sewaggel@gmail.com
>
> Dear Dr. Emejuru,
>
> Thank you for the opportunity to be part of Dr. Waggel's professional development. The following is my feedback regarding her performance.
>
> Dr. Waggel is incredibly empathetic, personable, and thorough. Above all, Dr. Waggle sees people as individuals, which allows her to persuade and connect to patients so easily. This can, however, be a challenge in the culture of medical training, where she is required to perform and react to others in accordance to hierarchical social role. On one hand, I applaud how she maintains an authentic self in all situations, however she sometimes tends to speak and behave in a manner more casual than is traditionally expected. In a way, it is almost like she has difficulty "code-switching" at times into "resident speech". Thus, she is transparent in her frustration, disappointment, or delight.
>
> In specific, we discussed phone consults to fellow residents, formal presentations, and sign-outs. We discussed the need to be friendly yet focused on the phone, and erring on the side of "ironic professionalism" rather than slang when talking to friends who are residents. She is already taking steps slow down her speech and organize presentations. Similarly, Dr. Waggle is improving in focus during sign outs, and was receptive to my suggestion that she not multi-task at all during this important task. We discussed the importance of thanking other members of the team (social workers, nurses, other residents) for their current contributions, even when they could use some improvement (as could we ourselves!). Finally, we spoke a great deal about the difficult necessity of humility, and the need to focus energy on productively serving others rather than defending against criticism. Dr. Waggle is taking active steps to improve her self-awareness and how it impacts her professionalism.

1

GWU 001444

I understand that the buddy call system is intended not as a punitive measure but to improve Dr. Waggle's ability to function on call. I feel that it was very helpful to have the roles and objectives for buddy call written down and understood by both parties prior to call. I feel that having not done so preceding her other shifts, put her at a severe disadvantage- because it is difficult to meet standards when one has no idea what they are. Having been in a similar situation myself as a PGY-2, I know how difficult it is to acquire the calm, collected demeanor of Resident On Call, when operating in the tense shadow of scrutiny. As such, I recommend that you continue to refine your expectations, and to positively reinforce the considerable efforts and improvements that Dr. Waggle makes. I also urge you to be aware of the stigma associated with remediation and physician-impairment. and to continue to respond sensitively to the individual needs of our colleague who has so much to offer the field of Psychiatry.

Sincerely,
Karen Wooten

---

"even when the rain falls,
even when the flood starts rising,
even when the storm comes
I am washed by the water."
- William Rinehart

2

GWU 001445

# EXHIBIT K

 Gmail                                         **Stephanie Waggel <sewaggel@gmail.com>**

---

## Doctor's note
1 message

---

**sewaggel@gmail.com** <sewaggel@gmail.com>                          Thu, Oct 22, 2015 at 2:33 PM
To: "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>, Jason Emejuru <jemejuru@gmail.com>, James Griffith
<jgriffith@mfa.gwu.edu>

Dear Dr. Griffith, Jason, and Tory,

Because of the negative repercussions I experienced this week as a result of my taking a sick day to have tests for
metastasis, I now have to take another sick day.

I am having extreme anxiety about the fact that was punished for this sick day despite: 1. informing multiple people in
advance via phone and email 2. Asking multiple people if I did everything that was appropriate to handle taking a sick
day 3. providing a doctors note 4. Being told that I would be given time to have one or two doctors appointments a
month for the ongoing cancer screening that I will have to have for at least the next few years.

I am now having extreme anxiety necessitating an emergency session with my psychologist. I will provide a doctors
note for today. If there is someone else I need to contact, a specific document I need to provide or anything else I can
do to avoid upsetting anyone please let me know. Please inform me via email as soon as you can if you think of any
negative repercussions that may occur as a result of my absence today so that I can address it in advance and not
have this happen again. As I have stated many times, my goal is to care for my health while upsetting the least number
of people possible. Thank you.


Sincerely,
Stephanie

# EXHIBIT L



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Stephanie Waggel <swaggel@gwmail.gwu.edu>

---

## Re: Demoralization
1 message

---

**James Griffith** <jgriffith@mfa.gwu.edu>                                   Thu, Oct 22, 2015 at 10:44 PM
To: "sewaggel@gmail.com" <sewaggel@gmail.com>
Cc: Carrie Lewis <cel2116@gmail.com>, John Tarim <johntarim@gwu.edu>, Monika Karazja <karazja@hotmail.com>, Seth
Rosenblatt <sethro123@gmail.com>, Stephanie Waggel <swaggel@gwmail.gwu.edu>, "T.J. Price" <tgp@gwu.edu>, "T.J.
Price" <tj.g.price@gmail.com>

Dear Stephanie:

What I was suggesting was something different— that I meet with all of you as a class to discuss dealing with
demoralization as a problem getting in the way of your learning and, it sounded to me, spoiling your experience of
residency together.  What I would have to draw upon would be my own experiences of struggling with hard
circumstances— failures, humiliations, and regrets at times— yet finding ways to make the struggle worthwhile in the
end.  If that were to be helpful, I would be glad to do that.

I am also aware that my administrative role as chair of the department might make it difficult to have the openness
needed for this to be useful.  I respect that, and someone else perhaps could better take that role.  You can let me
know.

Best wishes,
Griff

James L. Griffith, M.D.
Leon M. Yochelson Professor and Chair
Dept. of Psychiatry and Behavioral Sciences
2120 L Street, N.W.
Suite 600
Washington, DC 20037
Phone:   (202) 741-2879
FAX:      (202) 741-2891
E-Mail:   jgriffith@mfa.gwu.edu
Web:     www.gwupsychiatry.org

---

From: sewaggel@gmail.com <sewaggel@gmail.com>
Sent: Thursday, October 22, 2015 7:39 PM
To: James Griffith
Subject: Demoralization

Dear Dr. Griffith,

I was pleased to hear that you are willing to speak with us about what has been going on recently. I would like very
much to meet with you when you have the time. Please let me know if you still wish to meet and when you are available.

Sincerely,
Stephanie

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain
information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying
of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible
for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call
(202) 741-3636 and destroy the original message and all copies.

# EXHIBIT M

# EXHIBIT N



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

Office of Graduate Medical Education

**VIA EMAIL**

October 28, 2015

Stephanie Waggel, MD
Resident in Psychiatry

Dear Dr. Waggel:

This letter serves as a Letter of Deficiency under the current policy for academic improvement
for Graduate Medical Education at the George Washington University. You are receiving this
letter because you have shown deficiency in the competency of Professionalism.

In April 2015, Residents and Fellows were notified by email to log in to the MedHub system to
sign their contracts and to complete other requirements for the new academic year. One of the
requirements was that all residents and fellows complete the annual health clearance with the
GW Hospital Employee Health Office no later than September 30, 2015. Despite an extension
granted by Dr. Gary Little, Medical Director of GW Hospital, you were not cleared by Employee
Health by the extended deadline of October 14th.

It is our expectation that you will adhere to all administrative responsibilities prior to the
deadline going forward. Thank you for your attention to this important matter.

If you have questions, please contact me or Mary Tucker.

Sincerely,

Jeffrey S. Berger, MD, MBA
Associate Dean for Graduate Medical Education

cc: Lisa Catapano, MD

**School of Medicine & Health Sciences**
2300 Eye Street NW | Ross Hall Suite 718 | Washington, DC 20037
t 202-994-3737 | f 202-994-1604 | gwgme@gwu.edu | smhs.gwu.edu/academics/gme

444

# EXHIBIT O



**PSYCHIATRY & BEHAVIORAL SCIENCES**
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org

November 11, 2015

Dear Dr. Waggel,

This letter serves as a Letter of Deficiency under the current policy for academic improvement for Graduate Medical Education at the George Washington University. You are receiving this letter, after review of your clinical standing by the Department of Psychiatry Clinical Competency Committee (CCC) because you have shown deficiency in the competencies of Patient Care, Interpersonal Communication Skills and Systems-Based Practice.

You were the Psychiatry resident on call on August 25, 2015. The events on the inpatient psychiatry unit that evening triggered a root cause analysis (RCA). You met with Dr. Lorenzo Norris and Dr. Baiju Gandhi on October 15, 2015, to review the RCA, including three areas in which you are recommended to improve: Patient Care, Interpersonal Communications Skills, and Systems-Based Practice.

During your overnight call on August 25, 2015, you were required to manage escalating aggression in one of the 6S patients, which included decisions about 1:1 sitters, the use of IM vs PO medications, and calling a Code Strong. According to Dr. Norris, and documented in the RCA, your management of patient aggression, including recognizing escalating patient aggression and demonstrating leadership in a Code Strong situation, was below that expected for your level of training. This demonstrates a deficiency in Patient Care.

During the same call shift, your clinical presentations to Dr. Eindra Khin Khin (attending on call), and Dr. Norris were disorganized and incomplete. The RCA documents that your clinical presentations did not include a timeline, reason for agitation, dose of medications, or medical condition for the patient. This illustrates inadequate skills in Interpersonal Communication for your current level of training.

Finally, in regard to the management of the same agitated patient on the same night, you repeatedly attempted to "administratively discharge" this patient in the middle of an acute behavioral crisis. You told Dr. Norris afterward you did not properly understand the meaning of this term. According to the RCA, you also threatened to have the patient arrested. Your lack of understanding of inpatient discharge procedures, and your communication with the patient which exacerbated, rather than contained, the heightened emotions, demonstrate deficiencies in Interpersonal Communication and Systems-Based Practice.

489

It is also noted that you have not complied with the Improvement Plan set out in your Letter of Deficiency dated July 15, 2015.

To address the deficiencies outlined above, you will participate in the following Improvement Plan with Dr. Allen Dyer, Vice-Chair for Education in the Department of Psychiatry: within one week of receiving this letter, you must set up a meeting with Dr. Dyer to discuss the above deficiencies and outline a plan to prevent future lapses. Specifically, you must:

--Write a 600 word description of management strategies and alternatives for management of patient aggression in the in-patient setting. Included in this report, please address the indications for calling a "Code Strong" and the meaning of "administrative discharge." This report will be due within 4 weeks of the receipt of this Letter. Dr. Dyer will discuss the report with you after it has been submitted;

-Meet with Dr. Dyer within 1 week of receiving this Letter to address disorganized and incomplete clinical presentations on call. Formulate a template for consistency and present an agreed upon list of in-patients to Dr. Dyer on 2 occasions within 8 weeks of the receipt of this Letter. Dr. Dyer will assess you competency based on presentations and provide feedback to you and a formal evaluation of performance to the Clinical Competency Committee;

-Address the concerns laid out in your Letter of Deficiency dated July 15, 2015.

Furthermore, effective immediately, you will be assigned senior residents to be present for all of your overnight call shifts ("direct supervision immediately available," or "buddy calls"). The assigned senior residents will be tasked with supervising your patient care, systems-based knowledge and decision-making, and interpersonal communications with patients and co-workers, and providing feedback on the above directly to you, and also to Dr. Lori Kels, Associate Residency Director. Because of the above-listed deficiencies, and need for extra supervision, the Clinical Competency Committee's assessment is that you are not on track to be promoted to the PGYIII year on July 1, 2016.

The GW Misconduct Policy can be found at the following link:
http://smhs.gwu.edu/sites/default/files/GW%20GME%20Misconduct%20Policy.jb.6.27.pdf

It is solely your responsibility to ensure that the recommended items are completed in a timely manner. Failure to comply with the plan for improvement may result in additional measures, including, but not limited to, termination. A review and update of your progress will be reported at the next CCC meeting and will be reviewed in your next Semi-Annual Meeting with me. If you have any further questions, please feel free to discuss them with me.


Lisa A. Catapano, MD, PhD

Director, Psychiatry Residency Program

# EXHIBIT P



**PSYCHIATRY & BEHAVIORAL SCIENCES**
at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org

November 19, 2015

Dear Dr. Waggel,

     This letter serves as a Letter of Deficiency under the current policy for academic improvement for Graduate Medical Education at the George Washington University. You are receiving this letter, after review of your clinical standing by the Department of Psychiatry Clinical Competency Committee (CCC) because you have shown deficiency in the competencies of Patient Care, Interpersonal Communication Skills and Systems-Based Practice.

     You were the Psychiatry resident on call on August 25, 2015. The events on the inpatient psychiatry unit that evening triggered a root cause analysis (RCA). You met with Dr. Lorenzo Norris and Dr. Baiju Gandhi on October 15, 2015, to review the RCA, including three areas in which you are recommended to improve: Patient Care, Interpersonal Communications Skills, and Systems-Based Practice.

     During your overnight call on August 25, 2015, you were required to manage escalating aggression in one of the 6S patients, which included decisions about 1:1 sitters, the use of IM vs PO medications, and calling a Code Strong. According to Dr. Norris, and documented in the RCA, your management of patient aggression, including recognizing escalating patient aggression and demonstrating leadership in a Code Strong situation, was below that expected for your level of training. This demonstrates a deficiency in Patient Care.

     During the same call shift, your clinical presentations to Dr. Eindra Khin Khin (attending on call), and Dr. Norris were disorganized and incomplete. The RCA documents that your clinical presentations did not include a timeline, reason for agitation, dose of medications, or medical condition for the patient. This illustrates inadequate skills in Interpersonal Communication for your current level of training.

     Finally, in regard to the management of the same agitated patient on the same night, you repeatedly attempted to "administratively discharge" this patient in the middle of an acute behavioral crisis. You told Dr. Norris afterward you did not properly understand the meaning of this term. According to the RCA, you also threatened to have the patient arrested. Your lack of understanding of inpatient discharge procedures, and your communication with the patient which exacerbated, rather than contained, the heightened emotions, demonstrate deficiencies in Interpersonal Communication and Systems-Based Practice.

446

It is also noted that you have not complied with the Improvement Plan set out in your Letter of Deficiency dated July 15, 2015.

To address the deficiencies outlined above, you will participate in the following Improvement Plan with Dr. Lori Kels, Associate Program Director: within one week of receiving this letter, you must set up a meeting with Dr. Kels to discuss the above deficiencies and outline a plan to prevent future lapses. Specifically, you must:

--Write a 600 word description of management strategies and alternatives for management of patient aggression in the in-patient setting. Included in this report, please address the indications for calling a "Code Strong" and the meaning of "administrative discharge." This report will be due within 4 weeks of the receipt of this Letter. Dr. Kels will discuss the report with you after it has been submitted;

-Meet with Dr. Kels within 1 week of receiving this Letter to address disorganized and incomplete clinical presentations on call. Formulate a template for consistency and present an agreed upon list of in-patients to Dr. Kels on 2 occasions within 8 weeks of the receipt of this Letter. Dr. Kels will assess you competency based on presentations and provide feedback to you and a formal evaluation of performance to the Clinical Competency Committee;

-Address the concerns laid out in your Letter of Deficiency dated July 15, 2015.

Furthermore, effective immediately, you will be assigned extra attending supervision on your overnight call shifts, with my oversight. You will be required to check in with your attendings on a regular basis throughout the night to review patient care issues. Because of the above-listed deficiencies, and need for extra supervision, the Clinical Competency Committee's assessment is that you will not be promoted to the PGYIII year on July 1, 2016. Throughout the next year, the CCC will meet at regular intervals to review your progress and evaluations, and assess your readiness to be promoted to the PGYIII year. All of the above is contingent on your being found to be fit for duty in your upcoming evaluation.

The GW Academic Improvement Policy can be found at the following link: http://smhs.gwu.edu/sites/default/files/GW%20GME%20Academic%20Improvment%20Policy.jb.6.27.pdf

It is solely your responsibility to ensure that the recommended items are completed in a timely manner. Failure to comply with the plan for improvement may result in additional measures, including, but not limited to, termination. A review and update of your progress will be reported at the next CCC meeting and will be reviewed in your next Semi-Annual Meeting with me. If you have any further questions, please feel free to discuss them with me.


Lisa A. Catapano, MD, PhD

Director, Psychiatry Residency Program

# EXHIBIT Q

                       **Stephanie Waggel <sewaggel@gmail.com>**

# (no subject)
1 message

**sewaggel@gmail.com** <sewaggel@gmail.com>            Thu, Nov 12, 2015 at 11:42 AM
To: Stephanie Waggel <sewaggel@gmail.com>

On Tuesday November 10, 2015 at 6:05pm you called me from number 202-557-9270. We spoke for 11 minutes about a future meeting pertaining to me. I realize this conversation was vague and mysterious as most of my conversations with you and the rest of administration are, but surely you must remember this 11 minutes of time occurring. I asked questions such as "what is this meeting about?" "Who are the 'deans' that are meeting?" "When will the meeting take place?" Your reply was that "legal" would be at the meeting and you could not give me further information. It is evident that you are intentionally trying to cause me anxiety. As a psychiatrist, you must realize telling someone not to come into work, providing no information, and then acting as if you don't know what I am even referring to can put a great deal of stress on any human being. I can already predict that you will now try to cover yourself by saying there was a mixup or that there is not one particular meeting about me but many or that I am not invited to any meeting. Even if you genuinely did not know what meeting I was referring to, one would think you would say "I'm not sure which meeting, is it the one we talked about Tuesday?" It is out of character for me to be like this but this abuse has gone on since May and being polite and quite only led to me suffering more. I have recently been trying a new approach. I would appreciate your reply to one of my other emails that have gone unanswered.

On Thursday, November 12, 2015, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

> Stephanie,
>
> I'm sorry but I don't know what meeting you are referring to.
>
>
> Lisa Catapano, MD, PhD
>
> Director, Residency Training Program
>
> Associate Professor of Psychiatry
>
> Department of Psychiatry
>
> George Washington University
>
> 2120 L Street NW
>
> Washington DC 20037
>
> (202) 741-2886
>
>
>
> **From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
> **Sent:** Wednesday, November 11, 2015 2:53 PM
> **To:** Lisa Catapano; Jason Emejuru; Victoria H. Anderson
> **Subject:** Meeting
>
>
>
> I am requesting the following information about the meeting I am supposed to have at least four days prior to its occurence:
>
>
>
> Who are the parties involved?
>
> What is this meeting about?

When and where will this meeting occur?


Thank you for your cooperation.


Sincerely,

Stephanie


--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital


Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

Sent from my iPhone

# EXHIBIT R

Victoria H. Anderson

From:               Waggel, Stephanie <swaggel@email.gwu.edu>
Sent:               Tuesday, November 10, 2015 9:27 PM
To:                 Lisa Catapano; Victoria H. Anderson; Jason Emejuru
Subject:            Re: written confirmation

Good evening. I noticed that when I tried to get in touch with someone from administration from a different number after calling with my number, I then got a call back. I'm sure whatever is going on has a good explanation, however, I would appreciate further communication on it. There seems to be a continuing theme with miscommunication, therefore, I will explain my current understanding of the situation and invite you to correct it if need be. The phone conversation that occurred when Dr. Catapano around 6pm indicated that I am being investigated by the "deans" for taking medical leave multiple times. As I still do not have written information as to what is going on, or that Fairfax is aware of it, and have no desire to upset Dr. Crone or my attendings at Fairfax, I will be going to work. I will leave work if they tell me they were informed I should not be there, or if I receive a written confirmation that I should not be at work. Again, I apologize for emailing at this hour, but it was late when I was informed. Have a nice evening.

Sincerely,
Stephanie

On Tue, Nov 10, 2015 at 8:50 PM, Waggel, Stephanie <swaggel@email.gwu.edu> wrote:
  Unless I get written confirmation of what is going on, I will be going to work tomorrow. Informing me of something such as this by phone at 6:15pm the night before over the phone is unprofessional and uncalled for. I do not appreciate that no one replies to my emails, texts, or calls. This is a reoccurring phenomenon over the last few months. I understand it is after 5pm however, as I was informed after 5pm I have no choice but to attempt to make contact at this time.

  On Tue, Nov 10, 2015 at 8:09 PM, Waggel, Stephanie <swaggel@email.gwu.edu> wrote:
  I would like a written confirmation tonight (as I was only made aware of this an hour ago) explaining that I am on leave so that I can show it those who will have to cover my patients at work. I would also like information as to how to prevent upsetting those that I work for and those that teach didactics. For example, who do I need to inform and what I should inform them.

  Sincerely,
  Stephanie

  Stephanie E. Waggel M.D, M.S.

  Stephanie E. Waggel M.D, M.S.

DR. EMEJURU DECLARATION
EXHIBIT #65                    GWU 001312

# EXHIBIT S

| | |
|---|---|
| **From:** | Mary Lynn Reed [mlreed@gwu.edu] |
| **Sent:** | Friday, November 13, 2015 2:04 PM |
| **To:** | Victoria H. Anderson; Lisa Catapano; Jeffrey Berger |
| **Subject:** | RE: LOD - Privileged and confidential |

Thanks.

**From:** Victoria H. Anderson [mailto:vhanderson@mfa.gwu.edu]
**Sent:** Friday, November 13, 2015 2:03 PM
**To:** Lisa Catapano; Jeffrey Berger; mlreed@gwu.edu
**Subject:** RE: LOD - Privileged and confidential

Dear Mary Lynn,

I apologize for this missing document.  I've attached a scanned copy of her July LOD here.

She started her PGY-I year on July 1, 2014 and was promoted to PGY-II year starting July 1, 2015.  Here are the following dates of her LOA's that went through GME...
　　　　-July 20-August 3, 2015
　　　　-October 22-November 2, 2015

She also took time off in May, however, she did not go through GME and register this time as "medical leave" (May 18, 2015-June 7, 2015).  I've attached the email from Dr. Lisa Catapano to Dr. Stephanie Waggel.

Please let me know if you need any additional information.

Best,

**Tory Anderson**
Residency Coordinator
Department of Psychiatry
George Washington University
2120 L Street, NW Suite 600
Washington, DC 20037
Office: (202) 741-2893
Fax: (202) 741-2891

**From:** Lisa Catapano
**Sent:** Friday, November 13, 2015 1:43 PM
**To:** Jeffrey Berger; mlreed@gwu.edu
**Cc:** Victoria H. Anderson
**Subject:** Re: LOD - Privileged and confidential

Hi Mary Lynn,

Tory is getting the LOD and exact dates for you.
The reasons for the medical leaves were:
May: depression/anxiety
July: nephrectomy surgery and recovery
Oct/Nov: depression/anxiety

Thanks for all your help sorting this out.

1

GWU 001254

Lisa Catapano, MD, PhD
Program Director
Associate Professor of Psychiatry
George Washington University
2120 L Street, NW
Washington DC 20037
202-741-2886

---

**From:** Mary Lynn Reed <mlreed@gwu.edu>
**Sent:** Friday, November 13, 2015 1:10:28 PM
**To:** Lisa Catapano; Jeffrey Berger
**Subject:** RE: LOD - Privileged and confidential

Hi Lisa,
The one thing that I didn't see in the file was July 2015 LOD. Can you please have someone email to me? Also, can you please do a short timeline of the dates of when she started in the program, and the dates of her various leaves of absence and what they were for? I am having a hard time pulling that together from the emails. Thanks.

---

**From:** Lisa Catapano [mailto:lcatapano@mfa.gwu.edu]
**Sent:** Thursday, November 12, 2015 10:07 AM
**To:** Jeffrey Berger; Mary Lynn Reed (mlreed@gwu.edu)
**Subject:** RE: LOD - Privileged and confidential

Agreed. I will look into the allegations of residents leaving call, of course, but it has no impact at all on our concerns about her.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

---

**From:** Jeffrey Berger
**Sent:** Wednesday, November 11, 2015 5:04 PM
**To:** Lisa Catapano; Mary Lynn Reed (mlreed@gwu.edu)
**Subject:** Re: LOD - Privileged and confidential

I feel like she is trying to bully you. The aggressiveness is a defensive strategy meant to deflect us from continuing our efforts, like she is being backed into a corner with what she is hiding and she is trying to punch her way out with disrespectful comments hurled at whoever is within reach - PD, co-residents, mentors. We should investigate these allegations. No one said this was going to be easy.
-Jeff

---

**From:** Lisa Catapano
**Sent:** Wednesday, November 11, 2015 2:37 PM

GWU 001255

**To:** Mary Lynn Reed (mlreed@gwu.edu); Jeffrey Berger
**Subject:** Fw: LOD

Here is Stephanie's response to the Letter of Deficiency she received today.

Lisa Catapano, MD, PhD
Program Director
Associate Professor of Psychiatry
George Washington University
2120 L Street, NW
Washington DC 20037
202-741-2886

---

**From:** Stephanie Waggel <swaggel@gwmail.gwu.edu>
**Sent:** Wednesday, November 11, 2015 2:15:19 PM
**To:** Lisa Catapano
**Subject:** Re: LOD

Dear Dr. Catapano,

I have been limiting my contact recently as recommended by my colleagues who believe the best way to get through residency is to stay quiet. It seemed to be working as it has been awhile since last harassed by administration, and with that leaving me with nothing to talk about with my therapist. I finally thought I was coming out of this cycle of getting in trouble (warranted or not), alerting others that I have some "issues," making them feel I need to be scrutinized, ultimately leading back to my getting in trouble. Now that yet another anonymous self-perpetuating concern is occurring again, I will break my silence.

The meeting on Oct 1, which was already rescheduled twice - provoking anxiety, did not provide me with any understanding as to what was going on. You told me "the nurses are upset with your behavior and they wrote an email about you." You then told me that you did not see this email. I asked many times for information about this. You only stated that they were mad that I threatened to call the police. Nothing will discourage me from calling the police when multiple people were assaulted in front of me and I fear for my life and the lives of those around me. I am not the only one who thinks this way. Sunday, Dr. Torres wanted to call the police to escort out a dangerous patient. I told her that although it may be the safe thing to do, I have learned that administration frowns upon it or even the use of the word "police."

Secondly, you state that my presentation that night was "disorganized." I want you to know that I put safety above organization as Dr. Norris stated in our meeting. I was under stress that night but I, and many other physicians agree, was less stressed than most humans would be in a potentially life threatening situation. It was also stressful that I could not hear the majority of what Dr. Khin Khin said on the phone and that she did not even come to the unit.

I deeply regret going to you for help the next morning. I, up until that point, had found you to be genuinely caring of the resident's well being. Now I find that you have used my going to you for help as a weakness. The content of what I told you was ignored. Indeed, you said yes Six South is dangerous but you have to get through it like the other residents, then disregarded the rest of my concerns.  However, my emotions were remembered. My emotions about a night I feared for my life have been brought up several times as a negative

3

GWU 001256

quality. I believe that if it wasn't for my emotions, the situation wouldn't have been handled as safely as I handled it.

As for my "improvement plan," after a month of emailing Dr. Dyer I was finally able to meet with him. I provided him with phone records showing that the ED never called me as they stated in their letter. He said he would look into this and follow up with me. He never did and he never responded to any of my emails or calls since.

I would also like you to know that, as I found in the past when the back up residents refuse to come in, my current "buddies" have no desire to help me, or believe I even need help. They try to leave or actually do leave in the middle of the night with no explanation as to where they are going, and they do not return. And since they aren't even physically present, they certainly don't give me feedback. To cover themselves, they lie to you about the call shift in emails knowing full well you will not ask for or listen to what I have to say --which you indeed haven't. And that is fine as, honestly, I do not have any desire to get into this. However, I invite you to look at the camera footage at the six south unit door. I would never in my life even consider doing something like this. Perhaps you are trying to "fix" the wrong resident.

Sincerely,
Stephanie

On Wed, Nov 11, 2015 at 11:54 AM, Lisa Catapano <lcatapano@mfa.gwu.edu> wrote:

Hi Stephanie,
Attached please find the Letter of Deficiency regarding your call night on August 25, 2015. I think you will find that we've already covered all or most of the content in the meeting you and I had on October 1, and the meeting you had with Dr. Norris and Dr. Gandhi on September 24. Please let me know if you have any questions.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

--

GWU 001257

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

GWU 001258

# EXHIBIT T

| | |
|---|---|
| **From:** | Jeffrey Berger |
| **Sent:** | Thursday, April 21, 2016 11:02 AM |
| **To:** | Mary Lynn Reed (mlreed@gwu.edu) |
| **Subject:** | Fw: meeting tomorrow |



**From:** Jeffrey Berger
**Sent:** Thursday, November 19, 2015 8:09 AM
**To:** Mary Lynn Reed (mlreed@gwu.edu)
**Subject:** Fw: meeting tomorrow

**From:** Jeffrey Berger
**Sent:** Thursday, November 19, 2015 8:03 AM
**To:** Waggel, Stephanie
**Cc:** Lisa Catapano; Mary Tucker
**Subject:** Re: meeting tomorrow

Stephanie:

Please note that there are a few things that you wrote that don't jive with my intent from our meeting:
1. You should not be so forceful in dictating your plans with Dr. Catapano.  Your tone should soften.

2. Please do not reference your attorney going forward, particularly to the people in your Department.  It does not make for a safe working environment. It is your choice to continue to pursue this avenue.

3. Your point in number 5 is not consistent with our conversation.  You may appeal the decision to delay your promotion - as noted in the most recent Letter of Deficiency - to the PGY3 level, or a decision to deny credit for a rotation (as may be the case that you mentioned at our meeting) according to our Academic

1

**GWU 003958**

Improvement Policy.  If you choose to appeal, we will follow our GME policy.  You can easily find this policy on the website.  Note that there is a 14 day time limit to appeal following notification.

4. Point 7 is inconsistent with point 4.

5. I believe you misunderstood my point about feedback.  I stated that trainees get feedback all the time and don't necessarily appreciate the value of the feedback.  Later practice will naturally incorporate feedback (best-practice) from all of the faculty.  I did not suggest that the current feedback you were getting was in any way deficient.  On the contrary, I was suggesting that it is up to you, the trainee, to extract value from your interactions with your faculty and advocate for yourself as an adult learner.

6. A decision about "buddy call" is Dr. Catapano's to make.  I made the recommendation to her.  The rest of your comments are not necessary for your continued development.

I really had a good feeling from our meeting and I know that many members of your Department believe that you can succeed in completing the program.  Remember that we are investing in you - delaying promotion or asking you to repeat a course are significant costs that reflect our commitment to your success.  Doing your part is going to require some effort, and I am hopeful that you will succeed.

-Jeff
Assoc. Dean for GME

---

**From:** Waggel, Stephanie <swaggel@email.gwu.edu>
**Sent:** Wednesday, November 18, 2015 7:17 PM
**To:** Lisa Catapano
**Cc:** Jeffrey Berger
**Subject:** meeting tomorrow

Dear Dr. Catapano,

I have just returned from a highly productive meeting with Dr. Berger. He had asked that I meet with you when you are available to talk about my return to work and formulating a plan for the future. I am willing to work toward improvement, as long as the plan is clear. My goals are to be the best doctor I can be, take care of my health, and avoid further misunderstandings with the administration as this has caused a recent decline in my quality of life. The following are some solutions so that I can meet these goals:

1. Sort out my periodic leave for follow up appointments. This is currently being handled by the Standard and the benefits department and filed as FMLA leave. I was given the option of contacting the EEO as well.

GWU 003959

2. Find a new adviser to work with on my improvement plan as I was having difficulty meeting with Dr. Dyer.

3. Filter information through one individual so that each time I need approval or have a question I do not get directed in circles. Ideally, I would like to hear about issues through the person who has the issues and not their messenger.  I am hoping you could be the point person for these emails.

4. I will strive to not be so focused on what I believe was detrimental to me in the past. I stated that although I do not agree with the majority of the information in the two LODs, I will move on from that and work to make improvements.

5. Dr. Berger's goal is for me to graduate. My goal is to graduate on time. I would like to straighten out a number of things in this regard. My lawyer is also looking into this. I know there have been residents who have taken time off for medical reasons and have graduated on time. I also am still confused as to why I would have to repeat an entire month due to taking a licensing exam I was approved for and taking sick days I followed the protocol for and had doctor's notes for.

6. A check on the evaluation system will be conducted to see how it was Dr. Malik got a hold of my evaluation of her. I have been trying to resolve this issue for months and I am hopeful that this check will allow me to feel comfortable completing evaluations again.

7. It is still unclear to me what the issues are with the Aug 25th call. I have received a large amount of conflicting information. I believe it would be helpful for me to see the information from the RCA. I also would like to point out that this LOD about my meeting with Dr. Norris was said to be written before the meeting with Dr. Norris even took place. This meeting was rescheduled for a later time. I am wondering who was made aware of the details of that meeting. I can bring you the document that explains what was discussed in the meeting. It does not reflect the contents of the LOD.

8. I am willing to accept feedback. As we stated at the retreat, our class would appreciate feedback in a timely manner. Dr. Berger provided me with a great strategy for taking feedback given that my concern has been that my feedback has been conflicting. He stated that there will be people asking for different things and progress changes day to day. I will pick out the best "nuggets" of feedback to formulate the best strategy for improvement. I also think it would be helpful to receive clear and specific feedback. For example, I was told to "improve my organization." What I would find more helpful for example: "Morning report presentations were not clear. You should organize the signout sheets in a way that covers the main points that people want to know in morning report so that you can quickly transition from signout to morning report." I would certainly put in the effort to do what is requested as long as I can understand what is being requested and if completing these tasks requires working with another person, I would request that person be someone who is willing to work with me.

GWU 003960

9. Condo owners don't seem to like condo renters in their building. My retired neighbors complain to the condo board about everything from cars being parked out front to dogs barking to babies crying to people having parties. This neighbor has even kicked my car door in because he did not like where I was parked. They have never spoken to me directly but seem to be angry that the majority of the people on my floor are college students and also have parties. I'm considering moving. I do not have a problem and I am hoping this email about me has not been circulated.

10. I am no longer to be on buddy call. My "buddies" are my peers and seem to have the same knowledge and experience as me. I have not found this to be an educational or helpful experience. The first two buddies did not offer help or feedback and left hours before the call shift was over. I was told to not disclose this information to you so that they wouldn't get in trouble, however, this is at a cost to me as I was not receiving any kind of support during my "buddy call." I feel it would be more helpful to learn from an attending. If I am overwhelmed on call, it seems policies were sent to the social workers stating they have to see every 3rd patient (which when I was on there were not) and email was sent saying if the backup resident is needed they should come in (which this person did not when I needed her) after my difficult call night. Hopefully people now understand these policies.

Please let me know when you have time to meet. I look forward to making a plan with you.

Sincerely,

Stephanie

--
Stephanie E. Waggel M.D, M.S.

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

GWU 003961

# EXHIBIT U

Lisa:

Here's a summary of meeting.  Overall went well - I think Stephanie and I left the meeting hopeful.
I told her that you spoke very highly of her as a hard-working resident who cared about patients.

Discussed her record, LoDs, and improvement plan. Also discussed email from community member.

Explained that the goal is graduation.  Noted that she should not be so focused on time - if there is a delay or prolongation of training, that actually represents the program investing in her as it costs GW to keep trainees beyond their CMS-approved training time.

Plan:
1. Stephanie will accept some responsibility for her situation
2. Stephanie will work to successfully improve according to the plan laid out in the LoDs and is interested in specific actions that she can take to continue to improve.
3. Stephanie will get information from Mary Tucker to contact the Equal Employment Opportunities Office at GW and work on a plan for accommodation.  I told her that legally, you are not permitted to give her any special treatment for missing time, etc, without such an accommodation.  Stephanie is going to look into that.
4. Stephanie will not report for a "fitness for duty evaluation."  After discussing the complaint from the member of the community, it was clear that this complaint did not merit impinging on her employment with us at GW and represented a community matter that should remain as such.  Stephanie denied having a substance abuse or impairment problem.  She said that she would not report to work within 10 hours of requiring a pain medication.
5. I am requesting that you offer a new faculty member to meet with Stephanie to work on her LoDs (Not Dr. Dyer).
6. I am requesting that you minimize the residents, including chief residents, in the process of oversight and evaluation of Stephanie.  I understand that call changes require chief involvement.
7. Ranjeet will look into our MedHub system and report to me to confirm that the new system is indeed confidential for trainees who evaluate faculty.

Next steps:
1. Stephanie will reach out to you to meet.  Hopefully tomorrow (Thursday).  At that time, the corrected LoD can be given and you can discuss the plan for didactics and a LoD for time missed.  I am hopeful that some sort of compromise plan can be worked out for her that is acceptable to all parties.  Please reinforce the notion that we are investing in her to graduate; finishing "on time" shouldn't necessarily be the goal in light of important time missed.
2. Please clarify with her the status of her last rotation that she took time off for medical leave (and step III).

GWU 001303

We discussed options:
1. Return to work and comply with Improvement Plans.
2. Take extended Leave of Absence and start again as PGY2 in July 2016.
3. Seek another program for a fresh start.
I mentioned that at this point, all three are viable options.

Thank you for your efforts.
-Jeff

GWU 001304

Stephanie:

Please note that there are a few things that you wrote that don't jive with my intent from our meeting:
1. You should not be so forceful in dictating your plans with Dr. Catapano. Your tone should soften.

2. Please do not reference your attorney going forward, particularly to the people in your Department. It does not make for a safe working environment. It is your choice to continue to pursue this avenue.

3. Your point in number 5 is not consistent with our conversation. You may appeal the decision to delay your promotion - as noted in the most recent Letter of Deficiency - to the PGY3 level, or a decision to deny credit for a rotation (as may be the case that you mentioned at our meeting) according to our Academic Improvement Policy. If you choose to appeal, we will follow our GME policy. You can easily find this policy on the website. Note that there is a 14 day time limit to appeal following notification.

4. Point 7 is inconsistent with point 4.

5. I believe you misunderstood my point about feedback. I stated that trainees get feedback all the time and don't necessarily appreciate the value of the feedback. Later practice will naturally incorporate feedback (best-practice) from all of the faculty. I did not suggest that the current feedback you were getting was in any way deficient. On the contrary, I was suggesting that it is up to you, the trainee, to extract value from your interactions with your faculty and advocate for yourself as an adult learner.

6. A decision about "buddy call" is Dr. Catapano's to make. I made the recommendation to her. The rest of your comments are not necessary for your continued development.

I really had a good feeling from our meeting and I know that many members of your Department believe that you can succeed in completing the program. Remember that we are investing in you - delaying promotion or asking you to repeat a course are significant costs that reflect our commitment to your success. Doing your part is going to require some effort, and I am hopeful that you will succeed.

-Jeff
Assoc. Dean for GME


Waggel, Stephanie <swaggel@email.gwu.edu>


Reply all|

GWU 001305

To:
Lisa Catapano;

Cc:
Jeffrey Berger <jberger2@email.gwu.edu>;

Wed 11/18/2015 7:18 PM
Inbox
You replied on 11/19/2015 8:03 AM.

Dear Dr. Catapano,

I have just returned from a highly productive meeting with Dr. Berger. He had asked that I meet with you when you are available to talk about my return to work and formulating a plan for the future. I am willing to work toward improvement, as long as the plan is clear. My goals are to be the best doctor I can be, take care of my health, and avoid further misunderstandings with the administration as this has caused a recent decline in my quality of life. The following are some solutions so that I can meet these goals:

1. Sort out my periodic leave for follow up appointments. This is currently being handled by the Standard and the benefits department and filed as FMLA leave. I was given the option of contacting the EEO as well.

2. Find a new adviser to work with on my improvement plan as I was having difficulty meeting with Dr. Dyer.

3. Filter information through one individual so that each time I need approval or have a question I do not get directed in circles. Ideally, I would like to hear about issues through the person who has the issues and not their messenger.  I am hoping you could be the point person for these emails.

4. I will strive to not be so focused on what I believe was detrimental to me in the past. I stated that although I do not agree with the majority of the information in the two LODs, I will move on from that and work to make improvements.

5. Dr. Berger's goal is for me to graduate. My goal is to graduate on time. I would like to straighten out a number of things in this regard. My lawyer is also looking into this. I know there have been residents who have taken time off for medical reasons and have graduated on time. I also am still confused as to why I would have to repeat an entire month due to taking a licensing exam I was approved for and taking sick days I followed the protocol for and had doctor's notes for.

6. A check on the evaluation system will be conducted to see how it was Dr. Malik got a hold of my evaluation of her. I have been trying to resolve this issue for months and I am hopeful that this check will allow me to feel comfortable completing evaluations again.

GWU 001306

7. It is still unclear to me what the issues are with the Aug 25th call. I have received a large amount of conflicting information. I believe it would be helpful for me to see the information from the RCA. I also would like to point out that this LOD about my meeting with Dr. Norris was said to be written before the meeting with Dr. Norris even took place. This meeting was rescheduled for a later time. I am wondering who was made aware of the details of that meeting. I can bring you the document that explains what was discussed in the meeting. It does not reflect the contents of the LOD.

8. I am willing to accept feedback. As we stated at the retreat, our class would appreciate feedback in a timely manner. Dr. Berger provided me with a great strategy for taking feedback given that my concern has been that my feedback has been conflicting. He stated that there will be people asking for different things and progress changes day to day. I will pick out the best "nuggets" of feedback to formulate the best strategy for improvement. I also think it would be helpful to receive clear and specific feedback. For example, I was told to "improve my organization." What I would find more helpful for example: "Morning report presentations were not clear. You should organize the signout sheets in a way that covers the main points that people want to know in morning report so that you can quickly transition from signout to morning report." I would certainly put in the effort to do what is requested as long as I can understand what is being requested and if completing these tasks requires working with another person, I would request that person be someone who is willing to work with me.

9. Condo owners don't seem to like condo renters in their building. My retired neighbors complain to the condo board about everything from cars being parked out front to dogs barking to babies crying to people having parties. This neighbor has even kicked my car door in because he did not like where I was parked. They have never spoken to me directly but seem to be angry that the majority of the people on my floor are college students and also have parties. I'm considering moving. I do not have a problem and I am hoping this email about me has not been circulated.

10. I am no longer to be on buddy call. My "buddies" are my peers and seem to have the same knowledge and experience as me. I have not found this to be an educational or helpful experience. The first two buddies did not offer help or feedback and left hours before the call shift was over. I was told to not disclose this information to you so that they wouldn't get in trouble, however, this is at a cost to me as I was not receiving any kind of support during my "buddy call." I feel it would be more helpful to learn from an attending. If I am overwhelmed on call, it seems policies were sent to the social workers stating they have to see every 3rd patient (which when I was on there were not) and email was sent saying if the backup resident is needed they should come in (which this person did not when I needed her) after my difficult call night. Hopefully people now understand these policies.

Please let me know when you have time to meet. I look forward to making a plan with you.

Sincerely,

Stephanie

--

Stephanie E. Waggel M.D, M.S.

GWU 001308

# EXHIBIT V



Stephanie Waggel <swaggel@gwmail.gwu.edu>

---

## summary of our meeting

5 messages

---

**Lisa Catapano** <lcatapano@mfa.gwu.edu>                                   Thu, Nov 19, 2015 at 6:00 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>
Cc: Lori Kels <lkels@mfa.gwu.edu>


Hi Stephanie,


Just wanted to summarize the main points of our meeting this evening:

1.   I received feedback from Dr. Griffith and Dr. Collins that your performance in their classes in the first quarter/third of the year was unsatisfactory.  We discussed the possibility that they may recommend that you repeat their classes next year.  This would mean that you do not proceed with the rest of PGYII didactics going forward this year, as they build upon these early seminars.  Since they have not given you their final recommendations on this, we discussed the fact that you could have some time to meet with them, finish any outstanding work, and finalize your evaluations for the courses.

2.   I presented you with your corrected LOD.

3.   Dr. Kels and I will work with you to establish a detailed plan regarding your extra supervision by your attending on call.  We will also have to review the call schedule and make the appropriate changes to have you on solo call (with attending supervision available by phone).  We will get back to you as soon as possible to let you know when you are next on call.

4.   You pointed out that in a previous email, I was incorrect about the time of the meeting you had with Dr. Norris and Dr. Gandhi.  I was under the impression that it had taken place early on October 15, when it was in fact rescheduled to the end of that day.  My mistake.

5.   We discussed the fact that you would like more details about the root cause analysis of your call night on August 25.  I suggested you reach out to Dr. Norris and ask him to discuss it with you.  I also suggested that you bring your LOD regarding that night, so that you may compare its contents with his analysis and ask him if there are any discrepancies.

6.   We confirmed that you are to return to work on Geriatrics tomorrow for your normal duties.


Take good care of yourself, and as we discussed, let's plan to meet right after Thanksgiving next week.


Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886

---

Stephanie Waggel Supp. Prod. (Oct.) 261 of 466.

https://mail.google.com/mail/u/1/?ui=2&ik=64e5955d5d&jsver=g8gQ0BaJEzM.en.&view=pt&cat=Waggel%20v%20GW%20by%20Steph&search=cat&t…  1/4

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

---

Stephanie Waggel <swaggel@gwmail.gwu.edu>                    Thu, Nov 19, 2015 at 8:51 PM
To: Lisa Catapano <lcatapano@mfa.gwu.edu>
Cc: Lori Kels <lkels@mfa.gwu.edu>, "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>

Dear Dr. Catapano,

I am very glad that we had our meeting today. Dr. Berger stated that I would have 14 days from a decision to hold me back from PGY3 or having to repeat a rotation. My understanding is that decision was not made yet. I think you were going to try to find out if I do have to make up PHP. I mentioned that the idea to have me repeat PHP was made before I went on medical leave. Hopefully, I will have shown that I did enough on PHP to not have to do the month over again. I would like it be taken in consideration that the week Dr. Malik was on vacation, the replacement physician felt uncomfortable working with residents and asked me to go to another site. This was out of my control.

I had also sent an email to Jason to inform him when I had appointments this month so that I would not be on call on those days. I can forward the email so that if my call schedule does need to be changed it is not interfering with the days I requested to not be on call. Also, if it is okay with you, can I ask Tory to be my point person? Dr. Berger and I talked about having one main person be the contact person. As you mentioned, if I get sick during the night, for example, I will still need inform those affected. I will cc Tory and hopefully she will be able to tell me if the protocol I followed was acceptable. I appreciate the time you took with me this afternoon. I hope that things start turning around for the better. I am willing to do what it takes to make it work as long as those things are fair and explained to me.

Best,
Stephanie
[Quoted text hidden]
--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

Lisa Catapano <lcatapano@mfa.gwu.edu>                    Wed, Nov 25, 2015 at 10:34 AM
To: Stephanie Waggel <swaggel@gmail.gwu.edu>
Cc: Lori Kels <lkels@mfa.gwu.edu>, "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>

Hi Stephanie,

Thanks for all of the effort you are putting into your work, your scheduling, and your communications with us. It's obvious you are trying (as always) to make improvements.

With regard to your promotion to the PGY3 year, it is definite that you will not be ready on July 1, 2016, and that is stated in the Letter of Deficiency I gave you last Thursday. I know you also have an email from Dr. Collins from last Friday stating you will have to retake her course. I don't know if you have it in writing from Dr. Griffith, but from my communication with him, my understanding is that you will have to retake his course as well. Let me know if you have any questions about that.

As we discussed, we will need to work out a system for your absences, including a point person (probably me) to help you. (Also, as we discussed, this wouldn't be for last minute absences, and wouldn't be a substitute for you contacting your supervisors directly.) I will work on outlining a plan for that next week.

Take good care of yourself, and I hope you have a good holiday. We will talk again next week.

Lisa Catapano, MD, PhD

Stephanie Waggel Supp. Prod. (Oct.) 262 of 466.

https://mail.google.com/mail/u/1/?ui=2&ik=64e5955d5d&jsver=g8gQ0BaJEzM.en.&view=pt&cat=Waggel%20v%20GW%20by%20Steph&search=cat&t... 2/4

Header Page 263 of 466.

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886

**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Thursday, November 19, 2015 8:51 PM
**To:** Lisa Catapano
**Cc:** Lori Kels; Victoria H. Anderson
**Subject:** Re: summary of our meeting

[Quoted text hidden]
[Quoted text hidden]

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>        Wed, Nov 25, 2015 at 4:39 PM
To: Lisa Catapano <lcatapano@mfa.gwu.edu>
Cc: "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>

Dear Dr. Catapano,

Thank you for your reply and helping me find a point person. During our meeting on Thursday Nov, 19 you mentioned I speak with Dr. Griffith about my progress in his class. I stopped by his office before leaving the MFA and he said that as the exams are cumulative, I can demonstrate my neuroscience understanding by doing well on the next exam which is December 17. I remember sharing my excitement about this with you before leaving the MFA. Has something changed since then?

My specific time-sensitive question about Dr. Collin's class is, have I officially failed it despite being notified one week prior that I was passing and that Dr. Collin's has not graded my final paper?

My LOD states that I am to meet with Dr. Kels within one week of Nov, 19. On Nov 20 I contacted Dr. Kels, but she has not had a chance to meet with me yet. She said she'll get back to me next week. Is there a way to avoid the adverse consequences of not meeting with her in the 7 days?

Thank you,
Stephanie

[Quoted text hidden]

---

**Lisa Catapano** <lcatapano@mfa.gwu.edu>        Mon, Nov 30, 2015 at 2:37 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>
Cc: "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>

Hi Stephanie,

Regarding Dr. Griffith's course, what he told me after he spoke to you on November 19, and what he reiterated in his email to you today, is that he is allowing you to take the Dec 17 exam, but because you failed the first two exams, you will need to at least retake the first section of his course. He will have to decide, after the next exam, whether you will continue in his course for the rest of this year.

Stephanie Waggel Supp. Prod. (Oct.) 263 of 466.

Regarding Dr. Collins's course, her email from November 25 states that you did not pass her course, and will have to retake it next year.  This means you will not get a supervisor or therapy patient this year, and cannot take Dr. Zinner's course or T-group.

Just to make sure everything's clear regarding your didactic schedule, for the next few weeks you will continue to be in Dr. Griffith's course, and continue in the Global Mental Health course.

Regarding your meeting with Dr. Kels, I understand that you attempted to contact her last week, and got a response from her on Wednesday.  Although you were not able to meet with her within one week, I know that you made a significant effort and that she got back to you to say she got your message. You will not be penalized for the fact that you have not met with her yet.

Please let me know if you have any questions about any of the above.

Take care,


Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Wednesday, November 25, 2015 4:39 PM
**To:** Lisa Catapano
**Cc:** Victoria H. Anderson

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

Stephanie Waggel Supp. Prod. (Oct.) 264 of 466.

https://mail.google.com/mail/u/1/?ui=2&ik=64e5955d5d&jsver=g8gQ0BaJEzM.en.&view=pt&cat=Waggel%20GW%20by%20Steph&search=cat&t…    4/4

# EXHIBIT W



**PSYCHIATRY & BEHAVIORAL SCIENCES**

at The GW Medical Faculty Associates

2120 L Street, NW, Suite 600
Washington, DC 20037
phone: 202.741.2900  fax: 202.741.2891
www.gwupsychiatry.org


HAND DELIVERED

Stephanie Waggel, MD

Department of Psychiatry

The George Washington School of Medicine & Health Sciences


Re: Letter of Deficiency, Notification of Reportable Action

December 10, 2015

Dear Dr. Waggel:

This Letter of Deficiency follows your earlier Letter of Deficiency dated 11/19/15, in which you were informed that based on insufficient competencies in Patient Care, Interpersonal Communication Skills and Systems-Based Practice, that you will not be promoted to the PGYIII year on July 1, 2016.  You are receiving this current Letter of Deficiency under the current policy for academic improvement for Graduate Medical Education at the George Washington University.  According to a review of your clinical standing by the Department of Psychiatry Clinical Competency Committee (CCC), you have shown deficiency in the competency of Medical Knowledge.

As per Dr. Cheryl Collins's email to you on November 25, 2015, as well as phone conversations between Dr. Collins and you on November 24 and November 25, 2015, you did not demonstrate sufficient competency in her Psychodynamic Theory course to pass it and to progress to having an individual psychotherapy patient assigned to you this month.  As a result, you will not move on to Dr. Zinner's Psychodynamic Psychotherapy course.  Dr. Zinner does not permit residents who have not demonstrated sufficient competency in Psychodynamic Theory to participate in his course, part of which includes the assignment of psychotherapy patients.

Additionally, in Dr. Griffith's Neuroscience course, you received failing grades of 33 on both of the first two exams.  In Dr. Griffith's email to you dated November 25, 2015, he stated that you "did not acquire the needed level of knowledge needed to move forward.  You need to repeat the course next year, which is consistent with what residents have been required to do in the past when they did not show evidence of having learned the material."

Consequently, you will be required to repeat Dr. Collins's Psychodynamic Theory course next year.  If you pass the course at that time, you will be permitted to participate in Dr. Zinner's Psychodynamic Psychotherapy course, and will be assigned a psychotherapy patient and a supervisor.

1

In the meantime, if you would like to further your understanding of psychodynamic theory and better prepare yourself to be successful in Dr. Collins's class next year, you are welcome to contact her and request extra reading materials.

You will also be required to repeat at least the first part of his course next year in which the content of the first two exams is covered.  Pursuant to your conversation with Dr. Griffith on November 19, 2015, he is allowing you to take the next exam on December 17 before determining whether you may continue in the class this year, or withdraw from the class and repeat it in its entirety next year.

The Medical Knowledge deficiencies outlined above further demonstrate that you are not prepared to be promoted to the PGYIII year in July, 2016.  In accordance with your Letter of Deficiency dated November 19, 2015, , you will be required to continue in PGYII clinical rotations when the next academic year starts, and, as referenced above, repeat the PGYII didactic courses.  You will be eligible to be promoted to PGYIII standing at any time during the academic year, once the Clinical Competency Committee determines that you have satisfactorily completed all of your PGYII rotations, and, at least, successfully repeated both Dr. Collins's Psychodynamic Theory course and the first section of Dr. Griffith's Neurobiology course.

Please note that, given the way our program is structured, any resident who is promoted to PGYIII standing significantly after the academic year has started is required to continue in inpatient rotations until the following July.

The GW Academic Improvement Policy can be found at the following link: http://smhs.gwu.edu/sites/default/files/GW%20GME%20Academic%20Improvment%20Policy.jb.6.27.pdf.

According to this policy, if you wish to appeal your non-promotion as set forth in your Letter of Deficiency dated November 19, 2015, your appeal must be submitted no later than December 11, 2015. The appeal of the course failures must be submitted no later than 14 days after receipt of this Letter.

A review and update of your progress will be reported at the next CCC meeting and will be reviewed in your next Semi-Annual Meeting with me.  If you have any further questions, please feel free to discuss them with me.

Lisa A. Catapano, MD, PhD

Director, Psychiatry Residency Program

# EXHIBIT X

 Gmail

**Stephanie Waggel <sewaggel@gmail.com>**

---

## Appeal confirmation Dec 11
1 message

---

**Stephanie Waggel** <sewaggel@gmail.com>          Fri, Dec 11, 2015 at 2:17 PM
To: swaggel@gwmail.gwu.edu

Dear Dr. Catapano,

My appeal was confirmed as received by Dr. Berger, today, December 11, 2015. I have attached his confirmation to this email. Have a nice weekend.

Best,
Stephanie

Sent from my iPhone



**FullSizeRender.jpg**
69K

# EXHIBIT Y

Requesting a Review of a Reportable Action
Stephanie Waggel
12/23/15

Dear Dr. Cioletti

I am a PGY2 psychiatry resident writing to request a review of the decision for me to repeat the course "Introduction to Psychodynamic Thought" taught by Dr. Cheryl Collins and the "Clinical Neurosciences Seminar" taught by Dr. James Griffith for the following reasons:

1.  I was led to believe I was passing.

2.  I was told by my program director that I would have time to meet with my instructors and finish my assignments before my grades were finalized at 6pm November 19th, and at 9pm November 19th, I was informed that I failed.

3.  Multiple attempts to obtain feedback and clarity were unsuccessful and I was given no letter of deficiency warning me of the possibility of a reportable action.

4.  The reasons given to me for this failure were not made clear to me or mentioned in the syllabus for either class.

5.  I was informed that my failure of these classes was not up for discussion before my final assignments were graded giving me no chance to improve.

This decision negatively affects my progress in the psychiatry residency program by preventing me from being assigned a psychodynamic supervisor which is needed to continue with psychodynamic cases this year. Failing these courses will result in my repeating this entire year, which I am only five months into. Below I have provided further information on the five points listed above for both courses.

<u>Psychodynamic Thought</u>

1. I was led to believe I was passing.

On Nov 7th Dr. Collins emailed me stating I was passing. On Nov 10th I began administrative leave. On Nov 19th I returned from this leave. On Nov 19th Dr. Collins emailed me stating I had failed. Below is the Nov 7th email from Dr. Collins suggesting that I re-read a few articles to help with my final psychodynamic formulation.  She also stated that she would assign me a supervisor indicating that I am to go on to the second part of the course.



519

Before writing your final formulation please go back and reread Shedler's article
to help you distinguish between psychodynamic and cognitive ideas. I have
attached the link to it. In addition, reread the Cabiness articles on affect, ego and
the defenses and unconscious conflict to better understand them. Let me know if
you need the articles-I have them in PDF.

I will assign you a supervisor soon. I will be recommending that you go over the
material with her, a tutorial of sorts, and then she can decide when you have
mastered it sufficiently to begin seeing a patient. I don't think you can begin a
psychodynamic case until you are further along. I will be sharing these comments
and recommendations with Drs. Catapano, Kels and Dr. Zinner, the next
psychodynamic instructor.

On Nov 10th at 6pm I received a phone call from Dr. Catapano stating I was to begin administrative leave. I requested a written
confirmation of this and asked for guidance on how I should go about informing my didactics instructors of this leave. I was
concerned as this leave coincided with some of Dr. Collins' assignments. I did not receive a reply to my question of who/how to
inform of my absence during didactics. I remained under the impression I was passing and was not told otherwise until the day I
returned from leave.



2. I was told by my program director that I would have time to meet with my instructors and finish my assignments before my
grades were finalized at 6pm November 19th, and at 9pm November 19th, I was informed that I failed.

On Nov 19th when I returned from leave, I spoke with Dr. Catapano who stated that because Dr. Collins' and Dr. Griffith's
recommendations on my status in their classes were not final, that I could finish my assignments and meet with them before
my grade is finalized.



A few hours later on Nov 19th I was informed that it was "in my interest" to repeat this course. I was not given an opportunity to
make improvements or have my final graded. I attempted to speak with Dr. Collins over the phone to clarify how my current
situation had changed so dramatically since my last feedback. I explained that missing her class was due to an extenuating
circumstance necessitating a leave of absence. I asked if her email was an official indication of failure. I also asked if she would
grade my final paper before making the decision that I have already failed. She stated she would not be grading my final paper
as she did not have time. Dr. Collins stated that my failure was not up for discussion.

Requesting a Review of a Reportable Action
Stephanie Waggel
12/23/15



## 3. Multiple attempts to obtain feedback and clarity were unsuccessful.

I was not given a letter of deficiency stating that I was at risk for failing this class or an opportunity to cure this deficiency as required by the Academic Improvement Policy. I was only given a letter stating that the decision to fail me was final after I sent multiple emails asking for an explanation of this situation in writing. In addition, I received conflicting information from multiple sources as to the status of this situation. After my discussion with Dr. Collins on Nov 19th, I emailed Dr. Catapano to clarify how I could have failed a class that I was informed I was passing 12 days prior, 9 days of which I was on leave. According to the Academic Policy, I have 14 days from receiving official notification from the program director to ask for a review and therefore, needed a clear response from the program director.  In addition, I was confused as to how I could have failed without having my final paper graded. I also stated that Dr. Collins said this failure was a result of missing the classes on Nov 12th and 19th, however, I was instructed by Dr. Catapano to not attend classes on Nov 12th and 19thand did not get a reply to my question of how to inform her that would not be there. Because of the nature of this leave of absence, I asked for guidance on informing others of my absence but unfortunately did not receive any. I had missed the class prior to that due to FMLA leave. I also asked what failing this class would mean for the future. I did not receive a reply to this email.



On Nov 20th I received an email from Dr. Collins stating my questions about this course should be directed to Dr. Catapano.



On Nov 24th I sent another email with the same questions asked in my Nov 19th email. I did not receive a reply.

On Nov 25th I asked Tory to help me find out my status in Dr. Collins' class and indicated that it was time sensitive.

Requesting a Review of a Reportable Action
Stephanie Waggel
12/23/15



On Nov 25th Dr. Catapano stated that Dr. Collins said I would have to retake her course and I cannot go to PGY3 on July 1, 2016. This did not address my questions.



On Nov 25th I clarified that my question was if I was to consider this an official notice, considering I had been told I was passing and that my final paper had not been graded.



On Nov 30th Dr. Catapano stated that an email from Dr. Collins states that I did not pass her course, meaning I cannot take Dr. Zinner's course, or have a supervisor or therapy patient. This did not address my question of whether it could be taken into consideration that I was told I was passing and my final assignment was not yet graded. Also, it remained unclear what failing this class would result in. She first stated that taking a didactics class would mean taking all PGY2 rotations while being considered a PGY3, then she stated I would be delayed from becoming a PGY3, and then she stated it means not taking Dr. Zinner's course.  While attending didactics, I was asked to leave the room in front of everyone during the class and to sit outside to wait for the next class to start. Dr. Zinner stated this decision was Dr. Catapano's and Dr. Catapano stated the decision was Dr. Zinner's.



4. The reasons given to me for this failure were not made clear to me or mentioned in the syllabus for either class.

Requesting a Review of a Reportable Action
Stephanie Waggel
12/23/15

Below is the syllabus for this class. There is no mention of pass/fail criteria. I was unaware that failing this class was a possibility for me. The methods used to decide if a resident progresses to the next class were not made known to us.

Cheryl Collins, M.D.
Adult, Child & Adolescent Psychiatrist and Psychoanalyst
Office: 202.537.7045
Cell: 301.802.5700
Email: cherylcollins.md@verizon.net
Course dates/time: Thursdays: July 9th-November 19*  2-3:15 p.m.

Course Objective: The objective of this course is to introduce psychodynamic concepts and apply them to clinical examples. Psychoanalytic theory encompasses several theories of mind including but not limited to ego psychology, self-psychology and object relations psychology. This class will emphasize concepts that unify these theories rather than expounding upon any one theory.  In particular, we will focus on the unconscious, the ego, defenses, transference and countertransference. *Focusing on these concepts serves to highlight the principal distinctions between psychodynamic therapy and other therapies, namely the use of the unconscious and use of the psychiatrist-patient relationship as treatment tools.*

Course Format:  One resident will be assigned weekly to lead the discussion of the assigned reading. In addition, 1-2 class members should be prepared weekly to present a patient. (The presentation should be 1-5 minutes in length and the patient can be one you have seen on any rotation.) To accommodate post call scheduling, the order of presentations should be decided by class members but everyone should plan to present. Regarding the reading list that follows, all readings are required; those starred will not be discussed in class.

Course Assignments: You will write two formulations based on patient interviews. Attendance is mandatory for the patient interview dates which are currently scheduled for Oct 1st, Oct 15th, and October 29*. Your first formulation will be discussed in class, anonymously, to provide you with group feedback.  The second formulation will be discussed with you individually on the last two course dates, November 11th and 18*.

5.  I was informed that my failure of these classes was not up for discussion before my final assignments were graded giving me no chance to improve.

When I asked Dr. Collins if she would grade my final paper before making the decision that I have failed, she stated she would not be grading my final paper as she did not have the time. She then said she is volunteering her time to teach this lecture and can choose to not grade my assignment if she wishes. She stated I was grandiose for thinking she would give up her time for me. The ACGME states that faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment. However, I was not permitted to complete my assignment.

Clinical Neurosciences

1. I was led to believe I was passing.

I took the first neuroscience exam in the program coordinator's office as I was post 30-hour shift on the day the exam was scheduled. When I asked how much time I should spend on the exam she replied that I should try to do well but they would not count against me.  The information given to me guided my time management. I spent all free time studying for the USMLE Step Three as the importance of that exam was clear. I was led to believe that my class as a whole was performing poorly on the Clinical Neurosciences exams and I was unaware that my grades were of particular concern. On Nov 19th, I returned from administrative leave and met with Dr. Catapano who stated failing this class was indeed a possibility. After I met with her, I stopped by Dr. Griffith's office to clarify the grading system of his class and what could be done to improve. I offered to retake the exams now that I was aware these exam scores had repercussions.  At this point, there still remained material from October to December and a final exam. Dr. Griffith stated it was not necessary for me to retake the old exams and that I should strive to do well on the final to prove my over-all knowledge in this class as it is a cumulative final. I was visibly happy and thanked him. I then returned to Dr. Catapano's office stating I had good news and that I was going to put a great deal of effort into my final exam.  It was apparent that I was under the impression I had just received good news. Three hours later, Dr. Collins informed me that I had failed Dr. Griffith's class.

2.  I was told by my program director that I would have time to meet with my instructors and finish my assignments before my grades were finalized at 6pm November 19th, and at 9pm November 19th, I was informed that I failed.

On Nov 19th I left Dr. Griffith's office thanking him for the chance to prove myself in his class and informing Dr. Catapano of this good news. About an hour later I received this email from Dr. Catapano stating I would be given that chance to meet with my instructors and finish my assignments before my evaluations were finalized. I had created a study plan and looked at my schedule for times to meet. Three hours later, Dr. Collins emailed me stating it was in my interest to repeat her course. I then asked her to call me. During our conversation, I explained that I was confused as her previous feedback stated I would be assigned a supervisor and given an opportunity to work on my assignments. I asked if I could meet with her or she would at least grade my final assignment before making the decision. She stated that she does not have time to grade my assignment as she works as an instructor on a volunteer basis. She then commented that my failing her class would not impact my progress in the residency as I would be repeating Dr. Griffith's class anyway. I informed her that I had spoken with Dr. Griffith earlier that day and he had given me an opportunity to show my knowledge on the final exam next month. She then said the conversation was over and my failure was not up for discussion.



3.  Multiple attempts to obtain feedback and clarity were unsuccessful.

In October, Dr. Griffith addressed the class stating we were doing poorly on our exams and that we appear to be demoralized. I informed him that we were demoralized and that our suggestions for help were not being taken seriously. I emailed him stating that I would like to meet with him about this. He replied by saying that he would not meet with me one-on-one but he would meet with the class as a whole. After speaking with my class, I found that they had also performed poorly on the exam and issues with administration were interfering with their learning as well. However, as Dr. Griffith is the chair, they did not feel comfortable meeting with him to talk about this. I replied to Dr. Griffith by stating I would like to meet with him to talk about this but others would likely not. My classmates did not reply to his email and the meeting did not take place. From then until the day I was informed of my failure, I received no further feedback, no letter of deficiency, and no opportunity to cure this deficiency as required by the Academic Improvement Policy. I also do not understand why Dr. Collins was the one to first inform me that I failed Dr. Griffith's class.

Requesting a Review of a Reportable Action
Stephanie Waggel
12/23/15

From: sew1apple@gmail.com <sew1apple@gmail.com>
Sent: Thursday, October 22, 2015 7:39 PM
To: James Griffith
Subject: Demoralization

Dear Dr. Griffith,

I was pleased to hear that you are willing to speak with us about what has been going on recently. I would like very much to meet with you when you have the time. Please let me know if you still wish to meet and when you are available

Sincerely,
Stephanie

Re: Demoralization

James Griffith <jgriffith@mfa.gwu.edu>
to sewaggel, Carole, John, Monica, Seth, me, TJ, TJ

Dear Stephanie,

What I was suggesting was something different-- that I meet with all of you as a class to discuss dealing with demoralization as a problem getting in the way of your learning and, it sounded to me, spelling your experience of residency together. What I would have to draw upon would be my own experiences of struggling with hard circumstances-- failures, humiliations, and regrets at times-- yet finding ways to make the struggle worthwhile in the end. If that were to be helpful, I would be glad to do that.

I am also aware that my administrative role as chair of the department might make it difficult to have the openness needed for this to be useful. I respect that, and someone else perhaps could better take that role. You can let me know.

Best wishes,
Griff

Stephanie Waggel <sew1apple@gmail.com>
to James

Dear Dr. Griffith

Thank you for your response. I think that is a great idea. The issue with us all meeting for this is that I believe I will be the only one willing to voice my concern. For a variety of reasons, I do not believe the rest of my class would feel comfortable talking about what is going on. If others respond to this I would certainly be interested in attending.

Sincerely,
Stephanie

4. The reasons given to me for this failure were not made clear to me or mentioned in the syllabus for either class.

This year was the first year of residency during which my class participated in didactics. Most of our courses did not have exams or assignments. Based on the information provided by administration and my classmates, I did not realize it possible to "fail" a didactics course. I assumed one may have to repeat a course in extreme circumstances, but the possibility was not brought to my attention until the end of Novemeber. The syllabus (below) does not describe a method for assessment. It does not say what score is needed to pass or if the exams are weighed differently. It states that the course should enable a score in the 50th percentile on the PRITE exam (which has not been graded yet). I was not informed of the existence of the criteria for passing at anytime throughout the course including the time I received my test scores. Although it was mentioned in an email that I did poorly on 2 exams, I have only been given back one exam. If I was made aware that there was a concern about my grade, I would have rearranged my time after work to include both USMLE and neuroscience study.

September 10, 2015

TO:      All PGY-II Residents

FROM:  James Griffith, M.D.

RE:      Revised Schedule for Cognitive and Social Neuroscience Lectures

The Clinical Neurosciences Seminar will meet in the Freud Conference Room from 9:30 – 10:30 am on Thursdays according to the schedule below. All PGY-II residents are required to attend. This lecture series will address the neural circuitry and the cognitive and social neuroscience that underpins psychiatric treatment. A written examination on this material will be given at a midpoint and at the end of the series.

As a PGY-II seminar, the Clinical Neurosciences Seminar has as its objectives:
(1) Acquiring sufficient knowledge of psychopharmacology for patient care during PGY-II rotations;
(2) Acquiring a knowledgebase in psychopharmacology that will enable a score of 50th percentile or higher on the Somatic Treatments subscale of the nationally-standardized PRITE In-Service Examination, compared to other same level residents across the country;
(3) Learning a neurobiological model for the psychopathology of major psychiatric disorders that can guide psychopharmacological, psychotherapeutic, and psychoeducational therapies with outpatients.

In studying for examinations, you should review the learning objectives for each lecture in both the lecture handout and selected readings distributed for that lecture. All exam questions are based upon the lecture learning objectives.

5. I was informed that my failure of these classes was not up for discussion before my final assignments were graded giving me no chance to improve.

The PRITE exam mentioned in the syllabus is not yet graded. In addition, the final exam covering material from the months of October through December have not yet been graded. I was informed of my failure by Dr. Collins on Nov 19th and the final exam did not occur until one month later. Doing well on the final would have demonstrated my understanding of the majority of the material covered in this class. I was not made aware that it was possible to fail a class before it is over or that it was possible to fail parts of classes. Below are the lectures that I was not given an opportunity to demonstrate my knowledge on before the decision to fail me was made.

## October

| 15 | "The Neurobiology of Schizophrenia, Part One: Brain Circuitry and Neural Signaling" and "The Neurobiology of Schizophrenia, Part Two: The Roles of Dopamine and Glutamate Neurotransmitter Systems in Psychotic Disorders" |
| 22 | "First Generation (Typical) Antipsychotic Medications" (James Griffith, M.D.) |
| 29 | "Second Generation (Atypical) Antipsychotic Medications" |

## November

| 5 | "The Recovery Movement for Severe and Persistent Mental Illnesses" |
| 12 | "Excelsior: A Unified Understanding of Illnesses of Dopamine Dysfunction" (Dan Lieberman, M.D.) |
| 19 | "Family Psychoeducation and Multi-Family Groups for Outpatient Management of Schizophrenia" |
| 26 | THANKGIVING HOLIDAYS |

## December

| 3 | "Atypical Antipsychotics: From Neuropharmacology to Pharmacogenetics" (Jose Apud, M.D., Ph.D.) |
| 10 | "Drug-Induced Movement Disorders: Evaluation, Diagnosis, and Treatment" (Jose Apud, M.D., Ph.D.) |
| 17 | THIRD CLINICAL NEUROSCIENCES EXAM |

Please let me know if you need any additional information or clarification to assist in this review. I appreciate your time.

Thank you,

Stephanie Waggel, M.D.

# EXHIBIT Z

 THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC

Stephanie Waggel <swaggel@gwmail.gwu.edu>

---

## Automatic reply: Call Changes
2 messages

---

**Lisa Catapano** <lcatapano@mfa.gwu.edu>
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Tue, Dec 29, 2015 at 11:17 AM

   I will be out of the office until Tuesday, January 5.  For urgent clinical or residency matters, please contact Dr. Lori Kels at 202-741-2869.  For residency issues, you may also contact Ms. Victoria Anderson at vhanderson@mfa.gwu.edu.

Lisa Catapano, MD, PhD
Director, Residency Training Program
Associate Professor of Psychiatry
Department of Psychiatry
George Washington University
2120 L Street NW
Washington DC 20037
(202) 741-2886

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.

---

**Victoria H. Anderson** <vhanderson@mfa.gwu.edu>
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>

Wed, Dec 30, 2015 at 2:18 PM

I will be out of the office starting on Wednesday, December 30th and will return on Tuesday, January 5th. I will have limited access to emails.  For residency issues, please contact Dr. Lori Kels (lkels@mfa.gwu.edu).

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON, DC                                          Stephanie Waggel <swaggel@gwmail.gwu.edu>

---

## Call Changes

3 messages

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                          Tue, Dec 29, 2015 at 11:17 AM
To: Lisa Catapano <lcatapano@mfa.gwu.edu>, "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>, Lori Kels
<lorikels@gmail.com>, Jason Emejuru <jemejuru@gmail.com>

Dear Dr. Catapano, Dr. Kels, Jason, and Tory,

It has come to my attention that there have been multiple emails sent about me, however, not to me regarding my call
schedule. It would seem everyone in the program has been made aware of the fact that I was taken out of the call pool
except for me. I would greatly appreciate an explanation as to why I was taken out of the call pool and why I was only
made aware of it through a classmate. Thank you for your understanding.

Sincerely,
Stephanie

–

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

---

**Stephanie Waggel** <swaggel@gwmail.gwu.edu>                          Wed, Dec 30, 2015 at 2:18 PM
To: Lisa Catapano <lcatapano@mfa.gwu.edu>, "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>, Lori Kels
<lorikels@gmail.com>, Jason Emejuru <jemejuru@gmail.com>

Dear Dr. Catapano, Dr. Kels, Jason, and Tory,

Good afternoon. Yesterday at 11:17am I sent you an email asking why the PGY2 and 3 classes were made aware of
changes to my call schedule when I, however, was not informed. I was scheduled to be on call Jan 5th, 11th, 18th, and
28th and my classmates informed me administration sent emails stating this was no longer true. My classmates noticed
that I was not copied on the emails. If it was not for my close relationship with my fellow classmates and their concern
for my well-being, I would not currently not be aware of the fact that I was taken out of the call pool. I would appreciate
the answers to the following questions:

1. Dr. Kels replied to my email in a separate email after I sent mine (both included below) stating that I am not on call
"pending completion of your remediation with Dr. Gandhi as outlined in your Letter of Deficiency dated 11/19/15." My
11/19/15 Letter of Deficiency did NOT state that I would be taken out of the call pool. It stated that I was, in fact, to begin
call "effective immediately" and with extra help from the attending. By whom, when, and why was it decided to change
this?

2. Why did I find out about my call schedule changes from a third party and not included as a recipient in multiple emails
and texts of which I was the topic? If I had not made it known that I found out through my classmates, would anyone from
administration have informed me?

3. Since 11/19/15 I have attempted, daily, by phone and email to contact Dr. Kels (and others asking help in contacting Dr.
Kels) to work on this remediation plan which I informed her was due in 7 days from Nov 19th. When Dr. Kels was able to
meet with me weeks later, Dec 10th, she stated she could not work with me on this. If this remediation assignment was
significant enough to affect multiple resident's work schedules, why was it not taken seriously by those assigned to
supervise me on it?

4. I have also heard from a third party that it was decided I will make up these call shifts next year likely taking a 30 hour
shift every few days. Was there a plan to inform me of this? This, to me, is a punishment and on Nov. 30 I received an

email from Dr. Catapano stating that I "will not be penalized for the fact that you have not met with [Dr. Kels] yet." Why has this changed?

5.  I have repeatedly made administration aware of the fact that this lack of communication and unexplained, unwarranted, punishments have been negatively impacting my health. When my call schedule was changed  before at the last minute, I informed administration that I make my doctor's appointments months in advance and it is difficult to rearrange my schedule at the last minute as some of these appointments require months of preparation. My fellow residents are also having to rearrange their schedules and take extra call adding unnecessary tension in the program. Additionally, I feel as if no matter what lengths I go through to get clarity, I either receive no response, conflicting responses, or am instructed to ask someone else which eventually becomes circular. I spend a great deal of time attempting to understand what is going on and it takes a toll on my health. Could this fact please be taken into consideration in the future?


Sincerely,
Stephanie




On Tue, Dec 29, 2015 at 11:17 AM, Stephanie Waggel <swaggel@gwmail.gwu.edu> wrote:
  Dear Dr. Catapano, Dr. Kels, Jason, and Tory,

  It has come to my attention that there have been multiple emails sent about me, however, not to me regarding my call schedule. It would seem everyone in the program has been made aware of the fact that I was taken out of the call pool except for me. I would greatly appreciate an explanation as to why I was taken out of the call pool and why I was only made aware of it through a classmate. Thank you for your understanding.

  Sincerely,
  Stephanie


  --
  Stephanie E. Waggel, M.D., M.S.
  The George Washington University Hospital




--
Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

Hi Stephanie,


I hope you're having a good holiday.


I wanted to let you know that Jason updated the call schedule for January and February.  You are not scheduled for calls in that version, pending completion of your remediation with Dr. Gandhi as outlined in your Letter of Deficiency dated 11/19/15.  As we discussed at our meeting earlier this month, this includes submission of the 600 word description and also completion of on-call style presentations to Dr. Gandhi.  Once I have heard from Dr. Gandhi that you have successfully completed those tasks, we will update the call schedule to include you in the call pool.


Best wishes,

Dr. Kels

---

**Lisa Catapano** <lcatapano@mfa.gwu.edu>                                    Tue, Jan 5, 2016 at 4:06 PM
To: Stephanie Waggel <swaggel@gwmail.gwu.edu>, "Victoria H. Anderson" <vhanderson@mfa.gwu.edu>, Jason Emejuru
<jemejuru@gmail.com>
Cc: Lori Kels <lkels@mfa.gwu.edu>

Hi Stephanie,

I've returned from vacation this morning, and just got a chance to read your email. I understand that Dr. Kels has
already responded to you, and apologized for the fact that you heard about the call change before receiving direct
communication from her, so I won't be redundant, but I just wanted to let you know I received it. I will note that I
haven't any idea where the information in point #4 came from. The issue of how you will make up missed call is not a
conversation I have yet had with anyone. Also, I notice that you did not send the email to Dr. Kels's correct work
email ... you are probably already aware, but her work email is lkels@mfa.gwu.edu.


Lisa Catapano, MD, PhD

Director, Residency Training Program

Associate Professor of Psychiatry

Department of Psychiatry

George Washington University

2120 L Street NW

Washington DC 20037

(202) 741-2886


**From:** Stephanie Waggel [mailto:swaggel@gwmail.gwu.edu]
**Sent:** Wednesday, December 30, 2015 2:18 PM
**To:** Lisa Catapano; Victoria H. Anderson; Lori Kels; Jason Emejuru
**Subject:** Re: Call Changes


Dear Dr. Catapano, Dr. Kels, Jason, and Tory,


Good afternoon. Yesterday at 11:17am I sent you an email asking why the PGY2 and 3 classes were made aware of
changes to my call schedule when I, however, was not informed. I was scheduled to be on call Jan 5th, 11th, 18th, and
28th and my classmates informed me administration sent emails stating this was no longer true. My classmates noticed
that I was not copied on the emails. If it was not for my close relationship with my fellow classmates and their concern
for my well-being, I would not currently not be aware of the fact that I was taken out of the call pool. I would appreciate
the answers to the following questions:

1. Dr. Kels replied to my email in a separate email after I sent mine (both included below) stating that I am not on call "pending completion of your remediation with Dr. Gandhi as outlined in your Letter of Deficiency dated 11/19/15." My 11/19/15 Letter of Deficiency did NOT state that I would be taken out of the call pool. It stated that I was, in fact, to begin call "effective immediately" and with extra help from the attending. By whom, when, and why was it decided to change this?

2. Why did I find out about my call schedule changes from a third party and not included as a recipient in multiple emails and texts of which I was the topic? If I had not made it known that I found out through my classmates, would anyone from administration have informed me?

3. Since 11/19/15 I have attempted, daily, by phone and email to contact Dr. Kels (and others asking help in contacting Dr. Kels) to work on this remediation plan which I informed her was due in 7 days from Nov 19th. When Dr. Kels was able to meet with me weeks later, Dec 10th, she stated she could not work with me on this. If this remediation assignment was significant enough to affect multiple resident's work schedules, why was it not taken seriously by those assigned to supervise me on it?

4. I have also heard from a third party that it was decided I will make up these call shifts next year likely taking a 30 hour shift every few days. Was there a plan to inform me of this? This, to me, is a punishment and on Nov. 30 I received an email from Dr. Catapano stating that I "will not be penalized for the fact that you have not met with [Dr. Kels] yet." Why has this changed?

5. I have repeatedly made administration aware of the fact that this lack of communication and unexplained, unwarranted, punishments have been negatively impacting my health. When my call schedule was changed  before at the last minute, I informed administration that I make my doctor's appointments months in advance and it is difficult to rearrange my schedule at the last minute as some of these appointments require months of preparation. My fellow residents are also having to rearrange their schedules and take extra call adding unnecessary tension in the program. Additionally, I feel as if no matter what lengths I go through to get clarity, I either receive no response, conflicting responses, or am instructed to ask someone else which eventually becomes circular. I spend a great deal of time attempting to understand what is going on and it takes a toll on my health. Could this fact please be taken into consideration in the future?

Sincerely,

Stephanie

On Tue, Dec 29, 2015 at 11:17 AM, Stephanie Waggel <swaggel@gwmail.gwu.edu> wrote:

Dear Dr. Catapano, Dr. Kels, Jason, and Tory,

It has come to my attention that there have been multiple emails sent about me, however, not to me regarding my call schedule. It would seem everyone in the program has been made aware of the fact that I was taken out of the call pool except for me. I would greatly appreciate an explanation as to why I was taken out of the call pool and why I was only made aware of it through a classmate. Thank you for your understanding.

Sincerely,

Stephanie

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

--

Stephanie E. Waggel, M.D., M.S.
The George Washington University Hospital

Hi Stephanie,

I hope you're having a good holiday.

I wanted to let you know that Jason updated the call schedule for January and February. You are not scheduled for calls in that version, pending completion of your remediation with Dr. Gandhi as outlined in your Letter of Deficiency dated 11/19/15. As we discussed at our meeting earlier this month, this includes submission of the 600 word description and also completion of on-call style presentations to Dr. Gandhi. Once I have heard from Dr. Gandhi that you have successfully completed those tasks, we will update the call schedule to include you in the call pool.

Best wishes,

Dr. Kels

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please call (202) 741-3636 and destroy the original message and all copies.