⚠ Caution
As of: February 11, 2018 9:58 PM Z

# *Fleck v. WILMAC Corp.*

United States District Court for the Eastern District of Pennsylvania

May 19, 2011, Decided; May 19, 2011, Filed

CIVIL ACTION NO. 10-05562

**Reporter**

2011 U.S. Dist. LEXIS 54039 *; 18 Wage & Hour Cas. 2d (BNA) 84; 24 Am. Disabilities Cas. (BNA) 1836

LINDSAY FLECK, Plaintiff, v. WILMAC CORPORATION, WILMAC MEDICAL INSURANCE PLAN, ATTLEBORO ASSOCIATES, LTD., ATTLEBORO NURSING & REHABILITATION CENTER, and SUSAN MITCHELL, Defendants.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by, Claim dismissed by *Fleck v. WILMAC Corp., 2012 U.S. Dist. LEXIS 42087 (E.D. Pa., Mar. 27, 2012)*

## Core Terms

disability, termination, alleges, accommodation, rights, reasonable accommodation, benefits, declines, return to work, plaintiff's claim, discipline, impairment, retaliation, notice, surgery, punitive damages, full-time, ankle, substantial limitation, essential function, unwarranted, damages, walk, reinstatement, disciplinary, materially, notified, compensatory damages, major life activity, retaliation claim

## Case Summary

### Overview

Defendants did challenge the employee's allegations of interference via defendants' issuance of unwarranted discipline or delay in providing FMLA paperwork. An employee could allege denial of benefits by showing her employer "chilled" her desire to take FMLA leave. Whether defendants' actions rose to the level of prejudice necessary to chill the employee's desire to take leave was a question of fact the court would not consider without further briefing. Accordingly, the Court declines to dismiss the FMLA claim to the extent it relied upon these allegations.

### Outcome

The motion to dismiss was granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

***HN1***[⬇] **Motions to Dismiss, Failure to State Claim**

Under *Fed. R. Civ. P. 12(b)(6)*, a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. *Fed. R. Civ. P. 8* does not call for detailed factual allegations; rather, it requires a short and plain statement of the claim showing that the pleader is entitled to relief. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

***HN2***[⬇] **Motions to Dismiss, Failure to State Claim**

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Instead, the plaintiff must offer enough facts to state a claim to relief that is plausible on its face. To do so, the plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN3*[⬇]  **Disability Discrimination, Scope & Definitions**

The Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.* prohibits employment discrimination against a qualified individual on the basis of disability with regard to the hiring, advancement, or discharge of employees and other terms, conditions, and privileges of employment on the basis of such disability. *42 U.S.C.S. § 12112(a).* The term "discriminate" includes the failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer demonstrates that such accommodations would impose an "undue hardship" on the operation of their business. *42 U.S.C.S. § 12112(b)(5)(A).*

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

*HN4*[⬇]  **Burdens of Proof, Employee Burdens of Proof**

To establish a prima facie case of discrimination under the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.*, the plaintiff must allege that: 1) she is "disabled" within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) she has suffered an adverse employment decision as a result of discrimination.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN5*[⬇]  **Scope & Definitions, Qualified Individuals With Disabilities**

The Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.* provides that an individual has a disability if she has: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) is regarded as having such an impairment. *42 U.S.C.S. § 12102(1).*

Labor & Employment Law > ... > Disabilities Under

ADA > Mental & Physical Impairments > Substantial Limitations

*HN6*[⬇]  **Mental & Physical Impairments, Substantial Limitations**

Whether an individual is substantially limited in a major life activity is a question of fact.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN7*[⬇]  **Scope & Definitions, Qualified Individuals With Disabilities**

A qualified individual under the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.* is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8).*

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN8*[⬇]  **Disability Discrimination, Reasonable Accommodations**

The term "reasonable accommodation" may include part-time or modified work schedules. *42 U.S.C.S. § 12111(9).* To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee with a disability in need of accommodation. *29 C.F.R. § 1630.2(o)(3).* This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations. In turn, both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN9*[⬇]  **Family & Medical Leaves, Scope & Definitions**

2011 U.S. Dist. LEXIS 54039, *54039

The Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, entitles employees to take reasonable leave for medical reasons. *29 U.S.C.S. § 2601(b)(2)*. The FMLA contains two distinct types of rights. The first, known as prescriptive or substantive rights, entitles eligible employees to take up to twelve weeks of unpaid leave for a serious health condition and to reinstatement upon their return. *29 U.S.C.S. § 2612(a)(1)*, *2614(a)(1)*. The second, known as proscriptive rights, prohibits discrimination against those individuals exercising their prescriptive rights.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN10*[🔻] **Family & Medical Leaves, Scope & Definitions**

The Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the statute. *29 U.S.C.S. § 2615(a)(1)*. In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits. An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN11*[🔻] **Family & Medical Leaves, Restoration of Benefits & Positions**

When an employee returns from Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, leave, she is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. *29 C.F.R. § 825.214(a)*. However, if the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. *29 C.F.R. § 825.214(b)*. Likewise, the FMLA

does not require an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave. Rather, the employee must be able to perform the essential functions of the job without accommodation.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN12*[🔻] **Family & Medical Leaves, Scope & Definitions**

In light of the limitations to Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, coverage, an employer is free to terminate an employee who is unable to return to work at the expiration of the leave period, and may do so during the leave period, if it becomes apparent that the employee will not be able to resume her duties.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN13*[🔻] **Family & Medical Leaves, Restoration of Benefits & Positions**

It is well settled that under the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, an employee must be able to return to her original position without accommodation after her medical leave.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN14*[🔻] **Family & Medical Leaves, Scope & Definitions**

The Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, makes it unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter. *29 U.S.C.S. § 2615(a)(2)*. This provision prohibits retaliation by an employer for the employee's exercise of rights under the FMLA. As with other retaliation claims, the court utilizes the burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green.

Thus, to state a prima facie case for retaliation, a plaintiff must allege that (1) she invoked her right to FMLA benefits; (2) she suffered a "materially adverse" employment action; and (3) the adverse employment decision was causally related to the invocation of her rights.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

**HN15**[ ] **Family & Medical Leaves, Scope & Definitions**

An action is "materially adverse" if it would dissuade a reasonable worker from exercising a right under the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

**HN16**[ ] **Family & Medical Leaves, Scope & Definitions**

Once an employee exceeds the duration of her protected leave, the employer is not obligated by the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, to keep open the position or to reinstate the employee upon her return. However, the focus in retaliation cases is on the subjective motive of the employer. That [the defendant] may have had a legitimate basis for its employment decision is not a complete defense to a "proscriptive" FMLA claim. While [the defendant] may generally be justified in terminating Plaintiff because she remained absent at the end of her FMLA leave, this does not necessarily preclude the finding that unlawful considerations may have nevertheless played a determinative role in the particular decision at issue.

Labor & Employment Law > ... > Retaliation > Statutory Application > Family & Medical Leave Act

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

**HN17**[ ] **Statutory Application, Family & Medical Leave Act**

Whether an action is materially adverse often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. In evaluating whether actions are materially adverse, a court must remain mindful that it is important to separate significant from trivial harms because an employee's decision to engage in protected conduct cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. With these considerations in mind, courts have found retaliatory discipline to be a "materially adverse" action that could dissuade a reasonable worker from exercising her rights under the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Interference With Protected Rights

**HN18**[ ] **Causes of Action, Interference With Protected Rights**

Section 510 of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* prohibits purposeful interference by an employer with any right to which an employee may be entitled under a pension benefit plan. *29 U.S.C.S. § 1140.*

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Interference With Protected Rights

**HN19**[ ] **Causes of Action, Interference With Protected Rights**

To recover under § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.*, a plaintiff need only prove the defendant's intent to interfere with her attainment of benefits, "even if the intended results are not actualized and regardless of whether the participant would have actually received the benefits absent the interference.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > General Overview

Pensions & Benefits Law > ... > Civil

Litigation > Causes of Action > Suits to Recover Plan Benefits

**HN20**[⤓] **Civil Litigation, Causes of Action**

Section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* offers the exclusive enforcement scheme for violations of § 510. Section 502(a)(1)(B) provides recovery where a defendant has failed to comply with the terms of a plan, allowing plaintiffs to enforce their rights or recover benefits due to them under the plan.

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Covered Employers

**HN21**[⤓] **Family & Medical Leaves, Covered Employers**

The Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, defines an "employer" as any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer. *29 U.S.C.S. § 2611(4)(A)(ii)(I)*. Such language plainly evinces an intent to provide for individual liability. Courts have held that such individual liability attaches under the FMLA when an employee has "exercised control" over a plaintiff's FMLA leave or acts on behalf of the employer.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Interference With Protected Rights

**HN22**[⤓] **Causes of Action, Interference With Protected Rights**

The Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* makes it unlawful for "any person" — as opposed to only an employer — to discipline, discharge, or otherwise discriminate against a participant for exercising rights to which she is entitled under an employee benefit plan. *29 U.S.C.S. § 1140*. As defined by the statute, the term "person" includes "an individual." *29 U.S.C.S. § 1002(9)*.

**Counsel:** **[*1]** For LINDSAY FLECK, Plaintiff: VIRGINIA L. HARDWICK, LEAD ATTORNEY, HARDWICK LAW OFFICES LLC, DOYLESTOWN, PA.

For WILMAC CORPORATION, WILMAC MEDICAL

INSURANCE PLAN, ATTLEBORO ASSOCIATES, LTD., ATTLEBORO NURSING & REHABILITATION CENTER, SUSAN MITCHELL, Defendants: ANGELA ALLEN CRONK, JEFFREY S. ADLER, BURNS, WHITE AND HICKTON, WEST CONSHOHOCKEN, PA.

**Judges:** BUCKWALTER, S. J.

**Opinion by:** BUCKWALTER

# Opinion

**MEMORANDUM**

BUCKWALTER, S. J

Presently before the Court is the Motion of Defendants WILMAC Corporation, WILMAC Medical Insurance Plan, Attleboro Associates, Ltd., Attleboro Nursing & Rehabilitation Center, and Susan Mitchell to Dismiss the Amended Complaint of Plaintiff Lindsay Fleck pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the following reasons, the Motion is granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This action centers upon Plaintiff Lindsay Fleck's allegations of discrimination by her former employer, Defendant Attleboro Nursing and Rehabilitation Center ("Attleboro"), on the basis of Plaintiff's disability and exercise of rights related thereto. Plaintiff Fleck, of Newtown, Pennsylvania, was hired by Attleboro as a per diem physical therapist in August of 2007. (Am. Compl. **[*2]** ¶ 15.) She became a full-time employee in December of 2007. (Id.)

According to the facts set forth in the Amended Complaint, Plaintiff suffered an ankle injury in March of 2006 that has resulted in chronic medical problems. (Id. ¶ 16.) This ongoing ankle condition prevents Plaintiff from standing for more than an hour or walking for more than a half mile. (Id. ¶ 19.) Plaintiff had surgery on her ankle prior to her employment with Attleboro, but the surgery failed to resolve the injury. (Id. ¶ 18.) This chronic injury affected Plaintiff during her entire tenure at Attleboro, to the point that she used a cam boot to enable her to stand for the time required by her position. (Id. ¶¶ 20-21.) According to Plaintiff, her supervisor was aware of her disability because the cam boot was plainly

visible. (Id. ¶ 22.)

On or about August 7, 2008, Plaintiff notified Attleboro that she would need further surgery on her ankle and requested paperwork for short-term disability and leave pursuant to the Family Medical Leave Act ("FMLA"). (Id. ¶ 22.) Soon after, on or about August 18, 2008, Plaintiff's supervisor issued her a written disciplinary notice signed by Defendant Susan Mitchell, Director of Attleboro [*3] Human Resources. (Id. ¶ 29.) Plaintiff received the notice upon returning to work from vacation on August 27. (Id. ¶ 33.) The notice stemmed from an August 15th incident during which Plaintiff placed a speed restrictor on a patient's wheelchair. (Id. ¶ 29.) Plaintiff alleges that she did so appropriately, as the patient had posed a safety threat to other patients by rolling backwards in her chair. (Id. ¶ 29.) She maintains that her actions were properly documented in a twenty-four hour report and interdisciplinary progress notes, and were reported at a morning meeting. (Id. ¶ 30.) The notice stated that Plaintiff had refused to re-evaluate the device, although Plaintiff avers that she had actually "requested help to come up with an alternative intervention to maintain safety." (Id. ¶ 31.) Plaintiff further alleges that her employer, in issuing the notice, did not follow the progressive steps of discipline required by the WILMAC employee handbook, such as investigation by a supervisor and counseling of the employee before such notice is issued. (Id. ¶ 34.) According to Plaintiff, prior to the incidents in question, she had a positive performance record. (Id. ¶ 28.) In light of these [*4] events, Plaintiff asserts that Attleboro Nursing, via Defendant Mitchell, disciplined Plaintiff in retaliation for her request to take FMLA leave and with the intent of interfering with her taking such leave. (Id. ¶ 35.)

Additionally, Plaintiff avers that she had still not received the requested FMLA forms by October 2008, such that she had to re-request them. (Id. ¶ 36.) She submitted her completed FMLA and short-term disability paperwork to Defendant Mitchell on or about October 31, 2008. (Id. ¶ 37.) On or about November 19, 2008, Plaintiff learned that Defendant Mitchell had not submitted her disability claim. (Id. ¶ 38.) As a result, she would receive no income following her surgery, which was scheduled for the following day. (Id. ¶ 38.) When Attleboro finally submitted Plaintiff's claim, the company purportedly provided incorrect salary information, which decreased the amount of her benefits. (Id. ¶ 38.) Plaintiff commenced her FMLA leave on or around November 20, 2008. (Id. ¶ 39.)

On or about February 5, 2009, Plaintiff advised her supervisor that she was able to return to work at a schedule of four hours per day. (Id. ¶ 40.) She submitted a note from her doctor stating that she [*5] could increase her hours over a period of six weeks. (Id.) On February 6, 2009, Plaintiff's supervisor and Defendant Mitchell called Plaintiff to inform her that her employment was terminated because she was unable to work eight hours per day. (Id. ¶ 42.) Plaintiff alleges that they instructed her not to return to work on February 12, 2009 when her FMLA leave ended. (Id.) According to Plaintiff, her doctor then wrote an alternative order stating that Plaintiff could work an eight-hour day if she had a break every hour. (Id. ¶ 43.) She alleges that Defendant Attleboro refused to discuss this alternative work schedule or Plaintiff's proposal of extended unpaid leave, nor did Defendant make any effort to determine whether a different accommodation would allow Plaintiff to return to work. (Id. ¶¶ 44-47.) Consequently, Plaintiff did not return to work at the end of her FMLA leave on February 12. (Id. ¶ 51.)

Plaintiff emailed her supervisor and Defendant Mitchell on February 7, 2009 requesting written confirmation and explanation of her termination. (Id. ¶ 49.) When she received no response, she sent a letter requesting the same on February 10. (Id. ¶ 50.) On February 12, Plaintiff received [*6] a letter from Defendant Mitchell stating that she had exhausted her twelve weeks of leave under the federal Family and Medical Leave Act and was being voluntarily terminated "based on the failure to return from a leave of absence." (Id. ¶ 52.)

Post-termination, Attleboro Nursing paid Plaintiff for accrued vacation time. (Id. ¶ 53.) According to Plaintiff, however, the entity improperly deducted amounts for her health benefits and flexible spending account at rates higher than during her employment, despite the fact that she was no longer covered under those plans. (Id.) Plaintiff further alleges that, despite her termination on February 6, 2009, Defendant WILMAC Medical Insurance Plan did not send Plaintiff timely notice of her right to extend her health benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). (Id. ¶ 54.) According to Plaintiff, she did not receive such notice until nine months later, on November 23, 2009. (Id.) Similarly, Defendant WILMAC failed to notify Plaintiff of the reduction in COBRA premiums resulting from the passage of the American Recovery and Reinvestment Act of 2009 ("ARRA") until November 23, 2009. (Id. ¶¶ 56-57.)

Plaintiff [*7] avers that Attleboro, via Defendant

2011 U.S. Dist. LEXIS 54039, *7

Mitchell, terminated her employment because of her purported disability and in retaliation for her exercise of her FMLA rights. (Id. ¶ 58.) As a result, Plaintiff now alleges damages "including but not limited to lost income, lost benefits, emotional distress, and loss of enjoyment of life." (Id. ¶ 60.) Plaintiff commenced this action on October 21, 2010. On December 10, 2010, she filed an Amended Complaint, asserting violations of: (1) the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.*, by Defendants Attleboro, WILMAC, and Attleboro Associates Ltd. ("Attleboro Associates") for disability discrimination (Count I) and failure to accommodate (Count III); (2) the Pennsylvania Human Relations Act ("PHRA"), *43 P.S. § 951, et seq.*, against Defendants Attleboro, WILMAC, and Attleboro Associates for disability discrimination (Count II) and failure to accommodate (Count IV); (3) the Family and Medical Leave Act of 1993 ("FMLA"), *29 U.S.C. § 2601 et seq.*, by all Defendants (Count V); (4) the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001 et seq.*, by all Defendants (Count VI); and (5) COBRA, *29 U.S.C. §§ 1161-1169*, **[\*8]** and the ARRA, *Pub. L. No. 111-5 123 Stat. 115 (2009)*, by all Defendants (Count VII).

On December 30, 2010, Defendants moved to dismiss Plaintiff's ADA, PHRA, and FMLA claims (Counts I-V) for insufficient pleading, the ERISA and COBRA claims (Counts VI and VII) for failure to specify damages, all claims for emotional distress and punitive damages, and all individual claims against Defendant Mitchell. Plaintiff filed a Response in Opposition on January 20, 2011, and a Supplemental Memorandum in Opposition on March 30, 2011. Defendants filed a Reply on April 11, 2011. The Court now considers Defendants' Motion.

## II. STANDARD OF REVIEW

*HN1*[↑] Under *Rule 12(b)(6)*, a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*; see also *Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)*. *Federal Rule of Civil Procedure 8* does not call for detailed factual allegations; rather, it requires a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8*; *Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)*. Further, the court must "accept all factual allegations **[\*9]** in the complaint as true and view them in the light most favorable to the plaintiff." *Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006)*.

The Supreme Court has made clear, however, that "*HN2*[↑] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Instead, the plaintiff must offer "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570*. To do so, the plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft, 129 S. Ct. at 1949* (citing *Twombly, 550 U.S. at 556-57*); see also *Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)* (adopting Iqbal's standards).

## III. DISCUSSION

## A. Whether Plaintiff has Stated a Valid Claim Under the ADA and PHRA

*HN3*[↑] The ADA prohibits employment discrimination against "a qualified individual on the basis of disability" with regard to "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment" on the basis of such disability. *42 U.S.C. § 12112(a)*. **[\*10]** [1] The term "discriminate" includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer demonstrates that such accommodations would impose an "undue hardship" on the operation of their business. *42 U.S.C. § 12112(b)(5)(A)*.

*HN4*[↑] To establish a *prima facie* case of discrimination under the ADA, the plaintiff must allege that: 1) she is "disabled" within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) she has suffered an adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998)* (citing *Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996))*. Plaintiff alleges that

---

[1] The same legal standard applies to Plaintiff's claims under the ADA and the PHRA. *Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)*. Therefore, the Court's analysis of Plaintiff's ADA claims also applies to Plaintiff's PHRA claims.

Defendants violated the ADA and PHRA by refusing to provide or even discuss potential accommodations for Plaintiff's **[*11]** ankle condition upon her return from FMLA leave (Counts III and IV), and by terminating her on account of her alleged disability (Counts I and II). In response, Defendants contend that Plaintiff was neither disabled nor a "qualified individual" under the ADA, as she was unable to perform the essential functions of her position after her November 2008 surgery. (Defs.' Mot. Dismiss 7.) The Court considers these arguments in turn.

## 1. Whether Plaintiff was Disabled

**HN5**[⬆] The ADA provides that an individual has a disability if she has: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) is "regarded as having such an impairment." *42 U.S.C. § 12102(1)*. Plaintiff argues that her chronic ankle injury qualifies as a disability under the ADA because it substantially limits her ability to walk and stand. Defendants counter that Plaintiff's impairment does not constitute a disability because she was able to work full eight-hour shifts without restriction or accommodation before her November 2008 surgery. (Defs.' Mot. Dismiss 7.)

**HN6**[⬆] Whether an individual is substantially limited in a major life activity **[*12]** is a question of fact. *Carraway v. Borough of Wilkinsburg, No. CIV.A.9-372, 2009 U.S. Dist. LEXIS 83356, 2009 WL 2981955, at *1 (W.D. Pa. Sept. 11, 2009)* (citing *Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 763 (3d Cir. 2004)*). Before Congress amended the ADA in 2008, courts construed the Act strictly, finding that an individual was "substantially limited" only if she had "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 185, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). In another leading ADA case, the Supreme Court dictated that the degree of limitation caused by an individual's impairment should be determined with reference to the ameliorative effects of mitigating measures. *Sutton v. United Airlines, Inc., 527 U.S. 471, 499, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*.

With the passage of the ADA Amendments Act of 2008 ("ADAAA"), however, Congress explicitly rejected *Toyota* and *Sutton* in an effort to promote a less restrictive interpretation of "disability" under the ADA. *Pub. L. No. 110-325, § 2(b)(1)-(6), 122 Stat. 3553 (2008)*. In doing so, Congress declared that "the primary object of attention in cases brought **[*13]** under the ADA should be whether entities covered under the ADA have complied with their obligations," and that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Pub. L. No. 110-325, § 2(b)(5), 122 Stat. at 3554*.

As an initial matter, the Court must decide whether to evaluate Plaintiff's disability using the more restrictive pre-amendment standard or the broader interpretation espoused by the ADAAA. The Third Circuit has held that the ADAAA, effective January 1, 2009, is not retroactively applicable. *Britting v. Sec'y, Dept. of Veterans Affairs, No. CIV.A.10-2554, 409 Fed. Appx. 566, 2011 U.S. App. LEXIS 2096, 2011 WL 300240, at *2 (3d Cir. Feb. 1, 2011)*; *Larkin v. Methacton Sch. Dist., No. CIV.A.09-4146, 773 F. Supp. 2d 508, 2011 U.S. Dist. LEXIS 18124, 2011 WL 761548, at *27 n.8 (E.D. Pa. Feb. 23, 2011)*. Defendants argue that, because Plaintiff cites her use of the cam boot before her surgery in November 2008 as evidence that she was "substantially limited" in a major life activity, the Court should apply the pre-amendment ADA. (Defs.' Reply 1-2.) The Court's relevant determination, however, is whether the plaintiff had a disability *at the time* of the adverse employment decision. *Rahsman v. Dewberry-Goodkind, Inc., No. CIV.A.05-1931, 2007 U.S. Dist. LEXIS 4334, 2007 WL 188571, at *6 (M.D. Pa. Jan. 22, 2007)*. **[*14]** Here, the discriminatory acts at issue — Defendants' alleged refusal to accommodate and subsequent termination of Plaintiff — occurred in February of 2009. Given that these adverse decisions occurred after the ADAAA's effective date of January 1, 2009, the Court will use the amended standard.

Under the broadened standards of the ADAAA, the Court finds Plaintiff's allegations as to her disability sufficient to withstand the pleading requirements of *Rule 12(b)(6)*. According to the Amended Complaint, Plaintiff's condition renders her unable stand for more than an hour or walk more than a half mile. (Am. Compl. ¶ 19.) Prior to her surgery, Plaintiff alleges that she could stand or walk for a sufficient amount of time to fulfill her work duties only with the use of a cam boot. (Id. ¶ 21.) Post-surgery, her doctor's recommendation that she seek a part-time work schedule or additional breaks suggests even further limitation on Plaintiff's mobility. (Id. ¶¶ 40, 43.) Nowhere do the allegations suggest that Plaintiff's condition had improved at the

time of her termination or that she no longer required the use of the cam boot to aid her in standing and walking. Even under the more restrictive **[\*15]** standards of the pre-2009 ADA, these allegations, read in a light most favorable to Plaintiff, are sufficient to raise an inference that Plaintiff was disabled at the time of the adverse employment actions. As such, the Court would be premature in dismissing Plaintiff's claims at this stage of litigation. [2]

## 2. Whether Plaintiff was "Regarded as" Disabled

Alternatively, Plaintiff argues that she falls under the ADA's third definition of disability because Defendants regarded her as disabled. The pre-amendment ADA required a plaintiff to show that the employer either "mistakenly believed that [the employee has] a physical impairment that substantially limits one or more major life activities" or "mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities." _Wilson v. MVM, Inc., 475 F.3d 166, 179 (3d Cir. 2007)_ (quoting _Sutton, 527 U.S. at 489_); see also _29 C.F.R. § 1630.2(l)(1), (3) (2006)_ (defining "regarded as having such an impairment"). Under the more expansive standards of the ADAAA, an individual is regarded as disabled if she establishes that "she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment . . . ." _Pub. L. No. 110-325 § 3(3)(A), 122 Stat. at 3555._ In contrast to the pre-amendment ADA, an individual is "regarded as" disabled under the ADAAA "whether or not the impairment limits or is perceived to limit **[\*17]** a major life activity." _Id._

In light of the ADAAA's de-emphasis on an employer's beliefs as to the severity of a perceived impairment, Defendants' argument that Plaintiff could work a full shift without breaks pre-surgery fails to undercut her allegations that Defendants "regarded her" as disabled at the time of her termination. In support of her claim, Plaintiff emphasizes that (1) at all times during her employment, she wore a plainly visible cam boot to aid her in standing and walking a sufficient amount to carry out her duties; (2) she notified her employer of her need for additional surgery on her ankle, and subsequently requested FMLA leave and short-term disability; and (3) a week before her FMLA leave ended (and presumably her proposed return date), she notified her supervisor via a note from her doctor that she would be unable to work a full eight-hour shift without breaks due to her ankle condition. Given the broad standards of the ADAAA and the factually-intensive nature of this inquiry, the Court finds that these allegations raise a plausible inference that Defendants regarded Plaintiff as disabled within the meaning of the Act. [3] To the extent Plaintiff's claim relies upon **[\*18]** Defendants' unwarranted disciplinary action in 2008 and thus invokes the pre-amendment ADA, the Court again declines to dismiss the claim before the parties have a chance to fully develop the factual record.

## 3. Whether Plaintiff was a Qualified Individual

**HN7**[↑] ] A qualified individual under the ADA is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." _42 U.S.C. § 12111(8)._ Defendants contend that Plaintiff's inability to return to full-time employment after surgery rendered her unqualified for ADA protection. (Def.'s Mot. Dismiss 7.) This argument, however, ignores an essential element of the definition of a "qualified" individual — that the employee **[\*19]** may sufficiently perform her position "_with or without reasonable accommodation._" Plaintiff alleges that she notified her employer that she was able to return to work with the accommodation of a temporarily reduced work schedule. After learning that

---

[2] Plaintiff also alleges that Defendants discriminated against her on the basis of her disability by issuing her an unwarranted disciplinary notice in 2008. Notably, under the pre-amendment ADA, several Third Circuit cases found that plaintiffs who could walk up to a half mile or stand for up to an hour were not substantially limited for the purposes of the statute. See, e.g., _Kelly v. Drexel Univ., 94 F.3d 102, 108 (3d Cir. 1996)_. Those cases, however, had reached the summary judgment stage and relied upon a fully developed factual record. Unlike Kelly and its progeny, this Court has yet to evaluate a number of factors relevant to a disability determination — for example, the difficulty Plaintiff experienced in sustaining her level of mobility or the speed at which she could walk. Accordingly, the Court will allow Plaintiff's claim to proceed even to the extent it relies upon Defendants' **[\*16]** purportedly unwarranted disciplinary action in 2008.

[3] Notably, the ADAAA also dictates that a plaintiff who is only perceived as disabled may not seek reasonable accommodation. Pub. L. No. 110-325 § 6(a)(1)(h), 122 Stat. at 3558 (codified _42 U.S.C. 12201(h)_). Thus, the Court considers Plaintiff's alternative argument as to her perceived limitation only in the context of her discrimination claims (Counts I and II) — not her claims for failure to provide reasonable accommodation (Counts III and IV).

she would be terminated for her inability to return to work full-time, she proposed a full-time schedule with hourly breaks or extended unpaid leave. According to Plaintiff, rather than engaging in an interactive process to determine whether a reasonable accommodation was available, Defendants terminated her.

*HN8*[ ] The term "reasonable accommodation" may include "part-time or modified work schedules." *42 U.S.C. § 12111(9)*. "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of accommodation." *29 C.F.R. § 1630.2(o)(3)*. "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." Id. In turn, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997)*. **[*20]** Whether Plaintiff's requested accommodations were, in fact, reasonable is a factual question premature for this stage of the proceedings. Accordingly, the Court declines to dismiss Plaintiff's ADA and PHRA claims. [4]

## B. Whether Plaintiff has Stated a Valid Claim under the FMLA

*HN9*[ ] The Family and Medical Leave Act ("FMLA") entitles "employees to take reasonable leave for medical reasons." *29 U.S.C. § 2601(b)(2)*. The FMLA contains two distinct types of rights. *Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 462 (E.D. Pa. 2005)*. The first, known as prescriptive or substantive rights, entitles eligible employees to take up to twelve weeks of unpaid leave for a serious health condition and to reinstatement upon their return. *29 U.S.C. § 2612(a)(1)*, *2614(a)(1)*. The second, known as proscriptive rights, prohibits discrimination against those individuals exercising **[*21]** their prescriptive rights. *Dogmanits, 413 F. Supp. 2d at 462*. Plaintiff contends that Defendants violated both her substantive and proscriptive rights. The Court will address both sets of allegations in turn.

---

[4] In Plaintiff's Response, she also argues that Defendants retaliated against her in violation of the ADA by terminating her for engaging in the protected activity of requesting a reasonable accommodation. Nowhere in the Amended Complaint does Plaintiff assert a claim for ADA retaliation. As such, the Court will not consider this argument.

## 1. Prescriptive/Substantive Rights — Interference

*HN10*[ ] The FMLA makes it unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the statute. *29 U.S.C. § 2615(a)(1)*. "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007)* (citing *Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005))*. As the Third Circuit has explained, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison, 430 F.3d at 120*; *Atchison v. Sears, 666 F. Supp. 2d 477, 488 (E.D. Pa. 2009)*.

Plaintiff alleges that Defendants interfered with her right to take FMLA leave by (1) taking unwarranted disciplinary action **[*22]** against Plaintiff the week she notified Defendant Attleboro of her intention to take leave; (2) failing to timely provide her with the appropriate leave-related paperwork; (3) refusing to grant her reasonable accommodations in the form of a reduced schedule or hourly breaks upon her return from leave; and (4) terminating her during her last week of leave. Defendants contend that Plaintiff's interference claim should fail because the FMLA does not require employers to restore an employee to a former position if the employee cannot perform the essential functions of that position. (Defs.' Mot. Dismiss 4.) [5] They further assert that an employer need not offer reasonable accommodations to an employee with a continuing medical condition to facilitate her return to work. (Id.)

---

[5] In support of Defendants' argument that Plaintiff was not entitled to FMLA reinstatement because she required a modified work schedule for an indefinite period, Defendants have submitted a note from Plaintiff's doctor stating only that she could return to work on February 12, 2009 at four hours per day. (Defs.' Mot. Dismiss, Ex. B.) Plaintiff challenges the submission of this evidence as outside the pleadings, and **[*23]** therefore improper under *Rule 12(b)(6)*. Alternatively, Plaintiff asks to submit additional evidence showing that the company did not engage in an interactive process before terminating her. The Court declines to consider outside evidence at this stage of the proceedings, where Plaintiff's allegations, taken as true, are sufficient for the Court to make a determination as to the validity of Plaintiff's FMLA claim.

HN11[↑] "When an employee returns from FMLA leave, she 'is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.'" *Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 587 (3d Cir. 2004)* (quoting *29 C.F.R. § 825.214(a)*). However, "if the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." *Id.* (citing *29 C.F.R. § 825.214(b)*). Likewise, the FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his **[*24]** return to the same or equivalent position at the conclusion of his medical leave." *Fogleman, 122 Fed. Appx. at 587* (quoting *Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002)).* "Rather, the employee must be able to perform the essential functions of the job without accommodation." *Fogleman, 122 Fed. Appx. at 587.*

HN12[↑] In light of these limitations to FMLA coverage, "[a]n employer is free to terminate an employee who is unable to return to work at the expiration of the leave period, and may do so during the leave period, if it becomes apparent that the employee will not be able to resume her duties." *Anderson v. DSM N.V., 589 F. Supp. 2d 528, 537 (D.N.J. 2008)* (citing *Katekovich v. Team Rent A Car of Pittsburgh, Inc., 36 Fed. Appx. 688, 690 (3d Cir. 2002)); Rinehimer, 292 F.3d at 384.* "Thus, the critical question is whether [Plaintiff] required an accommodation to perform the essential functions of her job (or an equivalent job). If so, then [Defendants] had no duty to restore her to her position after she took FMLA leave." *Conroy v. Twp. of Lower Merion, 77 Fed. Appx. 556, 559 (3d Cir. 2003).*

Here, Plaintiff concedes that she was unable to return to work, at least temporarily, **[*25]** without accommodation after her twelve weeks of FMLA leave ended. Instead, she requested a part-time schedule, hourly breaks, or extended unpaid leave. While such a refusal to accommodate her ankle condition may be a violation of the ADA, these requests are fatal to Plaintiff's FMLA interference claim. Because Plaintiff has conceded that she could not return to her previous full-time position without some form of accommodation, she was not entitled to reinstatement pursuant to the FMLA. See *Baker v. Hunter Douglas Inc., 270 Fed. Appx. 159, 162 (3d Cir. 2008)* (affirming district court's grant of summary judgment for defendant "[b]ecause the FMLA does not

provide for a reasonable accommodation and the record indicates that [plaintiff] was unable to return to work full-time at the conclusion of her FMLA leave"); *Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 450 (W.D. Pa. 2008)* (granting summary judgment in favor of defendant where plaintiff was unable to return to full-time work, and stating that HN13[↑] "[i]t is well settled that under the FMLA an employee must be able to return to her original position without accommodation after her medical leave"); *Chapman v. UPMC Health Sys., 516 F. Supp. 2d 506, 521-22 (W.D. Pa. 2007)* **[*26]** (finding plaintiff was unable to perform essential function of position where she could not work full-time at a full-time position).[6] Therefore, the Court dismisses Plaintiff's interference claim to the extent it alleges that Defendants denied her reasonable accommodation or terminated her during her last week of leave.

Defendants have not, however, challenged Plaintiff's allegations of interference via Defendants' issuance of unwarranted discipline or delay in providing FMLA paperwork. An employee can allege denial of benefits by showing her employer "chilled" her desire to take FMLA leave. *Gibson v. Lafayette Manor, Inc., No. CIV.A.05-1082, 2007 U.S. Dist. LEXIS 22291, 2007 WL 951473, at *17 (W.D. Pa. Mar. 27, 2007)* (citing *Williams v. Shenango, Inc., 986 F. Supp. 309, 320-21 (W.D. Pa. 1997); Shtab v. Greate Bay Hotel and Casino, Inc., 173 F. Supp. 2d 255, 267-68 (D.N.J. 2001)).* Whether Defendants' actions rise to the level of prejudice necessary to chill Plaintiff's desire to take leave is a question of fact that the Court will not consider without further briefing. Accordingly, the Court declines to

---

[6] Plaintiff cites *Throneberry v. McGehee Desha Cnty. Hosp., 403 F.3d 972, 980 (8th Cir. 2005)* for the proposition that "every discharge of an employee while he is on leave interferes with his rights." (Pl.'s Resp. Opp'n 20.) The plaintiff in Throneberry, however, alleged FMLA interference because her termination prevented her from taking all 12 weeks of leave. Here, although Plaintiff was notified of her termination during her last week of leave, the termination did not take effect until her leave was over, such that she suffered no interference with her ability to take the full amount of leave to which she was entitled.

Moreover, the court went on to emphasize that an employee "enjoys no greater rights while on FMLA leave than had the employee not taken FMLA leave." *Id.* Thus, once Plaintiff indicated that she was unable to return to work without accommodation, her employer **[*27]** was not obligated to wait until Plaintiff's FMLA leave ended before deciding to discharge her when her leave period concluded.

dismiss the FMLA claim to the extent it relies upon these allegations.

## 2. Proscriptive Rights — Retaliation

*HN14*[↑] The FMLA also makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *29 U.S.C. § 2615(a)(2).* [*28] This provision prohibits retaliation by an employer for the employee's exercise of rights under the FMLA. As with other retaliation claims, the Court utilizes the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Sherrod v. Philadelphia Gas Works, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002).* Thus, to state a prima facie case for retaliation, a plaintiff must allege that (1) she invoked her right to FMLA benefits; (2) she suffered a "materially adverse" employment action; and (3) the adverse employment decision was causally related to the invocation of her rights. *Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004)); Hare v. Potter, 220 Fed. Appx. 120, 127-28 (3d Cir. 2007).* [7]

### a. Termination

Plaintiff first alleges that Defendants terminated her in retaliation for her exercise of FMLA rights. In support, she argues that the temporal proximity of her leave and her termination gives rise to an inference of a causal connection between her protected activity and the

adverse employment action. (Pl.'s Resp. Opp'n 19.) Defendants contend that because Plaintiff could not return to her pre-leave job without accommodation — thus rendering her ineligible for statutory reinstatement under the FMLA — her termination does not constitute a materially adverse decision necessary for a prima facie claim. (Defs.' Mot. Dismiss 5-6.)

*HN15*[↑] An action is "materially adverse" if it would "dissuade[] [*30] a reasonable worker" from exercising a right under the FMLA. *DiCampli, 257 Fed. Appx. at 501* (citing *Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006); Burlington, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345*). Defendants cite a number of cases holding that a termination is not "adverse" for purposes of an FMLA retaliation claim where the plaintiff could not return to work without accommodation and, as such, had no prescriptive right to reinstatement. See *Alfano v. Merck & Co., Inc., 175 F. Supp. 2d 792, 795 (E.D. Pa.. 2001); Dogmanits, 413 F. Supp. 2d at 464* ("to show that termination was adverse, Plaintiff needs to present evidence indicating that she could have performed her job duties at the time of her termination") (citing *Alfano); Gibson, 2007 U.S. Dist. LEXIS 22291, 2007 WL 951473, at *19.* The Court chooses not to follow *Alfano's* line of reasoning, however, as it appears to conflate the FMLA's prescriptive right to restatement and proscriptive right against retaliation. *Castellani v. Bucks Cnty. Municipality, No. CIV.A.07-1198, 2008 U.S. Dist. LEXIS 66036, 2008 WL 3984064, at *5-6 (E.D. Pa. Aug. 27, 2008); Chapman, 516 F. Supp. 2d at 524 n.4 (W.D. Pa. 2007); Keim v. Nat'l R.R. Passenger Corp., No. CIV.A.05-4338, 2007 U.S. Dist. LEXIS 54200, 2007 WL 2155656, at *7 n.6 (E.D. Pa. July 26, 2007).* [*31] As one court has noted:

> Certainly, *HN16*[↑] once an employee exceeds the duration of her protected leave, the employer is not obligated by FMLA to keep open the position or to reinstate the employee upon her return. However, the focus in retaliation cases is on the subjective motive of the employer. That [the defendant] may have had a legitimate basis for its employment decision is not a complete defense to a "proscriptive" FMLA claim. While [the defendant] may generally be justified in terminating Plaintiff because she remained absent at the end of her FMLA leave, this does not necessarily preclude the finding that unlawful considerations may have nevertheless played a determinative role in the particular decision at issue.

*Keim, 2007 U.S. Dist. LEXIS 54200, 2007 WL 2155656,*

---

[7] Hare adopted the Supreme Court's revised definition of "adverse employment action" for the purposes of Title VII retaliation claims set forth in *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).* "Prior to *Burlington Northern,* this Court defined an adverse employment action as one that 'alter[ed] the employee's compensation, terms, conditions, or privileges of employment, deprive[ed] him or her of employment [*29] opportunities, or adversely affect[ed] his or her status as an employee' . . . . The new standard 'protects an employee from a wider range of conduct' than the old one." *Hare, 220 Fed. Appx. at 127* (quoting *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); Phelan v. Cook Cnty., 463 F.3d 773, 781 n.3 (7th Cir. 2006)).* The Third Circuit has since applied this revised standard to retaliation claims under the FMLA. See *DiCampli v. Korman Cmtys., 257 Fed. Appx. 497, 501 (3d Cir. 2007).*

*at \*6* (citations omitted). As <u>Keim</u> further explained, the authority upon which <u>Alifano</u> relies does not question that the plaintiff's termination was an adverse action. *2007 U.S. Dist. LEXIS 54200, [WL] at \*7* (citing *Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 166 (1st Cir. 1998)* ("There is no dispute as to the second element [of the prima facie case]: [plaintiff]'s termination was an adverse action.")). Rather, the court granted summary judgment for the employer because plaintiff **[*32]** was unable to demonstrate pretext. <u>Id.</u> Following the logic of *<u>Keim</u>,* the Court finds that Plaintiff's termination could still constitute an adverse action under the FMLA even if she was not entitled to reinstatement under the FMLA. Accordingly, the Court declines to dismiss Plaintiff's FMLA retaliation claim. [8]

**b. Discipline**

Plaintiff also alleges that Defendants' issuance of unwarranted discipline in a manner inconsistent with Attleboro's disciplinary scheme was a retaliatory act. In response, Defendants contend that the disciplinary notice Plaintiff received for placing **[*33]** speed restrictors on a patient's chair does not constitute an "adverse action." (Defs.' Mot. Dismiss 6.)

*HN17*[⬆] "Whether an action is materially adverse 'often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Hare, 220 Fed. Appx. at 128* (quoting *Burlington, 548 U.S. at 68*). "In evaluating whether actions are materially adverse, [the Court] must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to [engage in protected conduct] cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Harley v. Geithner, No. CIV.A.07-3559, 2010 U.S. Dist. LEXIS 104303, 2010*

*WL 3906642, at \*14 (D.N.J. Sept. 29, 2010)* (quoting *Moore, 461 F.3d at 346*). With these considerations in mind, courts have found retaliatory discipline to be a "materially adverse" action that could dissuade a reasonable worker from exercising her rights under the FMLA. See, e.g., *Bell v. City of Philadelphia, 275 Fed. Appx. 157, 161 (3d Cir. 2008)* (finding plaintiff's claims for **[*34]** retaliatory discipline and termination met "materially adverse" threshold); *Harley, 2010 U.S. Dist. LEXIS 104303, 2010 WL 3906642, at \*14* (noting courts' acceptance of disproportionately heavy discipline as satisfying <u>Burlington Northern</u> standard) (citing *Moore, 461 F.3d at 346*). [9] Accordingly, the Court finds Plaintiff's allegations of unwarranted discipline sufficient to state a claim for FMLA retaliation.

**C. Whether Plaintiff has Stated Valid Claims Under ERISA and COBRA**

Defendants next assert that the Court should dismiss Plaintiff's ERISA and COBRA claims (Counts VI and VII ) for failure to allege her damages with specificity. Should the Court decline to dismiss these claims in their entirety, Defendants contend that Plaintiff's claim for **[*35]** compensatory, liquidated, and punitive damages under ERISA should be stricken because the statute does not contemplate such relief.

**1. ERISA**

*HN18*[⬆] *Section 510 of ERISA* prohibits purposeful interference by an employer with any right to which an employee may be entitled under a pension benefit plan. *29 U.S.C. § 1140*. According to Plaintiff, Defendants violated this provision by discharging and otherwise discriminating against her for the purpose of interfering with her attainment of benefits to which she might have become entitled. (Am. Compl. ¶ 86.) Specifically, Plaintiff alleges that Defendant Mitchell intentionally interfered with her ERISA rights by refusing to submit Plaintiff's short-term disability forms in a timely manner, failing to supply correct salary data to the short-term

---

[8] Defendants also move to strike Plaintiff's claims for physical and emotional injuries, loss of self-esteem, personal humiliation, and loss of enjoyment of life under the ADA, PHRA, FMLA, and ERISA for failure to allege any facts supporting such damages. (Defs.' Mot. Dismiss 9.) Given that Plaintiff has set forth a valid prima facie case under the ADA, PHRA, and FMLA, the Court declines to consider Plaintiff's requested relief until the parties have fully developed the factual record. The Court will consider Plaintiff's requested relief under ERISA in conjunction with Defendants' other challenges to the ERISA claim.

[9] Notably, under the pre-<u>Burlington</u> standard, courts found such discipline insufficient to state a claim for retaliation, as it failed to affect the compensation, terms, conditions, or privileges of employment. See, e.g., *Sconfienza v. Verizon Pa. Inc., 307 Fed. Appx. 619, 621-22 (3d Cir. 2008)* (finding formal written warning in progressive discipline scheme did not alter conditions of employment where it did not affect compensation, ability to receive transfer, or promotion).

disability carrier, terminating Plaintiff, and failing to supply her with required notices under COBRA and ARRA. (Id. ¶ 87.) Plaintiff's ERISA interference claim alleges wage loss and emotional distress, and requests "compensatory, liquidated, and punitive damages . . . plus costs of this action, reimbursement of back pay with interest, front pay, attorney's fees, and such other relief as the Court may deem just, **[\*36]** proper, and appropriate in the circumstances of this case." (Id. ¶ 90; Prayer for Relief.)

Defendants contend that Plaintiff's failure to specifically allege the type and amount of injury suffered (e.g. the correct value of her salary and the amount lost as a result of Defendants' misinformation) renders her claim insufficient under the standards of *Rule 12(b)(6)*. (Defs.' Mot. Dismiss 8-9.) In response, Plaintiff argues that she need only allege intent to interfere, not whether such interference was successful and the amount of the resulting loss. (Pl.'s Resp. Opp'n 25.)

*HN19*[⬆] To recover under *section 510*, a plaintiff need only prove the defendant's intent to interfere with her attainment of benefits, "even if the intended results are not actualized and regardless of whether the participant would have actually received the benefits absent the interference." *Meacham v. Bell Tel. Labs. Inc., No. CIV.A.87-3752, 1990 U.S. Dist. LEXIS 20925, 1990 WL 299805, at \*10 (D.N.J. Feb. 15, 1990)* (quoting *Gavalik v. Cont'l Can Co., 812 F.2d 834, 852 (3d. Cir. 1987)*); see also *Gavalik, 812 F.2d at 852 n.32* (noting that ERISA's legislative history envisions a "preventive, as well as corrective, purpose[]" for *section 510*) (citations omitted). **[\*37]** In light of *section 510*'s emphasis on intent versus actualized loss, the Court declines to dismiss Plaintiff's ERISA claim at this stage of the proceedings for failure to specify monetary damages.

Alternatively, Defendants assert that Plaintiff's claims for extra-contractual or punitive damages under ERISA and COBRA should be stricken because ERISA does not permit their recovery. (Defs.' Mot. Dismiss 9-10.) Plaintiff concedes that she cannot recover punitive damages for her ERISA and COBRA claims, but maintains that her other requests for relief are viable. (Pl.'s Resp. Opp'n 22.)

*HN20*[⬆] *Section 502(a) of ERISA* offers the exclusive enforcement scheme for violations of *section 510*. See, e.g., *Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 144, 111 S. Ct. 478, 112 L. Ed 2d 474 (1990)*; *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987)*; *Eichorn v. AT&T Corp., 484 F.3d 644, 651 (3d Cir. 2007)*. *Subsection 502(a)(1)(B)* provides recovery where a defendant has failed to comply with the terms of a plan, allowing plaintiffs to enforce their rights or recover benefits due to them under the plan. *Cox v. Keystone Carbon Co., 861 F.2d 390, 392 (3d Cir. 1988)* (quoting *§ 502(a)(1)(B)*); *Eichorn, 484 F.3d at 653*. In contrast, subsection **[\*38]** *502(a)(3)* provides the sole relief for plaintiffs alleging a defendant's interference with their ability to become eligible for future benefits under the plan. *Eichorn, 484 F.3d at 653*. Under subsection *502(a)(3)*, a plaintiff may bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other equitable relief." *Cox, 861 F.2d at 392*. Plaintiff does not specify under which subsection she brings her claim. In her Response, she argues only as to the relief permitted under *subsection (a)(3)*. Accordingly, the Court will proceed only with an analysis of remedies available under *§ 502(a)(3)*.

A plaintiff seeking relief under *§ 502(a)(3)* must tie that request to a form of relief typically available in equity, such as "injunction, mandamus, and restitution." *Eichorn, at 654-55* (quoting *Mertens v. Hewitt Assocs., 508 U.S. 248, 256, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)*). As Defendants correctly suggest, such remedies do not include Plaintiff's claim for legal relief in the form of monetary damages. Id. (compensatory damages not permitted under *§ 502(a)(3)*); *Cureton v. Verizon Serv. Corp., No. CIV.A.05-00213, 2005 U.S. Dist. LEXIS 18564, 2005 WL 1785302, at \*5 (E.D. Pa. July 25, 2005)* **[\*39]** (punitive damages not permitted for *§ 510* violation) (citing *Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144-48, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)*). Accordingly, the Court will dismiss Plaintiff's claims for punitive, liquidated, and compensatory damages (including those for emotional distress). [10]

"This is not to say that an ERISA plaintiff's demand for

---

[10] Plaintiff cites a number of cases she characterizes as having granted non-equitable relief to plaintiffs claiming ERISA interference. The only Third Circuit case Plaintiff references, however, does no such thing. See *Cox, 861 F.2d 390*. In Cox, the court denied Plaintiff's request for a jury trial based on its finding that the remedies available in actions under *section 502(a)(3)* are "exclusively equitable." *Id. at 393*. The Court instead chose to remand the plaintiff's **section 502(a)(1)(B)** claim to determine whether that claim was legal in nature and eligible for a jury trial. As discussed above, Plaintiff has given no indication that she is proceeding under **502(a)(1)(B)**.

money necessarily requires the conclusion that the relief sought is not 'equitable' within the meaning of the statute." *Eichorn, 484 F.3d at 655 n.6*. Although only available in "limited **[\*40]** circumstances," Eichorn notes that "some forms of equitable relief — such as constructive trusts, equitable liens, or accounting for the profits derived from wrongly held property — include the payment of money." *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-14, 122 S. Ct. 708, 151 L. Ed. 2d 635 & n.2 (2002))*. On this basis, the Court declines to dismiss Plaintiff's ERISA claim in its entirety solely because of Plaintiff's improper request for punitive and compensatory damages. Plaintiff has also requested back pay, front pay, and other remedies the Court may deem appropriate. Defendants have failed to challenge these damages beyond their broader objection to the remedies discussed above. "[W]hether a particular form of relief is legal or equitable in nature is largely dependent on the facts of a particular case." *Sessions v. Owens-Illinois, Inc., No. CIV.A.07-1669, 2008 U.S. Dist. LEXIS 89148, 2008 WL 4821755, at \*6 (M.D. Pa. Nov. 4, 2008)* (declining to rule on plaintiff's request for past-due benefits before summary judgment stage); see also *Pell v. E.I. de Nemours & Co. Inc., 539 F.3d 292, 307 (3d Cir. 2008)* (granting injunction to calculate plaintiff's future pension payments using an earlier adjusted service **[\*41]** date because the remedy is "forward-looking and entitles [plaintiff] to an amount of money that cannot be calculated with specificity (since it is unknown how long he will survive and be entitled to benefits)"). Given the fact-intensive nature of the Court's damages inquiry, the Court declines to evaluate Plaintiff's ERISA claim before the parties have developed a factual record reflecting the exact contours of Plaintiff's requested relief.

## 2. COBRA

Defendants also move to strike Plaintiff's request for compensatory and punitive damages stemming from Defendants' failure to timely provide Plaintiff with appropriate COBRA notices. See *29 U.S.C. § 1132(c)(1)* and *29 U.S.C. § 1166*. [11] Pursuant to *29 U.S.C. § 1132(c)(1)*, those employers in violation of ERISA's reporting and disclosure provisions are

personally liable to a plaintiff-participant for up to $110 a day from the date of such violation and for any other relief the court deems proper. Id.; see also *29 C.F.R. § 2575.502c-1* (increasing maximum civil penalty from $100 to $110 per day for violations occurring after July 29, 1997). "Both the decision to award penalties and the amount of any award are within the discretion of the trial **[\*42]** court." *Lloyyd v. Hanover Foods Corp., 72 F. Supp. 2d 469, 479-80 (D. Del. 1999)* (citing *29 U.S.C. § 1132(c)(1)*); *Boyadjian v. CIGNA Cos., 973 F. Supp. 500, 505-07 (D.N.J. 1997)*. Courts in the Third Circuit have "imposed a wide range of penalties under the statute," including reimbursement of unpaid medical expenses. *Lloyd, 72 F. Supp. 2d at 480*. Given the discretionary nature of the remedial scheme of *§ 1166*, the Court declines to dismiss Plaintiff's claims for compensatory damages at this time.

## D. Individual Liability of Defendant Susan Mitchell

Plaintiff names Susan Mitchell, director of Human Resources for Attleboro, individually as a Defendant to Plaintiff's FMLA and ERISA claims. In the introductory portion of the Motion to Dismiss, Defendants ask the Court to dismiss Defendant Mitchell from the case, but then fail to offer any further argument in support of this request. In response, Plaintiff offers a wealth of legal authority against Defendant Mitchell's dismissal. Given that **[\*43]** both parties have had the opportunity to fully address this issue, the Court will consider Defendants' request, albeit briefly.

*HN21*[↑] The FMLA defines an "employer" as, inter alia, "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *29 U.S.C. § 2611(4)(A)(ii)(I)*. Such language plainly evinces an intent to provide for individual liability. *Spagnoli v. Brown & Brown Metro, Inc., No. CIV.A.06-414, 2007 U.S. Dist. LEXIS 59698, 2007 WL 2362602, at \*16 (D.N.J. Aug. 15, 2007)*; *Kilvitis v. Cnty. of Luzerne, 52 F. Supp. 2d 403, 412 (M.D. Pa. 1999)*. Courts have held that such individual liability attaches under the FMLA when an employee has "exercised control" over a plaintiff's FMLA leave or acts on behalf of the employer. *Gude v. Rockford Ctr. Inc., 699 F. Supp. 2d 671, 684 (D. Del. 2010)* (citing *Spagnoli, 2007 U.S. Dist. LEXIS 59698, 2007 WL 2362602*); *Hewett v. Willingboro Bd. of Educ., 421 F. Supp. 2d 814, 817-18 n.4 (D.N.J. 2006))*. Here, Plaintiff alleges that Defendant Mitchell was "in whole or in part responsible for the decision to terminate Plaintiff" and "acted in the interest of her employer Attleboro with regard to the actions she

---

[11] As discussed above, Plaintiff has conceded that she cannot recover punitive damages under ERISA or COBRA. Accordingly, the Court will only consider the viability of her request for compensatory damages.

took concerning Plaintiff." (Am. Compl. ¶ 81.) **[\*44]** Thus, the Court sees no reason to dismiss Defendant Mitchell from Plaintiff's FMLA claim at this stage of litigation.

Likewise, *HN22*[⬆] ERISA makes it unlawful for "any person" — as opposed to only an employer — to discipline, discharge, or otherwise discriminate against a participant for exercising rights to which she is entitled under an employee benefit plan. *29 U.S.C. § 1140*. As defined by the statute, the term "person" includes "an individual." *29 U.S.C. § 1002(9)*. Accordingly, the Court finds Plaintiff has properly alleged that Defendant Mitchell is an individual intending to interfere with Plaintiff's rights in violation of *section 510*.

In light of Defendants' lack of supporting arguments and the Court's brief survey of pertinent Third Circuit jurisprudence, the Court declines to dismiss Defendant Mitchell from the case at this time. This holding does not, however, foreclose Defendants from moving for Ms. Mitchell's dismissal in the future.

## IV. CONCLUSION

Based on the foregoing, the Court denies Defendants' Motion to Dismiss Plaintiff's ADA and PHRA claims for disability discrimination and failure to accommodate. The Court also declines to dismiss Plaintiff's FMLA retaliation claim. Similarly, **[\*45]** the Court will allow Plaintiff's FMLA interference claim to proceed to the extent it relies upon Defendants' unwarranted issuance of discipline and failure to timely submit FMLA paperwork, as Defendants did not challenge these aspects of the claim. However, the Court grants dismissal of Plaintiff's interference claim with respect to her termination and Defendants' refusal to provide her with reasonable accommodation. Additionally, the Court strikes Plaintiff's claim for punitive and compensatory damages under ERISA and punitive damages under COBRA, but declines to dismiss either claim in its entirety. Finally, the Court declines to dismiss Defendant Mitchell from the case.

An appropriate Order follows.

**End of Document**

⊕ Positive
As of: February 11, 2018 9:51 PM Z

# *Haley v. Cmty. Mercy Health Partners*

United States District Court for the Southern District of Ohio, Western Division

January 28, 2013, Decided; January 28, 2013, Filed

Case No. 3:11-cv-232

**Reporter**
2013 U.S. Dist. LEXIS 11193 *; 20 Wage & Hour Cas. 2d (BNA) 502; 27 Am. Disabilities Cas. (BNA) 1280; 2013 WL 322493

NANCY HALEY, Plaintiff, v. COMMUNITY MERCY HEALTH PARTNERS D/B/A SPRINGFIELD REGIONAL MEDICAL CENTER, et al., Defendants.

## Core Terms

termination, disability, discipline, prima facie case, reasons, reasonable jury, patient, employees, site, tardies, attendance, marked, disciplinary, replacement, retaliation, impairment, requires, younger, non discriminatory reason, corrective action, summary judgment, prima facie, age discrimination claim, substantial limitation, hospital's, argues, notice, summary judgment motion, incidents, cancer

## Case Summary

### Overview

In an age discrimination suit brought by a nurse under the Age Discrimination in Employment Act, *29 U.S.C.S. § 623*, the former employer's motion for summary judgment was overruled because the nurse established that she was replaced by a younger person and that the employer showed more favorable treatment to younger employees.

### Outcome

Former employer's motion for summary judgment overruled.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

Civil Procedure > ... > Summary
Judgment > Evidentiary Considerations > Scintilla
Rule

**HN1**[⬇]  **Entitlement as Matter of Law, Genuine Disputes**

*Fed. R. Civ. P. 56* sets forth the standard and procedures for summary judgment. Upon motion by either party, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The party opposing the motion must cite to particular parts of materials in the record, including depositions, documents, affidavits or declarations admissions, interrogatory answers, as well as other relevant materials, to demonstrate the existence of a genuine issue of material fact. *Fed. R. Civ. P. 56(c)(1)(A)*. Generalized assertions lacking the support of particularized citation required by *Fed. R. Civ. P. 56* do not suffice, as a court has no obligation to wade through the record for specific facts in support of a party's arguments.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Movant Persuasion
& Proof

**HN2**[⬇]  **Entitlement as Matter of Law, Genuine Disputes**

2013 U.S. Dist. LEXIS 11193, *11193

The movant for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record] which it believes demonstrate the absence of a genuine issue of material fact. The movant's burden is to demonstrate the absence of a genuine issue of material fact as to at least one essential element on each of the plaintiff's claims.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

## HN3[↓] Burdens of Proof, Movant Persuasion & Proof

Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine dispute of a material fact that is resolvable only by a jury. At that stage, it is not sufficient for the nonmoving party to simply show that there is some metaphysical doubt as to the material facts. Instead, the nonmoving party must go beyond the pleadings and present some type of evidentiary material that demonstrates the existence of a genuine dispute. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

## HN4[↓] Entitlement as Matter of Law, Genuine Disputes

Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Conversely, material facts in genuine dispute that may reasonably be resolved in favor of either party require denial of summary judgment in order to be properly resolved by a jury.

> Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

> Evidence > Inferences & Presumptions > Inferences

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

## HN5[↓] Summary Judgment, Evidentiary Considerations

When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. A court must avoid credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, as such are jury functions that are inappropriate to employ at the summary judgment stage.

> Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

> Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

> Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

## HN6[↓] Burdens of Proof, Burden Shifting

Because direct evidence of discrimination is rare, victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof. Such claims will be analyzed under

2013 U.S. Dist. LEXIS 11193, *11193

the burden shifting method established by the United States Supreme Court in McDonnell Douglas Corp. v. Green.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

*HN7*[⤓] **Burdens of Proof, Burden Shifting**

The McDonnell Douglas-Burdine burden shifting analysis unfolds in three steps: First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden of going forward shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry that burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

*HN8*[⤓] **Entitlement as Matter of Law, Appropriateness**

The Sixth Circuit has described the particular application of McDonnell Douglas-Burdine in the summary judgment context as follows: On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry. The court first determines if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements, including whether she has met the legitimate expectations of her employer. It performs the same function with respect to defendant's production of evidence, and again for the plaintiff's response to that production.

Governments > Courts > Judicial Precedent

Labor & Employment Law > Discrimination > Actionable Discrimination

*HN9*[⤓] **Courts, Judicial Precedent**

While Ohio courts are not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes, federal district courts has looked to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > General Overview

*HN10*[⤓] **Evidence, Burdens of Proof**

The Age Discrimination in Employment Act, *29 U.S.C.S. § 623(a)(1)*, prohibits an employer from discharging or discriminating against an individual in the compensation, terms, conditions, or privileges of employment because of his or her age. Age discrimination claims brought under the analogous Ohio Civil Rights statute are analyzed according to federal law. A successful age discrimination claim requires the plaintiff to establish that age was the but-for cause of the employer's adverse action.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Scope & Definitions > Covered Employees

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Discharges & Failures to Hire

*HN11*[⤓]  **Evidence, Burdens of Proof**

A prima facie showing of age discrimination under the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 623* et set., requires a plaintiff to demonstrate that: 1) she was a member of the protected class; 2) she was subject to an adverse employment action; 3) she was qualified for the position; and 4) she was replaced by someone outside the protected class. The protections of the ADEA apply to persons 40 years of age and older. *29 U.S.C.S. § 631(a)*. Discharge, if done because of an employee's age, is one of the enumerated practices prohibited under the ADEA, and is unquestionably an adverse employment action. *29 U.S.C.S. § 623(a)(1)*. Indeed, a discharge for any purpose is an adverse employment action.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Defenses > Good Cause Discharges

*HN12*[⤓]  **Evidence, Burdens of Proof**

When assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason produced by the defense as its reason for terminating plaintiff. Discharge for good cause is a non-discriminatory basis for termination. *29 U.S.C.S. § 623(f)(3)*.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Discharges & Failures to Hire

*HN13*[⤓]  **Evidence, Burdens of Proof**

The fourth element of a prima facie age discrimination claim requires the plaintiff to show that a substantially younger person replaced her. For purposes of the fourth element of a plaintiff's prima facie case based on indirect evidence, an age difference of six years or less between an employee and a replacement is not significant. Replacement occurs only when another employee is hired or reassigned to perform the plaintiff's duties.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Discharges & Failures to Hire

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Reductions in Force

*HN14*[⤓]  **Evidence, Burdens of Proof**

In Lilley, a reduction in force case, the Sixth Circuit states that spreading the former duties of a terminated employee among the remaining employees does not constitute replacement that satisfies the fourth element of a plaintiff's prima facie age discrimination claim. That reflects the heightened evidentiary burden a plaintiff bears in a reduction in force case, which requires that she present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > General Overview

*HN15*[⤓]  **Evidence, Burdens of Proof**

A plaintiff may also demonstrate the fourth element of a prima facie case of age discrimination by showing that the employer gave more favorable treatment to similarly-situated non-protected employees.

2013 U.S. Dist. LEXIS 11193, *11193

Business & Corporate
Compliance > ... > Discrimination > Disability
Discrimination > ADA Enforcement

Business & Corporate Compliance > ... > Disability
Discrimination > Scope &
Definitions > Discriminatory Conduct

Business & Corporate
Compliance > ... > Discrimination > Disability
Discrimination > Federal & State Interrelationships

**_HN16_[⬇]   Disability   Discrimination,   ADA
Enforcement**

The Americans with Disabilities Act (ADA), _42 U.S.C.S.
§ 12112(a)_, prohibits an employer from discriminating
against a qualified individual on the basis of disability in
regard to the hiring, advancement, or discharge of
employees and other terms, conditions, and privileges
of employment. The Supreme Court of Ohio can look to
regulations and cases interpreting the ADA for guidance
in our interpretation of Ohio law.

Labor & Employment
Law > ... > Evidence > Burdens of
Proof > Employee Burdens of Proof

**_HN17_[⬇]  Burdens of Proof, Employee Burdens of
Proof**

In the Sixth Circuit, a prima facie case of disability
discrimination based on indirect evidence requires the
plaintiff to show that 1) he or she is disabled; 2) with or
without reasonable accommodation, the plaintiff is
otherwise qualified for the position; 3) the plaintiff
suffered an adverse employment decision; 4) the
employer knew or had reason to know of the plaintiff's
disability; and 5) the disabled individual was replaced.

Labor & Employment Law > ... > Disabilities Under
ADA > Mental & Physical Impairments > Mental &
Physical Impairments

Labor & Employment Law > ... > Disabilities Under
ADA > Mental & Physical Impairments > Substantial
Limitations

Labor & Employment Law > ... > Scope &
Definitions > Disabilities Under ADA > Regarded
With Impairments

**_HN18_[⬇]   Mental & Physical Impairments, Mental &
Physical Impairments**

The Americans with Disabilities Act (ADA), _42 U.S.C.S.
§ 12102(1)_, defines disability in three ways: (A) a
physical or mental impairment that substantially limits
one or more major life activities of such individual; (B) a
record of such an impairment; or (C) being regarded as
having such an impairment. An impairment includes any
physiological   disorder   or   condition,   cosmetic
disfigurement, or anatomical loss affecting one or more
body systems, such as neurological, musculoskeletal,
special sense organs, respiratory, including speech
organs,   cardiovascular,   reproductive,   digestive,
genitourinary, immune, circulatory, hemic, lymphatic,
skin, and endocrine. _29 C.F.R. § 1630.2(h)(1)_. Ohio law
tracks these examples of impairment, but specifically
includes   cancer   as   well.   _Ohio   Rev.   Code   §
4112.01(A)(16)(a)(iii)_.

Labor & Employment
Law > ... > Evidence > Burdens of
Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Disabilities Under
ADA > Mental & Physical Impairments > Major Life
Activities

Labor & Employment Law > ... > Disabilities Under
ADA > Mental & Physical Impairments > Substantial
Limitations

**_HN19_[⬇]  Burdens of Proof, Employee Burdens of
Proof**

The recognition of a plaintiff's impairment is only a
threshold issue in determining whether or not she has a
disability under the Americans with Disabilities Act
(ADA), _42 U.S.C.S. § 12102(1)_. When the United States
Congress passed the ADA Amendment Acts of 2008
(ADAAA), it amended the statute with specific rules of
construction for defining a disability. _42 U.S.C.S. §
12102(4)_. Those rules of construction state that
definitions of disability are to be drawn in favor of broad
coverage of individuals to the maximum extent
permitted by the statute. _42 U.S.C.S. § 12102(4)(A)_.
Therefore, when analyzing whether an impairment
substantially limits an individual's major life activity,

courts should interpret that phrase in accordance with the findings and purposes of the ADAAA. *§ 12102(4)(B)*. In passing the ADAAA, Congress intends to state a broad scope of protection to be available under the ADA and specifically reject the inappropriately high standards for interpreting the term substantially limits articulated by the United States Supreme Court in case law.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Mental & Physical Impairments

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

### HN20[⬇] Mental & Physical Impairments, Major Life Activities

The Americans with Disabilities Amendment Acts, *42 U.S.C.S. § 12102(4)(D)*, provides that an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. Major life activities include working. *§ 12102(2)(A)*. A major life activity may also include the operation of a major bodily function such as normal cell growth. *§ 12102(2)(B)*. Thus, the Equal Employment Opportunity Commission, applying the principles of construction described, states that it should be easily concluded that cancer, as an impairment, substantially limits the major life activity of normal cell growth. *29 C.F.R. §1630.2(j)(3)(iii)*.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

### HN21[⬇] Burdens of Proof, Employee Burdens of Proof

When enacting the Americans with Disabilities Amendment Acts, *42 U.S.C.S. § 12102(4)(D)*, the United States Congress expressly states that one of its

purposes is to reject the United States Supreme Court's reasoning in Sutton v. United Air Lines, Inc., with regard to coverage under the third prong of definition of disability and to restore previous reasoning in line with the definition of handicap under the Rehabilitation Act of 1973. The amended version of the Americans with Disabilities Act no longer requires the plaintiff bringing a claim under subpart (C) to show that the impairment limited her life activity, including working in a broad class of jobs.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

### HN22[⬇] Scope & Definitions, Covered Employees

The Family and Medical Leave Act of 1993 (FMLA), *29 U.S.C.S. § 2615 et seq.*, has been enacted to help employees balance their families' needs with the demands of the workplace and to allow them to take reasonable leave for medical reasons and for the care of a child, spouse, or parent who has a serious health condition. *29 U.S.C.S. § 2601(b)*. During any 12-month period, the FMLA provides an employee with the right to 12 weeks of leave because of a serious health condition that makes the employee unable to perform the functions of his or her job. *29 U.S.C.S. § 2612(a)(1)(D)*. The employee may also take leave, counted towards the same 12 week period, in order to care for a spouse or parent with a serious health condition. *§ 2612(a)(1)(C)*.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

Labor & Employment Law > ... > Retaliation > Statutory Application > Family & Medical Leave Act

### HN23[⬇] Scope & Definitions, Employee Leave Requirements

The Sixth Circuit has recognized two distinct theories of recovery under the Family and Medical Leave Act of

1993 (FMLA), *29 U.S.C.S. § 2615 et seq.* The first is the interference or entitlement theory. It is based on *29 U.S.C.S. § 2615(a)(1)*, which states that it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under that subchapter. The second theory of recovery involves FMLA retaliation or discrimination claims. Those arise under *29 U.S.C.S. § 2615(a)(2)*, which prohibits employers from discharging or otherwise discriminating against individuals who oppose unlawful FMLA practices.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

*HN24*[ ] **Family & Medical Leaves, Burdens of Proof**

A plaintiff's prima facie interference claim requires her to show that (1) she was an eligible employee; (2) the defendant was an employer as defined under the Family and Medical Leave Act of 1993 (FMLA), *29 U.S.C.S. § 2615 et seq.*; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

*HN25*[ ] **Scope & Definitions, Covered Employees**

The Family and Medical Leave Act of 1993 (FMLA), *29 U.S.C.S. § 2612(e)*, only addresses notice in cases of foreseeable leave, such as the leave required for an expected child or planned medical treatment. The

FMLA's implementing regulations, however, do address notice requirements for unforeseeable leave. *29 C.F.R. § 825.303*. With regard to timing, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case. *§ 825.303(a)*.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Employee Leave Requirements

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

*HN26*[ ] **Family & Medical Leaves, Burdens of Proof**

The content of the notice must also contain sufficient information for an employer to reasonably determine whether the Family and Medical Leave Act of 1993, *29 U.S.C.S. § 2615 et seq.*, may apply to the leave request. *29 C.F.R. § 825.303(b)*. The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition. The employer will be expected to obtain any additional required information through informal means. *29 C.F.R. § 825.303(b)*.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment Law > ... > Retaliation > Statutory Application > Family & Medical Leave Act

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

*HN27*[ ] **Retaliation, Burdens of Proof**

For a plaintiff to make out a prima facie retaliation/termination claim under the Family and

2013 U.S. Dist. LEXIS 11193, *11193

Medical Leave Act of 1993 (FMLA), *29 U.S.C.S. § 2615 et seq.*, she must show that: 1) she availed herself of a right protected under the FMLA; 2) she suffered an adverse employment action; and 3) a causal connection exists between the adverse action and the exercise of her FMLA-protected right.

Labor & Employment
Law > ... > Retaliation > Elements > Adverse
Employment Actions

Labor & Employment
Law > ... > Retaliation > Elements > Causation

*HN28*[ ] **Elements, Adverse Employment Actions**

The Sixth Circuit has held that proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection.

Governments > Legislation > Statute of
Limitations > Time Limitations

Labor & Employment
Law > ... > Retaliation > Statutory
Application > Family & Medical Leave Act

Labor & Employment Law > ... > Family & Medical
Leaves > Scope & Definitions > General Overview

*HN29*[ ] **Statute of Limitations, Time Limitations**

The Family and Medical Leave Act of 1993, *29 U.S.C.S. § 2617(c)*, provides that an action may be brought under that section not later than two years after the date of the last event constituting the alleged violation for which the action is brought.

Labor & Employment Law > ... > Disability
Discrimination > Defenses > General Overview

Labor & Employment Law > ... > Age
Discrimination > Defenses > Good Cause
Discharges

*HN30*[ ] **Disability Discrimination, Defenses**

Excessive tardiness and absenteeism are nondiscriminatory reasons for termination. An employee's systematic absenteeism is a legitimate, nondiscriminatory reason for discharge.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

Labor & Employment Law > ... > Age
Discrimination > Evidence > Burdens of Proof

*HN31*[ ] **Burdens of Proof, Burden Shifting**

After an employer articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are pretextual. To survive summary judgment, the plaintiff must produce evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. Conversely, summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. The plaintiff may prove pretext by showing that the reasons offered by the defendant 1) had no basis in fact; 2) were not the actual reasons for the defendant's actions; or 3) were an insufficient basis for the defendant's actions. A showing that the defendants' reasons had no basis in fact is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, for example, that they are factually false.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

Labor & Employment Law > ... > Age
Discrimination > Evidence > Burdens of Proof

*HN32*[ ] **Entitlement as Matter of Law, Genuine Disputes**

Under the third possible showing of pretext, the plaintiff must present sufficient evidence that other employees, particularly employees outside the protected class, were

not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff. That type of pretext also constitutes a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff, resulting in the factfinder's possible, but not required, inference of discrimination. In a summary judgment context, such an inference creates a genuine, triable issue of material fact.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

*HN33*[⤓]  **Burdens of Proof, Burden Shifting**

Pretext in an employment discrimination suit is a commonsense inquiry: did the employer fire employee for the stated reason or not?

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

*HN34*[⤓]  **Entitlement as Matter of Law, Genuine Disputes**

At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial.

**Counsel:**  **[*1]** For Nancy Haley, Plaintiff: Randolph Harry Freking, Freking & Betz, Cincinnati, OH; Katherine Daughtrey Neff, Freking & Betz LLC, Cnicinnati, OH.

For Community Mercy Health Partners, doing business as Springfield Regional Medical Center, Catholic Health Partners, Defendants: Thomas Joseph Wiencek, LEAD ATTORNEY, Catholic Healthcare Partners, Akron, OH; Kerri L Keller, Brouse McDowell LPA, Akron, OH.

**Judges:** WALTER H. RICE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WALTER H. RICE

# Opinion

DECISION AND ENTRY OVERRULING DEFENDANTS MOTION FOR SUMMARY JUDGMENT (DOC. #13); TELEPHONE CONFERENCE SET

Plaintiff Nancy Haley filed suit against her former employers, Community Mercy Health Partners, d/b/a Springfield Regional Medical Center and Catholic Healthcare Partners (collectively "SRMC"), alleging violations of the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 623*, the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12112*, and the Family and Medical Leave Act of 1993 ("FMLA"), *29 U.S.C. § 2615*. Plaintiff also alleges state law civil rights violations under Chapter 4112 of the Ohio Revised Code for age and disability discrimination. The Court has federal question jurisdiction, pursuant to *28 U.S.C. § 1331*, **[*2]** over Haley's federal claims and supplemental jurisdiction over her state law claims pursuant to *28 U.S.C. § 1367*.

Pending before the Court is the Defendants' Motion for Summary Judgment pursuant to *Rule 56(a) of the Federal Rules of Civil Procedure* (Doc. #13). For the reasons set forth below, the Court OVERRULES Defendants' motion.

## I. Factual Background

The following summary is confined to the undisputed facts. Nancy Haley worked as a registered nurse for SRMC from June of 1978 until April of 2010, a period just short of thirty-two years. Def.'s Answer (Doc. #3) ¶ 20; Def. Ex. #55 (Doc. #18-54). She was 58 years old when SRMC terminated her employment. Doc. #3 ¶ 9. From 1982 onwards, Haley worked as a Staff Nurse in SRMC's operating room. *Id.* ¶ 21. At the time of her termination, Haley performed part of her duties as a member of SRMC's Cardiac Team. Doc. #18-54; Elliot Dep. (Doc. #17) at 21; Abraham Dep. (Doc. #15) at 44. Barbara Elliot was Haley's supervisor from July of 2007 until Haley's termination. Doc. #17 at 21. Elliot was a

nurse manager in charge of the operating room and reported directly to Terri Abraham, an SRMC director. Doc. #15 at 9-10.

## A. Haley's FVLA Leave

During her tenure **[*3]** at SRMC, Haley took FMLA leave due to her own illness and family members' serious health conditions. Between March of 2007 and March of 2008, Haley took two to three days of intermittent FMLA leave every six to eight weeks in order to care for her father, who suffered from a cardiac condition. Pl. Ex. A (Doc. #22-1) at 1-2. After her father's death in July of 2008, Haley took the same type of intermittent leave to care for her mother, who also had heart problems and had recently been diagnosed with breast cancer. Doc. #3 ¶ 27; Doc. #18-55 at 3-4.

Haley herself was diagnosed with breast cancer in November of 2009 and underwent two surgical procedures for treatment. Doc. #18 at 33; Doc. #18-54 at 5-6. She took approximately five and a half weeks of FMLA leave during this time and returned to work on January 18, 2010. Doc. #18 at 33; Doc. #18-54 at 5-6.[1]

## B. SRMC's Corrective Action Plan

SRMC disciplines employees pursuant to its "Corrective Action" policy, also referred to as "CAP." Doc. #24-1. CAP is a four-stage, progressive process. Doc. #17 at 32-33. The process is "one track," meaning that the violations accrue towards termination regardless of the type of behavior that prompted discipline. *Id.* In other words, SRMC may place an employee at one disciplinary level and then later place the employee at a higher level, even if the incidents involved unrelated behavior. *Id.* Referred to as a "Step" or "CAP," each stage moves an employee closer to termination, but

_____

[1] The parties provide several different dates for this period of leave. Haley states that the FMLA leave occurred from November 20 until November 27, 2009, and from December 8, 2009, until January 29, 2010. Doc. #22 at 7. In its Answer, SRMC states that Haley's FMLA leave lasted from November 23 to November 27, 2009, and from December 3, **[*4]** 2009, to January 17, 2010, with Haley then working half days until February 18. Doc #3 ¶ 7. In their memoranda, the parties do not mention this discrepancy nor do they dispute the general length of the leave involved. The Court does not find the slight difference in these dates to be material to Haley's FMLA claims.

also institutes an "action plan" for performance improvement. *Id.* at 32. If an employee's violation warrants discipline, the policy mandates that the supervisor complete a Corrective Action form, "which shall be signed by the associate and placed in the associate's **[*5]** personnel file in the Human Resources Department." Doc. #24-1 at 1.

The first step of discipline, CAP 1, involves an oral warning or "counseling session" that amounts to "more than an anecdotal conversation or a coaching session" and is memorialized in an employee's personnel file. Doc. #17 at 37. CAP 1 may be bypassed if an infraction is deemed "serious enough" by a supervisor, but there is an expectation that a supervisor would first discuss the issue with a department head before skipping a step.[2] Doc. #15 at 28; Doc. #24-1 at 1. CAP 2 involves a written warning, and CAP 3 involves a "final warning" that may or may not involve an employee's three day suspension. Doc. #24-1 at 2. If an employee reaches the fourth step, CAP 4, he or she is terminated. *Id.*; Doc. #17 at 38.

## C. CAP 2

In the summer of 2009, SRMC issued a Haley a CAP 2 for missing pages while she was on call. Doc. #18-50. **[*6]** On call employees are expected to carry a pager, provide an alternative form of contact (such as a cell phone), and report to SRMC 20-30 minutes after a page. Doc. #17 at 118, 121. Haley did not initially respond to the hospital's page, was called at home, and arrived at the hospital 37 minutes after the initial page on June 2, 2009. Doc. #18-50. The second page occurred on July 13, 2009, when the page went out at 8:15 p.m. and Haley clocked in at 9:51. *Id.* The Corrective Action Form was signed by Elliot, but Haley did not sign it. *Id.* at 2. In the space for the employee's signature, it is instead written "Didn't sign — didn't believe event 6/2 was her fault." *Id.*

## D. CAP 3

SRMC placed Haley at the CAP 3 discipline step on

_____

[2] In Haley's situation, Step One was bypassed. It is noted that SRMS's policy in fact allows a supervisor to bypass more than the initial step: "However, the circumstances, severity, intent and frequency of the offense could justify initiation of corrective action at Steps Two, Three, or Four." Doc. #24-1 at 2.

November 9, 2009, for two incidents involving patient "site marking." Doc. #18-52. The hospital's Universal Protocol Policy outlines the procedures by which a patient's "proper surgical or procedure site(s)" are verified before surgery. Doc. #16-3. To safeguard against the occurrence of incorrect surgical procedures, the policy requires that the surgeon mark the site and that he or she do so prior to surgery while the patient is "awake and aware" for verification purposes. **[*7]** *Id.* On October 9, 2009, Haley took an unmarked patient into the operating room. Doc. #18-52. SRMC placed Haley at CAP 3 based on that incident and another that occurred on October 16. *Id.* The Corrective Action Form stated that both incidents violated the "established hospital policy regarding site marking for invasive procedures," resulting in Haley being placed on unpaid leave and having to make a brief presentation about the policy to operating room staff. *Id.*

### E. CAP 4 & Termination

Haley took "intermittent" FMLA leave approved by SRMC on the following dates in 2010: January 25 and 26, March 4 through March 12, and April 15 and April 16. Doc. #3 at ¶¶ 34, 36.

On February 12, 2010, Haley's husband, suffering from a heart condition, was transported to SRMC. Doc. #3 ¶ 35. Haley accompanied her husband to the hospital and contacted SRMC regarding her inability to work her shift that day. *Id.* SRMC did not classify any of Haley's time off during her husband's three-day hospitalization as FMLA leave, and marked her absence on February 12, 2010, as "unexcused." *Id.* ¶¶ 35, 41.

Three days after returning from her April FMLA leave, on Monday, April 19, SRMC terminated Haley. Doc. #13-1 at 2. Haley's **[*8]** absence on February 12, 2010, when she was with her hospitalized husband, was listed as one of three unexcused absences on the Corrective Action form filled out for her termination. *Id.*; Doc. #3 ¶ 41; Doc. #15-1 at 1; Doc. #17 at 80. Those absences, along with eleven instances of tardiness, were listed as the reasons for placing Haley at CAP 4 and terminating her. Doc. #15-1 at 1. Elliot had no conversations with Haley prior to her termination about excessive tardiness or absences. Doc. #17 at 81-83.

### II. <u>Procedural Background</u>

On July 1, 2011, Haley filed suit against SMRC, alleging age discrimination claims under the ADEA (Count 1)

and under Ohio civil rights law (Count II); disability discrimination claims under the ADA (Count III) and under Ohio civil rights law (Count IV); and a claim under the FMLA for retaliation and interference (Count V). Doc. #1. In her complaint, Haley alleges that the discipline administered by SRMC and its termination of her employment constituted discrimination based on her age and her disability from breast cancer, as shown by SRMC's differential treatment of a younger, non-disabled coworker with a similar employment record. *Id.* at 3. She also alleges that **[*9]** SRMC "disciplined her for conduct that was either manufactured or inflated" after she took FMLA leave to care for her ailing mother. *Id.* at 2. Plaintiff further alleges that SRMC's termination of her employment after Plaintiff took FMLA leave for her own breast cancer treatment and her husband's heart condition amounted to retaliation for exercising her statutory right to that leave. *Id.* She seeks injunctive relief, compensatory damages, punitive and liquidated damages, attorney's fees and costs. *Id.* at 10-11. SRMC filed an Answer to Haley's Complaint on August 30, 2011. Doc. #3.

SRMC filed a Motion for Summary Judgment on June 25, 2012. Doc. #13. In its Motion for Summary Judgment, SRMC argues that Haley fails to present a prima facie case of an age discrimination claim because she presents no direct evidence of discrimination and the only indirect evidence arises from unintentional differential treatment of a younger employee. *Id.* at 11. SRMC also argues that Haley fails to present a prima face case of disability discrimination. *Id.* at 12. The hospital claims that Haley concedes that she is not disabled, and that she therefore fails even to establish the first element of a disability **[*10]** discrimination claim. *Id.* Furthermore, SRMC argues that she cannot succeed on a perceived disability claim because there is no evidence to show that her employers perceived her to be disabled or that they regarded her as being substantially limited by a disability in performing her job. *Id.* at 13. SRMC contends that the timing of Haley's termination is insufficient to show discrimination, and that Haley's history of discipline at SMRC was a legitimate and nondiscriminatory reason for her termination. *Id.* at 14, 18. Haley's only evidence of pretext is the temporal proximity of her termination to her last absence, SRMC argues, which the hospital believes is insufficient to rebut its "numerous and legitimate reasons" for discharging her. *Id.* at 18.

Plaintiff Haley responded with her Memorandum in

2013 U.S. Dist. LEXIS 11193, *10

Opposition, filed September 13, 2012.[3] Doc. #22. A Reply in Support of Defendants' Motion for Summary Judgment was filed on October 1, 2012. Doc #26.

## III. Summary Judgment Standard

*Rule 56 of the Federal Rules of Civil Procedure HN1*[⬆] sets forth the standard and procedures for summary judgment. Upon motion by either party, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The party opposing the motion must "cit[e] to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations . . . admissions, interrogatory answers," as well as other relevant materials, to demonstrate the existence of a genuine issue of material fact. *Fed. R. Civ. P. 56(c)(1)(A)*. Generalized assertions lacking the support of particularized citation required by *Rule 56* do not suffice, as a court has no "obligation to 'wade through' the record for specific facts" in support of a party's arguments. *United States v. WRW Corp., 986 F.2d 138, 143 (6th Cir. 1993)* (citing *InterRoyal Corp. v. Sponseller, 889 F.2d 108 (6th Cir. 1989))*.

*HN2*[⬆] The **[*12]** movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the Plaintiff's claims." *Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000)* (citing *Celotex, 477 U.S. at 322*).

*HN3*[⬆] Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine dispute of a material fact that is resolvable only by a jury. *Celotex, 477 U.S. at 324*. At this stage, it is

not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Instead, the nonmoving party must "go beyond the pleadings" and present some type of evidentiary material that demonstrates the existence of a genuine dispute. *Celotex, 477 U.S. at 324*. **[*13]** "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

*HN4*[⬆] Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson, 477 U.S. at 250*.

*HN5*[⬆] When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id. at 255* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970))*. A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," as such are "jury functions" that are inappropriate to employ at the summary judgment stage. *Anderson, 477 U.S. at 255*.

## IV. **[*14]** Analysis

Haley's discrimination claims are based on circumstantial and indirect evidence. Her complaint alleges no acts of direct discrimination by her employer, and she concedes in her Memorandum in Opposition that her claims are based only on circumstantial evidence of discrimination. Doc. #22 at 21. *HN6*[⬆] Because direct evidence of discrimination is rare, "victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof." *Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997)*. Therefore, Haley's claims under the ADA, ADEA, and the FMLA will be analyzed under the burden shifting method established by the Supreme Court in *McDonnell Douglas Corp. v. Green,*

---

[3] Although filed eighty days after Defendants' Motion for Summary Judgment, Plaintiff's Memorandum in Opposition was timely filed. On July 5, 2012, she filed an Unopposed Motion for Extension of Time to prepare a response to the Defendants' Motion **[*11]** for Summary Judgment due to incomplete discovery. Doc. #19. The Court sustained this motion, thereby extending the due date for Plaintiff's Memorandum in Opposition until September 13, 2012.

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Tex. Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). See Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009)(applying McDonnell Douglas-Burdine framework to age discrimination claims brought under the ADEA);[4] Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 703(6th Cir. 2008) (applying McDonnell Douglas-Burdine to employment disability discrimination claims brought under the ADA); Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007) (applying [*15] "tripartite burden-shifting framework" to FMLA retaliation claims based on circumstantial evidence); Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir. 2012) (stating that, based on prior Sixth Circuit holdings,McDonnell Douglas-Burdine applies to both interference and retaliation claims under the FMLA).

HN7[↑] The McDonnell Douglas-Burdine burden shifting analysis unfolds in three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden [of going forward] shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the

---

[4] In Geiger, the Sixth Circuit interpreted the Supreme Court's decision in Gross v. FBL Financial Services, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009), as a rejection of the burden shifting analysis of Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), when applied to ADEA claims based on direct evidence of discrimination, not claims based on indirect or circumstantial evidence. Geiger, 579 F.3d at 622 (stating "Itlhus,Gross overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination"). Notably, the Supreme Court "has not definitely decided" the question of whether the McDonnell Douglas-Burdine burden shifting analysis applies to ADEA claims based on circumstantial evidence of discrimination. Gross,557 U.S. at 175 n.2; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.133, 141-42, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (applying [*16] McDonnell Douglas-Burdine analysis to ADEA claim in light of its widespread application by Courts of Appeals although issue "not squarely addressed" by the Supreme Court). Thus, in the Sixth Circuit, "theMcDonnell Douglas framework can still be used to analyze ADEA claims based on circumstantial evidence." Geiger, 579 F.3d at 622.

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Burdine, 450 U.S. at 252-53 (citing and quoting McDonnell Douglas, 411 U.S. 792, 802, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)) (citations omitted). HN8[↑] The Sixth Circuit has described the particular application of McDonnell Douglas-Burdine [*17] in the summary judgment context as follows:

> On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry. The court first determines if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements, including whether she has met the legitimate expectations of her employer. It performs the same function with respect to defendant's production of evidence, and again for the plaintiff's response to that production.

Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 661 (6th Cir. 2000).

This framework is also appropriate for the analysis of Haley's state law claims of age and disability discrimination. See Coryell Bank One Trust Co., N.A, 101 Ohio St. 3d 175, 803 N.E.2d 781, 786, 2004 Ohio 723 ¶ 15 (Ohio 2004) (stating that HN9[↑] while Ohio courts are "not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes, we have looked to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code").

The Court will first examine the basis for each of Haley's prima facie claims under [*18] the ADEA, the ADA, and the FMLA. If Haley is able to make out a prima facie case for any of these claims, the Court will then examine any legitimate, non-discriminatory reasons put forth by SRMC for her discipline and termination. The Court will then examine those reasons in light of the undisputed evidence and determine if a reasonable jury might find them pretextual. If a genuine issue of material fact exists, the Court will be unable to enter summary judgment.

**A. Age Discrimination Claims**

The ADEA HN10[↑] prohibits an employer from discharging or discriminating against an individual in the

"compensation, terms, conditions, or privileges of employment" because of his or her age. *29. U.S.C. § 623(a)(1)*. Age discrimination claims brought under the analogous Ohio Civil Rights statute are analyzed according to federal law, so Haley's state law claim will not require a separate analysis. *Peters v. Lincoln Elec. Co., 285 F.3d 456, 469 (6th Cir. 2002)*. A successful age discrimination claim requires the plaintiff "to establish that age was the 'but-for cause' of the employer's adverse action." *Gross v. FBL Fin. Servs., 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)*.

*1. Haley satsifies the first three elements of a prima [\*19] face case of age discrimination under the ADEA.*

**HN11**[↑] A prima facie showing of age discrimination under the ADEA requires a plaintiff to demonstrate that: "1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by someone outside the protected class." *Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 410 (6th Cir. 2009)*. The protections of the ADEA apply to persons 40 years of age and older. *29 U.S.C. § 631(a)*. Haley was 58 at the time of her discharge, and thus satisfies the first element. Doc. #1 ¶ 38; Doc. #3 ¶ 38. Discharge, if done because of an employee's age, is one of the enumerated practices prohibited under the ADEA, and is unquestionably an adverse employment action. *29 U.S.C. § 623(a)(1)*. Indeed, a discharge for any purpose is an adverse employment action. Haley's discharge is not in dispute, and she thus satisfies the second prong of the prima facie case. Doc. #3 ¶ 37.

Haley also meets the third element of the prima facie case. She was a registered nurse and worked for nearly 32 years in her profession. Doc. #3 ¶¶ 19-20. SRMC's Answer admits that Haley "met the minimum [\*20] qualifications for her positions but had been a progressively poor performer prior to her termination." Doc. #3 ¶ 49. For purposes of the prima facie inquiry, the only relevant part of SRMC's admission is that Haley was qualified. **HN12**[↑] "[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline, 206 F.3d at 660-61*. Discharge for good cause is a non-discriminatory basis for termination. *29 U.S.C. § 623(f)(3)*. Thus, whether or not Haley was a "poor

performer" goes to a just cause, nondiscriminatory basis for her discharge. SRMC's admission that Haley met its standards is therefore adequate for her to show that she was qualified for the position.

*2. Haley satisfies the fourth element of an ADEA claim by showing that SRMC replaced her with a younger person.*

**HN13**[↑] The fourth element of a prima facie age discrimination claim requires the plaintiff to show that a "substantially younger" person replaced her. *O'Connor v. Console Coin Caterers Corp., 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)*. [\*21] For purposes of the fourth element of a plaintiff's prima facie case based on indirect evidence, "an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003)*. Replacement occurs "only when another employee is hired or reassigned to perform the plaintiff's duties." *Id. at 336* (quoting *Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990)*). Barbara Elliot, Haley's supervisor at the time of her termination, stated that Haley's "replacement," Rob Koval, "was a lateral move from another RN already employed in the operating room who was interested in cardiac surgery, and transitioned into her role on the Cardiac Team." Doc. #17 at 53. *Id.* Koval was born in 1965. Doc. #16-4 at 11. In addition, Elianna Dawson, the first person hired after terminating Haley, was born in 1987. *Id.* As Haley was born in 1951, a jury could reasonably believe that SRMC did replace Haley with a significantly younger person.

SRMC argues that because Haley's duties "were spread among the remaining employees" at SRMC, she was not "replaced" in the legal sense required for the fourth element of a prima facie age discrimination [\*22] claim. SRMC cites *Lilley v. BTM Corp., 958 F.2d 746, 752 (6th Cir. 1992)*, in which the plaintiff's commission-based sales position was eliminated after the employer suffered a "downturn in the market" and the cancellation of several large orders. **HN14**[↑] In *Lilley*, a reduction in force case, the Sixth Circuit stated that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement" that satisfies the fourth element of a plaintiff's prima facie age discrimination claim. *Id. at 752*. This reflects the heightened evidentiary burden a plaintiff bears in a reduction in force case, which requires that she present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the

plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *see also Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (finding that the plaintiff's "discharge and failure to be re-hired arose from a work force reduction" and therefore "must meet a heightened standard to establish a prima facie case"). SRMC does not claim that Haley was terminated based on any **[\*23]** reduction in force at its facilities. Furthermore, Elliot's deposition contradicts SRMC's assertion that "duties were absorbed by another member of the cardiac team with her same job classification" because she stated that Koval, Haley's "replacement," had no role on the Cardiac Team prior to Haley's termination. Doc. #26; Doc. #17 at 53.

The facts surrounding Haley's replacement are also clouded by several inaccuracies that Haley points to in SRMC's responses to Plaintiff's interrogatories. Doc. #22. In response to Haley's request for identification of all persons who performed her job duties after termination, SMRC provided a list of 13 different individuals. Doc. #16-4 at 11. However, according to Elliot's deposition, at least one of those persons, Jamie Tuttle, did not work in the operating room at all. Doc. #17 at 55. SMRC's list stated that another person who performed Haley's duties was Elizabeth Sprinkle, and that Sprinkle started working at SMRC in 2008. Doc. #16-4 at 11. However, Elliot stated that Sprinkle did not begin working at SRMC until 2010, and, at the time she started, Sprinkle was a student nurse without licensure. Doc. #17 at 56-57. The Court notes another contradiction **[\*24]** between SRMC's list and Elliot's testimony. SRMC identifies Kelly Uzlik's date of hire as May 14, 2008, but Elliot stated that Uzlik had not been hired before Haley's termination in April of 2010, and that Uzlik never worked for Eliot in the operating room. Doc. #16-4 at 11; Doc. #17 at 56.

Based on the contradictions between Elliot's statements and SRMC's data, the Court concludes that there are genuinely disputed facts regarding Haley's replacement. Construing them in the light most favorable to Haley, and bearing in mind Elliot's specific identification of Koval as Haley's replacement, the Court cannot rule as a matter of fact or of law that she was not "replaced" by a significantly younger person, as SRMC contends.

*3. Haley also satisfies the fourth element of her ADEA claim because a reasonable jury might conclude that SRMC gave more favorable treatment to younger employees.*

**HN15**[⬆] A plaintiff may also demonstrate the fourth element of a prima facie case of age discrimination by showing that the employer gave more favorable treatment to similarly-situated non-protected employees. *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002)). **[\*25]** Haley claims that two younger employees, Amanda Dillow and Rick Parker, received more favorable treatment. Doc #18 at 24. SRMC admits that Dillow incurred twelve absences and ten tardies in the one year period before Haley's termination, resulting in her placement only at CAP 1, the lowest disciplinary step, which is essentially an oral warning. Doc. #13 at 13. Haley, with eleven tardies and four unexcused absences, was placed at CAP 4 and terminated. Doc. #15-1.

Rick Parker, who was born in 1963, incurred seven tardies by April of 2010, was initially placed on CAP 4 and also faced termination. Doc #22-3. Four of Parker's seven tardies were for clocking in one minute after his shift was to start. *Id.* ¶ 7. After complaining to both Elliot and Abraham, Parker was placed on CAP 2 and no longer faced termination. *Id.* ¶¶ 11-14; Doc. #22-1 at 6. Haley also clocked in one minute late four times, but her tardies were not excused and resulted in termination. Doc. #15-1 at 1, Doc. #e17 at 169. With attendance violations that equaled or exceeded Haley's violations, SRMC terminated neither employee and placed them at lower disciplinary steps than Haley. A reasonable jury could determine that SRMC **[\*26]** treated Dillow and Parker more favorably than Haley, and there is therefore a genuine issue of material fact as to the fourth element of Haley's prima facie case of age discrimination.

SRMC believes that Haley cannot show more favorable treatment of younger people for two reasons. First, SRMC argues that "corrective action and discipline over attendance were not unique to" Haley because over fifty percent of Elliot's staff also faced "some level of corrective action." Doc. #26 at 4. However, Haley does not argue that she was the only employee who faced discipline. The fact that SRMC disciplined all of its employees, or that half of them faced some type of action based on attendance, does not mean that the hospital did not treat some employees more or less favorably than others. SRMC does not point to an example in the record of another employee it terminated with an attendance record comparable to Haley's or otherwise show that younger employees were not treated more favorably. Haley has pointed to evidence to the contrary, and that is adequate to establish her prima facie case.

SRMC also argues that Dillow was not terminated "due to Elliot's failure to keep track of attendance." Doc. [*27] #26 at 4. As with SRMC's contention that Haley's poor performance justified her discharge, this is a nondiscriminatory reason for Haley's termination that is not appropriately considered at the prima facie stage. *See Cline v Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000)*. Based on the foregoing, and bearing in mind that Haley's burden at the prima face stage "is not onerous," the Court finds that she has established the four elements of her age discrimination claim required to proceed to the second stage of the *McDonnell Douglas-Burdine* analysis. *Tex. Dept of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*.

**B. Disability Discrimination Claims**

The Americans with Disabilities Act of 1990 ("ADA") **HN16**[⬆] prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. As with her age discrimination claims, Haley's state law disability discrimination claim may be evaluated under standards applicable to her federal claim. *See Columbus Civil Serv. Comm'n v. McGlone, 82 Ohio St. 3d 569, 1998 Ohio 410, 697 N.E.2d 204, 206-07 (Ohio 1998)* [*28] (stating that the Supreme Court of Ohio "can look to regulations and cases interpreting the [ADA] for guidance in our interpretation of Ohio law").

**HN17**[⬆] In the Sixth Circuit, a prima facie case of disability discrimination based on indirect evidence requires the plaintiff to show that 1) he or she is disabled; 2) with or without reasonable accommodation, the plaintiff is otherwise qualified for the position; 3) the plaintiff suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the disabled individual was replaced. *Whitfield v. Tenn., 639 F.3d 253, 259 (6th Cir. 2011)* (citing *Macy v. Hopkins Cnty. Sch Bd. of Educ., 484 F.3d 357, 364-65 (6th Cir. 2007))*. The threshold question, whether or not Haley was "disabled" under the ADA, is the only prima facie element of her claim that SRMC challenges. Doc. #13 at 11-15.

The ADA **HN18**[⬆] defines disability in three ways: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." *42 U.S.C. § 12102(1)*. An impairment includes "[a]ny physiological [*29] disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine . . . ." *29 C.F.R. § 1630.2(h)(1)*. Ohio law tracks these examples of impairment, but specifically includes cancer as well. *Ohio Rev. Code § 4112.01(A)(16)(a)(iii)*. Haley's cancer was a physiological condition affecting multiple body systems and was treated by a mastectomy, resulting in an anatomical loss. It unquestionably qualifies as an impairment under the ADA. *See Ellison v. Software Spectrum, Inc., 85 F.3d 187, 190 (5th Cir. 1996)* (analyzing ADA disability claim based on impairment of plaintiff's breast cancer).

However, **HN19**[⬆] the recognition of a plaintiff's impairment is only a threshold issue in determining whether or not she has a disability under the ADA. When Congress passed the ADA Amendment Acts of 2008 ("ADAAA"), it amended the statute with specific rules of construction for defining a disability. ADA Amendments Act of 2008, Pub. L. 110-315; *42 U.S.C. § 12102(4)*. These [*30] rules of construction state that definitions of disability are to be drawn "in favor of broad coverage of individuals . . . to the maximum extent permitted" by the statute. *42 U.S.C. § 12102(4)(A)*. Therefore, when analyzing whether an impairment "substantially limits" an individual's major life activity, courts should interpret that phrase in accordance with the findings and purposes of the ADAAA. *Id. § 12102(4)(B)*. In passing the ADAAA, Congress intended to "state a broad scope of protection to be available under the ADA" and specifically reject the "inappropriately high" standards for interpreting the term "substantially limits" articulated by the Supreme Court in *Sutton v. United Air Lines, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)* and *Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)*. Pub. L. 110-315.

The ADAAA also **HN20**[⬆] provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *42 U.S.C. § 12102(4)(D)*. Major life activities include working. *Id. § 12102(2)(A)*. A major life activity may also include "the operation of a major bodily function" such as "normal cell growth . . . ." *Id. § 12102(2)(B)*. Thus, the [*31] Equal Employment

Opportunity Commission, applying the principles of construction described above, states that "it should be easily concluded" that cancer, as an impairment, substantially limits the major life activity of normal cell growth. *29 C.F.R. §1630.2(j)(3)(iii)*.

Mindful of Congress's mandate to construe the ADA broadly when defining a disability and the non-onerous burden on the plaintiff at the initial stage of the *McDonnell-Douglas-Burdine* analysis, the Court finds that a reasonable jury could conclude that Haley was disabled under the ADA, and therefore fulfills the first element of her prima facie claim. She was obviously disabled when the cancer was active, as it substantially limited the major life activity of normal cell growth. In addition, the cancer substantially limited the major life activity of her work. Haley took extensive time off for surgery and recuperation between the end of November 2009 and January 18, 2010, during which time she could not work at all. Doc. #18 at 33; Doc. #18-54 at 5-6. When Haley did return to work, her activity was substantially limited by initially being restricted to half days. Doc #3 ¶ 7. If her cancer were to recur and become active **[*32]** again, it would again substantially limit the two areas of major life activity of work and normal cell growth. Other courts have reached the same conclusion when a plaintiff's prima facie case states that cancer, although in remission, is the basis for defining her disability under the ADA. *See Katz v. Adecco USA Inc., 845 F.Supp. 2d 539, 548 (S.D.N.Y 2012)* (stating that as "a result of the amendments to the ADA, it appears not to matter that [the plaintiff's] cancer was in remission at the time of the alleged discrimination"); *Norton v. Assisted Living Concepts, Inc., 786 F.Supp. 2d 1173 (E.D. Tex. 2011)* (holding that renal cancer could be classified as disability under the ADA); *Hoffman v. Carefirst of Fort Wayne, Inc., 737 F.Supp. 2d 976, 985 (N.D. Ind. 2010)* (holding that cancer in remission constitutes disability based upon the "clear language" of *42 U.S.C. § 12102(4)(D)*); *see also Angell v. Fairmount Fire Prot. Dist., No. 11-cv-03025-CMA-CBS, 907 F. Supp. 2d 1242, 2012 U.S. Dist. LEXIS 158365, 2012 WL 5389777 (D.Colo. Nov. 5, 2012)*; *Unangst v. Dual Temp Co., Inc., No. 10-6811, 2012 U.S. Dist. LEXIS 36852, 2012 WL 931130 (E.D. Pa. Mar. 19, 2012)*.

SRMC presents several reasons why it believes Haley cannot meet the first element of a prima facie disability discrimination **[*33]** claim. First, SRMC claims that Haley has no direct evidence of disability, pointing to Haley's response of "no" during her deposition when asked "do you consider yourself disabled?" and "are you

disabled?" Doc. #13 at 12. SRMC misunderstands the basis of Haley's claim, which is indirect or circumstantial evidence. A lack of direct evidence is therefore not fatal to Haley's claim. Furthermore, Haley's statements are not particularly probative of the determination of whether she is disabled under the ADA, which is a legal definition quite distinct from the colloquial meaning of "disabled." This Court has reached the conclusion that a reasonable jury could conclude that Haley was disabled, *as defined under the ADA*, only after consulting the technical specifications of the statute, regulations, and relevant case law. None of those authorities require a plaintiff to affirmatively self-identify as "disabled" in order to meet the legal definition of having a disability under the ADA.

Second, SRMC argues that Haley cannot "succeed on a theory of perceived disability" -- presumably a reference to the option of a plaintiff to show that she was "regarded as" having an impairment under *42 U.S.C. § 12102(1)(C)*. **[*34]** Doc. #13 at 15. Because the Court finds that a reasonable jury could conclude that she was disabled under *42 U.S.C. § 12102(1)(A)*, Haley need not also show that she was "regarded as having [] an impairment" under Subsection C of the statute. The requirements of *42 U.S.C. § 12102(1)* are disjunctive.

Even if Haley had brought a "regarded as" disabled claim, SRMC's argument would be unconvincing because of its basis on overruled authority. Doc. #13 at 15. SRMC asserts that to make out a claim based on a perception of disability, the third prong of *42 U.S.C. § 12102(1)*, Haley "must show [that] SRMC regarded her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes," citing *Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*. *Id*. **HN21**[⬆] When enacting the ADAAA, Congress expressly stated that one of its purposes was "to reject the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)* with regard to coverage *under the third prong of definition of disability*" and to restore previous reasoning in line with the "definition of handicap under the Rehabilitation Act of 1973." *Pub. L. 110-315 § 2(b)(3)* (emphasis **[*35]** added). We also have the benefit of the Sixth Circuit's explanation in *Miholland v. Sumner County Board of Education, 569 F.3d 562, 566 (6th Cir. 2009)*, that "[t]he amended version of the ADA no longer requires the plaintiff bringing a claim under *subpart (C)* to show that the impairment limited her life activity, including working in a broad class of jobs." SRMC's reliance on case law from outside the Sixth

Circuit predating the ADAAA amendments and applying case law overruled by those amendments is equally unpersuasive. Doc. #13 at 14-15 (citing *Giordano v. New York, 274 F.3d 740 (2nd Cir. 2001)* (applying *Sutton*) and *Treiber v. Lindbergh Sch. Dist., 199 F.Supp. 2d 949, 959-60 (E.D. Mo. 2002)* (applying *Toyota*)). "In citing authorities, the Court prefers that counsel rely upon cases decided by the Supreme Court of the United States, the United States Court of Appeals for the Sixth Circuit (or, in appropriate cases, the Federal Circuit), the Supreme Court of Ohio, and this Court." *S.D. Ohio Civ. R. 7.2(b)(2)*.

Other than the "disabled" element, SRMC does not challenge any other element of Haley's prima facie case of disability discrimination. Doc. #13 at 12-14. The Court interprets these **[*36]** omissions as SRMC's concession, for purposes of its motion, that Haley can show the other elements of her prima facie case of such discrimination. Because the Court has determined that a jury could reasonably conclude Haley was disabled under the ADA, SRMC is not entitled to summary judgment on her ADA or state law claims for disability discrimination for failure to make a prima facie case. Her claims therefore survive the first stage of the *McDonnell Douglas*-*Burdine* analysis.

## C. Claims for Interference and Retaliation under the FMLA

The Family and Medical Leave Act ("FMLA") **HN22**[⬆] was enacted to help employees balance their families' needs with "the demands of the workplace" and to allow them "to take reasonable leave for medical reasons . . . and for the care of a child, spouse, or parent who has a serious health condition." *29 U.S.C. § 2601(b)*. During any twelve-month period, the FMLA provides an employee with the right to twelve weeks of leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of his or her job. Id. *§ 2612(a)(1)(D)*. The employee may also take leave, counted towards the same twelve week period, in order to care for a spouse **[*37]** or parent with a serious health condition. Id. *§ 2612(a)(1)(C)*.

**HN23**[⬆] The Sixth Circuit has recognized "two distinct theories of recovery under the FMLA." *Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004)*. The first is the "interference" or "entitlement" theory. It is based on *29 U.S.C. § 2615(a)(1)*, which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under this subchapter." The second theory of recovery involves FMLA "retaliation" or "discrimination" claims. These arise under *29 U.S.C. § 2615(a)(2)*, which prohibits employers from discharging or otherwise discriminating against individuals who oppose unlawful FMLA practices. In this case, Plaintiff has asserted both an interference claim and a retaliation claim under the FMLA.

*1. Haley states a claim for interference under the FMLA.*

**HN24**[⬆] A plaintiff's prima facie interference claim requires her to show that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer **[*38]** denied the employee FMLA benefits to which she was entitled." *Edgar v. JAC Prods, Inc., 443 F.3d 501, 507 (6th Cir. 2006)*.

SRMC's arguments attack the fourth and fifth elements of Haley's prima facie case.[5] The fourth element is the crucial one, however, because, if Haley gave proper notice of her intention to take leave on February 12, 2010, then SRMS's categorization of that time off as "unexcused" supports a claim that she was denied the benefit of that leave. Thus, an initial assessment must be made of the requirements for "notice" under the FMLA and whether a reasonable jury could find that Haley's actions amounted to sufficient notice.

The FMLA **HN25**[⬆] only addresses notice in cases of "foreseeable leave," such as the leave required for an expected child or planned medical treatment. *29 U.S.C. § 2612(e)*. The FMLA's implementing regulations, however, do address notice requirements for unforeseeable leave. *29 C.F.R. § 825.303*. With regard to timing, "an employee must provide notice to the employer as soon as practicable under the facts and

---

[5] Haley's complaint presents her FMLA retaliation and interference claims as stemming from several acts by SMRC, without specifying which particular act or acts form the basis for her interference claim. Doc. #1 ¶ 78. As SRMC points out, the categorization of her February 12, 2010, absence as unexcused instead of excused FMLA leave is the only cognizable basis for an interference claim. Doc. #13 at 18. Haley's Memorandum in Response to SRMC's Motion for Summary Judgment concedes much, as she only addresses the February 12, 2010, absence and SRMC's **[*39]** treatment of it in the context of her interference claim.

circumstances of the particular case." *Id.* § 825.303 (a). The regulation also provides the following hypothetical, particularly applicable here:

> For example, if an employee's child has a severe asthma attack and the employee takes the child to the emergency room, the employee would not be required to leave his or her child in order to report the absence while the child is receiving emergency treatment.

*Id.*

Here, a reasonable jury could certainly conclude that Haley's notice was timely. She was able to report her absence while her husband was receiving medical treatment because of the unusual fact that he was transported to her employer, SRMC, for treatment. While there is some confusion as to whom exactly she reported at the time,[6] it **[*40]** is undisputed that Haley contacted SRMC. Doc. #3 ¶35. Haley's supervisor, Barb Elliot, knew on that day that Haley was in the emergency room with her husband. Doc. #17 at 76, 81. Haley states that she gave this notice by 6:30 a.m. that day. Doc. #22-2 at 2.

**HN26**[↑] The content of the notice must also contain "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Walton v. Ford Motor Co., 424 F.3d 481, 486 (6th Cir. 2005)* (quoting *Brohm v. JH Props., Inc., 149 F.3d 517, 523 (6th Cir. 1998)).* Furthermore, "[t]he employer **[*41]** will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303 (b). Here, Haley called her department early that morning, informed SRMC that she was in the emergency room with her husband, and stated that "I won't be in to work until I find out what's going on with him." Doc. #18 at 54. Haley was nevertheless able to work the next two days of the three that her husband spent in the hospital. Doc. #17 a79. Barb Elliot stated that she had been relayed the message that Haley was

in SRMC's emergency room with her husband. *Id.* at 81. Elliot also knew Haley's husband "had chest pain," which she agreed was a "serious medical condition." *Id.* at 76. Elliot also did not make any attempt to contact Haley that day. *Id.* A jury could reasonably conclude that Haley gave sufficient and timely notice that FMLA leave might apply to her absence on February 12, 2010, because SRMC knew of it the day it occurred and it concerned her husband's serious medical condition. For purposes of summary judgment, therefore, Haley can fulfill the fourth element of a prima facie interference claim.

SRMC argues that Haley cannot establish the fifth element of an FMLA interference **[*42]** claim because her complaint "plainly aver[red]" that "she was granted all the FMLA leave she requested," precluding any allegation that she was denied a benefit provided by the statute. Doc. #13 at 18. This argument misunderstands the nature of Haley's FMLA claim, which is based on SRMC's classification of her leave as unauthorized and her resulting termination. This is evident from Paragraph 74 through paragraph 80 of Haley's complaint, wherein she alleges that SRMC "fail[ed] to categorize her leave as FMLA" after absences due to serious health conditions of herself, her mother, and her husband. Doc. #1.

More importantly, for purposes of summary judgment, SRMC admits to the following facts: Haley's husband was transported to SRMC for his heart condition on February 12, 2010; Haley contacted SRMC regarding her absence; during the three days of her husband's hospitalization, Haley had no FMLA leave; and SRMC marked her absence on February 12, 2010, as "unexcused." Doc. #3 ¶¶35, 41. Based on those undisputed facts, a jury could reasonably conclude that SRMC denied Haley FMLA leave by categorizing her February 12, 2010, absence as unexcused, and that she, therefore, has stated a prima **[*43]** facie claim for FMLA interference.

*2. Haley states a claim for retaliation under the FMLA.*

**HN27**[↑] For Haley to make out a prima facie retaliation/termination claim under the FMLA, she must show that 1) she availed herself of a right protected under the FMLA, 2) she suffered an adverse employment action, and 3) a causal connection exists between the adverse action and the exercise of her FM LA-protected right. *See Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006).* The first two

---

[6] According to Haley's deposition, Rose White was the "desk person" on duty that morning, but Haley phoned before White arrived and asked that her message be relayed. Doc. #18 at 53-54. White did not recall Haley's husband's hospitalization (Doc. #25 at 11), but did confirm that either she or Elliot would have been the person contacted in the event of an employee's absence due to an emergency (Doc. #25 at 12).

elements of the claim are satisfied. As detailed *supra* in Section I.A., Haley availed herself of FMLA leave multiple times in the year before her termination and she was subject to the adverse employment action of termination.

A reasonable jury might also conclude that a causal connection existed between that FMLA leave and her termination, which would satisy the third element of her prima face case of FMLA retaliation or termination. **HN28**[↑] The Sixth Circuit has held that "[p]roximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis, 498 F.3d 561, 571 (6th Cir. 2007)* (citing *Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001))*. **[*44]** In *Bryson*, the Sixth Circuit found that the plaintiff's termination on the day she returned from three months of FMLA leave coupled with statements that her employer was angry about the leave and that it intended to terminate her sufficed to make out a prima facie case for retaliation. *Bryson, 498 F.3d at 571*. Likewise, in *Seeger v. Cincinnati Bell Telephone Co., LLC, 681 F.3d 274, 283 (6th Cir. 2012)*, the plaintiff satisfied "the low threshold of proof necessary to establish a prima facie case of retaliatory discharge" where the facts showed he was terminated within three weeks of returning from FMLA leave and two months after first notifying the employer of the need for leave.

Here, it is undisputed that Haley took "intermittent" FMLA leave on the following dates in 2010: January 25 and 26, March 4 through March 12, and on April 15 and 16. Doc. #3 at ¶¶ 34, 36. Three days later, on Monday, April 19, SRMC terminated Haley. Doc. #13-1 at 2. The temporal proximity of her termination to the leave taken, particularly against the background of the extensive leave taken in November and December of 2009 and January of 2010, meet the threshold required to state a prima facie case of retaliation. **[*45]** In addition, Elliot believed that Haley had lied to her in the past about her use of FMLA leave. Doc. #17 at 123-24. This comports with the level of proof considered adequate for stating a prima facie case in *Bryson*. *Bryson, 498 F.3d at 571*.

SRMC believes that Haley cannot make out a prima facie case of retaliation under the FMLA. It argues that Haley cannot "draw a nexus between her termination and her alleged use of FMLA time," because her February 12, 2010, absence was unexcused, not FMLA time. Doc. #13 at 19. However, this is tautological because, as stated above, Haley has made out a prima facie case that SRMC's categorization of that time as

unexcused interfered with a statutory right. A reasonable jury could also infer a causal connection between SRMC's decision to mark a day that Haley was entitled to FMLA leave as unexcused and its termination of Haley, because it relied in part on that unexcused absence when terminating her.

SRMC also challenges the inclusion of events "outside the FMLA's 2 year statute of limitations for interference claims" on a timeline of events in Haley's Memorandum in Opposition. Doc. #26 at 8. SRMC believes that Haley's mention of the FMLA leave she **[*46]** took in 2007 is an attempt to apply a "continuing violations" theory under the FMLA that is unsupported by Sixth Circuit authority. *Id.* The Court believes that this argument is illogical, as Haley alleges no violation in 2007. The statute **HN29**[↑] provides that "an action may be brought under this section *not later than 2 years after the date of the last event constituting the alleged violation* for which the action is brought." *29 U.S.C. § 2617(c)* (emphasis added). Her timeline mentions no adverse action taken by SRMC in 2007, only the FMLA leave that Haley took. Her termination in April of 2010 was the "first material adverse action" taken by SRMC that justified filing suit. *Butler v. Owens-Brockway Plastic Prods., Inc., 199 F.3d 314, 317 (6th Cir. 1999)*. Likewise, the statute of limitations would not be implicated by any FMLA violations a jury might recognize based on the temporal proximity of SRMC's progressive discipline of Haley to her FMLA leave during 2009. This is because only SRMC's termination of Haley's employment was:

> the first action serious enough to warrant plaintiff's resort to the legal system. To hold otherwise would force plaintiffs to bring suit each time they are assessed **[*47]** a negative mark on their absentee record, but before this mark results in probation, termination, failure to reinstate, or other adverse action. As [the plaintiff notes], such a requirement would unnecessarily clog the federal courts with premature claims.

*Id.*

Based on the foregoing, the Court finds that Haley has presented evidence sufficient for a reasonable jury to conclude that she has stated prima facie cases for both interference and retaliation under the FMLA.

## D. SRMC's Legitimate, Nondiscriminatory Reasons for Haley's Termination and Discipline

Haley's statement of a prima facie case of age discrimination under the ADEA shifts the burden of production to SRMC "to articulate some legitimate, nondiscriminatory reason" for her discharge. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* **HN30**[⬆] Excessive tardiness and absenteeism are nondiscriminatory reasons for termination. *See Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 378-79 (6th Cir. 2002)* (finding nurse's "systematic absenteeism" a legitimate, nondiscriminatory reason for discharge); *Townley v. Blue Cross & Blue Shield, 254 F.Supp. 2d 661, 669-70 (E.D. Mich. 2003)* (citing *Weigel* and finding "excessive absenteeism **[*48]** and tardiness" legitimate and nondiscriminatory reasons for termination of claims processor).

Here, SRMC states that Haley was terminated "for a chronic pattern of tardy arrival to work and multiple unexcused absences" that violated its established attendance policy. Doc. #13 at 3; Doc. #13-2 at 4. The hospital's policy states that "[a]ppropriate corrective action up to and including discharge may result when an associate's attendance record is determined to exceed acceptable standards." Doc. #13-1 at 15. The reasons are simple: in a hospital, employees with tardiness and unexcused absences "create a hardship for other associates and impact the delivery of patient/resident care." *Id.* at 14. SRMC's interest in enforcing its attendance policies is underscored by its responsibility to its patients, who have literally placed their lives in the hospital's hands. Violation of SRMC's attendance policy is an unquestionably legitimate and nondiscriminatory basis for just cause termination.

Haley's discharge form lists eleven dates that she was tardy between November 5, 2009, and April 6, 2010, as well as four unexcused absences. Doc. #13-1 at 2. The form indicates that the "Type of Action" taken **[*49]** is "Discharge" and provides as a "Reason for Action" the following:

> During the past six months, Nancy has demonstrated a chronic pattern of tardy arrival and multiple unexcused absences. This is a violation of HR policy 12.00 Attendance. Nancy received information regarding professional accountability and the need to be personally responsible for knowing the policies of the organization and what must be done to adhere to those policies during department meetings held December 17, 2009 & March 18, 2010.

*Id.* The Court finds that SRMC has satisfied its burden of production. By pointing to Haley's violation of its attendance policy though multiple absences and instances of tardiness, SRMC has articulated an unquestionably legitimate and nondiscriminatory reason for terminating her employment.

In addition, SRMC placed Haley at the second and third stages of its progressive disciplinary policy prior to termination. SRMC's stated reasons for taking those adverse employment actions against Haley, that she failed to respond to pages while "on call" and that she failed to follow the hospital's policy for patient surgical site marking, are both legitimate and nondiscriminatory. SRMC paged Haley **[*50]** while she was on call, because physicians required the assistance of Cardiac Team nurses to operate on patients with suddenly deteriorating conditions. Doc. #15-3. Disciplining a nurse for late response or no response in such a life threatening situation is unquestionably legitimate. Furthermore, the hospital's "Universal Protocol Policy" on site marking puts in place careful procedures and safeguards to ensure that the proper surgical site is marked on a patient before any invasive procedure is performed. *See* Doc. #16-3. Violation of a policy in place to prevent drastic medical error is an indisputably legitimate and nondiscriminatory reason for discipline.

## E. A Reasonable Jury Could Find that SMRC's Reasons for Disciplining and Terminating Haley were Pretextual

**HN31**[⬆] After an employer articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are pretextual. *Burdine, 450 U.S. at 253.* To survive summary judgment, the plaintiff must "produce[] evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to **[*51]** support an inference of discrimination at trial." *Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)* (citing *St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* Conversely, "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Chen, 580 F.3d at 400 n.4* (citing *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).* The plaintiff may prove pretext by showing that the reasons offered by the defendant 1) had no basis in fact; 2) were not the actual reasons for the defendant's actions; or 3) were an

insufficient basis for the defendant's actions. *Manzer v. Diamond Shamrock Chems., 29 F.3d 1078, 1084 (6th Cir. 1994)* (*overruled on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009)*). Haley believes that a reasonable jury would find that SRMC's articulated reasons for her discipline and termination were pretextual under each of *Manzer's* three inquiries.

*1. A reasonable jury might question the factual bases of the site marking incidents and Haley's attendance violations.*

A showing that the defendants' reasons had no basis in fact is "easily recognizable and consists of evidence **[\*52]** that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Manzer, 29 F.3d at 1084* (quoting *Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)*). Haley challenges the factual bases supporting each disciplinary step SRMC placed her on before termination and believes that a jury could "reject" each of them. Doc. #22 at 32-34.

There is sufficient dispute surrounding the two patient site marking incidents from which a jury might conclude that no factual basis supported placing Haley on the CAP 3 discipline step. The corrective action form describes two incidents: a violation for transporting a patient to the operating room before the patient had been site marked and another for "attempt[ing] to mark the site herself" before other staff paged the surgeon to mark the site. Doc. #18-52 at 1. Haley disputed that she ever marked or attempted to mark a patient's surgical site herself. Doc. #22-2 at 1; Doc. #18-55 at 3-4. In the grievance filed with her termination, Haley stated that she offered to take the patient to the operating room for the physician to site mark the patient there in order to expedite the case, because **[\*53]** the physician had been upset about a thirty minute delay in the procedure. Doc. #18-55 at 3-4.

Further complicating the picture is SRMC's statement, in its Responses to Plaintiff's Interrogatories, that Haley was terminated "*when she mismarked a patient for surgery* and failed to respond twice when she was on call as a surgical nurse." Doc. #16-4 at 5 (emphasis added). SRMC, by stating that Haley "mismarked" a patient, avers that Haley both marked a patient's surgical site herself and that she marked the site *incorrectly*. Elliott, Haley's supervisor, stated in her deposition that Haley neither marked nor mismarked a patient. Doc. #17 at 128. SRMC's statement not only

contradicts Elliot's deposition, it alleges a more serious violation: the actual mismarking of the procedure site on a patient before surgery. Elliot also stated that Haley would not have been put on the CAP 3 disciplinary step for just one incident of offering to site mark a patient. *Id.* at 131. Construing the foregoing in Haley's favor, genuine issues of material fact exist as to whether this disciplinary step had a "basis in fact." A reasonable jury could find that in at least one incident, Haley did not mark, mismark, **[\*54]** or offer to mark a patient, and consequently, that there was no basis in fact for placing her on the CAP 3 disciplinary step.

Haley also claims that a jury could question "the factual basis of SRMC's claim that [she] was chronically tardy." Doc. #22 at 33. She points out that the determination of an employee's tardiness could only be made by a comparison of the employee's schedule with data from the electronic time clock, and SRMC's failure to preserve these schedules entitles her to a rebuttable presumption that they would benefit her case. *Id.* The Court finds it unnecessary to reach this issue of spoliation at this time, however, because the printout from the time clock alone presents conflicting evidence that, if admissible, would best be evaluated by a jury. On that printout, there are handwritten notations ("due at 6:00") next to many entries that correspond to the tardies listed on Haley's termination report. Doc. #13-1 at 4-16. However, many entries also state that they were "approved by supervisor." *Id.* Whether or not the handwritten notations appear derived from the schedule is an inference that is a "jury function," as is the weight to be given to the printout itself and any **[\*55]** resolution of its contradictory indications. *Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. If the tardies were "approved by [a] supervisor," as the printout indicates, a reasonable jury could infer that the SRMC's categorization of them as unexcused was pretextual.

Haley claims that the CAP 2, the first progressive disciplinary step of consequence that Haley was subjected to, was never officially administered and that Elliot "was putting disciplinary documents in Haley's file without telling Haley." Doc. #22 at 32. Haley is not arguing that she did, in fact, respond to the pages in a timely fashion while on call, nor does she allege that SRMC fabricated its charges. She makes no challenge to SRMC's timeline of the pages and her delayed arrival. According to the Corrective Action Form filled out by Elliot, SRMC policy expects an employee to respond to a page within five minutes and arrive at the hospital within 20-30 minutes. Doc. #15-3. Based on the timeline

on the form, Haley did not respond to the hospital's page, was called at home, and arrived at the hospital 37 minutes after the initial page on June 2, 2009. The second incident occurred on July 13, 2009, when the page **[*56]** went out at 8:15 p.m. and Haley clocked in at 9:51. She was indisputably late according to hospital policy on each occasion. Thus, while a jury could reasonably conclude there was no basis in fact for the site marking incidents and Haley's attendance violations, a factual basis did exist for placing Haley at the CAP 2 discipline step for not answering pages while on call.

### 2. A reasonable jury could conclude that SRMC's proffered reasons did not actually motivate Haley's discipline or termination.

Haley's challenge to the CAP 2 discipline step is more properly evaluated under the second *Manzer* inquiry, which requires the plaintiff to show that the proffered reasons did not actually motivate the employer's actions. *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)*. Under this inquiry, "[t]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one." *Id.*

Although Haley's untimely arrival after being paged was a basis for discipline, Haley disputes that SRMC ever formally placed her **[*57]** at CAP 2 and claims that she was never formally disciplined at the time. Doc. #18-55 at 2. After discussing the incidents, Haley's termination grievance states that Elliot gave her no indication that Haley was going to be formally disciplined and did not ask her to sign anything. *Id.* Supporting this contention is Haley's handwritten indication on the CAP 3 form (issued several months after the CAP 2) that she was not aware that the paging incidents had resulted in her being placed on the second disciplinary step. Doc. #18-52 at 2. Elliot, however, indicated on the CAP 3 form that Haley had seen the CAP 2 form but refused to sign it. *Id.* Haley also points out that the CAP 2 form does not bear a "Received" stamp from SRMC's human resources department, as do the other disciplinary forms that Elliott drafted. *Compare id. with* Doc. #15-3. Because of this, Haley claims that the disciplinary step itself never occurred in an official manner and that Elliot "was putting disciplinary documents in Haley's file without telling Haley." Doc. #22 at 32. Construing the foregoing in Haley's favor, a reasonable jury might

conclude that the CAP 2 step was bypassed in order to hasten Haley's termination. **[*58]** The Court concludes that a jury should decide these contested factual issues, which are material because the issuance of the CAP 2 was a necessary predicate to Haley's termination.

### 3. A reasonable jury could conclude that SRMC's proffered reasons were insufficient to discharge Haley.

**HN32**[↑] Under the third possible showing of pretext, the plaintiff must present sufficient "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012)* (citing *Manzer, 29 F.3d at 1084*). This type of pretext also constitutes "a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff," resulting in the factfinder's possible— but not required—inference of discrimination. *Chattman, 686 F.3d at 349; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)* (stating that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination). In a summary **[*59]** judgment context, such an inference "creates a genuine, triable issue of material fact." *Chattman, 686 F.3d at 349*.

Haley argues that a jury could conclude that her attendance was an insufficient reason for her discharge, pointing to SRMC's dissimilar treatment of two similarly situated, younger employees. Both Amanda Dillow and Rick Parker were younger, had similar or worse attendance records, yet SRMC neither terminated nor similarly disciplined either employee. *See supra* Section IV.A. A reasonable jury could infer discrimination from SRMC's different treatment of its younger employees.

SRMC responds that this discrepancy in treatment was due to Elliot's "inability to keep up with her workload" because, as supervisor, she had over 100 employees who reported to her. Doc. #13 at 13. The explanation may very well convince a jury, but that would involve a determination of credibility that only a jury should make. A reasonable jury might believe that SRMC's treatment was due solely to Elliot's inability to adequately monitor all the employees who reported to her; or, in the alternative, it might find Elliot's explanation pretextual. Because of this, a genuine issue of material fact exists

**[\*60]** as to whether discrimination or Eliot's overwork lay behind SRMC's differential treatment of Haley.

**HN33**[↑] "Pretext is a commonsense inquiry: did the employer fire employee for the stated reason or not?" *Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4*. The Court cannot answer this question at the summary judgment stage, because of the array of unresolved factual issues that a reasonable jury could consider pretextual. To summarize, these include the factual bases for the site marking incidents (further confused by SRMC's inconsistent evidence and statements) and Haley's attendance record; whether Haley was actually placed on the CAP 2 disciplinary step; and the more lenient stance SRMC took with similarly situated employees.

The Court finds that Haley has presented sufficient evidence of genuinely disputed material facts such that a jury could doubt SRMC's stated reasons for its actions. As the Sixth Circuit stated in *Chen*, **HN34**[↑] "[a]t the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Chen, 580 F.3d at 400 n.4* **[\*61]** (citing *St. Mary's Honor Ctr. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. The Court accordingly makes no determination as to the discrimination Haley alleges that a jury might or might not infer from SRMC's actions. Such a determination is solely the function of the jury, as is the resolution of the disputed factual issues described herein.

## V. <u>Conclusion</u>

Accordingly, for the reasons set forth above, the Court OVERRULES Defendants' Motion for Summary Judgment (Doc. #13).

Counsel of record will note that a telephone conference call will be convened by the Court at <u>8:30</u> a.m. on <u>Friday</u>, February <u>8</u>, 2013, for the purpose of determining the viability of the May 20, 2013 trial date.

Date: January 28, 2013

/s/ Walter H. Rice

WALTER H. RICE

UNITED STATES DISTRICT JUDGE

**End of Document**

◆ Positive

As of: February 12, 2018 7:04 PM Z

## *Williams v. AT&T Mobility Servs., LLC*

United States District Court for the Western District of Tennessee, Western Division

June 6, 2016, Decided; June 6, 2016, Filed

Docket No: 2:15-cv-02150-STA-dkv

**Reporter**

2016 U.S. Dist. LEXIS 73017 *; 32 Am. Disabilities Cas. (BNA) 1473; 17 Accom. Disabilities Dec. (CCH) P17-056

KIRSTEN WILLIAMS, Plaintiff, v. AT&T MOBILITY SERVICES, LLC, Defendant.

**Subsequent History:** Affirmed by *Williams v. AT&T Mobility Servs. LLC, 2017 U.S. App. LEXIS 1503 (6th Cir.) (6th Cir. Tenn., 2017)*

**Prior History:** *Williams v. AT&T Mobility Servs., LLC, 186 F. Supp. 3d 816, 2016 U.S. Dist. LEXIS 63895 (W.D. Tenn., 2016)*

## Core Terms

attendance, accommodation, termination, absences, disability, essential function, unscheduled, reasonable accommodation, Customer, return to work, contends, disputes, flexible, undisputed, summary judgment, absenteeism, work schedule, requirements, pretext, regular, summary judgment motion, providers, requests, implies, records, breaks, statement of facts, temporal proximity, material fact, non-movant

**Counsel: [*1]** For Kirsten Williams, Plaintiff: Matthew Charles Gulotta, THE GULOTTA FIRM, Memphis, TN; Steven George Wilson, THE STEVE WILSON FIRM, Memphis, TN.

For AT&T Mobility Services, LLC, Defendant: Charles W. Hill, LEAD ATTORNEY, GLANKLER BROWN, PLLC, Memphis, TN.

**Judges:** S. THOMAS ANDERSON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** S. THOMAS ANDERSON

## Opinion

**ORDER GRANTING DEFENDANT'S MOTION FOR**

SUMMARY JUDGMENT

Plaintiff Kirsten Williams filed this action against her former employer, AT&T Mobility Services, LLC ("AT&T"), alleging that AT&T violated her rights under the Americans with Disabilities Act (as amended), *42 U.S.C. § 12101 et seq.* ("ADA"). (ECF No. 1.) Defendant AT&T has filed a motion for summary judgment. (ECF No. 38.) Plaintiff has filed a response to the motion (ECF No. 47-1), and Defendant has filed a reply to the response. (ECF No. 51.) For the reasons set forth below, Defendant's motion is **GRANTED**.[1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, **[*2]** if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant.[3] In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[4]

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present

---

[1] On May 16, 2016, the Court granted Plaintiff's motion for partial summary judgment on the sole issue of whether, at the time of the relevant events, she was disabled as defined by *42 U.S.C. § 12102(1).* (Order, ECF No. 53.)

[2] *Fed. R. Civ. P. 56(c).*

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

[4] *Laster v. City of Kalamazoo, 746 F.3d 714, 726 (6th Cir. 2014).*

2016 U.S. Dist. LEXIS 73017, *2

some "specific facts showing that there is a genuine issue for trial."[5] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[6] The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[7] The Court must enter summary judgment "against a party who fails to make a showing **[*3]** sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[8]

Statement of Facts

Initially, Defendant AT&T contends that Plaintiff has not sufficiently complied with *Rule 56.1 of the Local Rules* of this Court in her response.[9] According to Defendant, Plaintiff's sixty-three page response to its statement of undisputed facts is "a hodge podge of non-answers, argument, or challenges to the inferences the Plaintiff reads into the facts stated."[10]

*Local Rule 56.1(a)* requires that any motion for summary judgment be "accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial."[11] Any party opposing summary judgment must

respond to each fact stated by the movant by agreeing that it is undisputed, agreeing that it is undisputed for purposes of ruling on the summary judgment motion only, or by demonstrating that the fact is disputed, with specific citations to the record.[12] "Failure to respond to a moving party's statement of material facts ... shall indicate that the asserted facts are not disputed for purposes of summary judgment."[13] *Rule 56(e) of the Federal Rules of Civil Procedure* also **[*4]** provides that if a party "fails to properly address another party's assertion of fact ..., the court may consider the fact undisputed for purposes of the motion."[14]

As this Court stated in a previous case, "Argument in responses to statements of material facts clouds issues...."[15] In this case, despite Plaintiff's "clouding of

which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record. If the movant contends that the opponent of the motion cannot produce evidence to create a genuine issue of material fact, the proponent shall affix to the memorandum copies of the precise portions of the record relied upon as evidence of this assertion

(b) Non-moving Party. Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:(1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is **[*5]** disputed. Each disputed fact shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. In addition, the non-movant's response may contain a concise statement of additional facts that the non-movant contends are material and as to which the nonmovant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

---

[5] *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Eastham v. Chesapeake Appalachia, L.L.C., 754 F.3d 356, 360 (6th Cir. 2014)*.

[6] *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

[7] *Id. at 251 - 52*.

[8] *Celotex, 477 U.S. at 322*.

[9] (Reply, pp. 1-3, ECF No. 51.)

[10] (*Id.* at p. 2.)

[11] *Local Rule 56.1* provides as follows:

(a) Moving Party. In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to *Fed. R. Civ. P. 56* shall be accompanied by a separate, concise statement of the material facts as to

[12] *LR 56.1(b)*.

[13] *LR 56.1(d)*.

[14] *Fed. R. Civ. P. 56(e)(2)*.

[15] *Maverick Grp. Mktg., Inc. v. Worx Envtl. Products, Inc., 99 F.*

2016 U.S. Dist. LEXIS 73017, *5

the issues" by inserting argument and unsupported inferences in her response to Defendant's statement of facts,[16] the Court is able to discern factually based disputes and whether those disputed are material and will make its decision [*6] accordingly. To the extent that Plaintiff has presented any facts in her response that are not material or relevant to the issues presented by Defendant's motion, the Court will disregard those facts except as necessary to provide context or background.[17] The following facts are undisputed except as noted.[18]

Plaintiff was a Customer Service Representative with Defendant AT&T from 2006 to July 3, 2014, when she was terminated. Her job was to answer inbound calls and assist with technical support and billing at Defendant's Call Center.

Laura McArthur was the Attendance Manager, Lisa Todd-Kyle was the Attendance Analyst, and Darcus Payne was the Area Manager for the Memphis Call Center employees, including Plaintiff.

In performing her work as a Customer Service Representative, Plaintiff typically fielded about forty telephone calls a day. She worked an eight hour shift which changed every six months.

The job requires [*7] the Customer Service Representative to remain stationary for the majority of an eight hour shift and potentially longer when overtime is required. The representative signs on to a computer and stays at the workstation with the exception of allotted breaks and a lunch period.[19]

Among other performance standards, Plaintiff's work as a Customer Service Representative was subject to and

_____

Supp. 3d 822, 827 (W.D. Tenn. 2015).

[16] (ECF No. 47.)

[17] C.f. Hillman v. Shelby Cty., 2012 U.S. Dist. LEXIS 26289, 2012 WL 681778 at *1 (W.D. Tenn. Feb. 29, 2012) ("[C]ourts in the Western District of Tennessee do not strike inadmissible portions of affidavits; instead, they disregard the inadmissible testimony in their evaluation of the summary judgment motion before them.")

[18] (Def's SOF, ECF No. 39; Pl's Resp. to SOF, ECF No. 47.)

[19] Plaintiff's response to Defendant's statement of facts adds that she also left her desk for meetings and training and that Defendant allowed her three additional breaks as an accommodation beginning August 2012. (Pl's Resp. to SOF, ¶¶ 3 - 4, ECF No. 47.)

governed by Defendant's Attendance Guidelines. The Attendance Guidelines state that regular attendance and timeliness are essential job functions for every Customer Service Representative. The Guidelines state that repeated unscheduled absenteeism may result in discipline up to and including termination.[20]

The Memphis Call Center accepts incoming customer service calls from all over the nation. Call Center Workforce Management forecasts the volume of calls anticipated to be routed to the Memphis Call Center and schedules the workforce accordingly. Peak call loads occur early in the morning and late in the evening.

Unscheduled time away from work by Customer Service Representatives negatively impacts the level of and quality of service the representatives can offer customers. It forces Defendant to spread the work anticipated to be covered by the absent representative over the remaining representatives in attendance, increasing their call loads and potentially slowing response time over the entire center.[21] Longer wait times leads to customer frustration, and workforce morale may suffer as a result of added job pressure.[22]

Under the Attendance Guidelines, "unscheduled time

_____

[20] Plaintiff's response points out that the Guidelines allow for scheduled leave and other excused absences. (Id. at ¶ 5.) Plaintiff also notes that her actual job description, as opposed to the Attendance Guidelines, does not list regular attendance or timeliness [*8] as an essential function. (Id.)

[21] Plaintiff disputes this fact to the extent that it implies that her absences were unscheduled. The Court does not read Defendant's statement as having any such implication. (Id. at ¶ 7.)

[22] Plaintiff also disputes any implication in this statement that her absences were unscheduled. (Id. at ¶ 8.) Again, the Court does not read the statement as having [*9] this implication. Additionally, Plaintiff contends that Defendant has offered no "supporting evidence or data" that longer wait times may lead to customer frustration and that workplace morale may suffer as a result. (Id.) The Declaration of Darcus Payne, one of Defendant's area managers, was offered by Defendant in support of this statement and is made on the "personal knowledge" of Payne. (ECF No. 38-2.) Customer reaction and workplace morale are areas within the purview of an area manager. Therefore, Plaintiff's argument is without merit. See Counts v. Kraton Polymers, U.S. LLC, 260 Fed. App'x 825, 830 (6th Cir. 2008) ("After reviewing the affidavit, we conclude that based on Mulford's status as human resources manager of Kraton, he was competent to make the statements contained in his affidavit.")

away" due to absences, late arrivals, or early departures is tracked using an "unscheduled absence point system."[23]

Absenteeism is measured based on a rolling twelve-month calendar. The Attendance Guidelines state that "any unscheduled time away from your scheduled shift in excess of 8 total points in a rolling 12 months of active employment, regardless of reason, will be considered unacceptable absenteeism and will result in termination absent extraordinary circumstances as determined by the Company in its sole discretion."[24]

When an employee has an absence occurrence lasting more than eight calendar days in the preceding twelve months of employment that is approved for short term disability ("STD") under Defendant's benefit plan, the absence is excused when determining the employee's active employment.[25]

Absences incurred during a leave approved under the Family and Medical Leave Act ("FMLA") do not result in assessment of unscheduled absence points. But, absences due to illness or injury that are not covered by FMLA or STD or which are not protected by approved job accommodation will subject an employee to the accumulation of points under the Attendance Guidelines.[26]

As with all employees, Plaintiff's attendance history was maintained by Defendant and was available for her review at her request. An employee's attendance history

---

[23] Rather than agreeing or not agreeing with this statement, Plaintiff argues that her leave was not accurately recorded and that her requests for an accommodation under the ADA were ignored. (Pl's Resp. to SOF, ¶ 9, ECF No. 47.) Plaintiff's argument is not responsive to Defendant's statement of fact, [*10] and Defendant's statement as to its attendance policy is deemed to be undisputed.

[24] Again, Plaintiff attempts to use her response to this statement to argue that Defendant did not maintain accurate records (id. at ¶ 10) and, again, the Court notes that Plaintiff's argument is not responsive to Defendant's statement of fact, and Defendant's statement is deemed to be undisputed.

[25] Plaintiff continues to make her non-responsive argument that Defendant did not maintain accurate attendance records even though [*11] Defendant's statement refers to its general attendance policy and not how it was applied to Plaintiff. (Id. at ¶ 11.)

[26] Plaintiff, again, does not dispute Defendant's statement of its attendance policy but, instead, its execution. (Id. at ¶ 12.)

shows points incurred and the dates those points expire. A computer program tracks the attendance point data, automatically calculates the expiration dates for attendance points assessed, and takes into account any period of absence that extends the expiration dates for the points.[27]

Although Plaintiff missed work days in 2013, she was able to use a combination of approved STD and FMLA leave to avoid termination.[28]

Plaintiff was off work on STD from January through July 2013. She worked a few days in August 2013. She resumed STD in September 2013, which continued throughout October and part of November and December 2013.[29]

Plaintiff returned to work on January 20, 2014. Prior to her return, she had been absent from work since December 3, 2013.[30] At that time, Plaintiff's points were below the termination threshold. On January 30, 2014, and February 4, 2014, Plaintiff's managers discussed the attendance policy with her, and she stated her understanding of the policy.

On February 20, 2014, Plaintiff received her 2013 Performance Appraisal. As part of the evaluation, her supervisor evaluated her performance as not meeting Defendant's expectations for "Attendance and Punctuality."[31]

On March 11, 2014, Plaintiff reported to management that she had accessed a customer's account data more than once to verify her suspicions that the customer was

---

[27] Plaintiff disputes Defendant's statement on the ground that the attendance policy was not accurately applied to her or her co-workers. (Id. at ¶ [*12] 13.) See footnotes 23 - 26, supra.

[28] Plaintiff disputes this statement to the extent that it implies that Plaintiff did not qualify for approved leave. (Id. at ¶¶ 14 - 15.) The statement contains no such implication. Defendant's statement plainly says that the leave was approved.

[29] Plaintiff makes the same argument as she made for paragraphs fourteen and fifteen. (Id. at ¶ 16.) See footnote 28 above.

[30] Plaintiff makes the same argument as she made for paragraphs fourteen, fifteen, and sixteen. (Id. at ¶ 17.) See footnote [*13] 28 above.

[31] Plaintiff does not dispute that she received a negative evaluation, but, instead, argues that she did not deserve that kind of evaluation. (Id. at ¶ 19.)

2016 U.S. Dist. LEXIS 73017, *13

having an affair with her husband. Plaintiff acknowledges that her action was a violation of Defendant's Code of Conduct.[32]

During the period between March 11, 2014, and Plaintiff's last day of active work on April 9, 2014, Plaintiff missed several days of work. Plaintiff was not physically present at work from April 9 through the date of her termination on July 3, 2014.[33]

Plaintiff sought approval for her absences occurring after February 4, 2014, by having the absences covered by either FMLA leave, STD, or a job accommodation.[34]

FMLA leave requests are handled internally by Defendant's FMLA Operations Group. STD benefit requests and job accommodation requests are handled for Defendant by a third party administrator, Sedgewick Claims Management Services.[35] Sedgewick's Claims Management Services manages Defendant's Integrated Disability Service Center ("IDSC"). The IDSC publishes a guide which was available to Plaintiff online and in print for use in processing her STD and job accommodation claims.

Case Managers within the IDSC determine claims made for STD based on objective medical information provided by an employee's medical treatment providers. Only the IDSC has the authority to determine whether claims made by an employee qualify for STD. STD is awarded under Defendant's Short Term Disability Plan as wage replacement benefits for the employee's temporary absence from work. Absences for which STD is awarded do not incur attendance points under the Attendance Guidelines. Similarly, the IDSC determines whether job accommodation requests are medically necessary by reviewing information provided by an employee's medical care provider. If a request is determined to be medically necessary, the IDSC contacts the employee's work department which then confirms whether or not the work accommodation can be provided.[36]

Plaintiff pursued STD benefits and a job accommodation because of her anxiety and depression.

Plaintiff communicated with the IDSC over the provision of information by her medical treatment providers to support her STD **[*16]** and job accommodation claims, talking with them "20 or 30 times possibly." There was also communication between Plaintiff's medical treatment providers and the IDSC.[37]

Plaintiff had unscheduled time away from work on March 12, 13, 16, 17, 20, 23, 24, and 25, 2014, and on April 7, 8, and 9, 2014. Each of these absences incurred attendance points under the Attendance Guidelines.[38] Because she had not worked **[*17]** 1,250 hours in the twelve months preceding her absences, Plaintiff was unable to use FMLA to cover her unscheduled absences.

On April 10, 2014, the IDSC closed Plaintiff's request for

---

[32] Plaintiff attributes her action to her depression and anxiety. (*Id.* at ¶¶ 20 - 22.) Defendant did not rely on this incident as a ground for Plaintiff's termination, and, therefore, the Court has not referred to the incident in its analysis of Plaintiff's claims.

[33] Although Plaintiff does not dispute **[*14]** Defendant's statement that she was not physically present at work during this time period, she contends that she was seeking approved leave for these days and had requested an accommodation under the ADA "which would have allowed her back to work based on her request for a flexible/modified schedule." (*Id.* at ¶ 24.)

[34] Plaintiff objects to any implication in this statement that she should not have been granted leave. (*Id.* at ¶ 25.) The Court does not read Defendant's statement as containing any such implication.

[35] Plaintiff continues to dispute "inferences" in Defendant's **[*15]** statements where there are none. (*Id.* at ¶ 26.)

[36] Despite Plaintiff's contentions (*id.* at ¶¶ 28 - 29), there are no negative "inferences" in these statements.

[37] Plaintiff's response to this statement is confusing, to say the least. She disputes Defendant's statement that she was "in **constant** communication with the IDSC" about her leave "to the extent the statement [implies] Defendant was unaware or not kept informed" about Plaintiff's requests for an accommodation. (*Id.* at ¶ 31 (emphasis added).) The possible "inference" that Plaintiff seeks to refute is the opposite of what Defendant's statement actually says. Contradictorily, in addition to contending that the statement implies that Defendant was not aware of her requests, she also objects to the statement to the extent that it implies that Defendant was more aware than it actually was. (*Id.*) Plaintiff's deposition testimony that she talked to the IDSC "20 or 30 times possibly" speaks for itself.

[38] Plaintiff states that these dates should have been covered by her request for an ADA accommodation, but she does not dispute that she actually received attendance points for the dates. (*Id.* at ¶ 32.)

a job accommodation to excuse her unscheduled absences on the ground that Plaintiff had failed to provide medical information to support her request.[39]

Beginning April 10, 2014, Plaintiff sought to cover her absences from that date going forward by having them treated as either STD or job accommodation absences.[40] On April 29, 2014, after review of the submitted medical information, the IDSC approved STD for Plaintiff's absences from April 10, 2014, through [*18] April 27, 2014.[41] The IDSC denied STD for Plaintiff's absences from April 27, 2014, going forward on the ground that Plaintiff had not provided sufficient medical information.[42]

Because Plaintiff's absences from April 27, 2014, were not excused, Defendant issued Plaintiff a letter directing her to return to work by May 12, 2014. In discussions with Defendant's Attendance Analyst, Plaintiff stated she could not return to work during the month of May and that she would continue to have medical information sent to the IDSC.[43]

After a review of additional submitted medical information, the IDSC approved STD for Plaintiff's absences from April 28, 2014, through May 27, 2014.[44]

_____

[39] Plaintiff does not dispute the fact that her request for a job accommodation was closed for the stated reason. (Id. at ¶ 34.) Instead, she argues that she cooperated with Defendant as best she could but that her medical appointment was after the deadline for submitting paperwork to Defendant and Defendant would not grant her any further extensions of time. (Id.)

[40] Plaintiff disputes this fact to the extent that it implies that she only began seeking an ADA accommodation on April 10. (Id. at ¶ 35.) The Court does not read this statement as having such an implication.

[41] Plaintiff disputes this fact to the extent that it implies that she only requested leave from April 10 to April 27, 2014, and for the leave to be covered by STD instead of the ADA. (Id. at ¶ 36.) Again, the Court does not read the statement as having this implication.

[42] Plaintiff contends that this ground was not reasonable but does not dispute that this was Defendant's stated reason for denying her additional STD leave. (Id. at ¶ 37.)

[43] Nothing in this sentence implies that [*19] Plaintiff did not ask for a flexible work schedule as an ADA accommodation. (Id. at ¶ 38.) In fact, the crux of Plaintiff's claim is that Defendant denied her request for a flexible work schedule as a "reasonable accommodation" under the ADA.

On May 28, 2014, the IDSC denied STD for Plaintiff's absences from May 28, 2014, and thereafter on the ground that she had provided insufficient medical information.[45] Subsequently, Plaintiff was sent a letter directing her to return to work by June 10, 2014, in order to remain employed.[46]

Plaintiff did not return to work by June 10, 2014. As of June 11, 2014, she had accumulated twenty-six attendance points, which was in excess of the [*20] eight point threshold for termination stated in the Attendance Guidelines.[47] Defendant began the process for obtaining approval of Plaintiff's termination from employment for accumulation of excessive attendance points and for job abandonment for failure to return to work as directed.[48]

Plaintiff's record of attendance prior to her termination shows that she received warnings regarding her

_____

[44] There are no untoward inferences to be drawn from this statement of fact.

[45] Plaintiff does not dispute that this was the stated ground for the denial of her leave. Instead, she argues that the denial was not reasonable. (Id. at ¶ 40.)

[46] Again, Plaintiff does not dispute this fact itself but, rather, argues that the demand for her to return to work was not reasonable. (Id. at ¶ 41.)

[47] Plaintiff contends that Defendant's attendance policy was not applied consistently and, again, argues that Defendant ignored her requests for an accommodation under the ADA. (Id. at ¶ 42.) Plaintiff also states that she was not warned that she was accumulating attendance points that could be used for discipline or termination, even though she acknowledges that the Attendance Guidelines contain such a provision. (Id.; Pl's Resp., p. 4, ECF No. 47-1.) None of these arguments is responsive to Defendant's statement of fact. Finally, Plaintiff contends that Defendant did not calculate her attendance points correctly because Defendant allegedly erroneously assessed "penalty points" by recording her absences as "Illness — Unpaid" rather than correctly listing the absences as "unexcused." (Pl's Resp. to SOF, ¶ 42, ECF No. 47.) In its reply, Defendant has submitted the second declaration of its Attendance Manager, [*21] Laura McArthur, which refutes Plaintiff's assertion that her points were not calculated correctly. (ECF No. 51-1.) According to McArthur, Defendant uses the code "ILLU" or "Illness-Unpaid" to describe an unpaid, unexcused absence that results in attendance points. (Id. ¶ 3.)

[48] Plaintiff does not dispute that Defendant did, in fact, begin the process of seeking approval for her termination. (Pl's Resp. to SOF, ¶ 43, ECF No. 47.)

attendance point accumulations each year of her employment from 2007 through 2014, with a final written warning for attendance being issued to her on March 13, 2014.[49]

After June 11, 2014, Plaintiff's medical care providers provided additional information for the IDSC to review in consideration [*22] of her claims seeking STD or a job accommodation for her unscheduled absences following May 27, 2014.[50] Rather than continue the termination process, Plaintiff's management decided to have another return to work letter sent to Plaintiff setting her return to work for June 30, 2014.[51] Plaintiff responded that she could not return to work on June 30, 2014.[52] Plaintiff did not return to work on June 30, 2014.[53]

Plaintiff appealed the IDSC's denial of STD for her absences from May 28, 2014, going forward. After first determining that a successful appeal would still leave Plaintiff with sixteen attendance points, Memphis Call Center Management made the decision to terminate Plaintiff's employment as of July 3, 2014, for having incurred more than eight attendance points in violation of Defendant's Attendance Guidelines and for having abandoned her job by not reporting to work.[54]

Plaintiff has submitted her own statement of undisputed facts [*24] as follows.[55] Plaintiff believes that her request for a flexible work schedule would involve an hour adjustment to her start time. She needed this adjustment to her start time because, when she began her work shift at 6:15 or 6:30 a.m., she would still be "cloudy" from her medicine, and it took a while to get adjusted. Her request for a later start time did not mean that she would call and simply say she could not make it to work on time, but, rather, she wanted a daily adjustment to the start time for a matter of weeks or a month. She was also prepared to work later in the evenings to make up for the later start time. Plaintiff interpreted her request for flexible breaks to be ten minutes every two hours. Plaintiff believed that she "just needed to take a moment to calm down after [a stressful call.]"[56]

Plaintiff applied for FMLA on December 12 and 20, 2013, January 10 and 13, 2014, April 4 and 29, 2014, and May 15 and 30, 2014, based on depression and need for treatment. After these requests were denied, no one contacted Plaintiff to discuss other options to accommodate or assist her with her depression. Plaintiff's 2013 Appraisal was negatively impacted [*25] by her approved leave in 2013.

Analysis

In her complaint, Plaintiff alleges that Defendant discriminated against her in violation of the ADA by refusing to permit her to work a flexible job schedule and giving her additional leave. She also alleges that Defendant interfered with her right to engage in the interactive process under the ADA. Finally, she alleges that she was terminated because of her disability and in retaliation for her pursuit of a reasonable

---

[49] "Plaintiff concedes she received written warnings in 2007, 2008, 2009 and 2010," but she contends that she merely received counseling for attendance in 2011. (*Id.* at ¶ 44.) She also acknowledges that her 2012 performance appraisal stated that "she failed to meet Defendant's expectations for attendance," and she references a written warning that she received in 2014. (*Id.*)

[50] Plaintiff disputes this statement to the extent that it implies that Plaintiff and her medical providers only began to submit information to the IDSC after June 11, 2014, or that she did not have ongoing contact with Defendant about her absences. (*Id.* at ¶ 45.) There is no such implication contained in Defendant's statement. Defendant has already acknowledged that Plaintiff had regular contact with the IDSC concerning her medical information and leave. *See* footnote 37, *supra*.

[51] Once again, rather than responding to Defendant's statement, Plaintiff attempts to argue her case, i.e., the statement is disputed to the extent it implies that Defendant was not on notice of her treatment for depression and anxiety or her request for a flexible work schedule as an accommodation and that Defendant did [*23] not accurately record her attendance points. (*Id.* at ¶ 46.) Plaintiff's arguments are not responsive to Defendant's statement.

[52] Plaintiff disputes this statement to the extent that it implies that she was able to return to work or that she had not provided Defendant with enough information to qualify for STD or ADA protection. (*Id.* at ¶ 47.) The Court has not drawn any such inferences from Defendant's statement.

[53] Plaintiff notes that she was still in treatment for her depression on this date. (*Id.* at ¶ 49.)

[54] Plaintiff disputes that she had this many attendance points, but she does not dispute that this was Defendant's stated reason for terminating her. (*Id.* at ¶ 50.)

[55] (Pl's SOF, ECF No. 47-2.)

[56] (*Id.* at ¶¶ 1, 2.)

accommodation under the ADA.[57] Defendant has moved for summary judgment on the grounds that the undisputed facts show that (1) "regular and predictable attendance is an essential function of the Plaintiff's job as a call center customer services representative"; (2) Plaintiff's employment was terminated because she violated Defendant's Attendance Guidelines and abandoned her job and not because she requested an ADA accommodation; (3) Plaintiff and Defendant did, in fact, engage in an interactive process concerning Plaintiff's request for a job accommodation; and (4) Plaintiff's request for a flexible work schedule was unreasonable as a matter of law.[58]

Reasonable Accommodation [*26]  Claim

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[59]  To establish a claim of failure to provide a reasonable accommodation, a plaintiff must show that (1) she is disabled within the meaning of the ADA and that (2) she is otherwise qualified for the job she holds despite her disability either without accommodation, with an essential job requirement eliminated, or with a proposed reasonable accommodation.[60] If the plaintiff carries her burden, then the defendant employer bears "the burden of proving that a challenged job criterion is essential, and therefore a business necessity," or that a proposed accommodation would impose an undue hardship on the defendant.[61]

When the employee seeks an accommodation and claims that she would be qualified to perform the essential functions of the job with such accommodation, the issues are whether such accommodation is reasonable, [*27]  whether such accommodation would

impose an undue hardship on the employer, and whether the plaintiff is capable of performing the job even with the suggested accommodation.[62] "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions.[63] An employee who cannot perform the job's essential functions is not a qualified individual under the ADA.[64]

The Court has previously determined as a matter of law that Plaintiff's depression and anxiety constitute a disability within the meaning of the ADA.[65] Therefore, the Court must now determine if Defendant is entitled to summary judgment on the issue of whether Plaintiff is otherwise qualified for the job that she held despite her disability either without accommodation, with an essential job requirement eliminated, or with a proposed reasonable accommodation. The Court finds that Defendant is entitled to summary judgment because [*28]  Plaintiff cannot show that she can perform an essential function of her job with or without a reasonable accommodation.

Plaintiff's proposed "reasonable accommodation" was a flexible job schedule that consisted of "an extension of unpaid leave for ongoing treatment of her major depressive disorder, and, a flexible schedule involving up to 1 hour late start and finish times, with extra breaks when needed for panic attacks."[66] Plaintiff testified that

---

[57] (Complt. at ¶¶ 1, 47, 52, ECF No. 1.)

[58] (Defs MSJ, ECF No. 38.)

[59] *42 U.S.C. § 12112(a)*.

[60] *See Cash v. Siegel-Robert, Inc., 548 Fed. App'x 330, 334 (6th Cir. 2013)*; *see also Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452 (6th Cir. 2004)*.

[61] *Hedrick, 355 F.3d at 452*.

---

[62] *Id.*

[63] *29 C.F.R. § 1630.2(n)(1)*.

[64] *Hoskins v. Oakland Cnty. Sheriff's Dep't, 227 F.3d 719, 724 (6th Cir. 2000)*. Any argument by Defendant that Plaintiff is unqualified to perform her job rests on its argument that she failed to comply with its attendance requirements that were an essential function of her job.

[65] (Order Grt'ing Pl's MPSJ, ECF No. 53.)

[66] (Pl's Resp., p. 14, ECF No. 47-1.) These unscheduled breaks were to be in addition to the fifteen minute break Plaintiff ordinarily received after two hours of work, her lunch hour, and a fifteen minute break two hours after lunch. (Pl's Depo., pp. 109-111, ECF No. 37.) Plaintiff admits that she was "'often' able to leave her work station at any time for restroom breaks." (Pl's Resp., p. 3, ECF No. 47-1.) Additionally, Plaintiff acknowledges that Defendant did, in fact, provide [*29]  her with unpaid leave to accommodate her disability prior to her termination through its STD policy. (*Id.* at p. 18 (stating that Defendant "tried to end run the ADA by using the STD process

2016 U.S. Dist. LEXIS 73017, *29

she had panic attacks up to three times a day in response to "stressful" calls, and that there was no way to plan around when she would receive a stressful call.[67] The proposed flexible schedule would have lasted "[a]s long as needed."[68]

Plaintiff does not contend that she could do her job despite her disability without an accommodation. Instead, she proposed an accommodation that, according to Defendant, would have eliminated an essential job requirement, i.e., punctuality and regular attendance. Accordingly, the Court must determine whether punctuality and regular attendance were essential functions of Plaintiff's job.

As explained in *Denman v. Davey Tree Expert Co.*,[69]

"A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp., 251 F.3d 573, 584 (6th Cir. 2001)* (quotations marks and citations omitted). The inability to attend work can "fundamentally alter" a position which requires attendance to perform tasks. *Brenneman v. MedCentral Health Sys., 366 F.3d 412 (6th Cir. 2004)* (attendance can be an essential function of a position and excessive absenteeism rendered an employee unqualified for position); *Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998)* (employee who cannot meet the attendance requirements of the job cannot be a "qualified" individual protected by the ADA).

Defendant cites [*30] *EEOC v. Ford Motor Co.*,[70] for the proposition that regular attendance is generally an essential function of most jobs and that the ADA does "not endow all disabled persons with a job - or job schedule - of their choosing."[71]

Although *Ford Motor Co.* involved a telecommuting request by the plaintiff employee, the reasoning of that case is instructive in the present case.[72] The Court

noted that a "'reasonable accommodation' may include 'job restructuring [and] part-time or modified work schedules,' but it does not include removing an 'essential function [ ]' from the position, for that is *per se* unreasonable."[73] The Court relied on a "commonsense notion" in holding that "[r]egular, in-person attendance is an essential function - and a prerequisite to essential functions - of most jobs, especially the interactive ones."[74] The Court upheld the grant of summary judgment to Ford because "[r]egular and predictable on-site attendance was essential for [the employee's] position, and [the employee's] repeated absences made her unable to perform the essential functions of a resale buyer."[75]

In this case, Defendant has presented unrefuted evidence that Plaintiff's work as a Customer Service Representative, also an "interactive" position, was governed by Attendance Guidelines which stated that regular attendance and timeliness are essential job functions and that repeated unscheduled absenteeism may result in discipline, including termination.[76] It is

---

[67] (Pl's Depo., pp. 110, 112, ECF No. 37.)

[68] (*Id.* at p. 69.)

[69] *266 Fed. App'x 377, 380 (6th Cir. 2007)*.

[70] *782 F.3d 753, 757 (6th Cir. 2015)*.

[71] *Id. at 757, 761-63*.

---

to subsume all its obligations.")).

[72] Telecommuting would not have been an option for Plaintiff because she would still have been faced with the issues of being "cloudy" at [*31] the beginning of the work day and needing breaks whenever she received a "stressful" call.

[73] *Id. at 761* (citations omitted).

[74] *Id. at 762-63*.

[75] *Id. at 763*. Plaintiff attempts to distinguish her case from *Ford Motor Co.* in that the employee in that case was required to have some face-to-face contact with customers and had previously tried a flexible work schedule and telecommuting which did not work out. (Pl's Resp., pp. 16-17, ECF No. 47-1.) These distinctions do not outweigh the *Ford Motor Co.* Court's reliance on the employer's judgment and the consequences of not requiring the plaintiff to attend work in the office in holding that attendance was an essential function of the plaintiff's job. *782 F.3d at 762-63*. Moreover, Plaintiff's job required team work and a high level of interaction with the public, as did the *Ford Motor Co.* employee's job.

[76] (Pl's Resp. p. 4, ECF No. 47-1.) See *Wagner v. Sherwin-Williams Co., 2015 U.S. Dist. LEXIS 116882, 2015 WL 5174130 at *3 (E.D. Ky. Sept. 2, 2015)*, *aff'd sub nom. Wagner v. Sherwin-Williams Co., 647 Fed. Appx. 645, 2016 U.S. App. LEXIS 8689, 2016 WL 2641257 (6th Cir. May 10, 2016)* (stating that, to determine what is an essential function of a job, "the ADA itself provides two factors for courts to consider: 'the employer's judgment as to what functions of a job are essential,'" and any "written [job] description[s]." *42 U.S.C. §*

undisputed that Defendant's Call Center [*32] must be staffed with a sufficient number of representatives to service incoming call loads and that peak call loads occur early in the morning and late in the evening.[77] Plaintiff worked as part of a team responding to service inquiries from customers seeking help in resolving problems with their phones or services purchased.[78] Her team worked eight hour shifts, with each Customer Service Representative manning a computer and a telephone, answering and servicing as many as forty to fifty telephone calls per day.[79]

Peak call loads occur early in the morning and late in the evening.[80] The Call Center must be staffed with a sufficient number of Customer Service Representatives to service incoming call loads, and consistent and predictable attendance by the representatives staffing the Call Center is critical to its efficient delivery of services.[81]

When a Customer Service Representative does not show up to work as scheduled, the representatives who do report to work have their call volumes increased to pick up the slack.[82] Morale problems are enhanced by unscheduled absences during peak call periods, and the quality of customer service suffers.[83] To function effectively, the Call Center depends on its representatives to show up for and remain at work as scheduled.[84]

---

*12111(8)*.").

[77] (Pl's Resp. Def's SOF, ¶¶ 6-7, ECF No. 47.)

[78] (*Id.* at pp. 47 - 49.)

[79] (*Id.*)

[80] (Pl's Resp. to [*33] SOF, ¶¶ 6 - 8, ECF No. 47.) *See* footnote 22, *supra*, rejecting Plaintiff's argument that Defendant offered no "supporting evidence or data" that longer wait times may lead to customer frustration and that workplace morale may suffer as a result and finding that the Declaration of Darcus Payne (ECF No. 38-2), one of Defendant's area managers, in support of this statement was made on the "personal knowledge" of Payne and was admissible.

[81] (*Id.*)

[82] *See* footnote 78, *supra*. *See also* Payne Decl. (ECF No. 38-2.)

[83] (*Id.*)

[84] (*Id.*)

Plaintiff argues that work schedules may be modified as a job accommodation under Defendant's Integrated Disability Service Center Guide which provides that, if an employee's "condition requires a reduced work schedule or time off work (no matter the duration) that does [*34] not qualify for disability benefits under your disability benefits plan and you are not eligible for FMLA, a job accommodation specialist will assist you with your request."[85] She contends that Defendant could have used other employees and contract workers to fill in for her as needed.[86] However, as explained in *Belasco v. Warrensville Heights City Sch. Dist.*,[87]

> [T]he ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dep't, 227 F.3d 719, 729 (6th Cir. 2000)*. Likewise, the ADA does not require employers to hire a second person to fulfill the job responsibilities ordinarily performed by one person. *Johnson v. Cleveland City Sch. Dist., 443 Fed. App'x 974, 986 (6th Cir. 2011)* (rejecting a request for a teacher's aide as unreasonable).

In *Belasco*, the plaintiff employee, a school teacher with balance problems and shortness of breath, asked for a part-time teacher's aide and for disruptive students to be transferred to a different classroom because she was afraid that she would be knocked down. In upholding the granting of summary judgment to the defendant school district, the Court of Appeals found that "both actions [*35] would shift performance of essential child supervision functions onto another employee, either in Belasco's classroom or another. Any such accommodations would be unreasonable, and the District was not obligated to fulfill those requests."[88]

---

[85] (*Id.*)

[86] (*Id.*, p. 18.) Plaintiff notes that Defendant could "assign 'on-call duty' employees for an extra $36 per day." (Pl's Resp. to SOF, ¶ 8, ECF No. 47.)

[87] *634 Fed. Appx. 507, 2015 WL 8538096 at *8 (6th Cir. 2015)*.

[88] *Id.* In its decision, the Court mentioned that a collective bargaining agreement with the teachers' union prohibited the employment of part-time aides without the consent of both the prospective aide and the union, and the union did not agree to the school district's employing part-time aides for any reason, including accommodation of a disabled employee. *634 Fed. Appx. 507, Id. at *4*. However, the Court merely pointed this out as an additional reason as to why the plaintiff employee's

2016 U.S. Dist. LEXIS 73017, *35

Likewise, in the present case, "shifting" the performance of Plaintiff's duties onto her co-workers, either when she was absent or when she was on an unscheduled "flex" break and "for as long as needed," is *per se* unreasonable. Although time off, whether paid or unpaid, can be a reasonable accommodation, an employer is not required to provide a disabled employee with indefinite leave.[89]

Plaintiff attempts to rely on *Bracey v. Michigan Bell Telephone Co.*,[90] in which the plaintiff employee, who worked at a call center, suffered from irritable bowel syndrome. The employee requested an accommodation of immediate access to a restroom and flexible break times. **[*37]** The employer denied her request, based primarily on the assumption that her bathroom break needs would cause her to miss too much work and be too unpredictable.[91] The *Bracey* Court denied the employer's motion for summary judgment.[92]

*Bracey* is distinguishable from the present case because, in that case, the "impact of unscheduled bathroom breaks could be reduced by locating [the employee's] cubicle next to the restroom, which [a

---

proposed accommodation was unreasonable. *634 Fed. Appx. 507, Id. at *8* ("The unreasonableness of Belasco's proposed accommodation is further illustrated by the fact, uncontroverted by Belasco, that hiring a part-time aide would have violated the District's collective bargaining agreement with the teachers' union because the union was unwilling to provide its consent."). Cf. *Gardull v. Perstorp Polyols, Inc., 382 F. Supp. 2d 960, 965 (N.D. Ohio 2005)* (finding that "although Gardull's absences were unrelated to his disability, his excessive absenteeism required his co-workers to perform his job. It therefore **[*36]** rendered him unqualified for the position, for which regular attendance was a requirement.")

[89] *Aston v. Tapco Int'l Corp., 631 Fed. Appx. 292, 2015 WL 7434652 at *4 (6th Cir. 2015)* (determining that, when an employee's return date is not certain, an employer is not required to keep open a job for an employee indefinitely as a reasonable accommodation). According to Plaintiff her "[t]reatment was **projected** to last until August 15." (Pl's Resp., p. 7 (emphasis added), ECF No. 47-1.) At the time of her termination, she had not given Defendant a set return date, even if, after her termination, her treatment actually did end on August 15.

[90] *2015 U.S. Dist. LEXIS 171642, 2015 WL 9434496 (E.D. Mich., Dec. 24, 2015)*.

[91] *2015 U.S. Dist. LEXIS 171642, [WL] at *3-6*.

[92] *2015 U.S. Dist. LEXIS 171642, [WL] at *6*.

---

supervisor] said could be done easily."[93] Moreover, rather than asking for additional breaks, as Plaintiff has in this case, the *Bracey* employee proposed using her regular breaks and lunch break at unscheduled times to accommodate her flare-ups.[94]

More akin to the present case is *Davis v. George Washington Univ.*,[95] in which the employee's requested accommodation was to inform his supervisor "as soon as reasonably possible that [he] was unable to report to work due to his illness."[96] In granting summary judgment to the employer, the Court explained that "[a]lthough the ADA defines 'reasonable accommodation' to include 'part-time or modified work schedules,' [the] requested accommodation is too open-ended and is thus unreasonable as a matter of law."[97]

Here, Plaintiff s request **[*38]** for a "flexible" work schedule permitting her to come in late and to take breaks "as needed" and for an undetermined time period would remove an essential function from her job, i.e., punctuality and attendance, and is, therefore, *per se* unreasonable.[98] Accordingly, Defendant is entitled to summary judgment.

Alternatively, Plaintiff's excessive absenteeism prevented her from being "qualified" for protection under the ADA.[99] As explained in *Wheeler v. Jackson Nat'l Life Ins. Co.*,[100]

The Sixth Circuit has long held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified

---

[93] *Id.*

[94] *Id.*

[95] *26 F. Supp.3d 103 (D.C.C. 2014)*.

[96] *Id. at 115*.

[97] *Id.*

[98] *See Ford Motor Co., 782 F.3d at 761* (removing an "essential function" from a position is *per se* unreasonable) (citing *Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 850 (6th Cir. 1998)* and *Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 287 n. 17, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987)*).

[99] *See Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 322 (6th Cir. 2012)* (collecting cases).

[100] *159 F. Supp. 3d 828, 2016 WL 427796 (M.D. Tenn. 2016)*.

individual protected by the ADA." *Gantt, 143 F.3d at 1047* (internal quotation marks omitted); *Melange v. City of Ctr. Line, 482 Fed.Appx. 81, 84 (6th Cir. 2012)* (affirming *Gantt* and finding a custodian whose job required on-site manual labor and who could not meet attendance requirements could not make a prima facie case). Accordingly, excessive absenteeism can render an individual unqualified under the ADA as a matter of law, except in the exceptional case where an employee can effectively perform at home without a substantial reduction in the quality of his performance. [*39] *Smith v. Ameritech, 129 F.3d 857, 867 (6th Cir. 1997)* (citing *Vande Zande v. Wisconsin, 44 F.3d 538, 545 (7th Cir. 1995)); Brenneman v. MedCentral Health Sys., 366 F.3d 412, 419 (6th Cir. 2004).*[101]

Under this analysis, because Plaintiff could not perform all the essential functions of her job, she was not qualified for the job.

Failure to Engage in the Interactive Process Claim

The ADA's regulations provide that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."[102] The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[103]

Plaintiff contends that Defendant did not participate in good faith in the interactive process. If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would [*40] have been possible.[104] Accordingly, even if the employer "did

not put sufficient effort into the 'interactive process' of finding an accommodation, *29 C.F.R. § 1630.2(o)(3)*, 'that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual.'"[105] As explained in *Ford Motor Co.*,

> Courts thus need not consider this form of non-independent liability "if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." It suffices here to hold that any failure by Ford does not create liability because, as we just concluded, the EEOC did not produce such evidence.[106]

Because Plaintiff has failed to show that she could perform the essential functions of her job [*41] with her proposed accommodation, her interactive process claims fails even if Defendant did not participate in the process in good faith.[107]

Retaliation/Discrimination Claim

Plaintiff contends that she was terminated from her position because of her disability and in retaliation for asking for a reasonable accommodation under the ADA. Defendant has moved for summary judgment on this

---

[101] *159 F. Supp. 3d 828, Id. at *13* (footnote omitted). *See also Larkins v. CIBA Vision Corp., 858 F. Supp. 1572, 1582 (N.D. Ga. 1994)* (finding employee was not a qualified employee under the ADA because she was required to sign in to telephones for 8.5 hours per day and she conceded that taking telephone calls during that time was a major part of her job; therefore, the telephone duties were an essential function of her position, and she was unable to complete them).

[102] *29 C.F.R. § 1630.2(o)(3).*

[103] *Id.*

[104] *Lafata v. Church of Christ Home for Aged, 325 Fed. App'x*

---

*416, 422 (6th Cir. 2009)* (quoting *Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000)* (en banc), *judgment vacated on other grounds*, **535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002)).**

[105] *Ford Motor Co., 782 F.3d at 766* (quoting *Basden v. Prof'l Transp., Inc., 714 F.3d 1034, 1039 (7th Cir. 2013)).*

[106] *Id.* (citation omitted). *See also Silva v. City of Hidalgo, Tex., 575 Fed. App'x 419, 424 (5th Cir. 2014)* ("Accordingly, even if a genuine issue of material fact exists as to whether the City participated in the interactive process in good faith, its dereliction cannot be said to have led to a failure to reasonably accommodate Silva because there is no evidence that a reasonable accommodation was feasible.")

[107] Defendant points out that the record shows that Plaintiff talked with the IDSC between twenty and thirty times regarding her submission of medical information to support her claims, and her physicians engaged in a months-long back and forth process exchanging medical reports with the IDSC. (Pl's Depo., pp. 60-62, ECF No. 37.) According to Defendant, this evidence shows that it did, in fact, engage in the interactive process in good faith. There is no need for the Court to decide this issue because Plaintiff failed to show that she could perform the essential functions of her job with her proposed accommodation.

2016 U.S. Dist. LEXIS 73017, *41

claim on the ground that Plaintiff was terminated because of her chronic absenteeism and her job accommodation requests were not a "but for" cause of her termination.

To establish a prima facie case of [*42] ADA retaliation,[108] the plaintiff must show that: (1) she was engaged in a protected activity; (2) the exercise of her civil rights was known to the defendant; (3) the defendant subsequently took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action - in this case Plaintiff's termination.[109] Once the plaintiff has established a prima facie case, the defendant has the burden to "prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."[110] If the defendant does so, then the plaintiff must "show that the proffered reason was not its true reason but merely a pretext for retaliation" by demonstrating that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action.[111]

"[T]he showing of a good-faith request for reasonable accommodation" is a "protected act" for purposes of an ADA [*43] retaliation claim.[112] In the present case, for the purpose of deciding this motion, the Court finds that there is no dispute that Defendant knew of Plaintiff's request for an accommodation under the ADA. Therefore, the question for the Court is whether there are facts which, if believed by the trier of fact, show a causal connection between Plaintiff's request and her termination and, if so, whether there are facts which, if believed by the trier of fact, show that Defendant's

proffered reason for the termination was a pretext for discrimination.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."[113] Here, Plaintiff has not pointed to any evidence in the record showing a causal connection between her disability and request for an accommodation and her subsequent termination.

Plaintiff suggests that the proximity between her request for a reasonable accommodation and her termination is evidence that her request was a factor in her termination and, thus, establishes the requisite causation.[114] Plaintiff points to her statement to Defendant on June 27, 2014, that she could [*44] not return to work on June 30 as the beginning point and July 3, the date of her termination, as the end point in determining whether there is sufficient temporal proximity to show a causal connection. However, it is undisputed that Plaintiff asked Defendant for a flexible schedule as a job accommodation as early as February 4, 2014, five months before her termination.[115]

Although extremely close temporal proximity permits an inference of a retaliatory motive, evidence in addition to temporal proximity is required to permit the inference if close temporal proximity is not present.[116] This is not a case where the temporal proximity is so close that it suffices by itself since Plaintiff's request was made five months before her termination.[117] "The absence of

---

[108] See **Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014)** (When a plaintiff relies on circumstantial evidence of retaliation, as in the present case, the burden-shifting evidentiary framework of McDonnell Douglas applies.).

[109] See Walborn v. Erie Cnty. Care Facility, 150 F.3d 584, 588-89 (6th Cir. 1998).

[110] Sowards v. Loudon Cnty., 203 F.3d 426, 431 (6th Cir. 2000).

[111] Harris v. Metro. Gov't of Nashville & Davidson Cnty., 594 F.3d 476, 486 (6th Cir. 2010).

[112] Baker v. Windsor Republic Doors, 414 Fed. App'x 764, 776-77 & n. 8 (6th Cir. 2011).

---

[113] Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

[114] (Pl's Resp., pp. 25-26, ECF No. 47-1.)

[115] (Id. at p. 5.)

[116] See Donald v. Sybra, Inc., 667 F.3d 757, 763 (6th Cir. 2012) ("[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.").

[117] See, e.g., Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010) (finding no temporal proximity when adverse decision was made eight months after defendants were [*45] served with another lawsuit by plaintiff); Deister v. AAA Auto Club of Michigan, 91 F. Supp. 3d 905, 921-22 (E.D. Mich. 2015), reconsideration denied, 2015 U.S. Dist. LEXIS 53791, 2015 WL 1885576 (E.D. Mich. Apr. 24, 2015), and aff'd sub nom. Deister v. Auto Club Ins. Ass'n, 647 Fed. Appx. 652, 2016 U.S. App. LEXIS 8792, 2016 WL 2731606 (6th Cir. May 11, 2016) (finding no temporal proximity when the plaintiff was not terminated until almost five months after the Auto Club

2016 U.S. Dist. LEXIS 73017, *45

close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive."[118]

However, even if she has shown the requisite causation, Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, i.e., Plaintiff violated Defendant's absenteeism policy.[119] Accordingly, the burden shifts to Plaintiff to demonstrate that this reason is a pretext for unlawful discrimination.[120]

"A plaintiff may demonstrate pretext by showing that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge."[121] "A reason cannot be proved to be 'a pretext for **discrimination**' unless it is shown **both** that the reason was false, [*46] and that discrimination was the real reason."[122] Plaintiff has not established pretext under any of these methods. Plaintiff cannot show that Defendant's proffered reason had no basis in fact, was not the real reason, or was insufficient to explain Defendant's action in terminating her.

It is undisputed that Defendant's Attendance Guidelines warn that repeated absenteeism may result in discipline up to and including termination. Under the Guidelines

---

learned of his protected conduct); cf. *Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)* (finding temporal proximity was evidence of causation when termination occurred on the same day the employer learned of protected conduct).

[118] *Vereecke, 609 F.3d at 401*.

[119] This Court has previously held that an employee's excessive absenteeism constitutes a legitimate, nondiscriminatory reason for dismissal. See *McNeil v. Sonoco Products Co., 2012 U.S. Dist. LEXIS 44448, 2012 WL 1038767 at *11 (W.D. Tenn. Mar. 27, 2012)*, aff'd, *519 Fed. App'x 382 (6th Cir. 2013)*.

[120] See *Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008)*.

[121] *Gantt, 143 F.3d at 1048-49*.

[122] *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)* (emphasis in original); *Edmond v. State Dep't of Prob. & Parole, 386 Fed. Appx. 507, 515 (6th Cir. 2010)*; *Hughes v. Gen. Motors Corp., 212 Fed. App'x 497, 502 (6th Cir. 2007)*.

"unscheduled time away" due to absences, late arrivals, or early departures is tracked using an "unscheduled absence point system." Any unscheduled time away from a scheduled shift in excess of eight total points in a rolling twelve months of active employment, regardless of the reason, is considered unacceptable attendance and results in termination.[123]

The record shows Plaintiff's history of absenteeism. Plaintiff was off work on STD from January through July 2013, worked a few days in August, and then resumed STD in September 2013, which continued throughout October and part of November and December 2013.[124] She returned to work on January 20, 2014. Prior [*47] to her return, she had been absent from work since December 3, 2013.[125] On January 30, 2014, and February 4, 2014, Plaintiff's managers discussed the attendance policy with her, and she expressed her understanding of the policy. As part of her 2013 Performance Appraisal, she was evaluated as not meeting Defendant's expectations for "Attendance and Punctuality."[126] During the period between March 11, 2014, and Plaintiff's last day of active work on April 9, 2014, Plaintiff missed several days of work. Plaintiff was not physically present at work from April 9 through the date of her termination on July 3, 2014.[127]

At a minimum, Plaintiff's unscheduled time away from work on February 15, 2014, March 9, 12, 13, 16, 17, 20, 23, 24, and 25, 2014, and April 7, 8, and 9, 2014, resulted in attendance points under the Attendance Guidelines. At that time, Defendant started the process for obtaining approval of Plaintiff's termination on the ground of accumulation of excessive attendance [*48] points and job abandonment for failure to return to work as directed. Plaintiff was sent a letter directing her to return to work by June 10, 2014, in order to remain employed, but she did not return to work. As of June 11, 2014, Plaintiff had accumulated twenty-six attendance points, which was in excess of the eight point threshold

---

[123] (Pl's Resp. to SOF, ¶ 9, ECF No. 47.) See footnote 23, *supra*.

[124] (*Id.* at ¶¶ 14 - 16.)

[125] (*Id.* at ¶ 17.)

[126] (*Id.* at ¶ 19.)

[127] (*Id.* at ¶ 24.) Some of these absences were covered by STD. Because she had not worked 1,250 hours in the twelve months preceding her absences, Plaintiff was unable to use FMLA to cover her unscheduled absences.

2016 U.S. Dist. LEXIS 73017, *48

for termination stated in the Attendance Policy.[128] Defendant sent Plaintiff another letter setting her return to work for June 30, 2014; Plaintiff responded by stating that she could not return to work on June 30, 2014.[129] Plaintiff was terminated on July 3, 2014.[130]

As evidence of Defendant's pretext, Plaintiff points to what she terms Defendant's "unreasonable requirements [*49] for her to fully return to work, without schedule flexibility to assist her known depression and current treatment program."[131] According to Plaintiff, she would not have had to take off as often if Defendant had allowed her to have a flexible work schedule.[132] As discussed above, Plaintiff's proposed flexible work schedule was not a reasonable accommodation under the ADA. Plaintiff has cited no authority, and the Court knows of none, for the proposition that the denial of a proposed accommodation that is not reasonable can be evidence of discrimination.

Also as evidence of pretext, Plaintiff contends that similarly situated employees were treated differently than she was.[133] Although Plaintiff cites to the attendance records of some of her co-workers in her response to Defendant's statement of facts,[134] these documents have not been authenticated.

*Rule 803(6) of the Federal Rules of Evidence* permits records of regularly conducted business activity to be admitted into evidence if the records meet certain requirements: (1) they were "created in the course of a regularly conducted business activity," (2) they were "kept [*50] in the regular course of that business," (3)

they resulted from a "regular practice of the business" to create such documents, and (4) they were "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge."[135] The fulfillment of these requirements must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with *Rule 902(11)* or *(12)* or with a statute permitting certification."[136] Plaintiff has not fulfilled these requirements.

While submissions "by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial," that party must "lay[ ] out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists."[137] Consequently, "hearsay evidence not subject to any exception 'must be disregarded,'" and "unauthenticated documents do not suffice" to defeat summary judgment.[138]

When a document is produced in discovery, there may be sufficient circumstantial evidence to support its

---

[128] (*Id.* at ¶ 42.) *See* footnote 47, *supra*, rejecting Plaintiff's argument that Defendant did not calculate her attendance points correctly.

[129] (McArthur Decl., ¶¶ 28 - 30, 33-34, ECF No. 38-1.)

[130] Plaintiff's successful appeals of STD for her absences beginning May 28, 2014, and continuing through her termination date do not overcome the undisputed fact that as of June 30, 2014, she had exceeded the number of attendance points allowed under the Attendance Guidelines. (Payne Decl., ¶¶ 22, 23, ECF No. 38-2.)

[131] (Pl's Resp, at 24, ECF No. 47-1.)

[132] (*Id.*)

[133] (*Id.* at p. 23.)

[134] (Pl's Resp. to SOF, ¶ 10 (referencing Pl's Exbs. H - 0, ECF No. 48), ECF No. 47.)

---

[135] *United States v. Collins, 799 F.3d 554, 582-83 (6th Cir.)*, cert. denied, **136 S. Ct. 601, 193 L. Ed. 2d 480 (2015)**; *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC, 774 F.3d 1065, 1071-72 (6th Cir. 2014)* ("A custodian or otherwise qualified witness must attest that the proffered document meets these conditions."); *Fed. R. Evid. 803(6)*.

[136] *Fed. R. Evid. 803(6)(D).*

[137] *Reed v. Procter & Gamble Mfg. Co., 556 Fed. App'x 421, 427 (6th Cir. 2014)* (quoting *Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009))*; *Fed. R. Civ. P. 56(c)(1)(A)* & *(4)*. *See also Williamson v. Scioto Twp. Trs., 2014 U.S. Dist. LEXIS 124059, 2014 WL 4388266 at *7 (S.D. Ohio Sept. 5, 2014)* (finding that neither of the documents on which the plaintiff relied was authenticated because [*51] he provided no affidavit or deposition testimony from any individual with personal knowledge addressing the existence or requirements of such a policy and declining to consider these documents in opposition to the motion for summary judgment).

[138] *Reed, 556 Fed. App'x at 427* (quoting *Alexander, 576 F.3d at 558*). C.f., *Auto Indus. Supplier Employee Stock Ownership Plan v. Ford Motor Co., 435 Fed. App'x 430, 458 (6th Cir. 2011)* (rejecting the plaintiff's argument that it "would provide more witnesses at trial to present foundational testimony. As the district court pointed out, this statement shows that SNAPP implicitly conceded that it had failed to provide an adequate foundation for the Frazee report.")

2016 U.S. Dist. LEXIS 73017, *51

authenticity.[139] In the present case, it is not clear if the attendance records were produced by Defendant to Plaintiff during discovery, but even if they were and even if circumstantial evidence supports their authenticity, the documents do not establish Plaintiff's contention that similarly situation co-workers were treated differently.

Under this method of establishing pretext, plaintiff must demonstrate that other employees outside of her protected class were not fired, even though they were similarly situated and engaged in substantially identical [*52] conduct to that which the employer contends motivated its decision. Smith [v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000)]. To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ercegovich [v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)]. Although exact correlation is not required, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." Smith, 220 F.3d at 762 (quotation marks omitted).[140]

Although Plaintiff has attempted to explain and interpret the attendance records of her fellow employees,[141] she has provided little or no context for the records, and her speculation as to what the records might mean is not sufficient to show pretext.

As for Plaintiff's claim that she was terminated because of her disability in violation of the ADA, at the prima facie stage, the plaintiff's burden is to show that (1) she is disabled but (2) otherwise qualified for the position, with or [*53] without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) either the position remained open; she was replaced by a non-disabled person; or similarly-

situated non-disabled employees were treated more favorably.[142] In the present case, as explained above, Plaintiff was not qualified for her position because she could not perform an essential function, i.e., attendance and punctuality. Therefore, she has not established a prima facie case of discrimination. However, as with her retaliation claim, even if she has established a prima facie case, Defendant has presented excessive absenteeism and job abandonment as legitimate, non-discriminatory reasons for her termination, and Plaintiff cannot show that the reasons were pretextual.

"When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"[143] The "key inquiry ... is 'whether the employer made a reasonably informed and considered decision before taking' the [*54] complained-of action."[144] Although the employer must point to particularized facts on which it reasonably relied, the Sixth Circuit does "not require that the decisional process used by the employer be optimal or that it left no stone unturned."[145]

Here, Defendant has pointed to particularized facts on which it could reasonably rely to terminate Plaintiff. Even if Plaintiff only meant to discuss her request for a reasonable accommodation and not refuse to return to work on June 30, Defendant reasonably relied on her statement that she could not return to her job when it terminated her. Plaintiff has not pointed to any non-speculative evidence from which a jury could reasonably doubt Defendant's explanation. The facts are undisputed that Plaintiff's job was terminated for her having excessive attendance points in violation of Defendant's Attendance Guidelines and for failure to return to work as directed. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation and discrimination claims.

---

[139] See Gregg v. Ohio Dep't of Youth Servs., 661 F. Supp. 2d 842, 853 (S.D. Ohio 2009).

[140] Gunn v. Senior Servs. of N. Kentucky, 632 Fed. App'x 839, 848 (6th Cir. 2015).

[141] (Pl's Resp. to SOF, ¶ 10, ECF No. 47.)

[142] Whitfield v. Tennessee, 639 F.3d 253, 259 (6th Cir. 2011); Stanciel v. Donahoe, 570 Fed. App'x 578, 581 (6th Cir. 2014).

[143] Tingle v. Arbors at Hilliard, 692 F.3d 523, 531 (6th Cir. 2012) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir. 2009)).

[144] Id. (quoting Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598-99 (6th Cir. 2007)).

[145] Id.; Michael, 496 F.3d at 599.

2016 U.S. Dist. LEXIS 73017, *54

Because Defendant has presented undisputed material facts showing that it is entitled to judgment as a matter of law on all of Plaintiff's claims, Defendant's **[*55]** motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED**.

**/s/ S. Thomas Anderson**

S. THOMAS ANDERSON

UNITED STATES DISTRICT JUDGE

Date: June 6, 2016.

---

**End of Document**