**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GEORGE WASHINGTON UNIVERSITY'S MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dated: February 12, 2018

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/  Nicholas S. McConnell
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

<u>**TABLE OF CONTENTS**</u>

I.  **INTRODUCTION**.................................................................................. 1

II.  **FACTUAL BACKGROUND**................................................................. 3

  A.  Plaintiff's Inability to Perform the Essential Duties of a Program
     Resident...................................................................................4

  B.  Plaintiff's Curative Procedure for the Removal of a Cyst.......................4

  C.  Defendant's Established Procedure for Requesting Accommodations ...............5

  D.  Plaintiff's Failure to Seek a Reasonable Accommodation.......................6

  E.  Plaintiff Never Submitted a Claim for Disability or Request for Accommodation....7

  F.  Plaintiff's Dismissal from the Program Due to Incompetence, Dishonesty, Lack of
     Medical Knowledge, Unprofessionalism, and Risk to Patient Safety...................7

III.  **STANDARD OF REVIEW** ..........................................................................7

IV.  **ARGUMENT**..................................,.........................................................8

  A.  The ADAAA and DCHRA.........................................................................8

  B.  Threshold Elements of ADA Claims.........................................................8

     1.  Plaintiff Was Not a Qualified Individual for the Program......................8

        (a)  Time at Which the Determination Is Made..................9

        (b)  Determination of Which Job Functions Are Essential..................10

     2.  Plaintiff's Health Issues..................................................................11

  C.  Disparate Treatment Claims ...................................................... 13

     1.  Direct Evidence .................................................................14

     2.  McDonnell-Douglas Burden Shifting Framework.........................................14

(a)     Plaintiff Cannot Show a Casual Link between Her Alleged
        Disability and Any Adverse Employment Actions.......................14

(b)     Plaintiff Cannot Rebut Defendant's Legitimate Nondiscriminatory
        Reasons for Terminating Plaintiff..................................................16

(c)     Academic Institutions Are Entitled to Judicial Deference in Their
        Decisions Regarding the Qualifications of Their
        Students......................................................................................20

        (i)     Residency Programs Are Entitled to the Same or More
                Judicial Deference as Other Academic
                Institutions......................................................................21

D.      Failure to Accommodate Claims………………………......................................25

1.      Defendant Did Not Have Notice of Plaintiff's Alleged Disability………26

2.      Plaintiff Could Not Perform Her Essential Job Functions Even with a
        Reasonable
        Accommodation…………………………………………………...…..26

3.      Plaintiff Never Requested an Accommodation, and Defendant Never
        Denied, an
        Accommodation……………………………………………………….32

**V.  CONCLUSION**...........................................................................................................41

## **TABLE OF AUTHORITIES**

## Cases

*Adeyemi v. District of Columbia*, 525 F.3d 1222 (D.C. Cir. 2008) ............................... 18

*Aka v. Washington Hosp. Center*, 156 F.3d 1284 (D.C. Cir. 1998) ............................... 18

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999) ..................................... 20, 21

*Allen v. Pac. Bell*, 348 F.3d 1113 (9th Cir. 2003) ......................................... 33

*Amir v. St. Louis Univ.*, 184 F.3d 1017 (8th Cir. 1999) ................................... 20

*Anderson v. Univ. of Wis.*, 841 F.2d 737 (7th Cir. 1988) ................................. 20

*Angell v. Fairmount Fire Protection Dist.*, 907 F.Supp.2d 1242 (D. Colo. 2012) ...................... 16

*Barth v. Gelb*, 2 F.3d 1180 (D.C. Cir. 1993) .............................................. 25

*Basden v. Prof. Transp., Inc.*, 714 F.3d 1034 (7th Cir. 2013) ........................................ 9

*Bd. of Curators of Missouri v. Horwitz*, 98 S.Ct. 948 (1975) ...................................... 22

*Boitnott v. Corning, Inc.*, No. 7:06-CV-00330, 2010 WL 2465490 (W.D. Va. June 15, 2010) ... 10

*Brohm v. JH Properties, Inc.*, 159 F.3d 517 (6th Cir. 1998) ........................................ 13

*Burke v. Emory Univ.*, 338 S.E.2d 500 (1985) .............................................. 21

*Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994) .............................................. 29

*Chenari v. George Washington University*, 847 F.3d 740 (D.D.C. ................. 17, 19, 21, 26, 33, 34

*Clark Cty. School Dist. v. Breeden*, 532 U.S. 268 (2001) .......................................... 16

*Davis v. George Washington Univ.*, 26 F.Supp.3d 103 (2014) .......... 17, 25, 27, 28, 29, 32, 33, 34

*Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989) ...................................... 22, 33

*E.E.O.C. v. Chevron Phillips*, 570 F.3d 606 (5th Cir. 2009) ....................................... 14

*E.E.O.C. v. Howard Univ.*, 70 F. Supp.3d 140 (D.D.C. 2014) .................................... 10

*Edwards v. EPA*, 456 F. Supp.2d 72 (D.D.C. 2006) ........................... 15, 16, 27, 33, 34

*EEOC v. Yellow Freight Sys., Inc.,* 253 F.3d 943 (7th Cir. 2001) .................................................. 30

*Fields v. Lyng*, 705 F.Supp. 1134 (D. Md. 1988) ......................................................................... 9

*Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180 (D.C. Cir. 1996) ............................................... 24

*Fisher v. Vizioncore, Inc.*, 429 Fed. Appx. 613 (7th Cir. 2011) ........................................... 27, 29

*Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C. Cir. 1999) ............................................. 9, 33, 35

*Giles v. Transit Employees Credit Union*, 32 F.Supp.3d 66 (D.D.C. 2014) ................................. 8

*Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1 (D.D.C. 1996) ......................................................... 17

*Hajjar-Nejad v. George Washington Univ.*, 37 F.Supp.3d 90 (D.D.C. 2014) ...... 10, 22, 23, 24, 36

*Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012).... 13, 20, 30, 31, 32

*Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999) ............................................ 31

*Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (2001) ...................................................................... 8

*Howard v. Steris Corp.*, 886 F.Supp.2d 1279 (M.D. Ala. 2012) ................................................. 13

*Johnson v. W.M.A.T.A.*, 883 F.3d 125 (D.C. Cir. 1989) .............................................................. 19

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009) ..................................................................... 18

*Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F.Supp. 641 (D.D.C. 1997) .................................. 12

*Kallail v. Alliant Energy Corp. Servs., Inc.,* 691 F.3d 925 (8th Cir. 2012) ................................. 10

*Kaltenberger v. Ohio Coll. Of Podiatric Med.,* 162 F.3d 432 (6th Cir. 1998) ........................... 20

*Kaltenberger v. Ohio College  of Podiatric Medicine,* 162 F.3d 432 (6th Cir. 1998)................. 31

*Kraft v. W. Alanson White Psychiatric Found.,* 498 A.2d 1145 (D.C. 1985).............................. 20

*Laurin v. Providence Hosp.*, 150 F.3d 52 (1st Cir. 1998)........................................................... 28

*Law v. U.S.P.S.,* 852 F.2d 1278 (Fed. Cir. 1988).......................................................................... 11

*Little v. FBI*, 1 F.3d 255 (4th Cir. 1993) ..................................................................................... 13

*Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir. 1997).................................................. 13

*McCarter v. West,* 910 F. Supp. 519 (D. Kan. 1995)...................................................... 12

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . 14, 25

*McGregor v. La. State Univ. Bd. of Supervisors,* 3 F.3d 850 (5th Cir. 1993) .............................. 20

*Millington v. Temple Univ. Sch. of Dentistry,* 261 Fed. Appx. 363 (3d Cir. 2008)...................... 20

*Milton v. Weinberger,* 696 F.2d 94 (D.C. Cir. 1982)...................................................... 17

*Minter v. District of Columbia,* 809 F.3d 66 (D.C. Cir. 2015) ..................................... 9, 15, 17, 18

*Mitchell v. Yates,* 402 F.Supp.2d 222 (D.D.C. 2005) .................................................... 11

*Myers v. Hose,* 50 F.3d 278 (4th Cir. 1995) ............................................................. 32

*Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775 (2002)................. 26, 27

*Olsson v. Bd. of Higher Ed.,* 402 N.E.2d 1150 (N.Y. 1980).......................................... 21

*Palmer v. Circuit Court of Cook County, Social Service Dept.,* 905 F.Supp. 499 (N.D. Ill. 1995)

.......................................................................................................... 19

*Pinkerton v. Spellings,* 529 F.3d 513 (5th Cir. 2008) .................................................. 18

*Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79 (2d Cir. 2004) ................................... 20

*Rachid v. Jack in the Box, Inc.,* 376 F.3d 305 (5th Cir. 2004)....................................... 18

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO,* 507 F. Supp.2d 93 (D.D.C. 2007).............. 23

*Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233 (9th Cir. 2012). ...................... 27, 28

*Scarborough v. Natsios,* 190 F. Supp.3d 5 (D.D.C. 2002) ......................................... 35

*Sheller-Paire v. Gray,* 888 F. Supp.2d 34 (D.D.C. 2012) ........................................... 15

*Smith v. Chamber of Commerce,* 645 F. Supp. 604 (D.D.C. 1986)............................... 24

*Smith v. District of Columbia,* 430 F.3d 450 (D.C. Cir. 2005).................................... 15

*Thompson v. District of Columbia,* 2017 WL 4342059 (D.D.C. Sept. 28, 2017)............. 11, 12, 26

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.,* 31 F.3d 209 (4th Cir. 1994) ................................. 13, 30

*Waggoner v. Olin Corp.*, 169 F.3d 481 (7th Cir. 1999)........................................................ 27, 30

*Walker v. Children's National Medical Center*, 236 F.Supp.3d 136 (D.D.C. 2017)................... 18

*Weigert v. Georgetown Univ.,* 120 F.Supp.2d 1 (D.D.C. 2000) ................. 9, 10, 11, 16, 17, 18, 19

*Williamson v. American Nat. Ins. Co.*, 695 F. Supp.2d 431 (S.D. Tex. 2010) ............................ 14

*Woodruff v. LaHood*, 777 F. Supp.3d 33 (D.D.C. 2011) ............................................................. 33

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007) .................................................................... 18

*Wright v. Howard Univ.,* 60 A.3d 749 (D.C. 2013)..................................................................... 21

*Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19 (1st Cir. 1991) ................................................ 20

*Zukle v. Regents of the Univ. of Cal.,* 166 F.3d 1041 (9th Cir. 1999) ........................................ 20

**Statutes**

29 C.F.R. § 1630.2 .......................................................................................................................... 9

Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ... 2, 8, 10, 11, 13, 14, 25

D.C. Family and Medical Leave Act, D.C. Code § 2-1401.01 *et seq.*............................................ 2

D.C. Human Rights Act, D.C. Code § 32-501 *et seq.* ............................................................... 2, 8

Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq.*............................................................. 2

**Secondary Authorities**

EEOC, No. 915.002, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship*

    *Under the Americans with Disabilities Act* (2002), 2002 WL 31994335 ...................... 9, 10, 13

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,                    )
                                         )
             Plaintiff,                  )
                                         )    Civil Action No.: 1:16-cv-01412-CKK
      v.                                 )    Hon. Colleen Kollar-Kotelly
                                         )
GEORGE WASHINGTON UNIVERSITY,            )
                                         )
             Defendant.                  )

**DEFENDANT GEORGE WASHINGTON UNIVERSITY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant George Washington University ("Defendant" or the "University") submits this

Memorandum of Points and Authorities in opposition to the Motion for Partial for Summary

Judgment filed by Plaintiff Stephanie Waggel ("Plaintiff").

## I.      INTRODUCTION

Plaintiff is a former resident in Defendant's Psychiatry Residency Training Program (the

"Program") who was dismissed from the Program because she was not qualified for the position.

Plaintiff's academic performance was subpar. She failed to meet the standards that the

Accreditation Council for Graduate Medical Education ("ACGME") requires of each resident of

the Program. She lacked the medical knowledge necessary to perform the duties of a psychiatry

resident. She treated patients with disrespect. She repeatedly lied to her coworkers.  She failed to

show up for classes. She failed to show up for clinical duties. She lied to her faculty members

and to her coworkers. She failed to obtain a health clearance certification required by the laws of

the District of Columbia. She refused to take responsibility for her shortcomings. She refused to

accept constructive criticism. She refused to participate meaningfully in remediation. She

repeatedly endangered the health and safety of the University's patients. In short, Plaintiff lacked

the minimum qualifications that were required of any resident in order to advance through the Program. There is no accommodation that would have enabled Plaintiff to develop those qualifications. Therefore, Defendant had no choice but to dismiss her from the Program.

Plaintiff's Motion for Partial for Summary Judgment exposes her unwavering refusal to acknowledge reality. Instead, she contends that the University's decision to dismiss her from the Program violates the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq.* (the "FMLA"), the D.C. Human Rights Act, D.C. Code § 32-501 *et seq.* (the "DCHRA"), and the D.C. Family and Medical Leave Act, D.C. Code § 2-1401.01 *et seq.* (the "DCFMLA"). In so doing, Plaintiff conflates her unfitness to practice medicine with alleged acts of discrimination.

Plaintiff now seeks summary judgment on her claims under the ADA and DCHRA. Defendant hereby opposes that motion. It is clear on the record and the law that Plaintiff is not entitled to summary judgment and that the University is entitled to summary judgment on all of Plaintiff's claims on a number of grounds, including among others: (1) Plaintiff never invoked the proper procedures to present a claim of disability to the University or seek an accommodation despite repeated notice of the procedure and even repeated recommendations by University representatives that she pursue those matters with the University's EEO Office; (2) Plaintiff was not qualified for the position of a resident in the University's Psychiatry Residency Training Program; (3) Plaintiff always took the position that she had no extenuating circumstances requiring accommodation and that she in fact fully met and performed all requirements of the training Program, and (4) the evidence is overwhelming that the University had a rational basis for the decision for Plaintiff's dismissal from the Program and that the decision was not motivated by bad faith or ill will unrelated to academic performance.

## II.    FACTUAL BACKGROUND

Plaintiff began her psychiatry residency at the University on July 1, 2014. A full review of her tenure in the Program is set forth in the declarations submitted by the University in support of its motion for summary judgment, particularly those of Dr. Catapano (Def.'s Ex. A), Dr. Emejeru (Def.'s Ex. C), and Dr. Griffith (Def.'s Ex. N). Plaintiff's earliest days in the Program bore all the earmarks of the deficiencies and behaviors that would culminate in the decision for her dismissal. On the third day of her residency training, Plaintiff had to be pulled from her clinical duties because she had failed to submit papers showing she had complied with District of Columbia law requiring a health clearance. Def.'s SOF ¶¶ 95-96.

By the end of the first month, one of the Chief Residents reported major issues with Plaintiff's frequent unprofessional behavior, lack of medical knowledge, failure to recognize severity of threat to patient safety, significant deficits in patient care, and failure to work in a collaborative fashion in a team environment. *Id.* ¶ 98. Over the course of her tenure in the Program, Plaintiff displayed these same deficiencies and behaviors repeatedly. These matters are fully described in the University's motion for summary judgment, supporting memorandum of points and authorities, and statement of undisputed material facts with supporting exhibits, which are incorporated herein by reference.

Those deficiencies and behaviors are further demonstrated in Plaintiff's recently filed statement of allegedly undisputed facts in support of the present motion (Doc. No. 32.2) as noted in the University's reply thereto filed in conjunction with this opposition memorandum. *See, e.g.,* Def. GW's Response to Pl.'s SOF (filed herewith), ¶¶ 5, 23, 24, 34, 35 (a-d), 36, 42-44, 48, 50, 53, 56, 61, 63, 68, 69, 70, 82, 92, and 93.

### A.    Plaintiff's Inability to Perform the Essential Duties of a Program Resident

The record establishes that Plaintiff was not able to perform the essential duties of the residency training program. As noted in the University's motion for summary judgment, Plaintiff was an habitual "no show" offender with respect to clinical duties and didactics courses, was dishonest and disrespectful towards faculty and colleagues, failed two foundational didactics courses, engaged in unsafe patient practice, failed to comply with mandated health clearance requirements, and failed to acknowledge her deficiencies or engage in meaningful remediation. Over her tenure in the Program, it became apparent – and is apparent – that she was not able to perform the essential duties of the residency training program and was not qualified for such a position.

### B.    Plaintiff's Curative Procedure for the Removal of a Cyst

On April 15, 2015, Plaintiff learned that she had a cyst in her kidney that could become cancerous, although her original urologist (Dr. Engle) and her consulting urological surgeon (Dr. Jarrett) also noted that it would not be unreasonable to follow up after a six-month interval with further imaging studies. Def.'s Ex. H (Jarrett Decl) ¶¶ 3-5. Dr. Jarrett did suggest in light of Plaintiff's desire not to take any risk that she proceed to a partial nephrectomy  the  . On July 20, 2015, she underwent a robotic-assisted partial laparoscopic nephrectomy to have the cyst removed.  The cyst was successfully removed in full, and the procedure was deemed curative. Def.s SOF ¶¶ 271, 276. Subsequent to the procedure, Plaintiff was advised that on pathology review, the tissue removed had been cancerous. *Id.* ¶ 276 and Ex. H (Jarrett Decl.) ¶¶ 13-18. She was not aware it was cancerous at any time prior to its removal on July 20, 2015.  Because she did not know the cyst was cancerous prior to the procedure, and because the procedure was curative, Plaintiff did not require any form of "cancer treatment" at any time.  In addition,

follow-up genetic testing was not required by the applicable prevailing guidelines of the American Urological Association but was recommended by Plaintiff's oncologist for completeness and further reassurance to Plaintiff that she was not at genetic risk – a workup that was wholly normal as expected and provided further assurance to Plaintiff as expected. Def.'s SOF ¶¶ 269-272 and Ex. H (Jarrett Decl.) ¶¶ 19, 21. Her statements to the contrary are incorrect.

During the weeks and months following her curative procedure, Plaintiff discussed her health with her colleagues, changing the story of what had happened and her status regarding follow up treatment from one person to the next.  The story she told Dr. Catapano, Dr. Emejuru and Dr. Griffith (Def.'s SOF ¶¶ 264-267) and the information she had freshly received from her attending surgeon (Def's SOF ¶¶ 845-852) cannot be squared with the story she told Dr. Berger, Associate Dean for GME, when he was conducting an interview of Plaintiff (which she surreptitiously recorded) as part of an investigation of charges of unprofessional conduct which included Plaintiff's lies to other faculty members. *See* Def.'s Reply to Pl.s Statement of Facts (filed herewith), ¶ 80 (pp. 66-68). The significant inconsistencies in Plaintiff's stories left her faculty in the dark as to the true state of her health. *Id.* ¶¶ 18, 32, 94.

### C.   Defendant's Established Procedure for Requesting Accommodations

The University had a well established procedure for complying with all requirements of the ADA and DCHA with respect to accommodating individuals with disabilities. *See* Def.'s SOF ¶¶ 59 – 65. The University maintained an office staffed with personnel whose responsibility was to process all matters related to disability claims. *See* Def.'s Ex. P (Fair Decl.), ¶¶ 2-3. The University's policies and procedures regarding such matters were available on its website. *Id.* ¶ 63. The website is easily accessible from the GW Faculty and Staff homepage. *Id.* Faculty and staff were advised of the three ways to request an accommodation. *Id.*

**D.**    **Plaintiff's Failure to Seek a Reasonable Accommodation**

Plaintiff was notified of the University's disability policy and how to proceed under the policy even before she entered the residency training program. The Resident Physician Agreement signed by Plaintiff months before entering the Program (Plaintiff signed the first agreement on April 16, 2014, and she signed the second agreement on May 24, 2015) (Def's SOF ¶ 42 and Ex. #3 [GWU 000625] and Ex. #4 [GWU 000619]), specifically advised Plaintiff that the Resident Manual contained detailed information about the benefits and obligations of Resident Physicians in the Program and also noted that the manual was posted to the GW SMHS GME website. Def.'s SOF ¶ 43.

The University's disability policy posted to its website contained specific instructions on how to proceed under the policy to pursue a claim of disability and seek reasonable accommodation. *Id.* ¶¶ 60-62.

The Resident Agreement further incorporated the University's policies and procedures into the agreement and each resident agrees to abide by the policies and procedures. *Id.* ¶ 44. The Resident Manual set forth specific information and directions on how to request a disability related accommodation. *Id.* ¶ 57.

Finally, Plaintiff was directly advised and even received a recommendation that if she believed she was "a qualified individual with a disability and would like to request a reasonable accommodation (such as medical leave) under the Americans with Disabilities Act (ADA), please contact the Office of Equal Employment Opportunity at (202) 994-9656 or eeo@gwu.edu. ADA leave would provide similar job protections as FMLA *so it is recommended that you apply.*" Def.'s SOF ¶¶ 187-192 and Ex. O (Vanlewen Decl.) ¶¶ 13-17 and Ex. #4 (GWU

003182). The Director of Graduate Medical Education ("GME"), Mary Tucker, sent similar information to Plaintiff. Def.'s SOF ¶ 193.

At other points during her tenure in the Program, Plaintiff was also advised or encouraged to contact the EEO Office. Examples are noted at Def.'s SOF ¶¶ 166-168, 625-626.

### E. Plaintiff Never Submitted a Claim for Disability or Request for Accommodation

Plaintiff never contacted the EEO Office to present a claim of disability or request an accommodation of any kind. Def.'s Ex. P (Fair Decl.) ¶¶ 12-13. The only individuals Plaintiff ever claimed to discuss an accommodation with were individuals who under the University's policies and procedures did not have authority to process requests of that nature. *See* Def. GW's Response to Pl.'s SOF (filed herewith), Response to ¶ 28.

### F. Plaintiff's Dismissal from the Program Due to Incompetence, Dishonesty, Lack of Medical Knowledge, Unprofessionalism, and Risk to Patient Safety

The record establishes multiple instances of unprofessional behavior, dishonesty, substandard medical knowledge, unsafe practice endangering patients, failure of basic didactics courses, disrespectful treatment of patients and colleagues, and total lack of acknowledgment of her deficiencies or ability or willingness to remediate as documented in the four Letters of Deficiency Plaintiff received within a span of 5 – 6 months, the Notice of Concerns of Unprofessional Misconduct, the minutes of the April 8, 2016 meeting of the CCC resulting in the unanimous recommendation for dismissal from the Program, and the independent reviews conducted by Dr. Cioletti and Dr. Lucas all as set forth in the University's motion for summary judgment and supporting documents. Plaintiff's dismissal was clearly for academic reasons.

## III.   STANDARD OF REVIEW

Defendant agrees with Plaintiff's statement of the standard of review.

## IV.     ARGUMENT

### A.     The ADAAA and DCHRA

The Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008 (the "ADA") makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . ." 42 U.S.C. § 12112(a). Claims arising under the District of Columbia Human Rights Act ("DCHRA") are analyzed in the same manner as ADA claims. *See Giles v. Transit Employees Credit Union*, 32 F.Supp.3d 66, 70 (D.D.C. 2014). Thus, to prevail on an ADA or DCHRA claim, a plaintiff must prove that: (1) she is a qualified individual; (2) she has a disability; and (3) she suffered an adverse employment action because of her disability. See id.; 42 U.S.C. § 12112(a); D.C. Code § 2-1402.11(a)(1).

### B.     Threshold Elements of ADA Claims

As a threshold matter, a plaintiff must demonstrate she is a qualified individual with a disability. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (2001) (citing 42 U.S.C. § 12112(a)). Once a plaintiff has shown that she is a qualified individual with a disability, she can show discrimination in one of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate. See id.

### 1.     Plaintiff Was Not a Qualified Individual for the Program

For purposes of the ADA, the term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "[A] person with a disability who is unable to perform the essential functions, with or without reasonable accommodation, is not a 'qualified' individual with a disability within the meaning of the ADA." EEOC, No.

915.002, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (2002), *available at* 2002 WL 31994335, at *3. Put another way, the law "protect[s] only those who can do their job in spite of their handicap, not those who could do it but for their handicap.'" *Weigert v. Georgetown Univ.,* 120 F.Supp.2d 1, 14 (D.D.C. 2000) (quoting *Fields v. Lyng*, 705 F.Supp. 1134, 1136 (D. Md. 1988)).

### (a)      Time at Which the Determination Is Made

"The determination of whether an individual with a disability is qualified . . . should be based on the capabilities of the individual . . . at the time of the employment decision." 29 C.F.R. § 1630.2(m) app. (EEOC Interp. Guidance). Accordingly, a date at which a plaintiff is "wholly unable to work either with or without an accommodation . . . [falls] beyond the scope of the ADA's protection." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). For a failure to accommodate claim, the plaintiff must establish her ability to perform the essential functions of her job, with or without reasonable accommodation "at the time the employer denied her request for accommodation." *Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) (citing *Basden v. Prof. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013)) (holding that a plaintiff's "ability to come to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue").

While employers must provide reasonable accommodations to qualified individuals with disabilities, the obligation ceases if and when the person ceases to be a qualified individual. The enforcement guidelines issued by the EEOC contain an illustrative example. More specifically:

> An individual who has paraplegia applies for a secretarial position. Because the office has two steps at the entrance, the employer arranges for the applicant to take a typing test, a requirement of the application process, at a different location. The applicant fails the test. The employer does not have to provide any further reasonable

accommodations for this individual because she is no longer qualified to continue with the application process.

EEOC, No. 915.002, *supra* at *12.

### (b)     Determination of Which Job Functions Are Essential

"Courts defer 'to the employer's judgment as to what functions of a job are essential.'" Id. (quoting 42 U.S.C. § 12111(8)). Employers are not required to lower their standards of service "that are applied uniformly to employees with and without disabilities."  *See* EEOC, No. 915.002 at *3.

In *E.E.O.C. v. Howard Univ.,* 70 F. Supp.3d 140 (D.D.C. 2014), the court found that a general issue of material fact existed as to whether an applicant for a hospital security position who suffered from renal disease necessitating dialysis three times per week had the ability to serve on rotating shifts, which was an essential function of the job. *Id.* at 145. Courts have found rotating shifts to be essential functions of a job where, for example, the employer contends it enabled the employer to handle emergencies more effectively and enhanced the non-work life of its employees or where it allowed for 24-hour coverage and created consistent work teams.  Id. at 146 (citing *Kallail v. Alliant Energy Corp. Servs., Inc.,* 691 F.3d 925, 931 (8th Cir. 2012) and *Boitnott v. Corning, Inc.,* No. 7:06-CV-00330, 2010 WL 2465490, at *9 (W.D. Va. June 15, 2010)).

"Numerous courts have held that technical skills and experience are not the only essential requirements of a job and that stability and the ability to interact with co-workers and supervisors can constitute an essential function." *Weigert v. Georgetown Univ.*, *supra,*  120 F. Supp.2d at 14. This Court has concluded that "*particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions." *Hajjar-Nejad v. George Washington Univ.*, 37 F.Supp.3d 90, 116-118 (D.D.C. 2014) (original emphasis).

The *Weigert* court found that plaintiff's ability to interact with her coworkers and supervisors in a non-disruptive and non-abusive fashion was an essential element of her job. *Id.* 120 F. Supp.2d at 15. Because there was no accommodation the university or its employees could have instituted to control plaintiff's consumption of medication that would have permitted her to perform those essential functions, the court found that the plaintiff had failed to establish that she was a "qualified individual with a disability" within the meaning of the ADA. See id.

An employer "is inherently entitled to require an employee to be present during scheduled work times, and, unless an [employer] is notified in advance, an employee's absence is disruptive to the [employer's] efficient operation." *Law v. U.S.P.S.,* 852 F.2d 1278, 1279-80 (Fed. Cir. 1988).

### 2.      **Plaintiff's Health Issues**

"The law is clear that a plaintiff claiming discrimination under the ADA 'must adequately allege facts sufficient to support the claim that [she] has a 'disability' within the meaning of the ADA, or else be subject to dismissal.'" *Thompson v. District of Columbia*, 2017 WL 4342059, *3 (D.D.C. Sept. 28, 2017) (quoting *Mitchell v. Yates*, 402 F.Supp.2d 222, 227-29 (D.D.C. 2005)). The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).[1]

---

[1] Defendant acknowledges that the definition of the term "disability" was broadened in 2008 such that persons who are "regarded as" having a disability are considered disabled under the ADA. The record in this case, however, shows that Plaintiff was never regarded as having a disability Plaintiff's claim to the contrary notwithstanding. The evidence shows uniformly that the individuals with whom Plaintiff was interacting all deferred any judgment in the matter to the EEO Office and recommended that Plaintiff contact that office is she believed she were qualified. Further, as Plaintiff herself notes, the individuals in the Program were "agnostic" on Plaintiff's health status. Given Plaintiff's inconsistent stories to her coworkers concerning her

In determining whether a person has a disability for purposes of the ADA, courts first examine whether the person has an impairment that substantially limits a major life activity other than working. *See Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F.Supp. 641, 657 (D.D.C. 1997). An employee cannot show that her impairment substantially limits the major life activity of working where, by her own admission, she is able to perform her employment duties. *McCarter v. West,* 910 F. Supp. 519 (D. Kan. 1995). In this case, Plaintiff alleges in her Complaint that at all times "with (or without) reasonable accommodations Plaintiff could continue to perform the essential functions of her position." Cplt (Doc 2) ¶ 39.

The employee in *McCarter* claimed she was able to perform her essential employment duties but needed more notice before being required to make presentations at staff meetings. *Id.* The court found that her need for more advanced notice was not a significant limitation on her ability to work and thus was not a disability. *Id. See also Thompson v. District of Columbia,* 2017 WL 4342059, at *3 (D.D.C. Sept. 28, 2017). In finding that plaintiff failed to make a *prima facie* case of discrimination under the ADA, the *Thompson* court emphasized plaintiff's failure to identify whether or how her alleged disability impacted her ability to perform her job. *See Thompson*, 2017 WL at *3. To the contrary, the plaintiff had alleged that she *could* perform the essential functions of her employment position with or without reasonable accommodations. *Id.* Thus, plaintiff failed to satisfy the "disabled" element required for succeeded on a claim under the ADA. *Id.* In this case, not only alleges that she could fulfill all the duties of the employment, she insisted throughout her time in the Program that she *had* fulfilled those duties and refused to recognize or accept that she had failed to do so and needed remediation.

---

health status, they did not know whether she had an ongoing medical or other conditions affecting her ability to perform appropriately.

A number of courts have held that "misconduct—even misconduct related to a disability—is not itself a disability." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (citing *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir. 1997)).  *See also Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 214-15 (4th Cir. 1994) (no discrimination when an employee was terminated because of disability-related absences); *Little v. FBI*, 1 F.3d 255, 259 (4th Cir. 1993) (an employee could be terminated for intoxication even though it was related to alcoholism, a disability); *Brohm v. JH Properties, Inc.*, 159 F.3d 517, 521 (6th Cir. 1998) (no discrimination where an employee was terminated for sleeping on the job even though it was caused by chronic sleep deprivation caused by  sleep apnea, which was a disability); *Howard v. Steris Corp*., 886 F.Supp.2d 1279, 1295 (M.D. Ala. 2012) ("even if hindsight later reveals the employee's disability caused the misconduct, the employer has no duty to go back and retroactively excuse the misconduct") (citing EEOC, No. 915.002, *supra*, at *25 (an employer need not "withhold discipline or termination of an employee who, because of a disability, violated a conduct rule," as a "reasonable accommodation is always prospective.")).

Here, the record is replete with misconduct more than sufficient to justify Plaintiff's dismissal from the Program.

### C.   Disparate Treatment Claims

Disparate treatment claims arise from 42 U.S.C. § 12112(b)(1), which prohibits employers from "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." Plaintiffs can "establish a claim of discrimination under the ADA by presenting direct evidence or by using the indirect method

of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Williamson v. American Nat. Ins. Co*., 695 F. Supp.2d 431, 445 (S.D. Tex. 2010).

### 1.    Direct Evidence

Direct evidence proves intentional discrimination without the need for any inferences or presumptions. *See Williamson v. Am. Nat. Ins. Co.*, 695 F. Supp.2d 431, 445 (S.D. Tex. 2010). A statement showing a discriminatory motive on its face would be direct evidence of discrimination. *Id.* If an employee has direct evidence of discrimination, she can bypass the *McDonnell Douglas* burden-shifting framework. *Id.* Because Plaintiff did not present any direct evidence of discrimination, the *McDonnell Douglas* burden shifting framework.

### 2.    McDonnell-Douglas Burden Shifting Framework

Under the *McDonnell Douglas* framework applied to circumstantial evidence cases, a plaintiff must first make a prima facie case of an ADA violation by establishing that: (1) he has a disability; (2) he is qualified for his position; (3) he suffered an adverse employment action because of his disability or the perception of his disability; and (4) he was replaced or treated less favorably than non-disabled employees. *See Williamson*, 695 F. Supp.2d at 447. If the plaintiff establishes each of the foregoing elements, "[t]he burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action." Id. (citing *E.E.O.C. v. Chevron Phillips*, 570 F.3d 606, 615 (5th Cir. 2009)).

#### (a)    Plaintiff Cannot Show a Causal Link between Her Alleged Disability and Any Adverse Employment Actions

The ADA prohibits employers from retaliating against an employee for seeking an accommodation for her disability. *See* 42 U.S.C. § 12203(b). "To establish a retaliation claim, [the plaintiff] must show, inter alia, that there 'existed a causal link' between her termination and

her request for an accommodation." *Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) (citing *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005)).

In *Minter*, plaintiff claimed she had been terminated because she requested an accommodation. Her employer argued that she was terminated because she had effectively abandoned her job by failing to report to work for a significant period of time and failing to provide documentation to support her absence despite repeated requests to do so. *Id.* The court concluded that because the ability to appear for work was an essential function of plaintiff's job, her employer's explanation for terminating her was legitimate, "and no reasonable jury could conclude otherwise." *Id.* at 71.

In *Sheller-Paire v. Gray*, 888 F. Supp.2d 34 (D.D.C. 2012), the plaintiff claimed that he was retaliated against because of his race and perceived disability. *Id.* at 36. However, "the plaintiff allege[d] no fact from which a reasonable person could infer that his status as an African-American or his alleged disability caused him to suffer an adverse employment action." *Id.* at 41. Therefore, the court found that plaintiff had failed to state a claim under the ADA, because he "never alleges that the adverse employment actions, his placement on leave, were taken *because* of his race or disability." *Id.* (emphasis in original).

To succeed on a claim for unlawful discrimination, a plaintiff must prove that there is a causal connection between her disability and the adverse employment action. *See Edwards v. EPA*, 456 F. Supp.2d 72, 87 (D.D.C. 2006). In making that determination, courts will consider temporal proximity between the date the employer became aware of the disability and the date of the alleged discrimination. *Id.* Finding that the plaintiff had failed to point to any such causal connection, the *Edwards* court emphasized the lack of "temporal proximity that aggrieved employees . . . often cite as evidence of causation." *Id.* In *Edwards*, plaintiff was removed from

his post over a year after his protected conduct. *Id.* The court opined that "[s]uch a substantial passage of time between protected conduct and the allegedly retaliatory acts does not demonstrate a causal connection under controlling law." *Id.* (citing *Clark Cty. School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001)) (citing with approval cases holding that a three or four-month delay between the protected activity and the adverse action did not suffice to show a causal connection).  In another case, the court found that a five-month lapse between a plaintiff's cancer diagnosis and his termination was "at best . . . weak evidence of temporal proximity." *Angell v. Fairmount Fire Protection Dist.*, 907 F.Supp.2d 1242, 1252-53 (D. Colo. 2012) (explaining that "the passage of five months between Plaintiff's cancer diagnosis and his termination is too attenuated—without more—for Plaintiff to establish that there was a causal connection.").

In this case, there is no evidence of a causal connection between Plaintiff's alleged disability and the grounds leading to her dismissal. Her dishonesty and disrespect directed to faculty, colleagues, and patients were not the product of a disability or the University's alleged response to the disability. The same is true of the didactics courses Plaintiff failed, the multiple clinical and didactics "no shows," Plaintiff's sub-standard medical knowledge and unsafe practice, and refusal to remediate – although there is no remediation for dishonesty.

### (b)   Plaintiff   Cannot   Rebut   Defendant's   Legitimate, Nondiscriminatory   Reasons for Terminating Plaintiff

Employers can terminate an employee because of egregious misconduct, irrespective of whether the employee is disabled. *Weigert v. Georgetown Univ.*, *supra*, 120 F. Supp.2d at 20. Poor performance is a legitimate, nondiscriminatory justification for terminating a disabled employee. *Id.* "Filing a Title VII action . . . is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or

16

insubordination." *Davis v. George Washington Univ.*, 26 F.Supp.3d 103, 119 (2014) (hereinafter, "*Davis*") (quoting *Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1, 9 (D.D.C. 1996)) (internal quotations omitted).  In *Weigert*, "given the extensive documentation of [plaintiff's] problematic behavior over a prolonged period, the court rule[d] that the defendant has presented a legitimate nondiscriminatory reason for its termination of the plaintiff."  120 F. Supp.2d at 21.

Even if the court believes that the employer made a bad decision in disciplining or terminating its employee, it "may not second-guess that decision absent demonstrably discriminatory motive." *Davis*, 26 F.Supp.3d at 119 (citing *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  In *Chenari v. George Washington University*, 847 F.3d 740 (D.D.C.),[2] a medical student at GW, claiming to have a disability in the form of ADHD, became the subject of disciplinary proceedings resulting in dismissal from medical school for cheating on an examination. 847 F.3d 740 At 745-46 (2017).  There, the plaintiff argued that GW acted in bad faith by dismissing him rather than accommodating his ADHD. *Id.* at 746.  The plaintiff pointed to no evidence that GW or any individual involved in the disciplinary process acted out of bad faith or ill will and the court found  no discrimination on the part of the university.

"Where, as here, 'an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action,' the remaining question is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Minter v. District of Columbia*, 809 F.3d 66, 71 (quoting *Adeyemi v. District*

---

[2] It is telling that Plaintiff fails to cite a single case from this jurisdiction's rich jurisprudence in the field of alleged employment discrimination in the context of academic decision-making. The cases are discussed herein, are directly relevant, and lead to the conclusion that Plaintiff's claims should be dismissed on summary judgment.

*of Columbia,* 525 F.3d 1222, 1226 (D.C. Cir. 2008)).  *See also Rachid v. Jack in the Box, Inc.,*
376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008)).

Even if there is some inconsistency in the employer's proffered rationales, the plaintiff
"would still need to prove that the 'actual reason' for her termination was retaliatory." *Minter,*
809 F.3d at 71.  Instead, plaintiff simply relied on the temporal proximity between her request
for an accommodation and her termination. *Id.* Once the employer asserts a legitimate,
nondiscriminatory reason for having terminated the employee, "the court considers 'whether the
plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted
non-discriminatory reason was not the actual reason and that the employer intentionally
discriminated against the plaintiff on a prohibited basis.'" *Walker v. Children's National Medical
Center*, 236 F.Supp.3d 136, 144 (D.D.C. 2017) (quoting *Adeyemi v. District of Columbia*, 525
F.3d 1222, 1226 (D.C. Cir. 2008)).  *See also Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir.
2007); *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

"The focus of the proceedings on summary judgment is 'whether a jury could infer
discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the
plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any
further evidence that may be available to the plaintiff (such as independent evidence of
discriminatory statements or attitudes on the part of the employer) or any contrary evidence that
may be available to the employer (such as evidence of a strong track record in equal opportunity
employment).'" *Weigert*, 120 F.Supp.2d at 22 (quoting *Aka v. Washington Hosp. Center*, 156
F.3d 1284, 1289 (D.C. Cir. 1998)).

Here, the well-documented record, including the University's statement of facts and
supporting documents, establishes that no reasonable jury could infer discrimination. Plaintiff

claims essentially that the University made it difficult for her to attend medical appointments and keep up with her ongoing health care needs (although the declarations of Dr. Jarrett and Dr. Siegel establish that the follow up care was *de minimus* – an annual CT abdominal imaging study and chest x-ray for a period of three years). But, again, any difficulty Plaintiff may have had attending medical appointments had nothing to do with the multiple grounds leading to the decision for her dismissal.

"The plaintiff, who has the ultimate burden of persuasion, may not offer her own speculations and allegations to refute an employer's legitimate, non-discriminatory reasons for its decisions." *Id.* "Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Palmer v. Circuit Court of Cook County, Social Service Dept.*, 905 F.Supp. 499, 504 (N.D. Ill. 1995).   Accordingly, "a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits." *Id.*

Further, in deciding a motion for summary judgment, courts may "lawfully put aside testimony that is so undermined as to be incredible." *Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017) (internal citations omitted).  "That scenario is 'most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury.'" *Id.* (quoting *Johnson v. W.M.A.T.A.*, 883 F.3d 125, 128 (D.C. Cir. 1989)).

In this case, there are many instances in which Plaintiff makes broad conclusory assertions of difficulty attending medical appointments and receiving follow up care without

offering any corroborating evidence. *See, e.g.,* Def. GW's Response to Pl.'s SOF (filed herewith), ¶¶ 23, 24, 33, 37, and 38.

**(c)     Academic Institutions Are Entitled to Judicial Deference in Their Decisions Regarding the Qualifications of Their Students**

District of Columbia courts recognize that "a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference." *Alden v. Georgetown Univ.,* 734 A.2d 1103, 1108 (D.C. 1999) (citing *Kraft v. W. Alanson White Psychiatric Found.,* 498 A.2d 1145, 1149 (D.C. 1985)). Courts in other jurisdictions have overwhelmingly agreed.  *See, e.g., Halpern v. Wake Forest Univ. Health Sciences,* 669 F.3d 454 (4th Cir. 2012); *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 88 (2d Cir. 2004); *Amir v. St. Louis Univ.,* 184 F.3d 1017, 1028 (8th Cir. 1999); *Zukle v. Regents of the Univ. of Cal.,* 166 F.3d 1041, 1047–48 (9th Cir. 1999); *Kaltenberger v. Ohio Coll. Of Podiatric Med.,* 162 F.3d 432, 436 (6th Cir. 1998); *McGregor v. La. State Univ. Bd. of Supervisors,* 3 F.3d 850, 859 (5th Cir. 1993); *Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19, 25 (1st Cir. 1991) (en banc); *Anderson v. Univ. of Wis.,* 841 F.2d 737, 741 (7th Cir. 1988); *Millington v. Temple Univ. Sch. of Dentistry,* 261 Fed. Appx. 363, 367 (3d Cir. 2008).  In cases involving academic dismissal, the institution "will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Id.* at 1109.

The judiciary's reluctance to intervene is based upon sound considerations of public policy.  *See id.*  That is, "to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, 'it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional

20

educators who monitor the progress of their students *on a regular basis*.'" *Id.* (quoting *Olsson v. Bd. of Higher Ed.*, 402 N.E.2d 1150, 1153 (N.Y. 1980)) (emphasis added).[3] After all, "a diploma publicly signals a school's confidence in a student's knowledge and skills . . . ." *Chenari v. George Washington Univ., supra,* at 745. Thus, "[c]ourts must not 'substitut[e] their judgment improperly for the academic judgment of the school.'" *Id.* (quoting *Wright v. Howard Univ.,* 60 A.3d 749, 754-55 (D.C. 2013)).

"This rule of judicial nonintervention is 'particularly appropriate in the health care field' where the students who receive degrees will provide care to the public." *Alden,* 734 A.2d at 1109 (quoting *Burke v. Emory Univ.*, 338 S.E.2d 500, 501 (1985)).  Likewise, "courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine." *Id.* at 1110 (internal quotations omitted).

### (i) Residency Programs Are Entitled to the Same or More Judicial Deference as Other Academic Institutions

The different analysis for academic institutions also extends to medical residency training programs:

> The residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. *It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program.* The certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in

---

[3] Plaintiff has submitted the affidavit of a Dr. Spitz as an ostensible expert witness. Dr. Spitz apparently reviewed documents provided to her (presumably by Plaintiff's counsel) regarding Plaintiff's tenure in the Program and now offers opinions concerning the GW University faculty members' decision-making process and their evaluation of Plaintiff's conduct, behavior, aptitude, and remediability. It seems clear that Dr. Spitz does not begin to approach the status envisioned by the courts as the reason for deference to "the sound judgment of the professional educators who monitor the progress of their students *on a regular basis*." Her opinions ought carry no weight whatsoever.

> specified areas. The fact that the contract stated that an academic program would be provided and that [Plaintiff] agreed to satisfy the requirements of the program states nothing more than any other student-university enrollment agreement. The fact that the contract stated that the [residency] instruction was part of [Plaintiff's] compensation does not alter the [residency] program's academic nature.

*Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989) (emphasis added).

"Successful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review." *Id.* (citing *Bd. of Curators of Missouri v. Horwitz*, 98 S.Ct. 948, 954 (1975)). The fact that a resident receives a stipend for her clinical training in addition to the opportunity to successfully complete the residency program does not alter the fact that the resident was participating in an academic program in order to receive academic certification. *Id.*

The case whose facts are most analogous to the instant case is *Hajjar-Nejad v. George Washington Univ.*, 37 F.Supp.3d 90 (2014) (hereinafter, "*Hajjar-Nejad*"). *Hajjar-Nejad* involved a former GW medical student who was a Muslim of Iranian nationality. *Id.* at 97. Plaintiff's first rotation as a third-year medical student in the honors program was internal medicine, and he received a poor evaluation. *Id.* at 98. His evaluation identified various performance issues, including an average knowledge base, inconsistent attendance on rounds, and resistance to constructive feedback, as well as positive aspects of his performance. *Id.*

Plaintiff's second rotation was surgery. *Id.* at 100. The director of the rotation e-mailed the head of the honors program to express concerns about plaintiff's performance, noting that he lacked insight into his own deficiencies. *Id.* Plaintiff's third rotation was obstetrics and gynecology, where he received another negative evaluation. *Id.* at 102. More specifically, the head of the rotation concluded that plaintiff was intelligent and ambitious but that she had "very

serious concerns regarding his very unprofessional behavior," noting that he "openly lied to us on more than one occasion and he refused to pull his weight on patient care." *Id.* The school convened a professional comportment subcommittee to investigate his unprofessional behavior. *Id.* at 104-05. The subcommittee recommended that plaintiff be dismissed from the medical school, which he was. *Id.* at 108-09.

In the resulting lawsuit, GW stated that plaintiff was dismissed because his unprofessional conduct rendered him unfit to practice medicine. *Id.* at 118. In an effort to show that GW's asserted non-discriminatory reason was pretext for discrimination, plaintiff alleged, among other things, that the dean had director a professor to give plaintiff a failing grade, that GW had generated false evaluations for him, that the dean directed him to discontinue his medical research, that the dean advised plaintiff he would not be permitted to transfer to another medical school, that the dean removed plaintiff from thee honors program, and that GW included false allegations in his performance evaluations. *Id.* at 127.

GW explained that plaintiff's negative evaluations were the result of his poor performance and not because of any discriminatory animus. *Id.* at 131-32. Plaintiff alleged that the deficiencies noted in his various evaluations were pretext concealing a discriminatory motive. *Id.* at 132. In support thereof, plaintiff pointed to the fact that he received high marks on other clinical components of his education and high scores on standardized tests measuring clinical aptitude. *Id.* The court concluded that "the mere fact that Plaintiff performed well in other rotations or in other assessments of his clinical aptitude does not suggest that the evaluations at issue were false, much less pretext for discrimination." *Id.* (citing *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp.2d 93, 108 (D.D.C. 2007) ("It is nonsensical to suppose that a plaintiff should be able to demonstrate that a stated reason for its adverse action is

pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance.")) (original emphasis).  The fact that plaintiff's performance was not universally problematic, and that his conduct did not raise concerns with every physician he worked with at all times, does not show that his overwhelmingly negative evaluations were false. *Id.*

Further in *Hajjar-Nejad,* plaintiff claimed to no avail that his negative evaluations were the result of reliance on second-hand reports of his performance. *Id.* at 133. Even if that is the case, "supervisors are entitled to rely on the apparently truthful reports of those working under them." *Id.* (citing *Smith v. Chamber of Commerce*, 645 F. Supp. 604, 608 (D.D.C. 1986)). Although plaintiff also disputed his alleged clinical deficiencies, the issue is not the accuracy of the evaluations but rather whether the dean reasonably believed that such clinical deficiencies existed. *Id.* at 136 (citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).  In light of the foregoing, the court dismissed plaintiff's claims with prejudice. *Id.* at 146.

This case directly involves academic-decision making in a medical specialty training program. The record shows that the faculty struggled for months at great length to make decisions concerning the appropriate academic response to circumstances created by Plaintiff's behavior and conduct. The emails, memos, and minutes of meetings all show a protracted and complicated decision-making process subject to multiple layers of internal review, including plenary review by independent faculty members from entirely different medical disciplines. As in *Hajjar-Nejad*, Plaintiff has a discriminatorily-tinged explanation of virtually every encounter with multiple individuals in diverse settings. On the record, however, it is clear that the members of the CCC and Dr. Catapano as Program Director had more than sufficient information on

which the could reasonably believe the matters set forth as a basis for the CCC's recommendation and Dr. Catapano's decision for dismissal.

### D.   **FAILURE TO ACCOMMODATE CLAIMS**

Failure to accommodate claims arise from 42 U.S.C. § 12112(b)(5)(A), which prohibits employers from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

"To establish a failure to accommodate claim under the ADA, a plaintiff must proffer evidence from which a reasonable fact-finder could find that (1) he had a qualified disability within the meaning of the statute, (2) his employer had notice of the disability, (3) with reasonable accommodation, he could perform the essential functions of the position, and (4) he requested an accommodation but the employer denied the request." *Davis*, 26 F.Supp.3d 103, 113 (2014).

In the D.C. Circuit, claims for failure to accommodate are not subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. *See Davis*, 26 F.Supp.3d at 114.   Instead, such claims are tested through the application of traditional burdens of proof. *Id.* (citing *Barth v. Gelb*, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993)).

As set forth in Section V(B)(1) – (2) above, Plaintiff is not a qualified individual with a disability. Accordingly, she cannot prevail on a claim for failure to accommodate. Even if the Court were to find that she has satisfied those elements, however, her claim still fails because Plaintiff cannot satisfy the third or fourth element of such a claim.

### 1.    Defendant Did Not Have Notice of Plaintiff's Alleged Disability

"A person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination." *Thompson v. District of Columbia*, 2017 WL 4342059, at *3 (D.D.C. Sept. 28, 2017). The rationale behind this policy is that employers cannot accommodate disabilities of which they are unaware. *Id.* Nor should they "be expected to recognize a physical impairment based solely on an employee's 'say-so.'" *Id.* (internal citations omitted). Here, although repeatedly informed of the University's EEO disability accommodations policy and procedures even before entering the Program, followed by repeated reminders thereafter and even recommendations to contact the EEO Office, Plaintiff never did so. The University was not obligated to do anything further and is entitled to judgment on this claim. *Chenari*, *supra*, 847 F.3d at 749.

### 2.    Plaintiff Could Not Perform Her Essential Job Functions Even with a Reasonable Accommodation

Plaintiff cites *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775 (2002), for the proposition that an employer bears the burden to prove that reasonable accommodation would have created an undue hardship.  Plaintiff omits to mention, however, that the initial burden "is on the plaintiffs to show that the accommodation it seeks is reasonable on its face." *Oconomowoc*, 300 F.3d at 783.  It is only after the plaintiffs have made that prima facie showing that the defendants must demonstrate unreasonableness and undue hardship. *Id.* That is, the employer's burden to show unreasonableness or undue hardship does not come into play unless and until the plaintiff makes a *prima facie* showing that the accommodation she is seeking is reasonable. *Id.*  Further, Plaintiff fails to mention the court's statement that the burden is on the plaintiff as it is the plaintiff who is in the best position to show what is necessary to

accommodate her alleged disability, and, once that has been shown, the defendant is in the best position to show what is reasonable or unreasonable within the context.  *See Oconomowoc*, 300 F.3d at 783 n. 5.

Claims that a former employer did not engage in the interactive process to identify a potential reasonable accommodation will be rejected where the plaintiff has failed to meet her burden of identifying a reasonable accommodation that, had there been an interactive process, she might have obtained.  *See Fisher v. Vizioncore, Inc.*, 429 Fed. Appx. 613, 617 (7th Cir. 2011).  *See also Edwards v. EPA*, 456 F.Supp.2d 72 (D.D.C. 2006) (finding that an employee failed to carry his burden of proving that a proposed accommodation of allowing him to bring his dog to work was reasonable because he did not present any objective evidence that doing so would have ameliorated his stress and enable him to better perform the duties of his job).

It is a "rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual." *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999). In fact, "a majority of circuits have endorsed the proposition that in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012).   "In establishing their attendance policies, employers balance the 'the realities of illness, family matters, and other unplanned emergencies faced by [their] employees' against the needs for the employees' services." *Davis,* 26 F. Supp.3d 103, 117 (D.D.C. 2014) (quoting *Samper*, 675 F.3d at 1240)).

For a specialized healthcare worker at a hospital, "regular, predictable presence to perform specialized, life-saving work in a hospital context was even *more* essential" than in other positions for which courts had found regular, predictable presence to be an essential part of the job.  *Id.* at 1238.  "Medical needs and emergencies—many potentially life-threatening—do

not mind the clock, let alone staff-nurse convenience . . . .  The 24-hour hospital unit setting thus affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business." *Laurin v. Providence Hosp.*, 150 F.3d 52, 59-60 (1st Cir. 1998).

In reaching that conclusion, the court explained that the nurse's "at-risk patient population cries out for constant vigilance, team coordination and continuity." *Id.* Her job "unite[d] the trinity of requirements that make regular on-site presences necessary for regular performance: teamwork, face-to-face interaction with patients and their families, and working with medical equipment." *Id.* That precise trinity of requirements is equally applicable to the instant case.

In addition, the *Samper* court looked favorably on the fact that instead of relying on the plaintiff's own admissions or "the logical presumption that it is essential for a nurse to be present regularly and predictably to do her job," the employer-hospital offered actual evidence to meet its burden of production. *Id.* For instance, the employer pointed to the fact that the written job description requires strict adherence to the attendance policy and identifies both attendance and punctuality as essential function. *Id.* In addition, as set forth in the declaration of a former supervisor of the plaintiff, NICU nurses "must have specialized training, and it is very difficult to find replacements, especially for unscheduled absences." *Id.* In finding that the employer-hospital had met its burden of production, the court emphasized that "[u]nderstaffing compromises patient care." *Id.*

Courts in this jurisdiction have repeatedly held that, where a job must be performed on site, requests for an open ended, flexible work schedule that would preclude the plaintiff from performing her duties is, by nature, an unreasonable accommodation.  In *Davis*, plaintiff asked to

call in when he felt ill and make up time later in the week.  *See* 26 F. Supp.3d 103, 114 (2014). The court found that the requested accommodation was too open-ended in that the employee could not predict when, or for how long, he would need to stay home. *Id.* Together with the fact that the employee was required to be on site to perform his duties, this made the requested accommodation unreasonable as a matter of law. *Id.* As a result, the University's refusal to provide such an accommodation was not a violation of the ADA. *Id.*

In *Carr v. Reno*, the plaintiff requested a flexible arrival time because her disability caused periodic dizziness that made it difficult for her to get to work on time.  23 F.3d 525, 527, 529, 531 (D.C. Cir. 1994).  The employer denied the request because of a daily deadline that the employer wouldn't be able to make if plaintiff didn't arrive by 8 each day. *Id.* at 530. The court found in favor of the employer, reasoning that "to require an employer to accept an open-ended 'work when able- schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions and imperil the effectiveness of the employer's public enterprise." *Id.* at 531. In that case, the daily deadline was the critical element of the plaintiff's position that rendered her proposed accommodation of a flexible work schedule unfeasible.  *See Davis*, 26 F. Supp.3d 103, 116 (D.D.C. 2014) (citing *Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994); *see also Breen v. Dep't of Transp.*, 282 F.3d 839, 843 (D.C. Cir. 2002)).

District of Columbia courts have interpreted applicable case law to mean that "a specific and well-defined accommodation is deemed reasonable, and an erratic and unpredictable accommodation, such as an open-ended 'work whenever you want schedule' is unreasonable as a matter of law." *Davis*, 26 F. Supp.3d at 116. Other courts have agreed. *See Fisher v. Vizioncore*, *Inc.*, 429 Fed. Appx. 613, 616 (7th Cir. 2011) ("an open-ended schedule with the privilege to miss workdays frequently and without notice" is unreasonable as a matter of law). Indeed, "[t]he

ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability." *EEOC v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 948 (7th Cir. 2001) (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)). The Fourth Circuit agreed, explaining that "a regular and reliable level of attendance is a necessary element of most jobs." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).

The plaintiff in *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012), was a medical student suffering from ADHD. After passing his Step One Exam, plaintiff participated in a two-month internal medicine rotation. *See Halpern*, 669 F.3d at 458. He failed the rotation due to professional misconduct, including failing to appear for a week of the rotation without providing advanced notice. *Id.* Thereafter, plaintiff went on medical leave to address the side effects of his ADHD medication. *Id.* He returned several months later and told the dean he might seek accommodations for his insomnia. *Id.* The dean advised him that some of the accommodations he wanted, "including the ability to call out of work without prior notice if he had been unable to sleep—likely would be infeasible." *Id.* Plaintiff claimed that comment discouraged him from seeking an accommodation. *Id.*

Plaintiff successfully completed ten rotations over the next year and a half, but his evaluations revealed several incidents of unprofessional behavior, including skipping a required lecture and failing to appear for an exam. *Id.* The school convened a committee to investigate plaintiff's conduct, and plaintiff advised the committee that his medical conditions did not affect his performance. *Id.* at 459. The committee recommended that plaintiff be dismissed. *Id.* The recommendation was accepted, and, following an unsuccessful appeal of the decision, plaintiff filed suit. *Id.* at 459-460.

The court recognized that it was ill-equipped to substitute its judgment for that of the university. *Id.* at 463. Deferring to the university's judgment as to the essential components of the medical school's program, the court found that professionalism was an essential component and that, without an accommodation, plaintiff could not satisfy the requirement. *See Halpern*, 669 F.3d at 463. Because professionalism was an essential element of the medical school's program, the court concluded that plaintiff could not reasonably seek to avoid or lessen that requirement but must instead "show that a reasonable accommodation would have permitted him to satisfy this criterion." *Id.* at 464-65.

The court found that the special remediation plan proposed by plaintiff was facially unreasonable, and, as a result, that summary judgment had been properly granted in favor of defendant. *Id.* at 465. In reaching that conclusion, the court noted that plaintiff's request for an accommodation was untimely. *Id.* "The school was not obligated to accommodate [plaintiff's] disability until he 'provided a proper diagnosis . . . and requested specific accommodation.'" *Id.* (quoting *Kaltenberger*, 162 F.3d at 437). Plaintiff had not informed defendant of his disability until ten months after he returned from medical leave and, even then, he requested only testing accommodations. *Id.* Second, by the time plaintiff asked defendant to implement his proposed remediation plan, he had already engaged in misconduct warranting dismissal. *Id.* "Thus, [p]lainitff sought not a disability accommodation, but 'a second chance to better control [his] treatable medical condition.'" *Id.* (quoting *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999)). Second chances are "not a cause of action under the ADA." *Hill*, 181 F.3d at 894. "A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the

law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability." *Halpern*, 669 F.3d at 465.

Second, the indefinite duration and uncertain likelihood of success of plaintiff's proposed accommodation rendered it unreasonable. *Id.* The ADA does not require an employer to give a disabled employee "an indefinite period of time to correct [a] disabling condition" that renders the employee unqualified. *Id.* (quoting *Myers v. Hose*, 50 F.3d 278, 280 (4th Cir. 1995)). Likewise, the ADA does not require "a school to permit a student to continue in an educational program with the hope that at some unknown time in the future he will be able to satisfy the program's essential requirements." *Id.* at 466.

Finally, the court rejected plaintiff's claim that defendant violated the ADA by failing to engage in an interactive process to identify a reasonable accommodation. *Id.* The court reasoned that "[a]n interactive effort to identify an accommodation would not have corrected the untimeliness of [plaintiff's] request or erased his record of prior misconduct." *Id.* The school had considered alternatives to dismissal, but, because plaintiff had consistently reverted to unprofessional conduct even after the school's attempts to intervene, the school was unable to identify any accommodation that would ensure that the plaintiff would not engage in such behavior as a physician. *Id.* Accordingly, the school properly determined that "all possible accommodations permitting [plaintiff] to remain in the program would be unreasonable because they would allow [plaintiff] to graduate with a medical degree." *Id.*

### 3. Plaintiff Never Requested an Accommodation, and Defendant Never Denied, an Accommodation

"An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has *requested* an accommodation which the defendant-employer has *denied*." *Davis*, 26 F.Supp.3d at 114 (emphasis added) (quoting *Flemmings v. Howard Univ.*, 198 F.3d 857, 861

(D.C. Cir. 1999)).  In order for a plaintiff to succeed on a failure to accommodate claim, she must demonstrate that the employer actually denied the request. *Id*. at 121. The plaintiff cannot maintain her claim if the employer granted her request for an accommodation. *Id* .(citing *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003)); *see also Chenari v. George Washington Univ.*, 847 F.3d 740, 748 (2017) (explaining that "in order to prevail on his failure-to-accommodate claim, [the plaintiff] must demonstrate not only that he gave notice, but also that the University denied a requested accommodation."). The *Chenari* court rejected plaintiff's claim that his repeated notifications to the administration created an obligation on the university to investigate and implement reasonable accommodations. *Id.*

The burden lies with the employee to request any needed accommodation. *Davis*, 26 F.Supp.3d at 114; *see also Woodruff v. LaHood*, 777 F. Supp.3d 33, 40 (D.D.C. 2011). The request need not contain the words "reasonable accommodation." *Davis*, 26 F. Supp.3d at 114. "However, once an employer has established a fixed set of procedures to request accommodations, the plaintiff-employee's failure to file a request through this procedure could preclude a claim for failure to accommodate." *Id.*

This court has expressly held "that an employee's oral request cannot trump an employer's established procedure for requesting and approving disability accommodations." *Edwards v. EPA*, 456 F. Supp.2d 72, 103 (D.D.C. 2006). The *Edwards* court explained that its conclusion was supported by practical and persuasive policy justifications, as any other result would call into question both the utility and the validity of its workplace policies. *Id.* In *Edwards,* the former employee claimed his employer denied his request for an accommodation of an informal work-from-home arrangement. *Id.* The court pointed out that the employee had

never formally requested such an arrangement and, necessarily then, could not have been denied it. *Id.*

In *Davis*, the defendant-employer had an established protocol for requesting an accommodation. *See* 26 F. Supp.3d at 114. The employee formally notified his employer of his disability using that procedure but left blank the section labeled "requested accommodation" and stated that the anticipated duration of the accommodation was unknown. *Id.* The employer's EEO office followed up with the plaintiff, but he never specified an accommodation. *Id.* Thus, the court found that the plaintiff had never requested an accommodation as required to maintain his ADA claim. *Id.*

The *Chenari* court employed similar reasoning in finding that the plaintiff had failed to request an accommodation and therefore could not succeed on his ADA claim. *See* 847 F.3d at 748. There, the court found it significant that the university had an office of disability support services which was tasked with receiving and evaluating requests for accommodations. *Id.* The university advised all of its students that they if they had a disability and needed to request an accommodation, they were responsible for pursuing it with the Office of Disability Support Services. *Id.* In addition to advising all first-year students of the protocol for seeking an accommodation, the Office of Disability Support Services maintained a website that walked students through the process. *Id.* Because plaintiff had received a survival guide containing the protocol for seeking accommodations and the university had advised all entering students of the protocol, the court gave no weight to plaintiff's assertion that he was unaware of the website. *Id.* Finding that the university had made the plaintiff aware of the avenue for requesting an accommodation, plaintiff's failure to use that avenue was fatal to his claim for alleged failure to accommodate. *Id.*

Of particular importance here is the fact that only those requests for reasonable accommodations that are made at the time of the employer's denial are protected under the ADA. Requests for accommodation that have been suggested after the fact are irrelevant to the case. *See Scarborough v. Natsios*, 190 F. Supp.3d 5, 23 (D.D.C. 2002) (addressing a Rehabilitation Act claim but stating that the analysis is the same under the ADA) (citing *Flemmings v. Howard Univ.*, 198 F.3d 857, 862 (D.C. Cir. 1999)).  In *Scarborough*, at the time plaintiff requested an accommodation, the symptoms of his disability no longer interfered with his ability to work. *Id.* at 24.  Thus, plaintiff failed to show that he needed the requested accommodation. *Id.* The court granted the employer's motion for summary judgment because the plaintiff could not demonstrate that he had requested a reasonable accommodation. *Id.* at 27.

In this case, the evidence is indisputable that Plaintiff did not avail herself of the mechanism provided by the University for all employees to seek disability recognition and reasonable accommodation. Further, Plaintiff has never identified any accommodation that would have had any effect on events leading to her dismissal from the Program. The accommodations that Plaintiff claims to identify include "accommodations for her cancer treatment" (*see* Plaintiff's SOF ¶ 25) – when the evidence shows that was imaging studies (a CT scan and chest x-ray) once a year. Those appointments were in fact conducted and the results of the testing confirmed Plaintiff's recovery from her cancer. Plaintiff is not "in remission" as she argues throughout her brief and relies upon cases discussing remission – her surgery was curative.

Plaintiff also states (*id.*) that she needed an "accommodated work schedule to attend medical appointments" – but again, attendance at medical appointments had nothing to do with the issues leading to her dismissal. She also states (*id.*) that she needed a "modified and

preplanned work schedule in order to schedule medical appointments" – but that is the same and is equally immaterial. Plaintiff then states she needed "accommodations with respect to attending and passing didactics courses." *Id.* No such request was ever presented, and it is hard to conjure what is imagined. Attending and passing didactics courses is a matter of a duty on the part of the resident physician in training to show up for classes, learn the material, and show mastery of the material through class participation and/or passing exams.

Finally, Plaintiff states (*id.*) that she needed an accommodation "with respect to judging her work performance, and time off." No such request was ever presented, but even if it had been, the request is incomprehensible. The duty of the faculty members is to judge all students equally in terms of mastery of the material. The ACGME requirements for certification of physicians in medical specialty as competent to leave training and begin practicing independently do not lend themselves to an accommodation contemplating a different standard in how Plaintiff's work performance might be judged.

Specific further arguments Plaintiff makes (Plaintiff's Memo of Points and Auth, Doc 32-1) include the following:

Plaintiff was an employee (*id.* at p. 8): True, but Plaintiff ignores the fact that her claims arise in the context of academic medical decision-making with the analytical framework that differs from other employment relationships. *See Hajjar-Nejad, supra.*

Plaintiff had renal cancer and therefore had a disability (*id.* at p. 9): Plaintiff's renal cancer was not diagnosed until after it had been expunged. Plaintiff had curative surgery. Plaintiff did not have ongoing cancer, does not have "cancer in remission," and certainly had no disability related to the cancer. *See* Def.'s Ex. H (Jarrett Decl.) ¶ 29 and Ex. J (Siegel Decl.) ¶¶ 5, 32-33.

Plaintiff received "excellent 'Milestone' (performance reviews) from attending physicians who supervised her work on a day to day basis" (*id.* p 12): The evidence shows that Plaintiff did occasionally obtain favorable – and even highly favorable – reviews. But those must be weighed in the overall context of her performance in the Program. The University has addressed this in detail in the response to Plaintiff's SOF 91.

GW has failed to plausibly discredit Dr. Waggel's qualifications (*id.* p. 12): Nothing could be further from the truth. The University's extensive and thoroughly documented Statement of Facts in support of its motion for summary judgment shows that Plaintiff was totally unqualified for the position of a resident trainee in psychiatry.

GW has revealed an alternative explanation based on Plaintiff's retainer of an attorney (*id.* p. 12): The issue was not Plaintiff's retainer of an attorney so much as her direct threats against the Program, the faculty and administrators. The University has responded to this in more detail in the response to Plaintiff's SOF 80.

Dr. Griffith was "agnostic" about Plaintiff's cancer: The University agrees that Dr. Griffith made this statement, but the context was one in which he made clear he was not passing judgment regarding Plaintiff's health status one way or the other. Plaintiff had not shared that information with him, and it was not his domain, nor would it have been appropriate, for him to have pursued the matter further. This is also addressed in the University's response to Plaintiff's SOF 94.

Dr. Griffith testified that he was unwilling to meet with Plaintiff (*id.* p.16): This is wholly unsupported on the record citation by Plaintiff as set forth in the University's response to Plaintiff's SOF 95.

Defendant has also addressed in detail the assertions (*id.* p. 16) that Plaintiff did not get a follow-up renal ultrasound, and had "difficulty making a follow-up appointment with Dr. Jared [*sic*] in response to Plaintiff's SOF 35. These are simply not true.

Plaintiff was "penalized" for attending doctor's appointments (*id.* p. 17): Plaintiff says this but there is no support anywhere in the record for the statement. This is a wholly self-serving uncorroborated allegation, nothing more. These allegations are addressed in detail in the University's response to Plaintiff's SOF 37 and 38.

Plaintiff was wrongfully penalized for not appearing for her shift on June 10, 2015 (*id.* p. 17): Plaintiff completely mis-characterizes the reason for her discipline and her behavior on that day. She continues to insist that she "did appear for her shift" – but that is misleading at best. The University addresses this in detail in response to Plaintiff's SOF 41 and 42.

Dr. Catapano told Plaintiff she was being taken off work for "too many sick days" (*id.* p. 18): Plaintiff knows now that this statement is incorrect but insists on repeating it in her submission to the Court. The matter is fully addressed by the University in response to Plaintiff's SOF 53.

Plaintiff failed Dr. Collins' course in psychodynamics because of approved absences and sick leave (*id.* p. 18): This again is clearly false. The matter is fully addressed in response to Plaintiff's SOF 63 and 64.

The CCC met on February 6, 2016 "behind closed doors" and failed to conduct a review of the "total picture" (*id.* p. 19): This is false in every respect as is discussed in the University's response to Plaintiff's SOF 70.

The third "deficiency letter" was issued in bad faith (*id.* p. 24): These allegations are addressed by the University in its response to Plaintiff's SOF 54-57. Plaintiff attempts to relate

the decision that she would not be promoted to events that occurred in August 2015. But that was only part, and not the main part, of the reasons for the decision. The principal reasons for the non-promotion were Plaintiff's failure of two foundational didactics courses and, as a result, her inability to proceed to a further course beginning in January.

Plaintiff successfully appealed the non-promotion decision (*id.* p. 25): This is not true. The decision was sent back to the department and the CCC because of a procedural irregularity. Dean Simon specifically noted that the matter should be considered further by the CCC. The University addresses this fully in response to Plaintiff's SOF 67 and 68.

Dean Berger "tried to put the brakes" on the discharge process (*id.* p. 25): This is false and is fully addressed in the University's response to Plaintiff's SOF 78 and 84.

GW refused to support Plaintiff's transfer (*id.* p. 25): Dean Berger attempted to be helpful in an administrative capacity, and the University always was prepared to forward any complete, accurate records to third parties. What the University – and particularly, Dr. Catapano as Program Director – could not do was falsify records or agree to serve as a point of reference with restrictions Plaintiff sought to impose that she could not discuss candidly all aspects of Plaintiff's tenure. This is addressed in the response to Plaintiff's SOF 86-88.

Dean Berger could not help Plaintiff because she had an attorney and had to engage in a way to protect the University (*id.* p. 26): Plaintiff had threatened the University, the program, the faculty, and administrative personnel with litigation. Dr. Berger made clear that once that position had been taken in the context of academic decision-making the nature of the communication changed and he was acting on the advice of counsel. In fact, however, Dean Berger continued to offer to assist and provided advice to Plaintiff regarding matters she raised

concerning a possible transfer. These circumstances are addressed in the University's response to Plaintiff's SOF 81-82.

Plaintiff continues with her unsupported allegations in pages 27-28 of her memorandum. Each of the points has been addressed with appropriate further documentation in response to Plaintiff's Statement of Facts.

In her deposition, Plaintiff launched one further calumny at Dr. Catapano testifying that it was her "understanding" that "Dr. Catapano was also not treated very well by her administration when she had cancer" and Plaintiff then speculated that Dr. Catapano had discriminated against her as a cancer survivor because the situation was like fraternity hazing, 'If I went through it you have to go through it too. Why should I get off easy if she didn't.'" *See* Def.'s Ex. N (Griffith Decl.) ¶ 160 and Ex. #19 at 237:10-21.

Dr. Griffith in his declaration responded in a manner that distills this case to its essence:

> 1.  This testimony is not only clearly false but shows Dr. Waggel's mindset throughout her tenure to blame her troubles in the Program on her cancer diagnosis and impute non-existent motives to Dr. Catapano and others.
>
> 2.  As Chair of the GW SMHS Department of Psychiatry, I have significant latitude in setting expectations for Dr. Catapano's clinical and educational responsibilities.
>
> 3.  Dr. Catapano is a beloved teacher and senior clinician on our faculty.
>
> 4.  I so value Dr. Catapano's wisdom, commitment, and experience as a teacher that I have told her that she has my carte blanche support to work as much or as little as is best for her health.
>
> 5.  I have told Dr. Catapano that we will accommodate if she needs intervals of medical leave for treatment.  If she is able to resume a more intensive teaching or clinical role, we will provide that.
>
> 6.  Dr. Catapano has repeatedly expressed appreciation for my support.

7.  Dr. Waggel's problems and deficiencies in the Program leading to her dismissal clearly had nothing to do with her physical or mental health status or any faculty response to her physical or mental health status: Dr. Waggel did not lie to multiple people on multiple occasions, fail several fundamental didactic courses, no show for clinical rounds and didactics classes, fail to obtain a mandated medical health clearance on time or within an extended deadline, fail to be able to present patient reports succinctly and professionally, and fail to recognize and ameliorate her multiple deficiencies in patient care, medical knowledge, and professionalism because of any other person's behavior or thoughts towards her. All of those matters were Dr. Waggel's sole responsibility.

*Id.* at ¶¶ 161 – 167.

## V.    CONCLUSION

For all the foregoing reasons, the matters set forth in the University's motion for summary judgment and supporting documents, and the entire record herein, Plaintiff's motion for summary judgment should be denied.

Dated: February 12, 2018            Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/  Nicholas S. McConnell
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served by the court's electronic filing system and via email on this 12th day of February, 2018, upon:

> Jason H. Ehrenberg, Esq.
> Peter K. Tompa, Esq.
> Bailey & Ehrenberg PLLC
> 1015 18th Street, N.W.
> Suite 204
> Washington, D.C. 20036
> jhe@becounsel.com
> pkt@becounsel.com
> *Counsel for Plaintiff*

>    /s/ Nicholas S. McConnell     

3719995v.1