## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,      )
      )
      Plaintiff,      )
      )   Civil Action No.: 1:16-cv-01412-CKK
      v.      )   Hon. Colleen Kollar-Kotelly
      )
GEORGE WASHINGTON UNIVERSITY,      )
      )
      Defendant.      )

### DEFENDANT GEORGE WASHINGTON UNIVERSITY'S RESPONSE
### TO PLAINTIFF DR. STEPHANIE WAGGEL'S STATEMENT OF MATERIAL FACTS
### IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT

Defendant George Washington University, by undersigned counsel, pursuant to Fed. R. Civ. P. 56(c), Local Civil Rule 7(h), and this Court's Fourth Amended Scheduling and Procedures Order, ¶ 6 (Doc. 33), submits this response to Plaintiff's statement of material facts for which there is no genuine dispute in support of Plaintiff's motion for partial summary judgment as follows:

Defendant will respond to each of Plaintiff's designated statements of allegedly undisputed material facts seriatim in correspondingly numbered paragraphs pursuant to Local Civil Rule 7(h) and this Court's Scheduling and Procedures Order (Doc. 33), Para. 6. Before doing so, however, it is important to note that Plaintiff's Statement of Material Facts (Doc. 32-2) fails in multiple instances to comply with Rule 7(h) and this Court's Order by citing to parts of the record that do not support the fact asserted, citing to large segments of the record containing multiple facts (in violation of Order, Para. 6(f)), and setting forth statements that are demonstrably false based on contemporaneous records. These matters are noted in the responses set forth below.

1. Defendant, the George Washington University (Defendant or GW), employed Dr. Waggel from July 1, 2014 to August 10, 2016. (*See* Defendant's Responses to Plaintiff's Requests for Admissions ("Def.'s Resp. Admis.") at Resp. No. 1, Ex. A.)

RESPONSE: Agreed. GW further states that during the period set forth, Plaintiff was specifically employed as a resident in GW's Psychiatry Residency Training Program (the "Program").

2. GW has more than fifteen employees engaged in the medical residency program. *See* Defendant George Washington University's Answers and Objections to Plaintiff's First Interrogatories at No. 1, Ex B.)

RESPONSE: Agreed.

3. During this timeframe, Dr. Lisa Catapano, the Program Director for the Psychiatry Residency Training Program, acted as Dr. Waggel's supervisor. (Catapano Dep. 24:5-9, Ex. K.)

RESPONSE: Agreed. GW further states that in the testimony cited, Dr. Catapano testified that as the Program Director she was "the individual ultimately responsible for the supervision of Dr. Waggel." For further response, GW states that Dr. Waggel had many other supervisors during her tenure in the Program. *See, e.g.,* Def.'s SOF, ¶¶ 27, 98, 101, 111-112, 121-122, 133, 136, 138, 141, 161-162, 170, 208, 245, 307, 328-329, 372-373, and 397.

4. Although Dr. Catapano acted as Dr. Waggel's supervisor, Dr. Catapano never supervised Dr. Waggel directly in any of her rotations. (Catapano Dep. 30:10-15, Ex. K.)

RESPONSE: GW agrees that Dr. Catapano did not directly supervise Dr. Waggel during any of her clinical rotations. GW further states that its response regarding Dr. Catapano's supervisory role is set forth in its response to Paragraph 3, above.

5. Dr. Catapano was appointed as the Program Director by Dr. James Griffith. (Griffith Dep. 54:04-56:11, Ex. N.)

RESPONSE: Denied. At the testimony cited, Dr. Griffith notes that as Chair of the Department, he discussed with Dr. Catapano, then the Associate Program Director, whether she would agree to take over the position of Program Director (which he also then held but which needed a separate person to fulfill the duties) and that he effectively chose or "selected" (Griffith Dep. 56:4-9) Dr. Catapano for the position. The name and title of the individual who actually made the formal appointment of Dr. Catapano to serve as the Program Director is not set forth in the record.

In fact, an individual may serve as a Program Director only after his or her name is submitted to the Associate Dean for Graduate Medical Education, the Associate Dean has conducted a review for compliance with the Accreditation Council for Graduate Medical Education ("ACGME"), the individual's name is then submitted to GW's Graduate Medical Education Committee ("GCME"), which conducts a further review, and the GCME votes to approve the appointment. *See* Supplemental Declaration of Jeffrey W. Berger, M.D., dated February 5, 2018, attached as **EXHIBIT CC** hereto, ¶¶ 3-9.

Further, the individual must then submit his/her qualifications and statement of professional time available for the position to the ACGME, and the ACGME Resident Review Committee then reviews the Program Director's qualifications annually to assure compliance with ACGME requirements. *Id.* ¶¶ 10-11. The GW Psychiatry Residency Training Program has remained in good standing with and accredited by ACGME at all times. *Id.* ¶ 12.

6. After suffering severe abdominal pain for some months, Plaintiff consulted physicians about the problems. A CT scan of her abdomen on April 15, 2015 showed complex cystic mass in the mid-portion of the left kidney. (*See* Def.'s Resp. Admis. at Resp. No. 2, Ex. A; Plaintiff's Amended Response to Interrogatory ("Pl.'s Am. Resp. to Interrog.") at No. 5, Ex. D.)

RESPONSE: Agreed. GW further states that Defendant's Resp. No. 2 makes no reference to Plaintiff's condition regarding "severe abdominal pain for some months" prior to her diagnosis and refers to, but does not include the results of, the April 15, 2015 CT scan. Plaintiff's Amended Response to Interrogatory at No. 5, Ex. D, is seven typed double-spaced pages. Those pages include Plaintiff's statements regarding the contents of the April 15, 2015 CT scan report noting that it showed a "complex cystic mass in the mid-portion of the left kidney" and further stating that Plaintiff's condition "started with LLQ [left lower quadrant] abdominal pain in 2014." *Id.* at p. 2 (last paragraph). Plaintiff's record citations are not correct. The history is, however, essentially documented in Dr. Jarrett's office note of June 10, 2015 (Def.'s SOF, Ex. H at Ex. #1) and the actual imaging study. Def.'s SOF, Ex. D at MEDSTAR HEALTH 000008.

For further response, GW states that Plaintiff never contacted the GW Equal Employment Opportunity Office ("EEO Office") to report any diagnosis, illness, condition, symptoms, or complaints or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

7. An MRI of the abdomen on April 24, 2015 showed a cyst classified as Bosniak type 2F and a hepatic cyst.   (*See* Def.'s Resp. Admis. at Resp. No. 2, Ex. A; Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Agreed. GW further states that Defendant's Resp. No. 2 refers to but does not include the results of the April 24, 2015 MRI. As noted, Plaintiff's Amended Response to Interrog. at No. 5 is a seven double-spaced pages. In those pages, Plaintiff describes the contents of the MRI as showing "a cyst classified as Bosnia type 2F and a hepatic cyst." (*Id.* at p. 2 (last paragraph).) Plaintiff's record citations are not correct. The information is documented, however,

in the actual imaging study report at Def.'s SOF, Ex. D at MEDSTAR HEALTH 000011). GW

further states that the MRI report states that the lesion measured 1.3 x 1.3 x 1.2 cm and that

"[s]hort-term follow-up by CT or MRI in 6 months is recommended." (*Id.*)

8.  On or about April 20, 2015, Dr. Catapano indicated that she had heard that
    Plaintiff suffered from a possible kidney tumor.  (Pl.'s Am. Resp. to Interrog.
    at No. 8, Ex. D.)

RESPONSE:  Denied.  Plaintiff's Amended Response to Interrogatory No. 8 is

approximately 11-1/2 pages typed double-space pages. At Pltf's Ex. D, p. 9, Plaintiff makes this

statement. Dr. Catapano has testified that in the spring of 2015, she became aware that Plaintiff

was undergoing a workup for a kidney cyst and that in June, Plaintiff told Dr. Catapano that she

had "received a diagnosis of a cyst that had some probability of becoming cancerous in the

future." Transcript of Deposition of Lisa A. Catapano, taken September 7, 2017, portions of

which are attached as **EXHIBT DD** hereto, p. 38:13 – 20.

9.  Plaintiff's physician, Dr. Thomas Jarrett, M.D., an urologist at GW,
    recommended that the potentially cancerous cyst on Plaintiff's kidney be
    surgically removed. (Def.'s Resp. Admis. at Resp. No. 2, Ex. A; Pl.'s Am.
    Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Agreed.

10. Prior to the surgery, Plaintiff experienced pain requiring her to take medication
    and reported this discomfort to her employer on a number of occasions. (Pl.'s
    Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: GW agrees that Plaintiff experienced pain requiring her to take medication

prior to her surgery on July 20, 2015. For further response, GW denies that Plaintiff ever

contacted the EEO Office to report any diagnosis, illness, condition, symptoms, or complaints or

to request an accommodation of any kind although Plaintiff was repeatedly advised and even

encouraged to do so and was provided with the information to pursue that remedy upon entry

into the residency training program and repeatedly during her tenure in the program. Def.'s SOF

¶¶ 57-58, 60-63, 187-194, 944-947. GW further states that when Dr. Catapano became aware of Plaintiff's difficulty on an Internal Medicine rotation in May 2015, she promptly met with Plaintiff and recommended that Plaintiff take leave for medical evaluation (Def.'s SOF ¶¶ 159-166), but Plaintiff insisted she was fine and rejected the suggestion to take leave. Def.'s SOF ¶ 169. Two weeks later, when Plaintiff had an episode of apparent substance abuse later attributed by Plaintiff to a medication error leading to her dismissal by the Internal Medicine faculty from the rotation, Dr. Catapano met the next day with Plaintiff and again recommended that Plaintiff take leave to address the issues that had arisen, which Plaintiff accepted. Def.'s SOF ¶¶ 175-186.

11. Plaintiff also required frequent doctors' visits, medical scanning, and testing (cystoscopy, blood work, urinalysis, MRIs, CTs, etc.). (Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D; MFA 0001-0052, Ex. X.)

RESPONSE: Denied. In Plaintiff's Amended Response to Interrogatory No. 5, she states in a conclusory fashion that she "required frequent doctors' visits" etc. (Pl. SOF, Ex. D, p. 3), but does not provide a chronological list of those alleged frequent visits prior to surgery on July 20, 2015, or the reasons for them, and sets forth an apparently deliberate hodge-podge iteration of the events. Parsing the amended response (Pl. SOF, Ex. D, pp. 5-6), Plaintiff states she had an office visit on May 1 and a cystoscopy performed on May 5 by her prior urologist, Dr. Engel, and had appointments on May 4, 8 and 19 with her OB-GYN, Dr. Sikand, for reasons Plaintiff does not state. Dr. Sikand's office records actually document visits by Plaintiff on May 4 (for a repeat Pap smear and an STD check) (Pl. Bate 1235) and May 19 (for STD follow up) (Pl. Bate 1234) described more fully in the complete office note of the May 19 visit (Pl. Bate 1230-1233) as "Chlamydial infection – Onset: 05/05/2015" (Pl. Bate 1230) and further notes: "Wellness History: feels well with no/few symptoms no change in interval history; healthy diet; exercises

on a regular basis; good physical condition . . . . Psychological symptoms: normal mood; no depression; no anxiety; no PMDD." *Id.*

Plaintiff further states (Pl. SOF, Ex D, p. 6) that she completed pre-operative paperwork and billing with a GW nurse anesthesiologist on July 9 and 10 and had a further office visit with Dr. Shepard (primary care physician) on July 17, 2015. Plaintiff also cites to 51 pages of Medical Faculty Associates medical records. Pl. SOF, Ex. X. Those records show one preoperative office visit with her attending urological surgeon, Dr. Jarrett, on June 10, 2015 (Ex. X at MFA 0001 – 0003), that specimens were collected at GW Hospital on July 20, the day of surgery (Ex. X at MFA 0030 – 0031, 00370038) (and during the subsequent hospitalization), and that the two prior imaging studies had been performed on April 15 (the CT scan) (MFA 0048 – 0049), and April 24 (the MRI) (MFA 0047).

The chronology of medical visits from Plaintiff's Amended Interrogatory response and the records cited by Plaintiff prior to her surgery is as follows:

| | |
|---|---|
| April 13 | Dr. Shepard – Primary Care Physician - abdominal pain – orders imaging studies |
| April 15 | CT scan |
| April 24 | MRI |
| May 1 | Dr. Engel – Urologist – office visit re cyst – recommends no surgery |
| May 4 | Dr. Sikand – OB/GYN – Pap smear, STD check (unrelated) |
| May 5 | Dr. Engel - cystoscopy for hematuria (unrelated) |
| May 19 | Dr. Sikand – OB/GYN – STD follow up (unrelated) |
| June 10 | Dr. Jarrett – Urology Surgeon – office visit – second opinion – recommends surgery |
| July 9 | GW Hospital pre-op paperwork |
| July 10 | GW Hospital pre-op paperwork |
| July 17 | Dr. Shepard – Primary Care Physician – medication refill for ADD meds (unrelated) |
| July 20 | Surgery |

Copies of relevant office records for Dr. Sikand are attached as **EXHIBIT EE** hereto. Copies of relevant office records for Dr. Shepard are attached as **EXHIBIT FF** hereto. Copies of relevant office records for Dr. Engel are attached as **EXHIBIT GG** hereto.

12. On June 11, 2015, Plaintiff informed her supervisor, Dr. Catapano, that Plaintiff needed to schedule surgery to remove the potentially cancerous cyst. (Waggel Dep. Ex. 4, Ex. F; *See also* Def.'s Resp. Admis. at Resp. No. 2, Ex. A.)

RESPONSE: Denied. Plaintiff's Exhibit F shows that on June 1, 2015, Plaintiff sent an email to Dr. Catapano stating, "I need a nephrectomy [total removal of the kidney] sooner rather than later, Dr. Jarrett (chair of urology) said I should only need about two weeks off." Defendant's Response to Request No. 2 (Pl.'s Ex. A, p. 3) states only that Dr. Catapano was aware of Plaintiff's work up for a cyst that could potentially involve a cancer for which Plaintiff was then scheduled for surgery on July 20, 2015.

For further response, GW states that Dr. Jarrett's declaration and records show that he advised Plaintiff that while the cyst could be followed with surveillance imaging every 6 months for a year or so, he would suggest that she have the cyst surgically removed, that the surgery was not an urgent matter, that the surgery be done as a laparoscopic partial nephrectomy because the cyst was small and peripheral and that Plaintiff could have time during her residency over the next three months to schedule the surgery. Def.'s Ex. H, ¶¶ 5 – 7 and Ex. #1 at MFA 002 – 003.

13. On July 20, 2015, Dr. Jarrett performed a robotic-assisted laparoscopic partial nephrectomy. (GWUH 000075-76, Ex. Y;  *See also* Def.'s Resp. Admis. at Resp. No. 2, Ex. A; Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Agreed.

14. Following surgery, a pathology report confirmed the cyst to be cancerous, which was fully described as left renal cell carcinoma, clear cell type, stage 1, grade 2.  (Def.'s Resp. Admis. at Resp. No. 2, Ex. A; Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Agreed.

15. This type of cancer is unusual for Plaintiff's sex and age.  Its risk factors were not associated with healthy, young females, and, as such, warranted continued surveillance and genetic testing.   (Waggel Dep. 82:1-83:14; 84:18-85:8, Ex. E; Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Denied. Plaintiff makes these statements but shows no professional qualifications or supporting data for the statements. For further response, GW states that Thomas W. Jarrett, M.D., Plaintiff's Board certified urological surgeon, has stated that during surgery the cyst was removed in its entirety (Jarrett Decl., Def.'s Ex. H, ¶ 13), that the surgery was "curative" of Plaintiff's kidney cancer (*id.* at ¶ 29), and that the reason for any follow up was not related to risk factors specific to Plaintiff's circumstances but was pursuant to general guidelines published by the American Urological Association ("AUA") taking into consideration the complete excision of the cyst, the size and location of the cyst, and the diagnosis on pathology. *Id.* at ¶ 15.

Further, Dr. Jarrett states that pursuant to the AUA guidelines, no further adjuvant treatment of any kind, such as radiation or chemotherapy, was either indicated or necessary, and the only recommendation for follow up care was once-a-year imaging for three years with a chest x-ray and either a CT scan or MRI of the abdomen. *Id.* Genetic testing is not included within the guidelines. Dr. Jarrett has further stated that given Plaintiff's age, while genetic testing which had been recommended by an oncologist colleague, Robert S. Siegel, M.D., might be worthwhile, he did not expect there to be any significant findings from the testing (*id.* at ¶ 19), and there were none – the testing showed no evidence of any genetic abnormality. *Id.* at ¶ 21.

16. The type of cancer Plaintiff suffered from is not responsive to chemotherapy. (Waggel Dep. 115:8-21, Ex. E.)

RESPONSE: Denied. Plaintiff makes this statement but shows no professional qualifications or supporting data for the statement. For further response, GW states that the asserted fact is not material. Plaintiff was cured of her cancer and needed no further therapy of any kind, including either radiation or chemotherapy. Jarrett Decl. (Def.'s Ex. H, ¶¶ 13-15, 18-19, 29).

> 17. On July 24, 2015, Plaintiff informed Dr. Catapano that the pathology results showed that Plaintiff had clear cell carcinoma. (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed as far as the statement goes. Plaintiff makes this statement in Ex. D, p. 10. But the record further shows that on July 24, 2015, at 1:31 p.m., Plaintiff sent a text message to Dr. Catapano that Dr. Jarrett had phoned to state "it was clear cell carcinoma but he's pretty sure it's all gone." Def.'s SOF, ¶ 264.

> 18. Before and after her surgery, Plaintiff suffered from anxiety associated with her condition, which required treatment from a therapist beginning in or around September 2015. (Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Denied. If Plaintiff's reference to "anxiety associated with her condition" is a reference to her diagnostic workup and surgery by Dr. Jarrett, this is incorrect. Shortly after her surgery, Plaintiff was informed by Dr. Jarrett that he was pretty sure any cancer was all gone and Plaintiff reported this on July 24, 2015, to Dr. Catapano (Def.'s SOF ¶ 264) and to her Chief Resident, Jason Emejuru, M.D. (Def.'s SOF ¶ 265 – "Guess who had cancer but probably doesn't anymore. This gal!"). On July 28, Plaintiff confirmed again that "[e]verything points to a good prognosis" in an email exchange with James W. Griffith, M.D., Psychiatry Department Chair, who emailed to state he was sorry that she had needed to go through the surgery but he had heard the surgery was "curative." Def.'s SOF ¶¶ 266-267. On July 30, 2015, Plaintiff was informed by her attending Board certified oncologist, Dr. Siegel, that the surgery should be

"curative." Declaration of Robert S. Siegel, M.D., Def.'s Ex. J, ¶¶ 4-5. On August 5 during a post-op follow up visit Plaintiff had with Dr. Jarrett, he again confirmed that the surgery had gone well and that Plaintiff had "an excellent prognosis given the small size and location of the cyst and the completeness of the removal of the cyst." Jarrett Decl., Def.'s Ex. H, ¶ 17.

Despite these assurances and her own statements, Plaintiff then talked frequently about having cancer and a need for ongoing treatment, although she had informed Dr. Catapano that there was no treatment follow up recommended. *See* Transcript of Deposition of Lisa A. Catapano, M.D., taken July 27, 2017, relevant portions of which are attached as **EXHIBIT HH** hereto, 109:4 – 110:5. Nonetheless, in light of a series of disturbing events including those during an overnight call on August 25, 2015, when Plaintiff had shown disregard for her own health to a level impairing her performance, Dr. Catapano became concerned that stress related to Plaintiff's surgery may have been a factor in her performance. *Id.* 111:9 – 112:16.  Thus, when Plaintiff spoke with Dr. Catapano about arranging her clinical rotation schedule at Children's National Medical Center during September 2015 to assure she could attend regular appointments, Dr. Catapano worked hard to assure that would happen. *Id.* 109:15 – 110:5.

For further response, GW states that Plaintiff did not contact the EEO Office to report any of these matters, including any "anxiety associated with her condition," or any other diagnosis, illness, condition, symptoms, or complaints or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

    19. After the surgery, Plaintiff continued to experience frequent urination, stomach
        pain, and was referred for genetic testing, ultrasound, and frequent surveillance
        to monitor her health, which included follow up visits twice a year for five years

for chest x-ray and MRI and other medical monitoring. (Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: GW agrees that Plaintiff was referred by Dr. Siegel for genetic testing which was conducted during two appointments with Dr. Elizabeth Stark at GW Medical Faculty Associates, the first on August 11, 2015 (*see* Office visit note, Elizabeth Stark, dated August 11, 2015, **EXHIBIT II** hereto, MFA 000158 – 000159), the second on September 15, 2015. Def.'s SOF ¶¶ 424-428 and Ex. W. At the second meeting with Dr. Stark, Plaintiff was informed that all tests were negative (meaning no mutation had been identified), no further genetics testing was recommended, and no further genetics follow up visit was scheduled. *Id.*

GW further agrees that following Plaintiff's surgery on July 20, 2015, the only other follow up for the small cancerous cyst that had been removed resulting in cure of the cancer was once-a-year imaging for three years with a chest x-ray and either a CT scan or MRI of the abdomen. For further response, GW denies that any other medical monitoring was indicated related to the surgery.

GW further states that to the extent Plaintiff had any "experience with frequent urination, stomach pain," Plaintiff did not contact the EEO Office to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

20. Currently, Plaintiff continues surveillance of her health and experiences disabilities including frequent urination, anxiety, and other effects as a result of her cancer, treatment, and Defendant's mistreatment and retaliation. (Pl.'s Am. Resp. to Interrog. at No. 5, Ex. D.)

RESPONSE: Denied. GW denies that it mistreated or retaliated against Plaintiff in any respect. The grounds in support of the denial are set forth herein and in GW's Memorandum of Points and Authorities and in GW's Statement of Facts and evidentiary materials offered in support of its motion for summary judgment. GW further states that Plaintiff has not submitted evidence concerning her current health care regimen and her current medical and mental health conditions such that Plaintiff is barred from offering any such evidence in this matter. GW further denies that Plaintiff has submitted any admissible expert testimony through either retained expert witnesses or mixed fact-expert treating health care providers sufficient to establish a causal nexus between any of GW's alleged acts or omissions and any of Plaintiff's alleged current medical or mental health conditions and, therefore, is barred from offering any such evidence in this matter.

21. Consistent with a note Dr. Jarrett provided in advance of scheduling surgery, Plaintiff sought an accommodation by asking for two (2) weeks off for the surgery, two (2) weeks light duty, and set days in advance where she could schedule follow-up appointments with her doctors. (Waggel Dep. 59:6-12; 68:21-69:5, Ex. E; Pl.'s Am. Resp. to Interrog. at No. 9, Ex. D; *See also* MFA 0001-0003, Ex. X.)

RESPONSE: Denied. GW denies that Plaintiff ever contacted the EEO Office to report any diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

For further response, GW states that Plaintiff did send an email to Dr. Catapano on June 11 stating that she "need[ed] a nephrectomy sooner rather than later" and that "Dr. Jarrett (chair of urology) said I would only need about two weeks off," (Def.'s SOF ¶ 228), that Plaintiff later

provided information to her Chief Resident, Dr. Emejuru, concerning the specific dates of leave for her surgery and the expected recovery time (two weeks) (Def.'s SOF ¶¶ 235-236), and that Plaintiff and Dr. Emejuru also discussed two weeks light duty when Plaintiff first returned for clinical rotations. Declaration of Jason Emejuru, M.D., Def.'s Ex. C, ¶¶ 36, 51. There is no record that Plaintiff discussed with Dr. Emejuru "set days in advance" for doctors' appointments.

For further response, GW states that when Plaintiff returned from a medical leave from May 18 – June 7, 2015 (which she had been recommended to take after being removed from her Internal Medical rotation at that time as being unsafe to practice) (*id.* ¶¶ 175-179, 185-186), she began an Emergency Medicine rotation at the GW Hospital Emergency Department. *Id.* ¶ 207. The Emergency Medicine team had been made aware of Plaintiff's health issues and contacted Plaintiff prior to her beginning the rotation to inquire about dates for medical appointments in order to properly modify her schedule. *Id.* ¶ 208. Plaintiff was then scheduled for 14 shifts over her three weeks in the EM rotation, fewer than the normal rotation of 20 shifts over 4 weeks that non-ED residents are generally assigned (*id.* ¶ 209), and 10 of those 14 shifts were scheduled overnight so that Plaintiff would have time during the day to attend medical appointments. *Id.* ¶ 210.

> 22. Plaintiff requested by email on or around June 11, 2015 at 7:23 a.m. to meet with Dr. Catapano in order to discuss accommodation. (Waggel Dep. Ex. 4, Ex. F).

RESPONSE: Denied. GW agrees that Plaintiff sent the email to Dr. Catapano but the email requested a meeting "to talk about scheduling" as Plaintiff stated she had just been advised she needed "a nephrectomy" and her urology surgeon, Dr. Jarrett, had said she "should only need about two weeks off." Def.'s SOF ¶ 228, Ex. A (Catapano Decl.) ¶ 221 and Ex. #60.

GW further states that Dr. Catapano had no authority to grant formal accommodation under ADA pursuant to a claim of disability or need for leave. Under GW's policies and

procedures, any request for formal accommodation must be submitted to the EEO Office, Def.'s SOF ¶¶ 60, 62-63, which handles "all requests for reasonable accommodation under the ADA for all University employees and faculty. *Id.* ¶ 64. Dr. Catapano states that her responsibility would be to get a resident in need to the people that know the policies and detail and make sure they are followed, Def.'s Ex. HH 113:10-18, which she had already done in connection with Plaintiff's dismissal from the IM rotation in May. At that time, on May 15, 2015, Catapano recommended that Plaintiff take medical leave (the same recommendation she had made to Plaintiff several weeks earlier which Plaintiff had rejected saying she was fine). *Id.* ¶¶ 166, 169, 186. Plaintiff agreed to accept the recommendation and was then to decide whether to take either leave or personal vacation time from May 18 – June 7, 2015. *Id.* ¶ 186. As a result of Dr. Catapano's recommendation, on May 18, both the GME Director, Ms. Mary Tucker, and the Administrator of the GW Leave of Absence Program, Ms. Kimberly Vanlewen, emailed Plaintiff and advised her among other things that if she believed she had a qualifying disability, she could request a reasonable accommodation such as medical leave under the ADA. *Id.* ¶¶ 187-191. Ms. Vanlewen also provided Plaintiff with the contact information for the EEO Office and actually recommended that Plaintiff apply for ADA leave through the office. *Id.* ¶ 192. Ms. Tucker provided the same information to Plaintiff. *Id.* ¶ 193. Plaintiff elected not to pursue an accommodation through the EEO Office. *Id.* ¶ 194. So by June 11, Plaintiff had been fully reminded and informed about how to pursue any claims for accommodation.

For further response, GW states that as the Program Director, Dr. Catapano did have authority to discuss with Plaintiff matters related to scheduling of her ongoing residency training in light of the surgery and could attempt to accommodate Plaintiff in that regard which Dr.

Catapano in a reply email at 9:46 a.m. agreed to do either that afternoon or the following morning. Catapano Decl. ¶ 221 and Ex. #60.

> 23. GW made it logistically difficult for Plaintiff to schedule her surgery and forced her to "jump through a lot of hoops." (Waggel Dep. 55:19-57:3; 57:22 -58:5; 76:6-14, Ex. E.)

RESPONSE: Denied. This is false. The record shows that Dr. Emejuru – with Dr. Catapano's full support – worked closely with Plaintiff to coordinate her schedule both with respect to ongoing residency training and the timing of her surgery and leave for the surgery. Def.'s SOF ¶¶ 230, 232, 235-239 and Emejuru Decl. (Ex. C ¶¶ 13-14, 17-18). In fact, Dr. Emejuru emailed Plaintiff on June 17, 2015, requesting specific information on the date she needed to begin her leave, the date of the surgery and the expected recovery time and stated he would then work with Plaintiff to develop her schedule. Emejuru Decl. (Ex. C ¶¶ 18). Plaintiff responded that she had not scheduled her surgery yet because she wanted to see if she could finish an Emergency Medicine rotation first for which she was still awaiting further information. *Id.* ¶ 19. When Plaintiff responded two days later on June 19 with the information concerning her leave and the surgery (*id.* ¶ 20), Dr. Emejuru worked extensively to coordinate Plaintiff's ongoing training with her surgery leave. *Id.* ¶¶ 23-30. The date of the surgery, the start and end dates of the proposed leave, the expected recovery time, and the overall length of the leave requested were determined solely by Plaintiff and her surgeon. *Id.* ¶ 21. Neither Dr. Emejuru nor anyone else in the Program said anything to Plaintiff about limiting or constraining the amount of time she would need for the surgery and recovery. *Id.* ¶ 22.

When Dr. Catapano had reviewed and approved the schedule Dr. Emejuru had arranged, he emailed Plaintiff advising her of the schedule and closed: "Take care and let me know if you have any questions." *Id.* ¶ 30. Further, Dr. Emejuru had discussed the specific clinical rotations

with Plaintiff, including time she needed to make up on Internal Medicine and Emergency Medicine rotations, and Plaintiff was in agreement – and never expressed any disagreement – with them. *Id.* ¶¶ 32-33. To the contrary, on July 2,2015, Dr. Waggel sent a text message to Dr. Emejuru: "Thanks for making my schedule. I'm sure it was time consuming to talk to all those departments."

Further, when Plaintiff returned from a medical leave from May 18 – June 7, 2015 (which she had been recommended to take after being removed from her Internal Medical rotation at that time as being unsafe to practice) (*id.* ¶¶ 175-179, 185-186), she began an Emergency Medicine rotation at the GW Hospital Emergency Department. *Id.* ¶ 207. The Emergency Medicine team had been made aware of Plaintiff's health issues and contacted Plaintiff prior to her beginning the rotation to inquire about dates for medical appointments in order to properly modify her schedule. *Id.* ¶ 208. Plaintiff was then scheduled for 14 shifts over her three weeks in the EM rotation, fewer than the normal rotation of 20 shifts over 4 weeks that non-ED residents are generally assigned (*id.* ¶ 209), and 10 of those 14 shifts were scheduled overnight so that Plaintiff would have time during the day to attend medical appointments. *Id.* ¶ 210.

Further, the only medical appointment during this timeframe as to which Plaintiff claimed to have been given "a hard time" was a meeting on July 9, 2015, for anesthesiology paperwork. Plaintiff apparently went to that meeting and "no showed" her didactics class that day in psychodynamics with Dr. Cheryl Collins after she had explicitly told Dr. Collins she would attend the class. Def.'s SOF ¶¶ 244-247. When Dr. Emejuru heard of the no-show, he reminded Plaintiff that personal appointments were not to be scheduled on Thursdays 8 a.m. – 5 p.m. which was set aside for didactics, but if a class needed to be missed unexpectedly, the

resident still needed to alert the attending physicians and faculty members. *Id.* ¶¶ 253-254. Plaintiff responded that she "was actually very upset that I was given such a hard time about going to this appointment." *Id.* ¶ 255.

Dr. Emejuru has noted that no one gave Plaintiff "any difficulty – much less a 'hard time' – about going to the pre-surgery appointment." *Id.* ¶ 256. Plaintiff did not advise anyone in the Program that she had the appointment or make a request for sick leave or other personal time off – "[s]he simply went to the appointment and no showed for didactics after telling Dr. Collins she would attend the class. *Id.*

> 24. In the midst of her cancer diagnosis and treatment, Dr. Catapano required Plaintiff to complete an additional week of an emergency room medical rotation, even though Plaintiff had finished the requirements for that rotation and Dr. Catapano was aware of Plaintiff's ongoing cancer diagnosis. (Waggel Dep. at 89:9-22; 92:2-10, Ex. E.)

RESPONSE: Denied. This is false. The record shows that when the Internal Medicine attending physicians insisted that Plaintiff be removed from the clinical rotation on May 14, 2015 because Plaintiff was not able to practice safely (Def.'s SOF ¶¶ 170-180), Dr. Catapano received an email from Plaintiff that evening purporting to explain why she had appeared to be impaired by toxic substances while on duty earlier that day (*id.* ¶ 181), and then promptly considered the options for Dr. Waggel and emailed other members of the Program leadership with a proposal for medical leave. *Id.* ¶¶ 182-183. The next morning, Dr. Catapano asked the Program Coordinator to begin the process for Plaintiff to be able to take medical leave starting that day (Friday) or the following Monday (*id.* ¶ 184), and she then met with Plaintiff. *Id.* ¶ 185.

During that meeting, Dr. Catapano recommended that Plaintiff take medical leave (the same recommendation she had made to Plaintiff several weeks earlier which Plaintiff had rejected at that time saying she was fine). *Id.* ¶¶ 166, 169, 186. This time, Plaintiff agreed to

accept the recommendation and was then to decide whether to take either leave or personal vacation time from May 18 – June 7, 2015. *Id.* ¶ 186.

On May 18, both the GME Director, Ms. Mary Tucker, and the Administrator of the GW Leave of Absence Program, Ms. Kimberly Vanlewen, emailed Plaintiff to advise her that because she did not meet length of employment requirements she did not qualify for FMLA leave but if Plaintiff believed she had a qualifying disability, she could request a reasonable accommodation such as medical leave under the ADA. *Id.* ¶¶ 187-191. Ms. Vanlewen provided Plaintiff with the contact information for the EEO Office and actually recommended that Plaintiff apply for ADA leave through the office. *Id.* ¶ 192. Ms. Tucker provided the same information to Plaintiff. *Id.* ¶ 193. Plaintiff elected not to pursue an accommodation through the EEO Office. *Id.* ¶ 194.

Plaintiff was granted leave from May 18 – June 7, 2015 (*id.* ¶ 203) during which time she traveled to Italy with a friend and visited family in Pennsylvania. *Id.* ¶ 205. On Plaintiff's return, she began her Emergency Medicine Rotation at the GW Hospital Emergency Department. *Id.* ¶ 207.

The Emergency Medicine team had been made aware of Plaintiff's health issues and contacted Plaintiff prior to her beginning the rotation to inquire about dates for medical appointments in order to properly modify her schedule. *Id.* ¶ 208. Plaintiff was then scheduled for 14 shifts over her three weeks in the EM rotation, fewer than the normal rotation of 20 shifts over 4 weeks that non-ED residents are generally assigned (*id.* ¶ 209), and 10 of those 14 shifts were scheduled overnight so that Plaintiff would have time during the day to attend medical appointments. *Id.* ¶ 210. As a result, Plaintiff had one further week of the EM rotation which she was required to perform, and Plaintiff knew that.

On June 15, 2015, Dr. Emejuru spoke to Dr. Waggel on the telephone and she stated that she would like to plan to take medical leave for the surgery in mid-July, to make up her required week of EM rotation the first week of July, and to make up her IM rotation the first week in August. *Id.* ¶ 232 and Ex. C (Emejuru Decl. ¶ 14).

On June 16, 2015 at 5:34 p.m., Dr. Waggel sent an email to the Chief Residents on the EM service (with a cc to Dr. Emejuru and Dr. Catapano) confirming that she had another week of EM to complete stating:

> Hello Emed Chiefs!
>
> I am getting a nephrectomy the second week of July and I was wondering *if I can finish the one week of emed I have left* during the first week of July before my surgery. I am on the rotation right now but I'm not sure what the schedule is like in July. Thank you for your time.

*Id.* ¶ 233 and Ex. (Emejuru Decl. ¶ 15 and Exhibit #2 thereto) (emphasis added).

On June 17, Dr. Emejuru emailed Plaintiff requesting specific information on the date she needed to begin her leave, the date of the surgery and the expected recovery time and stating he would then work with Plaintiff to develop her schedule. Emejuru Decl. (Def.'s Ex. C ¶ 18). Plaintiff responded stating: "I didn't schedule my surgery yet *because I wanted to see if I could finish emed first* which I still don't have an answer to :( " *Id.* ¶ 19 and Ex. #4 (emphasis added). When Plaintiff responded two days later on June 19 with the information concerning her leave and the surgery (*id.* ¶ 20), Dr. Emejuru worked extensively to coordinate Plaintiff's ongoing training with her surgery leave, including the remaining one-week EM rotation. *Id.* ¶¶ 23-30.

When Dr. Catapano had reviewed and approved the schedule Dr. Emejuru had arranged, he emailed Plaintiff advising her of the schedule and closed: "Take care and let me know if you have any questions." *Id.* ¶ 30. Further, Dr. Emejuru had discussed the specific clinical rotations

with Plaintiff, including the time she needed to make up on both the Internal Medicine and Emergency Medicine rotations, and Plaintiff was in agreement – and never expressed any disagreement – with them. *Id.* ¶¶ 32-33. To the contrary, on July 2, Dr. Waggel sent a text message to Dr. Emejuru: "Thanks for making my schedule. I'm sure it was time consuming to talk to all those departments." Def.'s SOF ¶ 240 and Emejuru Decl. (Def.'s Ex. C), ¶ 34 and Ex. #11 (Plaintiff Bates 1115).

25. Following surgery, Plaintiff requested accommodations for her cancer treatment, recovery, and therapy appointments with her therapist, Dr. Kecmanovic, including an accommodated work schedule to attend medical appointments, a modified and preplanned work schedule in order to schedule medical appointments, accommodations with respect to attending and passing didactics courses, assistance coordinating work shifts and medical appointments/procedures, accommodation with respect to judging her work performance, and time off. (Pl.'s Am. Resp. to Interrog. at No. 9, Ex. D.)

RESPONSE: Denied. GW denies that Plaintiff ever contacted the EEO Office to report any diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

For further response, GW objects to the form of this statement of allegedly undisputed fact as containing multiple disparate and unrelated assertions without any specification of time, persons, dates, or events.

For further response, GW states that there was no known "ongoing treatment" for Plaintiff's cancer after the surgery since the cancer was "all gone." Shortly after her surgery, Plaintiff was informed by Dr. Jarrett that he was pretty sure any cancer was all gone and Plaintiff reported this on July 24, 2015 to Dr. Catapano (Def.'s SOF ¶ 264) and to her Chief Resident,

Jason Emejuru, M.D. (Def.'s SOF ¶ 265 – "Guess who had cancer but probably doesn't anymore. This gal!"). On July 28, Plaintiff confirmed again that "[e]verything points to a good prognosis" in an email exchange with Dr. Griffith, Psychiatry Department Chair, who emailed to state he was sorry that she had needed to go through the surgery but he had heard the surgery was "curative." Def.'s SOF ¶¶ 266-267. On July 30, 2015, Plaintiff was informed by her attending Board certified oncologist, Dr. Siegel, that the surgery should be "curative." Declaration of Robert S. Siegel, M.D., Def.'s Ex. J, ¶¶ 4-5. On August 5 during a post-op follow up visit Plaintiff had with Dr. Jarrett, he again confirmed that the surgery had gone well and that Plaintiff had "an excellent prognosis given the small size and location of the cyst and the completeness of the removal of the cyst." Jarrett Decl., Def.'s Ex. H, ¶ 17.

Further, Dr. Jarrett has confirmed that during surgery the cyst was removed in its entirety (Jarrett Decl., Def.'s Ex. H, ¶ 13), that the surgery was "curative" of Plaintiff's kidney cancer (*id.* at ¶ 29), and that pursuant to the American Urological Association guidelines, no further adjuvant treatment of any kind, such as radiation or chemotherapy, was either indicated or necessary, and the only recommendation for follow up care was once-a-year imaging for three years with a chest x-ray and either a CT scan or MRI of the abdomen. *Id.* Genetic testing is not included within the guidelines.

For further response, GW states that despite these assurances and her own statements, Plaintiff then talked frequently about having cancer and a need for ongoing treatment, although she had informed Dr. Catapano that there was no treatment follow-up recommended. *See* Transcript of Deposition of Lisa A. Catapano, M.D., taken July 27, 2017, relevant portions of which are attached as **EXHIBIT HH** hereto, 109:4 – 110:5. Nonetheless, in light of a series of disturbing events including those during an overnight call on August 25, 2015, when Plaintiff

had shown disregard for her own health to a level impairing her performance, Dr. Catapano became concerned that stress related to Plaintiff's surgery may have been a factor in her performance. *Id.* 111:9 – 112:16. Thus, when Plaintiff spoke with Dr. Catapano about arranging her clinical rotation schedule at Children's National Medical Center during September 2015 to assure she could attend regular appointments with her psychotherapist, Jelena Kecmanovic, Ph.D., a clinical psychologist, Dr. Catapano worked hard to assure that would happen and in that respect attempted to "accommodate" Plaintiff. *Id.* 109:15 – 110:5. In fact, Dr. Kecmanovic's records (Def.'s Exhibit U) show that Plaintiff had visits with Dr. Kecmanovic on September 3, 11, 15, 22, and 26. *Id.* Kecmanovic 000001.

For further response, GW states it is unaware of the meaning of a purported request (which it never received) regarding "accommodations with respect to attending and passing didactics courses" since that reflects the duty of each resident physician in training to show up for classes, learn the material, and show mastery of the material through class participation and/or passing exams. GW further states it is unaware of the meaning of the purported request (which it never received) regarding an accommodation "with respect to judging [Plaintiff's] work performance."

For further response, GW states that Plaintiff did not contact the EEO Office to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

26. Plaintiff communicated her accommodation requests by text, email, orally, and in writing.  (Pl.'s Am. Resp. to Interrog. at No. 9, Ex. D.)

RESPONSE: Denied. GW states that Plaintiff never contacted the EEO Office to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind, although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

28. Plaintiff communicated her accommodation requests to several offices, including one she thought was the Equal Opportunity Office.  (Waggel Dep. 6:2-5, Ex E.)

RESPONSE: Denied. GW states that Plaintiff did not contact the EEO Office – even if Plaintiff may have "thought" that she had done so – to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind, although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

28. Plaintiff testified during her deposition that at the end of April 2015, she spoke to Dr. Catapano about accommodations. (Waggel Dep. 52:18-22-55:15, Ex. E.)

RESPONSE: Assuming the citation is meant to be to Waggel Dep. 52:18 – f55:15, GW agrees that Plaintiff said this during her deposition. For further response, GW states that when Plaintiff was asked at deposition to identify any occasion she requested an accommodation, Plaintiff never stated that she went to the EEO Office. She stated at the portions of the deposition cited that she spoke with Dr. Catapano (Pl. Ex. E 52:9-54:9), and then Victoria Anderson, Dr. Catapano (again), Mary Tucker, and Jason Emejuru (*id.* 55:6-15), none of whom were employed in or representatives of the GW EEO Office. Dr. Catapano was the Program Director for the GW Psychiatry Residency Training Program (the "Program"). Def.'s SOF ¶ 17. Ms. Anderson was

the Program Administrator for the Program whose duties related solely to the Program. *Id.* ¶ 18. Ms. Tucker was the Director of Graduate Medical Education. Declaration of Jeffrey Berger, M.D., Def.'s Ex. B ¶ 28. Dr. Emejuru was a Chief Resident in the Program whose duties related solely to the Program. Emejuru Decl., Def.'s Ex. C ¶¶ 2-3.

For further response, GW states that Dr. Catapano, Ms. Anderson, Ms. Tucker, and Dr. Emejuru were not authorized, and Plaintiff knew or should have known that they were not authorized, to discuss formal "accommodation" for ADA purposes with Plaintiff. Under GW's policies and procedures, any request for formal accommodation must be submitted to the GW EEO Office, Def.'s SOF ¶¶ 60, 62-63, which handles "all requests for reasonable accommodation under the ADA for all University employees and faculty. *Id.* ¶ 64.

Residents are informed in the Resident Physician Agreement which each resident – including Plaintiff (*id.* ¶ 42) – signs before entering residency training and yearly thereafter, that the Resident Manual provides detailed information about their benefits and obligations and notes that the manual is posted to the GW SMHS GME website (giving the link to the website) and also notes that the GME Policies are posted to the GME website (again noting the link). *Id.* ¶ 41, 43. The Resident Agreement further incorporates the policies, terms, and conditions of the Resident Manual into the agreement with which the resident further agrees to abide. *Id.* ¶ 44.

The Manual further sets forth the policies governing leave, including but not limited to, sick leave, family and medical leave, temporary disability leave, and leave of absence. *Id.* ¶ 55.

The Manual sets forth the policy as to persons with a disability including explicitly "Residents Requesting an Accommodation" as follows:

> **Residents Requesting an Accommodation**
> The George Washington University's commitment to equal employment opportunity and affirmative action includes a commitment to provide reasonable accommodations for residents' religious obligations and for

> residents who are qualified individuals with disabilities pursuant to the Americans with Disabilities Act. Should a resident need an accommodation, he or she should contact the Office of Equal Employment Opportunity at (202) 994-9656 or fax (202) 994-9658. All requests for accommodations are kept in confidence to the extent feasible by law and practice.

*Id.* ¶ 57.

GW's policy on Equal Opportunity further specifically notes that "[T]o request disability accommodations, students should contact the Office of Disability . . . . *Employees and other members of the university community should contact the Office of Equal Employment Opportunity and Affirmative Action at (202) 994-9656 or* eeo@gwu.edu." *Id.* ¶ 60 and Ex. A (Catapano Decl.), Exhibit #7, p. 2 (GWU 000367). The policy further specifically directs any faculty or staff seeking additional information, "including a request for a reasonable accommodation on the basis of disability," to "refer to the Department of Equal Employment Opportunity website at http://hr.gwu.edu/eeo-statement, or contact EEO at (202) 994-9656." *Id.* ¶ 62.

For further response, GW states that as the Program Director, Dr. Catapano did have authority, as did Dr. Emejuru as a Chief Resident, Ms. Anderson as the Program Administrator, and Ms. Tucker as Director of GME, to discuss with Plaintiff matters related to scheduling or other issues Plaintiff encountered in her ongoing residency training and to try to assist or "accommodate" Plaintiff – in a non-formal, non-ADA sense – in that regard.

29. Plaintiff also testified at her deposition that she notified her chiefs and her medical team of her need to attend appointments, prior to April 2015, and her need to take two hours off in the afternoon. (Waggel Dep. 54:14-17, Ex. E.)

RESPONSE: Denied. There is no such testimony at this citation.

30. Plaintiff testified that she notified her employer, including Victoria Anderson, Dr. Catapano, Mary Tucker, and Jason Emejuru, that she needed time off for surgery. (Waggel Dep. 56:8-9, Ex. E.)

RESPONSE: Denied. There is no such testimony at this citation.

31. During her deposition (as opposed to her deposition as a 30(b)(6) corporate designee), Dr. Catapano admitted that Plaintiff sought a work place accommodation to attend therapy sessions to treat the stress due to her cancer. (Catapano Dep. 103:18-106:19, Ex. K, Catapano Dep. Ex. 12, Ex. L.)

RESPONSE: Denied if this is meant to assert that Plaintiff ever presented a claim of disability and request for accommodation through the EEO Office. Plaintiff did not contact the EEO Office to report any of these matters, including any stress due to her cancer, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

For further response, GW states that following Plaintiff's surgery on July 20, 2015, and despite assurances from her attending surgeon and her oncologist that the surgery had been curative and no further treatment was necessary, and despite Plaintiff's own report that she had been told the cancer was probably all gone, Plaintiff then talked frequently about having cancer and a need for ongoing treatment, although she had informed Dr. Catapano that there was no treatment follow up recommended. *See* Transcript of Deposition of Lisa A. Catapano, M.D., taken July 27, 2017, relevant portions of which are attached as **EXHIBIT HH** hereto, 109:4 – 110:5. Nonetheless, in light of a series of disturbing events including those during an overnight call on August 25, 2015, when Plaintiff had shown disregard for her own health to a level impairing her performance, Dr. Catapano became concerned that stress related to Plaintiff's surgery may have been a factor in her performance. *Id.* 111:9 – 112:16.  Thus, when Plaintiff spoke with Dr. Catapano about arranging her clinical rotation schedule at Children's National

Medical Center during September 2015 to assure she could attend regular therapy appointments, Dr. Catapano worked hard to assure that would happen and in that sense attempted to "accommodate" Plaintiff. *Id.* 109:15 – 110:5. In fact, Dr. Kecmanovic's records (Def.'s Exhibit U) show that Plaintiff had visits with Dr. Kecmanovic on September 3, 11, 15, 22, and 26. *Id.* At Kecmanovic 000001.

> 32. Dr. Catapano also admitted that she understood that Plaintiff's work was impacted by her medical condition. (Catapano Dep. 107:4-108:21; 109:4-112:21, Ex. K.)

RESPONSE: Agreed in that Dr. Catapano specifically testified that Plaintiff's mental state and anxiety were "impacting her work in a negative way" (Ex. K 111:2-10) because it had become "harder to track [her reasons for asking to leave work for doctor's appointments] because she [Plaintiff] was telling people different things" (*id*. 111:11-19) and that Plaintiff had engaged in "clearly insufficient self care to be able to do the job." *Id.* 111:20-112:5. For that reason, Dr. Catapano stated she "was concerned about [Plaintiff] and worried about her." *Id.* 112:7-8. Dr. Catapano further testified at this point, when asked whether she thought Plaintiff was using her former illness "as an excuse for poor performance" that "I [Dr. Catapano] don't think [Plaintiff] thought that she had poor performance." *Id.* 112:9-16.

> 33. Because GW did not accommodate Plaintiff's requests, Plaintiff was unable to schedule medical appointments necessary to address her physical and mental conditions, which caused Plaintiff to be late for or miss numerous appointments with her attending physicians and her therapist. (Pl.'s Am. Resp. to Interrog. at No. 10, Ex. D.)

RESPONSE: Denied. Plaintiff did not contact the EEO Office to report any of these matters, including any stress due to her cancer, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to

pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947. Further, every request for medical leave which Plaintiff did present to the Leave of Absence Program was granted. Declaration of Kimberly Vanlewen, Def.'s Ex. O, ¶¶ 28-30.

Further, when Plaintiff returned from a medical leave from May 18 – June 7, 2015 (which she had been recommended to take after being removed from her Internal Medical rotation at that time as being unsafe to practice) (*id.* ¶¶ 175-179, 185-186), she began an Emergency Medicine rotation at the GW Hospital Emergency Department. *Id.* ¶ 207. The Emergency Medicine team had been made aware of Plaintiff's health issues and contacted Plaintiff prior to her beginning the rotation to inquire about dates for medical appointments in order to properly modify her schedule. *Id.* ¶ 208. Plaintiff was then scheduled for 14 shifts over her three weeks in the EM rotation, fewer than the normal rotation of 20 shifts over 4 weeks that non-ED residents are generally assigned (*id.* ¶ 209), and 10 of those 14 shifts were scheduled overnight so that Plaintiff would have time during the day to attend medical appointments. *Id.* ¶ 210.

Further, the only medical appointment during this timeframe as to which Plaintiff claimed to have been given "a hard time" was a meeting on July 9, 2015 for anesthesiology paperwork. Plaintiff apparently went to that meeting and "no showed" her didactics class that day in psychodynamics with Dr. Cheryl Collins after she had explicitly told Dr. Collins she would attend the class. Def.'s SOF ¶¶ 244-247. When Dr. Emejuru heard of the no show, he reminded Plaintiff that personal appointments were not to be scheduled on Thursdays 8 a.m. – 5 p.m. which was set aside for didactics, but if a class needed to be missed unexpectedly, the resident still needed to alert the attending physicians and faculty members. *Id.* ¶¶ 253-254.

Plaintiff responded that she "was actually very upset that I was given such a hard time about going to this appointment." *Id.* ¶ 255.

Dr. Emejuru has noted that no one gave Plaintiff "any difficulty – much less a 'hard time' – about going to the pre-surgery appointment." *Id.* ¶ 256. Plaintiff did not advise anyone in the Program that she had the appointment or make a request for sick leave or other personal time off – "[s]he simply went to the appointment and no showed for didactics after telling Dr. Collins she would attend the class. *Id.*

For further response, GW states that while Plaintiff repeatedly states that she was "unable to schedule" medical appointments or was "late for" or had to "miss numerous appointments," with the exception of a genetics appointment on August 11, 2015, for which Plaintiff claims to have been late (she was required to complete medical records from an overnight shift with an unexpectedly high number of patients presenting to the Emergency Department) (Def.'s Ex. C, Emejuru Decl. ¶¶ 73-81 and Ex. #25), Plaintiff has never presented, despite request to do so, specific proof of any such events, and still does not do so in support of her statement of facts. There are no declarations from any health care providers regarding missed appointments or difficulty scheduling appointments, no copies of office records documenting missed appointments, no statements or invoices produced setting forth charges for missed appointments, no emails showing missed appointments attributable to any culpable conduct by the Residency Training Program, and no contemporaneous records submitted to the Program of any specific such events with proof of the event and request for Program response.

34. Dr. Griffith, one of Plaintiff's supervisors and Chair of Plaintiff's department, testified in his deposition that plaintiff's cancer diagnosis and condition were not relevant to whether or not she can perform her work duties. (Griffith Dep. 62:16-63:13, Ex. N.)

RESPONSE: Agreed that Dr. Griffith was Chair of the Department of Psychiatry and was an instructor for one of the didactic courses Plaintiff took. GW further admits that as Department Chair, Dr. Griffith had ultimate responsibility for the quality of clinical practice across all elements of the Department, including the residents in training and, as such, was one of Plaintiff's supervisors. Denied as to the purported summary of Dr. Griffith's testimony. This is false. What Dr. Griffith actually said on deposition was:

> Cancer is a tissue diagnosis. * * * That's a disease. Illness is all the behaviors and things in response to the disease. Whatever disease she may have is *not necessarily relevant* to how -- whether she can function or not. *What I'm looking at is her illness behavior around it.* And if she's going to be a doctor she is going to have to have a way to be able to provide good care to patients even if she has it. Because doctors have as many of these diagnoses as any of the rest of the population, you know.

*Id.* 62:22 – 63:13 (emphasis added).

35. Because Defendant did not accommodate Plaintiff's need to monitor her cancer, Plaintiff was late or missed several important medical appointments. For instance:
a. Plaintiff was unable to receive a follow-up renal ultrasound to check her kidney function because of scheduling difficulties. (Waggel Dep. 85:17-86:4, Ex. E.)
b. Plaintiff was late for a genetic testing work-up because she was not allowed to leave work. (Waggel Dep. 93:6-98:7, Ex. E.)
c. Plaintiff had difficulty making a follow-up appointment with Dr. Jarrett because GW scheduled her for a meeting with Dean Berger the same day. (Waggel Dep. 100:4-102:20, Ex. E.)
d. Plaintiff ultimately had to take FMLA leave because it was so difficult to schedule time for follow-up medical appointments. (Waggel Dep. 280:12-281:16, Ex. E.)

RESPONSE: Denied. These statements are false. As noted above, Plaintiff never contacted the EEO Office to report a disability or seek an accommodation although GW had advised Plaintiff on multiple occasions (through her employment contract, Resident Manual, policies and procedures, online web site, and multiple conversations with and emails from

employees) that any report of disability and/or request for accommodation must be presented to the EEO Office. Plaintiff never did that. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

Further, Plaintiff was informed promptly after July 20, 2015 surgery that the surgery was curative and that the cancer was all gone. Def.'s SOF ¶¶ 264-267, 271.  Dr. Jarrett confirmed that during surgery the cyst was removed in its entirety (Jarrett Decl., Def.'s Ex. H, ¶ 13), that the surgery was "curative" of Plaintiff's kidney cancer (*id.* at ¶ 29), and that pursuant to the American Urological Association guidelines, no further adjuvant treatment of any kind, such as radiation or chemotherapy, was either indicated or necessary, and the only recommendation for follow up care was once-a-year imaging for three years with a chest x-ray and either a CT scan or MRI of the abdomen. *Id.* Genetic testing is not included within the guidelines.

Paragraph 35(a): Dr. Jarrett's note of the first post-op visit on August 5, 2015 (Pl.'s Ex. X (MFA 0007) states in part: "We are going to get a renal ultrasound to make sure the kidneys are working well. * * * We will see her back after she has her ultrasound and proceed from there." There is no evidence that the ultrasound was actually scheduled. Plaintiff claims it was because of "scheduling difficulties" – not otherwise specified. Plaintiff has produced no evidence as to what those "scheduling difficulties" were, who the alleged source of the difficulties was, why the ultrasound could not be scheduled, or any follow up with Dr. Jarrett regarding the matter.

In fact, under guidelines published by the American Urological Association, patients with nephron-sparing surgery, i.e., partial nephrectomy which preserves kidney function – which is the surgery Dr. Waggel received – are to receive follow up abdominal imaging within three to twelve months following their renal surgery. *See* Supplemental Affidavit of Thomas W. Jarrett, M.D., attached hereto as **EXHIBIT PP**, ¶ 4. Dr. Jarrett's office note referred to a renal ultrasound which is a screening exam. *Id.* ¶ 5. In the interim, as noted in Dr. Jarrett's declaration

dated December 7, 2017, at paragraphs 21-23 and Exhibit 8 thereto, Dr. Siegel ordered a CT scan which was performed on October 20, 2015. *Id.* ¶ 6. With respect to imaging for kidney function, CT scanning is "the gold standard," so the AUA guidelines were fully complied with and Dr. Waggel received the imaging necessary to assure that she had good kidney function in her left kidney post-operatively. *Id.* ¶ 7. There was no interference by GW in any aspect of Plaintiff's medical care and treatment, and certainly not with regard to follow-up renal imaging post-operatively.

Furthermore, even if Plaintiff was not aware that the CT scan provided all the imaging reassurance necessary and she thought she needed to get a renal ultrasound, it is not correct that she could not have gotten the study done. The next visit with Dr. Jarrett was over seven months later on March 9, 2016. *Id.* MFA 0013. During the 7-month interval, Plaintiff engaged in at least the following appointments and leave:

| | |
|---|---|
| Aug 11 | Dr. Stark (MFA) office visit – genetics (MFA 0008-0009)[1] |
| Sep 03 | Dr. Kecmanovic office visit[2] |
| Sep 11 | Dr. Kecmanovic office visit |
| Sep 15 | Dr. Stark (MFA) office visit - genetics |
| Sep 15 | Dr. Kecmanovic office visit |
| Sep 22 | Dr. Kecmanovic office visit |
| Sep 22 | American Lipo Centers – laser lipo touch up (lower abdomen)[3] |
| Sept 26 | Dr. Kecmanovic office visit |
| Oct 06 | Dr. Kecmanovic office visit |
| Oct 13 | Dr. Kecmanovic office visit |
| Oct 20 | CT chest/abdomen/pelvis w/ contrast (MFA 0051) |
| Oct 20 | Dr. Kecmanovic office visit |
| Oct 26 | FMLA leave[4] |
| Oct 27 | FMLA leave |
| Oct 28 | FMLA leave |

---

[1] Pl.'s Ex. X (MFA records, MFA 0008-0050). This exhibit covers all MFA providers and studies.

[2] Def.'s Ex. U (Dr. Kecmanovic office records, Kecmanovic 000001-000002). This exhibit covers all Dr. Kecmanovic office visits noted here.

[3] Def.'s Ex. X (American Lipo Centers records, Amer Lipo Ctrs 000012-000015).

[4] Def.'s Ex. O (Vanlewen Decl. ¶ 20). This exhibit covers all FMLA leave noted here.

| | |
|---|---|
| Oct 29 | FMLA leave |
| Oct 30 | FMLA leave |
| Nov 03 | Dr. Kecmanovic office visit |
| Nov 04 | Dr. Shepard office visit – UTI, STD, refill med, referral |
| Nov 11 | Dr. Kecmanovic office visit |
| Dec 03 | Dr. Kecmanovic office visit |
| Dec 15 | Dr. Kecmanovic office visit |
| Dec 29 | Dr. Kecmanovic office visit |
| Jan 12 | Dr. Kecmanovic office visit |
| Jan 19 | Dr. Kecmanovic office visit |
| Jan 27 | Dr. Kecmanovic office visit |
| Feb 16 | Dr. Kecmanovic office visit |
| Feb 25 | Dr. Kecmanovic office visit |

GW has no record of any involvement of any kind regarding the scheduling of the post-op renal ultrasound and denies that it had any role in any "scheduling difficulties" that Plaintiff claims to have encountered in the matter.

Paragraph 35(b): Plaintiff's genetics work-up appointment, according to the MFA records, began on August 11, 2015 at 11:30 a.m. Pl.'s Ex. X (MFA 0008). Plaintiff had an overnight shift before the appointment during which an unexpectedly high number of patients presented to the ED and there was an admitted breakdown in the backup call (the Resident on backup call mistakenly believed another resident had the call and the Chief Resident also did not respond to Plaintiff's calls for assistance). Def.'s Ex. A, Catapano Decl. ¶¶ 305-309. Dr. Catapano was out of town that week (*id.* ¶ 305), but Plaintiff exchanged a number of contemporaneous text messages with her Chief Resident, Dr. Emejuru, about the circumstances. Def.'s Ex. C, Emejuru Decl. ¶¶ 73-81 and Ex. #25.

Dr. Emejuru agreed that there had been a breakdown in backup support and told Plaintiff to discuss that with the oncoming attending faculty member, Dr. Norris, when he came in that morning. *Id.* ¶ 74. In a text message beginning at 6:29 a.m. (*id.* Ex. #25 Bate 1130), Plaintiff told Dr. Emejuru that she had scheduled the genetics appointment on a "post call day so I wouldn't

have to miss work" (*id.*) and later noted that "sign out" was "in 30 min" and she was "signing out and going to my appointment then finishing my notes later." *Id.* Bate 1132.

Then, in a further text message starting at 11:39 a.m. (*id.* Bate 1140), Plaintiff reported to Dr. Emejuru: "Oh nice while I'm getting blood work done I get a text telling me to hurry up bc the social worker never wrote the one note she told me she wrote so I now need to write it." *Id.* Dr. Emejuru responded: "Just relax right now. I wouldn't do anything else beside take care of your appointment. Who was texting you?" Plaintiff texted further: "Also Elizabeth told me I had to finish my floor notes before leaving so I was late for my appointment that I told her I had. Carrie said the ED told her I had to submit my note but I thought we had 24 hours. Rushi used to do all his notes at home next day and I've done that before. Is there a new rule?" *Id.*

Dr. Emejuru responded further: "Not sure. But just submit them within 24 hrs. Don't worry. I will talk with Elizabeth." *Id.* Bate 1141. After further exchange with Plaintiff, Dr. Emejuru texted: "Keep doing what your doing. Your post-call. That's it. I will talk with Norris about the SW [Social Work Department] situation. Tomorrow, don't try to explain yourself to anyone (unless an attending/Norris). It's over. A new day. Keep doing your job on c/l." *Id.* Bate 1142. Plaintiff responded: "Sounds good to me!" *Id.*

On August 17, 2015, upon her return to town, Dr. Catapano emailed Plaintiff stating that she had been out of the office, had just heard about this incident, and that it sounded "like you made a heroic effort in the face of an awful night." Def.'s Ex. C ¶ 308 and Ex. #80 (Pl. Bates 748). Dr. Catapano further assured Plaintiff that "[w]e are looking at all of the things that went wrong that night to leave you with so little support, and will be addressing each of them. * * * I will keep you in the loop. Take care." *Id.* ¶ 309 and Ex. #80 (Pl. Bates 748).

These circumstances, while unfortunate and for which the Program immediately apologized, had no relationship to an alleged failure by GW to accommodate Plaintiff's claimed need to monitor her cancer.

Paragraph 35(c): Plaintiff's claims that she "had difficulty making a follow-up appointment with Dr. Jarrett because GW scheduled her for a meeting with Dean Berger the same day" and cites her deposition testimony at Pl.'s Ex. E, Waggel Dep. 280:12-281:16. The testimony in key part is as follows:

> Q      Well, it appears you did meet with him [Dr. Jarrett] on March 9, 2016; does that seem about right?
> A      That was the day that I told Dr. Emejuru and my attending and Ms. Anderson and some other people about that appointment. However they decided to schedule a meeting with the dean on that very day *at the same time as that appointment.*
>            So I was - - wouldn't have be [*sic*] able to go."

 *Id.* (emphasis added).

The purported statement of fact and Plaintiff's deposition testimony are false in every material respect and are denied.

 On February 18, 2016, Dr. Berger notified Plaintiff that he would be conducting a formal inquiry, including an interview with Plaintiff, concerning a Letter of Misconduct which had been issued regarding Plaintiff. *See* Email, dated February 18, 2016 from Dr. Berger to Plaintiff, a copy of which is attached at **EXHIBIT JJ** hereto (GWU 003713). The email did not set a date for the interview. *Id.*

At least as early as February 23, 2016, Plaintiff had scheduled her follow-up post-op visit with Dr. Jarrett for March 9, 2016. *See* Email, dated February 23, 2016 at 7:19 p.m., from Dr. Waggel to Dr. Gandhi, a copy of which is attached at **EXHIBIT JJ** hereto (GWU 003709).

The appointment was set for March 9 at 8:30 a.m. *See* Def.'s Ex. H, Jarrett Decl. ¶ 21 and Ex. #7 (MFA 0013).

In fact, Plaintiff stated at the time of these events that the "doctors [*sic*] appointments this week with specialists *took months to schedule*." *See* Email, dated March 8, 2016 at 7:27 p.m. from Plaintiff to Dr. Berger, a copy of which is attached at Ex. JJ (GWU 003735) (emphasis added).

The meeting with Dr. Berger was originally scheduled for March 17, but Dr. Berger advised Plaintiff by email that the issues needed to be addressed in a more timely manner so he had spoken with Dr. Catapano and Dr. Griffith and obtained their approval for time for the meeting the next day, March 9 at 1:00 pm instead of the 17th. *Id.*

On March 8, 2016 at 7:20 p.m., Plaintiff sent an email to Dr. Catapano dating that, "Due to my declining medical condition, I will be taking FMLA leave from 3/8/16 to 3/16/16. I have attached my approval from the Standard." *See* Email dated March 8, 2016 at 7:20 p.m. from Plaintiff to Dr. Catapano, et al., a copy of which is attached at Ex. JJ (GWU 003198).

On March 8, 2016 at 7:27 p.m., Plaintiff then replied to Dr. Berger that she would be on FMLA leave and planned to return for the meeting as scheduled on March 17th. *Id.* (GWU 003735).

In fact, the visit with Dr. Jarrett was a routine post-op follow up visit scheduled for March 9 at 8:30 a.m. *See* Def.'s Ex. H, Jarrett Decl. ¶ 21 and Ex. #7 (MFA 0013).

The visit lasted less than 15 minutes. *Id.*

The statement that because GW did not "accommodate Plaintiff's need to monitor her cancer" she was late or missed this appointment is false. Plaintiff attended on the date and time scheduled.

37

The statement that Plaintiff had difficulty making a follow-up appointment with Dr. Jarrett "because GW scheduled her for a meeting with Dean Berger the same day" is false. Plaintiff had scheduled the appointment months before the meeting with Dean Berger was scheduled.

The statement on deposition that GW decided to schedule a meeting with the dean on the very same day and "*at the same time*" is false. The medical appointment was at 8:30 a.m. and the meeting was scheduled for 1:00 p.m.

The statement on deposition that because the medical appointment and the meeting had allegedly been scheduled on the same date and time "So I was - - wouldn't have be [*sic*] able to go" is false. The appointment was for routine follow up and would never have lasted over four hours.

Paragraph 35 (d): This deposition testimony refers to circumstances in which Plaintiff said she was told near the end of a month that when she tried to go to appointments she would need to repeat the entire month on a clinical rotation. Waggel Tr. 281:1-7. Plaintiff then stated that she decided to apply for FMLA leave and while on leave got emails about "notes I have to write so "I basically had to work even though I was on FMLA leave." *Id.* 281:8-16.

These are the same circumstances set forth in Paragraph 36, below. GW denies these assertions and sets forth its response in Paragraph 36, below

> 36. While Plaintiff was on FMLA leave, in order to have time to attend appointments related to her cancer diagnosis, Defendant forced Plaintiff to work during her leave. (Waggel Dep. 280:12-281:16, Ex. E.)

RESPONSE: Denied. This is false.

Plaintiff was scheduled to take a required two-day, computer-based national licensing exam (USMLE Step 3 Exam) on October 29-30, 2015. *See* Appointment Reminder, dated

October 26, 2015, a copy of which is attached as **EXHIBIT KK** hereto (Pl.'s Bates 888-889). Plaintiff had previously requested from her attending physician at Inova Fairfax Hospital that she be granted four days administrative leave for the exam which the physician had signed. Def.'s Ex. C, Emejuru Decl. ¶¶ 189-190 and Ex. #54. When this was called to Dr. Catapano's attention she explained to Dr. Emejuru that the Program only allowed two days administrative leave for the two-day exam and, as a result, the Associate Program Director, Dr. Kels, had then informed Plaintiff that in fairness to all other residents in the Program the leave would need to be adjusted. *Id.* ¶¶ 191-193.

Since Plaintiff was already counting on the time off, Dr. Kels had offered Plaintiff either to take 2 admin days and 2 personal/vacation days or take 2 admin days and return to duty after the exam, the choice was up to Plaintiff. *Id.* ¶¶ 194-195.

In that regard, Dr. Kels also alerted Plaintiff to the fact that while the Program would approve whichever decision she made, she should be aware in making the decision that her "attendance at PHP [her current clinical rotation] this month puts you in jeopardy of failing the rotation, based solely on the number of days worked/not worked." *Id.* ¶ 196.

On October 22, 2015 at 4:48 p.m., Plaintiff responded that she was being treated unfairly "in regard to sick days for cancer follow up and taking administrative leave for my licensing exam . . . ." *Id.* ¶ 198 and Ex. #55 (GWU 001325). The proposed change in administrative leave had nothing to do with a discussion of sick days. *Id.* ¶¶ 199-200. An error had been made in processing the application for administrative leave and the Program Administrator apologized to Plaintiff for the error. *Id.* ¶ 203.

On October 22, 2015 at 5:00 p.m., Dr. Emejuru received a text message from Plaintiff stating that she was applying for sick leave immediately until November 2, which would cover

the time away for the USMLE Step 3 exam and the other two days of leave for which administrative time had been incorrectly granted. *Id.* ¶ 205 and Ex. #56 (GWU 001318).

On October 22, 2015 at 6:29 p.m., Plaintiff sent an email to Mary Tucker, Director, Graduate Medical Education, stating she had "become very ill" and was requesting medical leave until November 2. *See* Email, dated October 22, 2015 at 6:29 p.m. from Plaintiff to Ms. Tucker, attached within Ex. KK (GWU 003195). The next morning, Ms. Tucker promptly notified the GW Benefits Administrator (*see* Email, dated October 23 2015 at 8:04 a.m., Ms. Tucker to Mr. Paul, attached with Ex. KK (GWU003182)) who promptly contacted Plaintiff to advise that the administrator handled both leave and disability for the University and to instruct Plaintiff how to apply either by telephone or online. *Id.* Email, dated October 23, 2015 at 9:39 a.m., Mr. Martin to Plaintiff.

Plaintiff applied for the leave through November 1, a Sunday (*see* Email, dated November 2, 2015 at 5:01 p.m., Mr. Martin to Ms. Tucker, attached within Ex. KK (GWU 003184), went out on leave, and returned to duty on November 2. *Id.* Email, dated November 3, 2015 at 9:56 a.m., Ms. Tucker to Mr. Martin.

On October 28, 2015, during this leave, Bhavin Dave, M.D., a physician at Children's National Medical Center, where Plaintiff had done an off-site clinical rotation in September, sent an email to Plaintiff stating: "Hey Stephanie, I hate to keep bothering you guys, but I think you were following [patient name redacted]. Can you please clarify and if so, complete the d/c [discharge] summary. Thanks so much!" *See* Email dated October 28, 2015 at 1:07 p.m., Dr. Dave to Plaintiff, a copy of which is attached within Ex. KK (Stephanie Waggel Supp. Prod. (Oct) 197 – 198 of 466).

On October 28, 2015 at 2:45 p.m., Plaintiff responded: "Oh yes absolutely it's no bother. I have been really sick lately and on medical leave but I'll get it done by the weekend. Thank you."

On October 28, 2015 at 4:55 p.m., Dr. Dave responded: "I'm sorry to hear about your feeling sick. Feel better soon!"

Defendant is not aware of any other occasion that would relate to the circumstances described in Paragraph 36. The statements in Paragraph 36 are false:

Plaintiff was not on FMLA leave in order to have time to attend appointments related to her cancer diagnosis; she went on leave to take the USMLE Step 3 Exam.

Defendant did not "force" Plaintiff to work during her leave. The doctor who contacted Plaintiff did not even know she was on leave claiming to be ill, and Plaintiff volunteered to comply with his request to complete one (long overdue) discharge summary.

37. Additionally, Plaintiff was unable to schedule certain medical appointments in a timely manner due to not having a schedule set in advance for 7/18/15, 10/22/15[5], 11/23/15, 12/1/15, 12/2/15, 12/3/15, 1/24/2016, 1/26/16, and two appointments in February 2016. (Pl.'s Am. Resp. to Interrog. at No. 10, Ex. D.)

RESPONSE: GW objects to this assertion of fact containing multiple separate alleged episodes with no further identifying detail (which health care provider, what time of day, who failed to make the schedule, when was the schedule due, how far in advance was notice required to schedule an appointment). For further response, GW states that Plaintiff never contacted the EEO Office to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind, although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that

---

[5] Plaintiff missed her appointment on this day in part because Dr. Collins would not allow Plaintiff to leave her class early to attend the appointment.

remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

For further response, GW states it appears inconsistent that Plaintiff states she could not schedule appointments in advance on specifically identified dates because she did not yet know whether those dates were even within the realm of possibility depending on what the yet-to-be released schedule would block out.

The matters set forth are denied. GW specifically denies that members of the Program ever failed to attempt to work with Plaintiff to set an advance schedule to assist her in scheduling medical appointments. GW further states that every request for medical leave that Plaintiff did make was granted. *See* Def. Exhibit O, Vanlewen Decl. ¶ 30. The record is replete with efforts by individuals within the Program to assist Plaintiff with scheduling matters, e.g., Def.'s SOF ¶¶ 228-230 (Dr. Catapano, Dr. Emejuru), 235-240 (Dr. Emejuru), 375-377 (Dr. Catapano), 379 (Dr. Emejuru); Def. Ex. C, Emejuru Decl. ¶¶ 18-23, 185-188, 220-225, 247, 275-279, 283-286, and Def. Ex. G, Roche Decl. ¶¶ 6-9.

Plaintiff specifically states that she "missed" an appointment on October 22, 2015, because Dr. Collins would not allow Plaintiff to leave the class early to attend the appointment. That day was a Thursday – didactics day in the Program – and residents are instructed that those days are protected and residents are required to be available for didactics. Def. SOF ¶¶ 29-33. Residents are further instructed that if a medical appointment is scheduled on a Thursday, it must be treated as sick time off and "require[s] the same process of alerting attending/instructors and administration as required on any other day of the week." Def. SOF ¶ 32. There is no evidence that Plaintiff applied for and obtained sick leave for the appointment on October 22, 2015. Def. Ex. O, Vanlewen Decl. ¶ 28. The first record of Plaintiff ever applying for sick leave is on

October 26. *Id.* ¶ 20. Under the circumstances, Dr. Collins had no authority to "allow" Plaintiff to leave the class early.

38. Plaintiff was specifically penalized for attending doctors' appointments – even when she clearly followed proper protocol as requested by her supervisor. Plaintiff was punished in this manner (1) for all appointments she attended, but most particularly on 6/10/15, 7/9/15, and 11/10/2015, (2) for hospitalizations from 7/20/15 to 7/23/15, 8/5/15, 10/19/15 and 10/21/15, (3) and for FMLA leave taken on 10/22/15 to 10/31/16, and 3/9/16 to 3/16/16.  (Pl.'s Am. Resp. to Interrog. at No. 10, Ex. D.)

RESPONSE: GW objects to this assertion of fact containing multiple separate alleged episodes with no further identifying detail (which health care provider, what time of day, who failed to make the schedule, when was the schedule due, how far in advance was notice required to schedule an appointment). For further response, GW states that Plaintiff never contacted the EEO Office to report any of these matters, or any other diagnosis, illness, condition, symptoms, or complaints, or to request an accommodation of any kind, although Plaintiff was repeatedly advised and even encouraged to do so and was provided with the information to pursue that remedy upon entry into the residency training program and repeatedly during her tenure in the program. Def.'s SOF ¶¶ 57-58, 60-63, 187-194, 944-947.

For further response, GW denies the matters set forth. Plaintiff says in conclusory fashion that she was "penalized" for attending doctors' appointments but never says how, by whom, or to what effect. Defendant denies that Plaintiff was ever penalized in any fashion. Plaintiff specifically says she was "penalized" for the hospital admission on July 20-13, 2015, when Dr. Jarrett removed her cancer. There is no evidence that anyone did anything but support Plaintiff in scheduling this surgery and the related leave time and in coordinating her training schedule immediately before and after the surgery leave. These matters are more fully set forth in the responses to Paragraphs 21 – 24 above which are incorporated herein by reference.

39. A letter of deficiency (LOD) is given to residents to identify and help correct performance problems related to medical knowledge or professionalism. It is part of their record while in training, but not reportable once they leave. (Catapano Dep. at 29:20-30:15, Ex. K; 30(b)(6) Berger Dep. 56:4-16, Ex. O.)

RESPONSE: Agreed.

40. In contrast, a reportable action,[6] which means the action is reportable to other employers, medical boards, and licensing bodies once resident leaves the program, includes extensions in training, non-renewals, and terminations. (30(b)(6) Berger Dep. at 56:4-16, Ex. O; 30(b)(6) Dyer Dep. 47:17-48:18, Ex. P; GWU 00014, Ex. T.)

RESPONSE: Agreed.

41. On July 15, 2015, Defendant issued Plaintiff her first "deficiency letter." Defendant stated that the deficiency letter was issued because Plaintiff allegedly did not appear for her emergency room shift on June 10, 2015, the day she learned from her doctor she possibly was suffering from cancer. (Waggel Dep. at Ex. 8, Ex. E.)

RESPONSE: GW agrees that Plaintiff received her first Notice of Deficiency letter on July 15, 2015. Defendant denies that the letter was issued because Plaintiff "allegedly" did not appear for her ED shift on July 10, 2015. Plaintiff did not appear that morning on time for the shift, failed to notify any of the individuals she was required to notify if for any reason she was not going to appear on time, and was reached only after several hours of effort to contact her when she reported that "was not feeling well and had decided not to come to work that day." *See* Def. Ex. G, Roche Decl. ¶¶ 20-29. Plaintiff's shift began at 7:00 a.m. *Id.* ¶ 20. Plaintiff's appointment with Dr. Jarrett was at 2:45 p.m. *See* Def. Ex. H ¶ 3 and Ex. #1 (MFA 0001). GW further denies that Plaintiff's scheduled appointment with Dr. Jarrett that afternoon, or anything she may have learned during the appointment, had any bearing on her professional obligation

---

[6] "A reportable action would be an action that would be reported to ACGME that would affect the resident's education externally. So, for example, failure to be promoted to the next-year program would be reportable so that, if a resident wanted to transfer to another program, that other program would have that information and could look it up. Termination would certainly be a reportable action." (30(b)(6) Dyer Dep. 47:17-484:18, Ex. P.)

either (1) to appear for duty on time that morning or (2) either notify proper personnel in advance

of her non-appearance or secure a proper replacement.

42. Plaintiff in fact did appear for her July 10, 2015 shift and left on time to address her medical condition. (Waggel Dep. 145:8-149:15, Ex. E.)

RESPONSE: Denied if this is meant to suggest that Plaintiff made an appropriate

appearance for the ED shift on July 10, 2015. Plaintiff's conduct was highly unprofessional. *See*

Def. Ex. G, Roche Decl. ¶ 26. The fact that ED and Program personnel had to expend several

hours of effort before being able to contact Plaintiff, that Plaintiff then reported that she was not

feeling well and had decided not to come to work, that Plaintiff had not notified anyone as soon

as she became aware that she was ill and would not report for work and had not found an

appropriate substitute to take her place, and that Plaintiff agreed to come to work only after she

had been contacted and after further conversation and eventually reported for duty in the ED

several hours late does not meet any standard by which it can be said "Plaintiff in fact did

appear" for this shift.

43. Despite the fact that Plaintiff did appear for her shift, GW never retracted this deficiency letter. (Waggel Dep. 145:8-149:15, Ex. E.)

RESPONSE: Agreed that the Notice of Deficiency letter was never retracted. GW further

states that Plaintiff's conduct constituted a very clear breach of the standard of professionalism in

the ED, as well as the entire hospital. *See* Def. Ex. G, Roche Decl. ¶ 26. GW further states that

Plaintiff's report for duty to the ED several hours late and only after she had been contacted after

several hours of trying to reach her provides no justification for or defense of her behavior. There

has never been any reason to consider retracting the letter.

44. This July 15, 2015 LOD does not mention or discuss Plaintiff's medical condition as a possible mitigating factor. (Waggel Dep. Ex. 8, Ex. G.)

RESPONSE: Agreed. For further response, GW states this is immaterial and irrelevant. The Letter of Deficiency does not mention or discuss Plaintiff's medical condition since it is not a possible mitigating factor for this breach in professionalism. Plaintiff never claimed that she had been rendered unconscious or otherwise incapable of fulfilling her professional obligation to notify the attending physician and Program leadership that she was not going to show up at the time she was scheduled to begin – and the Emergency Medicine team expected and needed her to be available for – patient care duty. Instead, Plaintiff stated "that she was not feeling well and had decided not to come to work that day." *See* Def. Ex. G, Roche Decl. ¶ 23.

45. On August 5, 2015, Dr. Catapano informed Plaintiff during her semiannual review (also known as "milestones") that her new graduation date from residency would be July 14, 2018, because of the days Plaintiff had taken off from her surgery and recovery therefrom.  (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed that during the Milestones review on August 5, 2015, Dr. Catapano informed Plaintiff that the new date for her completion of the residency training program would be extended two weeks from June 30, 2018, to July 14, 2018. *See* Supplemental Declaration of Lisa A. Catapano, M.D., attached as **EXHIBIT LL** hereto, ¶ 4.  For further response, GW denies that the reason for the extension was attributable solely to the leave Plaintiff had taken for her July 20, 2015 surgery and post-op recovery. *Id.* ¶ 5. Even if the days were attributable to the leave for surgery, the ACGME minimum requirements for training days must be met without regard to any reason why they may have been missed, including health-related matters. *Id.* ¶ 6. There is no substitute for actual clinical training time for physicians to acquire the clinical skills necessary to complete a residency training program and receive a certificate of completion signifying that each physician is fully trained, qualified, and competent to begin practicing medicine within his or her specialty independently and across a variety of practice settings. *Id.* ¶

46

7. The notice to Dr. Waggel that her time in training would be extended by two weeks was not a form of punishment or discipline of any kind. *Id.* ¶ 8. To the contrary, extensions of time in training occur with some frequency and actually represent an investment by the training program in the physician since the training program does not receive additional payment from the Medicare program for the additional training time. *Id.* ¶ 9. *See also* Def.'s SOF ¶¶ 631-633, 636.

46.  On August 11, 2015, Plaintiff informed Dr. Catapano that
a.  although Plaintiff was supposed to be on light duty at that time (by her physician's orders), Plaintiff was working harder than regular duty, such that Plaintiff had no time for breaks to eat or rest (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.);
b.  Plaintiff had interviewed so many patients that day that lost her voice (*Id.*);
c.  Plaintiff had seen a record number of patients that day (*Id.*); and
d.  the backup resident and attending refused to come in to assist Plaintiff (*Id.*)

RESPONSE: Denied.

46(a) – Plaintiff had been scheduled for the night shift because it was expected to provide lighter than normal duty. *See* Def. Ex. C, Emejuru Decl. ¶¶ 36-37, 51. These arrangements were discussed with Dr. Waggel in advance and she agreed with them. *Id.* ¶¶ 36-37. On August 11, 2015, however, there was an unexpectedly high number of patients needing Psychiatry consults resulting in unexpected demands on Plaintiff. GW denies that it is ever either necessary or appropriate for a physician on clinical duty not to be able to manage resources sufficiently and that self-care, including appropriate rest breaks and nutrition, is an element of Professionalism to be maintained to remain safe for patient practice. *See* Def.'s Ex. C, Catapano Decl. ¶¶ 344, 353-357, and Ex. #85.

46(b) – GW agrees that Plaintiff stated in a text message at 6:29 a.m. to Dr. Emejuru that "I have no voice." Def. Ex. C, Emejuru Decl. ¶ 73, Ex #25 (Pl. Bates 1129). Later that morning, Plaintiff had a genetics office visit and consultation with Elizabeth Stark, M.S., CGC, beginning at 11:30 a.m. *See* Pl. Ex. X, MFA records (MFA 0008-0009). During the visit, Ms. Stark noted

that she obtained Plaintiff's personal and family history and stated: "All questions were answered. In total, 55 minutes were spent in consultation, of which the majority was spent in face-to-face counseling." *Id.* There was no notation by Ms. Stark of any difficulty communicating with Plaintiff during the consultation. *Id.*

46(c) – Denied. Plaintiff does not document the actual number of patients seen so GW cannot compare this with normal or exceptional patient census figures. GW agrees, however, that the patient load during this shift was unfortunately – and unexpectedly – greater than had been planned when Dr. Emejuru discussed this shift assignment with Plaintiff as an appropriate way to get her back into a clinical rotation on light duty. Please also see the response to Paragraph 35(b) above which is incorporated herein by reference.

46(d) – Agreed that the back-up resident unfortunately was confused as to whether it was her night on duty and referred Plaintiff to another resident who was not on call and therefore did not respond to requests for assistance. Please see the response to Paragraph 35(b) above which is incorporated herein by reference. Defendant denies that the attending refused to come in. There is no record of contact with the attending, this is generally not the role of the attending, and Plaintiff did not mention this in her contemporaneous text message communications with Dr. Emejuru through the night and into the early morning hours. GW agrees that there was a system failure resulting in a lack of proper support for Plaintiff during this shift for which the Program apologized and which Dr. Catapano specifically acknowledged, stated would be addressed, and told Plaintiff she would be kept in the loop on those matters. Defendant denies that this was the result of a failure to accommodate or of retaliation of any kind.

47. Because of this greater than full-time work, Plaintiff was late for her appointment with her geneticist.  (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Denied. Please see the response to 35(b) above which is incorporated herein by reference.

48. On October 22, 2015, Defendant informed Plaintiff that because she took three days off (which were approved at the start of her rotation) and was scheduled to take a licensing exam the following week (as suggested by Plaintiff's Chief Resident), Plaintiff would have to repeat the entire month's rotation. (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Denied. Please see the response to Paragraph 36 above which is incorporated herein by reference.

49. The notification that she would have to repeat the entire month's rotation caused Plaintiff debilitating anxiety, and Plaintiff informed the administration that their actions were impeding her medical treatment and causing her severe mental and physical harm.  (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Denied. For further response to this reference to the communications on October 22, 2015, please see the response to Paragraph 36 above which is incorporated herein by reference.

50. On October 28, 2015, Defendant issued Plaintiff a second "deficiency letter" for allegedly failing to complete an annual health clearance, even though it was Defendant's actions that impeded Plaintiff's ability to secure required documentation in a timely fashion because Defendant stationed her at another hospital.  (Waggel Dep. 200:10 -203:10, Ex. E.)

RESPONSE: Agreed that GW issued Plaintiff a second Notice of Deficiency letter on October 28, 2015. The remaining statements are false and are denied.

For further response, GW denies that the letter was issued for Plaintiff "allegedly failing to complete an annual health clearance." Plaintiff failed to complete the annual health clearance despite actual knowledge as early as April 2015 of the compliance deadline of September 30, 2015. *See* Def.s Ex. B, Berger Decl. ¶¶ 11-13. Plaintiff received multiple further notices and reminders of the need to comply and residents are told that this requirement is mandated by D.C. law as a public health safety measure, is considered a serious matter, and is to be strictly

enforced. *Id.* ¶ 14. Dr. Waggel failed to meet the September 30 deadline and was then given an extension to October 14. *Id.* ¶ 15. She then failed to meet the extended deadline. *Id.* ¶ 16. Dr. Berger then issued the October 28, 2015 Notice of Deficiency letter. *Id.* ¶ 16.

It is false to say that Plaintiff failed to meet the deadline "because Defendant stationed her at another hospital." Plaintiff was not stationed at another hospital for six months. And even when individuals are assigned to off-site rotations, they still have to comply with District of Columbia law.

Further, the annual health clearance process is simple, straight-forward, and easily accomplished. *See* Def.'s Ex. CC, Berger Supp. Decl. ¶ 15. Residents are even permitted to use a personal physician to complete the process. *Id.* ¶ 18. But even if they use the GW University Hospital Employee Health Office ("EHO"), the process is easily arranged (*id.* ¶ 22), involves two visits to EHO (one about 20-30 minutes, the other a matter of a few minutes). *Id.* ¶ 23.

51. Moreover, Defendant treated Plaintiff differently than other GW residents. Many other residents also failed to provide information in a timely fashion, but they did not receive any deficiency letters. (Waggel Dep. 200:10 -203:10, Ex. E.)

RESPONSE: Denied. There is no evidence in this record that anyone else received the extensive reminders that Plaintiff received concerning the September 30 deadline, failed to meet that deadline, received an extension of the deadline, and then failed to meet the extended deadline.

52. This LOD does not mention or discuss Plaintiff's medical condition as a possible mitigating factor.  (Waggel Dep. 200:10 -203:10, Ex. E; Waggel Dep. Ex. 11, Ex. I)

RESPONSE: Agreed. For further response, GW states that this is immaterial and irrelevant. Even with a medical condition, any physician providing clinical care to patients in the District of Columbia must complete an annual health clearance every year on or before

September 30. No exceptions. Physicians who have not completed the clearance must stop clinical practice until they do. Def.'s Ex. A, Catapano Decl. ¶¶ 81-82 and Ex. #14 (GWUH 000474-000475). *See also* Def.'s Ex. HH, Catapano Dep. (07/27/2017), 64:11-68:1. Dr. Catapano testified that she did not see "[w]hat her medical issues have to do with the fact that it is a requirement for every single clinical employee of the hospital to put in a health clearance." *Id.* 67:4-8. Dr. Catapano further testified: "Whether you have illness or not the health clearance says you are well enough to practice. And whether she had medical issues or not doesn't – doesn't change the fact that you have to put your health clearance in every year." *Id.* 67:8-12.

> 53. On November 10, 2015, Plaintiff received a call from Dr. Catapano. Dr. Catapano told Plaintiff that she had taken too many sick days and that she should not come back to work. During this call, Dr. Catapano informed Plaintiff that "the deans are going to have a legal meeting about you" and "you have taken too much medical leave." (Waggel Dep. 204:22-208:21, Ex. E; Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed that on November 10, 2015, Dr. Catapano telephoned Dr. Waggel to advise her that she was being removed from clinical duty effective immediately. The remainder of this statement is false and is denied.

For further response, GW states that Dr. Catapano telephoned Dr. Waggel and informed her that as a result of a decision made by Dean Berger, she was being removed from clinical rotations effective immediately and that Dean Berger would be meeting with her very soon to review the matter with her. *See* Def.'s Ex. LL, Catapano Supp. Decl., ¶ 10. This call was precipitated by the fact that Dean Berger had received very disturbing information through a community complaint from neighbors in Dr. Waggel's apartment building accompanied by DC Metropolitan Police Department reports that Dr. Waggel had engaged repeatedly in highly disruptive behavior apparently involving alcohol or potentially some other form of drug or substance abuse. *Id.* ¶ 11. Given the significant concern for patient safety raised by this

information, Dean Berger had instructed Dr. Catapano that Dr. Waggel was to be removed

immediately from clinical duties while he conducted a prompt review of the matter. *Id.* ¶ 12. The

reason for Dr. Catapano's telephone call to Dr. Waggel had nothing to do with any medical

issues related to Dr. Waggel or her use of medical or sick leave, and Dr. Catapano said nothing

about those matters to her during the telephone call. *Id.* ¶ 13.

> 54. On November 19, 2015, GW issued Plaintiff a third "deficiency letter" for
> alleged problems that occurred on an overnight shift on a psychiatry ward on
> August 25, 2015. (Waggel Dep. Ex. 10, Ex. H).

RESPONSE: Agreed that on November 19, 2015, a revised version of Plaintiff's third

Letter of Deficiency was issued to Plaintiff regarding problems that occurred on an overnight

shift on a psychiatry ward on August 25, 2015. GW denies that the problems were only "alleged"

– the events demonstrated deficiencies in Dr. Waggel's performance during the shift in the

ACGME domains of Patient Care, Interpersonal Skills, and Systems-Based Practice as set forth

in the letter (*see* Def.'s Ex. A, Catapano Decl. ¶¶ 602 (and Ex. #144), 656 (and Ex. #150)).

> 55. On that day the psychiatry ward was unprepared for a large influx of
> unexpected admissions caused of the closure of a homeless shelter. In issuing
> the LOD, Defendant held Plaintiff, and only Plaintiff, responsible for
> problems caused by this unexpected influx. (Waggel Dep. 171:2-199:22, Ex.
> E; Waggel Dep. Ex. 10, Ex. H.)

RESPONSE: Agreed that on August 25, 2015, there was an unexpectedly high number of

patient admissions requiring psychiatry services and consultations as a result, at least in part, of

the closure of a homeless shelter. GW denies that "only Plaintiff" was held responsible for

"problems caused by this unexpected influx." Plaintiff received the Letter of Deficiency not for

"problems caused by this unexpected influx" but solely for the several instances of her own sub-

standard performance and behavior during the shift which were thoroughly documented and

discussed with Plaintiff at the time of the events and in a series of subsequent meetings and discussions with Plaintiff. *See* Def.'s Ex. A, Catapano Decl. ¶¶ 311- 359 and Exs. 81-85.

 56. During the problems on August 25, 2015, Plaintiff had no proper backup, in violation of guidelines. (Spitz Expert Report at 5, 7-8, Ex. Z.)

RESPONSE: Denied. Leaving aside the irrelevance of Dr. Spitz's report, the pages cited (copies of which are attached as **EXHIBITT MM** hereto) do not contain the assertion that on the August 25, 2015 shift "Plaintiff had no proper backup, in violation of the guidelines."

On page 5, the only discussion of August 25 (at the bottom of the page) concerns an alleged delay in providing formal feedback to Dr. Waggel about the events, an observation born of the limited information available to Dr. Spitz for her review.

On page 7, there is no discussion whatever of the August 25 call.

On page 8, there are two references to the August 25 call. The first, in the middle of the page, refers to "the very demanding call of Aug. 25, 2015, which SW [Stephanie Waggel] did not handle well" and then notes an alleged failure to develop immediately an intervention addressing her "anxiety, her disorganization and her poor judgment evident on that August 25 call." The second reference at the bottom of page 8 discusses again Dr. Spitz's view that there was not "a meeting with the unit attending within a week, to identify in concrete terms of what occurred and how SW could have managed specific problems better, and to identify problems in . . . ." [end of page].

The words "no proper backup" and "in violation of guidelines" do not appear anywhere on the cited pages regarding the August 25 call nor is there any statement in substance to that effect.

 57. The letter indicated that Plaintiff would not progress to her third year of residency.  (Waggel Dep. 171:2-199:22, Ex. E; Waggel Dep. Ex. 10, Ex. H.)

RESPONSE: Agreed.

58. This third LOD does not mention or discuss Plaintiff's medical condition as a possible mitigating factor.  Moreover, the letter failed to acknowledge that Plaintiff had worked an extra shift and had been working thirty (30) hours, rather than light duty. (Waggel Dep. 171:2-199:22; 271:21-272:12, Ex. E.)

RESPONSE: Agreed that the third Letter of Deficiency did not mention or discuss any

medical issues as a possible mitigating factor. The remaining statements are denied. For further

response, GW states that the deficiencies in the ACGME domains noted as the basis for the letter

were not medically related as documented in the letter and the contemporaneous reports of the

events on the August 25 call. *See* Def.'s Ex. A, Catapano Decl. ¶¶ 311-359, 602, 656 and 656. In

fact, when Plaintiff reported she had worked a "30 hour shift," Dr. Catapano checked and found

out that the claim was not true. *See* Def.'s Ex. A, Catapano Decl. ¶ 354.

59. Defendant was aware that Plaintiff was struggling to keep pace with the residency requirements and was aware that Plaintiff had explained her difficulties were based on having to deal with her cancer diagnosis and corresponding treatment, even though the some members of the GW faculty refused to believe her. (*See* Griffith Dep. 32:18-36:18, Ex. N.)

RESPONSE: Denied. The testimony cited does not contain these statements.

60. On November 19, 2015, Dr. Catapano informed Plaintiff that she could return to work. (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed that on November 19, 2015, Dr. Catapano informed Plaintiff that

she could return to clinical rotations beginning with Geriatrics the next day.

61. At that time, Dr. Waggel learned that she was failing Dr. Collins' didactics class because of her approved absences and forced leave.  (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed that during the meeting with Dr. Catapano on November 19, 2015,

Dr. Waggel was explicitly notified that she was failing Dr. Collins' didactics class. The

remaining statements are false and are denied. For further response, GW states that the facts and

circumstances concerning Dr. Waggel's failing performance in Dr. Collins' course titled Introduction to Psychodynamic Thought are set forth in Dr. Collins' declaration, Def.'s Ex. I, which is incorporated herein by reference. On November 7, 2015, Dr. Collins had already informed Plaintiff based on Dr. Collins' review and extensive commentary on a writing assignment (known as a "formulation") Plaintiff had submitted that "[i]t likely will come as no surprise to you that I don't think you understand psychodynamic concepts. This has been evident both as I consider your 2 formulations and your class participation."  *See* Def.'s Ex. I, Collins Decl. ¶ 36 and Ex. #6.

> 62. Dr. Collins's class had neither tests nor a graded final assignment, but Dr. Collins would not allow Plaintiff to make up the time she missed so she could pass. (Waggel Dep. 209:10-211:14; 221:18-224:22, Ex. E.)

RESPONSE: Agreed that this course did not include tests or a graded final assignment. The remaining statements are denied.

Dr. Catapano has testified that she and Dr. Collins specifically discussed whether Plaintiff could make up the material without repeating the course and that Dr. Collins very much wanted to consider that option. Def.'s Ex. DD, Catapano Dep (09/07/2017) 35:2-17. As a result of that discussion, however, they both concluded that, given the level of Plaintiff's deficiency in not understanding the material, Plaintiff would not be able to make up the work and get back to a level where she could progress into Dr. Zinner's Psychodynamic Psychotherapy course beginning in January. *Id. See also* Pl.'s Ex. J (Letter of Deficiency dated December 10, 2015).

As Dr. Collins makes clear in her declaration, Plaintiff demonstrated repeatedly that she completely lacked understanding of the psychodynamic concepts covered in the course (Def.'s Ex. I, Collins Decl. ¶ 30), showed a non-mastery of the class material during class participation (*id.* ¶ 32), and could not even make an article presentation to the class although she had observed

other classmates who had presented before her. *Id.* ¶¶ 19-23. Dr. Collins had also explained to

Plaintiff in detailed commentary on a patient formulation Plaintiff had submitted that it was clear

that Plaintiff did not understand psychodynamic concepts and that it would be difficult to master

the material without attending classes: "Psychodynamic theory is difficult to comprehend

without the assistance of someone who does understand it. That is why I assign the readings and

then facilitate a discussion about them." *See* Def.'s Ex. I, Collins Decl. ¶ 36 and Ex. #6 (GWU

001541). Plaintiff was "routinely absent" from the classes (*id.* ¶ 15), missed "more classes than

she attended" (*id.* ¶ 16), and did not attend any of the feedback sessions that had been listed on

the course syllabus. *Id.* ¶ 17.

> 63. On December 10, 2015, Plaintiff received a fourth LOD.  That letter stated
>     that because she missed didactics classes, she would need to repeat classes
>     and rotations and she would not be permitted to progress to her third year of
>     residency.  (Catapano Dep. 80:5-82:20, Ex. K.)

RESPONSE: Agreed that on December 10, 2015, a fourth Letter of Deficiency was

issued to Plaintiff stating that she would need to repeat two didactics courses and would not

progress to the third year of residency training. The remainder of this statement is false and is

denied.

Leaving aside that the portion of the transcript cited involves testimony about the

contents of a document which speaks for itself, the representation that Dr. Catapano testified that

the "letter stated that *because she [Plaintiff] missed didactics classes*, she would need to repeat .

. . ." is false. (Emphasis added.) The transcript could not be clearer at the beginning of the

portion cited:

> Q       Okay. And can you tell me why Dr. Waggel was getting less
> than a month after the prior one, letter of deficiency, why she was
> getting another letter of deficiency?

>       A       This addressed a different issue which was her failure to meet a
> reasonable standard in two didactic courses.
>
>       Q       Okay. And in fact Dr. Waggel had missed quite a few of the
> didactic classes. Correct?
>
>       A       Yes, although *that's not the focus* of this letter.

*See* Pl.'s Ex. K, Catapano Dep. 80:11-21

In the transcript cited, Dr. Catapano made clear that the reason Plaintiff would need to repeat the two didactics courses was because Plaintiff had failed them, not because she had missed classes. *Id.* Catapano Dep. 81:2-9.

> 64. The December 10, 2015 LOD does not mention or discuss Plaintiff's medical condition as a possible mitigating factor. (Waggel Dep. Ex. 15, Ex. J.)

RESPONSE: Agreed that the third Letter of Deficiency did not mention or discuss any medical issues as a possible mitigating factor. For further response, GW states that such a reference would be irrelevant and inappropriate since a resident's health status does not eliminate the curriculum requirements to take and pass specified courses. Plaintiff was notified that she would have the opportunity to fulfill these requirements by repeating Dr. Colins' Psychodynamic Theory course and Dr. Griffith's Neuroscience course the next year. *See* Pl.'s Ex. K, pp. 1-2.

> 65. On December 29, 2015, Plaintiff learned from another resident that she had been taken off the call schedule.  As a result, she had an anxiety attack and went to the emergency room for treatment.  (Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed. In further response, GW states as the result of a misunderstanding on Chief Resident Dr. Emejuru's part, who thought Dr. Waggel had already been notified by the Associate Program Director, Dr. Kels, of the change in her call duty status, Dr. Emejuru sent an email notice on December 28, 2015 to the psychiatry residents concerning the call schedule for January noting that Dr. Waggel was not in the call pool. *See* Def.'s SOF ¶¶ 726-728, Def.'s Ex.

C, Emejuru Decl. ¶¶ 250-253. This was a mistake and Dr. Kels later sent an email to Plaintiff

apologizing for the error. *See* Def.'s SOF ¶ 735.

> 66. Defendant informed Plaintiff that she would not be allowed to progress to her third year of residency even though she took off less time to address her health problems than her peers took for vacation. Plaintiff also learned at orientation that some other residents had missed three months of work and Defendant still permitted them to finish their residency program on time. (Waggel Dep. 46:09-47:06 248:03-14, Ex. E.)

RESPONSE: Agreed that Plaintiff was informed that she would not be allowed to

progress to the third year of residency. The remainder is denied as irrelevant and based on

hearsay.

The decision that Plaintiff would not progress to PGY3 was based on the fact that

Plaintiff had failed two basic didactics courses (Dr. Collins' Psychodynamic Theory course and

Dr. Griffith's Neuroscience course) and, having failed the Psychodynamic Theory course, would

not be able to progress to having an individual psychotherapy patient assigned in the month of

December 2015 and thus also would not be able to move on to Dr. Zinner's Psychodynamic

Psychotherapy course beginning in January. *See* Pl.'s Ex. K (Letter of Deficiency, dated

December 10, 2015). The decision was not based on whether Plaintiff had taken time off for

health-related reasons, or how much of any such time off Plaintiff may have taken. GW further

objects to Plaintiff's hearsay proffer of what she may have "learned at orientation," and Plaintiff

has submitted no other evidence to support the assertion as to residents who allegedly missed

three months of work yet finished on time.

> 67. In compliance with Defendant's procedures, Plaintiff appealed the decision not to allow her to progress to her third year of residency.  (30(b)(6) Berger Dep. 40:4-19, Ex. O.)

RESPONSE: Agreed.

> 68. Plaintiff's appeal was ultimately successful. (*See* GWU 003223-24, Ex. V.)

RESPONSE: Denied. For further response, GW states that the appeal process included a final appeal to Richard J. Simons, M.D., as the Senior Associate Dean for M.D. Programs. *See* Def.'s SOF ¶¶ 854 and Ex. R, Simons Decl. ¶ 4. Dr. Simons concluded that there had been a procedural error in the decision-making process as the rules required a formal recommendation from the Clinical Competency Committee ("CCC") to the Program Director regarding non-promotion which did not appear to have occurred. *Id.* ¶¶ 866-867 and Ex. R. ¶¶13-14. On March 25, 2016, Dr. Simons then issued a letter to Dr. Waggel noting that it appeared that the procedures in the Academic Improvement Policy had not been followed (*id.* SOF ¶ 868, Ex. R. ¶ 15 and Ex. #3 GWU 0024955) and concluded: "I am referring this matter back to your department and Program Director. The Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." *Id.* SOF ¶ 868, Ex. R. ¶ 15 and Ex. #3 GWU 002496.

Dr. Simons did not review or make a determination on the merits of the Program Director's decision for non-promotion and noted that the matter was being referred back to the department for that purpose. *Id.* SOF ¶¶ 869-871, Ex. R. ¶¶ 16-18 and Ex. #3 GWU 002496.

On April 8, 2016, the CCC conducted a regularly scheduled meeting to review residents in the Program, including Dr. Waggel (*see* Def.'s Ex. M, Dyer Decl. ¶ 112), and then unanimously adopted a recommendation to the Program Director reaffirming the decision that Plaintiff not be promoted. *Id.* Def.'s Ex. M and Ex. #15, p. 3, ¶9 (GWUH 002906). At that meeting, the CCC further unanimously adopted a recommendation to the Program Director that Plaintiff be dismissed from the Program. *Id.*

69. On February 6, 2016, the Clinical Competency Committee ("CCC") met behind closed doors and decided to discharge Plaintiff. (Catapano Dep. Ex. 15, Ex. K.)

RESPONSE: Denied. There is no Ex. 15 attached to Ex. K. Assuming, however, that this is intended to refer to Pl.'s Ex. M (which actually is dated February 9, not February 6), this is again denied. Plaintiff has not submitted any testimony regarding Ex. M. GW admits, however, that all meetings of the CCC were conducted "behind closed doors" as they consisted of highly sensitive academic evaluations of each resident in the training program. *See* Def.'s SOF ¶ 20. For that reason, the minutes confirm that these meetings were attended solely by members of the CCC, the Program Director *ex officio*, and the Program Administrator. *See, e.g.,* Def.'s Ex. M, Dyer Decl. ¶ 112 and Ex. #15.

For further response, GW states that during his deposition taken by Plaintiff's counsel on August 28, 2017, Dr. Dyer specifically testified that Pl.'s Ex. M was a document he prepared based on his review of several hundred pages of documentation for consideration by the CCC, not formal minutes of a CCC meeting. See Pl.'s Ex. P, Dyer Dep. 23:9-24:2. *See also* Def.'s SOF ¶¶ 794-796, Ex. M, Dyer Decl. ¶¶ 82-84 and Ex. 11. GW further states that from the face of Pl.'s Ex. M, it is apparent that these are not minutes of a formal CCC meeting. There is no (1) list of persons in attendance, (2) statement of the start time of the meeting, (3) numerical listing of matters discussed during the meeting, or (4) statement of when the meeting adjourned. *See, e.g.,* Def.'s Ex. M, Dyer Decl. ¶ 112 and Ex. #15.

70. Although the CCC meeting minutes purport to take into account "the total picture of her time in this residency," the minutes do not reflect that Plaintiff's cancer or related stress was considered a mitigating factor. (Catapano Dep. Ex. 15, Ex. M.)

RESPONSE: Denied. This document does not constitute the minutes of a CCC meeting. Please see the response to Pl.'s SOF ¶ 69, above, which is incorporated herein by reference.

For further response, GW states that members of the CCC were repeatedly and fully apprised by Plaintiff of matters related to her medical status and were aware of those matters, including during the CCC meeting, but Plaintiff's medical status had no bearing on the issues the CCC had identified as the basis for the recommendation to terminate Plaintiff from the Program as is clear from the matters set forth in the minutes of the CCC meeting on April 8, 2015, where the CCC unanimously voted to make the recommendation for dismissal from the Program to the Program Director. *See* Def.'s Ex. M, Dyer Decl. ¶ 112-119 and Ex. #15.

71. The CCC chose to terminate Plaintiff despite a recommendation from Dr. Berger that Plaintiff be issued a letter of deficiency, which would not have been a "reportable action." (30(b)(6) Dyer Dep. at 56:08-60:02, Ex. P.)

RESPONSE: Agreed. For further response, GW states that the matters addressed in the Notice of Misconduct and Dr. Berger's review of those matters was only a part of the multifactorial basis for the CCC's decision to recommend termination. *See* Def.'s Ex. M, Dyer Decl. ¶ 112-119 and Ex. #15. Further, as Dr. Berger has noted, his role as Associate Dean for GME was to defer to the judgment of Plaintiff's direct clinical supervisors as to remediability and ability to continue in the Program. *See* Def.'s Ex. B, Berger Decl. ¶ 119. GW further states that whether Dr. Berger's recommendation would have been a "reportable action" is irrelevant to the decision the CCC was called upon to make.

72. Dr. Dyer testified, in his capacity as a corporate designee for Defendant, that Plaintiff's cancer diagnosis and the resulting impact on her life should have been considered and should have had a bearing on the CCC's decision. (30(b)(6) Dyer Dep. 23:14-24:19, Ex. P.)

RESPONSE: Denied. This statement is false. Dr. Dyer's testimony when asked whether Plaintiff's "cancer is an important consideration" with regard to the memo he prepared to present the "total picture" of Plaintiff's tenure in the Program for the CCC to review was as follows: "I

think it may be one of many circumstances that have a bearing." He did not say that the cancer

diagnosis "should have had a bearing on the CCC's decision."

73. During her Rule 30(b)(6) deposition, Dr. Catapano confirmed that Plaintiff's cancer was not considered a mitigating factor in deciding to dismiss her. (30(b)(6) Catapano Dep. 15:9-17, Ex. Q.)

RESPONSE: Agreed.

74. Furthermore, the CCC notes indicate that Plaintiff's contentions that the allegations against her were false were not considered by the CCC, even though the CCC could have obtained that information. (30(b)(6) Dyer Dep. 35:22-37:20, Ex. P.)

RESPONSE: Denied. Plaintiff takes the position that because a document she prepared

for her appeal of the decisions that she had failed two didactics courses and that she would not be

promoted to PGY3 in June 2016 was the only way the members of the CCC could have been

aware that Plaintiff contested all of the facts regarding events which had occurred and the

grounds on which she relied to dispute the fact. The members of the CCC were fully aware of the

underlying events and Plaintiff's oft-repeated assertions as to why the facts were wrong. *See,

e.g.*, Def.'s Ex. A, Catapano Decl. ¶¶ 445-452, ¶¶504-507, 596-603, 618-623, 633-643, 656-665,

683-684, 687-689; Def.'s Ex. M, Dyer Decl. ¶ 27 and Ex. #5, ¶¶ 50-54 and Ex. #6, ¶ 106 and Ex.

#12.

75. The CCC is required for all residency programs by the Accreditation Counsel for Graduate Medical Education ("ACGME") to monitor and oversee the progress of all medical residents in the particular residency program. (30(b)(6) Dyer Dep. 10:07-11:09, Ex. P.)

RESPONSE: Agreed.

76. The CCC is required to review each residents' progress towards the completion of twenty-one defined milestones. (30(b)(6) Dyer Dep. 10:07-11:09, Ex. P.)

RESPONSE: Agreed.

77. The members of the CCC for the times relevant to this matter were Dr. Dyer, Dr. Khin Khin, Dr. Norris, Dr. Crone, Dr. Kels, and Dr. Catapano. (30(b)(6) Dyer Dep. 14:17-15:19, Ex. P.)

RESPONSE: Agreed.

78. Dr. Berger, the Associate Dean for Graduate Medical Education, "put the brakes" on this effort to discharge Dr. Waggel without due process. (30(b)(6) Berger Dep. 81:21- 84:6, Ex. O.)

RESPONSE: Denied. This is a clear mis-citation of the record. The testimony does not relate to the decision by the CCC to recommend that Plaintiff be terminated from the Program but to the decision by Dr. Griffith as Chair of the Department of Psychiatry that Plaintiff was not safe to be participating in direct clinical care and was to be suspended from further clinical duties. For further response, GW states that there is no evidence of an effort to "discharge Dr. Waggel without due process." The University carefully followed and enforced its processes as evidenced by the review process culminating in Dean Simon's determination that the decision that Plaintiff had failed two didactics courses which she would need to repeat and that Plaintiff would not be promoted to PGY3 in June 2016 would be sent back to the Psychiatry Department for further review of Plaintiff's performance by the CCC and recommendations to the Program Director. *See* GW's response to Pl.'s SOF #68, above.

79. Although the CCC then charged Dr. Waggel with misconduct, Dean Berger did not adjudicate the charge as a "reportable action," but rather decided to issue Dr. Waggel another LOD with an improvement plan. (30(b)(6) Catapano Dep. 30:14-32:9, Ex. Q; 30(b)(6) Catapano Dep. Ex. 3, Ex. S.)

RESPONSE: Denied. This is a total and confusing *non sequitur*. For further response, GW states that the CCC did issue a Notice of Concerns of Unprofessional Misconduct, which is not a reportable action. After Dean Berger had conducted a full investigation (Def.'s Ex. B, Berger Decl. ¶¶ 74-79, 87-106), he then then sent a letter, dated April 7, 2016, to Plaintiff and Dr. Catapano setting forth his findings. *Id.* ¶113 and Ex. #13. Dean Berger in fact determined

that Plaintiff had engaged in four instances of misconduct involving misrepresentations to faculty members and that Plaintiff had engaged in further instances of misconduct in sending email and text message threats against the Program. *Id.* Ex. #13 (GWU 002428). Dean Berger further found that Plaintiff had demonstrated lack of professionalism in at least two other matters. *Id.* Dean Berger concluded the letter stating that his proposal was to address these matters through yet a further Letter of Deficiency. *Id.* The letter was not issued as the CCC, on remand of the appeal from Dean Simon, conducted a further full review of Plaintiff's tenure in the Program and unanimously voted to recommend to the Program Director that Plaintiff be terminated from the Program. *See* Def.'s Ex. B, Berger Decl. ¶¶ 118-119.

80. On March 17, 2017, Plaintiff met with Dean Berger and Mary Tucker, an administrator.  During that meeting, Berger informed Plaintiff that he would treat her differently and engage with Plaintiff in a way that protected GW because Plaintiff had engaged an attorney to assist with her employment issues with GW. (GWU 004282-83 at 30:02-37:14, Ex. W; Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed. For further response, GW states that Plaintiff had not only engaged an attorney but had threatened the Program in text messages to other residents that "Ya'll need to start looking for other jobs this department gunna be out of business soon" to which one resident had responded, "Well it's not funny to blithely make jokes about us all losing our jobs." Def.'s Ex. A, Catapano Decl. ¶ 592 and Ex. #147. The text messages were transcribed by the Program Coordinator and forwarded on November 18, 2015 to Dr. Catapano. *Id.* The next day, Plaintiff sent an email to Dr. Catapano concerning her meeting earlier that day with Dean Berger (to review her status in the Program but particularly related to her clinical duties) in which Plaintiff stated she "would like to straighten out a number of things" regarding faculty decisions that she might graduate on time and that "My lawyer is also looking into this." *Id.* ¶593 and Ex. #148.

On January 21, 2016, Dr. Catapano emailed Plaintiff to advise her that they needed to meet to discuss the fact that an essay she had written ostensibly to fulfill a requirement in one of the LOD remediation plans to acknowledge and address her serious substandard performance in handling patient aggression did not begin to meet the objectives of the remediation plan. The email also noted that Plaintiff was being removed from the call schedule, i.e., clinical duties, while the matter was reviewed further by the CCC. Def.'s Ex. A, Catapano Decl. ¶¶ 705-706 and Ex. #170 (Stephanie Waggel Supp. Prod. [Oct.] 380-382 of 466, at 380. Dr. Waggel responded with a further threat of legal action:

> I can meet at 4:30pm today. I would still like to have my 5 questions answered. It is a violation to change punishments from what they were originally written to be formally on paper. This is especially true given that it was never discussed with me. Who is in the CCC and when do they meet? I will be anticipating an explanation of how on call "effective immediately" written in my letter became on call after a series of events that we will make known to you after they come up. Much of what has occurred over the past few months has violated GW code, ACGME, JCAHO, OSHA, United States Law, and as you are aware, making me extremely ill. I've given more than enough time for it to be corrected. Hopefully our 4:30 meeting will provide some answers. If it does not, my law firm is prepared to contact you and the rest of the faculty in the department and hospital administrators. They specialize in resident cases so I have faith that if the psych department doesn't come through for me, my law firm certainly will.

*Id.* Ex. #170 at 381 of 466.

Plaintiff cannot have it both ways – threaten the university and its personnel with ruinous litigation, follow up with further threats of litigation against the Program Director personally as well as "the rest of the faculty in the department and hospital administrators," and expect the university's personnel to respond as if nothing had happened.

During the misconduct investigation interview, Dr. Berger informed Plaintiff that when he was notified that "there's an attorney tracking everything. And everything's getting sent up to some attorney in Baltimore" (Pl.'s Ex. W 32:47), he began receiving advice from his counsel that

he could not talk with Plaintiff about certain matters. *Id.* 32:8-11. Plaintiff was the individual who put the communications on a lawyer-driven track.

Plaintiff also does not attach the entire transcript of the surreptitiously recorded meeting with Dr. Berger. The first six pages contain a further example of Plaintiff's dishonesty in her communications with the faculty and administration all the more remarkable for the fact that the interview was part of Dr. Berger's misconduct investigation. *See* Transcript, Letter of Misconduct Investigation, Interview of Stephanie Waggel, M.D., relevant portions of which are attached as **EXHIBIT NN** (GWU 004274-004276). At the beginning of the interview, Dr. Berger noted that Plaintiff had stated in an earlier email that she was "dealing with potentially . . . a life threatening situation" (*id.* 4:20-22) and that he "had no idea, to the extent, that things are continuing to go on with your health." *Id.* 5:2-4. At that point, Plaintiff responded:

> DR. WAGGEL:   Mm-hmm. Yeah. I mean, it's hard to, like take care of my health and then have to deal with all this, all these letters that I keep getting and stuff.
>
> DR. BERGER:   Yeah.
>
> DR. WAGGEL:   I mean, like - -
>
> DR. BERGER:   Absolutely.
>
> DR. WAGGEL:   - - a month ago, they thought, like maybe my cancer spread. So, then I had to get, like more work-up. And then, my urologist and my oncologist are, like disagreeing on, like the workup. So it's just been, like really difficult to pic, which one I'm going to go with, and year. So, but I mean, I'm hanging in there, so . . .
>
> DR. BERGER:   Okay. All right, yeah, I mean, that's - - I think that's really hard for anyone but - -
>
> DR. WAGGEL:   Mm-hmm.
>
> DR. BERGER:   - - and you know, I mean, to the extent that I can, you know, be sensitive to that, or that you can, you know, let

me know when things are going on, so I'm not pushing for GB-related stuff - -

DR. WAGGEL:    Yeah.

DR. BERGER:    - - at a time when you're dealing with personal things. Le me know and I'll, obviously try to be sensitive to it.

*Id.* 5:13-6:16

Plaintiff's statements to Dr. Berger were clearly false. The interview with Dean Berger had been postponed because Plaintiff said she had to attend a long-scheduled meeting with her cancer surgeon. That was a less-than-15-minute visit with Dr. Jarrett on March 9 which began at 8:30 a.m. During that visit, Dr. Jarrett again informed Plaintiff that she was fine and would be scheduled for further follow up in one year. Def.'s Ex. H, Jarrett Decl. ¶ 21-23 and Ex. #7. Dr. Jarrett has further stated that at no time has he had any disagreement with Dr. Siegel (Plaintiff's oncologist) on the appropriate workup for Plaintiff's cancer, that he has never thought Plaintiff's cancer may have spread (including specifically the February-March 2016 timeframe), and that he did not order any further workup (imaging or otherwise) for Plaintiff in the February-March 2016 timeframe and certainly none out of any concern that Plaintiff's cancer may have spread. *Id.* 30-32. Dr. Siegel has confirmed the same information. Def.'s Ex. J, Siegel Decl. ¶¶ 29-31.

Plaintiff's representations to the contrary to Dr. Berger in the misconduct interview one week later were false and dishonest.

81. Dean Berger also informed Plaintiff that he was withholding information that he would ordinarily share with her, regarding things she could do to rectify the issues and challenges she was facing with her residency, because Plaintiff had engaged an attorney. (GWU 004282-83 at 30:02-37:14, Ex. W; Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed. Dr. Berger stated he was acting on the advice of counsel given Plaintiff's threats of legal action. Pl.'s Ex. W at 31:21-32:11.

82. Dean Berger also stated that he had been told by GW not to help Plaintiff because she had engaged an attorney. (GWU 004282-83 at 30:02-37:14, Ex. W.; Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Denied. This is false. Dean Berger stated he had to communicate and engage with Plaintiff in a way that was protective of the institution. Pl.'s Ex. W at 31:8-11. In fact, during the interview, he made clear that he would attempt to work with Plaintiff regarding her effort to transfer including coordinating communications with GW's counsel and Dr. Catapano and provided suggestions for Dr. Waggel's communication with third-party institutions. Def.'s Ex. B, Berger Decl. ¶ 110; Def.'s Ex. NN 66:3-69:10 (GWU 004291).

83. Dr. Berger agreed with Plaintiff that it was in her best interest to seek to transfer to another program. (GWU 004284 at 38:15-39:15, Ex. W.; Pl.'s Am. Resp. to Interrog. at No. 8, Ex. D.)

RESPONSE: Agreed.

84. On March 25, 2016, the Senior Associate Dean for M.D. Programs, Dr. Simons, denied the faculty decision to forbid Plaintiff's promotion to PGY and referred the matter back to the CCC. (GWU003223-24, Ex. V.)

RESPONSE: Denied. Please see the response to Pl.'s SOF #68, above.

85. After the remanded decision, the CCC met again, and although there was still no reportable action against Plaintiff, that CCC ordered that she be discharged. (30(b)(6) Catapano Dep. Ex. 2, Ex. R.)

RESPONSE: Agreed that the CCC met again to act on Dean Simons' referral of the appeal back to the department and Program Director with the directive that: "The Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." Pl.'s Ex. V (GWU 003224). For further response, GW states that whether there was an existing reportable action was not relevant to the CCC's response to Dr. Simons' directive.

86. In between her successful appeal and when she was discharged, Plaintiff sought a transfer to another program. (Waggel Dep. 281:17-282:18, Ex. E.)

RESPONSE: Agreed that Plaintiff sought a transfer to another program. Denied that Plaintiff's appeal was successful. Please see the response to Pl.'s SOF #68 above.

87. Plaintiff applied to approximately thirty (30) other programs in Spring 2016. (Pl's. Resp. to Interrog. No. 3, Ex C.)

RESPONSE: GW admits this statement on information and belief based on documents submitted by Plaintiff.

88. Although several programs expressed interest in accepting her into their own programs, and Dean Berger promised to help facilitate a transfer, Dr. Catapano and other faculty in the psychiatry program refused to provide the documentation to other schools necessary for Plaintiff to transfer. (Catapano Dep. 118:11-120:21; 123:6-8, Ex. K.)

RESPONSE: Denied. Plaintiff sought to require Dr. Catapano to falsify records certifying the amount of time she had completed in certain required clinical rotations. Transcript of Deposition of Dr. Jeffrey Berger, taken August 25, 2017, portions of which are attached as **EXHIBIT OO**, 95:5-96:5. Despite being pushed by Plaintiff to do this, Dr. Catapano refused to comply. *Id.* 95:20-96:5. Dr. Berger agreed that Dr. Catapano had filled the forms out in a way that was very fair to Plaintiff, but Plaintiff did not like it because they did not certify sufficient time. *Id.* 95:17-20. Plaintiff also sought to impose restrictions on the information Dr. Catapano could discuss in her communications with other institutions or programs which were inconsistent with Dr. Catapano's obligations of academic integrity and candor if such communications were to take place. *See* Def.'s Ex. HH, Catapano Dep. (07/27/2017) at 118:121-120:6; Def.'s Ex. LL, Catapano Supp. Decl. ¶¶ 14-21. Dr. Catapano remained available to speak with other institutions or programs on an appropriate basis. *Id.* ¶ 22. There is no evidence that GW was not prepared at any time to forward appropriate, accurate records of Plaintiff's tenure in the Program on an appropriate request.

89. Before a March 2016 CCC meeting that approved Plaintiff's termination, but after the CCC had determined to terminate Plaintiff, Dr. Catapano asked her assistant, Tory Anderson, to locate the performance reviews Dr. Waggel received in her PGY 2 year. (Catapano Dep. 152:19-160:7, Ex. K.; 30(b)(6) Catapano Dep. 80:3-82:3, Ex. Q.)

RESPONSE: Agreed. For further response, GW states that Dr. Catapano asked Ms. Anderson, the Program Administrator, for evaluations from the PGY2 year and got 4 – 5 evaluation forms back. On deposition, Dr. Catapano agreed that at least four of the evaluators stated in the evaluations that Plaintiff had performed during that rotation at a PGY2 level, or even better in one instance.

90. These evaluations, where [*sic*] were submitted by the attending physicians Dr. Waggel worked with on a day-to-day basis, showed Plaintiff was working at or above the level of a second year medical resident. (Catapano Dep. 152:19-160:7, Ex. K; 30(b)(6) Catapano Dep. 80:3-82:3, Ex. Q.)

RESPONSE: Agreed in part. Please see the response to Pl.'s SOF 89, above. For further response, GW states that it is not unusual to get mixed reviews from physicians who interact with a resident during off-site rotations – the reviews that carry the significantly greater weight are those from the primary attending supervising physicians within the same discipline since they have primary responsibility for the resident's supervision during the rotation, generally have the greater degree of contact with the resident, and clearly have the better understanding of the training benchmarks for the specialty. Def.'s Ex. A. Catapano Decl. ¶ 108.

Further, as Dr. Catapano testified during deposition, she was in contact with physicians on the various clinical rotations and while Plaintiff would receive favorable written evaluation reports, "personal feedback from many of the attendings was more concerning than was reflected in the evaluations." Def.'s Ex. DD, Catapano Dep. (09/07/2017) 84:8-15. As an example, Dr. Catapano cited an evaluation report prepared by Dierich Kaiser, M.D., regarding a month-long

rotation in January 2016 at Northern Virginia Mental Health Institute ("NVHMNI"). *Id.* 84:20-85:8 (referencing Plaintiff's Ex. U (GWU 000665-000668)).

Dr. Catapano had earlier noted that this was the timeframe in which the Program leadership and Dr. Berger were trying to figure out a way for Plaintiff to be continued on-call safely on nights and weekends. *Id.* 22:5-23:8. During Plaintiff's next clinical rotation in January 2016 at NVHMI, although residents were generally supervised by attending physicians, the NVHMI Medical Director, Dr. Navid Rashid, was called in because people working with Plaintiff had reported concerns about Plaintiff's performance. *Id.* 24:10-25:7. Dr. Catapano discussed this with Dr. Rashid later. *Id.* 25:4-7. Dr. Rashid told Dr. Catapano that Plaintiff "struggled a lot at the beginning of the month; that she needed some extra help, and that the month was really a pretty slow and easy month, so there wasn't a lot of work for her to do." *Id.* 87:18-8888:7.

Dr. Catapano then received the evaluation report from Dr. Kaiser for the rotation and noted that Dr. Kaiser had "checked off very high numbers . . . really, really, really high numbers" which were "much higher than a PGY2 . . . would be expected to get." *Id.* 86:11-87:1. In effect, Dr. Kaiser was "saying that she is functioning so well that she's ready to graduate." *Id.* 87:3-5. And that clearly was "not consistent with the . . . verbal comments." *Id.* 87:6-10.

Dr. Catapano further testified that her evaluations of Plaintiff on the semi-annual Milestones review were lower than the reports from individual rotations because the Milestones review was more comprehensive. *Id.* 82:18-83:13. When asked to elaborate, Dr. Catapano explained:

> Residents are evaluated on three or four major areas of responsibility and performance. So one is their daily work on the rotation. Two is their work on-call in the hospital. Three is their performance and didactics. And four is general administrative

> professionalism: making sure their licenses are up to date, their
> health clearances are in and that kind of thing.

*Id.* 83:14-84:1

In addition, these reviews would have to be considered and evaluated in light of reports

from other clinicians throughout Plaintiff's tenure, as well as direct observation by members of

the CCC who had been involved in events related to Plaintiff, that there were many instances of

lack of professionalism, failure of didactics courses, lack of basic medical knowledge, failure to

comply with remediation and acts of dishonesty known to the CCC members but not part of the

evaluations conducted by any of Plaintiff's clinical rotation supervisors, including, but not

limited to, the matters set forth at:

> Def.'s Ex. A, Catapano Decl. ¶ 99 (Dr. Cho, July 2014)
> Def.'s Ex. A, Catapano Decl. ¶¶ 100-103 (Dr. Malik, December 2014)
> Def.'s Ex. A, Catapano Decl. ¶¶ 110-112 (Dr. Little, March 2015)
> Def.'s Ex. A, Catapano Decl. ¶ 113 (Dr. Prior, March 2015)
> Def.'s Ex. A, Catapano Decl. ¶ 115 (Dr. Prior, March 2015)
> Def.'s Ex. A, Catapano Decl ¶¶ 150-152, 158, 161 (Dr. Mehta, March 2015)
> Def.'s Ex. A, Catapano Decl. ¶¶ 170, 186-191 (Dr. Catalanotti, May 2015)
> Def.'s Ex. K, Chang Decl., ¶¶ 25-28 and Ex. #2 (Dr. Chang, May 2015)
> Def.'s Ex. A, Catapano Decl. ¶¶ 237-238 (Dr. Roche, June 2017)
> Def.'s Ex. A, Catapano Decl. ¶ 311 (Dr. Khin Khin and Dr. Norris, August 2015)
> Def.'s Ex. A, Catapano Decl. ¶ 380 (Dr. Gandhi, August 2015)
> Def.'s Ex. I, Collins Decl. ¶¶ 20-23 (Dr. Collins, September 2015)
> Def.'s Ex. A, Catapano Decl. ¶¶ 481, 490 (Dr. Little, Dr. Berger, October 2015)
> Def.'s Ex. N, Griffith Decl. ¶¶ 63-71, 77-79 (Dr. Griffith, November 2015)
> Def.'s Ex. N, Griffith Decl. ¶¶ 91-93 (Dr. Griffith, January 2016)
> Def.'s Ex. N, Griffith Decl. ¶¶ 99, 103 (Dr. Griffith, February 2016)

All of this also ignores the fact that the CCC recommendations, first for failure of two

didactic courses and non-promotion to PGY3, and then for dismissal from the program, were

subjected to intensive independent review within GW and were upheld on the merits by the

reviewers at multiple levels. *See, e.g.* Def.'s Ex. Q, Cioletti Decl.; Def.'s Ex. S, Lucas Decl., and

Def.'s Ex. R., Simons Decl.

91. Throughout her residency at GW, Plaintiff received positive performance reviews, evaluations, and written and verbal feedback stating that she was performing her essential job functions. (*See e.g.* GWU 626- GWU 644 (Attending Physician Evaluation for PGY I (Aug. 18- Sept. 14 2014) rating as Competent to Outstanding), Ex. U; GWU 632- GWU 637 (Attending Physician Evaluation for PGY I (Jul. 21- Aug. 17, 2014) rating a very competent to outstanding), Ex. U; GWU 638- GWU 644 (Attending Physician Evaluation for PGY I (Jul. 21 - Aug. 17 2014) rating as Competent and Very Competent), Ex. U; GWU 645- GWU 650 (Attending Physician Evaluation for PGY I (Jul 1 - Jul 20 2014) rating as Very Competent to Outstanding), Ex. U; GWU 651- GWU 657 (Attending Physician Evaluation for PGY I (Jul 1 - Jul 20 2014) rating as Competent), Ex. U; GWU 658- GWU 660 (Milestone Summary (reviewing sixth month period through Thursday, February 25, 2016), Ex. U; GWU 661 (Aggregate Evaluation Report, a Faculty Evaluation of Stephanie Waggel; and Child Psychiatry Evaluation (From July 1 2015- February 25, 2016) noting that Dr. Waggel performed at a Second Year Level PGY II Level in many areas, and at a third year level PGY III in others) , Ex. U; GWU 662 (Inpatient Psychiatry Evaluation of Stephanie Waggel (July 1, 2015- February 25, 2016) noting Dr. Waggel performed at third (PGY 3) and fourth (PGY 4) year levels in some areas), Ex. U; GWU 663-664 (Child Psychiatry Evaluation for Rotation (January 1, 2014 to December 31, 2015) noting Dr. Waggel performed at second year level or higher), Ex. U; GWU 665- GWU 666 (Inpatient Psychiatry Evaluation for Rotation (January 1, 2016- January 31, 2016) (rating Dr. Waggel on target for graduation); GWU 667-668 (Inpatient Psychiatry Evaluation for Rotation (November 1-30, 2015) noting Dr. Waggel performance at a third year level or higher), Ex. U; GWU 669-670 (Child Psychiatry Evaluation for Rotation (September 1-30, 2015) rating at a second year residency level), Ex. U; GWU 671-674 (Wards Evaluation of a Resident (August 6, 2015)), Ex. U; GWU 679- 682 (Wards Evaluation (May 3, 2015- May 19, 2015)), Ex. U; GWU 683- 686 (Wards Evaluation Rotation (March 30, 2015- April 5, 2015)), Ex. U.)

RESPONSE: Denied. If this is intended to state that Plaintiff's reviews were all favorable and she was performing her essential job functions, that is clearly false. Please see the response to Pl.'s SOF #90, above.

For further response as to the evaluations listed here, GW states that Plaintiff mis-cites the location of the materials (for example, the first evaluation listed does not extend from GWU 626 to GWU 644; that evaluation ends at GWU 631), and mis-states the dates of evaluations (the first evaluation listed, GWU 626 – GWU 644, is not Aug 18 – Sept. 14, 2014, the "Subject

Participation Dates" are specifically listed as 07/01/2014 to 07/20/2014). The chronological order of the reports with correct dates, Bates numbers, physician evaluators and location of clinical rotation are as follows:

| | | | |
|---|---|---|---|
| 07/01/2014 to 07/20/2014 | GWU 626-631 | Dr. Norris | GW 6-South |
| 07/01/2014 to 07/20/2014 | GWU 645-650 | Dr. Browne | GW 6-South |
| 07/01/2014 to 07/20/2014 | GWU 651-657 | Dr. Norris | GW 6-South |
| 07/21/2014 to 08/17/2014 | GWU 632-637 | Dr. Browne | GW 6-South |
| 07/21/2014 to 08/17/2014 | GWU 638-644 | Dr. Norris | GW 6-South |
| | | | |
| 03/30/2015 to 04/05/2015 | GWU 683-686 | Dr. Ayanian | GW – Internal Medicine |
| April 2015 | GWU 679-682 | Dr. Teufel | GW – Hospitalist Service[7] |
| 05/05/2015 to 05/14/2015 | GWU 675-678 | Dr. Chang | GW – Internal Medicine[8] |
| | | | |
| 07/13/2015 to 07/28/2015 | GWU 671-674 | Dr. Ayanian | GW – Internal Medicine[9] |
| 09/01/2015 to 09/30/2015 | GWU 669-670 | Dr. Dave | CNMC – Child Psychiatry |
| 11/01/2015 to 11/30/2015 | GWU 667-668 | Dr. Suen | Inova Fairfax – Geriatrics |
| 12/01/2015 to 12/31/2015 | GWU 663-664 | Dr. Dave | CNMC – Child Psychiatry |
| | | | |
| 01/01/2016 to 01/31/2016 | GWU 665-666 | Dr. Kaiser | NVMHI – Outpatient Psych |

---

[7] This form again did not provide specific dates for the rotation but shows an issue date of 05/03/2015 indicating a clinical rotation sometime (otherwise unspecified) before that date.

[8] This form again did not provide specific dates for the rotation. This was the rotation, however, where Dr. Chang notes that Plaintiff was on medical leave the first two days and had been given an opportunity to take a longer leave of absence but stated that she felt ready to return to duty and was present on Dr. Chang's third duty day, which would have been May 5, 2015. This is also the rotation where, on May 14, 2015, Plaintiff was found asleep in the middle of her shift in an on-call room and stated that she had been out drinking late the night before and that morning had confused her Ativan and Ritalin and taken benzodiazepines accidentally before coming to work. Def.'s Ex. K, Chang Decl., ¶¶ 8, 13-15. Plaintiff was then sent home and was asked by the Internal Medicine service not to return. Def.'s Ex. A, Catapano Decl. ¶ 191. Dr. Catapano then convinced Plaintiff to take medical leave and Plaintiff agreed to go out on leave and was away from the Program from May 18 to June 7, 2015. *Id.* ¶¶197-198, 208. So this evaluation covers the dates of May 5 to May 18 (mid-day).

[9] On deposition, Dr. Catapano noted that this was specifically dated but appears to have covered the one-week Internal Medicine rotation which Plaintiff asked to be able to make up before taking leave for her surgery on July 20, 2015. Def.'s Ex. HH, Catapano Dep. (07/27/2017) 157:22-158:16. Dr. Emejuru confirms that he scheduled this rotation at Plaintiff's request for July 13-18 so Plaintiff would have the day off before her surgery. Def.'s Ex. C, ¶¶ 14, 20, 23-24.

07/01/2015 to 02/25/2016   GWU 661       Aggregate 2   CNMC – Child Psychiatry
07/01/2015 to 02/25/2016   GWU 662       Aggregate 2   GW – Inpatient Psychiatry

For further response, GW states that the first five evaluations relate to Plaintiff's first month and a half in the residency training program. While as Plaintiff notes, she received favorable evaluations, this is also the rotation where Plaintiff was pulled from clinical duty on July 3 for having failed to complete the health clearance process and was not allowed to return until July 9. Def.'s SOF ¶¶ 94-97. This is also the rotation during which Chief Resident Stephanie H. Cho reported multiple significant deficiencies in Plaintiff's performance and behavior. *Id.* ¶ 98.

The next evaluation, for one week (March 30 – April 5) of the rotation on Internal Medicine in March 2015, was prepared by Dr. Ayanian. That was the rotation, however, where the GW Hospital Medical Director after the very first shift raised serious concerns about matters that had occurred later attributed to Plaintiff. The attending on duty that first shift, Jason M. Prior, M.D., reported that it had quickly become apparent that Plaintiff was not even at a "level one" or intern status and had told the other residents to essentially treat Plaintiff as an A1, and also noted that "beyond her lack of knowledge, she just doesn't know the details of medicine." *Id.* ¶ 111. At the end of the first week, on March 6, Dr. Prior wrote further that "the current situation on green team cannot safely continue . . . ." *Id.* ¶ 112. He noted that he had spoken with "the primary offending intern in question [a reference to Plaintiff] all week but last night was the last straw." *Id.* Dr. Prior further stated that he had prepared a safety and remediation plan regarding Plaintiff and also presented the option of removing Plaintiff from the rotation and having her complete the IM rotation at a later date "to be determined based on re-evaluation." *Id.* ¶ 119.

Thereafter, there were extensive, specifically targeted remediation efforts to allow Plaintiff to remain on the rotation while assuring patient safety. *Id.* ¶¶ 132-134. But even then, the next attending, Dr. Mehta, reported significant further concerns with Plaintiff's performance and behavior. *Id.* ¶¶ 134-136. These concerns continued through an email by Dr. Mehta to Dr. Catapano on March 30. *Id.* ¶¶ 140-141.

It was at the end of this rotation that Dr. Ayanian worked with Plaintiff and provided very direct feedback as to which Dr. Mehta reported to Dr. Catapano that Plaintiff did appear to be doing better, "but from a very poor baseline." *Id.* ¶¶ 142-143.

On April 14, Dr. Ayanian submitted his favorable evaluation report.

The report by Dr. Chang concerning the brief time Plaintiff was on the Internal Medicine rotation in May 2015 (May 5 – May 14) before being asked to leave and not return to the service (*see* note 8, above) cannot be credibly cited as a favorable report. Def.'s Ex. K, Chang Decl. ¶¶ 25-28. As Dr. Chang notes, the report documented significant deficiencies (*id.* ¶ 27), and the Plaintiff's rating for Overall Clinical Performance on the rotation was "Lowest – Inadequate performance/Significant Deficiencies." *Id.* ¶ 28.

The favorable evaluation submitted for the November 2015 Geriatrics rotation at Inova Fairfax was received in the context of Dr. Catapano having met with Dr. Berger on November 5 concerning Plaintiff's status in the Program, which resulted in a suggestion by Dr. Berger that because of Plaintiff's then-current Milestone evaluation, which was significantly below that expected for her level of training, the Program consider extending Plaintiff's training by 6 months. Def.'s SOF ¶¶ 567-568.

Finally, Dr. Kaiser's written evaluation of the January 2016 rotation at NVMHI would in turn need to be evaluated by Dr. Catapano and the CCC in light of additional information concerning the rotation set forth in GW's response to Pl.'s SOF 90, above.

> 92. The CCC made the decision to terminate Plaintiff without regard for the proper process or procedures, and merely followed required steps after having already decided to terminate Plaintiff. (Griffith Dep. 78:21-82:13, Ex. N.)

RESPONSE: Denied. This statement mis-represents Dr. Griffith's testimony and conflates a series of different events. Dr. Griffith was examined on deposition about a document, dated February 9, 2016, that was Dr. Dyer's draft review of Plaintiff's tenure in the Program which concluded with a proposal to recommend Plaintiff's dismissal from the Program – that document was drafted by Dr. Dyer for consideration by the CCC at its next meeting. Def.'s Ex. M, Dyer Decl. ¶¶ 82-84 and Ex. #11. The document did not reflect a decision already made by the CCC before its meeting on April 8, 2016 where the CCC deliberated matters relating to Plaintiff's tenure in the Program (*id.* ¶¶112-118) for nearly two hours (*id.* ¶ 121) and then voted unanimously to recommend to the Program Director that Plaintiff be dismissed from the Program. *Id.* The questioning on deposition then further mistaken Dr. Griffith's meeting with Plaintiff to advise her of the issuance of the Notice of Concerns of Professional Misconduct with the CCC's decision-making process culminating in the decision to recommend Plaintiff's dismissal from the Program. Pl.'s Ex. N, Griffith Dep. 80:12-22.

> 93. During his deposition, Dr. Griffith testified he had a special expertise in the psychological impacts of cancer, but did not believe Defendant had any responsibility to accommodate Plaintiff's condition.  (Griffith Dep. 12:01-13:14, Ex. N.)

RESPONSE: Denied. This is a misrepresentation of the testimony and is false.

At the pages cited, Dr. Griffith was asked about an MFA web site bio that notes he "treats patients with psychiatric complications of medical illnesses." Pl.'s Ex. N, 11:4 – 20. Dr. Griffith

then described the nature of this practice area and described it as "both expertise in psychiatric illnesses that can appear as medical problems but in particular expertise in the life stress of being medically ill and how to help someone with that." *Id.* 12:1-21.

The testimony cited sets forth no testimony whatsoever by Dr. Griffith whether GW "had any responsibility to accommodate Plaintiff's condition." The remaining testimony in its entirety is as follows:

> Q   Would cancer be one of those underlying medical illnesses?
>
> A.  Yes.
>
> Q   So this is one – would you consider this one of your specialties?
>
> A   Yes.
>
> Q   And how have you used that specialty in the past?
>
> A   I have subspecialty board certification in this.
>
> Q   Oh, you do. Okay. So there is a board certification?
>
> A.  (nods)

94. Dr. Griffith stated that he was "agnostic" about whether Plaintiff had cancer. (Griffith Dep. 34:12-35:06, Ex. N.)

RESPONSE: Agreed. For further response, GW states that the context of the statement is relevant and is set forth at Pl.'s Ex. N 33:21 – 36:18 in which Dr. Griffith makes clear that he was not presented evidence one way or the other whether Plaintiff had had cancer (*id.* 36:6-7) and was basing his interactions with Plaintiff on what he could observe about her behavior and was just trying to respond to Plaintiff as he would any other resident under these circumstances. *Id.* 34:11-35:6. In that context, Dr. Griffith stated:

> But I always took a – maybe I'd use the word agnostic position. Like I know what she's saying. I know what things can be

> plausible. I don't have a solid belief on it. So I'm just trying to respond to [Plaintiff] as I would any other resident under these conditions.

*Id.* 35:1-6.

Dr. Griffith further noted that GW has a cancer survivorship clinic where he works with residents (*id.* 36:8-10), commented that "people with very severe often metastatic disease go about regular life," (*id.* 36:10-12), and stated further: "[I] could not put together what I could observe about the level of functioning, what she was saying, and the fact that she was not showing up and not taking exams and not – all I can say is it's a shrug. I can't make sense of this. It doesn't make sense." *Id.* 36: 12-18.

95. Dr Griffith also testified that he was unwilling to meet with Plaintiff about her concerns about the manner in which the program was treating her. (Griffith Dep. 35:13-19, Ex. N.)

RESPONSE: Denied. This is a misrepresentation of the testimony and is false.

The portion of the transcript cited contains no testimony by Dr. Griffith about meeting – or not meeting – with Plaintiff.

96. Dr. Griffith also testified that that he did not consider the fact that Plaintiff may have suffered from cancer as relevant to judgment of her job performance. (Griffith Dep. 37:3-5; 62:8-63:13, Ex. N.)

RESPONSE: Denied. This is a misrepresentation of the testimony and is false.

The transcript at 37:3-5 contains no testimony concerning relevance of cancer to judgment of job performance.

In his testimony at 62:8-62:13, Dr. Griffith in fact noted that it is not the tissue diagnosis of the presence of cancer that is the critical factor, it is the illness behavior related to the diagnosis which is important and which is very relevant to assessing job performance as

physicians get cancer just like everybody else and must still be able to provide safe patient care.

The testimony in its entirety is as follows:

> Q   But assuming that she did have the cancer, I mean does that -- does it matter?
>
> A   No, because –
>
>        \*   \*   \*
>
> Q   The question is assuming she did have a cancer would that be part of the things that you have to consider as to whether or not she was doing her job?
>
>        \*   \*   \*
>
> A   Cancer is a tissue diagnosis.
>
> Q   Okay.
>
> A   That's a disease. Illness is all the behaviors and things in response to the disease. Whatever disease she may have is not necessarily relevant to how – whether she can function or not. What I'm looking at is her illness behavior around it. And if she is going to be a doctor she is going to have to have a way to be able to provide good care to patients even if she has it. Because doctors have as many of these diagnoses as any of the rest of the population, you know.

*Id.*

97. According to GW policies and Dr. Dyer, in his deposition as the corporate designee, the CCC provides academic due process rights that include notice, an opportunity to cure, and careful and deliberate decision-making. (30(b)(6) Dyer Dep. 16:07-18:08, Ex. P.)

RESPONSE: Agreed.

98. Dr. Dyer further testified that it is important for the CCC, in order to provide proper due process, to make careful decisions and to review the resident's entire record before rendering a decision. (30(b)(6) Dyer Dep. 16:07-18:08, Ex. P.)

RESPONSE: Agreed.

99. Prior to filing this lawsuit, Plaintiff filed a timely complaint with the EEOC and was given a right to sue letter.  (Dismissal and Notice of Rights, U.S. Equal Employment Opportunity Commission, April 8, 2016, AA.)

RESPONSE: Agreed.

Dated: February 12, 2018                         Respectfully submitted,


                                                 JACKSON & CAMPBELL, P.C.

                                                  /s/  Nicholas S. McConnell
                                                 Nicholas S. McConnell (# 167742)
                                                 Jackson & Campbell, P.C.
                                                 1120 20th Street, N.W., Suite 300 South
                                                 Washington, D.C.  20036
                                                 (T) (202) 457-1600
                                                 (F) (202) 457-1678
                                                 nmcconnell@jackscamp.com
                                                 *Counsel for Defendant*


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served by the court's electronic filing system and via email on this 12th day of February, 2018, upon:

                        Jason H. Ehrenberg, Esq.
                        Peter K. Tompa, Esq.
                        Bailey & Ehrenberg PLLC
                        1015 18th Street, N.W.
                        Suite 204
                        Washington, D.C. 20036
                        jhe@becounsel.com
                        pkt@becounsel.com
                        *Counsel for Plaintiff*

                                                  /s/ Nicholas S. McConnell