**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

_/s/  Nicholas S. McConnell_
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

## TABLE OF AUTHORITIES

**Cases**

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999) .............................................................. 10

*Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) ...................................... 4

*Bonnette v. Shinseki*, 907 F. Supp.2d 54 (D.D.C. 2012) ............................................................ 7, 15

*Brady v. Office of Sergeant at Arms*, 380 U.S. App. D.C. 283,
    520 F.3d 490 (D.C. Cir. 2008) ............................................................................................... 4

*Burke v. Emory Univ.*, 338 S.E.2d 500 (1985) ............................................................................ 10

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) .................................................. 7

*Chenari v. George Washington University*, 847 F.3d 740 (D.C. 2017) ........................... 1, 3, 9, 10

*Czekalski v. LaHood*, 589 F.3d 449 (D.C. Cir. 2009) ................................................................... 7

*Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989) ............................................................................... 8

*Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002) ..................................................................... 7

*Glass v. Lahood*, 786 F. Wupp.2d 189 (D.D.C. 2011) .................................................................. 3

*Hajjar-Nejad v. George Washington University*,
    37 F. Supp.3d 90 (D.D.C.2014) ................................................................................... 4, 5, 7, 9

*Olsson v. Bd. of Higher Ed.*, 402 N.E.2d 1150 (N.Y. 1980) ......................................................... 9

*Rattigan v. Gonzales*, 503 F. Supp.2d 56 (D.D.C. 2007) .............................................................. 7

*Reetz v. Jackson*, 176 F.R.D. 412 (D.D.C. 1997) ......................................................................... 3

*Royall v. National Ass'n of Letter Carriers, AFL-CIO*,
    507 F. Supp.2d 93 (D.D.C. 2007) ......................................................................................... 5

*Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034 (8th Cir. 2007) ............................. 16

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013).........................................................................10

**Statutes**

42 U.S.C § 12111(8) .........................................................................................................................8

**Rules**

Fed. R. Civ. P. 56............................................................................................................................1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,     )
                              )
        Plaintiff,        )
                              )   Civil Action No.: 1:16-cv-01412-CKK
     v.                      )   Hon. Colleen Kollar-Kotelly
                              )
GEORGE WASHINGTON UNIVERSITY,  )
                              )
        Defendant.      )

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant George Washington University (the "University") hereby submits this Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, in support of states as follows:

Plaintiff's Opposition Memorandum (Doc 35) ("Op. Mem.") is remarkable for its omissions and mis-statements. Before addressing the specific arguments Plaintiff raises, the following are noteworthy:

1.    Plaintiff never addresses – she does not even mention much less attempt to distinguish or explain away – *Chenari v. George Washington University*, 847 F.3d 740 (D.C. 2017)**Error! Bookmark not defined.**, and for obvious reason. The *Chenari* case makes clear that Plaintiff's claims for failure to accommodate, discrimination, and retaliation under the ADA and the other statutes she invokes fail because Plaintiff indisputably did not follow the University's well-established and clearly known to Plaintiff[1] system for presenting a claim of disability and requesting any related reasonable accommodation. *Id.* at 748-49. Plaintiff now

---

[1] As early as May 18, 2015, even before Plaintiff received her post-surgical cancer diagnosis, Plaintiff was referred explicitly to the University's EEO Office to pursue relief under the ADA for any disability and to request any reasonable accommodation. Def.'s SOF (Doc 34) at ¶¶ 188-193. It was actually "recommended that you apply." *Id.* at ¶ 192.

attempts to plug the gap by an argument that she "went to Defendant's EEO office *to ensure she could make necessary follow up medical appointments without being harassed*" and cites an inadmissible assertion in her declaration as a basis for the argument. Op. Mem. 5, citing Pl.'s RSOF (Doc 37) ¶ 1017 (emphasis added). The attempt is futile for two reasons:

First, Plaintiff's declaration does not make the statement inserted into the memorandum. The statement in Plaintiff's declaration in its entirety regarding this alleged discussion of disability at the EEO Office is: "I asked them if they knew of any policies to protect residents who needed time off for medical leave. They stated that I should apply for Family Medical Leave Act (FMLA) leave." Pl.'s Decl. ¶ 98 (Doc 35-2). That's it. Plaintiff states she went to the office where the EEO Office was also located for an entirely different purpose – to check on "rules" so she could attempt to avoid a further LOD related to her use of media. While there, she asked about "policies." Her declaration says nothing about telling the EEO Office about needing to make medical appointments "without being harassed." She does not state she informed the Office she thought she had a disability, or that she may have a disability, or that she requested guidance as to whether she qualified for a disability, or that she wanted information about applying for a disability, much less that she discussed, or even suggested, that she personally had a need for medical time off or a need for accommodation or that she made a request for reasonable accommodation. Had she done so, she would clearly have been presented the one-page form (which she now submits as Doc 35-8, Ex. DDD) to fill out to begin the process. Even if Plaintiff went to the EEO Office (which she is barred from claiming at this point), it is clear

she did not present herself as someone wishing to engage in discussion about any disability she might have.[2]

Second, Plaintiff is forbidden under the sham affidavit rule from introducing this allegation – even if it were somehow helpful to her cause (which it is not for the reasons already noted) – as the statement contradicts her deposition testimony, is not set forth in her pleading or in answers to interrogatories expressly calling for the information, has not been presented by Plaintiff in any other discovery produced, and is not corroborated in any respect. *Reetz v. Jackson*, 176 F.R.D. 412, 414 (D.D.C. 1997) (rejecting statements in affidavit contrary to deposition testimony, as well as plaintiff's complaint and interrogatory responses, when offered to oppose summary judgment). *Id.* at 414-416. *See also Glass v. Lahood*, 786 F. Wupp.2d 189, 216 (D.D.C. 2011). The University is filing a motion to strike significant portions of Plaintiff's declaration on various grounds, including the matters set forth in Paragraph 98 for the reasons noted.

Under *Chenari*, Plaintiff's claims fail.

2.      Plaintiff's Statement of Facts and her declaration present an extensive and always discriminatorily tinged statement of events and her impression or interpretation as to why she was right and others were wrong regarding the facts of each particular event in an apparent effort to create triable issues of fact. But this misses the point. Where the employer has put forth credible non-discriminatory, non-retaliatory explanations for its disciplinary decision-making

---

[2] Despite further express notification that the University's Benefits Administrator (The Standard) handled both leave and disability and informed Plaintiff of that fact and how to apply for benefits on line (October 23, 2015 email, Martin to Waggel, Doc 34-19, Ex. O ¶¶ 18-19 and Ex. 4) and despite the fact that Plaintiff was again advised, this time by Dr. Berger on November 18, 2015, to go to the EEO Office to get an official accommodation if she felt her condition required it (Def.'s SOF ¶¶ 622-625), and Plaintiff was again provided email instructions on the process on November 19 (*id.* at ¶ 626), the record is clear that Plaintiff never did so. *Id.* at ¶¶ 194, 944-947.

and action, the issue is not whether the underlying events occurred as Plaintiff would portray them, rather "the issue is whether *the employer honestly and reasonably believed* that the underlying" events occurred as the employer understood them. *Brady v. Office of Sergeant at Arms*, 380 U.S. App. D.C. 283, 289, 520 F.3d 490, 496 (D.C. Cir. 2008). Plaintiff cannot "end-run" summary judgment in these circumstances by raising the specter that all others were invidiously motivated and reported or understood facts incorrectly. *Id.* 520 F.3d at 4956-96. As the court noted in *Brady*, employers need to make factual determinations in deciding disciplinary matters, and any other approach would "put employers in a damned-if-you-do, damned-if-you-don't posture when addressing disciplinary issues in the workplace." *Id.* Here, there were multiple decision-makers in a multi-layered process: Dr. Catapano as Program Director, members of the Clinical Competency Committee ("CCC") (Drs. Dyer, Khin Khin, Crone, Norris, and Kels), independent reviewers (Dr. Cioletti, Dr. Lucas), and appeal reviewers (Dr. Simon, Dr. Berger). In a medical-education context, there are yet further reasons for deference to the decision-making process, whether the determination relates to a grade in a specific course (Dr. Collins and Dr. Griffith), or a decision for non-promotion or dismissal. *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978).

3.      Plaintiff sets up a "straw man" – that the University says its decision for dismissal cannot be scrutinized for ADA and other statutory violations (Pl.'s Op. Mem. 1-2) – and then tries to knock it down. The University makes no such argument and specifically refers to cases applying the analysis that *is* appropriate in the context of Plaintiff's ADA and other statutory claims in an academic medical training environment. Def.'s Mem. (Doc 34) 27, 30. Plaintiff makes one passing reference to *Hajjar-Nejad v. George Washington University*, 37 F. Supp.3d 90 (D.D.C.2014), and attempts to sweep it away by saying the case is "ill-fitting" because the

plaintiff there "merely asserted negative employment actions by a defendant-hospital *were broadly motivated by discriminatory intent*." Pl.'s Op. Mem. 38. A perusal of Plaintiff's Corrected Statement of Genuine Issues and of Counterveiling [*sic*] Facts (Doc 37), Plaintiff's 281-paragraph declaration (Doc 35-2), and her argument (Doc35) shows that Plaintiff's description of *Hajjar-Nejad* aptly pigeon-holes her own case. The University has not argued for a different analytical framework.

4.      Plaintiff incorrectly faults the University's factual presentation on several grounds. Plaintiff claims that declarations have been submitted from persons "who did not witness the relevant events" (presumably a hearsay objection which is repeated throughout her presentation) or who were "not named during the discovery process." Pl.'s RSOF (Doc 37) 2. Both are wrong. The hearsay objection misapprehends the purpose to which the statements are being put and is unfounded in a case involving employment and academic decision making. *Royall v. National Ass'n of Letter Carriers, AFL*-CIO, 507 F. Supp.2d 93, 98-99 n. 10 (D.D.C. 2007). The statements and information are not offered for the truth of the matter asserted but as the explanation for how and why the employment-academic decisions were made. *Id.* Further, every one of the declarations involves an individual identified in the University's initial disclosures.[3]

Plaintiff also abjures that the factual submission is lengthy and includes details related to Plaintiff's tenure beginning from the very outset, a "contrivance brimming with red herring."

---

[3] The University submitted declarations from Drs. Catapano (Doc 34-2), Berger (Doc 34-6), Emejuru (Doc 34-7), Roche (Doc 34-11), Collins (Doc 34-13), Siegel (Doc 34-14), Chang (Doc 34-15), Dyer (Doc 34-17), Griffith (Doc 34-18), Ms. Vanlewen (Doc 34-19), Ms. Fair (Doc 34-20), and Drs. Cioletti (Doc 34-21), Dr. Simons (Doc 34-22), and Lucas (Doc 34-23). All were identified in the University's initial disclosures (Doc 13, pp. 3-5, 7-8). The remaining two declarants, Drs. Jarrett (Doc 34-12) and Siegel (Doc 34-14), were identified by Plaintiff in her initial disclosures (Doc 14, p.2), which were adopted by the University in its disclosures. Doc 13, p. 10. There were no stealth witnesses in the University's filings.

Pl.'s Op. Mem. (Doc 35) 16, Pl.'s RSOF (Doc 37) 1-4. But it is Plaintiff who claims that she was doing just fine until her diagnosis and surgery (Complaint ¶ 8, Doc 2), and this record is lengthy and complex because Plaintiff has engaged in an extensive pattern of playing individuals against one another and triangulating communications. Dr. Dyer, the first faculty member assigned for remediation with Plaintiff for her July 10 ED no show, noted this quickly. Def.'s Ex. M (Dyer Decl.) (Doc 34-7) ¶¶ 18-23. In an effort to set a date/time for their first meeting, Dr. Dyer was met with non-responsive, tangential, and eventually dishonest conduct (*id.* ¶ 23), not a direct answer to a yes/no question. *Id.* 24-26. When they did meet, Dr. Waggel's behavior followed a formula: the findings regarding her no show violation were "90% . . . false" (everybody else is wrong) (*id.* ¶ 28), followed by a reference to her illness (*id.* ¶ 29), then an offer of shifting and uncorroborated excuses (*id.* ¶¶ 30-32), segueing to a deflection of blame onto others or the system and a focus on others' deficiencies (*id.* ¶¶ 33, 34), all while demonstrating a lack of awareness of the impact of her own behavior (*id.* ¶ 35), accompanied by a refusal to answer questions (*id.* ¶ 36), defensiveness (*id.* ¶ 43), entanglements with fellow residents and staff, and general lack of reflectiveness. *Id.* ¶ 43.

When Plaintiff was scheduled to meet with Drs. Norris and Gandhi during their Root Cause Analysis review of the events of the August 25, 2015 overnight call shift which had led to a further Letter of Deficiency ("LOD") being issued to Plaintiff for deficiencies in Patient Care, Interpersonal Communications Skills, and Systems-Based Practice (Catapano Decl. ¶ 602 (and Ex. #144)), Plaintiff prepared a detailed 3000-word document with 22 screen shots from an electronic medical record in an effort to show that what a nurse had said had occurred, in fact, did not. Pl.'s Decl. (Doc 35-2) ¶ 131. The presentation missed the point that Plaintiff had interacted directly with several Psychiatry attending physicians during the shift, including Dr.

Dr. Norris (who was conducting the review) and Dr. Khin Khin, and it was the physicians' who served as the primary source of concerns regarding Plaintiff's deficiencies. Catapano Decl. ¶ 311 (and Ex. ##81-82, 84). But the approach was consistent: flood the record, vary the arguments, and blame as many others as possible. This is an extensive record and parsing it carefully is important.

5.      Plaintiff relies heavily on the issuance of the numerous Letters of Deficiency ("LOD") as a basis for her claims under the ADA and related statutes. The reliance is misplaced. An employment action must result in "materially adverse consequences" in order to make out the first element of a *prima facie* case, although the concept of an "adverse action" in the retaliation context is more expansive than in the discrimination context. *Bonnette v. Shinseki*, 907 F. Supp.2d 54, 69-70 (D.D.C. 2012). But even in the retaliation context, while the adverse action may fall short of a personnel action, such as denial of promotion, discharge, or salary reduction, the plaintiff "nonetheless must point to an action that a 'reasonable employee would have found . . . materially adverse.'" *Id.* quoting *Rattigan v. Gonzales*, 503 F. Supp.2d 56, 75 (D.D.C. 2007), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Here the evidence shows that an NOD is wholly remediable, does not constitute punishment of any kind, does not alter or affect any of the terms of employment, and if the resident "satisfactorily resolves the deficiency and continues to perform acceptably thereafter, the period of unacceptable academic performance should not affect the Resident's progress in the program." Catapano Decl. ¶¶ 57-59 and Ex. #13 GWU 447. "[N]ot everything that makes an employee unhappy is an actionable adverse action.'" *Hajjar-Nejad v. George Washington Univ.* 37 F. Supp.3d 90, 128 (D.D.C. 2014), quoting *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C. Cir. 2009) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Such non-adverse

events include written admonishment, *Bonnette*, 907 F. Supp.2d at 71, and performance improvement plans. *Id*

So, too, with LODs, which are designed to provide formal written notice and opportunity to cure without penalty. To the extent Plaintiff bases her claims on circumstances surrounding issuance of the LODs, those claims fail.

6. Plaintiff clearly was not a "qualified" individual under the ADA and related statutes for purposes of her employment as a resident in the University's Psychiatry Residency Training Program. The term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C § 12111(8). The quintessential nature of "employment" in a residency training program is not the stipend the physicians receive but the academic training and ultimately certification for independent specialty practice. *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989). Dr. Catapano's declaration makes clear, supported in great detail by the declarations of other attending physicians in the Program who encountered Plaintiff in a variety of settings, at different times, in multiple clinical disciplines, that by the point that the recommendation for dismissal was made, Plaintiff had demonstrated profound and irremediable deficiencies in virtually every domain demanded of a physician in independent specialty practice, not the least of which was a long and dismal record of dishonesty, falsehood, and disrespect for colleagues (and even patients) as well as the institution attempting to support her in her training. Catapano Decl. ¶¶ 76-77, 85. To the very end, Plaintiff refused to acknowledge her deficiencies or to accept remediation, including extension of time in training. Plaintiff cannot meet the threshold requirement of showing she was an individual qualified for psychiatry residency training.

7.      The issue was not one of failure to accommodate, or failure to provide reasonable accommodation. First, Plaintiff never presented a claim of disability or sought an accommodation of any kind, and for reasons already noted, her recently submitted declaration does not change that fact. Those claims fail under *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017)**Error! Bookmark not defined.**. There are two equally obvious impediments to Plaintiff's claims, however, since any possible accommodation for Plaintiff would have to have encompassed remediation to address her deficiencies: First, there is no remediation for dishonesty. Def.'s Ex. N (Griffith Decl.) ¶¶ 63-71, 95.[4] Second, the student must recognize and accept the need for remediation which Plaintiff has always refused to acknowledge or accept. Def.'s Ex. B (Berger Decl.) (Doc 34-6) ¶¶ 38-48.

8.      Plaintiff's reliance on a retained expert witness, Dr. Spitz, is unavailing. Plaintiff cites no authority for the proposition that an outside pedagogical reviewer can create a jury question in an academic decision-making case, and for good reasons both substantive and prudential. The judiciary's reluctance to intervene is based upon sound considerations of public policy, that is, "to ensure society's confidence in the qualifications of individuals who have graduated from *a particular educational institution,* 'it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of *the professional educators* who monitor the progress of *their* students *on a regular basis*.'" *Hajjar-Nejad,* 37 F. Supp.3d at 117 (quoting *Olsson v. Bd. of Higher Ed.*, 402 N.E.2d 1150, 1153 (N.Y. 1980) (emphasis added).

---

[4] Plaintiff remains dishonest, even in her representations to the Court as recently as her assertion of a triable fact that she could not complete the health clearance process in time, or in compliance with an extended deadline "because Defendant stationed her at another hospital." Pl.'s SOF (Doc 32-2) ¶ 50. The fact is, Plaintiff could go to any doctor she wants to complete the health clearance paperwork and TB test and then fax the paperwork to the GW Hospital Employee Health Office, and she had at least 3 – 4 months to get that done. *See* Def.'s Response to Plaintiff's Assertion of Additional Material Facts, filed February 26, 2016, ¶ 50.

After all, "a diploma publicly signals a school's confidence in a student's knowledge and skills . . . ." *Chenari v. George Washington Univ., supra,* at 745. Thus, "[c]ourts must not 'substitut[e] their judgment improperly for the academic judgment of the school.'" *Id.* (quoting *Wright v. Howard Univ.,* 60 A.3d 749, 754-55 (D.C. 2013)). "This rule of judicial nonintervention is 'particularly appropriate in the health care field' where the students who receive degrees will provide care to the public." *Alden,* 734 A.2d at 1109 (quoting *Burke v. Emory Univ*., 338 S.E.2d 500, 501 (1985)).

Dr. Spitz as an ostensible expert apparently reviewed documents provided to her (presumably by Plaintiff's counsel) regarding Plaintiff's tenure in the Program and now submits opinions concerning the GW University faculty members' decision-making process and their evaluation of Plaintiff's conduct, behavior, aptitude, remediability, and status in the program. It seems clear that Dr. Spitz does not begin to approach the role envisioned by the courts in according deference to "the sound judgment of the professional educators who monitor the progress of their students *on a regular basis*." It is clear from Dr. Spitz's discussion that there's much of the record either not provided or simply disregarded, including the multiple alarming instances of dishonesty, the surreptitiously recorded meeting with Dr. Berger in which Plaintiff steadfastly refuses the nostrum (extended leave from the Program) which Dr. Spitz appears to believe was never appropriately proffered, and the interaction with Plaintiff, herself, and her fellow trainees who provide so much insight concerning Plaintiff over many months of intense experience. Substantively, Dr. Spitz cannot achieve deferential status in this case from her campus in Chicago.

On the prudential side, any other result would open the floodgates and in the process crush the freedom and breathing space within the academy to take differing approaches,

10

experiment, disagree, and coalesce. The academy's vibrancy would disappear the instant Dr. Spitz were to be deputized by the courts to step in to revise curricula, assign grades, overrule departments, and confer degrees. Her opinions should carry no weight.

9.      Plaintiff repeatedly makes broad, self-serving, uncorroborated statements that she was unable to schedule or attend medical appointments but with rare exception fails to provide specifics and the record appears to the contrary. Plaintiff was granted every day of leave she requested, whether in single days, groups of days, or intermittent leave (2 times per month for 8 hours per day). Def.'s Ex. O (Vanlewen Decl.) (Doc 34-19) ¶¶ 18-28. Dr. Catapano and Plaintiff's Chief Resident, Dr. Emejuru, acted repeatedly to assure dates for leave (personal and medical) Plaintiff requested. Catapano Decl. ¶¶ 197-198, 208, 228, 411-412, 414, 419-420, 651, 655; Dr. Emejuru Decl. ¶¶ 14, 18, 20, 23, 28, 30, 34, 113, 171-172, 177, 187-188, 220-227, 247. One example Plaintiff cites of an appointment where she arrived late involved an appointment she had scheduled with her therapist for 3:30 p.m. on a day she had psychodynamics class until 3:15 p.m. and had told the lecturer (Dr. Collins) "but she went past 3:15." Pl.'s Decl. (Doc 35-2) p. 34. Plaintiff then describes how she turned this into an example of major unfairness by the Program without any description of what was going on in the class, whether other students were continuing a discussion. Despite repeated claims of obstruction and unfairness, those claims on this record stand largely as self-serving, uncorroborated instances where Plaintiff may bear as much responsibility as anyone for making this process (from her viewpoint) so difficult.

10.     It is not true that Plaintiff was undergoing frequent follow up treatment for her cancer. Both Dr. Jarrett (surgeon) and Dr. Siegel (oncologist), who were Plaintiff's primary treating physicians for any cancer-related follow up, agree that the cancer appears to have been completely removed, there was no indication for adjuvant therapy, and follow up per generally

11

recommended guidelines is a surveillance CT scan and chest x-ray once a year for three years. Def.'s Ex. H (Jarrett Decl.) (Doc 34-12) ¶¶ 17-18 (follow up care); Def.'s Ex. J (Siegel Decl.) Doc 34-14) ¶¶ 4-5 (surgery deemed curative). Plaintiff appears to have maintained a fairly regular schedule with the provider she was seeing most frequently, her therapist, Dr. Kecmanovic, during the period following her post-op visits with Drs. Jarrett and Siegel:

| | |
|---|---|
| Aug 11 | Dr. Stark (MFA) office visit – genetics (MFA 0008-0009)[5] |
| Sep 03 | Dr. Kecmanovic office visit[6] |
| Sep 11 | Dr. Kecmanovic office visit |
| Sep 15 | Dr. Stark (MFA) office visit - genetics |
| Sep 15 | Dr. Kecmanovic office visit |
| Sep 22 | Dr. Kecmanovic office visit |
| Sep 22 | American Lipo Centers – laser lipo touch up (lower abdomen)[7] |
| Sept 26 | Dr. Kecmanovic office visit |
| Oct 06 | Dr. Kecmanovic office visit |
| Oct 13 | Dr. Kecmanovic office visit |
| Oct 20 | CT chest/abdomen/pelvis w/ contrast (MFA 0051) |
| Oct 20 | Dr. Kecmanovic office visit |
| Oct 26 | FMLA leave[8] |
| Oct 27 | FMLA leave |
| Oct 28 | FMLA leave |
| Oct 29 | FMLA leave |
| Oct 30 | FMLA leave |
| Nov 03 | Dr. Kecmanovic office visit |
| Nov 04 | Dr. Shepard office visit – UTI, STD, refill med, referral |
| Nov 11 | Dr. Kecmanovic office visit |
| Dec 03 | Dr. Kecmanovic office visit |
| Dec 15 | Dr. Kecmanovic office visit |
| Dec 29 | Dr. Kecmanovic office visit |
| Jan 12 | Dr. Kecmanovic office visit |
| Jan 19 | Dr. Kecmanovic office visit |
| Jan 27 | Dr. Kecmanovic office visit |
| Feb 16 | Dr. Kecmanovic office visit |

*See* Def.'s Response to Pl.'s SOF for Partial Sum. Judg. (Doc 36-1) p. 35 of 81

---

[5] Pl.'s Ex. X (MFA records, MFA 0008-0050). This exhibit covers all MFA providers and studies.
[6] Def.'s Ex. U (Dr. Kecmanovic office records, Kecmanovic 000001-000002). This exhibit covers all Dr. Kecmanovic office visits noted here.
[7] Def.'s Ex. X (American Lipo Centers records, Amer Lipo Ctrs 000012-000015).
[8] Def.'s Ex. O (Vanlewen Decl. ¶ 20). This exhibit covers all FMLA leave noted here.

The record does not support the repeated self-serving uncorroborated assertions that Plaintiff was having difficulty arranging and attending medical appointments, and certainly not as the result of any impediment created by the Program. Summary judgment on those issues should be granted to the University.

11.     The record further clearly shows that Plaintiff was not "being punished for taking too much time off," Pl.s Op. Mem. 6, or that the more Plaintiff "complained, the more letters of deficiency the Program issued." *Id.* 7. The Letters of Deficiency were all clearly justified and Plaintiff can adduce no evidence of pretext. Plaintiff no showed for the ED on June 10, 2015 (LOD1, dated July 15, 2015). Catapano Decl. ¶ 278, Ex. #77. Plaintiff failed to get a health clearance timely despite ample time and multiple warnings, and even an extension of time (LOD2, dated October 28, 2015). Berger Decl. ¶ 16, Ex. #1. Plaintiff failed to remediate the many issues from the August 25 overnight call shift, including resisting the proper role of the residents serving on buddy call and then lying to the Program about their role (LOD3, dated November 11, 2015). Catapano Decl. ¶ 584, Ex. #144 (November 11, 2015)[9] Catapano Decl. ¶ 584, Ex. #144. And Plaintiff failed two fundamental didactics courses (Psychodynamic Theory, and Neuroscience) resulting in an inability to progress to a further course in Psychodynamic Psychotherapy thus also delaying promotion to PGY3 (LOD4, dated December 10, 2015). Catapano Decl. ¶ 667, Ex. 160.

12.     Plaintiff claims that on review of the fourth LOD, after independent review by Dr. Cioletti had upheld the decisions, Dr. Simons, the final reviewer as Senior Associate Dean for M.D. Programs, sent the matter back to the Clinical Competency Committee "to create an

---

[9] This letter was revised to provide a higher level of on call supervision from residents to faculty members to provide an even higher level of supervision (LOD3, dated November 19, 2015). Catapano Decl. ¶ 615, Ex. # 150

Improvement Plan" for Plaintiff. Pl.'s Op. Mem. 8. That is clearly false. After conducting a careful procedural review, and finding a procedural error only, Dr. Simons specifically noted in his letter to Plaintiff that he was "referring this matter back to your department and Program Director." Def.'s Ex. R (Simon Decl.) (Doc 34-22) ¶ 15, Ex. #3. Dr. Simons further stated that "[T]he Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." *Id.* As Dr. Simons has further noted, his letter made clear that he did not review or make a determination on the merits and that it was still within the CCC's discretion to recommend that Plaintiff not be promoted to PGY3 after meeting and conducting a formal evaluation of her performance. *Id.* ¶¶ 16-17. It is thus also wrong for Plaintiff to argue (Pl.'s Op. Mem.) that the CCC failed to follow "directions" in reviewing the matter again on the merits.

13.     Plaintiff also argues that the CCC focused on addressing the procedural issues identified by Dr. Simons, failed to engage in further plans for remediation, and "mined her employment history" searching for reasons to justify termination. Pl.'s Op. Mem. 10. But that is precisely what the appeal process was to accomplish and what Dr. Simons instructed the CCC to do on remand. Plaintiff has always conflated the notion of reversal for procedural error with vindication on the merits. Nor was it necessary to "mine the record" very hard or very deep to reach a not unreasonable conclusion that all efforts to bring Plaintiff into a meaningful remediation posture had failed. Plaintiff continued her misrepresentations regarding communications with the Department Chair (Dr. Griffith) in the process of responding to an investigation by the Dean of Graduate Medical Education (Dr. Berger) of the meaning of her allegedly "cumulative" test result in communicating with Dr. Berger regarding her pending appeal of LOD3. *Id.;* Def.'s Ex. B (Berger Decl.) (Doc 34-6) ¶¶ 68-69. Dr. Griffith noted that

Plaintiff's "portrayal of the situation was not honest." *Id. ¶ 69.* Plaintiff also contends that an email report by Dr. Dyer of a conversation with Dr. Berger showed that the appeal process would be a "rubber stamp." Pl.'s Op. Mem. 11. The email actually notes that the conversation with Dr. Berger was a review of procedures, perhaps not unexpected given the CCC's recent restructuring in light of Dean Simons' ruling, and summarized the manner in which the appeal process could be expected to proceed if the CCC and the Program Director produced a procedurally and substantively proper decision. Plaintiff's construction also ignores that under the review process, the review is conducted not by Dr. Berger as Dean of GME but by an independent reviewer from a wholly unrelated clinical service. In this instance, when the CCC's recommendation and the Program Director's decision were appealed, the review was conducted by Raymond Lucas, M.D., Vice Chair for Education for the Department of Emergency Medicine. Def.'s Ex. S (Lucas Decl.) (Doc 34-23) ¶ 2.

There is not the slightest hint in this record that Dr. Lucas conducted anything other than a rigorous, full, and objective review of the record before him. What is certain is that there is not a scintilla of evidence suggesting any anti-disability animus or retaliatory motive regarding Dr. Lucas personally or his conduct in this matter. It is not enough for an employee seeking to establish pretext to show that a reason given for employment related action is not just, or fair, or sensible; she must show that the explanation given is phony. *Bonnette v. Shinseki*, 907 F. Supp.2d 54, 74 (D.D.C. 2012). Here, given the huge record of Plaintiff's deficiencies noted by attendings at multiple sites, in multiple specialties, and the widest possible circumstances, there was nothing remotely phony about the decision for Plaintiff's dismissal. Even patients were reported as complaining about the doctor who did not know what she was doing. Def.'s Ex. K (Chang Decl.) (Doc 34-15), ¶ 10; Catapano Decl. ¶¶ 712-715.

Plaintiff further argues that Dr. Catapano "lied" to Plaintiff by telling her that "the CCC was working on *an improvement plan* instead of engineering her termination." Pl.'s Op. Mem. 11 (emphasis added). Again, this is false. The document cited at RSOF ¶ 1076 is an email dated February 8, 2016, and is quoted there as follows: "The CCC is *working on their recommendations*, and the plan is to get them together . . . ." *Id.* (emphasis added).

14.    Plaintiff also argues that it was somehow improper for the University's personnel to take a cautionary approach because Plaintiff "hired an attorney." Pl.'s Op. Mem. 11. But Plaintiff did not just hire an attorney, she directly threatened Program faculty and personnel with ruinous litigation if things did not work her way. The reaction to those threats hardly represents evidence of "animus towards those who seek protection" (Pl.'s Op. Mem. 35). Plaintiff cites no authority to that effect, and, in fact, courts have taken a different view:

> [V]ague statements regarding apparent concern by directors or supervisors as to possible litigation with persons who file complaints cannot suffice to prove retaliatory animus. Directors and supervisors would be ill-advised not to act in a guarded and careful manner after the receipt of a complaint. The exercise of such are in no way demonstrates that adverse actions are motivated by a desire to retaliate. If anything, it is evidence of a desire to placate.

*Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1045 (8th Cir. 2007).

15.    Plaintiff argues that all Plaintiff needed by way of accommodation to perform the essential functions of the position was "a couple of hours each week to attend medical appointments." Pl.'s Op. Mem. 15. The record appears to show that she got that time off as shown on page 12, above. But Plaintiff's significant hurdle is a causal nexus between the alleged failure to accommodate and the reasons for discharge. Plaintiff did get to whatever medical appointments she needed to attend and has not proven the contrary. It is also established that she received whatever leave she asked for. But there is no way two hours of medical time per week

was going to work a miracle on Plaintiff's basic lack of medical knowledge, no show behavior, lack of professionalism, and dishonesty. Plaintiff is also clearly wrong when she argues that "absences, not performance" were the real cause of her deficiencies. Pl.'s Op. Mem. Actually, Dr. Collins and Dr. Griffith both noted that a major feature of Plaintiff's obvious non-comprehension of their didactic course materials was her behavior when she showed up for class. Collins Decl. ¶¶ 19-23 (noting total lack of preparation for and inability to make a class room article presentation although Plaintiff had seen the presentation modeled by other residents), 32 (noting that it was "evident that Dr. Waggel lacked the insight necessary to recognize the inappropriateness of her behavior and how it impeded the class"); Griffith Decl. ¶¶ 47-49 (when Dr. Waggel came to class, she often distracted the entire class from the lecture and discussion of material being presented by tangential, inappropriate interruptions related to her personal problems). It is true that her "absence" for "no shows" was a significant problem, but her conduct when she was present was a major factor, for example, the LOD for the August 25 overnight on call shift was all about her sub-standard performance, knowledge, and lack of professionalism. The same was true of her performance when more senior residents made themselves available for "buddy call" to assist Plaintiff in transitioning back to independent clinical call.

16.     Plaintiff argues that Dr. Griffith, as Department Chair, had responsibility to accommodate Plaintiff's "illness or related-anxiety." Pl.'s Op. Mem. 17. But Plaintiff presents no evidence of anything Dr. Griffith was asked, expected, or required to do. *Id.* The conclusory assertion is made that he should have considered the fact that "Plaintiff may have suffered from cancer as relevant to judgment of her job performance." *Id.* But Plaintiff's job performance in a didactics course was to learn the material. There was no claim that Plaintiff needed a reading

assistant, or special classroom lighting, additional study time, or any other accommodation. Plaintiff certainly never said so. Plaintiff's argument is completely circular – because Dr. Griffith did not consider the fact of her cancer he failed to accommodate her. Pl.'s Op. Mem. 17.

17.     Dr. Waggel further argues that the University "attempted to dissuade and discourage her from taking leave . . . ." Pl.'s Op. Mem. 23. That is wholly inconsistent with the record. It was Dr. Catapano who persuaded Plaintiff to take leave in May 2015 when Plaintiff was dismissed by the Internal Medicine attending physicians from the rotation for abandoning her duties in the middle of a clinical shift as the result of apparent alcohol or drug abuse. Catapano Decl. ¶¶ 197-198. And it was Dr. Catapano who assured that Plaintiff would have protected time for psychotherapy during her post-surgery rotation at Children's National Medical Center. *Id.* ¶¶ 414-415, 419. The record shows that Plaintiff was granted every leave day she requested. Vanlewen Decl. 18-30.

18.     Plaintiff argues that she went to the University's EEO Office on September 17, 2015 because "Dr. Catapano had refused to provide her with an adjusted work schedule to accommodate her need to attend medical appointments." Pl.'s Op. Mem. 24. There are several major problems with the argument. First, Plaintiff should read her declaration. According to what she has told the Court: "I went to Rice Hall, Suite 101 *to make sure I was following every rule,* as I did not want to give administration something to write another LOD about. *They stated when it comes to social media, I must be clear to my readers that the views I express are mine and mine alone.*" Pl.'s Decl. (Doc 35-2) ¶ 98. But September was also the month when Dr. Catapano "refused to provide [Plaintiff] with an adjusted work schedule . . . ," Pl.'s Op. Mem. 24, that is the month Dr. Catapano specifically arranged for all the psychotherapy sessions Plaintiff had requested.

18

19.     Plaintiff argues that when she returned from a brief FMLA leave that she had taken to cover time off to take a national licensing exam – USMLE Step 3 – and shortly thereafter was placed on administrative leave. Pl.s Op. Mem. 26. What Plaintiff knows to be the truth is that Dean Berger had received a series of community reports from the apartment building where Plaintiff lived of stating she had engaged in drunken, loud, disruptive behavior involving calls to the Metropolitan Police Department. Berger Decl. ¶¶ 17-19 and Ex. ## 2-4. Dr. Berger believed that for Plaintiff's own safety, but certainly out of consideration for the health and safety of patients, co-workers and the general public, Plaintiff needed to be removed immediately from her duties while he conducted a review. *Id.* 20-23. There is no hint of pretext in this concern. The community reports and MPD Public Incident Reports are in Dr. Berger's files. They are obviously concerning. The community member reported that "this person has no regard for the police or any consideration of her neighbors. She has been drunk or drugged in the hallway before and became abusive when confronted." Berger Decl. Ex. #4. Dr. Berger moved as expeditiously as possible to meet with Plaintiff to review the matter, who oddly took her time responding to his request since his experience with most trainees placed on administrative leave is to seek resolution at the earliest opportunity. *Id.* ¶¶ 25-26. Dr. Berger did meet with Plaintiff fairly promptly, resolved in his mind that he had received appropriate assurances from Plaintiff that she did not have a substance abuse problem, and accepted her explanation of the events. *Id.* ¶¶ 29-30. This episode is hardly the anti-disability event described in bold face underlined type font in Plaintiff's memorandum. Pl.'s Op. Mem. 26.

20.     Plaintiff argues that there was no justification for denying her promotion to PGY3 "based on her didactics absences" Pl.'s Op. Mem. 27. The argument encounters an obvious problem. The "absences" were failures. Plaintiff had not learned the material. Dr. Collins had

provided extensive written feedback on a patient "formulation" assignment noting: "First, it will likely come as no surprise to you that I don't think you understand psychodynamic concepts." Def.'s Ex. I (Collins Decl) (Doc 34-13) ¶ 36 and Ex. #6. And Plaintiff had flunked two of the exams in the neurobiology course with exactly similar grades of 33 – worse than random guessing. Griffith Decl. ¶ 36, 42-43 and Ex. ##5-6.

## CONCLUSION

Plaintiff's arguments remain essentially the same through the rest of her brief. They are largely circular self-serving statements without corroboration. They raise no inference of improper animus in the University's decision-making process. The University has more than established Plaintiff's lack of qualification for the position of psychiatry residency trainee and abundant, clearly non-pretextual grounds for the decisions that were made. There was neither discrimination or retaliation. The University should be granted summary judgment on all claims presented and the case dismissed with prejudice.

Dated:  February 26, 2018

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

 _/s/  Nicholas S. McConnell_____
Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2018, a copy of the foregoing was

served by the court's electronic filing system upon:

> Jason H. Ehrenberg, Esq.
> Peter K. Tompa, Esq.
> Bailey & Ehrenberg PLLC
> 1015 18th Street, N.W.
> Suite 204
> Washington, D.C. 20036
> jhe@becounsel.com
> pkt@becounsel.com
> *Counsel for Plaintiff*

_/s/  Nicholas S. McConnell_____
Nicholas S. McConnell

3724193v.1