**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
ASSERTION OF ADDITIONAL MATERIAL
FACTS ALLEGEDLY  REQUIRING JURY TRIAL**

Defendant George Washington University (the "University"), by undersigned counsel, pursuant to Fed. R. Civ. P. 56(c), Local Civil Rule 7(h), and this Court's Fourth Amended Scheduling and Procedures Order, ¶ 6 (Doc. 33), submits this response to Plaintiff's statement of additional material facts allegedly requiring jury trial. These assertions are set forth at the conclusion of Plaintiff's response to the University's statement of material undisputed facts and being with Paragraph No. 978. None of the asserted facts is sufficiently material, disputed, or grounded in admissible evidence as to require a trial of any matter related to Plaintiff's claims.

The non-triable "issues" raised by Plaintiff fall into three broad categories:

1.      Plaintiff's Disagreement With the Outcome of the Academic Fact-Finding and Decision-making Process: It is apparent that Plaintiff is attempting to re-litigate in this Court the substantive decision-making regarding her academic disciplinary proceedings as many of the allegedly material disputed facts seek to challenge those decisions because Plaintiff's version of events was not accepted in most instances by the academic decision makers, both those within the Psychiatry Residency Training Program and other independent reviewers within the

University community. But those are matters as to which the Court defers to academic decision-makers (*Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 [D.C. 1999] [citing *Kraft v. W. Alanson White Psychiatric Found.*, 498 A.2d 1145, 1149 [D.C. 1985]), who are entitled to review those matters and make their decisions regarding them, even when allegedly mistaken. *Kraft v. William Alanson White Psychiatric Foundation*, 498 A.2d 1145, 1148-49 (D.D. 1985); *Glass v. Lahood*, 786 F. Supp.2d 189, 215 (D.D.C. 2011).   Rather "the issue is whether *the employer honestly and reasonably believed* that the underlying" events occurred as the employer understood them. *Brady v. Office of Sergeant at Arms*, 380 U.S. App. D.C. 283, 289, 520 F.3d 490, 496 (D.C. Cir. 2008). Plaintiff cannot "end-run" summary judgment in these circumstances by raising the specter that all others were invidiously motivated and reported or understood facts incorrectly. *Id.* 520 F.3d at 4956-96.

2.     Plaintiff's Self-Serving, Uncorroborated Conclusions and Speculation: Many of the disputed "facts" derive from Plaintiff's *ipse dixit*, such as the oft-repeated claim that she was "punished" for taking leave or she was treated "differently" than others, without any further specificity or substantiation. On summary judgment, these statements do not suffice. Courts give no particular weight to self-serving opinions without objective corroboration. *See*, *e.g.*, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996), cited with approval by *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004).

3.     Standard Evidentiary Deficiencies, Including Hearsay and Lack of Personal Knowledge: There are many instances in which Plaintiff makes assertions that are clearly objectionable on standard evidentiary grounds, particularly hearsay and lack of personal knowledge.

Because Plaintiff's declaration contains so many deficiencies in each of these categories, the University is filing a motion to strike the declaration. One further comment is apropos: In remarkable respects, many of Plaintiff's assertions are not only irrelevant but involve clearly calculated falsehood. A few examples, and the list is nowhere near exhaustive, are the assertions set forth in Paragraphs 992, 999, 1004, 1026, and 1035 below. There are many others.

**Paragraph 978.** According to guidelines issued by the Accreditation Council for Graduate Medical Education (AGGME) and the American Board of Psychiatry and Neurology, residents are to receive "Milestones" evaluations semi-annually. (Declaration of Stephanie Waggel, dated Feb. 1, 2018 (Waggel Declaration) ¶ 7.)

**RESPONSE:** Agreed but irrelevant as these matters do not create jury triable issues of fact. These matters involve academic decision-making as to which the Court does not substitute its judgment but defers to the University's judgment in determining how its medical academic training program should be conducted and how to evaluate the trainees' academic performance within the program.

**Paragraph 979.** On January 13, 2015, Plaintiff received the first of only two Milestone evaluations she received during her entire residency. Both covered her Post Graduate Year 1 (PGY1) year. (Waggel Decl. ¶ 9.)

**RESPONSE:** Agreed but irrelevant as these matters do not create jury triable issues of fact. The Court does not substitute its judgment regarding the manner in which the University conducted its academic program or evaluated the trainees' academic performance within the program, and for accuracy and completeness the statement should include the fact that the Second Milestones evaluation showed Plaintiff to be far below Program requirements in Patient Care and Professionalism with specific instances reviewed by Dr. Catapano. *See* Def.'s SOF (Doc 34) ¶¶ 269-270.

**Paragraph 980.** In this first Milestone evaluation, Plaintiff received 21 scores of Level 1 and one score of Level 1.5 in the category of problem-based learning: Teaching, Development as a teacher, Observable teaching skills. (Waggel

Declaration ¶ 9.) These scores are considered satisfactory, and placed Plaintiff ahead of at least some of her peers. (Waggel Decl. ¶ 10.)

**RESPONSE:**. Agreed but irrelevant as these matters do not create jury triable issues of fact. These matters involve academic decision-making as to which the Court does not substitute its judgment but defers to the University's judgment in determining how its medical academic training program should be conducted and how to evaluate the trainees' academic performance within the program.

Further, for accuracy and completeness, the Milestones Evaluation did not erase the serious deficiencies documented during this evaluation period with respect to Plaintiff's performance and behaviors in the domains, among others, of basic medical knowledge, professionalism, and systems-based practice. *See* Def.'s SOF (Doc 34)  ¶¶ 94-96, 98-99, 101-102.

**Paragraph 981.**  On March 2, 2015, Dr. Waggel began her first day of a rotation on internal medicine. Other residents had warned her that attending internal medicine doctors regularly berated psychiatry residents on this rotation. (Waggel Declaration ¶ 12.)

**RESPONSE:** Agreed as to the first sentence but the University objects to the first sentence and the remainder of this statement as irrelevant as the Court does not substitute its judgment regarding the manner in which the University conducted its academic program or evaluated the trainees' academic performance within the program. These statements do not create jury triable issues of fact. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program.

The University further objects to the remainder of the statement on the following additional grounds: (1) Hearsay, (2) self-serving and lacking any corroborative evidence, and (3) the alleged facts were not disclosed during pretrial discovery. The University is filing a motion to strike from Plaintiff's declaration the inadmissible and self-serving uncorroborated matters as well as those matters which were not disclosed during pretrial discovery.

> **Paragraph 982.**  Moreover, this was Dr. Waggel's first rotation through internal medicine. (Waggel Declaration ¶ 12.) Other residents who had done a prior rotation were more advanced in their internal medicine skills than she was. (*Id.*)

**RESPONSE:**   Agreed as to the first sentence but the University objects to the first sentence and the remainder of this statement as irrelevant as the Court does not substitute its judgment regarding the manner in which the University conducted its academic program or evaluated the trainees' academic performance within the program. This statement does not create jury triable fact issues. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program.

The University further objects to the remainder of the statement on the following additional grounds: (1) Hearsay, (2) self-serving and lacking any corroborative evidence, and (3) the alleged facts were not disclosed during pretrial discovery. A motion to strike regarding those matters is being filed.

> **Paragraph 983.**  On her first day on this rotation, Dr. Waggel left George Washington University (GWU) Hospital around 1:00 a.m., having worked approximately 19 consecutive hours. (Waggel Declaration ¶ 13.)

**RESPONSE:** Denied but irrelevant as these matters do not create jury triable issues of fact. These matters involve academic decision-making as to which the Court does not substitute its judgment but defers to the University's judgment in determining how its medical academic

training program should be conducted and how to evaluate the trainees' academic performance within the program. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program.

The University further objects to this statement as Plaintiff has not produced any evidence to corroborate this self-serving allegation.

> **Paragraph 984.** The grueling hours on the internal medicine rotation often exceeded the duty hour and patient load guidelines issued by ACGME. (Waggel Declaration ¶¶ 14-15, 18, 20.)

**RESPONSE:** Denied as phrased and irrelevant in any event as these matters do not create jury triable issues of fact. Further, Plaintiff has not produced any evidence to corroborate this self-serving statement and the reference to hours worked – "grueling" or otherwise – concerns academic matters regarding the nature of the residency training program as to which the Court does not substitute its judgment but defers to the University's judgment in determining how its medical academic training program should be conducted and how to evaluate the trainees' academic performance within the program. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the decisions for Plaintiff's need to repeat didactics course, non-promotion to PGY3, and, ultimately, dismissal from the Program.

> **Paragraph 985.** When Dr. Waggel brought these duty hour and patient load violations to the attention of two of her supervisors, Dr. Lisa Catapano, her residency program director, and Dr. Khin Khin, they told Dr. Waggel that she would need to deal with her patient load and did not address Dr. Waggel's duty hour complaints. (Waggel Declaration ¶ 19.)

**RESPONSE:** Denied as Plaintiff has not produced any evidence to corroborate this self-serving statement and the statement is further objected to as irrelevant as the Court does not

substitute its judgment for that of the University regarding the manner in which it conducted its academic program or evaluated the trainees' academic performance within the program. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program. This statement does not create jury triable issues of fact.

> **Paragraph 986.** Given the grueling hours, Dr. Waggel had difficulty finding the time to have her primary care Doctor, Doctor Shephard, examine the excruciating left side pain she was suffering. (Waggel Declaration ¶¶ 20-21.)

**RESPONSE:** Denied as phrased and irrelevant in any event. Plaintiff has not produced any evidence to corroborate this self-serving statement, and the reference to hours worked ("grueling" or otherwise) concerns academic decision-making regarding the nature of the residency training program as to which the Court does not substitute its judgment for that of the University in conducting its academic program or evaluating the trainees' academic performance within the program. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program. This statement does not create jury triable fact issues.

> **Paragraph 987.** When Dr. Waggel was finally allowed to make and to attend an appointment, Dr. Shephard noted that Dr. Waggel was working long hours, and he ordered a CT scan which took place on April 15, 2015. (Waggel Declaration ¶¶ 22, 25.)

**RESPONSE:** Denied as phrased but irrelevant in any event and not a jury triable fact issue. Plaintiff has not produced any evidence to corroborate this self-serving statement about being "finally allowed to make and to attend" the appointment with Dr. Shepherd – there is no evidence that anyone even knew about Plaintiff's communications with Dr. Shepherd at this

point. The assertion is further objected to as relating to academic matters (including the hours involved in the training program) as to which the Court does not substitute its judgment, and on the further ground that the assertion clearly includes inadmissible hearsay.

    **Paragraph 988.** On April 16, 2015, Dr. Waggel learned that the CT results showed a kidney mass. (Waggel Declaration ¶ 25.)

    **RESPONSE:** Agreed, irrelevant, and not a jury triable fact issue. The University agrees that at some point during the late-April timeframe Plaintiff learned the results of the CT scan performed earlier that month disclosing the presence of a cyst on Plaintiff's left kidney. The University has no knowledge of the specific date that Plaintiff learned of the results and therefore can neither admit nor deny that assertion.

    **Paragraph 989.** On April 20, 2015, Dr. Waggel learned that Dr. Catapano already knew about her medical problems. (Waggel Declaration ¶ 26.)

    **RESPONSE:** Agreed but irrelevant and certainly not a jury triable issue of fact. The specific date or even general timeframe when Dr. Waggel became aware that Dr. Catapano had heard about Plaintiff's workup for her kidney cyst is irrelevant and not a jury triable fact issue. Further, the University agrees that at some point during the latter part of April 2015, it was reported to Dr. Catapano that Plaintiff had discussed with other residents and physicians on a clinical rotation the results of a CT scan that had been performed since Plaintiff had actually brought the scan to clinical rounds and asked physicians there to review the scan for a second opinion. *See* Def.'s SOF (Doc 34) ¶ 168.

    **Paragraph 990.** In May 14, 2015, Dr. Waggel felt ill, went to the call room to lie down, and passed out. (Waggel Declaration ¶ 35.) One of the chief residents told her to go home. (*Id.*) When she arrived, she realized that she had taken the wrong medication in the morning. . (*Id.*) Of note, she went to bed around 11:30 p.m. the night before. She was not "out late drinking" as Dr. Catapano later claimed. (*Id.*)

**RESPONSE:** Irrelevant and not a jury triable issue. The University agrees as to the first two sentences – Plaintiff was found passed out in an on-call room (not having told anyone that she was feeling ill or would be unable to perform her clinical duties) and was then told to go home and was asked by the Internal Medicine service not to return to the clinical rotation. Def.'s SOF (Doc 34) ¶¶ 175-179. The University objects to the remainder as irrelevant, self-serving and not corroborated, and not disclosed during pretrial discovery and not a matter constituting a jury triable issue of fact. Defendant further denies that Dr. Catapano ever made a "claim" that Plaintiff was "out late drinking." That was a statement made by Plaintiff to the physicians who found her in the on-call room (Def.'s SOF [Doc 34] ¶ 178 and Ex. K [Chang Decl.] ¶¶ 13-14) and was reported to Dr. Catapano. *See* Def.'s Ex. A (Catapano Decl.) ¶¶ 200, 205- 205 and Ex. 52 (email report from Dr. Chang to Dr. Catalanotti forwarded to Dr. Catapano re May 14 and other IM clinical rotation events). This was not Dr. Catapano's "claim," this was Plaintiff's contemporaneous explanation to her colleagues of the circumstances leading up to her abandonment of clinical duties.

In any event, the University's evaluation of these circumstances, the judgments and conclusions reached, and the remediation undertaken in light of the events are matters involving academic decision-making as to which  the Court does not substitute its judgment for that of the University in conducting its academic program or evaluating the trainees' academic performance within the program. Further, these matters have nothing to do with Plaintiff's claims nor is there any causal relationship between these matters and the academic decisions for Plaintiff to repeat didactics courses, non-promotion to PGY3, and, ultimately, dismissal from the Program. This statement does not create jury triable fact issues.

**Paragraph 991.**  After a number of difficult to schedule follow up appointments for a MRI and additional consultations, Dr. Waggel made a 3:00 P.M. June 10,

9

2015 appointment with Dr. Thomas Jarett, the Chair of the GWU Urology Department. (Waggel Declaration ¶¶ 27-38.)

**RESPONSE:**  This is not a material disputed fact requiring trial. The University agrees that Plaintiff apparently had made an appointment to see Dr. Jarrett on June 10, 2015 at 3:00 p.m. on a date when her normal duty hours would run from 7:00 a.m. to 3:00 p.m. so she scheduled herself to be late for the appointment. The University objects to the remainder of the statement as self-serving, uncorroborated and without any evidence that there were difficulties scheduling appointments. Plaintiff repeatedly makes self-serving statements to that effect without any corroboration, and certainly none during pretrial discovery despite specific request.

**Paragraph 992.**  On June 10, 2015, Plaintiff went to work as required and arrived late for her appointment with Jarrett because the resident who promised to cover for Dr. Waggel if she needed to work overtime never came in as promised. (Waggel Declaration ¶¶ 38-39.)

**RESPONSE:** Objection. It is completely false that Plaintiff "went to work as required." The record is indisputably clear that Plaintiff was a no show for the 7:00 a.m. clinical duty start time in the Emergency Department that day. Def.'s Ex. G (Roche Decl.) (Doc 34-11) ¶¶ 20-25. Defendant further objects on the grounds that it is irrelevant whether someone else failed to cover for Plaintiff and, in any event, Plaintiff has never previously disclosed the name of any such individual (obviously a material witness concerning an event as to which Plaintiff received her first LOD) until her recently submitted declaration. Further, if that in fact occurred, Plaintiff should have disclosed it to the Program so that issues regarding communication and cross-coverage could be identified and resolved.

To the contrary, however, Plaintiff did not make this claim at the time of the events – her attempted justification for the duty hours no show was that she had a "doctor's excuse" for that day and that she would "be happy to talk about it with Dr. Dyer after my surgery." *See* Def.'s Ex.

A (Catapano Decl.) (Doc 34-2) ¶¶ 250-251 and Ex. #70. Plaintiff submitted the doctor's excuse months later (it was dated by Dr. Jarrett as prepared on September 3, 2015). *See* Ex. A (Catapano Decl.) (Doc 34-2) ¶442-443 and Ex. #102. The excuse from "work on that day" related to Plaintiff's 3:00 p.m. appointment when she had no-showed at 7:00 a.m. for ED duty.

Throughout the disciplinary process culminating in the decision for dismissal, and throughout this litigation, Plaintiff's argument has always been that she was treated unfairly and somehow discriminated against based on her health-care related disability because she had a "doctor's excuse" for her 3:00 p.m. appointment.

Plaintiff has also argued that the LOD was unfair because "Plaintiff did appear for her shift." *See* Def.'s Response to Pl.'s SOF (Doc 36-1) ¶ 43. Plaintiff has never acknowledged the disconnect between her attempted excuse and her no show, and continues apparently even to this date to insist that it was appropriate and defensible that she "no showed" important clinical duties without warning or notice. Plaintiff thus further corroborates her lack of professionalism regarding her duty hours not only at the beginning of the shift but at the end as well, lack of self-awareness, and irremediability.

Finally, the position Plaintiff now takes – that the person *she* chose to provide coverage towards the end of her shift so she could get to the 3:00 p.m. appointment with Dr. Jarrett (scheduled to begin while Plaintiff was still on duty) let her down is irrelevant, and certainly points to no unfairness by the Program.

These assertions in a sham affidavit or declaration do not create jury triable fact issues.

**Paragraph 993.** During Dr. Waggel's appointment, Dr. Jarrett stated that her tumor did not look good and further said that, "if you were my daughter I would want you to get this removed as soon as possible." (Waggel Declaration ¶ 39.)

**RESPONSE:** Denied and in any event the assertion is irrelevant and not a jury triable disputed material fact. Defendant further objects to this statement as hearsay without any corroborating evidence and on the grounds that the assertion is contradicted by the only admissible evidence consisting of Dr. Jarrett's contemporaneous medical records and the statements set forth in Dr. Jarrett's declaration. *See* Def.'s Ex. H (Jarrett Decl.) ¶¶ 2-9 and Ex. #1.

> **Paragraph 994.** Consistent with a note Dr. Jarrett provided in advance of scheduling surgery, Dr. Waggel requested to Dr. Catapano, Victoria Anderson, the psychiatry residency program coordinator, and Dr. Emejuru, the chief resident that she be allowed to take 2 weeks off for the surgery, 2 weeks for light duty, and that she further needed set days in advance where she could schedule follow up doctors' appointments. (Waggel Declaration ¶ 40.)

**RESPONSE:** The University agrees that Dr. Jarrett provided a note regarding the need for two weeks off for surgery followed by return to work with two weeks light duty (Plaintiff returned to work August 3 so light duty expired August 17). The remaining statements are denied, are irrelevant, and are self-serving uncorroborated assertions which do not create jury issues of fact. There is no evidence Plaintiff has produced regarding any request she submitted for "set days in advance" for medical appointments other than visits with Dr. Kecmanovic in September 2015 which Dr. Catapano coordinated with Dr. Cullins, Director of the Training Program at Children's National Medical Center and other physicians at Children's. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 419-420, 440-441. Plaintiff has offered no evidence that she did not receive the leave requested for her surgery. Further, Plaintiff received all the FMLA leave she ever requested. *See* Def.'s Ex. O (Vanlewen Decl.) (Doc 34-19) ¶ 30. There is no triable issue of fact concerning Plaintiff's leave for her surgery.

> **Paragraph 995.** In the context of this litigation, GWU has claimed that Dr. Waggel should have asked for extended time off to deal with her medical issues,

but all she really needed was time to schedule follow up appointments that would take an hour or two at most. (Waggel Declaration ¶ 41.)

**RESPONSE:** This is irrelevant and in any event is false and therefore denied. Dr. Catapano did suggest that Plaintiff take leave later in May 2015 when the Internal Medicine attending physicians dismissed her from the clinical rotation because of her behavior related to apparent medical conditions for which Plaintiff was then undergoing further workup without resolution of her work-related problems and Plaintiff had declined earlier suggestions by the Emergency Medical physicians and Dr. Catapano that she take time off to address those issues. *See* Def.'s Ex. A (Catapano Decl.) ¶¶ 179-182; Def.'s Ex. K (Chang Decl.) (Doc 34-15) ¶¶ 7-8, 13-15. After Plaintiff assured the Emergency Medicine attendings she was capable of returning to duty, Plaintiff's erratic behavior nonetheless continued, and when these circumstances culminated in the episode where Plaintiff was found asleep in the middle of an Emergency Medicine shift in the on-call room under the apparent effects of alcohol or other substances, she was told to go home and not return to the clinical service. *Id.* At that point, Dr. Catapano met with Plaintiff the next day and again suggested that Plaintiff take medical leave to address her problems, which Plaintiff then agreed to do. Def.'s Ex. A (Catapano Decl.) Doc 34-2) ¶¶ 194-198. Plaintiff returned from that leave in early June 2015, and when she provided the Program with notice of the date for her surgery and the two-weeks of leave recommended by her surgeon, Dr. Jarrett, the Program cooperated fully in coordinating her training leading up to the surgical leave including a further rotation on Emergency Medicine to complete her earlier incomplete rotation. *Id.* ¶¶ 221-224, 232, 234-236.

Plaintiff was not told to take further extended time off to schedule follow up appointments. To the contrary, while she was on the Emergency Medicine rotation, she was specifically assigned to night shifts so she could schedule and attend any further appointments

13

necessary in preparation for her surgery during her days off from duty. *See* Def.'s Ex. G (Roche

Decl.) (Doc 34-11) ¶¶6-9.

> **Paragraph 996.**  Dr. Waggel was aware that Dr. Catapano had a rule that to take time off one needed to get sequential approvals from on-site supervising attending physicians, Victoria Anderson, the program coordinator, and Dr. Emejuru, the chief resident. (Waggel Declaration ¶ 41.)

**RESPONSE:** This is irrelevant and in any event is false and therefore denied. Whatever

the requirements for scheduling time-off, Plaintiff – like everyone else – was required to comply

with them. Further, there is no evidence that Dr. Catapano created any requirements concerning

time off – those were established by the Program and were set forth in the Resident Manual and

in the Resident Time Off and Leave Policy. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34—2) ¶¶

51-53 and Ex. #6 (Resident Manual) (Bate GWU 000179) and Ex. #9 (Resident Time Off and

Leave Policy) (Bate GWU00415) (the policy on sick leave instructions on how to provide notice

specifically state: "Residents absent on a regular work day must email the PD, APD Chief

Resident[s], Program Coordinator, and site attending/director. It is the resident's responsibility to

confirm that the site attending is *directly notified* of their absence.") (emphasis added). Dr.

Catapano also reminded Plaintiff that there was a duty to make direct contact with attending

physicians. Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 221-222. Plaintiff has offered no

evidence that there was a requirement that the approval be obtained in any particular sequence,

and there was no such requirement, although it obviously made sense to confirm with the

attending physician on any clinical rotation that appropriate coverage would be available on any

particular day for which an appointment was to be scheduled to assure there would be

appropriate staffing available for safe patient care. There is no triable issue of fact concerning the

sick day notice requirements.

**Paragraph 997.** This was difficult to accomplish in practice for appointments with specialists which needed to be made sometimes months in advance. (Waggel Declaration ¶ 41.) A major problem was getting approvals from on-site supervising attending physicians. This is why Dr. Waggel requested set days in advance when she could schedule follow up appointments, a request that was never honored. (*Id.*)

**RESPONSE:** This is irrelevant and in any event is false and therefore denied as set forth in response to Paragraph 996, above. Further, there is no evidence that Plaintiff faced any different requirements for scheduling appointments than any other resident in all the various residency training programs conducted by the University for decades, nor has Plaintiff offered any evidence of difficulty with any particular attending concerning any particular appointment – she makes only broad, conclusory, self-serving, uncorroborated statements regarding these matters which are irrelevant and insufficient to create any factual issue. None of this is sufficient to create a jury triable fact issue.

**Paragraph 998.** Dr. Waggel had difficulty scheduling her surgery because she received conflicting information from Dr. Catapano and Mary Tucker of the Graduate Medical Education office. (Waggel Declaration ¶ 42.)

**RESPONSE:** This is irrelevant and in any event is false and therefore denied. Whether Plaintiff perceived she had "difficulty" scheduling her surgery is irrelevant. The date for surgery was set by her surgeon and Plaintiff then requested and was granted the time off for the surgery. Even if somehow relevant, and it is not, Plaintiff has not established what if any "conflicting information" she allegedly received from Dr. Catapano and Ms. Tucker or how that information in any way created any "difficulty," or that any such alleged "difficulty," if it occurred, arose above anything other than a minor inconvenience.

**Paragraph 999.** Although Dr. Waggel sought to comply with Dr. Catapano's procedures for seeking time off for surgery, Dr. Catapano ostracized Dr. Waggel and punished her with an additional week in the emergency medicine rotation before her surgery. (Waggel Declaration ¶¶ 43-45; Email from Catapano to

Medicine Chiefs, telling them to disregard email about surgery, dated June 17, 2015, Exhibit E.)

**RESPONSE:** This is false in every material respect and is supported solely by Plaintiff's self-serving, uncorroborated statements that she was "ostracized" and "punished" for "seeking to comply with Dr. Catapano's procedures" by assignment to "an additional week in the emergency medicine rotation."

First, as noted, the requirements for taking leave were not "Dr. Catapano's requirements." They were set by the University's Residency Training Program and applied to all residents in all training programs. *See* Response to Paragraphs 996-997, above.

Second, Plaintiff was required to complete another week of Emergency Medicine rotation because she did not perform a previously scheduled ED rotation at the end of May 2015 when she had been dismissed from the Internal Medicine rotation, had been told not to return to the Internal Medicine service, and then took leave through the end of the month into early June. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 186-198; Def.'s Ex. G (Roche Decl.) (Doc 34-11) ¶¶ 3-8. When Plaintiff was rescheduled to June 8-June 30, she was given 14 shifts rather than the normal 20 shifts in recognition of her ongoing health concerns, and she was also scheduled for overnight shifts to allow her to make and attend any necessary day-time medical appointments. *See* Roche Decl. ¶¶ 4-8. This left Plaintiff one week (6 shifts) short of the normal rotation.

Third, when Plaintiff received her surgery date from Dr. Jarrett, she then requested that her Chief Resident, Dr. Emejuru, schedule the one-week ED makeup rotation prior to her surgery. *See* Def.'s Ex. C (Emejuru Decl.) (Doc 34-7) ¶¶ 14-15 and Ex. #2 (Plaintiff's email requesting the makeup rotation). When Plaintiff sent an email directly to the EM Chief Residents regarding this scheduling matter, Dr. Catapano did instruct that the scheduling should be

arranged in the usual fashion through Dr. Emejuru as Chief Resident for the Psychiatry Program. *Id.* ¶¶ 15-17. This was not a matter of "ostracizing" Plaintiff but adherence to protocol.

Fourth, Dr. Emejuru then coordinated the one-week ED makeup rotation which Plaintiff had requested. *Id.* ¶¶ 18-20, 26-33.

The additional one-week of EM rotation was necessary to comply with time-in-training requirements, not as "punishment" when Plaintiff "attempted to comply" with scheduling procedures (which in any event makes no sense whatever), Plaintiff requested the scheduling of this rotation, Plaintiff agreed when Dr. Emejuru advised her that the week had been scheduled prior to her surgery, and Plaintiff, in fact, thanked Dr. Emejuru for getting this done for her. *Id.* ¶¶ 30-34.

The representations to the contrary which Plaintiff now makes to the Court in the form of alleged jury triable fact disputes are demonstrably false.

> **Paragraph 1000.**  On July 15, 2015, Dr. Waggel was issued a letter of deficiency (LOD) for missing time on the day she received her cancer diagnosis. The event that triggered the letter of deficiency took place on June 10, 2015, over a month before. (Waggel Declaration ¶ 49; Letter of Deficiency, dated July 15, 2015, Exhibit F.)

**RESPONSE:** False, and irrelevant. It has been established multiple times in this record that Plaintiff did not receive the first LOD "for missing time" on the day when she later had an appointment with Dr. Jarrett. *See* Response to Paragraph 992, above. Plaintiff was a no show for her 7:00 a.m. ED duty reporting time and remained a no show for several more hours while physicians on the shift, the Program Administrator, and others tried to locate her. Def.'s Ex. G (Roche Decl.) (Doc 34-11) ¶¶ 20-23.

Further, although also irrelevant, it is also not true that Plaintiff "received her cancer diagnosis" that day. Dr. Jarrett told Plaintiff he thought the small cyst on her left kidney had a

higher likelihood of becoming cancerous at some future time than Plaintiff's original urologist had thought, but he did not think it was cancerous at that point and Plaintiff could reasonably have it followed with a program of CT scan or MRI surveillance every 6 months. *See* Def.'s Ex. H (Jarrett Decl.) (Doc 34-12) ¶¶ 3-5 and Ex. #1.

Finally, the fact that Plaintiff's ED no show occurred on June 10 and the LOD was dated July 15 is irrelevant and does not create a jury triable fact issue since the determination that remediation such as an LOD is appropriate, and the nature and timing thereof, involve academic decision-making and the Court does not substitute its judgment regarding the manner in which the University conducted its academic program or evaluated the trainees' academic performance or carried out remediation procedures.

**Paragraph 1001.** The LOD inaccurately stated that Plaintiff did not appear for her shift on July 10, 2015. Dr. Waggel in fact did appear for her July 10, 2015 shift and left on time to address her medical condition. (Waggel Declaration ¶¶ 38-39; Waggel Dep. 145:8-149:15, Ex. OOO.)

**RESPONSE:** Irrelevant and false. This is irrelevant because whether the University appropriately issued an LOD is a matter involving academic decision-making and the Court does not substitute its judgment as to the manner in which the University conducted its academic program or evaluated the trainees' academic performance. Further, the statements are demonstrably false as set forth in the response to Paragraph 992, above, and upon review of the LOD, itself. Def.'s Ex. A (Catapano Decl.) and Ex. #77 (LOD dated July 15, 2015). The LOD specifically states that Plaintiff did not come to work at 7:00 a.m., failed to respond to efforts to reach her over the next two hours, and then further notes that after being contacted, Plaintiff did agree to come in for the rest of her shift. *Id.*

Plaintiff's representations to the Court to the contrary in this paragraph are falsehoods. This statement does not create jury triable fact disputes.

**Paragraph 1002.** Moreover, the LOD claimed that Dr. Waggel told someone over the phone that morning that she was not coming in and that she did not acknowledge the inconvenience she caused. As the first phone call Dr. Waggel received occurred after she had already started work for the day, these allegations were not possible to have occurred. (Waggel Declaration ¶ 50.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. Whether the fact-finding process leading to the issuance of the LOD resulted in a correct finding is a matter left to the academic decision-makers. Plaintiff presented her claims regarding the events on the morning of July 10, 2015, which were roundly rebutted by the attending physicians and residents on duty that morning, as well as the Program Coordinator, Ms. Anderson, and others. Def.'s SOF (Doc 34) ¶¶ 213-219 and Ex. G (Roche Decl.) ¶¶ 22-27. The Program was entitled during the course of its academic decision-making process to determine who was truthful, not truthful, accurate, or mistaken in their factual account of the matter, and based on the conclusions reached to then exercise its judgment as to any appropriate remediation or discipline. This allegedly "disputed fact," therefore, is irrelevant because whether the University appropriately issued an LOD is a matter involving academic decision-making and the Court does not substitute its judgment as to the manner in which the University conducted its academic program or evaluated the trainees' academic performance.

**Paragraph 1003.** Although Dr. Waggel had informed Dr. Catapano that she was to have surgery in 5 days and would be recovering for 2 weeks, the LOD told Dr. Waggel to remediate with Dr. Dyer within 2 weeks. (Waggel Declaration ¶ 50.)

**RESPONSE:** Irrelevant and false. This statement does not create a jury triable fact issue. The statements are false for all the reasons noted in response to Paragraphs 992 and 1001-1002, above. They are further false in that the LOD did not tell Dr. Waggel "to remediate" with Dr. Dyer within 2 weeks. The LOD stated that within two weeks (excluding time off for medical leave), Plaintiff was to "set up a meeting with Dr. Dyer to discuss strategies to prevent future

lapses in professionalism." Def.'s Ex. A (Catapano Decl.) (Doc 34-2) Ex. #77 (GWU 001223). That Plaintiff understood that all she had to do was make contact with Dr. Dyer to schedule a meeting at some point (including after her surgery) was made clear in Plaintiff's email back to Dr. Catapano arguing that the LOD was unfair because she had a "doctor's excuse" and stating that she would "be happy to talk about it with Dr. Dyer after my surgery." *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 250-251 and Ex. #70.

> **Paragraph 1004.** Based on the tenor of communications she received from Dr. Catapano, Dr. Emejuru and the psychiatry program administrator, Victoria Anderson, as she tried to schedule her surgery, Dr. Waggel felt that GWU psychiatry administration did not take her surgery seriously, and acted as if she was simply skipping class, rather than receiving a life-saving intervention. (Waggel Declaration ¶¶ 48, 51, 55, 58; Email from Dr. Emejuru, dated July 18, 2015, disallowing appointments on Thursdays after Waggel goes for pre operation appointment, Exhibit G.)

**RESPONSE:** The statement is irrelevant self-serving, conclusory, uncorroborated and in any event irrelevant. The statement does not create a triable fact issue. And the matters set forth are demonstrably false based on the very records Plaintiff cites.

First, Dr. Waggel's alleged state of mind concerning her speculation as to how the Program Director, Chief Resident, and Program Coordinator viewed her upcoming surgery is not an issue raised by any of the claims she alleges.

Further, Dr. Emejuru's email does *not* make the statements Plaintiff falsely sets forth in Paragraph 1004. To the contrary, Dr. Emejuru pointed out that he assumed "this was a *pretty important appointment with your surgery coming up* and it may have been difficult to schedule at another time." *See* Def.'s Ex. C (Emejuru Decl.) (Doc 34-7) ¶¶ 40-41 and Ex. #14 (emphasis added). He further noted that Dr. Collins was surprised at the no show because Plaintiff had stated she would be there and then reminded Plaintiff that if "things change suddenly," Dr. Collins would appreciate Plaintiff emailing her to let her know.

Finally, the email did remind Plaintiff that in the Psychiatry Residency Training Program, the Thursday didactics days were not allowed to be used to schedule personal appointments during the 8 a.m. to 5 p.m. hours. This was a standing policy of the Program and was not a matter of Dr. Emejuru "disallowing appointments on Thursdays after [Plaintiff had gone] for pre operation appointment" as Plaintiff implies.

This non-relevant allegedly disputed material fact is false in all material respects.

**Paragraph 1005.**  On July 20, 2015, Dr. Waggel underwent a laparoscopic partial nephrectomy. (Waggel Declaration ¶ 53.)

**RESPONSE:** Agreed. This is not a disputed material fact requiring trial.

**Paragraph 1006.**  On July 24, 2015, Dr. Waggel informed Dr. Catapano that she had kidney cancer based on a pathology report. (Waggel Declaration ¶ 54.)

**RESPONSE:** Agreed in substance – although the statement is not entirely correct, this is not a material disputed fact requiring trial. Plaintiff reported to Dr. Catapano in this time frame that her surgery had been successful, the pathology report had indicated that the cystic material removed had been graded as an early stage non-metastasized cancer that Dr. Jarrett informed her had been removed in its entirety, and that she would not need any further or adjuvant therapy.

**Paragraph 1007.** Even though it seemed as if some in the administration doubted whether Dr. Waggel had cancer, no one associated with GWU asked for medical documentation, which she would have readily provided. (Waggel Declaration ¶ 56.)

**RESPONSE:** This statement is irrelevant and immaterial and does not create a disputed fact requiring trial. The statement is another example of Plaintiff's self-serving, uncorroborated, irrelevant speculation as to the state of mind of "some" otherwise identified individuals raising a point (no one associated with GWI asked for medical documentation) having no relevance.

Plaintiff never claimed a disability and never undertook to submit any medical documentation of an alleged disability. *See* Def.'s Ex. P (Fair Decl.) (Doc 34-20) ¶¶ 12-13. It

was not the University's obligation to ask Plaintiff for medical records concerning her recent surgery. It was Plaintiff's duty to report to the EEO Office if she thought she had a disability and it was Plaintiff's further duty to submit – not the University's duty to ask for – any supporting medical documentation. Plaintiff never did either.

> **Paragraph 1008.** When Dr. Waggel returned from surgery, she was supposed to be placed on light duty, but instead worked grueling hours as she was required to attend extra shifts at night. (Waggel Declaration ¶ 63, 64, 66, 69, 72.)

**RESPONSE:** Irrelevant and denied. This assertion does not create a material disputed fact requiring jury trial. Whether Plaintiff actually performed one or more shifts that involved a work load beyond the light duty directed by her attending physician during the first two weeks on return from her surgery leave is wholly irrelevant. None of this was even remotely related to the facts and circumstances resulting in Plaintiff's termination from the Program.

Further, the statement is false as it is clearly intended to imply that Plaintiff was deliberately placed on a "grueling" schedule immediately following return from her surgery leave. In fact, Plaintiff and Dr. Emejuru had specifically agreed that the night call schedule duty should protect Plaintiff from any unusual physical or emotional stress. *See* Def.'s Ex. C (Emejuru Decl.) (Doc 34-7) ¶¶ 36-37, 51. In fact, Plaintiff reported no complaints to Dr Emejuru during the first eight days following her return to duty (August 3 – 11) (*id.* ¶¶ 50 – 72), other than complaints about fellow workers allegedly being "mean" to her (*id.* ¶ 52), although there were substantial complaints during this period about Plaintiff's unprofessional and abusive behavior towards her colleagues. *Id.* ¶¶ 53-57. In fact, on August 9, Plaintiff emailed Dr. Emejuru that after attending a cocktail party he had hosted, "You need to set up more resident parties/HHrs. I want to relive my intern year experience." *Id.* ¶ 72 and Ex. #24.

On August 11, there was one shift with an unexpectedly high patient load. *Id.* ¶ 73.

This statement is false in implying Plaintiff was assigned to grueling work duties on her return from leave. Plaintiff's self-serving, uncorroborated statements about working "extra shifts at night" are not sufficient to create jury triable fact issues.

> **Paragraph 1009.** Shortly after Dr. Waggel returned to work (post-surgery), Dr. Catapano issued Dr. Waggel her second and last Milestone evaluation of her residency, formally reviewing her work for PGY1. This evaluation placed Dr. Waggel at and above the PGY1 level for the second half of her PGY1 year. (Waggel Declaration ¶ 60; August 5, 2015, Second Milestone evaluation, Exhibit I.)

**RESPONSE:** This is irrelevant and not a material disputed fact creating an issue for jury trial. Plaintiff received a second Milestone evaluation during a meeting with Dr. Catapano in August 5, 2015. Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 269-270. The evaluation in fact showed Plaintiff to have substantial deficiencies in significant Milestones (Patient Care and Professionalism. *Id.* ¶ 270. Further, while Plaintiff as the trainee may attempt to characterize the evaluation, the fact is that the faculty members, and Dean Berger in particular as Dean of Graduate Medical Education, noted that the August 2015 Milestones scores of 1 – 2 were below expected level and took Plaintiff off track to advance. *See* Def.'s Ex. Q (Cioletti Decl.) (Doc 34-21) ¶¶ 28, 35-37. Any statement by Plaintiff to the contrary is self-serving, uncorroborated, and not sufficient to create a jury triable fact.

> **Paragraph 1010.** Because of an uncaring GWU administration, it continued to be difficult for Dr. Waggel to schedule follow-up medical appointments related to her cancer surgery and as a result Dr. Waggel missed or was late for these appointments. (Waggel Declaration ¶¶ 59, 64-66, 110, 136)

**RESPONSE:** Irrelevant and in any event not sufficient to create a jury triable issue of fact. This is a conclusory, self-serving, uncorroborated statement of Plaintiff's speculation concerning the state of mind ("uncaring GWU administration") of otherwise unidentified alleged GWU administrative personnel. There is no evidence – and Plaintiff has offered none – that any

University personnel were "uncaring." But even if there were one or more individuals who were "uncaring," that creates no material dispute of fact. Further, Plaintiff offers no proof beyond her self-serving uncorroborated statement that it "continued to be difficult" for her to schedule medical appointments. This is not sufficient to create a jury issue. These vague, self-serving and uncorroborated statements do not identify what "difficulty" Plaintiff allegedly had scheduling any appointments, which appointments, with whom, when, or why and how there was any difficulty. There is no evidence that anyone was interfering with Plaintiff's communications with any of her health care providers or even knew who or when she was communicating with them.

Finally, there is no proof that any of these alleged matters had any causal relationship to the circumstances and events that led to the decisions which form the basis for Plaintiff's claims in this matter, including the decisions regarding failure of two didactics courses, non-promotion to PGY3, and determinations related to Plaintiff's ongoing fundamental dishonesty, refusal to remediate, and lack of professionalism leading ultimately to the recommendation, decision, and upholding of her dismissal from the Program.

> **Paragraph 1011.** During this same period, Dr. Waggel was trying without success to meet with Dr. Dyer as required by her first LOD. (Waggel Declaration ¶¶ 61, 68, 70.)

**RESPONSE:** This statement is irrelevant, self-serving and incorrect. Plaintiff made minimal if any effort to contact Dr. Dyer and when he offered a specific date and time to meet, Plaintiff failed even to respond to that appropriately. *See* Def.'s Ex C (Emejuru Decl.) (Doc 34-7) ¶¶ 114-116. Further, this is irrelevant as the CCC's decision and recommendation for dismissal, Dr. Catapano's acceptance of that recommendation, and the final determination for dismissal to the extent based in part on Plaintiff's no show for her ED clinical duty, was not based on Plaintiff's failed initial efforts to contact Dr. Dyer but on the fact that Plaintiff never

developed sufficient self-awareness to recognize the total lack of professionalism on her part regarding her no show for clinical duty in the Emergency Department. Instead, Plaintiff developed excuse after shifting excuse for her behavior (out late drinking, then mixed up her medications, then another resident failed to live up to a commitment to provide cross coverage, then some other resident and attending had told her the first few hours of grand rounds in the morning did not involve the non-ED Department residents) and even today insists that she was right and everyone else was wrong in reaching a judgment that this was a clear example of lack of professionalism. In any event, this is irrelevant as the matter involves academic decision-making as to which the Court does not substitute its judgment for that of the University.

> **Paragraph 1012.** On August 25, 2015, after a full day of work, Dr. Waggel experienced a very difficult night call on Six South, a psychiatric ward. Problems with a violent and potentially suicidal patient that evening were exacerbated by staff shortages, delayed medication orders, and the lack of back up or responsive on-call attending doctors. (Waggel Declaration ¶¶ 74-90.)

**RESPONSE:** Agreed but irrelevant as these events resulted in the issuance of an LOD to Plaintiff based on multiple instances of unprofessional conduct and substandard performance by Plaintiff involving academic disciplinary decision-making related to Plaintiff's interactions with a number of attending faculty members and their conclusions and academic decisions regarding those interactions, matters as to which the Court does not substitute its judgment for that of the University.

> **Paragraph 1013.** Dr. Waggel understood that a Root Cause Analysis (RCA) was held with regard to the August 25th night call, but she was not invited to attend or recount her version of what happened that night. (Waggel Declaration ¶ 90.)

**RESPONSE:** False but irrelevant and not establishing a jury triable fact issue. Whether Dr. Waggel "understood" that an RCA was being conducted, or whether, how, and why the University conducted an RCA is irrelevant as this involved academic-decision making on the

part of the University arising out of Plaintiff's unprofessional conduct during the August 25 overnight call shift, matters as to which the Court does not substitute its judgment for that of the University.

Further, Plaintiff did participate in the RCA as she was interviewed to report her view of the events by the two faculty members who conducted the RCA – Dr. Norris and Dr. Gandhi – to whom Plaintiff says she provided a 3000-word document for their review to prove that what Nurse Shemika Anthony, who was on duty that night, said had occurred, did not. *See* Plaintiff's Declaration, (Doc 35-2) ¶131. Plaintiff's focus on Nurse Anthony, however, completely ignored the detailed reports prepared at the time of the events by a number of faculty members, including Dr. Norris, regarding their own personal observations of Plaintiff's sub-standard performance and lack of professionalism during the August 25 overnight call. *See* Def.'s Ex. A (Catapano Decl.) ¶ 311 (and Ex. ## 81-82, 84). This also ignores that Dr. Gandhi reported significant concerns on another clinical rotation shortly after the August 25 shift "about Dr. Waggel's ability to function effectively as a resident currently." *Id.* ¶ 380 (and Ex. #91).

> **Paragraph 1014.** After additional efforts, Dr. Waggel finally met with Dr. Dyer on September 2, 2015. (Waggel Declaration ¶¶ 91-94.)

**RESPONSE:** Irrelevant, self-serving, and incorrect. This is not a jury triable issue of fact. *See* response to Paragraph 1011, above.

> **Paragraph 1015.** Although the meeting was supposed to address issues related to the first LOD, Dr. Dyer was more interested in discussing an alleged "inappropriate response" Dr. Waggel made to an assignment. (Waggel Declaration ¶ 94.)

**RESPONSE:** Irrelevant, self-serving, and incorrect. This is not a jury triable factual issue. *See* Response to Paragraph 1011, above.

> **Paragraph 1016.** During this meeting, Dr. Dyer also made an offensive comment to Dr. Waggel to the effect that she might not have what it takes to be a

psychiatrist. (Waggel Declaration ¶ 94.) Dr. Waggel found this comment to be particularly insulting because prior to this meeting, Dr. Waggel had only met Dr. Dyer once before. (*Id.*)

**RESPONSE:** Irrelevant, self-serving, and incorrect. This is not a jury triable factual issue. *See* Response to Paragraph 1011, above.

**Paragraph 1017.** On September 17, 2015, Dr. Waggel visited the GWU EEO office located in Rice Hall, Suite 101. (Waggel Declaration ¶ 98.) At that time, in response to Dr. Waggel's question about policies to protect residents in need of medical leave, Dr. Waggel was told to apply for such leave under the Family Medical Leave Act. (FMLA). (*Id.*)

**RESPONSE:** Denied and motion to strike filed. There is no evidence other than Plaintiff's belated, self-serving, and uncorroborated assertions regarding events on September 17, 2015. The University has no knowledge and no records that Plaintiff in fact visited the EEO Office on September 17, 2015, or any other date, and certainly no knowledge or records that any such visit was for the purpose of inquiring about whether Plaintiff was qualified for a disability or requesting a reasonable accommodation. *See* Def.'s Ex. P (Fair Decl.) (Doc 34-20) ¶¶ 12-13. And, in fact, Plaintiff's own declaration does not even make that claim. Plaintiff says she went to Rice Hall Suite 101 to discuss matters about social media posting policies, not to discuss a possible disability. Plaintiff says that Suite 101 "was also the EEO office" and while she was there, she states:

> I asked them if they knew of any policies to protect residents who needed time off for medical leave. They stated that I should apply for Family Medical Leave Act (FMLA) leave.

That is the sum total of the discussion Plaintiff says she had with the EEO Office. *See* Declaration of Dr. Stephanie E. Waggel, M.D. ("Waggel Decl.") (Doc 35-2), ¶ 98. There is no statement that she was concerned she might have a disability, or that she might be eligible for disability, or that she wanted to know how to apply for disability, or that she thought she needed

help (accommodation) for a disability, etc. There was nothing to alert the EEO Office that Plaintiff was an individual seeking to present a claim for disability or seek an accommodation. Rather, Plaintiff admits that her sole discussion was with respect to any policy to protect students needing time off for medical leave – that includes people with a mild cold, brief episode of food poisoning, or broken thumb who need a day or two of sick leave or permission to go to a single doctor office visit – not a disability rating or accommodation for a disability.

Further, Plaintiff did not include this office visit in her answers to interrogatories,[1] either in the original responses served February 25, 2017, and verified by Plaintiff on February 28, 2017 (**EXHIBIT RR**, Response to Interrogatory No. 8, pp. 11 – 22, and to Interrogatory No. 9, p. 23), or in her supplemental responses, verified by Plaintiff on November 29, 2017, and served on November 30, 2017 (**EXHIBIT SS**, Response to Interrogatory No. 8, pp. 9 – 20, and to Interrogatory No. 9, 20-22.

In her supplemental interrogatory response, Plaintiff cites to her deposition transcript for the proposition that she "went to an office she was directed to as the Equal Employment Opportunity Office to submit a request for accommodation. *See* Exhibit SS, p. 21 (citing Pl.'s Dep. Tr. 51:17-19 and 77:4-5). Copies of those deposition pages are attached as **EXHIBIT TT**.

The testimony at Plaintiff's deposition transcript at 51:17-19, in its entirety, is as follows:

> [Q       When is the first time you made a specific]
> request to anybody at GW for an accommodation?
>
> A       At the end of April in 2015 I was called
> into Dr. Catapano's office. The reason was she wanted

The testimony at Plaintiff's deposition transcript at 77:4-5, in its entirety, is as follows:

> say cancer until they send it down to the pathology

---

[1] The University served the interrogatories on December 23, 2016. *See* Def.'s **EXHIBIT QQ** (first page and certificate of service for Defendant's First Interrogatories to Plaintiff).

lab and get the final say from the pathologists. So I

In none of this testimony by Plaintiff – and in no other testimony by Plaintiff during her deposition – did Plaintiff state that she had ever gone to the University's EEO Office to report or even discuss whether she had a disability or to discuss, much less propose, an accommodation of any kind.

The University's records show that Plaintiff never made such an inquiry of the University's EEO Office and never requested an accommodation of any kind. *See* Def.'s Ex. P (Fair Decl.) (Doc 34-20) ¶¶ 12-13.

Any claim that Plaintiff presented to the EEO Office on September 17, 2015, for disability purposes is false and is a wholly new matter presented for the first time in Plaintiff's declaration by reason of which the University is filing a motion to strike those portions of the declaration. Plaintiff's new assertions in Paragraph 1020 do not create a triable fact issue.

> **Paragraph 1018.**  A GWU form produced in this litigation entitled, "Request for Medical Accommodation," corroborates this advice because it refers to FMLA leave as an accommodation. (GWU Medical Accommodation form, Exhibit CCC.)

**RESPONSE:** Agreed that FMLA leave is a form of accommodation under the University's leave and disability policies. But ordinary sick leave for a common cold or time off to see a physician for a routine annual well-patient health exam, i.e., non-disability related sick leave time, can also be taken under FMLA. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 51-52 (and Ex. # 9). What seems clear is that if Plaintiff had even hinted at an interest in discussing disability during the alleged visit to the EEO Office on September 17, 2015, the very straight-forward one-page disability form she produces in blank as Exhibit CCC would have been presented to Plaintiff for her to complete. No such completed form exists in the records of the University's EEO Office. *See* Def.'s Ex. P (Fair Decl.) (Doc 34-20) ¶¶ 12-13.

29

For all the reasons noted here and in response to Paragraph 1017, above, this paragraph does not create jury triable issues of fact.

**Paragraph 1019.** However, provided Dr. Waggel with conflicting instructions for obtaining leave, and Defendant also then blamed Dr. Waggel for not following proper policy. More specifically, Dr. Emerjuru, Plaintiff chief resident, instructed Plaintiff that she need only inform him, the attending, and Tory Anderson of her need for leave, but later GW punished Dr. Waggel for not also notifying other individuals of her leave requests. (Catapano 30(b)(6) 64:10-17, 69:8-70:15, Exhibit HHH; Catapano 30(b)(6) Ex. 12, Exhibit JJJ.)

**RESPONSE:** Denied – this self-serving, uncorroborated, vague (the "Defendant" then "blamed" Plaintiff – Who? When? What "blame"?) overly broad and irrelevant assertion does not create jury triable issues of fact. The Resident Manual and the University's policy on sick leave stated explicitly how to apply for leave and the procedures inolved. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 45 (and Ex. #6), 51-53 (and Ex. # 9).  The sick leave policy specifically advised that residents who would be absent on a "regular work day must email the PD, APD, Chief Resident(s), Program Coordinator, and site attending/director. It is the resident's responsibility to *confirm that the site attending is directly notified* or their absence." *Id.* Ex. #9 (GWU 000415). On June 11, 2015, Dr. Catapano also reminded Plaintiff that she was responsible for directly notifying the attending physician. *Id.* ¶¶ 221-222. There is no evidence Plaintiff was ever "blamed" for anything other than those multiple instances where she no showed without properly alerting people. In any event, these matters were not causally related to the circumstances leading to the decision for Plaintiff's need to repeat two didactics course, Plaintiff's non-promotion to PGY3 and, ultimately, Plaintiff's dismissal from the Program.

**Paragraph 1020.** On September 21, 2015, Dr. Catapano informed Dr. Waggel that she would be put on "buddy call" with other residents as a remediation measure. (Waggel Declaration ¶ 100.)

**RESPONSE:** Agreed but irrelevant and not a jury triable factual issue. The University agrees that at or about the time set forth, Dr. Catapano advised Dr. Waggel that on her return to a regular medical rotation, she would be provided additional supervision through "buddy call" to assist her in addressing the deficiencies noted in her previous rotation. This determination was part of the academic decision-making process by Dr. Catapano and others in the Program involving matters as to which the Court defers to the University and does not create a jury triable issue of fact.

> **Paragraph 1021.** The "buddy calls" were presumably designed to help Dr. Waggel, but in practice the "buddies" either micromanaged Dr. Waggel, added to her work or were entirely absent. (Waggel Declaration ¶ 103.) Moreover, Dr. Waggel's "buddies" resented having to come into the hospital from home to act as a "buddy." (Waggel Declaration ¶ 104.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. These matters involved academic decision-making regarding Dr. Waggel's status in the Program and the appropriate steps to address her academic deficiencies, including lack of basic medical knowledge, deficiencies in systems-based practice, lack of patient care skills, lack of professionalism and other deficiencies. These are matters as to which the Court defers to the University's decision-making and does not create jury triable fact issues. Further, Plaintiff's self-serving, uncorroborated statements regarding the state of mind of the residents who attempted to assist Plaintiff by participating in the buddy call does not create jury triable fact issues regarding the claims Plaintiff makes. Finally, Plaintiff has never before specifically asserted, nor has she offered any evidence to establish, that the residents who assisted in buddy call "resented" any aspect of their participation in the buddy call. It is certainly not mentioned in any of their contemporaneous reports which do note, however, that Plaintiff attempted to abuse their role as senior back up assistants available to provide advice and guidance on an as needed basis for

31

Plaintiff who instead attempted to insist that their role was to take over significant portions of

Plaintiff's patient care duties. *See* Def.'s Ex. C (Emejuru Decl.) (Doc 34-7) ¶¶ 129-131 (and Ex.

#37), 132-133 (and Ex. #38).

> **Paragraph 1022.**  In October 2015, Dr. Waggel began a new rotation at INOVA
> Fairfax. At the start of that rotation, Dr. Crone, its director, refused to meet with
> Dr. Waggel to discuss her schedule and need for medical appointments. (Waggel
> Declaration ¶ 108.)

**RESPONSE:** Irrelevant and denied. This assertion does not create a jury triable fact

dispute. Other than Plaintiff's self-serving, uncorroborated assertions regarding Dr. Crone's

alleged refusal to meet, there is no evidence that Dr. Crone or others at the Inova Fairfax training

site failed to cooperate with any reasonable requests by Plaintiff regarding medical

appointments. Further, issues related to Plaintiff's alleged difficulty in scheduling medical

appointments bear no causal relationship to the reasons for the academic disciplinary decision-

making resulting in Plaintiff's dismissal from the Program, including failing and refusing to

remediate basic didactics courses, repeatedly lying to faculty members, failing to obtain

mandated health clearance, multiple acts of lack of professionalism directed towards faculty,

fellow residents, other University and hospital employees, and patients and their family

members.

> **Paragraph 1023.**  Instead, Dr. Waggel discussed her needs with the attending,
> Dr. Malik. Dr. Malik responded positively and also approved 2 days off to study
> for and 2 days off to take the United States Medical Licensing (USMLE) Step 3
> exam necessary for Dr. Waggel to practice medicine. (Waggel Declaration ¶ 109.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact dispute. *See*

response to Paragraph 1022, above. Further, the University agrees that Dr. Malik inappropriately

granted Plaintiff's leave request for four days to take the two-day MSLE Step 3 Exam.

Apparently, Dr. Malik failed to remember or overlooked the Program's longstanding policy of

granting only two days administrative leave for the exam. *See* Def.'s Ex. A (Catapano Decl.) (Doc 34-2) ¶¶ 520-522. When this was later noted by Dr. Kels and discussed with Dr. Catapano (*id.* ¶¶523-525), a decision was made to advise Plaintiff that all residents got only two days administrative leave for the two-day exam, and in fairness to all other residents, Plaintiff would be offered the option of one of two choices. In fairness to Plaintiff so she could adhere to the 4-day leave she had planned, she could either take the four days (with two days as administrative leave, and two days as personal leave) or she could take the two days administrative leave and then return to the rotation at Inova Fairfax where, Plaintiff was reminded to assist in her decision, her academic credit for the rotation was already in jeopardy because she had missed so many clinical days. *Id.* 526-528 (and Ex. # 132).

> **Paragraph 1024.** On October 19, 2015, Dr. Waggel, who was suffering from chest pain, consistent with Dr. Catapano's procedures, emailed Dr. Malik, her attending, her chief residents, and Ms. Anderson, the program coordinator that she was ill and would not be coming to work the next day. (Waggel Declaration ¶ 111.)

**RESPONSE:** This statement is irrelevant and does not create a jury triable fact issue. The notice requirements were not "Dr. Catapano's procedures," they were University procedures for the residency training programs. *See* Response to Paragraph 999, above. The procedures required that actual notice be made and where email is used, it is each resident's responsibility to assure that the notice has been received and noted by the attending and other persons to whom notice is to be given. *Id.* Plaintiff did not do that and Dr. Crone so advised Plaintiff.

These issues all involved academic-decision making concerning Plaintiff's compliance, or non-compliance, with training procedures and, therefore, are matters as to which the Court defers to the University in its decision-making. Plaintiff's belief as to whether she complied is

irrelevant. That dispute was resolved as part of the ongoing evaluation of Plaintiff's participation

in the Program by the academic officials responsible for her training.

> **Paragraph 1025.** Nevertheless, on the next day, Oct. 20, 2015, Dr. Waggel received an email from Dr. Crone stating that Dr. Waggel had not followed proper procedures. (Waggel Declaration ¶ 112.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. *See* response

to Paragraph 1024, above. Plaintiff did not take the steps to assure that Dr. Crone had been

notified directly of her impending absence and Dr. Crone reminded Plaintiff of her duties in that

regard which she had not fulfilled.

> **Paragraph 1026.** Moreover, on Oct. 20, 2015, Dr. Waggel received another email from Dr. Kels stating that the prior approval for time off to study for and take the upcoming USMLE Step 3 exam had been revoked, again for supposedly not following proper procedures. (Waggel Declaration ¶ 113.) With the USMLE just a week away, Dr. Waggel had been told that her administrative leave had been denied and she would only be allowed two administrative days off to take (but not study for) the USMLE exam. (*Id.*)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. *See* response

to Paragraph 1023, above. The statement is also false in at least two respects. Plaintiff's time off

for the USMLE Step 3 Exam was not "revoked" – to the contrary, Dr. Waggel was advised that

she would receive the same two days administrative leave for the two-day exam that all other

residents receive. The statement is further false in asserting that Plaintiff was told the change in

amount of administrative leave she would receive was for her "not following procedures." She

was explicitly advised that the change was made in accordance with longstanding policy so she

would be treated just like all the other residents and the other residents would not be put at a

disadvantage regarding time off for exams. This entire episode concerns academic decision-

making around the allowance of administrative time for standardized national exams, matters as

to which the Court defers to the University in the decision-making process and outcomes.

**Paragraph 1027.** Exasperated, Dr. Waggel emailed Dr. Catapano, Dr. Griffith, Ms. Anderson, and her chief residents about her problems. (Waggel Declaration ¶¶ 114-122.) She also applied for FMLA leave from Oct. 25-30, 2015, which was granted. (Waggel Declaration ¶¶ 124-125.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. *See* Response to Paragraphs 1023 and 1026, above. That Plaintiff was "exasperated" and emailed multiple faculty and program personnel about her "problems" that she was being treated just like all the other residents in the Program does not create a triable issue of fact, although it is certainly revealing as to her character. This entire episode concerns academic decision-making around the allowance of administrative time for standardized national exams, matters as to which the Court defers to the University in the decision-making process and outcomes.

**Paragraph 1028.** Dr. Waggel, given her growing frustration, also sought a meeting with Dr. Griffith, the Psychiatry Department Chair, to discuss her problems, but he denied her request. (Waggel Declaration ¶ 121.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. This self-serving, uncorroborated, vague (Plaintiff sought to discuss "her problems"), irrelevant statement regarding Plaintiff's state of mind does not create a material fact. There is no relationship between this request and the claims Plaintiff makes or the decisions regarding the need to repeat two didactics course, non-promotion to PGY3, and, ultimately, to terminate Plaintiff from the Program. Further, the statement is false. Dr. Griffith had offered to meet with his entire neuroscience class to discuss issues related to the class. Plaintiff attempted to convert that into a one-on-one meeting with Dr. Griffith which is not what he had offered, and which he did not believe to be appropriate. *See* Def.'s **EXHIBIT UU** (Email dated October 22, 2015 at 10:44 p.m., Dr. Griffith to Dr. Waggel).

In any event, these matters involved academic decision-making regarding appropriate channels of communication as to which the Court defers to the University's judgment.

**Paragraph 1029.** Despite all this personal turmoil, Dr. Waggel learned that she passed her USMLE Step 3 exam. (Waggel Declaration ¶ 126.)

**RESPONSE:** This is irrelevant and does not create a jury triable fact issue. Plaintiff's self-serving, vague ("all this personal turmoil"), uncorroborated, broad assertion as to her state of mind does not create a material fact dispute. That Plaintiff passed the USMLE Step 3 Exam is undisputed, immaterial, and, therefore, not a fact issue for trial.

**Paragraph 1030.** On or about October 14, 2015, which was nearly two months after the August 25th event, Dr. Waggel was informed that she did not "perform at the level expected" during the August 25th call on Six South. (Waggel Declaration ¶ 129.)

**RESPONSE:** These matters are irrelevant and do not create jury triable fact issues. The University agrees that Dr. Catapano met with Plaintiff on or about the October 14, 2015 timeframe to discuss further with Plaintiff (as she had on many previous occasions) the events of the August 25 overnight call shift and again reminded Plaintiff that she had not performed "at the level expected." This was clearly not the first time those issues had been addressed with Plaintiff. Her sub-standard performance on the August 25 shift was the reason Plaintiff was advised as early as September 21, 2015 (*see* Response to Paragraph 1021, above), that the next time she returned to a general medical clinical rotation (which was scheduled in October), the Program had arranged for more senior residents to serve on "buddy call" to provide remediation for the deficiencies. Plaintiff then abused the buddy call assignment by attempting to have the more senior residents perform her clinical duties for her and then turned around and falsely accused the more senior residents not only of abandoning her during the buddy call but also of submitting fraudulent reports to Dr. Catapano concerning their participation in buddy call. *Id. See also* Def.'s Ex. C (Emejuru Decl.) (Doc 34-7) ¶237-244 (and Ex. ##66-67). At Dr. Catapano's

request, Dr. Emejuru investigated the accusations Plaintiff had made against the buddy call residents and determined they were false. *Id.* ¶¶ 239-244.

The communications within the Program, the timing of the communications, and decisions regarding Plaintiff's status in the Program and implementation of appropriate remedial measures were all matters which became part of the academic clinical decision-making process as to which the Court defers to the University's judgment and therefore do not create jury triable fact issues.

> **Paragraph 1031.** When Dr. Waggel asked Dr. Catapano what she did to demonstrate she was not "performing at the level expected" Dr. Catapano stated something to the effect that "I know you've gone over it with Dr. Norris and Dr. Gandhi and a letter of deficiency will be coming which will outline what you spoke to them about." (Waggel Declaration ¶ 129.) Dr. Norris and Dr. Gandhi were the psychiatry attendings on staff during August 25th call. (*Id.*) Dr. Catapano was under the impression that Dr. Waggel had a meeting with them. (*Id.*) However, this meeting had been rescheduled. Therefore, a letter of deficiency was been written outlining a meeting that had never occurred. (*Id.*)

> **RESPONSE:** These matters are irrelevant and do not create jury triable fact issues.

Dr. Catapano had frequently discussed with Plaintiff issues related to her sub-par performance *See* Response to Paragraph 1030, above. In addition, Dr. Catapano was fully aware of the concerns both Dr. Norris and Dr. Gandhi had expressed concerning Plaintiff related to events on the August 25 overnight call shift and Plaintiff's performance on another rotation shortly afterwards where Dr. Ghandi was an attending.

> **Paragraph 1032.** When Dr. Waggel eventually had a meeting with Dr. Norris and Dr. Gandhi on October 15, she showed them her detailed documentation of the night of August 25th. (Waggel Declaration ¶ 130.) Dr. Waggel recalls them telling her that she had excellent patient care and put safety first. It was an overall positive feedback session that did not question Dr. Waggel's level of performance. (*Id.*) Dr. Norris and Dr. Gandhi also told Dr. Waggel that they did not know anything about a letter of deficiency. (*Id.*)

**RESPONSE:** These matters are irrelevant and do not create jury triable fact issues. *See* Response to Paragraph 1031, above. This statement makes clear that Plaintiff did participate in the Root Cause Analysis concerning the circumstances involved in the August 25 overnight call shift as she was interviewed by the two physicians conducting the investigation, Dr. Norris and Dr. Gandhi, and had prepared "detailed documentation" for their review. In fact, Plaintiff claims to have provided a 3000-word document for their review to prove that what Nurse Shemika Anthony, who was on duty that night, said had occurred, did not. *See* Plaintiff's Declaration, (Doc 35-2) ¶131. Plaintiff's focus on Nurse Anthony, however, completely ignored the detailed reports prepared at the time of the events by a number of faculty members, including Dr. Norris, regarding their own personal observations of Plaintiff's sub-standard performance and lack of professionalism during the August 25 overnight call. *See* Def.'s Ex. A (Catapano Decl.) ¶ 311 (and Ex. ## 81-82, 84). This also ignores that Dr. Gandhi reported significant concerns on another clinical rotation shortly after the August 25 shift "about Dr. Waggel's ability to function effectively as a resident currently." *Id.* ¶ 380 (and Ex. #91).

Further, the assertions are based on Plaintiff's self-serving, uncorroborated statements in her declaration. This was obviously another example of Plaintiff hearing only whatever somewhat favorable part of the information conveyed to her in discussion or feedback session (a phenomenon noted repeatedly during her tenure in the Program by a number of faculty members at different training sites and in different medical specialties. *See* Def.'s SOF (Doc 34) ¶¶ 126-131, 139, 146, 157-158.

In any event, these communications related to the attending faculty's information gathering and decision-making process regarding a Root Cause Analysis including evaluation of Plaintiff's performance, information to be exchanged with Plaintiff regarding those matters, and

steps taken to supervise and implement remediation for Plaintiff, all matters involving academic decision-making as to which the Court defers to the University's judgment. Whether these matters were appropriately conducted and whether Plaintiff fully or accurately comprehended the information communicated to her are not jury triable fact issues.

> **Paragraph 1033.** For the remainder of October, Dr. Waggel attempted to find out from Dr. Catapano what she based her decision on, but her questions went unanswered. (Waggel Declaration ¶ 130.)

**RESPONSE:** These matters are irrelevant and do not create jury triable fact issues. The statement is also based solely on the self-serving, uncorroborated, and vague assertions by Plaintiff in her declaration. There is no description of what the "attempted" contacts with Dr. Catapano were, how they were conducted, or even any specification of what the "decision" allegedly made at this point by Dr. Catapano may have involved, or what if any further response might have been appropriate. In any event, it is clear that these matters involved communications related to academic-decision making and do not create jury triable fact issues. *See also* Responses to Paragraphs 1030 and 1031, above.

> **Paragraph 1034.** On October 23, 2015, the CCC met and decided to hold Dr. Waggel back from advancing to her PGY3 year based on taking medical leave, one day after Dr. Waggel had sent an email expressing concern the she was receiving repercussions for taking sick days and the same day as Dr. Waggel's first request for FMLA leave. (*See* Ex. 8, 9 to Def.'s Mot. Sum. J. Ex. M; *see also* Def.'s SOF ¶ 522.)

**RESPONSE:** This is clearly false. While it is true that the CCC met on October 23, 2015, there was no formal determination at that point regarding Plaintiff's non-promotion to the PGY3 year. Indeed, that was the whole basis on which Plaintiff "won" her subsequent procedural appeal when Dr. Simons, as Senior Associate Dean for M.D. Programs, reviewed the minutes for the CCC meeting of October 23, 2015 and determined that the minutes did not reflect a CCC deliberation and vote to recommend non-promotion to the Program Director. *See* Def.'s Ex. R

(Simons Decl.) (Doc 34-22) ¶¶ 8, 13, and Ex. #2), and his interview of Dr. Dyer, as Chair of the

CCC, confirmed that that had not occurred. *Id.* ¶ 13. Plaintiff did not attend the CCC meeting so

her speculation as to what occurred or the basis for any decision-making is irrelevant.

Further, Plaintiff's self-serving, uncorroborated assertions regarding "repercussions" (not

otherwise specified and not attributed to any particular person, place, or time) are insufficient

and irrelevant.

This assertion does not create any triable fact issues.

**Paragraph 1035.** Although 17 other residents also failed to provide their
documentation in time, only Dr. Waggel received a LOD for this oversight.
(Waggel Declaration ¶ 127.)

**RESPONSE:** This statement does not create a jury triable issue of fact. The only support

is Plaintiff's self-serving, uncorroborated declaration. There is no evidence that there were in fact

17 other residents who failed to comply, or that they failed to comply under the same

circumstances, or that (like Plaintiff) they failed to comply without any justification, or that they

failed to comply (like Plaintiff) with even an extended deadline, or that the particular

circumstances of each of the other 17 allegedly non-compliant residents made them appropriate

"comparators" for purposes of whether Plaintiff had been treated differently in any relevant

respect regarding the LOD for non-compliance with the health clearance requirement. Plaintiff

never provided any such comparator information during pretrial discovery and provides none to

support her self-serving, uncorroborated assertion that she was treated differently.

Perhaps equally significantly, the statement is clearly false. Plaintiff's non-compliance

was not an "oversight." It is false for her to say so. Plaintiff failed to complete the annual health

clearance despite actual knowledge as early as April 2015 of the compliance deadline of

September 30, 2015. *See* Def.s Ex. B (Berger Decl.) (Doc 34-6) ¶¶ 11-13; Def.'s Ex. A

(Catapano Decl.) (Doc 34-2) ¶¶ 479-481 (and Ex. ##114-115). Plaintiff received multiple further notices and reminders of the need to comply and residents are told that this requirement is mandated by D.C. law as a public health safety measure, is considered a serious matter, and is to be strictly enforced. Berger Decl. ¶ 14. Dr. Waggel failed to meet the September 30 deadline and was then given an extension to October 14 by the Medical Director of GW Hospital. *Id.* ¶ 15. Dr. Catapano then sent an email instructing Dr. Waggel (and one other psychiatry resident then still not in compliance) that they needed to comply or would be "pulled from duty" and would "likely get a letter of deficiency from the GME office" and would probably need to "make up the days by having your graduation date delayed, not to mention disrupting the services who are depending on you." Catapano Decl. ¶ 485 and Ex. #117.

Plaintiff still did not comply and failed to meet the extended deadline. *Id.* ¶ 16. Dr. Berger then issued the October 28, 2015 Notice of Deficiency letter. *Id.* ¶ 16.

There was no "oversight" involved in this matter whatever. It is false to say so.

Plaintiff's most recent falsehood on this issue was directed not to the Program or any University officials, but to this Court, itself. Plaintiff recently proffered the excuse (newly invented and presented for the first time in this litigation) that she could not comply timely "because she was assigned to an offsite hospital" and could not get to the GW Hospital Employee Health Office. *See* Pl.'s SOF (Doc 32-2) ¶ 50. It is false to say that Plaintiff failed to meet the deadline "because Defendant stationed her at another hospital." Plaintiff was not stationed at another hospital for six months. And even when individuals are assigned to off-site rotations, they still have to comply with District of Columbia law.

Further, the annual health clearance process is simple, straight-forward, and easily accomplished. *See* Def.'s Ex. CC (Berger Supp. Decl.) (Doc 36-2) ¶ 15. Residents are even

permitted to use a personal physician – anyone they want to choose – to complete the process. *Id.* ¶ 18. They can even submit the paperwork by fax. There is no need to go to GW Hospital. But even if they use the GW University Hospital Employee Health Office ("EHO"), the process is easily arranged (*id.* ¶ 22), involves two visits to EHO (one about 20-30 minutes, the other a matter of a few minutes) (*id.* ¶¶ 23, 25) after which the paperwork is completed and the health clearance requirement is met. *Id.* ¶ 25.

Plaintiff's representations in her recent filing to the contrary are false and do not create a jury triable fact issue.

> **Paragraph 1036.** On November 2, 2015, Dr. Waggel learned from a department newsletter that she was set to present grand rounds on Nov. 5, 2015. When she asked Dr. Emejuru about it, Emejuru stated that the failure to inform Dr. Waggel about this assignment was an "oversight." (Waggel Declaration ¶ 135.)

**RESPONSE:** Agreed and Dr. Emejuru acknowledged that he had omitted Plaintiff from the mailing by mistake. This is neither relevant nor a jury triable fact issue.

> **Paragraph 1037.** On November 10, 2015, Dr. Waggel received a phone call from Dr. Catapano who stated that Dr. Waggel was to begin forced administrative leave because she had "taken too much sick leave" and "the deans were going to have a legal meeting about [her]." (Waggel Declaration ¶ 136.)

**RESPONSE:** This is false and Plaintiff now knows it is false.

> **Paragraph 1038.** Dr. Waggel was careful to document Dr. Catapano's admission that she was being punished for taking too much time off. (Waggel Declaration ¶¶ 137-138; Emails about Catapano telephone call, Exhibit Q, R.)

**RESPONSE:** This is false and Plaintiff now knows it is false.

> **Paragraph 1039.** On November 11, 2015, Dr. Waggel called the geriatrics department and was told she had been taken off their schedule. Later that day, Dr. Catapano sent an email confirming that Dr. Waggel had been placed on administrative leave. (Waggel Declaration ¶ 139.)

**RESPONSE:** Agreed.

**Paragraph 1040.** On November 11, 2015, Dr. Catapano also emailed Dr. Waggel a LOD for the August 25th call. (Waggel Declaration ¶ 141.) That letter stated, "Because of the above listed deficiencies, and need for extra supervision, the Clinical Compeitency [*sic*] Committee's assessment is that you are not on track to be promoted to the PGYIII year on July 1, 2016." (Waggel Declaration ¶ 133; LOD, dated November 11, 2015, Exhibit O.)

**RESPONSE:** Agreed.


**Paragraph 1041.** The Psychiatry Program did not consider mitigating factors or extenuating circumstances, such as Plaintiff's illness, in the decision-making process that led to the November 11, 2015 LOD. (Catapano 30(b)(6) Dep. 40:18-41:4, 43:11-44:13, Exhibit HHH; Catapano 30(b)(6) Ex. 7, Exhibit III.)

**RESPONSE:** Denied.

**Paragraph 1042.** On November 12, 2015, Dr. Waggel hired Greg Care, a lawyer who specializes in residency issues to help her with her problems. Care told Dr. Waggel that GWU's general counsel was handling her matter. (Waggel Declaration ¶ 142.)

**RESPONSE:** Defendant is without knowledge or information sufficient to form a belief

as to these matters.

**Paragraph 1043.** On November 18, 2015, Dr. Waggel had a positive meeting with Dr. Jeffrey Berger, a Graduate Medical Education Dean, and Mary Tucker, an administrator. (Waggel Declaration ¶ 143; Email exchanges about November 18, 2015 meeting with Dean Berger, Exhibit T, U.)

**RESPONSE:** The characterization is an oversimplification and therefore is denied

although this is not a material jury triable fact issue.

**Paragraph 1044.** At this meeting, Plaintiff made Dr. Berger aware of her cancer diagnosis, and Defendant was therefore definitely aware of her condition at that time, to the extent that it was not already aware beforehand. (Berger Dep. 69:1-70:11, Exhibit GGG.)

**RESPONSE:** Objection as to the legal conclusion and characterization although this is

not a jury triable fact issue.

**Paragraph 1045.** Dr. Waggel left the meeting hopeful that solutions could be worked out that would sort out her periodic leave requests and allow her to

graduate on time. One area Dr. Waggel explicitly discussed was having one contact point when she needed an accommodation to go to a medical appointment. (Waggel Declaration ¶ 143; Email exchanges about November 18, 2015 meeting with Dean Berger, Exhibit T, U.)

**RESPONSE:** Objection. Compound and requires the University to speculate as to

Plaintiff's state of mind and the matter is not a jury triable fact dispute.

**Paragraph 1046.** Significantly, in their meeting Dr. Berger also warned Dr. Waggel about her hiring of an attorney. He stated, "Please do not reference your attorney going forward, particularly to the people in your Department. It does not make for a safe working environment. It is your choice to continue to pursue this avenue." (Email exchange about November 18, 2015 meeting with Dean Berger, Exhibit T.)

**RESPONSE:** Denied in the form set forth and oversimplification of the matters

discussed although this is not a jury triable fact dispute.

**Paragraph 1047.** As a follow up to this meeting, Mary Tucker emailed Dr. Waggel he phone number to the EEO office, but Dr. Waggel had already gone to that office which told her to apply for FMLA leave, which she did as instructed in October 2015. (Waggel Declaration ¶ 144.)

**RESPONSE:** Objection as to the multiple and argumentative assertions. It is false that

Plaintiff ever went to the EEO Office to report a disability or requested accommodation for a

disability.

**Paragraph 1048.** On November 19, 2015, Dr. Catapano issued a revised LOD. That letter changed the wording from the November 11th letter to indicate that the CCC's assessment was that Dr. Waggel would not be promoted, but the final decision was left open. Waggel Declaration ¶ 133; LOD, dated November 19, 2015, Exhibit P.)

**RESPONSE:** Denied as to the characterization but this is not a jury triable fact issue as

the document speaks for itself.

**Paragraph 1049.** On November 19, 2015, Dr. Catapano also informed Dr. Waggel that she had received feedback from Dr. Griffith and Dr. Collins that her performance in didactics class had been unsatisfactory. (Waggel Declaration ¶ 145.) Dr. Waggel was told Dr. Catapano discussed with them the possibility that they may recommend that she repeat their classes next year. Failing Dr. Collins'

class would mean that Dr. Waggel would not proceed with the rest of PGY2 didactics, and would need to repeat the year. (*Id.*) Dr. Waggl was also told to meet with Dr. Kels to work on an improvement plan as part of her Letter of Deficiency (LOD) for the August 25, 2015 call. (*Id.*) On the bright side, Dr. Catapano also allowed Dr. Waggel to return to her regular duties with geriatrics. (*Id.*) Her administrative leave was evidently over. (*Id.*)

**RESPONSE:** Objection to multiple assertions although these matters do not constitute

jury triable fact issues.

**Paragraph 1050.** The November 19th LOD told Dr. Waggel she had 7 days to meet with Dr. Kels or face possible termination, but once again the designated Psychiatry Department representative was unresponsive to efforts to meet. (Waggel Declaration ¶¶ 158-161.)

**RESPONSE:** Denied as to the characterization but not a jury triable fact issue as the

document speaks for itself.

**Paragraph 1051.** After finally tracking Dr. Kels down, Kels fobbed Dr. Waggel off on Dr. Gandhi, but he was just as difficult to meet in order to accomplish the required remediation. (Waggel Declaration ¶¶ 162-163.)

**RESPONSE:** Denied as to the argumentative characterization of the events.

**Paragraph 1052.** On November 19, 2015, Dr. Collins informed Dr. Waggel she would be repeating her class starting in July, 2016. (Waggel Declaration ¶ 164.) On November 30, 2015, Dr. Catapano informed Dr. Waggel that she could take Dr. Griffith's December 17, 2015 exam, but would need to repeat the first half of the course. (*Id.*) The effect of these decisions was to preclude Dr. Waggel from progressing to her PGY3 year on July 1, 2016. (*Id.*)

**RESPONSE:** Denied as to the characterization and legal conclusion. It was not the

"effect of the decisions" that precluded Plaintiff from progressing to PGY3.

**Paragraph 1053.** Although Drs. Catapano, Griffith and Collins made a decision to make Dr. Waggel repeat coursework which precluded her from progressing to PGY3 (and potentially repeat all of PGY2 year), they did not inform her whether she could appeal the decisions internally. (Waggel Declaration ¶ 165.)

**RESPONSE:** Denied as to the characterization and legal conclusion. It was not the

"effect of the decisions" that precluded Plaintiff from progressing to PGY3.

**Paragraph 1054.** On December 4, 2015, Dr. Berger informed Dr. Waggel that, "A course cannot be appealed to GME." In other words, because Dean Berger erroneously thought a decision to require her to repeat a class was not a reportable action, she could not appeal it. (Waggel Declaration ¶ 166.)

**RESPONSE:** Denied but not jury triable as irrelevant.

**Paragraph 1055.** In response, Dr. Waggel pointed out that the decision to have Dr. Waggel repeat Dr. Collins class meant that Dr. Waggel, would be denied credit for previously completed rotations, which constituted an appealable reportable action. To this, Dr. Berger replied, "I hope to have that information by mid-week next week." (Waggel Declaration ¶ 166.)

**RESPONSE:** Denied as to the improper causative conclusion embedded in the statement and to multiplicity.

**Paragraph 1056.** On December 10, 2015, Dr. Waggel was at the MFA for didactics lectures. Her mailbox was also in that building. (Waggel Declaration ¶ 167.) In December, Dr. Waggel had been working at Children's Hospital. (*Id.*) Although Dr. Catapano knew that she would not be back in the MFA building until the next Thursday didactics day, the GWU Administration placed the December 10, 2015 LOD in Dr. Waggel's mailbox after class ended around 5:00 p.m. (*Id.*) Dr. Waggel only found the LOD in her box when she unexpectedly returned to the building that evening. (*Id.*) The letter stated that she had until the next day, December 11th to appeal. LOD, dated December 10, 2015, Exhibit W.) Had Dr. Waggel not returned to the building unexpectedly, she would have missed the less than 24-hour deadline to submit her appeal as provided in the letter. (Waggel Declaration ¶ 166.)

**RESPONSE:** Denied as to the nature, sequence, and consequences of the events described and to multiplicity of assertions made but irrelevant and not a jury triable issue.

**Paragraph 1057.** On December 11, 2015, Dr. Waggel appealed the decisions to make her repeat coursework as repeating this coursework would prevent her from progressing to PGY3 with her peers (or potentially necessitate her to having to repeat her entire PGY2 year). (Waggel Declaration ¶ 168.)

**RESPONSE:** Denied as to the argumentative causative assumptions embedded within what are supposed to be straightforward factual presentations but irrelevant and not a jury triable issue.

**Paragraph 1058.** On December 23, 2017, she provided the reviewer, Dr. Cioletti, with documentation in support of her appeal. (Waggel Declaration ¶ 169.)

**RESPONSE:** Assuming this is a reference to Plaintiff, agreed that whatever Plaintiff submitted was made available to Dr. Cioletti within this timeframe.

**Paragraph 1059.** On December 28, 2015, Dr. Waggel learned from another resident that she had been taken off the call schedule. (Waggel Declaration ¶ 170.) When queried, Dr. Kels stated Dr. Waggel was taken off call until she finished her essay and made an oral presentation to Dr. Gandhi. (Waggel Declaration ¶ 171.)

**RESPONSE:** Agreed in substance.

**Paragraph 1060.** Given the stress from this news, Dr. Waggel went to the emergency room for treatment. There, the hospital attending directed Dr. Waggel to Dr. Sarani, who acted as an ombudsman. (Waggel Declaration ¶ 174.)

**RESPONSE:** Agreed that Plaintiff presented to the GW Hospital ED reporting a chief complaint of stress.

**Paragraph 1061.** On January 3, 2016 after more prompts, Dr. Gandhi finally spoke to Dr. Waggel about remediation on the phone, and Dr. Waggel emailed him the essay she was required to submit as part of her remediation plan that day as well. (Waggel Declaration ¶¶163.)

**RESPONSE:** Denied. Irrespective of the date and other argumentative material, the University states that Plaintiff never submitted the essay she was required to submit.

**Paragraph 1062.** On or about January 8, 2016, Dr. Waggel was at MFA because it was Thursday, a didactics day. At that time, Victoria Anderson, the residency program coordinator, indicated that Dr. Waggel was taken off call in retaliation because she had filed an appeal that was causing the administration to do more work. (Waggel Declaration ¶ 175.)

**RESPONSE:** Denied, false, inadmissible and a non-triable matter.

**Paragraph 1063.** After completing her remediation project, Dr. Waggel began inquiring about when she would be returned to call. (Waggel Declaration ¶¶ 176, 178, 181.)

**RESPONSE:** Denied. Plaintiff never completed a remediation project.

**Paragraph 1064.** On January 19, 2016, Dr. Sarani promised Dr. Waggel that he would press Dr. Berger and Dr. Catapano to move the process along. (Waggel Declaration ¶ 181.)

**RESPONSE:** Denied as to form but irrelevant and not triable as an issue of fact.

**Paragraph 1065.** Later that evening, Dr. Gandhi finally reached out to Dr. Waggel to set up a time when he would hear the presentation she was required to give as part of her remediation, but then later inexplicably backed off from that commitment.  (Waggel Declaration ¶¶ 182, 183.)

**RESPONSE:** Denied as to argumentative form inappropriate to a proposed SOF.

**Paragraph 1066.** On or about January 21, 2016, Dr. Waggel received a communication from Dr. Catapano that she would review Dr. Gandhi's comments about Dr. Waggel's essay with the CCC and then get back to Dr. Waggel to let her know about their recommendations. (Waggel Declaration ¶ 185.)

**RESPONSE:** Agreed in substance.

**Paragraph 1067.** From this point forward, Dr. Waggel was subject to additional scrutiny from staff, had far more difficulties attending medical appointments, and was branded as a "problem resident" by the GWU Administration. (Waggel Declaration ¶¶ 186-191.)

**RESPONSE:** Denied as to form and characterization but irrelevant and non-triable as a material fact.

**Paragraph 1068.** On February 3, 2016, Dr. Catapano sent Dr. Waggel an email at 10:19 a.m., "The CCC did not yet come to a conclusion about next steps regarding your Improvement Plan or return to call. If/when you do return to call, you will have plenty of notice to arrange your schedule. For now, I will say we would not put you into the schedule until, at the earliest, February 19th." (Waggel Declaration ¶ 192.)

**RESPONSE:** Agreed.

**Paragraph 1069.** On February 3, 2016, at 5:13 p.m., Dr. Waggel emailed Dr. Sarani, the hospital ombudsman, "Good afternoon. Administration met yesterday to discuss her call schedule. Dr. Catapano stated the result was "The CCC did not yet come to a conclusion about next steps regarding your Improvement Plan or return to call. If/when you do return to call." I do not understand why this process is taking so long. Is there anything that can be done about this?" (Waggel Declaration ¶ 193.)

**RESPONSE:** Agreed in substance.

**Paragraph 1070.** In response, Dr. Sarani asked Dr. Waggel to call him. Over the phone he told her that he did not think the atmosphere with GWU psychiatry department was beneficial to her medical education and suggested she would have an opportunity at success if she went to a different program. (Waggel Declaration ¶ 193.)

**RESPONSE:** Denied as to form and characterization.

**Paragraph 1071.** On February 3, 2016, Dr. Waggel began a rotation at the Comprehensive Addiction Treatment Services (CATS) in Fairfax, VA, but had to leave to go to a personal medical appointment with Dr. Shepard. (Waggel Declaration ¶ 194.)

**RESPONSE:** Denied as to form and characterization.

**Paragraph 1072.** Dr. Shepard referred Dr. Waggel to Dr. Frank for evaluation of abdominal pain in the setting of renal cell carcinoma. He stated it was likely due to all this stress caused by Program administration but wanted to make sure it was not a symptom of cancer metastasis. (Waggel Declaration ¶ 194.)

**RESPONSE:** Objection. Hearsay.

**Paragraph 1073.** On February 4, 2016, Dr. Catapano accused Dr. Waggel of not turning in her keys from her prior rotation. (Waggel Declaration ¶ 195.) Later, Dr. Catapano subsequently recanted after confirming that Dr. Waggel had not received a key in the first place. (*Id.*)

**RESPONSE:** Objection as to form and characterization and irrelevant as not involving a

jury triable fact dispute.

**Paragraph 1074.** In that email, also dated February 4, 2016, Dr. Catapano stated, "I am sorry that it takes as long as it does for the CCC to come up with their recommendations for improvement (not punishment). They take the time to be careful to put together a plan that is substantive and reasonable, makes sense in terms of your improvement, and is appropriately supervised. I am very sorry that you continue to experience so much stress-related illness, and do hope you are taking care of yourself and getting appropriate care. I will continue to support you taking the time you need to go to your doctor's appointments." (Waggel Declaration ¶ 195; Email exchange with Dr. Catapano, dated February 4-8, 2016, regarding return of keys and awaited CCC improvement plan, Exhibit II.)

**RESPONSE:** Agreed.

**Paragraph 1075.** On February 8, 2016, Dr. Catapano emailed Dr. Waggel, "The CCC is working on their recommendations, and the plan is to get them together and review them with Dr. Berger this Thursday. I'll give you an update when I know more. Take care of yourself." (Waggel Declaration ¶ 196; ; Email exchange with Dr. Catapano, dated February 4-8, 2016, regarding return of keys and awaited CCC improvement plan, Exhibit II.)

**RESPONSE:** Agreed.

**Paragraph 1076.** At 4:04 p.m. on February 9, 2016, Dr. Waggel emailed Ms. Anderson, "If I need to leave early to go to a doctors (sic) appointment and have been given permission to do so by my attending, do I have to inform others?" She replied at 4:06 p.m., "No. If your attending has given you permission, you're allowed to leave early for a doctor's appointment. Thank you for checking!" (Waggel Declaration ¶ 197; Email exchange with Victoria Anderson regarding doctors' appointment, dated February 9, 2016, Exhibit JJ.)

**RESPONSE:**  Agreed re date/time/contents of email.

**Paragraph 1077.** Dr. Waggel did not understand why every preceding doctor's appointment required her to email numerous people for permission but now simply asking her attending was sufficient. (*Id.*)

**RESPONSE:** Objection. Irrelevant and unknown to the University.

**Paragraph 1078.** On February 11, 2016, at 3:45 p.m., Dr. Catapano emailed Dr. Waggel, "I just wanted to check in with you. The CCC is working on recommendations for your Improvement Plan … they are not ready yet but will be presented to you in due course. I'll keep you updated. Hope you are well." (Waggel Declaration ¶ 198; Email from Dr. Catapano, dated February 11, 2016, regarding CCC "improvement plan," Exhibit KK.)

**RESPONSE:** Agreed re date/time/contents of email.

**Paragraph 1079.** In fact, CCC was not "working on recommendations" for "an improvement plan." Instead, according to minutes of a CCC meeting dated February 9, 2016 produced in this litigation, Dr. Waggel's employment and training was to be terminated. (Minutes of February 9, 2016 CCC meeting, Exhibit LL.)

**RESPONSE:** Denied.

**Paragraph 1080.** As part of the due process afforded to residents, the CCC was required to consider mitigating circumstances that were favorable to Plaintiff. (Berger Dep. 100:13-21, Exhibit GGG.)

**RESPONSE:** Denied.

**Paragraph 1081.** In fact, Dr. Berger felt he needed to "put the brakes on" the CCC's discussions about Plaintiff because they were not following proper procedures or allowing Plaintiff proper due process, including the opportunity that Plaintiff should have been given to respond to new allegations brought against her by members of the CCC. (Berger Dep. 83:21-84:1, Exhibit GGG.)

**RESPONSE:** Denied.

**Paragraph 1082.** Plaintiff's health issues are among the mitigating factors that should have been considered. (Berger Dep. 100:13-21, Exhibit GGG.)

**RESPONSE:** Denied.

**Paragraph 1083.** Although Plaintiff's cancer and its resulting impact on Plaintiff was an important factor that should be considered, the CCC did not consider Plaintiff's medical condition as a mitigating factor when they decided to terminate her residency. (Dyer Dep. 23:9-24:19, Exhibit DDD; Dyer Dep. Ex. 3, Exhibit FFF; Catapano 30(b)(6) Dep. 15:9-17, Exhibit HHH.)

**RESPONSE:** Denied.

**Paragraph 1084.** The CCC also did not consider the positive performance evaluations that Plaintiff had received when they determined to terminate her residency. (Dyer Dep. 23:9-25:1, Exhibit DDD; Dyer Dep. Ex. 3, Exhibit FFF; *see also* Catapano 30(b)(6) 80:3-82:3, 91:6-13, 91:19-92:14, Exhibit _; Catapano 30(b)(6) Ex. 13, 16, 17, Exhibit KKK, LLL, MMM.)

**RESPONSE:** Denied.

**Paragraph 1085.** The CCC did not consider the mitigating facts that had been provided in Plaintiff's prior appeal, even though the information was available to the CCC. (Dyer Dep. 35:15-37:20, Exhibit DDD.)

**RESPONSE:** Denied.

**Paragraph 1086.** On February 12, 2016, Dr. Waggel underwent an endoscopy for stomach pain under general anesthesia at 12:15 p.m. at MedStar Surgery Center. They found "duodenal intraepithelial lymphocytosis" and a "lesion in the antrum" of her stomach with "heaped up tissue." Dr. Waggel was informed that it could be cancer metastasis, a concern that has persisted and has needed to be dealt with while Plaintiff has been in remission. (*See* Waggel Declaration ¶¶ 200, 205, 207.)

**RESPONSE:** Denied.

**Paragraph 1087.** On February 16, 2016, Dr. Griffith presented Dr. Waggel with a "letter of misconduct" that concerning purported misrepresentations Dr. Waggel made about didactics tests and her position in the program. (*See* Waggel Declaration ¶¶ 202-204.)

**RESPONSE:** Denied.

**Paragraph 1088.** On February 25, 2016, Dr. Waggel received notice the first level appeal of the decision to no allow her to progress to the PGY3 year was denied. After receiving misinformation from Dean Berger, Dr. Waggel ultimately perfected a second level appeal to Dean Simons. (*See* Waggel Declaration ¶¶ 206, 209-211.)

**RESPONSE:** Denied.

**Paragraph 1089.** Dr. Waggel applied for and was approved for FMLA leave from March 9-16, before she received notice from Dr. Berger that he wanted to conduct his misconduct inquiry on March 9th. Given Dr. Waggel's leave, Dr. Berger relented and rescheduled the matter for March 17th, the day Dr. Waggel returned from leave. (Waggel Declaration ¶ 207.)

**RESPONSE:** Denied.


**Paragraph 1090.** On March 17, 2016, Dr. Waggel was given an opportunity to present her side of the story to Dean Berger. (*See* Waggel Declaration ¶ 212; Transcript of meeting with Dean Berger, dated March 17, 2016, Exhibit NN.) At that time, Dr Waggel explained to him that the alleged misrepresentations that formed the basis of the misconduct allegation against her were really examples of miscommunication. (*Id.*) He questioned her about hiring a lawyer and suggested he could not treat her the same way as others because she had legal representation. (*Id.*) He stated he would help her transfer and he would not mention her current appeals and misconduct accusations. (*Id.*) He said he would negotiate a final evaluation and that she would finally be able to see her semiannual Milestone evaluation which should have been conducted in December, 2015 (that the other residents had already received). (*Id.*) He also said he could work on getting Dr. Waggel credit for the time in residency she had completed and that he would not be not discussing her health condition. (*Id.*)

**RESPONSE:** Denied.


**Paragraph 1091.** After conducting an inquiry, Dr. Berger adjudicated the misrepresentation claim not as a reportable action, but rather as the basis for another letter of deficiency. (*See* Waggel Declaration ¶ 212, 227; Dean Berger's adjudication of misconduct investigation, dated April 8, 2016, Exhibit UU.)

**RESPONSE:** Denied.


**Paragraph 1092.** Immediately following her positive meeting with Dean Berger, Dr. Waggel met with Dr. Griffith and Dr. Catapano who removed her from patient care. (*See* Waggel Declaration ¶¶ 213-215.)

**RESPONSE:** Denied.dddddddddddddddddddddd


**Paragraph 1093.** When Dr. Waggel asked Griffith for a concrete reason for such an action given that there had be no adverse patient outcomes, Griffith only responded that the "vagueness was inside" Plaintiff. (*See* Waggel Declaration ¶¶ 213-215; Transcript of meeting with Dr. Griffith and Dr. Catapano regarding removal from patient care, dated March 17, 2016, Exhibit OO)  Griffith's odd statement gave Plaintiff chills. (Waggel Decl. ¶ 214.)

**RESPONSE:** dddddddddddddddddddddddddddddddddddd

**Paragraph 1094.** During this period, Dr. Waggel was put on a research elective, but no one would agree to serve as her advisor. (*See* Waggel Declaration ¶¶ 218, 223.)

**RESPONSE:** Denied.

**Paragraph 1095.** Moreover, Dr. Waggel sought to transfer to another residency program, but although Emory, Virginia Tech and Howard expressed interest, this effort came to nothing because GWU administration failed to provide necessary documentation and disallowed credit for Dr. Waggel's PGY2 year. (*See* Waggel Declaration ¶¶ 208, 220-222, 225-230.)

**RESPONSE:** Denied.

**Paragraph 1096.** In addition, Dr. Waggel became aware of efforts to interfere with her license to practice medicine. (*See* Waggel Declaration ¶¶ 216, 224.)

**RESPONSE:** Denied.dddddddd

**Paragraph 1097.** Discovery in this litigation demonstrates that Dr. Catapano and/or Dr. Griffith were directly responsible for damaging Plaintiff's prospects to continue to practice psychiatry. (Griffith Dep. 63:19-66:17, Exhibit NNN; March 21, 2016 Memorandum from Dr. Griffith re instructions not to assist Dr. Waggel in procuring a transfer and threatening her medical license, Exhibit PP.)

**RESPONSE:** Denied.

**Paragraph 1098.** On March 25, 2016, Dean Simons informed Dr. Waggel that she had won her appeal and that he had remanded the decision not to allow Dr. Waggel to progress to the PGY3 year to the CCC. (Waggel Declaration ¶ 217; Appeal decision from Dr. Simons, dated March 25, 2016, Exhibit QQ.)

**RESPONSE:** Denied.

**Paragraph 1099.** Dr. Simons' email to Dr. Catapano about the decision directed the CCC to meet about the resident's evaluations/concern and make specific recommendations about Dr. Waggel's progress before meeting with her again to convey its recommendations. (March 25, 2016 Email from Dr. Simons to Dr. Dyer and Catapano re appeal decision, Exhibit RR.)

**RESPONSE:** Denied.

**Paragraph 1100.**   In contrast, Dr. Dyer was less interested in remediating Dr. Waggel than in "fixing" technical problems with CCC's structure, presumably so its decisions about Dr. Waggel would be upheld. (March 25, 2016 Email from Dyer regarding Simons decision and Waggel's draft milestones, Exhibit SS; March 25, 2016 Email from Dyer to Catapano regarding how to fix the problem, Exhibit TT.)

**RESPONSE:** Denied.


**Paragraph 1101.** On April 8, 2016, the same day Dr. Berger rejected Dr. Griffith's and Dr. Catapano's effort to use a misconduct allegation as the basis of a reportable action against Dr. Waggel, the CCC met on remand from Dr. Simons and decided to increase Dr. Waggel's punishment from non-progression to PGY3 year to dismissal. (April 8, 2016 CCC Minutes regarding dismissal, Exhibit VV.)

**RESPONSE:** Denied.


**Paragraph 1102.**   A few days later Dr. Dyer secured Dr. Berger's promise that Graduate Medical Education would uphold the decision to dismiss Dr. Waggel from the program against any appeal and further would support any decision to deny her credit for rotations necessary to effectuate a transfer to another residency program. (April 11, 2016 Email from Dyer to Catapano noting GME promise to affirm decision to terminate Dr. Waggel and back up any decision on credit for residency, Exhibit WW.).

**RESPONSE:** Denied.


**Paragraph 1103.** Although Dr. Waggel did appeal her dismissal from the program, as Dr. Berger promised Dr. Dyer, those appeals were denied. (*See* Waggel Declaration ¶¶ 231-232; Letter of dismissal, dated May 2, 2016, Exhibit XX; Appeals of dismissal, Exhibit YY.)

**RESPONSE:** Denied.


**Paragraph 1104.** Defendants representatives and agents have an obligation to ensure that the institution follows in own policies. (Berger Dep. 27:16-18, Exhibit GGG.)

**RESPONSE:** Denied.

**Paragraph 1105.** The requirements for academic due process, according to the Defendant's policies are notice, opportunity to cure, and a careful and deliberate decision-making process. (Dyer Dep. 15:20-18:8, Exhibit DDD; Dyer Dep. Ex. 2, Exhibit EEE; *see generally* Academic Improvement Policy, Exhibit A; *see generally* ACGME Clinical Competency Committees: A Guidebook for Programs, Exhibit B.)

**RESPONSE:** Denied.

**Paragraph 1106.** GW fails to provide due process if it does not meet its obligations for all three elements of academic due process. (Dyer Dep. 15:20-18:8, Exhibit DDD.)

**RESPONSE:** Denied.

**Paragraph 1107.** Plaintiff's decision to hire an attorney should not have affected the decision-making of by the CCC or any other GW decision-maker. (Berger Dep. 87:19-89:6, Exhibit GGG.)

**RESPONSE:** Denied.

Dated: February 26, 2018                           Respectfully submitted,

JACKSON & CAMPBELL, P.C.

  /s/  Nicholas S. McConnell

Nicholas S. McConnell (# 167742)
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served by the court's electronic filing system and via email on this 26th day of February, 2018, upon:

Jason H. Ehrenberg, Esq.
Peter K. Tompa, Esq.
Bailey & Ehrenberg PLLC
1015 18th Street, N.W.
Suite 204
Washington, D.C. 20036
jhe@becounsel.com
pkt@becounsel.com
*Counsel for Plaintiff*

  /s/ Nicholas S. McConnell

57

3730408v.1