# EXHIBIT RR

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. STEPHANIE WAGGEL, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:16-cv-01412-CKK |
| v. | ) | Hon. Colleen Kollar-Kotelly |
| | ) | |
| THE GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIRST INTERROGATORIES TO PLAINTIFF**

Plaintiff Dr. Stephanie Waggel ("Plaintiff" or "Dr. Waggel") by and through her undersigned counsel, hereby objects and responds to the Defendant George Washington University's ("GW") First Interrogatories to Plaintiff.

**GENERAL OBJECTIONS**

1.    Plaintiff objects to each interrogatory to the extent that it exceeds the requirements set forth by the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Columbia.

2.    Plaintiff objects to each interrogatory to the extent it is overly broad or unduly burdensome.

3.    Plaintiff objects to each interrogatory to the extent it is unreasonably cumulative or duplicative.

due to the fact that those employees of Defendant who had been assigned to work with her on her alleged deficiencies were avoiding her.

Further responding, Plaintiff notes that she had an endoscopy with Dr. James Frank for evaluation of abdominal pain status post renal cell carcinoma. As it turned out the stomach pain and vomiting Plaintiff was suffering (in the months of January, February and March 2016) was actually an ulcer. Dr. Frank informed Plaintiff that the ulcer was most likely the result of stress. Plaintiff suffered another panic attack on March 8, 2016 when – despite Plaintiff having notified the appropriate individuals in advance of an appointment with her urologist (Dr. Jarrett) scheduled for the next day – Dr. Berger instructed Plaintiff to attend a "mandatory" meeting the next day. Plaintiff specifically reserves the right to amend this interrogatory response as her attorneys' investigation into this matter continues and as her medical records become available to her attorneys.

**Interrogatory No. 5:**

5.      With respect to the allegations of Paragraph 3 of the Complaint concerning your kidney cancer (and referenced in other allegations in the Complaint), please state with specificity each visit you had with any health care provider related to the diagnosis and treatment of the cancer, including the full name, address and telephone number of each health care provider, the date, time and length of the visit, the treatment rendered, the nature of any disability arising from the diagnosis and treatment during the period from the visit to the next occasion you were seen by any health care provider for your cancer, whether treatment for the cancer is ongoing, and, if so, the nature and likely duration thereof, and, if not, the last visit you had with a health care provider regarding the kidney cancer.

**Response to Interrogatory No. 5**:

In addition to the foregoing General Objections, Plaintiff specifically objects to this interrogatory on the ground that it is vexatious, overbroad, unduly burdensome, and seeks (in part) information not likely to lead to the discovery of relevant evidence. Subject to the foregoing General and Specific Objections, Plaintiff refers Defendants to her document production (and the forthcoming production of documents that Plaintiff and/or Defendant has/have subpoenaed from Plaintiff's relevant medical providers). Further responding, Plaintiff notes that she and her attorneys are currently awaiting medical documentation from Plaintiff's relevant medical providers and Plaintiff specifically reserves the right to supplement her response to this interrogatory. Subject to the foregoing General and Specific Objections, Plaintiff responds as follows: *see* forthcoming production of Plaintiff's medical records; *see also* Response to Interrogatory No. 8. Further responding, Plaintiff notes that her medical condition(s) significantly impacted several major life activities, including but not limited to working, concentrating, thinking and major bodily functions.

**Interrogatory No. 6:**

6.      Aside from care and treatment for your kidney cancer as alleged in Paragraph 3 of the Complaint (and referenced in other allegations of the Complaint), please identify by full name, business address, and telephone number each and every health care provider and/or mental healthcare provider (individual or entity such as hospital, clinic, or health practice group), you have seen or consulted for your own medical, surgical, mental health or other health-care related services for the ten (10) year period next preceding the date of your response hereto. For each such health care provider, please state the date and reason for the initial visit or consultation, with the provider, the diagnosis you received at the first visit (if any) and the date and nature of all

subsequent diagnoses, any treatment rendered, whether the care and treatment is ongoing and, if

not, the date of your last visit or consultation with the provider.

**Response to Interrogatory No. 6**:

In addition to the foregoing General Objections, Plaintiff specifically objects to this

interrogatory on the ground that it is vexatious, overbroad, unduly burdensome, and seeks (in large

part) information not likely to lead to the discovery of relevant evidence. Plaintiff also specifically

objects to this interrogatory in that the scope/timing is/are overbroad. Subject to the foregoing General

and Specific Objections, Plaintiff refers Defendants to her document production and the forthcoming

production of documents that Plaintiff and/or Defendant has/have subpoenaed from Plaintiff's

relevant medical providers). Included within this production are documents showing Plaintiff's dates

of treatment with her mental healthcare provider. Further responding, Plaintiff notes that she and her

attorneys are awaiting medical records from her relevant medical providers and specifically reserve

the right to supplement this interrogatory response as that information becomes available. *See also*

Response to Interrogatory No. 8.

**Interrogatory No. 7:**

7.      Please identify by full name, address, and telephone number each pharmacy store

or other facility where you have had prescriptions filled for the ten (10) year period next preceding

the date of your response hereto.

**Response to Interrogatory No. 7**:

In addition to the foregoing General Objections, Plaintiff specifically objects to this

interrogatory on the ground that it seeks information not likely to lead to the discovery of

admissible evidence and the time period called for is overbroad. Subject to the foregoing General

and Specific Objections, Plaintiff responds as follows: from August 2005 to August 2009: CVS, 5600 Wilkins Ave, Pittsburgh, PA 15217 Phone: (412) 521-5690.  From August 2009 to August 2010: CVS 1424 Chestnut St, Philadelphia, PA 19102 Phone: (215) 963-9316. From August 2010 to August 2016: CVS 2240 M St NW, Washington, DC 20037 Phone: (202) 296-9876 and Wallgreens Address: 1217 22nd St NW, Washington, DC 20037 Phone: (202) 776-9084.

**Interrogatory No. 8:**

8.    Please describe each and every conversation you had with any faculty or staff member of GW in which you provided information, or documents (if any), concerning your disability and/or any other medical or mental health condition which affected your ability to fulfill the duties of your position in the Psychiatry Residency Program.

**Response to Interrogatory No. 8**:

In addition to the foregoing General Objections, Plaintiff specifically objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Plaintiff further specifically objects to this interrogatory on the basis that it seeks information more readily available to (or, at the very least, equally available to) Defendant, and on the ground that it assumes Plaintiff has a distinct memory of each and every conversation she had with representatives of Defendant regarding her illness. Plaintiff also specifically objects to this interrogatory to the extent it implies or concludes (or seeks to assert a legal conclusion) that Plaintiff was not able to fulfill the duties of her position in Defendant's Psychiatry Residency Program. To the contrary, Plaintiff was at all times relevant hereto fully qualified and capable of fulfilling her duties with or without a reasonable accommodation. Subject to the foregoing General and Specific Objections, Plaintiff notes that she is producing responsive documentation herewith (including recordings of

11

conversations with representatives of Defendant – some of which Plaintiff has attempted to transcribe below as well as emails and text messages). Plaintiff further responds by noting that she states below those oral conversations that she is presently able to recall, and Plaintiff reserves the right to supplement this interrogatory as her attorneys' investigation into this matter is ongoing:

Plaintiff recalls a conversation with Dr. Catapano on or around April 20, 2015. As relevant here, Dr. Catapano called Plaintiff in to meet with her to discuss sexually inappropriate comments made to Plaintiff and other female staff members made by Dr. Terry "TJ" Price. She began asking about this but asked "how are you?" Plaintiff said she was fine. Dr. Catapano said "how are you really" and informed Plaintiff that she had heard about Plaintiff's kidney tumor, from Defendant's internal medicine program director, Dr. Jillian Catalanotti. Plaintiff informed Dr. Catapano that she had a few appointments coming up.

Plaintiff informed Dr. Catapano on or around June 11, 2015, that Plaintiff's second urologist had confirmed that her kidney mass was likely cancer and recommended surgery. Plaintiff informed Dr. Catapano that her medical provider's exact words were "if you were my daughter I would want you to have this surgery as soon as possible." Dr. Catapano stated that Plaintiff would have to arrange this with her. The two were scheduled to meet to speak about the medical diagnosis and need for surgery that day at 4:45pm. At about 8:00 p.m., Dr. Catapano rescheduled the meeting until the next day, at which time Plaintiff informed Dr. Catapano that she had been advised to take off two weeks and remain on light duty for two weeks after that.

Sometime shortly thereafter, Plaintiff scheduled the surgery for July 21, 2015 and informed Dr. Catapano of that fact. Dr. Catapano initially told Plaintiff that she could finish her emergency medicine rotation before her surgery. Plaintiff confirmed this with the Chief Resident of

Psychiatry, Dr. Jason Emejuru. When Plaintiff attempted to arrange this with the Emergency Medicine Chiefs, Dr. Catapano told them to disregard Plaintiff's request. Dr. Emejuru apologized for this.

On June 19, 2015, Plaintiff sent Dr. Catapano and Dr. Emejuru the dates of her leave (Monday, July 20 to Monday August 3, 2015) and provided a note from her surgeon. Plaintiff also informed Dr. Catapano that Mary Tucker needed to talk to her about Plaintiff's schedule. Dr. Catapano did not reply to either message until weeks later, on July 9, 2015, when she informed Plaintiff that she wanted to meet with Plaintiff to go over her semiannual evaluation and clarify Plaintiff's graduation date. Dr. Catapano also informed Plaintiff at that time that Plaintiff would be receiving a letter of deficiency from Dr. Roche from the Emergency Department. .

On July 21, 2015, Plaintiff texted Dr. Catapano from the hospital to say that the tumor looked like cancer and the pathology would come back in a week and that Plaintiff also had a rapid response called as her blood pressure had gone from 84/45 to 160/100 in less than a minute.

On July 24, 2015, Plaintiff informed Dr. Catapano that the pathology results showed that Plaintiff had clear cell carcinoma.

On July 29, 2015, Plaintiff texted Dr. Catapano to inform her that I was she was quite ill and was debating returning to the hospital where her surgery had been performed or waiting for her oncologist appointment for the next day. Plaintiff also informed Dr. Catapano that Plaintiff had looked into working with the GME to make it easier for residents to get medical workups. Plaintiff stated it was very scary how close she had come to being gravely ill, considering clear cell carcinoma does not respond to chemotherapy or radiation.

13

On August 5, 2015, Plaintiff met with Dr. Catapano for her semiannual review (also known as "milestones"), during which Dr. Catapano informed Plaintiff that her new graduation date would be July 14, 2018, because of the days Plaintiff had taken off for her surgery and recovery therefrom.

On August 11, 2015, Plaintiff informed Dr. Catapano that, although Plaintiff was supposed to be on light duty at that time (by her physician's orders), Plaintiff was working harder than regular duty, such that Plaintiff had no time for breaks to eat or rest. Plaintiff had interviewed so many patients that day that lost her voice. Plaintiff was informed that she had seen a record number of patients that day. Despite this, the backup resident and attending refused to come in to assist Plaintiff. Because of all this work, Plaintiff was late for my appointment with the geneticist.

On September 3, 2015, Plaintiff was finally able to meet with Dr. Dyer (with regard to a letter of alleged deficiency). Plaintiff provided him with her doctor's note from June 10, 2015. Dr. Dyer, however, did not talk about the letter of deficiency; mostly he talked about a class he was teaching at that time. Dr. Dyer never followed up with Plaintiff.

Plaintiff met with Dr. Emejuru for coffee at some point in early to mid-October 2015 and told him that was very worried by the fact that GW personnel had treated her differently (negatively) since learning of her cancer diagnosis.

On October 19, 2015, Plaintiff was having musculoskeletal pain indicative of bone metastasis and had to arrange a CT scan which she received on October 21, 2015. Plaintiff followed all protocol and alerted Dr. Catapano.

On October 22, 2015, Plaintiff was informed that, because she took three days off (which were approved at the start of her rotation) and was scheduled to take a licensing exam the following week (as suggested by Plaintiff's Chief Resident), Plaintiff would have to repeat the entire month's

14

rotation. This caused Plaintiff debilitating anxiety. Plaintiff informed the administration that their actions were impeding her medical treatment and causing her severe mental and physical harm. Specifically, around this time, Plaintiff informed Dr. Kels, Dr. Emejuru, Dr. Minor, Ms. Anderson and Dr. Catapano that "the way I had been treated over the last five months has been inhumane" and that their treatment was negativity affecting her physical and mental health such that she needed to take medical leave. Plaintiff also informed Dr. Emejuru, Dr. Griffith, and Ms. Anderson of her belief that she was being punished/treated differently for taking sick days. Plaintiff received no reply from any of them. Plaintiff began to see a therapist strictly to help manage health while dealing with what she perceived as harassment, retaliation and discriminatory treatment by the administration. Plaintiff worked with Defendant's leave administrator and was approved for family and medical leave for the period October 26 through October 30, 2015.  Plaintiff informed Dr. Crone of her FMLA leave at this time. Dr. Crone replied by stating that Plaintiff was not to determine how Defendant would count/characterize her and accused Plaintiff of not following protocol.

On or around October 22, 2015, Plaintiff received a call from Dr. Catapano. Dr. Catapano told Plaintiff that she had taken too many sick days and that she should not come back to work. Plaintiff asked her why she was being punished for taking sick days and Dr. Catapano did not answer. Plaintiff inquired of Dr. Catapano as to how long Defendant would keep her out of work – once again, Dr. Catapano did not answer. Rather, she stated that Plaintiff would be getting another letter of deficiency. During this call, Dr. Catapano informed Plaintiff that "the deans are going to have a legal meeting about you" and "you have taken too much medical leave." Plaintiff subsequently emailed Dr. Catapano asking for a copy of this letter of deficiency. Dr. Catapano did not provide the letter of deficiency until November 11, 2015.

15

Plaintiff met with Dr. Catapano on November 19, 2015, during which Plaintiff was informed that she could return to work. Plaintiff informed Dr. Catapano of her belief that she had been following proper sick leave protocol and asked that no further punishments be brought against her for taking sick days or attending doctor's appointments should the need arise. Dr. Catapano responded by stating that Plaintiff needed to try to schedule appointments for after hours and that Dr. Collins was unhappy with the fact that Plaintiff had missed her class on a few occasions when Plaintiff was ill and/or on forced leave. Plaintiff noted that she had requested the time off in advance and provide a doctor's excuse. Plaintiff spoke with Dr. Collins on November 19, 2015, who confirmed that Plaintiff would be failing her class for missing the past week during her forced leave and the week Plaintiff was out on FMLA leave.

At 10:00 pm on November 19, 2015, after Plaintiff had spoken with Dr. Collins over the phone, Plaintiff emailed Dr. Catapano and Ms. Anderson stating that, on November 7, 2015, while Plaintiff was on approved medical leave and before Plaintiff was placed on forced leave, she was passing Dr. Collins class. Now, for some reason, Plaintiff noted, Dr. Collins was upset with her recent absences and intended to fail Plaintiff. Plaintiff asked Dr. Catapano if she could explain to Dr. Collins the reason for Plaintiff's most recent absence (forced leave) and that the prior absence.

On December 29, 2015, Plaintiff learned from another resident that Defendant had removed Plaintiff's name from the call schedule. Plaintiff had worked very hard to arrange her doctor's appointments according to this schedule and was shocked and dismayed (1) that this had happened, and (2) that she had not been informed by Defendant about this fact. Plaintiff also learned that Defendant had sent out emails with call schedule information to all other residents (but not to Plaintiff). Plaintiff was dismayed and suffered an anxiety attack upon learning this news. Plaintiff's blood pressure was double what it usually was her pulse was 150. Plaintiff's chest

was tight and she had trouble breathing. Plaintiff attempted for an hour to control this reaction but decided to go to the emergency room. There, Plaintiff met Dr. Roche. Plaintiff explained to Dr. Roche that her symptoms began when she discovered from another resident that she had been removed from the schedule.

On December 29, 2015, Plaintiff emailed Dr. Catapano, Dr. Kels, Dr. Emjuru and Ms. Anderson asking them why she had been taken off the call schedule, and why everyone except Plaintiff had been made aware of this fact.

On December 30, 2015, Plaintiff informed Dr. Catapano, Dr. Kels, Dr. Emjuru and Ms. Anderson that, "[s]ince 11/19/15 I have attempted, daily, by phone and email to contact Dr. Kels (and others asking help in contacting Dr. Kels) to work on this remediation plan which I informed her was due in 7 days from Nov 19th. When Dr. Kels was able to meet with me weeks later, Dec. 10th, she stated she could not work with me on this. I stated "If this remediation assignment was significant enough to affect multiple resident's work schedules, why was it not taken seriously by those assigned to supervise me on it?" Plaintiff also noted that "I have repeatedly made administration aware of the fact that this lack of communication and unexplained, unwarranted, punishments have been negatively impacting my health. When my call schedule was changed before at the last minute, I informed administration that I make my doctor's appointments months in advance and it is difficult to rearrange my schedule at the last minute as some of these appointments require months of preparation." Plaintiff informed them that any attempt she made at communication was circular. Plaintiff further noted that "I spend a great deal of time attempting to understand what is going on and it takes a toll on my health. Could this fact please be taken into consideration in the future?"

17

On December 30, 2015, Plaintiff emailed Dr. Catapano, Dr. Kels, Dr. Emejuru, and Ms. Anderson regarding the call schedule and the changes interfering with her ability to schedule medical appointments.

Dr. Catapano responded on January 5, 2016, stating that Dr. Kels had already answered Plaintiff's questions (she had not) and that Dr. Catapano would not say more as to not be redundant.

On January 6, 2016, Plaintiff asked Ms. Anderson (during a conversation in Ms. Anderson's office) for help in getting Dr. Catapano to reply to her in more detail. Ms. Anderson noted her own belief that what was happening was retaliation and that Plaintiff should try to transfer to another residency program. She told Plaintiff not to apply anywhere in northern Virginia, as Dr. Crone had ruined Plaintiff's reputation there.

On January 21, 2016, Plaintiff informed Dr. Catapano and Dr. Kels that their behavior and delay in giving her a schedule was making her ill and of her belief Defendant was violating relevant policies and protocol, and even the law. Plaintiff informed Defendant at that time that she was now represented by counsel. Plaintiff informed Defendant of her belief that she was not being permitted to take vacation days, even though she wanted to use them to attend medical appointments.

On January 22, 2016, Dr. Rashid at NVMHI informed Plaintiff that the GW Psychiatry Department had been informing people to "watch" Plaintiff because she was a "problem resident" and to not allow Plaintiff to leave early to attend medical appointments. Dr. Rashid stated to Plaintiff at this time his belief that Plaintiff was being "picked on."

On or around February 4, 2016, after being shown an email (from Dr. Catapano to various individuals outside of GW) by a nurse at another facility at which Plaintiff had worked, Plaintiff informed Dr. Catapano that "[t]he person who informed me that this was occurring was disgusted by this which is why they chose to let the secret out. I actually vomited uncontrollably when I learned of it. I needed to see a doctor and he recommends an endoscopy. I cannot eat without throwing up and my blood pressure and heart rate have nearly doubled.  You told me months ago it would stop but it continues. As a psychiatrist I plead that you have compassion. I've informed you now for the fifth time this mistreatment is negatively impacting my health. Not only is it physically harming me it violates national residency policies."

On February 13, 2016, Dr. Sarani voiced to Plaintiff his frustration with his attempts to get anyone from Defendant to reply to Plaintiff's efforts to resolve several outstanding issues. He stated that he could not understand what the problem with Plaintiff's department was and informed Plaintiff of his belief that she should transfer programs. He stated that the "atmosphere at GW is no longer conducive to your education."

On February 17, 2016 Plaintiff informed Dr. Alathari (her attending at CATS for the month of February), Ms. Crawford, Dr. Crone, Dr. Catapano and Ms. Anderson that she would be meeting with her doctor to discuss the results of a biopsy. Due to the fact that Plaintiff had been accused of lying a day prior, Plaintiff provided them with the contact information for her primary care physician and for her oncologist to contact (in the event they did not believe Plaintiff). Plaintiff also explained that this appointment had to be made last minute because her doctor was not sure what day the test results would come back. Plaintiff felt obligated to explain every small detail to them to avoid being accused of lying or not following protocol. When Plaintiff returned to CATS, Dr. Alathari spoke to Plaintiff in private. He informed Plaintiff of his belief that what was being

done to Plaintiff was not fair (as no other residents were being put under the microscope like Plaintiff). He stated that in the past there had been residents involved with drugs or committing crimes and even they were not being watched as closely as Plaintiff was. He apologized for the fact that Plaintiff was going through this and stated that perhaps this environment itself was harming her health

On February 18, 2016, Plaintiff gave her grand rounds presentation, which was well received by those in attendance. However, neither Dr. Catapano nor any other members of the administration of Defendant's Psychiatry Department attended (even though they attended the other residents' grand round presentations). Another resident in Plaintiff's class, Dr. Roseblatt, informed Plaintiff that he had overheard Dr. Gandhi and Dr. Slootsky talking about Plaintiff's grand rounds. According to Dr. Rosenblatt, they stated that Dr. Griffith had informed them that nobody was going to go and they alluded to the fact that Defendant expected Plaintiff to have some sort of breakdown during the presentation.

On March 8, 2015, Dr. Berger informed Plaintiff that Dr. Catapano and Dr. Griffith had approved time for her to meet with Dr. Berger the following day. This was less than one day notice for a meeting that originally was scheduled for later in the month. This was problematic because Plaintiff had previously (and timely) notified the relevant representatives of Defendant that she had an important medical appointment scheduled for that exact date. Because Dr. Berger expressed skepticism that Plaintiff, in fact, had scheduled that appointment and needed that appointment, Plaintiff applied again for FMLA leave so that any absence would be excused. Plaintiff forwarded the confirmation to Dr. Catapano and informed Dr. Berger that she would be on FMLA leave and planned to return for the previously scheduled meeting on March 17, 2016. Dr. Catapano, Dr. Griffith and Ms. Tucker were copied on this message. Dr. Berger responded that he would approve

this request and that he was going to confirm with human resources that Plaintiff had indeed applied for FMLA leave (implying to everyone copied on the email that Plaintiff had been untruthful). Dr. Berger threatened that "[i]f you have not been granted FMLA and do not appear for the interview on Thursday at 08:00, I will proceed with the Full Inquiry without your participation."

Plaintiff met with Dr. Berger as originally scheduled on March 17, 2016. Ms. Tucker was also present at this meeting. During the meeting, Plaintiff noted her position that she was being treated differently and felt that it was unfair. Dr. Berger responded with words to the effect that, because Plaintiff had an attorney involved, he had to engage Plaintiff in a way that protected Defendant. Dr. Berger also informed Plaintiff that there were a whole list of things he would like to share with Plaintiff to help her in the residency program but that he could not because Plaintiff now had an attorney and stated words to the effect that Defendant's attorneys had instructed him not to be helpful to Plaintiff. Plaintiff asked Dr. Berger what could happen if there were no attorneys involved (i.e., had she not engaged in protected activity). Dr. Berger responded by stating that: "Dr. Berger: Well then we could have a different kind of conversation. But I don't know how I would feel about it I would have to talk to my attorneys. One way I attempted to get around it is that I talked to Dr. Sarani and said 'hey why don't you talk to Stephanie about...this or that'...it's hard to have a surrogate. We had situations as recent as last year with a trainee who went to a different program and happily moved on her way and we are getting her applications for fellowship. She is super happy."

Plaintiff discussed her desire to transfer to another program in this meeting. Dr. Berger noted his belief that a transfer would be a good use of an attorney. Dr. Berger noted that Plaintiff could speak to other residency programs not mention the appeal or conduct allegations and that he

could work with Plaintiff to come up with a useful final evaluation. Dr. Berger asked what reason Plaintiff was going to give for wanting to transfer and that Defendant did not want Plaintiff to disparage Defendant. [*Plaintiff is producing with her document production a recording of this conversation.*] Plaintiff called Dr. Catapano after her meeting with Dr. Berger and was that she should report to Dr. Griffith immediately. Plaintiff met with Dr. Griffith soon thereafter. Dr. Catapano was at this meeting. [*Plaintiff is producing with her document production a recording of this conversation.*] Plaintiff believes that she spoke with Mary Tucker thereafter.

Plaintiff spoke with Dr. Tarim in mid-April 2016. Plaintiff noted at this time that Defendant's treatment of her was causing her significant anxiety. [*Plaintiff is producing with her document production a recording of this conversation.*] In particular, Plaintiff sought clarification from Defendant regarding her alleged deficiencies. Plaintiff was informed at this time that, indeed, it would be helpful for her to have that clarification.

Plaintiff spoke with Ms. Fair, in Defendant's office of disabilities, in late April 2016 about her feeling that she was being retaliated against by Defendant for attending doctor's appointments. [*Plaintiff is producing with her document production a recording of this conversation.*] The two discussed the letter of reprimand Plaintiff had received as a result of attending an appointment with her physicians in June 2015.

Defendant provided Plaintiff with a letter of dismissal from the residency program (i.e., a letter of termination) on May 2, 2016. Plaintiff appealed this decision on May 16, 2016. Dr. Berger informed Plaintiff on July 13, 2016 that her appeal was being denied. Plaintiff was provided written notice of her final termination in August 2016.

**Interrogatory No. 9:**

9.      Please state with particularity each disability accommodation you requested from GW (i.e., time off, modified work schedule, etc.), the date on which such an accommodation was requested, how that request was made (e.g., orally or in writing), and the response received from GW.

**Response to Interrogatory No. 9:**

In addition to the foregoing General and Specific Objections, Plaintiff objects to this interrogatory on the ground that it is overly burdensome and on the ground that much of the information sought is more readily available (or at least equally available) to Defendant. Plaintiff also specifically objects to this interrogatory to the extent it implies that the only discrimination Plaintiff suffered was Defendant's failure to engage in a good faith effort to accommodate Plaintiff's known disabilities/medical conditions. Plaintiff also specifically objects to this Interrogatory on the basis that it is duplicative of Interrogatory No. 8. Subject to the foregoing General and Specific Objections, Plaintiff notes as follows: *see* responses to Interrogatory Nos. 5, 6, 8 and 10. *See also* Plaintiff's document production.

**Interrogatory No. 10:**

10.      Please identify each and every occasion in which you requested and were denied time off and/or a modified work schedule in order to attend a medical appointment, state the date and time of the medical appointment, the name and address of the health care provider, and whether you were seen by the health care provider on that date.

**Response to Interrogatory No. 10:**

Subject to the foregoing General Objections, Plaintiff responds as follows: see response to Interrogatory No. 8. See also Plaintiff's document production. Further responding, Plaintiff notes her

23

belief that Defendant interfered with her medical care in the following ways. First, Plaintiff was intimidated into rescheduling, missing or being late for many appointments. Plaintiff brought this to the attention of many individuals. Plaintiff contends that she was forced to miss medical appointments on 4/10/15, 7/15/15, 8/3/15, 11/10/15, 11/18/15, 11/30/15, 1/26/16, and 2/11/16.  Plaintiff contends that she was made late for medical appointments on 4/27/15, 5/1/15, 8/11/15, and 10/7/15. Plaintiff further notes that Defendant frequently changed her schedule, although Plaintiff had informed Defendant that she needed to know her schedule in advance to plan doctors' appointments. Plaintiff contends that she was unable to schedule certain medical appointments in a timely manner due to not having a schedule on 7/18/15, 9/30/15, 11/23/15, and in January 2016. Finally, Plaintiff contends that she was penalized for attending doctor's appointments – even when she followed proper protocol. Plaintiff contends that she was punished (1) for appointments attended on 6/10/15 and 7/9/15, (2) for hospitalizations from 7/20/15 to 7/23/15, 8/5/15, 10/19/15 and 10/21/15, (3) and for FMLA leave taken on 10/22/15 to 10/31/16, 3/9/16 to 3/16/16. Plaintiff specifically reserves the right to supplement this response as her attorneys' investigation into this case continues and as documents become available from Plaintiff's medical providers.

**Interrogatory No. 11:**

11.     Do you contend that GW violated the rules, guidelines, provisions, etc. of the Accreditation Counsel for Graduate Medical Education, the Joint Commission on Accreditation of Healthcare Organizations, or the Occupational Health and Safety Act? If so, please identify and describe in detail each and every such violation, including but not limited to each conversation, request, disciplinary measure, statement, or any other action taken by GW, or any of its employees and/or agents that you contend represents a violation.

Plaintiff contends that Defendant violated her resident physician agreement (employment agreement) with Defendant by failing to provide a suitable academic environment. Plaintiff was told by the hospital ombudsperson that the environment of the GW Psychiatry Department was not conducive to her learning. Plaintiff also contends that Defendant violated this agreement in myriad other ways, as noted above (by violating the other policies and practices noted above).

Plaintiff specifically reserves the right to supplement this one as her attorneys' investigation into the case continues and as Defendant's document production.

**Interrogatory No. 12:**

12.    Please identify all individuals who have, or are likely to have, personal knowledge of any fact relevant to the claims and defenses in this case and the subject matter of the knowledge of each such individual.

**Response to Interrogatory No. 12:**

Subject to the foregoing General Objections, Plaintiff directs Defendant to her Initial Disclosures and refers Defendant to her response to Interrogatory Nos. 1-11. Plaintiff also directs Defendant to her responses to Interrogatory Nos. 1 through 12, to the extent any individuals included in these responses were not previously listed on Plaintiff's Initial Disclosures.

**Interrogatory No. 13:**

13.    Have you obtained any written or oral statement or interview from any person relative to the subject incident(s) and/or the losses or injuries you claim in this action? If so, please identify every person from whom a statement or interview was obtained, all persons present during the taking of such interview or statement, and the date(s) said statement(s) or interview(s) were

Dated: February 28, 2017

As to objections:

Bailey & Ehrenberg PLLC

/s/    Jason H. Ehrenberg

Jason H. Ehrenberg
1015 18th Street, N.W., Suite 204
Washington, D.C.  20036
(202) 331-1331
jhe@becounsel.com

*Counsel for Defendant*

As to responses:

**VERIFICATION**

I declare under penalty of perjury that the foregoing responses to interrogatories are true, correct, and answered to the best of my knowledge.

Executed on this _____ day of February, 2017,


Stephanie Waggel

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by email and United States Mail

First Class postage prepaid on this 25th day of February 2017, upon:

> Nicholas S. McConnell
> Jackson & Campbell, P.C.
> 1120 20th Street, N.W.
> Suite 300 South
> Washington, DC 20036
> nmcconnell@jackscamp.com
>
> *Counsel for Defendant*

//s// *Jason H. Ehrenberg*

Jason H. Ehrenberg

48

Dated: February 28, 2017

As to objections:

Bailey & Ehrenberg PLLC

/s/    *Jason H. Ehrenberg*

Jason H. Ehrenberg
1015 18th Street, N.W., Suite 204
Washington, D.C.  20036
(202) 331-1331
jhe@becounsel.com

*Counsel for Defendant*

As to responses:

## VERIFICATION

I declare under penalty of perjury that the foregoing responses to interrogatories are true, correct, and answered to the best of my knowledge.

Executed on this ___28___ day of February, 2017.

Stephanie Waggel

47