# EXHIBIT SS

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DR. STEPHANIE WAGGEL,                          )
                                               )
            Plaintiff,                         )
                                               )    Civil Action No.: 1:16-cv-01412-CKK
      v.                                       )    Hon. Colleen Kollar-Kotelly
                                               )
THE GEORGE WASHINGTON UNIVERSITY,              )
                                               )
            Defendant.                         )

## CLAIMANT'S AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORIES NO. 5, 8-10, & 15

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Court's Scheduling

Order, Plaintiff Stephanie Waggel ("Plaintiff" or "Dr. Waggel"), through undersigned counsel,

hereby objects and provides amended, additional responses to Defendant's Interrogatories

numbered 5, 8-10, and 15 as follows:

### General and Specific Objections

The Plaintiff reincorporates all prior general and specific objections to each interrogatory.

### Amended Response to Interrogatories

**Interrogatory No. 5:**

With respect to the allegations of Paragraph 3 of the Complaint concerning your kidney cancer

(and referenced in other allegations in the Complaint), please state with specificity each visit you had

with any health care provider related to the diagnosis and treatment of the cancer, including the full

name, address and telephone number of each health care provider, the date, time and length of the

visit, the treatment rendered, the nature of any disability arising from the diagnosis and treatment

during the period from the visit to the next occasion you were seen by any health care provider for

RECEIVED

DEC 0 5 2017

JACKSON & CAMPBELL, P.C.

your cancer, whether treatment for the cancer is ongoing, and, if so, the nature and likely duration thereof, and, if not, the last visit you had with a health care provider regarding the kidney cancer.

Amended Response to Interrogatory No. 5:

Plaintiff specifically objects to this interrogatory on the ground that it is vexatious, overbroad, unduly burdensome, duplicative, compound, and seeks (in part) information not likely to lead to the discovery of relevant evidence. In addition, Plaintiff objects because she does not have all of this information in her possession, including the time and length of many of her doctor visits. Further, Plaintiff noted in her original response that she and her attorneys were awaiting medical documentation from Plaintiff's relevant medical providers and Plaintiff specifically reserved the right to supplement her response to this interrogatory. Plaintiff specifically objects to this interrogatory on the ground that the Defendant more readily has the responsive medical records and information in its possession. Subject to the foregoing General and Specific Objections, Plaintiff refers Defendants to its own document production, including patient records of Plaintiff (MFA 1- MFA 52).  Further responding, Plaintiff responds as follows to each of Defendant's separate inquiries:

As to the inquiry, by stating that her medical condition(s) significantly impacted several major life activities, including but not limited to working, concentrating, thinking, regulating her anxiety, and major bodily functions as a resident, and that her condition is ongoing. The condition was diagnosed as renal cell carcinoma, clear cell type, Stage I, Grade II, which started with LLQ abdominal pain in 2014. A CT of the abdomen on April 15, 2015 showed complex cystic mass in the midportion of the left kidney. An MRI of the abdomen on April 24, 2015 showed a cyst classified as Bosniak type 2F and a hepatic cyst. She was referred for a partial nephrectomy (surgery) scheduled on July 20, 2015 by Dr. Thomas Jarrett. She was told that the removed tumor was grade II. She was taking medicine including Concerta, Viibryd, and Aviane. Prior to the surgery, she experienced pain

requiring her to take pain medication, and reported this discomfort to her employer on a number of occasions. She also required frequent doctors' visits, medical scanning and testing (cystoscopy, blood work urinalysis, MRIs, CTs, etc.). Plaintiff also was treated by a therapist on a regular basis beginning on or around September 2015. After the surgery, she continued to experience frequent urination, stomach pain, and was referred for genetic testing, ultrasound, and frequent surveillance to monitor her health, including follow up twice a year for five years for chest x-ray and MRI and other medical appointments. Currently, she continues surveillance of her health and experiences disabilities including frequent urination, anxiety, and other effects as a result of her cancer, treatment, and Defendant's mistreatment and retaliation.

Further, Plaintiff worked with urologists, oncologists, therapists, primary care physicians, and other doctors, including:

Dr. Thomas Jarrett, M.D
Patrick Gomella, M.D., Urology Resident
Department of Urology
2150 Pennsylvania Ave. NW
Washington DC 20037
202-741-3000/3115

Dr. Robert S. Siegel, M.D.
Division of Hematology-Oncology
2150 Pennsylvania Ave. NW
Washington DC 20037
202-741-3000/3115

Marc R. Shepard, M.D.
1145 19th St NW, Ste. 311
Washington D.C. 20036

Elizabeth Stark
Ruth Paul Cancer Prevention Program
Science and Engineering Hall
8th Floor
800 22nd St., N.W.
Washington, DC 20052
202-994-0329

Kathryn C. Humm, MD
Medical Faculty Associates
The George Washington University Medical Faculty Associates
2150 Pennsylvania Ave. NW
Washington DC 20037
202-741-3000

Colleen Roche
The George Washington University Medical Faculty Associates
2150 Pennsylvania Ave. NW
Washington DC 20037
202-741-3000

Ramin Abrahim, MD
Washington Radiology Associates
2141 K Street NW
Washington DC 20037
202-223-9722

Ahalya Premkumar, MD
Washington Radiology Associates
2141 K Street NW
Washington DC 20037
202-223-9722

Richard Sacks, M.D.
Radiologist
George Washington University Medical Faculty Associates ("MFA")
2150 Pennsylvania Ave NW
Washington DC 20037
202-741-3000

Jelena Kecmanovic, PHD
Psychologist
1655 North Fort Myer Dr
7th Floor
Arlington, Virginia 22209
(202) 800-2046

Anita Sikand, MD
OB/GYN
Center for Women's Health
2440 M St. NW Ste 320

Washington DC 20037

Jason D. Engel
Urologist
Urologic Surgeons of Washington
1147 20th St NW
Suite 400
Washington Dc 20036

James H. Frank, MD
Gastroenertologist
1133 21st St NW,
Washington, DC 20036

Robert E. Gutman, MD
Urogynecologist
1145 19th St NW
Washington D.C. 20036

Responsive information, including approximate dates of her medical appointments that she attended, missed, or was late for due to Defendant's actions, as well corresponding physicians, approximate times, treatment plans, diagnoses, and other information if available, is as follows:

Plaintiff missed or canceled appointments with Dr. Shepard on February 2, 2015; July 15, 2015; August 3, 2015; and April 10, 2015, who is her primary care physician. Plaintiff missed an appointment with Dr. Seigel on November 11, 2015. Plaintiff missed appointments for therapy with Dr. Kecmanovic on November 17, 2015; November 18, 2015; November 20, 2015; November 24, 2015; November 30, 2015; December 1, 2015; January 24, 2016; January 26, 2016; February 2, 2016; February 11, 2016; and May 20, 2016.

Plaintiff was late for an appointment with Dr. Engel on or around Friday, May 1, 2015 at around 12:30 p.m.. Plaintiff had blood work, labs collected, and a urine culture taken on November 5, 2015. She attended an appointment with Dr. Jarrett on or around 10:30 a.m. on August 5, 2015. She attended an appoint at Washington Radiology Associates on or around July 16, 2015. She

was late for an appointment with Dr. Jarret on or around 2:45 p.m. on June 10, 2015. She arrived at Washington Radiology Associates for appointments to get CT Scans on or around April 15, 2015; October 12, 2015; October 19, 2015. On May 5, 2015, she underwent a cystoscopy at Urologic Surgeons of Washington, Dr. Engel, on or around 1:00 p.m. May 5, 2015. She attended appointments with Dr. Anita Sikand, her OB/GYN, on or around May 8 and 19, 2015. She missed November 10, 2015 with Dr. Kecmanovic.

Plaintiff attended therapy with Dr. Kecmanovic on or around September 22, 2015; December 3, 2015 (when she also recalls having an appointment at MFA); and around 4 p.m. on October 6, 2015; October 13, 2015; and November 3, 2015. Plaintiff attended appointments with Dr. Shepard, her primary care physician, on or around July 17, 2015; January 5, 2015; November 4, 2015; December 2, 2015; February 3, 2016 (Plaintiff recalls being referred to Dr. Frank for evaluation of stomach pain, vomiting, and related anxiety she was experiencing over the course of days and on that day); and April 13, 2015 (for abdominal pain, and a CT scan was ordered).

Plaintiff attended an appointment with Dr. Siegel for post-operative follow up at approximately 8:30 a.m., on or around July 30, 2015. Plaintiff attended an appointment with Dr. Sikand on or around 2:30 p.m., May 4, 2015. Plaintiff attended an appointment for genetic testing with Ms. Stark on or around September 15, 2015 at 2:30 p.m., and therapy with Dr. Kecmanovic the same day. Plaintiff completed pre-operative paperwork and billing with a GW Hospital nurse anesthesiologist on or around July 9, 2015 and July 10, 2015. Plaintiff may have attended an appointment with Dr. Siegal on or around August 19, 2016. Plaintiff attended an appointment for an MRI at Washington Radiology Associates on or around April 24, 2015 but it was rescheduled for April 27, 2015. Plaintiff underwent an endoscopy at around noon on or around February 12, 2016. Plaintiff attended an appointment with an oncologist at around 8:45 a.m. on or around

August 4, 2016. Plaintiff had labs taken as ordered by Dr, Shepard on or around June 2, 2016. On or around July 19, 2015, she signed advanced directive and pre-operative paperwork at the GW hospital.

Plaintiff attended appointments on or around March 11, 2016 with Dr. Shepard. She underwent a chest x-ray and MRI on or around October 21, 2016. Plaintiff attended an appointment with Dr. Shepard on or around August 24, 2015. Plaintiff attended an appointment with Dr. Frank on or around March 18, 2016; June 6, 2016; February 9, 2016 at around 2:30 p.m.; and February 18, 2016 (to follow up on illness she was feeling including vomiting and stomach pain). She attended an appointment on or around December 17, 2016 with Dr. Gutman (Uro/GYN). She attended therapy with Dr. Kecmanovic on or around September 26, 2015; February 16, 2016; May 12, 2016; January 12, 2016 (approx. 4 p.m.); January 19, 2016 (approx. 4 p.m.); January 05, 2016 (approx. 4 p.m.); March 31, 2016 (approx. 1 p.m.); April 07, 2016 (approx. 2 p.m.); March 10, 2016 (approx. 6 p.m.); April 14, 2016 (approx. 9 p.m.); February 25, 2016 (approx. 5 p.m.); Dr. Kecmanovic (approx. 5 p.m.); and December 15, 2015 (approx. 8 p.m.). Plaintiff attended an appointment with Dr. Shepard on April 4, 2016.

Plaintiff was hospitalized for a laparoscopic partial nephrectomy at GW hospital on July 20, 2015, and was also hospitalized for pre- and post-operative care on or around July 21, 2015- July 23, 2015. She was admitted to the emergency room for chest pain and treated by Dr. Roche on or around December 29, 2015.

Plaintiff missed an appointment with Dr. Kecmanovic on November 23, 2015. Plaintiff was made late for appointments with Dr. Kecmanovic for therapy on or around September 11, 2015; September 29, 2015; October 22, 2015; and January 27, 2016. Plaintiff attended an appointment with Dr. Jarrett at approximately 8:30 a.m. on or around March 9, 2016.

Plaitniff was made late for appointments including with geneticist Ms. Stark at approximately 11:30 a.m on or around August 11, 2015, and for an MRI on or around April 27, 2015; and pre-operative care on July 18, 2015.

Plaintiff underwent a CT which showed a kidney mass, resulting in Dr. Shepard recommending an MRI on or around April 16, 2015. Plaintiff had a panic attack on or around January 10, 2016 and January 20, 2016. Plaintiff attended a therapy appointment with Dr. Keemanovic on or around March 24, 2016. Plaintiff scheduled appointments with Dr. Shepard on August 24, 2016 and May 16, 2016. Plaintiff saw a fertility specialist on 9:45 a.m (Dr. Humm) for issues related to the side effects of her cancer and treatment on May 16, 2016. Plaintiff scheduled an appointment with Dr. Sikand on or around May 19, 2016.

On February 13, 2016, endoscopy results indicated potential spread of her cancer, requiring follow up and surveillance. Plaintiff was on FMLA leave to treat matters related to her illness from March 9, 2016 through March 16, 2016. Plaintiff scheduled an oncology appointment at around 11:30 AM on May 23, 2016. Plaintiff underwent a second endoscopy on or around May 13, 2016. Plaintiff recalls experiencing stomach pain, vomiting, and anxiety on or around January 22, 2016.

This information represents the best of Plaintiff's recollection, and review of relevant documents and testimony produced during discovery that are readily available to opposing counsel, including MFA 1- MFA 52.

**Interrogatory No. 8:**

Please describe each and every conversation you had with any faculty or staff member of GW in which you provided information, or documents (if any), concerning your disability and/or any other medical or mental health condition which affected your ability to fulfill the duties of your position in the Psychiatry Residency Program.

<u>Amended Response to Interrogatory No. 8</u>:

In addition to the foregoing General Objections, Plaintiff specifically objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Plaintiff further specifically objects to this interrogatory on the basis that it seeks information more readily available to (or, at the very least, equally available to) Defendant, and on the ground that it assumes Plaintiff has a distinct memory of each and every conversation she had with representatives of Defendant regarding her illness. Subject to the foregoing General and Specific Objections, Plaintiff notes that she has produced responsive documentation herewith (including recordings of conversations with representatives of Defendant – some of which Plaintiff has attempted to transcribe below as well as emails and text messages). Plaintiff further responds by noting that she states below those oral conversations that she is presently able to recall, and Plaintiff reserves the right to supplement this interrogatory as her attorneys' investigation into this matter is ongoing:

Plaintiff recalls a conversation with Dr. Catapano on or around April 20, 2015. As relevant here, Dr. Catapano called Plaintiff in to meet with her to discuss sexually inappropriate comments made to Plaintiff and other female staff members made by Dr. Terry "TJ" Price. She began asking about this but asked "how are you?" Plaintiff said she was fine. Dr. Catapano said "how are you really" and informed Plaintiff that she had heard about Plaintiff's kidney tumor, from Defendant's internal medicine program director, Dr. Jillian Catalanotti. Plaintiff informed Dr. Catapano that she had a few appointments coming up.

Plaintiff informed Dr. Catapano on or around June 11, 2015, that Plaintiff's second urologist had confirmed that her kidney mass was likely cancer and recommended surgery. Plaintiff informed Dr. Catapano that her medical provider's exact words were "if you were my daughter I would want you to have this surgery as soon as possible." Dr. Catapano stated that

9

Plaintiff would have to arrange this with her. The two were scheduled to meet to speak about the medical diagnosis and need for surgery that day at 4:45pm. At about 8:00 p.m., Dr. Catapano rescheduled their meeting until the next day, at which time Plaintiff informed Dr. Catapano that she had been advised to take off two weeks and remain on light duty for two weeks after that.

Sometime shortly thereafter, Plaintiff scheduled the surgery for July 21, 2015 and informed Dr. Catapano of that fact. Dr. Catapano initially told Plaintiff that she could finish her emergency medicine rotation before her surgery. Plaintiff confirmed this with the Chief Resident of Psychiatry, Dr. Jason Emejuru. When Plaintiff attempted to arrange this with the Emergency Medicine Chiefs, Dr. Catapano told them to disregard Plaintiff's request. Dr. Emejuru apologized for this.

On June 19, 2015, Plaintiff sent Dr. Catapano and Dr. Emejuru the dates of her leave (Monday, July 20 to Monday August 3, 2015) and provided a note from her surgeon. Plaintiff also informed Dr. Catapano that Mary Tucker needed to talk to her about Plaintiff's schedule. Dr. Catapano did not reply to either message until weeks later, on July 9, 2015, when she informed Plaintiff that she wanted to meet with Plaintiff to go over her semiannual evaluation and clarify Plaintiff's graduation date. Dr. Catapano also informed Plaintiff at that time that Plaintiff would be receiving a letter of deficiency from Dr. Roche from the Emergency Department.

On July 21, 2015, Plaintiff texted Dr. Catapano from the hospital to say that the tumor looked like cancer and the pathology would come back in a week and that Plaintiff also had a rapid response called as her blood pressure had gone from 84/45 to 160/100 in less than a minute.

On July 24, 2015, Plaintiff informed Dr. Catapano that the pathology results showed that Plaintiff had clear cell carcinoma.

On July 29, 2015, Plaintiff texted Dr. Catapano to inform her that I was she was quite ill and was debating returning to the hospital where her surgery had been performed or waiting for her oncologist appointment for the next day. Plaintiff also informed Dr. Catapano that Plaintiff had looked into working with the GME to make it easier for residents to get medical workups. Plaintiff stated it was very scary how close she had come to being gravely ill, considering clear cell carcinoma does not respond to chemotherapy or radiation.

On August 5, 2015, Plaintiff met with Dr. Catapano for her semiannual review (also known as "milestones"), during which Dr. Catapano informed Plaintiff that her new graduation date would be July 14, 2018, because of the days Plaintiff had taken off for her surgery and recovery therefrom.

On August 11, 2015, Plaintiff informed Dr. Catapano that, although Plaintiff was supposed to be on light duty at that time (by her physician's orders), Plaintiff was working harder than regular duty, such that Plaintiff had no time for breaks to eat or rest. Plaintiff had interviewed so many patients that day that lost her voice. Plaintiff was informed that she had seen a record number of patients that day. Despite this, the backup resident and attending refused to come in to assist Plaintiff. Because of all this work, Plaintiff was late for her appointment with the geneticist.

On September 3, 2015, Plaintiff was finally able to meet with Dr. Dyer (with regard to a letter of alleged deficiency). Plaintiff provided him with her doctor's note from June 10, 2015 and her cell phone bill. Dr. Dyer, however, did not talk about the letter of deficiency; mostly he talked about a class he was teaching at that time. Dr. Dyer never followed up with Plaintiff.

Plaintiff met with Dr. Emejuru for coffee at some point in early to mid-October 2015 and told him that was very worried by the fact that GW personnel had treated her differently (negatively) since learning of her cancer diagnosis.

On October 19, 2015, Plaintiff was having musculoskeletal pain indicative of bone metastasis and had to arrange a CT scan which she received on October 21, 2015. Plaintiff followed all protocol and alerted Dr. Catapano.

On October 22, 2015, Plaintiff was informed that, because she took three days off (which were approved at the start of her rotation) and was scheduled to take a licensing exam the following week (as suggested by Plaintiff's Chief Resident), Plaintiff would have to repeat the entire month's rotation. This caused Plaintiff debilitating anxiety. Plaintiff informed the administration that their actions were impeding her medical treatment and causing her severe mental and physical harm. Specifically, around this time, Plaintiff informed Dr. Kels, Dr. Emejuru, Dr. Minor, Ms. Anderson and Dr. Catapano that "the way I had been treated over the last five months has been inhumane" and that their treatment was negatively affecting her physical and mental health such that she needed to take medical leave. Plaintiff also informed Dr. Emejuru, Dr. Griffith, and Ms. Anderson of her belief that she was being punished/treated differently for taking sick days. Plaintiff received no reply from any of them. Plaintiff began to see a therapist strictly to help manage health while dealing with what she perceived as harassment, retaliation and discriminatory treatment by the administration. Plaintiff worked with Defendant's leave administrator and was approved for family and medical leave for the period October 26 through October 30, 2015.  Plaintiff informed Dr. Crone of her FMLA leave at this time. Dr. Crone replied by stating that Plaintiff was not to determine how Defendant would count/characterize her and accused Plaintiff of not following protocol.

On November 10, 2015, Plaintiff received a call from Dr. Catapano. Dr. Catapano told Plaintiff that she had taken too many sick days and that she should not come back to work. Plaintiff asked her why she was being punished for taking sick days and Dr. Catapano did not answer.

12

Plaintiff inquired of Dr. Catapano as to how long Defendant would keep her out of work – once again, Dr. Catapano did not answer. Rather, she stated that Plaintiff would be getting another letter of deficiency. During this call, Dr. Catapano informed Plaintiff that "the deans are going to have a legal meeting about you" and "you have taken too much medical leave." Plaintiff subsequently emailed Dr. Catapano asking for a copy of this letter of deficiency. Dr. Catapano provided a November 11, 2015 letter of deficiency which contained many errors, and was revised on November 19, 2015.

Plaintiff met with Dr. Catapano on November 19, 2015, during which Plaintiff was informed that she could return to work. Plaintiff informed Dr. Catapano of her belief that she had been following proper sick leave protocol and asked that no further punishments be brought against her for taking sick days or attending doctor's appointments should the need arise. Dr. Catapano responded by stating that Plaintiff needed to try to schedule appointments for after hours and that Dr. Collins was unhappy with the fact that Plaintiff had missed her class on a few occasions when Plaintiff was ill and/or on forced leave. Plaintiff noted that she had requested the time off in advance and provide a doctor's excuse. Plaintiff spoke with Dr. Collins on November 19, 2015, who confirmed that Plaintiff would be failing her class for missing the past week during her forced leave and the week Plaintiff was out on FMLA leave.

At 10:00 pm on November 19, 2015, after Plaintiff had spoken with Dr. Collins over the phone, Plaintiff emailed Dr. Catapano and Ms. Anderson stating that, on November 7, 2015, while Plaintiff was on approved medical leave and before Plaintiff was placed on forced leave, she was passing Dr. Collins class. Now, for some reason, Plaintiff noted, Dr. Collins was upset with her recent absences and intended to fail Plaintiff. Plaintiff asked Dr. Catapano if she could explain to Dr. Collins the reason for Plaintiff's most recent absence (forced leave) and that the prior absence.

On December 29, 2015, Plaintiff learned from another resident that Defendant had removed Plaintiff's name from the call schedule. Plaintiff had worked very hard to arrange her doctor's appointments according to this schedule and was shocked and dismayed (1) that this had happened, and (2) that she had not been informed by Defendant about this fact. Plaintiff also learned that Defendant had sent out emails with call schedule information to all other residents (but not to Plaintiff). Plaintiff was dismayed and suffered an anxiety attack upon learning this news. Plaintiff's blood pressure was double what it usually was her pulse was 150. Plaintiff's chest was tight and she had trouble breathing. Plaintiff attempted for an hour to control this reaction but decided to go to the emergency room. There, Plaintiff met Dr. Roche. Plaintiff explained to Dr. Roche that her symptoms began when she discovered from another resident that she had been removed from the schedule.

On December 29, 2015, Plaintiff emailed Dr. Catapano, Dr. Kels, Dr. Emjuru and Ms. Anderson asking them why she had been taken off the call schedule, and why everyone except Plaintiff had been made aware of this fact.

On December 30, 2015, Plaintiff informed Dr. Catapano, Dr. Kels, Dr. Emjuru and Ms. Anderson that, "[s]ince 11/19/15 I have attempted, daily, by phone and email to contact Dr. Kels (and others asking help in contacting Dr. Kels) to work on this remediation plan which I informed her was due in 7 days from Nov 19th. When Dr. Kels was able to meet with me weeks later, Dec. 10th, she stated she could not work with me on this. I stated "If this remediation assignment was significant enough to affect multiple resident's work schedules, why was it not taken seriously by those assigned to supervise me on it?" Plaintiff also noted that "I have repeatedly made administration aware of the fact that this lack of communication and unexplained, unwarranted, punishments have been negatively impacting my health. When my call schedule was

14

changed before at the last minute, I informed administration that I make my doctor's appointments months in advance and it is difficult to rearrange my schedule at the last minute as some of these appointments require months of preparation." Plaintiff informed them that any attempt she made at communication was circular. Plaintiff further noted that "I spend a great deal of time attempting to understand what is going on and it takes a toll on my health. Could this fact please be taken into consideration in the future?"

On December 30, 2015, Plaintiff emailed Dr. Catapano, Dr. Kels, Dr. Emejuru, and Ms. Anderson regarding the call schedule and the changes interfering with her ability to schedule medical appointments.

Dr. Catapano responded on January 5, 2016, stating that Dr. Kels had already answered Plaintiff's questions (she had not) and that Dr. Catapano would not say more as to not be redundant.

On January 6, 2016, Plaintiff asked Ms. Anderson (during a conversation in Ms. Anderson's office) for help in getting Dr. Catapano to reply to her in more detail. Ms. Anderson noted her own belief that what was happening was retaliation and that Plaintiff should try to transfer to another residency program. She told Plaintiff not to apply anywhere in northern Virginia, as Dr. Crone and others had ruined Plaintiff's reputation there.

On January 21, 2016, Plaintiff informed Dr. Catapano and Dr. Kels that their behavior and delay in giving her a schedule was making her ill and of her belief Defendant was violating relevant policies and protocol, and even the law. Plaintiff informed Defendant at that time that she was now represented by counsel. Plaintiff informed Defendant of her belief that she was not being permitted to take vacation days, even though she wanted to use them to attend medical appointments.

On January 22, 2016, Dr. Rashid at NVMHI informed Plaintiff that the GW Psychiatry Department had been informing people to "watch" Plaintiff because she was a "problem resident"

and to not allow Plaintiff to leave early to attend medical appointments. Dr. Rashid stated to Plaintiff at this time his belief that Plaintiff was being "picked on."

On or around February 4, 2016, after being shown an email (from Dr. Catapano to various individuals outside of GW) by a nurse at another facility at which Plaintiff had worked, Plaintiff informed Dr. Catapano that "[t]he person who informed me that this was occurring was disgusted by this which is why they chose to let the secret out. I actually vomited uncontrollably when I learned of it. I needed to see a doctor and he recommends an endoscopy. I cannot eat without throwing up and my blood pressure and heart rate have nearly doubled. You told me months ago it would stop but it continues. As a psychiatrist I plead that you have compassion. I've informed you now for the fifth time this mistreatment is negatively impacting my health. Not only is it physically harming me it violates national residency policies."

On February 13, 2016, Dr. Sarani voiced to Plaintiff his frustration with his attempts to get anyone from Defendant to reply to Plaintiff's efforts to resolve several outstanding issues. He stated that he could not understand what the problem with Plaintiff's department was and informed Plaintiff of his belief that she should transfer programs. He stated that the "atmosphere at GW is no longer conducive to your education."

On February 17, 2016 Plaintiff informed Dr. Alathari (her attending at CATS for the month of February), Ms. Crawford, Dr. Crone, Dr. Catapano and Ms. Anderson that she would be meeting with her doctor to discuss the results of a biopsy. Due to the fact that Plaintiff had been accused of lying a day prior, Plaintiff provided them with the contact information for her primary care physician and for her oncologist to contact (in the event they did not believe Plaintiff). Plaintiff also explained that this appointment had to be made last minute because her doctor was not sure what day the test results would come back. Plaintiff felt obligated to explain every small detail to

them to avoid being accused of lying or not following protocol. When Plaintiff returned to CATS, Dr. Alathari spoke to Plaintiff in private. He informed Plaintiff of his belief that what was being done to Plaintiff was not fair (as no other residents were being put under the microscope like Plaintiff). He stated that in the past there had been residents involved with drugs or committing crimes and even they were not being watched as closely as Plaintiff was. He apologized for the fact that Plaintiff was going through this and stated that perhaps this environment itself was harming her health.

On February 18, 2016, Plaintiff gave her grand rounds presentation, which was well received by those in attendance. However, neither Dr. Catapano nor any other members of the administration of Defendant's Psychiatry Department Administration attended (even though they attended the other residents' grand round presentations). Another resident in Plaintiff's class, Dr. Roseblatt, informed Plaintiff that he had overheard Dr. Gandhi and Dr. Slootsky talking about Plaintiff's grand rounds. According to Dr. Rosenblatt, they stated that Dr. Griffith had informed them that nobody was going to go and they alluded to the fact that Defendant expected Plaintiff to have some sort of breakdown during the presentation.

On March 8, 2015, Dr. Berger informed Plaintiff that Dr. Catapano and Dr. Griffith had approved time for her to meet with Dr. Berger the following day. This was less than one day notice for a meeting that originally was scheduled for later in the month. This was problematic because Plaintiff had previously (and timely) notified the relevant representatives of Defendant that she had an important medical appointment scheduled for that exact date. Because Dr. Berger expressed skepticism that Plaintiff, in fact, had scheduled that appointment and needed that appointment, Plaintiff applied again for FMLA leave so that any absence would be excused. Plaintiff forwarded the confirmation to Dr. Catapano and informed Dr. Berger that she would be on FMLA leave and

17

planned to return for the previously scheduled meeting on March 17, 2016. Dr. Catapano, Dr. Griffith and Ms. Tucker were copied on this message. Dr. Berger responded that he would approve this request and that he was going to confirm with human resources that Plaintiff had indeed applied for FMLA leave (implying to everyone copied on the email that Plaintiff had been untruthful). Dr. Berger threatened that "[i]f you have not been granted FMLA and do not appear for the interview on Thursday at 08:00, I will proceed with the Full Inquiry without your participation."

Plaintiff met with Dr. Berger as originally scheduled on March 17, 2016. Ms. Tucker was also present at this meeting. During the meeting, Plaintiff noted her position that she was being treated differently and felt that it was unfair. Dr. Berger responded with words to the effect that, because Plaintiff had an attorney involved, he had to engage Plaintiff in a way that protected Defendant. Dr. Berger also informed Plaintiff that there was a whole list of things he would like to share with Plaintiff to help her in the residency program but that he could not because Plaintiff now had an attorney and stated words to the effect that Defendant's attorneys had instructed him not to be helpful to Plaintiff. Plaintiff asked Dr. Berger what could happen if there were no attorneys involved (i.e., had she not engaged in protected activity). Dr. Berger responded by stating that: "Dr. Berger: Well then we could have a different kind of conversation. But I don't know how I would feel about it I would have to talk to my attorneys. One way I attempted to get around it is that I talked to Dr. Sarani and said 'hey why don't you talk to Stephanie about…this or that'…it's hard to have a surrogate. We had situations as recent as last year with a trainee who went to a different program and happily moved on her way and we are getting her applications for fellowship. She is super happy."

Plaintiff discussed her desire to transfer to another program in this meeting. Dr. Berger noted his belief that a transfer would be a good use of an attorney. Dr. Berger noted that Plaintiff could speak to other residency programs not mention the appeal or conduct allegations and that he could work with Plaintiff to come up with a useful final evaluation. Dr. Berger asked what reason Plaintiff was going to give for wanting to transfer and that Defendant did not want Plaintiff to disparage Defendant. [*Plaintiff has produced with her document production a recording of this conversation.*] Plaintiff called Dr. Catapano after her meeting with Dr. Berger and was that she should report to Dr. Griffith immediately. Plaintiff met with Dr. Griffith soon thereafter. Dr. Catapano was at this meeting. [*Plaintiff has produced with her document production a recording of this conversation.*] Plaintiff believes that she spoke with Mary Tucker thereafter.

Plaintiff spoke with Dr. Tarim in mid-April 2016. Plaintiff noted at this time that Defendant's treatment of her was causing her significant anxiety. [*Plaintiff has produced with her document production a recording of this conversation.*] In particular, Plaintiff sought clarification from Defendant regarding her alleged deficiencies. Plaintiff was informed at this time that, indeed, it would be helpful for her to have that clarification.

Plaintiff spoke with Ms. Fair, in Defendant's office of disabilities, in late April 2016 about her feeling that she was being retaliated against by Defendant for attending doctor's appointments. [*Plaintiff has produced with her document production a recording of this conversation.*] The two discussed the letter of reprimand Plaintiff had received as a result of attending an appointment with her physicians in June 2015.

Defendant provided Plaintiff with a letter of dismissal from the residency program (i.e., a letter of termination) on May 2, 2016. Plaintiff appealed this decision on May 16, 2016. Dr. Berger

informed Plaintiff on July 13, 2016 that her appeal was being denied. Plaintiff was provided written notice of her final termination in August 2016.

In addition to the above, Plaintiff refers Defendant to her Amended Response to Interrogatory Nos. 10 and 15. These topics were elucidated during depositions in this case, and Defendant has equal access to these materials.

### Interrogatory No. 9:

Please state with particularity each disability accommodation you requested from GW (i.e., time off, modified work schedule, etc.), the date on which such an accommodation was requested, how that request was made (e.g., orally or in writing), and the response received from GW.

### Amended Response to Interrogatory No. 9:

In addition to the foregoing Specific Objections, Plaintiff objects to this interrogatory on the ground that it is overly burdensome and on the ground that much of the information sought is more readily available (or at least equally available) to Defendant. Plaintiff also specifically objects to this interrogatory to the extent it implies that the only discrimination Plaintiff suffered was Defendant's failure to engage in a good faith effort to accommodate Plaintiff's known disabilities/medical conditions. Plaintiff also specifically objects to this Interrogatory on the basis that it is duplicative of Interrogatory No. 8. Subject to the foregoing General and Specific Objections, Plaintiff refers Defendant to Amended Responses to Interrogatory Nos. 5, 6, 8, 10, and 15.

Plaintiff requested two weeks off for surgery, two weeks light duty and set days she could schedule follow-up medical appointments. Plaintiff notes that she requested an accommodated work schedule to attend medical appointments, a modified and preplanned work schedule in order to schedule medical appointments, accommodations with respect to attending and passing

didactics courses, assistance coordinating work shifts and medical appointments/procedures, accommodation with respect to judging her work performance, and time off in order to accommodate her cancer treatment, recovery, and therapy appointments with Dr. Kecmanovic. Instead, she was scheduled for heavy work shifts, forced to attend didactics classes, made late for medical appointments, and forced to miss appointments. Overall, Plaintiff was entitled to an interactive process to accommodate her, which she did not receive.

These requests were made by text, email, orally, and in writing. They are also reflected in Doctor's notes produced in this litigation. During her fact deposition, Dr. Lisa Catapano admitted that Plaintiff sought a work place accommodation to attend therapy sessions arising from stress due to her cancer. (Catapano 104:13-106:4.) Dr. Catapano also admitted that she understood that Plaintiff's work was impacted by her medical condition. (*Id.* at 107:4-108:21; 109:4-11.) During his deposition, Dr. James Griffith, Chair of the Psychiatry Program, indicated that that he did not consider the fact that Plaintiff may have suffered from cancer was relevant to judgment of her job performance. (Griffith 37:3-5; 62:8-63:13). Plaintiff also testified that Dr. Catapano told her that she was being taken off rotations for an investigation because she had taken too many sick days for FMLA leave. (Waggel 206:20-207:10).Dr. Waggel also testified that Victoria Anderson told her to focus on her licensure exams rather than on studying for Dr. Griffith's exam because it did not count, though she was later not provided an accommodation for not doing as well as her peers the exam. (Waggel 213:7-9.)

Plaintiff also went to an office she was directed to as the Equal Employment Opportunity Office to submit a request for accommodation. (Waggel 51:17-19; Waggel 77: 4-5). Plaintiff testified during her deposition that at the end of April 2015, she spoke to Dr. Catapano about accommodation. (Waggel 52: 18-22 through 55: 12). Plaintiff testified she notified her chiefs and her medical team of

21

her need to attend appointments prior to April 2015, and her need to take two hours off in the afternoon. (Waggel 54:14-17). Plaintiff testified she notified her employer, including Victoria Anderson, Dr. Catapano, Mary Tucker, and Jason Emejuru, that she needed time off for surgery. (Waggel 56: 8-9). Plaintiff requested two weeks off for surgery recovery and two weeks light duty from Victoria Anderson, Jason Emejuru, and Dr. Catapano. (Waggel 60: 9-12). Plaintiff requested by email on or around June 11, 2015 at 7:23 a.m. to meet with Dr. Catapano in order to discuss accommodation. (Dep. Exh. No. 4). A litany of texts and emails in Defendant's possession also record Plaintiff's attempts to notify the school of her need to attend didactics late, or miss didactics, in order to attend medical appointments, as well as illness she was feeling as a result of her cancer and otherwise related anxiety.

Interrogatory No. 10:

Please identify each and every occasion in which you requested and were denied time off and/or a modified work schedule in order to attend a medical appointment, state the date and time of the medical appointment, the name and address of the health care provider, and whether you were seen by the health care provider on that date.

Amended Response to Interrogatory No. 10:

Subject to the foregoing General Objections, Plaintiff responds as follows: see Amended Response to Interrogatory No. 8. See also Plaintiff's document production. Further responding, Plaintiff notes her belief that Defendant interfered with her medical care in the following ways. First, Plaintiff was intimidated into rescheduling, missing or being late for many appointments. Plaintiff brought this to the attention of many individuals. Plaintiff contends that she was forced to miss medical appointments on 4/10/15, 7/15/15, 8/3/15, 11/10/15, 11/18/15, 11/30/15, 12/1/15, 1/24/16 1/26/16, and 2/2/16, and 1/1/2015. Plaintiff contends that she was made late for medical appointments

on 4/27/15, 5/1/15, 8/11/15, 9/29/15, 10/7/15, and 10/22/15. Plaintiff further notes that Defendant frequently changed her schedule, although Plaintiff had informed Defendant that she needed to know her schedule in advance to plan doctors' appointments. For example, on 10/21/2015, Dr. Waggel informed her supervisor that she was going to attend a medical appointment on 11/10/2015. At 6:15 p.m. on that day, Dr. Catapano informed Plaintiff she had taken too many sick days and that she was not allowed to return to work as a result. Plaintiff did not wish to get in trouble for not going into work and therefore requested a written confirmation that she was, in fact, not to go to work. Dr. Catapano responded affirmatively the next day at approximately 10:30 a.m..

Plaintiff contends that she was unable to schedule certain medical appointments in a timely manner due to not having a schedule on 7/18/15, 10/22/15, 11/23/15, 12/1/15, 12/2/15, 12/3/15, 1/24/2016, 1/26/16, and two appointments in February 2016. Finally, Plaintiff contends that she was specifically penalized for attending doctor's appointments -- even when she clearly followed proper protocol as requested by her supervisor. Plaintiff contends that she was punished in this manner (1) for all appointments she attended, but most particularly on 6/10/15, 7/9/15, and 11/10/2015 (2) for hospitalizations from 7/20/15 to 7/23/15, 8/5/15, 10/19/15 and 10/21/15, (3) and for FMLA leave taken on 10/22/15 to 10/31/16, and 3/9/16 to 3/16/16. Though Plaintiff specifically reserves the right to supplement this response as her attorneys' investigation into this case continues and as documents become available from Plaintiff's medical providers, she has provided additional emails along with this amended response confirming missed appointments on 11/10/15, 11/17/15, and 2/11/16 from her clinical psychologist, Dr. Kecmanovic, received on or around May 19, 2016 at 2:01 PM. (See Attached "Fw Receipt"). In addition, Plaintiff has provided these answers in response to Interrogatory No. 5, including the date of an appointment, medical provider, and whether she was allowed to attend, cancel, or arrive late to those appointments.

<u>Interrogatory No. 15:</u>

Please identify and give the substance of each statement, action or admission against interest, declaration against interest or otherwise which you contend was made by the Defendant or any person whom you allege to be the Defendant's agent, servant and/or employee. Give the name and occupation of each person who has personal knowledge of the making of each such statement, state the place, date and time when each such statement was made, and identify all persons who were present.

<u>Amended Response to Interrogatory No. 15:</u>

In addition to Defendant's responses to Plaintiff's requests for admissions, Plaintiff notes the following additional declarations or admissions against interest.

In an email chain Defendant produced in this litigation, Drs. Griffith and Catapano recognized Plaintiff faced many problems on an overnight call on 6 South (15 admissions; no back up).  Dr. Catapano tells Plaintiff her efforts "heroic," but this incident was later used as a justification to terminate her.  (GW Bates 1506-10.)  In another (GW Bates 2228) Dr. Sarani (ombudsman) notes problem with how CCC handling Plaintiff's case; delays and difficulty in Plaintiff being able to remediate because faculty she is supposed to report to ignore her efforts to reach out to them.

In a March 17, 2016 meeting with Dr. Berger, GW GME Dean and Mary Tucker, GW GME, Dean Berger told Plaintiff he would have to treat her problems differently because she had hired an attorney.  A copy of a tape of this conversation has already been provided to Defendant.

In a May 26, 2016 meeting with Mary Tucker, GW GME, Ms. Tucker stated that a resident cannot be terminated without a predicate reportable action and that Plaintiff had no reportable actions.  A copy of a tape of this conversation has already been provided to Defendant.

24

During her fact deposition, Dr. Lisa Catapano admitted that Plaintiff sought a work place accommodation to attend therapy sessions arising from stress due to her cancer. (Catapano 104:13-106:4.) Dr. Catapano also admitted that she understood that Plaintiff's work was impacted by her medical condition. (*Id.* at 107:4-108:21; 109:4-11.)

During his deposition, Dr. James Griffith, Chair of the Psychiatry Program, indicated that that he did not consider the fact that Plaintiff may have suffered from cancer was relevant to judgment of her job performance. (Griffith 37:3-5; 62:8-63:13).

During his Rule 30 (b) (6) deposition, Dean Berger admitted that the prospect of litigation impacted the CCC's decision-making, causing CCC to reconsider its decision. (Berger 31:1-6.) He also admitted that residents are employees and that Plaintiff was a GW employee. (Berger 49:6-8 and 49:14-16.) Berger also admitted he never formed an opinion as to whether Plaintiff needed an accommodation. (Berger 70:12-16.)

During her Rule 30 (b) (6) deposition, Dr. Lisa Catapano, head of the residency program, indicated that Plaintiff's cancer was not considered a mitigating factor in deciding to dismiss her. (Catapano, 15:15-17.)

During her deposition, Dr. Stephanie Waggel testified that during her orientation and interview, she was told residents could take up to three months leave and still complete the residency program on time. (Waggel 46:19-21.)

Dr. Waggel also testified that Dr. Catapano told her that she was being taken off rotations for an investigation because she had taken too many sick days for FMLA leave. (Waggel 206:20-207:10.)

Dr. Waggel also testified that Victoria Anderson told her to focus on her licensure exams rather than on studying for Dr. Griffith's exam because it did not count. (Waggel 213:7-9.)

Dated: November 29, 2017

Respectfully submitted,

/s/ Jason H. Ehrenberg

Jason H. Ehrenberg (# 469077)
Peter K. Tompa (DC #413752)
BAILEY & EHRENBERG PLLC
1015 18th Street N.W.
Suite 204
Washington, D.C. 20036
T: (202) 331-4209
pkt@becounsel.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by email and United States Mail First Class postage prepaid on this 30th day of November 2017, upon:

Nicholas S. McConnell
Jackson & Campbell, P.C.
1120 20th Street, N.W.
Suite 300 South
Washington, DC 20036
nmcconnell@jackseamp.com

*Counsel for Defendant*

*//s// Jason H. Ehrenberg*
Jason H. Ehrenberg

Dated: November 29, 2017

As to objections:

Bailey & Ehrenberg PLLC

/s/ Jason H. Ehrenberg

Jason H. Ehrenberg (# 469077)
Peter K. Tompa (DC #413752)
1015 18ᵗʰ Street N.W.
Suite 204
Washington, D.C. 20036
T: (202) 331-4209
pkt@becounsel.com

As to responses:

### VERIFICATION

I declare under penalty of perjury that the foregoing responses to interrogatories are true,

correct, and answered to the best of my knowledge.

Executed on this 29 day of November, 2017.

Stephanie Waggel