**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STEPHANIE WAGGEL,<br><br>        Plaintiff,<br><br>   v.<br><br>THE GEORGE WASHINGTON<br>UNIVERSITY,<br><br>        Defendant. | Civil Action No. 16-1412 (CKK) |

**MEMORANDUM OPINION**
(November 9, 2018)

Plaintiff Stephanie Waggel is a former resident in the Psychiatry Residency Training Program of Defendant, The George Washington University. She alleges that through a series of actions culminating in her termination from the program, Defendant violated her rights under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), as well as their local analogues, the District of Columbia Human Rights Act, D.C. Code § 32-501 *et seq.* (the "DCHRA"), and the District of Columbia Family and Medical Leave Act, D.C. Code § 2-1401.01 *et seq.* (the "DCFMLA").

Presently pending before the Court is Defendant's [34] Motion for Summary Judgment, as well as its [41] Motion to Strike Portions of the Declaration of Dr. Stephanie Waggel, M.D. ("Defendant's Motion to Strike"). Today the Court issued a separate [47] Memorandum Opinion, which the Court expressly incorporates herein, that disposed of Plaintiff's [32] Motion for Partial Summary Judgment as to Counts I & II ("Plaintiff's Motion").

Upon consideration of the briefing,[1] the relevant legal authorities, and pertinent portions of the voluminous record in this matter,[2] the Court **GRANTS** Defendant's Motion for Summary Judgment. Because only limited portions of Plaintiff's declaration potentially impact the disposition of Defendant's Motion for Summary Judgment, the Court addresses Defendant's Motion to Strike only narrowly. Accordingly, in an exercise of its discretion, the Court **GRANTS-in-PART, DENIES-in-PART, and DENIES-in-PART as MOOT** Defendant's Motion to Strike. The Court grants the Motion to Strike as to specific language in paragraphs 38, 127, and 128; denies the Motion to Strike as to specific language in paragraphs 98, 107, and 136; and denies the Motion to Strike as moot with respect to the remainder of Plaintiff's declaration.

After setting forth pertinent background and the legal standard, the Court shall begin its analysis with Plaintiff's ADA and DCHRA claims. As with Plaintiff's Motion, the Court shall

---

[1] The Court's consideration of Defendant's Motion for Summary Judgment and Defendant's Motion to Strike has focused on the following documents:

- Def. George Washington University's Mem. of P&A in Supp. of Mot. for Summ. J., ECF No. 34 ("Def.'s Summ. J. Mem.");
- Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 35 ("Pl.'s Summ. J. Opp'n");
- Def.'s Reply to Pl.'s Opp'n to Mot. for Summ. J., ECF No. 42 ("Def.'s Summ. J. Reply");
- Def. George Washington University's Mem. of P&A in Supp. of Its Mot. to Strike Portions of the Decl. of Dr. Stephanie Waggel, M.D., ECF No. 41-1 ("Def.'s Mem. in Supp. of Mot. to Strike");
- Pl.'s Opp'n to Def.'s Mot. to Strike Portions of the Decl. of Dr. Stephanie Waggel, M.D., ECF No. 44 ("Pl.'s Opp'n to Mot. to Strike"); and
- Def.'s Reply Mem. to Pl.'s Opp'n to Mot. to Strike Portions of the Decl. of Dr. Stephanie Waggel, M.D., ECF No. 45 ("Def.'s Reply in Supp. of Mot. to Strike").

Where the parties have submitted corrected or simply late versions of materials, the Court has focused on those versions. *See, e.g.*, Min. Order of Sept. 28, 2018 (granting motions pertaining to certain corrected and late materials). The Court has generally resorted to Bates labeling or ECF page numbers where submissions otherwise lack clear page numbering.

[2] For one indication of the size of the record, note that Defendant's Motion for Summary Judgment contains an assertion of allegedly undisputed, material facts consisting of *977 paragraphs*, with associated citations to record evidence.

again find that Plaintiff failed to request reasonable accommodation of her alleged disability. Plaintiff likewise fails to show that Defendant's Clinical Competency Committee discriminated on the basis of disability when it recommended her termination after reviewing twelve issues with her performance. Plaintiff's FMLA and DCFMLA claims fare no better. Defendant granted FMLA leave each time that Plaintiff requested it. Plaintiff is unable to show that Defendant retaliated against her because of that leave, or that Defendant interfered with Plaintiff's rights under the FMLA.

## I. BACKGROUND

A brief summary of the factual background will suffice before the Court delves into the details relevant to Plaintiff's respective claims. This case concerns Plaintiff's first and second years as a psychiatry resident, culminating in Defendant's termination of her residency effective August 10, 2016. *See, e.g.*, Pl.'s Stmt. of Material Facts for Which There Are No Genuine Disputes in Support of Her Mot. for Partial Summ. J., ECF No. 32-2 ("Pl.'s Stmt."), ¶ 1; Def.'s Resp. to Pl.'s Stmt. of Material Facts in Supp. of Pl.'s Mot. for Partial Summ. J., ECF No. 36-1 ("Def.'s Resp. to Pl.'s Stmt."), ¶ 1. Shortly after beginning her second year in the program, Plaintiff underwent surgery in July 2015 for the removal of a cyst in her kidney. *See* Pl.'s Stmt. ¶¶ 6, 7, 9, 13; Def.'s Resp. to Pl.'s Stmt. ¶¶ 6, 7, 9, 13. She took various kinds of leave from the program during her two years, including sick leave during the surgery and FMLA leave at other times. *See, e.g.*, Def.'s Stmt. of Material Facts as to Which There Is No Genuine Dispute, ECF No. 34 ("Def.'s Stmt."), ¶¶ 230, 274, 531; Pl.'s Corrected Stmt. of Genuine Issues and of Counterveiling Facts, ECF No. 37 ("Pl.'s Resp. to Def.'s Stmt."), ¶¶ 230, 274, 531. In the meantime, Defendant allegedly identified a number of problems with Plaintiff's performance in the program, which were documented in, among other places, four Letters of Deficiency and a Notice of Unprofessional Conduct. *See, e.g.*, Def.'s Stmt. ¶¶ 744, 798-800; Pl.'s Resp. to Def.'s Stmt. ¶¶ 744, 798-800.

Purportedly as a result of these deficiencies, aspects of Plaintiff's clinical duties were suspended multiple times, her promotion to her third year in the program was delayed, and she was ultimately dismissed from the program. *See, e.g.*, Def.'s Stmt. ¶¶ 656, 726, 975, 977; Pl.'s Resp. to Def.'s Stmt. ¶¶ 656, 726, 975, 977.

Plaintiff filed suit on July 7, 2016. Compl., ECF No. 2. Her four-count Complaint alleges violations of the ADA and the FMLA, as well as comparable D.C. statutes. *Id.* Defendant now moves for summary judgment as to all four counts. Def.'s Mot. for Summ. J., ECF No. 34, at 1. Plaintiff's Opposition to Defendant's Motion for Summary Judgment attaches a declaration by Plaintiff that Defendant also moves to strike in part. *See* Pl.'s Opp'n, ECF No. 35-2 (Decl. of Dr. Stephanie Waggel, M.D. ("Waggel Decl.")); Def.'s Mot. to Strike Portions of Decl. of Dr. Stephanie Waggel, M.D., ECF No. 41. A separate opinion, which also issued today, denied Plaintiff's motion seeking summary judgment as to only the first two counts, namely the ADA claim and its D.C. analogue, the DCHRA claim. *See* Mem. Op., ECF No. 47.

Although the Court largely evaluates Plaintiff's Motion and Defendant's Motions separately, the Court—like the parties—draws upon materials submitted in connection with Plaintiff's Motion where such submissions facilitate the Court's consideration of Defendant's Motions.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not assess credibility or weigh evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences . . . drawn in his favor." *Anderson*, 477 U.S. at 255. "If material facts are at issue, or though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)) (internal quotation marks omitted). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In this regard, the non-movant must

"do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

### B. Motion to Strike

Whether *sua sponte* or by motion, a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) & (f)(1), (f)(2). A party seeking such action may move "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." *Id.* 12(f)(2). Courts routinely observe that this remedy is disfavored, presumably because it is often wrongly invoked and may have a significant impact on a party's presentation of its case. *See, e.g.*, *Canady v. Erbe Elektromedizin GmbH*, 384 F. Supp. 2d 176, 180-81 (D.D.C. 2005); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004); 5C Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 1380 (3d ed.) (observing movants' frequently "dilatory or harrassing" [sic] motives to obtain this "drastic remedy"). Movants must discharge a "heavy burden" to prevail. *Canady*, 384 F. Supp. 2d at 180 (citing, e.g., *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) (per curiam)).

Striking material may be warranted in the summary judgment context when a party's declaration or other pleading fails to comply with Federal Rule of Civil Procedure 56. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters asserted." Fed. R. Civ. P. 56(c)(4). In response to a declaration or other component of summary judgment briefing, "[a] party may object that the material cited to

support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id.*

56(c)(2). Among inadmissible evidence is hearsay that is not subject to any exceptions. *See*

*Brooks v. Kerry*, 37 F. Supp. 3d 187, 201 (D.D.C. 2014) (citing, e.g., *Gleklen v. Democratic Cong.*

*Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). Moreover, simply alleging

personal knowledge may not be enough to survive summary judgment if the allegations are "vague

or conclusory." *Johnson v. Perez*, 823 F.3d 701, 710-11 (D.C. Cir. 2016).

Disposition of motions to strike is committed to the "sound discretion of the trial judge."

*Judicial Watch, Inc.*, 224 F.R.D. at 263. When a court decides that some material in a declaration

should be stricken, "all properly stated facts" must remain. *Id.* (citing, e.g., *Evans v. Techs. Apps.*

*& Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)); *see also Canady*, 384 F. Supp. 2d at 180 (quoting

*Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)) (urging use of a "scalpel, not a

butcher knife" (internal quotation marks omitted)).

### III. DISCUSSION

At the threshold, the Court observes that it is not appropriate to decide this matter under

some form of academic or professional deference. *See* Def.'s Summ. J. Mem. at 27. Plaintiff is

suing for employment discrimination and violation of medical leave rights. Defendant wrongly

invokes extraneous contexts where a kind of deference or rational basis standard may apply. *See*

*id.* (citing, e.g., *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) (alleged

constitutional violations); *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 116

(D.D.C. 2014) (Kollar-Kotelly, J.) (alleged breach of contract); *Alden v. Georgetown Univ.*, 734

A.2d 1103, 1109 (D.C. 1999) (same)). Defendant's meager attempt to argue that such a standard

applies in this setting as well is belied by one of this Court's decisions, cited by Defendant, that

expressly applies different standards to the breach of contract and discrimination claims. *See Hajjar-Nejad*, 37 F. Supp. 3d at 115-16, 124-27.

For her part, Plaintiff urges the Court that residents should be treated as employees rather than students for purposes of ADA protections. *See* Pl.'s Summ. J. Opp'n at 38-39 (making administrative law arguments). The Court need not engage in Plaintiff's proposed administrative law analysis, however, for the Court finds that the standards applicable to Plaintiff's claims do not turn on her classification as an employee or student. *See, e.g.*, *Chenari v. George Washington Univ.*, 847 F.3d 740, 746-47 (D.C. Cir. 2017) (citing *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307-08 (D.C. Cir. 2010)) (articulating standard for medical student's reasonable accommodation claim based on hospital employee precedent). Below the Court shall identify the proper standards applicable to each of Plaintiff's claims.

Before turning in earnest to Defendant's Motion for Summary Judgment, the Court shall briefly introduce Defendant's Motion to Strike.

### A. Motion to Strike

In support of its Motion to Strike portions of Plaintiff's declaration, Defendant invokes Federal Rule of Civil Procedure 56, rather than Rule 12(f). Def.'s Mem. in Supp. of Mot. to Strike at ECF p. 1. Rule 56 contemplates that a motion to strike would be unnecessary for a party to express its objections to summary judgment materials. *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendments. In any event, the Court shall consider whether Defendant discharges its burden to show that portions of Plaintiff's declaration should be stricken based on Defendant's objections. *See Canady*, 384 F. Supp. 2d at 180.

Defendant addresses each paragraph of Plaintiff's declaration. Def.'s Mem. in Supp. of Mot. to Strike, Ex. A, ECF No. 41-2 (Def.'s Designation of Inadmissible Material Set Forth in

Pl.'s Decl. ("Def.'s Desig.")).  For those paragraphs that Defendant opposes, Defendant articulates one or more of three general arguments.  First, Defendant argues that Plaintiff lacks personal knowledge of certain events, and therefore the corresponding portions of the declaration should be disregarded as "self-serving" and "unsubstantiated."  Def.'s Mem. in Supp. of Mot. to Strike at ECF p. 3.  Other portions of the declaration purportedly contain impermissible hearsay upon which the Court cannot rely under Rule 56.  *Id.* at ECF p. 4.  And finally, Defendant urges that unjustified inconsistencies between Plaintiff's discovery responses and her present declaration show that the latter is a "sham affidavit," by which Plaintiff attempts to preclude summary judgment by raising frivolous factual disputes.  *See id.* at ECF pp. 2, 4 (citing, e.g., *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160 (D.D.C. 2008) (Kollar-Kotelly, J.), *aff'd sub nom. Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217 (D.C. Cir. 2011)).  Plaintiff responds that she does have personal knowledge, that "[b]y and large," her declaration contains either non-hearsay or permissible hearsay, and that only direct contradictions—which allegedly do not occur here—can warrant striking a declaration.  Pl.'s Opp'n to Mot. to Strike at 2-8 (citing, e.g., *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969)); *see also* Pl.'s Opp'n to Mot. to Strike, Ex. 1, ECF No. 44-1 (Pl.'s Specific Resps. to Def.'s Meritless Objs. to Portions of Decl. of Dr. Stephanie Waggel, M.D. ("Pl.'s Resp. to Def.'s Desig.")).

Some of Defendant's objections are traceable to the fact that Plaintiff generally omits record citations from her declaration.  Even where the Court would expect corroborating evidence to exist, such as when Plaintiff refers to emails, she does not furnish that support.  She refers to the record only in countering specific paragraphs in various of Defendant's declarations.  But the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has made clear that the lack of corroborating evidence in the record is not sufficient reason to grant summary

judgment against a party.  *See Johnson v. Perez*, 823 F.3d at 710-11; *Scott v. Dist. Hosp. Partners L.P.*, 715 F. App'x 6, 7 (D.C. Cir. Mar. 6, 2018) (Mem.).  As discussed above, it is only where a party's uncorroborated allegations are "vague or conclusory" that summary judgment for the counterparty may be warranted on that basis.  *Johnson v. Perez*, 823 F.3d at 710-11.

In light of precedent disfavoring such motions, and the significant burden for Defendant to prevail, the Court shall evaluate Defendant's Motion to Strike only where the Court considers it necessary.  The Court shall address the parties' arguments as to specific paragraphs in Plaintiff's declaration as the Court has need to resort thereto.  The Court finds that it is unnecessary to reach the Motion to Strike in other portions of this Memorandum Opinion.

The Court now shall turn to the briefing of Plaintiff's claims.

**B.  ADA and DCHRA Claims**

Under the ADA, covered entities are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  That discrimination is further defined to include seven different types of activity, including the failure to reasonably accommodate a disability.  *Id.* § 12112(b).  Defendant has not disputed that it is an employer within the scope of the covered entity definition.  *See* Pl.'s Mem. of P&A in Supp. of Pl.'s Mot. for Partial Summ. J. as to Counts I & II, ECF No. 32-1, at 8 (citing 42 U.S.C. § 12111(5)); *see also* 42 U.S.C. § 12111(2).  The DCHRA's prohibitions extend, in pertinent part, to certain employment acts performed "wholly or partially for a discriminatory reason based upon the actual or perceived . . . disability . . . of any individual."  D.C. Code § 2-1402.11(a).  Specifically, it is forbidden

[t]o fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms,

conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee,

when the employer has a discriminatory rationale.  D.C. Code § 2-1402.11(a)(1).

Courts in this jurisdiction have applied the legal analysis developed for ADA claims to DCHRA claims as well.  *See, e.g.*, *Giles v. Transit Emps. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015); *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001) (deeming ADA precedent to be "persuasive" where "comparable sections of DCHRA" are concerned).  Because the parties' arguments do not distinguish between the two statutes, the Court shall consolidate its analysis under the ADA.  *See Minter v. District of Columbia*, 809 F.3d 66, 68 n.2 (D.C. Cir. 2015).

In her Complaint, Plaintiff argues that Defendant failed to accommodate her disability, and that Defendant also discriminated against her in other ways on the basis of her disability. Compl., ECF No. 2 (Counts I & II).  Because the standards for these two types of disability discrimination claims differ, the Court shall deal separately with them below.

### 1. Reasonable Accommodation Claim

Plaintiff's claim that Defendant did not accommodate her disability falls under 42 U.S.C. § 12112(b)(5)(A), which imposes liability on a covered entity for "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  In light of this language, the Court shall refer more generally to Plaintiff's claim as alleging a failure to make reasonable accommodation.  The reasonable accommodation claim is but one type of alleged discrimination under the ADA that is enumerated in 42 U.S.C. § 12112(b). *See Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004).

In this Circuit, courts evaluating reasonable accommodation claims do not apply the *McDonnell Douglas* burden-shifting framework applicable to certain other discrimination claims. *Davis v. George Washington Univ.*, 26 F. Supp. 3d 103, 114 (D.D.C. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Barth v. Gelb*, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993)); *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). Rather, Plaintiff must establish by a preponderance of the evidence "that (1) she was a qualified individual with a disability, (2) the [Defendant] had notice of her disability and (3) the [Defendant] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014) (citing *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307-08 (D.C. Cir. 2010); *Barth*, 2 F.3d at 1186). "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings*, 198 F.3d at 861. A request for accommodation may trigger an "interactive process" to determine what accommodation would be reasonable. *Minter*, 809 F.3d at 69.

The Court dealt at length with Plaintiff's reasonable accommodation claim in the Court's decision today to deny Plaintiff's Motion. *See* Mem. Op., ECF No. 47, at 6-17. After assuming, *arguendo*, that Plaintiff satisfied the first two *Ward* prongs, the Court proceeded to find that "Plaintiff has not discharged her burden to prove, by a preponderance, that she sought accommodation for a disability and was denied that accommodation." *Id.* at 16 (citing *Flemmings*, 198 F.3d at 861). The Court expressly incorporates that decision into the present Memorandum Opinion. Once again, the Court shall find that Plaintiff is unable to discharge her burden to prove these aspects of the third *Ward* prong.

In its opening brief, Defendant does not expressly articulate the standard for a reasonable accommodation claim. But Defendant directly addresses the chief deficiency that the Court

observed today in Plaintiff's prima facie case. "Plaintiff never went to [Defendant's Office of Equal Employment Opportunity ("OEEO")] to pursue the procedure the University offered to all of its residents and other employees to present a claim of disability and a request for any reasonable accommodation they might need." Def.'s Summ. J. Mem. at 3.

Plaintiff responds by incorporating her previous attempt to make out a prima facie case of disability discrimination in her own Motion. *See* Pl.'s Summ. J. Opp'n at 13. As the Court made clear today, Plaintiff need only make out a prima facie case as to one specific type of disability discrimination, namely the failure to reasonably accommodate a disability. *See* Mem. Op., ECF No. 47, at 6-7 (citing, e.g., *Ward*, 762 F.3d at 31); *see also id.* at 17-19 (discussing *Adeyemi* standard for other forms of disability discrimination). Just as Plaintiff did not prove, in briefing her Motion, that Defendant ever denied a request for reasonable accommodation of a disability, so too she fails here to remedy that deficiency in her prima facie case.

Plaintiff's efforts to establish that she made a reasonable accommodation request are two-pronged. Most importantly, Plaintiff claims that she visited the OEEO and made an inquiry:

> On September 17, 2015, Dr. Waggel visited the GWU EEO office located in Rice Hall, Suite 101. At that time, in response to Dr. Waggel's question about policies to protect residents in need of medical leave, Dr. Waggel was told to apply for such leave under the Family Medical Leave Act. (FMLA).

Pl.'s Additional Material Facts, ECF No. 37, ¶ 1017 (citing Waggel Decl. ¶ 98).

At the threshold, the Court considers Defendant's Motion to Strike paragraph 98 of Plaintiff's declaration, which is the only support that she cites for her alleged OEEO visit. The language in the declaration elaborates on her material fact paragraph as follows:

> I went to Rice Hall, Suite 101 to make sure I was following every rule, as I did not want to give administration something to write another LOD about. They stated when it comes to social media, I must be clear to my readers that the views I express are mine and mine alone. Rice Hall, Suite 101, was also the EEO office. I asked them if they knew of any policies to protect residents who needed time off for

> medical leave. They stated that I should apply for Family Medical Leave Act (FMLA) leave. I also asked them if they knew any rules similar the [sic] media policy in that, they might not be that obvious, and explained to him that I was under scrutiny and needed to make sure that I was doing nothing that violated a policy that I was unaware of. They said I should be fine as long as I post a disclaimer on my Facebook page, which I did.

Waggel Decl. ¶ 98. Defendant argues that Plaintiff contradicts prior interrogatory responses that do not refer to an OEEO visit, and that her assertion also contains hearsay. Def.'s Desig. ¶ 98 (citing Def.'s Desig., Ex. 1 (Claimant's [sic] Am. Resp. to Pl.'s [sic] Interrogs. No. 5, 8-10, & 15, ECF No. 41-2 ("Pl.'s Am. Interrogs."), at Interrogs. 8, 9)). Plaintiff points to an assertion in her interrogatories that she "went to an office she was directed to as the Equal Opportunity Office to submit a request for accommodation." Pl.'s Resp. to Def.'s Desig. ¶ 98 (citing Pl.'s Am. Interrogs., Interrog. No. 9, at 21). The Court finds that Defendant has not met the standard for proving Plaintiff's subsequent declaration to be a sham, despite the additional factual detail therein. *See St. Paul Mercury Ins. Co.*, 573 F. Supp. 2d at 160-61 (quoting *Hinch v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries Conducting Sibley Memorial Hosp.*, 814 A.2d 926, 930 (D.C. 2003)) ("For the ['sham affidavit'] doctrine to apply, the affidavit must clearly contradict prior sworn testimony, rather than clarify confusing or ambiguous testimony, and the contradiction must lack credible explanation, such as new evidence." (internal quotation marks omitted)). The Court also shall not exclude the argument as hearsay. The most persuasive reason is not among Plaintiff's bases for challenging the hearsay argument. *See* Pl.'s Resp. to Def.'s Desig. ¶ 98. Rather, the statement about what Plaintiff was allegedly told at the OEEO is arguably an admission by a party opponent. *See* Fed. R. Evid. 801(d)(2)(D) ("The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ."). Accordingly, in an exercise of the Court's discretion, the Court shall *not* strike language from paragraph 98 of Plaintiff's declaration.

But Plaintiff's alleged visit to the OEEO fails on its merits. Defendant denies having any documentation of such a visit, whether on September 17, 2015, or at any other time, and likewise denies that Plaintiff ever requested an accommodation of a disability. Def.'s Resp. to Pl.'s Assertion of Additional Material Facts Allegedly Requiring Jury Trial, ECF No. 42-1, ¶ 1017 (citing Def.'s Mot. for Summ. J., Ex. P, ECF No. 34-20 (Decl. of Vickie V. Fair, ¶¶ 12-13)). Moreover, Plaintiff does not even allege that she notified the OEEO of a potential disability and requested accommodation of it. In the Court's decision today disposing of Plaintiff's Motion, the Court discussed at length Defendant's efforts to make Plaintiff aware of the process for notifying and requesting reasonable accommodation of a disability. *See* Mem. Op., ECF No. 47, at 9-10. The Court concluded that there was insufficient evidence that Plaintiff ever made such a request, such as by submitting the form that she identified. *Id.* at 12. The above-quoted paragraph from her declaration, recording an alleged inquiry about medical leave, is not sufficient evidence of a discussion of a disability or reasonable accommodation thereof, much less an actual request for such an accommodation. Accordingly, Plaintiff cannot establish her prima facie case of the denial of reasonable accommodation by referring to the alleged OEEO visit.

Apart from the alleged visit to the OEEO, Plaintiff also claims that she "asked for a modified work schedule, including a couple of hours off each week to attend medical appointments for her cancer and related-anxiety and a modified work schedule when she returned from surgery." Pl.'s Summ. J. Opp'n at 15. Such a claim suggests a rather formal request for accommodation. But that claim is devoid of citation. The record is, by contrast, replete with evidence of Plaintiff's informal requests for time off for medical appointments and with Defendant's informal efforts to grant them. *See, e.g.*, Def.'s Stmt. ¶¶ 375-77 (psychotherapy appointments); Pl.'s Resp. to Def.'s Stmt. ¶¶ 375-77. If Plaintiff was sometimes late for doctor's appointments or otherwise had

difficulty scheduling them—and if there is any basis for arguing that such issue arose in connection with her enrollment in Defendant's program—she has no legal grounds to complain. *See* Pl.'s Summ. J. Opp'n at 18-19 (raising various qualms). After all, despite being informed of the OEEO, Plaintiff has not identified any evidence that she ever asked the OEEO for accommodation of a disability. *See, e.g.*, Def.'s Mot. for Summ. J., Ex. B, ECF No. 34-6 (Decl. of Jeffrey Berger, M.D., Ex. #7) (email from Plaintiff to Dr. Catapano in Nov. 2015 noting that she was "given the option of contacting the [OEEO]," apart from channels specific to FMLA leave). Her argument that she "was specifically penalized for attending doctor's appointments" likewise goes nowhere absent any evidence that she in fact experienced any penalty, much less one tied to the medical appointments. Pl.'s Summ. J. Opp'n at 18-19 (citing merely administrator's comment that mounting absences may affect ability to pass rotation).

In its Reply, Defendant reiterates that Plaintiff has never established that she requested accommodation of a disability from Defendant's OEEO. *See* Def.'s Summ. J. Reply at 1-3 (citing *Chenari*, 847 F.3d 740).

The Court of Appeals has contemplated that "there may well be cases where the plaintiff's need for an accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *Chenari*, 847 F.3d at 748. Like the Court of Appeals in *Chenari*, however, this Court need not decide whether this is one of those cases. *See id.* Defendant granted her requests for FMLA leave, and Defendant strove to comply with her informal requests for other types of scheduling adjustments and time off for appointments. *See, e.g.*, Def.'s Stmt. ¶¶ 231-40 (coordination of schedule surrounding surgery); Pl.'s Summ. J. Opp'n at 23, 25 (conceding that FMLA leave requests were granted). Plaintiff is once again unable to show that Defendant ever denied any request for reasonable accommodation of a disability that Plaintiff made, whether

formally through the Office of Equal Employment Opportunity, or informally, assuming, *arguendo*, that an informal request could suffice.  *See* Mem. Op., ECF No. 47, at 12-17.

Plaintiff invokes the comments of two administrators in an apparent attempt to create a dispute of material fact.  She claims, in pertinent part, that Dr. James Griffith, chair of Defendant's Department of Psychiatry and Behavioral Science, disavowed "any responsibilities to accommodate Dr. Waggel's illness or related-anxiety."  Pl.'s Summ. J. Opp'n at 17 (citing Pl.'s Stmt. ¶¶ 93-94) (emphasis omitted).  The Court previously rejected any notion that Dr. Griffith's "agnostic" attitude regarding whether Plaintiff had cancer is direct evidence of disability discrimination.  *See* Mem. Op., ECF No. 47, at 18-19.  Furthermore, she suggests that Dr. Lisa Catapano, Director of the Psychiatry Residency Training Program, was wrong when she "made clear that doctors often get sick and ought to deal with their illness without expectation of accommodation."  Pl.'s Summ. J. Opp'n at 17-18 (citing Pl.'s Summ. J. Opp'n, Ex. OOO, ECF No. 35-8 (Dep. of Dr. Stephanie Waggel ("Waggel Dep.") at 54:13-16, 237:1-12)) (emphasis omitted).  Plaintiff's deposition testimony does not support this characterization of Dr. Catapano's comments.  In any event, Dr. Griffith's comments, and Dr. Catapano's alleged comments, are immaterial to Plaintiff's reasonable accommodation claim.  As discussed above, she did not request accommodation of an alleged disability.  Accordingly, Defendants' administrators were correct to imply that they lacked any obligation to provide an accommodation.  Defendant granted Plaintiff's requests for FMLA leave.  Its various attempts to grant Plaintiff's further, informal requests for schedule adjustments went beyond the call of duty.

## 2. Other Alleged Disability Discrimination

The wisdom of issuing separate memoranda to decide Plaintiff's and Defendant's summary judgment motions lies in part with the parties' differing approaches to claims of other alleged disability discrimination.

In its Memorandum Opinion disposing of Plaintiff's Motion, the Court addressed Plaintiff's claim that she experienced other forms of disability discrimination as well as a failure to accommodate her disability. Although Plaintiff attributed six alleged adverse actions to disability discrimination, the Court illustrated by reference to one—vacation time—that Plaintiff was unable to discharge her burden. *See* Mem. Op., ECF No. 47, at 19-22. Defendant's motion focuses instead on the rationale for Plaintiff's dismissal, relying on a discussion of the events precipitating that decision.

"Putting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Plaintiff may establish her claim by either direct or circumstantial evidence of discrimination. *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (assessing racial discrimination claim under Title VII of the Civil Rights Act of 1964 ("Title VII")), *aff'd sub nom. Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008). "While courts have not precisely defined what constitutes 'direct evidence,' it is clear that 'at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself.'" *Brady v. Livingood*, 456 F. Supp. 2d at 6 (quoting *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996)). Indeed, "[d]irect evidence of discrimination is evidence that, if believed by

the fact finder, proves the particular fact in question *without any need for inference*." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (quoting *Davis v. Ashcroft*, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005)) (internal quotation marks omitted). Plaintiff does not expressly argue that there is direct evidence of discrimination; the Court nevertheless shall consider pertinent comments by Defendant's administrators in the course of its analysis below.

Finding no direct evidence, the Court historically would evaluate whether Plaintiff makes out a prima facie case under *McDonnell Douglas* that each of the Defendant's adverse actions was attributable to an alleged disability, in violation of a specific statutory or regulatory requirement. *See McDonnell Douglas Corp.*, 411 U.S. at 802 (Title VII context). But *Adeyemi* has made clear that, at least in this Circuit, "the prima-facie-case aspect of *McDonnell Douglas* is irrelevant [in the ADA context] when an employer has asserted a legitimate, non-discriminatory reason for its decision—as an employer almost always will do by the summary judgment stage of an employment discrimination suit." *Adeyemi*, 525 F.3d at 1226; *see also Brady v. Office of Sergeant at Arms*, 520 F.3d at 494 (Title VII context).

Plaintiff alleges that Defendant discriminated in more than just the dismissal itself. Because the Court evaluates Defendant's justification first, under *Adeyemi*, the Court shall walk through the detailed chronology that Defendant presents to justify its ultimate decision to terminate Plaintiff from the residency program. That approach shall enable the Court to address, along the way, Plaintiff's contentions about individual incidents, including any argument that Defendant's purported rationales for various actions are pretextual. *See Adeyemi*, 525 F.3d at 1226.

### i. Clinical Competency Committee Meeting on April 8, 2016

Defendant argues that Plaintiff's dismissal was based on the "longstanding, thoroughly documented, objectively framed failures of performance on Dr. Waggel's part, her refusal to

acknowledge the deficiencies, and her refusal to attempt to remediate them." Def.'s Summ. J. Mem. at 29. Allegedly Defendant's Clinical Competency Committee ("CCC" or the "Committee") carefully considered this record during its April 8, 2016, meeting that resulted in a recommendation that Plaintiff be terminated from the program. *Id.* at 29-30.

Given the extensive record of events transpiring between Plaintiff and Defendant, the Court sought a definitive list of indicia that it ought to consider in evaluating whether Defendant's decision to terminate Plaintiff was legitimate and non-discriminatory. The Court found that list in the minutes of the CCC's meeting. Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-5 (Decl. of Lisa A. Catapano, M.D., Ex. #178) ("CCC Minutes"); Def.'s Stmt. ¶ 912. Plaintiff does not dispute Defendant's assertion of material facts that introduces these meeting minutes. Pl.'s Resp. to Def.'s Stmt. ¶ 912.

The minutes of the April 8, 2016, meeting reflect the Committee's discussion of procedural developments in February and March 2016. CCC Minutes at 1-2. Of note, Dr. Catapano, as program director, was designated as an *ex-officio* member of the Committee in order to correct a procedural flaw in the CCC's previous "consensus decision" that Plaintiff should not be promoted to her third year in the program. *Id.* Dr. Richard Simons, Defendant's Senior Associate Dean for M.D. Programs, had recognized the procedural issue upon Plaintiff's appeal of the decision to deny promotion. *See id.* at 2; Def.'s Stmt. ¶¶ 854-57, 865-67; Pl.'s Resp. to Def.'s Stmt. ¶¶ 854-57, 865-67.[3] According to Dr. Simons, Defendant's Academic Improvement Policy dictated that the non-promotion decision be based on a recommendation from the Committee to Dr. Catapano. CCC Minutes at 2; *see also* Def.'s Stmt. ¶¶ 865-67; Pl.'s Resp. to Def.'s Stmt. ¶¶ 865-67; Def.'s

_____

[3] Prior to Dr. Simons' review, a designated independent physician reviewer found the decisions to deny promotion and to deny credit for two courses to be reasonable. *See, e.g.*, CCC Minutes at 2; Def.'s Stmt. ¶ 827; Pl.'s Resp. to Def.'s Stmt. ¶ 827.

Mot. for Summ. J., Ex. A, ECF No. 34-3 (Decl. of Lisa A. Catapano, M.D., Ex. #12) ("Academic Improvement Policy"). Despite an October 23, 2015, meeting of the CCC at which Plaintiff's performance was discussed, Dr. Simons found that there was no formal recommendation to deny promotion prior to Dr. Catapano's issuance of a Letter of Deficiency to Plaintiff on November 11, 2015, conveying this decision. Def.'s Mot. for Summ. J., Ex. R, ECF No. 34-22 (Decl. of Richard J. Simons, M.D., Ex. 3, at GWU 002495) ("Simons Letter").[4] Dr. Simons' review did not concern the merits of the decision to deny promotion; rather, his task was limited to reviewing the Psychiatry Residency Training Program's decisionmaking process. Def.'s Stmt. ¶ 857; Pl.'s Resp. to Def.'s Stmt. ¶ 857. Moreover, he left open the possibility that the program could deny promotion again if the Committee met formally and recommended as much to Dr. Catapano. *See* Def.'s Stmt. ¶ 870; Pl.'s Resp. to Def.'s Stmt. ¶ 870; Simons Letter at GWU 002496.[5]

As of the April 8, 2016, meeting, the seven members of the Committee consisted of its chairman, Dr. Allen R. Dyer, Dr. Catapano as an *ex-officio* member, four other doctors, and the residency coordinator, Victoria Anderson. CCC Minutes at 1.[6] In keeping with Dr. Simons' decision, that Committee formally reviewed Plaintiff's performance and then, with Dr. Catapano abstaining, voted unanimously not only to "re-affirm[ ]" "previous letters of deficiency and [the]

---

[4] The letter mistakenly refers to an October 23, *2016*, meeting and November 11, *2016*, letter of deficiency. That mistake is evident from the March 25, 2016, date of the letter, as well as the other facts in the record.

[5] Dr. Simons' letter upon the conclusion of his review stated that he was "referring this matter back to [Plaintiff's] department and Program Director." Simons Letter at GWU 002496. He specifically indicated that "[t]he Clinical Competency Committee needs to meet to conduct a review of your performance and make recommendations to your Program Director to determine your status in the program." *Id.*

[6] Those four doctors were Eindra Khin Khin, Catherine Crone, Lorenzo Norris, and Lori Kels. CCC Minutes at 1. Dr. Kels was absent from the April 8, 2016, meeting due to maternity leave. *Id.*

associated recommendation for non-promotion" but also to recommend Plaintiff's termination from the residency program. *Id.* at 4. The following analysis details the Committee's decisionmaking process at the April 8, 2016, meeting.

Turning to the substantive portion of the meeting, Dr. Catapano began by "review[ing] the chronology relating to Dr. Waggel's performance through December 2015." *Id.* The minutes then recognize the above-described procedural developments in Plaintiff's file before proceeding to "additional performance and misconduct issues that have arisen since January 2016" regarding Plaintiff. *Id.* at 2-3. Such consideration resulted in the Committee's unanimous decision to recommend to Dr. Catapano—who abstained from the vote—that Plaintiff be dismissed from the program and suspended from clinical duties in the meantime. *Id.* at 3. It is this decision that should be evaluated for legitimate, non-discriminatory rationale.

Below the Court considers the twelve performance issues listed in the CCC Minutes leading up to the vote to recommend Plaintiff's dismissal. In the interest of judicial economy, the Court shall, upon determining that such rationales are legitimate and non-discriminatory, consider any argument by Plaintiff that Defendant's rationales are pretextual.[7] Interestingly, Plaintiff's brief expressly points to "pretextual" rationales for several actions only in the course of her FMLA argument. *See* Pl.'s Summ. J. Opp'n at 27. That said, the Court also notes Plaintiff's claim, in a footnote, that a CCC performance review dated February 9, 2016, demonstrated "discriminatory" intent. *Id.* at 6 n.4. Notwithstanding Plaintiff's mischaracterizations of the record, the issues raised in the cited performance review are part and parcel of the CCC's discussion at its April 8, 2016, meeting. *See* Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., Ex.

---

[7] Plaintiff does not expressly argue that Defendant had a mixed motive; rather, it appears to be an all-or-nothing proposition.

#11, at GWU 001115-17). The Court shall consider whether Defendant's purportedly legitimate and non-discriminatory rationales for its handling of each of the twelve performance issues discussed at the April 8, 2016, meeting are based on facts that Plaintiff does not dispute. Only if Defendant can surmount that hurdle shall the Court consider Plaintiff's various arguments for withholding summary judgment for Defendant on her ADA/DCHRA claims, notwithstanding the absence of any argument that the CCC acted with pretext when it recommended her dismissal on April 8, 2016.

ii.    CCC Minutes Issue #1: First Letter of Deficiency

The first of the twelve performance issues identified in the CCC Minutes of April 8, 2016, concerns Plaintiff's first Letter of Deficiency ("LOD"): "Dr. Waggel received a Letter of Deficiency (LOD) from the Department of Psychiatry on July 15, 2015, for not showing up for an ER shift June 10, 2015." CCC Minutes at 1.

Citing deficiencies in Professionalism and Systems-Based Care, Defendant's first LOD indicates that Plaintiff did not show up at 7:00 AM on June 10, 2015, for an Emergency Medicine shift, did not give notice that she would be absent, was not responsive to efforts to reach her over the course of several hours, and upon contact at last "stated [she] [was] not feeling well and decided not to come to work as a result." Def.'s Mot. for Summ. J., Ex. L, ECF No. 34-16 ("LOD 1"). Plaintiff disputes or offers "clarification" regarding a number of Defendant's assertions of material fact related to this incident. *See* Pl.'s Resp. to Def.'s Stmt. ¶¶ 213-19, 243, 252, 277-81, 283. But she does not dispute the material points, namely that she showed up at approximately 9:00 AM rather than 7:00 AM, and that she received the letter from Dr. Catapano about this incident. *Id.* ¶¶ 213, 279. Although Plaintiff argues that she "was told that off service residents like her are not required to attend grand rounds," which evidently took place from 7:00-9:00 AM, her only source

is her declaration. *Id.* ¶ 213 (citing Waggel Decl. ¶ 38). That declaration supplies no further details, such as who allegedly gave her this information, when she was told, and whether she was told that she would need to give notice if she decided not to attend grand rounds. Moreover, Plaintiff never claims that she gave notice that she would be absent from grand rounds that morning. She simply refers instead to irrelevant attempts to secure coverage for the tail-end of her shift that afternoon. *See* Pl.'s Resp. to Def.'s Stmt. ¶ 215 (citing Waggel Decl. ¶ 39).

Defendant's letter offers a legitimate explanation of why her performance on the morning of June 10, 2015, was considered deficient. That explanation has nothing to do with any sickness Plaintiff may have had that morning, nor with any alleged disability that Plaintiff may have had then or afterwards.

In rebuttal, Plaintiff nevertheless attempts to conflate the events on the morning of June 10, 2015, with her alleged disability. When Dr. Catapano informed Plaintiff in July 2015 that the LOD was forthcoming, Plaintiff indicated that she had "a doctor's excuse for that day." Def.'s Stmt. ¶¶ 249, 251-52 (internal quotation marks omitted). But Plaintiff indicates that her supposed doctor's note concerns "receiving a cancer diagnosis." Pl.'s Resp. to Def.'s Stmt. ¶¶ 249, 251-52. That diagnosis—the Court need not decide whether it was a diagnosis of cancer—did not occur on that morning. Plaintiff had an appointment in the afternoon with Dr. Thomas Jarrett, the doctor who gave his opinion on the cyst that led to her surgery. Def.'s Stmt. ¶¶ 220-22; Pl.'s Resp. to Def.'s Stmt. ¶¶ 220-22; *id.* ¶ 215 (discussing afternoon appointment with Dr. Jarrett). The Court notes with disapproval Plaintiff's obfuscation.

There is no genuine dispute of material fact regarding Defendant's issuance of a LOD regarding Plaintiff's actions on the morning of June 10, 2015, nor does the Court find any discriminatory basis for that letter. Lastly, the Court notes that this first LOD sets out a plan for

remediation and closes with the following language that put Plaintiff on notice—if she had not been already—of potential future consequences: "Should you continue to exhibit deficiencies, the Program reserves the right to seek further action, *including termination from training* as set forth in the GW Academic Improvement Policy (attached)." LOD 1 (emphasis added).

In the alternative to evaluating LOD 1 in light of Plaintiff's declaration, the Court considers whether Defendant discharges its burden to show that the pertinent portion of Plaintiff's declaration should be stricken. That portion is Plaintiff's assertion that "[e]mergency medicine has grand rounds on Wednesdays in the morning until 9:00 a.m. I was told that offservice residents did not have to attend." Waggel Decl. ¶ 38. This assertion is buried in a paragraph of the declaration that concerns various incidents on June 10, 2015. Although Defendant does not pair its objections to paragraph 38 with specific portions thereof, the Court assumes that its hearsay and "[s]elf-serving and without corroboration" objections apply to the portion of her statement which concerns the Court. Def.'s Desig. ¶ 38.

Plaintiff responds in pertinent part that it is "[n]ot hearsay to the extent it describes what she did that day and why." Pl.'s Resp. to Def.'s Desig. ¶ 38. This argument is problematic. If the reason for Plaintiff's assertion of what she was told is "to prove the truth of the matter asserted," then the statement is hearsay. Fed. R. Evid. 801(c)(2). She has not articulated a hearsay exception. Whereas if Plaintiff truly does *not* offer the statement to prove what she was told, but only to explain her actions, then Plaintiff has not supplied sufficient explanation of why she did not appear at 7:00 AM on June 10, 2015. For example, Plaintiff says nothing about the assertion, which Defendant alleges she made at the time, that she could not come in because she was not feeling well that morning.

Plaintiff does appear to explain at least some of what she was doing that morning, but even the following explanation does not undermine Defendant's assessment that she was missing-in-action. In Plaintiff's declaration, she refers to the need to make certain medical arrangements in connection with an afternoon medical appointment. *See* Waggel Decl. ¶¶ 38-39. By the placement of this assertion in paragraph 39, she intimates that she had to do so—or, in any event, that she did so—before 9:00 AM. *See id.* ¶ 39. The required arrangements are something she "found [out] that morning." *Id.* But even if the medical arrangements do explain why Plaintiff was absent, which the Court need not decide, her declaration says nothing about why she evidently did not give notice to her colleagues or respond to their alleged efforts to reach her.

Moreover, Plaintiff's passive-voice assertion about being told is simply too vague to survive summary judgment. *See Johnson v. Perez*, 823 F.3d at 710-11. Who told her that she did not need to show up? Even if Plaintiff could not remember the name, Plaintiff could have at least indicated whether she learned this information from a supervisor or a peer. As it is, her purported evidence lacks sufficient detail to create a genuine dispute.

For the foregoing reasons, and in an exercise of the Court's discretion, the Court STRIKES from paragraph 38 of Plaintiff's declaration the two sentences collectively asserting that she was told that she would not need to be present before 9:00 AM on a day with grand rounds.

Whether the Court evaluates LOD 1 with or without Defendant's Motion to Strike, the outcome is the same. The Court again finds that Defendant has asserted a legitimate, non-discriminatory basis for its actions in issuing LOD 1, and Plaintiff has not shown that its explanation is pretextual.

According to the April 8, 2016, minutes, "Dr. Waggel received another LOD on October 28, 2015 from Dr. Jeffrey Berger, Associate Dean for Graduate Medical Education, for failing to submit required documentation for hospital health forms despite having been granted extension of the deadline for submission."  CCC Minutes at 1-2.

Citing a deficiency in Professionalism, Defendant's second LOD indicates that Plaintiff was notified in April 2015 of a list of requirements for the following academic year, including a September 30, 2015, deadline for an annual health clearance form, but she did not comply either by that deadline or an extended deadline of October 14, 2015.  Def.'s Mot. for Summ. J., Ex. B, ECF No. 34-6 (Decl. of Jeffrey Berger, M.D., Ex. #2) ("LOD 2"); Def.'s Stmt. ¶ 545.

Plaintiff does not dispute that she was required under District of Columbia law to have such a health clearance and to complete it by the deadline.[8]  Def.'s Stmt. ¶¶ 81-82; Pl.'s Resp. to Def.'s Stmt. ¶¶ 81-82.  Nor does Plaintiff dispute Defendant's assertion about the April 2015 notification or that she missed both deadlines, but offers "clarification" in a declaration submitted with her opposition to Defendant's Motion for Summary Judgment.  Pl.'s Resp. to Def.'s Stmt. ¶ 545 (citing Waggel Decl. ¶¶ 127-28).  That declaration does not dispute that she missed either deadline.  *See* Waggel Decl. ¶¶ 127-28.  Rather, she offers tangential information about her response to a reminder received the day before the second deadline, and suggests that one of her tests, or perhaps test results, was "one day late" because "employee health lost it."  *Id.* ¶¶ 127-28.

---

[8] Evidently the Policy on Medical Clearance specified that this health clearance would be due by August 31.  Def.'s Stmt. ¶¶ 81-82.  The parties have not explained the discrepancy between this deadline and the September 30 deadline with which Plaintiff was apparently expected to comply.  In any event, that discrepancy is immaterial.  Plaintiff does not object on this basis.  Nor did she submit the required health clearance by either date.

Even if her declaration is correct, that test result was much later than one day overdue; it was allegedly submitted one day past the *extended* deadline.

Plaintiff's rebuttal argument essentially consists of a comparison with other residents. She points to a notification that she and seventeen other residents allegedly received on October 13, 2015, indicating that they had not submitted their health clearance documentation. *See* Def.'s Stmt. ¶ 463; Pl.'s Resp. to Def.'s Stmt. ¶ 463 (citing Waggel Decl. ¶¶ 127-28). She alleges in her declaration that after she received her second LOD, she "asked the other residents on this list if they received a LOD. They did not." Waggel Decl. ¶ 128.

The Court observes two substantive flaws with Plaintiff's rebuttal. She does not allege that those residents missed the October 14 deadline. There would be no reason for other residents to receive an LOD if they complied with the deadline. Nor does she take the next step of arguing that, by issuing LOD 2, Defendant was singling Plaintiff out because of her alleged disability.

In the alternative to considering rebuttal arguments founded on Plaintiff's declaration, the Court evaluates Defendant's basis for striking paragraphs 127 and 128 from her declaration. As with LOD 1, Defendant broadly lodges hearsay and self-serving/without corroboration challenges to paragraphs that contain a variety of allegations. *See* Def.'s Desig. ¶¶ 127-28. Plaintiff asserts, *inter alia*, that the allegations in these paragraphs are non-hearsay or are hearsay subject to exception. Pl.'s Resp. to Def.'s Desig. ¶¶ 127-28. Offering these statements for the truth of the matter asserted would mean that there actually was a list with Plaintiff and seventeen other residents on it, and that those residents told her after she received LOD 2 that they had not received an LOD. If the statements are offered to prove the truth of the matter asserted, then they are hearsay. Plaintiff maintains that these statements, or perhaps other portions of the same paragraphs, are subject to an exception for then-existing mental, emotional, or physical condition.

*Id.*; *see* Fed. R. Evid. 803(3).  But that exception is irrelevant.  Plaintiff's reaction to LOD 2 does not impugn Defendant's otherwise legitimate, non-discriminatory basis for issuing it.  Moreover, if the statements are *not* offered to prove that there was such a list and that other residents confirmed that they did not get an LOD, then the statements have no bearing on Defendant's legitimate, non-discriminatory basis for issuing LOD 2.  In paragraph 128, Defendant also objects to Plaintiff's reference to "other residents" as lacking specificity.  Def.'s Desig. ¶ 128.  This is an instance in which Plaintiff's declaration is simply too vague at the summary judgment stage.  *See Johnson v. Perez*, 823 F.3d at 710-11.  For the foregoing reasons, and in an exercise of the Court's discretion, the Court STRIKES the following portions of paragraphs 127 and 128, respectively: "There was a list attached with the names of 17 other residents who did not have their health clearance either"; and "I asked the other residents on this list if they received a LOD.  They did not."  Waggel Decl. ¶¶ 127-28.

There is no genuine dispute of material fact regarding Defendant's issuance of a LOD regarding Plaintiff's failure to submit the required health clearance documentation by the second of two deadlines to do so.[9]  The Court finds insufficient evidence that Defendant's seemingly legitimate, non-discriminatory reason for issuing that letter was instead pretextual.

### iv.    CCC Minutes Issue #3: Third Letter of Deficiency

The CCC meeting minutes also indicate that "Dr. Waggel received a third letter of deficiency on November 19, 2015 relating to an incident involving her handling of an agitated patient while she was on call.  The incident resulted in a root cause analysis which identified deficiencies of knowledge, disorganized thought, and lack of insight."  CCC Minutes at 2.

---

[9]  Again, Plaintiff does not dispute that she failed to timely submit the required health documentation.

Citing deficiencies in Patient Care, Interpersonal Communication Skills, and Systems-Based Practice, Defendant's third LOD details ways in which Plaintiff allegedly mishandled an overnight call on August 25, 2015, and set forth a plan for remediation, including a system of extra supervision by attending physicians. Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-4 (Decl. of Lisa A. Catapano, M.D., Ex. #150) ("LOD 3"); *see also* Def.'s Stmt. ¶ 656. LOD 3 was originally issued on November 11, 2015, and then in revised form on November 19, 2015. Def.'s Stmt. ¶¶ 602, 656; Pl.'s Resp. to Def.'s Stmt. ¶¶ 602, 656.

Plaintiff does not dispute that she received this letter. *See* Pl.'s Resp. to Def.'s Stmt. ¶ 656 (citing Waggel Decl. ¶ 145). Although Plaintiff does dispute a number of the occurrences on the evening in question, even what she does not challenge supports a finding that Defendant had a legitimate, non-discriminatory basis for issuing LOD 3. For example, Plaintiff evidently indicated, regarding a certain particularly difficult patient, that Plaintiff "had to 'jump' on the patient to restrain the patient." Def.'s Stmt. ¶ 348; Pl.'s Resp. to Def.'s Stmt. ¶ 348. The Court need not pass judgment on Plaintiff's conduct to observe that this is a matter of handling agitated patients. And indeed, the letter asserts among Plaintiff's failings that night: "your management of patient aggression . . . was below that expected for your level of training." LOD 3 at GWU 001123. The letter states the CCC's decision that, "[b]ecause of the above-listed deficiencies, and need for extra supervision," Plaintiff would not be promoted on time to her third year of residency. *Id.* at GWU 001124.

Plaintiff argues in a footnote that LOD 3 was discriminatory in several ways. First, the LOD allegedly "failed to take into account how her performance was affected by her disability (cancer)." Pl.'s Summ. J. Opp'n at 4 n.2. But, as established in the decision on Plaintiff's Motion and discussed further above, Plaintiff has failed to prove that she requested a reasonable

accommodation of a disability. Accordingly, it is unsurprising, and unobjectionable, that the letter did not expressly take her alleged disability into account.

Second, Plaintiff argues in this footnote that it was "unfair because it shifted the responsibility for problems that night onto Dr. Waggel, who was in the first weeks of the second year of her residency," an argument on which she slightly elaborates. *Id.* at 4 n.2. The Court need not decide whether this is true, as it does not demonstrate that Defendant's legitimate, non-discriminatory reasons in the letter were pretextual. At most it demonstrates a disagreement about the way that Defendant was administering its residency program, which is not directly relevant to this decision.

Elsewhere Plaintiff implies that she was supposed to be on light duty on August 25, 2015. *E.g.*, Pl.'s Resp. to Def.'s Stmt. ¶ 335 ("Dr. Waggel was fatigued because she was pulling sequential day and night shifts instead of light duty after surgery."). But that is not the case. Plaintiff's surgery was on July 20, 2015, and her leave for surgery ran through August 3, 2015. Def.'s Stmt. ¶ 236; Pl.'s Resp. to Def.'s Stmt. ¶ 236. Two weeks of light duty would have expired well before August 25. Perhaps it is true, as she contends, that her light duty during those few weeks was not so light. The Court need not decide. The circumstances of her light duty concluding before August 25, 2015, do not support any inference that Defendant's response to her actions on August 25, 2015, was an instance of discrimination based on her disability.

v.   CCC Minutes Issue #4: Fourth Letter of Deficiency

The minutes indicate that "[i]n the fall of 2015, Dr. Waggel failed two courses, Neuroscience and Psychotherapy courses, resulting in a fourth LOD on December 10, 2015. This LOD informed Dr. Waggel that she would not be promoted to the PGY-III year." CCC Minutes at 2.

Citing a deficiency of Medical Knowledge, Defendant's fourth LOD discussed the assessment of two of Plaintiff's instructors, Dr. Cheryl Collins and Dr. James L. Griffith, that she had not demonstrated competency in their respective courses, and indicated that she would be required to repeat the entirety of one course and a certain portion of the other course the following year. Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-5 (Decl. of Lisa A. Catapano, M.D., Ex. #160) ("LOD 4"). Retreading LOD 3, this letter also confirmed that she would not be advancing to her third year of residency on time, now stating that she could only become eligible to advance with the CCC's approval once she "satisfactorily completed" her second-year residency rotations and "at least, successfully repeated" the entirety or the relevant portion, respectively, of those two courses. LOD 4 at GWU 001126; Def.'s Stmt. ¶¶ 710-16.

Plaintiff does not dispute either that she received this letter of deficiency or the summary of its contents. Pl.'s Resp. to Def.'s Stmt. ¶¶ 710-16. Plaintiff raises various disputes regarding her participation in those courses. But she does not dispute certain material facts that support the issuance of LOD 4. One example is the following summary of Dr. Collins's assessment:

> Because of Dr. Waggel's glaring interpersonal deficiencies and lack of understanding of the material, Dr. Collins did not feel that she was ready to move forward with seeing a patient to apply the psychodynamic principles the other students had learned, which was the next step in the didactic training process. Dr. Collins provided this feedback to Dr. Waggel in writing on November 7, 2015.

Def.'s Stmt. ¶ 561; see also Pl.'s Resp. to Def.'s Stmt. ¶ 561. This is a legitimate, non-discriminatory basis for finding that Plaintiff had not passed Dr. Collins's course. Sifting through Plaintiff's comments about that course, the Court observes at least one other point for which Plaintiff offers no support.

Plaintiff asserts that "prior to taking FMLA leave, Dr. Collins wrote to Dr. Waggel to tell her she was passing the class." Pl.'s Summ. J. Opp'n at 27-28. This is directly contrary to Dr.

Collins's declaration: "At no point during this time did I indicate to Dr. Waggel that she was 'passing' my class, or even that her performance was satisfactory in any way." Def.'s Mot. for Summ. J., Ex. I, ECF No. 34-13 (Decl. of Cheryl Collins, M.D., ¶ 37). Plaintiff gives no citation to the record for her assertion that Dr. Collins "wrote" as much to Plaintiff; accordingly, this statement is insufficient to create a dispute of material fact regarding Plaintiff's performance in Dr. Collins's course. Even regarding areas in which Plaintiff raises disputes and offers citations, however, she does not allege that Dr. Collins's purported rationale for requiring her to retake the course is pretext for discrimination due to her alleged disability.[10]

As for Dr. Griffith's course, Plaintiff alleges that "discriminatory and retaliatory reasons" for her termination can be found in the CCC's February 9, 2016, performance review allegedly "citing her absences in Dr. Griffith's class while on medical leave." Pl.'s Summ. J. Opp'n at 6 n.4 (citing Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., Ex. #11, at GWU 001115-17)).[11] But there is no reference to absences in Dr. Griffith's course at the cited pages. Rather, the CCC report correctly observes that LOD 4 refers to Plaintiff's failure of Dr. Griffith's course.

In what may be construed as a rebuttal attempt, Plaintiff points to comments by Dr. Catapano and Dr. Griffith that allegedly demonstrate a belief that her medical issues should not be accommodated. Pl.'s Summ. J. Opp'n 17-18. There is insufficient evidence to create a genuine dispute of material fact. Plaintiff's citation for the Dr. Catapano assertion is Plaintiff's own

_____

[10] Note that Plaintiff does allege that Dr. Collins acted in retaliation against her for taking FMLA leave. Pl.'s Summ. J. Opp'n at 27-29. The Court shall consider that argument below in evaluating her claim that Defendant violated the FMLA and DCFMLA.

[11] Plaintiff's citation to pages 49-51 appears to be a reference to the ECF pages numbers, which correspond with these Bates-labelled pages.

deposition, where she admits that she offers "just a guess" about Dr. Catapano's allegedly discriminatory motives for her termination.  *Id.* (citing Waggel Dep. at 54:13-16, 237:1-12). Whereas Dr. Griffith's comments, in the context of his own deposition, demonstrate his belief that Plaintiff's medical condition was inapposite.  *See* Pl.'s Stmt. ¶¶ 93-94 (citing Pl.'s Mot. for Partial Summ. J. as to Counts I & II, Ex. N, ECF No. 32-4 (Dep. of James Griffith at 12:01-13:14, 34:12-35:06)).  Plaintiff offers nothing to connect Dr. Griffith's belief with her failure of a portion of his course.[12]  Plaintiff therefore does not discharge her burden to show that the actual reason for her not passing these two courses and/or the corresponding decision not to promote her to third year was not her poor performance but was instead discrimination on the basis of her disability.

### vi.   CCC Minutes Issue #5: Improvement Plans

After reciting the four LODs, the meeting minutes observe that Plaintiff "[f]ailed to comply with the improvement plans of the LODs."  CCC Minutes at 2.  The Court discerns improvement plans in two of the four letters, LOD 1 and LOD 3.[13]

LOD 1 indicated that "within two weeks of receiving this letter (excluding time off for medical leave), [Plaintiff was obligated to] set up a meeting with Dr. [Allen] Dyer to discuss strategies to prevent future lapses in professionalism," and "provide [him] with the contact information for [her] supervising physician for each rotation such that he may obtain attendance

---

[12] As with Dr. Collins, Plaintiff does allege that Dr. Griffith acted in retaliation against her for taking FMLA leave. Pl.'s Summ. J. Opp'n at 27-29.  Again, the Court shall consider that allegation below in evaluating the FMLA/DCFMLA claims.

[13] LOD 2 relates to health clearance and does not identify an improvement plan.  LOD 4 relates to failing the two courses and reaffirms that Plaintiff will be held back from promotion.  It too omits any specific improvement plan, though it does set forth certain next steps.  *See* LOD 4 at GWU 001125-26.  Viewing the evidence in the light most favorable to Plaintiff, the Court does not consider this LOD 4 language as articulating an improvement plan where LODs 1 and 3 specifically use such a term and LOD 4 does not.

reports to report to the CCC." LOD 1 at GWU 001120-21. There is some dispute regarding whether Plaintiff complied with the two-week requirement in the LOD. Resolution of that dispute might require deciding whether to "set up" the meeting within the two-week interval can include alleged efforts which did not result in the meeting's occurrence during that interval. *See* Def.'s Stmt. ¶¶ 307-08 (showing that Plaintiff made at least one attempt within two weeks of receiving letter); Pl.'s Resp. to Def.'s Stmt. ¶¶ 307-08. In any event, it is clear that nearly a month elapsed between the date Plaintiff was given LOD 1 on August 5, 2015, and the date her meeting with Dr. Dyer took place on September 3, 2015. *See* Def.'s Stmt. ¶¶ 277, 279, 391; Pl.'s Resp. to Def.'s Stmt. ¶¶ 277, 279, 391.[14]

But the dispute about the meeting with Dr. Dyer is ultimately immaterial, because Plaintiff clearly did not comply with the more substantive portion of the LOD 1 improvement plan. Plaintiff does not point to anything in the record to show that she provided the contact information for her supervising physicians. *See* Def.'s Stmt. ¶ 397; Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., ¶¶ 40-41) (maintaining that Plaintiff responded to Dr. Dyer's comment about this requirement by saying she was "paranoid" about ramifications); Pl.'s Resp. to Def.'s Stmt. ¶ 397 (not stating that she ever complied); Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., ¶ 97) (indicating that Dr. Dyer prepared performance review dated Feb. 9, 2016, asserting that Plaintiff "failed to meet with [him] in a timely fashion and failed to comply with the requirement to notify [him] of her supervising attendings so [administration] could confirm she was reporting to work and doing so in a timely fashion"). Defendant has offered

---

[14] Plaintiff disputes Defendant's fact paragraph regarding an August 5, 2015, meeting with Dr. Catapano, but the issues she raises do not include an objection to the meeting having taken place, or that it took place on the specified date. *See* Pl.'s Resp. to Def.'s Stmt. ¶ 277.

a legitimate, non-discriminatory rationale for finding that Plaintiff did not comply with the improvement plan in LOD 1, and Plaintiff has failed to show how that rationale is pretextual.

Pursuant to LOD 3, Plaintiff was to 1) "[w]rite a 600 word description of management strategies and alternatives for management of patient aggression in the in-patient setting," with certain further details; 2) meet with Dr. Lori Kels, Associate Program Director, "to address disorganized and incomplete clinical presentations on call," with other pertinent details; and 3) "[a]ddress the concerns laid out in [Plaintiff's] Letter of Deficiency dated July 15, 2015," namely LOD 1. LOD 3 at GWU 001124. Although Plaintiff was not able to meet with Dr. Kels within one week of receiving LOD 3, as the letter required, Dr. Catapano made clear that this would not be held against Plaintiff based on her efforts. Def.'s Stmt. ¶ 706; Pl.'s Resp. to Def.'s Stmt. ¶ 706. Eventually Dr. Kels met with Plaintiff on December 10, 2015. Def.'s Stmt. ¶¶ 731, 733; Pl.'s Resp. to Def.'s Stmt. ¶¶ 731, 733. Plaintiff disputes "any implication that remediation was discussed in any details or that Dr. Kels provided any meaningful guidance on the issue." Pl.'s Resp. to Def.'s Stmt. ¶ 731. But Plaintiff does not dispute that Dr. Baiju Gandhi, whom Dr. Kels tasked with reviewing Plaintiff's 600-word essay, found it to be deficient. *See* Def.'s Stmt. ¶¶ 734, 786; Pl.'s Resp. to Def.'s Stmt. ¶¶ 734, 786. The final prong of the improvement plan, directing Plaintiff's attention back to LOD 1, is rather difficult for the Court to evaluate, as "the concerns laid out" in LOD 1 stemmed from a specific shift but involved broad topics of professionalism and systems-based care. *See* LOD 1 at GWU 001120. Nevertheless, the Court observes once again the lack of evidence that Plaintiff ever provided contact information for any of her supervisors, which was part of the LOD 1 improvement plan. It may have been difficult to assess Plaintiff's improvement, if any, absent this means of contacting her supervisors.

The record could be more detailed regarding why Defendant found that Plaintiff did not comply with the LOD 3 improvement plan. But the deficiency in her essay is enough to show that Defendant has a legitimate, non-discriminatory basis for its assessment. And Plaintiff is unable to show that this assessment is pretext for discrimination.

vii.    <u>CCC Minutes Issue #6: Call Duties</u>

The CCC Minutes next observe that "[b]ecause of concerns about patient safety as well as professionalism, [Plaintiff] was taken off call duties in December, 2015." CCC Minutes at 2. That she was removed from the call schedule is not disputed. Def.'s Stmt. ¶ 726; Pl.'s Resp. to Def.'s Stmt. ¶ 726. Removal "because Dr. Waggel had not made progress in the remediation plan set forth in her third Letter of Deficiency" is a legitimate, non-discriminatory reason. Def.'s Stmt. ¶ 726.

Plaintiff nevertheless argues that Defendant's rationale is pretextual. "[T]he decision could not have been made" for that reason, she maintains, because she "had made every effort to remediate, but was stymied by Dr. Kels' and Dr. Gandhi's efforts to avoid meeting her about the required essay and remediation plan." Pl.'s Resp. to Def.'s Stmt. ¶ 726. But there is not sufficient evidence on this point to put before the jury. After some delay—which, again, Dr. Catapano said would not be held against her—Plaintiff succeeded in meeting with Dr. Kels on December 10, 2015. She does not dispute that the explanation, by email, for the decision to remove her from call duty was that it was "pending completion of her remediation" in LOD 3. Def.'s Stmt. ¶ 730; Pl.'s Resp. to Def.'s Stmt. ¶ 730. Whether it took a while to meet with Dr. Gandhi and to complete the 600-word essay aspect of the improvement plan is inapposite. Plaintiff was removed from the call schedule for a legitimate, non-discriminatory reason, and Plaintiff has not shown that this reason was motivated by discrimination on the basis of disability.

### viii. CCC Minutes Issue #7: Examples of Misrepresentation

The Court now turns to the first of the concerns discussed by the CCC at its April 8, 2016, meeting "that [had] arisen since January 2016," namely Plaintiff's "numerous examples of misrepresentation." CCC Minutes at 2-3. Three specific examples are articulated in the minutes.

First, Plaintiff allegedly "[told] a faculty member that she had been given permission by Dr. Catapano to attend his course, when she had not met the pre-requisite for the course and had not received permission from Dr. Catapano." *Id.* at 2. That course was Dr. John Zinner's Psychodynamic Psychotherapy. Plaintiff does not dispute that Dr. Catapano and LOD 4 alike informed her that she would not be permitted to take Dr. Zinner's course. Def.'s Stmt. ¶¶ 614, 706, 709, 712; Pl.'s Resp. to Def.'s Stmt. ¶¶ 614, 706, 709, 712. Plaintiff also does not dispute that "she claimed, despite the fact that her fourth Letter of Deficiency from December 10, 2015 had stated clearly in writing that she would not be allowed to progress to Dr. Zinner's course, that Dr. Catapano had told her that it would be left it [sic] up to Dr. Zinner to decide whether she could take his seminar." Def.'s Stmt. ¶ 747; *see also id.* ¶ 709; Pl.'s Resp. to Def.'s Stmt. ¶ 747 (adding the "clarification" that Plaintiff "saw her name printed on the sign-in sheet and thought she was allowed to at least audit the class"). Even if Plaintiff saw her name on a sign-in sheet, as she claims, that would not lessen the implications of her tacit admission that she misrepresented Dr. Catapano's comments to Dr. Zinner. Plaintiff fails to show that Defendant's legitimate, non-discriminatory basis for adjudging Plaintiff to have misrepresented the facts is instead pretextual.

Second, Plaintiff allegedly "misrepresent[ed] to Dr. Berger that she had passed the Neuroscience course, when she had failed it." CCC Minutes at 2. Plaintiff does not dispute that she sent an email on January 13, 2016, to the effect that she had "received a grade of 82% on her cumulative final in Dr. Griffith's Neuroscience class, which was one of the highest in the class."

Def.'s Stmt. ¶ 756; Pl.'s Resp. to Def.'s Stmt. ¶ 756. While in the most literal sense, it is true that her score was one of the highest, Dr. Griffith found that the email overstated her standing considering that her score was within a cluster around the mean. *See* Def.'s Stmt. ¶¶ 758-59 (citing Def.'s Mot. for Summ. J., Ex. N, ECF No. 34-18 (Decl. of James L. Griffith, M.D., Ex. #14)). Indeed, of the seven total test takers, she tied for second with a score of 82 on a test with an average score of 80. Def.'s Mot. for Summ. J., Ex. N, ECF No. 34-18 (Decl. of James L. Griffith, M.D., Ex. #14)). Moreover, the instructor expressly contradicted the notion that the exam was cumulative. Def.'s Stmt. ¶¶ 758-59. Plaintiff disputes these points. Pl.'s Resp. to Def.'s Stmt. ¶¶ 758-59. But her LOD 4 already had made clear that she "received failing grades . . . on both of the first two exams," and would need to re-take at least the first part, if not the entirety, of Dr. Griffith's course. LOD 4. Defendant puts forward a legitimate, non-discriminatory basis for finding Plaintiff's email to be a misrepresentation, and Plaintiff has not shown that Defendant's handling of this event was pretextual.

Third, according to the CCC Minutes, Plaintiff "stat[ed] that she had not been given any feedback about her performance, even though she had received four letters of deficiency, as well as numerous other written and verbal communications regarding her performance." CCC Minutes at 2-3. This comment is not very specific, for purposes of assessing its support in the record. But it appears to refer to the instance in which Plaintiff went to the hospital with panic symptoms and told Dr. Babak Sarani, a designated ombudsman, that "her symptoms had been precipitated by the email about being taken out of the call schedule in the context of *having been provided no information that there were any concerns about her clinical performance.*" Def.'s Stmt. ¶ 742 (emphasis added); *see also id.* ¶¶ 740-41 (ombudsman role); Def.'s Mot. for Summ. J., Ex. B, ECF No. 34-6 (Decl. of Jeffrey Berger, M.D. ¶ 76) (connecting the no-feedback comment with the Dr.

Sarani interaction). While she does dispute more of the specifics of what Dr. Sarani said, Plaintiff does not dispute this summary. *See* Pl.'s Resp. to Def.'s Stmt. ¶¶ 740-42.

Defendant has put forward a legitimate, non-discriminatory basis for assessing Plaintiff's comment to Dr. Sarani, as summarized, to be a misrepresentation. As recounted above, there is no dispute that Plaintiff received LOD 3, which concerned Plaintiff's performance during a call shift. And indeed, the need for her to complete the improvement plan in this LOD was cited as the basis for her suspension from call duties. *See* Def.'s Stmt. ¶ 730; Pl.'s Resp. to Def.'s Stmt. ¶ 730. Defendant therefore had reason to believe that Plaintiff received negative feedback about her clinical performance, that Plaintiff knew she had received this feedback, and that any comment to the contrary was a misrepresentation. Plaintiff has not shown that Defendant's assessment of her comments to Dr. Sarani is pretextual.

### ix. CCC Minutes Issue #8: Designating Supervisors in Medhub

The CCC next observed that "[t]here have been significant problems with getting Dr. Waggel's performance evaluations because she would not identify her supervisors in the Medhub system, resulting in the inability for her evaluation forms to be sent to her supervisors for each rotation." CCC Minutes at 3. Plaintiff does not dispute that she did not identify her supervisors in the Medhub system. Def.'s Stmt. ¶ 468; Pl.'s Resp. to Def.'s Stmt. ¶ 468. She does say that she "had problems logging into Medhub (as did other residents), [and that] most programs make the program director take responsibility for identifying supervising physicians." Pl.'s Resp. to Def.'s Stmt. ¶ 468. The latter point about the program director's role is irrelevant. The former point about login difficulties does not contradict Defendant's assessment that she failed to identify her supervisors in the Medhub system, which is a legitimate, non-discriminatory factor contributing ultimately to her termination. Plaintiff's comment that other residents had trouble

logging into the system does not go far enough.  For example, Plaintiff does not claim that other residents *were never able* to log into the system, or that they did not identify their supervisors by some other means.  Accordingly, she has not shown that Defendant was acting under pretext in holding Plaintiff's failure to comply against her.

x.   <u>CCC Minutes Issue #9: "Persecution from Fairfax"</u>

According to the minutes, Plaintiff "claimed persecution from Fairfax based on prejudice in the evaluation system (even though she had not been evaluated because she had not entered her supervisors into the system).  Dr. Berger investigated and assured her that the Medhub system was secure and confidential."  CCC Minutes at 3.  This appears to relate to Plaintiff's allegation that Dr. Aditi Malik, an attending physician at her Inova Fairfax rotation, had gotten hold of an evaluation that Plaintiff had made of Dr. Malik.  *See* Def.'s Stmt. ¶ 692.  Defendant alleges that Dr. Berger "confirm[ed] that the evaluations remained confidential and that Dr. Waggel had actually never submitted an evaluation of Dr. Malik."  *Id.*  Plaintiff flatly disputes this, simply citing her declaration. Pl.'s Resp. to Def.'s Stmt. ¶ 692 (citing Waggel Decl. ¶ 107)).  Her declaration asserts afresh that Plaintiff evaluated Dr. Malik anonymously and that Dr. Malik received that evaluation.  *See* Waggel Decl. ¶ 107.  Plaintiff claims that, in an email to Dr. Catapano, Plaintiff said that Dr. Malik disclosed Plaintiff's evaluation to some of her classmates. *Id.*  Despite allegedly requesting reassignment to a different attending physician, Plaintiff claims that Dr. Catapano denied that request.  *Id.*

The Court considers Defendant's argument that paragraph 107 of Plaintiff's declaration should be stricken as self-serving and without corroboration. Def.'s Desig. ¶ 107.  While the Court ordinarily would expect Plaintiff to cite record evidence of statements allegedly made in an email, the D.C. Circuit has made clear that a lack of corroboration is not sufficient to trigger summary

judgment.  *See Johnson v. Perez*, 823 F.3d at 710-11.  Nor should Plaintiff's claims about Dr.

Malik's actions be stricken as "vague or conclusory."  *Id.*  On the contrary, Plaintiff has made very

specific claims.  In an exercise of its discretion, the Court shall *not* strike language from paragraph

107 of Plaintiff's declaration.

But the Court finds that the lingering dispute is not material.  Defendant gives a legitimate,

non-discriminatory description of Dr. Berger's investigation of an incident and its response to

Plaintiff.   While Plaintiff offers a different version of the events, she has not shown that

Defendant's handling of this incident is pretext for discrimination on the basis of an alleged

disability.  Moreover, for whatever reason, the Committee referred to this incident in a discussion

culminating in a recommendation to terminate Plaintiff from the program.  Plaintiff has not

demonstrated that the Committee's reference to the incident reflects a pretext for a final decision

instead based on a discriminatory rationale.

> xi.   CCC Minutes Issue #10: Notice of Unprofessional Conduct

The CCC Minutes also summarize certain proceedings involving a Notice of

Unprofessional Conduct issued to Plaintiff:

> On February 15, 2016, Dr. Waggel was presented a notice of unprofessional
> conduct from Dr. Griffith, Department Chair, and Dr. Catapano. (Dr. Catapano was
> at a professional meeting and unable to attend the meeting with Dr. Waggel and Dr.
> Griffith.)  As a result of the notice of unprofessional conduct, Dr. Berger initiated
> an inquiry under the Office of Graduate Medical Education Resident Misconduct
> Policy.  After a complete review, Dr. Berger concluded that some of the instances
> described in Dr. Griffith's notice of unprofessional conduct constituted lapses in
> professionalism, while others rose to the level of misconduct.  He recommended
> that this CCC consider the incidents set forth in the notice of unprofessional
> conduct.

CCC Minutes at 3.  Plaintiff does not dispute that Dr. Catapano drafted this Notice with Dr. Dyer's

involvement, that this Notice covered certain specified topics, that Dr. Griffith met with her to

discuss the Notice, or that Dr. Berger met with her after investigating issues raised therein.  Def.'s

Stmt. ¶¶ 798-800, 880; Pl.'s Resp. to Def.'s Stmt. ¶¶ 798-800, 880.  The Notice itself recites a series of events—most of which the Court has discussed above—that plausibly demonstrated a deficiency in professionalism.  Def.'s Mot. for Summ. J., Ex. B, ECF No. 34-6 (Decl. of Jeffrey Berger, M.D., Ex. #16) ("Notice of Unprofessional Conduct").  Due in part to its prior evaluation of those events, the Court shall find that Defendant had a legitimate, non-discriminatory reason for issuing this Notice if Defendant can justify its assessment of the two incidents discussed in the Notice that the Court has not yet addressed.[15]

First among such incidents, the Notice of Unprofessional Conduct indicates that Plaintiff allegedly "[told] Dr. Collins that failing her course was the only thing holding [her] back from being promoted" to her third year in the program.  Notice of Unprofessional Conduct at GWU 003085.  Plaintiff disputes Defendant's material fact paragraph about this incident, raising boilerplate objections and a purported contradiction in the recounting of Plaintiff's comments.  *See* Pl.'s Resp. to Def.'s Stmt. ¶ 675.  But Plaintiff does not expressly dispute that the incident occurred.  Indeed, Plaintiff also does not dispute that Dr. Collins then reported to Dr. Catapano that Plaintiff had said this to her.  Def.'s Stmt. ¶ 677; Pl.'s Resp. to Def.'s Stmt. ¶ 677.  The reason why Plaintiff's statement is inaccurate is that LOD 4 made clear that she was not being promoted because of failing both Dr. Collins's course *and* the first part of Dr. Griffith's course.  *See* LOD 4.  Plaintiff appears not to dispute that she made some claim to the effect that she would be held back on the basis only of Dr. Collins's course.  Regardless of whether she actually made that claim

---

[15] The Notice of Unprofessional Conduct says "[i]t took six weeks to schedule [the] meeting" with Dr. Dyer about LOD 1.  Notice of Unprofessional Conduct at GWU 003085.  It is clear on the face of the record that this is not the case, as Plaintiff was given until following her July 2015 medical leave to schedule it within two weeks.  *See* LOD 1.  Elsewhere in this opinion, the Court has discussed how, at most, the scheduling took approximately one month.  Regardless, this discrepancy is not material.

though, the allegation thereof is among legitimate, non-discriminatory bases on which the Notice purportedly rested. And Plaintiff does not show that it is pretextual.

Second among fresh issues is the Notice's reference to Plaintiff's "disruptive" behavior, "[m]ost flagrant" of which was "a series of hostile and antagonistic emails and texts to the program director and to [her] classmates, threatening to 'bring down the program[.]'" Notice of Unprofessional Conduct at GWU 003085-86. Plaintiff asserts various objections to an email that allegedly transcribed a text thread in which she stated, *inter alia*, that "[m]y lawyer just won a case for a surgical resident who sued his program," and "[y]a'll need to start looking for other jobs this department gunna be out of business soon." Def.'s Stmt. ¶ 653 (citing, e.g., Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-4 (Decl. of Lisa A. Catapano, M.D., Ex. #147, at GWU 001666)) (internal quotation marks omitted); *see* Pl.'s Resp. to Def.'s Stmt. ¶ 653. But elsewhere she does not dispute that she sent an email to Dr. Catapano, copying Dr. Kels, that contained the following language:

> Hopefully our 4:30 meeting will provide some answers. If it does not, my law firm is prepared to contact you and the rest of the faculty in the department and hospital administrators. They specialize in resident cases so I have faith that if the psych department doesn't come through for me, my law firm certainly will.

Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-5 (Decl. of Lisa A. Catapano, M.D., Ex. #170, at ECF p. 37); *see also* Def.'s Stmt. ¶ 789; Pl.'s Resp. to Def.'s Stmt. ¶ 789. Setting aside the alleged text thread, even the email to Drs. Catapano and Kels is sufficient evidence to support Defendant's legitimate, non-discriminatory basis for issuing the Notice. Plaintiff does not suggest that Defendant's response to this threat was pretextual.

Based on these two events, and the other events described in the Notice, the Court finds that Defendant has put forward a legitimate, non-discriminatory basis for issuing this Notice, and that Plaintiff has not shown that such basis was pretextual.

xii.     CCC Minutes Issue #11: Patient Care/Safety Issues

The CCC Minutes also refer to "patient care/patient safety concerns" with Plaintiff.  CCC

Minutes at 3.  In the one example cited, Dr. Mary Chappell, a psychotherapist who had observed

Plaintiff at work, found "that Dr. Waggel's interaction with a patient and his family was odd and

potentially damaging to them in their vulnerable circumstances," and together with Dr. Gandhi

determined that Plaintiff "should not interact with the patient or his family."  *Id.*  Plaintiff does not

dispute that the incident occurred.  She simply refers to her expert's assessment that the incident

was somehow demonstrative of the program's "poor mentoring" of her.  Def.'s Stmt. ¶¶ 831-35;

Pl.'s Resp. to Def.'s Stmt. ¶¶ 831-35.  But Defendant has offered this further legitimate, non-

discriminatory building block towards its decision to terminate Plaintiff, and Plaintiff raises no

reason that it is pretextual.

xiii.     CCC Minutes Issue #12: Further Misrepresentations

Last on the CCC Minutes' list of twelve issues is "additional concerns regarding

misrepresentations by Dr. Waggel."  CCC Minutes at 3.  The one cited example is as follows:

> For example, on March 8, 2016, Dr. Waggel informed Dr. Berger that she was
> unable to meet that day to discuss misconduct concerns because she was on FMLA
> leave when, in fact, she had not yet requested FMLA leave.  She also told Dr. Berger
> that she informed Dr. Catapano that she intended to take medical leave when Dr.
> Catapano had not been informed of her intent.

*Id.*  Defendant asserts that Plaintiff requested FMLA leave on March 8, to begin on March 9.

Def.'s Stmt. ¶ 837.  Evidently she told Mary Tucker, the Director of Graduate Medical Education,

on the evening of March 8 that her leave request had already been approved, but it was not

approved until March 18 (retroactively so, to cover March 9-16).  *Id.* ¶¶ 836, 838; *see also* ¶ 187

(Ms. Tucker's title).  Plaintiff does not dispute this characterization of her leave request.  Pl.'s

Resp. to Def.'s Stmt. ¶¶ 187, 836-38.

The CCC Minutes state that Plaintiff went one step further in telling Dr. Berger on March 8 that she had been approved for leave, when in fact she did not even apply for it until that evening. Defendant submits a memorandum from Dr. Catapano to the Committee that corroborates the above account in the CCC Minutes, including with respect to Plaintiff's interactions with both Dr. Berger and Dr. Catapano. *See* Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., Ex. #14).

Plaintiff's response is internally inconsistent. In a footnote in her Opposition, Plaintiff intimates that she took the FMLA leave in response to a meeting request from Dr. Berger. *See* Pl.'s Summ. J. Opp'n at 18 n.9 (citing Pl.'s Stmt. ¶ 35).[16] But elsewhere she expressly asserts that she was granted FMLA leave before receiving Dr. Berger's meeting request. Pl.'s Additional Material Facts, ECF No. 37, ¶ 1090 (emphasis added); *see also* Def.'s Resp. to Pl.'s Assertion of Additional Material Facts Allegedly Requiring Jury Trial, ECF No. 42-1, ¶ 1089 (flatly denying Plaintiff's assertion);[17] Pl.'s Summ. J. Opp'n at 32-33 (citing Waggel Decl. ¶ 207). That sequence of events is the opposite of the sequence in her foregoing footnote. It is possible that Plaintiff misunderstood, at the time of her FMLA request, precisely when the request was approved, but she has since conceded, above, that such request was only approved retroactively on March 18.

---

[16] Plaintiff's assertion by footnote is as follows: "Plaintiff had difficulty making a following up-appointment with Dr. Jared [regarding her kidney] because GW scheduled her for a meeting with Dean Berger the same day. Because GW failed to engage with her, Plaintiff ultimately had to take FMLA leave because it was so difficult to schedule time for follow-up medical appointments." Pl.'s Summ. J. Opp'n at 18 n.9 (citing Pl.'s Stmt. ¶ 35).

[17] Plaintiff's material fact paragraph to this effect maintains that she "applied for and *was approved* for FMLA leave from March 9-16, *before* she received notice from Dr. Berger that he wanted to conduct his misconduct inquiry on March 9th." Pl.'s Additional Material Facts, ECF No. 37, ¶ 1090 (emphasis added); *see also* Def.'s Resp. to Pl.'s Assertion of Additional Material Facts Allegedly Requiring Jury Trial, ECF No. 42-1, ¶ 1089 (flatly denying Plaintiff's assertion). Defendant must have mistakenly omitted a response to one of Plaintiff's additional material fact paragraphs, as Defendant's responsive paragraph should instead be numbered as paragraph 1090.

Accordingly, it is disingenuous for Plaintiff to assert that she was approved for leave before Dr. Berger's meeting request. There is no excuse for her obfuscation now of the timeline of events. Any dispute is not genuine.

The Court finds that Defendant has put forward a legitimate, non-discriminatory basis for its assessment that Plaintiff misrepresented her FMLA leave situation. Plaintiff has not shown that this assessment is pretext for discrimination.

xiv.    CCC Conclusion

The Court has completed its review of the twelve performance issues listed in the CCC's minutes. As the foregoing analysis illustrates, Plaintiff is unable to discharge her burden to show that Defendant's legitimate, non-discriminatory bases for its assessment of these issues was pretextual. The Committee reviewed these twelve issues before deciding to recommend Plaintiff's termination from the program. In light of the Committee's reasoning, the Court finds that the Committee's ultimate decision was legitimate and non-discriminatory. If Plaintiff argues that such decision was pretextual, that argument lacks support in the record.[18]

Because the Court has discussed Dr. Simons' review of Plaintiff's initial appeal, the Court also pauses to note that Plaintiff appealed the final decision to terminate her residency. *See* Def.'s

---

[18] In the interest of completeness, the Court also notes that any good performance reviews that Plaintiff received at various points do not undermine Defendant's legitimate, non-discriminatory bases for recommending Plaintiff's termination. *See* Pl.'s Summ. J. Opp'n at 15 n.7 (claiming that Plaintiff received "excellent 'Milestone' (performance reviews) from attending physicians who supervised her work on a day to day basis"). *But see, e.g.*, Def.'s Resp. to Pl.'s Stmt. ¶ 90 (discussing "mixed reviews" by Plaintiff's attending physicians). In any event, her termination was only partially attributable to her performance in rotations. Nor is the fact that Plaintiff received "Milestone" reviews in her first year, but not her second year, demonstrative of pretext. *See* Pl.'s Summ. J. Opp'n at 7. Plaintiff points out that fact, but barely makes the argument—suggesting only that the lack of Milestone reviews supports her claim that she did not receive sufficient feedback. *See id.* at 6 n.4. The record is clear that Plaintiff received feedback about virtually all aspects of her time in the program through four LODs, a Notice of Unprofessional Conduct, and other communications.

47

Stmt. ¶¶ 952-53, 964, 975. The final decision was upheld first by an independent physician reviewer and then by Dr. Simons. *Id.* Plaintiff does not dispute that this review took place or that its outcome was unfavorable to her. *See* Pl.'s Resp. to Def.'s Stmt. ¶¶ 952-53, 964, 975. The Court's discussion elsewhere in this Opinion makes clear that her further complaints about the fairness of that review are inapposite. *See* Pl.'s Resp. to Def.'s Stmt. ¶¶ 964, 975, 1102-08 (referring, e.g., to Dr. Berger's support for termination decision, and to Plaintiff's hiring of counsel). Such complaints about the procedure do not suffice to show that Defendant's legitimate, non-discriminatory bases for terminating her residency were instead pretext for discrimination on the basis of an alleged disability.

The Court does not apply the described academic deference standard, so the Court need not reach Plaintiff's contingent discussion of such a standard from this Court's prior decision in *Hajjar-Nejad*. *See* Pl.'s Summ. J. Opp'n at 40 (citing *Hajjar-Nejad*, 37 F. Supp. 3d at 116). That standard may apply if the Court were evaluating a breach of contract claim—as the Court did in the cited portion of *Hajjar-Nejad*—but does not apply to the claims at issue in this case. *See supra* pages 7-8 (discussing *Hajjar-Nejad*, 37 F. Supp. 3d at 115-16, 124-27).[19]

## C. FMLA and DCFMLA Claims

As applicable here, the FMLA permits an employee to take up to twelve weeks of leave over twelve months "[b]ecause of a serious health condition that makes the employee unable to

---

[19] As part of her argument pursuant to *Hajjar-Nejad*, Plaintiff raises a variety of alleged flaws in Defendant's procedure leading up to her termination. *See* Pl.'s Summ. J. Opp'n at 40-44. But again, the standard she invokes relates to breach of contract, rather than the claims present here. Moreover, like much of Plaintiff's briefing, here Plaintiff often mischaracterizes the record. And even when her citation is accurate, Plaintiff is unable to show that Defendant's legitimate, non-discriminatory explanations for its actions—even where procedural missteps did or might have occurred—were instead pretext for discrimination. Above the Court discussed Dr. Simons' remand of the procedural flaw in the initial decision not to promote Plaintiff, which the Committee then re-affirmed and recommended that Plaintiff's residency be terminated. Dr. Simons upheld that final decision.

perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  A comparable provision of the DCFMLA allows up to sixteen weeks of leave over twenty-four months.  D.C. Code § 32-503(a).  "To avail himself of the protections of the FMLA, an employee must specifically take FMLA leave; naturally, all absences from work and all types of leave are not covered."  *Harris v. D.C. Water & Sewer Auth.*, 172 F. Supp. 3d 253, 268 (D.D.C. 2016).

Employers are prohibited from interfering with FMLA rights and from "discriminating" in response to the exercise of those rights, respectively:

### (a) Interference with rights

#### (1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

#### (2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).  The D.C. Circuit has recognized that Section 2615(a)(2), and even Section 2615(a)(1), can form the basis for a retaliation claim analogous to such a claim under Title VII. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015) (citing *Gleklen*, 199 F.3d at 1367-68; S. Rep. No. 103-3, at 34-35 (1993); H.R. Rep. No. 103-8, at 46 (1993)).  Plaintiff does not specify the provision under which her retaliation claim arises.  But because her retaliation claim is premised on Defendant's alleged "retaliation against her for taking medical leave," the Court finds that such claim arises under Section 2615(a)(2).  Compl., ECF No. 2, ¶ 55; *see also id.* ¶ 59.

"Like its federal counterpart, the DCFMLA recognizes two theories for recovery—the retaliation or discrimination theory and the entitlement or interference theory." *Harris*, 172 F. Supp. 3d at 267 (quoting *Washington Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1075-76 (D.C. 2008)) (internal quotation marks omitted); *see also id.* (citing D.C. Code § 32-507(b)(1) (retaliation); *id.* § 32-507(a) (interference)). As with the ADA and DCHRA above, the parties' arguments do not distinguish between the FMLA and DCFMLA. The Court finds that the standards are similar, if not the same, and the Court accordingly shall cite to them interchangeably except where expressly noted.

Retaliation claims proceed under the *McDonnell Douglas* "prima facie case and burden-shifting regime" developed in the Title VII context. *Gordon*, 778 F.3d at 161. The D.C. Circuit has not extended its truncated treatment of that regime in other contexts to FMLA retaliation claims. *Cf. Adeyemi*, 525 F.3d at 1226 (ADA claims); *Brady v. Office of Sergeant at Arms*, 520 F.3d at 494 (Title VII claims). Rather, "[t]he elements of a prima facie case of FMLA retaliation are the well-known triad: (1) the employee 'engaged in a protected activity under this statute'; (2) the employee 'was adversely affected by an employment decision'; and (3) 'the protected activity and the adverse employment action were causally connected.'" *Gordon*, 778 F.3d at 161 (quoting *Gleklen*, 199 F.3d at 1368); *see also Harris*, 172 F. Supp. 3d at 268 (citing *Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 329 (D.C. 2004) (same under DCFMLA)). The District of Columbia Court of Appeals has recognized that, under either the FMLA or DCFMLA, "taking FMLA leave constitutes a 'protected activity,' termination constitutes an 'adverse employment decision,' and temporal proximity between the two establishes 'causal connection.'" *Chang*, 846 A.2d at 329 (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999)). The D.C. Circuit has likewise recognized the role of temporal proximity in establishing a prima

facie case. *See Gleklen*, 199 F.3d at 1368 ("Temporal proximity is often found sufficient to establish the requisite causal connection for [retaliation] claims.").

Only if Plaintiff can establish her prima facie case would the burden shift to Defendant to provide support for a "legitimate, nondiscriminatory" rationale, at which point Plaintiff would have the opportunity to prove that such rationale was pretextual. *Harris*, 172 F. Supp. 3d at 268 (quoting *Chang*, 846 A.2d at 329) (internal quotation marks omitted); *see also Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)) (observing in Title VII case that despite the shift of "intermediate evidentiary burdens," the "ultimate burden of persua[sion]" remains with the plaintiff).[20]

"To prevail on her 'interference' claim under § 2615(a)(1), [Plaintiff] must show that 'her employer interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided by the FMLA and that she was prejudiced thereby.'" *Gordon*, 778 F.3d at 164 (quoting *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010)) (alteration omitted). "[A]n employer action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right may give rise to a valid interference claim under § 2615(a)(1) even where the action fails to actually prevent such exercise or attempt." *Id.* at 165. Case law in at least the DCFMLA context may lower the threshold for an interference claim still further by confirming that the interference need not be intentional: "If an employer

---

[20] In an attempt to discharge her rebuttal burden, Plaintiff cites out-of-circuit authority suggesting that the appropriate threshold is whether "filing for FMLA leave was at least one motivating factor" for Defendant's decisions. Pl.'s Opp'n at 22 (citing *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009)) (internal quotation marks omitted). She does not furnish any support for applying that standard in this jurisdiction, nor has *Di Giovanna* or the case law on which it relies been cited in this jurisdiction for that proposition.

interferes with an employee's substantive rights under the statute, such as his rights to medical leave or to reinstatement following such leave, 'a deprivation of this right is a violation *regardless of the employer's intent*.'" *Harris*, 172 F. Supp. 3d at 268 (quoting *Washington Convention Ctr. Auth.*, 953 A.2d at 1076) (emphasis added); *cf. Gordon*, 778 F.3d at 165 (not reaching issue of whether interference must be intentional to sustain FMLA claim).

Before turning to the merits, the Court disposes of one procedural issue. Plaintiff urges the Court to find that Defendant conceded the FMLA/DCFMLA claims because Defendant purportedly "fails to offer any legal arguments or facts in support of its motion as to" such claims. Pl.'s Summ. J. Opp'n at 19-20 n.10 (citing *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009)). But Plaintiff misrepresents the law on this issue. As this Court already has made clear in this case, it is a failure "to respond to arguments *in opposition papers*," not a failure to make an argument in Defendant's opening brief, that could trigger the Court's discretion to "treat those specific arguments as conceded." 4th Am. Scheduling and Procedures Order, ECF No. 33, ¶ 5(c) (citing *Phrasavang*, 656 F. Supp. 2d at 201) (emphasis added).

Despite moving for summary judgment as to all four claims, Defendant oddly omits the standards for the FMLA and DCFMLA claims. Nor does Defendant otherwise address these claims straightforwardly, in either its opening brief *or* its reply. Defendant comes closest when it rebuts any argument that it retaliated against Plaintiff by causing her, for example, to miss or arrive late for medical appointments. Def.'s Summ. J. Mem. at 31. But Defendant makes this argument under the ADA, rather than the FMLA. *Id.* (citing *Nichols v. Billington*, 402 F. Supp. 2d 48, 71 (D.D.C. 2005) (Kollar-Kotelly, J.), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006) (per curiam)).

As discussed above, Plaintiff must establish her prima facie case as to both the retaliation and interference claims. If Plaintiff does so, based on undisputed material facts, then the intermediate burden would shift to Defendant as to the retaliation claim, and informally shift as to the interference claim, insofar as Defendant would be left to rebut the alleged interference. In an exercise of the Court's discretion, the Court shall consider Defendant's briefing as conceding the retaliation and/or interference claims only if 1) Plaintiff can discharge her initial burden as to retaliation, and then the undisputed material facts fail to establish a legitimate, non-discriminatory rationale for Defendant's actions; and/or 2) Plaintiff can discharge her initial burden as to interference, bearing in mind that Defendant's intent is inapposite under at least the DCFMLA. *See Harris*, 172 F. Supp. 3d at 268 (intent under DCFMLA); *cf.* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"). If Plaintiff does not discharge one or both of her burdens, then the Court shall find for Defendant on the respective claim(s). The Court's decision to approach Defendant's Motion for Summary Judgment this way is influenced in part by Defendant's careful documentation of the basis for its interactions with Plaintiff in the program and the undisputed material facts justifying its approach.

Neither party disputes that Plaintiff applied for, and was granted, FMLA leave in both October 2015 and March 2016. *See, e.g.*, Pl.'s Summ. J. Opp'n at 22. Nor does Plaintiff dispute that, before October 2015, "all of Dr. Waggel's previous requests for sick leave had been granted." Def.'s Stmt. ¶ 520; *see* Pl.'s Resp. to Def.'s Stmt. ¶ 520 (disputing only a different portion of Defendant's material fact paragraph). Nevertheless, Plaintiff argues that disputes of material fact

preclude summary judgment as to the retaliation and interference claims. *See* Pl.'s Summ. J. Opp'n at 22. Ultimately, the Court shall find that the record does not support Plaintiff's attempts to prove either of these claims just as she was unable to prevail as to her ADA/DCHRA claims.

### 1. Retaliation

Plaintiff's briefing of the retaliation claim is not a model of clarity. Some dust in the cloud of allegations concerns Plaintiff's alleged visit to the OEEO in September 2015. *See* Pl.'s Summ. J. Opp'n at 24-25. The Court has dealt with that incident above. In any event, the OEEO visit allegedly occurred before Plaintiff ever requested FMLA leave and accordingly events surrounding that visit cannot qualify as retaliation for FMLA leave taken later.

The Court shall instead consider Plaintiff's efforts to prove retaliation that allegedly occurred in connection with the two instances of FMLA leave that she requested and was granted. The Court shall then consider Plaintiff's allegation that she was terminated in retaliation for activity that is protected under the FMLA.

### i. FMLA Leave Request in October 2015

Plaintiff claims that "[o]n November 10, 2015, shortly after Dr. Waggel returned from her October FMLA leave, Dr. Waggel requested sick leave to attend a medical appointment. The request was denied and Dr. Waggel missed her appointment." Pl.'s Summ. J. Opp'n at 26 (citing Pl.'s Additional Material Facts, ECF No. 37, ¶ 1010; Waggel Decl. ¶ 136). She invokes "temporal proximity" to establish the causal element of her retaliation claim. *Id.* But the Court need not reach precedent discussing temporal proximity—which, in any case, Plaintiff does not brief in connection with this incident. Rather, Plaintiff's argument is misleading, at best, as to Plaintiff's premise that she requested sick leave, and her conclusion that such leave was denied. The source of this assertion, her declaration, says nothing about a request for leave to attend a medical

appointment. It does say that "[o]n November 10, 2015, I missed my appointment with my therapist because I could not leave work." Waggel Decl. ¶ 136. But that declaration makes no allegation that Plaintiff either 1) requested sick leave to attend this appointment, or 2) that such a request "was denied" by some unspecified person.[21] Nor does Plaintiff's material fact paragraph add such specificity; it simply reiterates the generic allegation of difficulty scheduling appointments, this time "[b]ecause of an uncaring GWU administration." Pl.'s Additional Material Facts, ECF No. 37, ¶ 1010. At the summary judgment stage, Plaintiff's allegation that she "could not leave work," coupled with vague allegations of scheduling difficulties, is insufficient to suggest that Defendant received and denied a request for sick leave or that Defendant made scheduling difficult because Plaintiff had taken FMLA leave in the past.

One other assertion regarding the November 10, 2015, incident also warrants attention. In Plaintiff's briefing, her allegation of denied sick leave is immediately followed by a reference to a telephone conversation with Dr. Catapano on November 10, 2015. Pl.'s Summ. J. Opp'n at 25. Dr. Catapano allegedly said that Plaintiff had "taken too much sick leave" and that "the deans were going to have a legal meeting about [her]." *Id.* (quoting Waggel Decl. ¶ 136) (internal quotation marks omitted). It is irrelevant whether Defendant in fact had a legal meeting about Plaintiff. That is not an adverse employment action, nor does it suggest some retaliatory causal connection between Plaintiff's FMLA leave and an adverse action. Rather, the alleged comment about sick leave is what could impact the retaliation claim. Dr. Catapano expressly denies making any

---

[21] In her brief, Plaintiff claims more forcefully that she missed the appointment because she "was *not allowed* to leave work." Pl.'s Summ. J. Opp'n at 25 (emphasis added). But again, Plaintiff cites only to her declaration, which does not say that anyone prohibited her from leaving work or denied a sick leave request. *See* Waggel Decl. ¶ 136. Because Plaintiff fails to cite any record evidence for her assertion, the Court need not decide whether to rely on her declaration.

comment about sick leave in her November 10, 2015, conversation with Plaintiff. Def.'s Mot. for Summ. J., Ex. A, ECF No. 34-2 (Decl. of Lisa A. Catapano, M.D., ¶ 582).

The Court first considers whether Defendant has shown that Dr. Catapano's alleged comment about taking too much sick leave must be stricken. As elsewhere, the relevant paragraph of Plaintiff's declaration contains various allegations, which Defendant opposes as hearsay, self-serving/without corroboration, and, this time, "[u]nsubstantiated belief without personal knowledge." Def.'s Desig. ¶ 136. Assuming, *arguendo*, that Plaintiff offers Dr. Catapano's statement to prove a causal connection between her FMLA leave and her forced administrative leave, the Court agrees with Plaintiff that this statement may be admissible as an admission of a party opponent. *See* Pl.'s Resp. to Def.'s Desig. ¶ 136; Fed. R. Evid. 801(d)(2)(D). The corroboration and personal knowledge arguments carry Defendant no further. It is not enough that Plaintiff fails to corroborate Dr. Catapano's alleged statement with record evidence. Rather, the statement must be "vague or conclusory." *Johnson v. Perez*, 823 F.3d at 710-11. While that statement about "tak[ing] too much sick leave" is somewhat vague, in the Court's view it is not so vague as to warrant the drastic remedy of striking it from the record. And Plaintiff plausibly has personal knowledge of a statement allegedly made to her. Accordingly, in an exercise of the Court's discretion, the Court shall *not* strike from Plaintiff's declaration the alleged comment by Dr. Catapano.

Nevertheless, taking the sick leave comment on its merits, Plaintiff's declaration—the only purported evidence offered in support—undermines any suggestion that Dr. Catapano's call was in retaliation for FMLA leave. That declaration attributes Dr. Catapano's comments to a conversation about Plaintiff's forced administrative leave. Plaintiff has admitted elsewhere that she was put on leave on November 10, 2015, in connection with an investigation into a community

member's complaint about her alleged disorderly conduct in her condominium building. *See* Def.'s Stmt. ¶¶ 581-92; Pl.'s Resp. to Def.'s Stmt. ¶¶ 581-92. Evidently spotting the inconsistency in her view of the facts, Plaintiff says she "*may also* have been placed on administrative leave" based on the sick leave comment that Plaintiff attributes to Dr. Catapano. Pl.'s Resp. to Def.'s Stmt. ¶ 587 (emphasis added).[22]

Moreover, in light of the record—which the Court shall find is devoid of any other would-be direct evidence of retaliation—it appears that any comment by Dr. Catapano about taking too much sick leave is at most a stray comment. *See Brady v. Livingood*, 456 F. Supp. 2d at 6. Although Dr. Catapano made some of the decisions affecting Plaintiff's tenure, Plaintiff does not dispute that Dr. Berger is the one who told Dr. Catapano of the decision to place Plaintiff on forced administrative leave. *See* Def.'s Stmt. ¶¶ 587, 589; Pl.'s Resp. to Def.'s Stmt. ¶¶ 587, 589. Dr. Catapano's *ex post* comment about sick leave, if true, is a step removed from the decision maker, further weakening the alleged causal link to adverse employment action. Standing on its own, Dr. Catapano's statement appears to be insufficient evidence of any causal connection between Plaintiff's FMLA leave in October 2015 and any adverse employment action that Plaintiff experienced.

Nevertheless, the short interval between Plaintiff's FMLA leave and the forced administrative leave slightly more than a week later may be sufficient to establish the causal element of Plaintiff's prima facie case. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1357-59 (D.C. Cir. 2012) (finding that interval of less than three months satisfied "minimal burden" to

---

[22] Plaintiff's brief continues the speculation by asserting that "GWU's retaliation *could have* reasonably dissuaded Dr. Waggel from requesting FMLA leave in the future." Pl.'s Summ. J. Opp'n at 25 (emphasis added). This is something of a hybrid retaliation-interference claim, as might arise under 29 U.S.C. § 2615(a)(1). Yet, Plaintiff has not pointed to any evidence in the record that she was in fact dissuaded, at any time, from requesting FMLA leave.

establish prima facie Title VII retaliation case (internal quotation marks and citation omitted)). Even then, Plaintiff is unable to prevail, for Defendant has put forward a legitimate, non-discriminatory justification for placing Plaintiff on forced administrative leave, namely the investigation into complaints about Plaintiff's conduct in her condominium building. Borrowing from Circuit precedent in ADA and Title VII contexts,[23] the Court observes that "when an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity' is required 'to create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation.'" *Minter*, 809 F.3d at 71-72 (quoting *Solomon v. Vilsack*, 763 F.3d 1, 16 (D.C. Cir. 2014) (alterations in original); citing *Doak v. Johnson*, 798 F.3d 1096, 1107-08 (D.C. Cir. 2015); *Hamilton*, 666 F.3d at 1359). Even when the Court credits Plaintiff's declaration, Plaintiff offers no record evidence beyond the stray comment allegedly attributable to Dr. Catapano to justify any claim that Defendant's rationale for placing her on forced administrative leave was pretextual. In light of the record, the Court is not persuaded that this is sufficient evidence for a jury to find that Defendant's seemingly legitimate, non-discriminatory justification for the administrative leave was instead pretextual. *Cf. Hamilton*, 666 F.3d at 1351 (indicating that rebuttal argument in support of Title VII promotion discrimination claim must be assessed based on totality of the circumstances).

Plaintiff next turns to other alleged responses to her FMLA leave in October 2015. In a winding narrative, she tries to link a series of post-October occurrences into a story of retaliation, again based on their alleged temporal proximity. *See* Pl.'s Summ. J. Opp'n at 26-32 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Cifra v. Gen. Elec. Co.*, 252

---

[23] Some such precedent specifically concerns the Rehabilitation Act, which is interpreted in pertinent part according to ADA standards. *See Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014) (citing, e.g., 29 C.F.R. § 1614.203(b)).

F.3d 205, 217 (2d Cir. 2001)). As best the Court can distill, the list of alleged incidents consists of Plaintiff's placement on administrative leave, the decision not to award credit for certain of her courses, the decision not to promote her to the third year of the residency, the administration's "ignor[ance] of [her] requests for an accommodated schedule," the non-appointment of a tutor, her removal from the call schedule sometime after she filed a certain appeal, the notion that she "learned of these allegations" via LOD 3, her alleged difficulties in complying with LOD 3's improvement plan, the alleged non-responsiveness of the CCC to the assignments that Plaintiff submitted pursuant to the improvement plan, generic references to "ostraci[sm]," "isolati[on]," and "being avoided" by Defendant's administration, and not being supported in response to hiring an attorney. Pl.'s Summ. J. Opp'n at 26-32. At times she resorts to arguing about the forms of accommodation she should have received for various possible deficiencies, such as missed training hours or assignments. *See, e.g.*, *id.* at 29 n.13.

But Plaintiff widely misses the mark. First, virtually nowhere does Plaintiff expressly articulate a connection, much less causality, between the October FMLA leave and these incidents. The Court simply presumed causality with respect to the forced administrative leave, on the basis of temporal proximity, before finding that Plaintiff had not discharged her rebuttal burden to show pretext. Second, some of her citations literally lead nowhere. *See, e.g.*, *id.* at 27-28 (citing Waggel Dep. at 209:13-18; Accreditation Council for Graduate Medical Education (ACGME) Common Program Requirements, ECF No. 35-8, § IV.A.6.b) (pincites not contained in record). Third, some of her grievances *grossly* distort the record. For example, "these allegations" about which she allegedly learned through LOD 3 relate to the August 25, 2015, incident, long before the October FMLA leave for which she allegedly suffered retaliation. Nor does Plaintiff go so far as to argue that Defendant manufactured the deficiencies discussed in LOD 3 in retaliation for the October

FMLA leave, or that Defendant only issued an LOD about the August 25, 2015, incident because of the October FMLA leave.

The Court has addressed most of this laundry list of actions elsewhere in this Memorandum Opinion and/or the opinion disposing of Plaintiff's Motion. At least some of them, such as Plaintiff's alleged experience of ostracism, do not appear to constitute adverse employment actions. But even assuming, *arguendo*, that these alleged incidents took place, that at least some incidents qualify as adverse actions, and that at least some incidents were sufficiently proximate to presume causality, the Court has not identified any of these incidents as to which there is a genuine, material factual dispute regarding Defendant's rationale. Although Defendant generally frames its response to the above events in terms of Plaintiff's ADA/DCHRA claims, rather than FMLA/DCFMLA claims, Defendant has put forward legitimate, non-discriminatory explanations for its actions. Plaintiff often either mischaracterizes Defendant's approach or complains about Defendant's efforts—sometimes imperfect—to accommodate her. But the Court already has determined that Plaintiff did not request formal accommodation of a disability. Accordingly, there is no evidence that she was ever entitled, for example, to a tutor in Dr. Collins's class; Defendant evidently decided that re-taking the full course would be necessary. *See* Def.'s Mot. for Summ. J., Ex. I, ECF No. 34-13 (Decl. of Cheryl Collins, M.D., Exs. #6-#10).

Assuming, *arguendo*, that Plaintiff and then Defendant were to discharge their intermediate burdens, Plaintiff cannot show that Defendant's legitimate, non-discriminatory explanations for its actions are pretextual. Her effort to do so reflects a series of distortions to the record. *See, e.g.*, Pl.'s Summ. J. Opp'n at 27-29. The Court shall not strain to discern and respond to every whisper of pretext in Plaintiff's brief, because the Court has generally disposed of her arguments elsewhere

in this Memorandum Opinion. But the Court shall address a few salient examples of alleged pretext.

Plaintiff claims that, prior to her FMLA leave in October 2015, she had not received negative feedback in Dr. Collins's class, that she even had been told that she was passing the course, and that Dr. Collins was aware that Plaintiff's absences were attributable to medical appointments. The record does not support Plaintiff's contention about receiving negative feedback. Even before Plaintiff's FMLA leave, Dr. Collins emailed her to say that one of Plaintiff's assignment submissions reflected a "struggle to formulate," because, for instance, she failed to demonstrate understanding of a certain topic. Def.'s Mot. for Summ. J., Ex. I, ECF No. 34-13 (Decl. of Cheryl Collins, M.D., Ex. #4). Furthermore, as discussed above, Dr. Collins expressly denies ever telling Plaintiff that she was passing the course. And the record directly undermines any claim that Dr. Collins retaliated based on her awareness of Plaintiff's medical appointments. In the same email in which Dr. Collins delivered negative feedback, she acknowledged that she "understood why [Plaintiff] needed to miss class," and that Plaintiff's frequent absences were "beyond [Plaintiff's] control," but Dr. Collins "appreciate[d]" that Plaintiff was "receptive to learning" when she could attend class. *Id.* Dr. Collins's response to Plaintiff's medical absences is consistent with record evidence of Defendant's response more generally: empathy for the medical difficulties, coupled with an assessment that Plaintiff's performance was deficient. There is insufficient evidence for a jury to find that Defendant's legitimate, non-discriminatory reasons for determining Plaintiff's performance in Dr. Collins's class to be deficient were instead pretextual.

In another attempt to establish pretext, Plaintiff claims that the residency program coordinator, Victoria Anderson, "confirmed [Plaintiff's] suspicion" that she was removed from the

call schedule in retaliation for appealing the denial of course credit. Pl.'s Summ. J. Opp'n at 30 (citing Pl.'s Additional Material Facts, ECF No. 37, ¶ 1063). Defendant denies this. Def.'s Resp. to Pl.'s Assertion of Additional Material Facts Allegedly Requiring Jury Trial, ECF No. 42-1, ¶ 1062.[24] But even if the Court were to rely on Plaintiff's declaration, the Court would be confronted with a "stray comment" from someone who is not the decision maker. *See, e.g.*, *Brady v. Livingood*, 456 F. Supp. 2d at 6. This is insufficient to create an issue of material fact for the jury. Moreover, the comment is really a red herring. Whether or not Plaintiff experienced "retaliation" for appealing a course credit decision is irrelevant to this case. What matters is whether Plaintiff experienced retaliation for certain protected activity, such as taking FMLA leave. She does not argue that appealing a course credit decision is protected activity under the FMLA. Nor does the Court see how it could be.

Plaintiff also objects to what she characterizes as the unwillingness of the program to support her once she hired an attorney. *See, e.g.*, Pl.'s Summ. J. Opp'n at 31 (citing Pl.'s Summ. J. Opp'n, Ex. NN, ECF No. 35-7 (Tr. of Interview at 30:8-70:4)). She cites forty pages of transcript of her discussion with Dr. Berger on March 17, 2016, about the Notice of Professional Misconduct. But that record undermines Plaintiff's claim that the program would not support her. At most, the conversation about Plaintiff's hiring of an attorney demonstrates Dr. Berger's caution. *See* Pl.'s Summ. J. Opp'n, Ex. NN, ECF No. 35-7 (Tr. of Interview at 30:9-31:16). There is insufficient evidence to find that Dr. Berger's attitude towards Plaintiff demonstrates some sort of retaliatory animus. For example, regarding her potential transfer to another program, Dr. Berger says that "I would love to be helpful and I want to make that work for you." Pl.'s Summ. J. Opp'n, Ex. NN,

---

[24] As discussed above, Defendant's responsive paragraph should instead be numbered as paragraph 1063.

ECF No. 35-7 (Tr. of Interview at 53:20-21). Regardless, Plaintiff offers no explanation of how this March 17, 2016, conversation is in retaliation for FMLA leave in October.

        ii.     FMLA Leave Request in March 2016

Plaintiff next requested FMLA leave in March 2016. She claims that as part of a February 2016 request for vacation the following month, she mentioned that "she was too afraid to use FMLA leave because the Program had retaliated against her in the past for doing so." Pl.'s Summ. J. Opp'n at 32 (citing Pl.'s Summ. J. Opp'n, Ex. SSS, ECF No. 35-8). Leaving aside the Court's finding that there is no such evidence of past retaliation, there is also no support in the cited exhibit for Plaintiff's assertion. Nowhere does she mention that she is requesting vacation leave rather than FMLA leave for any reason; she never mentions FMLA leave. She also asserts that "Dr. Gandhi resisted giving her vacation." Pl.'s Summ. J. Opp'n at 32. Even if this characterization is accurate, which the Court need not decide, there is no evidence that he did so in response to any past or present effort to take FMLA leave.

When Plaintiff eventually did apply for FMLA leave in March 2016, she claims that Dr. Berger and Dr. Catapano proceeded to interfere with this leave, evidently by emailing her about the leave in various ways. *See id.* at 33. Notwithstanding that she now appears to allege interference rather than retaliation, Plaintiff cannot prove that she was on FMLA leave at the time of the alleged behavior. Rather, her March 8, 2016, application to start FMLA leave on March 9 was not approved (retroactively) until March 18, covering March 9-16. Def.'s Stmt. ¶¶ 836-38. She does not dispute these facts. Pl.'s Resp. to Def.'s Stmt. ¶¶ 836-38. Even if the Court credits Plaintiff's FMLA leave retroactively, none of what Plaintiff refers to is evidence of an adverse employment action against Plaintiff. And if Plaintiff were trying to make out an interference claim,

she is unable to sustain her burden in the absence of any showing of prejudice from Dr. Berger's and Dr. Catapano's emails.

The Court also disposes of Plaintiff's passing reference to "not [being] allowed to return to work after her FMLA leave." Pl.'s Summ. J. Opp'n at 33. She cites no evidence for this assertion. In any event, the Court has discerned in the record what Plaintiff must be referencing. As demonstrated by one of Plaintiff's exhibits, Dr. Berger sent Plaintiff an email instructing her to report for a meeting after her FMLA leave and indicating that she should "not report for clinical duties until after [that] meeting." Pl.'s Summ. J. Opp'n, Ex. TTT, ECF No. 35-8, at GWU 003746. But the email chain also shows that the meeting concerns allegations of misconduct that predated Dr. Berger's learning that Plaintiff requested FMLA leave in March 2016. *See id.* at GWU 003746-47 (concerning Dr. Berger's "Full Inquiry"); Def.'s Stmt. ¶ 808; Pl.'s Resp. to Def.'s Stmt. ¶ 808 (not disputing that Dr. Berger initiated Full Inquiry based on a misconduct notice). Plaintiff offers insufficient evidence of any causal connection between this FMLA leave and the instruction that she not resume clinical duties until after a misconduct meeting planned before Plaintiff told Dr. Berger of her leave request.

Plaintiff turns next to the meeting with Dr. Berger on March 17, 2016. The Court need not revisit this meeting. She recycles claims that the Court has rejected elsewhere in this Memorandum Opinion, such as the argument that she was being avoided or that the program retaliated based on her hiring of an attorney. *See* Pl.'s Summ. J. Opp'n at 33-34. Just as Plaintiff could not use this conversation to establish a prima facie case of retaliation based on the October 2015 FMLA leave, so she has not discharged her burden to do so with respect to March 2016 FMLA leave. Plaintiff is unable to show that any of Dr. Berger's comments constituted adverse employment action or that any such action was attributable to Plaintiff's taking FMLA leave in March 2016. Even if

Plaintiff were to establish causation on the basis of temporal proximity, she has not rebutted the legitimate, non-discriminatory rationale for Dr. Berger's conduct of that meeting.

Plaintiff also points to an internal email purportedly showing that "Dr. Berger would uphold whatever the decision of the CCC was regarding Dr. Waggel, thereafter, even if it meant termination." *Id.* at 35 (citing Pl.'s Summ. J. Opp'n, Ex. WW, ECF No. 35-7). The April 11, 2016, email from Dr. Dyer to Dr. Catapano, copying Dr. Griffith, evidently summarizes a conversation with Dr. Berger about termination procedures. *See* Pl.'s Summ. J. Opp'n, Ex. WW, ECF No. 35-7. Plaintiff offers no explanation as to why Dr. Dyer's characterization of Dr. Berger's remark represents retaliation for FMLA leave. The closest she comes is saying that Dr. Berger followed through in supporting the CCC's decision because Plaintiff "would not quietly accept the delay in her promotion and continued to insist she receive an accommodated work schedule." Pl.'s Summ. J. Opp'n at 35. But whether or not Plaintiff "quietly" accepted a delay in her promotion is irrelevant. And, as discussed elsewhere in this Opinion, Plaintiff did not ask the OEEO for accommodation of a disability. Plaintiff has failed to articulate how Dr. Berger's support for the CCC's decision was in retaliation for her taking FMLA leave. Dr. Berger's alleged comment is not an adverse employment action, nor does Plaintiff offer anything more than insinuation that his comment has any causal connection to FMLA leave. Again, temporal proximity would not be enough to rebut Defendant's legitimate, non-discriminatory documentation of its approach to Plaintiff's termination.

Lastly, Plaintiff argues that "the Program refused to support her transfer," which allegedly damaged her psychiatry career prospects. Pl.'s Summ. J. Opp'n at 35 (citing Pl.'s Summ. J. Opp'n, Exs. UUU, VVV, ECF No. 35-8). The Court already has rejected this contention with respect to Dr. Berger. *See* Def.'s Stmt. ¶¶ 890, 894; Pl.'s Resp. to Def.'s Stmt. ¶¶ 890, 894. She focuses

here on Drs. Catapano and Griffith. Among her evidence is what appears to be Dr. Griffith's note-to-file regarding a March 21, 2016, discussion with Dr. Catapano. Pl.'s Summ. J. Opp'n, Ex. VVV, ECF No. 35-8. According to the note, both doctors agreed that they could not tell another residency program that Plaintiff was in "good standing" in their own program. *Id.* (internal quotation marks omitted). Elsewhere, Plaintiff does not dispute Dr. Catapano's stated rationale, namely that issues with Plaintiff's honesty and her ability to perceive her own shortcomings precluded Dr. Catapano from recommending Plaintiff in good faith. Def.'s Stmt. ¶ 895 (referring to discussion between Drs. Berger and Catapano); Pl.'s Resp. to Def.'s Stmt. ¶ 895. The other exhibit that Plaintiff cites for her argument about transfer is an email thread between Drs. Catapano and Griffith. Dr. Griffith observes there that "we do not know how to remediate" Plaintiff's "pathological lying." Pl.'s Summ. J. Opp'n, Ex. UUU, ECF No. 35-8. Even if the Court presumes satisfaction of Plaintiff's prima facie case, on the basis of temporal proximity to Plaintiff's FMLA leave in March 2016, Plaintiff has not identified sufficient evidence to rebut Defendant's legitimate, non-discriminatory rationale for its handling of her transfer.

iii. <u>Termination</u>

Findings above illustrate that Plaintiff has not discharged her ultimate burden to establish that Defendant responded with retaliation to Plaintiff's FMLA leave in either October 2015 or March 2016. For good measure, the Court also addresses Plaintiff's separate, but brief argument that Defendant terminated her from the program in retaliation for her FMLA leave. Plaintiff's one premise for this conclusion is that on "February 9, 2016, the CCC found that [her] medical absences and performance were a basis for her termination without regard to [ADA] and FMLA protections." Pl.'s Summ. J. Opp'n at 26 (citing Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17

(Decl. of Allen Dyer, M.D., Ex. #11, at GWU 001115-17)).  Once again, she fails to discharge her burden.

Plaintiff perpetuates her habit of distorting the record.  The CCC report dated February 9, 2016, *does not even mention* her medical absences.  *See* Def.'s Mot. for Summ. J., Ex. M, ECF No. 34-17 (Decl. of Allen Dyer, M.D., Ex. #11, at GWU 001115-17).  Although the report certainly discusses her performance, there is indeed no reference to the ADA or FMLA.  Nor should there be.  Plaintiff never asked the OEEO for an accommodation of her alleged disability.  The Court would not expect the FMLA to be mentioned unless the OEEO had recognized an accommodation in the form of leave.  Instead, the CCC discussed the reasons why Plaintiff's performance justified termination from the program.

The Court finds that Defendant is entitled to summary judgment as to Plaintiff's retaliation claims under the FMLA and DCFMLA because she has not discharged her burden to establish her prima facie case or, in other instances, to rebut Defendant's legitimate, non-discriminatory rationale for its actions.

### 3. Interference

The Court shall now turn to Plaintiff's comparatively concise briefing of her interference claim.  At the threshold, she expressly concedes any allegation that Defendant denied any FMLA leave requests.  *See* Pl.'s Summ. J. Opp'n at 23, 25.  Rather, she alleges "that Defendant attempted to dissuade and discourage her from taking leave, opposing its employment practices that violated the FMLA, and preparing to file a charge or claim about FMLA violations."  *Id.*

The Court shall assess whether Plaintiff discharges her burden to prove that Defendant took one or more actions that had a "reasonable tendency" to obstruct her rights under the FMLA, and that such action(s) prejudiced her.  *Gordon*, 778 F.3d at 164-65.  For purposes of the DCFMLA,

the Court shall disregard Defendant's intent as the Court evaluates its actions. *See Harris*, 172 F. Supp. 3d at 268.

Plaintiff asserts that Defendant interfered with two purportedly protected activities: her retention of counsel and her appeal associated with a delay in her promotion. *See* Pl.'s Summ. J. Opp'n at 35-37.

### i. Retention of Counsel

The Court has dealt several times in this Memorandum Opinion with Plaintiff's allegations about retention of counsel. In each instance, Plaintiff objected to Dr. Berger's comments during their meeting on March 17, 2016, and the Court found that she had not made out a claim of retaliation. Now Plaintiff alleges that Dr. Berger's comments on a different occasion constituted attempted interference with a right to counsel that she exercised by hiring an attorney on November 12, 2015. *Id.* at 35. She does not expressly link the hiring of this attorney with her FMLA leave in October 2015, nor with any prospective attempt to obtain future FMLA leave. Nor does she cite any authority for finding that a generic reference to retaining counsel regarding employment issues—in a case with other claims in addition to those arising under the FMLA/DCFMLA— qualifies as protected activity under those statutes.

In any event, Plaintiff objects specifically to Dr. Berger's comment, as follows, in an email on November 19, 2015: "Please do not reference your attorney going forward, particularly to the people in your Department. It does not make for a safe working environment. It is your choice to continue to pursue this avenue." *Id.* (citing Pl.'s Additional Material Facts, ECF No. 37, ¶ 1047); Pl.'s Summ. J. Opp'n, Ex. T, ECF No. 35-6, at GWU 003958. Defendant objects to Plaintiff's

characterization of Dr. Berger's email. Def.'s Resp. to Pl.'s Assertion of Additional Material Facts Allegedly Requiring Jury Trial, ECF No. 42-1, ¶ 1046.[25]

This is simply insufficient to qualify as interference with Plaintiff's FMLA rights. Plaintiff does not show the link between her exercise—past or future—of FMLA rights and the comment by Dr. Berger. The email thread shows that Plaintiff was first to raise the topic of her lawyer, and that she did so in connection with her efforts to "straighten out" obstacles to "graduat[ing] on time." Pl.'s Summ. J. Opp'n, Ex. T, ECF No. 35-6, at GWU 003960. Viewing the evidence in the light most favorable to the non-movant, the Court reads Plaintiff's email as attributing the graduation timeline issues to "tak[ing] time off for medical reasons." *Id.* The Court also infers from this comment that Plaintiff hired counsel because of an issue that she ultimately attributes to FMLA or other medical leave. But even if so, Plaintiff fails to demonstrate how Dr. Berger's comment about referring to her counsel has anything to do with Plaintiff's substantive reason for hiring counsel. And taking Dr. Berger's comment on its merits, there is insufficient evidence to submit to a jury that his discouragement of references to an attorney, and his acknowledgement of Plaintiff's "choice" to "pursue this avenue," interferes with any right to that counsel under the FMLA. And even if she could establish that she experienced some sort of obstruction of FMLA rights, she fails to show any prejudice thereby.

ii. Appeal of Non-Promotion Decision

Plaintiff also alleges interference with her appeal of the denial of credit for certain courses. Pl.'s Summ. J. Opp'n at 36-37. She maintains that the course credit issue is the reason she was

---

[25] As discussed above, Defendant's responsive paragraph should instead be numbered as paragraph 1047.

not permitted to continue to the third year of the program. *See id.* at 36. But Plaintiff is again

unable to discharge her burden to show that Defendant interfered with her FMLA rights.

In a recurring theme, Plaintiff's arguments are plagued by misstatements of the facts. For

starters, Plaintiff was made aware of the decision not to promote her (on time, anyway) via LOD

3, issued in revised form on November 19, 2015. *See* LOD 3 at GWU 001124. That letter

concerned an August 25, 2015, call incident, not course credit. The course credit issue is therefore

distinct from the promotion issue, but the Court shall address both issues in the interest of covering

the waterfront.

Plaintiff claims that "Dr. Berger attempted to prevent her from filing her appeal" by giving

her incorrect or incomplete information about appeal rights, or perhaps not giving any information

at all. Pl.'s Summ. J. Opp'n at 36. The record shows that those "appeal" rights—more specifically,

rights to obtain review of "reportable actions"—were set forth in Defendant's Academic

Improvement Policy. *See* Academic Improvement Policy at GWU 000448. Reportable actions

included "[a] decision not to promote a Resident to the next . . . level" in the program. *Id.* Plaintiff

does not dispute that the Academic Improvement Policy set forth the process for requesting review

of such a decision. *See* Def.'s Stmt. ¶ 79; Pl.'s Reply to Def.'s Stmt. ¶ 79. The parties have not

described the scope of distribution of this policy, but Plaintiff does not argue that she did not

receive a copy or that it was not available to her. LODs 1, 3, and 4 either attached or included a

link to the Academic Improvement Policy. And according to Plaintiff's declaration, she herself

referred to that policy in communications with Dr. Berger about filing an appeal. *See* Waggel

Decl. ¶ 166. There is insufficient evidence that Plaintiff lacked access to the definitive source of

information about her right to seek review of reportable actions.

Plaintiff also objects to a letter delivered December 10, 2015, that purportedly established a one-day turnaround for an appeal. Pl.'s Summ. J. Opp'n at 36-37 (citing Pl.'s Summ. J. Opp'n, Ex. W, ECF No. 35-6). The letter that she cites is LOD 4. One look at LOD 4 illustrates that Plaintiff mischaracterizes it. LOD 4 noted that Plaintiff would have until December 11, 2015, to appeal *LOD 3*, the letter about the August 25th call incident. Pl.'s Summ. J. Opp'n, Ex. W, ECF No. 35-6, at 2. Once again, LOD 3 had nothing to do with course credit. Only LOD 4 pertained to the course credit, and LOD 4 expressly indicated that "[t]he appeal of the course failures must be submitted no later than 14 days after receipt of this Letter." That 14-day window for appeal is consistent with the Academic Improvement Policy. *See* Academic Improvement Policy at GWU 000448. The Court finds no evidence that the timing or content of LOD 4 somehow interfered with Plaintiff's rights under the FMLA.[26]

There is some question as to whether Plaintiff had any right to appeal the denial of course credit. *See* Pl.'s Summ. J. Opp'n at 36 (alleging that Plaintiff disputed this with Dr. Berger). The Academic Improvement Policy does not expressly specify that such a denial is a reportable action, which appears to be the only type of action for which an appeal is available. *See* Academic Improvement Policy at GWU 000448. Perhaps Plaintiff could succeed in her attempt to shoehorn this issue into a valid reportable action, based on its consequences. *See, e.g.*, Pl.'s Summ. J. Opp'n at 36 (connecting denial of course credit with denial of credit for previously completed rotations). Fortunately, the Court need not decide that issue. LOD 4 expressly states that Plaintiff would have 14 days to appeal. LOD 4 at GWU 001126. Whatever the source of the right to appeal the course credit decision, any argument with Dr. Berger about it is irrelevant. The fact that Defendant,

---

[26] Nor could Plaintiff claim that she did not have sufficient notice of appeal rights as to LOD 3, containing the non-promotion decision, because a link to the Academic Improvement Policy was included therein.

through LOD 4, made an appeal available eviscerates Plaintiff's claim that Defendant interfered with her FMLA rights through this appeal debacle.

The Court concludes that Plaintiff has not discharged her burden to show that Defendant interfered with her rights under the FMLA or that she was prejudiced thereby.

***

In the course of preparing this Memorandum Opinion, the Court considered each of Plaintiff's arguments. The Court has attempted to respond to each of the pertinent allegations by Plaintiff. Any allegation that it has not expressly addressed is without merit. Plaintiff is unable to discharge her respective burdens as to the ADA, DCHRA, FMLA, or DCFMLA claims. Defendant is entitled to summary judgment as to all four claims.

The Court has reached this conclusion based on a thorough analysis of Plaintiff's claims and Defendant's Motion for Summary Judgment and Motion to Strike Plaintiff's declaration. Beginning with her ADA and DCHRA claims, there is no evidence that Plaintiff submitted Defendant's form to request reasonable accommodation of an alleged disability, or that Plaintiff otherwise asked for a reasonable accommodation from the OEEO, the office that Defendant designated to handle such requests. Any other informal requests for scheduling adjustments and the like—directed to Defendant's administrators outside of the OEEO—did not trigger Defendant's obligations under the ADA to engage in an interactive process to accommodate a disability. Plaintiff likewise fails to show that the Clinical Competency Committee's legitimate, non-discriminatory basis for recommending her termination, after carefully reviewing twelve issues with her performance, was pretext for discrimination. As for Plaintiff's FMLA and DCFMLA claims, Plaintiff is unable to prove that Defendant retaliated against her based on her approved FMLA leave, or that Defendant interfered with Plaintiff's rights under the FMLA.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's [34] Motion for Summary Judgment. In an exercise of its discretion, the Court **GRANTS-in-PART, DENIES-in-PART, and DENIES-in-PART as MOOT** Defendant's [41] Motion to Strike Portions of the Declaration of Dr. Stephanie Waggel, M.D. The Court grants the Motion to Strike as to the above-discussed language in paragraphs 38, 127, and 128; denies the Motion to Strike as to the above-discussed language in paragraphs 98, 107, and 136; and denies the Motion to Strike as moot with respect to the remainder of Plaintiff's declaration.

A separate Order accompanying this Memorandum Opinion concerns Defendant's Motion for Summary Judgment and Motion to Strike, as well as Plaintiff's Motion.

Dated: November 9, 2018

_____
/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge